UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No. 22 Civ. 4563 |
| Plaintiff, | ECF Case |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| GEMINI TRUST COMPANY, LLC, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## I.     INTRODUCTION

1.      From at least in or around July 2017 through at least in or around December 2017 (the "Relevant Period"), Gemini Trust Company, LLC ("Gemini" or "Defendant"), through officers, employees, agents, or others, made false or misleading statements of material facts, or omitted to state material facts, to Commission staff in connection with Commission staff's evaluation of the potential self-certification by a designated contract market (the "DCM") of a bitcoin futures contract (the "Bitcoin Futures Contract") that was to be settled by reference to the spot bitcoin price on the relevant day as determined by an auction (the "Gemini Bitcoin Auction") held on Gemini's digital asset trading platform (the "Gemini Exchange").

2.      In furtherance of efforts to persuade Commission staff as to the compliance with the Commodity Exchange Act and Commission Regulations of the Bitcoin Futures Contract, Gemini, directly and through others, made false or misleading statements and omissions to Commission staff with respect to the operations of the Gemini Exchange and the Gemini Bitcoin Auction.  The statements were made during in-person meetings with Commission staff in July and August 2017, as well as in presentation materials, data, and documents provided to the Commission.  In some instances, Gemini made the false or misleading statements and omissions

in response to specific questions posed by Commission staff who were considering, among other things, whether the proposed Bitcoin Futures Contract would be readily susceptible to manipulation.

3.     Gemini officers, employees, and agents (collectively, "Gemini personnel") knew or reasonably should have known that the statements and information conveyed or omitted by Gemini directly and through others were false or misleading with respect to, among other things, facts relevant to understanding whether the proposed Bitcoin Futures Contract would be readily susceptible to manipulation.

4.     The false or misleading statements and information conveyed or omitted to Commission staff by Gemini directly and through others were material to evaluation of the Bitcoin Futures Contract, including compliance with core principles of the Commodity Exchange Act, including Core Principles 3 and 12, "Contracts Not Readily Subject to Manipulation" and "Protection of Market Participants," respectively.  Such statements and information were relevant to, among other things, assessing the size of, liquidity on, and number of market participants using the Gemini Exchange and the Gemini Bitcoin Auction.

5.     The proposed Bitcoin Futures Contract was particularly significant because it was to be among the first digital asset futures contracts listed on a designated contract market, at a time of fervent interest by market participants in obtaining exposure to bitcoin through the derivatives markets.  Information provided directly and indirectly by Gemini to Commission staff about the Gemini Exchange, the Gemini Bitcoin Auction, and the Bitcoin Futures Contract was important to the Commission's work as it sought to fulfill its statutory mission, including ensuring financial integrity of transactions subject to the Commodity Exchange Act, protecting

market participants, deterring and preventing price manipulation and any other disruptions to market integrity, and promoting responsible innovation.

6.       Through this conduct, Gemini has engaged, is engaging, or is about to engage in acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2021), specifically Section 6(c)(2) of the Act, 7 U.S.C. § 9(2).

7.       Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

8.       Unless restrained and enjoined by this Court, Gemini is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.       <u>JURISDICTION AND VENUE</u>

9.       <u>**Jurisdiction**</u>.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

10.    **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendant is found in, inhabits, or transacts business in this District, or because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

### III.    THE PARTIES

11.    Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

12.    Defendant **Gemini Trust Company, LLC** is a New York chartered limited liability trust company based in New York, New York, whose business is to operate a digital asset trading platform and to offer custodial and related services. Gemini has not been registered with the Commission.

### IV.    FACTS

#### A.    Virtual Currencies

13.    A virtual currency is a type of digital asset defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.  Bitcoin and other virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

14.    Digital assets such as bitcoin and other virtual currencies are encompassed by the definition of "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

### B.    Listing of Futures Products by DCMs

15.     It is the purpose of the Act to, among other things, deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to the Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.  Section 3(b) of the Act, 7 U.S.C. § 5(b).

