

500 E Main Street, Suite 1400      299 Broadway, Suite 1816
Norfolk, VA 23510                              New York, NY 10007
*Tel: (757) 904 5373*                           *Tel: (212) 548 3212*

February 3, 2023

**VIA ECF**

Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street, Room 1050
New York, New York 10007

> *Commodity Futures Trading Commission v. Gemini Trust Co., LLC*,
> Case No. 22 Civ. 4563

Dear Judge Hellerstein:

This firm represents defendant Gemini Trust Co., LLC ("Defendant" or "Gemini"). Per the Court's Individual Rules, we write jointly with counsel for plaintiff Commodity Futures Trading Commission ("Plaintiff" or the "CFTC") to raise several discovery disputes. Both parties have declined to produce documents or provide information that the other side has requested. Counsel for the parties have met and conferred numerous times in hopes of resolving these issues—including on December 9 and 19, 2022 and January 10 and 25, 2023, for at least an hour on each of those dates—but have not succeeded.

***Issues Regarding Plaintiff's Responses and Objections to Defendant's Discovery Requests***

**I.      Plaintiff's Refusal to Produce Relevant Policies and Procedures**

Plaintiff alleges that Gemini made material misrepresentations and omissions in connection with a self-certification filed with the CFTC in December 2017. The self-certification was related to an XBT futures contract that was pegged to the closing price of a daily bitcoin auction on the Gemini Exchange and listed by the Chicago Board Options Exchange. Gemini has requested that Plaintiff produce policies and procedures concerning its review and evaluation of self-certifications. (Ex. A, Req. 17.) Plaintiff has refused to produce these documents, contending that they are irrelevant and are protected from disclosure by privilege and confidentiality. (Ex. B, Obj. to Req. 17.)

**A.      Gemini's Position**

Plaintiff should be compelled to produce its policies and procedures concerning self-certifications. First, Plaintiff's policies and procedures are directly relevant to whether any of

Gemini's alleged misstatements or omissions were material.  Second, Plaintiff's assertions of privilege and confidentiality do not provide any basis for its categorical refusal to produce its policies and procedures.

1.    *The Policies and Procedures are Relevant*

Plaintiff's policies and procedures concerning the evaluation of self-certifications are discoverable because they are relevant to a key issue in this case: whether the alleged misstatements and omissions were material.  Plaintiff has sued under the Commodity Exchange Act ("CEA").  Under the CEA, misstatements and omissions are only actionable if they are material.  7 U.S.C. § 9(2).  "[A] statement is material if it has a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015) (citation omitted).  While nominally an objective standard, "the test for materiality in a fraud scheme targeting the federal government verges toward the subjective." *United States v. Raza*, 876 F.3d 604, 616 (4th Cir. 2017) (citing *Neder v. United States*, 527 U.S. 1 (1999)).

While there is little caselaw dealing with materiality under the CEA, "federal courts ha[ve] reached a 'uniform understanding of the "materiality" concept' in the context of 'federal statutes criminalizing false statements to public officials.'" *Raza*, 876 F.3d at 617 (quoting *Kungys v. United States*, 485 U.S. 759, 790 (1988)).  Statements must be analyzed in the context in which they were made.  *United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007).  Plaintiff's burden is to "prove materiality *by reference to the particular government agency or public officials that were targeted*." *Raza*, 576 F.3d at 617 (emphasis added).  A misstatement that cannot affect a decision is not material, regardless of its subject or contents.  *See, e.g.*, *Litvack*, 808 F.3d at 172 (misstatements immaterial because "government submitted no evidence that [the] misstatements were capable of influencing a *decision* of the *Treasury*"); *Rigas*, 490 F.3d at 235–36 (misstatements immaterial because they could not affect any decision).

Evidence revealing a decisionmaker's process and procedures is critical to the question of materiality.  In *United States v. Whab*, for example, the Second Circuit affirmed defendant's conviction for submitting false records to the Passport Agency.  355 F.3d 155, 163 (2d Cir. 2004).  In reaching this decision, the court relied on testimony from the Passport Agency's fraud prevention manager about the agency's understanding of the relevant regulations and evaluation of similar records.  In *United States v. Edwards* the Seventh Circuit held that the government had proven materiality through testimony that its standard practice is to "rel[y] on truthful disclosures on background check forms (particularly with respect to questions about foreign contacts) in determining whether an applicant is suitable for employment."  869 F.3d 490, 504 n.6 (7th Cir. 2017).  A failure to introduce such evidence precludes a finding of materiality.  *United States v. Finn*, 375 F.3d 1033, 1040 (10th Cir. 2004) (government did not prove false statements on government forms were material because it did not produce evidence about "the purpose or use of [the forms] from the agency's perspective").

Evidence showing whether or not the decisionmaker actually used or relied on the alleged misstatement is also relevant to materiality.  Though Plaintiff asserts that it does not matter whether

its employees relied on Gemini's purported false statements, that is not the law.[1] Courts routinely view evidence of actual reliance by government officials as critical to establishing materiality. *See, e.g.*, *United States v. Gerrans*, 477 F. Supp. 3d 1035, 1050 (N.D. Cal. 2020) (government proved materiality through evidence showing that "the statements at issue were not only *capable of influencing* the FBI's investigation, they *did* influence the FBI's investigation"); *United States v. Williams*, 934 F.3d 1122 (10th Cir. 2019) (citing extensive evidence of actual reliance by government official to support conclusion that government proved materiality). Conversely, failure to prove actual reliance can preclude a finding of materiality. *See United States v. Henderson*, 318 F. Supp. 3d 1221, 1242 (E.D. Wash. 2018) (alleged false statement to VA could not have been material where there was "no evidence supporting that the VA relied on [the false statements] in making the decision to grant the individual unemployability and ancillary benefits.").

It is therefore no surprise that courts permit discovery seeking documents showing what information or facts are relevant to the recipient of a purported misstatement when making a decision. In *United States v. Weigand*¸ for example, the government claimed defendant made false statements to induce banks to process transactions involving marijuana products. 520 F. Supp. 3d 609 (S.D.N.Y. 2021). In opposing a motion to quash a subpoena on the banks, defendant argued the evidence sought would show that "the banks *do not care* about whether their cardholders are purchasing marijuana." *Id.* at 614. The court denied the motion, explaining that "[i]f defendants uncover evidence sufficient to support such an inference, then, at least arguably, a juror might find that the alleged misstatements did not have a natural tendency to influence or a reasonable likelihood of influencing a bank's decision whether to process [the] transactions." *Id.*

These principles compel Plaintiff's production of its policies and procedures for self-certifications. A key issue for the jury is whether Gemini's alleged misstatements and omissions were material to "the [Plaintiff's] decision." *Litvak*, 808 F.3d at 170 (emphasis omitted). Plaintiff's policies and procedures are relevant to this analysis in two ways. *First*, Plaintiff's policies and procedures are critical to understanding what, if any, decision Plaintiff believed it was making. Critically, Gemini and its partner, the Chicago Board of Options Exchange, did not ask Plaintiff to approve the listing of the XBT futures product because it was *self*-certified. This self-certification framework imposes substantial constraints on Plaintiff's authority to take any action. As Plaintiff explained in a "backgrounder" about self-certifications, "the Commission has *limited ability* to require the [Designated Contract Markets] to make changes to their contracts or to require the [Derivatives Clearing Organizations] to change their approaches to clearing the contracts." (Ex. C (emphasis added).) Plaintiff's policies and procedures are critical to understanding what decisionmaking authority it believed it had when evaluating self-certifications and what its framework was for conducting any such evaluations or making any such decisions.

*Second*, Plaintiff's policies and procedures are probative of how Plaintiff conducts

---

[1] Both of the unpublished cases Plaintiff relies on are post-trial decisions in which the courts considered evidence from the government decisionmaker to determine materiality. *See CFTC v. Gramalegui*, Civil No. 15-cv-02313-REB-GPG, at *51, Comm. Fut. L. Rep. (CCH) ¶ 34,360 (D. Colo. Sep. 26, 2018) (relying at least in part on CFTC documents about its investigation into false statements); *United States v. Santiago*, 2014 WL 4827883, at *5 (S.D.N.Y. Sept. 26, 2014). Neither stands for the entirely different proposition that Gemini should be denied discovery about CFTC's decisionmaking or that the agency's own standards are irrelevant to materiality.

evaluations or exercises its authority concerning self-certifications. As explained above, evidence demonstrating a decisionmaker's process—including what information it seeks, what information it views as most important, and what standards it applies—is critical evidence of materiality. This evidence likely exists in the form of internal CFTC guidance, policies, and procedures and the CFTC must be compelled to search and produce it. There can be no doubt that the request for such information meets the low bar required to show relevance in the discovery context. *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) (relevancy in discovery is a "relatively low threshold" and "an extremely broad concept" that needs only be "reasonably calculated to lead to the discovery of admissible evidence.") (citations omitted). Indeed, it is likely that Plaintiff (like the government agencies in the cases described above) will seek to support its claim at trial through testimony on precisely these issues. To the extent any formal policy statements or procedures concerning Plaintiff's analysis of self-certifications exist, they could be relevant—indeed, critical—to rebutting such a showing.

Indeed, Plaintiff should be precluded from offering evidence at trial about CFTC employees' views as to materiality, any policy interests it considered or its procedures for reviewing self-certifications if it does not produce its policies and procedures. "If a party fails to provide information . . . , the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P 37(c)(1); *see also Harriman v. Hancock Cnty.*, 627 F.3d 22, 30 (1st Cir. 2010) ("Rule 37 authorizes district courts to sanction noncomplying parties; although sanctions can vary depending on the circumstances, *the baseline rule is that the required sanction in the ordinary case is mandatory preclusion*.") (emphasis added) (citation omitted). Were Plaintiff able to introduce this evidence, its refusal to produce its policies and procedures would be neither justified nor harmless. To the contrary, Gemini would be substantially prejudiced if Plaintiff is permitted to introduce evidence about how it evaluates self-certifications or how the alleged omissions and misstatements would have affected its review while at the same time withholding the documents that set forth those policies and provide structure to Plaintiff's review.

2.   *Plaintiff Cannot Categorically Withhold its Policies and Procedures Based on Privilege or Confidentiality*

Plaintiff's refusal to produce its policies on privilege or confidentiality grounds is similarly baseless. Courts routinely order the production of government policies and procedures when they are relevant to the claims and defenses in a case. *See, e.g.*, *Aboulissan v. City of New York*, 1991 WL 37067, at *3–4 (S.D.N.Y. Mar. 15, 1991) (ordering production of relevant government manual); *Velez v. City of New York*, 2010 WL 2265443, at *2 (E.D.N.Y. June 2, 2010) (same); *Arroyo v. City of Buffalo*, 2018 WL 5262462, at *2 (W.D.N.Y. Oct. 23, 2018) (same). Moreover, as explained at length below, the deliberative process privilege does not protect these documents because they are not relevant to high-level policy discussions and because any potential privilege is overcome by Gemini's needs in this case.

Nor can Plaintiff refuse to produce the documents based on confidentiality. The statute Plaintiff cites as the basis of its objection, 7 U.S.C. § 26(h)(2), concerns the confidentiality of whistleblower submissions. (Ex. B, Objs. to Reqs. 11, 17.) It has no application to policies and procedures about self-certifications.

4

### B.      Plaintiff's Position

Through Request 17, Defendant has demanded "[a]ll versions of any policies, procedures, or written guidance, formal or informal, relating to self-certifications for the period 2014 to present." As the CFTC has explained to Defendant several times during the meet-and-confers, the request is overbroad, irrelevant, and privileged. Regarding the request's overbreadth, the sheer scope of the request for "all versions" of all policies and procedures, which presumably includes drafts of policies or guidance, whether formal or informal, spanning almost a decade in time, is overbroad, especially when the self-certification process at issue took place over a period of several months in 2017.

Defendant's request for the CFTC's internal policies and procedures is a misguided attempt to argue that the CFTC did not have a decision to make regarding the self-certification—i.e., Defendant's lies could not have affected an agency decision because there was not one to make. But unlike *Litvak*, a matter that had nothing to do with internal agency policies and procedures, the statues and regulation governing self-certifications clarify that the CFTC has decision-making authority. Starting with the statutory language, Section 5c(c)(1) of the CEA, 7 U.S.C. § 7a-2(c)(1), provides that "[a] registered entity may elect to list for trading . . . any new contract . . . by providing to the Commission . . . a written certification that the new contract . . . complies with this chapter (including the regulations under this chapter)." Section 5c(c)(2) also provides for explicit "review" of certifications made pursuant to Section 5c(c)(1) and provides that the "certification of the registered entity" "shall become effective . . . *unless the Commission notifies the registered entity . . . that it is staying the certification because there exist novel or complex issues that require additional time to analyze*." 7 U.S.C. § 7a-2(2) (emphasis added). The statutory language thus clearly contemplates that the Commission will undertake an analysis and determine the appropriateness of the certification.

The regulations promulgated pursuant to Section 5c(c) are consistent with the statutory language and provide that "the Commission may stay the listing of a contract . . . ." 17 C.F.R. § 40.2(c). In promulgating Rule 40.2, the CFTC made its position clear that "the product certification provisions in Section 5c(c) of the Act . . . expedite *the submission review process and . . . ensure adequate consideration is given to legal and financial issues arising from new product and rule submissions.*" Provisions Common to Registered Entities, 76 FR 44,776, 44,779 (July 27, 2011) (emphasis added). In fact, the Commission addressed, head on, the argument Defendant makes here about its lack of decision-making authority:

> the Commission continues to view its product submission requirements as a logical adjunct to the certification provisions of Section 5c(c)(1) of the Act. To argue that the Commission's proposal exceeds statutory authority, the product submission provisions of the Act would need to be read strictly to require that registered entities merely make—and not support—certifications of compliance with the Act and regulations thereunder. This interpretation ignores the Commission's product oversight function and its duty to examine support for certifications of compliance with core principles, including certifications that new products are not susceptible to manipulation.

*Id.*

Faced with this statutory and regulatory authority, there is simply no credence to Defendant's claim that it needs the CFTC's internal policies and procedures to understand what decision Plaintiff believed it was making.  Tellingly, Defendant does not argue that it relied in any way on any specific CFTC policy, let alone internal policies, in formulating its statements to the CFTC.  This alone is dispositive of Defendant's request.  *See SEC v. Bank of Am. Corp.*, 2009 WL 4797741, at *1 (S.D.N.Y. Dec. 8, 2009) (denying request for internal SEC policies and practices and noting that "[b]ecause the documents sought are internal SEC communications, [defendant] cannot claim to have relied on them in preparing the Joint Proxy Statement"); *SEC v. BankAtlantic Bancorp, Inc.*, 285 F.R.D. 661, 668 (S.D. Fla. 2012) (finding that the SEC's internal policies had no bearing on materiality, as they did not relate to whether defendant's failure to disclose "would have been *viewed by the reasonable investor* as having significantly altered the 'total mix' of information made available regarding Bancorp") (emphasis in original).  Given the CFTC's explicit authority set forth in the CEA and the regulations promulgated thereunder, which Defendant does not challenge, Defendant's request is meritless.  Defendant is well aware that CFTC staff has the authority and capacity—and indeed exercised that ability with respect to the bitcoin futures contract at issue—to suggest changes to the contract prior to listing in order to better meet the principles and standards set forth by statute.

Whatever internal policies and procedure that may exist cannot trump the CFTC's statutory and regulatory authority over self-certifications—or render Defendant's lies incapable of influencing the CFTC's review of the bitcoin futures contract.  Defendant does not meaningfully dispute that the information it withheld from the CFTC would satisfy the "capable of influencing" prong of the materiality standard.  Instead, Defendant tries to infuse a subjective element into the materiality standard.  But the Fourth Circuit *dicta* Defendant cites in *United States v. Raza* for this novel proposition does not square with more recent Fourth Circuit precedent that addresses the materiality standard in the context of false statements made to government agencies.  *See United States v. Smith*, 54 F.4th 775, 769 (4th Cir. 2022) (reciting materiality standard in a false statement case and observing that the "inquiry is ultimately 'an objective test'" and that "[i]t's irrelevant 'whether the false statement actually influenced the [agency's] decision-making process'"); *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012) (same).  Courts in this District also adopt the objective view of the materiality standard.  *See United States v. Scali*, 2018 WL 604852, at *3 (S.D.N.Y. Jan. 29, 2018) (citing materiality standard and observing that "[t]he logical consequence of this *objective inquiry* is the insignificance of a statement's actual effect on the adjudicating or investigatory body") (emphasis added); *United States v. Santiago*, 2014 WL 4827883, at *5 (S.D.N.Y. Sept. 26, 2014) ("[T]he test of materiality is objective, not subjective; that is, a statement is material if it is capable of influencing a decision by a decision-making body even if the body did not in fact rely on the statement.").[2]

---

[2] These cases eviscerate Defendant's argument that "reliance" is an element of a Section 6(c)(2) claim and therefore supports the production of internal policies and procedures.  Indeed, Courts have rejected the "exceedingly strange" proposition that a false statement case would "turn upon the credulousness of the federal investigator (or the persuasiveness of the liar)."  *Santiago*, 2014 WL 4827883, at *6 (quoting *Brogan v. United States*, 522 U.S. 398, 402 (1998)).  Defendant argues that the Court should ignore *Santiago* and the binding precedent that it cites because the case did not address relevancy in the context of discovery.  This makes no sense because evidence cannot be relevant if it does not relate to any element of the asserted claim.  Moreover, Defendant has not cited any case, and we are not aware of one, that stands for the proposition that production of internal policies and procedures is required to establish materiality in a false statement case.

Defendant's request for the CFTC's internal policies is simply a distraction from the core issue of this litigation, which is whether Defendant made materially false or misleading statements to the CFTC during the self-certification of a bitcoin futures contract. Nothing in the CFTC's internal policies can absolve Defendant of liability for lying to the CFTC—even if the CFTC knew at the time that Defendant's statements were untrue. *CFTC v. Gramalegui*, 2019 WL 4610953, at *24 (D. Colo. Sept. 26, 2018) ("[I]t does not matter whether the CFTC knew the statement was false at the time it was made, or conversely, whether it did not discover the falsity until later.").

Finally, Defendant's request calls for privileged information. Specifically, the request calls for internal agency documents that would reveal the CFTC's internal deliberations of whether, and how, decisions will be made by the CFTC staff in evaluating self-certifications. That information falls squarely within the realm of deliberative process privilege, which is addressed in further detail below. *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84 (2d Cir. 1991) (a document is "deliberative" if it is "actually . . . related to the process by which policies are formulated") (internal citations omitted). Defendant appears to argue that the privilege may be pierced simply because the information sought is "relevant to the claims and defenses in a case," *see supra*. That is not the case. Rather, the courts evaluate a request for deliberative process privileged documents based on a multifactor balancing test. *In re Sealed Case*, 121 F.3d 729, 737–38 (D.C. Cir. 1997) (stating that the deliberative process privilege can only be overcome by "a sufficient showing of need," taking into account factors such as "the relevance of the evidence," "the availability of other evidence," "the seriousness of the litigation," "the role of the government," and the "possibility of future timidity by government employees") (internal quotation marks omitted).

In short, Defendant's request for all versions of the CFTC's internal policies and procedures is overbroad, calls for privileged information, and distracts from the core issue in this case, which is whether Defendant knew or should have known that statements it made to the CFTC were false or misleading.

## II.    Plaintiff's Withholding of Documents Based on the Deliberative Process Privilege

Plaintiff has withheld or redacted hundreds—and perhaps thousands—of documents on the basis of the deliberative process privilege. The documents in question relate both to the CFTC's original assessment of the futures product and to its subsequent investigation. Gemini disputes that this privilege applies.

### A.    Gemini's Position

Plaintiff's claims of privilege cannot stand, and the unfairness of its position can be easily summarized:

(1)    Plaintiff contends that Defendant made material misstatements *to Plaintiff*.

(2)    Plaintiff contends that Defendant is not entitled to any discovery about what Plaintiff *actually thought* about the allegedly false statements, and in some cases, what the specific false statements were.

That makes no sense. It is akin to a fraud victim refusing to answer the question: "did you believe or care about what the swindler told you?" Indeed, in some cases Plaintiff insists it is

allowed to withhold evidence of the very statements it claims were false.  For example, according to Plaintiff, Defendant is not entitled to know:  (i) what relevant statements were made to Plaintiff and what Plaintiff's employees said or wrote about the relevant statements; (ii) whether Plaintiff's employees even considered the relevant statements; (iii) whether Plaintiff's employees questioned any of the relevant statements or discussed them with colleagues; or (iv) whether Plaintiff cared about the relevant statements at all in any context.

Remarkably, in some instances Plaintiff appears to have claimed privilege over notes of meetings at which allegedly false statements were made.  For example, the CFTC has asserted a blanket privilege over notes taken by one of the CFTC's most senior representatives at a meeting with Gemini relating to the subject matter of the CFTC's complaint during which the CFTC claims it was lied to.  Other similar notes have been withheld as well.  In other words, the CFTC claims that records of the very statements at issue in this case are privileged "deliberations."  And Plaintiff also seeks to hold back notes of interviews with a pair of former Gemini employees (including a discredited whistleblower), and of separate calls with their counsel, that could be of central importance to this case.  Plaintiff also seeks to hold back documents that discuss its analysis of information provided by Gemini, which would be directly probative of materiality (or lack thereof).

Plaintiff's position has no basis in law and it is unjust and fundamentally unfair.  A government agency purportedly working in the public trust should not be able to proceed in this fashion, and Plaintiff's attempt to invoke governmental privileges to deny Gemini relevant and potentially exculpatory evidence raises substantial due process concerns.  This is particularly so because Plaintiff's position is legally baseless.  The deliberative process privilege does not apply here, and in any event is a qualified privilege that must yield under the facts of this case.  Further, as yet another reason why this information must be produced, Plaintiff has waived any conceivable privilege by disclosing the types of information Gemini seeks to a third party.[3]

1.     *The Deliberative Process Privilege Does Not Apply*

The deliberative process privilege does not apply to Plaintiff's communications at issue in this case.  That privilege covers documents that are part of the policy-making process.  *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999).  The privilege is "confined within the narrowest possible limits consistent with the logic of its principle," *In re Grand Jury Subpoena dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002) (quoting *United States v. Int'l Bd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997)), and documents that are "peripheral" are not protected, *MacNamara v. City of New York*, 249 F.R.D. 70, 78 (S.D.N.Y. 2008) (citation omitted).  Plaintiff bears the burden of proving that the privilege applies.  *Walls v. City of New York*, 502 F. Supp. 3d 686 (E.D.N.Y. 2000).  Plaintiff cannot meet that burden here for two reasons.

*First*, Plaintiff's review of the self-certification and investigation of Gemini's purported false statements are not privileged public policy decisions.  The deliberative process privilege

---

[3]     Defendant respectfully suggests that the issue of deliberative process goes to the heart of the case and the legitimacy of the Plaintiff's so-called "enforcement" action.  If the Court has any hesitation in overruling the CFTC's invocation of the deliberative process privilege, Plaintiff respectfully requests the opportunity to make and argue a formal motion on this topic.

applies to the "formulat[ion] of *important public policy*." *Torres v. City Univ. of N.Y.*, 1992 WL 380561, at *7 (S.D.N.Y. Dec. 3, 1992). For this reason, the privilege "is properly limited to communications relating to *policy formulation at the higher levels of government*; it does not operate indiscriminately to shield all decision-making by public officials." *Velez*, 2010 WL 2265443, at *4 (emphasis added) (citation omitted); *see also Torres*, 1992 WL 380561, at *7 ("The privilege is not intended to shield all communications that support any decision by a public official.").

Discrete, case- or incident-specific decisions are not "high level" policy formation that the deliberative process privilege protects. For example, routine reviews of discrete applications or submissions are also "'routine' decision[] . . . and thus cannot qualify for the deliberative process privilege." *Mitchell v. Fishbein*, 227 F.R.D. 239, 251 (S.D.N.Y. 2005) (citations omitted) (holding deliberative process privilege did not protect documents created during review of attorney's application to serve on panel of lawyers that provide services to indigent defendants). Nor do decisions about whether to initiate litigation or take other disciplinary actions. "A prosecutor's decision to indict or not prosecute someone is not a policy decision. . . . Such decisions are often fact-bound and affect only the case in which they are made. They are not office-wide and do not affect individuals other than those being prosecuted (or not). They are litigation decisions, not policy decisions." *Lawrence v. Suffolk Cnty.*, 2022 WL 855380, at *10 (E.D.N.Y. Mar. 23, 2022) (citation omitted). Moreover, government documents "relate[d] to the collection of facts pertaining to a singular occurrence" for purposes of determining whether to impose disciplinary sanctions were not "recommendations or analyses which speak to the adoption or rejection of a policy" and could not "possibly lead to the adoption or rejection of a policy." *Dobyns v. United States*, 123 Fed. Cl. 481, 488–89 (Fed. Cl. 2015); *see also Charles v. City of New York*, 2011 WL 5838478, at *2 (E.D.N.Y. Nov. 18, 2011) (disciplinary review of discrete incident did "not involve the policy formulations protected under the deliberative process privilege") (quoting *Velez*, 2010 WL 2265443, at *4).

These principles demonstrate why Plaintiff cannot meet its burden of proving that the privilege applies. As a threshold matter, Gemini disputes whether the CFTC had any decisionmaking power to exercise or deliberate over in the first place. But to the extent that there was any decision to be made by the CFTC at all, any decisions at issue in this case—*e.g.*, Plaintiff's review of the self-certification and investigation of Gemini's purported false statements—are not high-level decisions concerning the creation of public policy. There was no "office-wide" decision being made that would affect uninvolved entities. There were no recommendations or analyses that could lead to the adoption or rejection of a policy. There were simply discrete, incident-specific evaluations and communications being made about a single self-certification process and the statements made during that process. Routine "decisions" that arose from this process (if any) are not protected by the deliberative process privilege.

*Second*, the deliberative process privilege does not apply because the government's decision-making process is specifically at issue in this case. "The historical and overwhelming consensus and body of law within the Second Circuit is that when the decision-making process itself is the subject of the litigation, the deliberative process privilege cannot be a bar to discovery." *Children First Found., Inc. v. Martinez*, 2007 WL 4344915, at *7 (N.D.N.Y. Dec. 10, 2007); *see also Burbar v. Garden City*, 303 F.R.D. 9, 13 (E.D.N.Y. Sept. 22, 2014) (deliberative process privilege "may be inapplicable where the deliberations are among the central issues in the case");

*Dep't of Econ Dev. v. Arthur Anderson & Co. (U.S.A.)*, 139 F.R.D. 295, 299 (S.D.N.Y. 1991) ("Where the deliberations of government are genuinely at issue, privileges designed to shield the deliberative process from public scrutiny may not be raised as a bar against disclosure . . . . Where the adjudication of fraud claims turns upon issues of knowledge, reliance, and causation, direct evidence of the deliberative process is irreplaceable.  The governmental privilege must give way.") (citations omitted).  As explained above, Plaintiff's decision-making process is directly relevant— indeed, critical—to the issue of materiality.  Thus, the deliberative process privilege does not apply in this case.

<div style="margin-left: 2em;">

**2.**     *The Deliberative Process Privilege is a Qualified Privilege, and it Has Been Overcome in this Case*

</div>

Plaintiff's invocation of the deliberative process privilege also fails because, even if Plaintiff's review of the self-certification and investigation were protected policy-making, the protection should yield under the facts of this case.  The deliberative process privilege is a qualified privilege.  *Nat'l Res. Defense Council, Inc. v. Fox*, 1998 WL 158671, at *5 (S.D.N.Y. Apr. 6, 1998).  Thus, even when the privilege applies, "courts should 'balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.'" *Walls*, 502 F. Supp. 3d at 698 (quoting *Kunstler v. City of New York*, 439 F. Supp. 2d 327, 328 (S.D.N.Y. 2006)).  Courts apply a five-factor test to balance these competing interests.  "The balancing factors are: '(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.'"  *Noel v. City of New York*, 357 F. Supp. 3d 298, 303 (S.D.N.Y. 2019) (citation omitted).

All five of the balancing test factors support disclosure in this case.  *First*, relevance for purposes of this test is defined broadly, consistent with both Federal Rule of Civil Procedure 26(b)(1) and Federal Rule of Evidence 401.  *Id.*  As explained above, the documents Gemini seeks are directly relevant to the critical issue of materiality, as well as the central question of whether statements were even false in the first place.  That is why many relevant and to-date withheld statements were shown to CFTC witnesses during SDNY proffers.  *Second*, the evidence Gemini seeks—contemporaneous, internal Plaintiff documents demonstrating what facts and issues Plaintiff viewed as material while reviewing the self-certification—are not available through any other means.  *Third*, this case raises critically important issues for Gemini, which has been falsely accused of attempting to deceive its regulator.  *Fourth*, the government is the plaintiff in this case, and thus has a critical role.  *Finally*, there is little risk of a chilling effect here given that (i) the Court has entered a protective order that limits the dissemination of the materials Gemini seeks, (ii) Plaintiff's incentives will not change even if their communications are disclosed, and (iii) Plaintiff made a choice to bring this action and to publicly assert the relevance of its deliberations and conclusions in this matter.  *See MacNamara*, 249 F.R.D. at 83.

<div style="margin-left: 2em;">

**3.**     *Plaintiff Has Waived the Privilege by Discussing These Matters with the Southern District of New York*

</div>

There is a third reason Plaintiff cannot withhold documents concerning its deliberative process: it has waived any applicable privilege by disclosing many of the protected documents to

third parties.  In response to a third-party subpoena issued in this case, the United States Attorney's Office for the Southern District of New York ("SDNY") has produced its notes of and memos summarizing interviews it conducted during its parallel investigation of Gemini's purported false statements.  The SDNY obviously understands such material is not protected by any applicable privilege.  Moreover, these memos and notes make clear that SDNY interviewed Plaintiff's witnesses, who disclosed to SDNY the factors and information that they purport to have viewed as material.  For example, the Director of Plaintiff's Division of Market Oversight, Amir Zaidi, told the SDNY "that CFTC mostly looks at core principal number 3 and other factors to see if an applicant is in compliance with the Act."  This is precisely the type of information Gemini seeks through its discovery requests: evidence demonstrating what information Plaintiff actually sought and considered in evaluating the self-certification, and what information was in fact transmitted by Gemini.  The interview memos disclosed by the SDNY also make clear that documents shown to witnesses during those interviews included many of the very same documents that the CFTC now claims are privileged, including notes from key meetings conducted with CFTC.  There is no principled basis for Plaintiff to refuse to disclose such documents and information to Gemini when it has already revealed it to SDNY.  By doing so Plaintiff waived any otherwise applicable privilege, both with respect to the specific documents, and their subject matter, the central relevance has obviously been conceded by the very decision to use such documents in the witness interviews.  Indeed, Plaintiff's invocation of the deliberative process privilege under these circumstances would lead to an absurd result in which Gemini is able to obtain partial discovery on a critical issue from a government agency that *declined* to bring charges but not the agency that *did* file suit.

## B.       Plaintiff's Position

From the outset of discovery, the CFTC informed Defendant that it intended to invoke the deliberative process privilege with respect to predecisional documents and communications of the CFTC staff.  The parties engaged in numerous meet-and-confers on the issue, which resulted in a letter from Defendant on November 4, 2022 where Defendant made similar arguments that it now raises in this submission, but without any supporting authority.  Defendant refused throughout discovery to provide any authority that would support its position that the deliberative process privilege did not apply in this case.

Instead, Defendant repeatedly argued that the deliberative process was an "either-or proposition"—meaning that all internal communications related to the self-certification would either be subject to the deliberative process privilege or none of them would be.  The CFTC explained that this is plainly not the case.  *See In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) ("[T]his all-or-nothing approach has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular.").  As such, the CFTC adopted the prudent approach of reviewing the material it agreed to search for and produce before making a privilege determination and agreed to provide a log of the withheld communications related to the self-certification.[4]  The CFTC provided Defendant with rolling privilege logs starting on January 11, 2023.  In the intervening time period, Defendant never raised the application of the deliberative process privilege with the Court despite stating in November 2022 that it had discharged its meet-

---

[4]     It bears noting that the CFTC has produced 996 internal agency documents and communications related to the self-certification that it determined were not subject to any privilege.

and-confer obligations with respect to requests that expressly called for internal agency documents and knowing full well that the CFTC would invoke the privilege.

On January 30, 2023, Defendant provided the CFTC with a draft of this discovery letter, which, for the first time, set forth Defendant's legal basis for asserting that the deliberative process does not apply.  Despite receiving the privilege log earlier in the month, Defendant never met and conferred with the CFTC about any specific log entry or category of documents that has been withheld on the basis of the deliberative process privilege.  Such a step is necessary in the first instance because the applicability of the privilege is a document-specific inquiry.  *See Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (articulating factors used to determine a document is deliberative, including "whether the document '(i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency'"); *In re Delphi Corp.*, 276 F.R.D. 81, 84 (S.D.N.Y. 2011) ("A document is predecisional when it is prepared in order to assist an agency decisionmaker in arriving at his decision.").  Indeed, courts are reluctant to make broad-based determinations about the applicability of the deliberative process privilege out of concern that such an approach would undermine the purpose of the privilege.  *See Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 616 (S.D.N.Y. 2018) (declining the make a categorical determination on the application of the deliberative process privilege, which could "force agencies to prematurely 'operate in a fishbowl'"); *see also Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 76 (2d Cir. 2002) ("The rationale behind this privilege is 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance "the quality of agency decisions," by protecting open and frank discussion among those who make them within the Government.'").

Defendant's argument that the deliberative process does not apply at all in this case is flawed in at least two respects:

*First*, there can be no serious dispute that the deliberative process privilege applies to the CFTC's review of the self-certification of the bitcoin futures contract, which involved a first-of-its-kind product listing.  Defendant's attempt to limit the application of the deliberative process privilege to "high-level decisions concerning the creation of public policy" conflicts with settled law and ignores that the privilege covers "advisory opinions, recommendations and deliberations comprising part of a process by which governmental *decisions* and policies are formulated." *NAACP Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Just.*, 2020 WL 5237765, at *6 (S.D.N.Y. Sept. 2, 2020) (emphasis added).  As set forth above, the review of the bitcoin self-certification submission was not a ministerial act over which the CFTC lacked oversight authority.  To the contrary, in reviewing the self-certification of the bitcoin futures contract, the CFTC exercised its statutorily delegated poduct oversight function, and any communications that bear on the CFTC's analysis of the product in question and whether it satisfied the core principles of the CEA fall within the scope of the deliberative process privilege.  *See Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84 (2d Cir. 1991) ("Because [the staff inspectors'] opinions and recommendations enable[d] HUD to manage its projects and negotiate with its contractors effectively, they . . . related to the deliberative process by which HUD policies are formulated."); *Tigue*, 312 F.3d at 80 (finding document was "prepared to assist IRS decisionmaking on a specific issue" subject to deliberative process privilege); *Grand Cent. P'ship*, 166 F.3d at 482–83

(protecting documents related to HUD's decisions to terminate grant and to issue or void sanction); *Phillips v. Immigr. & Customs Enf't*, 385 F. Supp. 2d 296, 303 (S.D.N.Y. 2005) (holding "that the handwritten notes in dispute [were] both pre-decisional and deliberative" because they "pre-predate[d] INS' decision to grant asylum . . . . and were obviously prepared to assist INS decision makers").

Defendant's attempt to rebut this well-established authority is unconvincing. Defendant cites inapposite cases that deal with internal agency determinations, not federal agency determinations in furtherance of the agency's express authority. *See Velez v. City of New York*, 2010 WL 2265443, at *4 (E.D.N.Y. June 2, 2010) (observing that "courts have held that the deliberative process privilege does not preclude the disclosure of documents concerning internal affairs investigations in civil rights suits against law enforcement agencies"); *see also Tigue*, 314 F.3d at 80 (distinguishing between documents that are "merely part of a routine and ongoing process of agency self-evaluation" from documents "prepared to assist [agency] decisionmaking"); *Mitchell v. Fishbein*, 227 F.R.D. 239, 251 (S.D.N.Y. 2005) (finding internal steering committee decision—not a federal agency oversight decision—"routine" and not subject to the deliberative process privilege) (citation omitted). Tellingly, Defendant has not cited a single case holding that the deliberative process does not apply to a federal agency, like the CFTC, exercising its statutorily granted oversight and enforcement powers.[5]

*Second*, the CFTC's decision-making process with respect to the self-certification of the bitcoin futures contract has not been placed at issue by the simple fact that the CFTC brought a false statement enforcement action. It is well understood that an "ordinary enforcement action in no way implicates the [agency's] subjective motivations," *Landry v. FDIC*, 204 F.3d 1125, 1137 (D.C. Cir. 2000), even when a defendant places the agency's intent and decision-making processes at issue. *FTC v. Meta Platforms, Inc.*, 2022 WL 4078930, at *6 (D.D.C. Sept. 6, 2022) (rejecting argument that FTC's failure to block past transactions "puts squarely at issue the FTC's intent and decision-making processes in 2012 and 2014"); *see also CFTC v. Royal Bank of Canada*, 2013 WL 1932120, at *2 (S.D.N.Y. May 8, 2013) (rejecting argument that "the Commission waived the deliberative process privilege by putting the Commission's knowledge of RBC's trading strategies from a market oversight review 'at issue' in its Amended Complaint") (Hellerstein, J.).[6]

---

[5]   Defendant also argues that the Division of Enforcement's deliberations are not protected by the deliberative process privilege. For this point, Defendant relies on a tortured interpretation of *Lawrence v. Suffolk Cnty.*, 2022 WL 855380, at *10 (E.D.N.Y. Mar. 23, 2022), which addressed an active litigation decision, and whether or not to continue a prosecution, not the process by which a charging decision is made and authorized by a federal agency. The weight of authority holds that deliberations concerning whether to initiate litigation, or pursue a particular course of action in litigation, are protected by the deliberative process privilege. *See Adamowicz v. I.R.S.*, 402 F. App'x 648, 652 (2d Cir. 2010) (finding "[t]he documents at issue reflect the consultative process underlying IRS decisions concerning the Examination, the FOIA requests, and related litigation, and . . . therefore [were] entitled to the same protection as other important agency decision"); *Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 939 (10th Cir. 2005) (reasons for government's motion to dismiss *qui tam* case protected by deliberative process privilege); *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (referral memorandum from FTC to DOJ was predecisional and deliberative, so it was protected by DOJ's deliberative process privilege); *United States v. Furrow*, 100 F. Supp. 2d 1170, 1175 (C.D. Cal. 2000) (death penalty evaluation form and prosecution memorandum submitted to Attorney General's committee considering whether to authorize pursuit of that penalty were protected by the deliberative process privilege).

[6]   Defendant has not pointed to a single false statement case where a court found that the agency's decision-making

Defendant's arguments that the privilege has been "overcome" can also be rejected outright. The cases Defendant cites confirm that the five-factor balancing test cannot be conducted in the abstract and requires an analysis of "each challenged document withheld on the basis of the privilege." *Noel v. City of N.Y.*, 357 F. Supp. 3d 298, 304 (S.D.N.Y. 2019); *Stinson v. City of New York*, 304 F.R.D. 432, 436 (S.D.N.Y. 2015) ("Whether the showing of relevance and need rises to the requisite level is a discretionary determination that must necessarily be made on a case-by-case basis."). The weakness in Defendant's argument is exemplified by its claim that the CFTC's status as a plaintiff satisfies the factor that considers the "role of the government in the litigation." That factor, however, "refers, specifically, to the government's role in the allegedly unlawful conduct." *Noel*, 357 F. Supp. 3d at 304. Besides baseless and unsupported claims of being "falsely accused," there is no credible allegation of unlawful conduct on the part of the CFTC.

Finally, Defendant's waiver argument lacks merit. The deliberative process privilege covers inter-agency and intra-agency deliberations. *Tigue*, 312 F.3d at 79. It is therefore wrong to assert that disclosure to the SDNY waived the deliberative process privilege. Nor is it the case that such a disclosure would result in a "subject matter" waiver. *In re Sealed Case*, 121 F.3d at 741 (distinguishing the deliberative process privilege from the attorney-client privilege and observing that courts view the "release of a document" as "only waiv[ing] the[] [deliberative process privilege] for the document or information specifically released, and not for related materials"). However, if there are documents that were shown to witnesses that have not been produced by either the SDNY or CFTC, the appropriate step is for Defendant to confer with the CFTC before engaging in motion practice.

The current record has not been sufficiently developed at this point to allow the Court to conduct an inquiry into the applicability of the deliberative process privilege. Plaintiff respectfully requests that additional time should be afforded to the parties so they can confer on any challenged documents or category of documents. Should additional briefing be required, the CFTC requests sufficient time to complete its internal approval processes for making a formal deliberative process claim before the Court. *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 274 F.R.D. 106, 110 (S.D.N.Y. 2011) (setting forth the "three procedural requirements" for asserting the deliberative process privilege).

### III.  Plaintiff's Withholding of Documents Based on the Investigatory Files Privilege and Work Product Protection

Plaintiff has also withheld thousands of documents on the basis of the investigatory files privilege and work product protection. These documents also relate to the CFTC's original assessment of the futures product and to its subsequent investigation. Gemini disputes that this privilege applies.

---

process was a core issue that required a waiver of the deliberative process privilege. The cases it does cite are readily distinguishable. *See, e.g.*, *Child. First Found., Inc. v. Martinez*, 2007 WL 4344915, at *7 (N.D.N.Y. Dec. 10, 2007) (Plaintiff, who was not a government agency, brought action challenging agency decision which "reject[ed] [Plaintiff's] applications for a custom license plate"); *Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.)*, 139 F.R.D. 295, 299 (S.D.N.Y. 1991) (Case involving the British government, which "place[d] at issue questions of knowledge, justifiable reliance and causation" by asserting fraud claims).

### A.      Gemini's Position

Plaintiff has not met its burden of demonstrating that the investigatory files privilege applies, and there are numerous examples where it plainly does not.  Moreover, the work product protection does not apply to Plaintiff's review of the self-certification and pre-suit investigation.

### 1.      *Plaintiff Has Not Met Its Burden of Proving that the Investigatory Files Privilege Applies*

Plaintiff's indiscriminate assertion of the investigatory files privilege is improper.  As the party asserting the privilege, Plaintiff must establish that "(i) the head of the department having control over the information requested must assert the privilege; (ii) the official in question must do so based on actual personal consideration; and (iii) he or she must specify the information purportedly covered by the privilege, and accompany the request with an explanation as to why such information falls within the scope of the privilege."  *United States v. Wey*, 252 F. Supp. 3d 237, 251–52 (S.D.N.Y. 2017).  Plaintiff has made no showing that "the head of the department having control over" the categories of information withheld has personally considered more than 5,000 documents.  Nor has Plaintiff specified the information covered, stated why it is privileged, or provided any explanation for why these parts of CFTC's investigation should be protected (if the information was even part of such investigation).  Indeed, Plaintiff's categorical privilege log provides vanishingly little information about the content of the documents it is withholding on the basis of this privilege.  (*See* Ex. E.)[7]

Moreover, even if the investigatory files privilege did apply to some small number of withheld documents, the little information Plaintiff has provided indicates that many of the withheld documents are nevertheless subject to disclosure.  The investigative files privilege is also qualified, and it also must yield where the information sought is directly relevant to the claims or defenses in a case, are not available from any other sources, and will not reveal any information about ongoing investigations.  *Tuite v. Henry*, 98 F.3d 1411, 1418–19 (D.C. Cir. 1996) (citing *In re Sealed Case*, 862 F.2d 268 (D.C. Cir. 1988)).  Here, there are at least two categories of documents—communications among Plaintiff's employees responsible for communicating with Gemini about the self-certification and notes of Plaintiff's interviews with two former Gemini employees (*id.*, Cats. 1, 5)—where that threshold is met.  Both categories of documents are directly relevant to Gemini's defenses, and both can only be obtained from Plaintiff.  Moreover, disclosure of these materials will not reveal any information about ongoing investigations.  Thus, Gemini has "establish[ed] a need for the privileged information that outweighs the competing interest in non-disclosure." *DGM Invs., Inc. v. New York Futures Exch., Inc.*, 224 F.R.D. 133, 140 (S.D.N.Y. 2004).

### 2.      *Plaintiff Has Not Met Its Burden of Proving that the Work Product Doctrine Applies*

Plaintiff also has not met its burden of proof with respect to its assertions of the work product protection over documents concerning the self-certification and pre-trial investigation.  *First*, at the time of the self-certification, there was no reasonable expectation of litigation.  Thus,

---

[7]      Exhibit D has been intentionally omitted.

by definition, documents created during that time are not protected work product.  *Second*, documents generated during Plaintiff's pre-suit investigation are not protected, as the work product doctrine does not protect material related to government investigations like this one where, even "had there been no ongoing or anticipated litigation, [Plaintiff] would have conducted an investigation anyway."  *In re Leslie Fay Companies, Inc. Securities Litig.*, 161 F.R.D. 274, 281 (S.D.N.Y. 1995).  This rule applies to interview notes and other materials created during a government investigation.  *See S.E.C. v. Thrasher*, 1995 WL 46681, at *3 (S.D.N.Y. 1995) (citing *Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 304 (S.D.N.Y. 1991)).  *Third*, even if the work product protection applied, production would still be appropriate because—at least with respect to the internal communications and witness interview notes described above—Gemini has a substantial need for the documents and cannot obtain them by any other means.  *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 184 F.R.D. 49, 54 (S.D.N.Y. 1999).

### B.  Plaintiff's Position

#### 1.  *Defendant Is Not Entitled to Plaintiff's Investigatory Files*

Plaintiff has properly claimed investigatory privilege over the files generated during the investigation into Defendant's false and misleading statements to the CFTC.  The "investigatory privilege" is a qualified common law privilege protecting civil as well as criminal law-enforcement investigatory files from civil discovery.  *In re Adler Coleman Clearing Corp.*, 1999 WL 1747410 at *3 (S.D.N.Y. Dec. 8, 1999) (citing *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984); *Black v. Sheraton Corp. of America*, 564 F.2d 531, 541–42 (D.C. Cir. 1977); *Frankel v. Securities and Exchange Commission*, 460 F.2d 813, 817 (2d Cir.), *cert. denied*, 409 U.S. 889 (1972)).  It is predicated on a "public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources."  *Id.* (citing *Black*, 564 F.2d at 545).  The privilege also protects information that if revealed, could compromise future investigations.  *Morrisey v. City of New York*, 171 F.R.D. 85, 90 (S.D.N.Y. 1997).

As stated in the categorical log provided by the CFTC, the materials it is claiming investigatory privilege over are just that: the files of the Division of Enforcement ("DOE") investigative team.  These are exactly the sort of documents the privilege was intended to protect, as they would reveal investigative techniques of the CFTC (as well as other agencies, potentially), and their disclosure would impede the CFTC's ability to conduct future investigations. *See id.*; *Adler*, 1999 WL 1747410 at *3.[8]  It would be particularly chilling to the CFTC's ability to efficiently and effectively conduct confidential investigations if CFTC attorneys and investigators had to do so while anticipating that their investigative files could be turned over to their adversaries

---

[8]   Defendant argues that the investigatory privilege must be claimed by the head of the department controlling the information after personally considering the materials, and must include an explanation of the basis for the privilege.  These requirements have not been mandated by the Second Circuit, nor have they been uniformly applied by district courts in this Circuit.  *See, e.g. DGM Investments v. New York Futures Exchange*, 224 F.R.D. 133, 139-40 (S.D.N.Y. 2004).  The log already provided to Defendant gives a more than adequate explanation as to the basis of the privilege.  However, should the Court require full briefing of this issue, the CFTC is prepared to provide an appropriate affidavit or declaration.  As noted above, the CFTC requests additional time to complete its internal processes for asserting the privilege before the Court.

in litigation.

Defendant demands production of two categories of privileged documents in particular: (1) "communications among Plaintiff's employees responsible for communicating with Gemini about the self-certification" and (2) "notes of Plaintiff's interviews with two former Gemini employees." With respect to the first category, the CFTC has not withheld any such documents on the basis of the investigatory privilege—the CFTC did not withhold communications "among" its employees who communicated with Gemini, but instead only withheld communications during the pendency of the investigation between those employees and the DOE team investigating Gemini's wrongdoing. Such communications are clearly within the privilege and properly withheld.

Interview notes also fall within the privilege. *See, e.g., FEC v. Rivera*, 335 F.R.D. 541, 547-48 (S.D. Fla. 2020) (law enforcement investigatory privilege applies to summaries of witness interviews by agency's investigative team). Defendant has not made a showing that their need for these documents outweighs the privilege, particularly given that "the party seeking discovery may not rely on unsupported allegations in order to establish a particularized need for the information sought." *DGM Inv.*, 224 F.R.D. at 140. Such allegations are "inadequate to overcome the important public interest served by maintaining the confidentiality of . . . investigative files." *Adler*, 1999 WL 1747410, at *6. Nor will speculation as to the "mere possibility" of useful information be deemed sufficient to overcome the protection for investigative files; "[s]peculation of this sort is simply inadequate to justify overcoming the presumptive protection accorded the investigative files." *DGM Inv.*, 224 F.R.D. at 140 (citing *Apex Oil,* 110 F.R.D. at 498). Defendant's unsupported assertions that the documents are relevant and can only be obtained from Plaintiff are accordingly insufficient to waive the privilege, particularly where (1) Defendant has not made (and cannot credibly make) a showing that the witnesses otherwise are unavailable and (2) disclosure could interfere with future CFTC investigations. *See Rivera*, 335 F.R.D. at 548 (interview summaries protected where party could seek information from witnesses themselves because disclosure could discourage future witnesses from being truthful in government agency investigations and would chill government attorneys from creating witness summaries in future matters).

1.    *The Work Product Doctrine Applies to Documents Concerning Self-Certification and Pre-Trial Investigation*

Defendant, without citing any standard, claims Plaintiff has not properly claimed work product over certain materials. This is not true. "[T]hree conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." *In Re Grand Jury Subpoenas Dated December 18, 1981 & January 4, 1982,* 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)); *accord In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.,* 293 F.R.D. 568, 574 (S.D.N.Y. 2013). The documents withheld by the CFTC meet all three conditions.

Plaintiff has claimed work product protection over documents that were (1) created during the investigation and (2) were communications and/or files belonging to members of the DOE team running the investigation—exactly the sort of files that are prepared in anticipation of litigation and routinely protected. *See, e.g., SEC v. Downe*, 1994 WL 23141, at *2 (S.D.N.Y. Jan.

17

27, 1994) (attorney interview notes and other SEC investigation materials created during investigation but prior to filing of enforcement action are protected work product); *SEC v. NIR Group, LLC*, 283 F.R.D. 127, 133-34 (S.D.N.Y. 2012) (work product protection applies to investigative interviews conducted by SEC three years prior to commencement of enforcement action, because interviews were conducted in order to provide the SEC with information so it could determine whether or not to proceed with litigation); *see also Safecard Services, Inc. v. SEC*, 926 F.2d 1197, 1202 (D.C. Cir. 1991) ("The existence of an active investigation . . . is strong circumstantial evidence that the agency lawyer prepared the document with future 'litigation in mind.'"). Accordingly, the documents created during the investigation should be protected as work product.[9]

Though Defendant baselessly asserts that there cannot be work product protection for any document prepared prior to the filing of the lawsuit, there is no temporal requirement that work product documents be prepared within a certain time of the suit's filing. *NIR Group, LLC*, 283 F.R.D. at 133. Documents may be prepared in anticipation of litigation at any time, including during the self-certification time period. *See id.* ("[T]emporal distance is ultimately an unreliable indicator of the applicability of work product privilege"). Finally, Defendant's cursory invocation of "substantial need" for the documents is insufficient—Defendant has not articulated any need for these documents, let alone a "substantial" one.

## IV.   Plaintiff's Refusal to Produce Documents Concerning Other Self-Certifications

The self-certification at issue in this case was submitted on December 1, 2017. Two other self-certifications for digital assets were also submitted that day: one by the Chicago Mercantile Exchange Inc. ("CME") and one by the Cantor Exchange ("Cantor"). Gemini has requested the production of documents concerning those self-certifications. Plaintiff has refused to produce any documents in response to this request, contending that they are not relevant.

### A.   Gemini's Position

Documents concerning the CME and Cantor self-certifications are relevant and discoverable. Gemini seeks documents showing what information Plaintiff sought from CME and Cantor and what information Plaintiff considered when evaluating the CME and Cantor self-certifications. This evidence is relevant to whether Gemini's alleged misstatements and omissions were material. As set forth above, evidence about the types of information Plaintiff seeks and how it uses that information is probative of materiality. This request—which seeks documents that demonstrate what information Plaintiff *actually sought and considered* in two self-certifications of digital assets filed the same day—is designed to obtain precisely that evidence. Here again, Plaintiff should not be permitted to simultaneously present its cherry-picked evidence concerning materiality while denying Gemini its own internal documents that could refute that showing.

---

[9]   There were four documents that predated the investigation that were withheld on the basis of the attorney work product privilege and attorney-client privilege. The designation for those documents has been revised to reflect that they are only subject to the attorney-client privilege. An updated privilege log has been provided to Defendant to reflect these changes.

### B.      Plaintiff's Position

Through Request 7, Defendant has demanded "[a]ll documents and communications related to any self-certification reviews, or requests for approval, that CFTC has completed in connection with digital assets, including without limitation, the CME and Cantor products certified on December 1, 2017." Defendant's overbroad request for information regarding other self-certifications, even if narrowed to other entities' self-certifications of competing products, is irrelevant. Again, the standard for evaluating materiality is an objective one. Whether Defendant's misstatements were objectively material and misleading does not depend on statements made by other entities in unrelated matters. Likewise, the materiality of Defendant's misstatements does not depend on questions that the CFTC asked other entities in connection with the self-certification of other futures products. Defendant appears to suggest that if CME and Cantor had made similar misstatements to the CFTC during their self-certifications, that would somehow alleviate its own liability. That is simply not the law. *BankAtlantic Bancorp*, 285 F.R.D. at 668 ("Whatever the SEC may have been investigating or deciding not to investigate about other banks, though, cannot provide probative information regarding what [defendant] thought or intended when they allegedly made the omissions from [defendant's] disclosures. Only what [defendant] knew or understood is relevant to that determination.").

Further, Defendant's request is irrelevant for another, independent reason. That is, Defendant has never claimed to have relied on any statements from the other self-certifications in making its own statements to the CFTC. Absent such particulars, there is no basis to argue that other entities' statements to the CFTC in other self-certifications have any impact on the materiality of the statements Defendant made to the CFTC. *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Cuomo*, 332 F.R.D. 420, 439 (N.D.N.Y. 2019) (denying plaintiff's motion to compel materials or communications related to referrals to government agencies of matters not connected with the plaintiff NRA).

## V.      Plaintiff's Refusal to Agree to Reasonable Search Parameters

Gemini served Plaintiff with document requests on August 3, 2022. Gemini has proposed search terms and custodians that it believes are necessary to locate potentially responsive documents. Plaintiff has rejected nearly all of Gemini's proposed search terms and custodians several times. In the latest iteration of Plaintiff's search protocol, on January 19—the day before the document discovery cut-off in this case—Plaintiff agreed to add two custodians and three search terms.

### A.      Gemini's Position

As Plaintiff admits, it has produced fewer than 2,500 of its own documents in this case. Gemini, on the other hand, has produced *hundreds of thousands* of pages and is reviewing thousands more in response to Plaintiff's new search terms. Yet Plaintiff refuses to consider Gemini's narrowly tailored search terms and carefully considered requests for additional custodians. Specifically, Gemini requests that the Court order Plaintiff to apply the search parameters Gemini has proposed, which are identified in Exhibit G.[10]

---

[10]    On November 4, Plaintiff sent a letter setting forth its proposed search parameters. (Ex. F.) On November 18,

The search terms Gemini proposed are carefully tailored to identify documents relevant to the parties' claims and defenses. For example, Gemini requested that Plaintiff search for the names of some of the key individuals and entities involved in the self-certification to ensure that all of Plaintiff's communications concerning the self-certification are produced. Gemini also requested that Plaintiff run searches relating to some of the key conduct relevant to Plaintiff's claims in this case, including, for example, trading incentives, and certain of the terms Gemini used that Plaintiff claims were misleading (such as a "prefunded" exchange). Plaintiff has insisted that Gemini apply *the same or substantively identical terms* to Gemini's own custodians but refuses to acknowledge the relevance of the terms with respect to CFTC custodians.

Plaintiff's sole explanation for its refusal to add search terms is that it believes these additional terms are unnecessary because the terms it did agree to will reasonably capture all relevant documents related to the self-certification at issue. This argument is baseless for at least two reasons.

*First*, as explained above, relevance is not limited to documents concerning the self-certification at issue in this case. Plaintiff's discussion of key issues relating to self-certifications in other contexts—for example, communications concerning concepts such as self-trading, prefunding, and trading incentives—are all relevant to the critical issue of materiality. If, as Plaintiff argues, "[t]he only question is whether the statement was capable of influencing a reasonable decision-maker," what the purportedly reasonable decision-makers at the CFTC were actually influenced by is undeniably relevant.

*Second*, Plaintiff has made no showing that applying the additional terms proposed in Gemini's November 18 letter would impose a disproportionate burden. Remarkably, Plaintiff will not even run the suggested searches to determine whether review would, in fact, be any burden at all. Gemini has asked Plaintiff repeatedly to provide hit counts so that the parties could negotiate for more narrowly tailored terms if necessary, but Plaintiff has repeatedly refused to do so.

Further, the additional custodians Gemini proposed are also necessary to ensure that Plaintiff's production is complete. The additional custodians Gemini has proposed fall into the following categories:

- **Investigative Personnel:** Plaintiff has also refused Gemini's request that all members of its investigative team be made custodians. For example, Plaintiff issued a press release identifying Trevor Kokal as part of its investigative team, but it has refused to search Mr. Kokal's files for responsive documents. Plaintiff is effectively designating all of Mr. Kokal's internal communications as presumptively privileged without reviewing them. This should not be permitted.

- **Personnel Responsible for Monitoring the Futures Contract After the Self-Certification:** Gemini has also requested that Plaintiff produce documents from

---

Gemini proposed additional search terms and custodians and explained why it believed that these additions were necessary and proportional to the needs of the case. (Ex. G.) On November 23, Plaintiff sent a letter that included updated search parameters but that did not respond to Gemini's November 18 letter. (Ex. H.) On January 6, 2023, Plaintiff sent a letter rejecting most of the search terms or custodians proposed in Gemini's November 18 letter. (Ex. I.) Plaintiff confirmed this position during the parties' January 10 meet and confer.

the employees responsible for monitoring the self-certified bitcoin futures contract when it was traded (from December 2017 until March 2019). These individuals are likely to possess relevant information and exculpatory evidence on issues like whether the bitcoin futures contract was ever manipulated, whether measures designed to ensure market integrity were successfully implemented and effective, and whether the CFTC ever in fact monitored the bitcoin futures contract for manipulation. Plaintiff has refused to identify who these individuals were or search its existing custodians for communications on these topics or during this timeframe. None of these communications be privileged. *See Velez*, 2010 WL 2265443, at *3 ("measuring compliance with existing procedures is not predecisional, and thus not privileged.")

Here again, Plaintiff has not provided any showing of the incremental burden that reviewing these custodians' documents would impose. Indeed, Plaintiff does not even know whether such burden exists because it refuses to even search for new documents, let alone review them.

## B.    Plaintiff's Position

As part of the conferral process, the CFTC provided a search protocol that it developed in response to Defendant's broadly-worded document requests on November 4, 2022, and, after several meet-and-confers, provided an updated search protocol on November 23, 2022 and January 19, 2023. To put into context, in addition to the CFTC producing to Defendant over 85,000 documents collected during the CFTC's investigation (including approximately 59,000 documents produced by Defendant), the CFTC has produced 2,610 of its own internal documents over three rolling productions, starting on November 17, 2022. Additionally, the CFTC produced rolling privilege logs beginning on January 11, 2023. In contrast, Defendant has produced only 714 documents in response to the CFTC's requests for documents sent on October 12, 2022. In fact, Defendant's first production, which consisted of 6 documents, was not produced until two days before Christmas Day, 2022. And, despite claiming to be reviewing more documents in response to the CFTC's proposed search terms, Defendant has not indicated what search terms it is running or provided a search protocol equivalent to what it demanded from the CFTC (which the CFTC promptly provided and updated). Indeed, Defendant has yet to confirm whether it will be able to meet the extended discovery deadline for the conclusion of written discovery. As set forth in more detail below, the CFTC believes Defendant's productions and responses to be deficient.

With respect to Defendant's complaints above, Defendant mischaracterizes its search terms as "narrowly tailored" even though the terms are completely detached from the claims and defenses in this case. Nor were the terms tailored to account for the non-privileged documents the CFTC has produced to Defendant, or the volume of responsive, but privileged material that Plaintiff already reviewed and has individually logged. In justifying the additional terms, Defendant concedes that:

- The terms are not tied to the specific issues in this litigation because Defendant is seeking documents related to "*similar issues*" as well as information that the CFTC Division of Market Oversight ("DMO") considered in connection with the self-certification "*and elsewhere*."

- The document requests are not limited to the self-certification of the Defendant's bitcoin futures contract and include "any similar digital asset or other similar products."

- The requests "seek information beyond the Cboe/Gemini self-certification and the XBT Futures Contract, and encompass CFTC views surrounding digital asset products."

(*See* Ex. G at 3-4.)  In light of these admissions, the CFTC invited Defendant to refine their search terms and tie them to the specific issues in this case—i.e., propose proportional search terms that are designed to elicit documents that are relevant to the parties' claims and defenses.  Defendant declined to do so, electing instead to require the CFTC to run disproportionate searches before engaging in any substantive discussion regarding the proposed terms.  Running the remaining search terms from Defendant's letter yields almost 17,000 additional documents, which is an obviously burdensome number of documents to review in the time frame allotted for written discovery.  And, given Defendant's admission that the proposed terms are untethered from the specific claims and defenses, the relevance of any responsive material is marginal, at best.

To engineer a basis for arguing that documents "relating to self-certifications in other contexts" are somehow relevant, Defendant once again relies on the false notion that materiality turns on what the CFTC was actually influenced by.  This is wrong for at least two reasons.  First, the materiality standard is an objective one, and the focus is whether Defendant's lies were capable of influencing the CFTC's decision, not what the CFTC actually considered based on information provided in other, unrelated contexts.  In fact, concepts such as "self-trading, prefunding, and trading incentives" are only relevant here because Defendant provided misleading statements on these topics in the context of the self-certification.  That these concepts may have arisen in "other contexts" does not make Defendant's lies in the specific context of the self-certification any less culpable.

Second, and relatedly, Defendant has not made any showing that the bitcoin futures contract at issue here bears substantial similarities to other bitcoin futures contracts, which were not settled in reference to the Gemini bitcoin auction, let alone any auction at all.  *See Edwards v. Daniels*, 2020 WL 3057412, at *1 (S.D.N.Y. June 9, 2020) ("[W]here 'the information requested has no conceivable bearing on the case,' discovery of the requested material should be denied."); *Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) ("While Rule 26(b)(1) still provides for broad discovery, courts should not grant discovery requests on pure speculation that amount to nothing more than a 'fishing expedition.'"); *see also Franck v. N.Y. Health Care Inc.*, 2022 WL 806581, at *2 (S.D.N.Y. Mar. 17, 2022) ("Parties seeking discovery 'bear[] the burden of initially showing relevance,' and as such, they 'must make a prima facie showing that the discovery sought is more than merely a fishing expedition.'") (citation omitted).

The CFTC's search protocol includes multiple external domains that were broadly searched (without any additional search term limiters specific to the self-certification at issue) to capture the external communications from the CFTC's DMO staff to all of the key entities involved in the self-certification, as well as other entities such as the Futures Industry Association and the National Futures Association, which were specifically included to address Defendant's request.  The CFTC's search protocol also included a search for internal communications of 17 staff members

that includes search terms aimed at filtering through all of the day-to-day communications of these staff members about any subject matter to identify the communications related to the self-certification at issue, such as searching for the terms "bitcoin w/2 futures," "Winklevoss," "CBOE," "CFE," "Gemini," and others.  Taken together, the CFTC believes its protocol reasonably captures all relevant documents related to the self-certification of the futures contract at issue.

In terms of the two categories of additional custodians Defendant has identified, with respect to documents belonging to investigative personnel in this case, as the CFTC has told Defendant, the CFTC believes that the internal communications of its DOE staff pertaining to its investigation of Gemini fall under the investigative privilege, deliberative process privilege, attorney-client privilege, and/or work-product privilege.  Those privileges would also undoubtedly extend to Trevor Kokal, a CFTC Futures Trading Investigator.  *See NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 138 (N.D.N.Y. 2007) (noting that attorney-client privilege covers communications with agents of an attorney, "which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction") (collecting cases); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 435 (S.D.N.Y. 2013) (noting that the work product doctrine "protects materials prepared not only by attorneys but also by their agents").  The CFTC has already identified to Defendant its core DOE investigative team that was involved in interviewing witnesses and communicating with external third parties from which it sought information during its investigation, and the CFTC has searched for and reviewed internal and external communications of those individuals pursuant to Searches 3, 4, and 5 of its search protocol.  The CFTC believes that searching for and reviewing the communications of other DOE staff members like Trevor Kokal, who were solely involved in internal communications and analysis that are protected from disclosure by several privileges, is disproportional to the needs of this case, particularly given that Defendant has not shown, for example, any substantial need for such communications or analysis, which is necessary to overcome the work-product doctrine.  *In re Grand Jury Proc.*, 219 F.3d 175, 190 (2d Cir. 2000).

With respect to documents related to the monitoring of the futures contract after the self-certification, such documents are utterly irrelevant to whether Defendant made false statements to the CFTC during the self-certification process.  As noted above, "it does not matter whether the CFTC knew the statement was false at the time it was made, or conversely, whether it did not discover the falsity until later." *Gramalegui*, 2019 WL 4610953, at *24.  "The only question is whether the statement was capable of influencing a reasonable decision-maker." *Santiago*, 2014 WL 4827883, at *5.  Thus, evidence that the contract was not *in fact* manipulated on the market after the self-certification, even if such evidence exists, cannot "exculpate" Defendant from allegations that it misled the CFTC while it was attempting to self-certify its contract.

***Issues Regarding Defendant's Responses and Objections to Plaintiff's Discovery Requests***

**VI.    Defendant's Refusal to Produce Documents or to Provide Search Parameters**

**A.    The CFTC's Position**

The CFTC served Defendant with requests for production of documents on October 12, 2022.  These requests specifically noted that they were not seeking documents already produced

during the CFTC's investigation.   However, Defendant refused to search for and produce documents in response to all but six of the CFTC's 50 document requests.  In response to these six document requests, Defendant has produced a total of 714 documents to date.  For the rest of the requests, Defendant stated that it was relying on its prior productions to the CFTC during the investigation.[11]  Defendant also stated in its objections that, to the extent it would agree to produce any documents, it would only do so pursuant to a mutually negotiated search protocol that would include custodians, date ranges, search terms, and/or targeted document collections.  However, Defendant declined to abide by its own proposal and failed to provide the parameters of its prior productions.  It instead directed the CFTC to a July 2019 letter that identified certain search terms it ran across 14 custodians, without specifying whether this was the full scope of the search protocol.  Defendant finally confirmed during the December 19, 2022 meet-and-confer that the July 2019 letter reflected all of the custodians and search terms that were used in connection with responding to the CFTC's investigative subpoenas. Given this information, on January 6, 2023, the CFTC provided Defendant with a chart proposing additional search terms and custodians for each request as Defendant requested.

Defendant has agreed to make a production in response to that proposal, but has not stated whether it is adopting the CFTC's proposal for each request.  Instead, Defendant has stated that it is reviewing "thousands" of documents in response to the January 6 search terms, without indicating what the search terms are or the date ranges that have been adopted.  Nor has Defendant provided the search protocol that was initially required before Defendant would even begin the search and review process.  The CFTC lacks any insight into which document requests Defendant has now agreed to search for and produce additional documents that were not produced in connection with the CFTC's investigation.  The CFTC also lacks any insight into when Defendant will produce the material it claims to be reviewing.  As such, the CFTC requests leave to bring additional discovery disputes to the Court's attention pending further information from Defendant on the status of its document review and production and after the CFTC has had the opportunity to review Defendant's production for completeness.

B.     **Gemini's Position**

Gemini has produced more than 504,000 pages of documents to Plaintiff, including documents responsive to every one of Plaintiff's document requests.  As Plaintiff admits, it has been in receipt of the search terms and protocol through which these documents were produced since July 2019.  But despite having known of Gemini's search protocol for more than three years, it was not until January 6—two weeks before the end of document discovery—that Plaintiff identified what additional information it wanted Gemini to produce in the form of 28 pages of search terms.  As Gemini has explained during meet and confers, Plaintiff's proposed terms returned an exorbitant number of documents.  Gemini will provide Plaintiff with its final search

---

[11]   Defendant noted in several of the discovery letters that the CFTC's document requests are duplicative of the requests from the CFTC's investigative subpoenas.  However, the CFTC's document requests expressly excluded material Defendant previously provided in connection with the investigation into Defendant's false and misleading statements to the CFTC.  And, the CFTC has explained that, unless Defendant believes that it has a continuing obligation to respond to the CFTC's investigative subpoenas from the time of issuance until the present, the document requests are necessary to address the deficiencies in Defendant's prior productions and to obtain clarity on what, exactly, was searched and produced during the investigation.

terms (including hit counts) and produce responsive, non-privileged, non-duplicative documents.

## VII.  Defendant's Refusal to Permit the CFTC to Image Laptops Gemini Previously Provided the United States Attorney's Office for the Southern District of New York

### A.  The CFTC's Position

On January 18, 2023, which was two days before the original written discovery deadline (ECF No. 23), Defendant informed the CFTC that it possessed two laptops, which had previously been provided to the United States Attorney's Office for the Southern District of New York ("SDNY").  The laptops were Gemini-issued work laptops of two former employees who are potential witnesses central to the issues in this case, including one who was a Gemini representative who drafted, edited, reviewed, and made statements to CFTC staff concerning the bitcoin futures contract.  Defendant maintains that the prior searches it ran "suffice for the purposes of discovery in this case."  As noted above, Defendant has not disclosed what searches it is currently running and, during the January 25, 2023 meet-and-confer, counsel confirmed that it had not searched the two laptops to determine whether they contained potentially relevant information.

Defendant also refused to let the CFTC image the laptops on the grounds that they may contain privileged information.  Defendant's position is untenable given that it has waived any claim of privilege over the laptops by previously providing them to the SDNY.  *See, e.g.*, *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 n. 5 (2d Cir. 2003) (attorney-client privilege waived by selective disclosure to government agency); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) (work product waived by selective disclosure to SEC because "[t]he waiver doctrine provides that voluntary disclosure of work product to an adversary waives the privilege as to other parties"); *In re Terrorist Attacks on Sept. 11, 2001*, 293 F.R.D. 539, 544 (S.D.N.Y. 2013) (rejecting argument that sharing privilege material with "various government agencies should not lead to any waiver" because "even disclosure to non-adversaries waives work product protection if it materially increases the likelihood that an adversary can gain access to that information"); *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 170 (S.D.N.Y. 2002) ("A waiver will be found if the governmental agency was an adversary, a 'potential adversary' or even just 'stood in an adversarial position' with respect to the disclosing party.").[12]

Given the waiver of any potentially privileged material, the CFTC should be allowed to image and conduct its own review of the laptops.  Defendant cannot claim it is too burdensome to simply make the laptops available to the CFTC for imaging.

### B.  Gemini's Position

The Court should reject Plaintiff's request that Gemini turn over the requested computers, which belonged to former Gemini employees Ben Small and Shane Molidor, in their entirety.

*First*, Plaintiff misstates Gemini's position.  Gemini has made three separate offers that

---

[12]   Defendant has not claimed that there was any sort of confidentiality agreement protecting privilege of the laptops between it and the SDNY.  Even if there were, however, such an agreement would likely be insufficient to protect any privilege.  *See Gruss v. Zwirn*, 2013 WL 3481350 (S.D.N.Y. 2013).

would permit Plaintiff to obtain relevant, non-privileged documents from these computers:

- Gemini offered to make the computers available for inspection and to provide Plaintiff with copies of any documents it wanted, subject to a privilege screen;

- Gemini offered to search the computers using the same approach Plaintiff took to search the computers of its employees' computers, if possible; and

- Gemini offered to run search terms across the computers and produce responsive, non-privileged documents.

Plaintiff rejected all three offers, insisting that only the complete production of the computers would suffice. This approach is unreasonable and inconsistent with how both parties have conducted discovery. It would also, contrary to Plaintiff's suggestion, impose a substantial and undue burden on Gemini. Gemini has already produced Mr. Small and Mr. Molidor's responsive, non-privileged emails and Slack messages, as well as documents from the company's shared drive. Compelling Gemini to produce the entirety of these computers—and thus review their entire contents—would impose a burden that is disproportionate to the needs of the case.

*Second*, Gemini has not waived privilege over documents stored on these computers. Contrary to Plaintiff's suggestion, "[t]he Second Circuit has declined to adopt a *per se* rule against selective waiver, instead holding that courts should assess selective waiver on a case-by-case basis." *Police & Firefighters Sys. of City of Detroit v. SafeNet, Inc.*, 2010 WL 935317, at *1 (S.D.N.Y. Mar. 12, 2010) (citing *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993)). This rule serves a critical purpose: encouraging voluntary cooperation with government investigations. *Id.*, at *2 ("There is a strong public interest in encouraging disclosure and cooperation with law enforcement agencies; violating a cooperating party's confidentiality expectations jeopardizes this public interest."). Thus, no privilege waiver occurs where a cooperating entity provides privileged documents to a government entity with which it shares a common interest. *See, e.g.*, *In re Symbol Techs., Inc. Secs. Litig.*, 2016 WL 8377036, at *13 (E.D.N.Y. Sept. 30, 2016) (finding no waiver where company accused of violating the securities laws by misstating its revenues provided privileged materials to government investigators because the company and government shared a common interest in investigating potential wrongdoing); *In re Cardinal Health, Inc. Secs. Litig.*, 2007 WL 495150, at *9 (S.D.N.Y. Jan. 26, 2007) (finding no waiver where audit committee provided privileged materials to SEC and U.S. Attorney's Office notwithstanding that litigation with government was "almost certain" because the committee and government shared common interest in ensuring company's "financial and accounting practices be 'clean as a hounds tooth'").

A similar common interest existed here. Gemini provided the computers to SDNY in connection with an investigation into potential wrongdoing by two Gemini employees. At that time, Gemini's interests and the government's were perfectly aligned. It was only later that SDNY began investigating Gemini and the parties' interests diverged—and even then, as in *Cardinal Health*, Gemini and SDNY retained a common interest with respect to their investigations of the wrongdoing. Moreover, Gemini expected that the materials provided would be kept confidential, thus further supporting a finding of non-waiver here. *Pasternak v. Dow Kim*, 2013 WL 1729564, at *6 (S.D.N.Y. Apr. 22, 2013) (holding that "expectation of confidentiality" when providing

privileged documents "should not be undermined).

## VIII.   Defendant's Refusal to Provide a Privilege Log of Communications with Counsel Related to the Settlement of Claims Against Two Witnesses in This Case

### A.   The CFTC's Position

The CFTC seeks production of a privilege log and leave to conduct further discovery concerning communications between an important witness in this matter and JFB Legal, one of the two law firms that represent Defendant.  During discovery, the CFTC learned from this witness that JFB Legal had, in connection with an arbitration award issued in favor of the Defendant against the witness, engaged in settlement discussions with the witness.  As part of those discussions, JFB Legal offered to reduce the witness's monetary obligation in exchange for an affidavit from the witness stating that he "made false statements to the CFTC" during the CFTC investigation into the subject matter of this action.

On November 28, 2022, the CFTC subpoenaed JFB Legal for communications that JFB Legal had with the aforementioned witness as well as another witness that had provided an affidavit concerning this action. JFB Legal initially refused to produce any material that was responsive to the subpoena, but eventually relented on January 10, 2023 and agreed to provide responsive, non-privilege information prior to the written discovery cutoff.  Following an agreed upon extension to the written discovery deadline, JFB Legal produced documents on January 24, 2023 in response to the subpoena.  Those documents confirmed that the Defendant itself had authorized JFB Legal to relay the settlement terms, including the affidavit requirement, to the witness.

During a January 25, 2023 meet and confer, the CFTC inquired whether Defendant intended to provide a privilege log of communications related to the settlement or proposed settlement with the two potential witnesses.  Defendant declined to engage in any further discovery concerning this matter or produce a privilege log of the requested communications.  The Defendant maintains that a privilege log would purportedly intrude on attorney-client communications, the communications relate to information that is not relevant to the charges in this case, and the communications would not result in information responsive to the subpoena.  The court can swiftly reject each of these arguments.

*First*, the privilege log itself is not an intrusion on the attorney-client relationship.  It merely logs communications concerning two specific topics—communications surrounding the settlement and proposed settlement with two potential witnesses.  Local Rule 26.2 requires where, as here, there is "a claim of privilege . . .  in objecting to any means of discovery," that the objecting party identify certain information, including "the types of document[s]" withheld, the "general subject matter" of the withheld documents, "the date of the document[s]," and "the author of the document[s] . . . and any other recipients."  Local Civil Rule 26.2(a)(1)-(2).  Defendant has no basis for withholding this discrete information and has not claimed that providing it imposes an undue burden.

*Second*, settlement discussions with potential witnesses (particularly those related to the witnesses' testimony) are relevant and discoverable. *Newman & Assocs. v. J.K. Harris & Co.,*

*LLC*, 2005 WL 3610140, at *2 (S.D.N.Y. Dec. 15, 2005) ("Under federal law, courts have generally declined to recognize a privilege that would preclude discovery for the purpose of settlements or settlement negotiations."); *Playboy Enterprises Int'l, Inc. v. On Line Ent., Inc.*, 2004 WL 626807, at *5 (E.D.N.Y. Mar. 29, 2004) ("Courts have held that evidence otherwise excludable pursuant to Rule 408 is admissible for the purposes of impeachment."); *Trib. Co. v. Purcigliotti*, 1996 WL 337277, at *3 (S.D.N.Y. June 19, 1996) (compelling production of "all statements, correspondence, and other documents" related to settlement agreement between a potential witness and the plaintiffs because, among other things, "[t]he amount of money that plaintiffs have agreed to accept from [the witness] in exchange for dismissing the case against him, as well as other terms of the settlement, may bear on the issue of his bias and prejudice").

Further, Plaintiff is entitled under these circumstances to probe whether further motion practice may be necessary to the extent the settlement discussions and the actions of the Defendant in this matter reveal that the negotiations went beyond sharp—and acceptable—litigation practices. If that is the case, Defendant would not have a valid basis to assert privilege over the material set forth in the requested log. *See Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 425 (S.D.N.Y. 2013) ("[N]either the attorney-client privilege nor the attorney work-product doctrine protect communications made in furtherance of a crime or fraud."); *see also SEC v. Collector's Coffee Inc.*, 338 F.R.D. 309, 320 (S.D.N.Y. 2021) (applying "the crime-fraud exception . . . to . . . conversations with [attorneys] that were in furtherance of . . . efforts to cause the attorneys to give false statements to the SEC"); *In re Grand Jury Subpoena Dated Mar. 20, 2013*, 2014 WL 2998527, at *11 (S.D.N.Y. July 2, 2014) (applying the crime-fraud exemption to the attorney-client privilege based on witness tampering where witness was "encouraged . . . to contradict her prior written statement when testifying before the grand jury"); *Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008) ("Trying improperly to influence a witness is fraud on the court and on the opposing party . . . .").

*Third*, to dispel any doubt that the CFTC's document requests and subpoena call for a review of documents that Defendant had with its attorneys in connection with the proposed settlements, the CFTC has provided Defendant with a revised subpoena and document request calling for this information.

*Finally*, we understand that Defendant may argue that its attorneys were only asking the witnesses to sign truthful affidavits. Nevertheless, both affidavits included statements that bear on the issues in this case that are in dispute. The communications also show that the affidavits were drafted by counsel, and are not tied to any findings from the arbitration that are binding in this case. As such, the CFTC seeks leave to conduct further discovery concerning this matter and Defendant should provide a log of the communications so that the CFTC can assess whether further motion practice is appropriate in this case.[13]

---

[13] Defendant makes two erroneous assertions that merit addressing. First, Defendant argues that it is improper to subpoena opposing counsel. Defendant is represented by two law firms, and a party cannot insulate themselves from discovery and a validly issued subpoena based on the simple expedient that it retained the same counsel in two matters that it has affirmatively alleged are related. (*See* Ans. at 3-5, ECF No. 13.) Defendant bizarrely argues that it is Plaintiff that "claims" the arbitration is related when the arbitration is a central feature of Defendant's Answer. (*Id.*) Second, Plaintiff has relayed to Defendant numerous times that the subpoena was duly authorized, and it is unclear why Defendant continues to suggest that is not the case.

### B.    Gemini's Position

Plaintiff suggests that it was improper for Gemini's defense counsel, in the course of settlement discussions in a separate matter, to ask a former employee of a Gemini affiliate – who himself initiated those discussions – to sign an affidavit stating that he had lied to the CFTC.  As described below, it is beyond dispute that the former employee did in fact lie to the CFTC:  the former employee himself has admitted under oath that he did so.  And requesting that a witness sign a *truthful* affidavit is not witness tampering, as Plaintiff recklessly suggests.  *See United States v. Johnson*, 968 F.2d 208, 211 and 213-15 (2d Cir.1999) (no witness tampering if a defendant employed lawful means to encourage, induce, or cause a witness to testify truthfully); 18 U.S.C. § 1512(e).  Moreover, the former employee decided not to resolve the matter and did not sign the affidavit.  Plaintiff knows all of this because Defense counsel produced the relevant settlement communications with the former employee.  Plaintiff nevertheless requests an extension of the discovery schedule so that it may pursue discovery relating to *privileged* communications concerning these unsuccessful settlement discussions, and two days ago issued subpoenas to counsel and Gemini explicitly seeking privileged communications relating to these settlement discussions.  Plaintiff's gross overreach, which finds no support in fact or law, is designed to interfere with defense counsel's relationship with its client and to gain some perceived litigation advantage in exploring attorney-client communications it believes are related to this case.  This is improper and should summarily be denied

The former employee at issue is Benjamin Small.  He is the self-styled "whistleblower" who filed the letter with the CFTC that led to this enforcement action.  (*See* ECF 13 at 1–9.)  Mr. Small is an admitted liar and perjurer.  (Ex. J. at 5 ("Small has conceded that he did not tell the truth concerning many important items that are relevant to this case."); *id.* at 6 (Mr. Small's "lies were quote elaborate"); *id.* at 15 (describing one of Mr. Small's claims as "simply untrue").)  It is also indisputable that he made false statements in his purported whistleblowing submission.  Indeed, he has admitted under oath that he had no evidence to support various allegations that he made.  (Ex. J at 16 n.18.)[14]

For whatever reason, however, the CFTC apparently intends to rely on Mr. Small's testimony.  Indeed, the CFTC disclosed on February 1, 2023 that it is continuing to consult with him.  However, the CFTC has not yet produced (or put on a privilege log) any record of its ongoing communications with Mr. Small.

As it relates to Plaintiff's current request, some background is necessary.  From 2015 to 2017, Mr. Small worked for a Gemini affiliate ("WCM") and was seconded to Gemini until he was fired for misconduct.  In 2018 he sued WCM, claiming that he had been fired for whistleblowing.  Due to a peculiarity in Mr. Small's employment agreement, WCM was required to advance Small's legal fees during that lawsuit.  WCM was, however, entitled to recover those fees if it could prove that Mr. Small's allegations were false and that he did not act in good faith or was grossly negligent during his employment.  WCM prevailed on all contested issues in that arbitration after a nine day hearing.  In a lengthy opinion issued in January 2022, a well-respected

---

[14]    For example, in Mr. Small's whistleblower submission made allegations about purported improper use of a software program supposedly called "cryptolock."  When asked under oath in a prior proceeding whether he had any evidence of the existence of cryptolock, as the transcript reflects, his answer was simply "no."

arbitrator found:

- Mr. Small was not fired for whistleblowing.  (*Id.* at 12 n.12, 15–16.)

- Mr. Small did not act in good faith.  (*Id.* at 6.)

- Mr. Small was grossly negligent.  (*Id.* at 9, 19.)

- Mr. Small fraudulently induced WCM to hire him, including by creating fake documents and lying about his employment history.  (*Id.* at 17, 19.)

- Mr. Small was not credible and some of his testimony was "laughable."  (*Id.* at 15.)

Based on these findings, the arbitrator ordered Mr. Small to pay WCM $4,428,000, and his right to further advancement of fees was terminated.  (Ex. J.)[15]  Upon issuance of the award, Mr. Smalls' lawyers (who were the beneficiaries of the prior advancement) immediately fired Mr. Small as a client, and he had to proceed *pro se*.

In May 2022, Mr. Small—representing himself—contacted Defendant's counsel and asked to settle the matter.  Mr. Small knew that (i) WCM was in the process of confirming the arbitration award and beginning enforcement proceedings and (ii) about to start a new action to require Mr. Small to return equity in Gemini that he was required to forfeit because of his misconduct.  At Mr. Small's request, WCM made a settlement proposal.  WCM offered to cease litigation if Mr. Small:

1. Repaid at least a portion of the fees that had been advanced (Mr. Small claimed poverty and claimed not to be able to pay any significant portion of the money he owes).

2. Returned the equity he held in Gemini; and

3. Signed a truthful affidavit.

The affidavit, as drafted, would have done two things: (i) confirmed facts related to Mr. Small's actions while at WCM/Gemini and (ii) corrected the record as to some of the indisputably false statements Small made after being suspended and subsequently terminated later in 2017.  In addition, defense counsel offered to include in the affidavit any truthful statements Mr. Small claimed he made to the CFTC.  This settlement proposal was lawful and appropriate, particularly to ensure that a serial liar and perjurer like Mr. Small would not continue to offer false testimony against Gemini.

It quickly became apparent, however, that settlement discussions between Mr. Small and WCM were not productive and that was the end of it.  Accordingly, WCM sued Mr. Small for the return of his equity, and it is currently determining the best means to enforce the arbitration award

---

[15]   The final, as-entered judgment against Mr. Small is $5,115,942.59, plus interest and fees.  *See* Judgment, *Winklevoss Capital Management, LLC v. Small*, Index No. 650366/2022, Dkt. 74 (June 14, 2022).

and recover the money it is owed.

The brief and abortive settlement discussions between WCM and Mr. Small were not in any way improper, and they are not relevant to anything in this case. They took place almost five years after the events at issue here. They do not bear in any way on any element of the CFTC's claim or Gemini's defense. Moreover, given Mr. Small's demonstrated lack of credibility it seems doubtful that the CFTC will call him as a witness. That is, however, CFTC's choice and, apparently, the CFTC is in contact with him.

Indeed, given the close cooperation between the CFTC and Mr. Small, the CFTC could easily have obtained communications between Mr. Small and WCM/Gemini *from Mr. Small*. Instead, the CFTC took the highly irregular step of issuing a subpoena for these communications to Defendant's counsel. These confidential and inadmissible settlement communications are irrelevant to the issues in this case. The CFTC has admitted in a meet and confer that it issued its subpoena was done (i) without obtaining prior supervisory approval from CFTC Enforcement leadership, (ii) without any authorizing rule or regulation, and (iii) without any identifiable precedent. As defense counsel has explained in the meet and confer process, the CFTC's subpoena is improper and runs counter to strict limitations on serving subpoenas on counsel, much less opposing counsel in the matter at issue, that various agencies like the Department of Justice employ to avoid intruding on the attorney-client relationship. The subpoena also raised a significant due process issue because it compelled defense counsel *in this case* to disclose communications relating to its representation of a Gemini affiliate in what Plaintiff claims is a related case.

While counsel could have stood on its outright objections to the subpoena, in an effort to resolve the matter without putting tangential disputes before the Court, counsel agreed to produce all settlement communications with Small and it has now done so. That should have been the end of the matter.

However, on February 1, for the first time, the CFTC went further. It sent a new subpoena to defense counsel and a document request to Gemini specifically requesting *privileged* documents concerning the Small/WCM settlement discussions. It now seeks communications between Gemini and its counsel (at three different law firms) regarding their discussions about this potential settlement. This is unwarranted. While the underlying settlement communications themselves are irrelevant and inadmissible under FRE 408, the CFTC has those and can seek to use them in its case-in-chief (Gemini will oppose). But there is no articulable basis to probe into privileged, attorney-client discussions surrounding Gemini's settlement strategy in that case. As discussed above, there was nothing improper about the settlement offer Gemini made to Mr. Small. On the other hand, compelling Gemini and defense counsel to disclose privileged communications would invade "one of the oldest recognized privileges for confidential communications" in American jurisprudence. *Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998). Accordingly, the CFTC's request for leave to continue discovery into this issue should be denied.

For the same reasons, the CFTC's request for a privilege log should be denied. As discussed above, there is no basis to pierce the attorney-client privilege concerning these irrelevant settlement communications and it is therefore unnecessary to provide a privilege log (indeed, as Plaintiff acknowledges, its initial subpoena did not seek privileged information). As to its rationale for demanding a privilege log, all Plaintiff says—with no citation to legal authority—is that it

wants to "assess whether further motion practice is appropriate in this case."  Defendants do not know what that means, but it is not a basis for relief.[16]  The Court should deny Plaintiff's request.

Respectfully submitted,

/s/ John F. Baughman

cc:      Counsel of Record

---

[16]   Although the CFTC's application refers to two witnesses, Defendant is not aware of any issue or allegation involving the second one, Shane Molidor.  Mr. Molidor reported to Mr. Small, and he too was fired for misconduct.  Mr. Molidor was represented by counsel who negotiated a settlement with WCM and Gemini on his behalf.  Defense counsel also produced its settlement communications with Mr. Molidor.  The CFTC has not articulated any reason why the settlement with Mr. Molidor is relevant to anything.