# EXHIBIT 6

FD-302 (Rev. 5-8-10)



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

### FEDERAL BUREAU OF INVESTIGATION

Date of entry    01/06/2020

CHRISTOPHER J. GOODMAN, date of birth (DOB) ███████ ███
███████, Social Security Account Number ██████, work address of
United States Commodity Future Trading Commission (CFTC)██████
██ ████████ was interviewed both in person at his Washington DC
office and also via video teleconferencing (VTC) in New York. Located at his
office were CFTC Trial Attorneys Gates Hurand, Alejandra de Urioste and
David Oakland, as well as CFTC General Counsel Rob Schwartz and Raagnee
Beri. Present at the interview via VTC located at the CFTC New York City
office, address of ████████ ██ ████████ were Assistant
United States Attorneys of the Southern District of New York Samson Enzer
and Richard Cooper, CFTC Chief Trial Attorney Brent Tomer and Federal Bureau
of Investigation Special Agent Keith McLaughlin. After being advised of the
identity of the interviewing Agent and the nature of the interview, GOODMAN
provided the following information:

GOODMAN graduated from Nazareth College with a Masters in Economics in
2005. From there, he went to work for the U.S. Labor Department with a
focus on the unemployment rate. He also prepared cost benefit analysis
reports for the Chief Economic Officer.

GOODMAN joined the CFTC in 2012 and worked on the Product Review Team,
within the Division of Market Oversight (DMO). He worked on and reviewed
subject matter such as swaps, trade executions relative to Dodd-Frank, as
well as on interest rates. GOODMAN's current title within the DMO is
Economist.

The Bitcoin (BTC) futures product with GEMINI was the first BTC work
product for GOODMAN at the CFTC. Approximately late July of 2017, he dialed
in for a call on the project. There were also about four to five others
from the DMO involved. He recalled the president had some questions and
concerns related to volume on the project.

Investigation on   07/18/2019   at   New York, New York, United States (In Person)

File #   318C-NY-2461813                                           Date drafted   07/23/2019

by   MCLAUGHLIN KEITH JOHN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Up to this point, GOODMAN had no real knowledge of the WINKLEVOSS twins, CAMERON (CAM) and TYLER (TY). Although, he understood the twins had large holdings in BTC. He was aware the Securities Exchange Commission (SEC) rejected one of the twins projects, but was uncertain as to when he learned about it.

(Agent note, during the interview GOODMAN was presented two black three ring binders titled GEMINI CFTC Witness Interviews July 18-19, 2019. One binder was subtitled Common Witness Binder (CWB) with 28 tabs, the second was Individual Witness Binder (IWB)with 35 tabs)

(CWB, Tab 1, an April 26, 2017 email with GOODMAN copied) GOODMAN heard rumors of a BTC futures product, but at this point did not recall that CBOE was the entity involved.

(CWB, Tab 2, Meeting Invite for July 25, 2017) GOODMAN glanced at the attendee list. He confirmed this was the dial-in meeting and that he likely saw a slide deck after the meeting.

On his dial in of the late July 2017 meeting, CBOE and GEMINI were there. While GOODMAN knows KEN RAISLER, he did not recall RAISLER being there.

(IWB, Tab18) These notes were likely taken after the call while reading over the presented material. It was normal for exchanges to self-certify, but this product was high profile and needed a deeper look or review. It would need to meet Core Principal Three (CP3); not being readily susceptible to manipulation. GOODMAN knew it would be cash settled, but needed to know more on how it was settling. There was additional caution because this product was settling to only one auction.

GOODMAN's team cared about the design, liquidity, inclusion of market orders, methodology, settlement price, and close surveillance. On surveillance, CBOE brought some relief of concern. While there was no physical delivery, there was information sharing.

GOODMAN's notes were likely questions and thoughts after the presentation or call.

(IWB, Tab 18, page 2, note marked as (2)) There was concern for the level of liquidity on the product. Additionally, GOODMAN was not convinced

SDNY_000000776

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FD-302a (Rev. 5-8-10)

318C-NY-2461813

Continuation of FD-302 of (U) Interview of Chris Goodman of the CFTC , On 07/18/2019 , Page 3 of 5

on the two-times volume claim.  GOODMAN did not recall the detailed volume data.  (Page 5, Protections, Pre-funded term)  This term was understood as GEMINI participants needing "to pay for it in advance."  This topic was mentioned during the meeting, but GOODMAN was unsure who spoke about it. His note on trading on leverage was likely a note to self.

The pre-funded term impressed there was a preclusion of GEMINI or a GEMINI affiliate lending on the exchange.  It GEMINI was lending, "it would be misleading" relative to their pre-funding statements.  We "would want to know" such activity.

The topic of a GEMINI Line of Credit (LOC) was not recalled being discussed.  GOODMAN said, "I don't remember that."  GOODMAN agreed, if a LOC was applicable, the pre-funding statement was misleading.  He also agreed, if such activity occurred there would be a desire for the CFTC to know.  "I would expect that CBOE would not have said fully pre-funded" if loans or an LOC were involved.

GOODMAN's team at the CFTC assumed the presenter was "true."

The segment on Protections was to reflect limits of manipulation on the GEMINI auction.  This was relative to CP3.  Pre-funding was a selling point.  Pre-funding created a higher cost of capital to participate.  This higher cost for participation made manipulation less manageable. Conversely, a loan is essentially margin and reduced the cost of capitol.

GOODMAN's team did follow up on the topics of pre-funding and leverage, however, it was not certain how hard they pressed on the topic.

GOODMAN did not recall the mechanics of GEMINI's self-crossing protections.  Self-crossing was trading with oneself, where the price could be skewed.  GOODMAN was uncertain as to why he starred the topic in his notes.

Market-Maker rebates were discussed.  Rebates were not inherently a bad option, but GOODMAN was curious how GEMINI designed them to avoid wash trading.

GOODMAN also noted disclosure of auction participants.

GOODMAN circulated his questions coming out of the meeting.

SDNY_000000777

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

318C-NY-2461813

Continuation of FD-302 of <u>(U) Interview of Chris Goodman of the CFTC</u> , On <u>07/18/2019</u> , Page <u>4 of 5</u>

The name BEN SMALL was remembered, but GOODMAN did not recall SMALL speaking.

(CWB, Tab 7, AMIR ZAIDI)  ZAIDI was GOODMAN's boss', boss', boss.  The hierarchy went from GOODMAN to PHIL COLLING, to TOM LEAHY, to GREG KUSERK to ZAIDI.  The group's collective questions were viewed on this tab.  Such questions as to the number of market-makers, the view or general purpose of the platform, the percentages traded by the market-makers, the number of participants, and the market-maker liquidity or concentration of the auction were all part of further review.

There was a concern the exchange was too concentrated.

GOODMAN did not remember GEMINI's incentives being too out of the ordinary.

(CWB, Tab 8, question number 8) GOODMAN reviewed the question and answer.  The answer identified a web link for the market-maker program.  GOODMAN was asked hypothetically if there were bespoke programs available how it would effect the answer.  In such a situation, the answer to question eight "would be misleading."  If other bespoke options were true, "we would want to know."  "When we ask a question, we want as full of an answer as possible."  "We expected them to let us know" of a material change.

(IWB, Tab 21, August 28, 2017 Meeting)  This meeting was in person, and likely all the people listed were there.  They discussed the liquidity of the auction, the ratio of market to limit orders.  There was little auction activity.  MICHAEL MOLLET and JIM OVERDAHL handled data questions.

On the follow up of leverage, when pressed on it, "fully funded was fully funded."  GEMINI impressed that there was no leverage.  The team "took it at face value."

After the August 28, 2017 meeting there were subsequent monthly calls with CBOE.  On one specific call, GOODMAN remembered a twin being present.  This twin discussed the generalities of forks.

GOODMAN did not recall the term, fully collateralized.

(CWB, Tab 21)  This email was about a call discussing hard forks and information sharing.  One of the twins was on the call.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

318C-NY-2461813

Continuation of FD-302 of  (U) Interview of Chris Goodman of the CFTC  , On  07/18/2019  , Page  5 of 5

(CWB, Tab 12, NICOLE GORDON to GOODMAN)  There was likely a surveillance call in August prior to this email.  (Bates 218, page 2)  Cost of Capital in relation to pre-funded meant without leverage because of the increase cost for exposure.  This section reiterated that there was no leverage.

There was no recollection of special incentives for the auction.  GOODMAN was familiar with market incentives, but a 100 basis point incentive was not recalled.  A 100 basis point incentive was big relative to other markets, although in crypto, GOODMAN was uncertain to the relativity.

Wash trades were fictitious, and non bona-fide for volume.  Pre-arranged trading was akin to self-trading.  There was an assumption that all trades were bona-fide.  GOODMAN was asked, if GEMINI was assisting market-makers for trades would he want to know.  GOODMAN acknowledged if such a case existed, yes, it would be helpful to know.  If such activity was occurring it would be unusual and would have made the team less comfortable with GEMINI.  At the time, the focus was on trades right before the auction.

(CWB, Tab 27, Self Certification Letter, page 3, bottom paragraph, the August 2017 statistics)  GOODMAN was asked if the statistics included wash trades would they want to know.  There was an expectation that the statistics represented bona fide trade volume.  GOODMAN was under the impression the trading volume was bone-fide and of "true economic" scale.

GOODMAN was less comfortable with the depth of the liquidity, and more comfortable with the conveyed concepts of fully-funded, trade limits, surveillance, and the 5% caps.

The interview ended.

SDNY_000000779

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER