# EXHIBIT 16

Page 1

1              UNITED STATES DISTRICT COURT

                SOUTHERN DISTRICT OF NEW YORK

2

   - - - - - - - - - - - - - - -x

3     COMMODITY FUTURES TRADING    :

      COMMISSION,                  :

4                                  :

         Plaintiff,                :

5                                  :  No. 22-cv-4563

         v.                        :

6                                  :

      GEMINI TRUST COMPANY, LLC,   :

7                                  :

         Defendant.                :

8  - - - - - - - - - - - - - - - - x

                              Wednesday, August 23, 2023

9                                      Washington, D.C.

10

11

12

13  Videotaped Deposition of:

14                    GREGORY KUSERK,

15  called for oral examination by counsel for the

16  Defendant, pursuant to notice, at the law offices of

17  Shearman & Sterling, LLP, 401 Ninth Street, Northwest,

18  Suite 800, Washington, D.C., before Christina S.

19  Hotsko, RPR, CRR, of Veritext Legal Solutions, a Notary

20  Public in and for the District of Columbia, beginning at

21  9:33 a.m., when were present on behalf of the respective

22  parties:



```
                                          Page 25
 1   BY MS. LEE:
 2        Q.  Sure.  Sure.
 3            In or around 2017, did you make any
 4   policy or policy decisions regarding
 5   self-certifications?
 6        A.  No, I didn't.
 7        Q.  Do you have any experience with
 8   self-certifications while working for anyone other
 9   than the CFTC?
10        A.  No.
11        Q.  While working at the CFTC, was it your
12   responsibility to oversee any markets or products?
13        A.  Repeat that again.
14        Q.  Sure.
15            While working at the CFTC, was it your
16   responsibility to oversee any markets or products?
17        A.  I would say yes.  Uh-huh.
18        Q.  What products or markets did you oversee
19   while working at the CFTC?
20        A.  Pretty much anything that any exchange
21   was -- had listed.
22        Q.  And what was your role -- what was your
```



```
                                          Page 62
 1   anybody telling me that.

 2   BY MS. LEE:

 3        Q.  Did you think that anything in this

 4   self-certification is false --

 5             MR. RODGERS:  So --

 6   BY MS. LEE:

 7        Q.  -- or misleading?

 8             MR. RODGERS:  -- objection to the

 9   question.  I'm going to instruct the witness not

10   to answer on deliberative process grounds.

11   BY MS. LEE:

12        Q.  Did anyone ever tell you this

13   self-certification omitted any material facts?

14             MR. RODGERS:  Same objection.

15             You can answer to the extent it will not

16   reveal confidential Commission communications.

17             THE WITNESS:  No.

18   BY MS. LEE:

19        Q.  Did you think that there's anything in

20   this self-certification that omitted material

21   information?

22             MR. RODGERS:  I'm going to instruct the
```



```
                                              Page 85
 1   is?
 2        A.   I'm not aware of it, no.
 3        Q.   In the course of your work at the CFTC
 4   over 32 years, have you ever given a definition of
 5   market manipulation or heard of a definition of
 6   market manipulation?
 7        A.   No, not that I'm aware of.  No.
 8        Q.   To your knowledge, what is CFTC's
 9   definition of whether a contract is readily
10   susceptible to manipulation?
11             MR. RODGERS:  So object to the form of
12   the question.
13             You can answer to the extent it won't
14   reveal internal privileged communications that are
15   protected by the deliberative process privilege.
16             THE WITNESS:  So let me ask you to repeat
17   your question.
18   BY MS. LEE:
19        Q.   Sure.  Sure.
20             So to your knowledge, what is the
21   definition of whether a -- what is the meaning
22   when someone says a contract is readily
```

Page 86

1  susceptible to manipulation?

2          MR. RODGERS:  So objection on

3  deliberative process grounds.  I don't think he

4  can answer that without revealing his personal

5  opinion, so I'd instruct him not to answer.

6          THE WITNESS:  All right.

7  BY MS. LEE:

8      Q.  Is susceptible to manipulation different

9  from readily susceptible to manipulation?

10          MR. RODGERS:  Same objection.  I'd

11  instruct him not to answer to the extent it would

12  reveal his personal opinion, which is protected by

13  the deliberative process privilege.

14  BY MS. LEE:

15      Q.  Who at the CFTC decides if a contract is

16  readily susceptible to manipulation?

17      A.  So I think it would begin with, you know,

18  with the staff, you know, doing some kind of an

19  analysis.  And, I mean, there could be many

20  different factors that might lead something to be

21  susceptible to manipulation.

22          But ultimately, I think if there was



Page 127

1        A.   I'm not aware of any, no.

2        Q.   Are there any documents from 2017 --

3    around 2017 that we can review to identify what

4    was discussed in this meeting on July 25th, 2017?

5        A.   I'm not aware of any.

6        Q.   Did you hear about any documents about

7    this meeting?

8             MR. RODGERS:  You can answer to the

9    extent it won't reveal internal Commission

10   communications.

11            THE WITNESS:  Yeah -- no, I'm not aware

12   of any.

13   BY MS. LEE:

14       Q.   Did you ever determine that anything on

15   this Cboe slide deck from the meeting on

16   July 25th, 2017 -- did you ever determine anything

17   in there is false or misleading?

18            MR. RODGERS:  So object to the form of

19   the question on relevancy grounds and deliberative

20   process, and I'm going to instruct the witness not

21   to answer.

22

                                                    Page 128

1   BY MS. LEE:

2        Q.  Did you ever determine, in reviewing this

3   slide deck or attending the meeting on July 25th,

4   2017 -- did you determine or did the CFTC

5   determine that anything -- anything material has

6   been omitted?

7             MR. RODGERS:  Objection.  Same basis.

8   Same instruction.

9   BY MS. LEE:

10       Q.  After attending this meeting on

11  July 25th, 2017, and attending the meeting where

12  this presentation slide deck was presented, did

13  you take any actions based on any statements

14  contained in this presentation or statement that

15  was made during the meeting on 20 -- July 25th,

16  2017?

17            MR. RODGERS:  So objection to the

18  question.

19            You can answer to the extent it won't

20  reveal internal Commission communications or

21  predecisional deliberations.

22            THE WITNESS:  Okay.  So can I ask you to



```
 1  what are rebates?
 2          MR. RODGERS:  So same objection.  Same
 3  instruction.  Because you're asking for his
 4  personal opinion, it impacts the deliberative
 5  process privilege.
 6          VIDEO TECHNICIAN:  Counsel, your arm is
 7  rubbing the mic.
 8  BY MS. LEE:
 9      Q.  It's not illegal to provide rebates,
10  right?
11          MR. RODGERS:  Object to the form of the
12  question.  Calls for a legal conclusion.
13  BY MS. LEE:
14      Q.  Was it -- while you were at the CFTC, was
15  it a standard practice for exchanges to offer
16  incentives to encourage participation?
17      A.  I believe there was but, again, that's
18  not an area that, you know, I would have focused
19  on at all.
20      Q.  So rebates or incentives in and of
21  themselves do not make an exchange susceptible to
22  manipulation, right?
```

Page 142

1          MR. RODGERS:  Objection.  Calls for a

2     legal conclusion.  And calls for his personal

3     opinion, which is protected by the deliberative

4     process privilege.  And I'm going to instruct the

5     witness not to answer.

6     BY MS. LEE:

7          Q.  So here on that bullet point that we were

8     just looking at, it states that market maker trade

9     fee rebates encouraged participation.

10          Did the CFTC ask who the market makers

11     are?

12          A.  Not to my knowledge.

13          Q.  Did the CFTC ask who were the market

14     makers who received the rebates from Gemini?

15          A.  That -- I don't have any knowledge of

16     that.

17          Q.  Do you remember any oral statements or

18     any discussion over rebates during the meeting on

19     July 25th, 2017?

20          A.  I don't recall.

21          Q.  Do you remember if anyone at the CFTC

22     asked about rebates or incentives during the



                                                    Page 182

1    addressed on question number 8 and answers to

2    question number 8, you said that you did not ask

3    any questions about market makers rebate program

4    to Gemini.

5              Why didn't you ask any questions?

6              MR. RODGERS:  So that's -- I'm going to

7    instruct the witness not to answer based on the

8    deliberative process privilege.

9    BY MS. LEE:

10       Q.  So after reviewing this Q&A document, did

11   you discuss this with anyone at the CFTC?

12             MR. RODGERS:  Objection.  I'm going to

13   instruct the witness not to answer on the basis of

14   deliberative process privilege.

15   BY MS. LEE:

16       Q.  After reviewing this Q&A document, did

17   you think any of the content was false or

18   misleading?

19             MR. RODGERS:  Same objection.  Same

20   instruction.

21   BY MS. LEE:

22       Q.  So we just looked at this August 25th,



```
 1              (Kuserk Deposition Exhibit 14 marked for
 2              identification and attached to the
 3              transcript.)
 4   BY MS. LEE:
 5       Q.  So this document I just marked as
 6   Exhibit 14, it bears Bates number starting from
 7   CFTC/Gemini/00013781 and ends at
 8   CFTC/Gemini/00013927.
 9              MR. RODGERS:  Sorry, can I get a copy?
10              MS. LEE:  Oh, sorry.
11              MR. RODGERS:  That's okay.  And this
12   is 14?
13              MS. LEE:  Yes.  14.
14   BY MS. LEE:
15       Q.  Okay.  So if you look at the first page
16   of this Exhibit Number 14, it's an e-mail.  It's
17   an e-mail initially sent from Nicole Gordon from
18   Cboe on September 12th, 2017, to Chris Goodman at
19   the CFTC.
20              Do you see that?
21       A.  Yes.
22       Q.  Okay.  And Mr. Goodman forwarded this
```

Page 185

```
 1  e-mail to a number of people at the CFTC,
 2  including yourself, Mr. Kuserk.
 3          Do you see your name?
 4      A.  Yes.
 5      Q.  And this e-mail has attachments.  Let's
 6  look at the first attachment.  It's titled,
 7  "Gemini Trust Company Policies and Procedures
 8  Manual."
 9      A.  Yes.
10      Q.  And let's go to page 46.
11          And in the middle of the page there's the
12  title "Agreements Granting Preferential Terms."
13          Do you see that?
14      A.  Yes.
15      Q.  And then, below that, it's the subtitle
16  "Policy."
17      A.  Right.
18      Q.  And that paragraph below that, below the
19  word "policy" states, "Our organization may
20  provide certain high-volume users, market makers,
21  or other special-case users with terms different
22  from those given under the standard user agreement
```

Page 186

1  and fee schedule."

2        A.   Yes.  I see --

3        Q.   Right?

4        A.   -- that.

5        Q.   So Gemini disclosed that it sometimes

6  provides certain users with more favorable terms,

7  right?

8             MR. RODGERS:  Sorry.  Disclosed to whom?

9  Otherwise, I object on the basis of vague and

10 ambiguous.  And also, you know, he's not here as a

11 CFTC witness.

12 BY MS. LEE:

13       Q.   When you first received this e-mail from

14 Mr. Goodman and reviewed this document, what was

15 your understanding of what the policy regarding

16 rebates meant?

17            MR. RODGERS:  Objection.  And I'm going

18 to instruct him not to answer on the basis of the

19 deliberative process privilege.

20 BY MS. LEE:

21       Q.   So based on this document, Gemini

22 disclosed that it sometimes provides some users



Page 190

1    whether you reviewed it or not.

2        A.   Correct.

3        Q.   Is that your testimony?

4        A.   Yes.

5        Q.   Mr. Kuserk, in your 32 years experience

6    working at the CFTC, based on your experience --

7    withdrawn.

8            Based on your experience working at the

9    CFTC over 30 years, what does pre-funding mean?

10            MR. RODGERS:  So I'm going to object and

11    instruct him not to answer on the basis of the

12    deliberative process privilege.

13    BY MS. LEE:

14        Q.   Do you know if there was an industry

15    standard about the meaning of "pre-funding" in or

16    around 2017?

17        A.   Not that I'm aware of.

18        Q.   Was the DMO the division in charge of the

19    issue of pre-funding in a product that's being

20    self-certified?

21        A.   I guess I'd ask you to define what

22    pre-funding is.



Page 192

1        A.   Right.

2        Q.   Do you see the line that starts

3    with "pre-funding"?

4        A.   Yes.

5        Q.   It states that "Pre-funding requirements

6    for auction-only orders allowed for heightened

7    surveillance," right?

8        A.   Okay.   Yes.

9        Q.   So when you were at the meeting on

10   July 25th and when you were looking at this deck,

11   what was your understanding of what that meant?

12           MR. RODGERS:   Object on the basis of

13   deliberative process privilege, and I'm going to

14   instruct the witness not to answer.

15   BY MS. LEE:

16       Q.   Did you -- at the meeting on July 25th,

17   2017, did you ask what this pre-funding

18   requirement for auction-only orders allows for

19   heightened surveillance means?

20       A.   I don't recall.

21       Q.   Do you recall anyone at the meeting

22   discussing that pre-funding requirement with



Page 194

1    with "as with."

2         A.   Yep.

3         Q.   The first bullet there states, "As with

4    all Gemini orders, auction orders must be fully

5    pre-funded.

6              Do you see that?

7         A.   Yes.

8         Q.   When you were at the meeting on

9    July 25th, 2017, what was your understanding of

10   what that meant?

11             MR. RODGERS:   I'm going to object on the

12   basis of the deliberative process privilege and

13   instruct the witness not to answer.

14   BY MS. LEE:

15        Q.   Do you recall during the meeting on

16   July 25th, 2017, if anyone discussed anything

17   about this bullet point, all auction orders must

18   be fully pre-funded on Gemini orders?

19        A.   Yeah, I don't recall if there was a

20   discussion or not about it.

21        Q.   Do you remember after the meeting anyone

22   discussing the issue of pre-funding?



```
                                              Page 197

 1       A.   Right.

 2       Q.   -- after Chris Goodman received an e-mail

 3   from Nicole Gordon from CFTC with attachments on

 4   September 12th, 2017, correct?

 5       A.   Correct.

 6       Q.   Okay.  So we are looking at one of the

 7   attachments to that e-mail that you received.

 8            So if you look at the second page of this

 9   document.  So it's page 2.

10       A.   Okay.

11       Q.   Bates number -- at the bottom, Bates

12   number ends with 13925.

13       A.   Yep.

14       Q.   At the very top, do you see the first

15   bullet?

16       A.   Cost of capital?

17       Q.   Yes.

18       A.   Yes.

19       Q.   Okay.  So cost of capital states, "All

20   orders must be pre-funded, dollars must be

21   deposited prior to placing a buy order and bitcoin

22   must be deposited before placing a sell order.
```

Page 198

```
1    And participants are not permitted to place an
2    order unless they have enough funds in their
3    account to place such an order."
4          Do you see that?
5      A.  Yes.
6      Q.  So Gemini's statement explicitly says
7    that Gemini -- what Gemini meant by pre-funding
8    here, right?
9      A.  Yes.  It appears correct.
10     Q.  Do you agree with Gemini's definition of
11   pre-funding?
12         MR. RODGERS:  Object to the question on
13   the basis of the deliberative process privilege.
14   I'm going to instruct the witness not to answer.
15   BY MS. LEE:
16     Q.  In this bullet point, cost of capital
17   regarding pre-funding, do you see anything in this
18   statement that says anything about sources of
19   funds?
20     A.  No.
21     Q.  Does this paragraph say anything about
22   the funds cannot be -- cannot be borrowed?
```



Page 212

1    BY MS. LEE:

2         Q.  -- during the self-certification; is that

3    right?

4         A.  That would be correct.  And as -- as I

5    look now, too, I think the whole pre-funding, as I

6    recall now, is that they were using -- I think the

7    idea was that what they were trying to argue is it

8    was you couldn't basically overleverage in the

9    Gemini market because you would have had to put up

10   the funds first, which would prevent some -- you

11   know, a trader who's, you know, basically put up

12   very little money but controls a lot of contracts.

13           So as I recall, I think that's what the

14   pre-funding argument was that they were making.

15   But we wouldn't have had any direct jurisdiction

16   over GM -- or Gemini in terms of any kind of

17   pre-funding rules that -- you know, that would

18   apply from our regs.

19        Q.  Okay.  So you just testified that it

20   wasn't within your direct jurisdiction over

21   Gemini --

22        A.  Right, because --



1   on whatever the issue was.  But it's just a more

2   formal level.  That happens very infrequently.

3        Q.  During your -- while you were at the CFTC

4   for over 30 years, how many times have you seen a

5   self-certification having issues that are

6   elevate -- that's elevated to the Office of

7   General Counsel?

8             MR. RODGERS:  Asked and answered.

9             THE WITNESS:  I think I can recall once,

10  maybe twice.

11            MS. LEE:  Can we take a break?

12            THE WITNESS:  All right.

13            VIDEO TECHNICIAN:  The time is 3:23 p.m.

14  This ends unit 4.  We're off the record.

15            (A recess was taken.)

16            VIDEO TECHNICIAN:  The time is 3:45 p.m.

17  This begins unit number 5.  We're on the record.

18  BY MS. LEE:

19       Q.  Mr. Kuserk, you testified earlier that

20  you don't know what pre-funding means, right?

21       A.  I think, as I've gone through this, I do

22  have now a better understanding of what we're

Page 219

1    talking about.  Yes.

2        Q.  What is your understanding of what

3    pre-funding means?

4            MR. RODGERS:  So object to the form of

5    the question based on the deliberative process

6    privilege.  I'm going to instruct the witness not

7    to answer.

8    BY MS. LEE:

9        Q.  Was the 2017 Cboe self-certification the

10   first time that you've heard of the term

11   "pre-funding"?

12           MR. RODGERS:  Asked and answered.

13           THE WITNESS:  I believe so.  Yes.

14   BY MS. LEE:

15       Q.  Did you or the CFTC ever evaluate whether

16   Gemini's pre-funding requirement affects a futures

17   product being readily susceptible to manipulation?

18           MR. RODGERS:  So I'm going to object on

19   the basis of the deliberative process privilege

20   and instruct the witness not to answer.

21   BY MS. LEE:

22       Q.  I'm going to go back to Exhibit 14.  And



1      Q.   Okay.  So based on this document that we

2    just reviewed, Exhibit 15, Gemini made three

3    changes to its auction to address CFTC's concerns,

4    right?

5      A.   That's correct.

6           MR. RODGERS:  Object.  Misstates the

7    evidence.

8    BY MS. LEE:

9      Q.   These three changes that Gemini made to

10   the auction, how important were these changes to

11   the final decision on Cboe's self-certification?

12          MR. RODGERS:  I'm going to instruct the

13   witness not to answer based on the deliberative

14   process privilege.

15          MS. LEE:  Counsel, we're not asking for

16   predecisional information.  We're just asking for

17   final decision.

18          MR. RODGERS:  My objection stands.

19          MS. LEE:  Are you instructing the witness

20   to not answer the question?

21          MR. RODGERS:  That's the objection and

22   the instruction.



Page 262

```
 1   in -- representing other clients that I would have
 2   been in meetings, you know, with him.
 3       Q.   Were you in meetings with him -- were you
 4   in meetings with Mr. Raisler in regards to Cboe
 5   self-certification?
 6       A.   On this particular contract?
 7       Q.   Yes.  In 2017, Cboe self-certification.
 8       A.   I don't recall having a lot of
 9   discussions with him on this issue, on this
10   particular contract.
11       Q.   How relevant was pre-funding to the
12   CFTC's decision on self-certification?
13           MR. RODGERS:  I'm going to object on the
14   basis of the deliberative process privilege and
15   instruct the witness not to answer.
16   BY MS. LEE:
17       Q.   How would you define pre-funding in the
18   context of Cboe's self-certification?
19           MR. RODGERS:  Same objection.  Asked and
20   answered.  And an instruction not to answer.
21   BY MS. LEE:
22       Q.   I believe you testified earlier that
```



Page 271

```
1    to the redacted material was logged.  And beyond

2    that, the witness is not able to testify about the

3    substance of the redacted material.

4    BY MS. LEE:

5         Q.  Other than e-mails, are there other

6    documents that contain you and your colleagues'

7    analysis of whether a product is susceptible to

8    manipulation?

9         A.  Not that I'm aware of.

10        Q.  Can you think of anything that would

11   contain your and your colleagues at the CFTC's

12   analysis of whether a product was susceptible to

13   manipulation?

14        A.  No.  I can't think of anything.

15        Q.  When you and your colleagues were

16   assessing the question of whether Gemini auction

17   was readily susceptible to manipulation, were you

18   applying the existing policies and procedures of

19   the CFTC?

20            MR. RODGERS:  Objection to the extent it

21   calls for internal policies and -- internal

22   Commission communications and analysis.  I'm going
```

Page 272

1    to instruct the witness not to answer.

2    BY MS. LEE:

3        Q.  In assessing whether Gemini auction was

4    readily susceptible to manipulation, you were not

5    making up entirely new governmental policies to

6    assess the product, right?

7            MR. RODGERS:  Objection.  Same

8    instruction.

9    BY MS. LEE:

10       Q.  Any decisions that were made in regards

11   to the Bitcoin Futures contract, those decisions

12   were related to that single product, right?

13           MR. RODGERS:  I'm sorry, stand by.

14           I'm going to object.  I'm confused by the

15   question and, frankly, for the -- I'm going to

16   instruct the witness not to answer to the extent

17   you're asking about non- -- you know, preliminary

18   deliberations and decisions.

19   BY MS. LEE:

20       Q.  So when you were -- when you and your

21   colleagues at the CFTC was assessing the Bitcoin's

22   [sic] Futures contract, you were not creating new

Page 273

1   policies to apply to the product, correct?

2          MR. RODGERS:  Asked and answered.  Same

3   instruction.  Same objection.

4   BY MS. LEE:

5       Q.  Did you ever reach a conclusion as to

6   whether the Bitcoin Futures contract or Gemini

7   auction were readily susceptible to manipulation?

8          MR. RODGERS:  So this has been asked

9   several times, so I'm going to interpose the same

10  objection and instruct the witness not to answer.

11         MS. LEE:  Can we take a short break?

12         MR. RODGERS:  I'm ready to go.  So if you

13  guys are done, I can get jump into it.

14         MR. SCHWARTZ:  We want to  make sure

15  we're done.  Three minutes.

16         MR. RODGERS:  Okay.

17         VIDEO TECHNICIAN:  The time is 5:13 p.m.

18  We're off the record.

19          (A recess was taken.)

20         VIDEO TECHNICIAN:  The time is 5:19 p.m.

21  This begins unit number 7.  We're on the record.

22         MS. LEE:  I don't have any more



Page 277

```
 1   self-trading in the Gemini auctions?
 2              MS. LEE:  Objection to form.
 3   BY MR. RODGERS:
 4        Q.  You can answer.
 5        A.  No.
 6        Q.  During the relevant time period, did
 7   Gemini disclose to yourself or Commission staff
 8   that Gemini provided advances of both fiat
 9   currency and digital assets that were outstanding
10   for over a week?
11        A.  No.
12              MS. LEE:  Objection to form.
13   BY MR. RODGERS:
14        Q.  Again, talking about the relevant time
15   period --
16        A.  Uh-huh.
17        Q.  -- did Gemini disclose to yourself or
18   Commission staff that, historically, there had
19   been multiple incidences of self-trading on
20   Gemini?
21              MS. LEE:  Objection to form.
22              THE WITNESS:  Can you clarify what you
```