NCB4COMO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   COMMODITY FUTURES TRADING
     COMMISSION,
 4
                  Plaintiff,
 5
              v.                          22 Civ. 4563 (AKH)
 6
     GEMINI TRUST COMPANY, LLC,
 7
                                          Oral Argument
 8                Defendant.

 9   ------------------------------x
                                          New York, N.Y.
10                                        January 11, 2023
                                          2:20 p.m.
11
     Before:
12
                     HON. ALVIN K. HELLERSTEIN,
13
                                          ] Judge
14
                           APPEARANCES
15
     COMMODITY FUTURES TRADING COMMISSION
16   BY:  ANDREW J. RODGERS
          K. BRENT TOMER
17        ALEJANDRA de URIOSTE
          KATHERINE RASOR
18        DIANA WANG
          DAVID OAKLAND
19
     JFB LEGAL PLLC
20        Attorneys for Defendant
     BY:  JOHN F. BAUGHMAN
21        DANIEL A. SCHWARTZ
          ELIZABETH LEE
22

23   SHEARMAN & STERLING, LLP
          Attorneys for Defendant
24   BY:  CHRISTOPHER LaVIGNE
          RANDALL MARTIN
25
```

NCB4COMO

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. RODGERS:  Good afternoon, your Honor.  Andrew |
| 3 | Rodgers for the Commodities Futures Trading Commission, and I'm |
| 4 | joined by my colleagues Brent Tomer, Alejandra de Urioste, |
| 5 | David Oakland, Katherine Rasor and Diana Wang. |
| 6 | THE COURT:  Good afternoon all.  You can keep your |
| 7 | mask off.  You'll be talking quite a while. |
| 8 | MR. BAUGHMAN:  Good afternoon, your Honor Jack |
| 9 | Baughman on behalf of Gemini.  With me is my colleague Daniel |
| 10 | Schwartz and Chris LaVigne. |
| 11 | THE COURT:  Good afternoon. |
| 12 | We'll take up the motion to compel, first and that is |
| 13 | being by Mr. Baughman, right? |
| 14 | MR. BAUGHMAN:  My colleague, Mr. Schwartz is going to |
| 15 | argue that. |
| 16 | THE COURT:  Take the podium, please.  You don't need a |
| 17 | mask. |
| 18 | MR. SCHAWRTZ:  Good afternoon, your Honor. |
| 19 | THE COURT:  Good afternoon. |
| 20 | MR. SCHAWRTZ:  Your Honor, Gemini respectfully moves |
| 21 | that the Court compel witnesses for plaintiff, CFTC to answer |
| 22 | questions that were posed to them during their deposition. |
| 23 | The reason the CFTC is put forward as -- |
| 24 | THE COURT:  Do you have the questions? |
| 25 | MR. SCHAWRTZ:  Do I have the questions, there were a |

NCB4COMO

| | |
|---|---|
| 1 | number of them your Honor, well over 100.  They were submitted |
| 2 | in support of the papers. |
| 3 | THE COURT:  Is it part of your brief? |
| 4 | MR. SCHAWRTZ:  What's that, your Honor. |
| 5 | THE COURT:  Is it in your brief? |
| 6 | MR. SCHAWRTZ:  Yes. |
| 7 | THE COURT:  OK.  Just tell me what the questions are. |
| 8 | What document should I look at? |
| 9 | MR. SCHAWRTZ:  Sure.  In our brief, your Honor, at |
| 10 | page 6 there are a number of questions identified beginning |
| 11 | with the bullet list at the bottom.  These are summaries of the |
| 12 | questions, but they demonstrate the type of questions that we |
| 13 | were seeking testimony on. |
| 14 | For example, at the bottom of page 6 of our brief, we |
| 15 | ask if statements made in a July 25, 2017, presentation that |
| 16 | was a subject of a number of allegations in the complaint, they |
| 17 | were made at a meeting of the same date were false or |
| 18 | misleading.  Again, these are the allegations -- |
| 19 | THE COURT:  How are you going to get statements made |
| 20 | at a meeting?  That's the deliberative process we are talking |
| 21 | about. |
| 22 | MR. SCHAWRTZ:  Your Honor, these are statements made |
| 23 | purportedly by Gemini or at a meeting between Gemini and the |
| 24 | CFTC.  So these are the statements that were purportedly made |
| 25 | that form of the basis of the CFTC's complaint. |

NCB4COMO

```
 1              THE COURT:  And what's the question you were asking

 2    about?

 3              MR. SCHAWRTZ:  For example, there was a PowerPoint

 4    presentation that was submitted by the CBOE Futures Exchange to

 5    the CFTC in advance of the meeting.  We asked can you identify

 6    any false or misleading statements in this presentation.  That

 7    is one of the core allegations in the complaint, your Honor.

 8    And the CFTC instructed --

 9              THE COURT:  This instruction is not in the complaint.

10    That's not evidence.

11              MR. SCHAWRTZ:  That is at the core of the plaintiff's

12    allegations that --

13              THE COURT:  It's not evidence.  Unless it's an

14    admission.  If there is any admission you made, that can be

15    asked.

16              MR. SCHAWRTZ:  The CFTC's allegation is not that it

17    was an admission, your Honor.  It was that there was a false or

18    misleading statement, a statement in the document itself was

19    false or misleading.

20              THE COURT:  Which document?

21              MR. SCHAWRTZ:  In a July 25, 2017, presentation that

22    was submitted to the CFTC on that day or the day before.

23              THE COURT:  What's the answer, Mr. Rodgers?

24              MR. RODGERS:  Well, the answer is -- the questions

25    about objective facts, the witnesses answered.  The questions
```

NCB4COMO

1    that asked them for their subjective understanding of the

2    statements that were made, whether those statements were false,

3    those went to the core of the deliberative process privilege

4    and the witnesses in those circumstances were instructed not to

5    answer.

6           THE COURT:  Are these 30(b)(6) witnesses?

7           MR. RODGERS:  No, your Honor.  They were witnesses

8    that were percipient witnesses that were authorized to testify

9    on behalf -- by the commission, and they are two witnesses and

10   the only two witnesses --

11          THE COURT:  They were authorized by the commission to

12   testify.

13          MR. RODGERS:  Right.  Pursuant to the 2E regulations,

14   they were authorized to testify about the business of the

15   commission, non-privileged information about the business of

16   the commission that they obtained while they were CFTC

17   employees.

18          THE COURT:  But they don't bind the commission.  So if

19   these were 30(b)(6) witnesses, you would not be objecting?

20          MR. RODGERS:  If they were a 30(b)(6) witness, we

21   would also object on the basis of the deliberative process

22   privilege because the questions are aimed at the internal

23   deliberations and --

24          THE COURT:  Mr. Baughman is entitled to know what

25   statements made by his client were considered

NCB4COMO

```
1   misrepresentations.  Any way you want to do that, you can do

2   that.  He is not entitled to know how that process was formed,

3   how that decision was formed, but he is entitled to know what

4   was a misrepresentation.

5            MR. RODGERS:  Your Honor, we laid out the statements

6   that were false or misleading, and the reasons why those

7   statements are false or misleading in the complaint.  The

8   statements that they made --

9            THE COURT:  The complaint is not an evidentiary

10  document.

11           MR. RODGERS:  Understand, your Honor.  Understand what

12  statements were made.  We've laid out in detail in the

13  complaint.  They were also the ones that made the statements.

14  They put together the --

15           THE COURT:  It doesn't make any difference.  It's

16  what's on the record.  They are entitled to know, and you can

17  answer this any way you want.  They are entitled to know what

18  statements they made were misrepresentations and why.

19           MR. RODGERS:  Correct, your Honor.

20           THE COURT:  That's what going to be offered in proof

21  to me.

22           MR. RODGERS:  I'm sorry, your Honor, I missed that

23  last part.

24           THE COURT:  Because that's what's going to be offered

25  in proof to me.
```

NCB4COMO

1    MR. RODGERS:  Correct.

2    THE COURT:  So they are entitled to know that.

3    MR. RODGERS:  Right, and we are providing that

4    information during the course of discovery.

5    THE COURT:  How?

6    MR. RODGERS:  There are witnesses that have testified

7    about the statements that were relayed.  There are witness that

8    testified about what information could or should have been

9    disclosed during discovery.

10    THE COURT:  Mr. Schwartz, I can't tell what's been

11    properly asked and what's not unless I know the questions.

12    MR. SCHWARTZ:  So I have an example of one the

13    questions, your Honor.  This is Exhibit 15 to our motion,

14    page 185, row 7 through 11.  One of the questions was, did you

15    ever determine that any statement made in the July 25th

16    presentation, marked as Exhibit 20, or any statement made

17    during the July 25th meeting was false or misleading?

18    THE COURT:  You change "you" to "CFTC" and you could

19    get the question answered.  What an individual may have thought

20    is not relevant.  That is part of deliberative process.  What

21    the CFTC determined is relevant.

22    MR. SCHWARTZ:  This is the CFTC witness who is going

23    to show up at trial, your Honor.

24    THE COURT:  It doesn't make any difference.  He can't

25    testify his personal belief.

NCB4COMO

1          MR. SCHWARTZ:  Your Honor, respectfully, I just don't

2     think --

3          THE COURT:  Let me take that back.

4          How are you going to prove, Mr. Rodgers, how are you

5     going to prove misrepresentation and the falsity of a

6     misrepresentation?

7          MR. RODGERS:  Well, the misrepresentations were made

8     in writing and orally.  So those statements will be verified by

9     witness and the documents that were relayed.  The falsity of

10    those statements --

11         THE COURT:  Wait a minute.  Is the witness being

12    questioned able to answer that question?

13         MR. RODGERS:  Is a witness going to be able to answer

14    whether a statement that was relayed is false, subjectively, a

15    CFTC witness is not going to be able to make that statement

16    because it goes to the deliberative process privilege.

17         THE COURT:  The CFTC can't as a corporate body.

18         MR. RODGERS:  They certainly could take that position

19    and is the position of the CFTC.  I think one of the issues

20    with trying to elicit this information in the form of 30(b)(6)

21    testimony is --

22         THE COURT:  What's this witness going to say?

23         MR. RODGERS:  The witness would say that the

24    statements that were relayed were half-truths that omitted

25    information that did not provide a complete picture.

NCB4COMO

1        THE COURT:  In his opinion.

2        MR. RODGERS:  That opinion testimony?  A falsity,

3   would be a question for the -- I think for your Honor to

4   determine based on the statements that were relayed and the

5   information that was omitted.

6        THE COURT:  How are you going to prove that?

7        MR. RODGERS:  We'll have the statements that were

8   made, that were made in meetings, that were made in writing.

9   And you have the information that was not relayed in connection

10  with the statements that were relayed.

11       THE COURT:  So that doesn't need a witness.

12       MR. RODGERS:  For the information that was omitted,

13  correct.

14       THE COURT:  You don't need a witness at all for this.

15       MR. RODGERS:  Correct.

16       THE COURT:  You need an interrogatory answer, that's

17  what you need.

18       MR. RODGERS:  That's sort of the point I was leading

19  to, your Honor.  Because I think that is the least burdensome

20  way to get to this issue.  They have served an interrogatory

21  asking us to identify the false statements, and we would posit

22  that the best place to answer that is at the end of the

23  discovery pursuant to local rule 33.3

24       THE COURT:  No, you can do that now.

25       MR. RODGERS:  That's fine with us, your Honor.

NCB4COMO

| | |
|---|---|
| 1 | THE COURT:  Let me tell you what the rule is.  The |
| 2 | rule is you are entitled to know what the CFTC's position is, |
| 3 | not what any individual's position is, but what the CFTC's |
| 4 | position is.  And the best way of getting that is through an |
| 5 | interrogatory, two simple interrogatories.  What were the false |
| 6 | statements, and why? |
| 7 | MR. SCHWARTZ:  We could certainly propound that, your |
| 8 | Honor. |
| 9 | I do want to push back slightly on something that |
| 10 | counsel said -- |
| 11 | THE COURT:  I'm not going to allow an individual to |
| 12 | come up and say -- unless he's is an expert -- why something is |
| 13 | false or not false. |
| 14 | MR. SCHWARTZ:  Understood, your Honor.  There is one |
| 15 | point around the omissions.  Counsel's statements about how |
| 16 | they are going to prove omissions, and I think this is |
| 17 | illustrative of the core issue that we're facing right now. |
| 18 | THE COURT:  It's a very easy answer. |
| 19 | MR. SCHWARTZ:  I'm sorry, your Honor? |
| 20 | THE COURT:  A misrepresentation is an omission.  What |
| 21 | should have been said to make the representation not |
| 22 | misleading?  That's all that has to be asked. |
| 23 | MR. SCHWARTZ:  Understood, your Honor. |
| 24 | There is a factual dispute as to whether certain |
| 25 | information was disclosed.  And we prepared a demonstrative. |

NCB4COMO

1    It summarizes some of the testimony.  It has some of questions,

2    I could pass it up.

3              THE COURT:  You could show it.

4              MR. SCHAWRTZ:  Your Honor, on the left are questions

5    that the CFTC asked one of its witnesses, Mr. Goodman, during

6    his deposition.  So this is testimony the CFTC affirmatively

7    sought.  And on the right, these are questions that the

8    witnesses were instructed not to answer on the basis of the

9    deliberative process privilege.

10             THE COURT:  I'm not going to get involved in what the

11   CFTC has.  What you want to ask is not permissible.

12             MR. SCHAWRTZ:  Your Honor, it goes directly to the

13   basis of the --

14             THE COURT:  Let me tell you why.  I know what it goes

15   to.  Can you testify when the data provided to the CFTC

16   discloses the fact that there had been historic instances in

17   which the same account was on both the buy and sell side of the

18   auction.  Well, if it's been disclosed, it's in writing.  And

19   if it's in writing, what you want is the writing, and that is

20   asked by an interrogatory.  When what a witness says about what

21   he thinks the CFTC will do is not relevant, and it's part of

22   the deliberative process.

23             MR. SCHAWRTZ:  But, your Honor, if they are going to

24   put on testimony to the effect that information was not

25   disclosed, we need to be able to ask for the basis and

NCB4COMO

1    understand the foundation of that testimony.

2         THE COURT:  It's in writing, isn't it?  Everything

3    that was disclosed was in writing.

4         MR. SCHAWRTZ:  Your Honor, and in the context here --

5         THE COURT:  So you ask for the writing.  And then it

6    becomes a question of law, which I have to decide.  Not even an

7    expert witness will tell me the answer to that.  I have no

8    decide that.  So what I'm getting at is that I have discretion

9    with regard to the mode of discovery that's to be used.  In

10   this instance, and in other instance we are talking about it's

11   by interrogatory, not by deposition.  And these two questions

12   illustrate it.

13        What's your next point?

14        MR. SCHAWRTZ:  Your Honor, just revisiting --

15        THE COURT:  Don't revisit.  What's your next point?

16        MR. SCHAWRTZ:  Your Honor, on the deliberative process

17   privilege and the application of the deliberative process

18   privilege, quite simply we disagree with the CFTC's position.

19   We think that it does not apply here, and there and is a

20   conflation happening between the making of policy, which has

21   broad effect and the application of a policy, which has a

22   discreet effect to --

23        THE COURT:  You are entitled to the application of the

24   policy, but not by deposing individuals.  It's what individual

25   say, or what they think the CFTC will do or has done, is their

NCB4COMO

1   subjective attitudes and part of the process.

2          MR. SCHAWRTZ:  Your Honor --

3          THE COURT:  You ask by interrogatory what the CFTC

4   does, and they'll have to answer.

5          MR. SCHAWRTZ:  Understood.  I just want to be clear

6   and make sure I understand your Honor's rulings.

7          THE COURT:  You have the ruling.

8          MR. SCHAWRTZ:  Does that mean the CFTC is also

9   precluded from asking their own witnesses?

10          THE COURT:  Yes, I think so.

11          MR. SCHAWRTZ:  Understood, your Honor.

12          THE COURT:  Right, Mr. Rodgers?

13          MR. RODGERS:  We have no intention of eliciting

14   subjective testimony from CFTC witnesses.

15          THE COURT:  OK.  Mr. Schwartz, I'm going to run a fair

16   trial.  I don't want you to come into the trial not knowing

17   what the CFTC does or did or what position it has.  You are

18   going to have that information.  But it's not by asking

19   questions of particular witnesses.

20          MR. SCHAWRTZ:  Understood, your Honor.

21          THE COURT:  I don't think you understand.

22          MR. SCHAWRTZ:  I do understand.  If I might,

23   understanding that the information should come from the CFTC

24   itself, I would just request again that we be permitted to take

25   a 30(b)(6) deposition rather than an interrogatory --

NCB4COMO

| | |
|---|---|
| 1 | THE COURT:  Do it by interrogatories.  If you don't |
| 2 | get a candid answer in the interrogatories, I will allow you to |
| 3 | take depositions but this should be done by interrogatory. |
| 4 | MR. SCHAWRTZ:  How many -- |
| 5 | THE COURT:  Studied answer as to which the CFTC is |
| 6 | clearly bound, CFTC is clearly bound then you know where you |
| 7 | stand, otherwise you don't. |
| 8 | MR. SCHAWRTZ:  How many interrogatories may we -- |
| 9 | THE COURT:  I don't care, 1500 if you want. |
| 10 | MR. SCHAWRTZ:  Understood. |
| 11 | THE COURT:  But don't use 1500.  Use what you need. |
| 12 | MR. SCHAWRTZ:  Understood, your Honor. |
| 13 | THE COURT:  It's a very simple thing.  What are their |
| 14 | misstatements?  Why?  If it's because of a nondisclosure, what |
| 15 | disclosure should have been made to make the representations |
| 16 | accurate.  Three questions, and you got the whole thing. |
| 17 | MR. SCHAWRTZ:  I think we may need to ask specific |
| 18 | questions with respect to the some of the misstatements, but I |
| 19 | understand, your Honor. |
| 20 | THE COURT:  I doubt it.  If you take issue with |
| 21 | specific statements, you'll take issue it with it. |
| 22 | MR. SCHAWRTZ:  Understood, your Honor. |
| 23 | Your Honor, I think that likely addresses most of |
| 24 | what's at issue in this motion. |
| 25 | THE COURT:  Yes. |

NCB4COMO

1          Mr. Baughman, you got to let it go.  If you let your

2     colleague or partner take the stand, have faith.

3          All right.  What's next, anything on the medication to

4     compel?

5          MR. RODGERS:  Nothing from us, your Honor.

6          THE COURT:  What's your motion, Mr. Rodgers?

7          MR. RODGERS:  So our motion is to bar 30(b)(6)

8     testimony of CFTC representative.

9          THE COURT:  We are going to go by interrogatories so

10    it's moot.

11         MR. LAVIGNE:  Your Honor, may I be heard on that?

12         THE COURT:  Who wants to be heard?

13         MR. LAVIGNE:  I would like to be heard on whether they

14    have to be he by interrogatory.

15         I'm going to do my best to argue something different,

16    your Honor.  We need a 30(b)(6) deposition because what we are

17    trying to gather is the CFTC's collective knowledge.  And we

18    laid out 39 different topics, and I just have concern that an

19    interrogatory is not going to give us the form or the answer of

20    what we want.

21         And if I could just be very specific with the Court, a

22    key issue in this case is what was disclosed.  And it is

23    undisputed that some of the information the CFTC says we

24    withheld, we actually disclosed it.  It was disclosed in

25    various forms.  The CFTC has taken the position in depositions

NCB4COMO

```
1    that that was a deficient disclosure.  What we want to gather

2    from a 30(b)(6) deposition are key questions:  What did the

3    CFTC know, and what did they know it?  So for example on an

4    issue of bespoke fees, the CFTC has alleged our client lied by

5    omitting that information.  The reality is the existence of

6    those fees were disclosed.  We want a 30(b)(6) so we can have

7    somebody at the CFTC do the investigation they would need to do

8    and answer fundamental questions like, who reviewed this

9    document?  What was done with it?  Why were no follow up

10   questions asked?  That goes to materiality and goes to the

11   extent of their knowledge.  And the same thing goes with the

12   self-trading.

13            THE COURT:  I think you could ask the first two.  What

14   about them Mr. Rodgers?

15            MR. RODGERS:  No, your Honor.  That goes to the heart

16   of the deliberative process privilege.

17            I would want to point out, if we look at 39 topics --

18            THE COURT:  You are saying that his client gave you a

19   disclosure, and he wants to know when you received it.  Surely

20   he is entitled to that information.

21            MR. RODGERS:  Your Honor, that information was relayed

22   in an email that attached several attachments, one of which is

23   included a policy and procedures, and buried in 140 pages of a

24   policy and procedure was this reference to priority users.

25            But I would have to point out here that both CFTC
```

NCB4COMO

1    witnesses testified about that email and testified that the

2    email was received.  Both witnesses testified that they never

3    reviewed that part of the policy and procedures because the

4    cover email did not direct them to that piece of information.

5    So that testimony is there for Gemini.  And so I think giving a

6    30(b)(6) witness to say the same thing seems a little

7    duplicative.

8          MR. LAVIGNE:  Your Honor, may I respond to that?  This

9    goes to the fundamental dispute I have with the CFTC.  The CFTC

10    listed 18 witnesses on their interrogatory responses, 18 people

11    who had involvement in this self-certification.  We issued a

12    30(b)(6) because it's impossible for us to depose all 18.  Your

13    Honor said at the --

14          THE COURT:  Hold on a minute.

15          MR. RODGERS:  Your Honor, that's also not true.

16    That's not true.  We submitted a witness list with two

17    witnesses.

18          MR. LAVIGNE:  You had 18 --

19          MR. RODGERS:  Please, let me finish.

20          THE COURT:  Gentlemen, don't do that.  It's not a

21    deposition.

22          Did you list 18 witnesses?

23          MR. RODGERS:  No, your Honor.

24          THE COURT:  Not for the 30(b)(6).  You said you listed

25    18 trial witnesses.

NCB4COMO

1    MR. RODGERS:  No, your Honor, we listed ten trial

2    witnesses, as your Honor instructed us to do.  And two of those

3    witnesses, Mr. Goodman and Mr. Cuser [ph.] were deposed.  They

4    were the only two witnesses that we've identified to date that

5    we intend to call at trial.

6    THE COURT:  So you could forget about the other eight.

7    MR. RODGERS:  The other 18, at this point we have no

8    intention of calling them at trial.  We didn't disclose them on

9    our preliminary witness list, as you instructed us to.

10    THE COURT:  So now you are telling me that you are

11    only going to call two witnesses?

12    MR. RODGERS:  Only two witness from the CFTC, your

13    Honor.  There are other witnesses that we intend to call.  And

14    your Honor, we submitted that witness list in connection with

15    our motion, which I believe I can find the exhibit number and

16    direct your attention to it, if you would like.

17    MR. LAVIGNE:  Your Honor, may I respond?

18    THE COURT:  Yes.

19    MR. LAVIGNE:  I'm entitled to know, of these 18 people

20    who work at the CFTC, who reviewed that document on bespoke

21    fees --

22    THE COURT:  No, you're not.

23    MR. LAVIGNE:  Your Honor, that's exculpatory

24    information.

25    THE COURT:  No, it's not.

NCB4COMO

1          MR. LAVIGNE:  Can I be heard on that?

2          THE COURT:  When you are entitled to that is that you

3     gave the information.  What they did with the information is

4     their business.  But you gave the information, and that's the

5     exculpatory factor.

6          MR. LAVIGNE:  Your Honor the exculpatory value, we

7     cited the *Universal Health* case in our brief.  It's a Supreme

8     Court case.  It's a False Claims Act case.  It's the exact same

9     objective standard.  What the Supreme Court said in that case

10    is if the federal government knows there is false information

11    in claims and pays it, that is strong evidences that those

12    statements were not material.

13          Here, it's the exact same issue.  The CFTC was put on

14    notice that Gemini had these bespoke fee agreements.  Somebody

15    looked at it.  Somebody made the decision not to ask follow-up

16    questions, that's evidence of materiality.  We want to find out

17    who looked at it.  We want to find out the extent of the

18    knowledge.  That's why we need a 30(b)(6).  I don't care that

19    they have two witness who they're going to call at trial.  I

20    want to find out what does this institution know.  What did it

21    know?  What why did it decide not to ask follow-up questions,

22    that goes to materiality.  That's something we are entitled to

23    probe, and I submit it's exculpatory.

24          THE COURT:  What standard of materiality as to what?

25    Isn't it what the market would perceive and what not what the

NCB4COMO

1      CFTC would do?

2              MR. LAVIGNE:  The standard, your Honor, is it capable

3      of influencing a specific agency to which the false statement

4      was directed.  So it's an objective standard, but it's viewed

5      from the perspective of the CFTC.

6              THE COURT:  Because it's the CFTC who decides whether

7      you are a proper exchange or not?

8              MR. LAVIGNE:  I'm sorry, your Honor?

9              THE COURT:  It's the CFTC that decides whether you

10     could be certified as an exchange, is that what it is?

11             MR. LAVIGNE:  I understand.  Our position is no.

12     There is a mechanism where somebody could ask approval to be

13     certified as a product.  Here, the Chicago Board of Options

14     Exchange self-certified.  They basically filed their own

15     letter, which permitted the product to start trading.  So there

16     was no formal approval done by the CFTC.

17             THE COURT:  So what is the allegation, that

18     misrepresentations were made to the CBOE?

19             MR. LAVIGNE:  No, it's more complicated than that,

20     Judge.  I've been wrapping my head around it.  The contention

21     is CBOE made statements to the CFTC.  In connection with making

22     those statements, CBOE partnered with Gemini, and that some of

23     the information Gemini provided, either directly or indirectly,

24     omitted information.  They haven't charged CBOE, instead they

25     charged my client.

NCB4COMO

```
 1              We have a number of issues with that theory because,
 2     you know, the main entity that was responsible for making these
 3     statements was CBOE, not Gemini.  And again --
 4              THE COURT:  Let's assume that the individual you
 5     wanted to depose did not appreciate materiality and didn't do
 6     his job.  Your defense is what you gave.  It's not what was
 7     done with what you gave, it's what you gave.
 8              MR. LAVIGNE:  No, it's what I gave, but it's why they
 9     didn't ask follow-up questions.  That's the Universal Health
10     case.  They had this information, Judge, they had it.  This is
11     regulatory flyspecking.  And I'm sorry, but I am frustrated at
12     this case.  In 2017 the CFTC had information --
13              THE COURT:  Did you discuss the case in your memo?
14     Did you discuss the case in your memo?
15              MR. LAVIGNE:  I did, yes.  It's on page 19 of our
16     memo, Judge.
17              THE COURT:  Do you have a motion to compel?
18              MR. LAVIGNE:  This is in our motion in opposition for
19     their motion for protective order.  It's 60 on the docket.
20              THE COURT:  I got it, page 19.
21              MR. LAVIGNE:  Page 19.
22              THE COURT:  Your argument here, Mr. Rodgers, is that
23     the CFTC's subjective understanding, which means what
24     individuals thought, is relevant even if not automatically
25     dispositive and construe materiality.  They cite Universal
```

NCB4COMO

```
1    Health for that.
2              MR. RODGERS:  Right, your Honor.
3              THE COURT:  Do you want to speak to that?
4              MR. RODGERS:  Yes, your Honor.
5         This statement could not be more in opposite to what
6    the case law that addresses false statements to government
7    actors say.  And that says that subjective evidence is totally
8    irrelevant.  This case has been misconstrued.  It is a False
9    Claims Act case, and the materiality standard in this case is
10   set forth by statute.  The Supreme Court --
11             THE COURT:  Say it.
12             MR. RODGERS:  I don't have the language directly in
13   front of me from Universal Health, but it's different and the
14   reference Kungys here, the Supreme Court case was a general
15   discussion of materiality standards.  It wasn't a statement
16   about what the materiality means in a false statement case
17   involving a government actor.
18             MR. LAVIGNE:  Your Honor, may I respond to that?
19             THE COURT:  I want to pull up the case.
20             MR. LAVIGNE:  If you go to page 192 to 193, just in
21   response to what Mr. Rodgers said.  It says, Section 3729(b)(4)
22   defines materiality using language that we have employed to
23   define materiality in other federal fraud statutes.  "The term
24   material means having a natural tendency to influence or be
25   capable of influencing the payment or receipt of money or
```

NCB4COMO

1    property."  That's the same standard used in other false

2    statement cases.  It's an objective standard.  Does it have the

3    capacity to influence or is it capable of influencing?

4               THE COURT:  That's something I decide, isn't it?

5               MR. LAVIGNE:  I'm sorry, your Honor.  I didn't catch

6    that.

7               THE COURT:  It's something that I, the judge, has to

8    decide?

9               MR. LAVIGNE:  No, your Honor, it's a mixed question of

10   law and fact.  Materiality from the *Gaudin* case is clearly a

11   mixed question of law and fact, it's something for the jury.

12   Historically, some courts did say materiality was a question of

13   law.  But the *United States v. Gaudin* decision by the Supreme

14   Court reversed that.

15              THE COURT:  So we need an expert.

16              MR. LAVIGNE:  We do not need an expert.  Well,

17   potentially, we could debate whether expert testimony is

18   appropriate, but the jury has to decide materiality.

19              THE COURT:  But how does the jury get the information?

20              MR. LAVIGNE:  I think the jury gets the information

21   because I'm going to argue it.  One of the things I want to get

22   from this 30(b)(6) is what did the CFTC know?  When did they

23   know it?  Why didn't they ask follow-up questions if this was

24   so important.

25              THE COURT:  You are going to argue, in other words,

NCB4COMO

1    because this fellow in the CFTC didn't think it was important,

2    you can consider that a materiality.

3        MR. LAVIGNE:  I'm going to ask if it goes to

4    materiality just like *Universal Health*.

5        THE COURT:  So let me ask Mr. Rodgers to answer that.

6        MR. RODGERS:  I'm sorry, I'm a little -- can you just

7    clarify the question, please.  Because I mean, I think the case

8    law addressing --

9        THE COURT:  I'll put it to you.

10        Mr. LaVigne wants to argue that if the CFTC did not

11    feel that something was important, that's an argument he could

12    make to the jury, that a particular statement or misstatement

13    was not material.  That's what he wants to argue.  And

14    therefore, he wants to take a deposition of people who saw this

15    statement and didn't think much of it.  Because he argues that

16    evidence, that it's not material.  Did I fairly summarize what

17    you want to do, Mr. LaVigne?

18        MR. LAVIGNE:  Yes, your Honor.  It's not just this one

19    example I gave, there are others.  But I think that fairly

20    encapsulates it.

21        THE COURT:  All right.  Stick with this.

22        MR. RODGERS:  Your Honor, that argument is irrelevant.

23    Because the concept of materiality is based on the intrinsic

24    values of the statement that is made to influence an agency

25    decision.  It has no bearing --

NCB4COMO

```
 1                THE COURT:  How do you prove that?

 2                MR. RODGERS:  That the statement is false?  By

 3     reference to the decision-making process that was involved in

 4     the review of the self-certification.

 5                THE COURT:  Which means that because you think it's

 6     false, it's false.  If you think it's material, it's material.

 7                MR. RODGERS:  Well, that's an interesting concept,

 8     your Honor, but they think the statements they made are

 9     material because they made them in connection with a

10     self-certification, in order to meet the regulatory

11     requirements they had to meet to self-certify the product.

12                THE COURT:  They are saying that you're taking a

13     position that something they said is not accurate because it

14     omits something.  And they say they made a statement and no one

15     thought to follow up, which indicates that the statement itself

16     is not important.  That's what they're saying.

17                MR. RODGERS:  I understand, but that's totally

18     irrelevant under the materiality standard that's applied in

19     this case.

20                THE COURT:  So you are giving me two different

21     standards.  You're arguing for an objective standard in

22     materiality, provable by an expert witness.  And Mr. LaVigne is

23     saying that it's mixed fact and law, and he could prove it by

24     the inattention of an individual charged with being attentive,

25     that is somebody thing in the CFTC who receives and acts on
```

NCB4COMO

```
 1   this kind of information.  I can't decide that issue now.  That
 2   means he could take the deposition.
 3           MR. LAVIGNE:  I think we are.
 4           THE COURT:  You're winning, Mr. LaVigne, keep your
 5   mouth shut.
 6           (Discussion off the record)
 7           THE COURT:  So I think he's got to ask the question.
 8           MR. RODGERS:  Under the materiality standard, your
 9   Honor, under Gaudin and under the case law that addresses
10   statements to government actors, the internal subjective
11   thoughts of the recipient of the statement is totally
12   irrelevant.  So we would argue that the argument that he is
13   making, he couldn't make to the jury.  Because the idea that we
14   didn't follow-up, we didn't look at the document, it's
15   irrelevant.  Because the objective standard focuses on the
16   intrinsic capabilities of the statement to influence an agency
17   decision or decision-making process.  It's a broad standard in
18   this circuit, your Honor.
19           THE COURT:  Could you cite to the portion of your
20   brief that discusses this.
21           MR. RODGERS:  The materiality piece, it's cited in
22   both, but I think our opposition to the motion to compel has
23   the most, I guess, robust discussion, and I'll cite to you the
24   page in just a moment.
25           THE COURT:  It's all about the deliberative process
```

NCB4COMO

```
 1   privilege.  We are talking about materiality.

 2             MR. RODGERS:  There is some crossover.  Let's just go

 3   to our brief and stay on topic.  On page 9 of our opening brief

 4   we argue that --

 5             THE COURT:  What's your opening brief, which motion?

 6             MR. RODGERS:  Motion for a protective order, your

 7   Honor.

 8             MR. LAVIGNE:  It's Docket 50, Judge.

 9             THE COURT:  Page 9.

10             MR. RODGERS:  There we layout the standard for

11   determining liability under Section 6(c)(2) for making false

12   and misleading statements.  As your Honor observed in two prior

13   hearings, it's not measured by --

14             THE COURT:  Where is the argument?  OK.  I see it.

15             MR. RODGERS:  Then we cite the two case *Scali* and

16   *Santiago*, which are consistent with how courts address this

17   issue when statements are made to government actors.  They say,

18   we have it in our brief, the logical consequence of this

19   objective inquiry is the insignificance of a statement's actual

20   effect on the adjudicating or investigatory body.

21             THE COURT:  So both of these are Southern District of

22   New York cases?

23             MR. RODGERS:  Those are, your Honor.

24             THE COURT:  And Mr. LaVigne sent a Supreme Court case.

25             MR. RODGERS:  That's not addressing --
```

NCB4COMO

| | |
|---|---|
| 1 | THE COURT:  I thought the rule was that you stated.  I |
| 2 | need time to review subject.  I'll need a week. |
| 3 | MR. RODGERS:  The two cases I cited, your Honor, *Scali* |
| 4 | and *Santiago* are after *Universal Health*. |
| 5 | THE COURT:  One is, *Scali* is. |
| 6 | MR. RODGERS:  *Scali* and *Santiago*. |
| 7 | THE COURT:  *Santiago* is not. |
| 8 | MR. RODGERS:  Sorry, Scali, your Honor.  Apologies. |
| 9 | THE COURT:  *Universal Health* was a 2016 case. |
| 10 | MR. RODGERS:  But it did not change the law with |
| 11 | respect to false statements. |
| 12 | THE COURT:  I have to see that.  Who wrote *Scali*? |
| 13 | MR. RODGERS:  I don't have that information, your |
| 14 | Honor.  Let me just pull the case now. |
| 15 | THE COURT:  Decision is reserved on that issue. |
| 16 | What witnesses are we talking about?  What witnesses |
| 17 | are we talking about? |
| 18 | MR. LAVIGNE:  Right now? |
| 19 | THE COURT:  The rule 30(b)(6) witnesses |
| 20 | MR. LAVIGNE:  A 30(b)(6) witness, what I want to find |
| 21 | out, we have a number of topics -- |
| 22 | THE COURT:  You want to find out when your statements |
| 23 | were received -- |
| 24 | MR. LAVIGNE:  What did the CFTC know and what did they |
| 25 | know it.  And there are a number of examples of that, your |

NCB4COMO

1    Honor.  I'm happy to speak about the *Santiago* and *the Scali*

2    case.

3              THE COURT:  Go ahead.

4              MR. LAVIGNE:  So the *Santiago* case actually proves my

5    point.  The *Santiago* case was a case where there was a false

6    exculpatory that was provided by the defendant in the context

7    of an investigation.  And he raised whether or not that

8    statement was material because he basically said the

9    investigator knew all along it was him.  What the Court did in

10   finding that it was material, is they actually looked at what

11   the investigator had done, and concluded that the investigation

12   was very much open.  So the state of mind of the agency, what

13   it knew and when we knew it, that was relevant to assessing

14   whether there was materiality.  And that's what I'm after --

15             THE COURT:  I think that's a different issue.

16             MR. LAVIGNE:  Sorry?

17             THE COURT:  I think that's a different issue, but I'll

18   read the cases.

19             MR. LAVIGNE:  My point is what they knew goes to what

20   was disclosed.  Because the CFTC has argued that our

21   disclosures were deficient.  It also does go to materiality.

22   Because if they knew about it, and they didn't ask questions,

23   that's the core issue.

24             THE COURT:  I think we are repeating ourselves.

25             MR. LAVIGNE:  I understand.  I just think without

NCB4COMO

```
 1   getting to the root of our evidence, the CFTC is going to be

 2   arguing to the jury --

 3              THE COURT:  What is the subject of your disclosures?

 4   What are we talking about?

 5              MR. LAVIGNE:  We are talking about a disclosure

 6   associated with bespoke rebate fees.  Gemini disclosed that

 7   they used these bespoke fees which are basically agreements

 8   with preferential --

 9              THE COURT:  Is there disclosure in the record?

10              MR. LAVIGNE:  It was a disclosure that was in an email

11   during the self-certification.

12              THE COURT:  Is it in the record?

13              MR. LAVIGNE:  It's in the record.

14              THE COURT:  Where?

15              MR. LAVIGNE:  You mean the record before your Honor?

16   Have we submitted it?  No, we haven't.

17              THE COURT:  Will you submit it?

18              MR. LAVIGNE:  We can.

19              THE COURT:  Please.

20              MR. LAVIGNE:  There's that.  There are other examples

21   which we can also provide to the Court.  There's examples of

22   self-trading.  There's another example of --

23              THE COURT:  Give me all of the examples you want an

24   answer to.

25              MR. LAVIGNE:  OK.  Is there a form your Honor wants it
```

NCB4COMO

| | |
|---|---|
| 1 | in? |
| 2 | THE COURT:  Send it in. |
| 3 | These are the examples about which is asked, what was |
| 4 | received, and what was done with it. |
| 5 | MR. LAVIGNE:  OK. |
| 6 | THE COURT:  You'll docket it. |
| 7 | MR. LAVIGNE:  Sorry? |
| 8 | THE COURT:  And you'll docket it. |
| 9 | MR. LAVIGNE:  OK. |
| 10 | MR. RODGERS:  Your Honor, with respect, we would like |
| 11 | to ask for the opportunity to respond to anything that is |
| 12 | submitted to make sure the full record is before, your Honor. |
| 13 | THE COURT:  I wasn't thinking of an argument here. |
| 14 | You made your arguments.  I'm thinking I just want to know what |
| 15 | it is that we are going to be arguing about.  We are not going |
| 16 | to be having any briefing on the issue. |
| 17 | MR. RODGERS:  Your Honor, just one more point on the |
| 18 | *Scali*. |
| 19 | THE COURT:  It's been done.  I'll read *Scali*.  I'll |
| 20 | read *Santiago*.  I'll read *Universal Health*, and I'll read |
| 21 | whatever else I feel I need to read. |
| 22 | MR. LAVIGNE:  Your Honor, page 19 of our brief is |
| 23 | where we layout the standard, and I don't want to belabor it. |
| 24 | THE COURT:  Then don't.  I've read it.  I see it. |
| 25 | MR. RODGERS:  I have a new piece of information that I |

NCB4COMO

1    want to relay, your Honor.

2            THE COURT:  OK.

3            MR. RODGERS:  Which is that *Scali* was affirmed by the

4    Second Circuit in 2020.  The citation to that is 820 F. App'x

5    23.  It does not specifically address this point about --

6            THE COURT:  What's the page?

7            MR. RODGERS:  820 F. App'x 23.  It's a 2022 summary

8    order from the Second Circuit.

9            THE COURT:  Got it.

10           Let's go onto another point.

11           MR. LAVIGNE:  Your Honor, you know, there are a number

12   of other topics.  We ask for the 30(b)(6). I outlined the main

13   one.  There are 37 of them.  I'm happy to kind of go through

14   them by category.

15           THE COURT:  Yes, I want you to.  Just a moment.  Let

16   me get it.  This is in your 30(b)(6) notice?

17           MR. LAVIGNE:  This is our 30(b)(6) notice.  It's

18   Docket 50 --

19           THE COURT:  You list 40 topics.

20           MR. LAVIGNE:  40 topics.  I can group them by bucket,

21   which we did in our brief.

22           THE COURT:  Go ahead.

23           MR. LAVIGNE:  So the first one are the roles and

24   responsibilities of each CFTC employee who was involved in the

25   self-certification.  Again, the CFTC listed 18 witnesses on

NCB4COMO

1    their interrogatory responses.

2              THE COURT:  They've taken that back.

3              MR. LAVIGNE:  I'm sorry?

4              THE COURT:  They've taken that back.

5              MR. LAVIGNE:  Well, even though they are going to call

6    two witnesses, I want to find out who the others were and what

7    they knew.  We may want to call them.  That's one of the

8    reasons we want a 30(b)(6).

9              THE COURT:  I don't think I'm going to allow that.

10   That's a fishing expedition into the workings of the CFTC.

11             MR. LAVIGNE:  We also had topics related to the

12   particulars of the false statements like the who, what, when,

13   where, and why.

14             THE COURT:  I think you are going have go through this

15   one by one.

16             Why don't I lead off with Mr. Rogers.  You are not

17   going to give any of this information?

18             MR. RODGERS:  Your Honor, we responded with responses

19   and objections to each of the --

20             THE COURT:  Each one.  OK.

21             MR. RODGERS:  Each one, yeah.  And we didn't put a

22   complete block to any testimony, but they were just so many

23   different embedded topics in here that it was impossible to

24   respond to.  And we ask that the defendant revise and identify

25   specific issues that were appropriate, and we were unable to

NCB4COMO

 1  reach a resolution on those topics.

 2          THE COURT:  How would you answer the

 3  self-certification process?

 4          MR. RODGERS:  Well, they've withdrawn that topic in

 5  connection with our motion for a protective order.

 6          THE COURT:  Why don't I know that?

 7          MR. LAVIGNE:  We disclosed that in our brief, your

 8  Honor, that we withdrew Topic 1.

 9          THE COURT:  Are there any other topics withdrawn?

10          MR. LAVIGNE:  We also withdrew Topic 40.

11          THE COURT:  What about 2?

12          MR. LAVIGNE:  Topic 2, no, we did not withdraw that.

13          THE COURT:  What's your position on 2, Mr. Rogers?

14          MR. RODGERS:  Your Honor, our position would be that

15  that's been answered by the two witnesses that they've already

16  deposed.

17          THE COURT:  Louder, please.

18          MR. RODGERS:  Our position is that the answer to their

19  questions is in the depositions that they took.  They asked

20  about the roles and responsibilities of the CFTC employees

21  involved in the self-certification.  They got those answers.

22  We've also disclosed the individuals that were involved yet

23  reduced that list to the two that were deposed in this case.

24          THE COURT:  Mr. LaVigne?

25          MR. LAVIGNE:  Your Honor, they had two fact witnesses

NCB4COMO

```
 1    who we laid out in our brief, did not have clear recollections,
 2    were not testifying on behalf of the CFTC, they did disclose in
 3    interrogatory responses names but not the roles.  This is
 4    something that's pretty customary in a 30(b)(6).  The main
 5    reason you have a 30(b)(6) is to find out --
 6            THE COURT:  I know about 30(b)(6).
 7            MR. LAVIGNE:  I understand, Judge.  I don't think this
 8    is controversial request.
 9            MR. RODGERS:  This goes to our point, your Honor, and
10    we laid that out in a briefing, that they have taken --
11            THE COURT:  You can consider this an interrogatory,
12    and answer it as an interrogatory question.
13            3.
14            MR. LAVIGNE:  So 3, we want a 30(b)(6) witness because
15    we want to know how the CFTC requested the information that it
16    alleges should have been disclosed, and what the CFTC would or
17    would not have done with that information if it received it.
18    This goes to materiality, and it also goes to the form, means,
19    and methods by which --
20            THE COURT:  The first half of that will be an
21    interrogatory, and the second half is stricken.  It's
22    hypothetical.
23            4?
24            MR. LAVIGNE:  These are the policies, procedures, or
25    internal guidance.  Again, I think your Honor --
```

NCB4COMO

1          THE COURT:  Interrogatory.

2          MR. LAVIGNE:  OK.

3          MR. RODGERS:  Your Honor, also in our papers, we

4   pointed out that no witness testified about any policies and

5   procedures that were relevant.

6          THE COURT:  Answer it in an interrogatory.

7          MR. RODGERS:  Yes, your Honor.

8          THE COURT:  5?

9          MR. LAVIGNE:  5 is any public guidance the CFTC has

10  provided about the self-certification process.

11         THE COURT:  Same, as interrogatory.

12         MR. LAVIGNE:  OK.

13         THE COURT:  6?

14         MR. LAVIGNE:  6, we want information on the process.

15  This is similar to the process and procedures, how they

16  typically interact with DCMs.

17         THE COURT:  So it's answered already.  It's

18  repetitive.

19         MR. LAVIGNE:  I don't think it's repetitive.  It's

20  focusing on their overall process for interacting with DCMs,

21  and how they go about it.

22         THE COURT:  You've asked about policies, procedure, or

23  internal guidance made in connection with a self-serving

24  certification process.  6 is redundant.

25         7?  It's hypothetical.

NCB4COMO

1          MR. LAVIGNE:  7, your Honor, is important because the

2     CFTC as an element has to show what decision it was making.

3     The jury has to be told through competent evidence what they

4     were actually deciding.  We want the CFTC's official position

5     on that.

6          MR. RODGERS:  Your Honor, we provided that in multiple

7      settings.

8          THE COURT:  Provide it again.  Consider this an

9     interrogatory.

10          8?

11          MR. LAVIGNE:  Here this is similar to what

12     Mr. Schwartz was saying.  We want to know from the CFTC what

13     statements they are attributing to us associated with the

14     self-certification.

15          THE COURT:  That's a question I'm looking up.  It's

16     reserved.

17          Self-certification.

18          MR. RODGERS:  Sorry, could you repeat that.

19          MR. LAVIGNE:  I didn't catch that.

20          THE COURT:  I said that's a question I'm looking up.

21     So the answer is reserved, Number 8 is reserved.

22          MR. LAVIGNE:  Got it.

23          THE COURT:  9?

24          MR. LAVIGNE:  9 goes to materiality.  We want the

25     CFTC's position on whether any alleged misstatement or omission

NCB4COMO

```
 1    was capable of misleading or actually influencing the CFTC's
 2    decision.
 3              THE COURT:  Again, by interrogatory.
 4              MR. LAVIGNE:  Got it.
 5              THE COURT:  10?
 6              MR. LAVIGNE:  10 is important because here what we are
 7    trying to understand is the communications that CFTC had with
 8    the government agency about the self-certification.  Our
 9    position is there is limited information that --
10              THE COURT:  Which other entity do you think it would
11    be?  Which other entity do you have in mind?
12              MR. LAVIGNE:  Law enforcement.  And I'm going to
13    respond to the Court's question.  I'll ask, out of an abundance
14    of caution, that this be under seal.
15              THE COURT:  Then stop.  There's too many people in the
16    room.
17              MR. LAVIGNE:  Sorry?
18              THE COURT:  There's too many people in the room.
19              MR. LAVIGNE:  What I will say then, your Honor, is we
20    made a disclosure.  The disclosure is confidential.  The
21    disclosure included certain information that the CFTC claims
22    was withheld.  We believe the CFTC had access to that.  That's
23    what we want to get.
24              THE COURT:  What's your response to 10, Mr. Rogers?
25              MR. RODGERS:  That any communications that we, at the
```

NCB4COMO

1    CFTC, have with other government agencies is protected by the

2    deliberative process privilege and potentially the law

3    enforcement privilege.

4         THE COURT:  Agreed.  Objection sustained.

5         MR. LAVIGNE:  Your Honor, may I be heard on that?

6         THE COURT:  Yes.

7         MR. LAVIGNE:  This really fundamentally goes to core

8    issues in the case.  Because we have made disclosures of

9    information they say we did not disclose.  It goes to our

10   intent.  It also goes to what information they had and whether

11   they possessed it and, again, took no action that goes to

12   materiality.  What we want to do is find out if they knew this

13   information.

14        THE COURT:  This has to do not with whether they had

15   the information, but whether they shared it with other

16   government agencies.  You are not entitled to get that

17   information --

18        MR. LAVIGNE:  Well, the only way they would have

19   gotten it --

20        THE COURT:  The objection is sustained.

21        MR. LAVIGNE:  Judge, the only way --

22        THE COURT:  Objection is sustained.

23        MR. LAVIGNE:  Your Honor, I think this is an important

24   issue --

25        THE COURT:  I know it's important, and I heard you on

NCB4COMO

```
1    it, and I don't think you are right.  If you ask what they've

2    got, you can ask that in other questions.  This is what they

3    did, not what they had.

4              MR. LAVIGNE:  Your Honor, they only could have gotten

5    that information from that other agency.  We just want to find

6    out whether they possessed it, that's what I'm after.

7              THE COURT:  Objection sustained.

8              11, Mr. Rogers?

9              MR. RODGERS:  Our objection to 11, your Honor?

10             THE COURT:  Yeah.

11             MR. RODGERS:  It seeks irrelevant information because

12   what happened after the fact or after the contract was

13   self-certified is irrelevant.  There's not a free pass for

14   making false statements simply because something bad didn't

15   happen afterwards.

16             THE COURT:  I agree.

17             Mr. LaVigne?

18             MR. LAVIGNE:  Let me be heard on that.  They've

19   painted Gemini as a rouge exchange that had loans, operational

20   advances, self-trading, everything else.  The reality, Judge,

21   is the CFTC and CBOE actually monitored this exchange and did

22   surveillance after the contract was listed to see if there was

23   manipulation.  We just want to find out if it they identified

24   any evidence of manipulation and our understanding is there was

25   not.  That is probative of whether or not these issues were
```

NCB4COMO

 1  material.  And there is case law support for the idea that if

 2  you do an investigation, you can look at what that

 3  investigation would have revealed in terms of assessing whether

 4  something is material.  That's all we are trying to get here.

 5  What is did the CFTC's surveillance of Gemini show after this

 6  product was listed.  They can't, on the one hand, paint this

 7  exchange as a complete rouge with all these problems, and then,

 8  on the other hand, know that when they did surveillance there

 9  were no issues with it.

10          THE COURT:  The objection is sustained.  The question,

11  if relevant at all and that is minor bit of relevance, and more

12  importantly is, in effect, review what the policies of the CFTC

13  are generally in its responsibilities in the marketplace.  The

14  objection is sustained.

15          12.

16          MR. RODGERS:  Your Honor, we have the same objection.

17  I think the --

18          THE COURT:  Same ruling?

19          MR. RODGERS:  Yes, your Honor.

20          MR. LAVIGNE:  Same position.

21          MR. RODGERS:  Yes, your Honor.

22          THE COURT:  Objection is sustained to 12.

23          MR. LAVIGNE:  OK.  13, we want to know the individuals

24  who witnessed the supposed false statements, who determined

25  they were false or misleading, who take the position that they

NCB4COMO

| 1 | were material.  Again, 18 witnesses on their interrogatory |

1    were material.  Again, 18 witnesses on their interrogatory

2    responses, we want to know.

3        THE COURT:  Forget about the 18.  They've withdrawn

4    them.  They've got two, and you've already deposed those two.

5    So it's an interrogatory.  You can answer that, Mr. Rogers.

6        MR. LAVIGNE:  OK.

7        MR. RODGERS:  Your Honor, on Number 13, the identity

8    and roles of any individuals that witnessed Gemini's

9    purportedly false statement, we would agree that's an objective

10   fact that can be relayed in an interrogatory.

11       The second half of that, who determined any statements

12   or omissions were false or misleading, who considered those

13   statements or omissions to be material of the CFTC's

14   evaluation, that goes to the deliberative process privilege.

15   It's also, as we've discussed, irrelevant.  The Second Circuit

16   has said --

17       THE COURT:  I'm going to reserve on that.  It's the

18   same kind of question -- if Mr. LaVigne is entitled to ask who

19   didn't think it was material, to fill out the picture he needs

20   to know who determined that it was material.  So I'm reserving

21   the second half of 13.

22       MR. RODGERS:  Your Honor, let me just cite for you

23   another Second Circuit case that said, that the FBI knew the

24   statements were false when they were made is irrelevant to

25   their materiality.  What the CFTC knew --

NCB4COMO

1          THE COURT:  It's the same issue.  I'd like to know

2   that case.  What is it?

3          MR. RODGERS:  Sure, your Honor.  It's *United States v.*

4   *Foxworth*, another federal appendix case --

5          THE COURT:  It's not precedential.

6          MR. RODGERS:  I think summary orders now are

7   precedential.  It shows Second Circuit looked at this issue

8   consistently with *Scali, Santiago* --

9          THE COURT:  What's the cite?

10          MR. RODGERS:  Your Honor, it's 334 F. App'x 363.

11          THE COURT:  363.

12          MR. RODGERS:  Yes.  And the statement is at 366.

13          MR. LAVIGNE:  I would just point the Court to pages 18

14   to 19 of our brief, where we layout the Second Circuit and

15   other federal courts of appeals that indicate that an agency

16   subjective views of information is relevant, it's relevant, not

17   dispositive.

18          THE COURT:  We've heard that point before.  I will

19   read those cases.

20          MR. LAVIGNE:  Do you want me to give the cases, your

21   Honor?

22          THE COURT:  They are in the brief.

23          MR. LAVIGNE:  Yeah, in the brief.

24          THE COURT:  Pages 18, 19.

25          MR. LAVIGNE:  18, 19, to 20.

NCB4COMO

1          THE COURT:  Right.

2          MR. LAVIGNE:  I would also just emphasize that the

3    standard is uniform across different statutes.  Judge Rakoff

4    has a decision in the bank fraud context, which is also

5    measured from an objective standard.  And there he said if

6    banks know that customers are using marijuana, that's strong

7    evidence that it's not material.  It's the same type of issue.

8    It's relevant.

9          MR. RODGERS:  It's incorrect to say that the context

10   to import, like, false statement standards from other contexts,

11   false statements to a government actor, it's inconsistent --

12         THE COURT:  I'm not going to use a marijuana precedent

13   for a CFTC decision.  As much as I respect Judge Rakoff, on

14   securities matters and on commodities matters, this is

15   something different.  OK.  But it's on page 18 to 20.  I'll

16   read it.

17         MR. LAVIGNE:  18 to 20 of our brief, yes.

18         THE COURT:  I'll read it.

19         MR. RODGERS:  While we're on the topic of these cases

20   though --

21         THE COURT:  So the first part is to be answered, 13

22   the first phrase, and the second part is reserved.

23         MR. LAVIGNE:  OK.

24         THE COURT:  141.

25         MR. LAVIGNE:  So 14 goes to the issue I was talking

NCB4COMO

1  about before, what did the CFTC know?  We want to find out what

2  their understanding of the prefunding requirements were on the

3  bitcoin exchange.  Because, again, this goes to the issue of

4  materiality.

5          THE COURT:  What do you say, Mr. Rogers?

6          MR. RODGERS:  That goes to the subjective

7  understanding of the CFTC and is irrelevant, your Honor.

8          THE COURT:  It's answered in the question about the

9  policies and regulations of the CFTC and procedures.  So this

10  is redundant.

11          MR. LAVIGNE:  Your Honor, I respectfully submit it's

12  not redundant.  Here we are asking what they knew about

13  prefunding.  What was their understanding of the term

14  prefunding?  The CFTC has alleged that our representation that

15  the exchange was prefunded was false and misleading.  So how

16  the CFTC interpreted that goes to materiality.  We define

17  prefunding in the context of this back and forth, we want to

18  have a 30(b)(6) to ask the CFTC what their understanding of

19  that term was.

20          THE COURT:  I think you should answer that question,

21  Mr. Rogers.

22          MR. RODGERS:  I'm sorry, your Honor.

23          THE COURT:  You should answer that question as an

24  interrogatory question.

25          MR. RODGERS:  Your Honor, when you look at the case

NCB4COMO

1    law on the false statement cases, you'll see that what our

2    understanding of the statement is, is irrelevant.  And I think

3    it's a question of legal interpretation whether it meant there

4    was leverage or no leverage on the exchange.  And what Gemini

5    was trying to say --

6              THE COURT:  Reword the question.

7              MR. RODGERS:  I'm sorry, your Honor?

8              THE COURT:  Reword the question so you can answer it.

9              MR. RODGERS:  The question could be --

10             THE COURT:  Reword the question so you can answer it.

11   I think I need to know what do you mean by prefunding?

12             MR. RODGERS:  We didn't make the prefunding statement,

13   your Honor.  That statement was made by --

14             THE COURT:  Is that part of the rule, prefunding?

15             MR. RODGERS:  No, your Honor.  What happened in this

16   case was Gemini came in and said their exchange is prefunded,

17   which meant that customers or users have to have the funds in

18   their account to submit buy and sell orders.  And they made

19   that representation to convince the CFTC that their spot market

20   was not readily susceptible to manipulation, i.e. complied with

21   the core principles of the Commodity Exchange Act.  So the

22   materiality of that statement is proved by the fact that they

23   made it to us.

24             THE COURT:  So you don't really have a concern about

25   prefunding?

NCB4COMO

1          MR. RODGERS:  That's correct.  Prefunding was a way

2     that Gemini --

3          THE COURT:  What was the general standard?

4          MR. RODGERS:  The general standard for a

5     self-certification, your Honor?

6          THE COURT:  Yes.

7          MR. RODGERS:  That is set forth in part 38 of the

8     Appendix C.  And it sets forth what the CFTC looks at, and what

9     information should be provided to determine whether a spot

10     market like Gemini complies with Core Principle 3 which is that

11     its settlement mechanism is not readily susceptible to

12     manipulation.  To meet that requirement, Gemini came forward

13     and said, CFTC, our exchange is prefunded.  But what they

14     didn't say was we have an affiliate that's providing loans to

15     certain market participants.  We had advances that have been

16     outstanding for weeks --

17          THE COURT:  So you have an understanding of what they

18     meant.

19          MR. RODGERS:  Right.  And that understanding was

20     relayed by CFTC witnesses --

21          THE COURT:  Yeah.

22          MR. RODGERS:  As well as CBOE witness in this case.

23     And there is a general understanding in the market that what

24     Gemini was saying is you can't use leverage or margin.

25          THE COURT:  So you had an understanding of what they

NCB4COMO

1    meant by prefunding?

2          MR. RODGERS:  Yeah, of course, the CFTC understood

3    what prefunding meant.  Our point is slightly different in that

4    it doesn't matter what we thought.  Because that's irrelevant

5    to the determination of materiality here.  Because it turns on

6    whether that statement, "this is prefunded" or "everything here

7    is prefunded," is misleading.  And it was misleading, as we

8    laid out in the complaint and various other submissions.

9          THE COURT:  If you were asked about the CFTC's

10   position about Gemini's statement of prefunding, would you be

11   able to answer it?

12         MR. RODGERS:  I think it's a little tricky with the

13   deliberative process privilege because you are getting into the

14   internal subjective understanding of the CFTC.

15         THE COURT:  See what the CFTC understood was meant.

16   That's a bad way of putting it.  What was your position with

17   regard to their statement?

18         MR. RODGERS:  Well, in court today our position, as

19   relayed by Mr. Goodman was that there was no leverage on the

20   platform.  And that statement was confirmed by the CBOE

21   witnesses as well.  It's not controversial.

22         MR. LAVIGNE:  Can I respond to that, Judge?

23         THE COURT:  Yes.

24         MR. LAVIGNE:  I completely disagree with that.  Gemini

25   defined what prefunding meant.  Gemini did not define

NCB4COMO

```
1    prefunding in a way that meant that there was no leverage.  The
2    CFTC is trying to say that prefunding meant no leverage.  What
3    we want to do is take a 30(b)(6) and find out from them what
4    their witnesses believed prefunding meant.  On the one hand,
5    they can't come into court and say it meant this and on the
6    other hand the witnesses felt that that's something else.
7            MR. RODGERS:  We don't have to come into court and say
8    it because everybody else is saying it.
9            MR. LAVIGNE:  No.  Two witnesses have --
10           THE COURT:  Please don't comment with each other.
11           Here is my ruling, if the CFTC's position regarding
12   Gemini's statement concerning prefunding, that could be
13   answered as an interrogatory.
14           15?
15           MR. LAVIGNE:  15, your Honor, again, we want to find
16   out what the CFTC knew on certain pieces of information they
17   say were not disclosed.  This is why we needed 30(b)(6) to get
18   their collective knowledge.  CFTC has alleged Pearl Street was
19   not disclosed, operational advances were not disclosed,
20   rebates, and self-trading were not disclosed.  If portions of
21   those were disclosed, we have reason to believe the CFTC knew
22   about other positions.  And, again, if they knew about those
23   and did not take action, that's relevant to materiality.  If
24   they knew about those based on our --
25           THE COURT:  Supposed they knew about it and brought
```

NCB4COMO

1      this lawsuit?

2              MR. LAVIGNE:  Well, they did know about it, and they

3      brought the lawsuit, which I have serious issues with to begin

4      with as a matter of prosecutorial discretion.  But putting that

5      aside, they are taking the position that even though we

6      disclosed it, it was deficient.  It wasn't like specifically

7      flagged.  And if there were employees at the CFTC who looked at

8      the trading data and said, hey, there is self-trading but it's

9      *de minimis*, don't worry about it.  The CFTC can't then say that

10     the *de minimis* self-trading on the exchange was material, same

11     thing with the bespoke rebates, same thing with operational

12     advancements --

13             THE COURT:  What do you say, Mr. Rogers?

14             MR. RODGERS:  Your Honor, first of all, these are

15     omissions.  So we can't be expected to prepare a witness about

16     information that we didn't know about.  Mr. LaVigne can argue

17     to the jury all he wants that this informs was disclosed or

18     buried in disclosures --

19             THE COURT:  He is saying that some of your employees

20     knew.

21             MR. RODGERS:  If we get back to the point that whether

22     the CFTC was actually influenced by the false statements, which

23     is, you know, let's take the prefunding example, is just not

24     the test.  So whether somebody looked at it and decided to do

25     nothing or somebody looked at it and decided to do something,

NCB4COMO

1    that doesn't move the ball in any way with respect to

2    materiality.  So this is the same issue with the prefunding

3    requirement in that it's not something that was, you know, part

4    of the regulations or part of the disclosures.  If it was

5    disclosed at all, they can argue that to the jury and say it

6    was buried in this email or it was buried in a spreadsheet, and

7    you didn't do good enough job.

8            THE COURT:  Is it your position, Mr. LaVigne, that

9    these things, Pearl Street loans, operational advances, and so

10   on, were disclosed?

11           MR. LAVIGNE:  It's my position that operational

12   advances, rebates and self-trading were disclosed.  Pearl

13   Street loans, I can't say that our client disclosed them.

14   However, and we'll get to this later, there is evidence now

15   that a whistleblower told CFTC about the Pearl Street loans

16   well before the self-certification was finalized.  And we are

17   entitled to know what CFTC did with that information.  It goes

18   to the same issue, if they are saying Pearl Street was such a

19   problem, but a whistleblower came forward a month before the

20   self-certification and said, hey, Gemini has this Pearl Street

21   loan program, and they did nothing, sitting on their hands,

22   again, it goes to this concept of materiality.  That's what we

23   are trying to get with this 30(b)(6) notice.

24           THE COURT:  How many people potentially had this

25   knowledge?

NCB4COMO

1    MR. LAVIGNE:  All I know, your Honor, is 18 because

2  that's who they listed in the response.

3    THE COURT:  Forget about 18.  They are not going to

4  with 18.  They're going with two, maybe not even two.

5    MR. LAVIGNE:  Honestly, I'm not trying to be cute,

6  Judge.  I don't know what I don't know.  We were able to depose

7  two witnesses --

8    THE COURT:  The problem here is that CFTC does not

9  really have or may not have a group understanding of the

10  information.  It's possible that particular people within the

11  CFTC knew of this information.  They can't answer this question

12  the way it's worded.

13    MR. LAVIGNE:  I'm happy to rephrase, your Honor.  But

14  I think their job, you know, in the context of a 30(b)(6) is to

15  at least due diligence.  And if their response is "we don't

16  know," that's something we could introduce at trial.  But there

17  are people within the CFTC who looked at this trading data.  I

18  don't know who they are.  The witnesses --

19    THE COURT:  How do you know there are any?

20    MR. LAVIGNE:  Well, because I believe Mr. Goodman

21  indicated somebody reviewed it in his deposition.  I don't have

22  that at my fingertips, your Honor.  But, again, that's a

23  question we are entitled to ask.  Did they review it?  If the

24  answer is they didn't, that's also relevant.  Because they're

25  saying was this self-trading?  And they have trading data at

NCB4COMO

their disposal, and they never looked at it to inquire into
self-trading.

THE COURT:  Suppose you were to reword it to say, did
anyone at the CFTC had knowledge of the following.

MR. LAVIGNE:  Well, it's a question of reasonableness.
I mean, obviously the CFTC, these enforcement lawyers, they can
only do what they can do.  And I would expect them to take
reasonable diligence.  For example, to talk to the people they
had referenced on their interrogatory responses or to do a more
targeted email review to get a sense of how this far this
information was disseminated and who did what.  All we are
trying to figure out get the name of somebody who looked at the
trading data, whether they saw self-trading, for example, and
why they never acted on it or the person who saw this
information about bespoke rebates and said they could have
this, but let's not ask more questions about it.

Candidly, your Honor, if my client was asked these
questions, he would have provided the information.  That's why
this is has been a frustrating endeavor.

THE COURT:  The objection is sustained.  If it had to
do with a disclosure, Gemini had its own understanding of what
it disclosed.  It doesn't need the CFTC's understanding of
various aspects.  This is not a question of what the CFTC had
an understanding of, if anything.  It's a question of what
different people may have known or may have learned at

NCB4COMO

```
1    different times.  And as such, it's a fishing expedition within
2    the CFTC, not likely to lead to the discovery of relevant
3    evidence.  The objection is sustained.
4              16?
5              MR. RODGERS:  I think your Honor's ruling on 15
6    applies with equal force to 16, your Honor.
7              THE COURT:  No, the statements Gemini made to the
8    CFTC.
9              MR. RODGERS:  Right.  So those statements -- our
10   position is there were no statements on these issues.
11             THE COURT:  Interrogatory.
12             17?
13             MR. LAVIGNE:  This, your Honor, I think the Court has
14   previously indicated could be an interrogatory.  We want to
15   find out what statements they're claiming were false and
16   misleading.
17             THE COURT:  You already asked it.  17 is redundant.
18   Objection sustained.
19             18, same objection.  Again, sustained.
20             19?
21             MR. LAVIGNE:  Your Honor, here we're trying --
22             THE COURT:  Calls for an operation of mind, and it's
23   work product.  Objection sustained.
24             20, the same.  Objection sustained.
25             MR. LAVIGNE:  Why is that sustained, Judge?
```

NCB4COMO

1    THE COURT:  Because they are asking the basis for

2    asserting, which is the thinking of a lawyer.  What's the basis

3    for what I understand?  That's not in evidence, and you can't

4    ask that question.

5    MR. LAVIGNE:  I think we are entitled to know the

6    factual basis for the allegations.

7    THE COURT:  No, you're not.

8    21, you are entitled to the facts, not the factual

9    basis.

10    21, it's the same point, CFTC's evidence that price

11    manipulation or other harm included but not limited to the harm

12    to market participants, *et cetera*.  This is also seeking work

13    product.  Objection is sustained.

14    MR. RODGERS:  Your Honor, it's also seeking irrelevant

15    information as well because it goes to the harms and

16    manipulation after the fact, which I think we heard earlier was

17    irrelevant.

18    THE COURT:  The objection is already sustained.

19    22, sustained.

20    23, sustained.

21    24, sustained.

22    25, sustained.

23    MR. LAVIGNE:  Your Honor, 26 is different --

24    THE COURT:  I know.  That's why I'm reading it.

25    MR. LAVIGNE:  OK.

NCB4COMO

1    THE COURT:  It's vague and hard to understand.

2    MR. LAVIGNE:  Again, this goes to the question of what

3   the CFTC knew.  They say we never disclosed self-trading.  Our

4   understanding is they reviewed trading data, and if they did,

5   they would have identified self-trading.  So we want to figure

6   out whether they knew, based on their review of data, that

7   there was self-trading.

8    THE COURT:  They either knew or they didn't know.  The

9   data could be important, but not what the CFTC may have learned

10  or concerned itself with or extrapolated.  Objection is

11  sustained.

12   MR. LAVIGNE:  But, your Honor, if they knew

13  self-trading and never asked follow-up questions of it and

14  still permitted self-certification, that undercuts the idea

15  that it was material to their consideration.

16   THE COURT:  27, any basis for CFTC, *et cetera*,

17  sustained.

18   28 is sustained.

19   29, objection sustained.

20   30, objection sustained.

21   31, objection sustained.

22   Who is Benjamin Small?

23   MR. LAVIGNE:  Your Honor Benjamin Small is the key

24  cooperating witness they are going to call.  He's a former

25  employee of Gemini.  The rest of the --

NCB4COMO

1          THE COURT:  Are you entitled to depose him?

2          MR. LAVIGNE:  I'm sorry, Judge?

3          THE COURT:  Are you entitled to depose him?

4          MR. LAVIGNE:  Well, the CFTC hasn't confirmed whether

5     they are going to call him as a trial witness or not.  He is

6     currently in London.  Before we make the decision, we want to

7     get information relating to Mr. Small.  The main thing is to

8     find out from the CFTC what he told them on November 1, 2017,

9     about Pearl Street.  Because, again, if the CFTC was on notice

10    of Pearl Street a month before the self-certification and did

11    nothing or made a determination that it was not relevant, that

12    goes to materiality.  It's probative of materiality based on

13    the cases I cited.

14         THE COURT:  Mr. Rogers, if served a deposition notice

15    on Benjamin Small, would you object?

16         MR. RODGERS:  No, your Honor.  We've been waiting for

17    him --

18         THE COURT:  That's the way you have to do it, Mr.

19    LaVigne.  If you want to take his deposition, take his

20    deposition.

21         Objection is sustained to the question.

22         MR. RODGERS:  And, your Honor, they are running out of

23    time to take the deposition.

24         THE COURT:  Not if I enlarge it.

25         What's wrong with 33, Mr. Rogers?

NCB4COMO

1          MR. RODGERS:  That information has been provided in

2     discovery.  We turned over the information related to meetings

3     and any notes of meetings have been logged on the privilege

4     log.  So I don't know what more we could provide in response to

5     that.

6          THE COURT:  You could answer interrogatory as to

7     Number 1 and 2, but not as to 3 and 4.

8          34 is objected to and sustained.

9          35 is sustained.

10         36?

11         MR. LAVIGNE:  May I be heard on some of these?

12         THE COURT:  You may.

13         MR. LAVIGNE:  If they are going to call a cooperating

14    witness to testify against my client, we are entitled to know

15    if he has a cooperation agreement.

16         THE COURT:  You are.

17         MR. LAVIGNE:  Yeah.

18         THE COURT:  That's it, but you haven't asked for that.

19         MR. RODGERS:  Your Honor, we've also told them

20    multiple times that we don't have those agreements, and we put

21    that in our response and objections.

22         THE COURT:  OK.  You've been asked in 35, was there

23    any immunity non-prosecution or similar agreement with

24    Mr. Small?  It's an interrogatory.

25         36 asks for state of mind of the CFTC, privileged.

NCB4COMO

1    Objection is sustained.

2           Same with 37, it's sustained.

3           MR. LAVIGNE:  Can I be heard on that, Judge?

4           THE COURT:  No.  We covered this before.  What the

5    administration or organization wants to do with information

6    it's a matter of its own discretion.  It has nothing to do with

7    this case.

8           MR. LAVIGNE:  But if they know he lied and they're not

9    going to take any action against them?

10          THE COURT:  That's their business.

11          MR. LAVIGNE:  I think it's mine too though.  I should

12   be permitted to introduce that at trial if they call him.

13          THE COURT:  They may not have made their mind up, and

14   don't make their mind up until the end.  It's not allowed.

15   Objection is sustained.

16          How about 38, Mr. Rogers?

17          MR. RODGERS:  Your Honor, we answered this in our

18   responses and objections.  I don't necessarily understand the

19   question being asked or the implication of the question.  But

20   we can certainly state for the record that there has been no

21   promises made to Mr. Small of any nature.

22          THE COURT:  Then answer it in interrogatory form, same

23   with 39.

24          OK.  That covers it.  What else is there?

25          MR. RODGERS:  Your Honor, you may have seen that we

NCB4COMO

1     submitted a discovery letter last week.  I'm not sure if your

2     Honor had an opportunity to review it.

3                THE COURT:  No.  Tell me about it.

4                MR. RODGERS:  There's two issues.  The first is the

5     timing of a 30(b)(6) deposition for a Gemini representative.

6     And we asked that the discovery be extended to allow that

7     deposition to occur.

8                THE COURT:  I'll extend the discovery.  I'll enlarge

9     the time for discovery.  Both of you want it.  I'm granting it.

10               What's the second question?

11               MR. RODGERS:  The second issue is we are taking the

12    deposition of Cameron Winklevoss on December 18, so next

13    Monday.  We requested an additional seven hours to speak with

14    him since he is the only Gemini witness current employee that

15    we are going to speak with.

16               THE COURT:  You are not going to be able to finish it

17    in one day?

18               MR. RODGERS:  We would certainly wish that we could,

19    but don't think we would have enough time.

20               THE COURT:  Granted.

21               MR. BAUGHMAN:  Did you say granted, your Honor?

22               THE COURT:  Yes.

23               MR. BAUGHMAN:  Could I be heard, please?

24               THE COURT:  Yes.

25               MR. BAUGHMAN:  There's no basis whatsoever for

NCB4COMO

```
1    extending Mr. Winklevoss's deposition.  At the relevant time,
2    he was the president of the company.  The apex doctrine applies
3    in which you should not be chasing after senior executives.
4    They have a burden to meet which is good cause.  They have not
5    shown good cause as to why they cannot take his deposition in
6    seven hours.  What you heard today was something that's their
7    choice.  They said, well, he is the only person from Gemini
8    we're going to speak to.  They could take a deposition of
9    anyone they would like.  And, indeed, they've already taken
10   Mr. Winklevoss's deposition for two days, and they did that in
11   a way that is questionable at best.
12        After they issued a Wells notice, we responded to the
13   Wells notice, they then took deposition of Mr. Cameron
14   Winklevoss for two days, of his brother, Mr. Tyler Winklevoss
15   for two days.  The notion that they need two full days now is
16   not credible, and they have not shown, made any showing as to
17   anything, they can't do it.  I submit, your Honor, the proper
18   procedure would be for if they actually want to take the
19   deposition, and at the end of it if they can make a showing
20   they been blocked in some way, perhaps then it would be
21   appropriate to reconsider.  But to just say he should sit two
22   days when he is the head of the company is not good cause.
23        THE COURT:  This is a very complicated case.  It
24   involves matters that have not been well litigated in the
25   federal courts before.  If counsel, in good faith, believes he
```

NCB4COMO

1    needs more time to ask questions of the lead executive of

2    respondent, I will defer to that good faith.

3              It doesn't mean he can ask redundant questions.  It

4    doesn't mean he can make a position on the president, but it

5    does allow him to ask relevant questions.  If they can't finish

6    it in an hour or day, they can go on to the second day.

7              MR. BAUGHMAN:  Respectfully your Honor, I think the

8    latitude --

9              THE COURT:  I made the ruling, Mr. Baughman.

10              MR. BAUGHMAN:  It's not fair, your Honor.

11              THE COURT:  It's fair.  I've made the ruling.

12              MR. BAUGHMAN:  Could you give us a time for the

13    extension of the discovery?  Currently discovery is supposed to

14    close January 4.

15              THE COURT:  What do you want?

16              MR. BAUGHMAN:  I would suggest 60 days under the

17    circumstances.

18              THE COURT:  What do you say, Mr. Rogers?

19              MR. RODGERS:  That's fine, your Honor.

20              One more, sort of, outstanding issue --

21              THE COURT:  One minute.

22              How about February 2?

23              MR. BAUGHMAN:  For a conference, your Honor?

24              THE COURT:  No, February 2 for finishing discovery.

25              MR. BAUGHMAN:  We are currently scheduled January 4,

NCB4COMO

1    so that would be an extension of 28 days.

2         THE COURT:  What's your close date now?

3         MR. BAUGHMAN:  Technically, it's December 31, and we

4    have a conference on January 4.

5         THE COURT:  Yeah, so I'm giving you two months.

6         MR. BAUGHMAN:  I thought you said until February 2?

7         THE COURT:  You want to get to the end of February?

8         MR. BAUGHMAN:  I think it would be prudent, your

9    Honor.

10         THE COURT:  February 29.

11         MR. RODGERS:  And if I could ask a clarifying

12    question, your Honor?

13         THE COURT:  One minute.

14         I got a two-month trial in February and March.  And

15    that's one of the reasons I cut you down so I could get you

16    before the trial.

17         MR. BAUGHMAN:  This is only fact discovery, your

18    Honor.  We haven't got to expert discovery yet.

19         THE COURT:  February 29 to end discovery, and when

20    should we meet?

21         MR. BAUGHMAN:  To end fact discovery.

22         THE COURT:  To end fact discovery.

23         MR. BAUGHMAN:  Whenever your Honor is available in the

24    first two weeks of March is obviously fine.

25         THE COURT:  March 16?

NCB4COMO

1          MR. BAUGHMAN:  That's fine, your Honor.

2          THE COURT:  10:00.

3          I do these off the record, and maybe I shouldn't do

4    that with this case.  March 16 is Saturday anyhow.  I could

5    take you March 15.  I don't have a court reporter on these

6    conferences.  So if you want a court reporter on this I'll have

7    to do it another day of the week.

8          MR. BAUGHMAN:  I think we would want a court reporter.

9          THE COURT:  I figured.

10          MR. BAUGHMAN:  It's helpful because we cover a lot of

11    ground, and the parties are able to refer.  It's useful.

12          We have a transcript today though; right?

13          THE COURT:  Yes, you do.

14          March 28, at 2:15.

15          MR. BAUGHMAN:  Thank you, your Honor.

16          MR. RODGERS:  Your Honor, is this an extension that's

17    limited to the 30(b)(6) deposition?

18          THE COURT:  It's an extension of all fact discovery.

19          MR. RODGERS:  OK, your Honor.

20          THE COURT:  But finish it, and don't ask me for

21    another one.  And if you want to take the fellow in London,

22    take it.  You don't need permission.  Just do it.  If you want

23    to go it to London on a deposition, I suggest -- pay attention,

24    Mr. Rogers.

25          MR. RODGERS:  Sorry.  I was distracted.  Sorry about

NCB4COMO

1    that.

2          THE COURT:  Don't do that.  If you want time, ask me.

3          I was going to suggest if either of you want to take a

4    deposition in London, you should do so by commission.  And you

5    can agree on it, or you can do it by remote discovery which is

6    now frequently occurring.

7          MR. BAUGHMAN:  We would need so submit letters to your

8    Honor and so on and so forth.

9          THE COURT:  You should agree on a procedure.

10         MR. BAUGHMAN:  The witness, I'm quite confident, will

11   require that we dot the i's and cross the t's so we follow the

12   procedures.

13         THE COURT:  So you should probably go by commission.

14   Provide that you will do the questioning though.  Because

15   otherwise --

16         MR. BAUGHMAN:  Oh, yes.  You go to the master of the

17   roles and you get an order from the master of the roles

18   allowing you to do in a designated spot.  I've done it.

19         MR. RODGERS:  I've got two other points.  One

20   clarifying point, your Honor, is that document discovery has

21   been deleted; correct?  This doesn't open the door to

22   additional document discovery?

23         THE COURT:  Well, I allowed an interrogatory

24   procedure, haven't I?

25         MR. RODGERS:  Correct, your Honor.

NCB4COMO

1      THE COURT:  I assume that you've responded to all of

2  the documents that would be relevant?

3      MR. RODGERS:  We have.  There is a third-party

4  document subpoena that's outstanding, not from us, from defense

5  counsel that was recently served.

6      MR. BAUGHMAN:  I think we are going to need time to

7  get that one resolved.  It relates to what Mr. LaVigne was

8  referring to.  We moved as expeditiously as we can.

9      THE COURT:  If there is any more documents that are

10  relevant to the interrogatories that I've allowed, produce

11  them.

12      MR. RODGERS:  The last point, your Honor, is in this

13  30(b)(6) deposition.

14      THE COURT:  You said that in every interrogatory there

15  is in tandem a Rule 34 request for documents relevant to this,

16  not here for produced.

17      MR. RODGERS:  Understood, your Honor.

18      MR. BAUGHMAN:  That's helpful.  Thank you.

19      MR. RODGERS:  On 30(b)(6) notice that we served, we

20  are in the process of meeting and conferring.  We have not

21  received a written response from Gemini.

22      THE COURT:  Written response, why don't you get

23  together and talk?

24      MR. RODGERS:  It would be helpful, and I think the

25  case law that we cited in the letter, to sort of understand

NCB4COMO

Gemini's position on a lot of these topics.  Maybe it will be

framed a little bit more by what's happened here.  We don't

know but it would be helpful to get their position.

THE COURT:  You know what their position is.  These

so-called contention interrogatories are a waste of time.  They

lead to constant procedural impasses.  Talk to each other.

MR. BAUGHMAN:  That's what we said.  We said we

thought we would be informed by, your Honor's approach today,

and we will.  I think very likely what our response will be is

that they don't need a 30(b)(6), and they can serve

interrogatories in much the way your Honor has ruled with

respect to the one to them.  We will give them a formal

response.

THE COURT:  I think that's right, Mr. Rogers.  It

seems to me that you have -- do you have something to say?

MR. TOMER:  Sorry, your Honor.  I just wanted to make

one point.  With respect to the 30(b)(6), one of the issues

that we needed clarification on is some of the technical data

that was produced to us.  It's very complicated data.  It would

be very difficult to do in interrogatory.  We'd really need for

a custodian of records to explain some of the information to

us.

THE COURT:  Who would you ask for?

MR. TOMER:  They haven't identified a person that

could walk through that.  They clearly produced data.  They

NCB4COMO

1    clearly have someone in house that could explain it to us.

2            THE COURT:  Any problem, Mr. Baughman?

3            MR. BAUGHMAN:  Well, it's a shocking statement that

4    has just been made because it goes directly --

5            THE COURT:  Mr. Baughman, how many years have you been

6    practicing?  Are you shocked anything an adversary does?

7            MR. BAUGHMAN:  I think you are allowed to be shocked

8    about once a month.  But I take your point, your Honor.

9            But the fact that they don't understand the data, five

10   years after they got it and are bringing a case about it.

11           THE COURT:  You know how everybody works.  Nobody does

12   anything until the last minute.

13           MR. BAUGHMAN:  In any event, your Honor, we will -- I

14   don't have the request  in front of me.  I will take a look at

15   it.  We'll provide a response.

16           THE COURT:  What kind of data is it?

17           MR. BAUGHMAN:  Trading data.  I assume that's what he

18   asked about.

19           THE COURT:  Trades bought and sold?

20           MR. BAUGHMAN:  Correct, your Honor.

21           THE COURT:  So what do you need to ask about?

22           MR. RODGERS:  Your Honor, I think we just want to make

23   sure we are operating from the same choir sheet, what the data

24   is, what it reflects, Column A to --

25           THE COURT:  The data is the data.

NCB4COMO

1    MR. RODGERS:  Right, your Honor.  But it's produced in

2  a format that we wanted to make sure that we completely

3  understand, especially as we move into expert discovery, so we

4  knee know what the specific columns and information means.

5    THE COURT:  For example?

6    MR. RODGERS:  For example, there is -- let's take the

7  trading data.  There is a long list of columns that reflects,

8  you know, the buy, sell, offer, spread, all the data you would

9  expect from a trading organization.  And we just want to make

10  sure that what has been exported to us, we understand.

11    THE COURT:  Well, what's so hard to understand?

12    MR. RODGERS:  I mean --

13    THE COURT:  You know what a buy is.  You know what a

14  sell is.

15    MR. RODGERS:  Right.  I'm obviously not Google any

16  justice to the complexity of it.  That's why we are having

17  experts take a look at that kind of stuff.  There is some

18  misalignment in some of the information that we've identified.

19  And we are happy to -- I think it would be the easiest

20  mechanism to sit down with the custodian at Gemini who has an

21  understanding of how the trading engine works and how the

22  information was exported so that we're all on the same page.

23    THE COURT:  Take a page, circle what you need to know,

24  give it to Mr. Baughman.  He will give you back an answer, and

25  that will be the end of it.

NCB4COMO

1        MR. BAUGHMAN:  That would be fine, your Honor.  Thank

2   you.

3        THE COURT:  Not everything is complicated.

4        Yes, Mr. LaVigne.

5        MR. LAVIGNE:  Just one thing, Judge.

6        THE COURT:  You've been wanting to get up for five

7   minutes.

8        MR. LAVIGNE:  I'm holding myself back.

9        Your Honor asked us to file these disclosures I told

10  you about.  I just wanted to see if there was a timeframe your

11  Honor had for that.  Could we do it within a week?

12        THE COURT:  What do you want to give me?

13        MR. LAVIGNE:  Sorry?

14        THE COURT:  What is it you are talking about?

15        MR. LAVIGNE:  When we were talking earlier --

16        MR. BAUGHMAN:  I believe, your Honor, said that we

17  should make the filing in a week.  He is just asking for

18  confirmation on that.

19        THE COURT:  Yeah, is that OK?

20        MR. LAVIGNE:  Yeah, that's fine.

21        THE COURT:  All right.  Thanks very much, folks.  Have

22  a happy holiday.

23        (Discussion off the record)

24        THE COURT:  I asked Mr. Rogers off the record, and so

25  we are putting it now on the record.  Considering the question

NCB4COMO

1   of materiality, who gets fooled by a misstatement?  Assuming

2   there is a misstatement, it's the CFTC that is getting fooled;

3   right?

4           MR. RODGERS:  The CFTC is the target of the statement,

5   and I think under the jurisprudence since it's a false

6   statement provision under the Commodities Exchange Act that

7   they are misled by the statement, your Honor.

8           THE COURT:  So it's the CFTC that's misled?

9           MR. RODGERS:  That's right.

10          THE COURT:  So the touchstone is what's material

11  regarding a misrepresentation to the CFTC?

12          MR. RODGERS:  Your Honor, the CFTC is the decision

13  maker, and the standard is whether the statement was capable of

14  influencing an agency decision.

15          THE COURT:  And it's your argument that the question

16  is an objective one?

17          MR. RODGERS:  That's right.

18          THE COURT:  What is the standard?  In a market

19  situation the standard is what a reasonable investor would have

20  considered important, something like that.

21          MR. RODGERS:  Yeah, there is a reasonable person

22  standard.

23          THE COURT:  What does a reasonable administrative

24  agency think is or consider important?

25          MR. RODGERS:  That concept has not been imported into

NCB4COMO

1  the false statement jurisprudence.  So now we are going back to

2  things we discussed with Mr. LaVigne.  It is not --

3        THE COURT:  We're going back because it's hard for me

4  to grasp it.

5        MR. RODGERS:  I understand the difficulties here.  But

6  it is worth emphasizing that the jurisprudence on false

7  statements is different.  The focus is on the influential

8  capacity of the statement itself.  There is not a reasonable

9  administrative --

10       THE COURT:  Who judges that?  It could be a range.  It

11  could be a range.  You would be on top of the range, for

12  example, and I would be at the bottom of the range.  A simple

13  misstatement, I would be misled.  You would be more

14  sophisticated, you wouldn't be misled.  Is there a reasonable

15  man standard?

16       MR. RODGERS:  There is not, your Honor.  The standard

17  is set forth in the *Gaudin* decision.  I think both sides have

18  cited that.  And the analysis is laid out as determining what

19  the statement was made, and what decision the agency was trying

20  to make, and the ultimate question of whether the statement was

21  material to the decision requires applying a legal standard of

22  materiality, which I quoted above, which is a statement is

23  material if it --

24       THE COURT:  So am I the decision maker?

25       MR. RODGERS:  Your Honor, our position would be, you

NCB4COMO

1    would be in a position to make that determination as a matter

2    of law, assuming that are no questions of fact with regard to

3    the two subsidiary questions.

4            THE COURT:  Well, the question of fact would be only

5    on whether it's a misrepresentation or not.

6            MR. RODGERS:  The false statements and materiality

7    pieces kind of collapse into each other.

8            THE COURT:  No, they don't.  They are separate

9    inquiries.

10            MR. RODGERS:  That's true, but it's if it's false

11   statement, and was true, I think it's fair to say, as a matter

12   of law, that that was capable of influencing an agency

13   decision.  Unless as counsel pointed out --

14            THE COURT:  I can't think of that.  That doesn't --

15   Mr. LaVigne and colleagues, Mr. Baughman, they think it's a

16   jury question.  And that means that there has to be facts to

17   put before the jury, and hence they get into every agency

18   person is a factor.  And you are saying that I can look at the

19   statement, and assuming it's a misstatement, maybe the decision

20   if it's an important misstatement, it's significant.

21            MR. RODGERS:  That's correct, your Honor.  I think

22   that's consistent with how we looked at this standard through

23   the prior two hearings in this case.

24            THE COURT:  Has anybody written about this?

25            MR. RODGERS:  About the standard that's applicable in

NCB4COMO

1    a false statement case?

2            THE COURT:  Yes, to an agency.

3            MR. RODGERS:  To an agency, I don't have any sort of

4    legal --

5            THE COURT:  So you are a certifying agency.  That's

6    different, the FTC is not a certifying agency.  You certify an

7    exchange.  You are the certificate that an exchange change with

8    operate.

9            MR. RODGERS:  It's a little bit different here in that

10   they are certifying a product.  We are not certifying Gemini as

11   an exchange.  We're --

12           THE COURT:  By certification, you mean that it can be

13   is subject for trading on the Chicago Board of Trade or

14   options.  So you are a certifying agency.  So this standard

15   must be true of all other certifying agencies like Food and

16   Drug Administration.

17           MR. BAUGHMAN:  Could I make a couple comments.  I

18   think this is extremely helpful, your Honor.  And I'm glad you

19   focused on this.

20           THE COURT:  It's a puzzle.

21           MR. BAUGHMAN:  It's vital.

22           Counsel just said something that is important.  He

23   said that the question is what decision was being made and was

24   the statement or omission capable of influencing the decision

25   being made by the agency.  That's the standard, and I agree

NCB4COMO

```
1    with that.
2            Here is why we've been at such loggerheads on the
3    discovery.  We have asked them, and the discovery went to, what
4    is the decision that you make?  They have refused to answer the
5    question, what is the decision that the CFTC make?  They won't
6    tell us.
7            THE COURT:  Did they certify the product?
8            MR. BAUGHMAN:  They won't answer the question.
9    Technically, they don't do that.  The way a self-certification
10   works is you self-certify, then after a certain period of time
11   you are allowed to begin offering the public the product.  If
12   they don't do anything, you just go ahead.  We literally asked
13   them the question what decision did you make, and they
14   instructed their witness not to answer that.  They won't tell
15   us.
16           THE COURT:  So if they made no decision, it goes into
17   effect.
18           MR. BAUGHMAN:  If they made no decision then the case
19   should be dismissed because no statement influenced any
20   decision.  They must show --
21           THE COURT:  No, that's not show.  That part is not
22   true because they could say, oh, with this information I don't
23   need to involve myself.
24           MR. BAUGHMAN:  OK.  But the question of materiality,
25   everything --
```

NCB4COMO

1          THE COURT:  So it could be a matter of neglect or a

2     matter of choice.

3          MR. BAUGHMAN:  I think your Honor hit on it earlier

4     when you were focusing on what's evidence, that's the right

5     question.  The question is how is the jury going to decide

6     whether or not the statements were material.  And that's why we

7     think that whether people asked about them, what they did with

8     information when it was provided, all of that is just evidence

9     that goes directly to materiality and why we do think it's

10    important.

11          On the issue of who decides --

12          THE COURT:  Can I interpret you for a minute?

13          MR. BAUGHMAN:  Please.

14          THE COURT:  In a securities case --

15          MR. BAUGHMAN:  Yes.

16          THE COURT:  -- the question of materiality is to the

17    reasonable investor.

18          MR. BAUGHMAN:  Correct.

19          THE COURT:  Typically an expert would discuss that.

20          MR. BAUGHMAN:  Correct.

21          THE COURT:  Is there an expert that can discuss this

22    in a context where the agency is the recipient of the

23    information?

24          MR. BAUGHMAN:  Perhaps.  Although, we struggled to

25    find experts because most of them would be former CFTC people

NCB4COMO

1   who are reluctant to testify.

2          THE COURT:  A professor of administrative law.

3          MR. BAUGHMAN:  Perhaps.

4          On the issue of evidence, the question and everyone is

5 citing *Gaudin*.  And what *Gaudin* talks about is the inferences a

6 reasonable decision maker would draw from the given set of

7 facts.  So that's the test, what would a reasonable CFTC person

8 making a decision draw from a set of facts?  I agree that an

9 expert can give evidence on that, but it's not the only

10 evidence, nor is it the best evidence.  The best evidence is

11 what the actual CFTC people at the time did with that set of

12 facts.  What's why we are --

13          THE COURT:  I know.  I'm aware of it.  I'm aware of

14 what you are saying.

15          MR. BAUGHMAN:  This is hard.  I agree, your Honor.

16 This is hard.

17          THE COURT:  Mr. Rogers is telling me it's not an

18 individual, it's the organization itself.  And if you could

19 find an expert to testify that will be relevant, but basically

20 it's I who has to make that decision.  You're saying it's the

21 jury that has to make that decision, and it's a decision made

22 up of a lot of decisions of a lot of different people, which

23 gives me the tension that I have to resolve.

24          MR. BAUGHMAN:  And this is what judges do.

25          THE COURT:  Right.

NCB4COMO

1    MR. BAUGHMAN:  We come all the time with is there a

2    dispute?  Is there a material dispute?  And you decide that,

3    you know, once a week, I'm sure.  But if there is a dispute,

4    the ultimate question of falsity and materiality and so on and

5    so forth will be in the jury charge, for sure.

6    THE COURT:  Right.  Right, or in my decision that

7    avoid a jury charge.

8    OK.  I think we are spinning our wheels at this point

9    in time.  Both of you have the benefit of being an adversary,

10   so you know your answer.  I have to judge it.

11   MR. RODGERS:  I think there is one important gloss to

12   put on this.  And that is the Second Circuit has addressed the

13   type of evidence that is sufficient for an objective decision

14   maker to determine whether a statement is capable of

15   influencing an agency decision.  That is an examination of the

16   factors the decision maker would employee, the nature of the

17   investigation or inquiry and the purpose of the decision to be

18   made.  All of that is, frankly, already in the record and is

19   public guidance.

20   And just to Mr. Baughman's point about not saying what

21   the final decision would be --

22   THE COURT:  I didn't want this to be an argument for

23   the case.  It was really a speculation of who was going to

24   decide this issue of materiality and what that implies in terms

25   of what discovery can go to.

NCB4COMO

1            MR. BAUGHMAN:  It's these folks over here.

2            THE COURT:  Yes, right.  Motion to the jury.

3            All right, folks.  Have a good holiday.

4            MR. RODGERS:  Thank you.

5            MR. BAUGHMAN:  Thank you, your Honor.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25