# SHEARMAN & STERLING LLP

599 Lexington Avenue
New York, NY 10022-6069
+1.212.848.4000

Christopher.LaVigne@Shearman.com
212.848.4432

**Via ECF**

December 18, 2023

Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street, Room 1050
New York, New York 1000

> RE: *Commodity Futures Trading Commission v. Gemini Trust Co., LLC*, **Case No. 22 Civ. 4563**

Dear Judge Hellerstein:

Gemini respectfully submits this letter in response to the Court's directives at the December 11, 2023 Conference and in its December 12, 2023 Order that: (1) Gemini provide the Court with examples of documents that Gemini contends reflect Gemini's disclosure of information on issues that the CFTC has alleged Gemini withheld information; and (2) clarify the questions it intends to ask a CFTC witness during a 30(b)(6) deposition on these topics, *see* ECF Dkt. 70 at 3. As discussed at the Conference, it is Gemini's position that these disclosures are relevant to critical issues in this case, including whether any false or misleading statement was made, Gemini's knowledge and intent, and the materiality of any alleged omitted information. Although the CFTC bears the burden of proof on these issues, Gemini is entitled to present a defense. As discussed at the December 11 Conference, Gemini should be entitled to demonstrate that there was no false or misleading statement or scienter because Gemini disclosed the information that was requested, and that any alleged omissions are not material because (1) Gemini did provide relevant information on issues that the CFTC has alleged Gemini withheld information, but (2) the CFTC never asked any questions or for additional information relating to these disclosures.[1]

To assist the Court, as set out below, Gemini has categorized the subject matters of the disclosures at issue, attached relevant documents (with relevant excerpts highlighted), and listed

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to such terms in Gemini's Memorandum of Law in Support of its Motion to Compel (the "Motion to Compel"). *See* ECF Dkt. 54.

**SHEARMAN.COM**

Shearman & Sterling LLP is a limited liability partnership organized in the United States under the laws of the state of Delaware, which laws limit the personal liability of partners.

December 18, 2023

the topics that Gemini proposes to cover during a 30(b)(6) deposition of a CFTC witness.  If for any reason the Court concludes that a 30(b)(6) deposition on one or more of the topics is unnecessary, Gemini requests in the alternative that it be permitted to pose these questions on that topic (or those topics) through interrogatories.

### A.  Category 1 – Bespoke Fee Agreements

The CFTC's complaint alleges that Gemini withheld information from the CFTC regarding Gemini's use of so-called bespoke fee or preferential agreements with certain customers.  Specifically, the CFTC alleges that "Gemini made and caused to be made false or misleading statements and omissions to Commission staff regarding trading fee rebates and fee 'overrides.'"  Compl. ¶ 88.  This allegation claims, in particular, that Gemini, on occasion, entered into bespoke, custom, or preferential fee agreements with customers that differed from the Universal Fee Schedule Gemini offered to all participants on the Gemini Exchange, and that these arrangements were not disclosed to the CFTC.  *See id.* at ¶ 94 (CFTC alleging (under header entitled "Undisclosed bespoke fee rebates and overrides) that the withheld information includes that "Gemini at times before and during the Relevant Period entered into bespoke or custom fee arrangements with market participants, including market makers, that were not available to all Gemini market participants and that were not disclosed to the public on Gemini's website."); *see also id.* at ¶ 107 (alleging that Gemini did "not inform[] Commission staff of the existence of the bespoke or custom fee arrangement").  The CFTC has also alleged that this purported omitted information was "material, including to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract," *id.* at ¶ 92, because bespoke fee or custom fee arrangements could "reduce traders' cost of capital," "lead to wash trading or other types of abusive trading activities," or "skew the apparent volume, liquidity, or number of trading participants on the Gemini Exchange and in the Gemini Bitcoin Auction," *id.* at ¶ 93.

Gemini denies this allegation.  One of Gemini's defenses is that it **did disclose** to the CFTC Gemini's use of bespoke fee arrangements and its offering of individually negotiated, preferential fee structures to certain market makers.  Specifically, Gemini contends that these facts were disclosed in Gemini's Policies & Procedures Manual, which was transmitted to the CFTC on September 12, 2017 (almost three months before Cboe filed the Self-Certification).  The cover email and relevant portion of the Policies and Procedures are attached hereto as Exhibit A, and the relevant excerpts are highlighted in the table of contents at page 3 (entitled "Agreements Granting Preferential Terms") and on page 46.  The excerpts include the following language (under the heading "Agreements Granting Preferential Terms"):  "Our organization may provide certain high volume Users, market makers or other special-case users ('Priority Users') with terms different from those given under the standard User Agreement and fee schedule ('Fee Schedule')."  Ex. A at 46.  The document states that these bespoke, preferential terms relate to certain preferential users' "right to receive priority treatment and/or order execution relative to other Users," "the ability to obtain a more favorable Fee Schedule," and "[l]iquidity preferences in respect to withdrawals or deposits."  *Id.*  The document further states the procedures by which Gemini would enter into such bespoke, custom, or preferential

December 18, 2023

agreements with select customers.  *Id.* at 46-47.  It is undisputed that the CFTC did not ask questions about these policy excerpts.

Accordingly, Gemini proposes covering the following topics during a Rule 30(b)(6) deposition of the CFTC:

- Who, if anyone, at the CFTC reviewed Exhibit A before the Self-Certification (defined to include the time-frame during which the CFTC reviewed Cboe's and Gemini's planned Bitcoin Futures product that was self-certified on or about December 1, 2017);

- What was the purpose of the review;

- Whether the review revealed any evidence of Gemini offering individually negotiated (or bespoke, custom, or preferential) fee structures to certain traders;

- Whether, following receipt of this policy document, the CFTC requested any additional information from Cboe or Gemini regarding individually negotiated (or bespoke, custom, or preferential) fee structures on the Gemini Exchange to certain traders during the Self-Certification; and

- If not, then why the CFTC requested no such additional information.

The CFTC should be required to answer such questions.  Without being required to answer these questions, it would be unfair for the CFTC to make any argument at all as to the information that was or was not provided regarding bespoke, custom, or preferential fee arrangements and the materiality of any alleged omissions.  The requested information goes directly to Gemini's defense and to the elements the CFTC needs to establish.

## B.  Category 2 – Historical Self Trading

The CFTC's complaint alleges that Gemini failed to disclose the existence of historical instances of self-trading on the Gemini Exchange.  Specifically, the CFTC alleges that Gemini "made and caused to be made false or misleading statements and omissions to Commission staff regarding the extent and possibility of self-trading, or self-crossing, on the Gemini Exchange." Compl. ¶ 73.  The CFTC further alleges that self-trading on the Gemini Exchange "actually occurred" "from the inception of the Gemini Bitcoin Auction in 2016 to around May 2017," which "could account for a significant portion of the Gemini Bitcoin Auction's total trading volume in a given day."  *Id.* at ¶¶ 80-81.  The CFTC further alleges that self-trading continued to occur "on occasion" on the Gemini Auction after Gemini instituted self-trade protection in May 2017.  *Id.* at ¶ 83.  The CFTC further alleges that these allegedly undisclosed instances of self-trading were "material . . . to evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract" because "self-trading could lead to manipulative conduct" and "misleadingly skew the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction."  *Id.* at ¶¶ 78-79.

December 18, 2023

Gemini denies this allegation.  One of Gemini's defenses is that it **did disclose** instances of self-trading on the Gemini Exchange, including by providing all trading data on the Gemini Exchange that the CFTC requested.  *See* ECF Dkt. 54; ECF Dkt. 60.  Because the trade data is too voluminous to submit in its entirety, attached hereto as <u>Exhibit B</u> are excerpts of the auction trading data submitted to the CFTC on or about August 1, 2017.  These excerpts, which contain data from the December 27, 2016 auction and July 4, 2017 auction are examples of the trading data that reflect instances where the same party was on both the buy and sell side of a single auction (*i.e.*, purported "self-trading").  For example, there were 685 Bitcoin bought and sold in the December 27, 2016 auction.  Account 8972 sold 675 of those 685 Bitcoin, as indicated in green, and bought more than 482 Bitcoin, as indicated in red.[2]  Similarly, there were 50 Bitcoin bought and sold in the July 4, 2017 auction.  Account 10078 sold more than 27.5 of those 50 Bitcoin, as indicated in green, and bought all 50 Bitcoin, as indicated in red, another example of historical self-trading disclosed in auction data transmitted to the CFTC.  It is undisputed that the CFTC did not ask questions about specific instances of self-trading reflected in this trading data.

Accordingly, Gemini proposes covering the following topics during a 30(b)(6) deposition of a CFTC 30(b)(6) witness:

- Who, if anyone, reviewed or analyzed the Gemini trading data that was disclosed to the CFTC, including on or about August 1, 2017 and that is contained in Exhibit B, during the Self-Certification;

- What analysis, if any, was done with respect to this data during the Self-Certification;

- What was the purpose of this analysis;

- Whether any evidence of self-trading on the Gemini Exchange was discovered in connection with this analysis, or during the Self-Certification;

- Whether the CFTC requested any additional information from Cboe or Gemini regarding self-trading on the Gemini Exchange during the Self-Certification; and

- If not, then why the CFTC requested no such additional information.

Answers to these questions go directly to Gemini's defense on core issues in the case—including whether relevant information was withheld and the materiality of any alleged withheld information concerning historical self-trading.

---

[2] This disclosure regarding self-trading on the December 27, 2016 auction is particularly important because the CFTC alleges in the complaint that self-trading accounted for 70% of the trading volume associated with one unspecified Gemini auction in December 2016, which Gemini allegedly withheld.  Compl. ¶ 82.  The CFTC has not indicated how it calculated these self-trading figures, but it is almost certainly from the Gemini trading data that Gemini provided in August 2017, which disclosed historical instances of self-trading (including on December 2016 auctions).

December 18, 2023

### C.  Category 3 – Pearl Street

The CFTC's complaint alleges that Gemini failed to disclose the existence of Pearl Street, an affiliated but distinct entity from Gemini, which provided loans of Bitcoin to a small number of Gemini institutional traders.  Specifically, the CFTC alleges that "Gemini did not disclose to Commission staff, for example, that certain market maker Gemini customers could and did obtain loans of digital assets controlled by Gemini Principal-1 and Gemini Principal-2 from an entity they controlled ('Affiliate A')."  Compl. ¶ 47.  The CFTC further alleges that Pearl Street was "material" "to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract."  *Id.* at ¶ 60.  According to the CFTC's complaint, this is because (1) "digital asset loans, particularly unsecured or at low or below-market rates, could reduce traders' cost of capital—and the cost of manipulative conduct—and thus potentially undermine a purported rationale as to why the Bitcoin Futures Contract was not readily susceptible to manipulation," and (2) "Digital asset loans could misleadingly skew the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction."  *Id.* at ¶ 61.

Gemini denies this allegation.  Among other things, Gemini contends that the CFTC had knowledge of Pearl Street well before the Self-Certification was filed, based on information that a so-called whistleblower disclosed to the CFTC weeks before the Self-Certification was finalized.  The name of the whistleblower is Benjamin Small, a cooperating witness whom the CFTC has disclosed on its trial witness list.  Earlier this year, Mr. Small filed an affidavit in a related proceeding concerning the enforcement of an arbitration award Gemini obtained against Mr. Small after Gemini prevailed on all claims it filed against him.  In Mr. Small's affidavit, attached hereto as Exhibit C, he stated that he "considered that [he] was obliged to report the Pearl Street loans to the CFTC," that he made a formal report to the CFTC through a whistleblower complaint, and that he "gave evidence via confidential written submissions, over the phone, and at in-person meetings beginning on 1 November 2017."  Ex. C at 6, ¶ 21.  November 1, 2017—the date when Mr. Small allegedly self-reported information about Pearl Street to the CFTC—was one month before Cboe filed the Self-Certification.  The CFTC has not produced in discovery any statements Mr. Small provided to the CFTC concerning Pearl Street (or otherwise) during the November 2017 timeframe.[3]  Indeed, the CFTC has not answered the basic question of whether or not the November 1, 2017 meeting took place.

It is undisputed, however, that the CFTC never asked Gemini any questions about Pearl Street during the Self-Certification.  Accordingly, Gemini proposes covering the following topics during a 30(b)(6) deposition of a CFTC 30(b)(6) witness:

---

[3] Gemini has obtained a copy of the November 28, 2017 whistleblower submission Mr. Small provided to the CFTC, which does reference Pearl Street.  As summarized above, however, Mr. Small claims to have started providing information to the CFTC weeks earlier, starting on November 1, 2017.

December 18, 2023

- What information did Mr. Small provide to the CFTC concerning Gemini before the Self-Certification was filed on December 1, 2017, including about Pearl Street;[4]

- Who within the CFTC received and reviewed this information during the Self-Certification;

- What was the purpose of the review;

- Whether the review revealed any evidence that loans provided by Pearl Street to Gemini institutional customers (or any other information provided by Mr. Small) could render the Gemini Exchange or the Bitcoin Futures Contract readily susceptible to manipulation;

- Whether the information provided by Mr. Small was shared with CFTC officials who were evaluating the Self-Certification (and if not, why not);

- Whether the CFTC requested any additional information of Cboe or Gemini based on the disclosures made by Mr. Small; and

- If not, then why did the CFTC not ask Gemini for any information about Pearl Street, or any other topics that Mr. Small disclosed to the CFTC and that the CFTC claims Gemini withheld.

What the CFTC chose to do with information it obtained from Mr. Small during the Self-Certification bears directly on the materiality of information the CFTC claims Gemini withheld, especially regarding Pearl Street.

### D. Category 4 - Operational Advances

The CFTC's complaint alleges that Gemini withheld information regarding so-called "operational advances," which it has also characterized as "credits" or "advances" in the complaint. *See, e.g.,* Compl. ¶¶ 62-72. Specifically, the CFTC alleges that "Gemini did not disclose to Commission staff that, effectively, Gemini made its own digital assets and fiat currency available to customers to trade with on the Gemini Exchange . . . until such later time as the customer completed the deposit of the customer's funds at Gemini—potentially days or weeks later." *Id.* at ¶ 70. The CFTC further alleges this omission was "material" "to the evaluation of the compliance with the Act and Commission Regulations of the Bitcoin Futures Contract." *Id.* at ¶ 71. According to the CFTC's complaint, this is because (1) "credits and advances, particularly those of more significant size or duration, could reduce traders' cost of capital—and the cost of manipulative conduct—and thus potentially undermine a purported rationale as to why the Bitcoin Futures Contract was not readily susceptible to manipulation,"

---

[4] The focal point of these topics is Pearl Street as that is what Mr. Small claims he felt "obliged" to report. Ex. C at 6. However, Gemini believes it is entitled to any information Mr. Small disclosed to the CFTC that (1) the CFTC claims Gemini withheld, and (2) that the CFTC claims was material to its consideration of the Self-Certification.

December 18, 2023

and (2) "Credits and advances could misleadingly skew the apparent volume, liquidity, or number of participants trading on the Gemini Exchange and in the Gemini Bitcoin Auction." *Id.* at ¶¶ 71-72.

Gemini denies this allegation. Among other things, Gemini contends that it **did disclose** on its website that it provided different types of advances of digital assets or fiat currency, examples of which are attached as Exhibit D.1 and Exhibit D.2. Exhibit D.1, for example (published on Gemini's website as of January 31, 2017) relates to Gemini "pre-crediting" its customers' accounts for Bitcoin deposits. These documents state that Gemini permitted its customers to trade immediately the amounts of Bitcoin that had been deposited but not yet cleared through the Bitcoin Blockchain, a process that takes "much longer" than it used to and which can lead to "deposit delays" because of "Bitcoin network congestion." Ex. D.1 at 1-2. Gemini stated that it would permit its customers to trade this amount through a "credit" of Bitcoin that would be applied to the amount of a Bitcoin deposit. *See* Ex. D.1 ("If your transaction passes our criteria (which may take a few minutes), ***we'll precredit the amount of your deposit and make it available for trading immediately***") (emphasis in original). Once the deposit cleared, the assets could be withdrawn. Ex. D.1 at 2. Exhibit D.2 (published on Gemini's website as early as March 11, 2016) outlines Gemini's policy for advancing funds sent to Gemini by ACH deposit. In this document, Gemini stated that after an ACH deposit, a customer's "deposit amount was available for trading *immediately,"* and the amount of deposit could be withdrawn once the ACH deposit clears. Ex. D.2 ("No more watching the BTC price for 4-5 days while waiting for your ACH transfer to arrive; now you can trade and sit back while your funds clear."); *see also* Ex. D.1 at 1 ("[o]ur unique instant ACH system lets US-based customers deposit U.S. dollars and trade immediately, a process that used to take up to a week.") (emphasis in original). It is undisputed that the CFTC did not ask questions about these documents or operational advances.

Accordingly, Gemini proposes covering the following general topics during a 30(b)(6) deposition of a CFTC 30(b)(6) witness:

- Who, if anyone, at the CFTC reviewed Exhibits D.1 and D.2, or information contained on Gemini's website in connection with the Self-Certification;

- What was the purpose of the review;

- Whether the review revealed any evidence that Gemini provided operational advances of Bitcoin or fiat currency prior to such deposits clearing, and whether anyone at the CFTC was aware of any other forms of operational advances on the Gemini Exchange;

- Whether the CFTC requested any information from Cboe or Gemini concerning operational advances; and

- If not, then why the CFTC did not ask Gemini for any information about operational advances and Exhibits D.1 and D.2 in particular.

December 18, 2023

   Answers to these questions go directly to Gemini's defense on core issues in the case regarding operational advances, including whether relevant information concerning this practice was withheld and the materiality of operational advances to the CFTC's work concerning the Self-Certification.

*****

   Gemini thanks the Court for the opportunity to make this submission and can respond to any additional requests or questions the Court may have.

Dated: New York, New York
    December 18, 2023

                 SHEARMAN & STERLING LLP

                 By */s/ Christopher LaVigne*

                   John Nathanson
                   Christopher LaVigne
                   Randall Martin
                   599 Lexington Avenue
                   New York, NY 10022
                   (212) 858-4000
                   john.nathanson@shearman.com
                   christopher.lavigne@shearman.com
                   randall.martin@shearman.com

                 JFB LEGAL, PLLC

                   John F. Baughman
                   Daniel Schwartz
                   Elizabeth Lee
                   299 Broadway, Suite 1816
                   New York, NY 10007
                   (212) 548-3212
                   jbaughman@jfblegal.com
                   dschwartz@jfblegal.com
                   elee@jfblegal.com

                 *Attorneys for Defendant*
                 *Gemini Trust Company, LLC*