**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION | |
| Plaintiff, | No. 22-cv-4563 (AKH) |
| v. | Hon. Alvin K. Hellerstein |
| GEMINI TRUST COMPANY, LLC, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GEMINI TRUST**
**COMPANY, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMNARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

    A.    The Gemini Exchange ..................................................................................... 3

    B.    The Cboe Futures Exchange ........................................................................... 3

    C.    The Self-Certification ..................................................................................... 4

    D.    The Subject Statements ................................................................................... 5

        1.    The July 25, 2017 Presentation Statements (Statements 26–31) ............... 5

        2.    The July 25, 2017 Oral Statement (Statement 32) ..................................... 7

        3.    The August 1, 2017 Data Submission (Statement 25) ................................ 8

        4.    The March 10 Auction Analysis (Statement 18) ........................................ 9

        5.    The Self-Certification and Its Drafts (Statement 1–16) ........................... 10

ARGUMENT ........................................................................................................... 13

I.    SUMMARY JUDGMENT IS APPROPRIATE AS TO THE PART OF THE CFTC'S CLAIM THAT IS BASED ON THE WRITTEN SUBJECT STATEMENTS (STATEMENTS 1–16, 18, 25, AND 26–31) ...................................................... 14

    A.    Section 6(c)(2) of the CEA Prohibits *Making* False Statements, Not *Causing* False Statements .................................................................................................. 14

    B.    There Is No Genuine Question of Material Fact that Gemini Did Not Make the Written Subject Statements ........................................................................... 21

        1.    The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the July 25 Presentation (Statements 26–31) .................... 23

        2.    The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the August 1 Data Submission (Statement 25) ................... 24

        3.    The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the March 10 Auction Analysis (Statement 18) ................ 25

        4.    The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the Self-Certification and Its Drafts (Statements 1–16) ..... 26

II.    SUMMARY JUDGMENT IS APPROPRIATE AS TO THE PART OF THE CFTC'S CLAIM THAT IS BASED ON THE ALLEGED JULY 25, 2017 ORAL STATEMENT (STATEMENT 32) ................................................................................................ 28

CONCLUSION ........................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
  2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018),
  *as amended*, 2018 WL 11472420 (S.D.N.Y. Apr. 27, 2018)..................................................23

*Black v. Wrigley*,
  2023 WL 2591014 (2d Cir. Mar. 22, 2023).......................................................................14

*Bragdon v. Abbott*,
  524 U.S. 624 (1998)...........................................................................................................20

*Brown v. Eli Lilly & Co.*,
  654 F.3d 347 (2d Cir. 2011)..............................................................................................14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...........................................................................................................14

*CFTC v. Amaranth Advisors, L.L.C.*,
  554 F. Supp. 2d 523 (S.D.N.Y. 2008)...............................................................................21

*CFTC v. Monex Credit Co.*,
  931 F.3d 966 (9th Cir. 2019) ............................................................................................21

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)...............................................................................22

*DHS v. MacLean*,
  574 U.S. 383 (2015)...........................................................................................................16

*Dowd v. City of New York*,
  2012 WL 5462666 (S.D.N.Y. Nov. 5, 2012)......................................................................14

*Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*,
  636 F. Supp. 2d 223 (S.D.N.Y. 2009)...............................................................................29

*Floyd v. Liechtung*,
  2013 WL 1195114 (S.D.N.Y. Mar. 25, 2013) ...................................................................17

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
  639 F. App'x 664 (2d Cir. 2016) ..................................................................................22–23

*Ho v. Duoyuan Global Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)...............................................................................17

*In re Commodity Exch., Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016)..................................................................21

*In re Fannie Mae 2008 Secs. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012),
*aff'd*, 525 F. App'x 16 (2d Cir. 2013)...............................................................23

*In re Optimal U.S. Litig.*,
2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ................................................20, 22

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................................22

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)...........................................................22, 23

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)............................................................................... *passim*

*Jones v. Cnty. of Suffolk*,
936 F.3d 108 (2d Cir. 2019)........................................................................13–14

*Krasner v. Rahfco Funds LP*,
2012 WL 4069300 (S.D.N.Y. Aug. 9, 2012) ......................................................22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006)....................................................................................19–20

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021),
*aff'd*, 54 F.4th 82 (2d Cir. 2022) ....................................................................23

*Noto v. 22nd Century Grp., Inc.*,
35 F.4th 95 (2d Cir. 2022) .............................................................................23

*Raila v. United States*,
355 F.3d 118 (2d Cir. 2004)............................................................................15

*Rose v. Rahfco Mgmt. Group, LLC*,
2014 WL 7389900 (S.D.N.Y. Dec. 15, 2014) ....................................................17

*Rotkiske v. Klemm*,
589 U.S. ---, 140 S. Ct. 355 (2019)..................................................................16

*SEC v. Norstra Energy Inc.*,
202 F. Supp. 3d 391 (S.D.N.Y. 2016)...........................................................19, 22

*SEC v. Pentagon Cap. Mgmt. PLC,*
    725 F.3d 279 (2d Cir. 2013).................................................................19

*SEC v. Rio Tinto plc,*
    2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) .......................................19

*Smith v. City of Jackson,*
    544 U.S. 228 (2005)...............................................................................20

*Southwest Airlines Co. v. Saxon,*
    596 U.S. 450 (2022)..........................................................................15–16

*Stillwater Capital Partners Inc. Litig.,*
    853 F. Supp. 2d 441 (S.D.N.Y. 2012)..................................................22

*UBS AG v. Greka Integrated, Inc.,*
    2020 WL 1957530 (S.D.N.Y. Apr. 23, 2020),
    *aff'd,* 2022 WL 2297904 (2d Cir. June 27, 2022) ...............................28

*United States v. Bedi,*
    15 F.4th 222 (2d Cir. 2021) ..................................................................15

*United States v. Lockhart,*
    749 F.3d 148 (2d Cir. 2014)..................................................................16

*United States v. Magassouba,*
    619 F.3d 202 (2d Cir. 2010)..................................................................20

*United States v. Phillips,*
    --- F.3d ---, 2023 WL 5671227 (S.D.N.Y. Sept. 1, 2023) ....................21

*Wang v. Hearst Corp.,*
    877 F.3d 69 (2d Cir. 2017).....................................................................14

*Wellner v. City of New York,*
    2019 WL 1511022 (S.D.N.Y. Mar. 22, 2019) ......................................29

**Rules & Statutes**

7 U.S.C. § 9(2) ................................................................................1, 15, 16

7 U.S.C. 13c(a).................................................................................15–16

8 U.S.C. § 1158(b)(iii) ...........................................................................17

18 U.S.C. § 542 ......................................................................................17

Fed. R. Civ. P. 56...................................................................................13

17 C.F.R. 40.2(a)(3)(v) ................................................................................................11, 27

**Other Authorities**

156 Cong. Rec. S3333, S3348 (May 6, 2010) ........................................................20–21

Thomas Lee Hazen, 3 Law Sec. Reg. § 12.19 (Nov. 2023)....................................16–17

Defendant Gemini Trust Company, LLC ("Gemini") respectfully submits this memorandum of law in support of its motion for partial summary judgment on the portions of the CFTC's claim that are based on (i) statements that the undisputed material facts demonstrate Gemini did not make and (ii) unidentified oral statements as to which there is no evidence.

## PRELIMNARY STATEMENT

The CFTC's theory in this case is that Gemini "made, or caused to be made" a series of material false and misleading statements and omissions in connection with a 2017 self-certification filed by the Cboe Futures Exchange ("CFE" or "Cboe").  There are, Gemini acknowledges, innumerable disputes over whether the at-issue statements were false, misleading, or material.  But the Court need never reach those disputes to dispose of the majority of the CFTC's claim.  Rather, the Court can grant summary judgment in Gemini's favor as to approximately 80% of the CFTC's claim now—without any need for expert discovery or trial—because it relies on a premise that fails as a matter of law.

The CFTC has conceded from the outset that Gemini did not "make" many of the statements at issue.  Seven times in its Complaint, the CFTC alleged that Gemini "made, *or caused to be made*," the relevant false statements.  *See* Compl. ¶¶ 38, 40, 73, 88, 108, 109, 120 (emphasis added).  The CFTC's distinction between *making* a statement and *causing* a statement is critical.  The CFTC has sued Gemini under one statute: Section 6(c)(2) of the Commodity Exchange Act ("CEA"), which makes it "unlawful for any person *to make* any false or misleading statement of a material fact to the Commission . . . *or to omit to state* in any such statement any material fact that is necessary to make any statement of material fact made not misleading in any material respect." 7 U.S.C. § 9(2) (emphasis added).  Nothing in Section 6(c)(2)'s plain language prohibits "causing" a false statement.

Supreme Court precedent confirms that a statutory provision prohibiting the making of false statements does not also create liability for "causing" someone else to make a false statement. In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court dismissed claims under Rule 10b-5(b)—which is substantively identical to Section 6(c)(2)— against a defendant accused of causing an affiliate to issue prospectuses containing false statements. In so holding, the Court explained that "one 'makes' a statement by stating it" and "the maker of a statement is the person or entity with *ultimate authority* over the statement, including its contents and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.* at 142 (emphasis added).

Applying this clear law to the undisputed facts establishes that Gemini is entitled to summary judgment on all but seven of the statements at issue in this case. During fact discovery, the CFTC identified 31 written statements that it contends were false or misleading. But the undisputed evidence demonstrates ***Gemini did not make 24 of those statements***—CFE did. Among other things, CFE controlled what the documents that contained the statements said and whether to submit them to the CFTC; the documents at issue were printed on CFE letterhead or templates and were signed (or had signature lines) for CFE employees; and CFE employees sent the documents to the CFTC with no Gemini employees copied. This evidence is uncontroverted and leads to a clear conclusion: CFE, not Gemini, had ultimate authority over—and thus, for purposes of Section 6(c)(2), made—these statements.

Summary judgment is also appropriate as to one other portion of the CFTC's claim. The CFTC has asserted that Gemini made an oral false statement during an in-person meeting on July 25, 2017. Discovery, however, has uncovered no evidence of any such misstatement. Instead,

the trial witnesses who attended this meeting could not identify any specific statements made during this meeting *at all*.   So comprehensive is the lack of evidence to support this prong of the CFTC's claim that, even after years of investigation and discovery, the CFTC could not identify *any* details about the purported misstatements—including what they were or who made them—in its sworn responses to the Court's interrogatories.

*       *       *

The CFTC's case against Gemini was ill-conceived from the beginning.  While a sliver of the CFTC's baseless allegations must be resolved at trial, the majority can be rejected now.  The Court should grant Gemini's motion for partial summary judgment.

## STATEMENT OF FACTS

### A.      The Gemini Exchange

Gemini is a New York-based trust company chartered by the New York Department of Financial Services ("DFS") that was founded in 2015 by Cameron and Tyler Winklevoss.  56.1 ¶ 1.[1]  In 2017, Gemini operated an exchange on which customers could buy and sell digital assets, including bitcoin, by placing orders on the exchange's continuous order books or, for bitcoin only, by participating in one of two daily auctions.  56.1 ¶ 2.  The Gemini exchange was not regulated by the CFTC.  56.1 ¶ 3.  Instead, it was actively regulated by DFS.  56.1 ¶ 4.

### B.      The Cboe Futures Exchange

Cboe Futures Exchange, LLC ("CFE" or "Cboe") is a CFTC-regulated Designated Contract Market ("DCM")—a form of self-regulatory organization—that operates a series of exchanges on which futures, swaps, and other derivatives contracts are traded.  56.1 ¶ 5.  As a

---

[1]   "56.1" refers to the Statement of Undisputed Facts filed in support of Gemini's Motion.  "Ex." refers to exhibits to the Declaration of John F. Baughman.

DCM, CFE could introduce new contracts for trading either by seeking the CFTC's approval or by submitting a so-called "self-certification," in which CFE certified that the new contract met certain requirements, including compliance with the CFTC's "Core Principles." 56.1 ¶ 6.

    **C.    The Self-Certification**

On December 1, 2017, CFE filed a self-certification (the "Self-Certification") for a bitcoin-denominated futures contract (the "Bitcoin Futures Contract") that was to settle by reference to a 4:00 PM bitcoin auction held every day on the Gemini exchange. Ex. 8. CFE was responsible for deciding whether to submit the Self-Certification and for its contents. 56.1 ¶ 8. Gregory Kuserk, who in 2017 was the Deputy Director of Product Review for the CFTC's Division of Market Oversight ("DMO"), acknowledged this fact during his deposition:

> Q.    As a DCM, Cboe had the ultimate responsibility to decide what the Self-Certification would say, correct?
>
> A.    Okay. Yes, that would be their obligation.

Ex. 16 at 58:6–22 (cleaned up).[2] Mr. Kuserk's colleague, Christopher Goodman, who was a DMO economist in 2017, similarly testified "CBOE was responsible . . . for the content [in that] we expect when they file something, that it's truthful and whatnot." Ex. 17 at 288:4–12. Arthur Reinstein, who was in-house counsel for CFE in 2017, agreed that CFE made the "ultimate[] . . . decision" about "whether or not to pursue a self-certification," had an "obligation to ensure that the proposed bitcoin futures product complied with the applicable core principles," and had the "final decision" about "what to say in [the Self-Certification]." Ex. 15 at 157:15–158:2.

CFE's filing of the Self-Certification was the culmination of months of back-and-forth between CFE, Gemini, and the CFTC. 56.1 ¶ 9. As part of this dialogue, numerous documents

---

[2]    All objections have been omitted from cited deposition transcripts.

were submitted to the CFTC.  56.1 ¶ 10.  As Mr. Reinstein testified, it was "ultimately CBOE's decision" what materials to submit and what those materials would say.  Ex. 15 at 159:4–23. Gemini did not have the authority or power to force CFE to submit any specific document to the CFTC, Ex. 15 at 160:9–12, and Gemini "did not have control or agency on what information, necessarily, [CFE] chose or how they chose to present that to the CFTC," Ex. 13 [C. Winklevoss] at 528:5–23.

### D.    The Subject Statements

On January 4, 2024, the Court ordered the CFTC to "identify the statements in defendant's disclosures that plaintiff alleges were materially false and misleading."  Dkt. 77 at 3.  The CFTC served its response on January 19, 2024 (the "January 19 Submission").  Ex. 1.  The January 19 Submission identified 32 allegedly false or misleading statements: 31 written statements and unspecified "oral false statements" made by unidentified Gemini representatives during a July 25, 2017 in-person meeting.  Ex. 1 at Ex. A.[3]  This motion concerns 25 of those statements, including 24 of the written statements (the "Written Subject Statements") and the unspecified oral statement (the "Oral Statement," together with the Written Subject Statements, the "Subject Statements"). The material facts concerning the Subject Statements, identified by the document they appear in and the number the CFTC assigned to them in the January 19 Submission, are set forth below.

### 1.    The July 25, 2017 Presentation Statements (Statements 26–31)

The CFTC has identified six purportedly false or misleading statements in a presentation dated July 25, 2017 (the "July 25 Presentation").  *See* Ex. 1 at Ex. A (statements 26–31).  The July

---

[3]    Because the CFTC's January 19 Submission did not identify the alleged "oral false statements" and instead lumped them into a single entry, this motion treats them as a single statement.

25 Presentation is a PowerPoint presentation created on a Cboe template.  Ex. 3.  CFE's name and logo appear on the cover, and the final slide has CFE's logo, name, address, and website address:

**Cover Page**         **Final Page**

Ex. 3 at 2, 19.  In addition, CFE's name and logo appear on the heading and footer of each substantive slide.  *See* Ex. 3 at 2–19.  By contrast, Gemini's logo and contact information do not appear anywhere.  Ex. 3.  While Gemini participated in the preparation of this presentation, like all submissions to the CFTC concerning the Bitcoin Futures Contract, CFE had "final say" over whether to submit this presentation and what it said.  *See* Ex. 14 [Gordon] at 108:9–11 ("Q. And is it fair to say that Cboe had the final say over what was included in this document?  A. I think, yeah, that's fair."); Ex. 15 [Reinstein] at 159:8–23, 160:9–12 (quoted *supra* p. 3); Ex. 13 [C. Winklevoss] at 552:21–554:15 ("Q.  Did Gemini provide any input into the presentation that was made at the July 2017 meeting?  A.  Specifically? I'm not sure without -- you know, I can look at the presentation and try and recall or – or make a best guess.  I do believe that we were asked questions that the CBOE had in – in leading up to the presentation. And it's very possible information from their requests are part of that presentation.  But, ultimately, it was -- it was their presentation.") (cleaned up); Ex. 13 [C. Winklevoss] 574:25–575:2 ("[T]his is CBOE's presentation.").

On July 24, 2017, a CFE employee, Michael Mollet, sent the July 25 Presentation to a CFTC employee, Thomas Leahy, copying two other CFE employees, Nicole Gordon[4] and Art Reinstein. Ex. 2. Consistent with CFE's general practices, no Gemini employees were copied. Ex. 14 [Gordon] at 108:21–109:1 ("Q. Mr. Mollet sends it to the CFTC and doesn't copy anybody from Gemini. Do you see that? A. I see that. Q. And do you know why that was? A. I think our general practice was to only include CFE staff on correspondence to the CFTC.").[5]

### 2. The July 25, 2017 Oral Statement (Statement 32)

On July 25, 2017, representatives from the CFTC, CFE, Gemini, and others met at the CFTC's offices in Washington, D.C. 56.1 ¶ 26. In the January 19 Submission, the CFTC asserted that an unnamed Gemini representative made an unspecified number of unidentified "[o]ral false statements regarding prefunding, rebates, self-trading and volume" during this meeting. Ex. 1 at Ex. A (statement 32). But there is no evidence in the record of any such false statements—or, indeed, of any specific statements made during that meeting *at all*. Five individuals who attended this meeting were deposed in this case: Cameron Winklevoss from Gemini; Ms. Gordon and Mr. Reinstein from CFE; and Mr. Goodman and Mr. Kuserk from the CFTC. 56.1 ¶ 27.[6] None has identified any specific statements made during this meeting:

---

[4] Ms. Gordon has since changed her last name to Pursley. However, because the name "Gordon" appears on the contemporaneous documents, Gemini refers to her by her prior name.

[5] While the version of the July 25 Presentation that Mr. Mollet emailed did not include an appendix that was included in hard copies of the presentation that were provided at the meeting, none of the purported false statements in the July 25 Presentation are contained in that appendix, and nothing in the appendix is attributed to Gemini, though one slide explicitly states that it reflects Cboe's work product. 56.1 ¶¶ 23–25.

[6] In response to the Court's order, by letter dated April 14, 2023, the CFTC identified Mr. Goodman and Mr. Kuserk as the only CFTC witnesses it intends to call at trial. Ex. 20. The CFTC reiterated that it only intends to call these two witnesses during the December 11, 2023 hearing, Ex. 21 at 17:8–17, 17:24–18:16, and by letter dated February 7, 2024, Ex. 22.

- Mr. Winklevoss testified that he "believe[d] CBOE spoke" during the meeting but did not remember if he or another Gemini representative made any statements during the meeting. Ex. 13 at 555:8–20.[7]

- Ms. Gordon testified that she remembered "general things that were discussed" during the meeting but "d[id not] have a recollection of who said what and, like, specifics," including "what statements Gemini made." Ex. 14 at 103:16–25.

- Mr. Reinstein stated during an interview with the CFTC in February 2019, and then again during his deposition, that he did not have a "good recollection of any conversations about the bitcoin futures product." Ex. 15 at 147:25–148:8.

- Mr. Goodman testified that he did not remember any oral statements made during the meeting about prefunding, volume, rebates, or self-trading. Ex. 17 at 161:8–14, 162:19–25, 166:18–23, 168:7–12.

- Mr. Kuserk testified that he did not remember any oral statements made during the meeting about prefunding, rebates, or self-trading. Ex. 16 at 133:1–10, 142:17–20, 192:21–193:13.[8]

Document discovery also has not uncovered any evidence of specific statements made during the July 25 meeting, much less any false statements. 56.1 ¶ 34.

### 3.    The August 1, 2017 Data Submission (Statement 25)[9]

After the July 25, 2017 meeting, CFE sent the CFTC data it used to create graphs in the July 25 Presentation regarding volume on the Gemini exchange. 56.1 ¶ 35. CFE provided that data to the CFTC by sending a CD-ROM with seven Microsoft Excel files to Mr. Leahy of the

---

[7]    Tyler Winklevoss, Gemini's co-founder was not deposed during this litigation. 56.1 ¶ 33. He was, however, deposed by the CFTC during its investigation. 56.1 ¶ 33. During that deposition, Mr. Winklevoss testified that he did not remember who spoke during the July 25, 2017 meeting. Ex. 18 at 94:18–20.

[8]    While Mr. Kuserk did recall a discussion about whether increased volume on the Gemini exchange (as measured by value of bitcoin traded) was the result of increased trading on the exchange or an increase in the price of bitcoin, Ex. 16 at 152:18–153:21, Mr. Kuserk did not identify any specific statements made during this conversation, much less one that could be construed as either false or misleading.

[9]    While the CFTC only included a single entry for this data submission, it identified seven different spreadsheets within this single entry. Ex. 1 at Ex. A (statement 25). To avoid confusion, Gemini has used the CFTC's convention and treats these data as a single statement.

CFTC (the "August 1 Data Submission"). 56.1 ¶ 36. Gemini has not located a transmittal letter sent with these files, 56.1 ¶ 37, but Ms. Gordon emailed Mr. Leahy on August 1, 2017, copying Mr. Reinstein, to confirm CFE had sent the data, Ex. 4. While these spreadsheets contain Gemini trade data, the metadata the CFTC provided for these files (to the extent any was produced) demonstrates that the files were created by CFE employees named Tiago Silva and Dennis O'Callahan. 56.1 ¶ 39. No Gemini employee is identified as the "author" or "custodian" of any of these documents, no Gemini employees were copied on Ms. Gordon's email, and there is no evidence that Gemini received a copy of this data submission until discovery in this case. 56.1 ¶¶ 37, 40.

### 4.    The March 10 Auction Analysis (Statement 18)

On October 24, 2017, Ms. Gordon emailed Mr. Goodman to "follow up [on] our most recent group call" regarding the Bitcoin Futures Contract and attached "a document which provides an analysis of market orders in the Gemini auction." Ex. 6 at 1. Nobody from Gemini was copied on the email. Ex. 6. The metadata for this document—which contains CFE's analysis of the March 10, 2017 Gemini auction (the "March 10 Auction Analysis")—identifies CFE's Michael Mollet as the document's author. 56.1 ¶ 42. The document is written from CFE's perspective, as it repeatedly sets forth CFE's views and the work CFE did in reaching them. *See, e.g.*, Ex. 6 at 4 ("*CFE believes* that the March 10 auction resulted in the fairest possible price given market supply and demand conditions. In addition to evaluating the function of the market on March 10, *CFE staff also considered* the results in light of Core Principle 3, and our conclusion was that the auction result was due to market forces.") (emphasis added). By contrast, no statements are attributed to Gemini, no portion of the analysis conveys Gemini's assessment or opinions, and references to Gemini exclusively describe it as a third-party entity, in contrast to CFE, which frequently refers to itself in the first person. *See, e.g.*, Ex. 6 at 7 ("In short, *we believe*

that the likelihood of success is too low, and the economic benefit too small to provide an incentive to exploit the *Gemini auction price*.") (emphasis added). Even the purported false statement the CFTC identified makes clear that it reflects CFE's analysis rather than Gemini's, as it states that "*we believe* that the limited possible upside to undertaking [a plan to manipulate the Gemini auction] would not be worth the regulatory risk." Ex. 6 at 7 (emphasis added); Ex. 1 at Ex. A (statement 18).

### 5.    The Self-Certification and Its Drafts (Statement 1–16)

CFE filed the Self-Certification on December 1, 2017. Ex. 8. Before making that filing, CFE sent draft submissions to the CFTC on October 6, October 31, and November 14, 2017. 56.1 ¶ 53. The CFTC has identified four identical alleged false or misleading statements in each of these documents, for a total of 16 statements. Ex. 1 at Ex. A (statements 1–16). The following facts regarding the Self-Certification and its drafts—and the statements in them—are undisputed.

*First*, CFE filed the Self-Certification. The Self-Certification states that "*CFE hereby certifies* that the Product and Amendment comply with the Act and the regulations thereunder." Ex. 8 at 9 (emphasis added). The testimony confirms this was a CFE self-certification. During his deposition, Mr. Reinstein confirmed that "it was CBOE that self-certified the product" and that "Gemini did not self-certify that product," Ex. 15 at 145:24–146:5, while Ms. Gordon confirmed that "Cboe [was] the only entity that [could] actually file the self-certification," Ex. 14 at 126:14–16. Mr. Winklevoss confirmed that the Self-Certification was "CBOE's submission to the CFTC" and that "ultimately, the application that was filed was not our application. That is CBOE's application." Ex. 13 at 535:9–17, 653:13–18. The CFTC's contemporaneous statements also confirm that the CFTC itself knew that CFE was making the statement at issue. In a so-called "Backgrounder" the CFTC published in December 2017, the CFTC stated that "[o]n Friday,

December 1, 2017, . . . the CBOE Futures Exchange (CFE) self-certified [a] new contract[] for [a] bitcoin futures product[]." Ex. 19 at 1.

*Second*, as a CFTC-registered DCM, CFE had an obligation to confirm that the Self-Certification's statements—including its description of the Bitcoin Futures Contract and belief that it complied with the CFTC's core principles—were accurate. The CFTC regulation concerning self-certifications states that a DCM "must comply" with certain "submission requirements" before a self-certified product can begin trading, including that the DCM must submit "[a] concise explanation and analysis of the product and its compliance with applicable provision of the Act, including core principles, and the Commission's regulations thereunder." 17 C.F.R. § 40.2 (a)(3)(v). The CFTC and CFE witnesses who were deposed confirmed that CFE was responsible for the Self-Certification's contents and the accuracy of its statements. *See* Ex. 16 [Kuserk] at 59:21–60:7 ("Q. And DCM has the ultimate responsibility for the content of the self-certification, correct? A. Yes.") (cleaned up); Ex. 14 [Gordon] at 126:20–22 ("Q. And [CFE] wants to ensure that what it's submitting is fully truthful and accurate; is that right? A. Yes, that would be the practice."); Ex. 15 [Reinstein] at 157:15–18 ("Q. [I]t was ultimately CBOE that had the final decision about what to say in [the Self-Certification]; is that fair? A. Yes."). As Mr. Winklevoss confirmed, the Self-Certification's statement that the Bitcoin Futures Contract complied with CFTC Core Principle 3 was "made by CBOE." Ex. 13 at 658:25–659:14.

*Third*, all four documents—the three drafts and final Self-Certification—bear all of the indicia of being CFE documents. Each was submitted on CFE letterhead and states that it was being "submit[ed]" by CFE. Exs. 8–11. All four documents include a signature line for Andrew Lowenthal, who was identified as a "Senior Managing Director" signing on CFE's behalf, with the final Self-Certification also containing Mr. Lowenthal's signature. *Id.*; *see also* Ex. 15

[Reinstein] at 156:19–157:10 ("Q. This was the formal final self-certification submission to the CFTC associated with this product? A. Yes. Q. And if you take a look at Page 8, there's a signature indicated there of an Andrew Lowenthal, that he's a senior person or he was at the time a senior person at CBOE? A. Yes. He held the position of senior managing director at that time. So he would have been the senior CFE businessperson for our exchange. Q. And he signed this submission on behalf of CBOE? A. Yes. Q. Gemini did not sign this document, correct? A. Correct."). CFE employees sent all four documents directly to the CFTC, without copying anyone from Gemini. 56.1 ¶¶ 48, 54.[10]

*Finally*, the Self-Certification and drafts were written entirely from CFE's perspective. For example, the Self-Certification contained the following statements explicitly stating CFE's beliefs:

- "*CFE believes* that [data regarding the Gemini exchange obtained from a website called bitcoinity.org] reflect that the Gemini Exchange is a robust market for the trading of bitcoin in U.S. dollars and that the Gemini Exchange auctions for bitcoin in U.S. dollars and their corresponding auction prices are representative and indicative of the price of bitcoin in the larger bitcoin marketplace."

- "*CFE believes* that the Product and Amendment are consistent with Designated Contract Market . . . Core Principle 3 (Contracts Not Readily Susceptible to Manipulation) under Section 5 of the Act."

- "*CFE believes* that the Product and Amendment are consistent with Core Principle 3 given the volume, liquidity, and participation on, and structure of, the Gemini Exchange marketplace and auction process."

- "*CFE believes* that a liquidity event such as a Gemini Exchange auction in conjunction with the settlement of [the Bitcoin Futures Contract] is likely to drive greater participation and liquidity in the Gemini Exchange auction."

---

[10]    CFE's emails also make clear that it was responsible for all four submissions. *See* Ex. 9 at 1 (October 6, 2017 email from Reinstein transmitting "a draft of the rule certification filing that *we* have prepared for this product") (emphasis added); Ex. 10 at 1 (October 31, 2017 email from Gordon explaining changes from "previous version *we* sent you") (emphasis added); Ex. 11 at 1 (November 14, 2017 email from Gordon describing ways in which "*we* have revised the filing") (emphasis added); Ex. 8 at 1 (December 1, 2017 email from Gordon transmitting "product certification that *we* plan to file this morning") (emphasis added).

- "*CFE also believes* that the Product and Amendment are consistent with Core Principles 2 (Compliance with Rules), 4 (Prevention of Market Disruption), 5 (Position Limitations or Accountability), 7 (Availability of General Information), and 8 (Daily Publication of Trading Information") under Section 5 of the Act."

- "*CFE believes* that the impact of the Product and Amendment will be beneficial to the public and market participants."

Ex. 8 at 4, 8–9 (emphasis added).[11]  By contrast, no statements in the Self-Certification or any of the drafts are attributed to Gemini.  Exs. 8–11.  Indeed, one allegedly false statement—which concerns Gemini's market share in the bitcoin spot market—is specifically attributed to an unrelated website, bitcointy.org, rather than to Gemini.  *See* Ex. 1 at Ex. A (statements 3, 7, 11, 15); Ex. 8 at 4; Ex. 9 at 5; Ex. 10 at 5; Ex. 11 at 4.

### ARGUMENT

A party may seek summary judgment on any claim or any part of a claim "at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(a), (b).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A party seeking summary judgment can meet its burden either by proving that there are "no genuine disputes concerning any material facts, and . . . the moving party is entitled to judgment as a matter of law," *Jones v. Cnty. of Suffolk*, 936 F.3d 108, 114 (2d Cir. 2019) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013)), or by establishing "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Not all factual disputes preclude summary judgment.  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Wang v.*

---

[11]  The draft self-certifications contain substantially similar language.  56.1 ¶ 57.

*Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017) (citations omitted); *see also Dowd v. City of New York*, 2012 WL 5462666, at *1 (S.D.N.Y. Nov. 5, 2012) ("Only disputes over material facts—*i.e.*, 'facts that might affect the outcome of the suit under the governing law'—will properly preclude the entry of summary judgment.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  To establish that a genuine fact dispute exists, a party opposing summary judgment must present "specific facts showing that there is a genuine issue for trial," *Black v. Wrigley*, 2023 WL 2591014, at *1 (2d Cir. Mar. 22, 2023) (quoting *Beard v. Banks*, 548 U.S. 521, 529 (2006)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted).

## I.   SUMMARY JUDGMENT IS APPROPRIATE AS TO THE PART OF THE CFTC'S CLAIM THAT IS BASED ON THE WRITTEN SUBJECT STATEMENTS (STATEMENTS 1–16, 18, 25, AND 26–31)

The CFTC's sole claim in this case is that Gemini violated Section 6(c)(2) of the CEA. That provision only creates liability for the person or entity that makes a statement.  Because there is no material fact dispute that Gemini did not make the Written Subject Statements, the Court should grant summary judgment as to the portion of the CFTC's claim that is based on those statements.[12]

### A.   Section 6(c)(2) of the CEA Prohibits *Making* False Statements, Not *Causing* False Statements

CEA Section 6(c)(2) imposes liability on a person who makes a false or misleading statement, not on a person who causes one.  "Statutory construction begins with the plain text, and, 'where the statutory language provides a clear answer, it ends there as well.'"  *Raila v. United States*, 355 F.3d 118, 120 (2d Cir. 2004) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432,

---

[12]   Gemini does not concede that it "made" any of the statements not addressed in this motion, only that genuine issues of material fact preclude summary judgment as to them.

438 (1999)); *see also United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) ("[Statutory interpretation] begin[s] with the statutory text, exhausting all the textual and structural clues bearing on its meaning and construing each word in its context and in light of the terms surrounding it.") (citations and quotations omitted). Section 6(c)(2)'s plain language provides just such a clear answer. It states:

> It shall be unlawful for any person *to make any false or misleading statement of a material fact* to the Commission . . . , or *to omit to state in any such statement* any material fact that is necessary to make any statement of a material fact made not misleading in any material respect.

7 U.S.C. § 9(2) (emphasis added).

As this text makes clear, Section 6(c)(2) prohibits two acts. *First*, Section 6(c)(2) makes it unlawful "to *make* any false or misleading statement of a material fact." *Id.* (emphasis added). The word "cause" does not appear. Thus, giving this "language . . . its 'ordinary, contemporary, common meaning,'" *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)), this portion of Section 6(c)(2) establishes liability only for a person that *makes* a false or misleading statement, not for a person that *causes* the statement to be made.

Reading Section 6(c)(2) in the context of the full CEA confirms this interpretation. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *DHS v. MacLean*, 574 U.S. 383, 391 (2015). Where Congress uses different words within a statute, courts "assume that Congress used [the] two terms because it intended each term to have a particular, nonsuperfluous meaning." *United States v. Lockhart*, 749 F.3d 148, 153 (2d Cir. 2014) (quoting *Bailey v. United States*, 516 U.S. 137, 146 (1995), *superseded by statute on other grounds*, *see United States v. Saltares*, 358 F. Supp. 2d 297, 300 (S.D.N.Y. 2005)). Here, a separate CEA provision—Section 13(a)—prohibits causing another

person or entity to violate that Act, stating that "[a]ny person . . . who willfully *causes* an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provision of this chapter . . . may be held responsible for such violation as a principal." 7 U.S.C. § 13c(a) (emphasis added). Congress's use of the word "cause" in Section 13(a) confirms that, consistent with Section 6(c)(2)'s plain text, "causing" a false statement is not actionable under Section 6(c)(2). *See Rotkiske v. Klemm*, 589 U.S. ---, 140 S. Ct. 355, 360–61 (2019) ("It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts. . . . Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision.") (citations, quotations, and alterations omitted).

    *Second*, Section 6(c)(2) prohibits "omit[ting] to state" material facts "in *any such statement*." 7 U.S.C. § 9(2) (emphasis added). It is well established that liability for omissions can only exist by reference to an affirmative statement. *See* Thomas Lee Hazen, 3 Law Sec. Reg. § 12.19 (Nov. 2023) ("Rule 10b-5(b)'s application to an omission of material fact does not in itself create a duty to speak. Accountability under Rule 10b-5 for a material omission arises only if . . . a statement has been made and the omission makes the statement materially misleading . . . ."). Section 6(c)(2) conforms to this longstanding rule. "Such statement" is a familiar phrase that Congress frequently uses to refer to other statements identified earlier in the same statute.[13]

---

[13] *See, e.g.*, 18 U.S.C. § 542 (establishing criminal penalties for attempting to enter goods into the United States by "mak[ing] any false statement . . . without reasonable cause to believe the truth of *such statement*" or "procur[ing] the making of *any such false statement* . . . without reasonable cause to believe the truth of *such statement*") (emphasis added); 8 U.S.C. § 1158(b)(iii) (identifying factors relevant to evaluating asylum applications, including "the consistency between the applicant's or witness's written and oral statements . . . . the internal consistency of each *such statement*, the consistency of *such statement* with other evidence of record . . . and any inaccuracies or falsehoods in *such statements*") (emphasis added).

Applying this standard meaning here, the phrase "such statement" in Section 6(c)(2)'s omissions provision refers to the affirmative statement identified earlier in that section, and for that reason likewise imposes liability only on the statement's maker. *See Rose v. Rahfco Mgmt. Group, LLC*, 2014 WL 7389900, at *5 (S.D.N.Y. Dec. 15, 2014) ("If a party does not 'make' any statements under Section 10b or Rule 10b-5, it cannot be liable under an omission theory.").[14]

Supreme Court precedent confirms that Section 6(c)(2) only imposes liability on a statement's maker. In *Janus Capital Group, Inc. v. First Derivatives Traders*, 564 U.S. 135, 142 (2011), the Court reviewed a Fourth Circuit order holding that plaintiffs had stated a claim under Rule 10b-5(b) against a mutual fund investment advisory firm, Janus Capital Management, LLC ("JCM"), for making false and misleading statements in mutual fund prospectuses issued by its affiliate and client, Janus Investment Fund ("JIF"). *Id.*[15] Plaintiffs alleged that JCM "made" the alleged false and misleading statements for purposes of Rule 10b-5 because JCM provided JIF with various investment advisory services, was "significantly involved in preparing the prospectuses," was an affiliate of JIF, "all of the officers of [JIF] were also officers of JCM," and the companies shared a director. *Id.* at 138, 148. The Supreme Court reversed, holding that plaintiffs had not stated a claim against JCM. *Id.* at 148.

---

[14] *See also Floyd v. Liechtung*, 2013 WL 1195114, at *4 (S.D.N.Y. Mar. 25, 2013) ("[T]he Complaint fails to allege that any Defendants, other than Hill, made any representations to Plaintiff. . . . Plaintiff has not alleged any actionable omissions against the non-Hill Defendants."); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) ("Holding Park liable for Guo's alleged false statements based on a failure to correct, or omission, would be in tension with the Supreme Court's recent [*Janus*] decision. . . . Since each party is liable only for their own misstatements, *Janus* implies that each party is only liable for their own omissions as well.").

[15] Plaintiffs also asserted a claim for control person liability against JCM and JIF's parent company, Janus Capital Group, Inc. The Supreme Court did not review that portion of Plaintiff's claim, and it is not relevant to this motion. *Id.* at 141 n.5.

The Supreme Court's analysis is directly applicable here because it specifically addressed the meaning of "make" in the context of a prohibition on false and misleading statements contained in rules governing financial markets. As the Court explained:

> One "makes" a statement by stating it. When "make" is paired with a noun expressing the action of a verb, the resulting phrase is "approximately equivalent in sense" to that verb. 6 Oxford English Dictionary 66 (def.59) (1933) (hereinafter OED); accord, Webster's New International Dictionary 1485 (def.43) (2d ed. 1934) ("*Make* followed by a noun with the indefinite article is often nearly equivalent to the verb intransitive corresponding to that noun"). For instance, "to make a proclamation" is the approximate equivalent of "to proclaim," and "to make a promise" approximates "to promise." See 6 OED 66 (def.59). The phrase at issue in Rule 10b–5, "[t]o make any . . . statement," is thus the approximate equivalent of "to state."
>
> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between the speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142–43. Applying this reasoning, the Court rejected plaintiffs' assertion that JCM's role in drafting and otherwise preparing the at-issue prospectuses constituted "making" under Rule 10b-5(b). *Id.* The Court held that JIF—which alone "bears the statutory obligation to file the prospectus with the SEC"—was the sole maker of the alleged misstatements. *Id.* at 146–47.[16] In this case, only CFE—not Gemini—had an analogous statutory filing obligation.

---

[16] While *Janus* arose in the context of a private action, *Janus* applies with equal force to government enforcement actions, as the Second Circuit and this court have recognized regularly. *See, e.g.*, *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 286–87 (2d Cir. 2013) (applying *Janus* in civil enforcement action and finding that defendants made at-issue statements because they "retained ultimate control over both the content of the communication and the decision" to make them); *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *13 (S.D.N.Y.

The Supreme Court's analysis and holding in *Janus* is directly applicable to the interpretation of Section 6(c)(2). Section 6(c)(2) and Rule 10b-5(b) use the exact same verbs and are otherwise substantively identical:

| Rule 10b-5(b) | Section 6(c)(2) |
|---|---|
| It shall be unlawful for any person . . . **[t]o make** any untrue statement of a material fact or **to omit to state** a material fact necessary in order to make the statements made . . . not misleading. | It shall be unlawful for any person **to make** any false or misleading statement of a material fact . . . **or to omit to state** in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect . . . . |

Basic principles of statutory interpretate dictate that these similar provisions should be interpreted similarly. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate [the] . . . judicial interpretations as well.'") (quotations and citations omitted) (omission in original).[17] This result is particularly appropriate in light of the fact that, both here and in *Janus*, the "causing" at issue is explicitly addressed by a separate—and more restrictive—statute. *Supra* p. 16 (Section 13a prohibits "willfully caus[ing]" a violation of the CEA); *Janus*, 564 U.S. at 146 (declining to "read into Rule 10b-5 a theory of liability similar to—but broader in application

---

Mar. 18, 2019) (stating in SEC enforcement action that "[i]t is not enough to be significantly involved in preparing [a] statement, and attribution to the speaker is necessary") (quotations omitted); *SEC v. Norstra Energy Inc*., 202 F. Supp. 3d 391, 395–97 (S.D.N.Y. 2016) (applying *Janus* in enforcement action).

[17] *See also Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."); *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) ("Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations.").

than—what Congress has already created expressly elsewhere") (citations omitted); *In re Optimal U.S. Litig.*, 2011 WL 4908745, at \*5 (S.D.N.Y. Oct. 14, 2011) (dismissing Rule 10b-5(b) claims against controlling shareholder for controlled company's false statements because "*Janus* held that a statement is 'made' not by the entity that drafted it . . . but rather by the entity that delivers it" and the securities laws created a "separate statutory remedy" for control person liability).

Interpreting Section 6(c)(2) to be consistent with Rule 10b-5(b) is particularly appropriate here. The presumption that the same language in statutes with similar purposes should be interpreted consistently is particularly strong where one provision is "modeled on" the other. *United States v. Magassouba*, 619 F.3d 202, 207 n.4 (2d Cir. 2010). That is precisely the case here, where the CEA's antifraud provisions, including Section 6(c)(2), "track[] the Securities Act in part because Federal case law is clear that when the Congress uses language identical to that used in another statute, Congress intended for the courts and the Commission to interpret the new authority in a similar manner, and Congress has made sure that its intention is clear." 156 Cong. Rec. S3333, S3348 (May 6, 2010). In light of this close relationship, it is no surprise that courts routinely rely on securities laws cases to interpret the CEA—including, in particular, its anti-fraud provisions. *See, e.g.*, *United States v. Phillips*, --- F.3d ---, 2023 WL 5671227, at \*9 n.5 (S.D.N.Y. Sept. 1, 2023) (using Exchange Act precedent to interpret CEA Section 6(c)(1)); *CFTC v. Monex Credit Co.*, 931 F.3d 966, 976 (9th Cir. 2019) (applying Rule 10b-5 cases to interpret Section 6(c)(1) because it "is a mirror image of § 10(b) of the Securities Exchange Act," and thus creates the presumption that "by copying § 10(b)'s language and pasting it into the CEA, Congress adopted § 10(b)'s judicial interpretations as well").[18]

---

[18]    *See also In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 672 (S.D.N.Y. 2016) (using Section 10(b) to interpret Section 6(c)(1) because the "operative phrase[s]" were "virtually identical")

\*    \*    \*

Section 6(c)(2)'s plain language and application of basic principles of statutory interpretation all lead inexorably to the same conclusion:  Section 6(c)(2) prohibits *making* false statements, not *causing* false statements.  As demonstrated below, this critical distinction is sufficient to dispose of a substantial majority of the CFTC's claims.

### B.    There Is No Genuine Question of Material Fact that Gemini Did Not Make the Written Subject Statements

Because Section 6(c)(2) only applies to statements Gemini made, the CFTC cannot prevail on any portion of its claim that is based on statements Gemini allegedly caused.  This question—whether a defendant "made" purportedly false or misleading statements—is one that courts routinely answer as a question of law.  For example, courts have repeatedly identified certain indicia on the face of the document—for example, who signed it, whose logo or image appears on it, and to whom it attributes the statements it contains—to identify the "maker" of the document's statements.  *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163–64, 165 (S.D.N.Y. 2012) ("[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents . . . [h]owever, [defendant] is not responsible for misleading statements in SEC filings he did not sign.").[19]  Similarly, courts have repeatedly held that a

---

(citations omitted); *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (holding question regarding interpretation of CEA's anti-manipulation provision "ha[d] already been addressed in the context of federal securities laws").

[19]    *See also Norstra*, 202 F. Supp. 3d at 396–97 (rejecting individual defendant's summary judgment argument that he did not "make" misstatement contained in promotional materials bearing his picture and signature); *Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d 441 (S.D.N.Y. 2012) (holding party accused of jointly issuing proxy statement did not make statements contained therein because, *inter alia*, "the proxy statement [was] on [co-defendant's] letterhead and signed by principals of [co-defendant]"); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (holding individual defendants only "made" statements in documents they signed); *In re Optimal U.S.*

regulated entity is the maker of statements in its regulatory filings. Indeed, that was the holding in *Janus*. *See Janus*, 564 U.S. at 146–47 ("Under this rule, JCM did not 'make' any of the statements in the [JIF] prospectuses; [JIF] did. *Only [JIF]—not JCM—bears the statutory obligation to file the prospectuses with the SEC.*") (emphasis added).[20]

By contrast, courts routinely dismiss claims against defendants accused of making statements they helped draft, approved, or provided information for because those defendants did not have "ultimate authority" over the statement. *See, e.g.*, *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) (affirming dismissal of Rule 10b-5(b) claims against certain defendants that allegedly provided "approval and input" because those allegations were "not sufficient to demonstrate the control essential to maker liability") (citations omitted); *Turquoise Hill*, 625 F. Supp. 3d at 205 ("That [a majority shareholder] exercised control over [a company's] access to relevant information about the [relevant] project does not itself make [the shareholder] the 'maker' of [the company's] statements.").[21]

---

[20] *Litig.*, 2011 WL 4908745, at *6 (holding defendant was not liable for misstatements where "[t]he formatting of the [relevant document]'s cover page" identified another entity as the issuer and defendant was named "only the investment manager").

[20] *See also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 206 (S.D.N.Y. 2022) (granting majority shareholder's motion to dismiss claims related to statements made by company, including in regulatory filings, because "[a]s a New York Stock Exchange listed company . . . [the company was] subject to its own requirement that its financial reporting be truthful or it risk[ed] being delisted"); *Krasner v. Rahfco Funds LP*, 2012 WL 4069300, at *5 (S.D.N.Y. Aug. 9, 2012) (explaining that, under *Janus*, "only the filer of the prospectus could be held liable for misstatements therein, absent allegations that either (a) the defendant filed the prospectus and falsely attributed statements to the purported filer or (b) there is evidence on the face of the prospectus that the statements in the prospectus came from the defendant").

[21] *See also Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 103–04 (2d Cir. 2022) (affirming order dismissing complaint alleging defendant "reviewed and approved statements in the Company's press releases" because defendant did not publish, and thus "lacked final control over," the statements at issue); *In re Fannie Mae 2008 Secs. Litig.*, 891 F. Supp. 2d 458, 483 (S.D.N.Y. 2012) ("The Supreme Court rejected the argument that the person who 'suggests what to say' or drafts the language can be liable as the 'maker' of the statement."), *aff'd*, 525 F. App'x 16

Applying these well-established rules to the undisputed facts establishes that Gemini did not make the Written Subject Statements.  For this reason, summary judgment is appropriate as to all parts of the CFTC's claim that relies on those statements.

### 1.    The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the July 25 Presentation (Statements 26–31)

There is no genuine question of material fact that CFE made the statements in the July 25 Presentation.  The unrebutted testimony—including the testimony of the two CFE employees the CFTC has identified as trial witnesses—demonstrates that CFE had "final say" over whether to submit this presentation and what it should say.  *Supra* p. 6.  This testimony establishes that, while Gemini participated in drafting the presentation, CFE had "ultimate authority" over the presentation's statements.  That alone is sufficient to grant summary judgment on this portion of the CFTC's claim.  *See Janus*, 564 U.S. at 142–43 (only entity with "ultimate authority" over statement is maker of that statement).

The face of the document and the means by which it was provided to the CFTC further confirm that CFE had ultimate authority over the July 25 Presentation.  The presentation was on a CFE template, with CFE's logo on every page and its logo, name, address, and website on the final page.  Ex. 3.  A CFE employee sent the July 25 Presentation to the CFTC without any Gemini

---

(2d Cir. 2013); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *28 n.29 (S.D.N.Y. Mar. 30, 2021) ("The allegation that [defendant] 'approved, reviewed, ratified, and furnished information and language for inclusion' in certain statements . . . is insufficient to make [defendant] the 'maker' of about a half-dozen statements . . . that are expressly attributed to other individuals"), *aff'd*, 54 F.4th 82 (2d Cir. 2022); *Turquoise Hill*, 625 F. Supp. 3d at 205 (holding defendant was not "maker" of joint venture partner's statements despite contractual obligation to coordinate public statements because defendant did not have "practical ability to direct," and thus lacked ultimate authority over, partner's statements); *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *10 (S.D.N.Y. Mar. 30, 2018) (dismissing claim against defendant who allegedly "drafted" one statement, "at least reviewed" others, and "assisted in [the] filing" of documents containing alleged misstatements), *as amended*, 2018 WL 11472420 (S.D.N.Y. Apr. 27, 2018).

employees copied.  Ex. 2.  And, a portion of the appendix specifically states that it reflects CFE's analysis.  Ex. 3 at 13.  Individually and together, these factors confirm that, as Mr. Reinstein and Ms. Gordon testified, CFE made the statements in the July 25 Presentation.

In light of this undisputed evidence, there is no genuine question material fact that Gemini did not make the statements in the July 25 Presentation, and the Court should grant summary judgment on the portion of the CFTC's claims that relies on those statements.

### 2.    The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the August 1 Data Submission (Statement 25)

There is no genuine question of material fact that CFE made any statements contained in the August 1 Data Submission.  While that submission included data that originated on the Gemini platform, it was CFE that sent it to the CFTC.  56.1 ¶ 36.  Indeed, Gemini was not copied on the relevant email correspondence and did not contemporaneously receive a copy of the data submission; it was only when Gemini received the CFTC's document production that Gemini received these documents for the first time.  56.1 ¶ 37.  This point bears emphasis:  the CFTC seeks to hold Gemini liable for a data submission it did not make and which it only received during this litigation.  Gemini has not located any case in which a defendant has been *accused* of making false statements contained in a document or file it did not create, review, or receive before publication.  Certainly, Gemini is aware of no authority imposing liability in such circumstances.

The files CFE sent to the CFTC confirm that they are CFE statements.  While not all of the produced files contain metadata, the ones that do identify CFE employees—Tiago Silva and Dennis O'Callahan—as the authors.  56.1 ¶ 39.  No metadata associates any Gemini employee with the submitted files or otherwise attributes any statements in the files to Gemini.  Ex. 5.

In light of this undisputed evidence, there is no genuine question of material fact that Gemini did not make any statements contained in the August 1 Data Submission, and the Court should grant summary judgment on the portion of the CFTC's claim that relies on those statements.

**3.    The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the March 10 Auction Analysis (Statement 18)**

There is no genuine question of material fact that CFE made the statements in the March 10 Auction Analysis.  While this document was not printed on any letterhead, it was authored by Michael Mollet, a Senior Director of Product Development at CFE, and was emailed by a CFE employee to the CFTC without any Gemini personnel copied.  Ex. 6; Ex. 7.  Moreover, the document is written from CFE's perspective, as the analysis repeatedly uses phrases like "CFE believes" and "CFE staff also considered" and refers to CFE's obligation as a DCM to confirm that the Bitcoin Futures Contract complied with the CFTC's Core Principles.  Ex. 6 at 4, 8.  By contrast, the analysis only refers to Gemini in the third person, using phrases like "the Gemini auction" or "the Gemini system."  *E.g.*, Ex. 6 at 4, 7.  Indeed, even the paragraph the CFTC has identified as containing the purported false statement makes clear that it reflects *CFE*'s analysis rather than Gemini's, stating that "*we believe* that the limited possible upside to undertaking [a plan to manipulate the Gemini auction] would not be worth the regulatory risk."  Ex. 6 at 7 (emphasis added).  As demonstrated above, this type of explicit attribution of statements to CFE establishes that CFE, not Gemini, made the statements in the March 10 Auction Analysis.  *Supra* pp. 9–10.

In light of this undisputed evidence, there is no genuine question of material fact that Gemini did not make the statements in the March 10 Auction Analysis, and the Court should grant summary judgment on the portion of the CFTC's claim that relies on those statements.

4.    **The Undisputed Evidence Shows that CFE, Not Gemini, Made the Statements in the Self-Certification and Its Drafts (Statements 1–16)**

There is no genuine question of material fact that CFE made the statements in the Self-Certification and the drafts it sent to the CFTC.  As noted above, courts regularly hold that regulated entities make the statements in their regulatory filings. *Supra* p. 22.  Here, the undisputed evidence demonstrates the Self-Certification was CFE's regulatory filing and that CFE was responsible for ensuring the accuracy of its contents:

- CFE was the CFTC-regulated DCM that self-certified the Bitcoin Futures Contract. Ex. 8 at 2 ("Pursuant to Section 5c(c)(1) of the Commodity Exchange Act . . . Cboe Futures Exchange, LLC . . . hereby submits terms and conditions for a cash-settled bitcoin future to be traded on CFE called Cboe Bitcoin (USD) ('XBT') futures . . . ."); Ex. 16 [Kuserk] at 59:14–17 ("Q.  [T]his is Cboe's self-certification, correct?  A.  That's correct.  Q.  And Cboe is the DCM?  A.  That's correct."); Ex. 15 [Reinstein] at 145:24–146:2 ("Q.  With respect to the bitcoin futures self-certification process in 2017, it was CBOE that self-certified that product; is that right?  A.  Yes."); Ex. 19 at 1 ("On Friday, December 1, 2017, . . . the CBOE Futures Exchange (CFE) self-certified [a] new contract[] for [a] bitcoin futures product[] . . . .").

- CFE made the decision to self-certify the Bitcoin Futures Contract.  Ex. 15 [Reinstein] at 157:19–22 ("Q.  And it was ultimately CBOE's decision whether or not to pursue a self-certification in this case, right?  A.  Yes.").

- CFE decided what the Self-Certification would say.  Ex. 16 [Kuserk] at 58:6–22 ("Q.  As a DCM, Cboe had the ultimate responsibility to decide what the self-certification would say -- correct?  A.  Yes, that would be their obligation.") (cleaned up); Ex. 15 [Reinstein] at 157:15–18 ("Q.  It was ultimately CBOE that had the final decision about what to say in this document; is that fair?  A.  Yes.").

- CFE was responsible for ensuring that the Bitcoin Futures Contract complied with the CFTC's Core Principles.  Ex. 15 [Reinstein] at 157:23–158:2 ("Q.  Did you understand that CBOE had an obligation to ensure that the proposed bitcoin futures product complied with the applicable core principles?  A.  Yes."); *see also* 17 CFR § 40.2(a)(3)(v) (DCMs submitting self-certifications must provide "[a] concise explanation and analysis of the product and its compliance with applicable provisions of the Act, *including core principles*") (emphasis added).

- CFE was responsible for ensuring the statements in the Self-Certification were truthful and accurate.  Ex. 17 [Goodman] at 288:4–12 ("Q.  You understood in 2017 that CBOE was ultimately responsible for the contents of the self certification.  Correct?  A.  Yes, in the sense that CBOE was responsible, you know, for the

content [in that] we expect when they file something, that it's truthful and whatnot."); Ex. 16 [Kuserk] at 55:21–56:9 ("Q.  [I]t was Cboe's responsibility to ensure that the self-certification was accurate and correct -- right?  A.  Yes.  Yes.").

By contrast, Gemini was not a DCM and did not—indeed, could not—file the Self-Certification. Ex. 16 [Kuserk] at 59:19–20 ("Q.  And Gemini is not the DCM, correct?"  A.  Correct."); Ex. 17 [Goodman] at 39:19–21 ("Q.  Gemini was not a DCM in 2017.  Correct?  A.  That is correct."); Ex. 15 [Reinstein] at 146:3–5 ("Q.   Gemini did not self-certify that product, correct?  A.  Correct.").

Other aspects of the Self-Certification confirm that it is a CFE document and the statement it contains are CFE's statements.  The Self-Certification is drafted on CFE's letterhead, not Gemini's.  Ex. 8.  Andrew Lowenthal, a CFE "Senior Managing Director," signed the Self-Certification on CFE's behalf.  Ex. 8 at 9.  The Self-Certification attributes the statements in it to CFE and otherwise makes clear that it was drafted from CFE's perspective.  *See, e.g.*, Ex. 8 at 2 ("[CFE] . . . hereby submits . . . ."); *id.* at 8 ("CFE believes . . . .").  By contrast, no statements are attributed to Gemini—a fact that is all the more conspicuous given that one of the Written Subject Statements is actually attributed to a different website, bitcoinity.org.  *See* Ex. 1 at Ex. A (statement 3); Ex. 8 at 4.  These facts, individually and together, establish that CFE "made" the statements in the Self-Certification.  *Supra* pp. 12–13.

There is similarly no genuine question of material fact that CFE made the statements in the draft self-certifications.  Like the final version, all of the drafts were printed on CFE letterhead, contain a signature line for a CFE executive, and were written from CFE's perspective.  *See* Ex. 9, Ex. 10, Ex. 11.  The way in which these drafts were sent further confirms that CFE is the maker of the documents and the statements therein, as CFE employees sent the three documents to the CFTC without any Gemini employees copied.  *See* Ex. 9, Ex. 10, Ex. 11.  The October 6, 2017 draft was sent by Mr. Reinstein, who described the submission as "a draft of the rule certification

filing that *we* have prepared for this product". Ex. 9 (emphasis added). On October 31, 2017, Ms. Gordon sent the CFTC an updated draft, which she described as making changes to the "previous version *we* sent you." Ex. 10 at 1 (emphasis added). And, on November 14, 2017, Ms. Gordon sent another email to the CFTC describing ways in which "*we* have revised the filing." Ex. 11 at 1 (emphasis added).

In light of this undisputed evidence, there is no genuine question of material fact that Gemini did not make the statements in the draft or final Self-Certification, and the Court should grant summary judgment on the portion of the CFTC's claim that relies on statements made in those submissions.

## II.   SUMMARY JUDGMENT IS APPROPRIATE AS TO THE PART OF THE CFTC'S CLAIM THAT IS BASED ON THE ALLEGED JULY 25, 2017 ORAL STATEMENT (STATEMENT 32)

There are also no genuine questions of material fact that need to be resolved before the Court can enter judgment dismissing the part of the CFTC's claim that relies on the unidentified false statement made during the July 25, 2017 meeting. Courts routinely grant summary judgment where a party fails to elicit any evidence that supports its claim during discovery. *See, e.g.*, *UBS AG v. Greka Integrated, Inc.*, 2020 WL 1957530, *6–7 (S.D.N.Y. Apr. 23, 2020) (granting summary judgment on fraudulent inducement counterclaim where "there [was] no evidence [of] . . . any statement, let alone a partial or ambiguous statement"), *aff'd*, 2022 WL 2297904 (2d Cir. June 27, 2022).[22] That is precisely the case here: while the CFTC has asserted that false statements

---

[22]   *See also Wellner v. City of New York*, 2019 WL 1511022, at *2 (S.D.N.Y. Mar. 22, 2019) (denying motion to reconsider order granting summary judgment where "plaintiff provided no evidence" statements at issue were made); *Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*, 636 F. Supp. 2d 223, 232–33 (S.D.N.Y. 2009) (granting summary judgment where there was no "independent evidence" of false statement, only "testimony that some unidentified representative of [defendant] made a false statement to an unspecified person . . . out of [witness's] presence").

were made during the July 25 meeting, they have adduced no *evidence* of such statements.  *Supra* p. 8.  The absence of such evidence is not for lack of discovery:  two representatives each from Gemini, CFE, and the CFTC who attended the meeting have been deposed, and none remembered any specific statement made during the July 25 meeting, much less any specific *false* statement.[23] 56.1 ¶¶ 27–32.  Indeed, so thorough is Plaintiff's failure of proof that it could not identify any specific fact about this purported false statement—including, for example, what the false statement was or who made it—in its sworn January 19 Submission.

## CONCLUSION

For the foregoing reasons, Gemini respectfully requests that the Court grant summary judgment dismissing the part of the CFTC's claim that relies on the Subject Statements (Statements 1–16, 18, 25, 26–31, and 32 on the CFTC's January 19 Submission).

Dated:  New York, New York
         March 22, 2024

BAUGHMAN KROUP BOSSE PLLC

By: /s/John F. Baughman
    John F. Baughman
    Daniel A. Schwartz
    Elizabeth J. Lee
    One Liberty Plaza – 46th FL
    New York, NY 10006
    (212) 548-3212
    jbaughman@bkbfirm.com
    dschwartz@bkbfirm.com
    elee@bkbfirm.com

    *Attorneys for Defendant*
    *Gemini Trust Company, LLC*

---

[23]  While the CFTC has identified other CFTC employees who attended this meeting, it has repeatedly stated that it will only call the two Gemini has deposed—Mr. Kuserk and Mr. Goodman—as trial witnesses.  56.1 ¶ 27.  Thus, the Court should only consider evidence from these two witnesses.