**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**COMMODITY FUTURES TRADING**
**COMMISSION,**

                              **Plaintiff,**              **22-cv-4563 (AKH)**

         **v.**                                          **Hon. Alvin K. Hellerstein**

**GEMINI TRUST COMPANY, LLC,**

                              **Defendant.**

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT GEMINI TRUST COMPANY, LLC'S <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

COMMODITY FUTURES TRADING
COMMISSION

Diana Wang
Andrew J. Rodgers
Katherine Rasor
David W. Oakland
Peter Janowski
Alejandra de Urioste
K. Brent Tomer

Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 4

SUMMARY JUDGMENT STANDARD ................................................................... 6

I.  SECTION 6(c)(2) PROHIBITS ANY PERSON FROM MAKING FALSE
    STATEMENTS TO THE CFTC, REGARDLESS OF WHETHER THEY DO SO
    DIRECTLY OR THROUGH ANOTHER ENTITY ........................................... 7

    A.  Section 6(c)(2) is analogous to other statutes prohibiting false statements to the
        government, and should be interpreted consistently as those statutes. ................... 8

    B.  The plain text, history, and public policy of Section 6(c)(2) show that it should not
        be interpreted consistently with SEC Rule 10b-5, as the latter does not involve
        statements to a government agency. ..................................................................... 10

    C.  *Janus* and subsequent Supreme Court case law all caution against applying its
        holding to statements made to government agencies ............................................. 14

II. EVEN ASSUMING *JANUS* APPLIED TO SECTION 6(c)(2) CLAIMS,
    DEFENDANT'S MOTION FAILS BECAUSE DEFENDANT HAD ULTIMATE
    AUTHORITY OVER THE FALSE STATEMENTS ..................................... 16

    A.  Courts Interpreting *Janus* Have Imposed Liability on Defendants with Control
        Over the Statements, Even If They Did Not Directly Submit the Statements to the
        Intended Recipient ............................................................................................. 17

    B.  The Evidence Shows that Defendant Had Ultimate Authority over the Subject
        Statements .......................................................................................................... 19

III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ORAL FALSE
     STATEMENTS SHOULD BE DENIED ....................................................... 31

CONCLUSION ........................................................................................................ 37

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Coughlin*, 64 F.3d 77 (2d Cir. 1995) ............................................................. 7

*Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008) ................................. 8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 6

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549 (S.D.N.Y. 2014) ........................................................................................................ 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 6

*CFTC v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008) ................ 10

*CFTC v. Arista LLC*, No. 12 Civ. 9043 (PAE), 2013 WL 6978529 (S.D.N.Y. Dec. 3, 2013) ....................................................................................................................... 7, 36

*CFTC v. eFloorTrade, LLC*, No. 16 Civ. 7544 (PGG), 2018 WL 10625588 (S.D.N.Y. Sept. 21, 2018) ................................................................................................. 7, 9, 36

*CFTC v. Gramalegui*, No. 15-cv-02313-REB-GPG, 2018 WL 4610953 (D. Colo. Sept. 26, 2018) ....................................................................................................................... 9

*CFTC v. Kratville*, 796 F.3d 873 (8th Cir. 2015) ...................................................... 10

*CFTC v. McDonnell*, 332 F. Supp. 3d 641, 725 (E.D.N.Y. 2018) ............................ 10

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002) .............................. 10

*ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023 (9th Cir. 2016) .......................... 17

*Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) ........... 18, 25

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) ................................ 11

*Hersko v. United States*, No. 13-3255, 2015 WL 6437561 (S.D.N.Y. Oct. 20, 2015) ................. 6

*In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712 (D. Minn. 2019) ...... 18, 19, 31

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458 (S.D.N.Y. 2012) ........................ passim

*In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261 (S.D.N.Y. 2014) ...................... 22

*In re Pfizer Secs. Litig.*, No. 04 Civ. 9866 (LTS) (HBP), 2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) .................................................................................................. 18, 31, 34

*Jackson Cnty. Employees' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583 (M.D. Tenn. 2020) ............ 31

*Janus Capital Group, Inc. v. First Derivatives Traders*, 564 U.S. 135 (2011) .................... passim

*Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014) ...................................................... 10

*Lorenzo v. SEC*, 587 U.S. 71 (2019) ..................................................................................... 15-17

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) .................................................. 7

*Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011) ...................................................... 11

*Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993) ................................................................. 10, 11

*SEC v. Blackburn*, 431 F. Supp. 3d 774 (E.D. La. 2019) ........................................................... 18

*SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306 (D.D.C. 2014) ......................................... 28, 35

*United States v. Arcadipane*, 41 F.3d 1 (1st Cir. 1994) ............................................................. 13

*United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973) ............................................................. 9

*United States v. Davis*, 8 F.3d 923 (2d Cir. 1993) ....................................................................... 8

*United States v. Gilliland*, 312 U.S. 86 (1941) ......................................................................... 13

*United States v. Papagno*, 639 F.3d 1093 (D.C. Cir. 2011) ...................................................... 11

*United States v. Shanks*, 608 F.2d 73 (2d Cir. 1979) ................................................................. 13

*Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352 (S.D.N.Y. 2022) ........................................... 17

**Statutes**

7 U.S.C. § 9(2) ..................................................................................................................... passim

18 U.S.C. § 1001 ................................................................................................................... passim

31 U.S.C. § 3729 ......................................................................................................................... 9

**Regulations**

17 C.F.R. § 38.200 ....................................................................................................................... 4

17 C.F.R. § 145.9 ................................................................................................................... 27, 28

iii

17 C.F.R. § 240.10b-5 ............................................................................................... 10

**Other Authorities**

Hartman, et. al., THE CFTC'S NEW FALSE STATEMENT AUTHORITY: A PRACTITIONER'S
GUIDE ............................................................................................................... 12

Jean Eaglesham, *Legal Eagles in Cross Hairs*, WALL ST. J. (May 1, 2012) .............................. 12

Tyce Walters, *Regulatory Lies and Section 6(c)(2): The Promise and Pitfalls of the
CFTC's New False Statement Authority*, 32 YALE L. & POL'Y REV. 335, 335-36
(2013) ............................................................................................................... 12

Pursuant to Fed. R. Civ. P. 56 and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff Commodity Futures Trading Commission ("CFTC," or "Plaintiff") respectfully submits this Opposition to Defendant Gemini Trust Company, LLC ("Gemini," or "Defendant")'s Motion for Partial Summary Judgment (ECF No. 80).

## PRELIMINARY STATEMENT

This case concerns materially false or misleading statements and omissions Defendant made to the CFTC, a government agency, in its attempt to gain the CFTC's approval of a Bitcoin futures contract listing on a regulated exchange. Defendant now seeks to shirk responsibility for some of those false or misleading statements on the basis that they were submitted to the CFTC through an intermediary, the aforementioned regulated exchange, Cboe Futures Exchange ("CFE"), and thus were not "made" by Defendant.[1] Defendant's argument has no basis in law, the factual record, or common sense. The statements at issue concerned an indispensable part of the Bitcoin futures contract's specifications—the operations of Defendant's own exchange, auction mechanics, and auction volume—that Defendant provided to CFE *so that* CFE could submit them to the CFTC. Indeed, it is worth noting that Defendant is not moving for summary judgment on certain statements that it *did* submit directly to the CFTC—which are substantively similar to the statements at issue in this motion, rendering Defendant's motion a trivial exercise that has little practical impact on the case.[2]

---

[1] Unless otherwise defined, capitalized terms have the meaning ascribed to them in the Complaint, ECF No. 1. Reference to "DB" refers to Defendant's Memorandum of Law in Support of its Motion for Partial Summary Judgment, ECF No. 82. Reference to "CFTC Statement" refers to Plaintiff's Response to Defendant's Statement Pursuant to Local Rule 56.1 and Plaintiff's Statement of Additional Material Facts Pursuant to Rule 56.1(b).

[2] Even if Defendant prevailed on its motion, the Court would still need to resolve the other, substantively similar statements on which Defendant does not seek summary judgment—including the falsity of the substance

Defendant's motion fails for several reasons.  First, Defendant argues that it cannot be liable for some of its false or misleading statements to the CFTC (the "Subject Statements") because it was not the ultimate mouthpiece of those statements.  Nothing in the law supports Defendant's novel theory that it cannot be held liable simply because it submitted those statements through an intermediary, especially where, as here, the statements concerned Defendant's business, Defendant drafted or provided the factual content included in those statements, Defendant participated in discussions with the CFTC, and Defendant was fully aware—and indeed ultimately intended—that the statements would be presented to the CFTC.

Section 6(c)(2) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 9(2), is a broad provision added to the Act during Dodd-Frank reform.  It prohibits making materially false or misleading statements or omissions to the CFTC, a government agency.  The statute is analogous to the numerous other federal statutes prohibiting false statements to the government, all of which impose liability regardless of whether the defendant submitted the false statements directly, or did so through an intermediary.  Defendant relies heavily on *Janus Capital Group, Inc. v. First Derivatives Traders*, 564 U.S. 135 (2011), in support of its motion.  But that case involved an implied right of private action for an alleged violation of SEC Rule 10b-5 for false statements made in connection with a securities sale.  *Janus* has never been extended to false statements made to *government agencies*, as is the case here.  And for good reason: *Janus* itself

_____

contained in the statements, the materiality of the statements, and whether Defendant knew or should have known about their falsity before submitting them to the CFTC.  Defendant's motion is solely premised on the flawed legal theory that "maker" liability in the Securities and Exchange Commission Rule 10b-5 ("SEC Rule 10b-5") context applies to this case.  On that score, it is worth noting that Defendant never moved to dismiss on this hyper-technical argument, and chose instead to bring this motion well after fact discovery ended.

cautioned that its holding should be construed narrowly because "[c]oncerns with the judicial creation of a private cause of action caution against [the Rule's] expansion." *Id.* at 142.

Second, even proceeding from Defendant's flawed argument that *Janus* applies to Section 6(c)(2), Defendant's motion would still fail because the record shows that Defendant had ultimate authority over its own false or misleading statements to the CFTC, including the contents of the statements, all of which concerned Defendant's own business and operations, including its own trade data, and whether and how to communicate those statements and contents which the CFE delivered to the CFTC. Not only that, but Defendant also retained control over whether and when the statements would be submitted to the CFTC. The record shows that Defendant had ultimate authority over the Subject Statements. At the very least, summary judgment should be denied because material facts regarding Defendant's ultimate authority over the statements are in dispute.

Finally, Defendant seeks to preclude the oral false or misleading statements it made to the CFTC during a July 25, 2017 meeting. But the record contains ample evidence that at the meeting, Defendant made the same false or misleading claims about its business orally that it drafted in the written presentation prepared for the same meeting. Contrary to Defendant's implied argument, the CFTC need not show which specific employee of Defendant made the oral statements, so long as it can show that Defendant, through its representatives, made the statements. Viewed under the appropriate standard, the evidence shows that Defendant, not any other entity, made the oral false or misleading statements at issue in this case. At a minimum, there exists a dispute of material fact that precludes summary judgment on those oral statements.

Accordingly, the Court should deny Defendant's motion for partial summary judgment in its entirety.

3

## FACTUAL BACKGROUND

The core allegations in this case arise from false or misleading statements and omissions Defendant made to the CFTC in supporting the self-certification of a proposed Bitcoin futures contract (the "Bitcoin Futures Contract") that was to be listed on CFE for trading. The Bitcoin Futures Contract was to be settled by reference to the spot bitcoin price on the relevant day as determined by an auction held on Defendant's trading platform. CFTC Statement ¶ 7. Discussions between Defendant and CFE regarding the Bitcoin Futures Contract began as early as February 2017. As part of those discussions, CFE sent a due diligence questionnaire to Defendant, explaining that "the questions reflect information we'll need in order to rep[resent] to the CFTC that CFE complies with DCM Core Principles on the futures [contract]." In response, Defendant provided information about its exchange and auction mechanics, including the assertion that all orders placed on its exchange and auctions must be "pre-funded" or "fully funded," and that it monitored for "self-trading" on its exchange—two key categories of false or misleading statements at issue in this case. CFTC Statement ¶¶ 58-59; [Ex. M] (GEM_CFTC093208); [Ex. N] (Reinstein Dep. Ex. 1); *see also* ECF No. 83-1 (False Statements Chart).[3]

One Core Principle that the CFTC was to evaluate was whether the Bitcoin Futures Contract was readily susceptible to manipulation. *See* 17 C.F.R. § 38.200 (2023). In an effort to persuade the CFTC that the Bitcoin Futures Contract was not readily susceptible to manipulation, CFE and Defendant met with the CFTC on multiple occasions, and made several written

---

[3] Citations to "Ex." refer to the exhibits attached to the Declaration of Christopher Giglio in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. Citations to ECF No. 83 refer to the exhibits attached to the Declaration of John F. Baughman in Support of Defendant's Motion for Partial Summary Judgment.

submissions of information and data regarding Defendant's operations, auction mechanics, the reliability of Defendant's auction pricing, and Defendant's trading volume and liquidity. *See* CFTC Statement ¶¶ 9-10, 62.

According to testimony from Art Reinstein, CFE's legal counsel and liaison between Defendant and the CFTC during the self-certification process, when submitting "anything that described Gemini or how Gemini functions, information about Gemini, [] we [w]ould not have submitted that unless it was information *provided by Gemini or reviewed and signed off on by Gemini*." CFTC Statement ¶¶ 12, 62; [Ex. A] (Reinstein Dep. at 99:19-23); *id.* at 77:21-78:13 (testifying that "generally speaking," whenever CFE made written submissions to the CFTC, CFE sought "input from Gemini on those submissions," and that CFE would not have "included information related to Gemini that didn't come from Gemini or be something that we would have had them review before we submitted it."); *id.* at 100:5-12 (referring to a document created in response to CFTC's follow-up questions during the self-certification process, "it looks like . . . it's something that Gemini created . . . And so, yes, we're receiving information from [Gemini] in this case, and in that sense it's the information that [Gemini] provided and *approved*") (emphasis added).

Similarly, Nicole Gordon, another legal counsel to CFE and liaison between Defendant and the CFTC during the self-certification process, testified that "most, if not all, of the information pertaining to the Gemini Exchange was provided by Gemini." CFTC Statement ¶¶ 12, 62; [Ex. B] (Gordon Dep. at 30:23-31:1); *id.* at 32:9-11 ("[I]f it was relating to the Gemini Exchange or Gemini data, it likely would have been provided by Gemini."). Ms. Gordon further testified that CFE's practice was "to receive *approval* from the provider of the information before sending it *on their behalf*." *Id.* at 51:23-52:1 (emphasis added).

5

The four written submissions at issue in Defendant's motion include (1) a presentation slide deck given to the CFTC during a July 25, 2027 meeting between the CFTC, CFE, and Defendant's representatives; (2) a trove of Defendant's auction trade data submitted to the CFTC in August 2017; (3) a written analysis of Defendant's March 2017 auction data submitted to the CFTC in October 2017; and (4) three drafts as well as the final version of the Self-Certification letter submitted to the CFTC from October to December 2017.  As demonstrated more fully in Section II.B, *infra*, Defendant helped draft, commented on, and signed off on all four sets of submissions before they were sent to the CFTC.  CFTC Statement ¶¶ 16, 63-77.

## SUMMARY JUDGMENT STANDARD

To prevail on summary judgment, Defendant must show (1) that there is no genuine dispute as to any material fact and (2) that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The party moving for summary judgment bears the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim.  *See, e.g.*, *id.* at 322-23, 325.  "If the movant fails to meet his initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial."  *Hersko v. United States*, No. 13-3255, 2015 WL 6437561, at *9 (S.D.N.Y. Oct. 20, 2015).

A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations omitted).  "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (internal citation omitted).  Defendant has failed to show that no genuine disputed issue of material fact exists and that it is entitled to summary judgment as a matter of law.

## **ARGUMENT**

**I.     SECTION 6(c)(2) PROHIBITS ANY PERSON FROM MAKING FALSE STATEMENTS TO THE CFTC, REGARDLESS OF WHETHER THEY DO SO DIRECTLY OR THROUGH ANOTHER ENTITY**

Section 6(c)(2) of the Act makes it "unlawful for any person to make any false or misleading statement of a material fact *to the Commission* . . . , or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading."  7 U.S.C. § 9(2) (emphasis added).  To show a violation of Section 6(c)(2), the CFTC must prove, by a preponderance of the evidence, that: "(1) a false or misleading statement was made to the CFTC; (2) the statement was material; and (3) [the defendant] knew or reasonably should have known that the statement was false or misleading."  *CFTC v. eFloorTrade, LLC*, No. 16 Civ. 7544 (PGG), 2018 WL 10625588, at *8 (S.D.N.Y. Sept. 21, 2018); *see also CFTC v. Arista LLC*, No. 12 Civ. 9043 (PAE), 2013 WL 6978529, at *7, *13 (S.D.N.Y. Dec. 3, 2013) (consent order finding that defendants, through their attorney,

made material misrepresentations in a letter submission to the CFTC in violation of Section 6(c)(2), when defendants "provided the information" contained in the letter and "reviewed the contents of the [] Letter prior to it being sent to the [the CFTC]").

Defendant's motion focuses on only part of the first element, and only with respect to certain of the false or misleading statements at issue in this case. That is, Defendant suggests that the prohibition against "mak[ing] any false or misleading statement" should apply *only* to the person who ultimately relays the statements to the CFTC, and that the Court should ignore the fact that Defendant helped craft those statements, which were about Defendant's business, and had ultimate approval authority over their dissemination to the CFTC. Defendant argues that it should not be held liable for certain of its false or misleading statements because they were submitted to the CFTC through an intermediary. Defendant's argument ignores the plain text, purpose, and policy concerns of the statute.

### A. Section 6(c)(2) is analogous to other statutes prohibiting false statements to the government, and should be interpreted consistently as those statutes.

Section 6(c)(2) prohibits a person from making false or misleading statements "to the Commission," a government agency, and is treated by courts as analogous to other federal statutes that prohibit making false statements to the government. Courts analyzing such statutes do not restrict their scope to only those who *directly* submitted the statement to the government. *See*, *e.g.*, *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008) ("[A] subcontractor violates [the False Claims Act] if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim."); *United States v. Davis*, 8 F.3d 923, 929 (2d Cir. 1993) (holding that a defendant violated the False Statements Act by submitting false statements to a state

8

correctional facility, over which a federal agency had "supervisory authority"); *United States v. Candella*, 487 F.2d 1223, 1227 (2d Cir. 1973) (holding that "a violation of § 1001 does not require that the false statement must actually have been submitted to a department or agency of the United States," and that defendants were liable by submitting false statements to a municipal branch office, which defendants were fully aware would be made available to the federal agency); *United States v. Brooks*, 681 F.3d 678, 717 (5th Cir. 2012) (affirming the district court's finding that defendants obstructed justice by providing false statements to the CFTC and other investigating officials through their employer's legal counsel, even though "the statements were not made directly to government officials," when the statements "were made with intent to be communicated to government officials").[4]

Indeed, this Court need look no further than Defendant's own filings in this case to see that Section 6(c)(2) should be interpreted similarly to 18 U.S.C. § 1001, the False Statements Act, because "the elements of Section 6 of the CEA are almost identical to those of Section 1001 cases." ECF No. 60 (Def. Opposition to 30(b)(6) Protective Order), at 29. As Defendant itself pointed out, both statutes prohibit making materially false statements to a federal government agency. *Id.* For this reason, courts have often looked to Section 1001's case law in analyzing the elements of Section 6(c)(2). *See, e.g.*, *eFloorTrade*, 2018 WL 10625588, at *8 (relying on Section 1001 case law to assess elements under Section 6(c)(2)); *CFTC v. Gramalegui*, No. 15-

---

[4] The false statements statutes contain certain textual variations. *Compare* 7 U.S.C. § 9(2) (prohibiting anyone who "make[s] any false or misleading statement of a material fact [or a related omission] to the Commission"), *with* 31 U.S.C. § 3729 (prohibiting, *inter alia*, anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim") *and* 18 U.S.C. § 1001 (prohibiting, *inter alia*, anyone "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully...makes any materially false, fictitious, or fraudulent statement or representation"). However, those textual variations are not at issue here. As shown above, these statutes have never been construed so narrowly as to absolve liability simply because a defendant submitted the false statement through another entity before it reached the ultimate government recipient.

cv-02313-REB-GPG, 2018 WL 4610953, at *24 & n.19 (D. Colo. Sept. 26, 2018) (citing *United States v. Gaudin*, 515 U.S. 506 (1995), and other Section 1001 cases in analyzing the elements of Section 6(c)(2), and noting that "section 1001 may be instructive" in interpreting Section 6(c)(2)); *cf. CFTC v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 535-36 (S.D.N.Y. 2008) (finding that Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4)—which prohibits making false statements to a registered entity, board of trade, or futures association designated or registered under the Act—is a fraud claim and comparable to 18 U.S.C. § 1001).[5]

### B. The plain text, history, and public policy of Section 6(c)(2) show that it should not be interpreted consistently with SEC Rule 10b-5, as the latter does not involve statements to a government agency.

Now, Defendant does an about-face, arguing that Section 6(c)(2) is *not* analogous to statutes prohibiting false statements made to the government, but instead, is analogous to the SEC's Rule 10b-5(b) (DB: 17-21), but the plain text, history, and policy concerns of Section 6(c)(2) all indicate otherwise. To begin, there is one significant difference between the two texts that Defendant glosses over: SEC Rule 10b-5 does not concern false statements made to the government. Instead, it prohibits the making of false or misleading statements "*in connection with the purchase or sale of any security*." 17 C.F.R. § 240.10b-5 (emphasis added). Section

---

[5] If anything, Section 6(c)(2) should be read even more broadly than other statutes prohibiting false statements to the government. Courts have uniformly held that the Commodity Exchange Act is a "remedial" statute that is "to be construed liberally." *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993); *see also CFTC v. McDonnell*, 332 F. Supp. 3d 641, 725 (E.D.N.Y. 2018) (noting that the Commodity Exchange Act is meant to be construed liberally because it is "designed to prevent injury to the public and to deter future illegal conduct"); *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002) (noting that "the [Commodity Exchange Act] is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived."); *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014) (same); *CFTC v. Kratville*, 796 F.3d 873, 891 (8th Cir. 2015) (same).

6(c)(2), on the other hand, prohibits the making of false or misleading statements or omissions "*to the Commission*."  7 U.S.C. § 9(2) (emphasis added).

This key difference counsels against interpreting Section 6(c)(2) and SEC Rule 10-5 together as having the same meaning or scope.  *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("[W]hen we're engaged in the business of interpreting statutes[,] we presume differences in language like this convey differences in meaning."); *United States v. Papagno*, 639 F.3d 1093, 1100 n.3 (D.C. Cir. 2011) (Kavanaugh, J.) (explaining that "dissimilar language need not always [be] . . . found in the same statute" to infer that Congress's inclusion of certain language in one text and its omission of that language in another was intentional and purposeful).  Construing Section 6(c)(2) "liberally and giving plain meaning to its plain language," *Monieson*, 996 F.2d at 859, Section 6(c)(2) should not be interpreted together with Rule 10b-5, when the former concerns false statements made to a government agency, and the latter does not.[6]

The purpose and history of Section 6(c)(2) also shows that it is not analogous to SEC Rule 10b-5.  Section 6(c)(2) was an amendment to the Commodity Exchange Act enacted as part of the Dodd-Frank Act, Pub. L. No. 111-203, § 753, 124 Stat. 1376, 1750-51 (July 21, 2010).  The amendment expanded the scope of then-existing Section 9(a)(3) of the Act, 7 U.S.C.

---

[6] Defendant's argument that it could have been charged under "a separate CEA violation—Section 13(a)" for willfully "causing" another person to violate the Act (DB: 15-16) deserves short shrift.  The simple fact that Defendant could be liable under another section of the Act does not mean that it cannot be charged under Section 6(c)(2).  Defendant essentially argues that Section 13(a) would be superfluous if Section 6(c)(2) imposed liability on those who used another entity in submitting false statements.  But the "the canon against surplusage assists only where a competing interpretation gives effect to every clause and word of a statute." *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011) (internal quotation marks omitted).  Here, Section 13(a)'s "aiding and abetting" liability for any and all violations of the Act is clearly of a different and wider scope than Section 6(c)(2)'s prohibiting against making false statements to the CFTC.  Thus, Defendant's attempt to use Section 13(a) to escape liability under Section 6(c)(2) should be rejected by this Court.

§ 13(a)(3), from prohibiting false statements "made in registration applications or reports filed with the Commission," to prohibiting false statements "made to the Commission *in any context.*" *See* Final Rule, Prohibition on the Employment, or Attempted Employment of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,398 (July 14, 2011) (emphasis added).  In this way, Section 6(c)(2) granted "a significant but little-noticed power to the [CFTC] to bring civil enforcement actions against those who make false representations to the Agency . . . *a power denied to all other financial regulatory agencies, including the Securities and Exchange Commission (SEC).*"  Tyce Walters, REGULATORY LIES AND SECTION 6(C)(2): *The Promise and Pitfalls of the CFTC's New False Statement Authority*, 32 YALE L. & POL'Y REV. 335, 335-36 (2013) (emphasis added).[7]  In short, Section 6(c)(2) was a unique power granted to the CFTC in the wake of Dodd-Frank reform.  Defendant's attempt to graft a reading of SEC Rule 10b-5 onto Section 6(c)(2) is therefore contrary to the statute's purpose and history.

Finally, the policy concerns in prohibiting false statements to the government is distinct from prohibiting false statements related to the sale of securities.  Courts have made clear that prohibitions of false statements to the government serve an important function.  That is, they are "intended to promote the smooth functioning of government agencies and the expeditious processing of the government's business by ensuring that those who deal with the government

---

[7] *See also* Jean Eaglesham, *Legal Eagles in Cross Hairs*, WALL ST. J. (May 1, 2012) (SEC's former director of enforcement, Robert Khuzami, saying in reference to the CFTC's broad Section 6(c)(2) false statement authority, "Frankly, I wish we had the power the CFTC has."); Hartman, et. al., *The CFTC's New False Statement Authority: A Practitioner's Guide*, 34 No. 9 FUTURES & DERIVATIVES L. REP. 1 ("Importantly, however, SEC Rule 10b-5 does not give the SEC the same prosecutorial power as Section 6(c)(2) of the CEA gives to the Commission. Instead, Rule 10b-5 requires that false or misleading statement be made 'in connection with the purchase or sale of any security,' which effectively prevents the SEC from bringing perjury like charges based on false statements made during investigative testimony [like Section 6(c)(2)].").

furnish information on which the government confidently may rely." *United States v. Arcadipane*, 41 F.3d 1, 4 (1st Cir. 1994); *see also United States v. Gilliland*, 312 U.S. 86, 93 (1941) (explaining that Section 1001 was meant to "protect the authorized functions of governmental departments and agencies from the perversion which might result from [] deceptive practices"); *United States v. Shanks*, 608 F.2d 73, 75 (2d Cir. 1979) (same), *cert. denied*, 444 U.S. 1048 (1980). These objectives are no less diminished even if the Defendant made the false or misleading statements through an intermediary, rather than directly to the governmental authority.

The underlying policy concerns in prohibiting false statements to the government reveal the sheer absurdity of Defendant's argument. Defendant's motion seeks summary judgment only on certain false statements at issue in this case, based on the theory that it did not "make" the statements because it did not directly submit those statements to the CFTC. But those statements are substantively similar to the statements that Defendant tacitly concedes it did "make" by directly submitting them to the CFTC. *Compare, e.g.*, ECF No. 83-1, Statement 21 (a statement for which Defendant does *not* seek summary judgment, stating that Gemini "prohibit[s] the same market participant from crossing with himself or herself"), *with* Statement 31 (a statement for which Defendant *does* seek summary judgment, stating that "Self-crossing [is] prohibited" on Gemini's platform); *compare also id.* Statement 17 (a statement for which Defendant does *not* seek summary judgment, stating that Gemini's pre-funding requirement, which applied to "all orders at the auction" "disincentivizes potentially manipulative behavior"), *with* Statement 27 (a statement for which Defendant *does* seek summary judgment, stating that the Gemini auction price "is not readily susceptible to manipulation" in part because the "[p]refunding requirements for auction-only orders allows for heightened surveillance"). Defendant's novel reading of the

13

law would create the illogical result that one could avoid liability for false statements under Section 6(c)(2) simply by filtering them through an intermediary, even if the defendant's knowledge of the statements' falsity, the substantive content and materiality of the statements, and the statements' tendency to pervert governmental functions would remain the same. In short, Defendant's argument to extend *Janus* to Section 6(c)(2) is not supported by the text, purpose, history, or policy concerns of Section 6(c)(2), and should be roundly rejected by this Court.[8]

### C. *Janus* and subsequent Supreme Court case law all caution against applying its holding to statements made to government agencies

Aside from the key differences between Section 6(c)(2) and SEC Rule 10b-5, this Court need look no further than the *Janus* opinion itself to see that its holding should not be extended to Section 6(c)(2). Indeed, the *Janus* Court strongly cautioned that its holding regarding SEC Rule 10b-5 should be construed narrowly. Writing for the majority, Justice Thomas noted that the Court was tasked with deciding the scope of a judicially-created, implied right of action under Rule 10b-5, which did not "expressly create[] a private right of action." *Janus*, 564 U.S. at 142. Mindful that "[c]oncerns with the judicial creation of a private cause of action caution against its expansion," Justice Thomas explained that in analyzing liability "for purposes of Rule 10b-5," the Court "must give 'narrow dimensions . . . to a right of action Congress did not authorize." *Id.* (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 167 (2008)); *see also id.* (noting that one of the reasons the Court declined to adopt a broader definition of "make" in the SEC Rule 10b-5 context was that it would "lead to results

---

[8] For the reasons above, Defendant's citations to case law involving SEC Rule 10b-5, including SEC enforcement actions (*see, e.g.*, DB: 18-20) are unavailing. Regardless of whether the action arose from the SEC or a private party, all SEC Rule 10b-5 actions concern false statements made to investors in connection with security sales, not false statements made to the government. Such case law is therefore inapposite to an action involving Section 6(c)(2).

14

inconsistent with our precedent" which "rejected a private Rule 10b–5 suit against companies") (citing *Stoneridge*, 552 U.S. at 161).

Thus, the *Janus* Court's fear was that adopting a broader definition of what it meant to "make" a statement in the SEC Rule 10b-5 context would "permit private plaintiffs to sue" a whole host of persons secondarily involved in the statement. *Id.* That concern is not present in this case. As discussed above, Section 6(c)(2) is a unique governmental enforcement power. Unlike SEC Rule 10b-5, courts have not recognized an implied right of action for private plaintiffs to sue under Section 6(c)(2).[9] And like other federal statutes prohibiting false statements to the government, the policy concerns of prohibiting "deceptive practices" that may pervert the CFTC's governmental functions far outweigh the need for private plaintiffs to sue for false statements made to investors in security sales.

Indeed, the Supreme Court has since clarified that *Janus* is a limited holding. In *Lorenzo v. SEC*, 587 U.S. 71, 77–78 (2019), the Supreme Court held that *Janus*'s holding applied solely to subsection (b) of SEC Rule 10b-5. In *Lorenzo*, the Court affirmed imposing liability on the defendant, a director of investment banking at a brokerage firm, who sent emails containing falsehoods to prospective investors even though content of the emails was supplied by the defendant's boss. *Id.* at 75–76. Noting that this behavior was "plainly fraudulent" and that using "false representations to induce the purchase of securities would seem a paradigmatic example of securities fraud," the Court ruled that the "Rule's expansive language" plainly covered the defendant's false statements, despite the fact that other people also had a hand in the statements' content. *Id.* at 81. Accordingly, *Janus* is not meant to restrain federal agencies tasked with

---

[9] The Act does expressly grant a private right of action to plaintiffs to sue under the Act provided that those plaintiffs meet certain criteria. *See* Section 22(a) of the Act, 7 U.S.C. § 25(a).

combating fraud, and *Lorenzo* clarifies that liability can extend to anyone involved in making false statements to investors, even if they were not the only ones responsible for drafting the false statements. The reasoning of *Lorenzo* only underscores the preposterousness of Defendant's stance in this motion, where Defendant seeks to escape liability for statements it had primarily drafted and controlled (*see infra* Section I.B), simply because it had passed those statements onto an intermediary, who then submitted those statements to the CFTC.

In sum, Defendant's argument that liability under Section 6(c)(2) can be imposed only on those who ultimately relayed a false or misleading statement to the CFTC, a government agency, is unavailing. Defendant's strained attempt to wedge the expansive scope of Section 6(c)(2) into the narrow holding of *Janus* is contrary to Section 6(c)(2)'s plain text, purpose and history, public policy, and the holding of *Janus* itself. Defendant's motion fails as a matter of law.

## II.    EVEN ASSUMING *JANUS* APPLIED TO SECTION 6(c)(2) CLAIMS, DEFENDANT'S MOTION FAILS BECAUSE DEFENDANT HAD ULTIMATE AUTHORITY OVER THE FALSE STATEMENTS

Not only is Defendant's motion legally deficient, but, even under Defendant's flawed legal argument that *Janus*'s narrow holding should somehow apply to Section 6(c)(2), Defendant would still fail to establish under the facts that it is entitled to summary judgment. Defendant's core argument is that it was not the "maker" of the Subject Statements because it was CFE who transmitted the statements to the CFTC. Tellingly, Defendant does not—and cannot—claim that it is an innocent bystander to those statements. Indeed, the record is replete with evidence that Defendant had ultimate authority over the statements, including the content of the statements and in their dissemination to the CFTC. At a minimum, genuine issues of material fact exist that preclude summary judgment on the Subject Statements.

16

A. **Courts Interpreting *Janus* Have Imposed Liability on Defendants with Control Over the Statements, Even If They Did Not Directly Submit the Statements to the Intended Recipient**

A person "makes" a statement for purposes of SEC Rule 10b-5 when they have "authority over the content of the statement and whether and how to communicate it." *Janus*, 564 U.S. at 144. Whether an entity is the maker of the statements is a factual intensive test that can be discerned from "attribution within a statement or implicit from surrounding circumstances." *Id.* at 142. An entity who merely "prepares or publishes the statement on behalf of another" to the recipient is not the "maker" of the statement. *Id.* And, "as long as a statement is made, it does not matter whether the statement was communicated directly or *indirectly* to the recipient." *Id.* at 147 n.11 (emphasis added); *see also Lorenzo*, 587 U.S. at 83 (clarifying that *Janus* sought to divide "primary violators" from "actors too far removed from the ultimate decision to communicate a statement").

Post-*Janus*, courts have adopted a fact-intensive inquiry in determining whether an entity is the "maker" of a statement, without resorting to simple bright-line rules of who may have been the last person to convey the statement to the recipient, or who signed the final document. "While explicit attribution can be a strong indication of *Janus's* 'ultimate authority,' it also can be found if implicit in surrounding circumstances, or, in other words, evidenced by various indicia of control." *Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 359 (S.D.N.Y. 2022) (citing cases); *see also ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) ("While it is true that attributing a statement to another party generally indicates that party as the 'maker' of the statement, we are not convinced that such a short, easy preface could shield a messenger from liability in all circumstances.") (citing *Janus*, 564 U.S. at 142-43).

In particular, courts have not shied away from finding that a defendant had control over a

17

statement under *Janus*, even if the maker of the statements did not directly deliver the statement to the intended recipient. *See In re Pfizer Secs. Litig.*, No. 04 Civ. 9866 (LTS) (HBP), 2012 WL 983548, at *4, *20–21 (S.D.N.Y. Mar. 22, 2012) (holding that executive defendants could be liable for statements in press releases because they "approved" or "ratified" such statements); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. 2014) (deeming an allegation that company's President could instruct others to make statement "alone implies a level of control" that satisfied *Janus*); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015) (finding that trial evidence showed a CEO was maker of the statement even when he did not directly deliver it to the media, when he "drafted the statement…and [] sent it to various executives, including [the vice chair]," and the vice chair "simply read the statement verbatim to the media"); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 736 (D. Minn. 2019) (holding that allegations satisfied *Janus* when the company's presidents of global markets and sales "drafted, reviewed, or approved the prepared remarks that were given in joint presentations"); *SEC v. Blackburn*, 431 F. Supp. 3d 774, 811 & n. 182 (E.D. La. 2019) (holding that a CEO had "ultimate authority" over company announcement when he "approve[d] the final draft of the press release"), *aff'd*, 15 F.4th 676 (5th Cir. 2021).

Indeed, one of the cases cited by Defendant (DB: 22 n. 22) illustrates Defendant's liability best. In *In re Fannie Mae 2008 Sec. Litig.*, the court held that a company's risk officer "may be found to have made a misstatement" even though he "did not sign any of the SEC filings at issue." 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013). Instead, the officer's "knowledge" of the underlying falsehoods, his "participation in drafting relevant disclosures," his "review of draft filings," and the fact that he had "discussions

with [another executive] about the SEC filings," all indicated that there was at least a question of fact as to whether he "had ultimate authority over the misstatements, or ratified and approved the misstatements," in the SEC filings.  Just like the officer in *In re Fannie Mae*, Defendant had knowledge of the falsity of the Subject Statements, participated in drafting the Subject Statements, reviewed the draft submissions containing the Subject Statements, and had intensive discussions with CFE before the Subject Statements were submitted to the CFTC.  *See infra* Section II.B.  The evidence shows that Defendant *was* the "maker" of the Subject Statements, but there is at least a question of fact to preclude summary judgment at this stage.[10]

**B. The Evidence Shows that Defendant Had Ultimate Authority over the Subject Statements**

**1.  The July 25, 2017 presentation**

Contrary to Defendant's selective snippets of testimony, the CFE witnesses testified that with respect to *all of the submissions* to the CFTC, Defendant retained approval authority over the portions that pertained to Defendant, that is, the CFE would not "have submitted

---

[10] The other case law cited by Defendant (DB: 22 n. 21, 22) are not only legally irrelevant because they all concern private actions under Rule 10b-5, not Section 6(c)(2), *see supra* Section I.A, but they are also factually inapposite because the level of control Defendant exerted over the false statements in this case far exceeds the levels alleged in the cases cited by Defendant.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 204–05 (S.D.N.Y. 2022) (mere conclusory allegations that majority shareholder generally exercises "control over [company's] public statements" or that it controlled the company's "access to relevant information" does not make it maker of company's statements); *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) (adopting district court's analysis that a broker-dealer hired to conduct a debtor's private offering was not liable for statements in private offering memorandum when the broker-dealer was not a corporate official of debtor); *Krasner v. Rahfco Funds LP*, No. 11 Civ. 4092 (VB), 2012 WL 4069300, at *6 (S.D.N.Y. Aug. 9, 2012) (finding no allegation that auditor of a company "made" any statements in the company's prospectus by authoring or claiming authorship of the prospectus, and plaintiff's assertion that auditor "spoke" through company executive's letter to investors failed when there was no allegation that auditor "drafted, published, wrote, 'spoke,'" or made a statement in the letter."); *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 104 (2d Cir. 2022) (holding that a CEO not a maker of statements in articles when the CEO only "reviewed and approved" other documents, including press releases, which were then copied and repeated into promotional articles containing misstatements, absent any allegations that the CEO "directly wrote the articles, controlled what the authors put into the articles, or even saw them before their publication").

[information] unless it was information *provided by Gemini or reviewed and signed off on by Gemini*." CFTC Statement ¶¶ 12, 62; [Ex. A] (Reinstein Dep. at 99:19-23) (emphasis added); *see also id.* at 77:21-78:13 (testifying that CFE sought "input from Gemini on those submissions," and that CFE would not have "included information related to Gemini" unless it "c[ame] from Gemini" and CFE "had [Gemini] review [the information] before we submitted it"); *id.* at 100:5-12 (testifying that if the submission included information about Defendant, it would have been "information that [Defendant] provided and *approved*") (emphasis added); [Ex. B] (Gordon Dep. at 51:23-52:1) (testifying that it was CFE's practice "to receive *approval* from the provider of the information before sending it *on their behalf*") (emphasis added); *id.* at 30:23-31:1 (testifying that "information pertaining to the Gemini Exchange was provided by Gemini"); *see generally* [Ex. Z] (Winklevoss Investigative Dep. at 58:10-14, 59:12-17, 62:4-9) (testifying that Defendant strove to be "responsive" and "collaborative" to the CFTC's requests during the self-certification process).

With respect to the July 25, 2017 presentation, the record demonstrates Defendant's ultimate authority over the presentation and its extensive involvement in drafting, preparing, endorsing, and approving the presentation. As even Defendant admits, it "participated in the preparation of this presentation." ECF No. 81 at ¶ 20. Before the meeting, CFE sent multiple drafts of the presentation to Defendant. *See* CFTC Statement ¶¶ 34, 63-64; [Ex. X] (CBOECFTC_00006632) (July 19, 2017 email from CFE to Gemini attaching initial draft presentation); [Ex. E] (CBOECFTC_00006066) (July 21, 2017 email from CFE to Gemini attaching revised draft slide deck titled "CFTC presentation – draft 3.pptx"). Defendant, in turn, drafted wholesale slides to the presentation, including a key slide on "auction mechanics" that contained numerous Subject Statements, and sent the slides to CFE for inclusion in the

Case 1:22-cv-04563-AKH    Document 90    Filed 04/19/24    Page 26 of 42

presentation.  [Ex. F] CBOECFTC_00026960 (Defendant's Chief Operating Officer ("COO"),

Benjamin Small, providing CFE the "CFE Gemini Compliance Reg slides" to the presentation);

[Ex. G] GEM_CFTC075016 (Defendant's COO providing CFE "slides on [Defendant's] auction

mechanics").

As the meeting neared, CFE told Defendant that "as a group we need to determine what

we are comfortable providing to the CFTC ahead of the meeting," and scheduled a call with

Defendant days before the meeting to "Finalize Presentation/Details."  CFTC Statement ¶ 65;

[Exs. NN, OO] (CBOECFTC_00006043, CBOECFTC_00053751).  After that call, CFE sent

Defendant yet another updated draft of the presentation, which now included the slides Gemini

had drafted.  CFTC Statement ¶  66; [Ex. PP] (CBOECFTC_00029087).

Shortly thereafter, Defendant forwarded the presentation to its own legal counsel and

consultant and solicited comments for the presentation, which Defendant received and promptly

forwarded to CFE for incorporation into the presentation.  CFTC Statement ¶¶ 34, 67-68; [Ex. I]

(CBOECFTC_00029107).  Meanwhile, Defendant's principals contemplated potential edits to

the presentation.  *Id.*, [Ex. H] (GEM_CFTC286801) (internal email between Defendant's

President and CEO, Cameron and Tyler Winklevoss, respectively, debating whether to edit

certain terms used in the presentation).  Then, on the eve of the meeting, CFE sent a final version

of the presentation to Defendant's counsel, copying Defendant, stating that it had "made the

changes [Defendant's counsel] suggested" and asking Defendant's counsel to print the copies of

the presentation that would be handed to the CFTC at the meeting.  *Id.*, [Ex. J] (Reinstein Dep.

Ex. 6).

The presentation was primarily about Defendant.  The presentation mentioned "Gemini"

no fewer than 27 times.  It included slides purporting to show Defendant's auction volume and

mechanics, titled "Gemini Auction," and "Gemini Auction Mechanics." ECF No. 83-3. The false statements at issue in the presentation all relate to Defendant's exchange. Specifically, the false statements concern Defendant's auction volume, Defendant's rebate program for market makers, Defendant's self-trading prevention, and Defendant's "pre-funding" requirement. ECF No. 83-1 (Statements 26-31). As noted above, no information regarding Defendant would have appeared on the presentation without Defendant's approval. CFTC Statement ¶¶ 12, 62; [Ex. A] (Reinstein Dep. at 99:19-23); *id.* at 77:21-78:13; *id.* at 100:5-12; [Ex. B] (Gordon Dep. at 30:23-31:1); *id.* at 32:9-11; *id.* at 51:23-52:1 (quoted *supra*).

Moreover, as Defendant admits (DB: 7, 29), multiple of Defendant's representatives attended the July 25, 2017 meeting, including Defendant's President, CEO, and COO, as well as Defendant's legal counsel and consultant from Delta Strategy. CFTC Statement ¶ 78; [Ex. B] (Gordon Dep. at 29:5–6); ECF No. 83-12. At the meeting, Defendant's representatives did not remain silent (*see infra* Section III), but rather, fully endorsed the presentation's contents, especially with respect to information regarding its own auction and exchange. Indeed, Ms. Gordon recalled that "most of the questions pertaining to the Gemini Auction or the Gemini Exchange" posed by the CFTC during the presentation were "fielded by Gemini." CFTC Statement ¶¶ 28, 79; [Ex. B] (Gordon Dep. at 38:6-8).

In short, Defendant "actively participated in creating" the presentation, "draft[ed] it jointly" with another party, and had their name "prominently displayed" on the presentation, thereby "endorsing the statements within" the presentation, Defendant is the maker of the false or misleading statements contained in the presentation. *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014) (finding that underwriters were "makers" of material misstatements in a prospectus where they "actively participated" and "draft[ed] it jointly," had

approval over the form of the prospectus, and had "sign off" authority on the prospectus before it was filed with the SEC).

## 2. Defendant's August 2017 Data Submission

Next, Defendant argues that it is not the maker of the statements contained in its own trade data, which was submitted to the CFTC in August 2017 after the CFTC requested a copy of the "raw data" underlying the graphs in the July 25 presentation showing trading on Defendant's platform. At the outset, this argument is belied by the ample evidence that Defendant had full control over and was the source of any and all information that concerned its own business operations. *See* CFTC Statement ¶¶ 12, 62; [Ex. A] (Reinstein Dep. at 99:19-23); *id.* at 77:21-78:13; *id.* at 100:5-12; *see also* [Ex. B] (Gordon Dep. at 51:23-52:1); *id.* at 30:23-31:1 (quoted *supra*).

In the face of such evidence, Defendant is left to argue that "it was CFE that sent [the August 2017 Data Submission] to the CFTC" (DB: 24). Defendant concedes, however, that the submission "contain[s] [Defendant's] trade data" that "originated on [Defendant's] platform" (DB: 9, 24). Moreover, ahead of the July 25 presentation, Defendant sent CFE various iterations of its data no fewer than a dozen times, including instances where it expressly stated that the data was intended for analysis to be given to the CFTC. *See* CFTC Statement ¶ 71; [Ex. AA] (CBOECFTC_00010036) (CFE asking Defendant's COO for an update on data CFE had requested from Defendant for an upcoming "meeting with the OCC and CFTC," which was "contingent on our completing the auction analysis we discussed previously," and Gemini's COO responding, "Sorry about the delay. Please see the attached" and attaching a file titled "auction_orders_full_20170620.cs_"); *see also, e.g.*, [Exs. BB-LL] (CBOECFTC_00030516; CBOECFTC_00030571; CBOECFTC_00006602; CBOECFTC_00006605;

23

CBOECFTC_00009991; CBOECFTC_00030840; CBOECFTC_00031080;

CBOECFTC_00031116; CBOECFTC_00031422; CBOECFTC_00006645;

CBOECFTC_00031853) (cover emails from Defendant to CFE attaching Defendant's auction

and trade data).

The email from CFE alerting the CFTC to its shipment of the Gemini data also expressly

stated that it was sending "a CD-ROM containing the raw data" from Defendant's platform.

ECF No. 83-4.  Indeed, CFE sought approval from Defendant first before providing CFTC this

raw data, and Defendant gave that approval, telling CFE: "Yes, we're definitely comfortable

sharing that data" and suggesting that CFE already had "the form [of the data] that's easiest to

digest."  *See* CFTC Statement ¶¶ 35, 37, 69-70; [Ex. K] (CBOECFTC_00018072); *see also* [Ex.

L] (CBOECFTC_00007411) (CFE confirming that Defendant's raw data had been sent to the

CFTC, and Defendant's CEO thanking CFE for the update without raising any complaint, and

approving CFE's suggestion to "check back in" with the CFTC the following week "if we

haven't heard back yet").  In short, CFE did no more than the ministerial task of forwarding

Defendant's data to the CFTC.

Ironically, prior to this motion, Defendant has always maintained that it disclosed to the

CFTC that self-trading was possible on its platform—one of the key issues in this case—*because*

*instances of self-trading were contained in the August 2017 Data Submission.  See* ECF No. 73

at 4 (Defendant's Letter to the Court, stating "One of Gemini's defenses is that it *did disclose*

instances of self-trading on the Gemini Exchange, including by providing all trading data on the

Gemini Exchange that the CFTC requested . . . attached hereto as Exhibit B are excerpts of the

auction trading data submitted to the CFTC on or about August 1, 2017") (emphasis in original);

ECF No. 70 at 56 (Jan. 11, 2023 Court Hearing Tr.) (Defense Counsel stating, "[The CFTC]

24

say[s] we never disclosed self-trading. Our understanding is [the CFTC] reviewed trading data, and if they did, they would have identified self-trading"). Defendant cannot have it both ways: either it submitted the trading data, which it incorrectly argues constitutes adequate disclosure that self-trading was possible on its platform, or it did not, which means it made no disclosure on self-trading at all.

Defendant's attempt to escape liability for delivering its own trading data to the CFTC via CFE is unavailing. The record shows that Defendant was the sole creator of its own "raw data" that it approved sending to the CFTC, and that CFE merely shipped the CD-ROM containing the data. Defendant is therefore the "maker" of the falsehoods contained in that data. *See Glickenhaus*, 787 F.3d at 427 (CEO was maker of the statement when he drafted the statement and sent it to the vice chair, and the vice chair "simply read the statement verbatim to the media").

### 3. The Analysis of Defendant's March Auction Data

In October 2017, CFE sent the CFTC an analysis of Defendant's March 2017 auction data via email. The analysis included information regarding an auction on Defendant's platform on March 10, 2017, and a discussion of why Defendant's auction mechanics "satisfie[d] the standards set forth in Core Principle 3," that is, had sufficient safeguards to ensure that the Bitcoin Futures Contract was not readily susceptible to manipulation. ECF No. 83-6 at 9. The false statement at issue in this document touted that "another strength of the auction is Gemini's pre-funding requirement," which meant that traders needed to maintain "sizable cash deposits at Gemini where they don't earn interest or transfer money into their account in enough time for funds to clear before entering orders." The statement went on to suggest that this constraint on the traders' capital meant that there was a "limited possible upside" to any potential plan to

manipulate the auction. *Id.* at 8; ECF 83-1 (Statement 18). The message conveyed here was another iteration of Defendant's numerous false or misleading statements about pre-funding and the cost of capital. *Compare* ECF 83-1 (Statement 18), *with id.* (Statement 17) (a statement for which Defendant does *not* seek summary judgment, stating that Gemini's pre-funding requirement, "disincentivizes potentially manipulative behavior"), *and id.* (Statement 19) (a statement for which Defendant does *not* seek summary judgment, stating that the pre-funding requirement made it "costly for a malicious market participant to engage in manipulative tactics.").

As Defendant notes, elsewhere in the document, there appears to be phrases such as "CFE believes," and "CFE staff also considered" (DB: 25), but the false statement at issue did not include such a modifier. Instead, as set forth above, the false statement concerned Defendant's auction mechanics and why the auction was particularly resistant to potential manipulation. As the CFE witnesses testified, all information regarding Defendant's auction mechanics were provided and approved by Defendant. *See* CFTC Statement ¶¶ 12, 62; [Ex. A] (Reinstein Dep. at 99:19-23; 77:21-78:13; 100:5-12); [Ex. B] (Gordon Dep. at 30:23-31:1; 32:9-11; 51:23-52:1, quoted *supra*). Defendant's "pre-funding" requirement, specifically, was a concept taken directly from the due diligence questionnaire response that Defendant submitted to the CFE, with the understanding that the information contained therein were needed "to rep[resent] to the CFTC that CFE complies with DCM Core Principles on the futures." CFTC Statement ¶¶ 59-60; [Ex. N] (Reinstein Dep. Ex. 1 attachment at 6, 9, 10) (Defendant touting that "all orders on Gemini must be fully funded; this requirement substantially increases the economic risks of attempted manipulation").

Defendant's control over the analysis is bolstered by the fact that multiple draft versions

were sent to Defendant for review and comment prior to submission to the CFTC.  *See* CFTC

Statement ¶¶ 72-73; [Ex. QQ] (CBOECFTC_00040012) (CBOE sending draft to Defendant's

principals and representatives "for your review")]; [Ex. RR] (CBOECFTC_00040002) (CFE

sending revised draft to Defendant and asking for "any comments you have . . . so I can send the

submission to the CFTC"); [Ex. SS] (CBOECFTC_00039994) (CFE sending Defendant a further

revised draft).  And Defendant provided multiple rounds of comments by Defendant's

consultant, Jim Overdahl from Delta Strategy, and CFE accordingly made the changes requested.

[Ex. TT] (CBOECFTC_00039962) (Defendant sending CFE comments from Defendant's

consultant, as well as a marked up document); [Ex. UU] (CBOECFTC_00039953) (CFE sending

Defendant revised draft and confirming it "incorporates [Defendant's consultant's] marked

comments"); [Ex. VV] (CBOECFTC_00039939) (CFE sending further revised draft

"incorporating suggested changes from earlier" and soliciting final comments before

submission); [Ex. O] (CBOECFTC_00039913) (Defendant sending CFE "small" additional edits

to the analysis).

   Moreover, the email submitting the March Auction Data analysis to the CFTC included

two attachments, titled, respectively, "CFE-*Gemini* FOIA Letter CFTC Responses (10-24-17)"

and "CFE-*Gemini* Market Order Analysis 10-24 FOIA Treatment Requested."  ECF No. 83-6 at

1 (emphasis added).  The titles of the attachments alone indicate attribution to Defendant as well

as CFE.  Additionally, the first attachment specifically stated that, pursuant to 17 C.F.R. § 145.9,

both the CFE "and Gemini Trust Company, LLC" requested confidential treatment over the

information contained in the email and the analysis.  The second attachment, which is the

analysis of a March 2017 auction that occurred on Defendant's platform, has a stamp on the top

of every page stating "FOIA CONFIDENTIAL TREATMENT REQUESTED BY [CFE] *AND*

*GEMINI TRUST COMPANY, LLC*." ECF No. 83-6 (emphasis added). If the analysis had been submitted solely by CFE, then Defendant presumably would not have been able to request "FOIA Confidential Treatment" over the document. *See* 17 C.F.R. § 145.9 (2023) (permitting the "persons submitting information" to the CFTC to request that the information not be disclosed pursuant to a FOIA request). Further, after CFE confirmed the document had been submitted to the CFTC, Defendant's President thanked CFE and stated, "Onward and upward!" CFTC Statement ¶ 74; [Ex. WW] (CBOECFTC_00039901).

In short, Defendant, through its extensive involvement in drafting, reviewing, and approving the analysis before and after it was submitted, had control over the content of the false statement contained in the March 2017 analysis, which conveyed the same message Defendant conveyed in other false or misleading statements that Defendant does not contest that it made. *See SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 319 (D.D.C. 2014) (holding that a CEO could not escape liability for a press release simply because she did not draft it, where she was not only "involved in reviewing and editing drafts of the release," but also "wrote e-mails containing assertions similar to those made in the release").

### 4. The Self-Certification Letter and Drafts Submitted in October-December 2017

From October to December 2017, CFE sent the CFTC several versions of a self-certification letter regarding the Bitcoin futures product, including three drafts and a final version on December 1, 2017. Each of these different versions contained substantively the same false statements, which touted the "structural safeguards built into the Gemini Exchange auction process," including the facts that "self-crossing is prohibited on the Gemini Exchange" and that the "all orders on the Gemini Exchange . . . must be fully prefunded." ECF No. 83-1 (Statements

1-16). To begin, at least one of the versions sent to the CFTC was contained in an email with the subject line "CFE/*Gemini* Submission of Additional Information." ECF No. 83-9. And again, every draft was accompanied by a FOIA request letter submitted by both CFE and Defendant. ECF Nos. 83-9, 83-10, 83-11. As noted above, Defendant cannot claim it is not one of the submitters of a document when it requested FOIA Confidential Treatment pursuant to a regulation allowing "persons submitting information" to the CFTC to request such treatment.

More importantly, CFE witnesses testified that Defendant was one of the key drafters of the letter and its drafts. *See* CFTC Statement ¶ 75; [Ex. A] (Reinstein Dep. at 105:7-107:5) (recalling that Defendant's counsel was one of the "primary contributors to the drafting" of the letter; that the letter included "[i]nformation from Gemini"; and that Defendant provided that information knowing that the information would be shared with the CFTC); [Ex. B] (Gordon Dep. at 66:21-67:3) (testifying it "would not have been the general practice" to submit drafts of the self-certification letters "without input from [Defendant]," and that as part of CFE's "general practice," it had "open communication and a lot of back-and-forth" with Defendant prior to submission of any document to the CFTC).

As is the case with the analysis of Defendant's March 2017 auction data, the false or misleading statements at issue in the self-certification letters solely concerned Defendant's exchange, its auction mechanics and volume, the fact that all orders must be "fully pre-funded," and its auction's "structural safeguards," including its self-trading prohibition. ECF No. 81-1 Ex. A (Statements 1-16). The CFE witnesses uniformly testified that all such information would have been provided by Defendant. CFTC Statement ¶¶ 12, 62; [Ex. A] (Reinstein Dep. at 99:19-23); *id.* at 77:21-78:13; *id.* at 100:5-12; [Ex. B] (Gordon Dep. at 30:23-31:1); *id.* at 32:9-11; *id.* at 51:23-52:1 (quoted *supra*). The fact that *elsewhere* in the document, the letter attributes

certain statements to CFE such as "CFE believes" or "[CFE] submits" (DB: 27) only bolsters the fact that where a statement does not have such a qualifier—as is the case with the false or misleading statements at issue in the letter—it should not be read as being attributed to CFE.

Finally, as is the case with the other documents, CFE sent several drafts of the self-certification letter to Defendant before sending them to the CFTC, and Defendant provided comments and approval on those drafts. *See* CFTC Statement ¶¶ 49, 76; [Ex. P] (GEM_CFTC155239) (September 17, 2017 email from Defendant's President, Cameron Winklevoss, sending comments and edits to the first self-certification draft submitted to the CFTC); [Ex. Q] (CBOECFTC_00043198) (October 30, 2017 email from Defendant's President to CFE regarding second self-certification draft stating, "Looks good.  Gemini group has no comments"); [Ex. Y] (CBOECFTC_00039679) (November 9, 2017 email from CFE to Defendant's principals attaching third self-certification draft);  [Ex. R] (CBOECFTC_00039267) (in response to CFE sending a November 29, 2017 near-final draft of the self-certification letter, Defendant's President telling CFE, "Contracts specs LGTM," an acronym for "Looks Good To Me"); [Ex. S] (CBOECFTC_00004988) (in reference to CFE proposing language to be added to the near final self-certification letter, Defendant's employee telling CFE, "Cameron/Tyler [Winkloss] are reviewing this language right now – please hold until we have final comments and approval," and CFE responding, "Of course. . . . *We don't plan on doing anything without their approval*"); [Ex. T] (CBOECFTC_00005274) (Tyler Winklevoss stating that the proposed language was "acceptable and *approved by Gemini*").  After CFE confirmed it had submitted the final product certification, Defendant's President responded, "Awesome – amazing work team!" CFTC Statement ¶ 77; [Ex. MM] (CBOECFTC_00005303).

Accordingly, Defendant "drafted, reviewed, or approved" the statements in the self-certification letter and drafts that were submitted to the CFTC, and is therefore one of the "makers" of the false or misleading statements contained therein. *In re Pfizer Secs. Litig.*, 2012 WL 983548, at *4, *20–21.[11]

*     *     *

In sum, there is no reason to impute *Janus*'s holding regarding SEC Rule 10b-5 to Section 6(c)(2), a broad prohibition against making false or misleading statements to the CFTC in any context. But even if *Janus* did apply, the evidence supports a finding that Defendant had ultimate authority over the contents and dissemination of the Subject Statements. At a minimum, there is a genuine dispute over material facts that should be determined at trial. Defendant's motion for summary judgment on the Subject Statements should therefore be denied.

## III.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ORAL FALSE STATEMENTS SHOULD BE DENIED

Defendant also moves for summary judgment on certain oral false or misleading statements Defendant made during an in-person July 25, 2017 meeting between representatives of the CFTC, CFE, and Defendant. This motion should also be denied. Contrary to Defendant's claim that there is "no evidence of such statements" made during the July 25, 2017 meeting (DB: 29), there is clear testimony in the record that Defendant, through its representatives, made the oral statements at issue.

---

[11] Defendant's argument that it did not "sign" or file the self-certification letter (DB: 11-12, 27) is not dispositive. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d at 473 (fact that risk officer "did not sign any of the SEC filings at issue" not dispositive); *Jackson Cnty. Employees' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583 (M.D. Tenn. 2020) (allegations sufficient to make senior vice president the "maker" of misstatements contained in annual reports despite that he "did not sign" them, or contribute any "statements, or direct quotes" to the annual reports, when his name appeared in the reports, and was "intimately involved in this scheme and received all of the reports either before or shortly after they were published.").

At the outset, Defendant has not disputed—nor can it—that Cameron Winklevoss, Tyler Winklevoss, and Mr. Small, attended the July 25, 2017 meeting in their capacities as Defendant's executives and employees. *See* CFTC Statement ¶ 78; [Ex. B] (Gordon Dep. at 29:5-6). It is also undisputed that a written PowerPoint Presentation outlined the talking points for the meeting. *See, e.g.*, [Ex. D] (Goodman Dep. at 162:7-15) ("[M]y recollection is the . . . discussion [] at that meeting kind of followed closely to the slide deck."); ECF No. 83-2 (July 24, 2017 email from CFE to the CFTC before the meeting, stating, "Attached is a copy of the presentation we will be making tomorrow."). As Plaintiff laid out above, *see supra* Section II.B.1, the written presentation contained false statements that related solely to Defendant's business, including, for example, its assertions that all orders "must be fully (pre-) funded"; that the "[p]refunding requirement[]" was one of the reasons that the settlement price was not "readily susceptible to manipulation"; or that self-crossing was "prohibited" on Defendant's exchange. ECF No. 83-3 at 2, 5. The false statements in the presentation also included statements regarding Defendant's rebate program and trading volume, while omitting the fact that Defendant gave undisclosed, bespoke rebates to select market makers, and that Defendant's trading volume was inflated by undisclosed loans, advances, and special rebates given to certain market participants. *See id.* at 3, 5; *see generally* ECF No. 83-1 (CFTC's responses to court interrogatories).

Thus, a factfinder could make the reasonable inference that Defendant's representatives made oral misstatements reiterating the same written false statements contained in the presentation. Indeed, such an inference is more than supported by the evidence. As noted above, Ms. Gordon recalled that "most of the questions pertaining to the Gemini Auction or the Gemini Exchange" posed by the CFTC at the meeting were "fielded by Gemini." CFTC Statement

¶¶ 28, 79; [Ex. B] (Gordon Dep. at 38:6-8); *see also* CFTC Statement ¶ 84; [Ex. C] (Kuserk Dep. 259:5-7) (CFTC witness recalling that both Tyler and Cameron Winklevoss, the President and CEO of Defendant, actively "responded to questions" posed by the CFTC during the meeting). In other words, all oral statements made at the meeting, so long as they related to Defendant's exchange, were made by Defendant, not by CFE. Thus, a reasonable factfinder could find that Defendant restated the false statements contained in the presentation during the July 25 meeting.

Additionally, Ms. Gordon testified that "it was someone from Gemini," that is, "Cameron Winklevoss, Tyler Winklevoss, or Ben Small," who explained that the Bitcoin Futures Contract's settlement price would not be "readily susceptible to manipulation." CFTC Statement ¶ 81; [Ex. B] (Gordon Dep. at 31:20-32:1). Ms. Gordon also specifically recalled, with respect to the slide titled "Gemini Auction Mechanics," which discussed how all auction orders on Defendant's platform "must be fully pre-funded," that it was "perhaps Benjamin Small," Defendant's COO, who presented that slide to the CFTC. *Id.* (Gordon Dep. at 33:14-35:2). Consistent with Ms. Gordon's recollection, Mr. Goodman, one of the CFTC employees who attended the meeting, recalled that Defendant's representatives had made statements regarding "this pre-funding concept" during the meeting. CFTC Statement ¶ 82; [Ex. D] (Goodman Dep. 156:24-158:17). Finally, Mr. Kuserk, another CFTC employee, specifically recalled that he asked a question about a chart on page 3 of the July 25, 2017 presentation showing trade volume in Defendant's auctions, and it was Defendant's consultant, Jim Overdahl, who answered him while reiterating that the chart "show[ed] that somehow [trading] volume is going up" in Defendant's auctions. CFTC Statement ¶ 83; [Ex. C] (Kuserk Dep. 152:18-155:4). As the CFTC has explained, Defendant's volume figures reflected in the chart were significantly inflated due to its use of undisclosed loans, advances, and special rebates given to certain market

33

participants, as well as non-bona fide self-trading. *See* ECF No. 83-1 at 7 (CFTC's responses to court interrogatories explaining Defendant's false statements regarding the volume of its auctions).

Ms. Gordon, Mr. Goodman, and Mr. Kuserk's testimonies are further bolstered by the documentary evidence in this case. As noted above, it was Defendant's COO who drafted the slides regarding Defendant's auction mechanics—and thus, the false statements regarding its pre-funding requirement and its prohibition of self-crossing—in the first instance. *See* CFTC Statement ¶ 64; [Ex. G] GEM_CFTC075016. Further, according to a meeting agenda CFE drafted in preparation for the meeting, Defendant's representatives were charged with discussing "the Gemini Auction process and how it is not readily susceptible to manip[ulation]" at the meeting. *See* CFTC Statement ¶ 87; [Ex. XX] (CBOECFTC_00052295).

Moreover, Ms. Gordon's contemporaneous handwritten notes from the meeting reflect that Defendant's false and misleading statements about pre-funding and self-trading were in fact conveyed at the meeting. With respect to Defendant's statement on slide 5 of the presentation that all orders "must be fully pre-funded," Ms. Gordon testified that her contemporaneous handwritten note, "They seem to like this," referred to the CFTC seeming to like that the trades were pre-funded. CFTC Statement ¶ 34; [Ex. B] (Gordon Dep. at 34:1-11; 58:14-24). She further testified that her notes reflected a question that was asked regarding the auction, "Can't cancel [the order] at 3:59, but could put in another order?" and an answer was given: "Yes, but can't self-cross. So it would have to be new pre-funded order at a different price." *Id.*; [Ex. B] at 37:11-37:12. There is no reason to believe that anyone other than Defendant's representatives discussed those topics at the meeting. *See In re Pfizer Secs. Litig.*, 2012 WL 983548, at *20–21 (executive defendants could be liable for statements that they "approved" or "ratified"); *In re*

*Fannie Mae*, 891 F. Supp. 2d at 473 (question of fact existed as to whether risk officer made false statements in filings that he did not sign, given his knowledge of the falsity of the statements, his participation in the drafting and review process, and his discussions with another executive about the statements).

Even assuming, contrary to the evidence, that the oral false statements regarding Defendant's exchange were actually delivered by CFE (with Defendant's principals and representatives fully present and involved at the meeting), the fact remains that such statements were additional iterations of the same false or misleading statements about Defendant's own exchange, auction mechanics, and auction volume that Defendant made in numerous other written submissions to CFTC, including several which Defendant does not contest it made, and which Defendant fully intended would be conveyed to the CFTC.[12]  *See supra* Section II.B, *cf. E-Smart Techs.*, 74 F. Supp. 3d at 319 (CEO could not escape liability for a press release even if she did not draft it, where she not only edited and reviewed it, but also "wrote e-mails containing assertions similar to those made in the release").

Additionally, in an interview with the Southern District of New York conducted on August 27, 2019, Mr. Kuserk, a CFTC witness who attended the meeting, recalled that either Tyler or Cameron Winklevoss, or both, took the lead in discussing the Gemini Auction during the July 25, 2017 meeting, and that one of them had stated that the trades on Defendant's

---

[12] Because there is ample evidence that Defendant's representatives made the oral false statements in this case, the case law cited by Defendant (DB: 28) is factually distinguishable.  *See UBS AG v. Greka Integrated, Inc.*, No. 19 Civ. 10786 (LLS), 2020 WL 1957530, *6–7 (S.D.N.Y. Apr. 23, 2020) (finding no evidence that the counterclaim defendant made the misrepresentations at issue); *Wellner v. City of New York*, No. 16-cv-7032 (JGK), 2019 WL 1511022, at *2 (S.D.N.Y. Mar. 22, 2019) (same); *Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*, 636 F. Supp. 2d 223, 232–33 (S.D.N.Y. 2009) (finding no "independent evidence" of false statement aside from a witness's "secondhand account" of a conversation for which the witness was not present, and for which the witness could not provide the most basic details, such as to whom the supposed statement was made).

platform "wouldn't be leveraged trades."  CFTC Statement ¶ 85; [Ex. W] (SDNY_000000787) at

3.  Mr. Kuserk also recalled that "the Winklevosses stressed the idea of pre-funding," which he

understood to "imply[] there was no leverage . . . that the cash needed to be there up front."  *Id.*

at 4; *see also id.* at 5 (recalling that generally, the Winklevosses "were more marketing and less

data people" and that they "spoke about the concept of fully pre-funded and also the monitoring

[conducted on Defendant's platform] at high levels").  Finally, Mr. Kuserk recalled that "it was

one of the twins [Tyler or Cameron Winklevoss] who expressed the product would not be

susceptible to manipulation" at the July 25 meeting.  *Id.* at 3.

Finally, to the extent that Defendant suggests that it should not be liable because the

CFTC has not shown which *specific* employees of Defendant made the oral false or misleading

statements (DB: 28-29), that is irrelevant.  Defendant, as a corporate entity, can act only through

its employees and agents, and nowhere in the language of Section 6(c)(2) does it say that the

"person" making the false or misleading statements needs to be an individual, as opposed to a

corporate entity.  *See* 7 U.S.C. § 1a (for purposes of the Commodity Exchange Act, defining the

term "person" to include "individuals, associations, partnerships, corporations, and trusts"); *see

also eFloorTrade, LLC*, 2018 WL 10625588, at *10 (granting summary judgment against

corporate defendant for misstatements made by corporate defendant's employee to the CFTC in

violation of Section 6(c)(2)); *Arista LLC*, 2013 WL 6978529, at *7 (finding that all defendants

made false statements to the CFTC in violation of Section 6(c)(2), including the corporate

defendant through its agents).  Thus, the CFTC need not prove *which* of Defendant's employees

made the oral false or misleading statements, but only that they were made by *Defendant*'s

agents.  On that score, as detailed above, there is ample evidence supporting the fact that

Defendant's agents made false statements during the July 25, 2017 meeting.  Thus, the evidence

36

does not support Defendant's claim that none of the witnesses recalled Defendant making oral false or misleading statements during the July 25 meeting.  At a minimum, there is a genuine dispute of material facts of who made those oral statements.  Defendant's request for summary judgment on the oral statements should therefore be denied.

## **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendant's motion for partial summary judgment.

Dated: New York, New York
     April 19, 2024

              Respectfully submitted,
              COMMODITY FUTURES TRADING
              COMMISSION

              By:    /s/ Diana Wang

              Diana Wang
              Andrew J. Rodgers
              Katherine Rasor
              David W. Oakland
              Peter Janowski
              Alejandra de Urioste
              K. Brent Tomer

              Division of Enforcement
              290 Broadway, 6th Floor
              New York, NY 10007
              Phone: (646) 746-9700
              Fax: (646) 746-9888