UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | 22-cv-4563 (AKH) |
| v. | ) ) | ECF Case |
| GEMINI TRUST COMPANY, LLC, | ) ) | |
| Defendant. | ) ) ) ) | |

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S OBJECTIONS AND RESPONSES TO DEFENDANT GEMINI TRUST COMPANY, LLC'S STATEMENT PURSUANT TO RULE 56 IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the U.S. District Court for the Southern District of New York ("Local Rules"), Plaintiff Commodity Futures Trading Commission ("CFTC"), respectfully submits its Objections and Responses to Defendant Gemini Trust Company, LLC's ("Defendant") Statement Pursuant to Rule 56 in support of its Motion for Partial Summary Judgment, and Statement of Additional Material Facts as to which it is contended that there exists a genuine issue to be tried, pursuant to Local Rule 56.1.

The information supporting these responses and additional facts is described herein and can be found in the pleadings filed to date, and in the documents or transcripts of sworn testimony attached as exhibits to the declaration of Senior Futures Trading Investigator Christopher Giglio, dated April 19, 2024.

1

**GENERAL OBJECTIONS**

1.      Plaintiff Objects to Defendant's Rule 56.1 statement to the extent that it contains impermissible legal arguments and conclusions.  *See Alliance Sec. Products, Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 n.8 (S.D.N.Y. 2007) (legal arguments in Rule 56.1 statement are disregarded in determining whether there are genuine issues of material fact); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 509 n.12 (S.D.N.Y. 2003) (no heed given to legal conclusions in Rule 56.1 statement); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 318–19 & n.9 (S.D.N.Y. 2003) (counter-statement including legal conclusions without material facts to support them is insufficient to put facts into dispute).

2.      Plaintiff Objects to Defendant's Rule 56.1 statement to the extent any of the material cited does not support the factual assertion as claimed.  Where the cited material does not support the factual assertion, the Court may disregard the relevant assertion.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also* Fed. R. Civ. P. 56(c)(1), (2); Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b) . . . must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

3.      Plaintiff Objects to Defendant's Rule 56.1 statement to the extent it fails to provide a specific cite to admissible evidence for each allegedly uncontested "fact," as required by Federal Rule of Civil Procedure 56.  Fed. R. Civ. P. 56(c)(1), (2); Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b) . . . must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

4.    Plaintiff Objects to each paragraph of Defendant's Rule 56.1 statement to the extent they contain inadmissible evidence or evidence that cannot be presented in admissible form at trial.  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169–70 (2d Cir. 2014); *see also Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 186 n.3 (S.D.N.Y. 2014) (finding many of plaintiff's 56.1 statements to be improper because they "are argumentative or immaterial, rely on inadmissible hearsay, fail to cite supporting evidence, and/or marshal evidence in a manner perhaps appropriate for a legal brief, but not for a 56.1 statement"); *Epstein v. Kemper Ins. Co.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence.").

5.    Plaintiff objects to all paragraphs in Defendant's Rule 56.1 statement that include a speculative or conclusory assertion.  *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (explaining that at the summary judgement stage, "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions"); *Spratt v. Verizon Commc'ns Inc.*, No. 11-cv-273 (AJN), 2014 WL 4704705, at *3 n.3 (S.D.N.Y. Sept. 17, 2014) (disregarding speculative and conclusory assertions made in 56.1 statement); *Epstein*, 210 F. Supp. 2d at 314 ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative or do not cite to supporting evidence.").

## PLAINTIFF'S INDIVIDUAL RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.    Gemini is a New York-based trust company chartered by the New York Department of Financial Services ("DFS") that was founded in 2015 by Cameron and Tyler Winklevoss.

**Response**: Undisputed

2.      In 2017, Gemini operated an exchange on which customers could buy and sell digital assets, including bitcoin, by placing orders on the exchange's continuous order books or, for bitcoin only, by participating in one of two daily auctions.

**Response**: Undisputed

3.      The CFTC did not regulate the Gemini exchange.  *See* Ex. 13 [C. Winklevoss] at 578:24–579:2; Ex. 17 [Goodman] at 39:22–40:7; Ex. 16 [Kuserk] at 40:10–14.

**Response**: Disputed as incomplete.  The CFTC did not regulate Defendant's exchange as an entity registered with the CFTC.  However, the CFTC has civil enforcement authority over all persons who make "any false or misleading statement of a material fact to the Commission . . . or [who] omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading."  7 U.S.C. § 9(c)(2).  Thus, the CFTC regulated all persons who provide false or misleading statements or omissions of material fact to the CFTC.  Further, the CFTC regulates futures contracts self-certified to be listed on regulated exchanges, including those priced in reference to auctions held on other entities, such as the proposed Bitcoin Futures Contract at issue in this case.  *See* 7 U.S.C. § 7a-2(c)(1).

Plaintiff further disputes the statement because it is not supported by the cited evidence. The cited portions of Mr. Winklevoss's testimony state that he "believe[d] that we were asked about [the] marketplace more in depth throughout the . . . process" during a meeting between representatives of the CFTC, Defendant, and the Cboe Futures Exchange ("CFE") on July 25, 2017.  He recalled that it was originally "[CFE]'s idea [] to give the CFTC an overview" of Defendant's exchange in the July 25, 2017 presentation.  However, Mr. Winklevoss did not

testify that the CFTC did not regulate the Gemini exchange. The cited portions of Mr. Goodman's and Mr. Kuserk's testimony stated only that Defendant was "not registered with the [CFTC]" as a designated contract market, but that does not mean that the CFTC did not regulate Defendant.

4.      The Gemini exchange was actively regulated by DFS.

**Response**: Undisputed

5.      Cboe Futures Exchange, LLC ("CFE" or "Cboe") is a CFTC-regulated Designated Contract Market ("DCM")—a form of self-regulatory organization—that operates a series of exchanges on which futures, swaps, and other derivatives contracts are traded.

**Response**: Undisputed

6.      As a DCM, CFE could introduce new contracts for trading either by seeking the CFTC's approval or by submitted a so-called "self-certification," in which CFE described the product and certified that the new contract met certain requirements, including compliance with the CFTC's "Core Principles."

**Response**: Undisputed

7.      On December 1, 2017, CFE filed a self-certification (the "Self-Certification") for a bitcoin-denominated futures contract (the "Bitcoin Futures Contract") that was to settle by reference to a 4:00 PM bitcoin auction held every day on the Gemini exchange.

**Response**: Undisputed

8.      CFE was responsible for deciding whether to submit the Self-Certification and for its contents. *See* Ex. 16 [Kuserk] at 58:6–22; Ex. 17 [Goodman] at 288:4–12; Ex. 15 [Reinstein] at 157:15–158:2.

**Response**: Disputed as incomplete.  Plaintiff disputes the characterization that CFE was the only party responsible for the submission and contents of the self-certification.  Defendant's statement fails to include the fact that Defendant was involved in drafting the self-certification's contents, provided approval to CFE before the submission of the self-certification, and provided information that formed the basis of the contents of the self-certification, as set forth in more detail in responses to paragraphs 75-77, *infra*.

Further, Plaintiff disputes the statement because the cited testimony for Mr. Goodman and Mr. Kuserk do not set forth admissible evidence: in both depositions the witnesses were asked to provide legal conclusions as to the role of DCMs in the self-certification process.

Plaintiff also disputes the statement because it is not supported by the cited evidence.  The cited portions of Mr. Goodman's testimony state that CFE was responsible for the contents in the self-certification only "in the sense that . . . [the CFTC] expect[s] when [CFE] files something, that it's truthful."  ECF No. 83-17 (Goodman Dep. at 288:9–12).  The cited portions of Mr. Kuserk's testimony is immediately followed by Mr. Kuserk stating that he believed there *was* a "basis to attribute" the self-certification to Defendant, because the filing was "using Gemini's price to settle the contract."  Ex. [C] (Kuserk Dep. at 59:9–13).

9.    CFE's filing of the Self-Certification was the culmination of months of back-and-forth between CFE, Gemini, and the CFTC.

**Response**: Undisputed

10.    As part of this dialogue, numerous documents were submitted to the CFTC.

**Response**: Undisputed

11.    It was "ultimately CBOE's decision" what materials to send to the CFTC and what they should say.  Ex. 15 [Reinstein] at 159:4–23.

**Response**: Disputed.  Plaintiff disputes the characterization that it was only CBOE's decision as to what materials were sent to the CFTC and what they should say. Defendant's statement omits the fact that Defendant was intimately involved in crafting the content of the materials and in disseminating the materials, as set forth in more detail in responses to paragraphs 63-77, *infra*.

Further, Plaintiff disputes the statement because it is not supported by the cited evidence. The cited portions of Mr. Reinstein's testimony state that CFE had the authority only to transmit the self-certification drafts and modify their contents, but the cited testimony also includes Mr. Reinstein's statement that if the information "related to Gemini, then [CFE] would have vetted that with Gemini.  I don't think we would have just changed something" without Defendant's approval.  [Ex. A] (Reinstein Dep.) at 159:16–20.

12.    Gemini did not have the authority or power to force CFE to submit any specific document to the CFTC, Ex. 15 [Reinstein] at 160:9–12, and Gemini "did not have control or agency on what information, necessarily, [CFE] chose or how they chose to present that to the CFTC," Ex. 13 [C. Winklevoss] at 528:5–23.

**Response**: Disputed.  Plaintiff disputes that this is a material fact because it relates solely to the ministerial act of formatting and submitting self-certification documents to the CFTC, not to which party controlled the relevant statements contained in the self-certification documents.

Further, Plaintiff notes that Art Reinstein testified that when it came to "anything that described Gemini or how Gemini functions, information about Gemini," CFE would "not have submitted that unless it was information *provided by Gemini or reviewed and signed off on by Gemini*."  [Ex. A] (Reinstein Dep.) at 99:19–23.  Reinstein further testified that, his "general recollection is that . . . [CFE] confirmed information that we were providing related to Gemini,

you know, with Gemini.  We either obtained the information from Gemini or would have showed them the information.  I don't believe we would have included information related to Gemini that didn't come from Gemini or be something that we would have had them review before we submitted it."  *Id.* at 78:5–13; *see also id.* at 100:5-12 (while referencing a document created in response to CFTC's follow-up questions, testifying that "it looks like . . . it's something that Gemini created . . . .  And so, yes, we're receiving information from [Gemini] in this case, and in that sense it's the information that [Gemini] provided and *approved*") (emphasis added).  Similarly, Nicole Gordon[1], another legal counsel to CFE, testified that "most, if not all, of the information pertaining to the Gemini Exchange was provided by Gemini."  [Ex. B] (Gordon Dep. at 30:23–31:1); *see also id.* at 32:9–11 ("[I]f it was relating to the Gemini Exchange or Gemini data, it likely would have been provided by Gemini.").  Ms. Gordon also testified that it was CFE's practice "to receive *approval* from the provider of the information before sending it *on their behalf.*"  *Id.* at 51:23–52:1 (emphasis added).

13.    On January 4, 2024, the Court ordered the CFTC to "identify the statements in defendant's disclosures that plaintiff alleges were materially false or misleading." Dkt. 77 at 3.

**Response**: Undisputed

14.    The CFTC served its response on January 19, 2024 (the "January 19 Submission").

**Response**: Undisputed

15.    The January 19 Submission identified 32 allegedly false or misleading statements: 31 written statements and unspecified "oral false statements" allegedly made by an unidentified speaker during a July 25, 2017 in-person meeting.

---

[1] By the time of her deposition, Ms. Gordon had changed her name to Nicole Pursley.  However, Plaintiff will refer to her as Ms. Gordon for the sake of consistency with contemporaneous documents.

**Response**: Disputed in part.  Plaintiff disputes the characterization that the oral false or misleading statements were "unspecified" and made by "an unidentified speaker."  As the January 19 Submission makes clear, the oral false statements concerned "prefunding, rebates, self-trading, and volume made during the July 25, 2017 meeting" and were made by Defendant's representatives who attended the meeting.  ECF No. 83-1 Ex. A (Statement 32).

16.     The alleged written false statements at issue in this motion are contained in four documents or categories of documents: a presentation dated July 25, 2017 that was provided before and during a meeting on the same date between the CFTC, CFE, and Gemini (the "July 25 Presentation"), a data submission sent by CFE to the CFTC on or about August 1, 2017 (the "August 1 Data Submission"), an analysis of the March 10, 2017 Gemini bitcoin auction (the "March 10 Auction Analysis), and the Self-Certification and three drafts CFE sent to the CFTC (the "Draft Self-Certifications").

**Response**: Undisputed.

17.     The July 25 Presentation is a PowerPoint presentation created on a Cboe template.

**Response**: Disputed.  Plaintiff disputes that the template used to create a PowerPoint presentation is a material fact when the substance of the presentation, including the false or misleading statements alleged in the Complaint, was provided by Gemini.

18.     CFE's name and logo appear on the July 25 Presentation's cover, as well as the heading and footer of each page. The final slide has CFE's logo, name, address, and website address.

**Response**: Disputed.  For the same reasons set forth in Plaintiff's response to Paragraph 17, Plaintiff disputes that the use of CFE's logo or identifying information is a material fact.

9

19.     Gemini's logo and contact information do not appear anywhere in the July 25 Presentation.

**Response**: Disputed.  For the same reasons set forth in Plaintiff's response to Paragraph 17, Plaintiff disputes that the lack of use of Defendant's logo or identifying information is a material fact.

20.     While Gemini participated in the preparation of this presentation, like all submissions to the CFTC concerning the Bitcoin Futures Contract, CFE had "final say" over whether to submit this presentation and what it said.  *See* Ex. 14 [Gordon] at 108:9–11; Ex. 15 [Reinstein] at 159:8–23, 160:9–12; Ex. 13 [C. Winklevoss] at 552:21–554:15, 574:25–575:2.

**Response**: Disputed in part.  It is undisputed that Gemini participated in the preparation of the presentation.  It is disputed that CFE had "final say" over whether to submit this presentation and what it said.  As set forth in more detail in the response to paragraph 12 above, CFE witnesses testified that Defendant provided all information pertaining to Defendant's business operations, including its auctions, for use in the submissions to the CFTC, drafted the contents of portions of those submissions pertaining to Defendant, and had approval authority on any and all submissions to the CFTC.  *See* [Ex. A] (Reinstein Dep. at 99:19–23); *id.* at 77:21–78:13; *id.* at 100:5-12; [Ex. B] (Gordon Dep. at 30:23–31:1); *id.* at 32:9-11; *id.* at 51:23–52:1.

Further, Plaintiff disputes the statement because it is not supported by the cited evidence. The cited portions of Mr. Reinstein's testimony state that CFE had the authority to transmit the self-certification drafts and modify their contents, however, Mr. Reinstein's response also stated that if the information "related to Gemini, then we would have vetted that with Gemini.  I don't think we would have just changed something [without Gemini's approval]."  [Ex. A] (Reinstein Dep. at 159:16–20).

21.     On July 24, 2017, a CFE employee, Michael Mollet, sent the July 25 Presentation to a CFTC employee, Thomas Leahy, copying two other CFE employees, Nicole Gordon and Art Reinstein. Ex. 2

**Response**: Disputed.  Plaintiff disputes that the individuals included on an email completing the ministerial task of sending a PowerPoint presentation to the CFTC is a material fact.  Plaintiff notes that the form or manner in which the false statements were ultimately submitted to the CFTC is not dispositive to the determination of liability under Section 6(c)(2) of the Act.  In so for as the method of delivery is relevant, Plaintiff notes that Defendant's representatives printed the presentation in order to provide hard copies to CFTC representatives. *See* [Ex. J] (Reinstein Dep. Ex. 6).

22.     Consistent with CFE's general practices, no Gemini employees were copied on Mr. Mollett's email. Ex. 14 [Gordon] at 108:21–109:1; Ex. 2.

**Response**: Disputed.  For the same reasons set forth in Plaintiff's response to Paragraph 21, Plaintiff disputes that the individuals included on a submission email is a material fact. Plaintiff notes that the form or manner in which the false statements were ultimately submitted to the CFTC is not dispositive to the determination of liability under Section 6(c)(2) of the Act.

23.     The version of the July 25 Presentation that Mr. Mollet emailed did not include an appendix that was included in hard copies of the presentation that were provided at the meeting. *Compare* Ex. 2 with Ex. 3.

**Response**: Disputed.  Plaintiff disputes that this is a material fact because the appendix did not contain the false or misleading statements at issue in Defendant's motion.

24.     None of the purported false statements in the July 25 Presentation are contained in that appendix. Ex. 1 at Ex. A; Ex. 3.

**Response**: Undisputed.

25.    Nothing in the appendix is attributed to Gemini, but one slide explicitly states that it reflects an analysis conducted by CFE. Ex. 3 at 14.

**Response**: Disputed.  Plaintiff disputes that this is a material fact because none of the false or misleading statements at issue in Defendant's motion are in the appendix.

Further, Plaintiff disputes the statement because it is not supported by the cited evidence. Slide 17 of the Appendix contains two graphs attributing the information to Gemini in the title of each graph (i.e., "Mean Deviation between Gemini's Auction Price and Gemini's Continuous Market Price prior to 4 p.m. ET" and "Mean Deviation between Gemini's Auction Price and 1-minute VWAP of Global USD-denominated Bitcoin Exchanges as of 4 pm. ET").  ECF 83-3 at 17.  Further, slides 14-16 of the Appendix each attributes the substance of the information conveyed as pertaining to the "Auction," and it is implicit from the surrounding circumstances of the document that this is attribution to Defendant's bitcoin auction.  *Id.* at 14-16.

26.    On July 25, 2017, representatives from the CFTC, CFE, Gemini, and others met at the CFTC's offices in Washington, D.C. Ex. 12.

**Response**: Undisputed.

27.    Five individuals who attended this meeting were deposed in this case: Cameron Winklevoss from Gemini; Ms. Gordon and Mr. Reinstein from CFE; and Gregory Kuserk and Christopher Goodman from the CFTC. Exs. 13–17. The CFTC has repeatedly identified Mr. Kuserk and Mr. Goodman as the only CFTC employees it intends to call as witnesses at trial. Ex. 20; Ex. 21 at 17:8–17, 17:24–18:16; Ex. 22.

**Response**: Disputed in part.  Plaintiff disputes that the number of CFTC employees it intends to call as witnesses at trial is a material fact.  Plaintiff further notes that Mr. Kuserk is a former employee of CFTC.

28.    Mr. Winklevoss testified that he "believe[d] CBOE spoke" during the meeting but did not remember if he or another Gemini representative made any statements during the meeting.  Ex. 13 at 555:8–20.

**Response**: Disputed.  Plaintiff disputes the statement because it is not supported by the cited materials.  In the cited portion of Mr. Winklevoss's testimony, he was asked "Who did speak at that meeting, if you remember?"  And Mr. Winklevoss responded, "I believe [CFE] spoke.  I don't recall if . . . Ben Small spoke."  ECF No. 83-13 at 555:19–20.  Plaintiff notes that Mr. Small attended the meeting in his capacity as Defendant's Chief Operating Officer.

Plaintiff also notes that Mr. Winklevoss's testimony is inconsistent with the testimony of other witnesses in attendance at the meeting.  *See* [Ex. B] (Gordon Dep. at 38:6–8) (recalling that "most of the questions pertaining to the Gemini Auction or the Gemini Exchange" posed by the CFTC were "fielded by Gemini" at the meeting); *id.* at 33:14–35:2 (recalling that it was "perhaps Benjamin Small," Defendant's Chief Operating Officer, who presented the slide titled "Gemini Auction Mechanics," in the presentation); *id*. at 31:17–32:1 (recalling that the explanation of why the auction settlement price was "not readily susceptible to manipulation" was provided by "someone from Gemini," that is, "Cameron Winklevoss, Tyler Winklevoss, or Ben Small"); *see also* [Ex. C] (Kuserk Dep. 258:19-259:7) (recalling that both Tyler and Cameron Winklevoss, the CEO and President of Defendant, actively responded to the CFTC's questions during the meeting); [Ex. D] (Goodman Dep. 156:24–158:17) (recalling that Defendant had made statements regarding "this pre-funding concept . . . that had implied that there was no borrowed

13

funds" used by market participants in Defendant's auctions, at the meeting); *see generally id.* at 162:7–15 (when asked if Defendant or CFE made "any statements" concerning the assertion in the presentation that all auction orders on Defendant's platform "must be fully pre-funded," Mr. Goodman responded, "Yeah, I mean, certainly, you know, my recollection is the . . . discussion [] at that meeting kind of followed closely to the slide deck.").

29.     Ms. Gordon testified that she remembered "general things that were discussed" during the meeting but "did not have a recollection of who said what and, like, specifics," including "what statements Gemini made." Ex. 14 at 103:16–25.

**Response**: Disputed.  As set forth in more detail in Plaintiff's response to paragraph 28, Ms. Gordon recalled specific topics and subjects that were discussed by Defendant's representatives at the meeting.  *See* [Ex. B] (Gordon Dep. at 38:6–8); *id.* at 33:14–35:2; *id.* at 31:20–32:1.

30.     Mr. Reinstein stated during an interview with the CFTC in February 2019, and then again during his deposition, that he did not have a "good recollection of any conversations about the bitcoin futures product." Ex. 15 at 147:25–148:8.

**Response**: Disputed.  Plaintiff disputes that this is a fact material to who made what statements at the July 25, 2017 meeting.

31.     Mr. Goodman testified that he did not remember any oral statements made during the meeting about prefunding, volume, rebates, or self-trading. Ex. 17 at 161:8–14, 162:19–25, 166:18–23, 168:7–12.

**Response**: Disputed.  Plaintiff disputes the statement because it is not supported by the cited evidence.  In the testimony immediately preceding the cited portion, from page 160 of Mr. Goodman's testimony, he testified that he was "sure" that either Defendant or CFE "referenced"

the volume on Defendant's auction during the meeting, though he did not "recall the specific discussions of the volume, [or] how much detail went into that."  ECF No. 83-17 at 160:24–161:7.  Further, in the testimony immediately preceding the cited portion from page 162 of Mr. Goodman's testimony, he was asked "if anyone from Gemini or [CFE]" made "any statements" concerning the assertion in the presentation that all auction orders on Defendant's platform "must be fully pre-funded," and Mr. Goodman responded, "Yeah, I mean, certainly, you know, my recollection is the . . . discussion [] at that meeting kind of followed closely to the slide deck."  *Id.* at 162:7–15.

Separately, Mr. Goodman recalled that Defendant had made statements regarding "this pre-funding concept . . . that had implied that there was no borrowed funds" used by market participants in Defendant's auctions, at the meeting.  [Ex. D] (Goodman Dep. 156:24–158:17).

32.    Mr. Kuserk testified that he did not remember any oral statements made during the meeting about prefunding, rebates, or self-trading. Ex. 16 at 133:1–10, 142:17–20, 192:21–193:13. Mr. Kuserk did recall a discussion about whether increased volume on the Gemini exchange (as measured by value of bitcoin traded) was the result of increased trading on the exchange or an increase in the price of bitcoin but did not identify any specific statements made during this conversation.

**Response**: Disputed.  As forth in more detail in Plaintiff's response to paragraph 28, other witnesses in attendance at the meeting recalled oral statements made by Defendant's representatives.

Plaintiff further disputes the statement because it is not supported by the cited evidence. In the cited portion of the testimony, Mr. Kuserk was asked if anyone at the meeting discussed the "pre-funding requirement," and he responded, "I don't recall, but I'm assuming that

[Defendant and CFE] went through the slide deck.  They probably expanded on what [the pre-funding requirement] meant, but I don't recall what they may have told us."  ECF No. 83-16 at 192:21–193:9.

33.    Tyler Winklevoss, Gemini's co-founder was not deposed during this litigation, but the CFTC deposed him during its investigation.  During that deposition, Mr. Winklevoss testified that he did not remember who spoke during the July 25, 2017 meeting. Ex. 18 at 94:18–20.

**Response**: Disputed.  As forth in more detail in Plaintiff's response to paragraph 28, other witnesses in attendance at the meeting recalled oral statements made by Defendant's representatives.

34.    Document discovery has not uncovered any evidence of specific statements made during the July 25 meeting. Baughman Decl. ¶ 15.

**Response**: Disputed.  As set forth in more detail in Plaintiff's response to paragraph 28, Mr. Goodman recalled that the "discussion [] at that meeting kind of followed closely to the [written July 25 presentation]."  [Ex. D] (Goodman Dep. 162:7–15).  And document discovery has revealed that Defendant contributed to the content of, provided comments on, and gave approval of the presentation.  *See* [Ex. X] (CBOECFTC_00006632) (7/19/2017 email from CFE to Gemini attaching initial draft presentation); [Ex. E] (CBOECFTC_00006066) (7/21/2017 email from CFE to Defendant attaching the PowerPoint presentation); [Ex. F] (CBOECFTC_00026960) (7/21/2017 email from Defendant to CFE attaching revisions to the PowerPoint presentation); [Ex. G] (GEM_CFTC075016) (7/21/2017 email from Defendant's Chief Operating Officer ("COO") attaching proposed slides on Defendant's auction mechanics); [Ex. H] (GEM_CFTC286801) (internal email between Defendant's President and CEO debating

whether to edit certain terms used in the presentation); [Ex. I] (CBOECFTC_00029107) (Defendant forwarding its legal counsel's comments on the presentation to CFE); [Ex. J] (Reinstein Dep. Ex. 6) (7/24/2017 email explaining that CFE "made the changes [Gemini's counsel] suggested and sent it to the CFTC this afternoon").

Additionally, Ms. Gordon recalled that "most of the questions pertaining to the Gemini Auction or the Gemini Exchange" posed by the CFTC were "fielded by Gemini" at the meeting, and that it was "perhaps Benjamin Small," Defendant's COO and former Head of Market Structure, who presented the slide titled "Gemini Auction Mechanics," in the presentation to the CFTC during the meeting. [Ex. B] (Gordon Dep. at 38:6–8); *id.* at 33:14–35:2. Further, Ms. Gordon's contemporaneous notes from the meeting reflected the discussion of prefunding and self-trading, including recording a specific question and answer regarding self-crossing and prefunding. *Id.* at 37:11-37:12 (testifying that her notes reflected a question that was asked regarding the auction, "Can't cancel [the order] at 3:59, but could put in another order?" and an answer was given: "Yes, but can't self-cross. So it would have to be new pre-funded order at a different price."); *id.* at 58:14-24 (testifying that her handwritten note, "They seem to like this," referred to the CFTC seeming to like that the trades were pre-funded). Finally, as set forth in more detail in paragraph 83, *infra*, Gregory Kuserk recalled that Defendant's consultant answered a specific question about a chart reflecting trading volume on Defendant's exchange shown on page 3 of the presentation. [Ex. C] (Kuserk Dep. at 152:18–22).

35.    After the July 25, 2017, CFE sent the CFTC data it used to create graphs in the July 25 Presentation regarding volume on the Gemini exchange. Ex. 4.

**Response**: Disputed as incomplete. Plaintiff notes that the "data" sent to the CFTC originated from Defendant, and that as shown by the cited evidence, the submission contained

"raw data" from Defendant's platform. *See* ECF No. 83-4 (8/1/2017 email from CFE to the CFTC stating it was sending "a CD-ROM containing the raw data used to create the graphs and charts in the Appendix . . . ."). Further, CFE sought and received approval from Defendant before providing CFTC this raw data. *See* [Ex. K] (CBOECFTC_00018072) (7/31/2017 email where Defendant gave CFE approval to share raw data with the CFTC, telling CFE: "Yes, we're definitely comfortable sharing that data" and suggesting that CFE already had "the form [of the data] that's easiest to digest"); *see also* [Ex. L] (CBOECFTC_00007411) (8/3/2017 email from Tyler Winklevoss thanking Ms. Gordon for the update following submission of the raw data to the CFTC and agreeing to wait a week to check in with the CFTC).

36.    On August 1, 2017, Ms. Gordon sent an email to Mr. Leahy, copying Mr. Reinstein, stating that CFE was "sending overnight for delivery tomorrow via FedEx a package with a CD-ROM containing the raw data used to create the graphs and charts in the Appendix of the cash settled (USD) bitcoin futures product presentation that occurred on July 25, 2017." Ex. 4 at 1.

**Response**: Disputed as incomplete. Plaintiff notes that the "data" sent to the CFTC originated from Defendant, and contained the raw data used to create all graphs and charts for the entire presentation, not just the Appendix. As Defendant admits (*see* ¶ 38 *infra*), the CFTC identified seven files that were contained in the August 1 Data Submission.

37.    No Gemini employees were copied on Ms. Gordon's email, Gemini has not located any transmittal letter or other correspondence sent with this submission, and Gemini has not located any evidence that Gemini received a copy of this data submission until discovery in this case. Ex. 4; Baughman Decl. ¶ 7.

**Response**: Disputed.  Plaintiff disputes that whether Gemini employees were copied on the email is a material fact, particularly considering the data belonged to Gemini in the first place.  Plaintiff notes that the form or manner in which the false statements were ultimately submitted to the CFTC is not dispositive to the determination of liability under Section 6(c)(2) of the Act.

Plaintiff further notes that CFE sought and received approval from Defendant before providing CFTC the data.  *See* [Ex. K] (CBOECFTC_00018072) (7/31/2017 email from Defendant giving approval to share raw data with the CFTC).  Further, CFE confirmed that the data had been submitted to the CFTC shortly after the submission, and Defendant again indicated approval.  *See* [Ex. L] (CBOECFTC_00007411) (8/3/2017 email with CFE confirming that Defendant's raw data had been sent to the CFTC, and Tyler Winklevoss, Defendant's Chief Executive Officer, thanking CFE for the update and approving CFE's suggestion to "check back in with [CFTC]" the following week "if we haven't heard back yet").

38.    In the January 19 Submission, the CFTC identified seven files that were contained in the August 1 Data Submission. Ex. 1 at Ex. A (statement 25).

**Response**: Undisputed.

39.    The CFTC produced metadata for four of these files.  This metadata identifies CFE employees named Tiago Silva and Dennis O'Callahan as the creators of these files. Ex. 5; Ex. 14 [Gordon] at 146:13–14.

**Response**: Disputed.  Plaintiff disputes that the metadata field "creator" for an electronic document is material to the determination of who had ultimate authority over the statements contained therein.  Plaintiff further notes that the cited portion of Ms. Gordon's testimony states only that Tiago Silva and Dennis O'Callahan are part of CFE's "product group."  ECF No. 83-14

at 146:13–14.  Plaintiff also notes that CFE sought approval from Defendant first before providing CFTC this raw data, and Defendant told CFE: "Yes, we're definitely comfortable sharing that data" and suggested that CFE already had "the form [of the data] that's easiest to digest."  [Ex. K] (CBOECFTC_00018072).

40.    No Gemini employee is identified as the "author" or "custodian" of any of the documents in the August 1 Data Submission.  Ex. 5.

**Response**: Disputed.  Plaintiff disputes that the metadata fields "author" or "custodian" for an electronic document is material to the determination of who had ultimate authority over the statements contained therein.  Plaintiff also notes that CFE sought approval from Defendant first before providing CFTC this raw data, and Defendant told CFE: "Yes, we're definitely comfortable sharing that data" and suggested that CFE already had "the form [of the data] that's easiest to digest."  [Ex. K] (CBOECFTC_00018072).

41.    On October 24, 2017, Ms. Gordon emailed Mr. Goodman to "follow up [on] our most recent group call" regarding the Bitcoin Futures Contract and attached "a document which provides an analysis of market orders in the Gemini auction." Nobody from Gemini was copied on the email. Ex. 6 at 1.

**Response**: Disputed in part.  Plaintiff disputes that the second sentence of this paragraph, namely whether a Gemini employee was copied on an email, is a material fact.

42.    The metadata for this document—which contains CFE's analysis of the March 10, 2017 Gemini auction (the "March 10 Auction Analysis")—identifies CFE's Michael Mollet as the document's author. Ex. 6; Ex. 7.

**Response**: Disputed.  Plaintiff disputes that the metadata field "author" for an electronic document is material to the determination of who had ultimate authority over the statements contained therein.

43.    The March 10 Auction Analysis repeatedly sets forth CFE's views and the work CFE did in reaching them, including, for example, that "CFE believe[d] that the March 10 auction resulted in the fairest possible price given market supply and demand conditions" and that "CFE staff also considered the results in light of Core Principle 3, and our conclusion was that the auction result was due to market forces." Ex. 6 at 4, 8.

**Response**: Disputed.  Plaintiff disputes the characterization that the March 10 Auction Analysis "sets forth CFE's views and the work CFE did in reaching them."  While the document contains certain sentences that begin with "CFE believe[d]" or "CFE staff also considered," not all statements in the document began with such modifiers, nor is it reasonable to read the entire document as containing *only* CFE's belief, considerations, or opinions.  To the contrary, the false statement at issue in this document concerned "Gemini's pre-funding requirement."  ECF 83-1 (Statement 18).  And all information pertaining to Defendant included in submissions to the CFTC were provided by Defendant and approved by Defendant. *See* [Ex. A] (Reinstein Dep. at 99:19–23) ("I would say that anything that described Gemini or how Gemini functions, information about Gemini, that we would not have submitted that unless it was information provided by Gemini or reviewed and signed off on by Gemini."); *id.* at 77:21–78:13 ("[W]e at CBOE confirmed information that we were providing related to Gemini, you know, with Gemini. We either obtained the information from Gemini or would have showed them the information.  I don't believe we would have included information related to Gemini that didn't come from Gemini or be something that we would have had them review before we submitted it."); *id.* at

100:5–12 ("[Y]es, we're receiving information from them in this case, and in that sense it's the information that they provided and approved."); [Ex. B] (Gordon Dep. at 30:23–31:1) ("It's my recollection that most, if not all, of the information pertaining to the Gemini Exchange was provided by Gemini."); *id.* at 32:9–11 ("But like I said, if it was relating to the Gemini Exchange or Gemini data, it likely would have been provided by Gemini."); *id.* at 51:23–52:1 ("I don't recall if we technically needed approval, but our practice would have been to receive approval from the provider of the information before sending it on their behalf.").

44.    No statements in the March 10 Auction Analysis are attributed to Gemini. Ex. 6.

**Response**: Disputed.  As set forth in more detail in Plaintiff's response to paragraph 43, the document included information pertaining to Defendant, the false statement at issue in this document specifically concerned "Gemini's pre-funding requirement," and all information pertaining to Defendant were provided by Defendant and approved by Defendant.

45.    No portion of the analysis in the March 10 Auction Analysis conveys Gemini's assessment or opinions. Ex. 6.

**Response**: Disputed.  Plaintiff disputes that this is a material fact.  As set forth in more detail in Plaintiff's response to paragraph 43, Plaintiff further notes that all information pertaining to Defendant were provided by Defendant and approved by Defendant.  *See* [Ex. A] (Reinstein Dep.) at 99:19–23; *id.* at 77:21–78:13; *id.* at 100:5–12; [Ex. B] (Gordon Dep.) at 30:23–31:1; *id.* at 32:9–11; *id.* at 51:23–52:1.

46.    References to Gemini in the March 10 Auction Analysis exclusively describe Gemini as a third-party entity, in contrast to CFE, which frequently refers to itself in the first person. *See, e.g.*, Ex. 6 at 7 ("In short, *we believe* that the likelihood of success is too low, and

the economic benefit too small to provide an incentive to exploit the *Gemini auction price*.")
(emphasis added).

**Response**: Disputed.  Plaintiff disputes that the use of first- or third-person in the
document is a material fact.  Plaintiff further notes that the sentence cited by Defendant, when
put in context, lends to a reasonable reading that the first-person pronoun "we" encompasses
both CFE and Defendant.  Specifically, the preceding sentence states that "someone looking to
influence the auction would need to circumvent a regulatory program designed to detect such
activity and including an information sharing agreement between *CFE and Gemini* that identifies
all parties trading in the Gemini auction."  ECF No. 83-6 at 7.  The "information sharing
agreement" between CFE and Defendant is mentioned as a reason why a person "looking to
influence the auction" may be unlikely to succeed.  *Id.*  A reasonable way to read the sentence
cited by Defendant, therefore, would be that both CFE and Defendant "believe that the likelihood
of success" in trying to influence the auction is "low."

47.     CFE filed the Self-Certification on December 1, 2017. Ex. 8; Ex. 15 [Reinstein] at
145:24–146:5; Ex. 14 [Gordon] 126:14–16; Ex. 13 [C. Winklevoss] 535:9–17, 653:13–18; Ex.
19.

**Response**: Undisputed.

48.     Ms. Gordon emailed the Self-Certification to the CFTC and did not copy any
Gemini employees. Ex. 8 at 1.

**Response**: Disputed in part.  Plaintiff disputes that the ultimate sender of the Self-
Certification or who was copied on the email are material facts.  Plaintiff notes that the form or
manner in which the false statements were ultimately submitted to the CFTC is not dispositive to
the determination of liability under Section 6(c)(2) of the Act.

49.     CFE was responsible for the Self-Certification's contents and the accuracy of its statements.  *See* Ex. 16 [Kuserk] at 59:21–60:7; Ex. 14 [Gordon] at 126:20–22; Ex. 15 [Reinstein] at 157:15–18; Ex. 13 [C. Winklevoss] at 658:25–659:14.

**Response**: Disputed as incomplete.  Plaintiff disputes the characterization that only CFE was "responsible for the Self-Certification's contents and the accuracy of its statements."  As set forth in more detail in Plaintiff's response to paragraph 12 above, CFE witnesses testified that Defendant contributed to and approved all statements pertaining to Defendant's business and operations contained in submissions to the CFTC.  *See* [Ex. A] (Reinstein Dep.) at 99:19–23; *id.* at 77:21–78:13; *id.* at 100:5–12; [Ex. B] (Gordon Dep.) at 30:23–31:1; *id.* at 32:9–11; *id.* at 51:23–52:1.

Further, Defendant was one of the key drafters of the Self-Certification letter.  *See* [Ex. A] (Reinstein Dep. at 105:7–107:5) (recalling that Defendant's counsel was one of the "primary contributors to the drafting" of the letter; that the letter included "[i]nformation from Gemini"; and that Defendant provided that information knowing that the information would be shared with the CFTC); *id.* at 159:16–20 (testifying that if the information "related to Gemini, then we would have vetted that with Gemini.  I don't think we would have just changed something" without Gemini's approval); [Ex. B] (Gordon Dep. at 66:21–67:3) (testifying it "would not have been the general practice" to submit drafts of the self-certification letters "without input from [Defendant]," and that as part of CFE's "general practice," it had "open communication and a lot of back-and-forth" with Defendant prior to submission of any document to the CFTC).

CFE also sent several drafts of the Self-Certification to Defendant before sending them to the CFTC, and Defendant provided comments to and approval of those drafts.  *See* [Ex. P] (GEM_CFTC155239) (9/17/2017 email from Cameron Winklevoss sending comments and edits

to the self-certification draft); [Ex. Q] (CBOECFTC_00043198) (10/30/2017 email from

Cameron Winklevoss regarding the second self-certification draft stating, "Looks good.  Gemini

group has no comments"); [Ex. Y] (CBOECFTC_00039679) (11/9/2017 email from CFE to

Defendant attaching third self-certification draft);  [Ex. R] (CBOECFTC_00039267) (11/29/2017

email from Cameron Winklevoss responding to CFE sending a November 29, 2017 draft of the

Self-Certification, "Contracts specs LGTM," an acronym for "Looks Good To Me"); [Ex. S]

(CBOECFTC_00004988) (11/30/2017 email Defendant's employee telling CFE,

"Cameron/Tyler [Winklevoss] are reviewing this language right now—please hold until we have

final comments and approval," and CFE responding, "Of course . . . *We don't plan on doing

anything without their approval*") (emphasis added); [Ex. T] (CBOECFTC_00005274)

(11/30/2017 email where Tyler Winklevoss stated that the proposed language was "acceptable

and *approved by Gemini*" and CFE replying, "Thanks Tyler.  I will plan to include that language

in the certification filing tomorrow morning").

50.     The Self-Certification was submitted on CFE letterhead, states that it was being

"submit[ed]" by CFE, and was signed by Andrew Lowenthal, who was identified as a "Senior

Managing Director" signing on CFE's behalf.  Ex. 15 [Reinstein] at 156:19–157:10.

**Response**: Disputed.  Plaintiff disputes that the identity of the individual completing the

ministerial task of conveying the Self-Certification to the CFTC is a material fact, particularly

where Defendant had provided the substance of the false statements contained in the document.

Plaintiff notes that the form or manner in which the false statements were ultimately submitted to

the CFTC is not dispositive to the determination of liability under Section 6(c)(2) of the Act.

Plaintiff further disputes this statement is supported by the cited evidence, which only

shows that Mr. Reinstein agreed that the final Self-Certification letter was "the formal final self-

certification submission to the CFTC associated with this [Bitcoin Futures Contract]," and that the person on the signature line is Andrew Lowenthal.

Plaintiff disputes the characterization that the Self-Certification was "being 'submit[ed]' by CFE." To the contrary, at least one of the versions of the Self-Certification sent to the CFTC was contained in an email whose subject line was titled "CFE/*Gemini* Submission of Additional Information." ECF No. 83-9. And every draft version of the Self-Certification was accompanied by a FOIA request letter submitted by both CFE and Defendant. ECF Nos. 83-9, 83-10, 83-11. Finally, as set forth in more detail in Plaintiff's response to paragraph 49, CFE witnesses specifically testified that Defendant was one of the key drafters of the Self-Certification letter, and Defendant provided comments and approval on multiple versions of the self-certification letter.

51.     The Self-Certification contains a number of statements that are written from CFE's perspective. These statements include:

- "CFE hereby certifies that the Product and Amendment comply with the Act and the regulations thereunder."

- "CFE believes that [data regarding the Gemini exchange obtained from a website called bitcoinity.org] reflect that the Gemini Exchange is a robust market for the trading of bitcoin in U.S. dollars and that the Gemini Exchange auctions for bitcoin in U.S. dollars and their corresponding auction prices are representative and indicative of the price of bitcoin in the larger bitcoin market."

- "CFE believes that the Product and Amendment are consistent with Designated Contract Market . . . Core Principle 3 (Contracts Not Readily Susceptible to Manipulation) under Section 5 of the Act."

- "CFE believes that the Product and Amendment are consistent with Core Principle 3 given the volume, liquidity, and participation on, and structure of, the Gemini Exchange marketplace and auction process."

- "CFE believes that a liquidity event such as a Gemini Exchange auction in conjunction with the settlement of [the Bitcoin Futures Contract] is likely to drive greater participation and liquidity in the Gemini Exchange auction."

- "CFE also believes that the Product and Amendment are consistent with Core Principles 2 (Compliance with Rules), 4 (Prevention of Market Disruption), 5 (Position Limitations or Accountability), 7 (Availability of General Information), and 8 (Daily Publication of Trading Information") under Section 5 of the Act."

- "CFE believes that the impact of the Product and Amendment will be beneficial to the public and market participants."

Ex. 8 at 4, 8–9 (emphasis added).

**Response**: Disputed.  Plaintiff disputes that these statements are material to whether Gemini was responsible for its false and misleading statements contained in the Self-Certification.

52.    No statements in the Self-Certification are attributed to Gemini or written from Gemini's perspective, but one statement the CFTC has alleged was false or misleading—which concerns Gemini's market share in the bitcoin spot market—is specifically attributed to an unrelated website, bitcointy.org [*sic*], rather than to Gemini.  Ex. 1 at Ex. A (statement 3); Ex. 8 at 4.

**Response**: Disputed.  Plaintiff disputes that this is a material fact.  Plaintiff disputes the first part of the statement because it is not supported by the cited materials.  Plaintiff further disputes the second part of the statement to the extent that bitcoinity.org is a third-party website that simply reports the trading data, including trading volume, from certain cryptocurrency exchanges, including Defendant.[2]  Moreover, as set forth in more detail in Plaintiff's response to paragraph 49, Defendant was one of the key drafters of the Self-Certification, and Defendant provided comments and approval on multiple versions of the Self-Certification.  Defendant therefore adopted the bitcoinity.org data as an accurate reflection of Defendant's trading data.  Thus, the underlying statement, and the falsehoods contained therein, are from Defendant.

---

[2] *See* https://bitcoinity.org/press (stating that "[a]ll data is fetched directly from exchanges through their APIs") (last visited April 18, 2024).

53.     Before filing the final Self-Certification, CFE sent draft submissions to the CFTC on October 6, October 31, and November 14, 2017. Exs. 9–11.

**Response**: Undisputed.

54.     CFE employees sent all three Draft Self-Certifications documents directly to the CFTC, without copying anyone from Gemini. Exs. 9–11.

**Response**: Disputed in part.  Plaintiff disputes that the identity of the individual completing the ministerial task of conveying the Self-Certification to the CFTC is a material fact, particularly where Defendant had provided the substance of the false statements contained in the letter.  Plaintiff notes that the form or manner in which the false statements were ultimately submitted to the CFTC is not dispositive to the determination of liability under Section 6(c)(2) of the Act.

55.     The draft self-certifications were submitted on CFE letterhead, state that they were being "submit[ed]" by CFE, and included signature lines for Mr. Lowenthal.  Ex. 9 at 3, 10; Ex. 10 at 3, 10; Ex. 11 at 2, 10.

**Response**: Disputed.  Plaintiff disputes that the identity of the individual completing the ministerial task of conveying the Self-Certification to the CFTC is a material fact, particularly where Defendant had provided the substance of the false statements contained in the letter. Plaintiff notes that the form or manner in which the false statements were ultimately submitted to the CFTC is not dispositive to the determination of liability under Section 6(c)(2) of the Act.

Plaintiff further disputes the characterization that the draft self-certifications were "submit[ed]" by CFE.  To the contrary, at least one of the draft versions of the Self-Certification sent to the CFTC was contained in an email whose subject line was titled "CFE/*Gemini* Submission of Additional Information."  ECF No. 83-9 at 1.  And every draft version of the Self-

Certification was accompanied by a FOIA request letter submitted by both CFE and Defendant. ECF Nos. 83-9, 83-10, 83-11.   Finally, as set forth in more detail in Plaintiff's response to paragraph 49, Defendant was one of the key drafters of the Self-Certification, and Defendant provided comments and approval on multiple versions of the Self-Certification.

56.    The draft self-certifications also contain statements that are specifically from CFE's perspective. *See, e.g.*, Ex. 9 at 5 ("CFE believes that these statistics reflect that the Gemini Exchange is a robust market for the trading of bitcoin in U.S. dollars and that the Gemini Exchange auctions for bitcoin in U.S. dollars and their corresponding auction prices are representative and indicative of the price of bitcoin in the larger bitcoin marketplace."); Ex. 10 at 8 ("Additionally, CFE believes that the Product and Rules are consistent with Core Principle 3 given the volume, liquidity, and participation on, and structure of, the Gemini Exchange marketplace and auction process."); Ex. 11 at 8 ("CFE hereby certifies that the Product and Amendment comply with the Act and the regulations thereunder.").

**Response**: Disputed.  Plaintiff disputes that the statement is supported by the cited evidence.  The fact that in certain instances, the document contains sentences beginning with "CFE believes" or "CFE [] certifies" supports only the fact that, where a statement does not have such a qualifier—as is the case with the false or misleading statements at issue in the self-certification drafts—it should not be read as being solely attributed to CFE.  Plaintiff further notes that at least one of the draft versions of the Self-Certification sent to the CFTC was contained in an email whose subject line was titled "CFE/*Gemini* Submission of Additional Information."  ECF No. 83-9.  And every draft version of the Self-Certification was accompanied by a FOIA request letter submitted by both CFE and Defendant.  ECF Nos. 83-9, 83-10, 83-11.  Finally, as set forth in more detail in Plaintiff's response to paragraph 49,

Defendant was one of the key drafters of the Self-Certification letter, and Defendant provided comments and approval on multiple versions of the Self-Certification letter.

57.     The purported false or misleading statements in the draft self-certifications are identical to the purported false or misleading statements in the final Self-Certification, including the statement concerning Gemini's market share in the bitcoin spot market that is specifically attributed to bitcointy.org [*sic*] rather than to Gemini. Ex. 1 at Ex. A (statements 1–16); *compare* Ex. 8 at 3, 4, 8, *with* Ex. 9 at 4, 5, 8, Ex. 10 at 4, 5, 8, Ex. 11 at 3, 4, 7-8.

**Response**: Disputed in part. Plaintiff does not dispute that the false or misleading statements in the draft self-certifications are substantively identical to the false or misleading statements in the final Self-Certification. As set forth in more detail in Plaintiff's response to paragraph 52, however, Plaintiff notes that bitcoinity.org is a third-party website that simply reports trading information obtained from exchanges such as Defendant. *See* footnote 2, *supra*. Moreover, as set forth in more detail in Plaintiff's response to paragraph 49, Defendant was one of the key drafters of the Self-Certification, and Defendant provided comments and approval on multiple versions of the Self-Certification. Defendant therefore adopted the bitcoinity.org data as an accurate reflection of Defendant's trading data.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1(b), Plaintiff respectfully submits this Statement of Additional Material Facts as to which it is contends that there exists a genuine issue to be tried.

### Additional Facts Regarding the Self-Certification Process

58.     Prior to beginning discussions with the CFTC regarding the self-certification of the Bitcoin Futures Contract, Defendant and CFE began initial discussions regarding the Contract in February 2017. [Ex. M] (GEM_CFTC093208).

59.     As part of those discussions, CFE sent a due diligence questionnaire to Defendant, explaining that "the questions reflect information we'll need in order to rep[resent] to the CFTC that CFE complies with DCM Core Principles on the futures [contract]."  [Ex. N] (Reinstein Dep. Ex. 1).

60.     In response, Defendant provided information about its exchange and auction mechanics, including the assertions that all orders placed on its exchange and in its auctions must be "pre-funded" or "fully funded," and that it monitored for "self-trading" on its exchange.  *Id.* (attachment to 2/17/2017 email, at 6, 9, 10).

61.     One Core Principle that the CFTC was to evaluate during the self-certification process was Core Principle 3, which proscribes the listing of futures contracts that are readily susceptible to manipulation.  17 C.F.R. § 38.200 (2023).

62.     During the self-certification process, Defendant provided information to CFE for the purpose of their inclusion in submissions to the CFTC.  With respect to all information pertaining to Defendant contained in the submissions, CFE did not submit that information unless it was provided by Defendant, reviewed by Defendant, and approved by Defendant.  [Ex. A] (Reinstein Dep.) at 99:19–23; *id.* at 77:21–78:13; *id.* at 100:5–12; [Ex. B] (Gordon Dep.) at 30:23–31:1; *id.* at 32:9–11; *id.* at 51:23–52:1.

**Additional Facts Regarding the July 25, 2017 Written Presentation**

63.     Before the July 25, 2017 in-person meeting with the CFTC, CFE engaged in intensive discussions with Defendant regarding the contents of the July 25, 2017 presentation. During these discussions, CFE sent drafts of the presentation to Defendant.  *See, e.g.*, [Ex. X] (CBOECFTC_00006632) (July 19, 2017 email from CFE to Gemini attaching initial draft

presentation); [Ex. E] (CBOECFTC_00006066) (7/21/2017 email from CFE attaching a version

of the PowerPoint presentation to an email with the subject "CFTC presentation – draft 3.pptx").

64.     Defendant drafted wholesale slides for inclusion in the July 25, 2017 presentation

that related to Defendant's auction and business practices, and sent those slides to CFE for

inclusion in the July 25 PowerPoint presentation.  *See* [Ex. F] (CBOECFTC_00026960)

(7/21/2017 email Defendant's Chief Operating Officer providing "CFE Gemini Compliance Reg

slides" to be added to the presentation); [Ex. G] (GEM_CFTC075016) (7/21/2017 email from

Defendant's Chief Operating Officer providing "slides on [Defendant's] auction mechanics" to

be added to the presentation).  Notably, the slides that Defendant drafted and sent to CFE for

CFE's review already included CFE's logo.  *See id.*

65.     As the meeting neared, CFE told Defendant's COO that "as a group we need to

determine what we are comfortable providing to the CFTC ahead of the meeting," and scheduled

a call with Defendant's COO days before the meeting to "Finalize Presentation/Details" [Exs.

NN, OO] (CBOECFTC_00006043, CBOECFTC_00053751).

66.     After that call, CBOE sent Defendant another updated draft of the presentation,

which now included the slides Gemini had drafted.  [Ex. PP] (CBOECFTC_00029087) (7/21/17

email from CFE to Defendant attaching presentation draft).

67.     Defendant reviewed and commented on the overall July 25, 2017 presentation.

*See* [Ex. H] (GEM_CFTC286801) (7/23/2017 internal email between Defendant's President and

CEO debating whether to edit certain terms used in the presentation).

68.     Defendant also forwarded the July 25, 2017 presentation to its own legal counsel

and consultant and solicited comments for the presentation, and CFE implemented the changes

made by Defendant's counsel.  *See* [Ex. I] (CBOECFTC_00029107) (Defendant forwarding its

counsel's comments on the presentation to CFE for incorporation); [Ex. J] (Reinstein Dep. Ex. 6)

(CBOECFTC_00041293) (7/24/2017 email from CFE to Defendant, "We made the changes you

suggested and sent it to the CFTC this afternoon.").

### Additional Facts Regarding the August 2017 Data Submission

69.     Before providing Defendant's trade data to the CFTC in August 2017, CFE

sought and received approval from Defendant.  *See* [Ex. K] (CBOECFTC_00018072).

70.     After submitting the data, CFE confirmed that the data had been submitted to the

CFTC, and Defendant again indicated approval.  *See* [Ex. L] CBOECFTC_00007411 (8/3/2017

email from CFE confirming that Defendant's raw data had been sent to the CFTC, and Tyler

Winklevoss, Defendant's Chief Executive Officer, thanking CFE for the update without raising

any complaint, and approving CFE's suggestion to "check back in with [CFTC] if we haven't

heard back yet" the following week).

71.     Ahead of the July 25 presentation, Defendant sent CFE various iterations of its

data no less than a dozen times, including instances where it expressly stated that the data was

intended for analysis to be given to the CFTC.  *See, e.g.*, [Ex. AA] (CBOECFTC_00010036)

(6/21/2017 email from CFE asking Defendant's COO for an update on data CFE had requested

from Defendant for an upcoming "meeting with the OCC and CFTC," which was "contingent on

our completing the auction analysis we discussed previously," and Gemini's COO responding,

"Sorry about the delay. Please see the attached" and attaching a file titled

"auction_orders_full_20170620.cs_."); *see also, e.g.,* [Exs. BB-LL] (CBOECFTC_00030516;

CBOECFTC_00030571; CBOECFTC_00006602; CBOECFTC_00006605;

CBOECFTC_00009991; CBOECFTC_00030840; CBOECFTC_00031080;

CBOECFTC_00031116; CBOECFTC_00031422; CBOECFTC_00006645;

CBOECFTC_00031853) (cover emails from Defendant to CFE attaching Defendant's auction and trade data, with voluminous attachments containing trade data omitted).[3]

**Additional Facts Regarding the Analysis of Defendant's March Auction Data**

72.     Before providing the analysis of Gemini's March auction data to the CFTC, CFE sent draft versions of the analysis to Defendant.  *See* [Ex. QQ] (CBOECFTC_00040012) (CFE sending draft to Defendant "for your review")]; [Ex. RR] (CBOECFTC_00040002) (CFE sending revised draft to Defendant and asking for "any comments you have . . . so I can send the submission to the CFTC"); [Ex. SS] (CBOECFTC_00039994) (CFE sending Defendant a further revised draft).

73.     Defendant also provided comments through Defendant's consultant, Jim Overdahl from Delta Strategy, and CFE made the changes requested.  *See* [Ex. O] (CBOECFTC_00039913) (10/23/2017 email from Cameron Winklevoss forwarding edits from Defendant's consultant); [Ex. TT] (CBOECFTC_00039962) (10/23/1017 email from Cameron Winklevoss sending CFE comments from Defendant's consultant); [Ex. UU] (CBOECFTC_00039953) (10/23/2017 email from CFE sending Defendant revised draft and confirming it "incorporates [Defendant's consultant's] marked comments"); [Ex. VV] (CBOECFTC_00039939) (10/23/2017 email from CFE sending further revised draft "incorporating suggested changes from earlier" and soliciting final comments before submission).

---

[3] Because the iterative trade data is voluminous and not necessary for the resolution of Defendant's motion, it has been intentionally omitted from the exhibits, but Plaintiff is prepared, upon request, to submit the attachments containing the trade data should the Court wish to receive it.

74.     After CFE confirmed the document and FOIA confidential treatment request had been sent to the CFTC, Defendant's President thanked CFE and stated, "Onward and upward!" [Ex. WW] (CBOECFTC_00039901) (10/24/2017 email from Cameron Winklevoss to CFE).

### Additional Facts Regarding the Self-Certification Letter and Its Drafts

75.     Defendant was a key drafter of the contents of the Self-Certification and knew that the information contained in the letter would be submitted to the CFTC.  *See* [Ex. A] (Reinstein Dep. at 105:7–107:5) (recalling that Defendant's counsel was one of the "primary contributors to the drafting" of the letter; that the letter included "[i]nformation from Gemini"; and that Defendant provided that information knowing that the information would be shared with the CFTC); *id.* at 159:16–20 (testifying that if the information contained in the submissions "related to Gemini, then we would have vetted that with Gemini.  I don't think we would have just changed something [without Gemini's approval]"); [Ex. B] (Gordon Dep. at 66:21–67:3) (testifying it "would not have been the general practice" to submit drafts of the self-certification letters "without input from [Defendant]," and that as part of CFE's "general practice," it had "open communication and a lot of back-and-forth" with Defendant prior to submission of any document to the CFTC).

76.     CFE sent several drafts of the Self-Certification to Defendant before sending the final version to the CFTC, and Defendant provided comments and approval on those drafts.  *See* [Ex. P] (GEM_CFTC155239); [Ex. Q] (CBOECFTC_00043198); [Ex. R] (CBOECFTC_00039267); [Ex. S] CBOECFTC_00004988; [Ex. T] (CBOECFTC_00005274); [Ex. Y] (CBOECFTC_00039679).

77.     CFE also sent the Self-Certification submissions to Defendant after they were submitted to the CFTC, and Defendant expressed no complaints or lack of approval.  *See* [Ex. U]

(GEM_CFTC188130) (12/1/2017 email from CFE forwarding the Self-Certification to

Defendant); [Ex. V] (GEM_CFTC126442) (10/31/2017 email from Defendant's President

thanking CFE for the update following submission of the document and asking about next steps);

[Ex. MM] (CBOECFTC_00005303) (after CFE confirmed it had submitted the final product

certification, Cameron Winklevoss responded "Awesome – amazing work team!").

### Additional Facts Regarding the July 25, 2017 Meeting

78.    Multiple representatives of Defendant, including Defendant's President, CEO,

and COO, as well as Defendant's legal counsel and consultant from Delta Strategy, attended the

meeting.  [Ex. B] (Gordon Dep. at 29:5–6); ECF No. 83-12.

79.    At the meeting, representatives of Defendant spoke about the July 25, 2017

presentation's contents, especially with respect to information regarding Defendant's auction and

exchange.  [Ex. B] (Gordon Dep. at 38:6–8) (testifying that "most of the questions pertaining to

the Gemini Auction or the Gemini Exchange" posed by the CFTC during the presentation were

"fielded by Gemini"); *see generally* [Ex. Z] (Winklevoss Investigative Dep. at 58:10-14, 59:12-

17, 62:4-9) (testifying that Defendant strove to be "responsive" and "collaborative" to the

CFTC's requests during the self-certification process).

80.    With respect to the slide titled "Gemini Auction Mechanics" in the presentation,

which discussed how all auction orders on Defendant's platform "must be fully pre-funded," Ms.

Gordon recalled that it was "perhaps Benjamin Small," Defendant's COO, who presented that

slide to the CFTC.  [Ex. B] (Gordon Dep. at 33:14–35:2).

81.    With respect to who explained that the Bitcoin Futures Contract's settlement price

was "not readily susceptible to manipulation" at the meeting, Ms. Gordon testified that "it was

someone from Gemini," that is, "Cameron Winklevoss, Tyler Winklevoss, or Ben Small," who provided the explanation.  [Ex. B] (Gordon Dep. at 31:20–32:1).

82.    With respect to discussions regarding the "pre-funding concept" in Defendant's auctions, Mr. Goodman recalled that Defendant's representatives made statements regarding that topic during the meeting.  [Ex. D] (Goodman Dep. 156:24–158:17).

83.    Gregory Kuserk, a former CFTC employee who attended the July 25, 2017 meeting, recalled that Jim Overdahl, Defendant's consultant from Delta Strategy who was assisting Defendant with the Self-Certification, answered a specific question about a chart reflecting trading volume on Defendant's exchange shown on page 3 of the July 25, 2017 presentation.  [Ex. C] (Kuserk Dep. 152:18–22) ("Q: Did Jim Overdahl tell you that he created this chart?  A: . . . [L]ike I said, he addressed the question, so I assumed that he was the one who created the chart when I asked the question.").

84.    Mr. Kuserk also recalled that both Tyler and Cameron Winklevoss, the CEO and President of Defendant, respectively, actively responded to the CFTC's questions during the meeting.  [Ex. C] (Kuserk Dep. 258:19-259:7) ("Q: Did either Tyler or Cameron Winklevoss answer question[s] during the meeting?  A: I believe they did. Yes.").

85.    Mr. Kuserk, in an interview with the Southern District of New York conducted on August 27, 2019, recalled that either Tyler or Cameron Winklevoss discussed the Gemini Auction during the July 25, 2017 meeting, and that one of them had stated that the trades on Defendant's platform "wouldn't be leveraged trades."  [Ex. W] (SDNY_000000787) at 3.  Mr. Kuserk also recalled that the Winklevosses stressed the idea of pre-funding, which he understood to "imply[] there was no leverage . . . , that the cash needed to be there up front."  *Id.* at 4.

86.     At the same interview, Mr. Kuserk recalled that it was one of the twins (Tyler or Cameron Winklevoss) who expressed the product would not be susceptible to manipulation at the July 25 meeting.  *Id.* at 3.

87.     According to a meeting agenda CFE drafted in preparation for the meeting, Defendant's representatives were charged with discussing "the Gemini Auction process[,] and how it is not readily susceptible to manip[ulation]" at the meeting.  [Ex. XX] (CBOECFTC_00052295).


Dated: New York, New York
        April 19, 2024

                              Respectfully submitted,
                              COMMODITY FUTURES TRADING
                              COMMISSION

                              By:____/s/ Diana Wang_____

                              Diana Wang
                              Andrew J. Rodgers
                              Katherine Rasor
                              David W. Oakland
                              Peter Janowski
                              Alejandra de Urioste
                              K. Brent Tomer

                              Division of Enforcement
                              290 Broadway, 6th Floor
                              New York, NY 10007
                              Phone: (646) 746-9700
                              Fax: (646) 746-9888