UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

      v.

GEMINI TRUST COMPANY, LLC,

           Defendant.

22-cv-4563 (AKH)

Hon. Alvin K. Hellerstein

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

COMMODITY FUTURES TRADING
COMMISSION
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
(646) 746-9700

May 7, 2024

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF MATERIAL FACTS............................................................................ 5

    A.  The Gemini Exchange and Auction ................................................................ 5

    B.  Product Certification Requirements Under the Act and Regulations ............. 5

    C.  Gemini Spearheads a Bitcoin Futures Product and Provides Due Diligence
        Materials to the CFE ....................................................................................... 7

    D.  The SEC Denial of a Bitcoin-Linked Exchange Traded Product Tied to the
        Gemini Exchange Forces Gemini to Focus on Listing a Bitcoin Derivative
        Product with the CFE ...................................................................................... 8

    F.  The Bitcoin Futures Contract .......................................................................... 9

    G.  Gemini Made Statements to the CFTC Directly and Through the CFE About Its
        Exchange and Auction in Order to Meet the CFTC's Product Listing
        Requirements .................................................................................................... 9

    H.  Gemini Omits Material Information About Its Exchange and Auction..................... 16

SUMMARY JUDGMENT STANDARD....................................................................... 24

ARGUMENT ................................................................................................................. 25

  I.  There Is No Genuine Issue of Material Fact that Gemini Made Each of the Thirty-One
    Materially False or Misleading Statements to the CFTC................................... 26

    A.  Defendant Made Each of the Statements Contained in the August 25, 2017,
        September 12, 2017, and November 2, 2017 Written Submissions ........................ 27

    B.  Defendant Also Made Each of the Statements Contained in the Submissions that
        Were Subject to Defendant's Motion for Partial Summary Judgment ...................... 28

  II.  There Are No Genuine Issues of Material Fact that Each of the Thirty-One Written
    Statements Were False or Misleading, Material, and that Gemini Knew or Reasonably
    Should Have Known that Each Statement Was False or Misleading .............................. 29

    A.  There Is No Genuine Issue of Material Fact that Gemini's Statements About Its
        Prefunding Requirement and the Related Cost of Capital to Trade Violated
        Section 6(c)(2) of the Act ............................................................................. 32

B.  There Is No Genuine Issue of Material Fact that Gemini's Statements About Its Fee Rebate Incentives Violated Section 6(c)(2) of the Act ........................................ 41

C.  There Is No Genuine Issue of Material Fact that Gemini's Statements About Self-Trading and Self-Trade Prevention Violated Section 6(c)(2) of the Act.................... 48

D.  There Is No Genuine Issue of Material Fact that Gemini's Statements About the Volume and Liquidity of the Gemini Exchange and Gemini Auction Violated Section 6(c)(2) of the Act ............................................................................................. 54

CONCLUSION.................................................................................................................... 57

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................24, 25

*CFTC v. Arista LLC*,
    2013 WL 6978529 (S.D.N.Y. Dec. 3, 2013) ................................27, 50, 53

*CFTC v. eFloorTrade, LLC*,
    2018 WL 10625588 (S.D.N.Y. Sept. 21, 2018)............................ *passim*

*CFTC v. Gramalegui*,
    2018 WL 4610953 (D. Colo. Sept. 26, 2018).............................. *passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................24

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010) ......................................................25

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).......................................................43

*SEC v. Amah*,
    2023 WL 6386956 (S.D.N.Y. Sept. 28, 2023)...........................47

*SEC v. Collector's Coffee, Inc.*,
    2023 WL 6453709 (S.D.N.Y. Oct. 4, 2023) ...............................39

*SEC v. Constantin*,
    939 F. Supp. 2d 288 (S.D.N.Y. 2013)........................................40

*SEC v. Gallison*,
    588 F. Supp. 3d 509 (S.D.N.Y. 2022)...................................40, 53

*SEC v. Simeo*,
    2021 WL 4041562 (S.D.N.Y. Sept. 3, 2021)..............................39

*SEC v. Tecumseh Holdings Corp.*,
    765 F. Supp. 2d 340 (S.D.N.Y. 2011)........................................46

*United States v. Adekanbi*,
    675 F.3d 178 (2d Cir. 2012)..............................................30, 37, 45

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000)...........................................................................................30

*United States v. Blankenship,*
    2015 WL 1565724 (S.D. W. Va. Apr. 8, 2015)...........................................................27

*United States v. Byrnes*,
    644 F.2d 107, 111 (2d Cir. 1981*)*........................................................................52

*United States v. Calderon,*
    944 F.3d 72 (2d Cir. 2019)...........................................................................................30

*United States v. Candella,*
    487 F.2d 1223 (2d Cir. 1973)......................................................................................27

*United States v. Chan Lo,*
    2016 WL 9076234 (S.D.N.Y. Feb. 4, 2016)..........................................................44, 51

*United States v. Davis,*
    8 F.3d 923 (2d Cir. 1993) ......................................................................................26, 29

*United States v. Drame,*
    2021 WL 1226996 (S.D.N.Y. Apr. 1, 2021).....................................................25, 45, 52

*United States v. Finkelstein,*
    229 F.3d 90 (2d Cir. 2000)...........................................................................................31

*United States v. Gaudin,*
    515 U.S. 506 (1995).....................................................................................................31

*United States v. Litvak,*
    2013 WL 5740891 (D. Conn. Oct. 21, 2013) ............................................................27

*United States v. Kestenbaum,*
    908 F. Supp. 2d 364 (E.D.N.Y. 2012) .......................................................................37

*United States v. Klausner*,
    80 F.3d 55 (2d Cir. 1996) ...........................................................................................31

*United States v. Moore,*
    446 F.3d 671 (7th Cir. 2006) ......................................................................................47

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007)............................................................................ *passim*

*United States v. Santiago*,
    2014 WL 4827883 (S.D.N.Y. Sept. 26, 2014)........................................................................42

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006)........................................................................................................42

*United States v. Zhong*,
    95 F.4th 1296 (10th Cir. 2024) ..................................................................................................31

*Universal Health Serv. Inc. v. U.S. ex rel Escobar*,
    579 U.S. 176 (2016)........................................................................................................ *passim*

*Walker v. Carter*,
    210 F. Supp. 3d 487 (S.D.N.Y. 2016).......................................................................................25

*Wright v. Goord*,
    554 F.3d 255 (2d Cir. 2009)........................................................................................................25

**Statutes**

7 U.S.C. § 7a-2 ......................................................................................................................................6

7 U.S.C. § 7(d) .........................................................................................................................5, 20, 35

7 U.S.C. § 9(2) ............................................................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 56............................................................................................................................ 1, 24

**Regulations**

17 C.F.R. § 38.200 ...............................................................................................................................5, 35

17 C.F.R. § 38.201 ..................................................................................................................................6

17 C.F.R. § 40.2 ......................................................................................................................................6

17 C.F.R. pt. 38, App'x C ............................................................................................................ *passim*

**Other Authorities**

Ord. Disapproving a Proposed Rule Change, to Bzx Rule 14.11(e)(4), Commodity-Based Tr.
Shares, to List & Trade Shares Issued by the Winklevoss Bitcoin Tr.,
    Release No. 80206, 2017 WL 1491753 (Mar. 10, 2017) ...........................................................8

Provisions Common to Registered Entities,
   76 Fed. Reg. 44,776 (July 27, 2011) ......................................................................6

Technical and Clarifying Amendments,
   71 Fed. Reg. 1953-01, 2006 WL 53681 (Jan. 12, 2006) ...........................................7

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Plaintiff Commodity Futures Trading Commission ("CFTC" or "Plaintiff") respectfully submits this memorandum of law in support of its motion for partial summary judgment against Defendant Gemini Trust Company, LLC ("Gemini" or "Defendant") seeking judgment as a matter of law that Defendant is liable for violating Section 6(c)(2) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. § 9(2) with respect to thirty-one materially false or misleading written statements that Defendant provided to the CFTC in connection with the self-certification of a bitcoin futures contract.

## PRELIMINARY STATEMENT

Discovery has confirmed that Gemini repeatedly violated Section 6(c)(2) of the CEA by making scores of materially false or misleading statements and omissions in connection with the product certification of a first-of-its-kind bitcoin futures contract. Gemini is a cryptocurrency exchange founded by bitcoin billionaires Cameron and Tyler Winklevoss. Gemini and its two co-founders were determined to bring bitcoin from the fringes of the financial system into the mainstream because broader adoption of bitcoin in the United States was critical to Gemini's ability to develop a sustainable business. However, in March 2017, the SEC denied an application to list a bitcoin-linked Exchange Traded Product ("ETP"), which would have allowed investors greater access to bitcoin without actually holding the digital asset. Gemini had assumed key roles in the listing and had hoped that SEC approval would pave the way for additional products linked to its exchange and auction. In response to the SEC denial, Gemini shifted its strategy towards developing a bitcoin futures contract for trading on a U.S.-regulated futures exchange, which would address one of the missing elements necessary for the SEC to reconsider the ETP listing.

1

The concept of the bitcoin futures contract was simple—Cboe Futures Exchange ("CFE"), as the designated contract market ("DCM") registered with the CFTC, would list a cash-settled futures contract, and the contract would be settled by reference to Gemini's 4 p.m. bitcoin auction price.  As undisputed evidence shows, Gemini's exchange and its auction were the focal point of the CFTC's review because the key question for the CFTC under the statutory and regulatory framework was whether the contract was readily susceptible to manipulation. Published CFTC guidance made plain that the proposed contract's pricing mechanism was the most obvious source for potential manipulation of the futures contract.  Accordingly, because the auction price was calculated using both auction-only orders and unexecuted orders resting on the exchange, it was incumbent upon Gemini to show that both its exchange and auction could be a "reliable and robust" indicator of the value of bitcoin that was not readily susceptible to manipulation.  However, between July and December 2017, Gemini made, over several months, four categories of false or misleading statements to the CFTC about its exchange and auction. Each of those statements went directly to the CFTC's inquiry into whether the proposed contract was readily susceptible to manipulation, and were therefore material to the CFTC's review of the proposed product.

*First*, Gemini affirmatively and repeatedly represented that all orders on the exchange and in the auction were fully prefunded and that its prefunding requirement made it "costly," from a cost of capital perspective, for traders to engage in manipulative conduct on Gemini.  The message conveyed was that traders could not employ leverage or margin to fuel abusive trading. But Gemini knew it was not providing a complete and accurate picture of the state of affairs. Gemini failed to disclose to the CFTC that it reduced or eliminated traders' cost of capital in two ways:  (i) by providing loans to market participants under the auspices of Pearl Street Financial

LLC (formerly known as Gemini Financial LLC), a related company owned and controlled by the Winklevosses, whose sole business was to provide loans to Gemini customers; and (ii) by providing so called "operational" advances of both fiat currency and bitcoin, which acted as interest-free short-term loans that allowed Gemini market participants to trade both on the exchange and in auctions at times when it would otherwise not be possible due to lack of funds in the customer's account.

*Second*, Gemini stated that its market maker rebate program was an auction protection that encouraged participation, and when the CFTC asked for further details about its market maker rebate program, Gemini confirmed that it only had one market maker program that was available to all Gemini customers and disclosed on its website. In reality, Gemini had a written policy of offering market makers special fee discounts and rebates that differed from the public fee schedule on its website. Making matters worse, Gemini knew that the special deals had been exploited by market makers during the product certification process. Faced with the CFTC's request for more details about its market maker rebate program, Gemini obscured the rebates offered to market makers by stating that five to ten market participants earned rebates under the public fee schedule—and that these participants made up 90% of the auction volume—all while concealing that these same market makers received special rebate incentives. Gemini's response had the predictable effect of cutting off further inquiry into Gemini's rebate practices.

*Third*, Gemini represented that its prohibition on self-trading was another auction protection. Then, in response to an express question from the CFTC as to whether self-trading in the auction was possible, Gemini answered, unequivocally, "No, we have instituted self-trade prevention." Gemini further embellished on these statements by claiming that it had instituted self-trade prevention to prevent all types of self-trading, whether intentional or unintentional, in

Gemini auctions. But, Gemini had only recently instituted self-trading prevention in the auction in May 2017, which meant that self-trading was reflected in the trade data and volume figures used to support the product certification. And, when Gemini made its unqualified statements conveying that self-trading was not possible, it knew that there was no self-trade prevention between its auction order book and its continuous order book, which presented the very real possibility that an auction participant's unexecuted orders on the exchange would cross with its auction-only orders in a Gemini auction.

*Finally*, Gemini's statements about its volume and liquidity on the exchange and in the auction failed to account for the myriad of ways Gemini had inflated volume and liquidity by reducing traders' cost of capital, providing sweetheart loan deals and advances of free money to select market makers, and subsidizing volume with generous (and undisclosed) rebates. Gemini also knew that the trade data and volume figures included non-bona fide trading activity including self-trading, and in certain circumstances, known instances of wash trading.

In sum, this case is a strong candidate for resolution at the summary judgment stage because there is no dispute about the statements Gemini made to satisfy the product certification requirements, no dispute about the information Gemini withheld that made those statements false or misleading, and thus no genuine issue of fact that the misleading half-truths Gemini peddled to the CFTC about its business were capable of influencing the CFTC's review of the first-of-its-kind bitcoin futures contract. Based on the undisputed record adduced during discovery, the Court should decide as a matter of law that Gemini's statements violated Section 6(c)(2) of the Act, which prohibits exactly what Gemini did here: making false or misleading statements of material fact to the Commission or omitting material facts that are necessary to make any statements of material fact made not misleading. 7 U.S.C. § 9(2).

## STATEMENT OF MATERIAL FACTS

### A.   The Gemini Exchange and Auction

Gemini was founded in 2015 by Harvard-educated bitcoin billionaires Tyler and Cameron Winklevoss.  (56.1 Statement ¶ 3.)[1]  Tyler Winklevoss was Gemini's Chief Executive Officer and Cameron Winklevoss served as Gemini's President.  (56.1 Statement ¶ 4.)

In 2017, Gemini operated a cryptocurrency exchange that facilitated the purchase or sale of digital assets, including bitcoin, in exchange for fiat currency or another digital asset.  (56.1 Statement ¶¶ 5-6.)  Since its founding, Gemini offered trading in bitcoin in U.S. dollars through what it called a "continuous order book" that operated twenty-four hours a day.  (*Id.*)  On September 21, 2016, Gemini also launched a bitcoin auction, which was a two-sided auction for bitcoin in U.S. dollars that Gemini held daily at 4pm.  (*Id.* ¶ 7.)  All open orders, including both auction-only orders and resting orders on the continuous order book, participated in the auction and were considered in establishing the final auction price.  (*Id.* ¶¶ 8-9.)  The final auction price was "established as the price that executes the greatest aggregate quantity across both the auction and continuous order book."  (*Id.* ¶ 8; Ex. 7 at 6.)

### B.   Product Certification Requirements Under the Act and Regulations

DCMs are required by law to comply with core principles of the Act and with applicable requirements established by the Commission.  *See* Section 5(d) of the Act, 7 U.S.C. § 7(d).  With respect to contract listings, this includes Core Principle 3, which requires that a DCM "shall list . . . only contracts that are not readily susceptible to manipulation."  Section 5(d)(3) of the Act, 7 U.S.C. § 7(d)(3); Regulation 38.200, 17 C.F.R. § 38.200 (2023).

---

[1] "56.1 Statement" refers to the CFTC's Statement of Material Facts in Support of Motion for Summary Judgment filed contemporaneously with this memorandum.  "Ex. __" refers to the exhibits referenced in and attached to the Declaration of Christopher Giglio, also filed contemporaneously herewith.  Unless otherwise indicated, capitalized terms are defined in the Complaint, ECF No. 1.

Section 5c(c)(1) of the CEA, 7 U.S.C. § 7a-2(c)(1), permits a DCM to list a new futures contract for trading by providing the Commission a written certification that the new contract complies with the Act and Regulations. The product certification provision gives registrants the ability "to quickly self-certify new products," while also allowing applicants and the CFTC "to assure themselves that the certification is accurate—i.e., that the product . . . does indeed comply with applicable core principles." Provision Common to Registered Entities, 76 Fed. Reg. 44,776, 44,779 (July 27, 2011) (quotations cleaned up).

Regulation 40.2 requires that a product certification submission include:

- a certification "that the product to be listed complies with the Act and Commission regulations thereunder;" and

- a "concise explanation and analysis of the product and its compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder."

17 C.F.R. § 40.2(a)(3)(iv), (v).

In order to demonstrate compliance with Core Principle 3, the Regulations direct "[a]pplicants and designated contract markets . . . to the guidance in appendix C" to Part 38 of the CFTC's Regulations. 17 C.F.R. § 38.201. In evaluating the extent to which cash-settled futures contracts such as the bitcoin futures contract are readily susceptible to manipulation, the guidance identifies several relevant factors, including "the size and liquidity of the cash market that underlies the listed contract." 17 C.F.R. pt. 38, App'x C at (c)(2). In particular, "situations susceptible to manipulation include those in which the volume of cash market transactions and/or the number of participants contacted in determining the cash-settlement price are very low." *Id.* Additionally, where, as here, "an independent, private sector third party calculates the cash settlement price," the guidance instructs applicants to "verify that the third party utilizes business practices that minimize the opportunity or incentive to manipulate the cash settlement price." *Id.*

at (c)(3)(i).  These requirements are all geared toward the ultimate goal of showing that the cash settlement mechanism is "a reliable and robust indicator of the value of the underlying commodity or instrument."  *Id.* at (c)(2).[2]

The published guidance also warns that cash-settled contracts such as the bitcoin futures contract "may be susceptible to manipulation or price distortion."  *Id.* at (c)(2).  Indeed, "[c]ash-settled contracts may create an incentive to manipulate or artificially influence the data from which the cash-settlement price is derived or to exert undue influence on the cash-settlement price's computation in order to profit on a futures position in that commodity."  *Id.*  Accordingly, the guidance advises that "careful consideration should be given to the potential for manipulation or distortion of the cash settlement price."  *Id.*

Appendix C to Part 38 also states that, among other things, a product certification should include:

- "[a] narrative describing the contract, inclining data and information to support the contract's terms and conditions"; and

- "[a] detailed cash market description for physical and cash-settled contracts."

17 C.F.R. pt. 38, App'x C at (a)(1)-(2).

### C.    Gemini Spearheads a Bitcoin Futures Product and Provides Due Diligence Materials to the CFE

In February 2017, Gemini began discussions with the CFE about the possibility of listing a bitcoin futures product.  (56.1 Statement ¶ 26.)  At the time, Gemini had applied to the SEC for approval of a bitcoin-linked ETP.  (*Id.* ¶ 27.)  It was Gemini's belief that the ETP approval

---

[2] The CFTC has emphasized that, "in conducting routine due diligence reviews of self-certified new product listings[,] . . .  staff gives special consideration to particular requirements," including "Core Principle 3 (listing contracts that are not readily susceptible to manipulation)."  Technical and Clarifying Amendments to Rules for Exempt Markets, Derivatives Transaction Execution Facilities and Designated Contract Markets, and Procedural Changes for Derivatives Clearing Organization Registration Applications, 71 Fed. Reg. 1953-01, 1960, 2006 WL 53681, at *1960 (Jan. 12, 2006).

"would pave the way" for a bitcoin futures contract.  (*Id.* ¶ 28.)  To initiate the process of listing

a bitcoin futures contract, CFE sent a due diligence questionnaire to Gemini and informed

Gemini that "the questions reflect information we'll need in order to rep to the CFTC that CFE

complies with DCM Core Principles on the futures."  (*Id.* ¶ 31; Ex. 5 at GEM_CFTC092650.)

"Gemini at all times understood that information it provided to [CFE] could be shared with the

CFTC."  (*Id.* ¶ 32; Ex. 12 at 10-11.)

### D. The SEC Denial of a Bitcoin-Linked Exchange Traded Product Tied to the Gemini Exchange Forces Gemini to Focus on Listing a Bitcoin Derivative Product with the CFE

On March 10, 2017, the SEC disapproved a proposed rule change that would have

allowed the listing of shares of the bitcoin-linked ETP, which contemplated that Gemini would

serve as the custodian of the bitcoins underlying the ETP shares and Gemini's daily 4 p.m.

auction would be used as the ETP pricing mechanism.  *See* Ord. Disapproving a Proposed Rule

Change, to Bzx Rule 14.11(e)(4), Commodity-Based Tr. Shares, to List & Trade Shares Issued

by the Winklevoss Bitcoin Tr., Release No. 80206, 2017 WL 1491753, at *1 (Mar. 10, 2017).  In

denying the application, the SEC observed that, for all commodity-linked ETPs approved by the

SEC to that point, there had been "well-established, significant, regulated markets" for trading

futures on the underlying commodity and the ETP-listing exchange had entered into

surveillance-sharing agreements with those futures markets.  *Id.* at *11.  However, in this case,

there was no "significant markets for bitcoin or derivatives" that would allow the ETP-listing

exchange to enter into surveillance-sharing agreements like those that existed in prior cases.  *Id.*

at *17.

Gemini's takeaway from the SEC's denial of the ETP listing was that, because the spot

markets (like Gemini) were unregulated, there needed to be a "regulated derivatives market

related to the underlying asset."  (56.1 Statement ¶¶ 40-43; Ex. 13 at GEM_CFTC134789.)

Thus, Gemini turned to building the bitcoin derivatives market in order to "address[] the SEC's concerns." (56.1 Statement ¶ 42; Ex. 13 at GEM_CFTC134789.) In a company-wide email, Tyler and Cameron Winklevoss told Gemini employees that they were "already in the process of working to bring a bitcoin derivatives contract to market." (56.1 Statement ¶ 41; Ex. 13 at GEM_CFTC134790.) The derivatives contract, from the beginning, was Gemini's brainchild and a core "piece[]" of Gemini's vision for establishing a "successful and sustainable business." (56.1 Statement ¶ 43; Ex. 13 at GEM_CFTC134789.)

> ### F.    The Bitcoin Futures Contract

The proposed bitcoin futures contract would be a cash-settled futures contract. (56.1 Statement ¶ 44.) Cash settlement is a method of settling futures contract whereby, on the relevant day, the contract is settled by cash payment in lieu of physical delivery of the commodity underlying the contract. 17 C.F.R. pt. 38, App'x C at (c)(1). The proposed bitcoin futures contract would trade on CFE and settle on the relevant day by refence to the spot bitcoin price as determined by the 4 p.m. Gemini bitcoin auction. (56.1 Statement ¶ 45.) The bitcoin price as determined by the Gemini auction was therefore an important component to the futures contract. (*Id.* ¶ 46.) Gemini even considered, and requested, naming the proposed contract the "Gemini Bitcoin Futures Contract." (*Id.* ¶ 47.) Ultimately, the cash-settled bitcoin future was traded under the ticker XBT futures. (*Id.* ¶ 48.)

> ### G.    Gemini Made Statements to the CFTC Directly and Through the CFE About Its Exchange and Auction in Order to Meet the CFTC's Product Listing Requirements

Throughout the product certification process, which commenced in July 2017 and concluded on December 1, 2017 with submission of a final product certification letter, Gemini communicated directly with the CFTC's Division of Market Oversight and others at the CFTC "dozens of times." (Def.'s Ans. at 2, ECF No. 13; 56.1 Statement ¶¶ 49-50.) During this

product certification process, Gemini was well aware that the CFTC was focused on whether the Gemini auction was readily susceptible to manipulation.  (56.1 Statement ¶ 51.)

The CFTC itemized no less than thirty-one written false or misleading statements that Gemini made directly or through the CFE about its exchange and auction in documents and trading data provided to the CFTC in order to obtain approval of the new product listing.  (56.1 Statement ¶ 52; Ex. 18 at Ex. A (1/19/2024 Pl.'s Resp. to the Court's Jan. 4, 2024 Order ("CFTC's Resp. to Jan. 4 Order")).)  Those statements are set forth in Exhibit A to the CFTC's response to the Court's January 4, 2024 Order where it instructed the CFTC to, among other things, "identify the statements in defendant's disclosures that plaintiff alleges were materially false and misleading."  (*See* Jan. 4, 2024 Order at 3-4, ECF No. 77; *see also* Ex. 18 at Ex. A (CFTC's Resp. to Jan. 4 Order).)  For ease of reference, Exhibit A has been appended to this memorandum of law and is referred to here as "Exhibit A" or "Ex. A."

The thirty-one written statements set forth in Exhibit A were made through ten separate submissions to the CFTC.  (56.1 Statement ¶¶ 53-56.)  At all times, Gemini had ultimate authority over the information it provided to the CFE for submission to the CFTC, including whether and how that information was communicated.  (56.1 Statement ¶¶ 53-61.)  However, on March 22, 2024, Defendant moved for partial summary judgment on seven of the submissions based on the ill-conceived notion that Gemini was not the "maker" of the statements about its own exchange and auction set forth in the following submissions:

- A July 25, 2017 presentation provided to the CFTC;

- An August 1, 2017 disk of Gemini's proprietary trading data sent to the CFTC after the July 25, 2017 presentation;

- An October 6, 2017 draft product certification letter;

- An October 24, 2017 analysis of market orders in the Gemini auction;

- An October 31, 2017 draft product certification letter;

- A November 14, 2017 draft product certification letter; and

- The December 1, 2017 product certification letter.

(*See* Def.'s Mem. of Law in Supp. of Mot. for Summary Judgment at 5-13, ECF No. 82.)

The CFTC's opposition to Defendant's motion, including the CFTC's Statement of Additional Material Facts, ECF Nos. 90 & 91, details Gemini's deep involvement in drafting, editing, and approving the statements about its exchange and auction in the submissions that are subject to Gemini's partial motion. (*See* Pl.'s Stmt. of Add'l Facts ("CFTC SAFs") ¶¶ 58-87, ECF No. 91.) Tellingly, Defendant did not seek summary judgment on three of the submissions, all of which contain similar statements about Gemini's exchange and auction that Gemini claims to have not made in other submissions. (56.1 Statement ¶ 56.) Those submissions include:

- An August 25, 2017 written response to follow up questions from the CFTC (56.1 Statement ¶ 56(a); Ex. 19 at GEM_CFTC173218);

- A September 12, 2017 memorandum from Gemini summarizing attributes of its auction that promote integrity of the auction price and discourage manipulative conduct (56.1 Statement ¶ 56(b); Ex. 4 at GEM_CFTC084666); and

- Written talking points provided via email to the CFTC on November 2, 2017 (56.1 Statement ¶ 56(c); Ex. 20 at 22cv4563-CFTC-GEMINI-00017879).

For each of the statements in these submissions, Gemini not only drafted, edited, and approved the statements, but also had ultimate authority over the statements, including their content and whether and how to communicate the statements to the CFTC. (56.1 Statement ¶¶ 57-61.)

### *Gemini's August 25, 2017 Written Responses to the CFTC's Questions*

Gemini drafted the responses to the questions that the CFTC directed to it. (56.1 Statement ¶ 59; Exs. 19, 22, 23.) Gemini provided substantive feedback and edits, including edits from its counsel. (56.1 Statement ¶ 59; Ex. 23.) Gemini's answers were set forth on

Gemini letterhead (56.1 Statement ¶ 59; Ex. 22 at GEM_CFTC163832-40), and before submitting the final response, the CFE sought Gemini's approval (56.1 Statement ¶ 59; Ex. 23 at CBOECFTC_00007396).  Accordingly, when the CFE submitted the responses to the CFTC's questions, the CFE noted that the "[a]ttached are CFE's and Gemini's responses to the follow up questions sent to us on August 17, 2017."  (56.1 Statement ¶ 59; Ex. 19.)  The submission was also accompanied by a FOIA request letter submitted by both CFE and Gemini.  (Ex. 19 at GEM_CFTC173215.)

### Gemini's September 12, 2017 Memorandum Addressing Why Gemini's Auction Is Not Readily Susceptible to Manipulation

Gemini drafted the memorandum, placed it on Gemini letterhead, and circulated the draft to the CFE for comments.  (56.1 Statement ¶ 60; Ex. 24.)  Gemini accepted all proposed changes suggested by the CFE, attached the latest PDF version of the memorandum and stated: "you have our approval to send."  (Ex. 25.)  The transmittal email noted that it included "two documents from Gemini," including the memorandum, which "further describes why the Gemini Auction is not readily susceptible to manipulation."  (Ex. 4.)  The transmittal email was accompanied by a FOIA request letter submitted by both the CFE and Gemini.  (*Id.* at GEM_CFTC084669.)

### Gemini's November 2, 2017 Written Talking Points

Gemini's counsel proposed the idea of drafting talking points for a call with the CFTC to address "why the auction is not susceptible to manipulation" and "why an auction price works for settling a contract."  (56.1 Statement ¶ 61; Ex. 26 at GEM_CFTC126102-103.)  Gemini's counsel prepared the talking points with Gemini's input and previewed the talking points before the call.  (*Id.*)  Gemini's counsel confirmed on November 2, 2017 that the talking points had been sent to the CFTC prior to the call.  (Ex. 27 at GEM_CFTC125971; *see also* Ex. 20 at 22cv4563-CFTC-GEMINI-00017878-879).)

Unlike Gemini's hyper-technical and illogical partial motion, each of the thirty-one written statements in the ten submissions are subject to this motion. As discussed below, the thirty-one written statements fall into four categories: (1) statements related to Gemini's pre-funding requirement and the related cost of capital to trade on Gemini (Ex. A (statements 1, 2, 5, 6, 9, 10, 13, 14, 17-20, 22, 26 & 27)); (2) Gemini's fee rebate incentives (*id.* (statements 23 & 28)); (3) the extent and possibility of self-trading, self-crossing, or collusive trading on the exchange and in the auction (*id.* (statements 4, 8, 12, 16, 21, 24, 31)); and (4) the volume and liquidity of the Gemini exchange and Gemini auction (*id.* (statements 3, 7, 11, 15, 25, 29 & 30)).

### 1. Gemini's Statement About Its Prefunding Requirement and Related Cost of Capital

Gemini touted its prefunding requirement from the very beginning. In response to the CFE due diligence questionnaire, Gemini emphasized that all orders placed on the exchange and in the auction are "pre-funded" or "fully funded," which according to Gemini, "substantially increase[d] the economic risks of attempted manipulation or other nefarious activity (e.g. spoofing)." (56.1 Statement ¶ 62; Ex. 5 at GEM_CFTC092654, 657-658.) This is because Gemini did not offer margin or leveraged trading, which would have allowed market participants to place orders in excess of the funds market participants deposited into their accounts. (56.1 Statement ¶¶ 63-64.)

On July 25, 2017, Gemini represented in slides presented to CFTC staff, under the headings "Gemini Auction Mechanics . . . Protections," that "[a]s with all Gemini orders, auction orders must be fully (pre-) funded." (56.1 Statement ¶ 65; Ex. 16 Ex. 16 at slide 5; Ex. A (statements 26 & 27).) Gemini representatives drafted, edited, and printed the slides for the meeting. (56.1 Statement ¶ 66.) Gemini continued to make statements about its prefunding

requirement and the related cost of capital to trade as a key protection against manipulation in

subsequent submissions to the CFTC including in:

- An August 25, 2017 written response to CFTC questions about a trader's ability to break the auction by distorting the continuous market (56.1 Statement ¶ 67; Ex. 19 at GEM_CFTC173225; Ex. A (statement 22));

- A September 12, 2017 memorandum describing why the Gemini auction is not readily susceptible to manipulation (56.1 Statement ¶ 68(a); Ex. 4 at GEM_CFTC084666-667; Ex. A (statements 19 & 20));

- An October 6, 2017 draft product certification letter (56.1 Statement ¶ 68(b); Ex. 30 at GEM_CFTC126417; Ex. A (statements 13 & 14));

- An October 24, 2027 written analysis of market orders in the Gemini auction (56.1 Statement ¶ 68(c); Ex. 31 at GEM_CFTC187900; Ex. A ((statement 18));

- An October 31, 2017 draft product certification letter (56.1 Statement ¶ 68(d); Ex. 32 at CBOECFTC_00000270; Ex. A (statements 9 & 10));

- Written talking points emailed to the CFTC by Gemini's counsel on November 2, 2017 (56.1 Statement ¶ 68(e); Ex. 20 at 22cv4563-CFTC-GEMINI-00017878; Ex. A (statement 17));

- A November 14, 2017 draft product certification letter (56.1 Statement ¶ 68(f); Ex. 33 at CBOECFTC_00001271; Ex. A (statements 5 & 6)); and

- The December 1, 2017 final product certification letter (56.1 Statement ¶ 68(g); Ex. 6; Ex. A (statements 1 & 2)).

### 2.    Gemini's Statements About Fee Rebate Incentives

The fee rebate incentives that Gemini offered to market participants was another key area

of inquiry during the product certification.  (56.1 Statement ¶¶ 71-74.)  During the July 25, 2017

presentation, under the headings "Gemini Auction Mechanics . . . Protections," Gemini stated

that "[m]arket maker trading fee rebates encourage participation."  (*Id.* ¶ 72; Ex. 16 at slide 5;

Ex. A (statement 28).)  Then, on August 18, 2017, the CFTC posed a number of questions to

Gemini and CFE by email, one of which asked Gemini to "provide more detail on the market

makers rebate program? How many market makers are signed up? How much liquidity are they

providing to the auctions?"  (56.1 Statement ¶ 73; Ex. 34 at GEM_CFTC085490.)  In a written

response, on August 25, 2017, Gemini stated:

> We have implemented a trading fee program *which is available to all of our market participants; we have no specifically defined market maker program*.  In summary, fees are typically charged for liquidity-taking trades, but these fees can be reduced through high trading volumes and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but rebates can be earned in a similar way.  *The details are available at https://gemini.com/fee-schedule/. In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participants typically make up approximately 90% of volume in the auctions*.

(Ex. 19 at GEM_CFTC173222 (emphasis added); Ex. A (statement 23).)

### 3. Gemini's Statements About the Extent and Possibility of Self-Trading, Self-Crossing, or Collusive Trading

Similar to its statements about prefunding, Gemini lauded its self-trading prevention from

the outset of the product certification process as a core protection against manipulation.  (56.1

Statement ¶ 75; Ex. 16 at slide 5; Ex. A (statement 31).)  In the July 25, 2017 presentation, under

the headings "Gemini Auction Mechanics . . . Protections," Gemini represented that "[s]elf-

crossing" was "prohibited."  (Ex. 16 at slide 5.)  When the CFTC subsequently asked, in writing,

whether "an auction could occur where there is one participant trading with themselves," 

Gemini's responded in an August 25, 2017 written submission:  "No, we have instituted self-

trade prevention."  (56.1 Statement ¶¶ 76-77; Ex. 19 at GEM_CFTC173222; Ex. 34 at

GEM_CFTC085490; Ex. A (statement 24).)

Then, in a September 12, 2017 memorandum specifically addressing "attributes" of the

Gemini auction that "discourage manipulative conduct," Gemini stated that "[w]e prohibit the

same market participant from crossing with himself or herself (*either intentionally or

unintentionally*) on a continuous trading order book or in a Gemini Auction."  (56.1 Statement ¶¶

78-79 (emphasis added); Ex. 4 at GEM_CFTC08466; Ex. A (statement 21).)  Finally, in the draft

and final product certification letters, dated October 6, October 31, November 14, and December 1, 2017, Gemini portrayed its self-trade prevention capabilities as a "structural safeguard" that was built into the exchange auction process to "make it difficult for a market participant to improperly affect the action price." (56.1 Statement ¶¶ 80-81; Ex. 6 at 7; Ex. A (statements 4, 8, 12, & 16).)

### 4. Gemini's Statements About the Volume and Liquidity of the Gemini Exchange and Auction

In numerous submissions Gemini made representations that underscored the high volume and liquidity of the exchange, including in: (i) the July 25, 2017 presentation, which included a slide dedicated to Gemini's historical auction volume with corresponding assurances that Gemini's auction was "liquid" and "transparent" and had "roughly 2x the average maximum trade size of other bitcoin exchanges" (56.1 Statement ¶ 83(a); Ex. 16 at slides 2, 3; Ex. A (statements 29 & 30)); (ii) the trade data sent to the CFTC on August 1, 2017, which contained the raw data underlying the graphs in the July 25, 2017 presentation, including the graph reflecting Gemini's historical auction trading volume (56.1 Statement ¶ 83(b); Ex. A (statement 25)); (iii) the draft and final product certification letters, dated October 6, October 31, November 14, and December 1, 2017, which included representations about Gemini's exchange and auction trading volume in the month of August 2017. (56.1 Statement ¶ 83(c); Ex. 6 at 3; *see also* Exs. 30, 32, 33; Ex. A (statements 3, 7, 11 & 15).)

### H. Gemini Omits Material Information About Its Exchange and Auction

Gemini contends that "throughout the self-certification process," it "went above and beyond what it was obligated to do" and "did everything right." (Def.'s Ans. at 2; 56.1 Statement ¶ 84.) However, Gemini's contemporaneous actions and statements reveal a more cynical approach to the product certification. In a November 22, 2017 email from Cameron

Winklevoss during the final push to finalize the product certification, Gemini revealed that its strategy was to relay information to the CFTC that would was designed to "give comfort rather than invite additional scrutiny." (56.1 Statement ¶ 85; Ex. 35.) Following this approach, Gemini omitted or concealed material information about the following:

### 1.    Pearl Street Loans

Pearl Street Financial LLC ("Pearl Street") was originally called Gemini Financial LLC ("Gemini Financial"). (56.1 Statement ¶ 87.) At its inception, Gemini Financial was designed as a way for Gemini to provide lines of credit—or credit or margin—to market makers to increase volume on the exchange. (*Id.* ¶ 88.) But Gemini was not able to provide margin trading or loans directly to market participants. (*Id.* ¶ 89.) Thus, Gemini needed a "work around" to "provide traders leverage (either loaning them money and/or BTC from outside Gemini but for Gemini customers[])" because "[m]argin [was] . . . the most obvious way to get an instant multiplier on trading volume." (*Id.* ¶ 90; Ex. 41.)

Gemini Financial was rebranded as Pearl Street in early 2016 and started providing loans to Gemini customers. (*Id.* ¶ 91.) Throughout its existence, Pearl Street was owned and controlled by Tyler and Cameron Winklevoss and only provided loans to Gemini customers. (*Id.* ¶¶ 92-93.) Consistent with the philosophy behind Gemini Financial, it was Gemini's "hope and expectation" that the Pearl Street loans would increase the volume of activity on the Gemini exchange. (*Id.* ¶ 94; Ex. 1 at 233:3-17 (2/28-29/2024 C. Winklevoss Dep. Tr. ("Winklevoss Dep. Tr.")).)

Gemini employees performed all the functions necessary to facilitate Pearl Street loans. (56.1 Statement ¶¶ 95-97.) Gemini employees negotiated the loans terms, tracked the loans, helped facilitate transfers of the loan proceeds, communicated with the customers about the interest payments that were due on the loans, and helped confirm receipt of payments. (*Id.* ¶ 96.)

Pearl Street business was conducted on Gemini computers, through Gemini's messaging applications, and by Gemini employees using their Gemini email accounts.  (*Id.* ¶ 97.)  Pearl Street was so intertwined with Gemini that Gemini's Head of Business Development, Shane Molidor, viewed the Pearl Street loans as one of the main incentives offered to institutional customers to expand their "global balance sheet" and increase their trading balance.  (*Id.* ¶ 98; Ex. 29 at 25:17-26:9, 76:20-78:6, 163:13-22, 186:5-187:17 (12/13-14/2023 S. Molidor Dep. Tr.).)

To further solidify the connection between Gemini and Pearl Street loans, Gemini made clear to Pearl Street loan recipients that the "funds can't leave Gemini [ ] because they are intended for your trading on the platform / auction."  (56.1 Statement ¶ 100; Ex. 57.)  And, in certain loan documents, Gemini conditioned the receipt of loan funds to requirements that the loan recipient satisfy specific trading benchmarks on the exchange and in the auctions.  (56.1 Statement ¶¶ 101(a)-(c); Ex. 58 at GEM_CFTC058613; Ex. 59 at GEM_CFTC058568.) Whether loans were issued with or without Gemini-centric terms, recipients understood that Gemini "expect[ed] to see a significant increase / improvement in their account activity."  (56.1 Statement ¶ 103; Ex. 60 at GEM_CFTC208795.)

## 2.    Advances and Credits of Digital and Fiat Currency

In March 2016, Gemini began to "experiment [with] allowing people to get advanced credit for wire" transfers.  (56.1 Statement ¶ 106; Ex. 63.)  Fiat advances were purportedly permitted to allow a customer to trade the full value of the funds the customer was transferring to Gemini before the transfer settled, provided the customer supplied proof that the funds were in transit.  (56.1 Statement ¶ 107; Ex. 64 at 9.)  Once Gemini started providing operational advances of fiat currency, it amended its Policies and Procedures Manual to account for the practice.  As Cameron Winklevoss observed, the language that described "Purchase

Transactions" needed to be updated to delete the word "[p]re-funded." (56.1 Statement ¶ 111; Ex. 66.) Prior to offering operational advances, Gemini's Policies and Procedures Manuals stated that "[a]ll purchase transactions settle immediately from a *pre-funded* Digital Asset and Fiat Account as recorded on the Exchange Ledger." (Ex. 65.) As a result of the edits proposed by Cameron Winklevoss, the language describing Purchase Transactions was revised to simply state: "All purchase transactions settle immediately from a Digital Asset or Fiat Account as recorded on the Exchange Ledger." (*Compare* Ex. 65 at 48 (Gemini's March 3, 2017 Policies and Procedures Manual), *with* Ex. 67 at 48 (Gemini's January, 31, 2017 Policies and Procedures Manual).)

Gemini also had a regular business practice of providing digital asset advances, sometimes called "operational floats," to select market participants. (56.1 Statement ¶ 114.) There were numerous instances where bitcoin advances were never confirmed to be in transit and remained outstanding for weeks and months. (*Id.*) When Cameron Winklevoss was informed in October 2017—while he and Gemini were engaged in the product certification process—of one such example of an outstanding, long-term bitcoin advance, he confirmed that it reflected "gross negligence." (*Id.*; Ex. 72.)

Gemini provided fiat and bitcoin advances to market participants to allow them to trade in bitcoin auctions when they otherwise would have lacked the necessary funds to participate. For example, for one prominent market maker—Circle Financial, Inc. ("Circle")—Gemini provided:

- a $500,000 advance on December 15, 2016, because Gemini needed to "feed th[e] auction" (56.1 Statement ¶ 117(a); Ex. 73);

- a 700 bitcoin advance on December 21, 2016, thirty minutes before the auction and debited the funds shortly after the auction concluded (56.1 Statement ¶ 117(b); Ex. 74 at GEM_CFTC138965; Ex. 70 at rows 314-315 (reflecting C.

Winklevoss approval of 700 BTC operational advance and subsequent 700 BTC "[d]ebit of pre-auction operational advance of 700 BTC to Circle"));

- a $400,000 advance on December 27, 2016, so Circle "could cross themselves" in the auction, which Gemini facilitated because it "needed auction volume" (56.1 Statement ¶ 117(c); Ex. 75 at row 5128 (showing $400,000 "credit" posted to Circle's account at 3:54:27 PM EST on December 27, 2016); Ex. 76 (12/27/2017 slack message from S. Molidor seeking "advanced credit dual control for circle" because Gemini "[n]eed[ed] auction volume"); *see also* Ex. 70 at row 336 (C. Winklevoss approval of debit for "$400K advance credit . . . used for auction funding" and debiting this amount because "Circle crossed against themselves (had both boy (sic) and sell orders filled in the auction)"));

- a $600,000 advance on January 9, 2017, that was needed "asap pre-auction" (56.1 Statement ¶ 117(d); Ex. 77);

- a 500 bitcoin advance on January 30, 2017, because the Circle was "having network issues" and could not "transfer BTC prior to [the] auction."[3]  (56.1 Statement ¶ 117(e); Ex. 68); and

- a $1,500,000 advance on May 5, 2017, that Gemini "need[ed] . . . for auction" (56.1 Statement ¶ 117(f); Ex. 78).

### 3.    Bespoke Fee Agreements Offered to Select Market Participants

In 2017, Gemini's website set forth Gemini's "Fee Schedule," which was a "real-time dynamic maker-taker fee & rebate schedule . . . that allow[ed] individual and institutional traders to receive up to a 15 bps (0.15%) rebate on all liquidity-making traders and be charged only a 15 bps (0.15%) fee on all liquidity-taking trades."  (56.1 Statement ¶ 118; Ex. 79 at 2.)  "Fees and rebates are based on [a market participant's] *gross trading volume and liquidity-making buy/sell ratio* over the previous thirty (30) calendar day window."  (Ex. 79 at 2 (emphasis in original).)  Based on Gemini's public fee schedule, a market participant could either reduce the fee that was charged for a trade or receive a rebate based on increased volume and a buy/sell ratio that approaches a 50/50 ratio.  (56.1 Statement ¶ 121.)  By providing rebates, Gemini was

---

[3] Notably, this "advance" remained outstanding for an entire week.  (Ex. 70 at rows 498, 550.)

"essentially paying someone who . . . provide[d] liquidity or add[ed] liquidity to the market."
(56.1 Statement ¶ 122; Ex. 1 at 394:7-20 (Winklevoss Dep. Tr.).)

In 2017, Gemini also had special fee agreements, also called bespoke "fee overrides"
with certain market makers that provided for more favorable fee structures than were available
through Gemini's public fee schedule posted to its website.  (56.1 Statement ¶ 124.)  Gemini's
Policies and Procedures Manual permitted bespoke fee arrangements and contemplated that
Gemini would provide "more favorable fee structures" to "high volume Users, *market makers* or
other special case users."  (56.1 Statement ¶ 125; Ex. 65 at 47 (emphasis added).)  Gemini knew
that the bespoke fee agreements with select market makers would increase volume on the
exchange.  (56.1 Statement ¶¶ 127-128.)

Gemini was aware that bespoke fees could be viewed with skepticism by regulators.  (*Id.*
¶¶ 132-133.)  In May 2017, Benjamin Small, Gemini's Chief Operating Officer ("COO") and
Head of Market Structure, told Cameron Winklevoss that bespoke rebates were "not something
that normal exchanges do" because it was considered "unseemly . . . for exchanges . . . to give
anyone special treatment," and that it was "strongly discouraged for SEC and CFTC exchanges
to do so."  (*Id.* ¶ 132; Ex. 85.)

### 4.    Market Participants Manipulated the Gemini Exchange

In or around September 2017, while Gemini was engaged with the CFTC in the product
certification, Gemini discovered a multi-million-dollar rebate fraud that stemmed from the
bespoke rebate agreements that Gemini had extended to market makers.  (56.1 Statement ¶¶ 134-
144.)  Benjamin Small, in conjunction with Shane Molidor (Gemini's Head of Business
Development), extended favorable bespoke fee rebate agreements which resulted in Gemini
losing money when two entities that received the favorable terms engaged in collusive or wash
trading.  (*Id.* ¶ 135.)

Cameron Winklevoss stated that "Gemini discovered that Small had extended certain bespoke rebate agreements to traders on the Gemini exchange who colluded to manipulate the Gemini exchange." (*Id.* ¶ 136; Ex. 87 ¶ 17.)  The rebate fraud also created "fake volume" through "wash trading" because a handful of participants passed money back and forth to earn rebates.  (56.1 Statement ¶ 137; Ex. 80 at 16-17.)  Gemini also suspected that its own employees were involved in the fraud scheme and terminated two employees, one of which was Benjamin Small, who had been interfacing with the CFE and CFTC in connection with the product certification.  (56.1 Statement ¶ 138.)  Around the same time Gemini detected the collusive trading, a consultant retained by Gemini, who was an expert in market structure, informed Gemini that the CFTC would want to know "[i]f there [were] instances where Gemini has booted attempted manipulators." (*Id.* ¶ 139; Ex. 17.)

In response to the discovery of collusive trading stemming from the bespoke fee arrangements that were exploited to manipulate the exchange, Gemini suspended the customer accounts implicated in the "highly coordinated trading" and clawed back the rebates that had been earned.  (56.1 Statement ¶ 140; Exs. 88-90.)  Gemini did not disclose the rebate fraud to the CFE or the CFTC.  Nor did Gemini correct its prior statements about the rebate incentives offered to market makers.  Instead, Gemini continued the practice of offering bespoke fees to market makers.  (56.1 Statement ¶ 141.)  In the words of Cameron Winklevoss, Gemini needed "healthy vols" and could not "have a failed auction," which "would be problematic." (*Id*. ¶ 142; Ex. 91.)

### 5.    Gemini Lacked Effective Self Trade Prevention

In March of 2017, Gemini implemented the technological means to automatically prevent self-trading in the continuous order book, which Gemini sometimes referred to as "self-trade prevention." (56.1 Statement ¶ 145.)   Then, in May 2017, Gemini implemented self-trade

prevention in Gemini auctions.  (*Id.* ¶ 146.)  Prior to instituting self-trade prevention in the auction, Gemini knew about, and facilitated, self-trading in Gemini auctions.  (*Id.* ¶¶ 148-149.)

Gemini's self-trade prevention had a known gap:  in a Gemini auction, there was no self-trade prevention between a continuous order book order and an auction-only order.  (*Id.* ¶ 150.) In early September 2017, while Gemini was working on answering questions about Gemini's auction mechanics, Rose Toomey, a software developer at Gemini, told Cameron Winklevoss that "you could cross yourself between the continuous book and the auction book."  (*Id.* ¶ 152; Ex. 99.)  Days later, Cameron Winklevoss revisited the subject of self-trading between the continuous order book and auction-only order book and asked if there "is self-trade prevention between books."  (56.1 Statement ¶ 153; Ex. 95 at GEM_CFTC148012.)  In response, Rose Toomey relayed that "where we do not attempt 'self-trade' prevention is where the auction book and the continuous book are folded together during the auction."  (56.1 Statement ¶ 154; Ex. 95 at GEM_CFTC148016.)

The gap in Gemini's automatic self-trading prevention was also known to market makers. (56.1 Statement ¶ 155.)  In November 2017, while the bitcoin futures contract self-certification process was ongoing, a market maker reached out to Gemini to request a mechanism that would prevent its resting orders on the continuous order book from crossing with its auction-only orders.  (*Id.*; Ex. 100 at GEM_CFTC147306.)  Rather than implement self-trade prevention between the order books, Cameron Winklevoss decided that the market makers "are grown ups" and could "figure it out."  (56.1 Statement ¶¶ 156-157; Ex. 100 at GEM_CFTC147306-307.)

Days before the submission of the product certification, Cameron Winklevoss inquired internally within Gemini yet again about self-crossing in the auction and asked: "is it true that I can cross my auction order w/ my continuous order."  (56.1 Statement ¶¶ 158-59; Ex.101 at

GEM_CFTC143855.)  Rose Toomey reminded Cameron Winklevoss that this issue had come up previously and his "solution at that time was, market makers are grown ups who can manage their own spreads."  (56.1 Statement ¶ 160; Ex. 101 at GEM_CFTC143855.)  Rose Toomey provided two possible automated solutions, either to exclude both orders or cancel the auction-only order; however, she cautioned that "[b]oth of these are bad because they throw away liquidity from an auction which needs all the help it can get."  (56.1 Statement ¶ 160; Ex. 101 at GEM_CFTC143855.)  Rose Toomey advised Cameron Winklevoss that implementing self-trading prevention between the continuous order book and an auction-only order book was "a big deal" and observed: "it cannot be a launch blocker :pray:"  (56.1 Statement ¶ 160; Ex. 101 at GEM_CFTC143855.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party bears the burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Anderson*, 477 U.S. at 256.  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

To survive a summary judgment motion, the opposing party (here, Defendant) must establish a genuine issue of fact by "citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation to defeat the

summary judgment motion." *United States v. Drame*, 2021 WL 1226996, at *3 (S.D.N.Y. Apr.

1, 2021) (Hellerstein, J.); *see also Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("A party

may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a

motion for summary judgment.").  It is therefore insufficient to show a "mere . . . scintilla of

evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which

the [fact finder] could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

"[A] nonmoving party's self-serving statement, without direct or circumstantial evidence to

support the charge, is insufficient to defeat a motion for summary judgment." *Walker v. Carter*,

210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016).

## ARGUMENT

The Complaint asserts one count against Gemini for making numerous materially false or

misleading statements or omissions to staff of the CFTC in violation of Section 6(c)(2) of the

Act, 7 U.S.C. § 9(2).  Section 6(c)(2) makes it:

> unlawful for any person to make any false or misleading statement of a material
> fact to the Commission . . . or to omit to state in any such statement any material
> fact that is necessary to make any statement of a material fact made not misleading
> in any material respect, if the person knew, or reasonably should have known, the
> statement to be false or misleading.

"To prove a cause of action under this section, the CFTC must show defendant (1) made

a false or misleading statement or omission; (2) of material fact; (3) to the CFTC; (4) which

[defendant] knew or reasonably should have known was false or misleading." *CFTC v.

Gramalegui*, 2018 WL 4610953, at *23 (D. Colo. Sept. 26, 2018); *see also CFTC v.

eFloorTrade, LLC*, 2018 WL 10625588, at *8 (S.D.N.Y. Sept. 21, 2018) (same).

During the product certification process, Gemini made, directly and through the CFE, no

less than thirty-one written false or misleading statements of material fact about its exchange and

auction in ten submissions provided to the CFTC.  (*See generally* Ex. A.)[4]  Undisputed evidence

adduced during discovery conclusively establishes that (i) Gemini made each of the thirty-one

statements and cannot avoid liability for statements about its own exchange and auction that

passed through an intermediary, *see* Section I, *infra*.; and (ii) there are no genuine issues of

material fact that Gemini violated Section 6(c)(2) because each of the thirty-one statements was

false or misleading, material to the CFTC's review of the product certification, and Defendant

knew or should have known that each of its affirmative statements were false or misleading.  *See*

Section II, *infra*.

## I.    There Is No Genuine Issue of Material Fact that Gemini Made Each of the Thirty-One Materially False or Misleading Statements to the CFTC

The undisputed facts show that Defendant made each of the thirty-one written false or

misleading statements that were relayed in ten separate submissions directly or by the CFE to the

CFTC.  Establishing that Defendant made each of the thirty-one statements as a matter of law is

not a high bar.  It only matters that the Defendant "contemplate[]" that the statement be "utilized

in a manner which was within the jurisdiction" of the CFTC.  *See United States v. Candella*, 487

F.2d 1223, 1227 (2d Cir. 1973); *United States v. Davis*, 8 F.3d 923, 929 (2d Cir. 1993) (finding

that "it is the mere existence of the federal agency's supervisory authority that is important" for

the purposes of determining the scope of liability for false statements).  Here, Defendant readily

admitted that it "at all times understood that any information it provided to [CFE] could be

shared with the CFTC," and that "there is no information that Gemini provided that Gemini

asked or instructed [CFE] not to disclose to the CFTC."  (56.1 Statement ¶ 32; Ex. 12 at 10-11.)

This alone is dispositive of Defendant's liability for each of the thirty-one statements attributed

---

[4] In addition to the thirty-one written statements, Defendant also made numerous oral statements that parroted the information contained in the written submissions.  The oral statements are not subject to this motion.

to Gemini and its auction and exchange.  *See United States v. Litvak*, 2013 WL 5740891, at *9 (D. Conn. Oct. 21, 2013) (recognizing that, under Second Circuit precedent, "the potential that misstatements would be passed on to the federal government, even if the misstatements were not actually received by the government, was sufficient to establish jurisdiction under section 1001").

     As detailed below, Defendant was not a casual observer, it was deeply involved in each of the submissions, edited and approved the language, and had ultimate authority over the information it provided to the CFTC about its own exchange and auction.  This, too, more than exceeds what is required to establish, as a matter of law, that Gemini made each of the statements to the CFTC.  *See CFTC v. Arista LLC*, 2013 WL 6978529, at *7 (S.D.N.Y. Dec. 3, 2013) (entering consent order for liability under Section 6(c)(2) where Defendants "provided the information in," and "reviewed the contents of," the false and misleading letter Defendants' attorney submitted to the CFTC); *United States v. Blankenship*, 2015 WL 1565724, at *5 (S.D. W. Va. Apr. 8, 2015) (finding "unpersuasive" defendant's argument that he was not liable for false statements in documents "furnished" to the SEC by defendant's company because, "[a]t a bare minimum, the indictment alleg[ed] that the Defendant ordered individuals to prepare the statements, edited said statements, and then approved the release of the [false statements] after reviewing [them]").

### A.    Defendant Made Each of the Statements Contained in the August 25, 2017, September 12, 2017, and November 2, 2017 Written Submissions

     In this motion, the CFTC has set forth, in detail, the undisputed factual record that shows how Gemini made statements directly and through the CFE to the CFTC about its exchange and auction in (i) the August 25, 2017 written response to follow up questions from the CFTC, (ii) the September 12, 2017 memorandum from Gemini summarizing attributes of its auction that

promote integrity of the auction price and discourage manipulative conduct, and (iii) written talking points provided via email on November 2, 2017.  *See supra* at 12-13; (56.1 Statement ¶¶ 49-61.)

For example, Gemini's August 25, 2017 responses to the CFTC's questions were drafted on Gemini letter head and attributed directly to Gemini.  (56.1 Statement ¶ 59.)  The CFE sought Gemini's input on the timing of the submission, and when the CFE submitted the responses to the CFTC, it noted that it was doing so on Gemini's behalf.  (*Id.*; Exs. 19, 23.)  Similarly, the September 12 memorandum specifically addressed Gemini's auction and why it was not readily susceptible to manipulation.  (56.1 Statement ¶ 60; Ex. 4 at GEM_CFTC084666.)  It was drafted and edited by Gemini and sent to the CFTC with Gemini's express "approval."  (56.1 Statement ¶ 60; Ex. 25.)  The memorandum, itself, is on Gemini letterhead and confirms that Gemini "believe[d]" that "the Gemini Auction ha[d] a number of attributes that promote[d] the integrity of the auction price and discourage[d] manipulative conduct."  (Ex. 4 at GEM_CFTC084666.) And, finally, the November 2 talking points were delivered directly by Gemini's counsel to the CFTC.  (56.1 Statement ¶ 61; Exs. 20, 27); *see also Gramalegui*, 2018 WL 4610953, at *24 ("Statements made to the CFTC by an attorney on behalf of a client are attributable to the client for the purposes of [Section 6(c)(2)].").  Given this overwhelming, and uncontroverted, record, there can be no question that Defendant "made" each of the false or misleading statements contained in the submissions that were not subject to Gemini's partial motion for summary judgment.

**B.    Defendant Also Made Each of the Statements Contained in the Submissions that Were Subject to Defendant's Motion for Partial Summary Judgment**

The CFTC's opposition to Gemini's motion for partial summary judgment laid out, in detail, the undisputed factual record that shows how Gemini had ultimate authority over the

statements related to its exchange and auction that were relayed by the CFE in (i) the July 25,

2017 presentation, (ii) an August 1, 2017 submission of Gemini's proprietary raw data, (iii) the

October 24, 2017 analysis of Defendant's March 2017 auction data, and (iv) the draft and final

self-certification letters submitted to the CFTC between October and December 2017.  (*See* Pl.'s

Mem. of Law in Opp'n to Def.'s Mot. for Partial Summary Judgment ("Opp'n" or "Opposition")

at 19-31, ECF No. 90; *see also* CFTC SAFs ¶¶ 58-77.)  As detailed in the CFTC's Opposition,

Defendant cannot get a free pass for certain false or misleading statements that relate to its own

exchange and auction simply because Gemini had passed those statements onto an intermediary,

who then submitted those statements to the CFTC.  (Opp'n at 7-31.)   Not only does the

argument fail, but Gemini has it backwards because, as an initial matter, "there is no requirement

that a false statement be made [directly] *to* a federal agency."  *Davis*, 8 F.3d at 929; (*see also*

Opp'n at 8-16).  And, in any event, ample undisputed evidence shows that Gemini drafted,

reviewed, approved, and had ultimate authority over every statement contained in the written

submissions that were subject to Defendant's partial summary judgment motion.  (Opp'n at 19-

31; CFTC SAFs ¶¶ 58-77.)

## II.    There Are No Genuine Issues of Material Fact that Each of the Thirty-One Written Statements Were False or Misleading, Material, and that Gemini Knew or Reasonably Should Have Known that Each Statement Was False or Misleading

Under Section 6(c)(2) of the Act, "a statement is actionable . . . when it is either literally

untrue or when it fails to include all information necessary to give the recipient a complete and

accurate picture of the state of affairs communicated."  *Gramalegui*, 2018 WL 4610953, at *24.

As this Court recognized, "'[h]alf truths,' or 'representations that state the truth only so far as it

goes, while omitting critical qualifying information,' can also be actionable misrepresentations."

Jan. 4, 2024 Order at 2 (quoting *Universal Health Serv. Inc. v. U.S. ex rel Escobar*, 579 U.S.

176, 191 (2016)).  It is therefore "just as unlawful to speak 'half truths' or to omit to state facts

necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).

"In assessing whether a statement to a government actor is material, courts in this Circuit construe materiality broadly to include statements that have a capacity to influence the agency, to hinder its investigation, or to distract the investigators' attention away from a critical matter."  *eFloorTrade, LLC*, 2018 WL 10625588, at *8.  "The standard is objective; the omission or misrepresentation must have an intrinsic capability to influence the agency's decision 'at the moment the statement was made.'"  Jan. 4 Order at 2 (quoting *eFloorTrade*, 2018 WL 10625588, at *8).

Whether a misrepresentation is capable of influencing a decisionmaking process can be shown in "several ways," including by "[p]ublished regulations, policies, and procedures."  Jan. 4 Order at 3 (citing *Escobar*, 579 U.S. at 194-95).  "In the context of an objective decisionmaking process, whether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ, and the degree to which a misrepresentation would be 'capable of influencing[ ] the decision of the decisionmaking body.'"  *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007); *see also United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) ("[A] statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed, or if it is capable of distracting government investigators' attention away from a critical matter.").  "All of these specifications of the materiality inquiry target the same question: would the misrepresentation actually matter in a meaningful way to a rational decisionmaker?"  *United States v. Calderon*, 944 F.3d 72, 86 (2d Cir. 2019).

Where there are no subsidiary questions about the statements that were made or the decision the agency was trying to make, materiality can be resolved by the courts as a matter of law. *See United States v. Klausner*, 80 F.3d 55, 60 (2d Cir. 1996) (finding that the materiality of false itemized deductions on income tax returns presented "purely a question of law" that "was suitable for resolution by the district court"); *see also Rigas*, 490 F.3d at 231 n.29 (recognizing that "a statement's materiality may present a question of law resolvable by an appellate court in some contexts"). While the Supreme Court in held in *United States v. Gaudin* that, in the criminal false statement context, materiality is a question for the jury, 515 U.S. 506 (1995), the Court's holding turned on the application of the Fifth and Sixth Amendments, which "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he [or she] is charged, beyond a reasonable doubt." *Id.* at 506, 510. The Court left untouched the longstanding rule that courts can decide materiality as a matter of law in civil cases like this one. *See id.* at 516-17 (observing that "the courts' power to resolve mixed-law-and-fact questions in civil cases is not at issue here; civil and criminal juries' required roles are obviously not identical, or else there could be no directed verdicts for civil plaintiffs"), *affirming*, 28 F.3d 943, 945 (9th Cir. 1994) (holding "the issue of materiality in most of [the criminal perjury and false statement statutes] is a question of law for the judge" with "[t]he exception [being] section 1001 cases").

Finally, the CFTC must show that defendant knew or should have known its statements were false or misleading. 7 U.S.C. § 9(2). "[T]he should-have-known" language "connotes a concept more akin to negligence than to knowledge." *United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir. 2000); *United States v. Zhong*, 95 F.4th 1296, 1303 (10th Cir. 2024) ("'The 'should have known' language 'is equivalent to a negligence standard'—not the higher [mens rea] of

knowledge, purpose, or intent.").  "Defendant's history and background inform that determination, as do considerations of what a reasonable person would be expected to know in similar circumstances."  *Gramalegui*, 2018 WL 4610953, at *24.

There is no genuine issue of material fact that the statements that Gemini made about its exchange and auction (i) were false or misleading, (ii) were capable of influencing the CFTC's review of the product certification or distracting the CFTC away from a critical matter, and (iii) that Gemini knew or, at the very least, reasonably should have known that its statements were false or misleading.

### A.   There Is No Genuine Issue of Material Fact that Gemini's Statements About Its Prefunding Requirement and the Related Cost of Capital to Trade Violated Section 6(c)(2) of the Act

Throughout the self-certification, from July 2017 until the bitcoin contract was self-certified on December 1, 2017, Defendant repeatedly represented to Commission staff that the Gemini exchange was a full reserve exchange, which required that all orders be fully pre-funded. (*See* Ex. A (statements 1, 2, 5, 6, 9, 10, 13, 14, 17, 18, 19, 20, 22, 26 and 27); *see also* 56.1 Statement ¶¶ 62-70.)  Gemini further represented that the "pre-funding" requirement made the Gemini exchange and the Gemini bitcoin auction, and thus the bitcoin futures contract, less susceptible to manipulation because it increased traders' cost of capital, which, in turn, made improper trading conduct more expensive for malicious actors.  (56.1 Statement ¶¶ 63-67.)  The pre-funding requirement was a core feature of Gemini's pitch to the CFTC that its exchange and auction were not susceptible to manipulation.  As discussed below, Gemini's statements about prefunding and the cost of capital were false or misleading, material, and Gemini knew or reasonably should have known that its statements were false or misleading.

1.     **Gemini's Statements About Its Prefunding Requirement and the Related Cost of Capital for Market Participants to Trade Were False or Misleading**

Gemini's statements about its pre-funding requirement and the related cost of capital to trade on Gemini were false or misleading in at least two ways:

*First*, Gemini failed to disclose that it provided loans to customers under the auspices of Pearl Street, which undermined its statements about prefunding and the cost of capital. Pearl Street was a separate company in name only. Gemini facilitated loans to Gemini market participants through Pearl Street. (56.1 Statement ¶¶ 87-105.) In fact, it was originally called Gemini Financial and was, at all times, owned and controlled by Gemini's principals and beneficial owners—Cameron and Tyler Winklevoss. (*Id.* ¶¶ 87, 92.) Pearl Street did not have its own employees and utilized Gemini employees and infrastructure to conduct its business. (*Id.* ¶ 96.) Gemini's employees viewed Pearl Street loans as a Gemini trading incentive that could be offered to market makers to increase trading volume on the exchange and in the auction. (*Id.* ¶ 98.) As a result, Pearl Street only provided loans to Gemini market participants, and those participants were told that the funds were intended for trading on the platform and in the auction. (*Id.* ¶¶ 93, 100.) Indeed, in certain instances, Pearl Street loan documents expressly tied the receipt of loaned bitcoin to meeting certain trading criteria on Gemini's exchange and in its bitcoin auction. (*Id.* ¶¶ 101(a)-(c); Exs. 58, 59.)

The fact that Gemini was facilitating loans to its own customers through a related entity undermined the primary protection that the prefunding concept was meant to impart—that the requirement limited traders' ability (and made it more costly) for traders to use leverage or margin to engage in manipulative trading tactics. (56.1 Statement ¶¶ 62-65, 67, 69.) Pearl Street provided a means for Gemini to make capital available to customers to expand their "global balance sheet[s]" (*id.* ¶ 98) and thereby fuel customer trading, which is indistinguishable from an

33

exchange offering margin or leveraged trading to achieve the same goals. This firmly established practice rendered Gemini's representations about its prefunding requirement, and its related protection against manipulation, a misleading half-truth at best. *Escobar*, 579 U.S. at 191 ("A statement that misleadingly omits critical facts is a misrepresentation . . . .").

*Second*, Gemini provided capital to market participants in the form of advances of fiat currency and digital assets, including bitcoin, to facilitate trading on the exchange and in Gemini auctions. (56.1 Statement ¶¶ 106-117.) Providing advances or credits of fiat currency and digital assets was another established business practice that Gemini employed to facilitate trading. At times, Gemini doled out advances to market participants to facilitate trading on the exchange and in the auction at key moments when increasing or maintaining volume was critical, but traders would not otherwise have been able to trade due to lack of funds in their accounts. (*Id.* ¶ 117.) In addition, several digital asset operational advances Gemini provided to customers remained outstanding for weeks, if not months, and operated like short-term, interest-free loans. (*Id.* ¶¶ 115-116; Exs. 68, 69, 72.) During the time the interest-free loans remained outstanding, the customers were free to trade with the funds advanced by Gemini, essentially trading with the house's money. As Cameron Winklevoss acknowledged, "[e]veryone will gamble at the casino if they can get the chips for free." (Ex. 40) And this is precisely what happened with operational advances. Moreover, removal of the term "pre-funded" from Gemini's own policies and procedures manual to account for operational advances effectively concedes that there was tension between stating that transactions were "pre-funded" while also offering interest-free advances to market participants. (56.1 Statement ¶¶ 110-113.)

The capital Gemini provided to customers to trade via operational advances eliminated any cost of capital and could easily have been used to fund manipulative trading on Gemini, the

very risk Gemini claimed was mitigated by its prefunding requirement.  Much like the Pearl Street loans, the omission of Gemini's business practice of providing operational advances was an important caveat to its unqualified statement that all orders placed on the exchange and in the auction were fully pre-funded.  *Gramalegui*, 2018 WL 4610953, at *18 ("[A] statement also is considered false or misleading where the speaker omits 'important factual caveats.'").

> ### 2.  Gemini's Statements About Its Prefunding Requirement and Related Cost of Capital to Trade Were Capable of Influencing the CFTC's Review of the Product Certification

Undisputed facts show that Gemini's statements about prefunding and traders' cost of capital, and the related omitted information that undermined those statements, went squarely to the heart of the CFTC's inquiry into whether the proposed bitcoin futures contract satisfied the product listing requirements of the Act and Regulations.  Under the Act, Core Principle 3 requires that a DCM shall list only contracts that are not readily susceptible to manipulation. Section 5(d)(3) of the Act, 7 U.S.C. § 7(d)(3); Regulation 38.200, 17 C.F.R. § 38.200.  And, CFTC guidance addressing compliance with Core Principle 3 requires, among other things, a detailed "cash market description" and verification where, as here, a "private-sector third-party calculates the cash settlement price," "that the third party utilizes business practices that minimize the opportunity or incentive to manipulate the cash-settlement price."  17 C.F.R. pt. 38, App'x C at (a)(2), (c)(3).  As the Court recognized, "[p]ublished regulations, policies, and procedures are relevant to determining whether [an] issue is material to the decision-making process."  *See* Jan. 4 Order at 3, ECF No. 77 (citing *Escobar*, 579 U.S. at 194-95).

Gemini's statements about prefunding and the cost of capital directly addressed the main question for the CFTC arising from the statutory and regulatory framework: whether the proposed contract was readily susceptible to manipulation.  This is evident from Gemini's submissions to the CFTC and the statements themselves.  Gemini pushed the prefunding concept

from the outset of the product certification process in order to satisfy the CFTC's prohibition against listing contracts that were readily susceptible to manipulation, and continued to expand on why the requirement was an important factor for the CFTC to consider.  For example, in a September 12, 2017 memorandum, Gemini described several auction "attributes" that "promote the integrity of the auction price and discourage manipulative conduct," including that its prefunding requirement made it "costly for a malicious market participant to engage in manipulative acts."  (56.1 Statement ¶ 60; Ex. 4 at GEM_CFTC084667; *see also* Ex. 19 at GEM_CFTC173225-226 ("[B]ecause placing orders on the continuous market (and in the Gemini Auction) requires capital to be held . . . spoofing and other manipulative techniques are typically quite expensive and inefficient as well.").  The significance of the prefunding concept is further confirmed by the product certification, which represents that the prefunding requirement was a "structural safeguard[] built into the Gemini Exchange auction process . . . to . . . make it difficult for a market participant to improperly affect the auction price."  (Ex. 6 at 7.)

Given the direct connection between Gemini's prefunding statements and the central question about manipulation that was paramount to the CFTC's review, it is beyond dispute that Gemini's omissions that undermined its statements about prefunding and the cost of capital to trade were likewise material.  Gemini's business practices that reduced or eliminated a trader's cost of capital by replicating margin or leverage go directly to the question of whether the proposed contract was readily susceptible to manipulation and were important factors that the CFTC would have considered during its product certifications review.  *See Rigas*, 490 F.3d at 235 ("In the context of an objective decisionmaking process, whether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ . . . .").  CFTC testimony reinforced that, when an exchange or an affiliate of the exchange is "facilitating

leverage," such information should be included in the product certification as part of the "detailed description" of the cash market and "how it operates." (56.1 Statement ¶ 24; Ex. 9 at 96:14-17; 254:20-255:24 (8/25/2023 C. Goodman Dep. Tr. ("Goodman Tr.").) Thus, on this undisputed record, the Court can determine that the fact that Gemini provided loans to customers via Pearl Street was capable of influencing the CFTC's review of the product certification and was therefore a material omission. *Cf. Adekanbi*, 675 F.3d at 184 (finding materiality "obvious as a matter of common sense, and . . . adequately supported by testimony regarding the purpose and requirements of a safety-valve proffer").

Similarly, operational advances were another way Gemini facilitated trading activity with funds that would not have otherwise been available to Gemini market participants and thereby reduced or eliminated market participants' cost of capital to trade. Thus, the failure to disclose the existence and extent of operational advances provided to market participants masked a core business practice that undercut Gemini's mantra that its pre-funding requirement deterred manipulation on its exchange and in the auctions, one of the key issues for the CFTC's product review. *See United States v. Kestenbaum*, 908 F. Supp. 2d 364, 384 (E.D.N.Y. 2012) (finding materiality standard "easily" satisfied where statements to probation officer "masked the depth of [the defendant's] resources" and went to the heart of the inquiry into Defendant's "financial circumstances"), *aff'd and remanded for ministerial correction*, 552 F. App'x 74 (2d Cir. 2014).

### 3. Gemini Knew or Reasonably Should Have Known that Its Prefunding Statements and Related Cost of Capital to Trade Were False or Misleading

As a cryptocurrency exchange financed and controlled by Harvard-educated bitcoin billionaires, Gemini cannot feign ignorance of the patent inconsistency between facilitating loans to market participants through a related company while also maintaining that all orders on the exchange and in the auction are fully prefunded. *See Gramalegui*, 2018 WL 4610953, at *24

37

("Defendant's history and background inform" the determination of what a defendant knew or should have known, "as do considerations of what a reasonable person would be expected to know in similar circumstances").  Indeed, Gemini's President who also served as Pearl Street's manager—Cameron Winklevoss—confirmed that the term "pre-funded" was "another way to describe full reserve or fully funded" and that fully funded orders "make[] it harder to manipulate in the sense that people have to trade with physical assets as opposed to getting credit or . . . margin."  (56.1 Statement ¶ 63; Ex. 1 at 552:22-553:20 (Winklevoss Dep. Tr.).)  Ample evidence from Gemini employees, CFE, and CFTC witnesses shows that everyone understood the prefunding requirement conveyed an understanding that traders could not use leverage or margin to manipulate the exchange or auction.  (56.1 Statement ¶ 64 (collecting testimony).)

Ample evidence also shows that Pearl Street loans were well-known within Gemini and used as an incentive to increase trading activity and volume on the exchange and in the auctions. (56.1 Statement ¶¶ 96-103; Ex. 1 at 90:11-13 (Winklevoss Dep. Tr.) ("[Pearl Street] was certainly a . . . well-known thing, it was not by any means something that was hidden or kept secret.").)  Once again, Gemini's President, Cameron Winklevoss, approved each Pearl Street loan, and was personally involved in servicing the loans throughout 2017—the same the period when Gemini made statements about prefunding and the cost of capital to the CFTC.  (56.1 Statement ¶¶ 95, 104-105.)

Pearl Street's very existence originates from a desire to engineer a work-around to provide market participants with margin or leverage to overcome the prefunding requirement and increase trading volume.  (56.1 Statement ¶¶ 87-91.)  Yet, despite the obvious purpose that Pearl Street served by making capital available to Gemini customers for trading, Cameron Winklevoss attended the July 25, 2017 meeting with the CFTC where the prefunding requirement was touted

as a key protection against manipulation and barrier to margin and leverage trading and, not only remained silent about Pearl Street, but was *actively servicing Pearl Street loans with Gemini customers on the very same day*.  (56.1 Statement ¶ 104; Ex. 50.)  Moreover, on August 20, 2017, in a chat with others at Gemini about certain Gemini customers, Cameron Winklevoss remarked that "a number of them are using my capital, which makes up a material amount of their balance sheet."  (56.1 Statement ¶ 105; Ex. 61.)  This was a mere five days before Gemini's August 25, 2017 statement to the CFTC that "the manipulation of the continuous trading book would likely require substantial capital commitment" and that "because placing orders on the continuous market (and in the Gemini Auction) requires capital to be held . . . , spoofing and other manipulative techniques are typically quite expensive and inefficient."  (Ex. 19 at GEM_CFTC173225-226.)

This overwhelming evidence more than establishes that Gemini knew or reasonably should have known that providing Pearl Street loans to market participants rendered Gemini's statement about the prefunding requirement and related cost of capital to trade false or misleading.  *See SEC v. Simeo*, 2021 WL 4041562, at *10 (S.D.N.Y. Sept. 3, 2021) (finding "evidence in the record . . . easily support[ed] the conclusion that [defendant] acted with the requisite scienter" where, as here, Gemini "'[r]epresent[ed] information as true while knowing it [was] not' or, at the very least, 'recklessly misstat[ed] information'"); *see also SEC v. Collector's Coffee, Inc.*, 2023 WL 6453709, at *19 (S.D.N.Y. Oct. 4, 2023) (finding company and its founder and president "obviously knew their conduct was deceptive or acted recklessly with regard to the statements" where founder and president "had personal knowledge of the matters on which he was speaking"), *appeal filed sub nom. SEC v. Kontilai*, No. 23-7537 (2d Cir.)

The same is true for operational advances.  Gemini knew full well that advances were inconsistent with concept of prefunding because, when updating its Policies and Procedures Manual in March 2017 after it began providing fiat advances, Gemini removed the "pre-funded" language in light of the advances.  (56.1 Statement ¶¶ 110-113.)  This more than satisfies the knowledge prong of a Section 6(c)(2) claim.  *See SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013) ("Representing information as true while knowing it is not . . . [is] sufficient to support a conclusion of scienter.").

Moreover, Gemini had a significant history of providing advances of digital assets and fiat currency to customers at times when it needed to "feed th[e] auction," thereby bypassing the prefunding requirement in order to inflate auction volume and provide market participants with funds that would not have otherwise been available.  (56.1 Statement ¶ 117(a); Ex. 73.)  Cameron Winklevoss was aware of this practice and indeed approved many of the advances himself.  (56.1 Statement ¶ 116.)  For example, in October 2017, in the midst of making statements to the CFTC about prefunding and the cost of capital, Cameron and Tyler Winklevoss learned of a 750 BTC advance credit (worth approximately $3,582,157 million at the time) that had been provided to a customer in July 2017 and left available for the customer to freely use and trade, interest free, for almost three months.  *(Id.*; Ex. 70 at row 2843.)  Cameron Winklevoss's contemporaneous recognition that Gemini acted with "gross negligence" with respect to that advance credit (Ex. 72) is further proof that Section 6(c)(2)'s "knew or should have known" standard is satisfied here.  *See SEC v. Gallison*, 588 F. Supp. 3d 509, 524 (S.D.N.Y. 2022) (granting summary judgment where evidence of defendant's "conduct before the disclosure statement was released" "directly contradict[ed] the contents of the . . . disclosure statement").

**B.    There Is No Genuine Issue of Material Fact that Gemini's Statements About Its Fee Rebate Incentives Violated Section 6(c)(2) of the Act**

Gemini made numerous statements voluntarily and in response to the CFTC's explicit questions about its fee rebate incentives.  (*See* Ex. A (statements 23, 28); 56.1 Statement ¶¶ 72-74.)  Gemini informed the CFTC through its July 25, 2017 presentation that, as an auction "[P]rotection[]," its "[m]arket maker trading fee rebates encourage participation."  (56.1 Statement ¶ 72; Ex. 16 at slide 5.)  The CFTC followed up in an August 18, 2017 email with a question about Gemini's market maker rebate program.  The CFTC asked:  "Could you please provide more detail on the market makers rebate program?  How many market makers are signed up?  How much liquidity are they providing to the auctions?"  (56.1 Statement ¶ 73; Ex. 34 at GEM_CFTC085490.)  In an August 25, 2017 written response, Gemini stated that it had "implemented a trading fee program that was available to all of [Gemini's] market participants" but had "no specifically defined market maker program."  (56.1 Statement ¶ 74; Ex. 19 at GEM_CFTC173222.)  Gemini also stated that its trading fee program was disclosed publicly on its website which reflected the details of the program, and that typically, the market participants making up approximately 90% of the volume in Gemini's bitcoin auctions earned rebates pursuant to that program.  (*Id.*)  As discussed below, Gemini's statements about its rebate program were false or misleading, material, and Gemini knew or reasonably should have known that its statements were false or misleading.

**1.    Gemini's Statements About Its Fee Rebate Incentives Were False or Misleading**

Gemini's statements about the rebates available to market makers were demonstrably false.  Defendant's Policies and Procedures Manual stated—contrary to its answer to the CFTC's questions on August 18, 2017—that Gemini "may provide certain . . . *market makers* . . . with terms different from those given under the standard User Agreement," including "more favorable

41

fee structures." (Ex. 65 at 47 (emphasis added).) And, Defendant did in fact enter into *numerous* bespoke fee and rebate agreements with select "MMs" (i.e. market makers), including before and during the time it made its statements about trading rebates to the CFTC. (56.1 Statement ¶¶ 130-31, 141; Exs. 91-94.) Notably, these bespoke agreements were not disclosed on Gemini's website. (56.1 statement ¶¶ 124.) Thus, Defendant's statement that it did not have a specifically defined market maker program was true "only so far as it goes" because there was "critical qualifying information" omitted about Gemini's actual business practices with respect to market makers and their respective trading fees and rebates. *See* Jan. 4, 2024 Order at 2 (quoting *Escobar*, 579 U.S. at 191).

Defendant has argued in this litigation that, after it affirmatively stated that it did *not* have a specifically defined market maker program, it later disclosed that it offered bespoke fee arrangements when it sent the CFTC (via the CFE) its Policies and Procedures Manual in response to a different CFTC request. (12/18/2023 Def.'s Ltr. to Court at 2, ECF No. 73 ("Gemini's defense is that it **did disclose** to the CFTC Gemini's use of bespoke fee arrangements and its offering of individually negotiated, preferential fee structures to market makers." (emphasis in original)).) Putting aside that Defendant never told the CFTC that its prior statements were inaccurate or incomplete (nor did Gemini direct the CFTC to its policy of granting preferential terms when it submitted the Policies and Procedures Manual), this purported disclosure is still legally irrelevant and effectively concedes the falsity of the statement when it was made. *See United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006) ("[T]here is no safe harbor for recantation or correction of a prior false statement that violates section 1001."); *United States v. Santiago*, 2014 WL 4827883, at *6 (S.D.N.Y. Sept. 26, 2014) (observing that "even a swift recantation does not bar a conviction" for making false statements

because "the false statement law" differs from other federal laws that provide statutory safe harbors for recanted false statements).  If its initial statements about the market maker rebate program were not false, there would be no basis to argue that the later transmission of the Policies and Procedures Manual revealed the truth about Gemini's market maker rebate practices.  *Cf. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (observing that a "'corrective disclosure' . . . reveals the truth behind the alleged fraud").

### 2.    Gemini's Statements About Its Fee Rebate Incentives Were Capable of Distracting the CFTC Away from a Critical Matter

Defendant's own statements, CFTC guidance, and the CFTC's follow-up questions during the product certification dispel any doubt that Gemini's market marker trading fee rebates were a material part of the CFTC's inquiry into whether the proposed futures contract, and its cash market settlement price (the Gemini auction), were readily susceptible to manipulation.

*First*, Gemini placed its market maker rebate practices at the center of the CFTC's review by representing that the rebates were an auction "protection" against manipulation, and that they would encourage participation and thereby foster bona fide trading volume.  (56.1 Statement ¶ 72; Ex. 16 at slide 5.)  As a matter of common sense, Gemini would not have portrayed its market marker rebate program as an auction "protection" if it was not an important business practice that was relevant to understanding whether the auction was readily susceptible to manipulation.

*Second*, Gemini's statements about rebates spoke directly to factors in the published guidance.  The CFTC guidance confirms two things:  (i) that "the size and liquidity of the cash market that underlies the listed contract" are fundamental considerations because "situations susceptible to manipulation include those in which the volume of cash market transactions . . . are very low"; and (ii) that Gemini's "business practices" aimed at "minimize[ing] the

opportunity or incentive to manipulate the cash-settlement price" must be verified.   17 C.F.R. pt. 38, App'x C at (c)(2), (c)(3)(i).  Gemini's market maker rebate statements were aimed at both prongs of the CFTC's guidance.  According to Gemini, the rebates "encouraged participation" which speaks to whether there would be situations in which the volume of the relevant cash market transactions (i.e., Gemini auction transactions) was very low.  (56.1 Statement ¶ 72; Ex. 16 at slide 5.)  Further, Gemini's market maker rebate program was purportedly an auction "protection," which goes directly to whether it had business practices aimed at minimizing opportunities to manipulate the proposed futures contract's cash settlement price.  *Id.*

*Third*, after Gemini represented it had a market maker rebate program on July 25, 2017, the CFTC inquired directly, in writing, for more information about Gemini's market maker rebate program.  (56.1 Statement ¶¶ 73-74; Ex. 34 at GEM_CFTC085490.)  The CFTC's direct inquiry further substantiates the materiality of Gemini's rebate practices to the CFTC's review of the product certification.  *See United States v. Chan Lo*, 2016 WL 9076234, at *8 (S.D.N.Y. Feb. 4, 2016) ("The false statements may be material to any proper matter of inquiry, including collateral matters that might influence the outcome of decisions . . .."), *aff'd*, 679 F. App'x 79 (2d Cir. 2017).  And, the fact that bespoke fee arrangements that Gemini provided to certain market makers were being exploited until September 2017 as part of a collusive or wash trading scheme (which, according to Gemini, manipulated its exchange) underscores the importance of market marker rebate practices to trading volume and liquidity, and thus to the CFTC's review.  (56.1 Statement ¶¶ 134-144.)

Gemini cannot dispute that the CFTC's product review involved an examination of Gemini's market maker rebate practices, which were tied to Gemini's protections designed to deter manipulation as well as how Gemini fostered liquidity and trading volume, all of which are

key factors the CFTC has identified when considering susceptibility to manipulation.  The failure to disclose critical information on this issue, including the bespoke fee arrangements and fraud that flowed from them, more than satisfies the materiality element.  *See eFloorTrade*, 2018 WL 10625588, at *9 (finding materiality "established" as a matter of law where it was "undisputed that . . . the CFTC's investigation required an examination" of the Defendant's "records concerning trading" and Defendant's record keeping practices).  At the very least, Gemini's statement that it only had one market maker rebate program that was publicly available while omitting the existence of bespoke arrangements that were available to, and entered into with, market makers, had the predictable—and likely intended—effect of thwarting the CFTC's inquiry into the critical matter of Gemini's rebate practices.  *Id.* (finding false statement material where the statement "tended to 'distract [the CFTC's] attention away from' a central subject of its investigation") (*quoting Adekanbi*, 675 F.3d at 182); *Drame*, 2021 WL 1226996, at *4 (Hellerstein, J.) (granting summary judgment for the government where, as here, "it is reasonable to assume that such information would have influenced a decisionmaker to investigate further" had the defendant disclosed omitted information relevant to the underlying inquiry).

### 3.    Gemini Knew or Reasonably Should Have Known that Its Statements About Fee Rebate Incentives Were False or Misleading

Undisputed facts demonstrate Gemini knew or should have known its statements about rebates were false or misleading.  Gemini admits to having an internal policy that applied to market makers and provided them with special fee agreements, or bespoke "fee overrides," that were more beneficial than the published fee schedule.  (56.1 Statement ¶¶ 124-125.)  "It is undisputed that Cameron and Tyler Winklevoss were aware that fee overrides existed" because "they wrote the Policies and Procedures Manual where fee overrides were contemplated."  (56.1 Statement ¶¶ 126-127; Ex. 80 at 14.)  They were also aware that "fee overrides could increase

volume on the exchange." (*Id.*)  This knowledge by Gemini's executives who were responsible for drafting, reviewing, and approving statements about Gemini's market maker rebate programs is, alone, sufficient to support a finding that Gemini knew or reasonably should have known its statements were false.  *See eFloorTrade*, 2018 WL 10625588, at *9 (finding that "by virtue" of defendant's responsibilities, "he knew or should have known" about the company's trading activities); *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 357 (S.D.N.Y. 2011) (holding the SEC was entitled to summary judgment when principal officer "either knew or was reckless in not knowing" that information in documents principal officer "wrote" were "materially false and misleading").

But Gemini's knowledge of bespoke fee arrangements runs deeper than just its founders. For instance, in Gemini's June 6, 2017 management response to a recommendation from its independent auditor, Gemini acknowledged its auditor's concern about the lack of a formalized or automated process for bespoke agreements and noted that, although it "previously negotiated bilateral arrangements with market-makers and large market participants [that] were recorded and calculated manually," it now had a formalized process, with the company's COO "review[ing] and approv[ing] all fee arrangements."  (56.1 Statement ¶ 129; Ex. 81 at 5.) Additionally, on July 3, 2017, Gemini's COO Benjamin Small approved payment of a bespoke auction rebate for Circle, a market maker and frequent auction participant.  (56.1 Statement ¶ 130; Ex. 82.)   Again, on August 4, 2017, a Gemini employee requested that Cameron Winklevoss, Tyler Winklevoss, or Benjamin Small approve another bespoke auction rebate payment for the same market maker, and a few days later, after being alerted that the request was outstanding, Cameron Winklevoss confirmed that he had approved the request.  (56.1 Statement ¶ 131; Exs. 83-84.)  This was all occurring around and during the time Gemini was making

statements to the CFTC about its rebate practices and how those practices facilitated volume and discouraged manipulation of the auction.  (56.1 Statement ¶¶ 71-74.)

Perhaps most troubling of all, Cameron Winklevoss and Benjamin Small, who each attended the July 25 meeting and were responsible for drafting and commenting on the responses to the CFTC's questions (*id.* ¶¶ 65-66), knew two critical things:  *First*, that the CFTC "strongly discouraged" special treatment for select market participants, and, *second*, that the CFTC would want to know about any bad conduct Gemini had detected on its exchange.  (*Id.* ¶¶ 132-133; Exs. 85-86.)  Yet, despite Cameron Winklevoss, Benjamin Small, and Gemini's contemporaneous awareness of these two issues, Gemini remained silent about the bespoke rebates in the face of a direct question about Gemini's market maker rebate practices, which further reinforces that Gemini knew or reasonably should have known that its statements about market maker trading rebates failed to provide a complete and accurate picture.  *See SEC v. Amah*, 2023 WL 6386956, at *14 (S.D.N.Y. Sept. 28, 2023) (finding that SEC demonstrated that Defendant, "at the very least, acted with reckless disregard for the truth," where, as here, "Defendant had access to correct information"); *United States v. Moore*, 446 F.3d 671, 678 (7th Cir. 2006) (observing that, "[o]nce [an agency] explicitly asked for the information, the failure to respond honestly is something far greater than a failure to volunteer information," which supported the conclusion that defendant "not only to withheld obviously material information" but also "affirmatively to lie[d]").

Finally, considerations of what a reasonable exchange would be expected to know undermines any suggestion that Gemini lacked the sophistication to understand to importance of its bespoke rebate practices.  *See Gramalegui*, 2018 WL 4610953, at *24 (observing that "considerations of what a reasonable person would be expected to know in similar

47

circumstances" informs the analysis of what a defendant knew or reasonably should have known). Gemini's statements about its rebate program pertained directly to its core business model as the operator of an electronic trading platform: earning revenue by charging fees based on trading activity. It is entirely reasonable to expect the operator of a trading exchange to have a full grasp of how it generates revenue through trading fees—bespoke or otherwise. And this is acutely the case where an operator of a trading exchange approaches a government regulator seeking an approval and affirmatively presents multiple facts about its trading operations and business, including specifically its fee and rebate program, in support of its pitch. In such cases, there is no doubt that the operator of a trading platform would know whether statements about its trading fee and rebate programs were accurate. Accordingly, Gemini knew or "reasonably should have known" that its statements about its market maker rebate program were false or misleading. 7 U.S.C. § 9(2).

### C.     There Is No Genuine Issue of Material Fact that Gemini's Statements About Self-Trading and Self-Trade Prevention Violated Section 6(c)(2) of the Act

During the product certification process, Gemini prominently featured its ability to prevent self-trading or self-crossing as a key protection against manipulation of its exchange and auction. (Ex. A (statements 4, 8, 12, 16, 21, 24, 31); 56.1 Statement ¶¶ 75-81.) In the July 25, 2017 presentation, Gemini represented that Gemini's prohibition on "[s]elf-crossing" was an auction "[p]rotection[]." (56.1 Statement ¶ 75; Ex. 16 at slide 5.) Then, in response to a question posed by the CFTC in an August 18, 2017 email inquiring whether an "an auction [could] occur where there is one participant trading with themselves" (56.1 Statement ¶¶ 76-77; Ex. 34 at GEM_CFTC085490), Gemini definitively stated in a written submission, without exception: "No, we have instituted self-trade prevention." (56.1 Statement ¶ 77; Ex. 19 at GEM_CFTC173222.) Gemini doubled-down on this statement in a September 12, 2017

submission by stating: "We prohibit the same market participant from crossing himself or herself (*either intentionally or unintentionally*) on a continuous trading order book or in a Gemini Auction." (56.1 Statement ¶¶ 78-79; Ex. 4 at GEM_CFTC084667 (emphasis added).) Through these and other statements, the message conveyed to the CFTC was that self-trading in Gemini auctions was not possible. (*See* Ex. A (statements 4, 8, 12, 16, 21, 24, 31.)

### 1.    Gemini's Statements About Self-Trading and Self-Trading Prevention Were False and Misleading

Gemini's statements about its self-trade prevention capabilities were false or misleading. As an initial matter, as of July 25, 2017, at the time Gemini represented to the CFTC that self-trading was "prohibited," Gemini did not actually prohibit self-trading in any of its written policies and procedures, user agreements, or anywhere on its website. It was not until September 21, 2017 that Gemini first issued a user agreement with a provision addressing self-trading. (56.1 Statement ¶ 147; Ex. 96 at GEM_CFTC0066710.)

Moreover, Defendant omitted that, prior to May 2017, it lacked any self-trade prevention in the auction because it had yet to implement the technological measures to address it. (56.1 Statement ¶ 146.) And, even after Defendant implemented auction self-trade prevention in May 2017, it omitted to disclose to the CFTC that it did not actually prevent all self-trading. (*Id.* ¶¶ 150-160.) There was a gap in its self-trade prevention capabilities that could result in a single account being filled as a buyer and a seller in an auction, i.e., an auction participant trading with themselves. *See Gramalegui*, 2018 WL 4610953 at *18 ("[A] statement is . . . false or misleading where the speaker omits 'important factual caveats.'"). This gap persisted throughout the time Gemini made statements to the CFTC about self-trading. (56.1 Statement ¶¶ 150-160, 162.) Indeed, in October 2017, when a market participant inquired as to whether there was a technological way to prevent an auction self-trade between the continuous orderbook and

49

auction-only order, Gemini decided internally that market makers were "grown ups" and could figure it out how to deal with the issue themselves.  (56.1 Statement ¶¶ 155-57; Ex. 100 at GEM_CFTC147307.)

When squarely presented with a question from the CFTC calling for disclosure of whether self-trading in Gemini's auction was possible, Gemini told the CFTC "No" when the true answer was "Yes."  Indisputably, Gemini's representations about self-trading "fail[ed] to include all information necessary to give the [CFTC] a complete and accurate picture of the state of affairs communicated" and were therefore false or misleading.  *Gramalegui*, 2018 WL 4610953, at * 24 (citing *Arista LLC*, 2013 WL 6978529, at *7-9, 13).

### 2. Gemini's Statements About Self-Trading and Self-Trading Prevention Were Capable of Distracting the CFTC's Attention Away from a Critical Matter

Here, too, Defendant's own statements, CFTC guidance, and the CFTC's follow-up questions during the product certification confirm the materiality of Gemini's statements and omissions about self-trading and self-trade prevention.  *First*, the importance of self-trading and self-trade prevention to the CFTC's review is obvious from Gemini's consistent promotion of its self-trade prevention as a deterrent to manipulative conduct.  After characterizing the prohibition on self-crossing as an auction "[p]rotection[]" in the July 25 presentation, Gemini reinforced this concept in the September 12, 2017 memorandum that addressed "why the Gemini Auction is not readily susceptible to manipulation."  (56.1 Statement ¶¶ 75, 78; Ex. 4 at GEM_CFTC084666.)  In Gemini's own words, self-trade prevention was an "attribute" that served to "promote the integrity of the auction price and discourage manipulative conduct."   (Ex. 4 at GEM_CFTC084667.)  The final product certification underscores this point by listing Gemini's self-trade prevention as another "structural safeguard built into" the Gemini exchange to prevent and thwart manipulative conduct.  (Ex. 6 at 7.)

50

*Second*, self-trading, and the ability to prevent it, tie directly to the CFTC's guidance on demonstrating compliance with Core Principle 3. The guidance requires that applicants verify that the party determining the settlement price utilizes "business practices that minimize the opportunity or incentive to manipulate the cash-settlement price." 17 C.F.R. pt. 38, App'x C at (c)(3)(i). Here, the cash settlement price of the proposed contract was to be the Gemini auction price, and the party determining that auction price was Gemini. Self-trade prevention was a Gemini business practice that, according to Gemini, not only minimized the opportunity to manipulate Gemini auctions through self-trading, but in fact *eliminated* that possibility. Thus, Gemini's statements about self-trading bore directly on a key factor of the CFTC's review of the product certification.

*Third*, precisely because of the heightened concerns around self-trading and its ability to distort the cash-settlement price (i.e., Gemini's auction price), the CFTC specifically inquired, in writing, about self-trading by asking whether "an auction could occur where there is one participant trading with themselves." (56.1 Statement ¶ 76; Ex. 34 at GEM_CFTC085490.) The CFTC's direct inquiry further substantiates the materiality of self-trading to the CFTC's review of the product certification. *See Chan Lo*, 2016 WL 9076234, at *8 ("The false statements may be material to any proper matter of inquiry, including collateral matters that might influence the outcome of decisions.").

Gemini's wholesale failure to answer the question accurately, and to double down and expand on its false and misleading answer in subsequent submissions to the CFTC, deprived the CFTC of information necessary for it to determine whether further investigation into self-trading at Gemini was necessary. *See eFloorTrade*, 2018 WL 10625588, at *8 ("[M]ateriality is 'demonstrated if the question posed is such that a truthful answer could help the inquiry, or a

false response hinder it, and these effects are weighed in terms of potentiality rather than probability.'") (quoting *United States v. Byrnes*, 644 F.2d 107, 111 (2d Cir. 1981)); *Drame*, 2021 WL 1226996, at *4 (Hellerstein, J.) (finding it "reasonable to assume that [omitted] information would have influenced a decisionmaker to investigate further").  At the very least, the failure to disclose that self-trade prevention was a recent development; that instances of self-trading occurred in the past and were included in the trade data supporting the certification; and that self-trading could still occur in the future prevented the CFTC from getting a clear picture of whether the auction operated as a sufficient indicator of the price of the underlying commodity. *Gramalegui*, 2018 WL 4610953, at *24, 26 (finding omissions had "a natural tendency to influence, or [be] capable of influencing" the CFTC's decisionmaking process" where "the revelation" of the omitted information "would have led to the discovery of additional evidence relevant to the CFTC's investigation").

In sum, it is undisputed that Gemini's self-trade prevention, or lack thereof, bore directly on the key question and factors the statutory and regulatory framework set out for consideration for the product certification, making Gemini's false and misleading statements about self-trading, and its related omissions about the true state of affairs, material to the CFTC's decisionmaking process.  *See Rigas*, 490 F.3d at 235 ("In the context of an objective decisionmaking process, whether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ . . . .").

### 3. Gemini Knew or Reasonably Should Have Known that Its Statements About Self-Trading and Self-Trading Prevention Were False or Misleading

From the beginning of the product certification process, Gemini knew or reasonably should have known that its statements about self-trading and self-trade prevention were false or misleading.  For starters, Gemini knew when it stated that "[s]elf-crossing" was "prohibited" in

the July 25, 2017 presentation that the statement was true "only so far as it goes" because Gemini's written policies contained no such prohibition at the time; it had only recently instituted self-trade prevention in the auction (albeit, defectively); and it had on at least one occasion provided an operational advance to a market maker to facilitate self-trading in the auction. (56.1 Statement ¶¶ 75, 117(c), 145-162; Ex. 76 at GEM_CFTC2089754.) Cameron Winklevoss even admitted that he had self-traded in Gemini auctions himself. (56.1 Statement ¶ 149; Ex. 44 at 238:1-13; *Gamalegui*, 2018 WL 4610953, at *25 (finding "[d]efendant knew or reasonably should have known" statements were false where "[e]ach of the statements is flatly contradicted by evidence in the record").

Gemini was also well aware that there was no self-trade prevention between the order books. (56.1 Statement ¶¶ 150-162.) While crafting responses to CFTC questions and leading up the product certification, Cameron Winklevoss was informed multiple times about Gemini's self-trade prevention capabilities. (56.1 Statement ¶¶ 152, 153-154, 158-160.) Each time, he was told that there was a gap in the self-trade prevention that would not detect self-crossing between continuous order book orders and auction-only orders, and was even told that such self-crossing "very well may happen" if there is "a market maker participating in both books with a decent spread." (Ex. 95 at GEM_CFTC148016.) Nonetheless, Gemini stated that it prevented intentional and unintentional self-trading (56.1 Statement ¶ 79; Ex. 4 at GEM_CFTC08467)—a blatant oversight (at best) or an outright lie (at worst). Either way, Gemini's unquestioned knowledge of the gap in its self-trade prevention satisfies the knowledge requirement here. *See Arista LLC*, 2013 WL 6978529, at *7 ("Defendants knew or reasonably should have known" that their statements to the Commission were false or misleading where contradictory information was "available to Defendants"); *see also Gallison*, 588 F. Supp. 3d at 523 (granting motion for

summary judgment where, as here, the plaintiff "provide[d] admissible evidence that defendants were aware of facts or had access to [ ] information contradicting their statements").

But, putting aside Gemini's apparent concealment of the self-trading and the ongoing gap in self-trade prevention, on a basic level, Gemini's statements about self-trading relate to a basic, fundamental operation of a trading exchange:  whether a customer can trade with themselves. Any serious operator of a trading platform should know whether, and to what extent, self-trading on the exchange is possible.  This is especially so when that same exchange operator seeks approval from a government regulator of a new product listing and makes specific statements about its trading operations and mechanics, including specifically self-trading, in support of its application.  In such circumstances, its entirely reasonable to hold an operator of an exchange accountable for knowing whether its statements about self-trading were accurate.  *See Gramalegui*, 2018 WL 6410953, at *24 (observing that "considerations of what a reasonable person would be expected to know in similar circumstances" informs the analysis of what a defendant knew or reasonably should have known).  Accordingly, Gemini knew or "reasonably should have known" that its statements about self-trading were false or misleading.  7 U.S.C. § 9(2).

**D.    There Is No Genuine Issue of Material Fact that Gemini's Statements About the Volume and Liquidity of the Gemini Exchange and Gemini Auction Violated Section 6(c)(2) of the Act**

To satisfy the CFTC's bedrock consideration of the size and liquidity of the cash-settled market used to determine the proposed futures contract's cash-settlement price, Gemini emphasized its trading volume and liquidity on the Gemini exchange and in the auctions.  *See* (Ex. A (statements 3, 7, 11, 15, 25, 29, and 30).)  Defendant's volume and liquidity featured prominently in the July 25, 2017 presentation, including an entire slide dedicated to showing the growth in Gemini's historical auction volume.  (56.1 Statement ¶ 83(a); Ex. 16 at slides 2, 3.)

54

Following the presentation, Gemini provided the trading data underlying the chart to the CFTC and continued to characterize the volume and liquidity data that was cited in subsequent submissions to the CFTC as being consistent with Core Principle 3.  (56.1 Statement ¶ 83(b)-(c).)

### 1.    Gemini's Statements About the Volume and Liquidity of the Gemini Exchange and Gemini Auction Were False or Misleading

Defendant's statements about the volume and liquidity of its exchange and auction "fail[ed] to include all information necessary to give [the CFTC] a complete and accurate picture of the state of affairs communicated."  *Gramalegui*, 2018 WL 4610953, at *24.  It is undisputed that Defendant omitted that its auction trade volume and liquidity was bolstered (i) by providing loans to market participants under the auspices of Pearl Street; (ii) by providing advances and credits of fiat and digital currency to allow traders to trade at times they otherwise would not be able to due to lack of funds in their account; (iii) by bespoke fee agreements with market makers, which granted more beneficial trading terms than the terms available to all market participants on the public fee schedule; and (iv) by self-trading in auctions.  Instead, Gemini's auction trade volume and liquidity was promoted as being consistent with Core Principle 3, which requires that the cast-settlement price be a reliable or robust indicator of the value of the underlying commodity.  (Ex. 6 at 7.)

It is also undisputed that Defendant's August 2017 trading volume reported in the self-certification letter included non-bona fide volume from wash or collusive trading conducted as part of a rebate fraud scheme (56.1 Statement ¶¶ 134-144), and that its August 2017 auction trading volume reported in the self-certification included transactions by traders receiving Pearl Street loans, advance credits, and bespoke rebate agreements.  (56.1 Statement ¶¶ 95, 104-05,

116, 130-131; Ex. 45 at GEM_CFTC366491 (tab BTC – 2017).)  Accordingly, Defendant's statements about volume were false or misleading.

> ### 2. Gemini's Statements About the Volume and Liquidity of the Gemini Exchange and Gemini Auction Were Capable of Influencing the CFTC's Review of the Product Certification

Gemini's statements about the volume and liquidity of the Gemini exchange and auction went to the core of the CFTC's inquiry into whether the proposed contract would be readily susceptible to manipulation.  The CFTC's guidance makes plain that the "size and liquidity of the cash market that underlies the contract" are the fundamental factors in "evaluating the susceptibility of a cash-settled contract to manipulation."  17 C.F.R. pt. 38, App'x C at (c)(2). "In particular, situations susceptible to manipulation include those in which the volume of cash market transactions . . . are very low."  *Id.*  CFTC witnesses uniformly testified, without any testimony in the record to the contrary, that volume and liquidity were the "major focus" in determining whether a contract is readily susceptible to manipulation.  (Ex. 10 at 89:12-90:3 (8/23/2023 G. Kuserk Dep. Tr.); *see also* Ex. 9 at 100:3-101:24, 132:14-133:8, 137:8-138:2 (Goodman Tr.).)

Precisely because of these well-understood requirements, the "volume" and "liquidity" of "the Gemini marketplace and auction process" were specifically identified in the product certification as factors supporting the representation that the bitcoin futures contract was consistent with Core Principle 3.  (Ex. 6 at 7.)   Thus, overwhelming and undisputed evidence shows that Gemini's misstatements and omissions about the true nature of the volume and liquidity on Gemini's exchange and in its auction—and how that volume and liquidity was generated—were capable of influencing the CFTC's product review.  *See* Jan. 4 Order at 3 ("Published regulations, policies, and procedures are relevant to determining whether that issue is material to the decision-making process"), ECF No. 77; *Rigas*, 490 F.3d at 235 (observing that

"[i]n the context of an objective decisionmaking process, whether a misrepresentation is 'material' requires examination of the factors the decisionmaker would employ").

### 3. Gemini Knew or Reasonably Should Have Known that Its Statements About the Volume and Liquidity of the Gemini Exchange and Gemini Auction Were False or Misleading.

For all of the reasons outlined above, Defendant knew or reasonably should have known that its statements about the volume and liquidity of its exchange and auction were false or misleading.  In summary, Defendant was aware that the volume and liquidity on the exchange and in the auction were achieved through (i) loans provided under the auspices of Pearl Street; (ii) operational advances of fiat currency and digital assets that were negligently monitored and allowed traders to trade with house money; (iii) bespoke fee agreements that differed from the publicly disclosed fee schedule; and (iv) self-trading and, in certain circumstances on the exchange, collusive or wash trading.  *See supra*, Parts II.A.3, II.B.3, II.C.3; (56.1 Statement ¶¶ 134-144).  Moreover, trade volume is a fundamental metric for a trading exchange, and it is entirely reasonable to expect the operator of a trading exchange to be able to accurately report and describe its trading volume, particularly where it voluntarily presents its trading volume to a government regulator in order to obtain the regulator's approval.  *See Gramalegui*, 2018 WL 6410953, at \*24.  Accordingly, Gemini knew or "reasonably should have known" that its statements about its trading volume were false or misleading.  7 U.S.C. § 9(2).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's motion for partial summary judgment with respect to the thirty-one written statements and grant any further relief as the Court deems appropriate.

Dated: New York, New York
        May 7, 2024

                                    Respectfully submitted,


                                    By:    *Andrew J. Rodgers*

                                    K. Brent Tomer, Chief Trial Attorney
                                    Alejandra de Urioste, Chief Trial Attorney
                                    David Oakland, Senior Trial Attorney
                                    Katherine Rasor, Trial Attorney
                                    Diana Wang, Trial Attorney
                                    Andrew J. Rodgers, Trial Attorney
                                    Peter Janowski, Trial Attorney
                                    Manal M. Sultan, Deputy Director

                                    COMMODITY FUTURES
                                    TRADING COMMISSION
                                    Division of Enforcement
                                    290 Broadway, Suite 600
                                    New York, NY 10007
                                    Phone: (646) 746-9700
                                    Fax: (646) 746-9888

**Exhibit A**
**False Statements by Gemini**

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| 1 | 12/1/17 | 1 | The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order. All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled. | 22cv4563-CFTC-GEMINI-00017445 | Chris Goodman, Thomas Leahy, Philip Colling, Amir Zaidi, Gregory Kuserk, Sanam Gouloubandi, Stephen Sherrod, James McDonald |
| 2 | 12/1/17 | 1 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: . . . (v) all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded. | 22cv4563-CFTC-GEMINI-00017445 | Chris Goodman, Thomas Leahy, Philip Colling, Amir Zaidi, Gregory Kuserk, Sanam Gouloubandi, Stephen Sherrod, James McDonald |
| 3 | 12/1/17 | 4 | Data from data.bitcoinity.org reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. . . . The 20-day moving | 22cv4563-CFTC-GEMINI-00017445 | Chris Goodman, Thomas Leahy, Philip Colling, Amir Zaidi, Gregory Kuserk, |

---

[1] The Bates numbers identify one copy of the submission containing the statement.

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000. | | Sanam Gouloubandi, Stephen Sherrod, James McDonald |
| 4 | 12/1/17 | 3 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: . . . (v) self-crossing is prohibited on the Gemini Exchange. | 22cv4563-CFTC-GEMINI-00017445 | Chris Goodman, Thomas Leahy, Philip Colling, Amir Zaidi, Gregory Kuserk, Sanam Gouloubandi, Stephen Sherrod, James McDonald |
| 5 | 11/14/17 | 1 | The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order. All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled. | 22cv4563-CFTC-GEMINI-00017481 | Chris Goodman, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod |
| 6 | 11/14/17 | 1 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price.  Among these features of the auction process are that: . . . (iv) all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded. | 22cv4563-CFTC-GEMINI-00017481 | Chris Goodman, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| 7 | 11/14/17 | 4 | Data from data.bitcoinity.org reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. . . . The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.  The average trading volume in a Gemini Exchange auction for bitcoin in U.S. dollars is roughly twice the average maximum trade size on other bitcoin exchanges. | 22cv4563-CFTC-GEMINI-00017481 | Chris Goodman, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod |
| 8 | 11/14/17 | 3 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price.  Among these features of the auction process are that:  . . . (v) self-crossing is prohibited on the Gemini Exchange. | 22cv4563-CFTC-GEMINI-00017481 | Chris Goodman, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod |
| 9 | 10/31/17 | 1 | The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order. All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled. | 22cv4563-CFTC-GEMINI-00017534 | Chris Goodman, Gregory Kuserk, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod |
| 10 | 10/31/17 | 1 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that . . . (iv) all orders on the | 22cv4563-CFTC-GEMINI-00017534 | Chris Goodman, Gregory Kuserk, Thomas Leahy, Phillip Colling, Sanam |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | Gemini Exchange, including auction-only orders, must be fully pre-funded. | | Gouloubandi, Stephen Sherrod |
| 11 | 10/31/17 | 4 | Data from data.bitcoinity.org reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. . . . The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.  The average trading volume in a Gemini Exchange auction for bitcoin in U.S. dollars is roughly twice the average maximum trade size on other bitcoin exchanges. | 22cv4563-CFTC-GEMINI-00017534 | Chris Goodman, Gregory Kuserk, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod |
| 12 | 10/31/17 | 3 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that . . . (v) self-crossing is prohibited on the Gemini Exchange. | 22cv4563-CFTC-GEMINI-00017534 | Chris Goodman, Gregory Kuserk, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod |
| 13 | 10/6/17 | 1 | The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order. All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled. | 22cv4563-CFTC-GEMINI-00017569 | Chris Goodman, Gregory Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Michael Penick |
| 14 | 10/6/17 | 1 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market | 22cv4563-CFTC-GEMINI-00017569 | Chris Goodman, Gregory Thomas Leahy, Phillip |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | participant to improperly affect the auction price.  Among these features of the auction process are that: . . . (iv) all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded. | | Colling, Sanam Gouloubandi, Stephen Sherrod, Michael Penick |
| 15 | 10/6/17 | 4 | Data from data.bitcoinity.org reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. . . .   The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.  The average trading volume in a Gemini Exchange auction for bitcoin in U.S. dollars is roughly twice the average maximum trade size on other bitcoin exchanges. | 22cv4563-CFTC-GEMINI-00017569 | Chris Goodman, Gregory Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Michael Penick |
| 16 | 10/6/17 | 3 | There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price.  Among these features of the auction process are that:  . . . (v) self-crossing is prohibited on the Gemini Exchange. | 22cv4563-CFTC-GEMINI-00017569 | Chris Goodman, Gregory Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Michael Penick |
| 17 | 11/2/17 | 1 | • Pre-funding required for all orders at the auction. The pre-funding requirement for all orders on the Gemini Exchange (including both generally and with respect to Gemini Exchange auctions) disincentivizes potentially manipulative behavior. | 22cv4563-CFTC-GEMINI-00017879 | Gregory Kuserk, Thomas Leahy, Phillip Colling, Chris Goodman, Sanam Gouloubandi, Stephen Sherrod, Amir Zaidi |
| 18 | 10/24/17 | 1 | While price collars coupled with position limits and surveillance contribute to the soundness of the Gemini auction, another strength of the auction is Gemini's pre-funding requirement. The need to maintain a cash balance in support of any order means that funds must | 22cv4563-CFTC-GEMINI-00017561 | Chris Goodman, Gregory Thomas Leahy, Tom Leahy, Phil Colling, Sanam |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | be in a trader's account before an order is placed or else the Gemini system will reject the order. To support large trades, firms would need to carry sizable cash deposits at Gemini where they don't earn interest or transfer money into their account in enough time for funds to clear before entering orders. Whichever approach a firm might choose to take, any meaningful change in behavior could be flagged easily by Gemini, CFE, or both. Again, we believe that the limited possible upside to undertaking such a plan would not be worth the regulatory risk. | | Gouloubandi, Stephen Sherrod |
| 19 | 9/12/17 | 1 | Cost of Capital - All orders must be pre-funded — dollars must be deposited prior to placing a buy order and bitcoin must be deposited before placing a sell order — and participants are not permitted to place an order unless they have enough funds in their account to place such order (orders that are submitted without backing funds are rejected). As a result, no participant's outstanding interest on our books can exceed their account balance at any time and all open orders reduce a participant's available balance until such orders are fulfilled or canceled. Therefore, it is costly for a malicious market participant to engage in manipulative tactics. | 22cv4563-CFTC-GEMINI-00017751 | Chris Goodman, Gregory Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Rahul Varma, Rachel Berdansky |
| 20 | 9/12/17 | 1 | Time Priority - We do not permit the cancellation of any auction orders in the final minute leading up to the Gemini Auction Price. Participants can only add to their position, thereby (1) making it costly for them to try to influence the Gemini Auction Price in the last sixty (60) seconds and (2) reducing the opportunity for "spoofing" of the auction order book. | 22cv4563-CFTC-GEMINI-00017751 | Chris Goodman, Gregory Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Rahul Varma, Rachel Berdansky |
| 21 | 9/12/17 | 3 | Self-Trade Prevention - We prohibit the same market participant from crossing with himself or herself (either intentionally or unintentionally) on a continuous trading order book or in a Gemini Auction. | 22cv4563-CFTC-GEMINI-00017751 | Chris Goodman, Gregory Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Rahul |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | | | Varma, Rachel Berdansky |
| 22 | 8/25/17 | 1 | **19. Could a trader break the auction by distorting the continuous market?**<br><br>Because we require the Gemini Auction Price to be within 5% of the midpoint of the continuous trading book, it is possible for a malicious market participant to intentionally attempt to exceed this threshold by manipulating either the Gemini Auction Price itself or the midpoint of the continuous trading book. Such manipulation would likely be very easy to detect since it would be concentrated over a short period of time and involve direct interaction with either the price levels at the inside of the continuous trading book (i.e., the highest bid and lowest offer) or the Gemini Auction Price pricing itself. Furthermore, other market participants are strongly economically motivated to counteract or arbitrage any such occurrence in order to receive fills at their desired prices.<br><br>Moreover, the manipulation of the continuous trading book would likely require substantial capital commitment and not yield a predictable outcome for the malicious market participant. Because the futures contracts settle to the Gemini Auction Price rather than to the continuous market prices, there is no guarantee that contract settlement would be affected favorably for the malicious participant. In fact, in the event of a failed Gemini Auction, the procedure outlined in Question 12 would determine the settlement price, likely thwarting any attempted manipulation.<br>. . .<br>...Similarly, because placing orders on the continuous market (and in the Gemini Auction) requires capital to be held (as discussed above), spoofing and other manipulative techniques are typically quite expensive and inefficient as well. | 22cv4563-CFTC-GEMINI-00017761 | Chris Goodman, Gregory Kuserk, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Amir Zaidi, David Pepper, David Van Wagner, Philip Raimondi, Rachel Berdansky, Rahul Varma, Swati Shah, David Steinberg |
| 23 | 8/25/17 | 2 | **8. Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?** | 22cv4563-CFTC-GEMINI-00017761 | Chris Goodman, Gregory Kuserk, Thomas Leahy, Phillip Colling, |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | We have implemented a trading fee program which is available to all of our market participants; we have no specifically defined market maker program. In summary, fees are typically charged for liquidity-taking trades, but these fees can be reduced through high trading volumes and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but rebates can be earned in a similar way. The details are available at https://gemini.com/fee-schedule/. In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participants typically make up approximately 90% of volume in the auctions. | | Sanam Gouloubandi, Stephen Sherrod, Amir Zaidi, David Pepper, David Van Wagner, Philip Raimondi, Rachel Berdansky, Rahul Varma, Swati Shah, David Steinberg |
| 24 | 8/25/17 | 3 | **10. Could an auction occur where there is one participant trading with themselves?**<br><br>No, we have instituted self-trade prevention. | 22cv4563-CFTC-GEMINI-00017761 | Chris Goodman, Gregory Kuserk, Thomas Leahy, Phillip Colling, Sanam Gouloubandi, Stephen Sherrod, Amir Zaidi, David Pepper, David Van Wagner, Philip Raimondi, Rachel Berdansky, Rahul Varma, Swati Shah, David Steinberg |
| 25 | 8/1/17 | 4 | Disk of trading data sent to Thomas Leahy on August 1, 2017 | 22cv4563-CFTC-GEMINI-00016508-16514 | See response to Interrogatory 2 |
| 26 | 7/25/17 | 1 | "Gemini Auction Mechanics . . . Protections . . . As with all Gemini orders, auction orders must be fully (pre-) funded" | 22cv4563-CFTC-GEMINI-00016161 | Gregory Kuserk, Stephen Sherrod, |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | | | Thomas Leahy, Phillip Colling, David Van Wagner, Philip Raimondi, David Pepper, Chris Goodman, Sanam Gouloubandi, Rosaria Troia, Ward Griffin, John Paul Rothenberg, Michael Penick, Amir Zaidi, Rahul Varma, Rachel Berdansky |
| 27 | 7/25/17 | 1 | "CFE Bitcoin Futures Highlights . . . Cash-settled into a liquid, transparent auction . . . Settlement price is not readily susceptible to manipulation . . . Prefunding requirements for auction-only orders allows for heightened surveillance" | 22cv4563-CFTC-GEMINI-00016161 | Gregory Kuserk, Stephen Sherrod, Thomas Leahy, Phillip Colling, David Van Wagner, Philip Raimondi, David Pepper, Chris Goodman, Sanam Gouloubandi, Rosaria Troia, Ward Griffin, John Paul Rothenberg, Michael Penick, Amir Zaidi, Rahul Varma, |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | | | Rachel Berdansky |
| 28 | 7/25/17 | 2 | "Gemini Auction Mechanics . . . Protections . . . Market maker trading fee rebates encourage participation" "Gemini Auction Mechanics . . . Protections . . . Market maker trading fee rebates encourage participation" | 22cv4563-CFTC-GEMINI-00016161 | Gregory Kuserk, Stephen Sherrod, Thomas Leahy, Phillip Colling, David Van Wagner, Philip Raimondi, David Pepper, Chris Goodman, Sanam Gouloubandi, Rosaria Troia, Ward Griffin, John Paul Rothenberg, Michael Penick, Amir Zaidi, Rahul Varma, Rachel Berdansky |
| 29 | 7/25/17 | 4 | "CFE Bitcoin Futures Highlights . . . Cash-settled into a liquid, transparent auction . . . Settlement price is not readily susceptible to manipulation . . . Gemini auction volume is already roughly 2x the average maximum trade size of other bitcoin exchanges" | 22cv4563-CFTC-GEMINI-00016161 | Gregory Kuserk, Stephen Sherrod, Thomas Leahy, Phillip Colling, David Van Wagner, Philip Raimondi, David Pepper, Chris Goodman, Sanam Gouloubandi, Rosaria Troia, Ward Griffin, |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | | | John Paul Rothenberg, Michael Penick, Amir Zaidi, Rahul Varma, Rachel Berdansky |
| 30 | 7/25/17 | 4 | Graph on slide 3 showing the dollar value of auction volume from 9/21/16 – 6/21/17 | 22cv4563-CFTC-GEMINI-00016161 | Gregory Kuserk, Stephen Sherrod, Thomas Leahy, Phillip Colling, David Van Wagner, Philip Raimondi, David Pepper, Chris Goodman, Sanam Gouloubandi, Rosaria Troia, Ward Griffin, John Paul Rothenberg, Michael Penick, Amir Zaidi, Rahul Varma, Rachel Berdansky |
| 31 | 7/25/17 | 3 | "Gemini Auction Mechanics . . . Protections . . . Self-crossing prohibited"" | 22cv4563-CFTC-GEMINI-00016161 | Gregory Kuserk, Stephen Sherrod, Thomas Leahy, Phillip Colling, David Van Wagner, Philip Raimondi, David Pepper, |

| Statement number | Date Statement was Made | Category of False Statement | False Statement | Bates Reference[1] | CFTC Personnel Who Viewed or Received Document |
|---|---|---|---|---|---|
| | | | | | Chris Goodman, Sanam Gouloubandi, Rosaria Troia, Ward Griffin, John Paul Rothenberg, Michael Penick, Amir Zaidi, Rahul Varma, Rachel Berdansky |
| 32 | July 25, 2017 meeting | 1, 2, 3, 4 | Oral false statements regarding prefunding, rebates, self-trading, and volume made during the July 25, 2017 meeting | | Gregory Kuserk, Thomas Leahy, Phillip David Van Wagner, Philip Raimondi, David Pepper, Chris Goodman, Sanam Gouloubandi, Rosaria Troia, Ward Griffin, John Paul Rothenberg |