# EXHIBIT 1

1

```
 1
 2      UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
 3      -------------------------------------------X
          COMMODITY FUTURES TRADING COMMISSION,
 4                          PLAINTIFF,
 5          -against-     Case No.:
                            22-cv-4563 (AKH)
 6
 7      GEMINI TRUST COMPANY, LLC,
 8                          DEFENDANT.
 9      -------------------------------------------X
10
11                      DATE: February 28, 2024
12                      TIME: 9:32 A.M.
13
14
15              CONFIDENTIAL VIDEOTAPED REALTIME
16      DEPOSITION of the Defendant, CAMERON
17      WINKLEVOSS, taken by the Plaintiff,
18      pursuant to a Subpoena and to the Federal
19      Rules of Civil Procedure, held at the
20      offices of Commodity Futures Trading
21      Commission (CFTC), 290 Broadway, 6th Floor,
22      New York, New York 10007, before Karyn
23      Chiusano, a Notary Public of the State of
24      New York.
25
```

2

1
         A P P E A R A N C E S:

2
       Commodity Futures Trading Commission
3
           Attorneys for the Plaintiff
         COMMODITY FUTURES TRADING COMMISSION
4
           290 Broadway ~ 6th Floor
         New York, New York 10007
5
           BY: ANDREW RODGERS, ESQ.
         arodgers@cftc.gov

6
         BAUGHMAN KROUP BOSSE
7
         Attorneys for the Defendant
           GEMINI TRUST COMPANY
8
          1 Liberty Plaza ~ 46th Floor
           New York, New York 10006
9
          BY: JACK BAUGHMAN, ESQ.
             jbaughman@bkbfirm.com
10


11
          ALSO PRESENT:
12
         PAUL BAKER, Videographer
            ELIZABETH LEE, ESQ.
13
         DIANA WANG, ESQ.

14
            BRETT TOMER, ESQ.

15
         KATIE RASOR, ESQ.

16
            DAVID OAKLAND, ESQ., via Zoom

17
          ALEJANDRA de URIOSTE, ESQ., via Zoom

18

19
                    *        *        *

20

21

22

23

24

25

3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4      IT IS HEREBY STIPULATED AND AGREED by and

5      between the counsel for the respective

6      parties herein that the sealing, filing and

7      certification of the within deposition be

8      waived; that the original of the deposition

9      may be signed and sworn to by the witness

10      before anyone authorized to administer an

11      oath, with the same effect as if signed

12      before a Judge of the Court; that an

13      unsigned copy of the deposition may be used

14      with the same force and effect as if signed

15      by the witness, 30 days after service of

16      the original & 1 copy of same upon counsel

17      for the witness.

18

19      IT IS FURTHER STIPULATED AND AGREED that

20      all objections except as to form, are

21      reserved to the time of trial.

22

23                    *    *    *    *

24

25

17

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2           And continued after college for

3     some period of time.

4           Q.    All right.  So, moving to still

5     in the pre-Gemini period, when did you

6     first start investing in digital

7     currencies?

8           A.    In the late summer, early fall

9     of 2012.

10          Q.    And are you aware of articles

11     calling you "a bitcoin billionaire"?

12          A.    I -- I've seen articles with

13     headlines of that sort.

14          Q.    Have you participated in any

15     articles that reported on you being a

16     bitcoin billionaire?

17          A.    I guess it would depend -- it's

18     -- there's probably been a -- a number of

19     different media articles.  If there is

20     something specific, where I give a quote,

21     but I -- I don't know if I can say for

22     certain, based on -- you know, without

23     looking at the article or the -- the

24     individual, who wrote it.

25          Q.    Are you a bitcoin billionaire?

18

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2          A.    I guess I haven't thought about

3     it in awhile.

4               I -- I believe so, but I --

5     yeah, I haven't really thought about it in

6     awhile.

7          Q.    Do you have a rough idea of

8     what your net -- net worth is, currently?

9               MR. BAUGHMAN:  What is -- what

10          is this relevant to?

11               MR. RODGERS:  Please refrain,

12          counsel.

13               MR. BAUGHMAN:  No.

14               I'm -- I'm asking:  What is

15          this relevant to?

16               I object.

17               MR. RODGERS:  Please ref- --

18          okay.

19               That's your objection.

20          Q.    Sir, can you answer the

21     question?

22               MR. BAUGHMAN:  I'm asking you

23          to make a proffer as to how this is

24          relevant.

25               MR. RODGERS:  Please refrain.

```
1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2              You know what the rules are.

3              MR. BAUGHMAN:  And so do you.

4              MR. RODGERS:  You can object.

5              MR. BAUGHMAN:  And so do you.

6              MR. RODGERS:  This is relevant

7          to the -- to this matter.

8              MR. BAUGHMAN:  It's not.

9              MR. RODGERS:  Please refrain.

10         You know the rules.

11              MR. BAUGHMAN:  You can give a

12         proffer.

13              MR. RODGERS:  Can you please

14         stop grandstanding in front of your

15         client?

16              I want an answer to my

17         question.

18              MR. BAUGHMAN:  I'm not

19         grandstanding.

20              You know what?  How is that

21         relevant?

22              Make a proffer.

23              If you can't, we will note for

24         the record that you can't.

25         Q.   Sir, can you tell us what your
```

```
1           CONFIDENTIAL ~ CAMERON WINKLEVOSS
2      net worth is today?
3              MR. BAUGHMAN:  I direct you not
4          to answer.
5          A.    I can not.
6          Q.    What about in 2017, do you know
7      what your net worth was then?
8              MR. BAUGHMAN:  I direct you not
9          to answer.
10         A.    I can not.
11             MR. RODGERS:  Can you hand me
12          Ex- -- Tab 3, please?
13             So, I'm going to mark, as
14          Exhibit 3, this is a 2017 New York
15          Times article titled:
16             "How the Winklevoss Twins Found
17          Vindication in a Bitcoin Fortune."
18             We're going to mark this as
19          Exhibit 3.
20             As I noted off the record, we
21          are going to be a little out of order
22          on the exhibits, but I think that
23          will help things move a little smooth
24          -- more smoothly today.
25             (Whereupon, New York Times
```

21

```
 1            CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2          Article was marked as Winklevoss

 3          Exhibit 3 for identification as of

 4          this date by the Reporter.)

 5              MR. BAUGHMAN:  Is this

 6          Winklevoss Exhibit 3 or your general

 7          series of --

 8              MR. RODGERS:  It's Exhibit 3.

 9              MR. BAUGHMAN:  Just Exhibit 3?

10        Okay.

11              THE WITNESS:  Thank you.

12              (Witness reviews document.)

13          A.    Okay.

14          Q.    Okay.  I just want to direct

15     your attention to the first page of the

16     article.

17              It's the fourth paragraph from

18     the bottom, it says:

19              "But the souring value of

20     bitcoin in recent months has given the

21     brothers a moment of vindication, and quite

22     a bit more than that.  Their bitcoin stock

23     pile was worth around $1.3 billion on

24     Tuesday."

25              And this article is dated
```

```
1            CONFIDENTIAL ~ CAMERON WINKLEVOSS

2       December 19, 2017.

3                Is that statement accurate, Mr.

4       Winklevoss?

5           A.    I -- I mean, it's been seven

6       years since that statement.

7                I mean, I have no reason to

8       believe that it's not, but I -- I don't

9       know.

10          Q.    And is this an article that you

11       -- you -- does this --

12               MR. RODGERS:  Withdrawn.

13          Q.    Is this an article that you

14       participated in -- in -- on December, 2017?

15               MR. BAUGHMAN:  Object to the

16          form of the question.

17               "Participated in?"

18          A.    We -- we clearly provided

19       quotes to the article.

20          Q.    And on the -- on the second

21       page, below the -- the picture, three

22       paragraphs down, it says, in the last

23       sentence of that paragraph:

24               "The brothers are also majority

25       owners of the virtual currency exchange
```

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1    they founded, Gemini, which most likely

2    takes their joint holdings to a value of

3    well over two billion, enough to make each

4    of them a billionaire."

5         Do you agree with that

6    statement, Mr. Winklevoss?

7       A.   Which part of the statement?

8       Q.   That the -- your joint holdings

9    are well over $2 billion?

10       A.   Because of ownership in -- in

11    Gemini?

12       Q.   Are your joint holdings, in

13    addition to your bitcoin investments, along

14    with your investment in Gemini, well over

15    $2 billion?

16       A.   I'd have to check.

17       Q.   Is this in the ballpark, you

18    think?

19       A.   Again, it's been seven years,

20    but I -- I -- I mean, I'd have to check.

21         I don't have a reason to

22    believe it's necessarily wrong, I just --

23       Q.   Yeah.

24         How about today, do you have a

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2      ballpark of how much Gemini is worth today?

 3              MR. BAUGHMAN:  Objection;

 4          relevance?

 5              Yet again, counsel hasn't

 6          offered any relevance.

 7              MR. RODGERS:  You can refrain

 8          from the speaking objections, Jack.

 9              You know the process here.  You

10          understand that I'm asking the

11          questions, I control the record.

12              MR. BAUGHMAN:  No. You don't.

13              MR. RODGERS:  You're not

14          permitted to give speaking

15          objections.

16              MR. BAUGHMAN:  No. You don't.

17              MR. RODGERS:  I understand your

18          desire to grandstand in front of your

19          client.

20              MR. BAUGHMAN:  I'm not

21          grandstanding.

22              MR. RODGERS:  You get to sit

23          there, and you get to object, and you

24          get to provide the basis.

25              MR. BAUGHMAN:  I am --
```

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2          MR. RODGERS:  If you don't --

3      if you continue to -- to engage in

4      this, then we will raise this with

5      the Judge.

6          MR. BAUGHMAN:  That would --

7      I'd be happy to.  Because it's

8      abusive, it's irrelevant.  And

9      it's -- you're the one who's

10      grandstanding.

11          And please stop.

12          Get to the point of this thing.

13          MR. RODGERS:  This is

14      background questions, Jack.

15          I'm not going to engage with

16      you.

17          We can engage off the record.

18          Please refrain.

19          MR. BAUGHMAN:  If you'd like to

20      call the Judge, go ahead.

21          MR. RODGERS:  Let's move on.

22          MR. BAUGHMAN:  Go ahead.

23      Q.    Do you know what Gemini is

24  worth today, roughly?

25      A.    I don't.

26

```
 1            CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2                In the sense that we last

 3      raised funding, I think two or three years

 4      ago, and we're a privately-held company, so

 5      we'd have to look at -- look into that.

 6            Q.    What was the valuation two or

 7      three years ago?

 8            A.    It was $7.1 billion post-money

 9      valuation.

10            Q.    Thank you.

11                So, let's turn to the -- the

12       founding of Gemini.

13                You can put that exhibit away.

14                (Witness complies.)

15            Q.    So, when did you found Gemini

16       Trust Company, LLC?

17            A.    The -- the initial sort of

18       formulation and idea, I believe, was in

19       2013 -- late 2013, 2014, with myself and

20       Tyler.

21                We then hired a founding team

22       in the -- the fall of -- of 2014 and

23       proceeded to build the -- the software and

24       technology for Gemini, as well as pursue a

25       license with the New York Department of
```

27

1         CONFIDENTIAL ~ CAMERON WINKLEVOSS

2    Financial Services, DFS.

3              And we engaged with them for, I

4    think, 12 to 18 months, received our

5    license, in October of 2015, and launched

6    Gemini then.

7         Q.    Do you know what day Gemini

8    launched, by any chance?

9         A.    The exact day?  I think it

10    would be probably the first Monday in

11    October.

12              And -- and the license I was

13    referring to was the New York Trust Company

14    license.  So, we're chartered as a New York

15    Trust Company, under the New York banking

16    law.

17              And I believe -- I believe --

18    I'm going to say October 5th, but,

19    obviously, we can get you the exact date.

20         Q.    Understand.

21              I'm not going to hold you to --

22    to that date.

23              Were there any other

24    co-founders, besides you and your brother?

25         A.    We're the two co-founders.

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2          Q.    And where did the money come

 3    from to create Gemini?

 4          A.    Myself and Tyler, through --

 5    via Winklevoss Capital Fund, we were the

 6    initial investors.

 7          Q.    And what is Winklevoss Capital

 8    Fund?

 9          A.    It's a private investment fund.

10          Q.    And is Gemini its only

11    investment?

12          A.    No.

13              We have many investments across

14    technology, in various industries,

15    including space and cryptocurrency.

16          Q.    Are you the direct owner -- I

17    guess --

18              MR. RODGERS:  Withdrawn.

19          Q.    Who is the beneficial owner of

20    Winklevoss Capital Fund?

21              MR. BAUGHMAN:  Objection.

22              There's no basis for these

23         questions.

24              They are not relevant to the

25         case.
```

37

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2        --

3        Q.    Well, what are your titles at

4    Gemini Spaceship and Gemini Space Station?

5              MR. BAUGHMAN:  You mean in 2017

6        or today?

7              MR. RODGERS:  2017.

8        A.    I'm not sure if Spaceship

9    existed in 2017.

10              I can definitely answer the

11    question, with respect to Gemini Trust

12    Company, LLC.

13        Q.    Well, that's what I'm getting

14    at, yeah.

15        A.    Okay.  I was just asking, for

16    clarification.

17              If that's the case, then my

18    title was President.

19        Q.    And has that title changed?

20              Are you still President of

21    Gemini?

22        A.    I'm not still President of

23    Gemini Trust Company, LLC.

24        Q.    Who is President of Gemini

25    Trust Company, LLC?

38

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2          A.    I don't know if we have a

3    President, but we have a -- there's a CEO

4    of Gemini Trust Company, LLC, as of today.

5          Q.    And when did you stop being the

6    President of Gemini Trust Company, LLC?

7          A.    I believe it was in April of

8    2022.

9          Q.    And what is your current

10    position?

11          A.    I do not have a position at

12    Gemini Trust Company, LLC.

13          Q.    You're no longer -- you no

14    longer have an employment relationship; is

15    that correct?

16          A.    I don't believe I'm an employee

17    or -- nor do I have a title.

18          Q.    Okay.  So, working back to

19    2017, I think it just would make sense so

20    that we can level set and get on the same

21    page, just go over some sort of Gemini

22    basics.

23               So, Gemini -- is it fair to say

24    Gemini operates a cryptocurrency exchange;

25    is that right?

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2          A.    Among other things, but yes.

3          Q.    And what is a cryptocurrency

4    exchange?

5          A.    We -- in -- in the -- in the

6    simplest form:  We allow people to buy,

7    sell, and store cryptocurrency.

8          Q.    Is Gemini Trust Company --

9               MR. RODGERS:  Withdrawn.

10          Q.    Was Gemini Trust Company, LLC a

11    full reserve and highly-regulated

12    cryptocurrency exchange, in 2017?

13          A.    Yes.

14          Q.    And what does "full reserve"

15    mean?

16          A.    In the simplest form, it means

17    that people trade with assets that they

18    have.

19          Q.    "Trade with assets that they

20    have" where?

21          A.    In their control, on Gemini.

22          Q.    Okay.  And you're familiar with

23    a -- the Gemini Bitcoin Auction; is that

24    correct?

25          A.    Yes.

45

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2          I just would prefer to speak

3     to a specific person, if you have someone

4     in mind.

5          MR. RODGERS:  Can I see Tab 4?

6          I'm going to mark, as Exhibit

7          4, a document that's Bates numbered

8          GEM_CFTC067941.

9          Unfortunately, it's small.

10          So, we are going to have to

11          test our eyesight, but --

12          (Whereupon, Org Chart was

13          marked as Winklevoss Exhibit 4 for

14          identification as of this date by the

15          Reporter.)

16          THE WITNESS:  Thank you.

17          (Witness reviews document.)

18     A.    Okay.

19     Q.    Do you recognize this document,

20     Mr. Winklevoss?

21     A.    It looks like an org chart.

22          I may have seen it before, but,

23     again, this is -- it looks like it's from

24     2017, so quite awhile ago.

25     Q.    Does Gemini -- Gemini maintain

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     updated organizational charts in the
 3     ordinary course of its business?
 4          A.    I believe we do.
 5          Q.    Okay.  Do you know who prepared
 6     organizational charts, in 2017?
 7          A.    I do not.
 8          Q.    Do you know how the
 9     organizational charts were stored or
10      maintained?
11          A.    I do not.
12          Q.    Looking at this organi- --
13     organizational chart, do you have any
14      reason to doubt the accuracy of it?
15          A.    I do not.
16                But I -- you know, will say,
17     you know, once again, it's been awhile.
18                It -- it looks fine, but I'm
19      not entirely sure.
20          Q.    Nothing jumps out to you, to
21      suggest that it's inaccurate; right?
22          A.    With my quick review of the
23      document?  No.
24                But perhaps, if there's
25      something specific, I just want to say that
```

47

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2      nothing, initially, I mean, I could spend

3      another minute or two reviewing it, if

4      that's helpful.

5          Q.    I can direct you to areas of

6      the document.

7          A.    Okay.

8          Q.    And if something comes up that

9      looks inaccurate, you can let us know.

10             As you noted, the

11     organizational chart is from February 23,

12     2017.  I just want to walk through the

13     chart with you, starting with the Board of

14     Managers.

15             What is the Board of Managers?

16         A.    The Board of Managers is --

17     comprises the Board of Gemini Trust

18     Company, LLC, and I believe it needs to

19     have a minimum of seven Managers or Members

20     that are Managers.

21             Two -- at least five of which

22     need to be independent, as in, not

23     employees of Gemini Trust Company.

24             And I think this is per New

25     York Banking Law and DFS rules and

48

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2    regulations.

3        Q.    And -- and you're listed here

4    as a Member of the Board of Managers?

5        A.    Yes.

6            I'm -- I'm a Manager on the

7    Board of Managers.

8        Q.    Okay.  And it lists your --

9    above your name, it says, "President."

10            I think we've established that

11    is your role and then --

12        A.    Well, that -- that might --

13    just to clarify:  That might be my Board

14    title, which could be different -- in this

15    case would be the same as -- as my title at

16    Gemini Trust, but that could be an Officer

17    title on the Board, as well.

18            So, I could be President of the

19    Board, but also President of Gemini Trust

20    Company, LLC.

21        Q.    Okay.  And that was kind of my

22    next question because Tyler Winklevoss is

23    listed as "Vice President" of the Board of

24    Managers, but he's the Chief Executive

25    Officer of Gemini, the company.

49

CONFIDENTIAL ~ CAMERON WINKLEVOSS

2         Is that a fair

3  characterization?

4     A.   He -- he -- at that time, he

5  was the CEO of Gemini Trust Company, LLC.

6     Q.   As well as Vice President of

7  the Board of Managers?

8     A.   I believe that's correct.

9     Q.   And what's -- what's the

10  difference in the role of the Board of

11  Managers versus an executive at the

12  company.

13        With "the company" being

14  Gemini.

15     A.   Well, I believe that,

16  ultimately -- I think the -- the executives

17  report into the Board.

18        So, there's a -- a difference,

19  in terms of being on the Board of Managers

20  versus being an executive at the company.

21     Q.   Okay.  So, the Board of

22  Managers oversees the executives; is that

23  correct?

24     A.   I believe it oversees the

25  company.

89

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1
2    Small reported to you?

3         A.    Yes.

4         Q.    Can you just take a look at

5    Chart 4?

6              MR. RODGERS:  Oh, sorry.

7         Q.    Exhibit 4 for me.

8         A.    This is the previous chart?

9         Q.    Right.

10        A.    Or -- okay.

11             And you're familiar with

12   PearlStreet Financial LLC?

13        A.    Yes.

14        Q.    Can you tell us who, in Exhibit

15   4, worked for PearlStreet Financial LLC, in

16   February of 2017?

17             (Witness reviews document.)

18        A.    When you say "worked for," what

19   do you mean by that?

20        Q.    Worked on business related to

21   PearlStreet Financial LLC.

22        A.    Well, I -- I -- I guess,

23   myself.  I -- I worked on matters around

24   PearlStreet during that period.

25             At some point, I asked Shane

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2     Molidor to help me manage the loan

3     recordkeeping, and -- but that was -- for

4     the majority of PearlStreet, I did that

5     myself.

6              And, obviously, Benjamin Small

7     was aware of PearlStreet.  I think Michael

8     Breu did not work on PearlStreet, but he

9     was aware of it, as the Chief Compliance

10     Officer, of Gemini.

11              It was certainly a -- a

12     well-known thing, it was not by any means

13     something that was hidden or kept secret.

14              But in terms of performing,

15     like, actual work?  The -- I think that

16     other than Shane Molidor, helping with some

17     recordkeeping and interacting -- I guess

18     the question is, like:  What does work

19     mean?

20              In the sense of, like, Ben

21     Small was aware and spoke to market

22     participants about PearlStreet loans.

23              Does that mean he worked on it

24     or how do you constitute "work"?

25          Q.    Does that -- does talking to

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1    there's a direct reference to the banking

2    system not being open 24/7.

3              So, that -- that's, clearly, a

4    reference to the friction and the mismatch

5    with timing.

6         Q.   And at the top of the e-mail,

7    you say:

8              "We're going to experiment with

9     allowing people to get advanced credit for

10    wires."

11             Does this refresh your

12     recollection that Gemini started

13     experimenting with advances in March of

14     2016?

15        A.   I don't know the exact date.

16             Based on this document, it

17    looks like some time thereafter.  We

18    clearly hadn't been doing it on March 7th.

19             Whether operational advances

20    were first used weeks or a month from then,

21    I just -- I don't know.

22        Q.   Marcia says:

23             "Is there a limit as to the

24    number of days we will credit an advance?

131

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2          A.    Gemini Trust Company was not

 3     permitted to provide loans under our

 4     Supervisory Agreement.

 5          Q.    Could Gemini provide other

 6     types of financing to market participants?

 7          A.    Provided that had it fit within

 8     the -- the bounds of the funds being

 9     delivered, and, so, that we're fully --

10      fully funded, and a full reserve exchange,

11      yes.

12          Q.    So, the critical component is

13      that the funds show up in the account, in

14      order for it not to constitute some form of

15      lending?

16               MR. BAUGHMAN:  Object to the

17          form of the question.

18          A.    Well, I don't think it's a

19      lending arrangement.  I mean we can try and

20      spend some time on why that is.

21               But people -- in the simplest

22      form, people are sending funds.  We have

23      evidence that they're in transit, and they

24      will be delivered, and they will settle and

25      clear.
```

135

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     collateralized withdrawal holds eliminate

 3     the necessary aspect of trust we use to

 4     require advance credits."

 5               And then, in the next chat,

 6     Shane Molidor types:

 7               "Ben Small."

 8               Do you understand that to mean

 9     that "Ben Small" was added to the chat?

10          A.    Yes.

11          Q.    Based on the next entry, it

12      says.

13               "Ben Small has joined the

14      group"?

15          A.    Yes.

16          Q.    And then, you say:

17               "Proof equals documentation

18     around the operational advance, i.e., not

19     credit/margin.  I am less concerned about

20     the risk of the funds arriving and more

21     about the characterization."

22               So, let's unpack that a little

23      bit.

24               Why was the documentation

25     important to show that the operational
```

136

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1    advance was not credit or margin?

2         (Witness reviews document.)

3    A.    I think, as I stated earlier,

4    the -- the fact of the funds, we have

5    evidence that they're arriving, and will

6    settle and clear, means that the funds are

7    not -- there's - there's not credit or a

8    margin being offered to the customer

9    because they're actually sending funds that

10   are delivered.

11        Q.    And why are you concerned about

12   the characterization?

13             MR. BAUGHMAN:  Object to the

14             form of the question.

15        A.    Well, for starters, we were a

16   full reserve exchange.  So, we don't --

17   we're not permitted to do credit or margin,

18   and so, we need delivery of -- actual

19   delivery of the funds.

20             And provided we have that, and

21   we have that evidence, then, we're

22   confident that we're not providing credit

23   or margin.

24        Q.    And who would characterize the

137

```
 1            CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     advances as "credit" or "margin"?
 3            A.    What do you mean -- what do you
 4     mean by that?
 5            Q.    You say "you're more concerned
 6     about characterization," but who -- who are
 7     you concerned would characterize
 8     operational advances as "credit" or
 9     "margin"?
10            A.    I guess one party we'd be
11      concerned with if DFS thought that we were
12      not adhering to our Supervisory Agreement
13      and offering something like credit or
14      margin, in contravention to our Supervisory
15      Agreement, that would not be a good thing.
16                 Of course, DFS has never said
17      that.
18            Q.    Did --
19                 MR. BAUGHMAN:  Please.  Please,
20          I don't want to interfere, but don't
21          talk about what DFS said or didn't
22          say.
23                 THE WITNESS:  Understood.
24          Okay.
25            A.    So, I will not speak any
```

138

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     further than that.
 3               But that will be one party
 4     that, obviously -- we want to keep our --
 5     fulfill our obligations under the -- under
 6     our Supervisory Agreement.
 7          Q.   Were there any other entities
 8     that you were concerned would characterize
 9     "operational advances" as "margin" or
10      "credit," without appropriate
11      documentation?
12               (Witness reviews document.)
13          A.   Well, it's -- it's -- it's not
14      what we're doing and not what we were
15      trying to do.  So, it's, I think, as simple
16      as that.
17               I don't know their -- you know,
18      what's required of credit or margin to
19      offer that.  That's not what we were
20      offering and not what we were trying to
21      offer.
22               And we wanted to make sure that
23      -- that these would follow, in line with
24      the operational advance, and not some other
25      characterization.
```

139

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2      Q.    So, providing credit or margin

3   would have created a -- a regulatory risk

4   for Gemini; correct?

5            MR. BAUGHMAN:  Object to the

6        form of the question.

7      A.    It -- it could.  It could.

8      Q.    And as you stated earlier,

9   Gemini could not pro- -- provide credit

10   directly to its customers?

11      A.    Gemini Trust Company does not.

12      Q.    Is providing credit the same

13   thing as a loan?

14      A.    I'd have to think about it.

15      Q.    Could Gemini provide loans to

16   customers?

17      A.    No.

18      Q.    How were advances monitored?

19      A.    A loan would require us to give

20   assets to a customer.

21            That -- that -- that is -- that

22   would be, probably, the distinction between

23   "credit" and "a loan."

24            Gemini, physically delivering

25   assets to somebody, that would be a loan.

157

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2      Q.    The number.

3      A.    The -- the number of -- of

4   digital asset, operational advances?

5      Q.    Fiat and digital asset

6   advances?

7      A.    I don't.

8      Q.    Would that number be in the

9   thousands?

10      A.    Well, if you include ACH, then,

11   I guess, there would be probably tens of

12   thousands of operational advances.

13      Q.    And so, fair to say that

14   operational advances of both digital and

15   fiat currency were a regularly-conducted

16   activity in the operation of the Gemini

17   exchange?

18           MR. BAUGHMAN:  Object to the

19        form of the question.

20      A.    It was part of our -- our

21   business, the way we operated.

22           Operational advances were

23   clearly part of -- part of -- how funding

24   operated on the exchange.

25      Q.    As a regularly-conducted

```
 1            CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2      that they -- that they line up and are
 3      related.
 4            Q.    Does it take over a week for
 5      the Bitcoin Network issues to resolve
 6      themselves?
 7            A.    The Bitcoin Network would
 8      presumably a -- a issue with the Bitcoin
 9      Network would not, hopefully take that --
10       that long.  I am -- though it's -- I mean,
11       I haven't -- I have to look at the
12       document, specifically closer.
13              The numbers correspond, but I
14       don't know if there's actually tied to
15       those two advances or not.
16            Q.    Assuming that these two 500
17       bitcoin operational advances are tied to
18       the 1,000 bitcoin deposit -- or debit,
19       would this then reflect that there were --
20       there was a 500 bitcoin operational advance
21       that was outstanding for over a week?
22              MR. BAUGHMAN:  Object to the
23         form.
24            A.    Based on the review of this
25       document, the -- if these are related
```

197

```
1           CONFIDENTIAL ~ CAMERON WINKLEVOSS

2       corresponding transactions, then it would

3       look like the 1,000 bitcoin Admin_Debit, on

4       February 7th, that would be more than a

5       week after the corresponding Line 498, and

6       426.

7                However, I don't know if we can

8       definitively say, at least from this

9       document alone, that it -- that it ties to

10       it, other than the math.

11           Q.    Right.

12                The math adds up; right?

13           A.    The math adds up, but I don't

14       know if it's referring to those two things

15       right now.

16           Q.    And if the math adds up, there

17       was a 500 BTC operational advance that had

18       been outstanding on February 7th, 2017

19       since January 17th, 2017?

20           A.    If these are actually related,

21       then it would look like there's a -- from

22       January 17th until February 7th, whatever

23       time period that is, would be the

24       difference.

25                But again, I don't know if
```

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     these are related or if there's some other
 3     accounting --
 4          Q.   I can tell you that I've looked
 5     and I didn't find any, but we can -- let me
 6     ask you this:
 7               Does it take 21 days for a
 8     bitcoin transfer to clear the blockchain?
 9          A.   Hopefully not.
10               I don't think that that would
11      be the time that it would take for a
12      blockchain -- to settle on bitcoin
13      blockchain.
14          Q.   So, for 21 days, Circle had,
15      effectively, an interest-free bitcoin loin
16      -- loan from Gemini?
17          A.   Again, I don't know whether
18      there was another accounting or a debit, if
19      these are actually corresponding or
20      relating to each other.
21               So, I -- I just can't --
22          Q.   Let's say we can't find that
23      additional accounting, would that reflect
24      the 21-day interest-free loan?
25               MR. BAUGHMAN:  Object to the
```

203

```
1            CONFIDENTIAL ~ CAMERON WINKLEVOSS

2     April 18, 2017, for 1,250 bitcoin."

3                 And the Request_Reason states:

4                 "Debit from operational

5     advances provided on March 2nd and March

6     30th.  And this debit was approved by

7     Cameron Winklevoss."

8                 Did I get that right?

9         A.    It looks like I approve Line

10    162.  The amount is a debit for 1,250

11    bitcoin.

12                What -- what is your question?

13    Sorry.

14        Q.    The debit was for operational

15    advances provided on March 2nd, 2017 and

16    March 10th, 2017; correct?

17        A.    That's what it appears like,

18    from this language.

19        Q.    So, here, we have another

20    example of Gemini providing advances that

21    were outstanding for over a month; is that

22    a fair description of -- of this entry?

23        A.    Unclear from this entry if

24    there was other offsetting things that --

25    at different times or -- I just don't know
```

```
 1           CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2      the flow of funds.
 3               We can look at the ledger and
 4      -- and see --
 5           Q.   Well, if you look at -- just
 6      above it, at Row 727 and 814, you see
 7      credits, on March 2nd and March 30th, that
 8      correspond with the total amount debited on
 9      April 18th.
10               Do you see that?
11           A.   I do see two credits.
12           Q.   Okay.  So, it's --
13           A.   And, again, the numbers match
14      out.  It -- you know, there could be other
15      offsetting circumstances.  We can also just
16      refer to the -- whatever policies were in
17      place and try to understand that.
18           Q.   So, assuming there are no
19      offsetting entries, and I can represent to
20      you in this document that there are none,
21      would this, then, reflect a bitcoin
22      operational advance that was outstanding
23      for over a month?
24               MR. BAUGHMAN:  Object to the
25           form of the question.
```

1      CONFIDENTIAL ~ CAMERON WINKLEVOSS

2          A.    If there's no other

3      circumstances or offsetting debits then --

4      then it would appear that these two advance

5      -- operational advances would -- would have

6      not been debited for a couple of weeks,

7      assuming no other circumstances or

8      information that I'm not aware of.

9          Q.    And "a couple of weeks," you

10      mean over a month?

11              Well, you can agree March 30th,

12      which was the last day that the admin

13      credit was provided, is a month before

14      April 18th, which is when the subsequent

15      debit occurred?

16          A.    March 10th is -- is -- is a

17      month -- it -- there is more than a month

18      after March 10th to April 18th.

19          Q.    Would you consider it gross

20      negligence for a -- an advance to be

21      outstanding for over a month, without a --

22      a corresponding debit?

23          A.    Again, I would have to

24      understand all of the circumstances.  I

25      think, you know, we could ask Mr. Molidor

212

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2    alone, I have no reason to believe that it

3    did not follow the policy.  The issue seems

4    to be around the fact that it was not

5    debited.

6         Q.    Let's take a look at 11B, Row

7    3,044.

8              (Witness complies.)

9         Q.    It's on the last page, and it's

10    the fourth row from the bottom.

11         A.    Sorry.

12              What number?  What -- what --

13         Q.    3044.

14              Last page, fourth from bottom.

15              (Witness reviews document.)

16         Q.    So, this entry reflects an

17    administrative debit, on October 3rd, 2017,

18    of the 700 BTC with a description that

19    says:

20              "Circle was provided an

21    operational advance, on July 20th, 2017,

22    for 750 bitcoin during quarterly rec- --

23    rec- -- reconciliation, it was discovered

24    that Circle did not deposit 750 BTC to

25    true-up the operational advance."

CONFIDENTIAL ~ CAMERON WINKLEVOSS

Any reason to doubt the
statement in here that Circle never
deposited 750 BTC, in connection with the
operational advance that was provided on
January 20th, 2017?

A.    It -- it looks to be the case
that they did not -- that this -- this
operational advance did not follow policy.

Q.    And if you look up at Row
2,843, which is the third from the top of
the same page, this is the admin credit for
750 BTC to Circle Financial, and it shows
that you approved that operational advance.

Do you see that?

A.    I do.

Q.    Did you, at that time, confirm
that the funds were in transit, when you
approved the 750 BTC operational advance?

A.    I don't know what
representations were made to me at the
time, but, clearly, I would have assumed
that Mr. Molidor was following the -- the
Operational Advance Policy, when I approved
this.

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2        Q.    Is there a difference between

 3    an operational advance and an operational

 4    float?

 5        A.    I believe they would be talking

 6    about the same thing.

 7        Q.    Did you have any concern that

 8    by providing operational advances of fiat

 9    currency and digital assets that accounts

10     on Gemini would not be pre-funded?

11        A.    I think that is why we built

12     the policy such that you could ensure that

13     there was actual -- actual delivery of both

14     the fiat and -- and bitcoin.

15            So, assuming that things

16     followed policy, I would not have a

17     concern.

18        Q.    Did you discuss with anyone at

19     Gemini whether operational advances

20     impacted Gemini's pre-funding requirement?

21        A.    I'm not sure.

22            There may have been discussions

23     as -- as we discussed earlier, we -- we

24     obviously wanted proof of the delivery of

25     the assets, and -- and created a policy
```

215

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     around that so that we could ensure that,
 3     and that we would satisfy all of our
 4     requirements of being a full reserve
 5     exchange.
 6          Q.    So, compliance with the policy
 7     was critical to Gemini customers'
 8     pre-funding their account?
 9              MR. BAUGHMAN:  Object to the
10          form of the question.
11          A.    Well, the policy did a number
12       of things.
13              It protected Gemini from being
14       defrauded or customers not sending in
15       assets, and it also insured that -- that
16       assets were actually delivered.
17              There's a cup -- there's --
18       there's many reasons why we would have a
19       policy around this.
20          Q.    A policy around digital asset,
21     operational advances?
22          A.    Operational advances in -- in
23     general, whether they're ACH or -- or
24     something else.
25          Q.    And what type of proof was
```

223

                CONFIDENTIAL ~ CAMERON WINKLEVOSS

1     is probably just a reflection of LLC's need

2     Managers and I'm probably one of the

3     Managers.

4         Q.    Did PearlStreet have any

5     employees?

6         A.    I don't think so.

7             MR. BAUGHMAN:  Can you move

8         over so you're in the camera?

9             THE WITNESS:  Sorry.

10        Q.    Did PearlStreet have its own

11    bank account?

12        A.    I don't think it did, because I

13    think PearlStreet only dealt with digital

14    assets.

15        Q.    Who provided funding for

16    PearlStreet?

17        A.    The assets were provided, I

18    believe, by Winklevoss Capital Fund, LLC.

19        Q.    And you are the beneficial

20    owner of Winklevoss Capital Fund, LLC?

21        A.    I believe I'm -- it's -- I -- I

22    manage it through Winklevoss Capital

23    Management, LLC.

24            And -- I guess I would have to

224

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     look at the org chart as to the ultimate
 3     beneficial owner, but I'm not a direct
 4     owner.
 5          Q.    Do you know when PearlStreet
 6     was established?
 7          A.    I would say 2016, but I -- I
 8     don't know exactly what the -- what the
 9     date was.
10               That's -- that's my best guess.
11          Q.    And apologies if we covered
12      this, but:  Is it your testimony that you
13      are a part owner of PearlStreet?
14          A.    I -- I would have to look at
15      the -- think about the corporate structure.
16      I'm -- I think I'm an ultimate beneficial
17      owner of it.
18               Whether or not I'm a direct
19      owner, I'm -- I'm not -- I'm not entirely
20      sure.
21               MR. RODGERS:  I'm going to
22          mark, as Exhibit 30, a document
23          that's Bates Numbered GEM_CFTC064558.
24               (Whereupon, Due Diligence
25          Questionnaire was marked as Exhibit
```

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1       30 for identification as of this date

2       by the Reporter.)

3       THE WITNESS:  Thank you.

4    A.    Okay.

5    Q.    Do you recognize this document?

6    A.    I don't.

7    Q.    Does it reflect a due diligence

8  questionnaire that Gemini provides to

9  potential customers?

10    A.    It -- it certainly could.

11    I just don't -- don't remember

12  the document, but that could be right.

13    Q.    Looking at the last page of the

14  document.

15    (Witness complies.)

16    Q.    There's a "BENEFICIAL OWNER'S

17  (ENTITY)."

18    It has "Winklevoss Capital

19  Management, LLC."

20    A.    I see that.

21    Q.    And then, under "PARENT

22  OWNER/ENTITY" it has:

23    "Cameron Winklevoss, 50

24  percent; Tyler Winklevoss 50 percent."

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2          A.    I see that.

3          Q.    Does that reflect that you're a

4     50 percent owner -- beneficial owner of

5     PearlStreet?

6          A.    I -- it looks like I'm a 50

7     percent beneficial owner, I would agree

8     with that, based on the document.

9          Q.    Let's talk about the idea

10      behind PearlStreet.

11             Do you know when the concept of

12      PearlStreet first developed?

13         A.    I don't know the exact timing,

14      but I believe that it was probably some

15      time in 2016.  I don't know if this

16      document gives us any information on that.

17             It looks like, as a Manager,

18      from January of 2016, so it probably was in

19      that -- some time in that time period.

20             I do think that there was maybe

21      discussions around P2P lending and -- and

22      whatnot.  But, ultimately, PearlStreet, you

23      know, took the form that it took.

24         Q.    Prior to PearlStreet, did

25      Gemini consider the concept of providing

          CONFIDENTIAL ~ CAMERON WINKLEVOSS

1    loans to Gemini users?

2         A.    We probably looked into -- I

3    think we looked into various ways to

4    potentially offer loans or P2P lending.

5    There was a number of different companies

6    at the time offering that.

7              Gemini never, ultimately, did

8    anything in that regard.

9         Q.    Why did Gemini look into

10   peer-to-peer lending and loans to

11   customers?

12        A.    I think at the time, Bitfinex,

13   which was probably the biggest exchange in

14   -- in the world, they had a P2P lending

15   product that was very popular.

16             And I think we may have looked

17   to see if it's something that we could --

18   we could do.

19             They, obviously, were not a New

20   York Trust Company and are not a New York

21   Trust Company, so they have different --

22   different limitations on the business.

23        Q.    And was there a benefit to

24   Gemini if they could provide lending to

228

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2    Gemini customers?
 3        A.    Customers who want to lend can
 4    earn yield and customers who want to borrow
 5    can borrow assets that they can use in the
 6    ecosystem.
 7        Q.    What about Gemini?
 8             What is the benefit to Gemini
 9    of providing credit to customers?  What
10    would the benefit have been, in 2015, of
11    doing that?
12        A.    Well, you, presumably, would --
13    would earn an agent fee for -- for
14    providing the service of the matching of
15    borrowers and lenders.
16        Q.    Any other benefits that you can
17    think of?
18        A.    Well, it really depends.
19             I mean, if the -- if the -- if
20    it's just a lending product, like one I
21    just described, then it would -- it would
22    be an agency fee model.
23             I -- I don't -- I mean, what
24    people do with the borrowed capital is --
25    is entirely -- it would be up to them, I
```

229

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2      assume.

3                   They can trade on Gemini, they

4      can trade elsewhere.  It depends.

5                   MR. RODGERS:  Can I see Tab 50

6          -- 35?

7          Q.    Do you know if PearlStreet was

8      originally called Gemini Financial?

9          A.    It may have been.

10         Q.     And what is -- so, what was

11     Gemini Financial?

12         A.     Well, I would have to look at

13     -- it would be helpful to -- to look at any

14     documents that reflect the evolution, but I

15     think it -- I think that there was an

16     exploration around providing a P2P lending

17     or bulletin board service, which may have

18     been the Gemini Financial Service that

19     could have been what we were contemplating

20     using for that -- that product.

21                  However, I think that that

22     evolved into PearlStreet, because it was no

23     longer -- it became a different thing.

24         Q.     And PearlStreet provided loans

25     to Gemini market participants; correct?

230

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2      A.    I disagree, in the sense that

3   it provided loans to people who wanted to

4   borrow.

5           I think in most, if not all,

6   cases they were Gemini customers, but it

7   was a -- a lending business.

8      Q.    Who did PearlStreet lend to

9   that was not a Gemini customer?

10     A.    I'm -- I'm not sure if any of

11  them were not Gemini customers, but --

12     Q.    So, they all were Gemini

13  customers?

14         MR. BAUGHMAN:  Object to the

15      form of the question.

16     A.    Again, we lend to a number of

17  participants.  I think that they were --

18  most, or all of them, were Gemini

19  customers.

20     Q.    And you expected that all of

21  the recipients of PearlStreet loans would

22  use the assets they received to trade on

23  Gemini and in the Gemini auction; correct?

24     A.    It was -- it was a hope and an

25  expectation.  I think there may have been

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2    one or two loan documents that outlined an

 3    expectation, but the majority of loans did

 4    not have that.

 5              And I think, as I testified

 6    earlier, we didn't really have a way to

 7    monitor where the funds were being used.

 8    They could have been traded on Gemini, but

 9    they could have also been traded on another

10     venue.

11              I don't think we had

12     sophisticated tooling at the time to really

13     know where the assets were being traded.

14        Q.    But if somebody did trade --

15              MR. RODGERS:  Withdrawn.

16        Q.    But if somebody took the

17     PearlStreet assets off of the Gemini

18     exchange, that was grounds to withdraw the

19     -- the loan; right?

20        A.    I don't know if there was

21     actual language in a loan document that

22     would give us the ability to call the note.

23              I do think, though, like having

24     a general sense of where the assets are is

25     important, and has been further proven to
```

```
 1            CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     be very important in the wake of FTX.

 3              There's -- counterparty risk is

 4     -- is very real in the space.  If you look

 5     at going as far back as Mt. Gox, you had --

 6     which famously imploded with billions of

 7     dollars.

 8              You have got FTX.

 9              Counterparty risk is -- is very

10      real.  So, being mindful of where the

11      assets are would be a very natural --

12      natural concern and -- and curiosity, on

13      our part.

14         Q.   Do you know if PearlStreet

15      loans increased the volume on the Gemini

16      exchange and in the Gemini auction?

17         A.   I -- I think it's reasonable

18      that -- that -- I mean, it's possible that

19      some of the borrowed coin was -- was used

20      on the Gemini exchange, and used on the

21      Gemini auction, and used on the Coinbase

22      exchange and used probably on the bin- --

23      the -- the -- the FINEX exchange.

24              There's -- probably -- it was

25      probably used in a number of different
```

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2     places.

3          Q.    Wasn't it the intention, behind

4     PearlStreet, that the loans would be

5     provided to select market participants so

6     that they could increase the volume of

7     activity on the Gemini exchange?

8          A.    Certainly, a hope and

9     expectation.

10             The more -- we always want more

11      customers and we always want more activity.

12      That's how we build our business, and

13      that's how we -- we earn trading fees.

14             So, that's -- our goal has been

15      to grow our customers and our marketplace,

16      since Day 1, and that's still our goal

17      today, and we're -- we're proud of that.

18          Q.    And PearlStreet was one method

19      in which you could -- Gemini could increase

20      trading volume by providing funds to

21      customers to trade on the platform; right?

22             MR. BAUGHMAN:    Object to the

23          form of the question.

24          A.    As I've stated before,

25      customers could certainly use borrowed coin

```
1              CONFIDENTIAL ~ CAMERON WINKLEVOSS

2          characterize it.

3                  Withdrawn.

4          Q.    So, then, going to the bullet

5      point that I was going to cover:

6                  "This is not a comprehensive"

7      -- I think he meant to say "list" -- "but

8      here are some strategy questions I wrote

9      down during the meeting."

10                  Do you understand him to be

11      talking about a -- a Board of Managers

12      meeting here?

13          A.    It could be.

14                  But it could also be a little

15      less formal.  It could have been a -- you

16      know, we could have caught up after a Board

17      of Managers meeting, because, again,

18      they're very heavy on process and procedure

19      as he -- as he mentions further up.

20                  So, it might have been, you

21      know, before or after.

22          Q.    Okay.  And one of the bullet

23      points is:

24                  "Margin Trading."

25                  It says:
```

247

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2               "DFS will only allow Gemini

3     customers to trade on full reserve;

4     correct?  Can we negotiate that and/or work

5     around it somehow?"

6               Do you see that?

7          A.   I see that question.

8          Q.   So, what is he -- what is he

9     suggesting in this bullet point -- point

10     about DFS?

11          A.   I think he's asking if there is

12     a way to provide margin trading, given our

13     DFS charter.

14          Q.   And is it correct that "full

15     reserve" means that they can- -- there's no

16     margin trading on Gemini?

17          A.   I think that's accurate.

18               And I think that's a -- that's

19     -- that's the charter that we have.

20               And any change -- material

21     change that would require us to -- to speak

22     to DFS, if -- it doesn't mean they wouldn't

23     allow us to do margin, we would just have

24     to ask for an approval.

25          Q.   Right.

```
1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2               Because at this time, in 2016,

3     correct me, if I'm wrong, but I guess the

4     DFS charter did not allow or permit for

5     margin trading?

6          A.    Our specific agreement did not.

7               But I think if you have seen

8     one, you have seen one.  And they're all

9     pretty specific to the company that they're

10     regulating.

11          Q.    He goes on to say:

12               "Seems like we could encourage

13     a lot more activity if we can take margin.

14     Even, say, 20 percent (5:1 leverage) would

15     provide a lot more juice to traders."

16               Do you see that?

17          A.    I do.

18          Q.    Do you agree that margin "would

19     provide more juice to traders"?

20          A.    I think it's fair to say that

21     -- that margin -- if you look at any trad-

22     -- traditional finance platform, margin

23     increases people's abilities to be trade

24     their activity.

25          Q.    And he says, in the next bullet
```

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2                  So, for 51A, it's the BTC 2016

3           tab.

4                  And for 20 -- 51B, it's the BTC

5           2017 tab.

6                  And I'm going to start, for

7           ease of reference, with the BTC 2017

8           tab, which is 51B.

9          A.    Okay.

10          Q.    And my first question:  Does

11     this reflect the loan matrix that we were

12     talking about?

13          A.    Yes.

14          Q.    And does this is reflect the

15     entities that received PearlStreet loans in

16     2017?

17                  And I'm talking about Exhibit

18     51B.

19          A.    Yes.

20          Q.    Were there any other entities,

21     besides those listed on Exhibit 51B, that

22     received loans in the calender year 2017?

23          A.    I don't think so.

24          Q.    And the PearlStreet loan

25     recipients, listed on 51B, are all Gemini

1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

2    customers; is that correct?

3        A.    Yes.

4        Q.    What is XBT Opps, LLC?

5        A.    It was a -- it -- it is a

6    trading firm.  They might have other lines

7    of business, but I think that they had --

8    you know, they're a proprietary trading

9    firm.

10        Q.    And here, on this Exhibit 51B,

11    it shows, am I reading this correct:

12            "3 bitcoin loans in the amount

13    of 1,000 bitcoin"?

14        A.    I'm sorry, which -- are you --

15    which cell are you referring to?

16        Q.    XBT Opps.

17        A.    Okay.

18        Q.    There is -- it looks like there

19    are three loan amounts for 1,000 BTC, which

20    is translated into $2,700,000.00.

21            Do you see that?

22        A.    Yes.

23        Q.    And then, in -- in "Column F"

24    there's an interest rate.  It's "1.5

25    percent."

379

1
      UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF NEW YORK
      ------------------------------------------X
3        COMMODITY FUTURES TRADING COMMISSION,

4                         PLAINTIFF,

5          -against-    Case No.:
                        22-cv-4563 (AKH)
6

7     GEMINI TRUST COMPANY, LLC,

8                         DEFENDANT.

9        ------------------------------------------X

10

11                      DATE: February 29, 2024

12                      TIME: 9:36 A.M.

13

14

15          CONTINUED CONFIDENTIAL VIDEOTAPED

16     REALTIME DEPOSITION of the Defendant,

17     CAMERON WINKLEVOSS, taken by the Plaintiff,

18     pursuant to a Subpoena and to the Federal

19     Rules of Civil Procedure, held at the

20     offices of Commodity Futures Trading

21     Commission (CFTC), 290 Broadway, 6th Floor,

22     New York, New York 10007, before Karyn

23     Chiusano, a Notary Public of the State of

24     New York.

25      Job No. CS6346514

380

1
      A P P E A R A N C E S :
2
      COMMODITY FUTURES TRADING COMMISSION
3         Attorneys for the Plaintiff
        COMMODITY FUTURES TRADING COMMISSION
4         290 Broadway ~ 6th Floor
        New York, New York 10007
5         BY: ANDREW RODGERS, ESQ.
        arodgers@cftc.gov
6
        BAUGHMAN KROUP BOSSE
7        Attorneys for the Defendant
          GEMINI TRUST COMPANY
8         1 Liberty Plaza ~ 46th Floor
          New York, New York 10006
9         BY: JACK BAUGHMAN, ESQ.
            jbaughman@bkbfirm.com
10

11
        ALSO PRESENT:
12       PAUL BAKER, Videographer
          ELIZABETH LEE, ESQ.
13       DIANA WANG, ESQ.

14         DAVID OAKLAND, ESQ., CFTC, via Zoom

15       ALEJANDRA de URIOSTE, CFTC, via Zoom

16         STEPHEN HITT, ESQ., JFB Legal

17       KATHERINE RASOR, ESQ.

18         BRENT TOMER, ESQ.

19

20

21

22            *        *        *

23

24

25

392

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2      2016.  And it outlines the various fees and
 3      rebates, based on volume and buy/sell
 4      ratio.
 5          Q.    Again, what -- what -- I'm
 6      going to focus your attention on -- on Page
 7      1387, which is Page 3.
 8               And -- and is it your
 9      understanding that this information was
10       available on Gemini's website?
11          A.    Yes.
12          Q.    And this "Maker - Fee
13       Schedule," as an example, would have been
14       available to any participant on the -- in
15       the Gemini marketplace?
16          A.    Correct.
17          Q.    And can you explain --
18               MR. RODGERS:  Sorry.
19          Q.    Turning to Page 2, which is
20       Bates Numbered 173186, what -- and maybe
21       this is what you have -- explained what
22       Dynamic Fee Schedule is.
23               (Witness complies.)
24          A.    I believe that the "Dynamic"
25       element refers to that it will be, I guess,
```

393

```
 1              CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2       re-assessed during different period --

 3       periods --

 4            Q.    Okay.

 5            A.    -- of time.

 6            Q.    I understand.  And that's

 7       helpful.

 8                  And on Page 3, just focussing

 9       on the "Maker - Fee Schedule."

10                     What is a "Maker"?

11            A.    I believe a Maker is someone

12        who places or -- places -- well, I'll just

13        -- I'll read the text here, since that's

14        what we wrote:

15                  "A Maker order adds liquidity

16        to the marketplace, and it's called

17        'liquidity making.'  The customer who

18        places it is referred to as a Maker."

19            Q.    And based on this graph, or

20        chart, a Maker can either reduce the fee

21        that is charged or -- and/or obtain a

22        rebate, based on increased volume and a

23        buy/sell ratio that approaches 50/50; is

24        that -- is that accurate?

25            A.    If you're -- yeah.  If the
```

```
1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
2     buy/sell ratio is 50/50, it looks like the
3     -- you can achieve the highest rebates at
4     that ratio.  And at the highest volume, you
5     can achieve the lowest fees.
6          Q.   And what is a -- a rebate?
7          A.   A rebate is, essentially,
8     paying someone who -- who -- who provides
9     liquidity or adds liquidity to the market.
10             And the reason they get paid is
11      because they take risk by showing liquidity
12      on the book.  That has risk, as opposed to
13      takers, who take orders or take liquidity
14      off the book.
15             Liquidity makers are providing
16      a service and taking risk for that service,
17      so they're compensated in rebates.
18             And I think this is a pretty
19      common structure throughout traditional
20      finance.
21        Q.   And the rebate, it -- just to
22      -- just so it's clear:  The rebate is paid
23      by whom?
24        A.   By Gemini, to the market
25      participant.
```

395

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2    Q.    And based on the cover e-mail

3    and the date of the Policy and Procedure,

4    is it your understanding that this is the

5    Public Fee Schedule that was in place in

6    2017?

7    A.    It's -- I think so, but it

8    doesn't look like maybe it was revised.

9          So, I'm not -- I -- I think so.

10    Though, there's isn't, like, a timestamp on

11    the -- the actual fee schedule.

12    Q.    Yeah.

13          I was relying on your

14    statement, at the bottom of the e-mail,

15    that the trading -- the attached trading

16    schedules outlines the trading fee program

17    that we had in place at the time we

18    submitted it.

19          And you understood that you

20    submitted information to the CFTC in the

21    fall of 2017; correct?

22    A.    Yeah.

23          So, maybe it's the -- maybe

24    it's the fee schedule in the fall of 2017.

25          I -- I don't know exactly --

396

1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

2        Q.    Okay.

3        A.    -- the timing.

4        Q.    One last thing on this

5    document, it says -- below the chart,

6    there's a -- at the very bottom, it says:

7            "Note, all trades executed in

8    Gemini's daily auction."  And then, there

9    is a paren:  "(Link to marketplace page and

10    anchor received the liquidity making fee

11    rate.)"

12            So, what -- what does that

13    indicate?

14        A.    Auction orders were -- were

15    treated as -- as liquidity making orders

16    and received that -- that fee rate.

17        Q.    And so, if somebody was

18    participating in the auction, would their

19    auction volume and their buy/sell ratio be

20    included in -- in their participation on

21    the Gemini exchange, as well?

22            Would those two be consolidated

23    to determine Dynamic Fee Schedule for a

24    specific participant?

25        A.    Based on this, it -- it sounds

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     like your auction volume and your gross
 3     trading volume across three order --
 4     respective Order Books would all contribute
 5     or count towards your -- your overall
 6     volume.  I think that's what it's saying.
 7               Therefore, you would receive --
 8     you -- you would, essentially, receive a
 9     benefit from your total volume between the
10      auction and the three Order Books.
11          Q.   If you look back at Exhibit 53,
12      on Page 47, which addresses the agreements
13      granting preferential terms.
14               It says -- in -- in the first
15      paragraph:
16               "Our organization may provide
17      certain high volume users, Market Makers,
18      or other special case users (priority
19      users) with certain terms different from
20      those given under the Standard User
21      Agreement."
22               Do you see -- do you see that
23      sentence?
24               MR. BAUGHMAN:  I'm just
25          objecting.
```

1       CONFIDENTIAL ~ CAMERON WINKLEVOSS

2              I don't like the word:

3          "Certain" was in with what was

4           written there.

5              MR. RODGERS:  Apologies.

6       Q.    Do you see the first sentence

7   of the -- the policy, Mr. Winklevoss?

8       A.    Of the -- this page, 47?

9       Q.    Of the agreement granting

10   Preferential Terms Policy?

11       A.    Yes.

12       Q.    In this agreement granting

13   Preferential Terms Policy, this applied to

14   Market Makers; correct?

15       A.    It -- it looks like it does,

16   yes.

17       Q.    So, if you're a Market Maker on

18   the Gemini exchange or in the Gemini

19   auction, you can earn rebates through the

20   Public Fee Schedule, as well as,

21   potentially, obtain a Side Letter to -- to

22   obtain more -- more preferential fee

23   schedule; correct?

24       A.    I think any market participant

25   could ask and request a different fee

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     schedule, in any part of the marketplace,

 3     based on their needs or what they're

 4     looking for to do.

 5              Whether it was the Continuous

 6     Order Book or -- or the auction, I think

 7     that's -- that was available to anybody.

 8        Q.   So, there were two programs for

 9     the Market Makers; there's the Public Fee

10      Schedule, and then the special deals under

11      the policy of granting preferential terms;

12      right?

13              MR. BAUGHMAN:  Object to the --

14         object to the form of the question.

15              Object to the word "program."

16        A.    Yeah.

17              I was going to disagree that we

18     did not have a Market Making Program.

19              We had a publicly-available

20     published Fee Schedule, and then market

21     participants could request different fees.

22     And we evaluated that on a case-by-case

23     basis.

24        Q.    Okay.  So, a -- a Market Maker

25     could obtain fees under the Public Fee
```

400

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     Schedule or rebates under the Public Fee
 3     Schedule, as well as obtain special deals
 4     under the Preferential Treatment Policy;
 5     correct?
 6          A.   I'm not sure I agree with
 7     the -- the -- how -- how you stated that.
 8               There's a publicly-available
 9     Published Fee Schedule, which anybody can
10      achieve.
11               And then, separately, any
12      participant could request a different fee
13      schedule or structure.  And we would
14      evaluate that on a case-by-case basis,
15      according to our policy.
16          Q.   And, specifically, Market
17      Makers, as referenced in this policy, could
18      request special terms under the
19      Preferential Treatment Policy?
20          A.   Anybody could.
21               Obviously some of the -- I
22      think most of the individuals were
23      liquidity providers or professional
24      traders, and people who make markets and
25      trade through venues throughout the crypto
```

401

        CONFIDENTIAL ~ CAMERON WINKLEVOSS

1    ecosystem.

2            But as I stated before, it was

3    open to anybody.

4        Q.    And what is the purpose of the

5    rebate and fee override --

6            MR. RODGERS:  Withdrawn.

7        Q.    What is the -- the purpose of a

8    -- of the Public Fee Schedule that Gemini

9    published on its -- on its website?

10       A.    I believe it's to allow

11   customers to know the fee schedule that we

12   offer.

13       Q.    And then, what is the purpose

14   of the policy granting preferential terms?

15       A.    To cover the instances where

16   participants request a adjustment or a

17   different fee structure, and how we handle

18   that as a company.

19       Q.    In 2017, were you aware that

20   the agreement granting Preferential Terms

21   Policy was in place?

22       A.    I believe so.

23       Q.    Did you write the policies and

24   procedural --

409

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     the fee schedule.

 3          Q.    And -- and can you name any

 4     entities that did that, in 2017?

 5          A.    Off the top of my head, without

 6     looking at the -- the schedule or -- or the

 7     -- the different agreements?  No.

 8          Q.    This says, in this last

 9     paragraph:

10               "It is undisputed that Cameron

11      and Tyler Winklevoss were aware that fee

12      overrides existed."

13               Is that an accurate statement,

14      Mr. Winklevoss?

15          A.    Yes.

16               As I stated before, this was a

17      -- you know, we had a policy for this.

18               We tried to meet our customer's

19      needs.  And our goal was to, of course,

20      always grow our marketplace since Day 1.

21          Q.    It says:

22               "The Winklevosses were also

23      aware that appropriate fee overrides could

24      increase volume on the exchange."

25               Is that an accurate statement,
```

410

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2    Mr. Winklevoss?

 3          A.    I think that, as I've -- as

 4    I've stated before, as the Founder of a

 5    marketplace, we're always try to grow the

 6    marketplace.  So, it's -- it's an accurate

 7    statement.

 8                And there's absolutely nothing

 9    wrong with wanting to try to build your

10     business and grow volume.

11          Q.    As you alluded to, I'm going to

12     switch gears and move on to the -- the

13     rebate fraud.

14                At some point, you discovered

15     that there was a multi-million dollar

16     rebate fraud occurring on Gemini; is that

17     correct?

18          A.    Yes.

19          Q.    Do you recall when you learned

20     about the rebate fraud?

21          A.    I believe it was some time in

22     September -- either late August or

23     September of 2017.

24                MR. RODGERS:  I'm going to do

25          61.
```

411

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2                    (Whereupon, Slack Message was

3            marked as Exhibit 61 for

4            identification as of this date by the

5            Reporter.)

6          Q.    Who was involved in the rebate

7     fraud?

8          A.    There was a couple of different

9     parties.

10                    Benjamin Small and Shane

11    Molidor were the individuals at Gemini that

12    were involved.

13                    In addition to Danny Kim, who

14    was not at Gemini at the time, but was part

15    of the fraud, and interacting with the two

16    market participants that would trade and

17    generate rebates.

18                    And -- and those entities were

19    Cardano and Hashtech.  And they traded

20    against each other to defraud Gemini of

21    millions of dollars in rebates.

22          Q.    And what is your understanding

23    of Danny Kim's role in the fraud?

24          A.    I believe that, based on what I

25    have come to -- to learn, is that he played

415

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2    Q.    And what is -- can you explain

3    to us what Shane is saying here, in

4    response to your request -- the question

5    about the source of the 113 bitcoin

6    negative trading fees?

7    A.    When he says:  "The reason

8    behind this?"

9    Q.    That's right.

10    A.    He's describing, generally

11    speaking, if someone with a -- well, I'll

12    just read it:

13    "The reason behind this is fee

14    overrides for sub-15 BPS taker fee, given

15    to selected accounts.

16    For example, when an account

17    with a fee override of 10 basis points,

18    taker fee trades in -- in an account with a

19    15 basis point maker rebate, Gemini incurs

20    a 5 basis point loss in the trade."

21    So, essentially, if someone --

22    if two people cross each other, and the net

23    rebate paid out is positive, then Gemini

24    will lose money on that trade because it's

25    only earning -- it's earning less in fees

416

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     than paying out in rebates.
 3          Q.    Okay.  That's what I was
 4     driving at.
 5               The fees charged and the
 6     rebates given meant that Gemini lost money
 7     on every trade between certain accounts?
 8          A.    And that -- yeah.  And
 9     that's -- that's what he's describing.
10          Q.    And further down, you say:
11               "Where is the 13" --
12               MR. RODGERS:  Withdrawn.
13          Q.    Further down, you say:
14               "Where is the 113 bitcoin going
15     to?  Who, in particular"?
16          A.    Yes.
17          Q.    And then, you ask:
18               "Was this an active decision to
19     subsidize and increase volume on the
20     ETC-BTC?"
21               What -- what are you asking
22     about here?
23          A.    I'm trying to understand what's
24     going on.  And if there's one or two
25     accounts, in particular, that are
```

424

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     needs of our customers.  We had a policy

 3     around that.  It was part of operating our

 4     marketplace.

 5          Q.   Who was responsible for

 6     business development in August of 2017 at

 7     Gemini?

 8          A.   Well, I believe Shane Molidor

 9     was either the Head of that or -- or a

10      Senior Member of that team.

11               And then, essentially, was

12      transitioning out of Gemini at some point

13      this month.  I think he gave notice within

14      a couple of weeks before the end of August.

15               So -- but I think that he would

16      have been point on all of these customer

17      relationships.

18          Q.   And at this time, did Ben --

19     Shane Molidor report to Ben Small?

20          A.   I believe he did.

21          Q.   So, you suspected that both Ben

22     Small and Shane Molidor were involved in

23      the rebate fraud that resulted in the July

24      trading losses; correct?

25          A.   At this time, I'm trying to
```

```
 1            CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2      understand what -- what happened.
 3                 We have since won a $5 million
 4      judgment against Benjamin Small.  And, yes,
 5      they were -- they were involved.
 6          Q.    Was the -- the judgment based
 7      on his involvement in the rebate fraud?
 8          A.    We can go and read the
 9      judgment -- the specifics of it, but I
10       believe he was grossly negligent.  And
11       clearly presided over a massive
12       multi-million dollar fraud.
13          Q.    And as a result of that, was
14       Shane Molidor suspended by Gemini?
15          A.    He was suspended.
16                 The initial suspension, because
17       -- was, I believe, due to directing
18       business to a competitor that he was going
19       to.  That was the initial basis for the
20       suspension.
21                 And then, we later uncovered
22       the fraud and the fee arrangements that he
23       gave to two participants that then
24       defrauded the market.
25          Q.    Did you learn about the basis
```

426

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     for the suspension, which was -- I'm going

 3     to paraphrase -- channelling business away

 4     from Gemini to a competitor, as part of the

 5     investigation into the rebate fraud?

 6          A.    I believe that they were -- we

 7     suspended him based on him directing

 8     business to a competitor that he was going

 9     to.  That was, I believe, the basis of the

10      suspension.

11             And then, as we continued to

12      dig deeper, we uncovered the rebate fraud.

13          Q.    And did Shane Molidor end up

14      working for the competitor?

15          A.    He did not.

16             The competitor chose not to

17      employ him, based on the -- the behavior

18      that we raised to the competitor that he

19      was steering business over to -- to them.

20          Q.    And who's the competitor?

21          A.    Circle.

22          Q.    And Circle is the entity we

23      discussed earlier that received operational

24      advances and also PearlStreet loans?

25             MR. BAUGHMAN:  Object to the
```

427

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2         form.
 3        A.    Circle was the customer.  I
 4   believe, that they got operational
 5   advances.  Or, rather, you know, had some.
 6             And they -- what was the other
 7   part of your question?
 8        Q.    Did they also receive
 9   PearlStreet loans?
10        A.    They were borrowers of
11    PearlStreet loans.
12        Q.    And then, what happened to Ben
13    Small?
14        A.    We suspended Ben Small on the
15    same day -- later the same day, because it
16    became clear to us that Ben had tipped off
17    Shane Molidor about the -- about his
18    pending suspension, and Ben mishandled
19    that.
20             We suspended him, and then
21    tried to understand why the Chief Operating
22    Officer would do that.
23             What would be the motivation?
24             And then, as we dug deeper, we
25    uncovered the gross negligence on his part,
```

428

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     and the fraud that he oversaw, with Shane

 3     as his direct report.

 4          Q.   But do you remember the date on

 5     which Ben Small was suspended?

 6          A.   It was in -- well, it was the

 7     same date -- day that Shane Molidor was

 8     suspended.

 9               And it was late August.

10          Q.   So, let's see if we can get

11       more specific.

12               MR. RODGERS:  Can I see the

13          Exhibit 66, please?

14               (Whereupon, E-mail Chain was

15          marked as Exhibit 66 for

16          identification as of this date by the

17          Reporter.)

18               MR. RODGERS:  I'm going to mark

19          as Exhibit 66 a document Bates

20          Stamped GEM_CFTC165393.

21               THE WITNESS:  Thanks.

22               THE COURT REPORTER:  You're

23          welcome.

24          A.   Okay.

25          Q.   Does this -- so, this is an
```

429

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2    e-mail chain between yourself and Ben

 3    Small.  It's dated August 30th, 2017.

 4            Does this document refresh your

 5    recollection on the date that Ben Small was

 6    suspended by Gemini?

 7        A.    Yes.

 8            It looks like it was August

 9    30th of 2017.

10        Q.    And why was it a grounds for

11    suspension that he had informed an -- an

12    employee that he was going to be

13    terminated?

14            MR. BAUGHMAN:  Object to the

15      form.

16            I -- okay.  No.  No.

17            Go -- go ahead.

18            Sorry.

19        A.    It's highly concerning if a

20    C-level Executive is unable to -- or

21    mishandles a HR issue of this matter.

22            And we needed to understand

23    why.

24        Q.    Had you had any prior issues

25    with Mr. Small's performance, prior to his
```

430

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2    suspension on August 30th, 2017?

 3        A.    What type of performance?

 4            Like, his ability to handle an

 5    HR matter or --

 6        Q.    Were there any other concerns,

 7    on your part, with the way in which Mr.

 8    Small was performing his job functions?

 9        A.    I think there is -- we -- I

10    think that there is one point, when I asked

11    him to, I believe, for audit reasons, file

12    information related to fee schedules.

13            And he -- I later found out

14    that he did not do that.  Though, I'm not

15    sure I knew that at the time.

16            And -- but I think that the --

17    the -- his handling of this issue was --

18    was deeply concerning.

19        Q.    So, the -- the sole grounds for

20    his suspension was that he tipped off Shane

21    Molidor; correct?

22        A.    That was the grounds for his --

23    his suspension, his handling -- his

24    mishandling of that issue.

25            And then, we later uncovered
```

431

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2    gross negligence and the large rebate fraud

 3    against Gemini.

 4        Q.    And what happened when you

 5    terminated Ben Small?

 6            MR. RODGERS:  Withdrawn.

 7        Q.    What happened when you

 8    suspended Ben Small?

 9        A.    Well, he -- he threatened to

10    destroy the company and retaliate against

11    the company, which he proceeded to do by

12    falling -- filing multiple false

13    whistleblower complaints, which were full

14    of lies and -- and incorrect.

15            And that's what he's been

16    doing.

17        Q.    So, he threatened to destroy

18    the company by reporting -- by providing

19    information to the CFTC, when you suspended

20    him on August 30th, 2017?

21        A.    No.

22            He -- during that meeting, he

23    simply said that he would destroy the

24    company.  And he -- he threatened -- he was

25    very threatening, but did not go beyond
```

437

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2      different thing, and must be called out in

3      the context of a marketplace.  That's not

4      what this is referring to.

5          Q.   Yeah.

6              But mark- -- but Market Makers

7      could collude to manipulate the exchange,

8      and that's what you're saying here;

9      correct?

10         A.   I'm not saying that.

11         Q.   What did Gemini do to the

12      colluding traders?

13         A.   Well, we -- we sued them.

14              We also froze their accounts,

15      and clawed back the value of the rebates

16      that they defrauded us of.

17              And they -- I believe we

18      settled the -- the arbitration, and the

19      traders gave back everything.

20              So, in a very short period of

21      time, we recovered all of the losses, and

22      that's what we did.

23         Q.   In September and October of

24      2017, was -- was Gemini involved in the

25      product certification of -- of a bitcoin

438

```
1           CONFIDENTIAL ~ CAMERON WINKLEVOSS

2       futures contract?

3           A.    I just want to clarify:  Like,

4       "involved" on what level?

5               What do you mean by that?

6           Q.    Were you -- was Gemini engaged

7       with the CFE in providing information to

8       the CFTC about a proposed product listing?

9           A.    We provided information to the

10      CFE.  We may have also provided information

11      to the CFTC in -- as part of a -- the

12      self-certification process of the XBT

13      futures contract.

14          Q.    And did you think the CFTC

15      would want to know that Gemini had detected

16      manipulation on the Gemini exchange tied to

17      Gemini's Market Maker Rebate Program?

18              MR. BAUGHMAN:  Objection to the

19          form of the question.

20          A.    I can't read the minds of this

21      CFTC.

22              But if they asked us a question

23      around anything related to price

24      manipulation, of course we would answer

25      that and -- and be as helpful as possible.
```

439

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2      But as I also stated earlier,

3    this was not price manipulation, this was a

4    rebate fraud.

5      Q.    You knew that the disclosing

6    manipulative conduct to the CFTC would have

7    raised more questions from the CFTC?

8          MR. BAUGHMAN:  Object to the

9       form of the question.

10     A.    I have no reason to believe --

11    I -- I don't know what the CFTC would have

12    asked about it.

13          And if the CFTC asked -- we --

14    we answered dozens and dozens of questions

15    and multiple submissions throughout the

16    summer and fall of 2017.

17          There's never -- there was

18    never a question that went unanswered.  And

19    all of our answers were complete and

20    accurate.

21          And everything in our behavior

22    demonstrates our willingness to provide

23    information on anything the CFTC requested.

24          And this was probably one of

25    the longest self-certification processes.

440

```
1         CONFIDENTIAL ~ CAMERON WINKLEVOSS
2    I think, that there's been -- I think the
3    Chairman at the time, Chairman Giancarlo,
4    said as much, that it was the most
5    scrutinized and robust self-certification
6    process the CFTC has ever gone through.
7              So -- and -- and we were part
8    of that.  And we were proud of -- of the
9    way we contributed.  And would have
10    absolutely answered any other additional
11    questions.
12         Q.    Okay.  We will get to that.
13    I'm going to go over the self-certification
14    in -- in a moment.
15              I just want to get to the
16    question about disclosing manipulative
17    conduct that you knew about in September of
18    2017.
19              MR. RODGERS:  So, I'm going to
20         mark an exhibit, 73, which is Bates
21         Stamped GEM_CFTC084698.
22              (Whereupon, E-mail from Jim
23         Overdahl to Cameron Winklevoss was
24         marked as Exhibit 73 for
25         identification as of this date by the
```

441

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2        Reporter.)

 3             THE COURT REPORTER:  Here you

 4        go.

 5             THE WITNESS:  Thank you.

 6             THE COURT REPORTER:  You're

 7        welcome.

 8             MR. RODGERS:  And for the

 9        record, Exhibit 73 is an e-mail

10         between Jim Overdahl,

11         O-V-E-R-D-A-H-L, and Cameron

12         Winklevoss, CCing others, dated

13         September 1st, 2017.

14        A.   Okay.

15        Q.   At the bottom of this e-mail,

16     Mr. Winklevoss --

17             MR. RODGERS:  Withdrawn.

18             Let me start over.

19        Q.   Who is Jim Overdahl?

20        A.   He worked -- works at Delta

21     Strategy, and he -- I believe, he's an

22     expert in market structure.  And -- yeah,

23     that's -- that's what I think is his

24     expertise.

25        Q.   Did Gemini retain Jim Overdahl
```

442

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     in connection with the self-certification

 3     of -- of the proposed bitcoin futures

 4     contract?

 5         A.   I'm not sure if he was retained

 6     prior or during, but he certainly -- I

 7     think he joined some meetings with the

 8     CFTC, and was -- was helpful in the

 9     process.

10         Q.   And what is Delta Strat?

11         A.   I'm not entirely sure what the

12     -- what the organization is.  I think that

13     they -- it's -- it's a strategy group, but

14     I -- I think they have market insight and

15     strategy.

16              But I'm not sure, specifically,

17     beyond that, what they do.

18         Q.   And do you recognize this

19     e-mail?

20              (Witness reviews document.)

21         A.   It has been a little while, but

22     it -- it looks familiar.

23         Q.   Yeah.

24              And on the bottom e-mail, you

25     write in the second -- third full sentence:
```

443

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2               "Basically, they want to

3      understand auction mechanism better and how

4      it is not susceptible to manipulation."

5               Do you see that?

6          A.    Yes.

7          Q.    And do you understand "they" to

8      mean the CFTC?

9          A.    Yes.

10         Q.    And how did you know --

11         A.    How- -- however, it -- it could

12     be the CFE or CBOE asking on behalf of the

13     CFTC.

14              But -- okay.  Let -- let's --

15     let's assume it's the CFTC.

16         Q.    So, how did you know that the

17     CFTC was focused on the auction mechanism

18     and how it is not susceptible to

19     manipulation?

20         A.    It, likely, was a question, or

21     multiple questions, through different

22     questions and Q and A -- or submissions

23     that they -- or, rather, requests for

24     information that they sent, either to the

25     CFE and/or to us directly.

473

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     prevention --

 3               MR. RODGERS:  Excuse me.

 4          Q.   -- in the Gemini auction?

 5          A.   I believe at some point, we

 6     did.

 7               I don't think it was there,

 8     initially, but we -- we did add it.

 9          Q.   Did Gemini have self-trade

10     prevention between the Continuous Order

11     Book and the auction-only Order Book?

12               MR. BAUGHMAN:  Object to the

13          form of the question.

14          A.   So, the self-trade prevention

15     was in the Continuous Order Book and the

16     auction Order Book.

17               I don't believe there was any

18     type of mechanism in between the auction

19     and the Continuous Order Book when they

20     interacted, in part, because it is not a

21     self-cross, so to speak.

22               It's a -- the -- the auction is

23     a bulk trade that's printed, and then

24     interacts with the Continuous Order Book.

25          Q.   And did you know, in November
```

474

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2    of 2017, that the Market Maker

3    participating in both books, with a decent

4    spread, may very well cross themselves

5    between the auction-only Order Book and the

6    Continuous Order Book?

7        A.    I'm aware of -- of a phenomena

8    called folding.  I don't know when I became

9    aware of it.

10            Probably through this -- this

11    matter -- at some point during this matter.

12    And --

13        Q.    Can I pause there and ask you

14    what you mean by "this matter?"

15        A.    The CFTC suing Gemini.

16        Q.    Okay.

17        A.    I think that the -- the folding

18    phenomena -- I don't believe -- I'm not

19    sure if there's ever examples of it.  There

20    could be.

21            But as I stated before:  The --

22    a self-cross implies that individuals are

23    actually able to cross themselves.  And --

24    and the auction was a bulk trade or a bulk

25    print that interacted with the continuous

475

                    CONFIDENTIAL ~ CAMERON WINKLEVOSS

1       book.  And you could not, I think,

2       purposely, or with intent, try to cross

3       yourself.

4               It was a phenomena that could,

5       theoretically, occur.  I don't know if we

6       ever witnessed instances of it.

7               But I don't believe that

8       constitutes a -- a self-cross.

9           Q.   But you were told that a

10      self-cross may very well happen, based on

11      the nature of the way the auction is

12      executed through the Continuous Order Book?

13          A.   Again, I became aware of a

14      theoretical phenomena that folks

15      identified.

16              And a determination was also

17      made, I think, in that identification that

18      it would not be possible for someone to

19      actively abuse or take advantage of, given

20      the properties that I just outlined.  And

21      it doesn't constitute self- -- a

22      self-cross.

23          Q.   But it could very well result

24      in a Market Maker that's participate --

486

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2          "Where we do not attempt

3     self-trade prevention is where the auction

4     book and the continuous book are folded

5     together during the auction, because the

6     auction fill is regarded as a bulk trade.

7          It would be impossible for a

8     Market Maker to be on both sides, but the

9     auction volume is co-mingled, so we do not

10     regard it as a self-trade."

11          Do you see that?

12     A.    I do.

13     Q.    And is that what you were

14     describing to me before you saw this

15     document, that the nature of this folding

16     phenomenon, where the auction is executed

17     as a bulk trade through the Continuous

18     Order Book?

19          MR. BAUGHMAN:  Object to the

20       form.

21     A.    This is in line with what I

22     just testified.

23     Q.    And Rose Toomey is telling you

24     that:  It's possible for a Market Maker to

25     be on both sides; correct?

487

CONFIDENTIAL ~ CAMERON WINKLEVOSS

A.    She says, in quote:

        "Both sides."

        So -- and she further clarifies

exactly what I was just saying, that:

        "It's a bulk trade, we don't

regard it as a self-trade."

        And for all of the reasons that

I just outlined.

    Q.    Who -- who told you that --

that this phenomenon would not result in a

self-trade and should not be regarded as a

self-trade?

    A.    I believe Rose and -- and --

and a number of Engineers, who are not only

great Engineers, but also worked -- are

very familiar with -- with market structure

and worked at firms in the electronic

market world or space.

        I don't know who else they

spoke to, but these are very talented,

intelligent people.  And I -- I trust their

judgment.

    Q.    Did you ask Jim Overdahl

whether executing the auction as a bulk

514

```
 1            CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2      to Dennis to discuss the folding
 3      phenomenon?
 4                MR. BAUGHMAN:  Object to the
 5         form of the question.
 6         A.    I -- I don't know, based on the
 7      timing of that other conversation.  But she
 8      may not have spoken to him yet about this.
 9         Q.    And further down, Rose Toomey
10      says:  "It's a big deal.  It cannot be a
11      launch blocker.  Pray."
12                What did you understand her to
13      be saying here?
14         A.    It has been a while, but based
15      on what she is saying, that anything that
16      -- I think the -- the lift to make a change
17      to the auction, with respect to this, would
18      probably be a fairly large lift.  And she
19      is, you know, hoping that that does not --
20      is not required.
21                I think it's as simple as that.
22         Q.    Did you ever follow-up with --
23      with Rose Toomey to see if she spoke with
24      Dennis at CBOE?
25         A.    I have no reason to believe
```

515

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2      that she didn't.
 3              I don't know if there was a
 4      direct follow-up, but I have -- I have no
 5      reason -- I mean, Rose is brilliant, and
 6      she is diligent, and I have no reason to
 7      believe she did not talk to Dennis or other
 8      folks at CBOE about this.
 9          Q.   Did you think the
10       implementation of self-trade prevention
11       between the Continuous Order Book and the
12       auction order book could be a launch
13       blocker?
14              MR. BAUGHMAN:  Object to the
15          form of the question.
16          A.   So, I -- I disagree that --
17      that there was -- it was not possible to
18      self-trade between the two -- the two --
19      there was an interaction, as we discussed,
20      about folding.  About a possible
21      theoretical phenomena.
22              I don't know what Rose's
23      conversations were with Dennis, but I have
24      no reason to believe that she didn't
25      discuss her determination, and that the --
```

```
1              CONFIDENTIAL ~ CAMERON WINKLEVOSS

2       the analysis done by folks on our side with

3       the CBOE.

4                   We, of course, could ask

5       Dennis.  That might be a good path to

6       pursue.

7                   And I'm trying to think what

8       else, related to your question --

9          Q.   Well, I don't think -- in

10       fairness, I don't think you answered my

11       question.  So, let me just repeat it.

12                  Did you think self-trade

13       prevention between the Continuous Order

14       Book and the auction order book could be a

15       launch blocker?

16                  MR. BAUGHMAN:  Object to the

17            form of the question.

18          A.    I don't think -- I don't think

19       it was -- I don't -- I -- I don't think it

20       was.

21          Q.   And the launch blocker you

22       understand to be a reference to the

23       self-certification of the bitcoin futures

24       contract?

25                  MR. BAUGHMAN:  Object to the
```

540

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2          identification as of this date by the

 3          Reporter.)

 4              THE COURT REPORTER:  Here you

 5          go.

 6              THE WITNESS:  Thank you.

 7              MR. RODGERS:  So, for the

 8          record, Exhibit 88 is an e-mail chain

 9          involving Tyler Winklevoss, copying

10           Cameron Winklevoss, dated February

11           21st, 2017.

12          Q.    Have you had a chance to review

13      the e-mail, Mr. Winklevoss?

14          A.    Yes.

15          Q.    What do you understand to be

16      happening in this e-mail?

17          A.    It sounds like the CBOE wants

18      to list more products, based on the Gemini

19      auction or the Gemini marketplace.

20          Q.    And so, Tyler Winklevoss, on

21      February 20th, he's the one that reached

22      out to CBOE to share some timing on items

23      with you, and -- and checks in on the

24      status, I believe, for specs for the

25      bitcoin settled futures product.
```

541

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2          So, does this reflect Tyler

3    Winklevoss liaising with the CBOE on the

4    bitcoin futures contract?

5          MR. BAUGHMAN:  Object to the

6           form.

7          A.    I believe the initial

8    discussions with CBOE was to be the

9    exchange that would list our bitcoin ETF.

10          And they were working on the

11    19B4 application.  And we had -- you know,

12    we were -- we decided to list the ETF, if

13    approved, on CBOE.  And so, that started

14    the working relationship with them.

15          That product wasn't -- was

16    disapproved.  And then, after the

17    disapproval, I believe in May of that year,

18    there or abouts, we also were talking about

19    potentially building derivative products

20    off of the Gemini marketplace.

21          Q.    Who's John Deters?

22          A.    I believe he was the Head of

23    Strategy at CBOE.

24          Q.    And he says in an e-mail on

25    February 20th, 2017, at 9:56 P.M., the end

542

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1    of the first -- the second paragraph:

2            "So, you can expect us to ask

3    for your close collaboration along those

4    dimensions as we move forward."

5            What did you understand him to

6    -- to mean when he said he -- he would

7    expect to ask for -- I'm assuming "your"

8    means Gemini's -- "close collaboration?"

9        A.    I think it relates to all of

10    the interaction we had working through --

11    trying to stand up the XBT futures product.

12            And it ended up, you know,

13    taking many long days and nights and

14    working through weekends to provide

15    information, and whatever was necessary to

16    help them -- assist them in, ultimately,

17    filing their application.

18        Q.    And the next sentence says:

19            "Likewise, we will be looking

20    to you for support in our efforts with O --

21    OCC and the CFTC."

22            So, what's OCC?

23        A.    It is a clearing -- I think

24    it's the clearing organization that CBOE

543

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2      uses.

 3          Q.    And so, he's making clear here

 4      that the -- that CBOE would be looking for

 5      Gemini's support in the efforts with the

 6      CFTC?

 7          A.    Well, if we're not responsive

 8      to CBOE, and we're not supportive or able

 9      to give them the information they need to

10       be responsive to the CFTC, then -- then it

11       probably wouldn't work or the product would

12       get approved much later.

13              So, I think that that, again,

14       just describes the -- the engagement that

15       we had with them throughout 2017.

16          Q.    And Tyler responds:

17              "Great.  Sounds good.  Like we

18       are all on the same page with regards to

19       moving quickly.  And we look forward to

20       working closely with you to collaborate on

21       IP, et cetera, in addition to interfacing

22       with the OCC and CFTC."

23              So, is it fair to read this

24       e-mail as indicating that you and Gemini

25       understood that you would need to interface
```

544

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     with the CFTC in connection with the

 3     proposed product listing?

 4              MR. BAUGHMAN:  Objection.

 5              You didn't read it correctly.

 6        A.    I'm not sure what the question

 7     -- I feel like I answered this already.

 8              The -- the -- it was a CBOE

 9     product.  We engaged with them throughout

10      2017 to be helpful and supportive in that

11      product.

12              I think at times we may have

13      interacted with the CFTC directly or as

14      part of a -- a group.

15              And I'm not sure what else your

16      asking on this topic.

17              MR. RODGERS:  Well, let's move

18          on to Exhibit 89, which is a document

19          Bates Numbered GEM_CFTC092650.

20              (Whereupon, E-mail Chain was

21          marked as Exhibit 89 for

22          identification as of this date by the

23          Reporter.)

24              THE COURT REPORTER:  Here you

25          go.
```

551

CONFIDENTIAL ~ CAMERON WINKLEVOSS

author of this used italics to describe the
characteristics of something.  So, instead
of saying market orders, it's italicized.

Limit orders is an order type,
that's italicized.  Auction-only is an
order type, that's italicized.

And it looks like pre-funded is
describing the orders, which I think is --
is perhaps different than how other
exchanges in TradFi work, because most of
them are probably not pre-funded.  And so,
it's simply referring to the fact that ours
is pre-funded.

So, I think the italicized is
to assist the reader in understanding
different characteristics of different
orders.

Q.   Is pre-funded the same thing as
fully funded?

A.   Well, we've used the term "full
reserve exchange."  I think -- I don't know
if we've used pre-funded elsewhere, but I
believe that it's describing the same
thing.

```
1         CONFIDENTIAL ~ CAMERON WINKLEVOSS

2     Q.    And if you can turn to Page 7.

3           (Witness complies.)

4     Q.    Which is Bates Numbered 92658.

5           Under the question it says:

6           "Please describe procedures to

7    eliminate or reduce the impact of

8    potentially unrepresented data in auction."

9           In the last sentence it says:

10          "Also, as discussed above, all

11   orders on Gemini must be fully funded.

12   This requirement substantially increases

13   the economic risks of attempted

14   manipulation or other nefarious activity.

15   Example:  Spoofing."

16          MR. BAUGHMAN:  Is there a

17      question?

18          MR. RODGERS:  I'm asking if he

19      -- if he's --

20    Q.    Do you see that language?

21    A.    Yes.

22    Q.    Okay.  Did -- it's the Gemini

23   users that fully fund the orders; is that

24   right?

25    A.    Correct.
```

553

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2               We are a full reserve exchange.

3               We probably -- it looks like we

4      described it as orders being also

5      pre-funded, another way to describe full

6      reserve or fully funded.  They're all

7      speaking to the same thing.

8          Q.    What is the connection between

9      fully funded or- -- orders and attempted

10      manipulation?

11          A.    Well, I believe that the -- the

12      -- the greater the -- if -- if assets have

13      to be delivered to a venue, then that makes

14      it harder to manipulate in the sense that

15      people have to trade with physical assets

16      as opposed to getting credit or -- or

17      margin.

18               And I guess they can scale

19      their trading and -- and engage in more

20      manipulative activity.

21          Q.    Do you know when you first met

22      with the CFTC, in connection with the

23      certification of the bitcoin futures

24      contract?

25          A.    I believe CBOE gave a

554

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2    presentation in the summer of 2017, and I

 3    was present during their presentation.  And

 4    I think Tyler was also present, as was Ben

 5    Small.

 6        Q.    Do -- do you recall, besides

 7    the Gemini representatives that you

 8    mentioned, who else was in attendance at

 9    the July meeting?

10        A.    It's possible Ken Raisler was

11     there.  I don't know for sure.  It's

12     possible Jim Overdahl was there.  Again, I

13     don't know for sure.

14        Q.    And you mentioned a

15     presentation.  Did Gemini provide any input

16     into the presentation that was made at the

17     July 2017 meeting?

18        A.    Specifically?  I'm not sure

19     without -- you know, I can look at the

20     presentation and try and recall or -- or

21     make a best guess.

22            I do believe that we were asked

23     questions that the CBOE had in -- in

24     leading up to the presentation.  And it's

25     very possible information from their
```

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

2    requests are part of that presentation.

3    But, ultimately, it was -- it was their

4    presentation.

5        Q.    Was it one --

6           MR. BAUGHMAN:  Hang on.  Hang

7      on.  Hang on.

8         I want to clarify what you

9      said.

10         Can you read his answer back

11     and ask him if that's what he said?

12          MR. RODGERS:  Well --

13          MR. BAUGHMAN:  I don't think it

14     was -- I don't think it was

15     transcribed correctly.  I really

16     don't.  And it's important.

17       (Whereupon, the referred to

18     Answer was read back by the Reporter:

19       "ANSWER:  Specifically?  I'm

20     not sure without -- you know, I can

21     look at the presentation and try and

22     recall or -- or make a best guess.

23       I do believe that we were asked

24     questions that the CBOE had in -- in

25     leading up to the presentation.  And

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2          Q.    And so -- and -- and I do that
 3     because I want to confirm whether the
 4     attachment to the e-mail reflects the
 5     presentation that was provided to the CFTC
 6     on July 25th, 2017?
 7          A.    It does seem to be the
 8     presentation that's attached to the e-mail.
 9          Q.    And if you go to Slide 3.
10               (Witness complies.)
11               (Witness reviews document.)
12          Q.    I don't think we're looking at
13     the same thing, Mr. Winklevoss.
14          A.    Oh.
15          Q.    It's the slide with the graph.
16               (Witness complies.)
17          Q.    And can you -- can you tell me
18     what this slide shows?
19          A.    This is Gemini auction volume.
20          Q.    And is this data from Gemini's
21     bitcoin auctions?
22          A.    I think this is the bitcoin
23     auction.
24          Q.    And where did the data come
25     from in this slide?
```

725

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2     to the operational advance policy.

 3          Q.    And did that operational

 4     advance policy apply to advances of digital

 5     assets?

 6          A.    I believe the policy -- that

 7     there was some form of policy for both.

 8          Q.    And is the policy that applied

 9     to digital assets memorialized in a formal

10      policy and procedure?

11          A.    I'm not sure.

12          Q.    And was that un-memorialized

13      policy and procedure ever provided to the

14      CBOE or CFTC?

15          A.    Again, I'm not sure if there

16     was a policy or not written.

17          Q.    You mentioned that the special

18      deals -- and I'm summarizing -- that

19      resulted in the rebate fraud only resulted

20      in trading on the ETH USD book; is that

21      correct?

22          A.    I believe that's correct.

23          Q.    Were the special deals that

24     were offered to the rebate fraud

25     participants only available to participants
```