# EXHIBIT 29

1

UNITED STATES DISTRICT COURT

  SOUTHERN DISTRICT OF NEW YORK

Case No. 22-cv-4563

- - - - - - - - - - - - - - - - - - - - - - - - -x

COMMODITY FUTURES TRADING COMMISSION,

                    Plaintiff,

            -against-

GEMINI TRUST COMPANY,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -x


    CONFIDENTIAL VIDEOTAPED DEPOSITION OF

                SHANE MOLIDOR

            NEW YORK, NEW YORK

        WEDNESDAY, DECEMBER 13, 2023


REPORTED BY:

DANIELLE GRANT

JOB NO.: 6305652

2

1

2

3

4

5

6

7

8

9

10

11

12                          DECEMBER 13, 2023

13                            8:30 A.M.

14

15

16

17

18          Confidential Videotaped Deposition of

19    SHANE MOLIDOR, held at the offices of the

20    COMMODITIES FUTURES TRADING COMMISSION, 140

21    BROADWAY, NEW YORK, NEW YORK pursuant to Notice

22    before DANIELLE GRANT, a Shorthand Reporter and

23    Notary Public of the State of New York.

24

25

3

1

    A P P E A R A N C E S:
2   U.S. COMMODITY FUTURES TRADING COMMISSION
    Division of Enforcement
3        1155 21st Street NW
         Washington, D.C. 20581
4   BY:  ALEJANDRA DE URIOSTE, ESQ.
              ANDREW ROGERS, ESQ.
5         DIANA WANG, ESQ.

6

7   SHEARMAN & STERLING, LLP

8   Attorneys for the Defendant

9        599 LEXINGTON AVENUE

10       New York, NEW YORK 10022

11  BY:  CHRISTOPHER L. LAVIGNE, ESQ.

12            RANDY MARTIN, ESQ.

13

14  KRAMER LEVIN NAFTALIS & FRANKEL, LLP

15  Attorneys for the Witness

16       1177 Avenue of the Americas

17       New York,  10036

18  BY:  DARREN LAVERNE, ESQ.

19            NATHAN SCHWARTZBERG, ESQ.

20

21    ALSO PRESENT:

22       BRENT TOMER, ESQ., CFTC

23       KATIE RASOR, ESQ., CFTC

24       DAVID OAKLAND, ESQ., CFTC

25       PHILIP GLAUBERSON, Videographer

25

                    MOLIDOR

1

2      Q    I'm not asking if you have a

3  specific recollection about any particular

4  discussion with a customer about their

5  trading strategy, but did you generally have

6  conversations that included discussions

7  about trading strategy?

8           MR. LAVIGNE:  Objection.  Form.

9      A    Not that I recall.

10     Q    Did you discuss with Gemini

11  customers incentives to trade on Gemini?

12          MR. LAVIGNE:  Objection.  Form.

13     A    I didn't have an independent

14  recollection of exact conversations.  I do

15  have general recollections of conversations

16  related to incentives.

17     Q    And what type of incentives would

18  you discuss?

19          MR. LAVIGNE:  Objection.  Form.

20     A    To the best of my recollection,

21  Gemini offered roughly four types of

22  incentives on the platform.  The first type

23  of incentive related to bespoke fee and

24  rebates that were offered to select

25  institutional clients.

26

```
 1                      MOLIDOR
 2          The second type of incentive
 3   related to Pearl Street Loans, receiving a
 4   loan in either bitcoin or ether.  The third
 5   type of incentive related to advanced credits
 6   often referred to as operational advances.
 7   And the fourth type of incentive related to
 8   payment for participation in Gemini's
 9   auction.
10      Q   Starting in the December 2016 time
11   period, how did you communicate with Gemini
12   customers?
13      A   The methods of communication with
14   clients at Gemini varied by channel.  For
15   example, some communications with Gemini
16   clients occurred over Skype.  Some
17   conversations occurred over Telegram.  Some
18   conversations occurred over text message.
19   Some conversations occurred over office
20   landline.  Some conversations occurred over
21   personal cell phone or mobile device.  And
22   some conversations occurred in person.
23      Q   Were there others in sales at
24   Gemini that you worked with?
25      A   Throughout my tenure at Gemini,
```

```
 1                      MOLIDOR
 2        A    I can't speak to correlations on
 3   the platform today, and I cannot speak to
 4   correlations on the platform that may have
 5   occurred during my tenure at Gemini.
 6        Q    You mentioned earlier Pearl Street
 7   Loans.
 8             What's Pearl Street?
 9        A    My understanding of Pearl Street,
10   based on my general recollections during my
11   time at Gemini, was that Pearl Street was a
12   personal investment vehicle owned by Cameron
13   and Tyler Winklevoss.
14        Q    And what was your role with regard
15   to Pearl Street?
16             MR. LAVIGNE:  Objection.
17        A    During my tenure at Gemini, my
18   recollection of my role related to Pearl
19   Street was to negotiate potential loans to
20   be received by select VIP customers, loans
21   denominated in bitcoin or ether.
22        Q    Were you an employee of Pearl
23   Street?
24        A    No.
25        Q    Who asked you to negotiate on
```

72

```
 1                    MOLIDOR
 2   behalf of Pearl Street?
 3        A    I don't have an independent
 4   recollection of who might have asked me.
 5        Q    Do you have a general
 6   recollection?
 7             MR. LAVIGNE:  Objection.
 8        A    My general recollection is that I
 9   absorbed this responsibility after Danny
10   Kim's departure from Gemini in or around
11   December of 2016.
12        Q    And after Danny Kim departed
13   Gemini, was there anyone else at Gemini that
14   you worked with in relation to Pearl Street?
15        A    My general recollection is that
16   conversations regarding Pearl Street Loans
17   were had with Cameron Winklevoss, Tyler
18   Winklevoss and, at times, Benjamin Small.
19        Q    And what was the nature of those
20   conversations?
21        A    I don't have an independent
22   recollection of the conversations.
23        Q    Did you ever receive instructions
24   from Cameron Winklevoss or Tyler Winklevoss
25   related to Pearl Street?
```

73

                            MOLIDOR

1

2              MR. LAVIGNE:  Objection.  Form.

3        A    I don't have independent

4    recollection of instructions being provided.

5        Q    Apart from Cameron Winklevoss,

6    Tyler Winklevoss and Benjamin Small, was

7    there anyone else from Gemini that worked on

8    Pearl Street matters?

9              MR. LAVIGNE:  Objection.  Form.

10       A    Can you define "worked on"?

11       Q    That engaged in any type of

12   business related to Pearl Street?

13             MR. LAVIGNE:  Objection.  Form.

14       A    I have general recollection of

15   Michael Breu's awareness of Pearl Street

16   Loans.

17       Q    Did Michael Breu have a role with

18   respect to Pearl Street?

19             MR. LAVIGNE:  Objection.

20       A    I can't speak to a role that he

21   may have had.

22       Q    Did you recall having any

23   discussions with anyone Gemini -- at Gemini

24   about the purpose of Pearl Street?

25       A    I don't have independent

74

```
 1                    MOLIDOR

 2    recollections; I have recollections that

 3    based on my review of documentation as part

 4    of our past arbitrations.

 5         Q    Is that something you understood

 6    at the time but just don't recall at the

 7    moment?

 8              MR. LAVIGNE:  Objection.  Form.

 9         A    Can you clarify your question?

10         Q    During the time that you worked at

11    Gemini, did you have an understanding of the

12    purpose of Pearl Street?

13              MR. LAVIGNE:  Objection.  Form.

14         A    I can't speak to my state of my

15    mind and what I may have understood during

16    my tenure.  That was almost seven years ago.

17         Q    And my question is do you have --

18    did you have an understanding at the time,

19    you just don't recall now?

20              MR. LAVIGNE:  Objection.  Form.

21         A    I can't speak to my state of mind

22    something that occurred almost seven years

23    ago.

24         Q    What type of loans did Pearl

25    Street offer?
```

75

1                        MOLIDOR

2              MR. LAVIGNE:  Objection.  Form.

3        A    My recollection is that there were

4    three loans extended to institutional

5    customers by Pearl Street.  These loans were

6    denominated in bitcoin and, based on my

7    general recollection, also ether.

8        Q    And just to clarify, when you say

9    "three loans," do you mean that there were

10   loans to three customers?

11       A    That's correct.

12       Q    And at times, would those loans

13   finish and then be renewed or extended?

14             MR. LAVIGNE:  Objection.  Form.

15       A    My general recollection is yes.

16       Q    Focusing on the loans related

17   to -- to the Pearl Street loans related to

18   bitcoin, what was the size of the loans in

19   bitcoin?

20             MR. LAVIGNE:  Objection.  Form.

21       A    I don't recall.

22       Q    What were the names of the

23   borrowers of the Pearl Street loans?

24       A    Best of my recollection, there

25   were three institutional clients that, at

76

1                         MOLIDOR

2    times, had loans outstanding with Pearl

3    Street.  Those institutional clients would

4    be one, Circle Internet Financial; two, XBT

5    Ops; and, three, B2C2.

6         Q    And to your knowledge, did Pearl

7    Street ever lend to anyone Gemini -- any --

8    anyone that was not a Gemini customer?

9              MR. LAVIGNE:  Objection.  Form.

10        A    I have no insight of Pearl Street

11   operations aside from my interaction between

12   Pearl Street and the three institutional

13   clients that received the loans.

14        Q    What was the purpose of the Pearl

15   Street loans?

16             MR. LAVIGNE:  Objection.  Form.

17        Asked and answered.

18        A    I can't speak to what the general

19   purpose may have been.

20        Q    You mentioned earlier that the

21   Pearl Street loans were an incentive to

22   trade on Gemini.

23             Can you explain how they were an

24   incentive?

25             MR. LAVIGNE:  Objection.

77

1                    MOLIDOR

2        Misstates testimony.

3        A    My general recollection is that

4    offering Pearl Street loans as an incentive

5    may have been attractive to select

6    institutional customers given that it would

7    expand their available trading balance at a

8    global scale.

9        Q    And why was expanding an available

10   trading balance an incentive?

11            MR. LAVIGNE:  Objection.  Form.

12       A    I can't speak to why it may have

13   been an incentive to an institutional

14   customer.

15       Q    And what was the reason that the

16   loan was being offered as an incentive?

17            MR. LAVIGNE:  Objection.  Form.

18       A    I can't speak to the potential

19   reason of an institutional entity that I did

20   not control.

21       Q    But you said the loans were

22   offered as an incentive.

23            How did it incentivize the Gemini

24   customer?

25            MR. LAVIGNE:  Objection.

78

1                    MOLIDOR

2       Misstates testimony.

3       A    As I mentioned earlier, my general

4   recollection is that receiving a Pearl

5   Street loan would expand an institutional

6   client's global balance sheet.

7       Q    And how would that benefit Gemini?

8            MR. LAVIGNE:  Objection.

9       A    I can't speak to how it may have

10  benefited Gemini.

11      Q    Did it incentivize the borrower to

12  trade on Gemini?

13           MR. LAVIGNE:  Objection.  Form.

14      A    I can't speak to how a borrower

15  may or may not have been incentivized by

16  receiving a Pearl Street loan.

17      Q    Was it intended to incentivize

18  trading on Gemini?

19           MR. LAVIGNE:  Objection.  Asked

20      and answered.

21      A    I have general recollections of

22  discussions around increasing trade activity

23  on Gemini with recipients of Pearl Street

24  loans.

25      Q    And who were those discussions

79

1                    MOLIDOR

2   with?

3        A    I don't have independent

4   recollections of these conversations.  My

5   general recollections is that these

6   conversations would have been had with the

7   three recipients of the Pearl Street loans.

8        Q    Did you have any discussions with

9   people internal to Gemini about how the

10  Pearl Street loans would be an incentive?

11            MR. LAVIGNE:  Objection.

12       A    I don't have independent

13  recollections.  My recollections are limited

14  to review of documentation as past -- part

15  of past arbitrations.

16       Q    While you worked at Gemini, about

17  how much of your time was spent on Pearl

18  Street loans?

19       A    To the best of my recollection, I

20  would estimate roughly 10 percent of my

21  time.

22       Q    Did you understand working on

23  Pearl Street loans to be part of your Gemini

24  job responsibilities?

25            MR. LAVIGNE:  Objection.  Form.

80

1                          MOLIDOR

2         A    I can't speak to my general

3    understanding during my time at Gemini more

4    than seven years ago.

5         Q    Did you work on Pearl Street

6    matters during a -- regular Gemini business

7    hours?

8         A    General recollection, yes.

9         Q    Did you work on Pearl Street

10   matters using Gemini computers and office

11   equipment?

12        A    Based on my recollection, yes.

13        Q    Did you communicate about Pearl

14   Street using Gemini messaging platforms?

15             MR. LAVIGNE:  Objection.  Form.

16        A    My general recollection is yes.

17        Q    Was your Pearl Street-related work

18   intended to benefit Gemini?

19             MR. LAVIGNE:  Objection.  Form.

20        A    I can't speak to what the

21   intention of my scope of responsibilities

22   was meant to be.

23        Q    Do you have an understanding of

24   why Gemini didn't lend directly to

25   customers?

```
1                      MOLIDOR

2           MR. LAVIGNE:  Objection.  Form.

3      A    No.

4      Q    Can you describe the basic

5  economic terms of a Pearl Street bitcoin

6  loan?

7           MR. LAVIGNE:  Objection.  Form.

8      A    I don't have an independent

9  recollection of the commercial terms.  I

10  have general recollections that they would

11  include a loan of a set quantity of bitcoin

12  or ether that would need to be returned upon

13  maturity of the loan, general recollections

14  that the loans would have fixed terms with

15  the date set in the future at which the

16  bitcoin would need to be received, and that

17  the loans would carry with it an interest

18  rate that the borrower would need to pay for

19  receipt of this loan.

20      Q    And what were the interest rates

21  for Pearl Street loans?

22      A    I don't recall.

23      Q    Did you have discussions with

24  Pearl Street borrowers about the interest

25  rates that they would get on a Pearl Street
```

                          MOLIDOR

1

2    loan?

3        A    I don't have independent

4    recollections of those conversations.

5        Q    Were the Pearl Street loans

6    secured?

7            MR. LAVIGNE:  Objection.  Form.

8        A    I don't know what that means.

9        Q    Was there any type of guarantee

10   that was needed for a Pearl Street loan?

11           MR. LAVIGNE:  Objection.  Form.

12       A    I don't know.

13       Q    Were the borrowers required to

14   post any collateral?

15       A    I don't recall.

16       Q    Were the Pearl Street loan

17   agreements in writing?

18       A    My general recollection is that

19   Pearl Street loans were executed with a

20   legal contract.

21       Q    Was it always the case that Pearl

22   Street loans were executed with a legal

23   contract?

24       A    I can't speak to the business

25   activity of Pearl Street beyond my tenure

83

MOLIDOR

1

2    and involvement with them.

3        Q    Based on your personal experience

4    with Pearl Street loans, were they always

5    subject to a written agreement?

6        A    I don't recall.

7        Q    Were there any loan terms related

8    to how the loan proceeds would be used?

9            MR. LAVIGNE:  Objection.

10       A    I have general recollections of

11   conversations related to -- conversations

12   with select VIP customers related to use of

13   funds.

14       Q    And what do you recall about those

15   conversations?

16           MR. LAVIGNE:  Objection.

17       A    Again, I don't have independent

18   recollection of these conversations.  My

19   general recollection is that they would

20   reference Gemini-centric terms.

21       Q    You mentioned "select VIP

22   customers."

23           What is a "select VIP customer"?

24           MR. LAVIGNE:  Objection.  Form.

25       A    I don't believe that's any sort of

84

```
 1                        MOLIDOR
 2   vernacular that is used.  That might have
 3   just been something that I said.
 4        Q    During your time at Gemini, did
 5   others at Gemini refer to the Pearl Street
 6   loan recipients as "VIP customers"?
 7        A    I can't speak to how others may
 8   have referred to customers.
 9        Q    Based on your understanding, did
10   you hear others refer to the Pearl Street
11   borrowers as VIP customers?
12        A    I don't remember.
13        Q    You mentioned "Gemini-centric
14   terms."
15             What is a Gemini-centric term?
16        A    I don't have independent
17   recollections of discussing Gemini-centric
18   terms.  My general recollections would be
19   they that these referred to increased trade
20   activity on the platform for recipients of
21   Pearl Street loans.
22        Q    And during your time at Gemini,
23   did you have any involvement in helping
24   transfer the loan proceeds to the loan
25   recipients?
```

```
 1                       MOLIDOR

 2        Q     What did you mean by

 3   Gemini-centric terms?

 4        A     I can't speak to what I may have

 5   meant in January of 2017, almost seven years

 6   ago.

 7        Q     Sitting here today, what do you

 8   understand "Gemini-centric terms" to refer

 9   to?

10             MR. LAVIGNE:  Objection.

11        A     My general recollection of

12   Gemini-centric terms, based on review of

13   documentation and preparation for past

14   arbitrations, is that this refers to trade

15   activity which would occur on Gemini for

16   recipients of Pearl Street loans.

17             MR. LAVIGNE:  Same objection.

18        Same application.

19        Q     And has your understanding of

20   Gemini-centric terms changed over the last

21   seven years?

22             MR. LAVIGNE:  Objection.

23        A     I can't speak to my understanding

24   more than seven years ago; therefore, I

25   can't speak to any sort of evolution or
```

```
 1                    MOLIDOR
 2   Winklevoss, Tyler Winklevoss, and Ben Small.
 3           MR. LAVIGNE:  Same objection.
 4       Same application.
 5       Q    I want to focus on this first loan
 6   with XBTO in early January 2017.
 7           Did you have any discussion with
 8   Cameron Winklevoss and Tyler Winklevoss
 9   about that loan?
10       A    I don't have any independent
11   recollections of conversations.
12       Q    Did you negotiate Pearl Street
13   loans without the approval of Cameron or
14   Tyler Winklevoss?
15           MR. LAVIGNE:  Objection to form.
16       A    I have no recollection of doing
17   so.
18       Q    Did you go to Cameron and Tyler
19   Winklevoss for approval over loan terms
20   before you extended them to the loan
21   recipients?
22           MR. LAVIGNE:  Objection.  Form.
23       A    Based on my recollection, my scope
24   of responsibilities in relation to Pearl
25   Street loans was to negotiate potential
```

109

```
 1                    MOLIDOR

 2   terms for loan recipients.

 3        Q    And once you negotiated the terms,

 4   would you go to Cameron or Tyler Winklevoss

 5   for approval?

 6        A    My general recollection is, yes,

 7   Cameron and Tyler Winklevoss would need to

 8   approve any terms that were negotiated in

 9   order for the Pearl Street loan to be

10   extended to a recipient.

11        Q    And would that include approving

12   the interest rate being offered?

13        A    My recollection is that the

14   interest rate was in consideration amongst

15   all terms that would need to be approved.

16        Q    And would that include any

17   Gemini-centric terms that were included as a

18   term of a Pearl Street loan?

19             MR. LAVIGNE:  Objection.  Form.

20        A    I don't recall independent

21   recollections.  I don't have independent

22   recollections of conversations related to

23   Gemini-centric terms.  My general

24   recollections is that all terms would need

25   to be approved by Cameron and Tyler
```

110

                        MOLIDOR

1

2    Winklevoss for a Pearl Street loan.

3            MS. DE URIOSTE:  Could you mark

4        this as Exhibit CFTC 3.

5                (Whereupon, a Document,

6                Bates-stamped GEM_CFTC055833 was

7                marked as CFTC Exhibit No. 3 for

8                identification, as of this date.)

9        Q    I have handed you -- or you have

10   been handed a document marked as CFTC

11   Exhibit 3.  This document is Bates-numbered

12   in the bottom right-hand corner,

13   GEM_CFTC055833.

14            Can you take a moment to look it

15   over and let me know when you're ready.

16       A    Okay.

17       Q    Do you recognize this document?

18       A    I don't have independent

19   recollection.  I have recollection of

20   documents similar to this based on my

21   preparation for past arbitration.

22       Q    And what is --

23            MR. LAVERNE:  I just want to

24       clarify one thing.  You say

25       "independent recollection."  You don't

1                        MOLIDOR

2          have a specific recollection, but you

3          do have a general recollection of

4          documents like this.

5               THE WITNESS:  Correct.

6               MR. LAVERNE:  Okay.  I'm not

7          trying to interfere.  I just want to

8          make sure everyone was clear what

9          you're saying.

10         Q    And what is this?

11         A    The document is titled:  Bitcoin

12   Loan Note.

13         Q    Is this an example of one of the

14   bitcoin loans that you negotiated with XBTO?

15         A    Based on the date of January 5,

16   2017, yes, it appears so.

17         Q    Could you turn your attention to

18   the middle of the page where there are two

19   items itemized, number one and number two.

20              Do you see that?

21         A    I see it.

22         Q    And Item No. 2, can you explain

23   what that means?

24         A    Submit both both and sell

25   auction-only limit orders within 150 BPS,

112

```
 1                     MOLIDOR

 2    parentheses, 1.5 percent of the midpoint of

 3    BTC/USD continuous order book no later than

 4    3:50 p.m. Eastern time.  This in addition to

 5    No. 1 and further consideration of the loan,

 6    the borrower agrees to the below terms with

 7    regards to the borrower's presence on the

 8    Gemini exchange.

 9           My understanding is that this is a

10    Gemini-centric term tied to the loan.

11        Q    And why did the Pearl Street loan

12    agreement have a Gemini-centric term?

13           MR. LAVIGNE:  Objection.

14        A    I can't speak to why it may have

15    had a Gemini-centric term.

16        Q    Does Item No. 2 relate to trading

17    in a Gemini auction?

18        A    Based on the inclusion of

19    auction-only limit orders, it appears so.

20        Q    And can you explain what this loan

21    term is requiring?

22        A    It seems like there is a request

23    for the submission of both both and sell

24    auction-only limit orders within a certain

25    range relative to the midpoint price of the
```

163

```
 1                    MOLIDOR
 2   discussions?
 3            MR. LAVIGNE:  Objection.  Form.
 4        A    My general recollections of these
 5   conversations is in or around January and
 6   February of 2017, perhaps December of 2016,
 7   I had communications with Cameron and Tyler
 8   Winklevoss regarding high interest rates
 9   being a deterrent for loan recipients and
10   that offering lower interest rates may
11   further incline institutional customers to
12   receive Pearl Street loans.
13        Q    And was there a desire to further
14   incline institutional customers to receive
15   Pearl Street loans?
16        A    My understanding was yes.
17            MR. LAVIGNE:  Objection.
18        Q    And why was that?
19        A    As mentioned, Pearl Street loans
20   were an incentive offer to select
21   institutional clients on the platform in
22   order to expand their balance sheet.
23        Q    Was there a time when you
24   discussed imposing conditions on Circle's
25   Pearl Street loans?
```

                              MOLIDOR

 1

 2              MR. LAVIGNE:  Objection.

 3       A    General recollections of

 4    conversations related to those topics.

 5       Q    Did you have discussions about

 6    potential Pearl Street borrowers being

 7    capital constrained?

 8              MR. LAVIGNE:  Objection.

 9       A    I have general recollections of

10    conversations of that nature.

11       Q    What do you recall about

12    conversations about potential Pearl Street

13    borrowers being capital constrained?

14       A    I have general recollections of

15    conversations related to institutional

16    clients that would communicate that a lack

17    of capital was inhibiting them from trading

18    larger amounts on the exchange, and I took

19    this to be interpreted as capital

20    constraints.

21       Q    And what did Pearl Street loan do

22    in relation to a potential borrower's

23    capital constraints?

24              MR. LAVIGNE:  Objection.

25       A    As mentioned earlier, Pearl Street

187

```
 1                    MOLIDOR

 2   loans were one of a number of incentives

 3   that could be offered to institutional

 4   clients.  My understanding, the benefit of a

 5   Pearl Street loan is that it would expand a

 6   client's balance sheet.

 7        Q    And what do you mean "expand a

 8   client's balance sheet"?

 9        A    Increase the amount of capital

10   that they could use to trade.

11        Q    Did you have discussions with

12   Gemini customers about Gemini auctions

13   requiring capital to be able to participate

14   in Gemini auctions?

15            MR. LAVIGNE:  Objection.  Form.

16        A    I don't recall specific

17   conversations related to that.

18            MS. DE URIOSTE:  Can you mark this

19        16.

20                (Whereupon, a Document,

21                Bates-stamped GEM_CFTC071477 was

22                marked as CFTC Exhibit No. 16 for

23                identification, as of this date.)

24        Q    I have handed you a document

25   marked as CFTC Exhibit 16.  The first page
```

450

1

  UNITED STATES DISTRICT COURT

2
    SOUTHERN DISTRICT OF NEW YORK
  Case No. 22-cv-4563

3
  - - - - - - - - - - - - - - - - - - - - - - - -x

4
  COMMODITY FUTURES TRADING COMMISSION,

5
            Plaintiff,

6
       -against-

7
  GEMINI TRUST COMPANY,

8

9
           Defendant.

10
  - - - - - - - - - - - - - - - - - - - - - - - -x

11

12

13
           VOLUME II

14
   CONFIDENTIAL VIDEOTAPED DEPOSITION OF

15
         SHANE MOLIDOR

16
       NEW YORK, NEW YORK

17
     THURSDAY, DECEMBER 14, 2023

18

19

20

21

22
  REPORTED BY:

23
  DANIELLE GRANT

24
  JOB NO.: 6349727

25

451

1

2

3

4

5

6

7

8

9

10

11

12                              DECEMBER 13, 2023

13                              8:35 A.M.

14

15

16              Continued Confidential Videotaped

17   Deposition of SHANE MOLIDOR, held at the offices

18   of the COMMODITIES FUTURES TRADING COMMISSION,

19   140 BROADWAY, NEW YORK, NEW YORK pursuant to

20   Notice before DANIELLE GRANT, a Shorthand

21   Reporter and Notary Public of the State of

22   New York.

23

24

25

452

1
     A P P E A R A N C E S:
2    U.S. COMMODITY FUTURES TRADING COMMISSION
     Division of Enforcement
3         1155 21st Street NW
          Washington, D.C. 20581
4    BY:  ALEJANDRA DE URIOSTE, ESQ.
             ANDREW ROGERS, ESQ.
5         DIANA WANG, ESQ.

6

7    SHEARMAN & STERLING, LLP

8    Attorneys for the Defendant

9         599 LEXINGTON AVENUE

10        New York, NEW YORK 10022

11   BY:  CHRISTOPHER L. LAVIGNE, ESQ.

12           RANDY MARTIN, ESQ.

13

14   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

15   Attorneys for the Witness

16        1177 Avenue of the Americas

17        New York,  10036

18   BY:  DARREN LAVERNE, ESQ.

19           NATHAN SCHWARTZBERG, ESQ.

20

21     ALSO PRESENT:

22        BRENT TOMER, ESQ., CFTC

23        KATIE RASOR, ESQ., CFTC

24        DAVID OAKLAND, ESQ., CFTC

25        PHILIP GLAUBERSON, Videographer

665

1

2          MR. LAVERNE:  Objection.  Asked

3      and answered.

4      Q    You can answer.

5      A    I believe I've already answered

6  that.

7      Q    Can you answer again?

8      A    Yes.

9      Q    While you worked at Gemini, did

10  Gemini permit its customers to trade on

11  leverage on the Gemini exchange?

12          MR. LAVIGNE:  Objection.  Form.

13      A    I'm sorry.

14          Can you clarify what you mean by

15  "leverage"?

16      Q    Do you have an understanding of

17  what leverage means with respect to trading

18  on bitcoin exchanges?

19      A    I have a general understanding as

20  I sit here today.

21      Q    What is your general understanding

22  of what it means to trade on leverage?

23          MR. LAVIGNE:  Objection.  Form.

24      A    My understanding of leverage is

25  that it's a form of margin, wherein a

1

2    customer posts collateral and is able to

3    borrow against that collateral to many

4    multiples the extent of said collateral in

5    order to potentially place trades on a

6    leverage matching engine, often referred to

7    as a margin trading platform or a

8    derivatives-type platform.

9        Q    And based on that understanding of

10   the term "leverage," while you worked at

11   Gemini, did Gemini permit its customers to

12   trade on leverage on the Gemini exchange?

13           MR. LAVIGNE:  Objection.  Form.

14       A    No.

15       Q    Do you recall yesterday, Gemini's

16   counsel asked you about there being a witch

17   hunt on self-trading at Gemini around

18   February 2017?

19       A    Yes.  I recall.

20       Q    Who was involved in the witch

21   hunt?

22           MR. LAVERNE:  Objection.  Form.

23       A    I have general recollections that

24   both engineers and compliance, as well as

25   senior leadership, were involved in this