**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

GEMINI TRUST COMPANY, LLC,

Defendant.

No. 22-cv-4563 (AKH)

Hon. Alvin K. Hellerstein

# GEMINI TRUST COMPANY, LLC'S OPPOSITION TO
# THE CFTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 3

    A.    The Gemini Exchange ......................................................................................... 3

    B.    CFE Approaches Gemini About The Bitcoin Futures Contract ........................... 6

    C.    Gemini Provides Extensive Information To CFE ............................................... 7

    D.    CFE, The CFTC, And Gemini Engage In An Iterative Dialogue About The
            Bitcoin Futures Contract .................................................................................. 10

    E.    The Self-Certification Process ......................................................................... 11

    F.    The At-Issue Documents .................................................................................. 14

    G.    The At-Issue Statements .................................................................................. 15

            1.    Gemini Was A Pre-Funded Exchange .................................................. 15

            2.    Self-Trading On The Gemini Exchange ................................................ 25

            3.    Bespoke Fee Agreements ...................................................................... 28

            4.    Volume And Liquidity ........................................................................... 32

LEGAL STANDARD ....................................................................................................... 33

ARGUMENT ................................................................................................................. 34

I.    THE CFTC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE
    QUESTION WHETHER GEMINI MADE THE AT-ISSUE STATEMENTS TO
    THE CFTC .................................................................................................... 36

    A.    Section 6(c)(2) Applies Only When A Defendant *Makes* A False Or
            Misleading Statement To The CFTC, As Determined By Ultimate Authority
            Over The Statement .......................................................................................... 36

    B.    The Undisputed Evidence Does Not Demonstrate That Gemini Made
            Any Of The At-Issue Statements To The CFTC ............................................... 37

II.    THE CFTC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE
    REMAINING LIABILITY ISSUES .................................................................. 40

    A.    The CFTC Misapprehends The Governing Legal Framework ........................... 40

            1.    To Proceed On Its Omissions Theory, CFTC Must Identify
                    Affirmative Statements That Were Rendered Misleading By The
                    Omission Of Critical Qualifying Information ........................................ 40

            2.    Section 6(c)(2)'s Materiality Element Requires Evidence—Not
                    Merely Speculation—Of An Actual CFTC Decision That Was
                    Capable Of Being Influenced In A Meaningful Way ............................. 42

            3.    The CFTC Must Proffer Evidence That Gemini Knew Or Should
                    Known That The At-Issue Statements Were False Or Misleading ......... 45

B.      Genuine Issues Of Material Fact Preclude Summary Judgment As To Each
        Category Of At-Issue Statements ........................................................................46

        1.      The CFTC Is Not Entitled To Summary Judgment With Respect To
                The Statements Regarding Gemini's Pre-Funding Requirement ..............46

        2.      The CFTC Is Not Entitled To Summary Judgment With Respect To
                The Statements Regarding Gemini's Fee Rebate Incentives ...................51

        3.      The CFTC Is Not Entitled To Summary Judgment With Respect To
                The Statements Regarding Self-Trading ..................................................55

        4.      The CFTC Is Not Entitled To Summary Judgment With Respect To
                The Statements Regarding Volume And Liquidity ...................................60

CONCLUSION ...................................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Coughlin*,
64 F.3d 77 (2d Cir. 1995) ................................................................. 33

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................. 33, 45

*CFTC v. eFloorTrade, LLC*,
2018 WL 10625588 (S.D.N.Y. Sept. 21, 2018) ........................... 34, 44

*CFTC v. Gramalegui*,
2018 WL 4610953 (D. Colo. Sept. 26, 2018) ................................. 39

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ................................................................. 37

*Lennon v. Miller*,
66 F.3d 416 (2d Cir. 1995) ......................................................... 46, 50

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) ................................................................. 40–41

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) ....................................................... 34

*McLanahan v. Universal Ins. Co.*,
1 Pet. 170, (1828) ................................................................. 44

*Pellegrino v. County of Orange*,
313 F. Supp. 2d 303 (S.D.N.Y. 2004) ........................................ 46

*Noto v. 22nd Century Grp., Inc.*,
35 F.4th 95 (2d. Cir. 2022) ......................................................... 38, 39

*Rubin v. HSBC Bank USA*,
2024 U.S. Dist. LEXIS 27593 (E.D.N.Y. Feb. 16, 2024) ................ 46

*Rupp v. Buffalo*,
91 F.4th 623 (2d Cir. 2024) ....................................................... 34, 35

*TSC Industries, Inc. v. Northway, Inc.*,
426 U. S. 438 (1976) ................................................................. 44

*United States v. Calderon*,
944 F.3d 72 (2d Cir. 2019) ................................................. *passim*

iii

*United States v. Davis*,
  8 F.3d 923 (2d Cir. 1993) ................................................................... 36

*United States v. Gaudin*,
  515 U.S. 506 (1995) ..................................................... 35, 43–44, 54

*United States v. Klausner*,
  80 F.3d 55 (2d Cir. 1996) ................................................................ 44

*United States v. Litvak*,
  808 F.3d 160 (2d Cir. 2015) ...................................................42–43, 45

*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007) ................................................43, 50, 53

*United States v. Santiago*,
  2014 WL 4827883 (S.D.N.Y. Sept. 26, 2014) ................................ 53

*United States v. Stewart*,
  433 F.3d 273 (2d Cir. 2006) ............................................................ 53

*United States v. Uchimura*,
  125 F.3d 1282 (9th Cir. 1997) ......................................................... 44

**Rules & Statutes**

7 U.S.C. § 9 ...................................................................................*passim*

7 U.S.C. § 13 ......................................................................................... 37

17 C.F.R. § 38.200 ................................................................................. 12

17 C.F.R. § 240.10b-5 ...................................................................*passim*

18 U.S.C. § 1001 ................................................................................... 36

Fed. R. Civ. P. 56 .................................................................................. 44

Fed. R. Civ. P. 56.1 ............................................................................... 33

**Other Authorities**

Criminal Resource Manual § 911 ........................................................ 44

Merriam Webster Dictionary ............................................................... 55

Restatement (Second) of Torts § 529 (1977) ...................................... 41

Defendant Gemini Trust Company, LLC ("Gemini") respectfully submits this memorandum of law in opposition to plaintiff Commodity Futures Trading Commission ("CFTC")'s motion for partial summary judgment.

## PRELIMINARY STATEMENT

The CFTC's motion for summary judgment reads more like a closing argument. Indeed, the CFTC's presentation reveals the series of tenuous inferences upon which its case rests: where the law imposes a high burden on the CFTC, the CFTC tacitly rewrites the rules; where there are competing pieces of evidence, the CFTC cherry-picks its preferred snippets and simply ignores the rest; and on issues where discovery did not reveal any evidence favorable to the CFTC *at all*, the CFTC relies on erroneous assumptions and outright speculation. The reality is that this case will be incredibly difficult for the CFTC to win *at trial*.  The notion that no reasonable factfinder could disagree with the CFTC simply blinks reality.

The CFTC's motion starts with a thinly veiled (unauthorized) sur-reply in opposition to Gemini's summary judgment motion. As that motion explained, the undisputed facts show CFE, not Gemini, made the vast majority of the allegedly false statements. Yet again, the CFTC is unable to dispute that CFE not only transmitted these statements to the CFTC but also retained ultimate authority over them. In the event the Court does not grant partial summary judgment to Gemini, at the very least the evidence is hotly disputed as to whether Gemini actually made these statements.

In any event, the CFTC's motion rests on erroneous legal principles and hotly disputed factual questions. For example, because the CFTC's case ultimately rests on purported *omissions*, the CFTC must prove that Gemini omitted "*critical* qualifying information"—*i.e.*, a particular fact is so overwhelmingly essential that its absence transforms an otherwise true statement into falsehood. The CFTC's motion occasionally pays lip service to that heightened burden, but does not seriously attempt to meet it. And on the crucial element of materiality, the CFTC tries to have

its cake and eat it too. Having successfully refused any discovery into whether the purportedly false statement could or did actually influence the CFTC's decision, the CFTC cannot now claim that the *absence* of probative evidence transforms this question into a pure matter of law reserved for the Court. Likewise, on the issue of Gemini's knowledge of the statements' purported falsity, the CFTC relies on mere *ipse dixit* to keep this quintessentially factual determination from the jury.

When the CFTC does actually turn to the evidence, its presentation is (quite ironically) rife with omissions of facts that do not support its narrative. For example, the CFTC contends that statements about "pre-funding" of trades on Gemini were misleading because loans by a Gemini affiliate to certain traders were not also disclosed. But the CFTC simply ignores factual and expert evidence showing that "pre-funding" meant that traders could only place an order on Gemini if they had an actual economic stake in the underlying assets, whether borrowed or not. As Gemini's written descriptions explicitly stated, the pre-funding requirement discouraged "spoofing," a manipulative practice where a trader posts an artificial buy or sell order that it does not intend will actually clear. The CFTC does not dispute that fact. Nor does the CFTC dispute that Gemini's pre-funding requirement foreclosed pure "margin" trading, where a trader posts buy or sell orders and borrows the assets *only if the trade clears*—making "spoofing" relatively costless. Because these facts do not fit the CFTC's theory, it ignores them and instead relies on the conclusory, erroneous assertion that any trading using borrowed assets meant Gemini was not a pre-funded exchange.

Similarly, the CFTC claims that Gemini falsely denied having a "specifically defined market maker program." But the CFTC simply assumes that a "specifically defined market maker program" forecloses the existence of ad hoc decisions to offer rebates to particular traders. But there is ample evidence in the record demonstrating that a reasonable juror in this context would not conflate a "specifically defined program" with "case by case consideration." As any juror who

has ever sought to return a purchase beyond, say, a stated 30-day window understands, a stated policy (or the absence thereof) logically does not preclude individual requests.

The CFTC's insistence that it is undisputed that Gemini lied about the potential for "self-trading" is, quite simply, head-scratching. The CFTC does not dispute that Gemini had self-trade prevention technology when it said self-trading was prohibited. The CFTC merely complains it was never told that Gemini had *previously* permitted self-trading. The CFTC cites no evidence proving that this information would have been relevant, much less critical. The CFTC's assertion that it is entitled to summary judgment because there was a "gap" in Gemini's self-trade prevention is similarly baseless. The contemporaneous evidence shows that Gemini did not believe this "gap" constituted self-trading at all—and that CFE agreed.

These are just a handful of examples in which the government's motion for summary judgment attempts to paper over significant, deeply contested factual and legal issues in this case. Many, many more are detailed in the pages that follow. The only real question on summary judgment goes to the scope of the upcoming trial—namely, whether Gemini legally *made* the statements over which CFE had ultimate authority and actually transmitted to the CFTC. At trial, the government faces a genuine factual dispute on literally every element of every claim. The CFTC's motion for summary judgment should be denied.

## STATEMENT OF FACTS

### A.    The Gemini Exchange

Gemini is a limited purpose trust company founded in 2014 by Cameron and Tyler Winklevoss. 56.1 ¶ 1.[1] Since October 2015, Gemini has operated a cryptocurrency exchange. 56.1

---

[1]    "56.1" refers to Gemini's Counterstatement of Disputed Material Facts. "Ex." refers to exhibits to the Declaration of John F. Baughman. "T. Winklevoss Decl." refers to the Declaration of Tyler Winklevoss. "Barker Decl." refers to the Declaration of Marcia Barker. "MSJ" refers to the CFTC's memorandum of law in support of its motion for partial summary judgment. Dkt. 99. "CFTC Ex." refers to an exhibit to the Declaration of Christopher Giglio.

¶ 3. In 2017, the Gemini exchange was "a continuously operated, full-reserve exchange that enable[d] customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets." Ex. 2 at 2.

Gemini is not designated contract market ("DCM"). 56.1 ¶ 5. Indeed, because Gemini operated a spot exchange that did not offer futures or derivatives trading, Gemini was not licensed or regulated by the CFTC in 2017. 56.1 ¶ 6. Rather, Gemini was closely regulated by the New York Department of Financial Services ("NYDFS"), which granted Gemini one of the first licenses to operate a cryptocurrency exchange and which has scrupulously overseen Gemini's activities since it received its license. 56.1 ¶ 7.

From the beginning, Gemini has worked hard to increase the amount of trading and build liquidity on its exchange. 56.1 ¶ 8. There are two reasons for this focus. First, Gemini, like most exchanges, makes money by charging fees to customers that trade on it. 56.1 ¶ 9. Second, it is well-known that liquidity is critical to attracting customers—indeed, it is an old aphorism in finance that "liquidity begets liquidity." 56.1 ¶ 9.

One way Gemini sought to grow its exchange was by launching a daily auction to "provide[] an opportunity for both buyers and sellers to trade in an instant of elevated liquidity and price discovery." Ex. 3 at 5. The auction, which initially launched in September 2016, worked as follows:

> The auction price is determined by finding the price at which the greatest aggregate buy demand and sell demand from all eligible orders can be fulfilled; all continuous trading orders and auction-only orders are considered. The auction price then applies to all fills, allocated based on price-time priority. An auction will be automatically canceled if the final auction price deviates from the value of [a benchmark price] by more than 5% at the time of the auction. Beginning ten minutes before the time that the auction runs, at 3:50 p.m. Eastern Time, the Gemini Exchange begins publishing indicative auction data via both its public market data

---

Dkt. 100. "CFTC 56.1" refers to the CFTC's Statement of Undisputed Facts. Dkt. 98.

application programming interface ("API") and website, which contain information about the current state of buy/sell interest in the auction. One minute before the auction runs, at 3:59 p.m. Eastern Time, the Gemini Exchange begins publishing a "final" indicative price every fifteen seconds. In order to calculate indications, the Gemini Exchange simulates the auction process at that point in time. At 4:00 p.m. Eastern Time, the auction runs.

Ex. 2 at 2–3.

Contrary to the CFTC's suggestion, MSJ 8–9, Gemini had no incentive to design an auction that could be manipulated. To the contrary, the risk of manipulation tends to drive potential customers away. 56.1 ¶ 12. And many features of the Gemini auction helped reduce the risk of manipulation:

- The 5% price "collar" ensured that the auction would fail if the settlement price deviated too far from prevailing market prices.

- Sharing indicative prices helped traders identify arbitrage opportunities that would bring the auction price in line with prevailing market prices.

- Gemini did not make the auction order book visible to market participants, who were thus unable to use bid and offer information to engage in coordinated or collusive trading.

- Auction orders could not be canceled in the last minute before the auction, which again inhibited malicious actors' ability to engage in manipulative trading.

- The auction included all orders resting on Gemini's continuous order book, which increased liquidity and made manipulation more difficult and expensive.

- Participants could not have both buy and sell auction orders filled in a single auction.

- All orders had to be pre-funded, meaning participants needed to commit bitcoin or dollars to fund the full amount of every order at the time it was placed.

- The auction was a double auction, so the only way a malicious actor could affect the auction price would be to place buy orders at prices above or sell orders at prices below the prevailing market price, which increased the cost of manipulation.

56.1 ¶ 14. These efforts worked. Volume on the Gemini auction grew over time, and Gemini's auction price was very similar to the price on other prominent exchanges. 56.1 ¶ 15.

B.      **CFE Approaches Gemini About The Bitcoin Futures Contract**

The CFTC contends—incorrectly—that the Bitcoin Futures Contract was Gemini's "brainchild" and that it was conceived in response to the SEC's decision not to approve a rule change that would have allowed a Gemini affiliate to offer a bitcoin-linked ETF. MSJ 8–9. These assertions are wrong and, at minimum, disputed.

It simply is not true that the Bitcoin Futures Contract was Gemini's "brainchild." Conversations between Gemini and CFE regarding the Bitcoin Futures Contract began in January 2017, when CFE approached Gemini. 56.1 ¶ 16.[2] During these initial conversations, it was agreed that CFE would create a "product sketch" that created a "framework" for the project. Ex. 3 at 2. CFE provided this framework on February 18, 2017, when it sent draft product specifications to Gemini. 56.1 ¶ 19.

The CFTC's assertion that the SEC's decision not to approve the ETF somehow "forced" Gemini to proceed with the ETF is also wrong. MSJ 8. The only document the CFTC cites proves that it has the timeline wrong. That document states that when the SEC issued its decision work on the Bitcoin Futures Contract was "already in process"—and had been for "the past month or so." CFTC Ex. 13 at GEM_CFTC134789. This document further reflects that the Bitcoin Futures Contract was just one piece of Gemini's "overall picture." CFTC Ex. 13 at GEM_CFTC134790.

---

[2]    *See also* Ex. 9 [C. Winklevoss] at 99:25–100:14 ("Q. You just said that CBOE was interested in launching a futures contract. A. Okay. Q. So why were you speaking to CBOE in 2016 and 2017 if they were interested in launching a futures contract? A. I believe they may have reached out or started discussions because they wanted to do a futures contract based on the price of bitcoin."); Ex. 10 [T. Winklevoss] at 38:4–39:3 ("Q. In 2017, did you and your brother and Gemini work with CBOE to try to get a bitcoin futures contract into the world? A. Which year? Q. 2017. A. I don't remember the specific year. At some point CBOE reached out to Gemini because they wanted to create a futures product. . . . Q. And did you work with people at CBOE to try to make that happen? A. CBOE reached out to us and ultimately we started working with them.").

6

**C.      Gemini Provides Extensive Information To CFE**

In the months following CFE's initial outreach, Gemini provided extensive information about its exchange to CFE. Gemini knew at all times that this information could be shared with the CFTC, and it went to great lengths to ensure that it provided any and all information it was asked for or thought could be relevant. 56.1 ¶ 21. The direction to provide complete transparency came from Gemini's most senior levels. 56.1 ¶ 22. As CFTC trial witness and former Gemini employee Rose Toomey testified in response to the CFTC's questions:

> Q.     Do you remember saying, in the same general discussion, that you were instructed to provide information to Cboe in an accurate manner?
>
> A.      Yes.
>
> Q.     Who instructed you to provide information to Cboe in an accurate manner?
>
> A.      Well, separately, Cameron and Tyler Winklevoss introduced me to Dennis O'Callahan. Sorry, by "separately," I mean Michael Breu had put me into contact with Stephanie Marrin's office, while around that same time Cameron and Tyler Winklevoss had asked me to -- had asked me and my colleague, Noah Cornwell, to contact Dennis O'Callahan.
>
> Q.     Okay. And they instructed you to report information to Cboe in an accurate manner?
>
> A.      They asked me, as I recollect, to provide as much detail as possible to answer whatever questions that they had, to arrange -- to arrange to create and provide whatever datasets that they requested.

Ex. 13 [Toomey] at 438:11–439:5[3]; *see also* T. Winklevoss Decl. ¶ 1 ("Cameron and I instructed our employees to give everything anyone asked for, and Gemini went to great lengths to provide everything anyone requested or we thought could be relevant.").

The evidence also demonstrates the breadth of information Gemini provided in compliance with this directive.

---

[3]    All objections are omitted from quoted testimony.

*Responses to CFE's Due Diligence Questionnaire*: On February 16, 2017, CFE sent Gemini a list of due diligence questions about bitcoin and the Gemini exchange. 56.1 ¶ 24. Gemini sent the answers to CFE's questions the next day. 56.1 ¶ 25. These answers provided extensive information about Gemini's exchange and auction, including that (i) self-trading was permitted on its exchange, and (ii) Gemini was a "fully funded" or "pre-funded," meaning "funds used to place orders are 'held' and may not be withdrawn nor used to place additional orders." Ex. 3 at 8–9. Gemini also explained the benefits of pre-funding, including that "the economic risks of attempted manipulation or other nefarious activity (e.g. spoofing)" are "substantially increased." Ex. 3 at 9.

*Gemini Trade Data*: Gemini gave CFE "as much data as possible," which amounted to "almost everything [] available at Gemini internally," including "a whole market dataset of the complete history of Gemini" and data showing all trades, orders, and auction results. Ex. 13 [Toomey] at 290:20–291:16, 296:12–18, 297:17–21. Indeed, for a time leading up to the Self-Certification, Gemini provided data "practically every day of the week," including data sets so voluminous that Gemini sent them in monthly increments because CFE had problems downloading or opening the full files. Ex. 13 [Toomey] at 291:17–292:3. Gemini provided everything it was asked for, and it never provided false or misleading data. Ex. 13 [Toomey] at 297:22–298:4 ("Q. Was there any data that either Mr. Small or Mr. O'Callahan or Ms. Marrin or anyone else requested that you provide, in connection with the self-certification in 2017, that you didn't provide? A. Not to my knowledge."); Ex. 13 [Toomey] at 298:5–23 ("Q. Did you ever provide any false data to Cboe? A. No. Q. Did you ever provide any misleading data to Cboe? A. No.").

*Gemini's Policies and Procedures*: In September 2017, Gemini provided CFE with a complete copy of its Policies & Procedures to ensure the CFTC could "see the full text for themselves." Ex. 14. These Policies & Procedures disclosed, among other things, that Gemini had

a policy regarding "Agreements Granting Preferential Terms" under which it could "provide certain high volume Users, market makers or other special-case users . . . with terms different from those given under the standard User Agreement and fee schedule." Ex. 15 at 47.

***Answers to Questions Posed by CFE***: Throughout the self-certification process, CFE sent Gemini questions about its exchange. For example, on September 11, 2017, CFE asked for "the date when the self-trade prohibition was effected in the Gemini auction"; Gemini promptly answered that "[t]he code that prohibited auction book self-cross was released on 23 May 2017." Ex. 16. On October 5, 2017, CFE sent Gemini questions about data it had provided; Gemini's response to one of those questions explained that the data could reflect debits or credits to an account "due to a signed agreement with a specific customer . . . to rebate fees for part of a month before an agreement providing a specific fee rate to that customer was signed and put into effect." Ex. 17 at 3.

There were no questions that Gemini did not answer. CFE's in-house counsel and CFTC trial witness Art Reinstein's testimony makes this clear:

> Q.    Did CBOE ever complain that -- to your knowledge, that Gemini refused to provide information?
>
> A.    I don't have a recollection of that occurring.
>
> Q.    Are you aware of any question asked to Gemini that Gemini did not answer?
>
> A.    Asked by who?
>
> Q.    Asked by either CBOE or CFTC during the course of the self-certification.
>
> A.    I don't recall that occurring. I don't have a recollection of that.

Ex. 18 [Reinstein] at 151:7–20. Nicole Gordon, Mr. Reinstein's colleague and another CFTC trial witness, testified similarly:

> Q.    And you don't recall any instance when Cboe complained that Gemini was not providing information to it, right?

9

A.    Not that I recall.

Q.    You don't recall any instance where Gemini refused to respond to a question Cboe posed, right?

A.    No. I think the information was typically, from what I remember, provided on a timely basis. And that's the information that then informed the self-certification filing.

Q.    And there was not one instance where you recall Gemini not responding to a question that Cboe posed, right?

A.    Not that I recall.

Q.    So fair to say Gemini was fully cooperative in this process, right?

A.    I think I would agree with that.

Q.    And if Cboe had questions, Gemini would answer them, right?

A.    Yes.

Q.    You never had any questions about Gemini's good faith, right?

A.    I personally didn't.

Ex. 19 [Gordon] at 99:19–100:14.

### D.    CFE, The CFTC, And Gemini Engage In An Iterative Dialogue About The Bitcoin Futures Contract

Just as it initiated conversations with Gemini, CFE also approached the CFTC regarding its plan to introduce the Bitcoin Futures Contract. In April 2017, CFE's Nicole Gordon emailed the CFTC's Thomas Leahy and David Van Wagner to inform them that "CFE ha[d] a product initiative related to cash settled bitcoin futures" and was "trying to touch base . . . about it." Ex. 20. CFE and the CFTC met the following week. 56.1 ¶ 40. No Gemini employees attended. 56.1 ¶ 41.

Conversations with the CFTC about the Bitcoin Futures Contract continued in July 2017, when representatives from CFE and the CFTC—joined for the first time by representatives from Gemini—met at the CFTC's offices in Washington, D.C. 56.1 ¶ 42. In the following months, CFE, Gemini, and the CFTC engaged in an extensive dialogue in which CFE and Gemini provided

additional and supplemental information, including numerous written submissions, about the Bitcoin Futures Contract. 56.1 ¶ 43. CFE determined what submissions to make and what to say in them. As Mr. Reinstein testified:

> Q.     There were a number of submissions in addition to this final self-certification that CBOE made to the CFTC; is that fair?
>
> A.     Yes.
>
> Q.     And in each case, it was ultimately CBOE's decision to transmit those submissions to CFTC, right?
>
> A.     Yes.
>
> Q.     And CBOE had the authority to change or modify those submissions as it believed appropriate; is that fair?
>
> A.     I think that we had the authority to do so. If we were going to do so related to something that was not in our personal knowledge, meaning not something related to our market but related to Gemini, then we would have vetted that with Gemini. I don't think we would have just changed something. But we did, I believe to your point of your question, have ultimate authority to submit the document.

Ex. 18 [Reinstein] at 159:4–23.

### E.     The Self-Certification Process

Conversations between CFE, Gemini, and the CFTC regarding the Bitcoin Futures Contract ended on December 1, 2017, when CFE filed the Self-Certification. 56.1 ¶ 45. A self-certification is not a request for the CFTC's approval. 56.1 ¶ 46. Rather, the self-certification process permits a DCM like CFE to step into the CFTC's shoes by analyzing the new product and "certify[ing] that [it] does not violate any provision of the [Commodity Exchange Act ("CEA")] or the CFTC's regulations and policies thereunder." Ex. 25 at 2. The CFTC acknowledged in 2017 that under the then-existing "statutory and regulatory framework . . . the Commission ha[d] limited ability to require . . . DCMs to make changes to" self-certified contracts. Ex. 26 at 1.

When self-certifying a product, a DCM was required to provide "[a] concise explanation and analysis of the product and its compliance with applicable provisions of the [CEA], including [the CFTC's] core principles." Ex. 25 at 1. The CFTC's core principles are a set of 23 rules and requirements that DCMs were required to follow to maintain their self-regulatory status. 56.1 ¶ 50. The CFTC has said the "whole ball of wax in this case is Core Principle 3," Ex. 27 at 10:19–22, which states that DCMs "shall list . . . only contracts that are not readily susceptible to manipulation," 17 C.F.R. § 38.200.

There is precious little public guidance about how to determine if a contract is "readily susceptible to manipulation." The CFTC has never defined the phrase, and it asserted privilege and instructed its witnesses not to answer questions about what it means or how it is different than "susceptible to manipulation." 56.1 ¶ 52. The only public guidance the CFTC has provided is called "Appendix C." 56.1 ¶ 53. But Appendix C provides only a generic instruction that DCMs should provide a "description" of the "cash market" used to set the price of cash-settled futures contracts and examine "the size and liquidity of [that] cash market." Ex. 30 at (a)(2) and (c)(2).

Because there is so little practical or meaningful public guidance, experience with the self-certification process is critical to knowing what is relevant to Core Principle 3. 56.1 ¶ 55. As the CFTC's Mr. Goodman testified, "[e]xchanges that have been through the process a few times . . . generally have a better understanding than newer exchanges" of what information is relevant to whether a contract is readily susceptible to manipulation. Ex. 24 [Goodman] at 90:11–21. For this reason, while Gemini—which had never before been involved in launching a new product for trading on a CFTC-regulated exchange—knew that anything it provided to CFE could be shared with the CFTC, it relied on CFE for guidance on what information was important. 56.1 ¶ 57. And CFE understood that Gemini was relying on its guidance. As Ms. Gordon testified:

> Q.    Is it fair to say Gemini was relying on Cboe in connection with the self-certification?
>
> A.    I think that's fair.
>
> Q.    So Gemini relied on Cboe to identify what information was needed in connection with the self-certification; is that fair?
>
> A.    Yes.

Ex. 19 [Gordon] at 100:15–101:12.

There is one final aspect of the self-certification process that bears emphasis. Given its limited role, there are material fact disputes around whether the CFTC could make any decision regarding the Self-Certification. Gemini has repeatedly sought discovery on this topic but has been stymied at every turn:

- During depositions, the CFTC repeatedly gave instructions not to answer questions about what decisions the CFTC did or could have made. 56.1 ¶ 59.

- Gemini's Rule 30(b)(6) Notice to the CFTC sought testimony about "[t]he decisions that the CFTC could have made in connection with the Self-Certification and whether any such decision were made," Ex. 31 at 5, but the CFTC objected and sought a protective order preventing Gemini from obtaining testimony on this topic, Dkt. 50 at 13.

- After the Court ordered Gemini to address this topic by interrogatory, Dkt. 70 ¶ 7, Gemini asked the CFTC to "[i]dentify all decision the CFTC could have made in connection with the Self-Certification and the source of the CFTC's authority for each such decision." Ex. 28 at 9. The CFTC asserted a panoply of objections and identified just one piece of evidence: a statement in a declaration by a CFTC employee that the CFTC could make some unidentified decision. Ex. 29 at 11–12.

- Gemini asked the Court to compel the CFTC to provide an adequate response to this interrogatory in a February 29, 2019 letter, but the Court denied this request. 56.1 ¶ 59.

In light of the near-total absence of evidence about what decision the CFTC could make and the CFTC's prior statements about the limitations on its authority, there is a critical fact question about whether the purported false statements could have affected a decision by the CFTC.

**F.      The At-Issue Documents**

The CFTC alleges that 10 written submission it received in connection with the Self-Certification contained false or misleading statements. 56.1 ¶ 60. Gemini's motion for partial summary judgment described seven of those documents at length and explained why the statements in them were made by CFE, not Gemini. 56.1 ¶ 61. The three remaining documents include (i) an August 25, 2017 response to questions posed by the CFTC (the "August 25 Submission"), (ii) a September 12, 2017 submission explaining why the Gemini auction was not readily susceptible to manipulation (the "September 12 Submission"), and (iii) talking points sent to the CFTC on November 2, 2017 (the "November Talking Points"). 56.1 ¶ 62.

The August 25 Submission contains answers to questions posed by the CFTC. Ex. 22. Portions of the response appear under CFE's logo and portions of the response appear under Gemini's logo, but it was CFE that ultimately sent the August 25 Submission to the CFTC with no Gemini employees copied. Ex. 22 at 1–4. The September 12 Submission describes why the Gemini auction was not readily susceptible to manipulation. Ex. 15. The document bears Gemini's logo, but CFE submitted it to the CFTC with no Gemini employees copied. Ex. 15 at 1, 144. The November Talking Points were sent to the CFTC by Sullivan & Cromwell's Ken Raisler, who was CFE's longtime counsel and who represented Gemini in connection with the Self-Certification. 56.1 ¶ 65. The decision to send the November Talking Points was made during a call between Mr. Raisler, Mr. Reinstein, and Ms. Gordon—without any Gemini representatives. 56.1 ¶ 65. It was "ultimately CBOE's decision" over whether to make these submissions: CFE had the authority to change or modify them, and Gemini could not force CFE to submit any particular documents to the CFTC. Ex. 18 [Reinstein] at 159:4–160:12; *see also* Ex. 23 [C. Winklevoss] at 535:17–536:10 (Gemini "did not have control or agency on what information, necessarily, [CFE] chose or how they chose to present that to the CFTC.").

### G.    The At-Issue Statements

Notwithstanding its extraordinary openness or Gemini and CFE's respective roles in connection with the Self-Certification, the CFTC alleges Gemini (but not CFE) failed to disclose various information that rendered certain statements false or misleading. The CFTC places these statements into four broad categories: statements about whether Gemini was a "pre-funded" exchange; statements about whether Gemini permitted self-trading; statements about fee incentives Gemini offered to market participants; and statements about the volume on Gemini's exchange. Gemini provides the facts relevant to each category of statements below.

### 1.    Gemini Was a Pre-Funded Exchange

Numerous written submissions provided to the CFTC described Gemini as a "pre-funded" or "full reserve" exchange. 56.1 ¶¶ 68–73. The CFTC argues these statements were false or misleading. MSJ 32. The CFTC's claim depends on three arguments: that "pre-funding" means no borrowed assets were traded on Gemini exchange; that operational advances offered by Gemini were inconsistent with the pre-funding requirement; and that loans issued by Pearl Street Financial, LLC ("Pearl Street"), a separate entity owned by Cameron and Tyler Winklevoss, were inconsistent with pre-funding. MSJ 33–35. There is extensive evidence demonstrating that fact questions exist regarding all three points.

#### (a)    Genuine Fact Questions Exist Regarding the CFTC's Assertion that "Pre-Funded" Meant "No Borrowing"

"Pre-funded" is not an industry term of art. 56.1 ¶ 68. The CFTC has not defined it, and "the concept . . . is not found in the text of Appendix C." Ex. 24 [Goodman] at 92:21–93:18. Thus, "pre-funded" needed a definition, and the CFTC was given one. The September 12 Submission stated that "[a]ll orders must be pre-funded — *dollars must be deposited prior to placing a buy order and bitcoin must be deposited before placing a sell order* — and participants are not

permitted to place an order unless they have enough funds in their account to place such order (orders that are submitted without backing funds are rejected)." Ex. 15 at 145.[4] CFE's Self-Certification repeated this definition, explaining that "[t]he Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. . . . As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. *Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order*." Ex. 2 at 2.

The CFTC's argument that these statements were false or misleading ignores extensive evidence to the contrary. For example, the CFTC argues the statements about pre-funding must be false because Gemini removed the word "pre-funded" from one section of its Policies & Procedures in March 2017. MSJ 40. The CFTC's exclusive focus on this single deletion in a single section of a single document paints an incomplete and misleading picture. Gemini did *not* stop using the word "pre-funding" or describing itself as a pre-funded exchange after March 2017. Indeed, Gemini continued to use "pre-funded" in other portions of its Policies & Procedures— including in the version the CFTC received in September 2017, which stated that "Gemini is a *full reserve exchange* — funds must be deposited prior to placing any order and all *orders must be pre-funded* (i.e., Users are not permitted to place an order unless they have enough funds in their accounts to place such order)." Ex. 15 at 79. These Policies & Procedures also stated that, consistent with the pre-funding requirement, any order that exceeded the funds available in the relevant account "is rejected." Ex. 15 at 49.

---

[4]     Unless otherwise noted, all emphasis is added to quoted documents, cases, and other authorities. Similarly, all citations are omitted and all quotations are cleaned up.

The CFTC also ignores Gemini's User Agreement. Gemini's User Agreement dated October 19, 2017 stated that all buy orders "settle[d] immediately from a *pre-funded* Fiat Account" and all sell orders "settle[d] immediately from a *pre-funded* Digital Asset Account." Ex. 35 at 6. The same User Agreement also stated that any "sell Order that exceeds the amount of available Digital Assets in the associated Digital Asset Account will be rejected" and any "buy order that exceeds the amount of available fiat currency in the associated Fiat Account will be rejected." Ex. 35 at 6.

The CFTC similarly glosses over the extensive evidence showing the Gemini exchange worked exactly as described. Ms. Toomey explained that "if your account [was] not pre-funded with the money to cover that order . . . then that entire order . . . would be rejected." Ex. 13 [Toomey] at 50:21–51:2. Gemini business development employee and fellow CFTC trial witness Shane Molidor testified that "a Gemini account balance must reflect assets on deposit in order to then buy assets." Ex. 36 [Molidor] at 123:3–14. Dan Matuszewski, a former employee of Circle Internet Financial ("Circle") and another CFTC trial witness, testified to the same effect:

> Q.   In your experience, did dollars have to be deposited into Circle's account before Circle could place a buy order?
>
> A.   Yes.
>
> Q.   And, in your experience, did bitcoin need to be deposited into Circle's account before Circle could place a sell order on Gemini?
>
> A.   Yes.

Ex. 37 [Matuszewski] at 249:5–14; *see also id.* at 214:15–215:10 ("[I]f the Gemini account balance didn't have the cash or coin in it, the order wouldn't go through."). The contemporaneous evidence confirms this testimony. As of September 2017, "[t]he most common reason for orders being rejected [was] 'insufficient funds.'" Ex. 38 at 1.

Gemini's definition of pre-funding was also economically sensible. Gemini's pre-funding requirement compelled market participants to incur both capital costs (to acquire the backing funds) and opportunity costs (because the trader could not use those funds elsewhere) just to place an order. Ex. 5 [Skrzypacz] ¶ 49. These costs differentiated pre-funded trading on Gemini from, for example, margin trading, in which the trader incurs no costs until a trade is actually executed, thus reducing the cost of common forms of manipulation like spoofing in which a market participant places orders it does not intend to execute. Ex. 5 [Skrzypacz] ¶ 50. Indeed, this is *precisely* the purpose identified in Gemini's response to CFE's due diligence questionnaire and in the August 25 Submission. Ex. 3 at 9 (explaining that pre-funding requirement "substantially increases the economic risks of attempted manipulation or other nefarious activity (e.g. spoofing)."); Ex. 22 at 12–13 (pre-funding makes "spoofing and other manipulative techniques . . . quite expensive and inefficient").

By contrast, the CFTC's witnesses' professed understanding of "pre-funding" is not reasonable, and at minimum creates fact issues. While the CFTC refused to state during discovery what it understood "pre-funding" to mean, 56.1 ¶ 79, Mr. Goodman testified that he understood "pre-funding" meant "there was no borrowing whatsoever on the Gemini exchange," Ex. 24 [Goodman] at 250:21–25. There is no evidence Gemini ever gave this definition, and the CFTC neither told Gemini that it had this understanding nor asked Gemini any questions about the source of its customers' funds. 56.1 ¶ 81.[5] Moreover, borrowing is extremely common in financial

---

[5]    *See* Ex. 24 [Goodman] 254:6–16 ("Q. Did you ever tell Gemini or anybody working on behalf of Gemini that you defined 'leverage' to mean any form of lending whatsoever? A. You know, again, I can't recall specific, you know, discussions we would have had with them on that. But I do know broadly pre-funding was a point that was -- that was a point of discussion throughout this and a point that they had noted."); *See* Ex. 58 [Kuserk] 200:7–16 ("Q. Did you ever ask Gemini about source of funding in regards to the accounts being pre-funded? A. No. Q. Did you ask Gemini -- after receiving this document, did you ever ask Gemini about whether the accounts could be - - the money could be borrowed in order for the account to be pre-funded before trading? A. No."); *id.* 202:5–8 ("Q. Do you know if anyone at the CFTC asked Gemini whether its market participants borrowed funds to trade on the Exchange? A. I'm not aware of anybody asking.").

industry. 56.1 ¶ 82. For this reason, the notion that pre-funding meant a total ban on trading with borrowed assets is not reasonable. 56.1 ¶ 83.

(b)    *Genuine Fact Questions Exist Regarding Gemini's Provision of Operational Advances*

Because Gemini was a pre-funded exchange, customers needed to have dollars or bitcoin in their accounts before placing orders. To fund their accounts, customers could send U.S. dollars by ACH or wire transfer or bitcoin via the blockchain. 56.1 ¶ 84. Those transfers did not happen instantly. In 2017, the time it took for a bitcoin transfer to be finalized increased substantially as transaction volume grew. 56.1 ¶ 85. Delays in sending U.S. dollars via ACH or wire transfer were also common, particularly given that "the banking system works 9:00 to 5:00, Monday through Friday, not including bank holidays," while "[c]rypto trades 24/7, 365, does not take any holidays." Ex. 23 [C. Winklevoss] at 102:13–103:25.[6]

To address these delays, Gemini offered customers "operational advances" (sometimes called pre-credits or advance credits) of U.S. dollars or bitcoin. 56.1 ¶ 88. Advances of this kind were common practice because they "reduced the processing time it took for a market participant to complete transfers of Bitcoin or US dollars into their accounts." Ex. 5 [Skrzypacz] ¶¶ 114, 142; *see also* Ex. 39 [Cusimano] ¶¶ 54, 56 ("Advances and credits to customer accounts are a routine and accepted practice in financial markets. . . . Providing advances to digital asset exchange customer accounts is not unique to Gemini. In fact, other digital asset exchanges also extended similar advances or credit to customers.").

The fact that Gemini offered operational advances was not a secret. On January 31, 2017 Gemini announced *on its website* that "[t]o help ease [] deposit delays," it was introducing "zero-

---

[6]    Documentary evidence illustrates these delays. *See, e.g.*, Ex. 86 (transfer initiated at 11 AM not complete as of 1:50 PM); Ex. 87 (transfer caused by bank holiday in Asia); Ex. 88 (27 hour wait to complete wire transfer).

confirmation Bitcoin deposits," which would "pre-credit the amount of [a] deposit and make it available for trading immediately." Ex. 40 at 2. Under this process, when a Gemini customer initiated a bitcoin transfer on the blockchain, Gemini would utilize a "proprietary analysis to determine how likely" the transfer was to go through. Ex. 40. "If [the] transaction passe[d] [Gemini's] criteria," Gemini would "pre-credit the amount of [the] deposit and make it available for trading immediately." Ex. 40 at 2.

Gemini's January 31, 2017 announcement also noted "that [the] new zero-confirmation BTC deposit feature" was "similar to [Gemini's] existing Instant ACH system," under which customers could receive U.S. dollar advances. Ex. 40 at 2. Under this system, after a Gemini customer provided "proof that their Wire is in transit," Gemini could "provide an operational advance to bridge" the time between the initiation of the wire and the time at which funds were received. Ex. 43 at 8.[7] Acceptable forms of proof included wire transfer confirmations and Fedwire reference numbers. 56.1 ¶ 95.[8] These U.S. dollar advances "typically [did not] exceed twenty four (24) hours," Ex. 43,[9] and customers who received an operational advance could "immediately trade the full value of such an advance," though Gemini placed "a hold . . . on their account in an amount equal to or greater than the funds in transit, thereby preventing withdrawals in excess of the User's actual asset balance," Ex. 44 at 9.

---

[7]    *See also* Ex. 44 at 9 ("In some cases, for select institutional Gemini Accounts, we may provide an operational advance to bridge an incoming funds transfer if such customer is able to provide proof that the funds are in transit . . . .").

[8]    In some instances, Gemini employees accepted other forms of proof, including "verbal promise[s]," "indication[s] of good faith based on past trade experience," and "attestation[s] to holding of funds on chain or a blockchain transaction ID." Ex. 36 [Molidor] at 407:25–408:16.

[9]    *See also* Ex. 48 [Molidor Aff.] ¶ 17 ("It was my understanding of company policies and procedures . . . that market participants were expected to send corresponding funds for these advancements to be delivered to Gemini within approximately 24 hours."); *see also* Ex. 37 [Matuszewski] at 84:20–85:5 ("Q. Okay. Do you have any recollection as to whether or not the advance -- well, how long would it normally take to transfer the funds to cover the advance on your account? A. I'd say 90 percent of all the advances we got settled within 24 to 48 hours. Q. Okay. And of those, how many would settle within the same day? A. 30 to 40 percent.").

While the CFTC argues (and its expert claims) that these operational advances were loans, MSJ 34; Ex. 6 [Harris] ¶ 94, there is substantial evidence to the contrary. As a limited purpose trust company, New York law required Gemini to submit annual audited financial statements to NYDFS. 56.1 ¶ 99. Gemini's auditor, BPM, was fully aware that Gemini gave operational advances. BMP received extensive documentation detailing administrative credits and debits, including operational advances, and there is direct documentary evidence of communications between Gemini and BPM about operational advances in connection with an audit in April 2017. 56.1 ¶ 100. Consistent with Gemini's view that these advances were not loans, Gemini's financial statements did not treat these advances as loans. 56.1 ¶ 101. BPM signed off on those financial statements, and NYDFS has never raised any concerns about this accounting treatment. 56.1 ¶ 101.

Gemini's provision of operational advances was consistent with Gemini's definition of pre-funding. Daniel Matuszewski, a former Circle employee, testified as follows:

> Q.    Could you use the money to place orders before it was -- before your account increased -- your account balance went up or only after the account balance went up?
>
> A.    Only after the account balance went up.
>
> Q.    And when Circle received a precredit or advance of bitcoin, what happened to Circle's account balance at Gemini?
>
> A.    Same as with cash. The balance would increase by whatever that precredit amount was.
>
> Q.    And before the account balance increased, could Circle place an order using the advanced or precredited bitcoin?
>
> A.    No, not until the balance had updated.

Ex. 37 [Matuszewski] at 241:18–242:11. Moreover, Gemini's provision of operational advances did not reduce the costs associated with Gemini's pre-funding requirement. Allocating funds to be transferred—as required to receive an advance—imposed opportunity costs (because the backing

funds could not be used elsewhere while they were in transit to Gemini) and capital costs (if the customer needed to buy or borrow U.S. dollars or bitcoin to back its orders). 56.1 ¶ 103.

In contrast to this evidence, the CFTC cites a small number of outlier advances in which Gemini's policies and procedures were not followed or operational errors occurred. MSJ 40. But the CFTC's myopic focus on this handful of undisputed operational mistakes obscures the broader picture. Between January 2017 and December 2018, Gemini made 150,512 automated bitcoin advances totaling 812,242 bitcoin and 712 U.S. dollar advances totaling $1.46 billion. 56.1 ¶ 104.[10] All were repaid, and the vast majority were repaid in a matter of hours. 56.1 ¶ 105.

The eight examples the CFTC identifies in its papers do not demonstrate anything to the contrary. For example, the CFTC places a great deal of emphasis on a 750 bitcoin advance that Gemini issued to Circle in July 2017 that was not repaid until October 2017. MSJ 40. But this delay in repayment was purely the result of an operational error, and this advance was promptly repaid when Gemini discovered the error during a quarterly reconciliation. 56.1 ¶ 107. When informed of the issue, Cameron Winklevoss stated that this mistake constituted "gross negligence," Ex. 47, and Mr. Winklevoss testified during his deposition that the issue appeared to relate to Mr. Molidor's failure to follow company policy, Ex. 23 [C. Winklevoss] at 210:13–213:25. Mr. Winklevoss reaction underscores that this long-outstanding advance was an operational failure, not Gemini's approved way of doing business. Indeed, there is also no evidence Gemini's senior executives ever knowingly authorized an out-of-policy advance. To the contrary, Mr. Molidor—who was responsible for providing many of the advances the CFTC addresses—"was

---

[10]    Notably, while the CFTC has alleged that Gemini failed to disclose *any* advances, Compl. ¶ 62, the CFTC's expert analyzed only a small subset of the advances Gemini provided. *See* Ex. 6 [Harris] ¶ 96 & Figure 39; Ex. 5, Figures 7.1, 7.2. It is not clear whether the CFTC has abandoned its claim that the excluded advances rendered statements false or misleading or the CFTC's expert consciously decided to exclude unhelpful evidence to skew his analysis in his client's favor. In either event, this decision creates additional fact questions for the jury.

never advised by Cameron or Tyler Winklevoss that it was permissible for operational advances to remain outstanding in a manner that was not consistent with company policies and procedures." Ex. 48 ¶ 17.

(c)    <i>Genuine Fact Questions Exist Regarding The Pearl Street Loans</i>

The CFTC asserts that the statements concerning pre-funding were false because Pearl Street, a separate entity, served as "a way for Gemini to provide lines of credit—or credit or margin—to market makers to increase volume on the Gemini exchange." MSJ 17. Substantial evidence undercuts the CFTC's theory.

Cameron and Tyler Winklevoss formed Pearl Street to lend their personal cryptocurrency to fill a demand in the market. 56.1 ¶ 111. These loans provided benefits to both lender and borrower. For Cameron and Tyler Winklevoss, Pearl Street was a way to earn a return on their bitcoin, which (absent a loan) is not a yield-generating asset. 56.1 ¶ 114. For borrowers, a loan from Pearl Street—like any loan—was a way to obtain additional assets with which to do business. 56.1 ¶ 115.[11]

The Pearl Street loans issued were governed by signed contracts setting forth the parties' agreed-upon terms and respective obligations. 56.1 ¶ 116. Two particular loan terms are at issue in this case. *First*, the CFTC alleges the Pearl Street loans were issued at "low or below-market" prices. Compl. ¶ 61. Substantial evidence contradicts this claim. As explained by Angelo Chan— an expert retained by Gemini with extensive experience in bitcoin lending—"the question of whether a loan is issued 'at low or below-market rates' requires comparison with other similar loans in the market at the time." Ex. 49 [Chan] ¶ 35. In 2016 and 2017, no "published or industry-

---

[11]    While the CFTC suggests Pearl Street was created in response to a March 10, 2016 email suggesting that Gemini find a way to permit customers to engage in margin trading, MSJ 17, the evidence does not support this assertion. Cameron and Tyler Winklevoss began negotiating loans for what became Pearl Street in 2015, 56.1 ¶ 112, Pearl Street was formed on January 7, 2016, and Pearl Street issued its first loans that same month, 56.1 ¶ 113.

23

recognized benchmark rates" existed. Ex. 49 [Chan] ¶ 35. Mr. Matuszewski testified to the same effect, explaining that "to call [the bitcoin lending environment in 2016 and 2017] a market . . . is a little overselling it" because there were not "counterparties every day out there looking to . . . borrow and lend coin." Ex. 37 [Matuszewski] at 259:25–261:13. Nevertheless, to the extent that contemporaneous evidence regarding interest rates exists, it demonstrates that (i) the interest rates Pearl Street charged were the result of arms-length negotiation, (ii) those rates were in line with other bitcoin loan rates, and (iii) the Pearl Street loan rates were *higher* than benchmark rates identified by the CFTC's expert witness. Ex. 49 [Chan] ¶¶ 42–56; Ex. 6 [Harris], Figure 31.

*Second*, the CFTC alleges that Pearl Street loan borrowers were required to use the borrowed bitcoin to transact on the Gemini exchange. Compl. ¶ 53. Again, there is substantial contrary evidence. There is no question that Cameron and Tyler Winklevoss hoped that Pearl Street loan borrowers would use the bitcoin to trade on Gemini and encouraged some of those borrowers to use the bitcoin in that way. 56.1 ¶ 123. That is only natural: what business owner would *not* want its businesses to help each other? But just 2 of the 35 Pearl Street loan agreements contained any requirement that the borrower transact on Gemini. 56.1 ¶ 123. Moreover, Gemini did not, and could not, track whether those requirements were being met, and there is no evidence these requirements affected the borrowers' trading activity. 56.1 ¶¶ 124–25. This lack of impact is no surprise. The Pearl Street loan borrowers' trading activity dwarfed the amount of Pearl Street-issued loans outstanding at any given time. 56.1 ¶ 126. If anything, the evidence shows that general market forces, not loans from Pearl Street, were the driving force behind the Pearl Street loan borrowers' trading activity on Gemini. 56.1 ¶ 127.

*Finally*, the CFTC asserts that the Pearl Street loans amounted to margin Gemini offered to the Pearl Street loan borrowers. MSJ 33–34. The CFTC cites no evidence to support this

assertion, and again there is evidence to the contrary. Placing orders on Gemini's pre-funded exchange carried real costs, even when using borrowed funds. 56.1 ¶ 129. Placing orders on a margin trading account does not carry any of those costs: traders can place trades cost-free, as there are no opportunity costs and interest charges only accrue when a trade is executed. 56.1 ¶ 130. This difference makes it much more costly to engage in common types of manipulation like spoofing, in which a trader places fake orders on one side of the market to create the illusion of supply or demand and move prices, executes trades on the other side, and then cancels the fake orders. 56.1 ¶ 131. This is precisely the type of cost-increasing, anti-manipulative effect pre-funding was intended to have, and that Gemini identified. Ex. 3.[12]

### 2. Self-Trading On The Gemini Exchange

The CFTC also claims that statements that Gemini prohibited self-trading on its exchange were false or misleading. MSJ 49. Here again, the CFTC ignores substantial evidence that contradicts its claims.

Self-trading was permitted when trading on Gemini began. 56.1 ¶ 134. Gemini did not try to hide this fact. Gemini's response to CFE's due diligence questionnaire stated that Gemini "monitor[ed] . . . participant self-trading," which necessarily meant such trading was permitted. Ex. 3 at 9. Trade data Gemini gave CFE—some of which CFE subsequently sent to the CFTC—also included instances of self-trading. 56.1 ¶ 136. As Ms. Toomey explained, using the data Gemini provided—which included "everything that [Gemini] had access to"—"you could absolutely have seen that [one account] had a buy order and a sell order filled, and you could infer that they had been on both sides of the auction." Ex. 13 [Toomey] at 292:15–293:22. Finding this

---

[12]   To the extent that the CFTC's position is that any loan by a Gemini affiliate is *de facto* margin, that argument also fails because, as a matter of economics, the identity of the lender is not relevant to a susceptibility to manipulation analysis. 56.1 ¶ 126.

information was not a complicated task: as Ms. Toomey testified, it was the type of work "a junior developer straight out of school" could do. Ex. 13 [Toomey] at 453:5–15.

Gemini's self-trading policy changed in spring 2017. Although self-trading accounted for a very small portion of trading on Gemini at that time, Gemini implemented self-trade prevention technology on both its continuous order book (in March 2017) and its auction (in May 2017). 56.1 ¶ 139.[13] And after it barred self-trading, Gemini did not hide that it had once allowed it: when CFE asked on September 11, 2017 for "the date when the self-trade prohibition was effected in the Gemini auction," Gemini promptly answered that "[t]he code that prohibited auction book self-cross was released on 23 May 2017." Ex. 16.

The parties' experts disagree about whether Gemini's self-trade prevention was effective. Gemini's expert, Stanford Professor Andrzej Skrzypacz, analyzed Gemini's trade data and concluded that "there was zero self-trading on the continuous order book after March 2017," and there "is no evidence that self-trading occurred within the Gemini auction after restrictions were put in pace in May 2017." Ex. 5 [Skrzypacz] ¶¶ 167–68. By contrast, the CFTC's expert, USC Professor Lawrence Harris, opined that self-trading continued on the Gemini exchange even after Gemini implemented self-trade prevention technology. Ex. 6 [Harris] ¶ 51.

The disagreement between Prof. Skrzypacz and Prof. Harris centers on a phenomenon that Gemini called "folding." As Gemini explained to CFE before it filed the Self-Certification, "there [were] self-trade prevention mechanisms on the Gemini Exchange," but Gemini did not "prevent the possibility that a single account might participate in both sides of the auction, one side from

---

[13]    Though the CFTC does not dispute that Gemini implemented this self-trade prevention technology in March and May 2017, it suggests that Gemini's statements that self-trading was prohibited on its exchange were false because Gemini did not update its User Agreement to ban self-trading until September 2017. MSJ 49. At most, this delay in updating Gemini's User Agreement to reflect how its exchange operated creates fact questions for the jury.

the continuous book and the other side from the auction-only book." Ex. 53 at 2. Prof. Harris (like

the CFTC) treats folding as self-trading; Prof. Skrzypacz (like Gemini) does not.

There is substantial contemporaneous evidence to support Gemini and Prof. Skrzypacz's

view. Gemini had extensive conversations about folding in 2017 and concluded it is not self-

trading. For example, on September 1, 2017, Cameron Winklevoss asked Ms. Toomey if it was

possible to engage in manipulation "between the continuous book and auction books." Ex. 54 at

3. She answered that "since the auction executes as a bulk trade on a blind book . . . you could

cross yourself between the continuous book at the auction book . . . ben [Small, Gemini's COO],

noah [Cornwell, a Gemini software engineer], and i discussed this and decided that *it didn't count

as a self-cross*." Ex. 54 at 3. Ms. Toomey reiterated this view two days later, when Cameron

Winklevoss asked her if it was accurate to say that Gemini had "self-trade prevention that prohibits

the same market participant from crossing with himself or herself on a continuous trading Order

Book or in a Gemini Auction." Ex. 55 at 5. Ms. Toomey responded as follows:

> [Y]es we have both: if a participant submits an order that could cross a standing
> order on the continuous book. . . . [W]here we do not attempt "self trade" prevention
> is where the auction book and the continuous book are folded together during the
> auction: because the auction fill is regarded as a bulk trade, it would be possible for
> a market maker to be on "both sides" but *the auction volume is comingled so we do
> not regard it as a self trade*.

Ex. 55 at 5. Moreover, CFE did not respond to Gemini's disclosure, amend any prior statements

about self-trading, or include this information in the Self-Certification. 56.1 ¶ 145. CFE's apathy

towards folding strongly suggests it agreed it was not self-trading.

Opinions offered by Gemini's experts are consistent with these contemporaneous views.

Prof. Skrzypacz does not believe folding is self-trading because "the trader does not control the

price or amount that might be filled in the auction." Ex. 5 [Skrzypacz] at 113 n.266.[14] Another

---

[14]    Prof. Skrzypacz also concluded that so-called "folding" trades "represented a tiny fraction of overall volume on

Gemini expert, former CFTC employee Jeremy Cusimano, confirmed that it is standard for exchanges to treat trades by a single account across different books as unintentional rather than as self-trades. Ex. 39 [Cusimano] ¶¶ 12(c)(i), 97–99.

### 3.    Bespoke Fee Agreements

The CFTC also claims Gemini did not disclose that it offered some market participants preferential fee structures, which rendered statements about fee incentives Gemini offered false or misleading. MSJ 41–43. There are numerous material fact disputes for the jury on this argument.

Gemini, like most exchanges, earned money by charging market participants fees to trade. 56.1 ¶ 149. In 2017, Gemini used a "dynamic maker-taker fee & rebate schedule" that provided Gemini market participants with different fees based on their gross trading volume and ratio of liquidity-making trades to liquidity-taking trades. 56.1 ¶ 150. While the fees in this schedule were the default, some Gemini customers asked for and received bespoke fee arrangements. 56.1 ¶ 151.[15] While the CFTC focuses on bespoke fees offered to market makers, MSJ 41–43, these fee agreements were not so limited. As Cameron Winklevoss testified, "any participant could request a different fee schedule or structure" and Gemini "would evaluate that on a case-by-case basis, according to our policy." Ex. 23 [C. Winklevoss] at 400:11–401:4.

These bespoke fee deals were in no sense programmatic. Fees were individually negotiated, and not everybody got the same preferential terms. 56.1 ¶ 153; *see also* Ex. 57; Ex. 5 [Skrzypacz], Figure 3.8. Danny Kim—a former Gemini employee who negotiated bespoke fees and whom the CFTC has named as a trial witness—explained why different customers received different terms:

---

the exchange (only 0.3 percent transaction volume in BTC on Gemini auction in 2017) and occurred rarely, as only 29 out of 333 successful auctions in 2017 (less than 10 percent) had any folded trades." Ex. 5 [Skrzypacz] at 113 n.266.

[15]    Providing such bespoke fee agreements is in no way unusual. Bespoke fee agreements are extraordinarily common—including on CFTC-regulated exchanges—and the CFTC has never indicated that they are in any way relevant to the Core Principle 3 analysis. 56.1 ¶ 152.

Q.    Do you know why customers got these different rates?

A.    I believe it was negotiation, from what I can remember.

Q.    And would it be fair to say that some customers negotiated better deals than others?

A.    Yes.

Q.    Would it be fair to say that there was no specifically designed program for priority users, but that everyone had to negotiate their own deal?

A.    Yes.

Ex. 4 [Kim] at 149:8–18.

Here again, Gemini did not try to hide that it used fee rebates to attract participants. To the contrary, this is yet another place where Gemini disclosed the very things the CFTC claims it hid. For example, as noted above, Gemini gave CFE a complete copy of its Policies & Procedures in September 2017. This document included a section called "Agreements Granting Preferential Terms," which stated that Gemini could provide certain users with "terms different from those given under the standard User Agreement and fee schedule" and monitored "[t]he ability to obtain a more favorable Fee Schedule." Ex. 15 at 47. In addition, Ms. Toomey sent CFE an email describing "signed agreement[s] with [] specific customer[s] . . . providing a specific fee rate to that customer." Ex. 17 at 3.[16] There is no evidence CFE asked Gemini any questions about its Policies & Procedures or this email disclosure. Nor is there any evidence that CFE changed any of its statements after receiving this information or told Gemini this information needed to be disclosed to the CFTC or rendered any prior statements false or misleading.

---

[16]    *See also* Ex. 13 [Toomey] at 327:10–14 ("Q. And is the agreement providing a specific rate to that customer that you referenced in DX110, on page 3, GEM_CFTC088647, one of the bespoke fee agreements that you just described earlier? A. Correct.").

The CFTC also received—and was also uninterested in—information about Gemini's agreements granting preferential terms. Indeed, one alleged false statement specifically disclosed that Gemini offered "trading fee rebates" to "encourage participation." Ex. 32 at 23. Moreover, in September 2017, CFE sent Gemini's full Policies & Procedures to the CFTC. 56.1 ¶ 159. Mr. Goodman did not dispute that the CFTC received the full Policies & Procedures—which, as noted above, Gemini provided in its entirety specifically to ensure the CFTC would see its "full text," Ex. 14—or that this manual contains the very information the CFTC claims was not disclosed:

> Q.    You have no reason to doubt that you received the policies and procedures manual contained in Exhibit 14. Right?
>
> A.    Right. Yeah, it was attached to the e-mail.
>
> *      *      *
>
> Q.    The CFTC was provided with Gemini's policies and procedures which explicitly stated that Gemini may provide certain high volume users, market makers or other special case users with terms different from those given under the standard user agreement and fee schedule. Correct?
>
> A.    I'm going to say we received -- although I don't specifically recall receiving this document, it seems that we did receive this document. It was included as an attachment in the e-mail. *And so insofar as we received this document and -- then I guess we would see the statements that are provided here.*

Ex. 24 [Goodman] at 221:10–14, 224:6–20.

Mr. Kuserk also confirmed Gemini disclosed that it provided some customers with non-standard fee agreements:

> Q.    Okay. So on that page 46, sort of in the middle of the page, do you see a section called, "Agreement Granting Preferential Terms"?
>
> A.    Yes.
>
> Q.    And then there's a subtitle that says, "Policy." Do you see that?
>
> A.    It's -- yes.
>
> Q.    Okay. And in that subsection that says, "Policy," it states that "Our organization may provide certain high-volume users, market makers, or

other special cases users with terms different from those given under the
standard user agreement and fee schedule."

A.    Okay.

Q.    Do you see that?

A.    Yes.

Q.    So Gemini disclosed that it sometimes provided certain users with favorable
terms –

A.    Uh-huh.

Ex. 58 [Kuserk] at 148:14–149:11. The CFTC took no action whatsoever in response to this

information. 56.1 ¶ 160.

The CFTC also complains Gemini did not disclose collusive trading perpetrated by two

Gemini customers: Hashtech LLC ("Hashtech") and Cardano Singapore PTS Ltd. ("Cardano").

MSJ 22. There are numerous fact disputes about this trading. As an initial matter, as the Court is

aware, there is an ongoing dispute over Gemini's efforts to obtain evidence that could disprove the

CFTC's assertion that Gemini did not disclose the Hashtech-Cardano fraud. 56.1 ¶ 162. If Gemini

prevails, it may obtain relevant and exculpatory evidence. If the government prevails and does not

produce the requested evidence, it should be precluded from arguing or introducing evidence that

Gemini did not disclose this collusive trading. Gem. Mot. *in Limine* No. 1 (June 7, 2024).

There is also a substantial dispute over the scope of the Hashtech-Cardano fraud. The

CFTC's expert, Prof. Harris, asserts that trading between Hashtech and Cardano "constitute[d] a

substantial portion" of trading on Gemini. Ex. 6 [Harris] ¶ 16. Gemini's expert, by contrast,

concluded that trading between these two counterparties constituted less than six percent of trading

on Gemini. Ex. 5 [Skrzypacz] ¶ 159; *see also* Ex 5 [Skrzypacz], Figure 8.2.

Finally, there are also material fact disputes about whether this fraud—of which *Gemini*

was the sole victim, 56.1 ¶ 164—was material to Core Principle 3. *First*, there is no evidence that

Hashtech and Cardano ever traded in the Gemini auction. 56.1 ¶ 165. This is no surprise, as this type of collusive trading is "difficult if not impossible in the context of the Gemini auction." Ex. 5 [Skrzypacz] ¶ 158. *Second*, there is no evidence the Hashtech-Cardano trading affected the price of the Gemini auction, or the exchange more broadly. 56.1 ¶ 167. *Third*, though Hashtech and Cardano's collusion caused millions of dollars of losses and "wiped out any profits [Gemini] would have made since inception," Ex. 93 [C. Winklevoss] at 2619:20–2621:11, the CFTC did not take any action against any of the perpetrators of this fraud. A reasonable jury could conclude that this inaction demonstrates that this fraud was not material.

### 4.    Volume And Liquidity

The CFTC also argues Gemini made various false and misleading statements about the volume on its exchange. MSJ 55–57. As demonstrated in Gemini's summary judgment motion, however, CFE, not Gemini, made the purported false statements about volume. Dkt. 82 at 24–25. For this reason alone, the Court should deny this portion of the CFTC's motion. Nevertheless, even if the Court does not grant Gemini's motion, material fact questions preclude summary judgment in the CFTC's favor.

There is no dispute Gemini provided genuine data. The CFTC's claim is that this genuine data is misleading because it includes volume the CFTC attributes to self-trading, advances, bespoke fees, and the Pearl Street loans. MSJ 55–57.[17] As demonstrated above, the evidence demonstrates that there are substantial fact questions relevant to these claims. Many of the same

---

[17]  While Prof. Harris asserts that Self-Certification's calculation of Gemini's rolling average trade volume may not be accurate, Ex. 6 [Harris] ¶¶ 141–43, the CFTC should not be allowed to offer this argument because it did not disclose this claim in its response to Court's order. *See generally* Ex. 32. Moreover, as demonstrated in Gemini's summary judgment motion, CFE made these statements. Dkt. 82 at 24–25. If, however, the Court denies Gemini's motion and is inclined to permit the CFTC to introduce this evidence at trial, this late-disclosed claim raises substantial fact questions concerning how Prof. Harris made this calculation, including whether he used the correct data and whether he is drawing the correct conclusions based on his analysis.

things the CFTC complains were not disclosed are standard strategies the Commission has never indicated are relevant to assessing whether a contract is readily susceptible to manipulation. *Supra* § E–F. Gemini specifically disclosed information about historic self-trading, folding, and bespoke fee agreements to CFE, the DCM responsible for certifying compliance with Core Principle 3, but CFE took no action in response to this information. *Supra* § E–F. The CFTC also received information about bespoke fees and historic self-trading on Gemini, but it, too, took no action in response to this information. *Supra* § G(2)–(3). Information about advances was publicly disclosed on Gemini's website, but neither CFE nor the CFTC ever raised the issue with Gemini. *Supra* § E–G. The inaction and apparent apathy of both the CFTC and a CFTC-registered DCM in response to Gemini's disclosure of this information creates substantial fact questions about whether that information was relevant or material to the CFTC, and thus whether Gemini's purported failure to disclose it constitutes an actionable omission.

## LEGAL STANDARD

A court may grant summary judgment only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.1(a). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 252–53.

A court faced with a motion for summary judgment must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)). Thus, "[s]ummary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## ARGUMENT

Section 6(c)(2) of the Commodity Exchange Act provides:

> It shall be unlawful for any person to make any false or misleading statement of a material fact to the Commission, . . . or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

7 U.S.C. § 9(2). Thus, to prove its claim here, the CFTC must establish that (i) Gemini made a statement of fact to the CFTC, (ii) the statement was false or misleading, (iii) the statement was material, and (iv) Gemini knew or should have known that the statement was false or misleading. *See, e.g.*, *CFTC v. eFloorTrade, LLC*, 2018 WL 10625588, at *8 (S.D.N.Y. Sept. 21, 2018).

As to the statements that are subject to Gemini's pending summary judgment motion, the undisputed evidence demonstrates that Gemini did not make those statements to the CFTC. Thus Gemini—and not the CFTC—is entitled to summary judgment as to those statements. At a minimum, disputed issues of fact preclude summary judgment in the CFTC's favor on whether Gemini made those statements to the CFTC, as well as the remainder of the at-issue statements that are not subject to Gemini's summary judgment motion.

With respect to the remaining liability issues, the CFTC mangles the governing legal framework at every turn. First, although the CFTC proceeds exclusively on an omissions theory, it makes no serious attempt to show that a reasonable jury would be required to find that the additional facts the CFTC contends should have been disclosed were "critical qualifying

information" required to avoid making any affirmative statement made to the CFTC misleading. Dkt. 77 at 2 (quoting *Universal Health Serv. Inc. v. U.S. ex rel Escobar*, 579 U.S. 176, 188 (2016)). Second, the CFTC has failed to proffer any *actual evidence* that any of the alleged omissions was capable of influencing a CFTC decision. The CFTC instead attempts to treat materiality as a purely legal question, but that argument is in direct conflict with the Supreme Court's decision in *United States v. Gaudin*, 515 U.S. 506 (1995), and binding Second Circuit authority. And third, the CFTC makes no serious effort to show that a reasonable jury would be required to find what Section 6(c)(2)'s scienter element logically demands—*i.e.*, not merely that Gemini knew of the at-issue statements and knew of the additional facts that the CFTC contends should have been disclosed, but that Gemini knew or reasonably should have known that failing to disclose those facts would render its statements misleading.

Genuine issues of material fact preclude entry of summary judgment in the CFTC's favor on any of the liability questions. Put simply, a reasonable jury could readily find that the CFTC has not met its burden of proving that Gemini made false or misleading statements; that Gemini's statements were material to the CFTC's decision-making; and that Gemini knew or reasonably should have known that its statements were false or misleading. The CFTC's contrary submission asks this Court to adopt the CFTC's view of the evidence, treating the CFTC's debatable (and often tenuous) inferences as though they were the only reasonable ones. But "the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and are thus beyond this Court's role at the summary judgment stage. *Rupp*, 91 F.4th at 634. The CFTC's motion should accordingly be denied.

I.      **The CFTC Is Not Entitled To Summary Judgment On The Question Whether Gemini Made The At-Issue Statements To The CFTC**

A.      **Section 6(c)(2) Applies Only When A Defendant *Makes* A False Or Misleading Statement To The CFTC, As Determined By Ultimate Authority Over The Statement**

Although the CFTC acknowledges its burden to "[e]stablish[] that [Gemini] made each of the thirty-one statements as a matter of law," MSJ 26, it fundamentally misunderstands what that requirement entails. Citing cases addressing 18 U.S.C. § 1001, the CFTC contends that it only matters that the Defendant "contemplate[] that the statement be 'utilized in a manner which was within the jurisdiction' of the CFTC." *Id.* (quoting *United States v. Candella*, 487 F.2d 1223, 1227 (2d Cir. 1973), and citing *United States v. Davis*, 8 F.3d 923, 929 (2d Cir. 1993)). But as Gemini has previously explained in connection with its own pending motion for partial summary judgment—and the CFTC wholly fails to address—those cases are inapposite because they construe the particular language of Section 1001, which materially differs from the language of Section 6(c)(2) that is at issue here. *See* Dkt. 93 at 8–9.

Section 1001(a) criminalizes false statements "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a). That language is why the Second Circuit has held that Section 1001 imposes "no requirement that a false statement be made *to* a federal agency" and that "it must only have been made in any matter *within the jurisdiction of any department or agency of the United States*." *Davis*, 8 F.3d at 929.

Section 6(c)(2) contains no similar language. It applies only when the defendant "make[s] any false or misleading statement of a material fact *to the Commission*." 7 U.S.C. § 9(2). Thus, Section 6(c)(2) prohibits only *making* false statements to the CFTC, not *causing* false statements

to be made to the CFTC by another—a distinct situation addressed by 7 U.S.C. § 13c(a). *See* Dkt. 82 at 14–21; Dkt. 93 at 3–6.

Because the CFTC must prove that Gemini "made" the challenged statements to the CFTC, this case is controlled by *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), where the Supreme Court held that "one 'makes' a statement by stating it." *Id.* at 142. The Supreme Court further explained that "[o]ne who prepares or publishes a statement on behalf of another is not its maker"—it is only "the person or entity with *ultimate authority over the statement*, including its content and whether and how to communicate it" that can be treated as its maker. *Id.* That conclusion, reached by the Supreme Court in the context of SEC Rule 10b-5, readily applies to Section 6(c)(2)'s materially identical text. *See* Dkt. 82 at 17–20; Dkt. 93 at 4–6.

In sum, to prevail the CFTC must prove that Gemini made the at-issue statements to the CFTC, which in turn requires a showing that Gemini had "ultimate authority over the statement[s], including [their] content and whether and how to communicate [them]." *Janus*, 564 U.S. at 142. This Court should reject the CFTC's baseless contention that it may establish liability by showing merely that Gemini made a statement within the CFTC's regulatory jurisdiction.

## B. The Undisputed Evidence Does Not Demonstrate That Gemini Made Any Of The At-Issue Statements To The CFTC

Under the proper legal standard articulated above, the CFTC is not entitled to summary judgment that Gemini made any of the at-issue statements.

This Court should reject the CFTC's conclusory argument, MSJ 28–29, that it is entitled to summary judgment that Gemini made the statements contained in the submissions that are subject to Gemini's pending motion for partial summary judgment—*i.e.*, (i) CFE's July 25, 2017 presentation to the CFTC, (ii) CFE's August 1, 2017 submission of Gemini's trading data to the CFTC, (iii) the analysis of Gemini's March 2017 auction data that CFE submitted to the CFTC on

October 24, 2017, and (iv) the draft and final self-certification letters that CFE submitted to the CFTC between October and December 2017. *See* Dkt. 82 at 5–13.

After pressing the mistaken threshold argument that Section 6(c)(2) does not require proof that Gemini made a statement to the CFTC at all, the CFTC contends that "ample undisputed evidence shows that Gemini drafted, reviewed, approved, and had ultimate authority" over each of these statements. MSJ 29. But evidence that Gemini participated in drafting the statements, reviewed them, or approved them is not sufficient to establish that Gemini *made* them. *See* Dkt. 82 at 22; Dkt. 93 at 13–14. "[F]inal control," not "review[] and approv[al]," determines whether a defendant made a statement. *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 103–04 (2d. Cir. 2022).

On the question of ultimate authority, Gemini has already explained in detail that the undisputed evidence shows that CFE had final control over these submissions, which means that Gemini—and not the CFTC—is entitled to summary judgment. *See* Dkt. 82 at 22–28; Dkt. 93 at 13–14. Even if this Court were to disagree with that conclusion, the ample evidence of CFE's control would at least create a genuine issue of fact that would have to be resolved by the jury.

The three submissions that are not subject to Gemini's pending motion are the August 25 Submission, the September 12 Submission, and the November Talking Points. *See* MSJ 27–28. As Gemini has previously acknowledged, there are genuine issues of fact regarding the proper attribution of these statements. *See* Dkt. 82 at 14 n.12. For that reason, Gemini does not contend that it is entitled to summary judgment that it was not the maker of these statements. At the same time, however, the existence of factual disputes preclude entry of summary judgment in the CFTC's favor.

To be sure, these statements do bear some indicia of control by Gemini. For example, the August 25 Submission is a series of responses to questions posed by the CFTC, with some portions

of the responses appearing under Gemini's logo. Ex. 22 at 5–13. But other portions appeared under CFE's logo, and it was CFE that ultimately sent the August 25 Submission to the CFTC with no Gemini representatives copied. Ex. 22 at 1–4. And more broadly, it was always CFE's ultimate decision to transmit submissions to the CFTC, and CFE retained authority to modify before doing so as it believed appropriate. 56.1 ¶ 66. That undisputed fact provides strong evidence that CFE had ultimate authority over the August 25 Submission, which a jury must weigh against other evidence suggesting control by Gemini.

The same is true of the September 12 Submission. That document was drafted on Gemini letterhead, but it too was sent to the CFTC without any Gemini representative copied. 56.1 ¶ 64. As with all of the other submissions, moreover, CFE made the ultimate decision to submit it and retained authority to modify it before submission. 56.1 ¶ 66. And although the CFTC cites an email to CFE from Gemini's Cameron Winklevoss as evidence that Gemini approved the submission, the full text of the relevant sentence actually reads: "I have attached latest PDF versions—*if you think these are ok*, you have our approval to send." CFTC Ex. 25. If anything, that email exchange is additional evidence that CFE—not Gemini—was the party with "final control" over the submission *Noto*, 35 F.4th at 104. At a minimum, there is evidence pointing in both direction, which means the question must be resolved by the jury.

Finally, the CFTC has not established that the talking points transmitted by Sullivan & Cromwell can be treated as statements made by Gemini. The CFTC contends that "[s]tatements made to the CFTC by an attorney on behalf of a client are attributable to the client." *CFTC v. Gramalegui*, 2018 WL 4610953, at *24 (D. Colo. Sept. 26, 2018). But that general proposition must be weighed against the specific evidence here that CFE always retained ultimate authority to

determine whether and how to make submissions to the CFTC. 56.1 ¶ 66. Because weighing those competing inferences is a task for the jury, summary judgment is not warranted.

**II.     The CFTC Is Not Entitled To Summary Judgment On The Remaining Liability Issues**

  **A.     The CFTC Misapprehends The Governing Legal Framework**

   **1.     To Proceed On Its Omissions Theory, CFTC Must Identify Affirmative Statements That Were Rendered Misleading By The Omission Of Critical Qualifying Information**

Section 6(c)(2) make it unlawful for a defendant (i) to make "any false or misleading statement of a material fact to the Commission" or (ii) to "omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect." 7 U.S.C. § 9(2). Thus, as this Court has correctly observed, Section 6(c)(2) extends beyond literal falsehoods and also encompasses "[h]alf truths"—that is, "representations that state the truth only so far as it goes, while omitting *critical* qualifying information." Dkt. 77 at 2 (quoting *Escobar*, 579 U.S. at 188). As the Court's phrasing demonstrates, a literally true statement is not transformed into an actionable misrepresentation merely because the CFTC can point to some other potentially relevant information that was not disclosed. Rather, the CFTC must identify a particular affirmative statement that was made to the CFTC and explain how it was rendered materially misleading by the omission of *critical* information.

That conclusion is reinforced by the Supreme Court's recent decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024), which applied the same analysis to SEC Rule 10b-5(b). Using language that tracks Section 6(c)(2) in relevant part, Rule 10b-5(b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b) (2022). The Supreme Court held that because Rule 10b-5's language focuses on "statements made," it extends only so far as "[h]alf-

truths"—*i.e.*, statements that "omit[] critical qualifying information"— and does not prohibit "pure omissions." 601 U.S. at 263–64. That is, there is no violation if a securities issuer fails to disclose facts that might be material but are not necessary to avoid making a particular affirmative statement misleading. *See id.*

The need to distinguish between actionable half-truths and a failure to disclose any and all material information is, if anything, even more pronounced in the case. Section 6(c)(2) imposes liability when the defendant "knew, or reasonably should have known" that its statement was false or misleading. 7 U.S.C. § 9(2). This feature of the statute extends liability beyond the common law of fraud, which treats half-truths as fraudulent misrepresentations only when the maker "knows or believes" his affirmative statement "to be materially misleading because of his failure to state additional or qualifying matter." Restatement (Second) of Torts § 529 (1977). And it could impose effectively boundless liability if the CFTC is not required to focus on particular affirmative statements and explain how an omission renders them misleading—since the CFTC could almost always fault a defendant for failing to reasonably anticipate that there were some additional fact that, in its view, could have played some role in the CFTC's decision-making.

Yet that is precisely what the CFTC seeks to do here. The CFTC is proceeding on an omissions theory, faulting Gemini for failing to disclose additional details that, according to the CFTC, were necessary to avoid rendering the at-issue statements misleading. *See* MSJ 33–35, 40–41, 49–50, 55–56. But despite occasionally paying lip service to the need to identify *critical* omissions, *see id.* at 29, 34, 42, 44, the CFTC makes no real effort to grapple with that requirement. To the contrary, as we explain in detail below with respect to each category of at-issue statements, the CFTC's evidence falls far short of demonstrating that a reasonable jury would be required to

find that any of the challenged statements conveyed a misleading message to the CFTC because of the alleged omissions. *See* § IIB, *infra*.

> **2.** **Section 6(c)(2)'s Materiality Element Requires Evidence—Not Merely Speculation—Of An Actual CFTC Decision That Was Capable Of Being Influenced In A Meaningful Way**

The CFTC fares no better when it comes to materiality. On that element, the CFTC proffers *no evidence at all* regarding what decisions the CFTC made or could have made in connection with the Self-Certification. The CFTC does not point to any action that it took after learning of the additional facts that it now says Gemini should have disclosed, and it does not proffer any evidence of how the at-issue statements influenced the CFTC's decision-making or could have done so. As we explain in further detail below with respect to each category of at-issue statements, the CFTC points only to the highly general regulatory guidance in Appendix C, and otherwise stresses the fact that the statements were made (or that the CFTC asked questions) as if that were itself an indication of materiality. *See* MSJ 6–7; *infra* §§ IIB1(b), IIB2(b), IIB3(b), IIB4(b).

Nothing about Section 6(c)(2)'s materiality element can justify the CFTC's complete failure to proffer evidence. Of course, the materiality element is objective, in the sense that the CFTC is not required to prove that the false or misleading statement had an actual effect on the CFTC's decision-making. Dkt. 77 at 2. It is enough that the statement be "capable of influencing a decision" of the CFTC. *Id.* (quoting *Kungys v. United States*, 485 U.S. 759, 770–71 (1988)). But that standard still demands evidence regarding the potential effect of the defendant's statement. As the Second Circuit has explained, the materiality inquiry asks a real-word question about the effect of the defendant's statement: "would the misrepresentation *actually* matter in a *meaningful* way to a rational decisionmaker." *United States v. Calderon*, 944 F.3d 72, 86 (2d Cir. 2019) (emphasis in original). That question can be answered only by "adduc[ing] evidence of an actual *decision* . . . that was reasonably capable of being influenced by" an alleged misstatement. *United*

*States v. Litvak*, 808 F.3d 160, 172 (2d Cir. 2015) (reversing Section 1001 conviction because of failure to prove materiality) (emphasis in original). "[S]peculation is not permitted" as a substitute for evidence, and "evidence of such a decision cannot be purely theoretical and evidence of such a capability to influence must exceed mere metaphysical possibility." *Id.* at 172–73.

Nor does it suffice that a statement may relate, in some general way, to a *topic* of unquestioned importance. In *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007), for example, the Second Circuit held that certain misstatements regarding a borrower's leverage ratios were not material in bank fraud prosecution. *See id.* at 235–36. In particular, the relevant contract provided for the same interest rate for a range of leverage ratios, and no "witnesses testif[ied] that variations in leverage ratios within a given range for which interest rates remain constant could influence the bank's decisions." *Id.* at 235. Thus, although the "[d]efendants' misrepresentations certainly concerned a variable that mattered to the banks," *id.* at 234, misrepresentations that did not result in a move from one interest-rate range to another were not proven to have any potential effect on a bank decision and could not be found material, *id.* at 235–36.

There is thus no basis for the CFTC's contention that "materiality can be resolved . . . as a matter of law" in this case. MSJ 31. Far from supporting the CFTC's contention, the Supreme Court's decision in *United States v. Gaudin*, 515 U.S. 506 (1995), decisively forecloses it. There, the Supreme Court noted that the materiality inquiry implicates not only what statement was made and what decision the agency was trying to make, but also "the ultimate question" of "whether the statement was material to the decision," which in turn "requires applying the legal standard of materiality . . . to these historical facts." *Id.* at 512. In criminal cases, this question must always be resolved by the jury, since the "jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence."

*Id.* at 514. In civil cases, mixed questions of fact and law (just like purely factual questions) can be resolved by the court only under the summary-judgment standard—*i.e.*, when the evidence is so one-sided that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Indeed, the Supreme Court noted that even in civil cases, "the materiality inquiry, involving as it does delicate assessments of the inferences a reasonable [decisionmaker]' would draw from a given set of facts and the significance of those inferences to him. . . [is] peculiarly on[e] for the trier of fact." *Gaudin*, 515 U.S. at 512; *see also TSC Industries, Inc. v. Northway, Inc.*, 426 U. S. 438, 450 (1976) (securities fraud); *McLanahan v. Universal Ins. Co.*, 1 Pet. 170, 188–189, 191 (1828) (materiality of false statements in insurance applications).[18]

The need for actual evidence regarding the government's decision-making is why the Department of Justice has recognized that, in Section 1001 cases, "[m]ateriality is best shown by the testimony of a witness, generally those who make the decisions on the application or statements in the particular case, concerning the influence that defendant's allegedly false statement might have had on the ultimate result of the transaction." U.S. Dep't of Justice, *Criminal Resource Manual* § 911, https://www.justice.gov/archives/jm/criminal-resource-manual-911-materiality. And it is why the CFTC itself has previously offered just this sort of evidence to establish materiality on a Section 6(c)(2) claim.[19]

---

[18] The CFTC's reliance on *United States v. Klausner*, 80 F.3d 55 (2d Cir. 1996), is misplaced. In that case, the defendant included false itemized deductions on the tax returns that he prepared for his clients. *See id.* at 58. Given the mechanics of computing taxable income, those false entries "invariably caused errors in the computation of their taxes." *Id.* at 61. This case, by contrast, does not involve a form on which a false entry could invariably flow to the bottom-line. In any event, this Court should be particularly reluctant to expand *Klausner*'s logic given that the decision stands in considerable tension—if not outright conflict—with the Supreme Court's decision in *Gaudin*. *See United States v. Uchimura*, 125 F.3d 1282, 1286 (9th Cir. 1997) (declining to follow *Klausner* for this reason).

[19] *See CFTC v. eFloorTrade, LLC*, 2018 WL 10625588, at *9; Statement of Undisputed Facts in Supp. of Pl.'s Mot. Summ. J. ¶¶ 80–81, *eFloorTrade*, Dkt. 51 (describing false statements' actual effect on CFTC's investigation);

For reasons unknown, the CFTC has taken a different approach here. It has invoked the deliberative process privilege to preclude any inquiry regarding its decision-making process, and it has accordingly declined to offer any evidence regarding how the statements at issue here did or could have influenced *any* decision of the CFTC. But that strategic decision obviously cannot alter the CFTC's burden of proof. The CFTC must "adduce *evidence* of an actual *decision* . . . that was reasonably capable of being influenced," *Litvak*, 808 F.3d at 172, to show that an alleged misrepresentation would "*actually* matter in a *meaningful* way to a rational decisionmaker," *Calderon*, 944 F.3d at 86.

Here, the CFTC's materiality arguments—at best—ask the Court to adopt an inference that the challenged statements must have been material given the general regulatory background and the circumstances under which they were made. But even if that kind of debatable inference were enough for the CFTC to present its case to the jury, it plainly does not constitute overwhelmingly "one-sided" evidence of materiality that would be required to take the issue away from the jury by resolving it in the CFTC's favor on summary judgment. *Anderson*, 477 U.S. at 253.

### 3. The CFTC Must Proffer Evidence That Gemini Knew Or Should Have Known That The At-Issue Statements Were False Or Misleading

To prevail on a Section 6(c)(2) claim, the CFTC must also demonstrate that Gemini "knew, or reasonably should have known" its statements to "be false or misleading." 7 U.S.C. § 9(2). As a matter of basic logic, this standard requires more than proof that Gemini knew about the information the CFTC now asserts should have been disclosed. The CFTC must also prove that Gemini knew or should have known that failing to disclose that information would render its statements materially misleading—*i.e.*, that the information was "critical qualifying information"

---

Giglio Decl. in Supp. of Pl.'s Mot. Summ. J. ¶¶ 4, 6, 8, *eFloorTrade*, Dkt. 51-42 (same).

that needed to be disclosed to avoid misleading the CFTC (or at a minimum, that the information was material to the CFTC's decision-making). *See* § IIA1, *supra*. But the CFTC's motion makes no serious effort to demonstrate that a reasonable jury would be required to make that finding.

As with materiality, moreover, the question of what Gemini reasonably should have known is peculiarly within the jury's ambit, since "[d]isputes over reasonableness are usually fact questions for juries." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995); *see also, e.g.*, *Pellegrino v. County of Orange*, 313 F. Supp. 2d 303, 321 (S.D.N.Y. 2004). ("Reasonableness determinations are, of course, quintessential jury issues . . . ."); *Rubin v. HSBC Bank USA*, 2024 U.S. Dist. LEXIS 27593, at *7–8 (E.D.N.Y. Feb. 16, 2024) ("Generally, the question of reasonableness in FCRA cases presents a fact question for the jury."). This Court should thus decline the CFTC's invitation to preempt the jury's exercise of its critical fact-finding role.

### B.    Genuine Issues Of Material Fact Preclude Summary Judgment As To Each Category Of At-Issue Statements

Applying the foregoing legal framework to each category of at-issue statements, the Court should conclude that genuine disputes of fact preclude entry of summary judgment in the CFTC's favor on any liability question.

#### 1.    The CFTC Is Not Entitled To Summary Judgment With Respect To The Statements Regarding Gemini's Pre-Funding Requirement

##### (a)    *A Reasonable Jury Could Find That The Pre-Funding Statements Were Not False Or Misleading*

The CFTC does not contend that any submission to the CFTC was literally false in describing Gemini as a "pre-funded" or "full reserve" exchange. MSJ 32–37. That concession is warranted, because the submissions to the CFTC provided a definition of pre-funding that is entirely consistent with the operation of the Gemini exchange. The September 12 Submission stated that "[a]ll orders must be pre-funded — *dollars must be deposited prior to placing a buy*

*order and bitcoin must be deposited before placing a sell order* — and participants are not permitted to place an order unless they have enough funds in their account to place such order (orders that are submitted without backing funds are rejected)." Ex. 15 at 145. And CFE's Self-Certification repeated this definition, explaining that "[t]he Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. . . . As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. *Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order*." Ex. 2 at 2. There is no suggestion that the Gemini exchange did not operate in the manner described.

Instead, the CFTC contends that the pre-funding statements were misleading because Gemini failed to disclose two additional facts: that Pearl Street, an affiliate of Gemini, provided loans to certain Gemini market participants; and that Gemini provided operational advances of fiat currency and digital assets to Gemini market participants. MSJ 33–35. But a reasonable jury would not be required to find that either fact constitutes the sort of "critical qualifying information" that would be necessary to avoid rendering the submissions misleading. *See* § IIA1, *supra*.

The CFTC's contrary argument rests on the premise that, when the submissions described the Gemini exchange as pre-funded, they necessarily implied that traders on the exchange could not employ leverage or margin trading. MSJ 33. But the submissions cannot plausibly be understood as an assurance that the Gemini users could not borrow any of the assets they deposited on the Gemini exchange. 56.1 ¶ 83. Such borrowing is commonplace in both traditional financial markets and digital assets markets, and absent an explicit representation to the contrary, it was not reasonable for the CFTC to merely assume that Gemini's pre-funding requirement constituted a

complete ban on trading with borrowed funds. 56.1 ¶¶ 82–83. Moreover, funding a customer account with loan proceeds does not necessarily lower the customer's cost of capital, since the customer is still responsible for repayment of the loan with interest, and there is likewise no reason to assume that funding a trading account with borrowed funds makes market manipulation more likely. 56.1 ¶¶ 129–32. For those reasons, a reasonable jury could readily find that the existence of borrowing on the Gemini Exchange—including borrowing from an affiliated company like Pearl Street—did not render the statements about pre-funding misleading.

Margin trading, by contrast, would be inconsistent with the concept of pre-funding, but the CFTC is incorrect that either of the challenged practices is analogous to margin trading as a matter of law. Margin trading describes a distinct market arrangement that enables a trader to place an order in excess of the amount of assets on deposit in her account, in anticipation of a margin loan to finance the transaction if it closes. 56.1 ¶ 130. Critically, the trader does not become liable for the loan—and thus incur any cost—unless and until the trade is executed. 56.1 ¶ 77. Margin trading has the potential to facilitate "spoofing"—a particular manipulative practice in which a trader places phony trade orders in an effort to manipulate the market price, without any intent for the trades to be executed. 56.1 ¶¶ 130–31. If margin trading is permitted, then the would-be manipulator faces lower costs in placing those fraudulent orders, because she does not need to purchase or borrow the relevant assets before placing the trade order. 56.1 ¶ 130. By contrast, with a pre-funded exchange like Gemini, the trader faces higher costs because an asset must be on deposit when the trade is initiated and then cannot be used for other purposes while the order is outstanding. 56.1 ¶ 76. Indeed, this is precisely the dynamic that was emphasized in the submissions to the CFTC, which called out spoofing as a particular manipulative practice that Gemini's pre-funding requirement served to protect against. *E.g.*, Ex. 22 at 12–13.

A reasonable jury would not be required to accept the CFTC's argument that the Pearl Street loans and Gemini's operational advances were analogous to margin trading. The Pearl Street loans were extended to certain Gemini market participants separate and apart from any trading activity; they thus could not enable the sort of cost-free trade orders that could diminish the cost of a spoofing scheme. 56.1 ¶¶ 76–77. The operational advances likewise did not extend credit in a way that could allow traders to place cost-free orders: Consistent with common practice in other financial institutions—and as publicly disclosed on Gemini's website—Gemini required verification that assets had been transferred to Gemini before advancing a deposit in a customer's account. 56.1 ¶¶ 90–94. Indeed, Gemini's practice of extending operational advances was vetted with Gemini's auditors, and the transactions were accounted for as "deposits in transit," not loans. 56.1 ¶¶ 100–01. There is thus at least a genuine issue of act as to whether the advances should be treated as loans at all; they certainly are not anything like margin trading.

(b)    *A Reasonable Jury Could Find That The Pre-Funding Statements Were Not Materially Misleading*

Genuine disputes of fact also preclude a determination that the pre-funding statements were material to any CFTC decision as a matter of law. As explained above, the CFTC fails to proffer *any* evidence of a decision that was or could have been influenced by these statements. There is simply no evidence of what decisions the CFTC made or could have made with respect to CFE's Self-Certification, and no evidence of how any decision could have been influenced. That failure, standing alone, is a sufficient basis to deny summary judgment. *See* § IIA2, *supra*.

The CFTC instead points to the requirement of Core Principle 3—that a DCM shall list only contracts that are not readily susceptible to manipulation—along with CFTC guidance in Appendix C requiring submissions to include a "detailed cash market description" and requiring verification that the third party that calculates a cash settlement price "utilizes business practices

49

that minimize the opportunity or incentive to manipulate the cash-settlement price." MSJ 35. But that highly general legal guidance is not a substitute for actual evidence about the CFTC's decision-making. At most, it might help identify *general topics* that could be relevant to the CFTC's consideration of the Self-Certification—which is a far cry from evidence that the omission of particular facts would actually be capable of influencing a CFTC decision. *See Rigas*, 490 F.3d at 235–36. It therefore would not *require* a reasonable jury to find materiality here.

The CFTC also appears to contend that the pre-funding statements must have been material because they were included in the submissions to the CFTC. MSJ 35–36. But that argument would suggest that *every* statement made to the CFTC is material, and thus would impermissibly read the materiality element out of Section 6(c)(2) altogether. *Cf. Rigas*, 490 F.3d at 234 ("The simple fact that [the relevant bank agreements] required information does not make any misstatement of that information *per se* material.").

In short, the CFTC has not proffered admissible evidence to support a finding of materiality. And even if the evidence-free arguments that the CFTC presses could somehow support a finding of materiality, they plainly do not *require* that finding. Summary judgment therefore is not warranted.

(c)     *A Reasonable Jury Would Not Be Required To Find That Gemini Knew Or Should Have Known That The Pre-Funding Statements Were False Or Misleading*

The CFTC likewise fails to proffer evidence that would require a finding in the CFTC's favor that Gemini knew or reasonably should have known that any statements regarding pre-funding were false or misleading. The CFTC largely repeats its erroneous conflation of margin and leverage, suggesting that Gemini must have understood that claiming to be a pre-funded exchange would be misleading if it were to offer margin trading. MSJ 38–39. But that argument is mistaken for the reasons explained above: Gemini never offered margin trading or anything

analogous to it, and its pre-funding requirement *did* serve to inhibit manipulation in the form of spoofing tactics. *Supra* § IIB1. At a minimum, a reasonable jury would not be required to accept the CFTC's contrary inference.

The CFTC also stresses that Gemini knew certain of its customers received Pearl Street loans and that it was offering operational advances to its customers. That much is true, of course, but as explained above, Section 6(c)(2) does not merely require knowledge of the fact the CFTC contends should have been disclosed. It requires evidence that the Gemini knew or should have known that not disclosing that information would render any of its affirmative statements misleading. *See* § IIA3, *supra*. The CFTC does not point to any direct evidence on this point, and Gemini should be permitted to present its defense to the jury: That even if the pre-funding statements are ultimately found to be misleading (contrary to the arguments set forth above), that conclusion is not so obvious that Gemini would have been *unreasonable* in failing to know. There is thus no reason to depart from the general rule that "[d]isputes over reasonableness are usually fact questions for juries." *Lennon*, 66 F.3d at 421.

## 2.    The CFTC Is Not Entitled To Summary Judgment With Respect To The Statements Regarding Gemini's Fee Rebate Incentives

### (a)    *A Reasonable Jury Could Find That The Statements Regarding Fee Rebate Incentives Were Not False Or Misleading*

The CFTC contends that Gemini misleadingly claimed that it had "no specifically defined market maker program," because Gemini did not disclose to the CFTC that certain "market makers" had bespoke fee arrangements that were more favorable than the general terms publicized on Gemini's website. MSJ 41–42. But a reasonable jury would not be required to accept the CFTC's proposed inference that the statement "we have no specifically defined market maker program" necessarily implies that the exchange will never make bespoke arrangement with individual market participants.

For one thing, Gemini will present evidence that the bespoke fee arrangements were in no sense programmatic. Fees were individually negotiated, and not everybody got the same preferential terms. 56.1 ¶ 153. And they were not limited to market makers: As Cameron Winklevoss testified, "any participant could request a different fee schedule or structure" and Gemini "would evaluate that on a case-by-case basis, according to our policy." Ex. 23 [C. Winklevoss] 400:11–401:4. At a minimum, there is a genuine fact issue as to whether disclaiming the existence of a "specifically defined market maker program" is properly understood to also disclaim the existence of individually negotiated fee arrangements.

Moreover, as the CFTC effectively concedes, MSJ 42–43, Gemini's bespoke fee arrangements *were* disclosed to the CFTC when CFE transmitted Gemini's Policies and Procedures Manual to the CFTC. 56.1 ¶¶ 32, 158–60. It is thus perfectly clear that Gemini did not seek to hide this practice from the CFTC, and that there was no non-disclosure at all.

The CFTC's only response is that the disclosure of Gemini's Policies and Procedures is irrelevant because it came after the submission stating that "no specifically defined market maker program," and hence must be understood as an ineffective recantation of a prior false statement. MSJ 42. But that characterization is belied by the context of the relevant interactions, which were an iterative process in which the CFTC received information, asked for further input, received additional information in response, and continued in an ongoing dialogue regarding CFE's Self-Certification. 56.1 ¶¶ 39–45. Given that context, it would blink reality to treat one particular submission as a distinct statement that was misleading by omission, when the CFTC then received the supposedly omitted information in short order. The CFTC's cases provide no support for that perverse result, since they involve the very different context of after-the-fact attempts to recant

literally false statements. *See United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006); *United States v. Santiago*, 2014 WL 4827883, at *5 (S.D.N.Y. Sept. 26, 2014).

> (b)    *A Reasonable Jury Could Find That The Statements Regarding Fee Rebate Incentives Were Not Materially Misleading*

The CFTC fails to demonstrate that a reasonable jury would be *required* to find that the fee-rebate statements were material to a CFTC decision. Instead, the CFTC largely repeats the errors discussed above: It notes that the submissions to the CTFC flagged Gemini's rebate incentives as a market protection and that the CFTC asked follow-up questions about the topic. MSJ 43–44. But the fact that information was provided or requested does not make it material; otherwise every statement to the government would necessarily be material. *See* § IIA2, *supra*; *Rigas*, 490 F.3d at 234 (request for information does not establish materiality).[20] And the CFTC's appeal to the general regulatory guidance, MSJ 43–44, is not a substitute for actual evidence about CFTC decision-making. *See* § IIA2, *supra*.

Moreover, fee rebates—including those that grant preferential terms to larger market participants—are ubiquitous features of financial markets that can promote market efficiency by adding volume and liquidity to the market. Ex. 5 [Skrzypacz] ¶ 152; Ex. 39 [Cusimano] ¶ 12(b). In other words, incentivizing more traders to participate leads to a healthier market—which is exactly why fee rebate incentives were stressed as a market protection. There is thus no reason to think that Gemini's bespoke fee arrangements—*i.e.*, further fee concessions that helped to add *more* volume and liquidity to the market—were material to any CFTC decision, particularly without any explanation from the CFTC to that effect.

---

[20]    Moreover, as demonstrated in Gemini's Motion *in Limine* No. 1, the CFTC should be precluded offering any argument or evidence about why it asked the questions it did (or did not ask any other questions) because it asserted privilege and instructed its witnesses not to answer questions on those issues during their depositions. Gem. Mot. *In Limine* No. 1 at 8.

Especially because the "materiality inquiry . . . is peculiarly one for the trier of fact," *Gaudin*, 515 U.S. at 512, there is at least a jury question as to whether the general regulatory context and the nature of the interactions with the CFTC could overcome Gemini's contrary evidence and justify a finding of materiality.

> (c)    *A Reasonable Jury Would Not Be Required To Find That Gemini Knew Or Should Have Known That The Statements Regarding Fee Rebate Incentives Were False Or Misleading*

Once again, the bulk of the CFTC's scienter argument with respect to the fee rebates incentives is misdirected: The CFTC labors to establish that Gemini knew it was offering bespoke fee arrangements. *See* MSJ 45–47. But that is undisputed, and it is not the relevant question. What matters is whether Gemini knew or reasonably should have known that disclosure of the bespoke fee arrangements was necessary to avoid misleading the CFTC. *See* § IIA3, *supra*.

On that score, the CFTC misleadingly suggests that Gemini "knew" that the CFTC "'strongly discouraged' special treatment for select market participants." MSJ 47. But the cited document merely reflects Benjamin Small's idiosyncratic view that the CFTC "strongly discouraged" such arrangements—not knowledge on the part of Cameron Winklevoss or Gemini more broadly. 56.1 ¶ 152. Tellingly, the CFTC does not point to *any* statutory or regulatory basis for that understanding, *see* MSJ 47; CFTC 56.1 ¶ 132, and we are unaware of any. Moreover, the cited exchange was not part of any discussions regarding the Self-Certification and thus does not suggest any motive or intent to hide the fee arrangements from the CFTC. *See* Ex. 84. To the contrary, Cameron Winklevoss consulted with Mr. Small to bolster Gemini's record-keeping procedures for the fee arrangements, thus undermining any suggestion that he understood them to be a problematic practice that needed to be hidden. *Id.*

The CFTC also appears to contend, MSJ 47, that Gemini should have known that the fee rebate arrangements were material because in one case fee rebates had been exploited by collusive

trading. That contention is not supported by the cited passage in the CFTC's 56.1 statement, which has nothing to do with the CFTC wanting to learn about "bad" conduct on the Gemini exchange. *See* CFTC 56.1 ¶ 133.

In sum, the inferences the CFTC seeks to draw are highly debatable at best. There is simply no reason that experience with collusive or wash trading would suggest to Gemini that a truthful statement that Gemini had "no specifically defined market maker program" would be deemed misleading without a disclosure of Gemini's non-programmatic, bespoke arrangements with certain market participants. Because the Court's role at the summary judgment state does not include weighing the evidence or drawing these inferences, the CFTC is not entitled to summary judgment.

### 3.    The CFTC Is Not Entitled To Summary Judgment With Respect To The Statements Regarding Self-Trading

#### (a)    *A Reasonable Jury Could Find That The Statements Regarding Self-Trading Were Not False Or Misleading*

The CFTC contends that statements that Gemini "prohibited" self-trading on its exchange were undisputedly false or misleading, such that summary judgment is warranted on that issue. MSJ 49–50. That is wrong. A reasonable jury could readily conclude that these statements were not false or misleading.

The CFTC first quibbles with phrasing, arguing that self-trading was not actually "prohibited" in Gemini's user agreement until September 2017, MSJ 48—even though Gemini implemented self-trade prevention technology on both its continuous order book (in March 2017) and its auction (in May 2017), 56.1 ¶ 139; *see also* MSJ 22–23. But using technology to prevent self-trading was a way to prohibit the practice. *See Merriam Webster Dictionary* (defining "prohibit" to include "to prevent from doing something," in addition to "to forbid by authority"). And when the CFTC asked whether one participant could trade with itself in the Gemini auction,

it was informed that the answer was "No" because Gemini "[had] instituted *self-trade prevention*." Ex. 22 at 9. That phrasing accurately conveyed that Gemini was using technological safeguards to prevent self-trading. The delay in updating Gemini's user agreements to reflect the changes in how the exchange operated does not suggest that any statements to the CFTC were false or misleading—and would at most create a fact question for the jury.

The CFTC also contends that the statements about self-trading were misleading because the CFTC was not informed that self-trading prevention had not been instituted in Gemini's auction until May 2017. MSJ 49. But a statement that self-trading *is* prohibited is not fairly understood to imply that self-trading *had always been* prohibited, and the CFTC makes no effort to establish that the date on which Gemini introduced self-trading prevention constitutes the sort of "critical qualifying information" that could render a statement misleading by omission. *See* § IIA1, *supra*. Moreover, when CFE asked on September 11, 2017 for "the date when the self-trade prohibition was effected in the Gemini auction," Gemini promptly answered that "[t]he code that prohibited auction book self-cross was released on 23 May 2017." Ex. 16. CFE did not choose to share that information with the CFTC, include it in the Self-Certification, or amend any other statements that had been made to the CFTC. CFE's reaction suggests that CFE did not view the information as relevant to the CFTC's decision-making and powerfully undermines any suggestion that it was critical qualifying information that needed to be disclosed. In all events, the CFTC is really asking for this Court to adopt its own preferred inference from the evidence, but at most that demonstrates a fact issue for the jury to resolve.

Finally, the CFTC suggests that the self-trading statements were misleading because they failed to disclose what the CFTC labels a "gap" in Gemini's self-trading prevention—namely, the possibility that a single trader might participate in both sides of Gemini's auction, with one order

placed from the continuous-order book and the other from the auction-only books. MSJ 49. Gemini, however, did not understand that possibility—referred to as "folding"—to constitute self-trading, given the way the two order books were integrated in the auction. 56.1 ¶¶ 143–44.

Expert evidence also supports Gemini's contemporaneous understanding: Prof. Skrzypacz has explained that folding does not constitute self-trading because "the trader does not control the price or amount that might be filled in the auction." Ex. 5 [Skrzypacz] at 113 n.266. And another Gemini expert, former CFTC employee Jeremy Cusimano, confirmed that self-trading prevention measures employed by other financial institutions commonly would not prevent trades by a single account across different order books and that any such trades would ordinarily be understood as unintentional. Ex. 39 [Cusimano] ¶¶ 12(c)(i), 97–99. Given that this sort of trading is commonly understood to be possible and not problematic, there is no basis to think that it would have been relevant to the CFTC, *see id.* ¶¶ 12(c), 88–99—let alone so *critical* that not disclosing it to the CFTC rendered any affirmative statements regarding self-trading prevention misleading.

Finally, the undisputed evidence makes clear that Gemini specifically told CFE about folding, but CFE did not respond to this disclosure. 56.1 ¶ 140. CFE also did not amend any prior statements about self-trading, 56.1 ¶ 145, or include this information in the Self-Certification, Ex. 2. CFE's apparent understanding that the possibility of folding did not negate Gemini's self-trade prevention—and that it was unnecessary to disclose to the CFTC—thus strongly supports a conclusion that this was *not* "critical qualifying information" that was necessary to be disclosed under the circumstances. At a minimum, there is a fact question for the jury as to whether the possibility of folding rendered any statements to the CFTC misleading by omission.

> (b)    *A Reasonable Jury Could Find That The Statements Regarding Self-Trading Were Not Materially Misleading*

The CFTC's materiality arguments as to self-trading are of a piece with its arguments regarding pre-funding and bespoke fee arrangements, and thus fail for similar reasons. The CFTC suggests that materiality can be inferred from the fact that the statements were made and from CFTC's questions regarding self-trading, and it invokes the general regulatory guidance in Appendix C. *See* MSJ 50–51. But the CFTC must proffer *actual evidence* of a potential effect on the CFTC's decision-making—and even if the debatable inferences that the CFTC seeks to draw could possibly justify a finding of materiality, they come nowhere close to *requiring* one. *Supra* § IIA2.

Moreover, the CFTC's evidence-free arguments are unpersuasive even on their own terms. That the submissions to the CFTC emphasized self-trade prevention as an important market protection and that CFTC followed up with its questions would at most suggest that the *general topic* of self-trading was viewed as an important one. As a logical matter, that does not suggest that the CFTC's decision-making was capable of being influenced by the *particular alleged omissions* that the CFTC now targets—*i.e.*, the absence of provisions addressing self-trading in Gemini's user agreement until September 2017, the timing of Gemini's introduction of self-trading prevention, and the alleged "gap" in self-trading provision associated with folding.

Nor is there any apparent reason that the CFTC's decision-making would have been influenced by these alleged omissions. Tellingly, the CFTC does not attempt to explain how it could have been influenced by whether Gemini's technological prohibition on self-trading was echoed by language in Gemini's user agreement or by the timing of Gemini's introduction of self-trading prevention. The technological limits on self-trading were in place when the submissions

were made to the CFTC and continued going forward, which was presumably the relevant question for determining whether the Gemini market was susceptible to manipulation.

Any suggestion that CFTC decision-making could have been influenced by a "gap" in self-trading prevention associated with folding is highly implausible—and certainly not so overwhelming as to justify summary judgment in the CFTC's favor. In qualitative terms, the possibility of folding could not be exploited to manipulate the Gemini auction because it was not subject to a trader's control; any folding between the two order books would thus be unintentional. 56.1 ¶¶ 145–47. And in quantitative terms, folded trades made up only "a tiny fraction of overall volume on the exchange (only 0.3 percent transaction volume in BTC on Gemini auction in 2017) and occurred rarely, as only 29 out of 333 successful auctions in 2017 (less than 10 percent) had any folded trades." Ex. 5 [Skrzypacz] ¶ 168 n.266. The CFTC does address the magnitude of folding, and it does even attempt to explain how a practice that played such a minuscule role in the Gemini auction would "*actually* matter in a *meaningful* way to a rational decisionmaker." *Calderon*, 944 F.3d at 86.

      (c)    *A Reasonable Jury Would Not Be Required To Find That Gemini Knew Or Should Have Known That The Statements Regarding Self-Trading Were False Or Misleading*

The CFTC renews its flawed approach when it attempts to establish that Gemini knew or reasonably should have known that statements regarding self-trading prevention were false or misleading. Here too, the CFTC cites only evidence that Gemini knew of the additional facts that the CFTC now contends should have been disclosed. *See* MSJ 52–53. It cites no evidence suggesting that Gemini knew or reasonably should have known that those disclosures were necessary to avoid rendering any affirmative statements to the CFTC misleading.

Moreover, the CFTC overlooks critical evidence regarding Gemini's interactions with CFE, which shows that Gemini readily informed CFE about the date on which the self-trading

prevention was introduced and about the possibility of folding across the two orders books. 56.1 ¶¶ 140, 142. Gemini knew that this information could be shared with the CFTC, and it never suggested to CFE that the information should be withheld. 56.1 ¶¶ 135–36, 140, 142. Gemini's demonstrated willingness to share that information with CFE thus negates any suggestion that Gemini was attempting to mislead the CFTC by concealing information known to be important. In turn, CFE's decision not to share the information with the CFTC undermines any suggestion that Gemini must reasonably have known that disclosure was required. After all, CFE was the entity that was actually making the Self-Certification to the CFTC, and Gemini—as a first-time participant in the process—was relying on CFE to identify the information required for the Self-Certification. 56.1 ¶ 57. At a minimum, CFE's decision not to share the information with the CFTC reinforces that there is a genuine factual dispute as to whether Gemini reasonably should have known that disclosure was necessary to avoid rendering any affirmative misstatements to the CFTC misleading.

### 4.   The CFTC Is Not Entitled To Summary Judgment With Respect To The Statements Regarding Volume And Liquidity

#### (a)   A Reasonable Jury Could Find That The Volume And Liquidity Statements Were Not False Or Misleading

The CFTC errs in contending, MSJ 55–56, that undisputed evidence establishes that statements to the CFTC about the volume and liquidity of the Gemini Exchange and Gemini Auction were misleading. In large part, that contention merely duplicates the CFTC's other arguments: The CFTC contends that Gemini's volume and liquidity information was misleading because it was not accompanied by additional disclosures regarding Pearl Street lending and operational advances, bespoke fee arrangements, and self-trading. The CFTC is therefore incorrect for all of the reasons discussed above. As shown above, genuine disputes of fact preclude a determination that these alleged "omissions" rendered any statements about pre-funding, fee rebate

programs, or self-trading misleading as a matter of law. *See* §§ IIB1, IIB2, IIB3, *supra*. It follows *a fortiori* that the CFTC is not entitled to summary judgment that the same alleged omissions rendered statements about volume and liquidity misleading, since those statements do not imply anything one way or the other about pre-funding, fee rebates, or self-trading prevention.

The CFTC's only incremental argument is that Gemini did not disclose to the CFTC that August 2017 trading volume data for the Gemini Exchange included "non bona fide volume from wash or collusive trading." MSJ 55. As the Court is aware, there is an ongoing dispute over Gemini's efforts to obtain evidence that could disprove this claim. *See* Dkt. 104. If the government does not produce this evidence, the CFTC should be precluded from offering this argument or introducing any evidence to suggest that Gemini did not disclose this trading. *See* Gem. Mot. *in Limine* No. 2 (June 7, 2024).

In any event, there is at least a jury question as to whether unadorned statements about volume and liquidity on the Gemini Exchange implied to the CFTC that none of the trading resulted from the fraudulent scheme that had victimized Gemini. In fact, there is especially good reason to doubt that information about the Hashtech-Cardano scheme was the sort of *critical* qualifying information that would be necessary to avoid rendering any affirmative statements misleading. While the CFTC's expert states that the Hashtech-Cardano trading made up a "substantial portion" of trading on Gemini, Ex. 6 [Harris] ¶ 16, his own calculations show that the collusive trades made up at most 13.1% of the moving-average volume figure that was included in CFE's Self-Certification, Ex. 6 [Harris], Figure 13. And there is no evidence at all that Hashtech or Cardano ever participated in the Gemini Auction—*i.e.*, the component of the Gemini trading market that would produce the cash-settlement price for the proposed Bitcoin Futures Contract. 56.1 ¶ 165. Thus, the CFTC is incorrect that a reasonable jury would be required to find that

additional disclosures regarding the fraud were necessary to avoid rendering the statements regarding volume and liquidity misleading.

          (b)      *A Reasonable Jury Could Find That The Volume And Liquidity Statements Were Not Materially Misleading*

    The CFTC's materiality argument as to the volume and liquidity statements also fails for the reasons discussed above. As with each of the other categories of at-issue statements, the CFTC seeks only to establish that volume and liquidity were important *as general topics*. *See* MSJ 56. But that does not address whether any of the *alleged omissions* were capable of influencing an actual CFTC decision—and as with all of the categories discussed above, the CFTC does not even attempt to identify any actual decision that was capable of being influenced.

    Moreover, the CFTC has not established materiality with respect to the alleged omissions on pre-funding, bespoke fee arrangements, and self-trading prevention. *See* §§ IIB1(b), IIB2(b), IIB3(b), *supra.* The CFTC's attempt to connect those alleged omissions to statements about volume and liquidity does nothing to change the analysis.

    As for the volume attributable to the Hashtech-Cardano scheme, multiple factual disputes preclude entry of summary judgment. For starters, the fraud accounted at most 13.1% of the moving-average volume figure for the Gemini Exchange that was included in CFE's Self-Certification. Ex. 6 [Harris], Figure 13. Neither Hashtech nor Cardano ever participated in the Gemini Auction that would produce the cash-settlement price for the proposed Bitcoin Futures Contract, 56.1 ¶ 165, and there is no evidence that the scheme affected prices on the Gemini exchange, 56.1 ¶ 167. Against all of this evidence that the scheme did not suggest that the relevant market price was susceptible to manipulation, the CFTC offers no evidence at all that further disclosure would "*actually* matter in a *meaningful* way to a rational decisionmaker." *Calderon*,

944 F.3d at 86. The CFTC thus cannot justify taking the issue away from the jury by granting summary judgment in its favor.

>    (c)    *A Reasonable Jury Would Not Be Required To Find That Gemini Knew Or Should Have Known That The Volume And Liquidity Statements Were False Or Misleading*

Finally, the CFTC's single-paragraph argument on scienter, MSJ 57, does not come close to demonstrating that a reasonable jury would be required to find that Gemini knew or reasonably should have known that statements regarding volume and liquidity were false or misleading. The CFTC merely argues that Gemini was aware of the allegedly omitted information, and must have understood that the *general topic* of trade volume was an important one. The CFTC does not even attempt to establish—as it must to prevail—that Gemini knew or reasonably should have known that the particular information that the CFTC contends was omitted was necessary to avoid rendering the volume and liquidity statements misleading. At a minimum, a reasonable jury could readily find that any "omitted" information was not so obviously relevant to the CFTC's decision-making that Gemini would have been *unreasonable* in failing to appreciate that further disclosure was required to avoid rendering any statement to the CFTC misleading. As a result, the CFTC is not entitled to summary judgment.

## CONCLUSION

In its attempt to avoid trial, the CFTC presents the Court with an incomplete and misleading factual record and an incorrect statement of law and then asks the Court to draw numerous inferences in its favor. As demonstrated above, the full evidentiary record, when applied to the correct legal standard, reveals that there are numerous material fact disputes that must be resolved before judgment can be entered in the CFTC's favor. Only a jury can resolve those fact disputes.

The Court should deny the CFTC's motion for partial summary judgment.

Dated:  New York, New York
        June 7, 2024

BAUGHMAN KROUP BOSSE PLLC

By /s/ John F. Baughman

    John F. Baughman
    Daniel A. Schwartz
    Elizbeth J. Lee
    Ernest E. Butner IV
    One Liberty Plaza – 46th Floor
    New York, NY 10006
    (212) 548-3212

*Attorneys for Gemini Trust Company, LLC*
