# EXHIBIT 36

CONFIDENTIAL

December 13, 2023

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-cv-4563

     - - - - - - - - - - - - - - - - - - - - - - - - - -x

4

     COMMODITY FUTURES TRADING COMMISSION,

5

6                        Plaintiff,

7                -against-

8    GEMINI TRUST COMPANY,

9

                         Defendant.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12

13       CONFIDENTIAL VIDEOTAPED DEPOSITION OF

14                  SHANE MOLIDOR

15              NEW YORK, NEW YORK

16          WEDNESDAY, DECEMBER 13, 2023

17

18

19

20

21

22   REPORTED BY:

23   DANIELLE GRANT

24   JOB NO.: 6305652

25



CONFIDENTIAL

December 13, 2023

```
 1                      MOLIDOR
 2   resigned in that role.  In or around March of
 3   2023, I created my own consulting company of
 4   which I am currently employed as a
 5   consultant.
 6        Q    I want to focus on your time when
 7   you were working at Gemini.
 8             When you first started, what was
 9   your title?
10        A    Customer support specialist.
11        Q    And did your title change during
12   your tenure at Gemini?
13        A    No.
14        Q    Who did you report to?
15        A    At the beginning of my employment,
16   in or around January of 2016 up until March
17   of 2017, I reported to Cameron Winklevoss.
18   In or around March of 2017, my direct report
19   changed to report directly to Benjamin
20   Small, who at the time, I believe, had
21   received a promotion to chief operating
22   officer of Gemini.
23        Q    What was Cameron Winklevoss' role?
24        A    My recollection is that his role
25   at the time was the president of Gemini.
```



1                          MOLIDOR
2    times, had loans outstanding with Pearl
3    Street.  Those institutional clients would
4    be one, Circle Internet Financial; two, XBT
5    Ops; and, three, B2C2.
6        Q    And to your knowledge, did Pearl
7    Street ever lend to anyone Gemini -- any --
8    anyone that was not a Gemini customer?
9              MR. LAVIGNE:  Objection.  Form.
10       A    I have no insight of Pearl Street
11   operations aside from my interaction between
12   Pearl Street and the three institutional
13   clients that received the loans.
14       Q    What was the purpose of the Pearl
15   Street loans?
16              MR. LAVIGNE:  Objection.  Form.
17       Asked and answered.
18       A    I can't speak to what the general
19   purpose may have been.
20       Q    You mentioned earlier that the
21   Pearl Street loans were an incentive to
22   trade on Gemini.
23              Can you explain how they were an
24   incentive?
25              MR. LAVIGNE:  Objection.



CONFIDENTIAL
December 13, 2023

Page 78

1                    MOLIDOR

2        Misstates testimony.

3        A    As I mentioned earlier, my general

4    recollection is that receiving a Pearl

5    Street loan would expand an institutional

6    client's global balance sheet.

7        Q    And how would that benefit Gemini?

8             MR. LAVIGNE:  Objection.

9        A    I can't speak to how it may have

10   benefited Gemini.

11       Q    Did it incentivize the borrower to

12   trade on Gemini?

13            MR. LAVIGNE:  Objection.  Form.

14       A    I can't speak to how a borrower

15   may or may not have been incentivized by

16   receiving a Pearl Street loan.

17       Q    Was it intended to incentivize

18   trading on Gemini?

19            MR. LAVIGNE:  Objection.  Asked

20        and answered.

21       A    I have general recollections of

22   discussions around increasing trade activity

23   on Gemini with recipients of Pearl Street

24   loans.

25       Q    And who were those discussions

```
 1                     MOLIDOR
 2   with?
 3        A    I don't have independent
 4   recollections of these conversations.  My
 5   general recollections is that these
 6   conversations would have been had with the
 7   three recipients of the Pearl Street loans.
 8        Q    Did you have any discussions with
 9   people internal to Gemini about how the
10   Pearl Street loans would be an incentive?
11             MR. LAVIGNE:  Objection.
12        A    I don't have independent
13   recollections.  My recollections are limited
14   to review of documentation as past -- part
15   of past arbitrations.
16        Q    While you worked at Gemini, about
17   how much of your time was spent on Pearl
18   Street loans?
19        A    To the best of my recollection, I
20   would estimate roughly 10 percent of my
21   time.
22        Q    Did you understand working on
23   Pearl Street loans to be part of your Gemini
24   job responsibilities?
25             MR. LAVIGNE:  Objection.  Form.
```

CONFIDENTIAL

December 13, 2023

                              MOLIDOR

 1
 2     A    I can't speak to my general

 3  understanding during my time at Gemini more

 4  than seven years ago.

 5     Q    Did you work on Pearl Street

 6  matters during a -- regular Gemini business

 7  hours?

 8     A    General recollection, yes.

 9     Q    Did you work on Pearl Street

10  matters using Gemini computers and office

11  equipment?

12     A    Based on my recollection, yes.

13     Q    Did you communicate about Pearl

14  Street using Gemini messaging platforms?

15          MR. LAVIGNE:  Objection.  Form.

16     A    My general recollection is yes.

17     Q    Was your Pearl Street-related work

18  intended to benefit Gemini?

19          MR. LAVIGNE:  Objection.  Form.

20     A    I can't speak to what the

21  intention of my scope of responsibilities

22  was meant to be.

23     Q    Do you have an understanding of

24  why Gemini didn't lend directly to

25  customers?



December 13, 2023

                          MOLIDOR

 1

 2    vernacular that is used.  That might have

 3    just been something that I said.

 4         Q    During your time at Gemini, did

 5    others at Gemini refer to the Pearl Street

 6    loan recipients as "VIP customers"?

 7         A    I can't speak to how others may

 8    have referred to customers.

 9         Q    Based on your understanding, did

10    you hear others refer to the Pearl Street

11    borrowers as VIP customers?

12         A    I don't remember.

13         Q    You mentioned "Gemini-centric

14    terms."

15              What is a Gemini-centric term?

16         A    I don't have independent

17    recollections of discussing Gemini-centric

18    terms.  My general recollections would be

19    they that these referred to increased trade

20    activity on the platform for recipients of

21    Pearl Street loans.

22         Q    And during your time at Gemini,

23    did you have any involvement in helping

24    transfer the loan proceeds to the loan

25    recipients?



1                        MOLIDOR

2        Q    What did you mean by

3   Gemini-centric terms?

4        A    I can't speak to what I may have

5   meant in January of 2017, almost seven years

6   ago.

7        Q    Sitting here today, what do you

8   understand "Gemini-centric terms" to refer

9   to?

10            MR. LAVIGNE:  Objection.

11       A    My general recollection of

12  Gemini-centric terms, based on review of

13  documentation and preparation for past

14  arbitrations, is that this refers to trade

15  activity which would occur on Gemini for

16  recipients of Pearl Street loans.

17            MR. LAVIGNE:  Same objection.

18       Same application.

19       Q    And has your understanding of

20  Gemini-centric terms changed over the last

21  seven years?

22            MR. LAVIGNE:  Objection.

23       A    I can't speak to my understanding

24  more than seven years ago; therefore, I

25  can't speak to any sort of evolution or

CONFIDENTIAL                      December 13, 2023

Page 100

1                         MOLIDOR
2    change that may or may not have occurred.
3         Q    Do you have any reason to think
4    that your understanding of Gemini-centric
5    terms might have changed over the past seven
6    years?
7              MR. LAVIGNE:  Objection.
8         A    Again, I can't speak to my state
9    of mind or understanding more than seven
10   years ago; therefore, I can't speak to
11   whether I may or may not believe that they
12   may have changed.
13        Q    Well, I'm asking whether you have
14   any reason to think that it has changed.
15             MR. LAVIGNE:  Objection.
16        A    I can't respond to that question
17   given that I can't recall my state of mind
18   or understanding more than seven years ago.
19        Q    Now, in this same entry, you
20   state:  Pearl Street should be a tool to
21   bolster operations.
22             Do you see that?
23        A    I see it.
24        Q    What does "Pearl Street should be
25   a tool to bolster Gemini operations" mean?



Page 123

                        MOLIDOR

 1     liabilities on the exchange.

 2          Q    Have you ever heard of Gemini

 3     or -- did you ever hear of Gemini stating

 4     that it required orders to be fully

 5     pre-funded?

 6          A    Yes.  I have recollection of this.

 7          Q    What does "pre-funded" mean?

 8          A    My understanding of pre-funding is

 9     that this means a Gemini account balance

10     must reflect assets on deposit in order to

11     then buy assets with those assets; so

12     selling your assets to receive another asset

13     and therefore engaging in a trade.

14          Q    Do you recall having discussions

15     with XBTO about providing an operational

16     float in connection with the Pearl Street

17     loan?

18               MR. LAVIGNE:  Objection.  Form.

19          A    I have general recollections of

20     discussing operational floats with XBT Ops.

21          Q    Do you have any discussion --

22     recollection of discussing operational

23     floats in connection with Pearl Street Loans

24     with XBTO?



CONFIDENTIAL

December 13, 2023

```
1                        MOLIDOR

2        A     Not that I can see.

3        Q     And sitting here today, to the

4   best of your recollection, the only loan

5   agreement that had Gemini-centric terms was

6   for XBT; is that right?

7              MR. LAVERNE:  Objection to form.

8        A     That's right.

9        Q     And is it fair to say that there

10  was no mechanism for Gemini to prevent an

11  entity that borrowed bitcoin from Pearl

12  Street to take the bitcoin off the exchange?

13       A     I am not aware of any such

14  mechanism.

15       Q     So there was crypto lock, for

16  example?

17       A     I don't know what crypto lock is.

18       Q     You have never heard of that term?

19       A     No.

20       Q     Now, XBT, that was a liquidity

21  provider to crypto exchanges; is that right?

22       A     My understanding of XBT Ops is

23  that they are an institutional trading

24  counterparty that traded on Gemini as well

25  as other crypto exchanges.
```



CONFIDENTIAL
December 13, 2023

Page 406

```
 1                         MOLIDOR
 2             Do you see that?
 3             MR. LAVERNE:  Objection.  You
 4       didn't read it right.
 5             MR. LAVIGNE:  What's that?
 6             MR. LAVERNE:  You didn't read it
 7       right.  You skipped over some words.
 8             MR. LAVIGNE:  I'm trying to move
 9       it along for your benefit.
10        Q     Do you see the first sentence of
11   the document, Mr. Molidor?
12        A     I do, yes.
13        Q     And were you familiar with that
14   part of the policy at the time you were at
15   Gemini?
16        A     My recollection of the policies is
17   that they evolved over time.  I can't speak
18   to my state of mind or potential
19   understanding at that point.
20        Q     Okay.  But it's fair to say that
21   for an operational advance or a pre-credit
22   or an advance credit, the idea was that a
23   customer would send evidence or proof of an
24   incoming deposit, and Gemini would give a
25   credit in that amount to allow the person to
```

CONFIDENTIAL
December 13, 2023

1                    MOLIDOR

2    trade before the funds actually hit the

3    account; is that fair?

4              MR. LAVERNE:  Objection.

5         A    My understanding of the policies

6    as they're written here is that wire deposit

7    could receive an operational advance if the

8    client provided any number of proof that the

9    funds would be sent.

10        Q    Okay.  And when you were approving

11   advanced credits or pre-credits, you were

12   approving this, an operational advance; is

13   that fair?

14             MR. LAVERNE:  Objection.

15        A    I'm sorry.  Is there a particular

16   instance that you are referring to?

17        Q    Just in general, when you were

18   shown documents earlier about pre-credits or

19   advance credits?

20             MR. LAVERNE:  Same objection.

21        A    My understanding of an operational

22   advance is that it could provide a credit to

23   the account's account balance prior to

24   receiving funds on deposit.

25        Q    And it's fair to say that for

CONFIDENTIAL

December 13, 2023

Page 408

```
 1                      MOLIDOR
 2    operational advances, the client needed to
 3    show that they were going to or indicate
 4    that they were going to send funds in the
 5    amount of the credit; is that right?
 6              MR. LAVERNE:  Objection.
 7         A    My recollection is that the
 8    business practice had many forms of proof or
 9    intent of the customer to send funds.
10         Q    And what were some of those forms?
11         A    In my recollection, forms could be
12    a verbal promise, an indication of good
13    faith based on past trade experience,
14    sometimes a wire deposit receipt or an
15    attestation to holding of funds on chain or
16    a blockchain transaction ID, for example.
17         Q    And who made the decision about
18    whether that attestation or that
19    representation was sufficient?
20              MR. LAVERNE:  Objection to form.
21         A    I think it varies based on the
22    type of operational advance being provided
23    as well as the time at which this occurred
24    at Gemini.  For example, as communicated
25    earlier, for certain types of operational
```



CONFIDENTIAL                                December 14, 2023

Page 450

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-cv-4563

    - - - - - - - - - - - - - - - - - - - - - - - - - -x

4

    COMMODITY FUTURES TRADING COMMISSION,

5

6                   Plaintiff,

7              -against-

8   GEMINI TRUST COMPANY,

9

                    Defendant.

10  - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12

13                 VOLUME II

14      CONFIDENTIAL VIDEOTAPED DEPOSITION OF

15                SHANE MOLIDOR

16             NEW YORK, NEW YORK

17          THURSDAY, DECEMBER 14, 2023

18

19

20

21

22  REPORTED BY:

23  DANIELLE GRANT

24  JOB NO.: 6349727

25



CONFIDENTIAL

Page 457

1

2    yesterday, Mr. Molidor, that your

3    understanding was this policy applied to

4    operational advances of fiat, not digital

5    assets; is that right?

6        A    My recollection is, yes, I

7    testified to that.

8        Q    Okay.  And is what I just said

9    consistent with your understanding, your

10    belief is this policy only applies to

11    operational advances not fiat?

12            Strike that.

13            Only applies to fiat not digital

14    asset currencies?

15        A    My understanding of this policies

16    and procedures is that operational advances

17    reference wire deposits which references a

18    fiat deposit.

19        Q    And if you look at the bottom of

20    page 8, it says:  An operational advance for

21    a wire deposit may be provided to select

22    institutional Gemini accounts in an effort

23    to bridge an incoming wire deposit if the

24    registered user of such a Gemini account can

25    provide proof that their wire is in transit.

1

2              Do you see that?

3      A     Yes, I see that.

4      Q     And it's my understanding, from

5   your testimony yesterday, that that proof of

6   a wire being in transit can take various

7   forms; is that right?

8      A     My recollection is that

9   attestation and proof could take a variety

10  of forms based on communication with the

11  client that is to receive said operational

12  advance and based on my understanding of

13  Gemini's common business practices.

14     Q     Okay.  Now am I -- and the policy

15  also says, the next sentence, the time

16  period for an operational advance does not

17  typically exceed 24 hours.

18              Do you see that?

19     A     That's what the policy says.

20     Q     And for operational advances of

21  fiat, I believe your testimony from

22  yesterday was you don't know how many times

23  an operational advance exceeded 24 hours; is

24  that right?

25     A     I don't recall what my testimony



CONFIDENTIAL
December 14, 2023

Page 460

```
 1
 2        A    No.
 3        Q    And for an operational advance
 4   list to be granted there need to be -- there
 5   needed to be some proof, as the policy says,
 6   that -- for fiat, that funds were in
 7   transit; is that right?
 8             MR. LAVERNE:  Objection.  Asked
 9        and answered.
10        A    I believe I've responded to that.
11        Q    I want you to respond again then.
12        A    Based on my recollection, proof
13   could take on any number of forms.  For
14   example, the recipient of an operational
15   advance could provide proof by providing an
16   attestation of their intent to send funds by
17   alluding to funds that are in transfer or in
18   transit, by pointing to funds on an
19   appropriate blockchain, or by providing
20   proof through means of a wire deposit, for
21   example.
22        Q    And --
23        A    These are not exhaustive
24   mechanisms of proof.
25        Q    Okay.  And the bottom line is
```