# EXHIBIT 1



*CFTC v. Gemini*

# Summary Judgment Presentation

*July 23, 2024*

## Summary Judgment Should Be Denied

 GEMINI

**1** The statements were true

**2** Attribution is disputed

**3** Materiality is disputed

**4** Knowledge of falsity is disputed

### All of these issues are jury questions

# Summary Judgment Should Be Denied



**1** **Overview of Evidence**

**2** **Key Legal Issues**
- Attribution
- Materiality
- Knowledge/*mens rea*

**3** **Disputed Issues of Fact**
- Prefunding
- Pearl Street Loans
- Operational Advances
- Volume
- Rebates
- Self-Crossing



# Overview

# Cboe Made the Self-Certification





- Only Cboe could file a self-certification
- Submitted on Cboe letterhead
- Signed by Cboe
- Product named "Cboe Bitcoin futures" product
- Traded on the Cboe Futures Exchange
- Gemini not cc'd or included on transmittal
- Gemini not mentioned in press releases

Dkt. 83-8

6

# Evidence Regarding the Statements





- Gemini has substantial evidence **all statements were true**

- Gemini has substantial evidence **all statements were not material**

Dkt. 83-8

**7**

## Gemini Was Completely Transparent





- Gemini never refused to answer any question from CFTC

- Gemini never refused to answer any question from Cboe

- Gemini never refused to provide any trading data or documents

8

# Gemini Was Completely Transparent

 **GEMINI**



**Rose Toomey**
*Lead API Developer*

**GEMINI**

Q. Who instructed you to provide information to Cboe in an accurate manner?

A. **Well, separately, Cameron and Tyler Winklevoss introduced me to Dennis O'Callahan. Sorry, by "separately", I mean Michael Breu had put me into contact with Stephanie Marrin's office, while around that same time Cameron and Tyler Winklevoss had asked me to — had asked me and my colleague, Noah Cornwell, to contact Dennis O'Callahan.**

Q. Okay. And they instructed you to report information to Cboe in an accurate manner?

A. **They asked me, as I recollect, to provide as much detail as possible to answer whatever questions that they had, to arrange — to arrange to create and provide whatever datasets that they requested.**

Dkt. 109-12 (Toomey Tr. 438:16-439:5)

9

## Gemini Gave Everything Anyone Asked For

 GEMINI



**Arthur Reinstein**

*Cboe Lawyer*

Q. **Are you aware of any question asked to Gemini that Gemini did not answer?**

A. **Asked by who?**

Q. Asked by either CBOE or CFTC during the course of the self-certification.

A. **I don't recall that occurring.** I don't have a recollection of that.

Dkt. 109-17 (Reinstein Tr. 151:14-20)

10

## Gemini Gave Everything Anyone Asked For

 GEMINI



**Nicole Gordon**

*Cboe Lawyer*

Q. And there was not one instance where you recall Gemini not responding to a question that Cboe posed, right?

A. **Not that I recall.**

Q. So fair to say **Gemini was fully cooperative** in this process, right?

A. **I think I would agree with that.**

Dkt. 109-18 (Gordon Tr. 100:3-8)

11

## Evidence of Gemini's Approach to Process





- Provided all trade data on an ongoing basis for monitoring

- Made changes to User Agreement requested by Cboe

- Made changes to auction requested by CFTC

Dkt. 83-6 at 7-8; CBOECFTC_00020566 at 583-589; Dkt. 109-58

12



# Attribution: Did Gemini Make the Statements?

# Cboe Made the Self-Certification





- Only Cboe could file a self-certification

- Submitted on Cboe letterhead

- Signed by Cboe

- Product named "Cboe Bitcoin futures" product

- Traded on the Cboe Futures Exchange

- Gemini not cc'd or included on transmittal

- Gemini not mentioned in press releases

Dkt. 83-8

15

# Cboe Made the Self-Certification





CFE believes that the impact of the Product and Amendment will be beneficial to the public and market participants. CFE sought and received input from market participants regarding the Product and Amendment in a number of ways and took that input into consideration in the design and implementation of the Product and Amendment. CFE is not aware of any substantive opposing views to the Product and Amendment. CFE hereby certifies that the Product and Amendment comply with the Act and the regulations thereunder. CFE further certifies that CFE has posted a notice of pending certification with the Commission and a copy of this submission on CFE's Web site (http://cfe.cboe.com/aboutcfe/rules.aspx) concurrent with the filing of this submission with the Commission.

Questions regarding this submission may be directed to Arthur Reinstein at (312) 786-7570 or Nicole Gordon at (312) 786-8109. Please reference our submission number CFE-2017-018 in any related correspondence.

Cboe Futures Exchange, LLC

/s/ Andrew Lowenthal

By:   Andrew Lowenthal
      Senior Managing Director

# Cboe Submitted Other Statements "to the Commission"





- The statements were made in 9 separate documents

- Cboe sent 8 of those documents "to the Commission"

- Gemini was not copied on any of those documents

Dkts. 83-2; 83-4; 83-6; 83-9; 83-10; 83-11; 100-6; 100-21; 100-22

17

## Attribution: The Law

# The Law of the Case





ORDER denying [80] Motion for the Partial Summary Judgment Whether and to what extent defendant is the maker of the representations passed on to the CFTC by the Chicago Finance Exchange is a question of fact. And whether and to what extent the rule of Janus Capital Group, Inc. v. First Derivatives Traders, 364 U.S. 135 (2011) and SEC v. Pentagon Mgmt plc, 725 F.3d 279 (2d Cir. 2013) applies in the context of CFTCs oversight of commodities exchanges and companies seeking to use the facilities of the exchange to trade futures contracts, and the manner used by the CFTC to gather information necessary and relevant to its supervisory obligations, also present questions of fact. (HEREBY ORDERED by Judge Alvin K. Hellerstein)(Text Only Order) (Hellerstein, Alvin)

Dkt. 115

# The CFTC Has No Grounds for Reargument





It is well-settled that a party may move for reconsideration and obtain relief only when the defendant identifies "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255 (internal quotation marks omitted).

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 108 (2d Cir. 2013)

# Section 6(c)(2) Requires *Making* a Statement *to the Commission*

GEMINI



## (2) Prohibition regarding false information

It shall be unlawful for any person **to make** any false or misleading statement of a material fact **to the Commission**, including in any registration application or any report filed with the Commission under this chapter, or any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

7 USC § 9(2)

21

# *Janus* Is Directly Applicable





One "makes" a statement by stating it. When "make" is paired with a noun expressing the action of a verb, the resulting phrase is "approximately equivalent in sense" to that verb. 6 Oxford English Dictionary 66 (def.59) (1933) (hereinafter OED); accord, Webster's New International Dictionary 1485 (def.43) (2d ed. 1934) ("Make followed by a noun with the indefinite article is often nearly equivalent to the verb intransitive corresponding to that noun"). For instance, "to make a proclamation" is the approximate equivalent of "to proclaim," and "to make a promise" approximates "to promise." See 6 OED 66 (def.59). The phrase at issue in Rule 10b—5, "[t]o make any ... statement," is thus the approximate equivalent of "to state."

For purposes of Rule 10b—5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest who prepares or publishes a statement on behalf of another is not its maker.

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)

22



# The CFTC Knows Section 6(c) Is Modeled on Section 10(b)

 GEMINI



Section 6(c) of the CEA was modeled on Section 10(b) of the Securities Exchange Act, "which the Supreme Court has interpreted as a 'catch-all clause to prevent fraudulent practices," *Monex*, 931 F.3d at 976 (quoting *Chiarella v. United States*, 445 U.S. 222, 226 (1980).) Presumably, "by copying § 10(b)'s language and pasting it in the CEA," Congress contemplated that the two statutes would be interpreted similarly. *Id.*

Pl.'s Opp'n Def.'s Mot. Transfer Venue at 26 n.10, *CFTC v. Fisher Capital LLC, et al.*, No. 1:23-cv-03121-CBA-PK (E.D.N.Y., Nov. 13, 2023), Dkt. 29

# The CFTC Ignores Second Circuit Authority Applying *Janus*





*SEC v. Pentagon Cap. Mgmt. PLC,* 725 F.3d 279 (2d Cir. 2013)



*SEC v. Norstra Energy Inc.,* 202 F. Supp. 3d 391 (S.D.N.Y. 2016)



*SEC v. Rio Tinto PLC,* 2019 WL 1244933 (S.D.N.Y. 2019)

## Section 6(c)(2) Does Not Apply to "Indirect" Statements

 **GEMINI**



**Section 6(c)(1)**

It shall be unlawful for any person, **directly or indirectly**, to use or employ, or attempt to use or employ … any manipulative or deceptive device or contrivance ….



**Section 6(c)(2)**

It shall be unlawful for any person to make any false or misleading statement of a material fact **to the Commission** ….

7 USC § 9

26

# The CFTC Elected Not to Charge a "Causing" Violation





(a) Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who **willfully causes an act to be done** or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

# The CFTC's Reliance on Section 1001 Is Misplaced

 GEMINI



**(a)** Except as otherwise provided in this section, whoever, **in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government** of the United States, knowingly and willfully--

    **(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

    **(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

    **(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

**Section 1001 does not require that statements be made *to* the government agency**

18 USC § 1001(a)

28

# Plaintiff's Section 1001 Cases Are Inapplicable





Davis first argues that he did not violate section 1001 because he made documents containing false statements *from,* not *to,* the federal agencies. This distinction is irrelevant because **there is no requirement that a false statement made *to* the federal agency; it must only have been made in "any matter *within the jurisdiction of any department or agency of the United States.*"** 18 U.S.C. § 1001 (emphasis added)

*United States v. Davis,* 8 F.3d 923, 929 (2d Cir. 1993)

29

## CFTC's Reliance on Executive Cases Is Misplaced

 GEMINI



- **CFTC's cases involve executives who made statements in capacity as company's agents**

- **Gemini, like JCM, was a "separate and independent entity"**

Dkt. 93 at 16-18; *In re Pfizer Fees. Litig.*, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2021) (quoting *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011))

30

# Attribution: The Record

# Cboe Made the Self-Certification





- Only Cboe could file a self-certification

- Submitted on Cboe letterhead

- Signed by Cboe

- Product named "Cboe Bitcoin futures" product

- Traded on the Cboe Futures Exchange

- Gemini not cc'd or included on transmittal

- Gemini not mentioned in press releases

## Cboe Had the Final Decision About What to Say

 GEMINI



**Arthur Reinstein**

Lawyer

Cboe

Q. It was ultimately **CBOE that had the final decision** about what to say in this document; is that fair?

A. Yes.

Q. And **it was ultimately CBOE's decision** whether or not to pursue a self-certification in this case, right?

A. Yes

Dkt. 109-17 (Reinstein Tr. 157:15-22)

33

## Cboe Was Responsible for What the Self-Certification Said

 GEMINI



**Gregory Kuserk**

*Deputy Director –
Division of Market Oversight*

**CFTC**
COMMODITY FUTURES TRADING COMMISSION

Q. And **the DCM has the ultimate responsibility** for the content of the self-certification, correct?

A. Yes.

Dkts. 109-57 (Kuserk Tr. 59:21-60:1, 60:7); *see also* 83-17 (Goodman Tr. 288:4-12)

34

## Gemini Did Not Have Control





**Cameron Winklevoss**

*President*



"We provided information to CBOE, but **we did not have control** or agency on what information, necessarily, they chose or how they chose to present that to the CFTC.

Ultimately, they are the interface between us and the CFTC. We were not — **it's not our application**."

Dkt. 83-13 (C. Winklevoss Tr. 528:16-23)

35

# The CFTC Miscites the Record: Cboe Had Ultimate Authority

 **GEMINI**



**Arthur Reinstein**

*Lawyer*

**Cboe**

Q. And CBOE had the authority to change or modify those submissions as it believed appropriate; is that fair?

A. **I think that we had the authority to do so. If we were going to do so related to something that was not in our personal knowledge, meaning not something related to our market but related to Gemini, then we would have vetted that with Gemini. I don't think we would have just changed something.**

**CFTC Cites**

**But we did, I believe to your point of your question, have ultimate authority to submit the document.**

**CFTC Omits**

Dkt. 100-10 (Reinstein Tr. 159:12-23); Dkt. 98 ¶ 57

36

# The CFTC Wants It Both Ways





- CFTC argues that Gemini can be liable for statements made to Cboe

### *** **BUT** ***

- CFTC also argues that Gemini cannot rely on statements to Cboe as part of its defense

37

## Proposed Resolution of the Motions





**1** **The Court should grant Gemini's motion for summary judgment as to Statements 1-16, 18, 25-31**

**2** **The Court should hold a trial on attribution as to Statements 17, 19-24**

38



# Materiality

# The Definition of Materiality





"[A] statement is material if it has a natural tendency to influence, or be *capable of influencing, the decision of the decisionmaking body to which it was addressed*."

United States v. Litvak, 808 F.3d 160, 170 (2d Cir. 2015);
see also United States v. Rigas, 490 F.3d 208, 231 (2d Cir. 2007); United States v. Calderon, 944 F.3d 72, 85 (2d Cir. 2019)

41

## Material Means Important, Not Relevant

 **GEMINI**



"All of these specifications of the materiality inquiry target the same question: **would the misrepresentation actually *matter* in a *meaningful way* to a rational decision maker?**"

*United States v. Calderon,* 944 F.3d 72, 86 (2d Cir. 2019) (emphasis in original)



"Defendants' misrepresentations certainly concerned a variable that mattered to the banks.... **But 'relevance' and 'materiality' are not synonymous.**"

*United States v. Rigas,* 490 F.3d 208, 234 (2d Cir. 2007)

# Material Means Important, Not Relevant





"Half-truths," or "representations that state the truth only so far as it goes, while omitting critical qualifying information," can also be actionable misrepresentations. *Escobar,* 579 U.S. at 191.

# Materiality Depends on Evidence





- "[T]he materiality of a statement rests upon a factual evidentiary showing"

- Establishing materiality requires "proof"

- Defendant can contest materiality with "evidence"

*Kungys v. United States*, 485 U.S. 759, 772, 774-777 (1988)

44

## Materiality Depends on Evidence





By limiting the jury's constitutionally prescribed role to "the factual components of the essential elements" the Government surely does not mean to concede that the jury must pass upon all elements that contain some factual component, for that test is amply met here. ==Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "what decision was the agency trying to make?" The ultimate question: (c) "whether the statement was material to the decision," requires applying the legal standard of materiality (quoted above) to these historical facts.== What the Government apparently argues is that the Constitution requires only that (a) and (b) be determined by the jury, and that (c) may be determined by the judge. We see two difficulties with this. First, the application-of-legal-standard-to-fact sort of question posed by (c), commonly called a "mixed question of law and fact," has typically been resolved by juries.

# Materiality Requires Evidence

**⊘ GEMINI**



Defendant's misstatements were **not material because Government submitted *no evidence*** demonstrating they were capable of influencing Treasury Department.

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015)



Misstatements were **not material because *no evidence*** banks' investment decisions would have been affected.

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007)



Statements were material when government "***presented substantial evidence at trial***" that banks would have rejected bills of lading had they not been altered.

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019)

46

# Materiality Is a Jury Question





Case: 2:20-cv-00076-wmc   Document #: 181   Filed: 04/18/22   Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

COMMODITY FUTURES TRADING
COMMISSION and SECURITIES
EXCHANGE COMMISSION

## CLOSING JURY INSTRUCTIONS

A factual statement is "material" if a plaintiff establishes by a preponderance of the evidence that there is a substantial likelihood a reasonable investor would consider the fact important in deciding whether or not to buy or sell fund shares given the total mix of information.

*CFTC v. Walczak et al.*, Nos. 20-cv-075-wmc & 20-cv-076-wmc (W.D. Wis. Apr. 18, 2022)

47

# Materiality Is a Jury Question





Case 4:19-cv-02901  Document 234  Filed on 08/05/22 in TXSD  Page 1 of 18

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

CIVIL ACTION NO. H-19-2901

EOX HOLDINGS L.L.C., and
ANDREW GIZIENSKI,

Defendants.

**JURY CHARGE**

MEMBERS OF THE JURY:

"Material" information is information that a reasonable trader would consider significant in the decision whether to trade, a fact that alters the "total mix" of information available to a reasonable trader. A minor or trivial detail is not material.

instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

In these instructions, the term "Plaintiff" or "CFTC" shall be used to mean Plaintiff Commodity Futures Trading Commission.

*CFTC v. Eox Holdings, LLC et al.,* No. 4:19-cv-02901(S.D. Tex. Aug. 5, 2022)

48

# The CFTC's Reliance on Tax Cases Is Misplaced





In order to establish a violation of § 7206(2), the government must prove that a tax return is false as to a material matter. In the present case, the itemized deductions on the income tax returns of Klausner's clients constituted material matters if they were essential to the accurate computation of the clients' taxes. *See United States v. Warden*, 545 F.2d 32, 37 (7th Cir.1976) ("The test of materiality with respect to a false return case is whether a particular item must be reported in order that the taxpayer estimate and compute his tax correctly." (quotation omitted)); *United States v. Null*, 415 F.2d 1178, 1181 (4th Cir.1969)

## This is not the standard applicable in this case

# The CFTC's Reliance on *eFloorTrade* Is Misplaced





As to materiality, it is undisputed that, as of the September 2015 hearing, the CFTC's investigation required an examination of eFloorTrade's records concerning trading instructions or signals that it received from TPTSs. (See Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No 57) ¶ 80; Giglio Decl. (Dkt. No. 51-42) ¶¶ 6-8).

Beginning in at least March 2014, the CFTC's investigation required, in part, an examination of the trading instructions or signals EFT received from third party trading systems on behalf of its customers, order tickets or other written records of customer orders, and all other records that are part of the audit trail relating to the placement and execution of customer orders in order to determine whether EFT made and kept required books and records and whether customer orders were properly entered and executed. Giglio Dec ¶ ¶ 4, 6, 7

**RESPONSE: Admit.**

# Unlike here, the CFTC *had evidence* of impact

*CFTC v. eFloorTrade, LLC,* 2018 WL 10625588, at *8 (S.D.N.Y. Sept. 21, 2018); Dkt. 57 ¶ 80, *CFTC v. eFloorTrade, LLC,* No. 1:16-cv-07544-PGG (S.D.N.Y. Nov. 22, 2017)

# What Decision Did the CFTC Make?

# Sample Questions the CFTC Refused to Answer





**Christopher Goodman**

*Economist*



- **What decisions does the CFTC make** concerning self-certifications?
- **Can you testify to any decision that the CFTC made** with respect to the CBOE self-certification filed December 1st, 2017?
- Without revealing the substance of any internal commission communications, **are you aware of any decision the CFTC made** with respect to the CBOE self certification filed on December 1st, 2017?
- **Did the CFTC ever make any decisions whatsoever** with respect to the 2017 CBOE Bitcoin futures contract self-certification?

**There is *no evidence* of any decision — only speculation**

Dkt. 112-2 (Goodman Tr. 64, 36, 37, 38)

# Sample Questions the CFTC Refused to Answer

 GEMINI



**Christopher Goodman**
*Economist*



**Gregory Kuserk**
*Deputy Director –*
*Division of Market Oversight*

- **What did the CFTC look into to determine whether or not [the Gemini] exchange [was] readily susceptible to manipulation?**

- Do you recall **why you asked Question 8** [about rebates] on [the August 25 submission]?

- Do you recall **why you asked Question 10** [about self-trading] on [the August 25 submission]?

- Do you remember **why you didn't ask any questions about prefunding** to Gemini or Cboe?

> There is *no evidence* of what the CFTC
> actually considered or how — only speculation

Dkts. 112-6 (Kuserk Tr. 88:22-89:2, 195:17-18), 112-2 (Goodman Tr. 212:16-17, 212:11-12)

53

# The CFTC's Improper Reliance on the McGonagle Declarations

 GEMINI



- The CFTC did not identify McGonagle:

  - In Rule 26 initial disclosures

  - In response to Rule 33 interrogatories

- The CFTC did not include McGonagle on its witness list

- The CFTC did not cite the McGonagle affidavits in its moving papers — only in reply

- The affidavits are **inadmissible hearsay**

# The CFTC's Hail Mary Reply Argument About Rule 40.2

 **GEMINI**



[T]he CFTC's decisionmaking authority with respect to product certifications is unquestionable because it is set out in the statutory and regulatory framework. Under the express language of Rule 40.2 the CFTC can request "additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder." 17 C.F.R. § 40.2(b) (emphasis added). The CFTC can also "stay the listing of a contract" under certain circumstances, including during proceedings for "filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions." *Id.* § 40.2(c). These provisions confirm that the CFTC, not only has the ability to make decisions, but also possesses the authority to review product certifications for compliance.

## The CFTC *never* made this argument before

Dkts. 118 at 21-22; *see also* 123 at 21

# Knowledge / *Mens Rea*

# The CFTC's Core Principles Apply to "DCMs"



Cboe is a DCM

Gemini is not a DCM

17 C.F.R. pt. 38

# The CFTC's Self-Certification Rules Apply to "DCMs"





**Cboe is a DCM**

**Gemini is not a DCM**

# Gemini Reasonably Relied on Cboe

 **GEMINI**

 **Christopher Goodman**
*CFTC Economist*

Q.  Do you know if there is a common understanding or practice among industry participants to what information the CFTC wants to receive in evaluating compliance with core principle 3?

A.  **Yeah, I would say that that varies depending on exchange.**

   **Exchanges that have been through the process a few times are — you know, generally have a better understanding than newer exchanges.**

 **Nicole Gordon**
*Cboe Lawyer*

Q.  And is it also fair to say that at the time of the self-certification, to your knowledge, Gemini had never been involved in that process before, right?

A.  **To my knowledge, yes.**

Q.  Is it fair to say Gemini was relying on Cboe in connection with the self-certification?

A.  **I think that's fair.**

Q.  **So Gemini relied on Cboe to identify what information was needed in connection with the self-certification** is that fair?

A. Yes.

## Gemini Was Completely Transparent





- Gemini never refused to answer any question from CFTC

- Gemini never refused to answer any question from Cboe

- Gemini never refused to provide any trading data or documents

# Gemini Was Completely Transparent





**Rose Toomey**
Lead API Developer

**GEMINI**

Q. Who instructed you to provide information to Cboe in an accurate manner?

A. **Well, separately, Cameron and Tyler Winklevoss introduced me to Dennis O'Callahan. Sorry, by "separately", I mean Michael Breu had put me into contact with Stephanie Marrin's office, while around that same time Cameron and Tyler Winklevoss had asked me to — had asked me and my colleague, Noah Cornwell, to contact Dennis O'Callahan.**

Q. Okay. And they instructed you to report information to Cboe in an accurate manner?

A. They asked me, as I recollect, to provide as much detail as possible to answer whatever questions that they had, to arrange — to arrange to create and provide whatever datasets that they requested.

Dkt. 109-12 (Toomey Tr. 438:16-439:5)

61

## Gemini Gave Everything Anyone Asked For

 GEMINI



**Arthur Reinstein**

Lawyer

Cboe

Q. **Are you aware of any question asked to Gemini that Gemini did not answer?**

A. **Asked by who?**

Q. Asked by either CBOE or CFTC during the course of the self-certification.

A. **I don't recall that occurring.** I don't have a recollection of that.

Dkt. 109-17 (Reinstein Tr. 151:14-20)

62

# Gemini Made All Trade Data Available to Cboe and CFTC



**Information Sharing Agreement**

This Information Sharing Agreement (this "Agreement"), dated as of September 25, 2017, is by and between Gemini Trust Company, LLC (hereinafter referred to as "Gemini") and Chicago Board Options Exchange, Incorporated (hereinafter referred to as "CBOE"), on behalf of itself and CBOE Trading Venues (as defined below). Gemini and CBOE are each hereinafter referred to as a "Party" or collectively as the "Parties."

1. For purposes of this Agreement:

   a) "CBOE Trading Venues" means any affiliates of CBOE that are self-regulatory organizations and are regulated by either the U.S. Securities and Exchange Commission ("SEC") and/or the U.S. Commodity Futures Trading Commission ("CFTC"). A list of CBOE Trading Venues, current as of the date of this Agreement, is attached hereto as Exhibit A.

   b) "Regulatory Purposes" means any regulatory, self-regulatory, legal, investigatory, regulatory examination, adjudicatory, disciplinary, or other compliance functions; complying with applicable laws, rules, and regulations, without limitation, regulating markets, maintaining fair and orderly markets, or CBOE Trading Venue rules; responding to requests from regulatory agencies, and regulators with jurisdiction over the Parties; complying with and responding to surveillance and regulatory obligations; the activities of self-regulatory organizations; and other purposes consistent with the regulatory, surveillance and regulatory obligations, of the Parties, and the respective regulatory organizations.

   c) "Digital Asset" means a digital asset (also called a "cryptocurrency," "virtual currency," "digital currency," or "digital commodity"), such as bitcoin or ether, which is based on the cryptographic protocol of a computer network that may be (i) centralized or decentralized, (ii) closed or open-source, and (iii) used as a medium of exchange and/or store of value.

2. As set forth below and pursuant to this Agreement, Gemini shall provide information specified in this Agreement, at the times and in the manner specified herein, to the CBOE and/or CBOE Trading Venues, as applicable, relating to Gemini's trading markets and/or auction mechanisms that are the sources of Gemini Trade Prices, Gemini Auction Prices, and/or Gemini Market Data, as defined in the license agreement entered into by and between the Parties and dated as of June 27, 2017 (the "License Agreement"), as well as information related to and/or used to price financial products such as exchange-traded funds that may be listed on CBOE and CBOE Trading Venues by Gemini or its affiliates, including, but not limited to, Digital Asset Services, LLC (collectively, "Gemini Information"). Terms not defined in this Agreement shall have the meaning set forth in the License Agreement. The terms of the License Agreement shall prevail in any conflict between the terms of this Agreement and the License Agreement, except with respect to the sharing of Gemini Information.

3. Gemini shall provide on a daily basis (in a form and within a time period agreed to by the Parties) to CBOE or a CBOE Trading Venue designated by CBOE, the following Gemini Information for Regulatory Purposes:

> 2. As set forth below and pursuant to this Agreement, Gemini shall provide information specified in this Agreement, at the times and in the manner specified herein, to the CBOE and/or CBOE Trading Venues, as applicable, relating to Gemini's trading markets and/or auction mechanisms that are the sources of Gemini Trade Prices, Gemini Auction Prices, and/or Gemini Market Data,

## Gemini provided all data every day for monitoring

GEM_CFTC092970; Dkt. 83-8 at 7-8 (discussing information sharing agreement)

63

# Gemini Updated Its User Agreement at Cboe's Request





**Cameron Winklevoss**

| | |
|---|---|
| **From:** | Cameron Winklevoss [cameron@gemini.com] |
| **Sent:** | 9/13/2017 12:33:35 AM |
| **To:** | Marrin, Stephanie [marrin@cboe.com] |
| **CC:** | tyler@gemini.com; michael@gemini.com; Bent, Denise [bent@cboe.com] |
| **Subject:** | Re: Gemini - CBOE - Marketplace Conduct |
| **Attachments:** | Gemini - WORKING - Website - User Agreement.docx |

Hi Stephanie — thanks for sending this information — it was very helpful! I made updates to our User Agreement (attached), including new 'Marketplace Conduct' and 'Marketplace Conduct Investigations' section. Would love any input or feedback you have.

Best,

Cameron



**GEMINI TRUST COMPANY, LLC**
**USER AGREEMENT**
**(WEBSITE)**

CBOECFTC_00020566

# Gemini Made Auction Changes CFTC Requested



  

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC AND GEMINI TRUST COMPANY, LLC

Cboe Futures Exchange, LLC (CFE), in conjunction with Gemini Exchange, is proposing three modifications to the Gemini auction process. The combination of changes will address questions raised by CFTC staff and further enhance protections for customers in Cboe Bitcoin Futures.

First, the Gemini Exchange auction collar will be augmented to incorporate an index of bitcoin prices from several bitcoin exchanges. This new bitcoin index will replace the Gemini Exchange continuous order book as the source for the price collar calculation.

The Gemini bitcoin index will be a 10 minute VWAP disseminated via the Gemini API beginning no later than 10 minutes before completion of the auction. The value will also be available through CFE's CSMI data feed. The index value will also be added to the waterfall of possible settlement options in the event the Gemini auction fails.

Additionally, Gemini Exchange will eliminate auction-only market orders. This change eliminates the possibility of large market orders combining to push the auction toward or beyond the auction price collar.

Finally, Gemini Exchange will modify the auction allocation algorithm from time priority to price/time priority. The new allocation algorithm will provide traders with greater flexibility in submitting auction-only orders. That flexibility will strengthen the responsiveness of the auction to market movements. However, it should be noted that this enhancement will only impact the allocation of auction trades. The final auction price and auction quantity will not be affected.

CFE believes that these changes combine effective market protections with the price discovery benefits inherent in an auction. And we would welcome the opportunity to discuss these changes with the CFTC staff at their earliest convenience.

- Implemented "auction collar"

- Eliminated "auction only" orders

- Introduced price/time priority

**Gemini would have made any reasonable modification Cboe or CFTC requested**

# The CFTC's Misplaced Appendix C Guidance Argument

 **GEMINI**

> In evaluating the susceptibility of a cash-settled contract to manipulation, a **designated contract market** should consider the size and liquidity of the cash market that underlies the listed contract in a manner that follows the determination of deliverable supply as noted above in (b)(1).

> Where an independent, private-sector third party calculates the cash settlement price series, the **designated contract market** should verify that the third party utilizes business practices that minimize the opportunity or incentive to manipulate the cash-settlement price series.

17 C.F.R. pt. 38, App'x C

66



# Things Not in Appendix C

- Nothing about prefunding
- Nothing about self-crossing
- Nothing about rebates
- Nothing about fee schedules
- Nothing about bespoke fees
- Nothing about third party lending
- Nothing about operational advances

17 C.F.R. pt. 38, App'x C

67

# The CFTC's Knowledge "Case" Is Speculative and Argumentative

 GEMINI



- CFTC has no evidence that Gemini ever thought any statement was misleading

- CFTC has no industry or standard of care evidence to support a "should have known" case

68

## Only Gemini's Expert Provided Industry Standards Evidence





**Jeremy Cusimano**

*Regulatory Expert*

- Managing Director at Alvarez & Marsal

- Former economic advisor to CFTC Director of Enforcement

- Expert analyst for enforcement actions

- Led team of CFTC experts dedicated to forensic analysis of trading and market events to identify violations of CEA

69

## Gemini Had No Notice





**Jeremy Cusimano**

*Regulatory Expert*

14.   In summary, it is my opinion that **Gemini would not have known or had reason to believe that the CFTC would have considered its actions, policies, or representations to amount to alleged false, misleading, or omitted statements, that were relevant and material to the Core Principle 3** compliance self-certification analysis for the CFE Bitcoin Futures Contract.

# The CFTC Is Trying to Change the Rules

 **GEMINI**



**Jeremy Cusimano**

*Regulatory Expert*

100.   … As described throughout my report, it is my opinion that **Gemini's actions were consistent with common and acceptable market practices** at the time.

101.   Additionally, as discussed above, **the CFTC had not previously publicly suggested that any of these activities raised concerns with respect to Core Principle 3** compliance. It was not reasonable to expect that Gemini should have known the CFTC would view the alleged false or misleading statements or omissions as being relevant or material to susceptibility to manipulation.

Dkt. 124-16 ¶¶ 100-101

71



# Fact Issue: Prefunding
# (CFTC Category 1)

## The CFTC's Mistaken Assertions

 **GEMINI**

**1** Prefunding means no use of borrowed funds

**2** Gemini is responsible for the Pearl Street loans

**3** Operational advances were undisclosed loans

**All of the CFTC's assertions are strongly disputed**

## The CFTC Ignores the Court's Guidance





"If it's objective, it's measured by the words themselves."

Dkt. 38 at 6:2-3



"Materiality, misstatements, they are all measured by what the defendant said."

Dkt. 38 at 28:5-9

75

# The CFTC Was Told What Prefunding Means



## C'boe

**Statements 1, 5, 9, 13**

The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. **As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order.** All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled.

This product certification does not constitute or imply a CFTC endorsement of the use of digital currency generally, or bytecoin specifically

Digital Currency Series » Continuing Interest » Litigation

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          ZZIv4563-CFTC-GEMINI-00017445
Exhibit 8, page 2 of 29

- **These statements are true**

- **No statement about leverage**

Dkts: 83-8 at 4; 83-9 at 5; 83-10 at 5; 83-11 at 4

# The CFTC Was Told What Prefunding Means

 **GEMINI**

Case 1:22-cv-04563-AKH    Document 106-14    Filed 06/07/24    Page 145 of 146
FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE LLC
AND GEMINI TRUST COMPANY, LLC

 **GEMINI**

**Statement 19**

**Cost of Capital** - **All orders must be pre-funded — dollars must be deposited prior to placing a buy order and bitcoin must be deposited before placing a sell order— and participants are not permitted to place an order unless they have enough funds in their account** to place such order (orders that are submitted without backing funds are rejected). As a result, no participant's outstanding interest on our books can exceed their account balance at any time and all open orders reduce a participant's available balance until such orders are fulfilled or canceled. Therefore, it is costly for a malicious market participant to engage in manipulative tactics.

In trading terms, a Walrasian (tâtonnement) auction is a type of simultaneous auction in which each agent calculates its demand for the good at every possible price and submits this to an auctioneer. The price is then set so that the total quantity demanded across all agents equals the total quantity supplied of the good.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
DX 026, page 144 of 147
22-cv-4563-CFTC-GEMINI-00012319

- **These statements are true**

- **No statement about leverage**

# The CFTC's Claim About Prefunding Is Disputed

 **GEMINI**

64.    Prefunding was generally understood to mean that Gemini did not offer margin or leveraged trading. (Ex. 1 at 136:12-24, 246:22-247:24, 551:19-553:20 (Winklevoss Dep. Tr.); Ex. 8 at 53:9-25 (Reinstein Tr.); Ex. 9 at 92:21-93:18, 149:8-23 (Goodman Tr.); Ex. 10 at 211:16-212:18, 213:17-214:2, 262:22-263:9 (Kuserk Dep. Tr.); Ex. 21 at 33:14-23 (Pursley Tr.)); Ex. 28 at 388:1-6 (11/15-16/2023 R. Toomey Dep. Tr. ("Toomey Tr.")); Ex. 29 at 665:21-666:14 (12/13-14/2023 S. Molidor Dep. Tr. ("Molidor Tr.")); *see also* Ex. 7 at 3.)

**Response: Disputed.** The CFTC has not produced any evidence that there was a "generally understood" meaning of pre-funding. To the contrary, the evidence demonstrates that "pre-funded" is not an industry term of art: the CFTC has never defined it, and "the concept . . . is not found in the text of Appendix C." Ex. 24 [Goodman] at 92:21–93:18. In connection with the self-certification, the CFTC was given specific definitions of what pre-funding meant.

\* \* \*

The evidence the CFTC cites also does not support its statement. While Gemini agrees that it did not provide margin trading, there is no evidence that it ever said that pre-funding meant Gemini customers could not use borrowed funds on the Gemini exchange or that such a rule was "generally understood." The quoted testimony by Cameron Winklevoss says no such thing . . .

## The CFTC's Contradictory Arguments





"Prefunding was generally understood to mean that Gemini did not offer margin or leveraged trading."

Dkt. 98 ¶ 64



"No subjective CFTC evidence is needed to show what message Defendant conveyed when it stated that all orders on the exchange and in the auction were fully prefunded."

Dkt. 123 at 8

79

## Prefunding Has Nothing to Do With Borrowing





- Prefunding and borrowing are two separate things

- Prefunding transactions with borrowed funds is normal

- The CFTC never said prefunding means no borrowing

# What Prefunding Means in the Real World







-$58.88

# Prefunding: The Actual Evidence

# The CFTC Ignores Testimony From Gemini Employees

 GEMINI



**Shane Molidor**

*Customer Support Specialist*

GEMINI

Q. What does "pre-funded" mean?

A. My understanding of pre-funding is that this means a Gemini account balance must reflect assets on deposit in order to then buy assets with those assets; so selling your assets to receive another asset and therefore engaging in a trade.

Dkt. 109-35 (Molidor Tr. 123:8-14)

83

## The CFTC Ignores Testimony From Gemini Employees





**Rose Toomey**
Lead API Developer

**GEMINI**

Q. What are some other reasons an order could be rejected?

A. Well, if you don't — **if your account is not pre-funded with the money to cover that order**, so if you have $50 on deposit and you place an order for $100, then that entire order $100 would be rejected.

Dkt. 109-12 (Toomey Tr. 50:21-51:2)

# The CFTC Ignores Gemini's Internal Polices





Gemini is a full reserve exchange — funds must be deposited prior to placing any order and all orders must be pre-funded (i.e., Users are not permitted to place an order unless they have enough funds in their account to place such order). As a result, no User's outstanding interest on our Order Books can exceed his or her account balance at any time and all open orders reduce a User's available balance until such orders are fulfilled or canceled. Consequently, all Gemini Inputs, which are Gemini Market Data generated by Matching Engines, are validated by default as directly linked to assets on deposit on our Exchange before they are submitted on a real-time basis to the software components of our Online Platform for compilation and dissemination as Gemini Indices.

## Nothing about borrowed funds

# The CFTC Ignores What Customers Were Told





All buy transactions are purchases of Digital Assets with fiat currency that settle immediately from a pre-funded Fiat Account and are recorded on our Exchange Ledger. All sell transactions are sales of Digital Assets for fiat currency that settle immediately from a pre-funded Digital Asset Account and are recorded on our Exchange Ledger. There is no margin trading, options trading, or shorting offered on Gemini at this time.

When a you enter a limit Order on Gemini to sell Digital Assets, the full amount of the Digital Assets offered for sale is placed on hold in your associated Digital Asset Account and any associated fees in fiat currency are deducted by Gemini from the sale proceeds. Until the sell Order fills, expires or is canceled, the amount of Digital Assets being offered for sale will not be available to be used for any other purpose, including other sell Orders or withdrawals. For partially filled sell Orders, the unfilled portion of Digital Assets offered for sale will remain on hold until the remaining sell Order is filled, expires or is canceled. *You agree that it is your responsibility to cancel any sell Order (or part of any sell Order) that you do not want filled.* If you submit a sell Order and you have the Digital Assets available in your Digital Asset Account, you understand that you may not be able to cancel this sell Order prior to it filling (in whole or in part) and that we will not be liable to you for the completion of an Order after you have submitted a cancellation request. Any limit or market sell Order that exceeds the amount of available Digital Assets in the associated Digital Asset Account will be rejected.

## Nothing about borrowed funds

Dkt. 109-34 at 7

86

## The CFTC Ignores What Customers Said

 **GEMINI**



**Dan Matuszewski**



Q. In your experience **did dollars have to be deposited** into Circle's account before Circle could place a buy order?

A. Yes.

Q. And, in your experience, **did bitcoin need to be deposited** into Circle's account before Circle could place a sell order on Gemini?

A. Yes.

Dkt. 109-36 (Matuszewski Tr. 249:5-14)

87

# The CFTC Ignores What Customers Said





Leveraged trading on some other exchanges has historically sparked excessive price volatility and instability. Gemini does not offer such products and would be able to serve as a trusted, regulated spot exchange for institutional market participants driving the arbitrage mechanism that ensures efficient pricing between spot price and the Winklevoss Bitcoin Shares. The Gemini exchange would also have the potential for more robust price discovery as liquidity is concentrated on the exchange.

**Circle received Pearl Street loans and operational advances**

Dkt. 109-70 at 3

# The CFTC Ignores Its Own Refusal to Define Prefunding

 GEMINI



**Gregory Kuserk**

*Deputy Director –*
*Division of Market Oversight*

Q. Based on your experience working at the CFTC over 30 years, **what does pre-funding mean**?

**MR. RODGERS**:  So I'm going to object and instruct him not to answer on the basis of the deliberative process privilege.

Dkt. 112-6 (Kuserk Tr. 190:8-12)

89

# The CFTC Ignores Its Own Refusal to Define Prefunding

 **GEMINI**



**Christopher Goodman**

*Economist*

**CFTC**
COMMODITY FUTURES TRADING COMMISSION

Q. To your general understanding . . . **What is pre-funding**?

MR. RODGERS: So you can answer to the extent it would not reveal internal preliminary deliberations and opinions and also your own personal opinion.

THE WITNESS: **Yeah, I guess I would be hesitant to answer that for fear of maybe talking about deliberative process.**

Dkt. 112-2 (Goodman Tr. 92:10-19)

90

# In Reality: The CFTC Has No Definition of Prefunding





(Federal Register excerpt image, text illegible)

- It is undisputed that Appendix C says nothing about prefunding

- It is undisputed the CFTC has never defined prefunding in any context

## The CFTC's omissions are evidence that prefunding is not material

# The CFTC Ignores What Was Actually Said



## C'boe

**Statement 2, 6, 10, 14**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(iv) all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded;

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          ZZIv4563-CFTC-GEMINI-0007445
Exhibit E, page 2 of 20

- **These statements are true**

- **No statement about leverage**

# The CFTC Ignores What Was Actually Said



Case 1:22-cv-04563-AKH  Document 100-22  Filed 06/07/24  Page 3 of 3

SEC Draft of November 2, 2017
CONFIDENTIAL

The Gemini Auction and the CFE Bitcoin (USD) Futures Contract is Not Susceptible to Manipulation

**Statement 17**

## Pre-funding required for all orders at the auction.

The pre-funding requirement for all orders on the Gemini Exchange (including both generally and with respect to Gemini Exchange auctions) disincentives potentially manipulative behavior.

• **These statements are true**

• **No statement about leverage**

with other cash bitcoin markets, this helps keep prices in line with broader market levels.

• *The futures contract will drive even more liquidity and competition to the Gemini auction.* The Gemini Exchange auction focuses trading activity to a single moment in time (the time of the auction), which enhances liquidity, market depth, and price discovery at that time. The settlement of a CFE futures contract to the auction result is likely to drive even greater participation and liquidity in the Gemini Exchange auction.

• *Surveillance of the Gemini auction and order book by Gemini and CFE (and all data available to CFTC Market Intelligence office).* In addition to these structural aspects, CFE will actively review the potential manipulation of XBT futures, including through the utilization of both XBT futures trading data and Gemini information with regard to the trading of bitcoin on the Gemini Exchange (which CFE will receive through an information sharing agreement with Gemini).

• *5% auction collar.* There is a 5% collar on the auction price compared to the Gemini Exchange continuous order book mid-point price.

• *Closing cross is industry convention/industry standard.* The Gemini Exchange auction mechanism is similar to the "Closing cross" auction utilized on large stock exchanges, which is a widely accepted mechanism for determining the end-of-day price for an asset. For example, the NASDAQ closing cross auction generates a closing price that is widely used throughout the industry, including Russell Indexes, Standard & Poor's and Dow Jones. Additionally, securities (except those dually listed on other exchanges) are eligible for the closing cross auction.

WASHINGTON

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER      ZZ1-4565-CFTC-GEM10-0001787-6

# The CFTC Ignores What Was Actually Said



Case 1:22-cv-04563-AKH Document 83-6 Filed 03/22/24 Page 4 of 9
GEMINI TRUST COMPANY, LLC

**March 10, 2017 Auction**

On March 10, 2017, an order submitted caused by large market orders resulted in the Gemini auction price

**Statement 18**

While price collars coupled with position limits and surveillance contribute to the soundness of the Gemini auction, **another strength of the auction is Gemini's pre-funding requirement. The need to maintain a cash balance in support of any order means that funds must be in a trader's account before an order is placed or else the Gemini system will reject the order.** To support large trades, firms would need to carry sizable cash deposits at Gemini where they don't earn interest or transfer money into their account in enough time for funds to clear before entering orders.

submitted in auction-only orders during the ten minute auction window while orders for 5120 bitcoin were cancelled and another 1555 bitcoin became immediately due to price improvement.

Meanwhile the quantity of bitcoin to buy via market orders actually increased due to the deep of indicative prices. The end result of the auction was price improvement of almost 3% (2.87%), a reclassifying of the number of auction-only sell orders from 24 to 45, and an increase in the volume executed against marketable auction-only orders from 11% to 95%.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          22cv4563-CFTC-GEMINI-00071081
Exhibit, page 1 of 5

- **These statements are true**

- **No statement about leverage**

# The CFTC Ignores What Was Actually Said



Case 1:22-cv-04563-AKH   Document 106-14   Filed 06/07/24   Page 145 of 148
FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

**Statement 20**

**Time Priority** - We do not permit the cancellation of any auction orders in the final minute leading up to the Gemini Auction Price. **Participants can only add to their position**, thereby (1) **making it costly for them to try to influence the Gemini Auction Price** in the last sixty (60) seconds and (2) reducing the opportunity for "spoofing" of the auction order book.

- **Arbitrage** - A closing cross is well understood by arbitrageurs, making it easy for market participants to interact with the auction. This arbitrage serves to cause prices to move into proper alignment. Because bitcoin is fungible, it can be arbitraged across exchanges. This increases the possibility of price manipulation on any one exchange because manipulation of the price on any one venue would require manipulation of the gross price of bitcoin to be effective — a prohibitively costly activity. As a result, price discrepancies across trading venues will be reduced as arbitrage forces converge prices to within the bounds of arbitrage.

- **Price Discovery** - The Gemini Auction focuses trading activity to a single moment. As a result, the quality of the price discovery process is enhanced because of the enhanced liquidity and depth of the market at the concentrated point in time.

*In broad terms, a Walrasian tâtonnement auction is a type of simultaneous auction in which each agent calculates its demand for the good at every possible price and submits that to an auctioneer. The price is then set so that the total quantity demanded across all agents equals the total quantity supplied of the good.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    22-cv-4563/CFTC/GEMINI-00012319
DX 026, page 144 of 147

- **These statements are true**

- **CFTC has no contrary evidence**

# The CFTC Ignores What Was Actually Said





**Statement 22**

### 19. Could a trader break the auction by distorting the continuous market?

Because we require the Gemini Auction Price to be within 5% of the midpoint of the continuous trading book, it is possible for a malicious market participant to intentionally attempt to exceed this threshold by manipulating either the Gemini Auction Price itself or the midpoint of the continuous trading book. Such manipulation would likely be very easy to detect since it would be concentrated over a short period of time and involve direct interaction with either the price levels at the inside of the continuous trading book (i.e., the highest bid and lowest offer) or the Gemini Auction Price pricing itself. Furthermore, other market participants are strongly economically motivated to counteract or arbitrage any such occurrence in order to receive fills at their desired prices.

Moreover, the manipulation of the continuous trading book would likely require substantial capital commitment and not yield a predictable outcome for the malicious market participant. Because the futures contracts settle to the Gemini Auction Price rather than to the continuous market prices, there is no guarantee that contract settlement would be affected favorably for the malicious participant. In fact, in the event of a failed Gemini Auction, the procedure outlined in Question 12 would determine the settlement price, likely thwarting any attempted manipulation.

Similarly, because placing orders on the continuous market (and in the Gemini Auction) requires capital to be held (as discussed above), spoofing and other manipulative techniques are typically quite expensive and inefficient as well.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    2015-ANDA-CFTC-EXAMN-0001-7265
CK 002, page 5 of 67

- **These statements are true**

- **CFTC has no contrary evidence**

# The CFTC Ignores What Was Actually Said





- **These statements are true**

- **No statement about leverage**

# The CFTC Ignores What Was Actually Said





- **These statements are true**

- **CFTC has no contrary evidence**

# The CFTC Ignores Market Reality





**Jeremy Cusimano**
Regulatory Expert

"Customer borrowing is a **common and accepted practice in financial markets**. Loans do not necessarily reduce the cost of funds."



**Andy Skrzypacz**
Auctions Expert

"These practices of providing advances, trading **incentives, and loans generally encourage participation and liquidity** on an exchange, which, all else equal, reduces susceptibility to manipulation, and are commonly used by exchanges and trading platforms . . ."

Dkts. 124-16 ¶ 46; 124-15 ¶ 100

99

# In Reality: Prefunding Helps Prevent Manipulation





Similarly, because placing orders on the continuous market (and in the Gemini Auction) requires capital to be held (as discussed above), **spoofing and other manipulative techniques are typically quite expensive and inefficient** as well.

Dkt. 109-21 at 13-14

100

# In Reality: Prefunding Helps Prevent Manipulation





**Andy Skrzypacz**

*Auctions Expert*

Fifth, all orders (on both the continuous order book and auction) were required to be pre-funded,[141] which meant that participants had to commit their own Bitcoin or dollars for the full amount of their orders for the entire time the order was outstanding, regardless of whether the order was executed or not. This increased the cost of placing "fake" orders relative to not having a pre-funding requirement, as I explained in **Section III.C.5**. **This made it more difficult for market participants to manipulate the continuous order book price through spoofing** (that is, submitting orders outside the current best bid and ask in the continuous order book, to also create a false sense of demand or supply).[142] It also made it more difficult for auction participants to submit orders to affect the indicative price that might create a false sense of demand or supply in the auction.

# The CFTC's Position Is a Litigation Construct





- **The CFTC never asked what prefunding meant**
- **The CFTC never asked about leverage**
- **The CFTC never told Gemini that prefunding meant no borrowing**

102



# Fact Issue: Pearl Street

# The CFTC Claims Gemini Made the Pearl Street Loans





"Pearl Street was a separate company in name only. Gemini facilitated loans to Gemini market participants through Pearl Street."

## This is false (or at least disputed)

Dkt. 99 at 40

105

# Pearl Street Is Not Gemini



Case 1:22-cv-04563-AKH    Document 108-67    Filed 06/07/24    Page 3 of 3

**CERTIFICATE OF FORMATION**

OF

**PEARL STREET FINANCIAL, LLC**

Pursuant to Chapter 18, Section 18-201 of the Delaware Limited Liability Company Act, the undersigned, being authorized to execute and file this Certificate of Formation, hereby testifies as follows:

FIRST: The name of the limited liability company is Pearl Street Financial, LLC (the "Company").

SECOND: The address of the Company's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, Delaware 19801. The name of the Company's registered agent at such address is The Corporation Trust Company.

THIRD: The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Delaware Limited Liability Company Act and engaging in any and all activities necessary or incidental to the foregoing.

IN WITNESS WHEREOF, the undersigned shall have caused this Certificate of Formation to be executed this 7th day of January 2016.

By: /s/ Jenna Levy
Name:  Jenna Levy
Title:  Authorized Person

Confidential Treatment Requested by Gemini Pursuant to FOIA          GEM_CFTC083043
DX 108, page 2 of 2

- Separate companies

- Separate financial statements

- Separate tax returns

- No parent/subsidiary relationships

**CFTC made no effort to establish alter ego liability**

Dkts. 109-67; *see also* 100-3

106

# Pearl Street Is Not Gemini





**Tyler Winklevoss**

14.    **I am aware that the CFTC has claimed Pearl Street was created as a tool to get around limitations on Gemini's ability to provide loans to customers. That is wrong.**

15.    Cameron and I created Pearl Street because we believed there was a demand in the market that we could fill with some of our bitcoin and ether holdings, which were otherwise being HODLed and not generating any interest or other return.

## Pearl Street Made Real Loans





- Governed by written loan agreements

- Real, on-blockchain loans

- Borrowers paid negotiated interest rates

- Interest rates in line with other bitcoin loan rates and higher than benchmarks identified by CFTC's expert

- Only 2 of 35 referenced Gemini

*See, e.g.*, Dkts. 109-50; 109-51; 124-14, Fig. 2

108

# It Is Not True That Pearl Street Loan Recipients Were Required to Trade on Gemini

 **GEMINI**



**Cameron Winklevoss**

*President*



"It was — it was a hope and an expectation. I think there may have been one or two loan documents that outlined an expectation, but the majority of loans did not have that. And I think, as I testified earlier, we didn't really have a way to monitor where the funds were being used. They could have been traded on Gemini, but they could have also been traded on another venue."

Dkt. 109-22 (C. Winklevoss Tr. 230:24-231:10)

109

# Lending Is Common In Financial Markets

 **GEMINI**



**Angelo Chan**
*Bitcoin Expert*

Lending is well established in traditional finance



**Jeremy Cusimano**
*Regulatory Expert*

Borrowing does not increase the likelihood of manipulation



**Andy Skrzypacz**
*Auctions Expert*

Whether entities use borrowed assets is irrelevant to any assessment of these firm's trading activity

Dkts. 124-14; 124-15; 124-16

## Affiliate Lending Is Routine and Noncontroversial





**Jeremy Cusimano**

Although the Affiliate lender shared owners with Gemini, it was a separate entity. **In traditional finance, for example a large Wall Street bank, there are both lending and trading businesses within the same firm.** A customer could receive funds from the lending business and utilize them for trading.

Dkt. 124-16 ¶ 48

## Pearl Street Loans Did Not Influence Trading

 **GEMINI**



**Dan Matuszewski**

CIRCLE

Q. After entering into the Bitcoin Loan Note included in DX425, did Circle make an active effort to hit this 25 percent target ?

A. So our activity didn't change tremendously because we were already doing so much that **we basically were, like, just maintain status quo and continue doing it** and we should be fine.

Dkt. 109-36 (Matuszewski Tr. 306:10-18)

112

# Lending Does Not Increase the Chance of Manipulation





**Jeremy Cusimano**
Regulatory Expert

"Contrary to the CFTC's contentions **unsecured debt does not necessarily make manipulative conduct more likely**."



**Andy Skrzypacz**
Auctions Expert

"These practices of providing advances, trading incentives, and **loans generally encourage participation and liquidity on an exchange, which, all else equal, reduces susceptibility to manipulation**, and are commonly used by exchanges and trading platforms to compete for trading volume…"

Dkts. 124-16 ¶ 51; 124-15 ¶ 100

113

# Shane Molidor's Testimony Does Not Help the CFTC

 **GEMINI**



**Shane Molidor**
*Customer Support Specialist*



Q. What was the purpose of the Pearl Street loans?

A. I can't speak to what the general purpose may have been.

**Testimony not cited by CFTC**

\* \* \*

A. As I mentioned earlier, my general recollection is that receiving a Pearl Street loan would expand an institutional client's global balance sheet.

**Testimony cited by CFTC**

Q. And how would that benefit Gemini?

A. I can't speak to how it may have benefited Gemini.

**Testimony not cited by CFTC**

Q. Did it incentivize the borrower to trade on Gemini?

A. I can't speak to how a borrower may or may not have been incentivized by receiving a Pearl Street loan.

**Testimony not cited by CFTC**

Dkt. 109-35 (Molidor Tr. 76:14–19; 78:3-16)

114



# Operational Advances

# Gemini Explained Operational Advances on Its Website





- You initiate an **Instant ACH deposit**.

- **Your deposit amount is available for trading *immediately*. You can buy and sell BTC at any point, but you won't be able to withdraw any BTC you buy.**

- 4–5 business days later, once your Instant ACH deposit clears, you will be able to withdraw the amount of your deposit and/or any BTC purchased with your deposit.

# Gemini Explained How Operational Advances Work





## Zero-Confirmation Bitcoin Deposits

To help ease these deposit delays, we're proud to introduce zero-confirmation pre-credited Bitcoin deposits. Here's how it works: we're running every Bitcoin deposit on Gemini through a proprietary analysis to determine how likely it is to get confirmed, even if the network is clogged with other transactions. If your transaction passes our criteria (which may take a few minutes), *we'll pre-credit the amount of your deposit and make it available for trading immediately.* Our tests show that around two out of the three deposits meet the criteria for being pre-credited.

That means that you'll be able to sell BTC for USD or ETH faster and more efficiently. You can also trade in our daily two-sided auction without delay due to Bitcoin network congestion. Then, once your deposit eventually reaches its required three confirmations, you'll be able to withdraw the amount of your deposit or any USD or ETH purchased with your deposit.

# Operational Advances Have a Legitimate Purpose





"In some cases, for select institutional customers, we may provide an operational advance to bridge an incoming funds transfer if such customer is able to provide proof that the funds are in transit"



"An operational advance for a Wire deposit may be provided to select institutional Gemini Accounts in an effort to bridge an incoming Wire deposit, if the registered User(s) of such a Gemini Account can provide proof that their Wire is in transit"

# Operational Advances Have a Legitimate Purpose

 **GEMINI**



**From:** "John Lindsay" <john@bitwage.com>
**To:** "Cameron Winklevoss" <cameron@gemini.com>
**Cc:** "Jonathan Chester" <jonathan@bitwage.com>, "Tyler Winklevoss" <tyler@gemini.com>, cash <cash@institution.gemini.com>
**Subject:** Re: Line Of Credit For Bitwage?
**Date:** Thu, 8 Sep 2016 11:08:47 -0700

Hi Cameron,

We just got it credited, thanks a lot!

John

On Thu, Sep 8, 2016 at 10:47 AM, John Lindsay <john@bitwage.com> wrote:
Hi Cameron,

We're waiting on a wire to be deposited, and it has been over 27 hours since it left our bank's accounts. I have a ticket with gemini support, but we have to pause future wires until this is resolved because we don't know if the issue with this wire is on our side or on your side. I called our bank (bbva) and they confirmed it left their accounts, and their website portal confirms it too.

Thanks in advance for any help.

John

On Thu, Sep 8, 2016 at 7:33 AM, Cameron Winklevoss <cameron@gemini.com> wrote:
email Cash @ (cc'd) when you plan to send a wire – include a screenshot and/or some confirmation info from your bank. Once we receive the email and info, we will do an **advanced credit** and will be on the lookout for the actual wire later that same day.

# Providing Advances Is Routine





**Jeremy Cusimano**

*Regulatory Expert*

Providing advances to digital asset exchange customer accounts is not unique to Gemini. In fact, other digital asset exchanges also extended similar advances or credit to customers.



**Andy Skrzypacz**

*Auctions Expert*

I note that in addition to Gemini's operational advances enhancing the liquidity of the exchange, providing advances of funds is a common practice across financial services to reduce frictions related to transfers of funds. For example, banks often make funds from check deposits immediately available for customers. Similarly, banks often provide earlier access to direct deposits for customers.

Dkts. 109-38 ¶ 56; 109-5 ¶ 142

121

# Gemini Had Procedures for Operational Advances





### Approval Design — Operational Advances

An **operational advance** for a Wire deposit may be provided to select institutional Gemini Accounts in an effort to bridge an incoming Wire deposit, if the registered User(s) of such a Gemini Account can provide proof that their Wire is in transit (e.g., wire transfer confirmation, Fedwire reference number, etc.). The time period for an operational advance does not typically exceed twenty four (24) hours. If a Gemini Account is extended an operational advance, that Gemini Account can immediately trade the full value of such advance; however, a withdrawal hold is put on the Gemini Account in an amount equal to or greater than the amount of the operational advance while the funds are in transit, thereby preventing withdrawals in excess of the actual Gemini Account asset balance. When the funds in transit are received and considered settled, the withdrawal hold is removed from the Gemini Account.

The following approval are required for an operational advance of a User's wire deposit:

- An **operational advance** of a Wire must be approved by one (1) **Inbound Wire Approver,** which will immediately credit the Wire amount to the User's Fiat Account while the funds are still in transit, and place a withdrawal hold on the User's Gemini Account in an amount equal to or greater than the Wire. Once the Wire has been received, one (1) additional **Inbound Wire Approver** can release the withdrawal hold placed on the User's Gemini Account.

# Operational Advances Are Not Loans or Lines of Credit





**Marcia Barker**
*Senior Controller*

**GEMINI**

- Gemini recorded operational advances as "deposits in transit"

- Confirmed approach with outside consultant and auditor

- Financial statements given to regulators

- NYDFS aware of operational advance policies and procedures

*See* Dkt. 108

# Operational Advances Are Not Loans or Lines of Credit





**Cameron Winklevoss**

*President*



Hi Mitchell — to reiterate Shane's email — all outstanding funds should be sent no later than end of business day today. This is not a "credit" line.

Best,

Cameron

On Mon, Apr 17, 2017 at 11:34 AM, Shane Molidor<shane.molidor@gemini.com> wrote:
Mitchell,

As previously discussed, any USD pre-credit should be thought of as an operational advance that allows you to trade against prevailing markets on Gemini immediately rather than a "line of credit". We expect any USD operational advance to be paid in full within 24 hours if granted on a business day, and by EOBD of the next business day if granted over the weekend.

Let me know if you have any questions.

Best,
Shane

GEM_CFTC311044

# The CFTC Mischaracterizes Testimony About Advances





**Cameron Winklevoss**

President

⊕ **GEMINI**

Q. And why are you concerned about the characterization?

A. Well, for starters, we were a full reserve exchange. So, we don't — we're not permitted to do credit or margin, and so, we need delivery of — actual delivery of the funds.

And provided we have that, and we have that evidence, then, we're confident that we're not providing credit or margin.

Dkt. 100-1 (C. Winklevoss Tr. 136:12-24)

125

# Gemini Followed Its Procedures





Matuszewski_0002243 at 263
126

# Advances Facilitated Prefunding





**Daniel Kim**

Messages in **approvals-credit** on **2016-11-10**

**DK** danny.kim (Danny Kim) 2016-11-10 03:00 PM
ZEXJV - $400,000.00 (XBTOpps) - ADVANCED CREDIT

**DK** danny.kim (Danny Kim) 2016-11-10 03:12 PM
michael (Michael Breu), Can you approve the Admin Credit of 500BTC for Circle. It's for prefunding.
https://blockchain.info/tx/e9eb6c676e17490937ea3125d5d23428a30894c59ce7d89f56a313a32c9e740d
View information about a bitcoin transaction
e9eb6c676e17490937ea3125d5d23428a30894c59ce7d89f56a313a32c9e740d
Bitcoin Transaction e9eb6c676e17490937ea3125d5d23428a30894c59ce7d89f56a313a32c9e740d
https://blockchain.info/tx/e9eb6c676e17490937ea3125d5d23428a30894c59ce7d89f56a313a32c9e740d

**DK** danny.kim (Danny Kim) 2016-11-10 04:02 PM
michael (Michael Breu) cameron (Cameron Winklevoss) tyler (Tyler Winklevoss) - Please approve the Admin
Debit of 500BTC for Circle.

# Advances Facilitated Prefunding





**Dan Matuszewski**

**Daniel Kim**

dan.matuszewski Daniel Matuszewski — 10/3/2016 3:01:54 PM(UTC-4)
have a 400K wire coming at ya

dannykimny Daniel Kim — 10/3/2016 3:02:49 PM(UTC-4)
I guess Mondays are slow, we haven't received it yet

dannykimny Daniel Kim — 10/3/2016 3:02:56 PM(UTC-4)
can you send a screenshot and I'll prefund

dan.matuszewski Daniel Matuszewski — 10/3/2016 3:03:41 PM(UTC-4)
Getting it from finance for you

dan.matuszewski Daniel Matuszewski — 10/3/2016 3:03:44 PM(UTC-4)
idk if it went out yet

dan.matuszewski Daniel Matuszewski — 10/3/2016 3:17:54 PM(UTC-4)
boom

dan.matuszewski Daniel Matuszewski — 10/3/2016 3:18:01 PM(UTC-4)
SINGLE WIRE - Confirmation Gemini 10.3.16.pdf received. To view it, go to:
https://login.skype.com/login/sso?go=xmmfallback&docid=0-eus-d5-0694792b1448981a5019fdeb526879c7

Matuszewski_0002243 at 266

128

# Occasional Mistakes Did Happen





FIGURE 23: SUMMARY STATISTICS CHARACTERIZING OPERATIONAL ADVANCES

| | Count | Earliest Date Extended | Latest Date Extended | Latest Date Closed | Amount of Advance (USD Millions) | | Number of Auction Days Outstanding | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Total | Mean | Min | Mean | Max |
| Circle Internet Financial Inc | 36 | 12/15/2016 | 7/20/2017 | 10/2/2017 | $43.3 | $1.2 | 0 | 8 | 74 |
| Cumberland Mining & Materials LLC | 2 | 5/1/2017 | 7/20/2017 | 7/21/2017 | $5.4 | $2.7 | 0 | 1 | 1 |
| XBTO Trading LLC | 4 | 1/5/2017 | 3/10/2017 | 3/13/2017 | $3.5 | $0.9 | 4 | 16 | 49 |
| Total | 42 | | | | $52.2 | | | | |

**CFTC identifies 42 out of 151,224 advances (0.028%)**

# Occasional Mistakes Were Not Tolerated

 GEMINI



**Cameron Winklevoss**



**Marcia Barker**

**MB**  marcia (Marcia Barker) 2017-10-02 11:52 AM
!subteam^S521LQPNG|@cameronwinklevossandtylerwinklevoss FYI as part of the quarterly rec that I am working with Eric on, we found an outstanding advanced credit of 750 BTC issued to Circle on 7/20 that was not subsequently debited

**MB**  marcia (Marcia Barker) 2017-10-02 11:53 AM
I asked John R. to confirm and resolve today

**CW**  cameron (Cameron Winklevoss) 2017-10-02 12:07 PM
Jesus Christ,

**CW**  cameron (Cameron Winklevoss) 2017-10-02 12:08 PM
Please make a not of all of these failures — this is gross negligence.

**MB**  marcia (Marcia Barker) 2017-10-02 12:09 PM
Will do

**CW**  cameron (Cameron Winklevoss) 2017-10-02 07:10 PM
What are the chances that other admin debits / credits are lurking?

**MB**  marcia (Marcia Barker) 2017-10-02 07:45 PM
Very likely - I will know more next week after Eric fixes the reporting for this

**MB**  marcia (Marcia Barker) 2017-10-02 07:46 PM
With USD we're good because I review the admin debits/credits every month and I am able to pull the report myself

**CW**  cameron (Cameron Winklevoss) 2017-10-02 08:10 PM
Cool. I really hope whatever is outstanding is w/ a reputable firm.

# Management Was Not Involved in Occasional Errors

 GEMINI



## Shane Molidor

17.   On several occasions, I arranged for Gemini to extend operational advances to market participants. It was my understanding of company policies and procedures (attached) that market participants were expected to send corresponding funds for these advancements to be delivered to Gemini within approximately 24 hours. I never advised Cameron or Tyler Winklevoss of any situation where operational advances did not comply with company polices and procedures. I was never advised by Cameron or Tyler Winklevoss that it was permissible for operational advances to remain outstanding in a manner that was not consistent with company policies and procedures.



# Fact Issue: Bespoke Fees and Rebates (CFTC Category 2)

# The CFTC Ignores What Was Actually Said





- **This statement is true**

- **CFTC has no contrary evidence**

# The CFTC Ignores What Was Actually Said



**GEMINI**

**Statement 23**

**8. Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?**

We have implemented a trading fee program which is available to all of our market participants; we have no specifically defined market maker program. In summary, fees are typically charged for liquidity-taking trades, but these fees can be reduced through high trading volumes and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but rebates can be earned in a similar way. The details are available at https://qemini.com/fee-schedule/. In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participants typically make up approximately 90% of volume in the auctions.

Confidential Treatment Requested by Gemini Pursuant to FOIA                    GEM_CFTC173218

- **These statements are true**

- **CFTC has no contrary evidence**

# There Was No Market Maker Program





**Cameron Winklevoss**

*President*

⊕ **GEMINI**

Q. And, specifically, Market Makers, as referenced in this policy, could request special terms under the Preferential Treatment Policy?

A. **Anybody could. Obviously some of the — I think most of the individuals were liquidity providers or professional traders, and people who make markets and trade through venues throughout the crypto ecosystem.**

**But as I stated before, it was open to anybody.**

# Fees Were Individually Negotiated





**Daniel Kim**

*Head of Sales*



Q. Do you know why customers got these different rates?

A. **I believe it was negotiation, from what I can remember.**

Q. And would it be fair to say that some customers negotiated better deals than others?

A. Yes.

Q. **Would it be fair to say that there was no specifically designed program for priority users, but that everyone had to negotiate their own deal?**

A. Yes.

Dkt. 109-4 (Kim Tr. 149:8-18)

137

# Gemini Provided Its Policy on Bespoke Fee Agreements





**To:** Goodman, Chris[CGoodman@CFTC.gov]
**Cc:** Reinstein, Art[Reinstei@cboe.com]; Dickman, Laura[dickman@cboe.com]
**From:** Gordon, Nicole[gordon@cboe.com]
**Sent:** Tue 9/12/2017 3:40:30 PM (UTC-04:00)
**Subject:** Gemini Policies and Procedures Manual and Auction Review Process Overview - FOIA CONFIDENTIAL TREATMENT REQUESTED

2017-09-12 - Gemini - Policies and Procedures.pdf
2017-09-12 - Gemini - CBOE - Auction Review Process - Overview.pdf
CFE-Gemini_FOIA Letter CFTC Responses (9-12-17).pdf

Hi Chris,

As a follow up to what was discussed on the call regarding surveillance in relation to the CFE bitcoin futures contract, attached are two documents from Gemini. The first document is the Gemini Trust Company, LLC's Policies and Procedures Manual. Pages 93-95 cover Gemini's Auction Review Process. Page 95 of this document also contains information related to Gemini's hard fork methodology.

# Gemini's Policies and Procedures Disclose Bespoke Fee Agreements

 **GEMINI**

Case 1/22-cv-04563-AKH  Document 109-14  Filed 06/07/24  Page 2 of 148

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC AND GEMINI TRUST COMPANY, LLC

 **GEMINI**

**GEMINI TRUST COMPANY, LLC**
**POLICIES AND PROCEDURES MANUAL**
**CONFIDENTIAL**

**Agreements Granting Preferential Terms**

**Policy**

Our Organization may provide certain high volume Users, market makers or other special-case users ("Priority Users") with terms different from those given under the standard User Agreement and fee schedule ("Fee Schedule"). While no specific law covers the granting of Priority User status for a trading platform, we are interested in developing policies and procedures to monitor potential conflicts of interest and compliance with our Organization's interest in fair dealing with Users. We closely monitor arrangements with Priority Users as they relate to:

- The right to receive priority treatment and/or order execution relative to other Users;

- The ability to obtain a more favorable Fee Schedule;

- Liquidity preferences in respect to withdrawals or deposits (e.g., more rapid confirmation of deposit availability or processing of withdrawals);

- Preferential access to Order Book information; and

- The right to submit an order that does not appear in part or in full on the Order Book.

Our Organization will not enter into a Priority User agreement (e.g., "Designated Liquidity Provider" or "DLP") unless such agreements have been reviewed by the CCO.

# Fee Discounts Are Common and Permitted

 **GEMINI**



**Andy Skrzypacz**
*Auctions Expert*

"While my understanding is that Gemini did not have a structured program to incentivize liquidity providers, **offering different fee arrangements for liquidity providers is a common practice** on other exchanges. For example, the NYSE has several programs that provide incentives for providing liquidity."



**Jeremy Cusimano**
*Regulatory Expert*

"It is **common in the financial industry for trading incentive programs, including fee rebates, to be offered to market participants**. To my knowledge, there is no regulatory prohibition on having a trading incentive program, nor on tailoring features of that program to create bespoke arrangements for certain customers."

Dkts. 109-38 at 8; 109-5 ¶ 152

140

# Gemini Could Not Have Known Bespoke Fee Agreements Were Material

GEMINI



**Jeremy Cusimano**

*Regulatory Expert*

69. Gemini would not reasonably have known that the CFTC would view information about bespoke fee arrangements as relevant and material to Core Principle 3 compliance. Trading incentive programs, which may include fee rebates and bespoke fee arrangements, are commonplace and provide key liquidity to markets.[75] Additionally, in my experience, these trading incentive programs are not uniformly applied to every market participant. **To my knowledge, the CFTC has not provided a public position that trading incentive programs, including fee rebates and bespoke fee arrangements, increase susceptibility to manipulation.** In fact, many CFTC-regulated exchanges offer such trading incentive programs. The CFTC lacks rationale for its assumption that Gemini's trading incentive program is substantially different or less appropriate than those deemed acceptable to the CFTC which are offered by other exchanges.



# The Hashtech-Cardano Fraud

# The Hashtech-Cardano Fraud





- Coordinated trading by two Gemini customers

- Objective was to obtain rebates, not to affect prices

- Traded exclusively on continuous order books

144

## Gemini Was *the Victim* of the Fraud

 **GEMINI**



- Nothing required disclosure, but **Gemini did disclose to regulators**

- Fraud had **nothing to do with auction**

- Fraud had **nothing to do with "Cboe Bitcoin futures"** product

- The **CFTC took no action** against anyone involved in the fraud

145

## Hashtech and Cardano Never Traded in the Auction

 **GEMINI**



**Rose Toomey**
*Lead API Developer*

**Q.** Did Hashtech and Cardano ever trade with each other through the Gemini auction?

**A.** I can't remember that happening.



**Andy Skrzypacz**
*Auctions Expert*

"The Gemini auction **data show that neither Hashtech nor Cardano ever participated** in the Gemini auction."

Dkts. 109-12 (Toomey Tr. 412:12-14); 109-5 ¶ 158

146

# Hashtech and Cardano Did Not Affect Prices

 GEMINI



**Andy Skrzypacz**
*Auctions Expert*

"[T]here is no evidence that Hashtech or Cardano's wash trading activity affected the Gemini auction prices."

"Based on my analysis, it is also clear that the manner in which Hashtech and Cardano coordinated their trades did not affect prices on the Gemini continuous order book."

Dkt. 109-5 ¶¶ 158, 160

147

# The CFTC Ignores the Timeline





# The CFTC Ignores the Timeline





**Cameron Winklevoss** 2017-08-23 07:01 PM
Benjamin Small how do we have negative 113 BTC fees for July?

**Benjamin Small** 2017-08-23 07:02 PM
I assume you're talking about trading fees? If so, that's all from the ETH/BTC book. Shane was too generous with fee overrides. We're going to pare those back.

**Statement 28**

**July 25**          **August 23**

Dkt. 109-73 at 5

149

# The CFTC Ignores the Timeline





**Statement 23**

**8. Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?**

We have implemented a trading fee program which is available to all of our market participants; we have no specifically defined market program. In summary, fees are typically charged for liquidity-taking trades, but these fees can be reduced through high trading volumes and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but rebates can be earned in a similar way. The details are available at https://gemini.com/fee-schedule/. In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participant typically make up approximately 90% of volume in the auctions.

**Statement 28**

**Cameron Winklevoss learns of losses**

**July 25**     **August 23**     **August 25**

# The CFTC Ignores the Timeline





Dkt. 113-11 at 2

151

# The CFTC Ignores the Timeline





**Filing 1** — Disclosure to state authorities

October 9

**Filing 2** — Disclosure to federal authorities

October 19

Dkts. 109-89; 113-05

152



# Fact Issue: Self-Crossing (CFTC Category 3)

# The CFTC Ignores What Was Actually Said





**Statements 4, 8, 12, 16**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that:  ...

(v) **self-crossing is prohibited on the Gemini Exchange**;

- **This statement was true**

Dkts. 83-08 at 9; 83-09 at 9; 83-10 at 9-10; 83-11 at 8-9

155

# The CFTC Ignores What Was Actually Said

 **GEMINI**

 **GEMINI**

**Statement 21**

**Self-Trade Prevention - We prohibit the same market participant from crossing with himself or herself (either intentionally or unintentionally)** on a continuous trading order book or in a Gemini Auction.

exchanges throughout Europe and Asia. In addition, a closing cross is widely accepted as the end-of-day "price" of a given asset, even if a significant amount of trading volume occurs on multiple venues.

**Gemini Auction** - We believe the Gemini Auction has a number of attributes that promote the integrity of the auction price and discourage manipulative conduct.

- **Arbitrage** - A closing cross is well understood by arbitrageurs, making it easy for market participants to interact with the auction. This arbitrage serves to cause prices to move into proper alignment. Because bitcoin is fungible, it can be arbitraged across exchanges. This constrains the possibility of price manipulation on any one exchange because manipulation of the price on any one venue would require manipulation of that global price of bitcoin to be effective — a prohibitively costly activity. As a result, price discrepancies across trading venues will be reduced as arbitrage forces converge prices to within the bounds of arbitrage.

- **Price Discovery** - The Gemini Auction focuses trading activity to a single moment. As a result, the quality of the price discovery process is enhanced because of the enhanced liquidity and depth of the market at the concentrated point in time.

' In broad terms, a Walrasian tâtonnement auction is a type of price/no-price auction in which each agent calculates its demand for the good at every possible price and submits this to an auctioneer. The price is then set so that the total quantity demanded across all agents equals the total quantity supplied of the good.

Confidential Treatment Requested by Gemini Pursuant to FOIA          GEM_CFTC084666

- **This statement was true**

# The CFTC Ignores What Was Actually Said

 **GEMINI**

---

Case 1:22-cv-04553-AKH  Document 100-21  Filed 05/07/24  Page 6 of 69
FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

## GEMINI

**Statement 24**

### 10. Could an auction occur where there is one participant trading with themselves?

### No, we have instituted self-trade prevention.

NYBL's.⁷ Under the NYBL, a "trust company" has general powers available to banks and trust companies, as well as powers generally associated with trustees and other fiduciaries.

Apart from general fiduciary powers and obligations, the following activities are among those specifically identified in the statute as activities that New York trust companies may conduct with respect to their fiduciary accounts, including (i) the power to accept deposits exclusively in a fiduciary capacity, to receive and disburse money, to transfer, register and countersign evidences of indebtedness or other securities; and to act as attorney in fact or agent and (ii) the power to accept appointment as receiver, trustee, or committee of the property of an estate of any person in insolvency or bankruptcy proceedings.⁸

A limited purpose trust company must conduct its business and operations subject to the limitations or restrictions as the NYSCFS may prescribe in its sole discretion. In practice, most limited purpose trust companies typically engage in activities such as employee benefit trust, personal trust, corporate trust, transfer agency, securities clearance, investment management, and custodial services. A trust company, including a limited purpose trust company like Gemini, can serve as the custodian of customer funds itself.

Under the NYBL, the same general procedures, requirements and criteria for the formation of a full service bank apply also to the formation of a limited purpose trust company with two exceptions: (i) no requirement to carry FDIC insurance and (ii) a level of capitalization deemed satisfactory to the Superintendent of NYSDFS. Once submitted in acceptable form, a limited purpose trust company application receives the same level of scrutiny as other bank and trust company proposals and ultimately requires the approval of the Superintendent of NYSDFS. In addition, trust companies are subject to many of the same requirements that apply to a bank

⁷ See N.Y. Banking Law § 100 et seq (McKinney).
⁸ Ibid

Confidential Treatment Requested by Gemini Pursuant to FOIA          GEM_CFTC173218

---

• **This statement was true**

# The CFTC Ignores What Was Actually Said





- **This statement was true**

Dkt. 83-2 at 7

158

# It Is Undisputed That Gemini Did Ban Self-Crossing



**Gemini Continuous Order Book**



Self-crossing banned in **March 2017**

**Gemini Auction**



Self-crossing banned in **May 2017**

Dkts. 109-12 (Toomey Tr. 330:19-331:8); 109-12; 98 ¶¶ 145-46

159

# Gemini Answered Questions About the Ban

 **GEMINI**



**Rose Toomey**

*Lead API Developer*

From: "Rose Toomey" <rose@gemini.com>
To: "O'Callahan, Dennis" <ocallahd@cboe.com>
Cc: "Noah Cornwell" <noah.cornwell@gemini.com>, "Sarah Olsen" <sarah.olsen@gemini.com>
Subject: ==Re: Questions that have arisen==
Date: Mon, 11 Sep 2017 21:51:02 +0000

Hi Dennis,

1. ==The code that prohibited auction book self-cross was released on 23 May 2017.==

2. Beginning at ten minutes before 16:00, a number of "simulated" auctions run to supply indicative prices. Those events supply a provisional success or failure depending on whether the price is within the +/- 5 pct collar. When the final, "real" auction runs at 16:00, once the auction price is established we determine at that time if it's within the collar. If it is, we proceed with filling the orders and publish a successful result. If it's outside that collar, nothing is filled, and we publish a failure.

3. Nobody earns any interest on Bitcoin holdings at Gemini. Users do not explicitly have funds "in" one wallet or the other. Account balances allow users access to funds from a co-mingled hot wallet.

4. I'm cc'ing Sarah Olsen, our head of business, to provide further details about block trading.

Best,
Rose

# Gemini's Data Disclosed Pre-Ban Self-Crossing





**Data given to CFTC included instances of self-crossing**

# What Is "Folding"?





# **Folding Is Not Self-Crossing**





**Rose Toomey**

*Lead API Developer*



## 🔷 slack September 3, 2017

**cameron (Cameron Winklevoss)** 2017-09-03 08:00 PM
we have self trade prevention in both auctions and continous trading?

\* \* \*

**rose (Rose Toomey)** 2017-09-03 08:02 PM
yes, we have both: if a participant submits an order that could cross a standing order on the continuous book
or the auction book, then the incoming order will be cancelled

**cameron (Cameron Winklevoss)** 2017-09-03 08:02 PM
so is the statement above accurate?

**rose (Rose Toomey)** 2017-09-03 08:03 PM
where we do not attempt "self trade" prevention is where the auction book and the continuous book are folded
together during the auction: because the auction fill is regarded as a bulk trade, it would be possible for a
market maker to be on "both sides" but the auction volume is comingled so we do not regard it as a self trade

**rose (Rose Toomey)** 2017-09-03 08:03 PM
yes, the quoted statement is accurate

# Folding Is Not Self-Crossing





**Rose Toomey**
*Lead API Developer*

GEMINI

## slack February 22, 2017

**RT** | **Rose Toomey** 2017-02-22 06:00 PM
not really

**RT** | **Rose Toomey** 2017-02-22 06:00 PM
first off, it is really difficult/impossible to predict at the time an order is placed whether you will be "trading with yourself"

**RT** | **Rose Toomey** 2017-02-22 06:00 PM
second, you are not "trading with yourself", you're participating in a mass buy/sell event

# Gemini Told Cboe About Folding





*Gemini Exchange Auction*

In addition to the continuous trading order book, our BTC/USD order matching engine conducts an Auction (or "cross") at 4:00 p.m. Eastern Time (i.e. 21:00 UTC during the winter and 20:00 UTC during the summer in New York) every day. This provides an opportunity for both buyers and sellers to trade in an instant of elevated liquidity and price discovery. All active orders (including resting vanilla limit and MOC limit orders) may interact with the Auction and influence the *final auction price* ("Auction Price"), which is determined by finding the price at which the greatest aggregate buy demand and sell demand are fulfilled. All participating, eligible orders are fulfilled at the Auction Price. (We use a mechanism similar to Arca, Nasdaq, Bats, and other large stock exchanges throughout Europe and Asia, which is sometimes called Walrasian equilibrium.)

# Gemini Told Cboe About Folding





**From:** Rose Toomey [mailto:rose@gemini.com]
**Sent:** Monday, November 27, 2017 3:59 PM
**To:** O'Callahan, Dennis <ocallahd@cboe.com>
**Cc:** Mollet, Michael <mollet@cboe.com>; Silva, Tiago <silva@cboe.com>
**Subject:** Re: Self Trade Preventions on the Gemini Exchange

Hi Dennis,

Gemini has self-trade protection within the continuous order book and the auction order book.

However, we don't at present prevent the possibility that a single account might participate in both sides of the auction, one side from the continuous book and the other side from the auction-only book. We've been discussing this very topic recently:

1. it's a logistic challenge to determine how to exclude self-trades only at the time the auction runs, and
2. we're unclear what the usual and customary auction/continuous order book self-trade prevention strategy would be

GDAX prohibit self-trade:
https://docs.gdax.com/#self-trade-prevention

Can't find anything on whether ItBit or Bitstamp prohibit self trade.

I figured as much: fifty percent truncation of the data is really throwing out the baby with the bathwater. I'd prefer to see if a longer time period might be made to work with ten percent truncation.

Best,
Rose

# The Actual Facts: Folding Is Rare and Had No Impact



**Continuous Order Book**



**Auction Orders**

- 16 out of 12,098 (0.132%) auction trades after July 24, 2017

- The 16 trades involved 8 different customers

- No evidence anyone did it deliberately

- No evidence of any impact on auction

Dkts. 124-19 at 24 (Fig. 6, Gemini Trade Data); *see also* 124-15 at 113 n.266

167



# Fact Issue: Volume
# (CFTC Category 4)

# Every Business Wants to Increase Volume







# Using Incentives to Increase Volume ("Liquidity") Is Common

⊕ GEMINI



31. Exchanges often try to attract traders by offering rebates, reduced fees, and other economic incentives to traders who trade on their platforms. Traders who offer to trade attract other traders who want to trade, increasing the utility of the exchange to traders. The more traders an exchange has, the more useful it is to traders, and obviously, the more valuable it is to the exchange's owners.

## Gemini's Volume Data Was Real





**Rose Toomey**
Lvad API Developer

**GEMINI**

Q. Did you ever provide **any false data** to Cboe?

A. **No.**

Q. Did you ever provide **any misleading data**
to Cboe?

A. **No.**

Dkt. 109-12 (Toomey Tr. 298:5-12)

172

# All Data Provided Were Accurate





Statement 30

- **The CFTC has no evidence these data were wrong**

Dkt. 83-3 at 4

173

# All Data Provided Were Accurate



**Statement 25**

| | |
|---|---|
| **To:** | Leahy, Thomas M., Jr. [tleahy@CFTC.gov] |
| **Cc:** | Reinstein, Art [Reinstei@cboe.com] |
| **From:** | Gordon, Nicole [gordon@cboe.com] |
| **Sent:** | Tues 8/1/2017 5:25:34 PM (UTC-4:00) |
| **Subject:** | CFTC Data Request Response – CFE FOIA CONFIDENTIAL TREATMENT REQUESTED |

CFE FOIA Request Information and Email Dated August 1 2017.pdf

Tom,

I am sending overnight for delivery tomorrow via FedEx a package with a CD-ROM containing the raw data used to create the graphs and charts in the Appendix of the cash-settled (USD) bitcoin futures product presentation that occurred on July 25, 2017. I am also attaching a letter requesting FOIA confidential treatment of this email and the information contained on the CD-ROM.

Please let me know if you do not receive the package tomorrow and also if you have any questions or would like further information.

Thanks,
Nicole

- **The CFTC has no evidence these data were wrong**

# All Data Provided Were Accurate



Case 1:22-cv-04563-AKH    Document 83-8    Filed 03/22/24    Page 3 of 33

## C'boe

**Statement 3, 7, 11, 15**

**Data from data.bitcoinity.org** reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. As of August 28, 2017, 553 market participants have traded at least once in a Gemini Exchange auction for bitcoin in U.S. dollars. **The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Exhibit 8, page 2 of 26

- **The CFTC has no evidence these data were wrong**

# The CFTC Never Said Certain Trades "Don't Count"

GEMINI

- Appendix C says nothing relevant

- The CFTC never provided any alternate guidance





# Additional Reference Material

# The Gemini Org Chart in 2017





*See* Dkt. 100-3

# The Pearl Street Loans Were Not Below Market





**Joshua Lim**
OTC Trading Desk



| From: | Joshua Lim <jlim@circle.com> on behalf of Joshua Lim <jlim@circle.com> |
|---|---|
| Sent: | Tuesday, December 20, 2016 2:33 PM |
| To: | Shane Molidor <Shane Molidor <Shane.molidor@gemini.com>> |
| Subject: | Fwd: BTC borrow on Gemini |
| Attach: | 2016-09-20-PearlStreet-Circle-Note-BITCOIN.pdf |

This is an example of an old one.

We had been at 4%, which is why we stopped using it. Would be great to get the 1.5%

## The Pearl Street loans were set by market forces

Circle_CFTC_0000633

180

# Gemini Provided Complete Documents

⊖ GEMINI



**Benjamin Small**

| | |
|---|---|
| **From:** | Benjamin Small [benjamin.small@gemini.com] |
| **Sent:** | 8/20/2017 9:20:30 AM |
| **To:** | Mollet, Michael [mollet@cboe.com] |
| **CC:** | Tyler Winklevoss [tyler@gemini.com]; Cameron Winklevoss [cameron@gemini.com] |
| **Subject:** | Re: FW: CFE Bitcoin Futures |

Hi, Michael. We're wading through these questions now. I think some, especially regarding OCC settlement procedures, are in our section rather than yours; please feel free to compose answers to those. We'll try to send you a final or final-ish draft tonight or tomorrow morning before your noon (EDT) meeting.

I think it's in our best interest to load this up with our full policy and procedures manuals as exhibits. In part so that can see the full text for themselves, and in part to impress them with how much written supervisory procedures Gemini has built over the years. We also intend to incorporate our policies pursuant to IOSCO Financial Benchmark Principle 14—I hope that gives them some confidence as well.

Thanks.

CBOECFTC_00029137

181

# Rule 10b–5





It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5

182

# Bitcoin Loans Are Public



| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | **Pearl Street Financial, LLC** | | | | | | | | |
| 2 | | | | | | | | | | | 2017 | | | | | **Bitcoin Address** |
| 3 | Entity | Account ID | Value (USD) | BTC | Duration | Interest | Loan Start | Maturity | Interest | Loan Start | Maturity | Interest | Loan Start | Maturity | Interest | |
| 4 | **XBT OPPS - LOAN** | | | | | | | | | | | | | | | |
| 5 | XBT Opps, LLC | 10078 | $2,700,000 | 1000 | 180 | 1.5% | 2017-01-05 | 2017-05-31 | 6.98630138996301 | 2017-06-01 | 2017-10-01 | 5.01369863 | 2017-10-02 | 2017-12-27 | 3.5342 575 | 3Am8DqrGfEv3hUm3f5fwBFmebeAJ22Wdwn |
| 6 | | | $2,700,000 | 1000 | 180 | 1.5% | 2017-01-05 | 2017-05-31 | 6.82191780821918 | 2017-06-01 | 2017-10-01 | 5.01369863 | 2017-10-02 | 2017-12-27 | 3.5342 575 | |
| 7 | | | $2,700,000 | 1000 | 180 | 1.5% | 2017-01-05 | 2017-05-31 | 4.06849315068493 | 2017-06-01 | 2017-10-01 | 5.01369863 | 2017-10-02 | 2017-12-31 | 3.6986 0137 | |
| 8 | | Total | | | | | | | 17.87671232876710 | | | 15.04109589 | | | 10.76 12329 | |
| 9 | **B2C2 - LOAN** | | | | | | | | | | | | | | | |
| 10 | B2C2 Ltd. | 1595 | $1,620,000 | 600 | 180 | 4.0% | 2017-01-01 | 2017-06-30 | 11.83561643835620 | 2017-06-30 | 2017-10-02 | 6.180821918 | 2017-10-03 | 2017-12-28 | 5.654 4521 | 3LiaVxfy1pKZVyMvjmPcqY3Rfa31q57owL |
| 11 | **CIRCLE - LOAN** | | | | | | | | | | | | | | | |
| 12 | Circle Financial, Inc. | 8972 | $2,700,000 | 1000 | 180 | 1.5% | 2016-12-21 | 2017-05-31 | 7.43835616438356 | X | X | X | X | X | X | TLubasDyxf8Uv88yg1RpxEHVXsqBoPr2SN |
| 13 | | | $5,400,000 | 2000 | 180 | 1.5% | 2017-01-01 | 2017-05-31 | 13.97260273972600 | 2017-06-01 | 2017-09-01 | 11.34246575 | X | X | X | |
| 14 | | Total | | | | | | | 21.41095890410960 | | | 11.34246575 | X | X | X | |
| 16 | | | | | | | | | | | | | | | | |
| 17 | | **TOTAL** | | | | | | | | | | | | | | **INTEREST** 1Ng VCVCgcfzWR2jSDm8HZUdyE8 gu |
| 19 | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | |
| 21 | | | | | | ######## | | | | | | | | | | |
| 22 | Interest rate / annum | | | | | | | | **Est. 4Q17** | | | @ 12/8/17 | @12/28/17 | @12/28/17 | @12/28/17 | |
| 23 | # BTC * interest * (# days / 365) | | | | | | | | XBT Opps | 2017-10-02 | 2017-12-31 | 3.698630137 | | | | |
| 24 | Price / BTC/USD | $2,700 | | | | | | | XBT Opps | 2017-10-02 | 2017-12-31 | 3.698630137 | | | | |
| 25 | | | | | | | | | XBT Opps | 2017-10-02 | 2017-12-31 | 3.698630137 | | | | |
| 26 | | | | | | | | | B2C2 | 2017-10-02 | 2017-12-31 | 5.917808219 | | | | |
| 27 | | | | | | | | | | | | 17.01369863 | 10.7671233 | 5.6547945 | | |
| 28 | | | | | | | | | | | | $20,000.00 | $14,740.00 | $13,878.46 | | |
| 29 | | | | | | | | | | | | $340,273.97 | $158,707.40 | $77,348.86 | $236,056.28 | |

# Transactions on the Blockchain are public

# The CFTC's Reliance on *AEP Energy Services* Is Misplaced – Gemini's Expert's Opinion Is Admissible





As the district court found, however, the plaintiffs' have repeatedly represented, in both the transaction documents and in tax and regulatory filings, that the natural gas contained in the Storage Facility constitutes "personal property" natural gas and that no "native gas" —or "real property" natural gas —existed in the facility after 1996.

We further conclude that the two recently created regulatory filings, not submitted by the plaintiff's to the district court until after summary judgment motions were filed, which appear to assert that the Storage Facility contains mostly "native gas," and the plaintiffs' expert report purporting the same conclusion, are insufficient to create a genuine issue of material fact on this question, especially in light of our conclusion regarding the inability of the plaintiffs to make such an assertion contrary to their previous representations in this regard.

## There is nothing remotely similar in this case

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 735-36 (2d Cir. 2010)*

# Statements at Issue

# The Four Categories





## Prefunding
Statements: 1, 2, 5, 6, 9, 10, 13, 14, 17, 18, 19, 20, 22, 26, 27



## Rebates
Statements: 23, 28



## Self-Trading
Statements: 4, 8, 12, 16, 21, 24, 31



## Volume
Statements: 3, 7, 11, 15, 25, 29, 30

# Summary Judgment Should Be Denied



Case 1:22-cv-04563-AKH   Document 83-8   Filed 03/22/24   Page 3 of 30

## C'boe

**Statement 1**

The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. **As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order.** All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled.

- **This statement is true**
- **Materiality is disputed**
- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



Case 1:22-cv-04563-AKH   Document 03-8   Filed 03/22/24   Page 3 of 39

## C'boe

**Statement 2**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(iv) **all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded**;

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



## C'boe

**Statement 3**

**Data from data.bitcoinity.org** reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. As of August 28, 2017, 553 market participants have traded at least once in a Gemini Exchange auction for bitcoin in U.S. dollars. **The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Exhibit 8, page 2 of 26
23nv04563-CFTC-GEMINI-0001/445

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

Dkt. 83-8 at 5

189

# Summary Judgment Should Be Denied



Case 1:22-cv-04563-AKH Document 83-8 Filed 03/22/24 Page 3 of 30

## C'boe

**Statement 4**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(v) **self-crossing is prohibited on the Gemini Exchange**;

Designations and CFE Policy and Procedure XIX (Submission Time Frames). A chart that summarizes the Product specifications is also attached. The terms and conditions for XBT futures and the Assessment will become effective on December 1, 2017 ("Effective Date"). XBT futures will be listed for trading on CFE on a date to be determined by the Exchange through the issuance of a circular that is on or after the Effective Date.

XBT futures are cash-settled futures contracts that are based on the auction price of bitcoin in U.S. dollars on the Gemini Exchange. XBT futures are designed to reflect economic exposure related to the price of bitcoin. The final settlement value for XBT futures will be the official auction price (rounded to the nearest point) for bitcoin determined at 4:00 p.m. Eastern time on the final settlement date by the Gemini Exchange.

Bitcoin is a digital asset based on the decentralized, open source protocol of the peer-to-peer Bitcoin computer network ("Bitcoin Network"). The Bitcoin Network hosts the decentralized public transaction ledger, known as the Blockchain, on which all bitcoin is recorded. No single entity owns or operates the Bitcoin Network. The infrastructure of the Bitcoin Network is collectively maintained by a decentralized user base. Bitcoin can be used to

This product certification does not constitute or imply a CFTC endorsement of the use of digital currency generally, or bitcoin specifically.

Regulatory under Section 5c(c)(1) of the Act - view more

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Exhibit 8, page 2 of 26
22cv4563-CFTC-GEMINI-00014443

- **This statement is true**

- **Materiality is disputed**

- *Mens rea* is disputed

# Summary Judgment Should Be Denied

 GEMINI



**Statement 5**

The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. **As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order.** All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled.

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

Dkt. 83-11 at 30

191

# Summary Judgment Should Be Denied





**Statement 6**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(iv) all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded;

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



## C'boe

**Statement 7**

**Data from data.bitcoinity.org** reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. As of August 28, 2017, 553 market participants have traded at least once in a Gemini Exchange auction for bitcoin in U.S. dollars. **The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.**

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   22cv0463-CFTC-GEMINI-0001/487
Exhibit 11, page 2 of 52

# Summary Judgment Should Be Denied



**Statement 8**

**C'boe**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(v) **self-crossing is prohibited on the Gemini Exchange**;

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

Dkt. 83-11 at 34-35

194

# Summary Judgment Should Be Denied





**Statement 9**

The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. **As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order.** All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled.

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          23cv4563-CFTC-GEMINI-0007/134
Exhibit 15, page 3 of 27

# Summary Judgment Should Be Denied





**Statement 10**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(iv) all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded;

- **This statement is true**

- **Materiality is disputed**

- **_Mens rea_ is disputed**

# Summary Judgment Should Be Denied





**Statement 11**

**Data from data.bitcoinity.org** reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. As of August 28, 2017, 553 market participants have traded at least once in a Gemini Exchange auction for bitcoin in U.S. dollars. **The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.**

- **This statement is true**
- **Materiality is disputed**
- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied





**Statement 12**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(v) **self-crossing is prohibited on the Gemini Exchange;**

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied





**Statement 13**

The Gemini Exchange is a continuously operated, full-reserve exchange that enables customers to buy and sell digital assets, including bitcoin, for fiat currency or digital assets. The Gemini Exchange currently offers trading in bitcoin in U.S. dollars through a continuous order book with four different order types. **As a full reserve exchange, the Gemini Exchange requires all orders to be fully pre-funded with assets on deposit. Dollars must be deposited prior to placing a buy order to fully fund that buy order and bitcoin must be deposited before placing a sell order to fully fund that sell order.** All open orders on the Gemini Exchange from a Gemini Exchange market participant reduce that market participant's available balance to submit other orders on the Gemini Exchange until that market participant's pending orders are filled or canceled.

- **This statement is true**
- **Materiality is disputed**
- ***Mens rea* is disputed**

Dkt. 83-9 at 5

199

# Summary Judgment Should Be Denied





**Statement 14**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(iv) all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded;

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied

 **GEMINI**



**Statement 15**

**Data from data.bitcoinity.org** reflects that as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and that the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin. As of August 28, 2017, 553 market participants have traded at least once in a Gemini Exchange auction for bitcoin in U.S. dollars. **The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.**

- **This statement is true**
- **Materiality is disputed**
- ***Mens rea* is disputed**

Dkt. 83-9 at 6

201

# Summary Judgment Should Be Denied



 **FUTURES EXCHANGE**

**Statement 16**

There are a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price. Among these features of the auction process are that: ...

(v) **self-crossing is prohibited on the Gemini Exchange**;

- **This statement is true**

- **Materiality is disputed**

- *Mens rea* is disputed

# Summary Judgment Should Be Denied

 GEMINI

SAN Draft of November 2, 2017
CONFIDENTIAL

The Gemini Auction and the CFE Bitcoin (USD) Futures Contract is Not Susceptible to
Manipulation

**Statement 17**

## Pre-funding required for all orders at the auction.

The pre-funding requirement for all orders on the Gemini
Exchange (including both generally and with respect to
Gemini Exchange auctions) disincentives potentially
manipulative behavior.

with other cash bitcoin markets; this helps keep prices in line with broader market levels.

- *The future's contract will drive even more liquidity and competition to the Gemini auction.* The Gemini Exchange auction focuses trading activity to a single moment in time (the time of the auction), which enhances liquidity, market depth, and price discovery at that time. The settlement of an XBT futures contract to the auction result is likely to drive even greater participation and liquidity in the Gemini Exchange auction.

- *Surveillance of the Gemini auction and order book by Gemini and CFE limit all data available to CFTC Market Intelligence office.* In addition to these structural aspects, CFE will actively survell for potential manipulation of XBT futures, including through the utilization of both XBT futures trading data and Gemini information with regard to the trading of bitcoin on the Gemini Exchange (which CFE will receive through an information sharing agreement with Gemini).

- *5% auction collar.* There is a 5% collar on the auction price compared by the Gemini Exchange continuous order book mid-point price.

- *Closing cross is industry convention/industry standard.* The Gemini Exchange auction mechanism is similar to the "Closing cross" auction utilized on large stock exchanges, which is a widely accepted mechanism for determining the end-of-day price for an asset. For example, the NASDAQ Closing cross auction generates a closing price that is widely used throughout the industry, including Russell Indexes, Standard & Poor's and Dow Jones. Anticipated securities, except those dually listed on other exchanges, are eligible for the closing cross auction.

WARRENSTEIN

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ZDI-4565 CFTC-GEMINI 00017875

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



Case 1:22-cv-04563-AKH   Document 83-6   Filed 07/22/24   Page 4 of 9

GEMINI TRUST COMPANY, LLC

**March 10, 2017 Auction**

On March 10, 2017, an order submitted caused by large market orders resulted in the Gemini auction price

**Statement 18**

While price collars coupled with position limits and surveillance contribute to the soundness of the Gemini auction, **another strength of the auction is Gemini's pre-funding requirement. The need to maintain a cash balance in support of any order means that funds must be in a trader's account before an order is placed or else the Gemini system will reject the order.** To support large trades, firms would need to carry sizable cash deposits at Gemini where they don't earn interest or transfer money into their account in enough time for funds to clear before entering orders.

submitted in auction-only orders during the one-minute auction window while orders for 3120 bitcoin were cancelled and another 1551 bitcoin became immediately due to price improvement.

Meanwhile the quantity of bitcoin to buy via market orders actually increased due to the drop in indicative prices. The end result of the auction was price improvement of almost 1% (2.95%), a net doubling of the auction of auction-only sell orders from 24 to 48, and an increase in the volume executed against marketable auction-only orders from 41% to 95%.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    22cv4563-CFTO-GEMINI-00071981
Exhibit 6, page 1 of 3

- **This statement is true**
- **Materiality is disputed**
- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



**GEMINI**

**Statement 19**

**Cost of Capital** - **All orders must be pre-funded — dollars must be deposited prior to placing a buy order and bitcoin must be deposited before placing a sell order— and participants are not permitted to place an order unless they have enough funds in their account** to place such order (orders that are submitted without backing funds are rejected). As a result, no participant's outstanding interest on our books can exceed their account balance at any time and all open orders reduce a participant's available balance until such orders are fulfilled or canceled. Therefore, it is costly for a malicious market participant to engage in manipulative tactics.

In broad terms, a Walrasian tâtonnement auction is a type of private-goods auction in which each agent calculates its demand for the good at every possible price and submits this to an auctioneer. The price is then set so that the total quantity demanded across all agents equals the total quantity supplied of the good.

Confidential Treatment Requested by Gemini Pursuant to FOIA          GEM_CFTC084666

- **This statement is true**
- **Materiality is disputed**
- *Mens rea* **is disputed**

# Summary Judgment Should Be Denied

 **GEMINI**

Case 1:22-cv-04563-AKH   Document 100-8   Filed 05/07/24   Page 2 of 4
FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

**GEMINI**

**Statement 20**

**Time Priority** - We do not permit the cancellation of any auction orders in the final minute leading up to the Gemini Auction Price. **Participants can only add to their position**, thereby (1) **making it costly for them to try to influence the Gemini Auction Price** in the last sixty (60) seconds and (2) reducing the opportunity for "spoofing" of the auction order book.

- **Arbitrage** - A closing cross is well understood by arbitrageurs, making it easy for market participants to interact with the auction. This arbitrage serves to cause prices to move into proper alignment. Because bitcoin is fungible, it can be arbitraged across exchanges. This constrains the possibility of price manipulation on any one exchange because manipulation of the price on any one venue would require manipulation of that global price of bitcoin to be effective — a prohibitively costly activity. As a result, price discrepancies across trading venues will be reduced as arbitrage forces converge prices to within the bounds of arbitrage.

- **Price Discovery** - The Gemini Auction focuses trading activity to a single moment. As a result, the quality of the price discovery process is enhanced because of the enhanced liquidity and depth of the market at the concentrated point in time.

In broad terms, a Walrasian tâtonnement auction is a type of simultaneous auction in which each agent calculates its demand for the good at every possible price and submits this to an auctioneer. The price is then set so that the total quantity demanded across all agents equals the total quantity supplied of the good.

Confidential Treatment Requested by Gemini Pursuant to FOIA            GEM_CFTC084666

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



Case 1:22-cv-04563-AKH   Document 100-6   Filed 05/07/24   Page 1 of 4
FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC



**Statement 21**

**Self-Trade Prevention - We prohibit the same market participant from crossing with himself or herself (either intentionally or unintentionally)** on a continuous trading order book or in a Gemini Auction.

exchanges throughout Europe and Asia. In addition, a closing cross is widely accepted as the anti-chaty "price" of a given asset, even if a significant amount of trading volume occurs on multiple venues.

**Gemini Auction** - We believe the Gemini Auction has a number of attributes that promote the integrity of the auction price and discourage manipulative conduct.

- **Arbitrage** - A closing cross is well understood by arbitrageurs, making it easy for market participants to interact with the auction. This arbitrage serves to cause prices to move into proper alignment. Because bitcoin is fungible, it can be arbitraged across exchanges. This constrains the possibility of price manipulation on any one exchange because manipulation of the price on any one venue would require manipulation of that global price of bitcoin to be effective — a prohibitively costly activity. As a result, price discrepancies across trading venues will be reduced as arbitrage forces converge prices to within the bounds of arbitrage.

- **Price Discovery** - The Gemini Auction focuses trading activity to a single moment. As a result, the quality of the price discovery process is enhanced because of the enhanced liquidity and depth of the market at the concentrated point in time.

In broad terms, a Walrasian tâtonnement auction is a type of price/clearing auction in which each agent calculates its demand for the good at every possible price and submits this to an auctioneer. The price is then set so that the total quantity demanded across all agents equals the total quantity supplied of the good.

Confidential Treatment Requested by Gemini Pursuant to FOIA    GEM_CFTC084666

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



Case 1:22-cv-04563-AKH    Document 103-21    Filed 03/07/24    Page 6 of 89
FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

## GEMINI

**Statement 22**

**19. Could a trader break the auction by distorting the continuous market?**

Because we require the Gemini Auction Price to be within 5% of the midpoint of the continuous trading book, it is possible for a malicious market participant to intentionally attempt to exceed this threshold by manipulating either the Gemini Auction Price itself or the midpoint of the continuous trading book. Such manipulation would likely be very easy to detect since it would be concentrated over a short period of time and involve direct interaction with either the price levels at the inside of the continuous trading book (i.e., the highest bid and lowest offer) or the Gemini Auction Price pricing itself. Furthermore, other market participants are strongly economically motivated to counteract or arbitrage any such occurrence in order to receive fills at their desired prices.

Moreover, the manipulation of the continuous trading book would likely require substantial capital commitment and not yield a predictable outcome for the malicious market participant. Because the futures contracts settle to the Gemini Auction Price rather than to the continuous market prices, there is no guarantee that contract settlement would be affected favorably for the malicious participant. In fact, in the event of a failed Gemini Auction, the procedure outlined in Question 12 would determine the settlement price, likely thwarting any attempted manipulation.

Similarly, because placing orders on the continuous market (and in the Gemini Auction) requires capital to be held (as discussed above), spoofing and other manipulative techniques are typically quite expensive and inefficient as well.

Confidential Treatment Requested by Gemini Pursuant to FOIA    GEM_CFTC173218

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



**GEMINI**

**Statement 23**

**8. Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?**

We have implemented a trading fee program which is available to all of our market participants; we have no specifically defined market maker program. In summary, fees are typically charged for liquidity-taking trades, but these fees can be reduced through high trading volumes and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but rebates can be earned in a similar way. The details are available at https://qemini.com/fee-schedule/. In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participants typically make up approximately 90% of volume in the auctions.

Confidential Treatment Requested by Gemini Pursuant to FOIA          GEM_CFTC173218

- **This statement is true**
- **Materiality is disputed**
- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



## GEMINI

**Statement 24**

**10. Could an auction occur where there is one participant trading with themselves?**

No, we have instituted self-trade prevention.

NYBL's.[7] Under the NYBL, a "trust company" has general powers available to banks and trust companies, as well as powers generally associated with trustees and other fiduciaries.

Apart from general fiduciary powers and obligations, the following activities are among those specifically identified in the statute as activities that New York trust companies may conduct with respect to their fiduciary accounts, including (i) the power to accept deposits exclusively in a fiduciary capacity, to receive and disburse money, to transfer, register and countersign evidences of indebtedness or other securities, and to act as attorney in fact or agent and (ii) the power to accept appointment as receiver, trustee, or committee of the property of an estate of any person in insolvency or bankruptcy proceedings.[?]

A limited purpose trust company must conduct its business and operations subject to the limitations or restrictions as the NYSCFS may prescribe in its sole discretion. In practice, most limited purpose trust companies typically engage in activities such as employee benefit trust, personal trust, corporate trust, transfer agency, securities clearance, investment management, and custodial services. A trust company, including a limited purpose trust company like Gemini, can serve as the custodian of customer funds itself.

Under the NYBL, the same general procedures, requirements and criteria for the formation of a full service bank apply also to the formation of a limited purpose trust company with two exceptions: (i) no requirement to carry FDIC insurance and (ii) a level of capitalization deemed satisfactory to the Superintendent of NYSDFS. Once submitted in acceptable form, a limited purpose trust company application receives the same level of scrutiny as other bank and trust company proposals and ultimately requires the approval of the Superintendent of NYSDFS. In addition, trust companies are subject to many of the same requirements that apply to a bank

[?] See N.Y. Banking Law § 100 et seq (McKinney).
[?] Ibid.

Confidential Treatment Requested by Gemini Pursuant to FOIA       GEM_CFTC173218

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



**Statement 25**

| To: | Leahy, Thomas M., Jr. [tleahy@CFTC.gov] |
| Cc: | Reinstein, Art [Reinstei@cboe.com] |
| From: | Gordon, Nicole [gordon@cboe.com] |
| Sent: | Tues 8/1/2017 5:25:34 PM (UTC-4:00) |
| Subject: | CFTC Data Request Response – CFE FOIA CONFIDENTIAL TREATMENT REQUESTED |

CFE FOIA Request Information and Email Dated August 1 2017.pdf

Tom,

I am sending overnight for delivery tomorrow via FedEx a package with a CD-ROM containing the raw data used to create the graphs and charts in the Appendix of the cash-settled (USD) bitcoin futures product presentation that occurred on July 25, 2017. I am also attaching a letter requesting FOIA confidential treatment of this email and the information contained on the CD-ROM.

Please let me know if you do not receive the package tomorrow and also if you have any questions or would like further information.

Thanks,
Nicole

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          22ov4565/CFTC-GEMINI-00011350

- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied





- **This statement is true**

- **Materiality is disputed**

- *Mens rea* **is disputed**

Dkt. 83-2 at 7

212

# Summary Judgment Should Be Denied





- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

Dkt. 83-2 at 4

213

# Summary Judgment Should Be Denied





- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

Dkt. 83-2 at 7

214

# Summary Judgment Should Be Denied

 **GEMINI**



- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied



**Statement 30**



- **This statement is true**

- **Materiality is disputed**

- ***Mens rea* is disputed**

# Summary Judgment Should Be Denied





- **This statement is true**
- **Materiality is disputed**
- ***Mens rea* is disputed**

Dkt. 83-2 at 7

217

# The Disputed Statements

# There Are Fact Disputes Over Who Made the Statements in the August 25 Submission (Statements 22-24)

GEMINI



- Sent by Cboe to CFTC

- No Gemini employees copied

- Cboe made "ultimate[] ... decision to submit"

- Cboe had ability to modify before submitting

- Gemini couldn't force Cboe to submit

Dkts. 109-21 at 6; 109-17 (Reinstein Tr. 159:4-160:12); 109-22 (C. Winklevoss Tr. 535:17-536:10)

219

# There Are Fact Disputes Over Who Made the Statements in the September 12 Submission (Statements 19-21)

 GEMINI

- Sent by Cboe to CFTC

- No Gemini employees copied

- Cboe made "ultimate[] ... decision to submit"

- Cboe had ability to modify before submitting

- Gemini couldn't force Cboe to submit

Dkts. 109-14 at 145; 109-17 (Reinstein Tr. 159:4-160:12); 109-22 (C. Winklevoss Tr. 535:17-536:10)

220

# There Are Fact Disputes Over Who Made the Statements in the November Talking Points (Statement 17)

⫴ GEMINI



- Submitted by lawyer named Ken Raisler

- Decision to send made during call between Raisler, Reinstein and Gordon – with nobody from Gemini involved

- Cboe made "ultimate[] … decision to submit

- Cboe had ability to modify before submitting

- Gemini could not force Cboe to submit

Dkts. 109-32 at 3; 109-17 (Reinstein Tr. 159:4-160:12); 109-22 (C. Winklevoss Tr. 535:17-536:10)

221

# Motion in Limine 1

## Gemini Seeks to Preclude

 GEMINI

- **Issue 1:** What decisions the CFTC made or could have made regarding the Self-Certification;

- **Issue 2:** What information the CFTC considers when reviewing self-certifications or compliance with Core Principle 3;

- **Issue 3:** The CFTC's evaluation, review, understanding, or analysis of the Bitcoin Futures Contract or Gemini;

- **Issue 4:** Why the CFTC did or did not ask for specific information before CFE filed the Self-Certification;

- **Issue 5:** The CFTC's understanding of "pre-funding"; and

- **Issue 6:** Whether anything said in connection with the Self-Certification was false or misleading.

## Classic Sword and Shield Situation





The CFTC should be precluded from offering evidence on topics where it refused to provide discovery

224

# MIL 1: Questions

# The CFTC's August 17 Questions





## Christopher Goodman

*Economist*



**Questions for CFE:**

1. Does CFE plan on providing any "hedge" or other exemptions to the proposed futures contract position limits?
2. What is the basis of the proposed position limits? How do the contract position limits compare to the size of the daily Gemini auctions?
3. Does CFE have the ability to access Gemini trade data? Would CFE have the ability to share that data with the commission?

**Questions for Gemini:**

4. What are the requirements and responsibilities resulting from Gemini's licensing with the NYS DFS?
5. How would one arbitrage across Gemini and other bitcoin platforms? It is argued that bitcoin is hard to arbitrage across markets given transaction costs and the slow settlement processing time. Could you please provide information to show that prices on Gemini can be successfully arbitraged (Ex. Strong correlation in price changes between Gemini prices and prices on other exchanges? When prices get out of line they quickly converge?)
6. Does Gemini have insights into participant's positions on other Bitcoin exchanges? Are participants contractually obligated to share information with Gemini on their Bitcoin positions or activity away from the Gemini Exchange?
7. How does Gemini envision forks in the bitcoin blockchain affecting continuous trading, the auction process and prices?
8. **Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?**
9. Does Gemini envision adopting any minimum thresholds on numbers of participants and auction volumes to consider an auction successful?
10. Could an auction occur where there is one participant trading with themselves?

Dkt. 100-36 at 2-3

226

# Gemini's August 25 Answers



Case 1:22-cv-04563-AKH   Document 100-21   Filed 05/07/24   Page 9 of 94
FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC



**Questions for Gemini**

4. What are the requirements and responsibilities resulting from Gemini's licensing with the NYSDFS?

*Regulatory Oversight:* Gemini Trust Company, LLC ("Gemini" or "we") sought to comply with the New York State Department of Financial Services (the "NYSDFS") to obtain a limited purpose trust company license. The term "limited purpose trust company" refers to entities that are chartered under the bank and trust company provisions of the New York Banking Law ("the NYBL").[1] Under the NYBL, a "trust company" has general powers available to banks and trust companies, as well as powers generally associated with trustees and other fiduciaries.

Apart from general fiduciary powers and obligations, the following activities are among those specifically identified in the statute as activities that New York trust companies may conduct with respect to their fiduciary accounts, including (i) the power to accept deposits exclusively in a fiduciary capacity, (ii) receive and disburse money, to transfer, register and countersign evidences of indebtedness or other securities, and to act as attorney in fact or agent and (iii) the power to accept appointment as receiver, trustee, or committee of the property of an estate of any person in insolvency or bankruptcy proceedings.[2]

A limited purpose trust company must conduct its business and operations subject to the limitations or restrictions as the NYSDFS may prescribe in its sole discretion. In practice, most limited purpose trust companies typically engage in activities such as employee benefit (retirement) trust, corporate trust, transfer agency, securities clearance, investment management, and custodial services. A trust company, including a limited purpose trust company like Gemini, can serve as the custodian of customer funds itself.

Unlike the NYBL, the term general provisions requirements and criteria for the formation of a full-service bank apply also to the formation of a limited purpose trust company with two exceptions: (i) no requirement to carry FDIC insurance and (ii) a level of capitalization deemed satisfactory to the Superintendent of NYSDFS. Once submitted in acceptable form a limited purpose trust company application receives the same kind of scrutiny as other bank and trust company proposals and ultimately requires the approval of the Superintendent of NYSDFS. In addition, trust companies are subject to many of the same requirements that apply to a form.

[1] See N.Y. Banking Law § 102 et seq. (Minimum)
[2] Ibid.

Confidential Treatment Requested by Gemini Pursuant to FOIA      GEM_CFTC173218

**8. Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?**

We have implemented a trading fee program which is available to all of our market participants; we have no specifically defined market maker program. In summary, fees are typically charged for liquidity-taking trades, but these fees can be reduced through high trading volumes and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but rebates can be earned in a similar way. The details are available at https://gemini.com/fee-schedule/. In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participants typically make up approximately 90% of volume in the auctions.

**9. Does Gemini envision adopting any minimum thresholds on numbers of participants and auction volumes to consider an auction successful?**

At this time, we have not, and we have not seen similar requirements for the point-in-time auctions of other asset classes. We strongly believe market forces will encourage participation in auctions which affect futures settlement, especially if such participants observe arbitrage opportunities.

**10. Could an auction occur where there is one participant trading with themselves?**

No, we have instituted self-trade prevention.

## The CFTC Blocks Questioning





**Christopher Goodman**

*Economist*



Q. Do you recall why you asked Question 10 to Exhibit 13?

**MR. RODGERS:** **Objection on the basis of the deliberative process privilege. And an instruction not to answer.**

Q. Do you recall why you asked Question 8 on Exhibit 13?

**MR. RODGERS:** **Same objection. Same instruction.**

Dkt. 112-2 (Goodman Tr. 212:11-19)

228

# The CFTC's Arguments on Summary Judgment

 **GEMINI**



*Third*, after Gemini represented it had a market maker rebate program on July 25, 2017, the CFTC inquired directly, in writing, for more information about Gemini's market maker rebate program. (56.1 Statement ¶¶ 73-74; Ex. 34 at GEM_CFTC085490.) The CFTC's direct inquiry further substantiates the materiality of Gemini's rebate practices to the CFTC's review of the product certification. *See United States v. Chan Lo*, 2016 WL 9076234, at *8 (S.D.N.Y. Feb. 4, 2016) ("The false statements may be material to any proper matter of inquiry, including collateral matters that might influence the outcome of decisions . . .."), *aff'd*, 679 F. App'x 79 (2d Cir. 2017). And, the fact that bespoke fee arrangements that Gemini provided to certain market makers were being exploited until September 2017 as part of a collusive or wash trading scheme (which, according to Gemini, manipulated its exchange) underscores the importance of market marker rebate practices to trading volume and liquidity, and thus to the CFTC's review. (56.1 Statement ¶¶ 134-144.)