```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   COMMODITY FUTURES TRADING
     COMMISSION,
 4
                     Plaintiff,
 5
                 v.                          22 Civ. 4563 (AKH)
 6                                              Oral Argument
     GEMINI TRUST COMPANY LLC,
 7
                     Defendant.
 8
     ------------------------------x
 9                                           New York, N.Y.
                                             July 23, 2024
10                                           1:00 p.m.

11   Before:

12                 HON. ALVIN K. HELLERSTEIN,

13                                           District Judge

14                        APPEARANCES

15   U.S. COMMODITY FUTURES TRADE COMMISSION
          Attorneys for Plaintiff
16   BY:  ANDREW J. RODGERS
          K. BRENT TOMER
17        ALEJANDRA de URIOSTE
          PETER JANOWSKI
18        DIANA WANG

19   BAUGHMAN KROUP BOSSE PLLC
          Attorneys for Defendant
20   BY:  JOHN F. BAUGHMAN
          DANIEL A. SCHWARTZ
21        ELIZABETH LEE

22   ALSO PRESENT:
              Shannen Dotson, Technical Specialist (plf)
23            Clinton Lam, Technical Specialist (deft)

24

25
```

1             (In open court)

2             THE COURT:  I want to apologize to everybody about

3    this morning.  I would give you excuses, but they are not

4    relevant.  I inconvenienced the whole lot of you, and I'm

5    sorry.  We will go today until 4:00 and, if necessary, we'll

6    resume tomorrow.  Okay.

7             (Case called)

8             DEPUTY CLERK:  Counsel, please state your appearance

9    for the record.

10            MR. RODGERS:  Good afternoon, your Honor.  Andrew

11   Rodgers for the Commodity Futures Trade Commission.  I'm joined

12   today by my colleague, Diana Wang, Brent Tomer, Alejandra

13   de Urioste, Peter Janowski, and with us at counsel table is

14   Shannon Dotsun, who will be our courtroom technology

15   coordinator.

16            THE COURT:  Thank you.

17            MR. BAUGHMAN:  Good afternoon, your Honor.  Jack

18   Baughman on behalf of Gemini.  With me are my colleagues Daniel

19   Schwartz and Elizabeth Lee.  We also have assistance from

20   Mr. Clinton Lam, who is the technical man.

21            THE COURT:  Thank you all.

22            Mr. Rodgers, why don't you take the podium, and we

23   will start not with a discuss of *Janus*, as I ordered

24   supplementally, but with the first statement that is alleged to

25   be a representation, and in discussing that, we will discuss

1  all the issues that come up with who was the maker and so on;

2  in reality, whatever is relevant to that issue.

3          MR. RODGERS:  Yes, your Honor.  Before we jump into

4  the statements, we have prepared a demonstrative that I think

5  will help guide the discussion today on the false and

6  misleading statements that were made by Gemini.  I have a

7  demonstrative prepared for the Court as well as counsel, and it

8  just lists out the false statements.

9          THE COURT:  Have you shown this to Mr. Baughman?

10          MR. RODGERS:  I'm sorry.

11          THE COURT:  Have you shown it to Mr. Baughman?

12          MR. RODGERS:  Not before today, your Honor.

13          THE COURT:  Then you can't use it.

14          MR. RODGERS:  Okay.

15          THE COURT:  I don't know why this is so -- if you are

16  going to use a document in court, courtesy says give it to your

17  adversary, let your adversary see it.

18          MR. RODGERS:  Understood, your Honor.  I would just

19  note that the statements that are in the demonstrative that we

20  prepared are from the Exhibit A to our motion for summary

21  judgment, and they were provided in the context of

22  interrogatories that we responded to.  It's just those

23  statements broken out by category so that, you know, it's

24  nothing new.  It's just a reorganization of what we've already

25  provided.

```
 1              MR. BAUGHMAN:  Your Honor, might I be heard very

 2    briefly?

 3              THE COURT:  Yes, of course.

 4              MR. BAUGHMAN:  I don't object.  And I don't object

 5    because I also have prepared slides.  We did a tech run through

 6    both sides.  I think there was a tacit understanding on both

 7    sides we would be able to use technology for that, so I do not

 8    object.

 9              THE COURT:  It's not my way, folks.  It's not my way.

10    I don't believe in trial by surprise.  I also don't believe in

11    trial by epithet, and I find the first three pages of your

12    brief, Mr. Baughman, I won't characterize it, but all it is is

13    epithets against your adversary.  What do you think a judge

14    does with that?  He just flips it.  It's not becoming to you.

15    It takes away from your argument.  I see it so many times, and

16    it's just the wrong thing to do.

17              All right.  Now I've vented, let's go.  You want to

18    use your demonstrative, you may.

19              MR. RODGERS:  May I approach the bench, your Honor?

20              THE COURT:  You may.

21              MR. RODGERS:  Your Honor, just briefly today on the

22    division of labor, I am going to be covering the false

23    statements related to prefunding and the cost of capital.

24    These are the Group One statements.  My colleague, Diana Wang,

25    will cover Gemini Groups Two and Three which are Gemini's
```

1    statements that deal with free rebate program and the

2    self-trade prevention capabilities.  And then I will return to

3    address the fourth group of false statements which relate to

4    volume and liquidity.

5            Starting with the group one statements.  We have

6    excerpted them here in the demonstrative on pages 1 through 6.

7    There are 15 total false statements that fall into the category

8    of statements about Gemini's prefunding requirement and the

9    relating cost of capital to trade on Gemini.  The statements

10   related to prefunding and cost of capital have been organized

11   chronologically with the first statements being the ones that

12   were made on July 25.  And then we've broken it out basically

13   where we have the advocacy submissions first.  And then at the

14   end we have the certification letters.  So I think it makes

15   sense to cover the submissions that we're advocating for the

16   product.

17           THE COURT:  I'd rather you did it by a particular

18   statement.

19           MR. RODGERS:  Understood, your Honor.  So it's

20   important to clarify upfront that the prefunding requirement

21   was a key feature of Gemini's exchange which Gemini repeatedly

22   touted.

23           THE COURT:  Mr. Rodgers, look up from your notes.

24           MR. RODGERS:  Understood, your Honor.

25           THE COURT:  Did you hear what I said?

1              MR. RODGERS:  Yes, your Honor.

2              THE COURT:  Then do it.  Pick out a statement and work

3    with that statement.

4              MR. RODGERS:  Your Honor, let's start with the first

5    statement on the demonstrative is statement 26.

6              THE COURT:  Okay, I have it.

7              MR. RODGERS:  Your Honor, for context this statement

8    26 and statement 27 come from a July 25, 2017 presentation that

9    Gemini made, along with CBOE, which is the futures market that

10   Gemini partnered with to list the futures contract.  They met

11   with the CFTC on July 25, 2017.  In advance Gemini and CBOE

12   provided a slide deck that includes slides that Gemini drafted.

13   This presentation referenced prefunding twice.  So the first

14   reference, if we go to the actual slide presentation which is

15   CFTC Exhibit 16, which is what I'm going to refer to them with

16   my tech coordinator is GX-16, starting on page 2 this is the

17   presentation from July 25, 2017.

18             If we go to slide 2 of the presentation which is GX-16

19   at 3, we see Gemini's first statement about its prefunding

20   requirement.  Here you see under the second bullet point

21   settlement price not readily susceptible to manipulation.  One

22   of the key features is that the prefunding requirement for

23   auction only orders allows for heightened surveillance.  That's

24   the first statement about prefunding tying it directly to what

25   is commonly referred to as core principle three which requires

 1  the contract and settlement mechanism that Gemini was

 2  responsible for not be readily susceptible to manipulation.

 3  Here they're saying the prefunding requirement goes to that

 4  core principle three.

 5          On the next slide, if we go to GX-16 at 3, you see the

 6  second -- sorry -- GX-16 at 6 please.  This slide 4 of the

 7  presentation deck.  Here we have a summary slide about Gemini's

 8  auction mechanics, and here there's a bullet protections, and

 9  the first bullet says:  "As with all Gemini orders, auction

10  orders must be fully prefunded."

11          Everybody knew what Gemini meant when it said that its

12  orders needed to be fully prefunded.  It meant that traders

13  have sourced their own funds and were not trading on Gemini's

14  dime.  They weren't trading on margin, leverage, or credit

15  provided by Gemini.  Cameron Winklevoss summed up what

16  prefunding meant at his deposition.  I think it's helpful to

17  look at his deposition transcript, which is CFTC Exhibit 1.

18  It's GX-exhibit 1 at page 107.  This is page 552 of his

19  deposition transcript at the bottom, and we've highlighted the

20  text.  He's asked at line 22:  "It's Gemini's users that fully

21  fund the orders; is that right?

22  "A.  Correct."

23          If we go to the next page, which is 108, he continues

24  and says, "We are a full reserve exchange.  It looks like we

25  described it as orders being also prefunded, another way to

1   describe full reserve or fully funded.  They're all speaking to

2   the same thing."

3           Then he's asked:

4   "Q.  What is the connection between fully funded orders and

5   attempted manipulation?"

6           He says:  "Well, if assets have to be delivered to a

7   venue, then that makes it harder to manipulate in the sense

8   that people have to trade with physical assets" - this is the

9   key part - "as opposed to getting credit or margin, and I guess

10  they can scale their trading and engage in more manipulative

11  activity."

12          Other witnesses that were deposed in this matter

13  understood that prefunding meant there was no margin, credit or

14  leverage being provided to traders to allow them to scale their

15  trading activity.  We deposed CBOE witnesses, the two inhouse

16  counsel Arthur Reinstein and Nicole Pursley.  They both

17  testified Arthur Reinstein testified that prefunding meant

18  there's no margin.  And when further asked to clarify what

19  margin meant, he said traders were not being given credit or

20  funding from another party in order to place the order.  For

21  the Court's reference and for the transcript that is CFTC

22  Exhibit 8 that was on page 53 of his deposition transcript.

23  His testimony was in singe with Nicole Pursley.  She was

24  formerly known as Nicole Gordon, another inhouse counsel at

25  CBOE.  She said she understood prefunding.  She specifically

1    said that her understanding is that the prefunded element meant

2    that trades had to be 100 percent funded.  You weren't trading

3    on margin or leverage.

4         This is the exact same message that was relayed to the

5    CFTC at the July 25 meeting.  Chris Goodman an economist at the

6    CFTC testified that the message relayed to him was essentially

7    that the trader is --

8         THE COURT:  Let me stop you for a minute.  Prefunding

9    was Gemini's word, was it not?

10         MR. RODGERS:  It was a concept that Gemini touted to

11    the CFTC.

12         THE COURT:  Who developed that word, that sentence

13    prefunding?

14         MR. RODGERS:  Prefunding is a word that Gemini used to

15    satisfy the core listing requirements for the futures product.

16         THE COURT:  Now there's a common understanding of

17    prefunding.

18         MR. RODGERS:  There is a common understanding from the

19    witnesses in this case what prefunding meant, yes.

20         THE COURT:  Departing from the witnesses and looking

21    at a general usage, so when one sees prefunding, that means

22    funded before the transaction.  That's what an ordinary English

23    meaning of prefunded is.

24         So I'm going to ask you a question.  Let's suppose

25    that the customer borrows money from the bank and uses that

 1    money to put into his account.  Is that a prefunded account?

 2          MR. RODGERS:  So, your Honor, I think there's a

 3    distinction between the common understanding of the word

 4    prefunded and the message that was conveyed and the common

 5    understandings of the parties in this case.

 6          THE COURT:  I want to ask you the question and you

 7    have to answer my question.

 8          MR. RODGERS:  Understood, your Honor.

 9          THE COURT:  Then do it.

10          MR. RODGERS:  That would be a different scenario

11    because the point here was that prefunded meant that Gemini was

12    not providing or facilitating margin, leverage or credit.

13          THE COURT:  Did you hear my hypothetical?

14          MR. RODGERS:  Your hypothetical is -- yes.  That would

15    satisfy the requirements that the account was prefunded with

16    assets sourced by the trader, but the distinction I'm trying to

17    raise is that the message that was conveyed --

18          THE COURT:  Mr. Rogers, do you have to make a decision

19    in the case or do I have to make a decision in the case?

20          MR. RODGERS:  Your Honor, you have to make a decision

21    in the case.

22          THE COURT:  Why don't you pay attention to my question

23    and answer my question.

24          MR. RODGERS:  Your Honor, I'm trying my best to answer

25    your question.

1          THE COURT:  Just listen.  First listen.  The first

2     thing to do to answer a question is to listen to the question.

3          MR. RODGERS:  Yes, your Honor.

4          THE COURT:  The question is if someone, a customer,

5     borrows money from his bank that he uses all the time and puts

6     that money into his accounts and then trades with it, is that a

7     prefunded transaction?

8          MR. RODGERS:  In that situation, the trader is trading

9     with an asset that it sourced, and, yes, it personally

10    prefunded its own account.

11         THE COURT:  Let's suppose it borrows from the broker.

12    It's making a trade with a broker, and it borrows the money

13    from the broker and puts that money into his account.  Is that

14    prefunded?

15         MR. RODGERS:  I guess I'd like to clarify whether the

16    broker is also the Exchange or affiliated with the Exchange or

17    an independent separate entity?

18         THE COURT:  It's whoever it is, it's the entity that

19    is going to execute a buy transaction.  And so I, the customer,

20    go up to this broker that I use all the time to buy stocks for

21    me or commodities for me or swaps for futures for me, and I

22    said, lend me 30 percent of the transaction and I'll make a

23    transaction with you.  Is that prefunded?

24         MR. RODGERS:  No, your Honor.  Because you're talking

25    about leverage and margin that's being facilitated by a broker,

1    so, no, that would be --

2            THE COURT:  So the distinction you're drawing is that

3    prefunded can accommodate someone who finances elsewhere, puts

4    the money into the account and uses it as opposed to obtaining

5    money from a party that's going to execute the trades.

6            MR. RODGERS:  Yes, that's the distinction we're

7    making.

8            THE COURT:  Now let's suppose the party, the broker

9    who is going to execute if the trades doesn't himself make the

10   loan to you, doesn't himself extend the margin but gets an

11   affiliate company to extend the margin, would that make a

12   difference?

13           MR. RODGERS:  That would not be a situation where the

14   loan was fully prefunded because you're facilitating -- the

15   broker in that situation is facilitating the provision of

16   margin and leverage to trade.

17           THE COURT:  So your point is that it's the same if the

18   broker extends the margin or if an affiliate of the broker

19   gives the loan.

20           MR. RODGERS:  Correct.

21           THE COURT:  Mr. Baughman, how do you feel about that?

22           MR. BAUGHMAN:  We disagree, your Honor.

23           THE COURT:  I think it would be easier if -- well, go

24   ahead.  I can hear you very well.  I want this interplay.

25           MR. BAUGHMAN:  Okay.  I would like to show you, if I

1    might, please, the statement.  Because if we could look,

2    please, at slide 187 which is the statement, I think it will be

3    very helpful.

4           Mr. Rogers, might I stand at the podium so I can use

5    the microphone?

6           MR. RODGERS:  Sure.  I don't know where I'm supposed

7    to go with that, but okay.  Do you want to give me a second?

8           MR. BAUGHMAN:  There is an important --

9           THE COURT:  Mr. Baughman, we're going to be here for

10   three hours.

11          MR. BAUGHMAN:  I understand.  I will give Mr. Rogers

12   obviously as much time as we possibly need.

13          The key thing, your Honor, when it comes to the

14   statements, your Honor has already ruled, is the words.  You

15   have said that materiality and misrepresentation depend on the

16   words that are used.  So it is important to look at exactly the

17   words that are at issue, and I have on the screen statement

18   number one.

19          THE COURT:  The word is prefunded.

20          MR. BAUGHMAN:  But it gives a definition, your Honor.

21          THE COURT:  Sorry?

22          MR. BAUGHMAN:  The key thing is, this is a statement,

23   it is actually not a statement by Gemini.  It is a statement by

24   CBOE in the self-certification.  Gemini did not make this

25   statement, but it is one of the ones at issue.

```
 1              THE COURT:  Just a moment.  Who originated the
 2    statement prefunded?  Who originated that phrase?
 3              MR. BAUGHMAN:  Where did the word prefunding come
 4    from?  I think it's a statement that Gemini used.  I'm not
 5    disputing that.
 6              THE COURT:  Mr. Baughman, who originated the phrase
 7    prefunded?
 8              MR. BAUGHMAN:  In the world, I don't know.  In this
 9    context, I acknowledge that it was a word Gemini used that CBOE
10    then picked up on.  Absolutely.  I agree with that.
11              THE COURT:  We'll get to the Janus issue a few
12    minutes.  Let's focus what I'm asking about.
13              MR. BAUGHMAN:  I am trying to, your Honor.
14              THE COURT:  You made a point to shorten this.  Get
15    away from the rhetoric.  You made a point in your brief that
16    there's a distinction between Gemini itself advancing the money
17    which would be margin, and one of its affiliated companies
18    extending the money.
19              MR. BAUGHMAN:  Correct, your Honor.
20              THE COURT:  And is that a distinction --
21              MR. BAUGHMAN:  That is a distinction.
22              THE COURT:  Could you not interrupt me?
23              MR. BAUGHMAN:  I apologize.  I didn't realize.  I'm
24    sorry.
25              THE COURT:  I will ask you the same question I asked
```

1    Mr. Rogers.  Who is going to make this decision, you or I?

2              MR. BAUGHMAN:  You are, your Honor.

3              THE COURT:  So is it important to listen to what I'm

4    saying?

5              MR. BAUGHMAN:  Absolutely.

6              THE COURT:  As opposed to what you want to argue.

7              MR. BAUGHMAN:  It is.

8              THE COURT:  Then do it, please.

9              MR. BAUGHMAN:  Yes, sir.

10             THE COURT:  This misstatement that the CFTC alleges -

11   and we're focusing only whether it's a true statement or a

12   misstatement - is that there is no difference between margin

13   extended by Gemini and a loan extended by Gemini's affiliate.

14   Do you agree with that?

15             MR. BAUGHMAN:  I don't agree that that question is

16   relevant to the definition of prefunding.  I do agree that as a

17   matter of certain other things that's a relevant distinction,

18   but --

19             THE COURT:  You say it's a relevant distinction.

20             MR. BAUGHMAN:  I don't think it is relevant to the

21   definition of prefunded.  And if I can show you why.

22             THE COURT:  You argued that that's why it's not a

23   misrepresentation.

24             MR. BAUGHMAN:  Among other reasons, your Honor, that

25   is responsive to their point.

```
 1              THE COURT:  Well, let's take that reason first.

 2              MR. BAUGHMAN:  I'm sorry, I didn't hear the last --

 3              THE COURT:  Let's take that reason first.

 4              MR. BAUGHMAN:  Sure.

 5         Is there a distinction between -- can I give you an

 6    example, your Honor, that I think will illustrate the point

 7    very well?

 8              THE COURT:  Yes.

 9              MR. BAUGHMAN:  Show the slide with the robe.  Suppose

10    that your Honor wanted to buy a new robe.  You needed a new

11    robe.  And you went onto Amazon and you ordered a new robe, and

12    you clicked on the button to buy your robe now.  And you paid

13    for your new robe with an Amazon credit card.  Amazon issues

14    credit cards.  And you bought that robe using Amazon credit

15    card borrowing money from Amazon.  You would have prefunded the

16    purchase of that new robe.

17              THE COURT:  I don't believe so.  You're buying on

18    credit.

19              MR. BAUGHMAN:  But prefunding has nothing to do with

20    credit.

21              THE COURT:  You're buying on Amazon's credit which is

22    the opposite of prefunding in its ordinary sense.

23              MR. BAUGHMAN:  I disagree --

24              THE COURT:  Prefunding means -- I know you do, but I

25    have to make the ruling.  Prefunding means that there is
```

1    adequate amount of funds in the account in order to create the

2    transaction.

3              MR. BAUGHMAN:  Correct.

4              THE COURT:  If the funds have to be borrowed from the

5    seller, then it's not prefunded.

6              MR. BAUGHMAN:  That is not the definition that was

7    used in this case.  Can we please look at 187?

8              THE COURT:  Now let's go into that.  What is the

9    definition that was used in the case?

10             MR. BAUGHMAN:  Okay.  The definition that was used in

11   the case I have on the slide.  This is statement number one and

12   they're all consistent.  And I have it highlighted.  It says,

13   "As a full reserve exchange, the Gemini Exchange requires all

14   orders to be fully prefunded with assets on deposit.  Dollars

15   must be deposited prior to placing a buy order to fully fund

16   that buy order, and bitcoin must be deposited before placing a

17   sell order to fully fund that sell order."

18             There is no representation in there, no statement

19   whatsoever about borrowing or leverage.  None.  None

20   whatsoever.

21             THE COURT:  That's right.

22             MR. BAUGHMAN:  Could we please, Mr. Lam, go to slide

23   74.

24             THE COURT:  Let's stay with that for a moment.

25             MR. BAUGHMAN:  Okay.

1          THE COURT:  If you require all orders to be fully

2   prefunded with assets on deposit, that means you are not buying

3   with partial assets or assets insufficient to fully pay.  It

4   means you have assets in the account, so it's fully prefunded

5   with respect to the asset being purchased.

6          MR. BAUGHMAN:  Correct.  And that is the crucial

7   difference between a margin account because the way a margin

8   account works on Wall Street is you don't have the assets in

9   your account.  If you have the ability to trade on margin --

10  say I have a $10,000 margin limit with XYZ Brokerage.  I may

11  only have $100 in my account, but I am allowed to place a buy

12  order up to $10,000.

13         THE COURT:  That's because you're borrowing the

14  balance from the broker.

15         MR. BAUGHMAN:  Correct, which is not what is permitted

16  on Gemini.  What this statement says, the statement on --

17         THE COURT:  Everyone agrees with that.

18         MR. BAUGHMAN:  And that's why their position is

19  incorrect because they are relying on subjective

20  interpretations for which the evidence is strongly disputed.

21         THE COURT:  Is it a fair statement that a portion of

22  the transactions that were purchased in the Gemini Exchange

23  were purchased about money advanced by Gemini's affiliate?

24         MR. BAUGHMAN:  There is an affiliate called Pearl

25  Street which made a small number of loans.  There were, I think

```
 1    it is undisputed --

 2              THE COURT:  What would you define as a small portion?

 3              MR. BAUGHMAN:  Pardon me?

 4              THE COURT:  How would you define small portion?

 5              MR. BAUGHMAN:  The amount of trading that was done by

 6    the recipients of Pearl Street loans, there's a chart in

 7    Professor Skrzypacz's report.  I'm going to ask Mr. Schwartz to

 8    pull it up because I don't remember the percentage exactly.  I

 9    believe it's in the five to six percent range, but the

10    important thing to understand is that those entities also

11    traded with their own funds, so I am not sure there is evidence

12    in the record.

13              THE COURT:  Which are the entities that traded with

14    their own funds?

15              MR. BAUGHMAN:  For example, Circle.  An entity about

16    which there is the most is an entity called Circle.

17              THE COURT:  They traded with their own funds and they

18    traded with funds borrowed from the affiliate.

19              MR. BAUGHMAN:  I don't there is evidence in the record

20    able to disaggregate specifically how much was traded.  And if

21    you sort of accept that money is fungible or bitcoin is

22    fungible, it would be hard to answer that.

23              THE COURT:  The question I have to decide is whether

24    there was borrowing into the accounts from Gemini's affiliate,

25    and whether that fact causes a misrepresentation of the concept
```

1    of prefunding.  Those are the two questions I have to ask.

2              MR. BAUGHMAN:  Respectfully, your Honor, I think today

3    your job is more limited.  Your question is only to decide

4    whether or not there is a disputed fact on those issues in

5    which case it would go to a jury.

6              THE COURT:  Correct.  Correct.  But since I'm dealing

7    with the record, we can represent what the record is.  It's not

8    mysterious.  I just need an accurate representation of what's

9    in the record.

10             MR. BAUGHMAN:  I'm having my colleague look up the

11   figure.

12             THE COURT:  Maybe Mr. Rodgers has a perspective on

13   that.  What percentage of the transactions made through the

14   Gemini Exchange were funded by -- what's the name of the

15   affiliate?

16             MR. RODGERS:  Circle.  We don't have --

17             THE COURT:  No, the affiliate.

18             MR. RODGERS:  Pearl Street, formerly known as Gemini

19   Financial, but they changed their name in 2016.

20             THE COURT:  Do you know the percentage?

21             MR. RODGERS:  We don't have a specific number, but I

22   can draw your attention to several Pearl Street loan agreements

23   that required specific amounts of trading to occur on the

24   Gemini platforms.

25             THE COURT:  You don't know the order of magnitude of

```
 1    all Gemini trades, all buys.

 2              MR. RODGERS:  That's subject to expert discovery, and

 3    I don't think we need to get into that to determine if --

 4              THE COURT:  I asked if you know.

 5              MR. RODGERS:  I don't know.  I don't have that number

 6    available to me, your Honor.

 7              THE COURT:  Let me put this to you.  Let's say it's an

 8    infinitesimal amount, less than one percent.  Would that make a

 9    difference?

10              MR. RODGERS:  If the amount of trading that occurred

11    on the Gemini Exchange and in the Gemini Auction was

12    one percent, that probably wouldn't be an issue, but that's

13    not --

14              THE COURT:  That's why I'm pushing to get an order of

15    magnitude.  What are we -- what magnitude are we talking about?

16              MR. RODGERS:  We have loan agreements that require --

17              THE COURT:  But loan agreements don't tell you how

18    much was done.

19              MR. RODGERS:  They were required to trade as much as

20    25 percent.

21              THE COURT:  Of the loan.

22              MR. RODGERS:  They're required to make up almost

23    25 percent of the volume on Gemini's continuous order book.  If

24    we could pull up Exhibit 58.

25              THE COURT:  That would tell you that the inference to
```

1  be taken from that is that 25 percent of the buys were funded

2  by Pearl Street.

3          MR. RODGERS:  At the very least, and this was

4  consideration for the loan.  So in order to receive the loan--

5          THE COURT:  Do you concede that, Mr. Baughman?  Is

6  that issue a fact?

7          MR. BAUGHMAN:  Absolutely, your Honor.  What the

8  evidence is, as both Tyler Winklevoss and Cameron Winklevoss

9  have testified -- first thing, there were 35 loan agreements.

10  The condition that he is referring to appears in only two,

11  okay?  It is two out of 35 loan agreements.

12          Moreover, what Cameron Winklevoss and Tyler Winklevoss

13  both testified is they had no way to enforce it because the way

14  the loans worked --

15          THE COURT:  Enforce what?

16          MR. BAUGHMAN:  The requirement -- assuming it's a

17  requirement.  What Mr. Rodgers said is you're supposed to make

18  25 percent on the exchange.  What both Cameron and Tyler

19  testified is you couldn't enforce it.

20          THE COURT:  It doesn't mean it didn't happen.

21          MR. BAUGHMAN:  We don't know.  This would be part of

22  their burden to show this if they want to show it.

23          THE COURT:  Mr. Rodgers, please put up one of the two

24  loan agreements.  First of all, do you agree it's only two of

25  35?

1           MR. RODGERS:  Your Honor, I think that requires a

2    little bit of context.  It's two loan agreements from 2017.

3    There were three Pearl Street loan recipients in 2013.  Those

4    loans were rolled over throughout the year and the loan amounts

5    are millions of dollars, and we can show you the internal

6    records that show you how they accounted for the Pearl Street

7    loans.  We're talking back of envelope figures.  I don't want

8    to overstate it, but it's millions of dollars.

9           THE COURT:  When you say, Mr. Baughman, two of 35,

10   those are of the agreements, right?

11          MR. BAUGHMAN:  Correct, your Honor.

12          THE COURT:  They date from when to when?

13          MR. BAUGHMAN:  I believe the first one is in, I'm

14   going to say, early 2016.  The last one is in January 2018.

15          THE COURT:  Now, why don't you put up, Mr. Rodgers,

16   one of those agreements and show me.

17          MR. RODGERS:  I think we're looking at CFTC Exhibit

18   58.  This is a Pearl Street loan to Circle Financial on

19   February 2, 2017.  You can see that the loan amount is 3,000

20   bitcoin, and you can see that the loan is going to Circle

21   Financial.  Circle Financial is a large market maker on the

22   Gemini Exchange, and they're a relatively significant player in

23   the crypto industry.  So it says here that the loan goes from

24   February 2 to March 15, 2017.  But as I mentioned earlier, this

25   loan was outstanding through the entire year of 2017, and you

1    can see in the paragraph below the first paragraph, it says,

2    "In further consideration of the loan."  I think we all

3    understand what consideration means. "The borrower agrees to

4    the below terms with regards to the borrower's presence on the

5    Gemini Exchange operated by Gemini Trust Company LLC."  Then

6    you see the first bullet point says, "To maintain greater than

7    or equal to 25 percent of the total volume on Gemini's BTC/USD

8    continuous order book on non-NYSE holidays."  That's saying you

9    have to make up 25 percent of the volume, and by the way --

10                THE COURT:  Stop.

11                That's a significant number, right, Mr. Baughman?

12                MR. BAUGHMAN:  I don't know that there's evidence that

13    that was achieved, and there is evidence from Circle which I

14    can show that says that the loan did not affect their trading

15    activity at all.

16                THE COURT:  But if they have promised to do enough

17    transactions to make up equal or greater than 25 percent of

18    volume, that's a significant number?

19                MR. BAUGHMAN:  That's a jury question.

20                THE COURT:  Now, having -- no, it's not.

21                MR. BAUGHMAN:  Respectfully, I disagree.

22                THE COURT:  25 percent of a lie is a lie.

23                MR. BAUGHMAN:  But there's no lie.  Judge, there is no

24    lie.

25                THE COURT:  Just a minute, Mr. Baughman.

```
 1                 With regard to the phrase prefunded, if there is money
 2      advanced by an affiliate of Gemini implemented by personnel of
 3      Gemini to a party that promises to make up enough transactions
 4      to equal or exceed 25 percent of the volume of transactions on
 5      any particular period of time, I hold that that is significant
 6      and contrary to the representation of prefunding.
 7                 MR. BAUGHMAN:  Respectfully, your Honor, I don't think
 8      you've looked at the full record yet, and I don't think that
 9      is--
10                 THE COURT:  I'm willing to do that.
11                 MR. BAUGHMAN:  What's that?
12                 THE COURT:  I'm willing to do that.  I wanted you to
13      know where I stood.  Now you can attack it.
14                 MR. BAUGHMAN:  If you can give me a little bit of -- a
15      few minutes to show you the evidence on this case.
16                 THE COURT:  I promise not to speak for a few minutes.
17                 MR. BAUGHMAN:  Okay.  Thank you, your Honor.
18                 The first thing is this:  The premise I think is
19      incorrect.  The premise is they have stated in paragraph 64 of
20      their 56.1 statement that it was "generally understood" that
21      prefunding meant no borrowing.  That's their assertion.  We
22      strongly dispute the premise, and we have evidence to refute
23      the premise which I would like to show you.
24                 THE COURT:  You may.
25                 MR. BAUGHMAN:  Please show slide 83.  This is
```

 1    testimony from Shane Molidor.  They cite Mr. Molidor, and what

 2    Mr. Molidor's testimony is --

 3                THE COURT:  Who was he?

 4                MR. BAUGHMAN:  He was a person at Gemini.  He was a

 5    customer support specialist.  He worked at Gemini, and he's

 6    involved in everything at issue in this case.

 7    "Q.  What does prefunded mean?

 8    "A.  My understanding of prefunding is that this means a Gemini

 9    account balance must reflect assets on deposit in order to then

10    buy assets with those assets."  Nothing in his understanding

11    about borrowing.

12                Next slide.  This is testimony --

13                THE COURT:  Excuse me.  Go back.  If the account

14    balance must reflect assets on deposit -- oh, you're saying it

15    doesn't matter how those assets came in.

16                MR. BAUGHMAN:  Exactly correct, your Honor.  You got

17    it.

18                THE COURT:  Okay, that's your point.

19                MR. BAUGHMAN:  Next one.  Rose Toomey.  Rose Toomey

20    was the lead technical person at Gemini involved in this

21    project.  And it's worth noting the people involved in the

22    project involving the bitcoin, there's only four or five,

23    Cameron Tyler Winklevoss, Rose Toomey, a man named Ben Small

24    and then Mr. Molidor is not really involved.  Look at her

25    testimony.

1    "Q.  What are some other reasons an order could be rejected?

2    "A.  Well, if you don't -- if your account is not prefunded

3    with the money to cover that order, so if you have $50 on

4    deposit and you place an order for $100, then that entire order

5    would be rejected."  Nothing about borrowing.  Nothing about

6    how the money gets into the account.

7            Next slide, please.  Let's look at Gemini's internal

8    policies.  This is very important.  It says, "all orders must

9    be prefunded (i.e.)."  I.e., means that is.  It says, "Users

10   are not permitted to place an order unless they have enough

11   funds in their account to place such an order."  nothing in the

12   policies about borrowed funds.  Not there.

13           Next slide, please.  This is the customer user

14   agreement.  This is the agreement between Gemini and its

15   customers.  It says at the top, "All buy transactions are

16   purchases of Digital Assets with Fiat currency that settle

17   immediately from a prefunded account."  And at the end, it

18   states, "any limit or market sell order that exceeds the amount

19   of available Digital Assets in the associated Digital Asset

20   account will be rejected."  nothing in there about borrowed

21   funds.

22           MR. RODGERS:  I think that misstates that slide.

23   Sorry to interrupt, but there's a sentence in there that

24   Mr. Baughman maybe meant to read that said something about

25   there is no margin trading, options trading, or shorting

1    offered on Gemini.

2            THE COURT:  Do you think you have enough patience to

3    wait until he finishes before telling me that?

4            MR. RODGERS:  Sure, your Honor.

5            MR. BAUGHMAN:  And that was a true statement.  There

6    was no margin trading on Gemini.  Absolutely true.  Margin

7    trading is when you don't have the money in your account, and

8    you actually trade, and you're then at risk for a margin call.

9    There was no margin trading and they have no evidence that

10   there was.

11           THE COURT:  Yeah.  It's not a good analogy because the

12   broker is, in effect, extending part of the price in the same

13   time of making a loan to you.

14           MR. BAUGHMAN:  But, your Honor, I am not saying --

15   first of all, it's not the broker.

16           THE COURT:  A cash buy is different from a margin buy.

17           MR. BAUGHMAN:  Correct.

18           THE COURT:  A cash buy is a prefunded buy.

19           MR. BAUGHMAN:  And all transactions on Gemini were

20   cash buys, absolutely correct.

21           THE COURT:  But A significant number, we have found

22   out, had money coming in from Pearl Street.

23           MR. BAUGHMAN:  Right.  But as your Honor has already

24   pointed out, it doesn't matter whether they borrowed from Pearl

25   Street or from JP Morgan.  It's still prefunded.

1          THE COURT:  That seems to be the issue, whether it

2     makes a difference that it's Gemini's affiliate Pearl Street

3     using the same people in Gemini to implement the transactions

4     and focused only on transactions within the Gemini Exchange.

5     Whether that's different from a borrowing to an outside bank.

6     I think I would hold that it is different.

7          MR. BAUGHMAN:  But I think that's a jury question,

8     your Honor.

9          THE COURT:  I don't think it's a jury question.

10         MR. BAUGHMAN:  Your Honor, there is -- I am showing

11    you evidence to the contrary.

12         THE COURT:  You are showing me statements of

13    prefunding which have nothing in them about whether the funds

14    are on hand or borrowed.

15         MR. BAUGHMAN:  And they have no statements to the

16    contrary.

17         THE COURT:  When the lender is the exchange itself,

18    the Gemini Exchange itself or a close affiliate the way I

19    described, that's not a borrowing.  That's an advance.  That's

20    a margin.  That's a disguised margin transaction.  That is what

21    I would rule on the record.  I don't need a jury for that.

22         MR. BAUGHMAN:  Respectfully, I think you are

23    overlooking the evidence to the contrary.  There is not a

24    single statement by anyone at the time suggesting what you are

25    suggesting.  Not a single one.

1                  THE COURT:  Doesn't have to be, Mr. Baughman.

2                  MR. BAUGHMAN:  Respectfully --

3                  THE COURT:  All these statements -- anybody reading

4       these statements would think that there is cash on hand without

5       the help of the exchange that is doing the transactions for

6       you.

7                  MR. BAUGHMAN:  Respectfully, your Honor, there is no

8       evidence of that.  And then.

9                  THE COURT:  There doesn't have to be.

10                 MR. BAUGHMAN:  There has to be evidence.

11                 THE COURT:  I don't want to fight with you,

12      Mr. Baughman.  I made the ruling unless there's something else

13      that's different that you want to advance.

14                 MR. BAUGHMAN:  Yes.  I want to go to the issue of

15      knowledge.  Even if you are saying that the issue of this --

16      that the statements about Pearl Street are false, their case is

17      not over.  First they have to show that we made the

18      statements --

19                 THE COURT:  We're going to everyone of those things.

20                 MR. BAUGHMAN:  I understand that.  But I want to talk

21      to you about -- and I want to talk at length about materiality,

22      but right now I want to talk about knowledge.

23                 THE COURT:  There are issues whether statements made

24      through CBOE are made by Gemini, there are those issues.

25                 MR. BAUGHMAN:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                THE COURT:  There's issues of materiality.

2                MR. BAUGHMAN:  Yes.

3                THE COURT:  There's issues of scienter.

4                MR. BAUGHMAN:  Yes.

5                THE COURT:  Are there any others?

6                MR. BAUGHMAN:  Those are the issues, your Honor.

7                THE COURT:  So I was going to deal with them one at a

8     time, but you want to jump into scienter, it's okay, we'll do

9     it.

10               MR. BAUGHMAN:  Okay.  Could we go to slide 57.

11               THE COURT:  I've made the ruling that there is a

12    misrepresentation --

13               MR. BAUGHMAN:  Okay.  First of all --

14               THE COURT:  -- as to prefunding.

15               MR. BAUGHMAN:  First of all, your Honor, again, we'll

16    come to the issue of attribution who stated that, but it

17    wasn't--

18               THE COURT:  Which one are we now going to argue?

19               MR. BAUGHMAN:  I understand.  Let me talk about

20    knowledge.

21               THE COURT:  That's the scienter requirement.

22               MR. BAUGHMAN:  Correct.  Knowledge.  Okay?

23               They have to show that Gemini knew or had reason to

24    know that the statements were false, okay?

25               THE COURT:  That means a statement of prefunding.

1          MR. BAUGHMAN:  Correct.  They have to show that Gemini

2     had reason to know; that they actually knew or had reason to

3     know.  Now, the context here is very important.  CFTC's core

4     principles apply to what are called DCM's, designated contract

5     markets.  CBOE is a DCM, and Gemini is not.  Also, their case

6     depends on application of something called the CFTC's core

7     principles.  Those apply to DCMs.  CBOE is a DCM, and Gemini is

8     not.  And the evidence is undisputed, undisputed that Gemini

9     was relying on CBOE for what to say.  The evidence is

10    undisputed of this.  Here is testimony on the screen.

11         THE COURT:  You're talking now about the maker.  I

12    thought you were going to talk about scienter.

13         MR. BAUGHMAN:  I am, because this goes to --

14         THE COURT:  The question on scienter is whether Gemini

15    knew or had reason to know that's the standard, right?

16         MR. BAUGHMAN:  Correct.

17         THE COURT:  Know or reason to know that the statement

18    of prefunding was false when made.

19         MR. BAUGHMAN:  Correct.  And look at the testimony I

20    have on the screen.

21         THE COURT:  So we've seen that Gemini made this

22    statement.

23         MR. BAUGHMAN:  It didn't, your Honor.

24         THE COURT:  Maybe we should argue that first.  How

25    about that?

1          MR. BAUGHMAN:  We really should start with

2     attribution, your Honor.

3          THE COURT:  Let's do that.  Let's go into section 6-E

4     which says very plainly --

5          MR. BAUGHMAN:  I would like to do that.  Let's go to

6     slide 15, please, and please let me explain how this statutory

7     scheme works.

8          What is at issue in this case is something called a

9     self-certification.  This self-certification -- the vast

10    majority of the statements are in the self-certification.  That

11    self-certification was submitted by CBOE.  Only CBOE could

12    submit the self-certification.  It was submitted on CBOE

13    letterhead.  It is signed by CBOE.  The product being certified

14    is named the CBOE bitcoin futures product.  It is traded on the

15    CBOE Futures Exchange.  Gemini was not cc'd nor was Gemini

16    included on the transmittal.  And Gemini was not included in

17    the press releases.  There were two press releases.  CBOE put

18    out a press release, as did the CFTC put out a press release.

19    Neither of them mentioned Gemini.  I want to emphasize if you

20    look at the certification, which is in the record repeatedly,

21    Docket No. 83-8, for example.

22          THE COURT:  Is that not it?

23          MR. BAUGHMAN:  It's on the screen.  It says CFE,

24    that's CBOE Futures Exchange hereby certifies that the product

25    and amendment comply with the act.  It's a certification by

1    CBOE.  Gemini didn't certify anything.  Gemini wasn't asked to

2    certify anything.  Gemini didn't have the ability to certify

3    anything, and you see there it's signed by CBOE, and it says if

4    you have any questions, call CBOE.  Now that is true for nine

5    of the other -- eight of the other nine statements that were

6    submitted.

7            So let's look at the law.  Now, your Honor already

8    ruled - and I submit it's law of the case - that there are fact

9    issues here, and if your Honor wishes to reopen the issue,

10   respectfully, I think you should reopen our motion and find

11   that as a matter of law Gemini did not make the statements

12   because they have not come to you with any grounds for

13   reargument.  Your Honor already ruled it's an issue of fact,

14   and there's a standard in the Second Circuit for reargument,

15   which is an intervening change of law or new evidence.  They've

16   cited nothing to your Honor.  There is no basis for revisiting

17   your Honor's ruling in Docket No. 80.

18           But in any event, if we go on, what we are faced with

19   is a matter of statutory construction.  It's very simple.  And

20   what does the Supreme Court tell us in every case involving

21   interpretation of a statute?  You must start with the words.

22   You have to start with the words of the statute.  Fine.  Let's

23   do that.

24           The statute is on the screen, it's Section 6(c)(2) of

25   the Commodities Exchange Act.  What it says is, "It shall be

1    unlawful for any person to make any false or misleading

2    statement of a material fact to the Commission."

3          So two requirements in the same sentence.  You have to

4    make the statement, and you must make it to the Commission.

5    Not to a third party.  Not to an intermediary.  it must be made

6    to the Commission.  And the Supreme Court in *Janus* has told us

7    specifically what this means.  *Janus* is directly on point, and

8    it says, "One makes a statement by stating it."  The maker of a

9    statement is the person or entity with ultimate authority over

10   the statement."  That's the rule that we think should be

11   applied.

12         And the facts of *Janus* are very illustrative and

13   helpful, your Honor.  What happened in *Janus* was there was a

14   set of mutual funds called the **Janus** Investment Funds.  They

15   didn't even have employees.  What they did was issue

16   prospectuses.  Those prospectuses were arranged for by a

17   management company called **Janus** Capital Management.  Some of

18   the people who worked for **Janus** Capital Management were

19   officers of the **Janus** funds, so there's overlap of personnel.

20         What the Supreme Court held very clearly is that the

21   management company, the management company who drafted the

22   prospectuses, dealt with the lawyers, all that stuff, was not

23   liable under the Securities Exchange Act despite being

24   "significantly involved in preparing the prospectus."

25         THE COURT:  Who were the plaintiffs?

1          MR. BAUGHMAN:  The plaintiffs were investors in the

2   mutual funds.

3          THE COURT:  And the supposed misrepresentation, it was

4   that day trading was not allowed.

5          MR. BAUGHMAN:  Yes, market timing, your Honor.

6          THE COURT:  And when it came out, a number of people

7   who owned shares of the mutual fund left the mutual fund, and

8   it was thought that because they left the management fee to

9   **Janus** Capital Management would decrease, and so that would

10  affect the funds and income of **Janus** Capital Group, so a

11  shareholder of **Janus** Capital Group would not be the one who

12  benefited by making the statement.

13         The statement there was made not to **Janus** Capital

14  Group, it was made not to shareholders of **Janus** Capital Group.

15  It was made to people who owned part of the **Janus** funds, who

16  owned stock in the **Janus** funds, in the mutual fund.  That's

17  where the statement was made.  But the statement was not made

18  to people who owned stock in the Janus Capital group.  If there

19  had been a shareholder sued by someone in the fund, then your

20  argument would be telling.  But **Janus** Capital -- *Janus* does not

21  apply to this

22         MR. BAUGHMAN:  Respectfully, your Honor, it applies

23  directly.  Because what *Janus* deals with is what it means to

24  make a statement.  You have to say the statement.  That's what

25  *Janus* says.  The Court could not be clearer.  You have to make

1    a statement by stating it, and indirectly stating it doesn't

2    make it.

3         The second requirement is that -- and I want to pause

4    on this.  It's a 10b-5 case, I admit, but 10b-5 cases are

5    applicable to the CEA.  I think there should be no dispute

6    about this.  The other side is arguing, ignore 10b-5 cases.

7    But the Commodities Exchange Act, lawyers signing the briefs in

8    this case eight months ago argued across the river that the CEA

9    was modeled on 10b of the Securities Exchange Act and

10   "presumably by copying 10b's language and pasting it into the

11   CEA, Congress contemplated that the two statutes were to be

12   interpreted similarly."

13        We agree, and I submit to you that a government agency

14   should not be taking different positions on statutory

15   construction on opposite sides of the river.  The public has a

16   right to get consistent interpretations of law from agencies.

17        MR. RODGERS:  Can I address that point, since there's

18   some level of accusations about the CFTC's level of

19   inconsistency here?

20        THE COURT:  Do you think you might make a note of it

21   and tell me afterwards?

22        MR. RODGERS:  Okay.

23        THE COURT:  Don't do it again, Mr. Rodgers.

24        MR. BAUGHMAN:  Thank you, your Honor.  I'll continue.

25        THE COURT:  All right, Mr. Rodgers?

```
 1              MR. RODGERS:  Understood, your Honor.

 2              THE COURT:  Don't do it again.

 3              MR. RODGERS:  Understood.

 4              MR. BAUGHMAN:  The next argument that they make, your

 5  Honor, is that they say Janus doesn't apply in enforcement

 6  actions.  That's simply incorrect.  I have on the screen for

 7  you three citations.  SEC v. Pentagon Management Corp., SEC v.

 8  Norstra Energy.  SEC v. Rio Tinto, where courts in the Second

 9  Circuit have applied Janus in enforcement actions, and indeed

10  on Thursday it happened again.  Judge Engelmayer in an

11  excellent opinion in a case called Solar Winds, a footnote on

12  page 80 of that opinion applied Janus to an enforcement action.

13  So it does apply.

14              Now, let's talk about the directly or indirectly.

15              THE COURT:  I want to get those cases, please.

16              MR. BAUGHMAN:  Of course, your Honor.  It's SEC --

17              THE COURT:  I got them.  I see them.

18              MR. BAUGHMAN:  I have a copy of the slides I'm happy

19  to hand up, your Honor.  I would be happy to do that.

20              THE COURT:  Who decided Norstra Energy, do you know?

21              MR. BAUGHMAN:  Mr. Schwartz will look it up.  I don't

22  remember, your Honor.

23              THE COURT:  Is Judge Engelmayer's Rio Tinto.

24              MR. BAUGHMAN:  Your neighbor across the hall Judge

25  Pauley decided Norstra Energy.
```

1          THE COURT:  Unfortunately, he's no longer my neighbor.

2   He was a very close friend.

3          MR. BAUGHMAN:  That's true, your Honor.  That shows my

4   age.

5          THE COURT:  Is Judge Engelmayer's decision a *Rio Tinto*

6   case.

7          MR. BAUGHMAN:  That's Judge Torres, your Honor.

8          THE COURT:  *Rio Tinto* is Judge Torres.

9          MR. BAUGHMAN:  *Tinto* is Torres.  Judge Engelmayer, I'm

10  happy to provide a copy to the Court a subsequent authority.

11  It just came out on Thursday.

12         THE COURT:  I saw the blurb.

13         MR. BAUGHMAN:  Called *Solar Winds* Docket 23 Civ. 9518.

14         THE COURT:  Who sued Solar Winds?

15         MR. BAUGHMAN:  The SEC.  Footnote 40 on page 80, Judge

16  Engelmayer applies --

17         THE COURT:  I'll look at those cases.

18         MR. BAUGHMAN:  Now, there's two other reasons as

19  matters of statutory construction why the government's argument

20  does not work.  They plead on the first page of their

21  complaint, they say that Gemini made statements directly and

22  indirectly.  They argue at length in their brief that we should

23  be liable for indirectly made statements.  That is incorrect,

24  and I want to show you --

25         THE COURT:  That's for the reasons you just gave.

```
 1           MR. BAUGHMAN:  I'm giving you another one, a very good
 2    one.  A very sound reason based in statutory construction.  If
 3    you look on the screen, I am comparing Section 6(c)(2) and
 4    Section 6(c)(1).  We are being sued -- Gemini is being sued
 5    under 6(c)(2).
 6           THE COURT:  Let me take a minute.  So the effect of
 7    10b-5 was divided into two in the Commodities Exchange Act.
 8    One part of it became 6(c)(1), another became 6(c)(2).
 9           MR. BAUGHMAN:  Yes.  And what the key thing here is,
10    your Honor, and I have highlighted --
11           THE COURT:  I see 6(c)(1) says directly or indirectly
12    and 6(c)(2) does not, correct?
13           MR. BAUGHMAN:  Correct.
14           THE COURT:  I have your point.
15           MR. BAUGHMAN:  So the statutory provision they are
16    suing under does not provide for statements that are made
17    indirectly.  It only provides for statements to the Commission.
18           And as the guy on TV used to say:  Yet, there's more.
19    I have another one.  It's Section 13(c) of the Commodities
20    Exchange Act, which is 7 U.S.C. 13(c).  Here is what this
21    section says.
22                (Continued on next page)
23
24
25
```

```
 1              THE COURT:  Let me get it, please.

 2              MR. BAUGHMAN:  So it will be 7 U.S.C. Section 13(c).

 3              THE COURT:  13(c).

 4              MR. BAUGHMAN:  Yes, your Honor, subparagraph (A).

 5              THE COURT:  I think the numbering might be off.  The

 6   Commodities Exchange Act numbers are lower than Title 7

 7   numbers.

 8              Mr. Rodgers, do you know what section it is?

 9              MR. RODGERS:  Sorry, your Honor.  I know the numbers

10   are different.  What sections did he refer to the Commodities

11   Exchange Act?

12              THE COURT:  Section 13(c).

13              MR. BAUGHMAN:  I have it on the screen, your Honor.

14              MR. RODGERS:  I can look it up, but I don't have that

15   kind of recall.

16              THE COURT:  What's it titled?

17              MR. BAUGHMAN:  Responsibility as principal, minor

18   violation.

19              THE COURT:  All right.  Let me——

20              MR. BAUGHMAN:  Section 13(c), spec 7.  It's

21   Section 13(a), but——of the Commodities Exchange Act.

22              THE COURT:  It's not Section 13.  We'll find it.  I'll

23   look on your board.

24              MR. BAUGHMAN:  Yeah, I don't think there's any

25   dispute——
```

```
 1                THE COURT:  Let me take it in.

 2                MR. BAUGHMAN:  Okay.

 3                THE COURT:  It's willful causation.

 4                MR. BAUGHMAN:  Correct.

 5                THE COURT:  Generally a crime, like aiding and

 6     abetting is a crime.

 7                MR. BAUGHMAN:  Right.  And the point, your Honor, is,

 8     what I've shown you now is that the Commodities Exchange Act

 9     has a provision.  They could sue civilly under this.  It

10     doesn't have to be a crime.  The very statute that the

11     Commodity Futures Trading Commission acts under.  They had the

12     ability to bring a claim for indirect statements.  They chose

13     not to.  They also had the ability to bring a claim for causing

14     someone else to make a statement.  They chose not to.  They're

15     now trying to read that ability into 6(c)(2).  You can't do

16     that.  You got to pick your poison.  And you got to take the

17     bitter with the sweet.  They chose to sue under 6(c)(2), and

18     that does not permit claims based on indirect statements or on

19     statements that you cause someone else to make.

20                So let's look now at what they do rely on.  They

21     actually——

22                THE COURT:  I want to ask you another question.

23                MR. BAUGHMAN:  Yes.

24                THE COURT:  Were there instances where Gemini people

25     were involved alone or with CBOE in direct communication to the
```

 1    CFTC?

 2              MR. BAUGHMAN:  I'm aware of two, and possibly a third,

 3    though the record is unclear.  Okay?  The statement was made

 4    earlier that Gemini did the slides at the meeting on July 25th.

 5    That's at best disputed.  There was a meeting——

 6              THE COURT:  At best what?

 7              MR. BAUGHMAN:  Disputed.  There was a meeting on

 8    July 25, 2017, attended by a number of people from CBOE and a

 9    few people from Gemini.  The record is——and we in fact moved

10    for summary judgment on this point, and your Honor has yet to

11    rule on this part of our motion.  There is no evidence of any

12    statement made by Gemini at that meeting.  There isn't.  We

13    moved on that in our motion, and it's still pending.  There's

14    no evidence of Gemini making a statement that is at issue in

15    the case.  The slides were made by CBOE.  They were sent in by

16    CBOE, but yes, Gemini people were there.

17              Secondly, there was a meeting, I believe it was

18    August 25th or August 28th of 2018, in Washington, DC, again,

19    attended mostly by CBOE people, but one representative of

20    Gemini was there.  But I do not believe that there are any

21    statements alleged to have been made at that meeting that are

22    at issue in the case.

23              There is also some evidence that there was a

24    conference call, I believe on October 24th, but the evidence of

25    actually who participated is unclear, and it's not at issue on

1  this motion, anything that was said in that conference call.

2        Those are the three instances I'm aware of.  I am also

3  aware that there is an extensive history of meetings, calls,

4  emails, communications between CBOE and the CFTC, which Gemini

5  is not copied on, is not a participant on.

6        And finally, there is not any evidence, ever, with one

7  possible exception, in November, of any direct communication

8  between anyone from Gemini and anyone at CFTC that CBOE is not

9  participating in.  None.  That's I believe the record.

10        If I could go next to the other issue in statutory

11  construction, your Honor.  I believe it is clear that under the

12  Commodities Exchange Act, they must show a statement made

13  specifically by Gemini to the Commission, and the vast majority

14  of statements are not in that category.  However, they avoid

15  their own statute.  They don't rely on the statute that gave

16  them a job.

17        THE COURT:  They rely on 1001.

18        MR. BAUGHMAN:  Correct.  Which is a criminal statute.

19        THE COURT:  18 U.S.C. 1001.

20        MR. BAUGHMAN:  Yes.

21        THE COURT:  And I was going to ask Mr. Rodgers if

22  Section 6(c)(2) in the specific statute overruled the general

23  statute of 1001.  So why don't you wait until I ask him that

24  question.

25        MR. BAUGHMAN:  Can I give you my answer?

```
 1              THE COURT:  You may.

 2              MR. BAUGHMAN:  Absolutely, your Honor.

 3              THE COURT:  I know what your answer is.  The specific

 4    overrules the general.

 5              MR. BAUGHMAN:  Correct, your Honor.

 6              THE COURT:  The issue is really under 6(c)(2), and—

 7              MR. BAUGHMAN:  Correct, your Honor.

 8              THE COURT:  Maybe I should talk now with Mr. Rodgers?

 9              MR. BAUGHMAN:  That would be fine, your Honor.  Also,

10    that's the law.  If your Honor would like, I would also like to

11    show you the record about who made the statements, but right

12    now this is the law.

13              MR. RODGERS:  Thank you, your Honor.

14              So I agree with Mr. Baughman that context is

15    important.  And each of the 31 written statements that we

16    charge in this case relate to the Gemini exchange and the

17    Gemini's auction.  They were all made with the intent to

18    convince the CFTC that Gemini's exchange in auction complied

19    with listing requirements, including the critical one, Core

20    Principle 3.

21              So Gemini couldn't list a futures product because

22    they're not registered with the CFTC, so they partnered with

23    CBOE.  Gemini was told from the very beginning, in early 2017,

24    that the information it provided to CBOE would be used to make

25    representations to the CFTC.  Gemini also, by the way, has
```

1    readily admitted that it communicated directly with——

2            THE COURT:  We have lots of records of communications

3    by Gemini to the CBOE.  But that's not the issue here.  The

4    issue is the language of Section 6(c)(2).  And specifically, it

5    requires a material fact made to the commission.

6            MR. RODGERS:  Correct, your Honor.

7            THE COURT:  How do you deal with that?

8            MR. RODGERS:  A statement can be made to the

9    commission in a variety of ways, including through an

10   intermediary, like CBOE, who was transmitting the information

11   that Gemini provided, and under established precedent,

12   interpreting 18 U.S.C. Section 1001, which is the criminal

13   false statement counterpart to Section 6(c)(2), a statement——it

14   doesn't matter whether the statement was made directly to the

15   agency.  It only matters that the party contemplated that the

16   statement would be used by the agency as part of its regulatory

17   authority.

18           THE COURT:  Don't you think the specificity of

19   Section 6(c)(2) overrules the generality of 1001?

20           MR. RODGERS:  They both——so the answer would be no, I

21   don't think 6(c)(2) is any more specific than 1001.

22           THE COURT:  Any statement within the jurisdiction of

23   the CFTC can be criminal, if they made a false statement.  But

24   we don't have that here.  We have a Section 6(c)(2) that

25   requires a direction to the commission.

1          MR. RODGERS:  It also includes that it applies to any

2   person.  It's not limited to registrants or people that are

3   registered with the CFTC.

4          THE COURT:  It says any person registered or required

5   to be registered.  Now Gemini is not required to be registered.

6   Only a product of it is being registered.  So is any person

7   meaning the CBOE?

8          MR. BAUGHMAN:  Your Honor, I just——I don't mean to

9   interrupt, but I think you may be reading the wrong section.

10  That's not in——

11         THE COURT:  I am reading the wrong section.  You're

12  right.  Thank you.  Thank you very much.

13         MR. BAUGHMAN:  6(c)(2) doesn't have that requirement.

14         THE COURT:  No.  Thank you.  I understand that.  I was

15  reading Section 13.

16         It's unlawful for any person to make any false or

17  misleading statement of a material fact to the commission.  So

18  what is the argument?

19         MR. RODGERS:  I'm sorry, your Honor?

20         THE COURT:  What is the argument?

21         MR. RODGERS:  It applies to——it's not limited to

22  registrants.  This is a unique——

23         THE COURT:  No.  I was mistaken.  Any person, any

24  person——

25         MR. RODGERS:  Correct.

1          THE COURT:  Any person can make a false or misleading

2     statement of a material fact to the commission.

3          Okay.  So the question is:  Has Gemini made its

4     statements to the commission?

5          MR. RODGERS:  Your Honor, they have made—they've made

6     the statements to the commission, within the concept of

7     Section 6(c)(2), because they partnered directly with CBOE.

8     They knew at the time that all information would be relayed by

9     CBOE to the CFTC.

10          THE COURT:  The record shows that the statements were

11     made by CBOE to the CFTC, does it not?

12          MR. RODGERS:  CBOE committed the act of transmission,

13     but they were transmitting—the content of those statements,

14     all 31 of them, relate to Gemini, and from the outset of this

15     case, CBOE told Gemini that it was relying on them to provide

16     complete and accurate information.  Gemini knew that it had to

17     do so in engaging with the commission, and there's no reason to

18     interpret—

19          THE COURT:  Take me through the documentary evidence.

20          MR. RODGERS:  Okay.  So if we can go to CFTC

21     Exhibit 5.

22          This is GX 5 at 2.  This is the one of the first

23     communications we have between CBOE and Gemini relating to the

24     application process, and what information needs to be provided.

25     The top email is an email from Cameron Winklevoss.  He is the

 1  president and CEO of Gemini.  And he's emailing with William

 2  Speth, and he's a representative of CBOE.  And we can review

 3  the entire chain, but the chain deals with the Bitcoin futures

 4  contract and them partnering together.  And in here, in an

 5  email from William Speth, the second from the top, on

 6  February 16, 2017, he says, "Thanks, Ben.  For background—" so

 7  I guess a little bit more context.  The CBOE had provided—

 8             THE COURT:  Sorry.  Who is William Speth?

 9             MR. RODGERS:  He's an individual at CBOE who, you

10  know, I think works in their product development.

11             THE COURT:  It's a CBOE person.

12             MR. RODGERS:  Yes, that's right.

13             THE COURT:  And who is Ben?

14             MR. RODGERS:  Ben Small.

15             THE COURT:  Yes.

16             MR. RODGERS:  He is the COO of Gemini.

17             THE COURT:  All right.  So he says, "Thanks, Ben.  For

18  background, the questions reflect the information we'll need in

19  order to rep to the CFTC that CFE complies with DCM core

20  principles on the futures."

21             MR. RODGERS:  Right.

22             THE COURT:  In other words, that CBOE, which is the

23  designated contract market, satisfies the core principle of not

24  being susceptible, readily susceptible to manipulation, if it

25  allows the Gemini futures contract to trade.  And that's a fair

1    interpretation.

2            MR. RODGERS:  Yes, your Honor, he's telling——

3            THE COURT:  So what the gentlemen from CBOE is telling

4    the gentleman from Gemini is that the questions——and what are

5    these questions?

6            MR. RODGERS:  So that was the other context I was

7    getting to.

8            THE COURT:  Are these questions put by the CFTC?

9            MR. RODGERS:  The questions were provided by CBOE.

10   It's a due diligence questionnaire that they're asking Gemini

11   to fill out.

12           THE COURT:  So that they can report to the CFTC.

13           MR. RODGERS:  So that they can——

14           THE COURT:  In other words, CBOE wants information

15   from Gemini to enable CBOE to report to the CFTC and satisfy

16   its obligations to the CFTC, if it registers the futures

17   contract of Gemini; is that fair?

18           MR. RODGERS:  It's fair that they're going to be

19   take——I think so, your Honor.  They're taking statements that

20   Gemini is providing and then they're going to use that

21   information to make representations to the CFTC about the

22   product's compliance, and I think we're saying the same thing,

23   with the listing requirement.

24           THE COURT:  Yeah.  So there's an interest in CBOE to

25   get registered.  And there's an interest in Gemini to have its

1    product being registered.  But everything is going through

2    CBOE.  And the statute says the person making the

3    misrepresentation must make it to the commission.  So if Gemini

4    is making a misstatement to CBOE, knowing that that is going to

5    be passed on to the CFTC, does that satisfy the statutory

6    requirement?

7         MR. RODGERS:  That's our position, that that would

8    be——

9         THE COURT:  I know it's your position.

10         MR. RODGERS:  Under Section 6(c)(2).

11         THE COURT:  Under the arguments made by Mr. Baughman,

12    I'm concerned mostly with the language of Section 6(c)(2), and

13    the language compared to Section 6(c)(1), because 6(c)(1) has

14    the direct and indirect language, and 6(c)(2) does not.

15         MR. RODGERS:  Your Honor, those are different

16    provisions.  So the CFTC has a 10b-5 equivalent, and that's

17    6(c)(1) that you're picking up on, but 6(c)(2) is a pure false

18    statement statute, and there's no reason to interpret it any

19    differently than courts have interpreted Section 1001.  And in

20    our briefing, we go into the policy considerations for that,

21    which is that it would provide a free pass for false and

22    misleading statements in a situation where a party like Gemini

23    knows full well and has admitted that any information that they

24    provided to the CFTC, they authorized; they are responsible for

25    the contents of those documents.  Mr. Baughman said that Gemini

1    was not responsible for the slide presentation.  I can show

2    your Honor an email from Benjamin Small where they delivered

3    the slides with the first false representation, which is the

4    prefunding requirement, to CBOE.  And we have CBOE witnesses——

5              THE COURT:  Show me that.

6              MR. RODGERS:  What's that?

7              THE COURT:  Show me that.

8              MR. RODGERS:  Sure.  Let's go to Government GX G, I

9    believe.  CFTC Exhibit G.

10             This was an exhibit that was filed in response to

11   Gemini's motion for summary judgment.  So let's go to the next

12   page.

13             This is an email from Benjamin Small on July 21, 2017,

14   to Michael Mollet, copying Nicole Gordon.  She's also known as

15   Nicole Pursley.  And you see, he's providing a couple of slides

16   on auction mechanics.  He says:  Feel free to adjust as you see

17   fit.  But if we go to the next page, which is page 3, we have

18   the exhibit, the slide.  So this is auction mechanics.

19             Let's go to the next one, please.

20             Here it is.  Drafted by Mr. Small, sent to the CBOE.

21   It's the exact same slide that was presented to the CFTC on

22   July 25, 2017.

23             THE COURT:  Yeah, but in point of transit, Gemini gave

24   it to CBOE, which in turn gave it to the CFTC.

25             MR. RODGERS:  Correct, your Honor.  But they had——

1           THE COURT:  Same point we were having before.  It's

2     clear from the record that Gemini gave a tremendous amount of

3     information to CBOE, and that CBOE transmitted it to the CFTC.

4     And the question I'm struggling with is whether a party

5     interested in getting clearance from CFTC and making statements

6     through another intended to persuade CFTC is making those

7     statements to CFTC.

8           MR. RODGERS:  And your Honor, I would just point out

9     that Section 6(c)(2) is a unique power that was granted to the

10    commission.

11          THE COURT:  6(c)(2)?

12          MR. RODGERS:  6(c)(2), the false statements statute,

13    as part of the Dodd-Frank reforms.  Prior to that, it's my

14    understanding—and we're happy to present the evidence—there

15    was a limited false statements statute that was limited to

16    registrants, and now, post Dodd-Frank, it was expanded to any

17    person.  And "to the commission," your Honor, is similar to the

18    "within the jurisdiction of an agency of the federal

19    government."  It's just making clear that the statement had to

20    be made to, you know, or contemplated the statement would be

21    made and used by the CFTC as part of its supervisory and

22    regulatory authority.  And that's precisely what happened here.

23    Our point is, no court has implied concepts from *Janus* to a

24    false statement statute, and courts uniformly interpret

25    Section 6(c)(2) in accordance with its false statement

1    counterpart.

2              THE COURT:  I have looked at those cases, and they are

3    consent decrees.  First of all, they are district court

4    decisions dealing with consent decrees, so they're not really

5    precedent.

6              MR. RODGERS:  Your Honor, there's—well, there are

7    district court cases, but there's the *eFloor*—

8              THE COURT:  No, I read *eFloor*.  I read Judge

9    Gardephe's decision on *eFloor*.

10             MR. RODGERS:  Okay.

11             THE COURT:  This issue we're dealing with was not

12   discussed by Judge Gardephe.

13             MR. RODGERS:  My part is a smaller one, which is that

14   it makes sense to interpret the statute consistently because

15   the policy considerations are the same.

16             THE COURT:  Consistent with what?

17             MR. RODGERS:  1001.

18             THE COURT:  1001?

19             MR. RODGERS:  Yeah.

20             THE COURT:  That's a very broad statute.  It sweeps in

21   a lot of different things, and 6(c)(2) is not in the same

22   language; it's different language.

23             MR. RODGERS:  But it's also a remedial statute that's

24   meant to be interpreted broadly, and there's no indication—

25             THE COURT:  Yes, that's true, and maybe that is a

1    sufficiently wide umbrella to pick up what we're doing here.

2    But it's not the same as 1001.

3              MR. RODGERS:  1001—

4              THE COURT:  And it makes my issue more difficult.

5              The way I reason this, Mr. Rodgers, is that CFTC has a

6    supervisory authority over designated contract makers, and over

7    the products that are put up on the exchange for the designated

8    contract makers.  And in order to effectuate that policy, they

9    must gather information, and they gather information directly

10   from the designated contract maker, or designated contract

11   market, but they know and they appreciate that the information

12   will be coming from the originator of a product that's desired

13   to be traded on CBOE.  And so it's the expectation of the CFTC

14   to gather information from parties like Gemini, and it is

15   Gemini's expectation that the information it provides to the

16   CBOE will be passed on to the CFTC.  And in that context, one

17   can argue, and I'm likely to rule, that the provisions of

18   Section 6(c)(2) are satisfied, that it is a false or misleading

19   statement made by a person, Gemini, of a material fact, which

20   we've yet to discuss, to the commission.  And the fact that

21   it's done through an intermediary doesn't change it.

22             But then we run into *Janus*.  So what's your insight

23   about *Janus*?

24             MR. RODGERS:  Well, *Janus* is unique to its facts

25   because it's interpreting Rule 10b-5 and the judicially created

 1   private right of action.

 2          THE COURT:  Do you think Justice Thomas thought it was

 3   confined to its facts, a sport, of the law?

 4          MR. RODGERS:  I can just rely on——I can't, you know,

 5   read Justice Thomas's mind, but I can read his opinion, and

 6   what he says is that, you know, that the construction, that it

 7   construed *Janus* narrowly, and based on the specific context

 8   that they were deciding the decision in *Janus*.

 9          THE COURT:  Do you have that language in mind?

10          MR. RODGERS:  Yes, your Honor.

11          This is at 142 of the *Janus* opinion.  Justice Thomas

12   noted——

13          THE COURT:  One minute.  One minute.  One minute.

14          MR. RODGERS:  And we cite this in our briefing, but I

15   don't have the page cite there.

16          THE COURT:  Well, I'm looking at the language right

17   now.

18          It's not there, I don't think.

19          MR. RODGERS:  Excuse me, your Honor?

20          THE COURT:  I don't see it.

21          MR. RODGERS:  The court says, mindful that

22   concerns——they were——

23          THE COURT:  Okay.  I got it.  I see.  Yes.  I was on

24   the page before.

25          Citing *Stoneridge Investment Partners*.  Justice Thomas

1   cites the language, concerned with the judicial creation of a

2   private cause of action, cautioned against its expansion.

3   Thus, in analyzing whether JCM made the statements for purposes

4   of Rule 10b5, we are mindful that we must give narrow

5   dimensions to a right of action Congress did not authorize when

6   they first enacted the statute and did not expand when it

7   revisited the law.

8           And that cites a string of cases so narrowing the

9   statute.  But you're arguing that Section 6(c)(2) is remedial,

10  and entitled to a broad and liberal reading.

11          MR. RODGERS:  It involves statements to the government

12  rather than statements to investors.

13          THE COURT:  And more so the statements to the

14  government, it's made in the context of the supervisory

15  authority of the CFTC, and in order to obtain a product

16  exchanged on the designated contract market, which would be an

17  extraordinary achievement for Gemini and its ability to trade

18  cryptocurrency.  I have it.

19          I'm going to rule that the——

20          MR. BAUGHMAN:  Your Honor, might I be allowed to

21  respond?  Because they put in some evidence that——

22          THE COURT:  Yes, yes, yes.

23          MR. BAUGHMAN:  Please.

24          THE COURT:  As to the argument made by the SEC, in

25  another case, another place, it's of no concern to me.  I don't

1    care what you argue anywhere else.  I'm only concerned about

2    getting the things right in my court.

3            MR. BAUGHMAN:  I understand, your Honor.  I would like

4    to address precisely——

5            THE COURT:  Yes, you can.

6            MR. BAUGHMAN:  There is evidence in the record that

7    bears on this topic, your Honor.

8            THE COURT:  Say again?  I missed that.

9            MR. BAUGHMAN:  There is evidence in the record that

10   bears directly on this topic, your Honor.

11           THE COURT:  Okay.

12           MR. BAUGHMAN:  And I'd like to show it to you.

13           THE COURT:  Yes.

14           MR. BAUGHMAN:  What *Janus* says and what I submit is

15   the correct statement of the law under *Janus* is whether or not

16   you have the ultimate authority about making the statement.

17   And Mr. Lam, could we please put up slide 32.

18           THE COURT:  Do you have repeating language from *Janus*?

19           MR. BAUGHMAN:  Yes.

20           THE COURT:  I have *Janus*.  One makes a statement by

21   stating it.

22           MR. BAUGHMAN:  No, no, your Honor.  On slide 32, I'm

23   putting on the screen——

24           THE COURT:  Oh.

25           MR. BAUGHMAN:  Sorry.  Slide 33, okay?  We asked the

1    witnesses in this case——this is Mr. Reinstein of CBOE:

2             "Q.  It was ultimately CBOE that had the final

3    decision about what to say in this document; is that fair?"

4             "A.  Yes."

5             "Q.  And it was ultimately CBOE's decision whether or

6    not to pursue a self-certification in this case, right?"

7             "A.  Yes."

8             And look at the evidence from the CFTC.  We took

9    testimony from Mr. Kuserk.  He was the deputy director at the

10   time.

11            "Q.  And the DCM has the ultimate responsibility for

12   the content of the self-certification, correct?"

13            "A.  Yes."

14            And now let's go to——and we look at Mr. Winklevoss's

15   testimony.  Mr. Winklevoss was the president of Gemini.  He

16   testified, "We provided information to CBOE, but we did not

17   have control. . .  It's not our application."

18            And if we could go, Mr. Lam, please, to slide 66.

19            I want to show you something, your Honor, that's very

20   important on this question.  Because your Honor raised the

21   issue about, well, Gemini is providing information to CBOE and

22   CBOE, you know, it might want to get approved, okay?  I have on

23   the screen two provisions of so-called appendix C that they

24   cite in their reply brief on the subject of materiality.  And

25   they talk about the size and liquidity of the cash market, and

 1    the business practices.  But when they cited this to your

 2    Honor, they left out the requirements in red.  And what you see

 3    is that appendix C imposes an obligation on the DCM.  The DCM

 4    has to check the information that is given to it.  The DCM has

 5    a responsibility to certify in its own right, so that is why I

 6    showed you and began the morning, or the afternoon, by showing

 7    you the signature page of the document.

 8            THE COURT:  I take your point.

 9            MR. BAUGHMAN:  Yeah.  That's the point.

10            THE COURT:  I take your point.  The self-regulation

11    nature of the transaction puts a large responsibility on the

12    designated contract market.

13            MR. BAUGHMAN:  Correct, your Honor.

14            THE COURT:  No doubt.  But there's also the question

15    of oversight.  And that's CFTC's oversight, because the final

16    word is not with CBOE, it's with CFTC.

17            MR. BAUGHMAN:  Correct.

18            THE COURT:  CFTC has the final word.  And so the

19    question is, when Gemini supplies information to the CBOE, even

20    though CBOE has a right to control the information, reject the

21    information, perhaps even to change the information, but when

22    it passes along the information, it really is effecting the

23    carrying of a communication initiated by Gemini.

24            MR. BAUGHMAN:  And that's a jury question, your Honor.

25            THE COURT:  And it intended it to reach the CFTC.  It

 1    is not a jury question.  It's clear from the documentation.

 2                MR. BAUGHMAN:  Your Honor——

 3                THE COURT:  The issue is one of law.

 4                MR. BAUGHMAN:  Your Honor——

 5                THE COURT:  The issue is whether that kind of analysis

 6    passes muster with the statute, and my ruling of law is that it

 7    does.

 8                MR. BAUGHMAN:  Your Honor, respectfully, let me make

 9    my point, please.

10                THE COURT:  Yeah.  Have I ever stopped you from making

11    a point, Mr. Baughman?

12                MR. BAUGHMAN:  Yes.

13                THE COURT:  I have?

14                MR. BAUGHMAN:  It has happened over the two years of

15    this case, yes, you have.

16                THE COURT:  I've made rulings.

17                MR. BAUGHMAN:  Your Honor——

18                THE COURT:  It's my job.

19                MR. BAUGHMAN:  Look what happened in *Janus*.  In *Janus*,

20    the court made a ruling and remanded the case for further

21    proceedings.  It did not decide as a matter of law who the

22    speaker was.  The case was remanded on that point.

23                Judge Engelmayer's decision the other day deals with

24    the specific circumstance of a motion to dismiss.  Who the

25    speaker is is a question of something that a jury can decide.

 1   It's very similar to the issue of materiality.  You have a

 2   standard, a legal standard, was this made to the commission.

 3   That is what the question is.  But the jury is entitled to hear

 4   the evidence, the evidence we are discussing today, and form

 5   their own conclusion.  Absolutely, your Honor.  It is

 6   not——there is a dispute.  The whole we've been having for the

 7   last 90 minutes is a dispute over who spoke to the commission.

 8           THE COURT:  Facts are not disputed, the legal

 9   inference drawn from those is what's in dispute, and I made a

10   ruling, or before my rulings are final——I plan to write in this

11   area——I will certainly read closely the four cases that you

12   cite.

13           MR. BAUGHMAN:  Can you be——I want to be clear what

14   you——

15           THE COURT:  And I may change my mind.

16           MR. BAUGHMAN:  Your Honor, I want to be clear what

17   you're ruling.

18           THE COURT:  I'm ruling that Gemini is a maker of

19   statements eventually passed on through CBOE to the CFTC, and

20   I'm reasoning that there is an overall responsibility of the

21   CFTC to assure that the product on the designated contract

22   market is not readily susceptible to manipulation.  That's the

23   finding that the CFTC has to make.  It's not a finding that

24   ultimately is made by the CBOE, although it initially may make

25   that finding, but ultimately the finding has to be made by the

1    CFTC.  And in order to elicit that finding, both Gemini and

2    CBOE made representations to the CFTC, and in the case of CBOE,

3    those representations were based and entirely passed on

4    communications made by Gemini in the first instance.

5            MR. BAUGHMAN:  May I——

6            THE COURT:  I'm ruling, at least provisionally, that

7    those are statements that are made by Gemini to the commission

8    because they knew, they expected, and they wanted those

9    statements to be carried on to the CFTC by CBOE.  That's my

10   ruling.  I will read the cases you cited and it could change my

11   mind, but that's where I am right now.

12           MR. BAUGHMAN:  Well, I mean, your Honor, respectfully,

13   I vigorously disagree on the law.  I also disagree as a matter

14   of Rule 56.  I think there is a——

15           THE COURT:  I think you made that clear.

16           MR. BAUGHMAN:  ——strong——if your Honor is going to

17   make such a ruling, if you are going to make a ruling that as a

18   matter of law, you are finding that Gemini is the maker of

19   these statements to the commission within the meaning of

20   Section 6(c)(2), I would respectfully ask your Honor to certify

21   that question for an interlocutory appeal.  I think that

22   satisfies the statute completely because it's undisputed that

23   this is a partial summary judgment.

24           THE COURT:  Make that point at the end of the

25   arguments.

1          MR. BAUGHMAN:  Okay.  Well, I will.

2          The other thing is——and I got to jump in front of

3    this, your Honor——there is an assumption in your ruling for

4    which there is no evidence.  You said a few moments ago that

5    the CFTC had to make a decision about whether or not to certify

6    this product and whether or not this product complied with the

7    rules against manipulation.  That is not the evidence in this

8    case.  There is in fact no evidence in this case as to any

9    decision the CFTC made, because they have refused repeatedly to

10   answer that question.

11         Mr. Lam, could we please go to slide No. 52.

12         We asked them, over and over and over, what decision

13   did you make?  And then we were blocked.  I have on the screen

14   just examples of questions they refused to answer.

15         Q.  What decisions does the CFTC make?  Instructed not

16   to answer.

17         Q.  Can you testify as to any decision CFTC made?

18   Instructed not to answer.

19         THE COURT:  Is there any order made by the CFTC?

20         MR. BAUGHMAN:  Pardon?

21         THE COURT:  Did the CFTC issue any order?

22         MR. BAUGHMAN:  No.

23         THE COURT:  They just took all the information.

24         MR. BAUGHMAN:  There is no evidence that they even did

25   anything.

1          THE COURT:  Let me understand.  So the CFTC received

2    all this information, but never acted.

3          MR. BAUGHMAN:  There's no evidence they did anything.

4          THE COURT:  Okay.

5          MR. BAUGHMAN:  None.  Zero.  Because they refused to

6    answer.  We asked them——

7          THE COURT:  In other words, they never gave the

8    certificate that you wanted.

9          MR. BAUGHMAN:  There is no certificate, your Honor.

10         THE COURT:  What was it that you wanted?  What did

11   Gemini want?

12         MR. BAUGHMAN:  What did Gemini want?

13         THE COURT:  Yes.

14         MR. BAUGHMAN:  Gemini was approached by CBOE.

15         THE COURT:  It wanted to trade a product on CBOE.

16         MR. BAUGHMAN:  Incorrect, your Honor.

17         THE COURT:  It didn't want to?

18         MR. BAUGHMAN:  No.  That's not how this worked at all.

19         THE COURT:  It didn't want to have its product traded

20   on CBOE?

21         MR. BAUGHMAN:  No.  It wasn't Gemini's products, at

22   all.  That's not at all what was going on.  Not remotely.

23         THE COURT:  Well, what——

24         MR. BAUGHMAN:  Let me back up.  May I explain?

25         THE COURT:  What was Gemini's interest in this matter?

1            MR. BAUGHMAN:  Gemini was——CBOE approached Gemini.

2    That's the fact.  Gemini was approached by CBOE.  CBOE wanted

3    to create a product called a Bitcoin futures product.  CBOE is

4    in the business of offering futures.  It's one of the world's

5    largest futures exchange.  It can buy frozen orange juice or

6    pork bellies or yen futures.  That's what CBOE does.  CBOE came

7    to Gemini and said, we would like to create a Bitcoin futures

8    product.  We would like to get from you an input.  We need an

9    input for the price of the futures product, and we're going to

10   price our product off of the closing price of the Gemini

11   auction.  That's it.  Gemini did not——the product was not a

12   Gemini product.  Gemini didn't sponsor the product.  Gemini

13   didn't get trading fees on the product.  Gemini didn't host the

14   product.  None of that.  All of this was done by CBOE.  Gemini

15   was one input into a much larger product.

16           Now you said:  Why did Gemini want to do that?  The

17   same reason, you know, any business wants to do anything.  You

18   would like to, you know, have a business.  But the idea that

19   this was somehow a Gemini product is completely incorrect.  I'm

20   sorry.  But it is a utter misrepresentation.

21           THE COURT:  How would Gemini make money on this

22   transaction?  If it got the futures contract, if the futures

23   contract were to have been listed——

24           MR. BAUGHMAN:  Gemini's interest would be, generally

25   speaking, that it's good for their brand in the marketplace and

1    perhaps would attract more trading on the Gemini exchange.

2    That's it.  The trading fees went to CBOE.

3            THE COURT:  Mr. Rodgers?

4            MR. RODGERS:  Your Honor, there is undisputed evidence

5    that Gemini was deeply involved in the Bitcoin futures

6    contract, that it was a core piece of their business plan.  I

7    can pull up an exhibit that shows that Winklevoss is explaining

8    that they were going to seek a Bitcoin futures contract because

9    it was critical to the adoption of Bitcoin in the main——by

10   mainstream financial institutions.  There were ample benefits

11   to Gemini.  And I don't want to overstate it, but I'm pretty

12   confident they were compensated for their role in this, in this

13   process.  As to who reached out to who, Gemini had meetings

14   with the CFTC well in advance of, you know, engaging with the

15   CFTC, along with CBOE, and that was in the email I just showed

16   you.  So this is a partnership.

17           THE COURT:  The email you showed me was CBOE checking

18   with Gemini, but it was CBOE who was——

19           MR. RODGERS:  There's a comment in there from one of

20   the Winklevosses saying that it met with the CFTC on another

21   issue, but before they had started conversations with CBOE.

22   They were coming into the CFTC looking for ways to build their

23   brand, build their product.

24           THE COURT:  So what we're talking about is a futures

25   contract on CBOE, the price of which would be based on the

 1   price set by the closing on the Gemini auction.

 2              MR. RODGERS:  That's right.

 3              THE COURT:  And Mr. Baughman says that's not a Gemini

 4   product.

 5              MR. RODGERS:  Well, it's a product that they

 6   collaborated; they were partners.

 7              THE COURT:  Is it a Gemini product?

 8              MR. RODGERS:  That's a difficult question.  They were

 9   the cash settlement mechanism, and if you look at the CFTC

10   regulations, in appendix C, that is the very focus of the

11   review that the CFTC was conducting.

12              THE COURT:  Which that was the thing that they

13   manipulated.

14              MR. RODGERS:  Correct.  So it was a critical

15   component.  And it was extremely unique that it was just

16   settled in reference to a single——

17              THE COURT:  What was in it for Gemini?

18              MR. RODGERS:  Name recognition.  I do believe——like I

19   said, I don't want to overstate it——they were compensated for

20   their role.  But this is critical to building their brand.  You

21   have to keep in mind, 2017, there was not general or broad

22   adoption of Bitcoin.  They had just had a ETF application

23   rejected that would include components of the Gemini exchange.

24   And, you know, that was recently adopted by the SEC.  But this

25   idea that you could partner with a regulated entity and sort of

1    get the seal of approval from CBOE really was a boon to Gemini

2    and the Bitcoin industry generally, and would have drawn

3    attention to the 4 p.m. Bitcoin auction and attracted big

4    traders to the auction, because they're saying they've made it

5    in a mainstream listing.  It's a huge boon to them.

6            THE COURT:  Before I get Mr. Baughman's comment, he

7    also was asking about what decision the CFTC made.

8            MR. RODGERS:  Mr. Baughman has raised——Gemini.  Excuse

9    me.

10           THE COURT:  I'm asking that.  What decision did the

11   CFTC make?

12           MR. RODGERS:  They had an independent obligation to

13   review the Bitcoin futures contract.  We submitted declarations

14   from the director of DMO.

15           THE COURT:  I'm asking a simple question.

16           MR. RODGERS:  They——

17           THE COURT:  Was there ever an order issued by the CFTC

18   of approval?

19           MR. RODGERS:  They did not make an up-and-down

20   decision on whether it was appropriate or inappropriate for the

21   Bitcoin futures contract to be listed.  But within the

22   statutory framework and the regulatory framework, the CFTC can

23   stay the listing if they find an issue with it, or they can

24   request and mandate changes.  We can also request additional

25   information.  All of which happened in this case, except for

 1    the staying piece.

 2            THE COURT:  All right.  So I'm going to ask you again.

 3    At the end of the game, did the CFTC just have inaction, or did

 4    it issue any kind of an order?

 5            MR. RODGERS:  They decided to take no action with

 6    respect to the listing.  After the review.

 7            THE COURT:  And is it required as a precondition of

 8    the DCM having certain product on its market that that product

 9    be in effect certified in some way by the CFTC?

10            MR. RODGERS:  The party, the DCM, in this case,

11    alongside Gemini, but the DCM comes into the CFTC and says, we

12    certify that this product complies with the listing

13    requirements, and then the CFTC has an independent review

14    obligation and can take action with respect to the——

15            THE COURT:  So if it doesn't take action, can the

16    designated contract market list that particular product?

17            MR. RODGERS:  That's how the framework is set up is,

18    the CFTC says——well, doesn't say, but they're like——and then

19    this is what happened in this case, because there was this

20    preliminary process, said, we are not going to take action.

21    Get your self-certification.

22            THE COURT:  The CBOE did issue a self-certification,

23    didn't it?

24            MR. RODGERS:  That's right.

25            THE COURT:  So has that product been traded?

1           MR. RODGERS:  It was——yeah, it did trade.

2           THE COURT:  Does it continue to trade?

3           MR. RODGERS:  Once the CBOE caught wind of this

4   investigation, they delisted the product.

5           THE COURT:  What?

6           MR. RODGERS:  Once CBOE caught wind of this

7   investigation, they delisted the product.

8           THE COURT:  They did.

9           MR. RODGERS:  Yes.

10          THE COURT:  So they could have continued trading it,

11  could they have not?

12          MR. RODGERS:  Arguably it could have continued to

13  trade or the CFTC could have taken some action with respect to

14  it, but that was not necessary because they voluntarily

15  delisted the product.

16          THE COURT:  Okay.

17          MR. BAUGHMAN:  May I make a couple points, your Honor?

18          THE COURT:  Yeah.  Just let me——I'm trying to absorb

19  this.

20          MR. BAUGHMAN:  Okay.

21          THE COURT:  Give me just one minute.

22          How did the interchange between CBOE and the CFTC

23  become initiated?  Who did what to initiate the relationship

24  over this product?

25          MR. RODGERS:  Well, there was the first——the first

1    meeting was on July 25, 2017, and that would have been

2    initiated by CBOE.

3              THE COURT:  And——

4              MR. RODGERS:  It was also——sorry.  I just want to be

5    clear.  There was also a prior email after the earlier——I think

6    in April of 2017.

7              THE COURT:  By who and to whom?

8              MR. RODGERS:  I believe there was a meeting or call,

9    initial precall in April of 2017, and then——with CBOE and the

10   CFTC, and then there was the July 25, 2017, meeting with CBOE

11   and Gemini.

12             THE COURT:  Did the CFTC initiate an inquiry about

13   that product or did CBOE come to the CFTC?

14             MR. RODGERS:  So the product had not been listed yet,

15   so these were preliminary discussions.  This initial discussion

16   was to propose the product, to gauge the CFTC's reaction and

17   interest, and in response to that meeting, the CFTC had

18   follow-up questions that would have been responded to, and then

19   there were incremental submissions on September 12, 2017, and

20   then there was a market order analysis that was submitted along

21   with draft and final product certification letters, all seeking

22   the CFTC's review and feedback.

23             THE COURT:  At what point, if any, did CBOE certify

24   the product?

25             MR. RODGERS:  On December 1, 2017.

1           THE COURT:  And what happened?

2           MR. RODGERS:  The letter——I think ten days later the

3    product started listing for trading.

4           THE COURT:  Say again?

5           MR. RODGERS:  Ten days later, the product was listed

6    for trading.

7           THE COURT:  Yeah.  Then?

8           MR. RODGERS:  Then it traded until——and I have to kind

9    of rely on my colleagues for——till March 2019, when it was

10   voluntarily delisted by CBOE.

11          THE COURT:  So it traded for a year and three or four

12   months after, before being delisted.

13          MR. RODGERS:  I'm sorry?

14          THE COURT:  It traded for a year and three or four

15   months before being delisted.

16          MR. RODGERS:  That's correct.

17          THE COURT:  And Mr. Baughman has been trying to get

18   the communication between CFTC and CBOE that caused the

19   delisting, or that preceded the delisting.

20          MR. RODGERS:  That's not what I understand him to be

21   requesting.  He's requesting, and has requested throughout

22   litigation, the internal communications within the CFTC because

23   their theory is that in order to demonstrate materiality, there

24   has to be a specific decision that was influenced.

25          THE COURT:  Is there in the record any kind of a

1    communication between CBOE and CFTC preceding a meeting to the

2    trade stop?

3             MR. RODGERS:  I'm not sure, your Honor.

4             MR. TOMER:  Your Honor, if I may.

5             THE COURT:  Yes.

6             MR. TOMER:  My understanding——

7             THE COURT:  Give me your name again, sir.

8             MR. TOMER:  Brent Tomer, your Honor.

9             THE COURT:  Yes.

10            MR. TOMER:  My understanding is that there were oral

11   communications.  I want to be careful here to not sort of dive

12   into the internal deliberations of the CFTC, but between CFTC

13   and CBOE, my understanding is that there were oral

14   communications via phone calls, etc., concerning the delisting.

15   And I think it was limited to oral communications and emails

16   sent to the——

17            THE COURT:  There's something definitely on the

18   record, though, about that.

19            MR. TOMER:  Correct, your Honor.

20            THE COURT:  Okay.  Mr. Baughman.  Then I want to take

21   a little break.

22            MR. BAUGHMAN:  Of course.  I want to go back to

23   evidence, because there was a lot of statements that were made

24   that are not——or we dispute are not in the record.  And I would

25   need to show you a few things.

```
 1              First, your Honor asked specifically whose product was
 2      this.  And you didn't get a very clear answer.  But it's in the
 3      record.  Look on the screen, your Honor.  Document 83-8.  This
 4      is the self-certification.  And look at what it says.  In the
 5      fourth line, it says, a cash-settled bitcoin future to be
 6      traded on CFE called CBOE Bitcoin (USD) (XBT) futures
 7      (product).  This was CBOE's product.  CBOE designed it, CBOE
 8      wrote it, CBOE's responsible for it.  It's not a Gemini
 9      product.  That's the facts.
10              Now we go to this question of decision.  And here is
11      why it is so important, your Honor.
12              If I could ask Mr. Lam to please go to slide 41.
13              Okay?  This is the law that applies to the question of
14      materiality.  Both sides cite the cases.  The principle of law
15      is not disputed.  And it says, "[A] statement is material——"
16              THE COURT:  We haven't gotten into materiality yet.
17              MR. BAUGHMAN:  But, your Honor, I want to——I need to——
18              THE COURT:  That's the next point.
19              MR. BAUGHMAN:  But——
20              THE COURT:  It's the next point.
21              MR. BAUGHMAN:  Okay.  If we want to——let me respond to
22      one other thing then and perhaps we can take a break?
23              THE COURT:  Right.
24              MR. BAUGHMAN:  Let's look at slide——
25              THE COURT:  And I want to rule on the relationship of
```

1   *Janus* to this case, then we'll take a break.

2          MR. BAUGHMAN:  Okay.  But, slide 54.

3          Okay.  They have relied heavily in their papers——and

4   you just heard counsel do it, rely on an affidavit submitted by

5   someone named Mr. McGonagle.  I submit, your Honor——and they

6   did this in reply.  We didn't have the chance to respond in

7   writing.  Okay.  You should not rely on the McGonagle

8   affidavit.

9          THE COURT:  I don't remember it.  Who is he?

10         MR. BAUGHMAN:  He is currently the director of the

11  division of DMO, Division of Market——at the CFTC, okay?

12         THE COURT:  And what did he say that I should not pay

13  attention to?

14         MR. BAUGHMAN:  They are relying on Mr. McGonagle as

15  evidence of what the decision the CFTC made.  Remember I showed

16  you that when we asked at depositions——

17         THE COURT:  They didn't make a decision.

18         MR. BAUGHMAN:  But they're relying on McGonagle's

19  affidavit to say, we had the ability to make various decisions.

20  That's the evidence they're submitting to your Honor.

21         THE COURT:  That's a question of law.  I interpret

22  that in terms of its oversight.

23         MR. BAUGHMAN:  But your Honor——

24         THE COURT:  The CFTC could have done one of three

25  things.  It could have said, okay, CBOE, go trade; could have

1    said, don't trade; or, which is also an action, it could do

2    nothing, which puts the thing into limbo and which makes CBOE

3    uncertain, which is a characteristic agency maneuver when it

4    doesn't want to go on the record but it doesn't want to prove

5    either.

6              You've made some very good points, Mr. Baughman,

7    which, although I made my ruling, I confess to some second

8    thoughts on this, and I've got to think about it some more, in

9    terms of this being CBOE's products.  And sure, it would be of

10   enormous benefit to Gemini, and would grant legitimacy to

11   Gemini, and its exchange would become much busier.  I can

12   appreciate that.  But I have to pull it all together, and I

13   haven't done that.

14             I want to just speak now about my attitude towards

15   *Janus*, and then we'll take a short break.

16             I regard *Janus* as a distinguishable case.  First, on

17   the facts.  The lawsuit was brought by a stockholder of Janus

18   Capital Group.  The statements that were allegedly

19   misrepresentations that we don't really know what they were

20   from the opinion, there's been some suggestion having to do

21   with whether or not there was day trading permitted by Janus,

22   in its funds.  Statement was made in the prospective issued to

23   Janus's shareholders, mutual fund shareholders.  The fund made

24   the statement with its own board of trustees having legal

25   responsibility for whatever happened to the fund, but

1    practically speaking, by the manager of the fund and the

2    investment advisor, a subsidiary of Janus Capital Group called

3    Janus Capital Management.  And Justice Thomas held that the

4    statement was made to the shareholders of Janus Fund by Janus

5    Fund.  If those shareholders were to have sued for the

6    misrepresentations, it would be anyone's guess whether Justice

7    Thomas would have ruled the same way.  This is a lawsuit by

8    someone complaining about some kind of a derivative activity.

9    If shareholders had been lost to Janus Mutual Fund and if the

10   annual fee or whatever percent of 1 percent there was would

11   have resulted in less money, and if that less resulted in less

12   profits to Janus Capital Group, then perhaps there would be

13   some kind of a cross-examination into it.  It's so indirect,

14   and so offbeat, that it doesn't have a relationship to what a

15   government agency has to do in terms of its oversight.

16          Now Section 10-b5 has been subject to a series of

17   restrictive holdings by the Supreme Court, ever more

18   constrictive of the implied right of action.  The Supreme Court

19   has not done that in terms of core agency oversight over a

20   particular area.  And this is a core oversight by the CFTC on

21   trading on futures markets.  It's the CFTC's job to assure that

22   there is fair trading on those markets, and in order to assure

23   that, it must get information; it must get information from the

24   market, and it must get information from those having products

25   in the market or related to the market or connected with the

market.  And the market there is a futures contract regarding

cryptocurrency.  And so because of the CFTC's oversight and

because it anticipated getting information not only from CBOE

but from other interested parties, and because Gemini was such

an interested party, and understood that the statements it made

to CBOE would be in turn retransmitted to the CFTC, and

ultimately hoping for the CFTC's blessing on trading, I hold

that CFTC was the maker.

Now as I said before, those are my initial rulings.  I

want to read those four cases that Mr. Baughman has cited,

cases of my colleagues in the district court.  And I want to

consider more carefully the argument that Mr. Baughman made

about CBOE's self-interest in this particular matter.  But

those are my initial rulings.

Now we'll take a short break and we'll come back in

about five minutes.

MR. BAUGHMAN:  Thank you very much, your Honor.

(Recess)

```
 1                    (In open court)

 2              THE COURT:  Mr. Rodgers pony up.

 3              Mr. Baughman, concede the podium, please.

 4              MR. BAUGHMAN:  I just wasn't sure where we were

 5    headed.

 6              THE COURT:  Materiality.

 7              MR. RODGERS:  Thank you, your Honor.  I think one

 8    administrative matter, I think at the end of the hearing the

 9    first section you might have said CFTC was the maker, and I

10    wanted to make sure Gemini was the maker.

11              THE COURT:  I didn't hear what you were saying.

12              MR. RODGERS:  I believe before the break you made a

13    provisional ruling, and I think I heard you say -- the

14    transcript might reflect the CFTC was the maker, and I wanted

15    to clarify it was Gemini was the maker of the statements.

16              THE COURT:  If I said that, I was in error.  I meant

17    Gemini.  CFTC is a recipient, not the maker.

18              MR. RODGERS:  I just also wanted to point out that

19    Gemini did receive licensing fees as part of their engagement

20    with CBOE in addition to being a key component of the product

21    certification.

22              THE COURT:  Licensing fees from whom?

23              MR. RODGERS:  I believe -- they got licensing fees

24    from CBOE as part of their compensation for participating in

25    the bitcoin futures contract.  We allege this at paragraph 34
```

```
 1    of our complaint, and that was admitted by Gemini in the

 2    answer.  And they also admitted that --

 3              THE COURT:  It tends to show the interest of CBOE in

 4    the product.

 5              MR. RODGERS:  Yes.  So the allegation, your Honor, is

 6    the bitcoin futures contract was expected to benefit Gemini's

 7    business, as such, among other ways -- sorry -- such as, among

 8    other ways, through licensing fees and increasing trading

 9    volume on the Gemini Exchange and during the Gemini Bitcoin

10    Auction, and in their answer, Gemini admits to allegations in

11    this paragraph.  I just wanted to direct your attention to that

12    in terms of the benefits --

13              THE COURT:  What use of that is to me?

14              MR. RODGERS:  It was just -- I think you were

15    equivocating or had some questions about the benefits to

16    Gemini.

17              THE COURT:  What use would it make to me?

18              MR. RODGERS:  It shows --

19              THE COURT:  You're telling me there are licensing fees

20    that came from the CBOE I guess because they're using Gemini's

21    auction?

22              MR. RODGERS:  As well as the increased trading volume

23    that they admitted to.

24              THE COURT:  And Gemini would expect increased trading

25    volume.  We talked about that.
```

```
 1              MR. RODGERS:  Right.

 2              THE COURT:  All right.  Let's do materiality.

 3              MR. RODGERS:  Your Honor, do you want to address

 4    materiality in the context of each specific false statement?

 5              THE COURT:  Give me one false statement.

 6              MR. RODGERS:  I think it makes sense to --

 7              THE COURT:  One false statement.  And then after that,

 8    we'll -- at the end of the discussion, I'll ask you to what

 9    extent my rulings apply to other statements, and you might

10    overnight think about that and discuss with Mr. Baughman to

11    what extent you agree because, if not, I will have to hear

12    arguments.

13              MR. RODGERS:  Okay.  Let me get to my spot here.

14              THE COURT:  So the rule of law is that which

15    influences or is capable of influencing, something like that.

16              MR. RODGERS:  That's correct, capable of influencing

17    agency decision-making or distracting investigators away from

18    critical matters.

19              THE COURT:  So a representation of prefunding without

20    disclosing that the prefunding also accounted for loans made by

21    Pearl Street was a misstatement.  And your argument is that

22    misstatement was capable of misleading, and reasonably would

23    mislead, the CBOE and the CFTC in terms of the reliability of

24    the market.  If the closing price on the Gemini Exchange would

25    be the reference point for the pricing of the futures contract,
```

1    and that price was readily susceptible to manipulation, then

2    that would be material, and an omission, therefore -- this was

3    your argument -- an omission therefore to state that it was not

4    prefunded, that trades were not prefunded; that they were

5    encouraged by lending by Gemini's affiliate Pearl Street made

6    this a material misstatement -- made this a misstatement and a

7    material misstatement.  That's your argument, right?

8              MR. RODGERS:  That's correct.

9              THE COURT:  Okay.  Mr. Baughman?

10             MR. BAUGHMAN:  My response is could we start at page

11    41 of the slides.  That is an argument.  It is an assertion.

12    It is a thing that Mr. Rodgers and counsel are testifying to

13    but materiality requires evidence, actual evidence.  And let me

14    show you the Supreme Court has held that repeatedly.  The

15    Second Circuit has held that repeatedly.  We do not dispute

16    and, I have on the screen the standard is capable of

17    influencing decision of a decision-making body to which it is

18    addressed.  That's the standard.

19             It is important to note that is not a standard unique

20    to government agencies.  The decision-making body can be a bank

21    or a financial institution.  It can be anybody, okay.  The key

22    thing you need to know, your Honor, is this:  Material means

23    important.  It's not the same as just being relevant.  The

24    *United States v. Calderon* case, which the government cites says

25    that the material misrepresentation must matter in a meaningful

1    way to a rational decision-maker.

2           Your Honor has already held at Docket No. 77 that a

3    materiality must be critical.  It must be critical qualifying

4    information.  That is your Honor's ruling.  And what the cases

5    tell us is that the question of materiality is a fact question

6    for a jury.  Let me show you, please.

7           *United States v. Kungys* is the Supreme Court case from

8    1987.  Mr. Kungys may or may not have been a Lithuanian Nazi

9    who participated in the murder of 2,000 Jews.  He emigrated to

10   the United States and he lied on his citizenship application.

11   He lied about his birthdate and his place of birth.  And the

12   INS was trying to de-citizenship him, take away his

13   citizenship.

14           THE COURT:  Denaturalization.

15           MR. BAUGHMAN:  There you go.  They were trying to kick

16   him out.  And it went to the Supreme Court, and the question

17   was, was his lie -- he admitted that he lied about his

18   birthdate and his place of birth, and the question was, was

19   that material to granting him citizenship.  And the Supreme

20   Court said the materiality of a statement rests upon a factual

21   showing.  The Supreme Court said establishing materiality

22   requires proof.  And the Supreme Court said defendant can

23   contest materiality with "evidence."  Nine years later --

24           THE COURT:  What happened to Escobar?

25           MR. BAUGHMAN:  It got remanded.  *Kungys* got remanded.

```
 1              THE COURT:  For proof that birth place and birthdate
 2   would be important in a naturalization decision.
 3              MR. BAUGHMAN:  Yes, they needed evidence.  Then eleven
 4   years later in the Gaudin case --
 5              THE COURT:  Just comment on Escobar because just lying
 6   about your date of birth and where you were born doesn't tell
 7   us much about how significant it is unless there's proof to
 8   show it's significant.
 9              MR. BAUGHMAN:  I think Escobar is a different case,
10   your Honor.  The case I was talking about was Kungys lying
11   about your date of birth.
12              THE COURT:  Spell it.
13              MR. BAUGHMAN:  Kungys, K-U-N-G-Y-S, Supreme Court
14   case.  And Gaudin is 1998 Supreme Court case.  I think it's
15   very instructive.  In this case, the defendant was charged with
16   making false statements to HUD in connection with some federal
17   programs.  The trial court judge in the district of Montana
18   instructed the jury that the statements were material.  He took
19   that issue away from the jury, and the Supreme Court reversed.
20              The Supreme Court held in Gaudin that: "Deciding
21   whether a statement is material requires the determination of
22   at least two questions of purely historical fact:  (A) what
23   statement was made?  And (B) what statement was the agency
24   trying to make?  The ultimate question whether the statement
25   was material to the decision requires applying a legal standard
```

 1    of materiality to these historical facts.  And it says that

 2    this is a mixed question of law and fact that has typically

 3    been reserved for juries."  And subsequent cases from this

 4    district and from this circuit show very clearly how

 5    materiality is an important question for a jury.

 6            The *U.S. v. Litvak* case is a good example.  It's

 7    another case involving false statements involving a HUD

 8    program, and the conviction was reversed because the government

 9    did not submit evidence.  It had no evidence demonstrating that

10    the statements were capable of influencing the Department of

11    the Treasury.

12            THE COURT:  What were the statements?

13            MR. BAUGHMAN:  They were false statements on HUD loans

14    to get financing for certain --

15            THE COURT:  What were the false statements?

16            MR. BAUGHMAN:  Specifically, I don't remember, your

17    Honor, but the question was there.

18            Another good example *United States v. Rigas*.  You

19    probably remember the Rigases.  They were the family that owned

20    Adelphia, and they were prosecuted in a big fraud.  In this

21    case, Count 23 of the indictment against them was reversed, and

22    the conviction was reversed in this sense:  The Rigases had

23    submitted false statements about their income to a bank in

24    order to get certain loans, and the conviction was reversed

25    because the government did not put on evidence that the bank's

1    investment decisions specifically had to do with what interest

2    rate to charge on the loans.  The government failed to present

3    evidence that the statements in the documents affected the

4    decision.

5         The case going the other way is the *Calderon* case.

6    This is another case involving false statements to a bank,

7    specifically forged bills of lading.  And in that case, unlike

8    *Rigas* and unlike *Litvak*, the conviction was affirmed because

9    the government "presented substantial evidence at trial that

10   the banks would have rejected bills of lading that had not been

11   altered."  They called witnesses to testify to this.  And it

12   should be undisputed that materiality is a jury question.

13        In connection with preparing for this trial, your

14   Honor, I did work on the jury instructions, and I went and read

15   jury instructions in the most recent CFTC cases.  There are

16   two.  One of them is a case called *CFTC v. Walczak* from the

17   District of Wisconsin.  Counsel at this table participated in

18   that trial, and the question of materiality was submitted to

19   the jury in the District of Wisconsin.  There was a jury

20   instruction on materiality.  Same thing in the case *CFTC v. EOX*

21   *Holdings*, a recent case from the District of Texas.  The CFTC

22   participated in a trial where materiality went to the jury.

23   And the cases they are relying on are inapplicable.  They rely

24   significantly on tax cases.  They have a whole discussion in

25   their brief about a case called *U.S. v. Klausner*.  What

1  *Klausner* is, is a tax case, and it says that if you

2  misrepresent your income on your tax return, that is *ipso facto*

3  a material misstatement in your taxes.

4          I'll be honest, that doesn't really offend me.  It's

5  not really crazy that sort of fundamentally misrepresenting on

6  a tax form is material, but that's not this case.  And that

7  doesn't apply in this case.

8          THE COURT:  So I generally thought that prefunding was

9  a pretty important principle.  It said so in its documents.

10  And it's clear that the CFTC was interested in it in terms of

11  judging the reliability of the marketplace and the reliability

12  of the pricing mechanism of the Gemini Auction.

13          MR. BAUGHMAN:  Respectfully, your Honor, that's not

14  true.  There is no evidence of that.  There is no evidence.

15          THE COURT:  They asked questions to elicit

16  information.

17          MR. BAUGHMAN:  No.  No, they didn't.  This is the

18  point, your Honor.  Prefunding is not mentioned in Appendix C.

19  The CFTC never asked the question about --

20          THE COURT:  They asked about it's readily susceptible

21  to manipulation.

22          MR. BAUGHMAN:  They did.

23          THE COURT:  And there was --

24          MR. BAUGHMAN:  And they published guidance which is in

25  Appendix C.  In fact, when we asked in discovery what guidance

1    did the CFTC give as to what matters about what is readily

2    susceptible manipulation, they said in their answers to

3    interrogatories that the only thing to look at was Appendix C.

4    They said don't look anywhere else.

5              THE COURT:  Isn't it true that Gemini's own documents

6    concerned itself with prefunding?

7              MR. BAUGHMAN:  Among many, many, many other things.

8              THE COURT:  Isn't it true they did?

9              MR. BAUGHMAN:  The word prefunding is in Gemini's

10   documents.

11             THE COURT:  In the policy manuals.

12             MR. BAUGHMAN:  It is.

13             THE COURT:  And in the requirement of trading?

14             MR. BAUGHMAN:  I think you mean the user agreement.

15             THE COURT:  And in the statement that trades wouldn't

16   be made unless there was prefunding and pre-holding of stocks

17   to be delivered -- of the crypto to be delivered.

18             MR. BAUGHMAN:  I agree with that, your Honor, but that

19   is not evidence that the CFTC --

20             THE COURT:  Mr. Baughman, please.

21             And isn't it true that the CFTC in inquiries made to

22   CBOE and from there to Gemini, isn't it true they were asking

23   about prefunding?

24             MR. BAUGHMAN:  No, that is false.

25             THE COURT:  Not true?

1          MR. BAUGHMAN:  There is no evidence.  There is no

2    evidence.

3          THE COURT:  No evidence that CFTC was interested in

4    prefunding?

5          MR. BAUGHMAN:  None whatsoever.  None.

6          THE COURT:  Let's see what --

7          MR. BAUGHMAN:  It is undisputed --

8          THE COURT:  Let's see what Mr. Rodgers says.

9          MR. BAUGHMAN:  They never asked, not once.

10         MR. RODGERS:  Your Honor, I take your point, and I

11   won't belabor it.  Defendant's position prefunding from the

12   outset, as directed towards the core requirements of core

13   principle three, including Appendix C, and they stated in no

14   uncertain terms that prefunding was a protection against

15   manipulation going directly to the requirements.

16         THE COURT:  Who said that?

17         MR. RODGERS:  The statements themselves.  We can look

18   at --

19         THE COURT:  Gemini's statements.

20         MR. RODGERS:  Gemini -- every document advocacy piece.

21         THE COURT:  I want to just point that out, and

22   Mr. Baughman agreed.  But is there any indication of CFTC

23   interest in prefunding?

24         MR. RODGERS:  Yes, your Honor, there is.

25         THE COURT:  Don't do that, Mr. Baughman.  Don't be

```
 1    juvenile.
 2              MR. BAUGHMAN:  I didn't mean to do anything.
 3              THE COURT:  You're showing nods.
 4              MR. BAUGHMAN:  I didn't.
 5              THE COURT:  Why don't you sit down?
 6              MR. BAUGHMAN:  Okay.
 7              THE COURT:  You ought to know that counsel is
 8    poker-faced.
 9              MR. BAUGHMAN:  I understand, your Honor.
10              THE COURT:  Go ahead, Mr. Rodgers.
11              MR. RODGERS:  During the deposition of Christopher
12    Goodman, who is an economist at the CFTC, who was the recipient
13    of all the prefunding statements that were made, he testified
14    that leverage and the provision of leverage by an exchange is
15    an important factor that should have been disclosed as part of
16    the detailed description of the cash market that's required
17    under Appendix C.
18              THE COURT:  And how did he define leverage?
19              MR. RODGERS:  Excuse me, your Honor?
20              THE COURT:  How did he define leverage?
21              MR. RODGERS:  He defined it as borrowing funds, and
22    including funds that were borrowed from an affiliate or
23    somebody that is affiliated with the Exchange.
24              THE COURT:  The more capacity an investor or
25    speculator has to trade, the more possibility there is of
```

1  manipulation because of trading on somebody else's money.  Is
2  that what we're saying?
3          MR. RODGERS:  Correct.
4          THE COURT:  For leverage?
5          MR. RODGERS:  Yes.
6          THE COURT:  Anything else?
7          MR. RODGERS:  That in and of itself is sufficient
8  evidence to show that it was a factor that the CFTC considers
9  under the applicable guidance and therefore sufficient to show
10 that it was capable of influencing the decision-making of the
11 CFTC.
12          MR. BAUGHMAN:  Your Honor, may I respond?
13          THE COURT:  Let him finish, okay, Mr. Baughman?
14          MR. BAUGHMAN:  I thought he did.
15          MR. RODGERS:  I'm happy to go through the testimony.
16          THE COURT:  Yes.
17          MR. RODGERS:  Let's go to the testimony.  I think it's
18 helpful because Mr. Goodman was asked repeatedly where it says
19 in Appendix C that you have to disclose that an exchange or
20 that borrowers were using credit leverage and margin, so can I
21 get -- it's GX Exhibit 9, please, at 24 and 25.  This is the
22 testimony.  I think it's helpful to kind of review it together.
23 This is on page 103 of his transcript starting at line 9, he
24 was asked --
25          THE COURT:  This is Christopher Goodman?

1          MR. RODGERS:  Yes.

2          THE COURT:  Who is what?

3          MR. RODGERS:  An economist at the CFTC in the division

4    of market oversight.

5          THE COURT:  And he's an employee at the CFTC?

6          MR. RODGERS:  He's an employee of the CFTC.

7          THE COURT:  Yes.

8          MR. RODGERS:  He's asked, "Is there any guidance that

9    the CFTC has offered that would have specified to Gemini that

10   it needed to disclose whether any of the participants in the

11   Gemini auction were using borrowed or advanced or pre-credited

12   funds?"

13         He answers, "Yeah, I mean, again, I would say that

14   there's a requirement for a detailed description of the cash

15   market."  That is specifically referenced in Appendix C.

16         And then he goes on to say in sum and substance that

17   providing leverage or if someone is being provided leverage,

18   that seems to be a relevant factor that should be disclosed.

19   Going on to the other page there on 104.

20         Then he's asked, "What publicly available guidance is

21   there that would have told Gemini that the CFTC reviews whether

22   or not leverage was used to participate in the Gemini auction

23   was material in any way to compliance with core principle three

24   or any decision by the CFTC?"  And he goes,

25             "Again, I would just go back to the previous

1    statements about the requirement that they provide a detailed

2    description and that they consider the factors that could

3    potentially lead to manipulation in the market."  He goes on to

4    say at the bottom, "That's a pretty major factor to be leaving

5    out of a detailed description of a cash market."

6          THE COURT:  Okay.  Anything else?

7          MR. RODGERS:  No.  I'll leave it there as the

8    testimony and evidence that shows that the provision of

9    leverage is a major factor that the CFTC considers.

10          THE COURT:  Mr. Baughman, relax, will you?  Sit down.

11          MR. BAUGHMAN:  I thought he was finished.

12          THE COURT:  I'm not going to rule without giving you

13   an opportunity.  We have lots of statements in Gemini's

14   materials about the importance of prefunding, Mr. Rodgers.

15          MR. RODGERS:  That's correct, your Honor.

16          THE COURT:  So they consider it significant.

17          MR. RODGERS:  They would demonstrate that Gemini

18   itself viewed the material as -- sorry, the information as

19   material and by presenting it to the CFTC, they are -- you

20   know, making the affirmative representation that prefunding is

21   a protection against manipulation, and they're inviting the

22   CFTC to consider that information as part of their review.

23          THE COURT:  There were many instances where the CFTC

24   had questions that they addressed the CBOE to obtain answers,

25   were they not?

1          MR. RODGERS:  They did -- yes, there was one instance

2    where they asked a series of followup questions.

3          THE COURT:  Just one time?

4          MR. RODGERS:  That's right.  There were some oral

5    communications that resulted in subsequent submissions, but

6    there was one instance where there was a list of specific

7    questions that were asked.

8          THE COURT:  Did anything in those list of questions

9    have to do with prefunding?

10         MR. RODGERS:  Yes, your Honor.  In the response to the

11   CFTC's questions about whether a trader could break the auction

12   by distorting the continuous market, there were representations

13   made in that document that addressed prefunding and a trader's

14   cost of capital, and they made representations that placing

15   orders on the continuous market and the Gemini auction requires

16   capital to be held, making spoofing and other manipulative

17   techniques quite expensive and inefficient.

18         THE COURT:  Could you put that up?

19         MR. RODGERS:  Sure, your Honor.  Could we go to C-1,

20   please.  This is a demonstrative, but we can go to the

21   document.

22         THE COURT:  Exhibit 19.

23         MR. RODGERS:  Yes.  If you go to exhibit 19 at 13.

24   This is the question.

25         THE COURT:  What number is it?

 1          MR. RODGERS:  Question 19.  It's on page 13 of the

 2   ECF.  For Exhibit 19.

 3          THE COURT:  "Could a trader break the auction by

 4   distorting the continuous market," is that where it is?

 5          MR. RODGERS:  Yes, that's correct.  And part of their

 6   response relies on this concept of cost of capital and the

 7   increased cost of capital associated with prefunding, so we've

 8   highlighted the language here that makes this point starting

 9   with "moreover."

10          THE COURT:  "Moreover the manipulation of the

11   continuous trading book would likely require substantial

12   capital commitment and not yield a predictable outcome for the

13   malicious market participant.  Because the futures contracts

14   settle to the Gemini auction price rather than to the

15   continuous market prices, there is no guarantee that contract

16   settlement would be affected favorably for the malicious

17   participant.  In fact, in the interest of a failed Gemini

18   auction, the procedure outlined in question 12 would determine

19   the settlement price, likely thwarting any attempted

20   manipulation."

21          So you're pointing the substantial capital commitment

22   and not yield the predictable outcome with the idea that a

23   requirement of prefunding limits the available capital to

24   someone who wants to spoof the market or create an artificial

25   market?

```
 1                  MR. RODGERS:  Correct.

 2                  THE COURT:  Got it.  So these are questions put by the

 3    CFTC to CBOE, and the answer came back from Gemini to CBOE, and

 4    then to CFTC?

 5                  MR. RODGERS:  So it's this document --

 6                  THE COURT:  In the responses.

 7                  MR. RODGERS:  It was sent to the CFTC from CBOE, but

 8    this document is on Gemini letterhead.  We can go to the cover

 9    email.

10                  THE COURT:  These two paragraphs that we're talking

11    about, these are Gemini's answers?

12                  MR. RODGERS:  That's correct.

13                  THE COURT:  The question is:  Does the CFTC puts could

14    a trader break the auction by distorting the continuous market?

15                  That was the question put by the CFTC.

16                  MR. RODGERS:  Directly to Gemini.

17                  THE COURT:  And this is the response.

18                  MR. RODGERS:  That's right.

19                  THE COURT:  Okay.  Thank you.

20                  Mr. Baughman.

21                  MR. BAUGHMAN:  Your Honor asked the question:  Did the

22    CFTC ever ask about prefunding.  That was what you asked, and

23    the answer to that question is no.  They never asked that

24    question.  And, indeed, if we could look at slide 53, I would

25    like to show you here are some more examples of questions the
```

 1   CFTC refused to answer during discovery.

 2           One of them specifically was, we asked Mr. Kuserk, "Do

 3   you remember why you didn't ask any questions about

 4   prefunding?"  Instruction not to answer.

 5           They have no evidence that prefunding was important to

 6   them.  They are pointing to statements made by Gemini and

 7   arguing that because Gemini said something, it must have been

 8   important to the CFTC.  That is an argument.  At the end of the

 9   trial they can stand here and argue that to the jury.  But it

10   is not evidence that they ever asked about prefunding.  In

11   fact, they didn't.

12           And if we could go back to statement number -- it's

13   actually statement 22, Mr. Lam.  If you could put that one up

14   on the screen, which was just read to you.  I don't recall --

15   there was no statement -- there was no identification of

16   anything in this statement that it's false.  First of all,

17   there's nothing in the statement about prefunding at all.  The

18   concept isn't even in there, and I don't know what words in

19   this statement are alleged to have been false.

20           Your Honor read the sentence in the second paragraph,

21   and I'll go through it.  "Moreover, the manipulation of the

22   continuous order book would likely require substantial capital

23   commitment and not a predictable outcome for the malicious

24   market participant."  There is no evidence.  None was cited to

25   you that that statement is false.  None.  No evidence at all

1    supporting the proposition that that is false, let alone that

2    such falsity was material.

3            Next sentence, "Because futures contracts settle to

4    the Gemini Auction price rather than to the continuous market

5    prices, there is no guarantee that the contract settlement

6    would be affected favorably for the malicious participant."

7            I submit that statement is entirely true, and there

8    has been no evidence provided to your Honor suggesting that it

9    is false.  They don't have a witness who says it's false.

10   Their expert didn't say it was false.  They have no evidence of

11   falsity, let alone evidence of materiality.

12           Next sentence, "In fact, in the event of a failed

13   Gemini Auction, the procedure outlined in question 12 would

14   determine the settlement price, likely thwarting any attempted

15   manipulation."

16           Again, that's true, and they have no evidence and none

17   has been cited to you suggesting that that is false.  There is

18   simply no way that your Honor has a basis to make a finding

19   that statement 19 is a material misrepresentation.  No evidence

20   of falsity.  No evidence of materiality.  At best, they have

21   arguments that they perhaps could use to persuade a jury on

22   that point.

23           And, your Honor, as I'm trying to say, these things

24   are jury questions, and the evidence is actually undisputed

25   that they never asked about prefunding at all.  The question

1    and answer that was read to you from Mr. Goodman was testimony

2    from his deposition.  What he was saying was, well, here's what

3    I think they could have learned by looking at Appendix C.  Here

4    is what he didn't say in his testimony:  We told them that.

5             THE COURT:  Could we look at that again?

6             MR. BAUGHMAN:  Could I ask my colleagues at the CFTC

7    to put back up the testimony?

8             MR. RODGERS:  Yes.  Stand by, please.  It's GX-9 at

9    pages 24 to 25.

10            MR. BAUGHMAN:  Let's go through it.  I'm happy to.

11            This is a question on his deposition: "Is there any

12   guidance that the CFTC has ever offered that would have

13   specified to Gemini that it needed to disclose whether any of

14   the participants in the Gemini Auction were using borrowed or

15   advanced or pre-credited funds?

16   "A.  Yeah, I mean, again, I would say that there's a

17   requirement for a detailed description of the cash market.  I

18   think the cash market, you know, for organizing an exchange,

19   providing leverage or if there's somehow, you know, leverage

20   provided, you know, in concert with that, that seems to be a

21   relevant factor that should be disclosed."

22            First of all, there's nothing in there about

23   prefunding at all.  Second of all, he's not saying we told them

24   that at the time.  He is offering is subjective interpretation

25   of what Appendix C means, and it's just like his opinion, man,

1    that's what it is.  We have countervailing evidence.  We have

2    evidence from our witness who will say we didn't understand

3    that at all.  So, sure, this is a Rule 56 motion on summary

4    judgment.  That's a piece of evidence for them.  They can argue

5    whatever they like from it, but it's not dispositive.

6         The issue is, is there a disputed fact, and there is

7    actually a disputed fact as to materiality because they need to

8    have evidence, evidence that the false statements influenced

9    the decision.  That's what the case holds.  That's what *Kungys*

10   holds.  All the cases say they need evidence of influencing a

11   decision.  Given that they would never tell us what the

12   decision is and given that they have blocked us from finding

13   out how they made decisions, they simply have a failure or at

14   least, I would argue, they would have a failure of proof as to

15   materiality completely.

16        What they are making to you is arguments that are not

17   based on evidence.

18        THE COURT:  Thank you, both.  So the touchstone is a

19   natural tendency to influence or be capable of influencing.

20   The fact of how the CFTC reacted is not an issue.  The issue

21   has to do with the words prefunding, the phrase prefunding, and

22   whether or not that phrase in the context of the issues which

23   the CFTC was concerned, mainly the susceptibility to

24   manipulation, was whether that phrase prefunding had a natural

25   tendency to influence the decision-maker or be capable of

1    influencing the decision-maker, and I hold that it did.

2    Prefunding was an important part of the discussion within

3    Gemini, and which it ultimately passed on to the CFTC to show

4    that its auction market was really reliable.  It was not an

5    artificial market; that it could not be manipulated; that the

6    price was true; and it means that what an investor or

7    speculator or someone who wants to buy a cryptocurrency or

8    wishes to sell a cryptocurrency as a requirement to have that

9    cryptocurrency in hand before the transaction of sale and has

10   the money in hand before the transaction to buy is a limitation

11   on that person's ability to manipulate.  Manipulation requires

12   a very large amount of liquidity and the requirement of a

13   hundred percent cashing funding or a hundred percent commodity

14   availability is one of the key points to avoid manipulation.

15           Now, the record on that is clear, and Mr. Baughman

16   asserts that the CFTC did not ask specifically about

17   prefunding.  But the record is also clear that the aspect of

18   prefunding and this requirement by Gemini was a major part of

19   its representations to the CFTC to procure its acceptance of

20   CBOE's self-certification.  In that context, it was a

21   significant piece of information, the misstatement of which

22   corrupted the ability of a decision-maker to make a decision.

23   I therefore hold that it had a natural tendency to influence or

24   be capable of influencing the decision-maker, and, hence, was

25   material.

1          It's ten minutes to 4:00.  We have to break now.  The

2     next issue will be scienter, and the issue after that was how

3     many other documents are covered by my rulings today.  So we

4     don't have to go into those documents.  Work that out with

5     Mr. Baughman overnight.  If there are differences, of course I

6     will hear the differences.  I suggest we come in at 9:30

7     tomorrow morning if that's convenient to everybody.  Yes?

8          MR. RODGERS:  That works for myself and the CFTC, your

9     Honor.

10         MR. BAUGHMAN:  Of course, your Honor.

11         THE COURT:  And we will continue until about 11:00

12    when I have a very short criminal matter.  Then we will

13    continue after that and break at 4:00 tomorrow.  And if we are

14    not finished, we will go on Wednesday.  Good night everyone.  I

15    will see you tomorrow morning at 9:30.

16         (Continued July 24, 2024 at 9:30 a.m.)

17

18

19

20

21

22

23

24

25