# EXHIBIT 107

```
                                                                    1

     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
     Case No. 22-cv-4563
       - - - - - - - - - - - - - - - - - - - - - - - -x

       COMMODITY FUTURES TRADING COMMISSION,

                       Plaintiff,

                  -against-

     GEMINI TRUST COMPANY,


                       Defendant.
       - - - - - - - - - - - - - - - - - - - - - - - -x




         CONFIDENTIAL VIDEOTAPED DEPOSITION OF

                    SHANE MOLIDOR

                 NEW YORK, NEW YORK

            WEDNESDAY, DECEMBER 13, 2023






     REPORTED BY:

     DANIELLE GRANT

     JOB NO.: 6305652
```

426

1               MOLIDOR
2        A    I don't recall if a locking
3   mechanism was in place as part of the admin
4   credit process.
5        Q    Okay.  But do you know if
6   customers were able to actually do that, if
7   they were able to withdraw the amount before
8   the corresponding deposit hit?
9        A    Again, my recollection, I'm not
10  aware of any locking mechanism that existed.
11       Q    Are you aware of what the policy
12  said?
13            MR. LAVERNE:  Objection.
14       A    No.
15       Q    So in your affidavit, on paragraph
16  17 you wrote:  It's my understanding in
17  company policies and procedures attached,
18  that market participants were expected to
19  send corresponding funds for these
20  advancements to be delivered to Gemini
21  within 24 hours.
22            Do you see that?
23       A    Yes.
24       Q    And that is consistent with the
25  policy that we just read; is that right?

[12/13/2023] Shane Molidor - 12.13.2023 v

427

|     |     |                                                        |
| --- | --- | ------------------------------------------------------ |
| 1   |     | MOLIDOR                                                |
| 2   |     | MR. LAVERNE: Objection.                                |
| 3   | A   | My understanding of the policies                       |
| 4   |     | and procedures attached is they refer to               |
| 5   |     | fiat operational advances.                             |
| 6   | Q   | You then wrote: I never advised                        |
| 7   |     | Cameron or Tyler Winklevoss of any situation           |
| 8   |     | where operational advances did not comply              |
| 9   |     | with company policies and procedures.                  |
| 10  |     | Do you see that?                                       |
| 11  | A   | Yes.                                                   |
| 12  | Q   | And that's an accurate statement,                      |
| 13  |     | right?                                                 |
| 14  | A   | Based on the attached company                          |
| 15  |     | policies and procedures that relate to fiat            |
| 16  |     | operational advances.                                  |
| 17  | Q   | And then you also wrote: I was                         |
| 18  |     | never advised by Cameron or Tyler Winklevoss           |
| 19  |     | that it was permissible for operational                |
| 20  |     | advances to remain outstanding in a manner             |
| 21  |     | that was not consistent with company                   |
| 22  |     | policies and procedures.                               |
| 23  |     | Do you see that?                                       |
| 24  | A   | Yes.                                                   |
| 25  | Q   | So it's fair to say that, to your                      |

[12/13/2023] Shane Molidor - 12.13.2023 v

                                                                    428

1                        MOLIDOR

2    knowledge, Cameron and Tyler Winklevoss

3    never knew that fiat operational advances

4    were outstanding longer than the 24 hours

5    set forth in the policy; is that fair?

6            MR. LAVERNE:  Objection.

7            MS. DE URIOSTE:  Objection.

8        A    I can't speak to what Cameron or

9    Tyler may or may not have known.

10       Q    Okay.  But you never told them

11   that there were fiat operational advances

12   that were extended for more than 24 hours;

13   is that right?

14       A    As stated in the affidavit, I

15   never advised Cameron or Tyler Winklevoss of

16   any situation where operational advances, as

17   referenced in the attached policies and

18   procedures that relate to fiat operational

19   advances, did not comply with company

20   policies and procedures.

21       Q    So you have no reason to believe

22   that Cameron and Tyler Winklevoss thought

23   that fiat operational advances as a matter

24   of course were not in compliance with the

25   policy; is that fair?

429

```
 1                      MOLIDOR
 2           MR. LAVERNE:  Objection.
 3       A    Again, I can't speak to what
 4  Cameron or Tyler may or may not have known.
 5  So I can't opine on that.
 6       Q    You can opine on what you
 7  specifically said to them, and you never
 8  told them there was any violation of company
 9  policy when it came to fiat operational
10  advances; is that fair?
11           MR. LAVERNE:  Objection.  Asked
12       and answered.
13       A    I believe I responded to that.
14       Q    Okay.  And your answer is yes,
15  right?
16           MR. LAVERNE:  Objection.
17       A    That is not my answer.  If you
18  would like, we can pull up the transcript to
19  see my answer.
20       Q    Well, my question is simple.
21           Do you have any -- do you have
22  any -- I know you can't get inside Cameron
23  and Tyler Winklevoss' heads.
24           But do you have any reason to
25  believe any interaction you had with them
```

[12/13/2023] Shane Molidor - 12.13.2023 v

430

|  |  |
|---|---|
| 1 | MOLIDOR |
| 2 | that suggested that they thought fiat |
| 3 | operational advances at Gemini were not |
| 4 | complying with the policy? |
| 5 | MR. LAVERNE:  Objection. |
| 6 | A   Again, I can't speculate to state |
| 7 | of mind or what they may have not known -- |
| 8 | may or may not have known. |
| 9 | Q   Okay.  But you can testify as to |
| 10 | what you said to them, right? |
| 11 | A   I can testify that I never advised |
| 12 | Cameron or Tyler Winklevoss of any situation |
| 13 | where operational advances as referenced in |
| 14 | the attached policies and procedures related |
| 15 | to fiat operational advances did not comply |
| 16 | with company policies and procedures. |
| 17 | Q   And it's your testimony that this |
| 18 | policy only applies to fiat, not advances of |
| 19 | digital asset -- digital assets; is that |
| 20 | right? |
| 21 | A   My understanding of reading of the |
| 22 | attached policies and procedures is that it |
| 23 | explicitly states fiat operational advances |
| 24 | with reference to wire deposits. |
| 25 | Q   And is it -- do you have any |

431

1           MOLIDOR

2    knowledge about what Gemini publicly said

3    about advancing funds associated with

4    bitcoin transfers?

5         A    No.

6         Q    Do you know if they said anything

7    about that on the website?

8         A    I don't recall.

9         Q    Do you know if there was a

10   specific policy associated with advances of

11   digital currency assets?

12        A    I don't recall.

13        Q    Now, on the topic of advances of

14   digital currency assets, just so I'm clear,

15   you are not the sole person who is

16   responsible for proposing these to

17   institutional customers; is that right?

18        A    That's correct.

19        Q    Who else was involved in this, to

20   your knowledge?

21        A    These are my general

22   recollections.  Proposals for operational

23   advances could come from a number of

24   individuals.  That might include Ben Small.

25   It might include Cameron Winklevoss, Tyler

[12/13/2023] Shane Molidor - 12.13.2023 v

432

|   |   |
|---|---|
| 1 | MOLIDOR |
| 2 | Winklevoss, or Sarah Olsen or John |
| 3 | Reinhardt. |
| 4 | Q   Now, you testified earlier about |
| 5 | how these operational advances or floats |
| 6 | could, quote, expand the balance sheet of a |
| 7 | client. |
| 8 | Do you recall that? |
| 9 | A   Yes, I recall. |
| 10 | Q   But I want to make sure I |
| 11 | understand this because the idea of an |
| 12 | operational advance was to allow a client to |
| 13 | trade the amount that corresponds to funds |
| 14 | or bitcoin that was in flight; is that |
| 15 | right? |
| 16 | A   As stated earlier, my general |
| 17 | recollection of operational advances and |
| 18 | advance credits is that it was a means to |
| 19 | credit the account balance of an institution |
| 20 | prior to receiving funds. |
| 21 | Q   Okay.  But the idea was it was |
| 22 | not -- it was not a credit; it was to give |
| 23 | them a bridge until an actual deposit came |
| 24 | in; is that fair? |
| 25 | A   Again, my understanding was that |

[12/13/2023] Shane Molidor - 12.13.2023 v

433

1               MOLIDOR
2    it provided a credit prior to receiving
3    funds.
4        Q    And what's that understanding
5    based on?
6        A    The general business practices
7    employed by Gemini.
8        Q    Now, you also in the last sentence
9    of your affidavit on paragraph 17, you said:
10   I was never advised by Cameron or Tyler
11   Winklevoss that it was permissible for
12   operational advances to remain outstanding
13   in a manner that was not consistent with
14   policies and procedures.
15           Do you see that?
16       A    I see that.
17       Q    That's an accurate statement,
18   right?
19       A    Operational advances as referenced
20   in the policies and procedures attached
21   here, which relate to wire deposits and fiat
22   transfers.
23       Q    So the only thing not that's not
24   covered in this affidavit, then, when it
25   comes to operational advances is advances of

[12/13/2023] Shane Molidor - 12.13.2023 v

```
                                                        434
 1                        MOLIDOR
 2    digital currencies; is that right?
 3             MR. LAVERNE:  Objection.
 4        A    My understanding is that the
 5    policies and procedures attached do not
 6    provide insight on operational advances of
 7    digital currency.
 8        Q    Now, I want to talk about
 9    operational floats.
10             So for -- from your perspective,
11    would operational floats apply to both fiat
12    and digital assets?
13        A    Based on my recollection,
14    operational floats was a term used for
15    digital currency.
16        Q    So operational floats has no
17    application to fiat?
18        A    I have no recollection of
19    operational floats being used to describe
20    fiat advanced credits.
21        Q    And for operational floats, was
22    there an approval mechanism that you recall
23    associated with those?
24        A    As discussed earlier, operational
25    floats were a consequence of an operational
```

[12/13/2023] Shane Molidor - 12.13.2023 v

435

1                    MOLIDOR

2  advance.  Therefore, there was an approval

3  mechanism for an operational advance.

4       Q    And the approval associated with

5  the operational advance would flow to the

6  approval associated with the operational

7  float?

8       A    The approval mechanism for the

9  operational advance was the admin credit

10 dual-control process.  That provided the

11 operational advance.  The operational

12 advance was then, at times, allowed to float

13 either intentionally or at times, my

14 recollection is, unintentionally.

15      Q    And how would that unintentionally

16 happen to the best of your recollection?

17      A    To the best of my recollection,

18 these operational advances were often

19 provided during bouts of high marketplace

20 volatility, where many funds were in flight,

21 both in and out of the platform from high

22 value institutional clients.  Given that

23 there is no automated way to exercise a

24 subsequent debit of an operational advance,

25 my recollection is that sometimes, in the

                                                                              436

|     |                                                    |
| --- | -------------------------------------------------- |
| 1   | MOLIDOR                                            |
| 2   | chaos of the market volatility, individuals        |
| 3   | would forget to exercise a debit despite an        |
| 4   | institution having received their funds that       |
| 5   | they deposited.                                    |
| 6   |     Q    So it would be a scenario where           |
| 7   | the institution would actually do the              |
| 8   | transfer, but the debit would never happen         |
| 9   | on the spreadsheet because it just got lost        |
| 10  | in the shuffle?                                    |
| 11  |     A    That's correct.                           |
| 12  |     Q    Understood.                               |
| 13  |          And do you recall how frequently          |
| 14  | that happened?                                     |
| 15  |     A    My recollection is that it                |
| 16  | happened somewhat frequently.                      |
| 17  |     Q    But there was an error on the             |
| 18  | internal booking for Gemini, right?                |
| 19  |     A    I can't speak to the                      |
| 20  | classification of the error.                       |
| 21  |     Q    Okay.  But it is true that, at the        |
| 22  | time, the client had send the funds or the         |
| 23  | digital currency that it said it would send?       |
| 24  |     A    To clarify, at that point, the            |
| 25  | client would have not only sent the funds,         |

[12/13/2023] Shane Molidor - 12.13.2023 v