16.     In furtherance of this purpose, DCMs are required by law to comply with core principles of the Act and with applicable requirements established by the Commission.  *See* Section 5(d) of the Act, 7 U.S.C. § 7(d).  For instance, Core Principle 3 requires that a DCM shall list only contracts that are not readily susceptible to manipulation.  *See* Section 5(d)(3) of the Act, 7 U.S.C. § 7(d)(3); Regulation 38.200, 17 C.F.R. § 38.200 (2021).  Further, Core Principle 12 requires that a DCM shall establish and enforce rules to protect markets and market participants from abusive practices committed by any party and to promote fair and equitable trading.  *See* Section 5(d)(12) of the Act, 7 U.S.C. § 7(d)(12); Regulation 38.650, 17 C.F.R. § 38.650 (2021).

17.     In evaluating the extent to which cash-settled futures contracts such as the Bitcoin Futures Contract are readily susceptible to manipulation, Regulations identify several relevant factors, including, for example, the size and liquidity of the underlying cash market and the trading volume and number of participants involved in determining the settlement price.  *E.g.*, Part 38 of the Regulations App'x C(c)(2), 17 C.F.R. pt. 38, App'x C(c)(2) (2021) ("In particular, situations susceptible to manipulation include those in which the volume of cash market transactions and/or the number of participants contacted in determining the cash-settlement price are very low.").

18.     Section 5c(c)(4) of the Act and Commission Regulation 40.3 permit a DCM to request that the Commission approve a new futures contract product prior to listing the product for trading.  7 U.S.C. § 7a-2(c)(4); Regulation 40.3(a), 17 C.F.R. § 40.3(a) (2021).  Such a request for approval requires a voluntary submission by the DCM of certain information set forth in Regulation 40.3(a).  If such a request for approval is made, Commission staff may request additional evidence, information, or data demonstrating that the contract meets the requirements of the Act.  Regulation 40.3(a)(10), 17 C.F.R. § 40.3(10) (2021).  After a forty-five-day review period, which may be extended if the product raises novel or complex issues that require additional time to analyze, the Commission shall approve the product unless the terms and conditions of the product violate the Act or the Commission's regulations.  Regulation 40.3(b)-(d), 17 C.F.R. § 40.3(b)-(d) (2021).

19.     Alternatively, Section 5c(c)(1) of the Act permits a DCM to list a new futures contract for trading by providing the Commission a written certification that the new contract complies with the Act and Regulations.  7 U.S.C. § 7a-2(c)(1).  The written certification, often submitted in the form of a letter (a "self-certification letter"), must include, among other things, an explanation and analysis of the product's compliance with the core principles for contract markets set forth in the Act and Regulations,[1] including Core Principle 3.  *See* Regulation 40.2(a), 17 C.F.R. § 40.2(a) (2021).

20.     In evaluating a new product submitted for approval or in anticipation of self-certification, the Commission may, and did regarding the Bitcoin Futures Contract, engage in discussions with the DCM and other relevant parties (e.g., as in this case, the underlying market

---

[1] The core principles for contracts markets are set forth in 7 U.S.C § 7(d) and Part 38 of the Regulations, 17 C.F.R. pt. 38 (2021).

provider) concerning the contours and operation of the potential contract, and may ask the relevant parties to alter the terms to conform with or better meet the core principles.

21.     In evaluating a new product, Commission staff also can require additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act and Regulations.  *See* Regulation 40.2(b), 17 C.F.R. § 40.2(b) (2021).

22.     Absent a finding by the Commission that certification of the new product would be inconsistent with the Act or Regulations, a DCM may list the new product no sooner than one full business day following the self-certification.  *See* 7 U.S.C. § 7a-2(c); 17 C.F.R. § 40.2(a).

23.     The Commission is authorized, upon requisite findings and proceedings, to alter or supplement the rules of a DCM, including relating to such a new product.  *See* Section 8a(7) of the Act, 7 U.S.C. § 12a(7).  The Commission may stay the listing of the contract during such proceeding, as well as during a proceeding for false certification.  Regulation 40.2(c), 17 C.F.R. § 40.2(c) (2021).

24.     In sum, the Commission has oversight authority with respect to new products, including self-certified listings, and can act as necessary to ensure their compliance with the Act and Regulations.

### C.     <u>The Bitcoin Futures Contract Under Evaluation</u>

25.     In and around the Relevant Period, Gemini and the DCM engaged with Commission staff in connection with Commission staff's evaluation of compliance with the Act and Regulations of the potential self-certification by the DCM of the Bitcoin Futures Contract.

26.     The Bitcoin Futures Contract to be traded at the DCM was to be cash settled by reference to the spot bitcoin price on the relevant day as determined by the Gemini Bitcoin Auction.

27.     This meant that the Gemini Bitcoin Auction price on the final settlement day of the Bitcoin Futures Contract determined the price of the Bitcoin Futures Contract, with settlement by a cash payment rather than by physical delivery.

28.     The bitcoin price as determined by the Gemini Bitcoin Auction thus was an important component to the Bitcoin Futures Contract.

### D.     The Gemini Bitcoin Auction

29.     During the Relevant Period, as well as before and after, the Gemini Exchange operated as a digital asset trading platform, where customers could trade assets such as bitcoin and ether, typically for a small fee per trade.

30.     The Gemini Exchange began conducting the Gemini Bitcoin Auction daily at around 4 PM ET in or around September 2016.  According to Gemini, the Gemini Bitcoin Auction was designed to attract bids and offers in the hours and minutes leading to the auction time, and then to arrive at a price in U.S. Dollars that would result in the greatest volume of matched orders.

31.     In the hours and minutes before 4 PM ET, market participants could enter auction-only orders as well as continuous trading orders.  The Gemini Bitcoin Auction price was determined at 4 PM ET by finding the price at which the greatest aggregate buy demand and sell demand from all eligible orders can be fulfilled, with all continuous trading orders and auction-only orders.

32.     Before and during the Relevant Period, Gemini took various steps to increase trading volume and liquidity on the Gemini Exchange, including the Gemini Bitcoin Auction.

33.     In or around March 2017, the Securities Exchange Commission rejected an application for an exchange-traded product involving Gemini.  The rejection noted the Gemini Exchange's lack of significant trading volume as a factor.

34.     The Bitcoin Futures Contract was expected to benefit Gemini's business, such as, among other ways, through licensing fees and increased trading volume on the Gemini Exchange and during the Gemini Bitcoin Auction.

**E.      Gemini's False or Misleading Statements and Omissions to Commission Staff**

35.     In furtherance of efforts to persuade Commission staff that the Bitcoin Futures Contract complied with the Act and Regulations, Gemini, directly and through others, made statements to Commission staff in connection with and concerning the proposed Bitcoin Futures Contract and the operations of the Gemini Exchange and the Gemini Bitcoin Auction.

36.     For example, such statements were made during in-person meetings with Commission staff in or around July 25, 2017, and in or around August 28, 2017, as well as in presentation materials, data, and documents provided to the Commission during the Relevant Period.

37.     At times, Gemini personnel conveyed information directly to Commission staff. At times, Gemini personnel provided information to the DCM (or others) concerning Gemini with the understanding and intent that the DCM (or others) would convey the information to Commission staff.

38.     At various times during the Relevant Period, as part of efforts to persuade Commission staff that the Bitcoin Futures Contract complied with the Act and Regulations, Gemini made and caused to be made false or misleading statements and omissions to Commission staff concerning the Bitcoin Futures Contract.

39.     Such false or misleading statements and omissions to Commission staff were material, including to the evaluation of compliance with the Act and Commission Regulations of the Bitcoin Futures Contract.

### F.     False or Misleading Statements and Omissions Concerning Loans and Advances

40.     During the Relevant Period, for instance, Gemini made and caused to be made false or misleading statements and omissions to Commission staff regarding Gemini's purported "prefunding requirement" and the related cost of capital to trade on Gemini.

41.     One area under evaluation was whether the Gemini Bitcoin Auction and the Bitcoin Futures Contract were readily susceptible to manipulation.

42.     In oral and written communications to Commission staff during the Relevant Period, Gemini represented that it was a "full reserve" exchange and that it required all transactions to be fully "pre-funded."  Gemini represented that the "prefunding" aspect of the Gemini Exchange made the Gemini Exchange and the Gemini Bitcoin Auction, and thus the Bitcoin Futures Contract, less susceptible to manipulation because it increased traders' cost of capital and made improper trading conduct more expensive to malicious actors.

43.     For example, in or around July 25, 2017, orally and in writing, as part of the claim that the Bitcoin Futures Contract was not readily susceptible to manipulation, Gemini personnel asserted to Commission staff that Gemini required all transactions to be fully "prefunded."  In a July 25, 2017 written submission to Commission staff, with respect to the Gemini Bitcoin Auction, Gemini referred to its "prefunding requirements" for auction orders and stated that, "[a]s with all Gemini orders, auction orders must be fully (pre-) funded."

44.     Similarly, in a September 2017 written submission to Commission staff, Gemini cited the idea of "cost of capital" and the supposed prefunding requirement as one of the "attributes that promote the integrity of the auction price and discourage manipulative conduct." According to Gemini, a Gemini market participant "was not permitted to place an order unless they had enough funds in their account to place the order."  The claim was that these aspects

supposedly made manipulative trading tactics costlier, and thus less likely, for a malicious market participant to undertake.

45.    Such statements were false or misleading and omitted material information.

46.    Gemini did not disclose its substantial efforts to *reduce or largely eliminate* market participants' cost of capital in order to facilitate greater trading volume on the Gemini Exchange, including in the Gemini Bitcoin Auction.

### *Loans to Gemini customers*

47.    Gemini did not disclose to Commission staff, for example, that certain market maker Gemini customers could and did obtain loans of digital assets controlled by Gemini Principal-1 and Gemini Principal-2 from an entity they controlled ("Affiliate A").

48.    These loans were designed to facilitate trading on the Gemini Exchange, including in the Gemini Bitcoin Auction.

49.    The loans were unsecured.

50.    The loans amounted to thousands of bitcoin.

51.    The interest rates of these loans reached as low as 1% or 1.5%.

52.    Gemini Principal-1 or Gemini Principal-2 caused these loans to issue in part to induce increased trading on the Gemini Exchange and/or the Gemini Bitcoin Auction in particular.

53.    For example, certain of the loans extended by Affiliate A included terms explicitly requiring the recipient customer to maintain certain trading volumes on the Gemini Exchange.  Other loans extended by Affiliate A to select Gemini customers were accompanied by written or oral statements that the loan proceeds were to be used for trading on the Gemini Exchange and in the Gemini Bitcoin Auction.

54.     In effect, the select loan recipients could use Gemini Principal-1 and Gemini Principal-2's digital assets, rather than their own, to trade on the Gemini Exchange, including in the Gemini Bitcoin Auction.

55.     For example, shortly before the first Gemini Bitcoin Auction, a potential auction participant expressed concerns to Gemini personnel about having cash or bitcoins (btc) in their account in order to participate in the auction and asked for a line of credit.  In response, a Gemini personnel indicated, among other things, "I can ask [Gemini Principal-1 and Gemini Principal-2] if they'd do a personal loan to you guys for btc."

56.     Shortly thereafter, Affiliate A extended a loan to that potential auction participant to facilitate their participation in the Gemini Bitcoin Auction.

57.     As Gemini Principal-1 explained to another Gemini personnel in an internal Gemini communication in or around August 2017, regarding certain Gemini market maker customers, "a number of them are using my capital, which makes up a material amount of their balance sheet."

58.     The loans effectively allowed the borrowing Gemini customers to place orders on the Gemini Exchange without fully prefunding their accounts with their own funds.

59.     However, Gemini did not disclose to Commission staff that Gemini Principal-1 and Gemini Principal-2 made their own digital assets available to potential market makers to trade with on the Gemini Exchange, including in the Gemini Bitcoin Auction.

60.     Such false or misleading statements and omissions to Commission staff were material, including to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract.

61.     For instance, digital asset loans, particularly unsecured or at low or below-market rates, could reduce traders' cost of capital—and the cost of manipulative conduct—and thus potentially undermine a purported rationale as to why the Bitcoin Futures Contract was not readily susceptible to manipulation.  Digital asset loans could misleadingly skew the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction.

### *Advances and credits to Gemini customers*

62.     Gemini also did not disclose to Commission staff that before and during the Relevant Period Gemini gave "advances" or "credits" of fiat currency or digital assets to select customers, such that the funds could immediately be used for trading on Gemini, and that Gemini provided such advances by directly crediting the customer's account.

63.     Gemini further did not disclose that at times it provided such "advances" or "credits" in order to induce, facilitate, or fund trading on the Gemini Exchange or in the Gemini Bitcoin Auction that would otherwise not be possible due to lack of funds in the customer's account.

64.     While these advances or credits were outstanding, the auction participants could, and at times did, use the advanced or credited funds to trade on Gemini and participate in the Gemini Bitcoin Auction.

65.     For example, to facilitate participation in the Gemini Bitcoin Auction in or around late 2016, Gemini provided an advance "credit" of approximately $400,000 to a select Gemini market maker customer so that the customer could participate in the Gemini Bitcoin Auction that day, which the customer then did.

66.     Soon after the Gemini Bitcoin Auction that day, Gemini debited the funds from the customer's account.  Gemini personnel discussed this round-trip credit and debit to the

customer's account as "a quick operational advance so they could cross themselves" in the Gemini Bitcoin Auction.

67.    As another example, in or around July 2017, Gemini extended a so-called "operational advance" to a select market maker customer in the amount of 750 bitcoin in order to induce greater trading volumes by that market participant on the Gemini Exchange.

68.    Gemini records reflect that Principal-1 approved this "operational advance" of 750 bitcoin.

69.    The market maker customer was not debited the advanced amount of 750 bitcoin until in or around October 2017.

70.    However, Gemini did not disclose to Commission staff that, effectively, Gemini made its own digital assets and fiat currency available to customers to trade with on the Gemini Exchange, including in the Gemini Bitcoin Auction, until such later time as the customer completed the deposit of the customer's funds at Gemini—potentially days or weeks later.

71.    Such false or misleading statements and omissions to Commission staff were material, including to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract.

72.    For instance, credits and advances, particularly those of more significant size or duration, could reduce traders' cost of capital—and the cost of manipulative conduct—and thus potentially undermine a purported rationale as to why the Bitcoin Futures Contract was not readily susceptible to manipulation.  Credits and advances could misleadingly skew the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction.

### G.   False or Misleading Statements and Omissions Concerning Self-Trading

73.     During the Relevant Period, Gemini made and caused to be made false or misleading statements and omissions to Commission staff regarding the extent and possibility of self-trading, or self-crossing, on the Gemini Exchange.

74.     For example, in or around July 25, 2017, orally and in writing, as part of the claim that the Bitcoin Futures Contract was not readily susceptible to manipulation, Gemini represented to Commission staff that self-crossing was prohibited on Gemini.  In a July 25, 2017 written submission to Commission staff, with respect to the Gemini Bitcoin Auction, Gemini stated, "[s]elf-crossing prohibited."

75.     As another example, in response to further inquiries by Commission staff concerning whether a Gemini Bitcoin Auction could occur when there is one participant trading with itself, Gemini represented to the Commission in or around August 25, 2017, "No, we have instituted self-trade prevention."

76.     As another example, in a submission on or around September 12, 2017, Gemini indicated that "self-trade prevention" was among the "attributes that promote the integrity of the auction price and discourage manipulative conduct," explaining that "[w]e prohibit the same market participant from crossing with himself or herself (either intentionally or unintentionally) on a continuous trading order book or in a Gemini Bitcoin Auction."

77.     Such statements were false or misleading and omitted material information.

78.     Such false or misleading statements and omissions to Commission staff concerning self-trading were material, including to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract.

79.     For instance, self-trading could lead to manipulative conduct, thus implicating whether the Bitcoin Futures Contract was in fact readily susceptible to manipulation.  Self-

trading could misleadingly skew the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction.

### *Lack of effective self-trading prevention before May 2017*

80.     In fact, before in or around May 2017, Gemini did not effectively prohibit self-trading in Gemini Bitcoin Auctions or have any technological means to prevent self-trading from occurring in Gemini Bitcoin Auctions.  Indeed, from the inception of the Gemini Bitcoin Auction in 2016 to around May 2017, self-trading in Gemini Bitcoin Auctions on occasion actually occurred.

81.     Self-trading that occurred in the Gemini Bitcoin Auction during this period could account for a significant portion of the Gemini Bitcoin Auction's total trading volume on a given day.

82.     For example, for one auction in December 2016, approximately 70% of the total auction trading volume resulted from a single auction participant trading with itself.

### *Flawed self-trading prevention after May 2017*

83.     In fact, even after Gemini applied a technological mechanism aimed at preventing self-trading in the Gemini Bitcoin Auction, self-trading continued to occur on occasion during and beyond the end of the Relevant Period.

84.     In fact, for example, the same market participant could effectively enter into whole or partially offsetting trades with himself or herself in a Gemini Bitcoin Auction because there was not self-trade prevention between the Gemini continuous order book and the Gemini auction-only order book.

85.     In fact, in or around November 2017—after Gemini had made numerous statements to Commission staff concerning self-trading and shortly before the Bitcoin Futures Contract was listed—a Gemini customer inquired as to a mechanism that would prevent that

customer's continuous trading order (e.g., an order to sell) from crossing that same customer's auction-only order (e.g., an order to buy) in a Gemini Bitcoin Auction.

86.     Rather than address such risk of a customer effectively trading with itself, Gemini personnel discussed the issue, decided it was too hard to deal with, and left it up to the market maker customers (at times abbreviated as MMs).

87.     As Gemini Principal-1 then wrote in an internal message to several other Gemini personnel regarding self-crossing and the Gemini Bitcoin Auction: "it's really up to the MMs . . . MM's are grownups, they can figure it out."

**H.     False or Misleading Statements and Omissions Concerning Fee Rebates and Overrides**

88.     During the Relevant Period, Gemini made and caused to be made false or misleading statements and omissions to Commission staff regarding trading fee rebates and fee "overrides."

89.     For example, in a July 25, 2017 written submission to Commission staff, with respect to the Gemini Bitcoin Auction, Gemini personnel represented that its "[m]arket maker trading fee rebates encourage participation."

90.     Then, in or around August 25, 2017, in response to Commission staff requests for details concerning fee rebates and in particular Gemini's market maker trading fee rebate program, Gemini indicated to Commission staff:  (a) that Gemini had no specifically defined market maker program; (b) that Gemini had implemented a trading fee program that was available to all Gemini market participants; and (c) that the public fee schedule on Gemini's website at the time reflected details of the program available to all Gemini customers.

91.     Such statements and omissions were false or misleading and omitted material information.

92.     Such false or misleading statements and omissions to Commission staff concerning fee rebates and overrides were material, including to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract.

93.     For instance, fee rebates and overrides could reduce traders' cost of capital—and of manipulative conduct—and thus potentially undermine a purported rationale as to why the Bitcoin Futures Contract was not readily susceptible to manipulation.  Fee rebate and overrides could lead to wash trading or other types of abusive trading activities that affect prices.  Fee rebates and overrides could misleadingly skew the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction.

### Undisclosed Bespoke Fee Rebates and Overrides

94.     In fact, Gemini at times before and during the Relevant Period entered into bespoke or custom fee arrangements with market participants, including market makers, that were not available to all Gemini market participants and that were not disclosed to the public on Gemini's website.

95.     In fact, Gemini at times offered special fee rebate incentives and "fee overrides" to preferred market participants, including incentives designed to induce trading in the Gemini Bitcoin Auction, and including at more favorable terms than those on the public fee schedule.

96.     For example, in or around August 2017, Gemini records reflect that Gemini paid more than $90,000 to a Gemini customer as a rebate, based on the Gemini market maker customer's participation in the Gemini Bitcoin Auction the previous month.

97.     In fact, Gemini offered special fee rebate incentives that could be and at times were exploited by customers to engage in collusive, non-bona-fide, wash, or self-trading described above.

98.     For example, in or around August 2017, Gemini personnel learned that certain Gemini customers had generated millions of dollars of fee rebates over a period of weeks essentially by trading large volumes among themselves.

99.     Upon learning of the significant rebates accrued to the Gemini customers, Gemini personnel expended significant resources to investigate.  Gemini Principal-1 and Gemini Principal-2 were involved in these efforts.

100.     In or around August 30, 2017, Gemini suspended and later terminated two Gemini personnel involved in arranging or approving the fee rebates.

101.     One of the suspended personnel was closely involved in the engagement with Commission staff concerning the Bitcoin Futures Contract.

102.     This person also had been a principal speaker on behalf of Gemini during the in-person meetings with Commission staff on July 25, 2017, and August 28, 2017.

103.     Gemini Principal-1 and Gemini Principal-2 believed at that time that the suspended Gemini personnel were not trustworthy.  The two employees were later terminated.

104.     Gemini considered the trading as improper and the rebates as fraudulent.

105.     Gemini also initiated arbitration proceedings against the customers and the employees.

106.     Gemini expended millions of dollars in investigating and litigating these issues during and beyond the end of the Relevant Period.

107.     During the Relevant Period, in addition to not informing Commission staff of the existence of the bespoke or custom fee arrangement, Gemini did not inform Commission staff that it had chosen to suspend an employee who had been speaking for Gemini at the meetings or

that Gemini Principal-1 and Gemini Principal-2 had formed the belief that this employee was not trustworthy.

I.    **False or Misleading Statements and Omissions Concerning Trading Volume and Liquidity**

108.   During the Relevant Period, Gemini made and caused to be made false or misleading statements and omissions to Commission staff regarding the Gemini Exchange's trading volume and liquidity, which were relevant to evaluating the Gemini Bitcoin Auction and the Bitcoin Futures Contract.

109.   For example, Gemini representatives made a series of statements to Commission staff concerning trading volume and liquidity on the Gemini Exchange.  For example, in a July 25, 2017 written submission to Commission staff, Gemini presented auction and trading information, including auction trading volume information.   In or around August 1, 2017, Gemini submitted, or caused to be submitted, data underlying the auction and trading information cited in its July 25, 2017 written submission, including auction trading volume data.

110.   Gemini also provided information describing the number of market participants who placed orders in the Gemini Exchange and the moving average of the Gemini Exchange's trading volume during a twenty-day period in August 2017.

111.   Such statements also formed part of the self-certification to the Commission of the Bitcoin Futures Contract on or around December 1, 2017.

112.   Such statements were false or misleading and omitted material information.

113.   Such false or misleading statements and omissions to Commission staff concerning the Gemini Exchange's and the Gemini Bitcoin Auction's operations, such as trading volume, liquidity, and number of participants, were material, including to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract.

114.    For instance, the nature of the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction are factors relevant to evaluating whether such a futures contract is readily susceptible to manipulation.

115.    Gemini did not disclose and omitted that the information included trading by Gemini customers who had received loans from Affiliate A and that, effectively, Gemini Principal-1 and Gemini Principal-2 had made their own digital assets available to potential market makers to trade with on the Gemini Exchange, including in the Gemini Bitcoin Auction.

116.    Gemini did not disclose and omitted that the information included trading by Gemini customers who had been provided advances or credits by Gemini to encourage or permit those customers to trade on the Gemini Exchange, including in the Gemini Bitcoin Auction, until such later time as the customer completed deposit of the customer's funds at Gemini—potentially days or weeks later.

117.    Gemini did not disclose and omitted that the information included trading by customers who were offered special fee rebate incentives and "fee overrides" to preferred market participants, including incentives designed to induce trading in the Gemini Bitcoin Auction.

118.    Gemini did not disclose and omitted that the information included trading during which Gemini had limited or ineffective preventions of self-trading or collusive trading, and that such trading in fact had occurred on the Gemini Exchange.

119.    Gemini did not disclose and omitted that the information included substantial amounts of trading by certain Gemini customers who had generated millions of dollars of bespoke fee rebates over a period of weeks essentially by large volumes of trading among themselves.

*       *       *

120.    Gemini made, and caused to be made, such false or misleading statements and omissions during the Relevant Period to Commission staff orally and in writing, by and through Gemini personnel as well as through others such as the DCM.

121.    Gemini personnel involved in the false or misleading statements and omissions knew or reasonably should have known the statements and omissions to be false or misleading.

122.    The information directly and indirectly conveyed by Gemini to Commission staff related to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity.

123.    Among other things, the information directly and indirectly conveyed by Gemini to Commission staff concerning the Gemini Exchange, the Gemini Bitcoin Auction, and/or the Bitcoin Futures Contract was relevant to the evaluation of whether the Bitcoin Futures Contract complied with the core principles for contract markets set forth in the Act and Regulations, as required by law, such as whether it was readily susceptible to manipulation.

124.    The false or misleading information directly and indirectly conveyed by Gemini to Commission staff was relevant to and impeded the Commission's oversight role.  The false or misleading statements and omissions prevented the Commission from having a complete and true picture from which to evaluate whether, in what manner, under what conditions, and subject to what changes the proposed Bitcoin Futures Contract should be allowed to be listed or continue to be listed following self-certification.

## V.    <u>VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS</u>

### <u>Count I—False or Misleading Statements or Omissions to the Commission</u>
### <u>Violations of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2)</u>

125.    Paragraphs 1 through 124 are re-alleged and incorporated herein by reference.

126.    7 U.S.C. § 9(2) makes it unlawful—

> [F]or any person to make any false or misleading statement of a material fact to the Commission, including in any registration application or any report filed with the Commission under this chapter, or any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

127.    During the Relevant Period, as described above, Gemini personnel violated 7 U.S.C. § 9(2) by, among other things, making and causing to be made false or misleading statements of a material fact to the Commission, including information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, and omitting to state material facts necessary in order to make statements made not untrue or misleading, such as the following:

A.    Statements and omissions concerning the purported track record, function, and reliability of the Gemini Bitcoin Auction;

B.    Statements and omissions concerning the extent to which Gemini's purported prefunding requirement and the related cost of capital to trade on Gemini made the Gemini Bitcoin Auction less susceptible to manipulation, while omitting the extent to which Principal-1, Principal-2, and Gemini made their own funds available for customers to trade on the Exchange;

C.    Statements and omissions concerning self-trading on the Gemini Exchange, while failing to disclose that Gemini customers could and did trade with themselves, e.g., self-crossing, as well as could and did engage in collusive or wash trading;

D.  Statements and omissions concerning Gemini's fee override and rebate program, while omitting the extent to which Gemini offered bespoke rebates and other incentives to select market maker customers; and

E.  Statements and omissions concerning the purported volume and liquidity of trading on the Gemini Exchange and/or in the Gemini Bitcoin Auction, and the number of participants therein, while omitting the extent to which the information included various instances of self-crossing, wash or collusive trading, bespoke rebates, fee overrides and rebates; and trading with funds provided by Gemini, Gemini Principal-1, or Gemini Principal-2.

128.  Gemini personnel knew or reasonably should have known the statements and omissions described above to be false or misleading.

129.  The statements and omissions were material to the Commission's evaluation of the Bitcoin Futures Contract.

130.  Gemini personnel engaged in the acts, practices, or conduct described above while acting within the scope of their agency, employment, and office at Gemini.  Accordingly, Gemini is liable pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and 17 C.F.R. § 1.2 (2021), as a principal for Gemini personnel's acts, omissions, or failures in violation of 7 U.S.C. § 9(2).

131.  By this conduct, Gemini violated 7 U.S.C. § 9(2).

132.  Each act of making any false or misleading statement of a material fact to the Commission of any information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or omitting to state in any such statement any material fact that is necessary to make any statement

of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(2).

## VI.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.      An order finding that Defendant violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2);

B.      An order of permanent injunction enjoining Defendant and any other person or entity associated with them Defendant, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with Defendant, including any successor thereof, from:

    i.   Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. § 9(2);

    ii.  Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

    iii. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for its own personal account(s) or for any account in which Defendant has a direct or indirect interest;

    iv.  Having any commodity interests traded on Defendant's behalf;

    v.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

     vi.   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

     vii.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

     viii.   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9));

C.     An order requiring Defendant to pay civil monetary penalties of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act or Regulations, plus post-judgment interest;

D.     An order directing Defendant, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or

indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

  E. An order requiring Defendant and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

  F. An order providing such other and further relief as the Court deems proper.

*  *  *

## VII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated:  June 2, 2022

COMMODITY FUTURES TRADING
   COMMISSION

By: _David Oakland_
David Oakland
Senior Trial Attorney
doakland@cftc.gov

Alejandra de Urioste
K. Brent Tomer
Chief Trial Attorneys
adeurioste@cftc.gov
ktomer@cftc.gov

Manal M. Sultan
Deputy Director
msultan@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
Ted Weiss Federal Office Building
290 Broadway, Suite 600
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION
