# EXHIBIT 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------X
     COMMODITY FUTURES TRADING COMMISSION,
 4
                             PLAINTIFF,
 5
 6        -against-    Case No.:
                       22-cv-4563 (AKH)
 7
 8   GEMINI TRUST COMPANY, LLC,
 9                     DEFENDANT.
     ------------------------------------------X
10
11                     DATE: February 28, 2024
12                     TIME: 9:32 A.M.
13
14
15          CONFIDENTIAL VIDEOTAPED REALTIME
16   DEPOSITION of the Defendant, CAMERON
17   WINKLEVOSS, taken by the Plaintiff,
18   pursuant to a Subpoena and to the Federal
19   Rules of Civil Procedure, held at the
20   offices of Commodity Futures Trading
21   Commission (CFTC), 290 Broadway, 6th Floor,
22   New York, New York 10007, before Karyn
23   Chiusano, a Notary Public of the State of
24   New York.
25
```



CONFIDENTIAL                                                February 28, 2024

Page 22
CONFIDENTIAL ~ CAMERON WINKLEVOSS

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2  December 19, 2017.
3       Is that statement accurate, Mr.
4  Winklevoss?
5     A.   I -- I mean, it's been seven
6  years since that statement.
7       I mean, I have no reason to
8  believe that it's not, but I -- I don't
9  know.
10    Q.   And is this an article that you
11 -- you -- does this --
12       MR. RODGERS:  Withdrawn.
13    Q.   Is this an article that you
14 participated in -- in -- on December, 2017?
15       MR. BAUGHMAN:  Object to the
16    form of the question.
17       "Participated in?"
18    A.   We -- we clearly provided
19 quotes to the article.
20    Q.   And on the -- on the second
21 page, below the -- the picture, three
22 paragraphs down, it says, in the last
23 sentence of that paragraph:
24       "The brothers are also majority
25 owners of the virtual currency exchange

Page 23
1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2  they founded, Gemini, which most likely
3  takes their joint holdings to a value of
4  well over two billion, enough to make each
5  of them a billionaire."
6       Do you agree with that
7  statement, Mr. Winklevoss?
8     A.   Which part of the statement?
9     Q.   That the -- your joint holdings
10 are well over $2 billion?
11    A.   Because of ownership in -- in
12 Gemini?
13    Q.   Are your joint holdings, in
14 addition to your bitcoin investments, along
15 with your investment in Gemini, well over
16 $2 billion?
17    A.   I'd have to check.
18    Q.   Is this in the ballpark, you
19 think?
20    A.   Again, it's been seven years,
21 but I -- I -- I mean, I'd have to check.
22       I don't have a reason to
23 believe it's necessarily wrong, I just --
24    Q.   Yeah.
25       How about today, do you have a

Page 24
1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2  ballpark of how much Gemini is worth today?
3       MR. BAUGHMAN:  Objection;
4  relevance?
5       Yet again, counsel hasn't
6  offered any relevance.
7       MR. RODGERS:  You can refrain
8  from the speaking objections, Jack.
9       You know the process here.  You
10 understand that I'm asking the
11 questions, I control the record.
12       MR. BAUGHMAN:  No. You don't.
13       MR. RODGERS:  You're not
14 permitted to give speaking
15 objections.
16       MR. BAUGHMAN:  No. You don't.
17       MR. RODGERS:  I understand your
18 desire to grandstand in front of your
19 client.
20       MR. BAUGHMAN:  I'm not
21 grandstanding.
22       MR. RODGERS:  You get to sit
23 there, and you get to object, and you
24 get to provide the basis.
25       MR. BAUGHMAN:  I am --

Page 25
1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2       MR. RODGERS:  If you don't --
3  if you continue to -- to engage in
4  this, then we will raise this with
5  the Judge.
6       MR. BAUGHMAN:  That would --
7  I'd be happy to.  Because it's
8  abusive, it's irrelevant.  And
9  it's -- you're the one who's
10 grandstanding.
11       And please stop.
12       Get to the point of this thing.
13       MR. RODGERS:  This is
14 background questions, Jack.
15       I'm not going to engage with
16 you.
17       We can engage off the record.
18       Please refrain.
19       MR. BAUGHMAN:  If you'd like to
20 call the Judge, go ahead.
21       MR. RODGERS:  Let's move on.
22       MR. BAUGHMAN:  Go ahead.
23    Q.   Do you know what Gemini is
24 worth today, roughly?
25    A.   I don't.

Page 26

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2       In the sense that we last
3  raised funding, I think two or three years
4  ago, and we're a privately-held company, so
5  we'd have to look at -- look into that.
6       Q.   What was the valuation two or
7  three years ago?
8       A.   It was $7.1 billion post-money
9  valuation.
10      Q.   Thank you.
11           So, let's turn to the -- the
12 founding of Gemini.
13           You can put that exhibit away.
14           (Witness complies.)
15      Q.   So, when did you found Gemini
16 Trust Company, LLC?
17      A.   The -- the initial sort of
18 formulation and idea, I believe, was in
19 2013 -- late 2013, 2014, with myself and
20 Tyler.
21           We then hired a founding team
22 in the -- the fall of -- of 2014 and
23 proceeded to build the -- the software and
24 technology for Gemini, as well as pursue a
25 license with the New York Department of

Page 27

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2  Financial Services, DFS.
3           And we engaged with them for, I
4  think, 12 to 18 months, received our
5  license, in October of 2015, and launched
6  Gemini then.
7       Q.   Do you know what day Gemini
8  launched, by any chance?
9       A.   The exact day?  I think it
10 would be probably the first Monday in
11 October.
12          And -- and the license I was
13 referring to was the New York Trust Company
14 license.  So, we're chartered as a New York
15 Trust Company, under the New York banking
16 law.
17          And I believe -- I believe --
18 I'm going to say October 5th, but,
19 obviously, we can get you the exact date.
20      Q.   Understand.
21          I'm not going to hold you to --
22 to that date.
23          Were there any other
24 co-founders, besides you and your brother?
25      A.   We're the two co-founders.

Page 28

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2       Q.   And where did the money come
3  from to create Gemini?
4       A.   Myself and Tyler, through --
5  via Winklevoss Capital Fund, we were the
6  initial investors.
7       Q.   And what is Winklevoss Capital
8  Fund?
9       A.   It's a private investment fund.
10      Q.   And is Gemini its only
11 investment?
12      A.   No.
13          We have many investments across
14 technology, in various industries,
15 including space and cryptocurrency.
16      Q.   Are you the direct owner -- I
17 guess --
18          MR. RODGERS:  Withdrawn.
19      Q.   Who is the beneficial owner of
20 Winklevoss Capital Fund?
21          MR. BAUGHMAN:  Objection.
22          There's no basis for these
23     questions.
24          They are not relevant to the
25     case.

Page 29

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2           If you want to -- I'm going to
3      direct him not to answer.
4       Q.   Who is the owner of Winklevoss
5  Capital Fund?
6           MR. BAUGHMAN:  You don't have
7      to answer.
8       A.   I'm going to follow Counsel's
9  advice.
10          MR. ROGERS:  And what's the
11     basis for the objection:  Relevance?
12          MR. BAUGHMAN:  The basis is it
13     is utterly irrelevant.
14          There's no issue in the case as
15     to equity ownership of Winklevoss
16     Capital Funds and it's personal
17     information and it's invasive.
18      Q.   Do you know why your Counsel
19 doesn't want you to reveal the information
20 about the ownership structure of Gemini?
21          MR. BAUGHMAN:  Because it's
22     none of your business.
23      A.   Did you mean to say Winklevoss
24 Capital?  Or --
25      Q.   Well, I -- I want to know who



```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------------------X
      COMMODITY FUTURES TRADING COMMISSION,
 4
                              PLAINTIFF,
 5
 6         -against-    Case No.:
                        22-cv-4563 (AKH)
 7
 8    GEMINI TRUST COMPANY, LLC,
 9                      DEFENDANT.
      ------------------------------------------X
10
11                      DATE: February 29, 2024
12                      TIME: 9:36 A.M.
13
14
15         CONTINUED CONFIDENTIAL VIDEOTAPED
16    REALTIME DEPOSITION of the Defendant,
17    CAMERON WINKLEVOSS, taken by the Plaintiff,
18    pursuant to a Subpoena and to the Federal
19    Rules of Civil Procedure, held at the
20    offices of Commodity Futures Trading
21    Commission (CFTC), 290 Broadway, 6th Floor,
22    New York, New York 10007, before Karyn
23    Chiusano, a Notary Public of the State of
24    New York.
25     Job No. CS6346514
```



* * *

CONFIDENTIAL                                                February 29, 2024

Page 692

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2  of Gemini?
3      A.   Gemini is not regulated by the
4  CFTC, PearlStreet's not regulated by the
5  CFTC.
6           I don't believe we have an
7  obligation, or a reason, to ask the CFTC
8  questions about entities that aren't
9  regulated by them.
10          But I do believe the CFTC was
11 aware of the PearlStreet, via Mr. Small, in
12 the fall of 2017.  And I don't think the
13 CFTC ever asked us a single question.
14          And yet, they proceeded to
15 approve the CBOE self-certification, XBT
16 futures contract, knowing full well that
17 PearlStreet existed, via Benjamin Small's
18 false whistleblower complaint.
19     Q.   You're -- you're speculating
20 now, aren't you here?
21          MR. BAUGHMAN:  Don't interrupt
22     the witness.
23     Q.   You have no idea what the CFTC
24 knew in the fall of 2017.
25     A.   I -- I believe it's a -- it's

Page 693

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2  evidence -- it's a fact that his complaint,
3  with the false PearlStreet allegations, was
4  -- was submitted or conveyed to the CFTC
5  in -- in/or around November of 2017.
6           So, the CFTC has had since then
7  to ask us, and we had never gotten a
8  question from the CFTC during that process,
9  or for, you know, months afterwards about
10 PearlStreet loans.
11          And we've never been told that
12 they were illegal or improper.
13     Q.   Well, the CFTC brought this
14 enforcement action.
15          Does that answer your question?
16          MR. BAUGHMAN:  Object to the
17     form of the question.
18     Q.   Going back to the exhibit that
19 has the draft declaration, there's a
20 paragraph, in Paragraph 5, that says:
21          "The company and Senior
22 Management always strive to comply with the
23 law."
24          Do you see that?
25     A.   Which paragraph?

Page 694

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2      Q.   Paragraph 5.
3      A.   Yes.
4      Q.   And you would agree with that
5  statement; correct?
6      A.   Yes.
7      Q.   And Senior Management would
8  refer to -- to yourself, in 2017, as a
9  principal -- as a President of Gemini;
10 correct?
11     A.   I believe this would encompass
12 me, but also the ethos of our company as a
13 whole.
14     Q.   Yeah.
15          Gemini tried to build a culture
16 of compliance; is that correct?
17     A.   Compliance with -- with what,
18 in particular?  I mean --
19     Q.   Well, what distinguishes
20 Gemini?
21          Is it -- is it that it's a
22 highly-regulated exchange?
23          MR. BAUGHMAN:  Object to the
24     form of the question.
25     A.   There's a lot of

Page 695

1  CONFIDENTIAL ~ CAMERON WINKLEVOSS
2  differentiators or things that distinguish
3  us.
4           But we -- we have an ethos
5  of -- of, you know, trying to always follow
6  the -- the law and -- and the spirit of the
7  law.
8      Q.   Did Gemini tolerate illegal
9  drug use in the workplace?
10          MR. BAUGHMAN:  Object to the
11     form of the question.
12     A.   No.
13     Q.   Would you agree that illegal
14 drug use would be inconsistent with an
15 atmosphere of legal compliance?
16     A.   I don't believe our policies
17 permitted that in the workplace, yes.
18     Q.   Did you do any illegal
19 narcotics with Gemini employees?
20     A.   I did not.
21          MR. RODGERS:  So, I'm going to
22     mark, as Exhibit 115 a document
23     that's Bate Stamped SDNY_ several
24     zeros 533.
25          (Whereupon, FBI 302 form that

80 (Pages 692 - 695)

CONFIDENTIAL                                           February 29, 2024

Page 696

CONFIDENTIAL ~ CAMERON WINKLEVOSS
1  was produced in response to a
2  subpoena served by Gemini was marked
3  as Exhibit 115 for identification as
4  of this date by the Reporter.)
5     THE COURT REPORTER: Okay.
6     Here you go.
7     THE WITNESS: Thank you.
8     MR. RODGERS: And this
9  document, Exhibit 115, is an FBI 302
10 Form that was produced in response to
11 a subpoena served by Gemini.
12    The FBI 302 memorializes
13 statements that Shane Molidor made to
14 the FBI in connection with its
15 parallel investigation into Gemini.
16    Q.  Do you understand what you're
17 looking at?
18    A.  I'll -- I'll take your word for
19 it.
20    Q.  And -- and Shane Molidor was a
21 former employee of Gemini?
22    A.  He was a Gemini employee, yes.
23    Q.  And in the second-to-last
24 paragraph, starting on 548 and ending on

Page 697

CONFIDENTIAL ~ CAMERON WINKLEVOSS
1  549, 302 memorializes:
2     "The picture was taken by Jeff
3  Martin.  Martin works in Logistics.  The
4  picture was, at the time, when Ty, Cam and
5  Molidor did cocaine for the second time
6  together.  This picture captured Ty using
7  cocaine.
8     Molidor was asked how to
9  identify which twin was in the picture.
10 Molidor informed that Ty did not have
11 sideburns, while Cam did have sideburns."
12    The next paragraph states:
13    "The first time Molidor and the
14 twins took cocaine together was at Cam's
15 Cinco De Mayo party at Cam's apartment."
16    Do you recall doing cocaine
17 with Shane Molidor?
18    A.  I've never done cocaine with
19 Shane Molidor.
20    Which -- which paragraph are
21 you referring to?
22    Q.  It at 548 to 549.
23    So, your -- your position is
24 that Mr. Molidor also relayed false

Page 698

CONFIDENTIAL ~ CAMERON WINKLEVOSS
1  information to the FBI during his FBI
2  interview?
3     A.  I'm sorry.
4     I'm just going to read this
5  really quick.
6     Can you repeat your question,
7  please?
8     Q.  Your testimony is that Mr.
9  Molidor lied to the FBI in -- during his
10 interview?
11    A.  That's my position.
12    I also think it's interesting
13 that he says that one of us had sideburns
14 and one of us does not, which simply just
15 isn't true.
16    We've had the same haircuts for
17 probably the better part of the last
18 decade.  So, I have no idea what he's
19 talking about there.
20    Q.  So, the inconsistency in the
21 haircuts is what undercuts his credibility
22 with respect to his testimony or statements
23 that he did cocaine with yourself and your
24 brother at a Cinco de Mayo party?

Page 699

CONFIDENTIAL ~ CAMERON WINKLEVOSS
1  A.  It's -- it's not a true
2  statement.  That is why I disagree with it.
3     And I'm also just pointing out
4  that further inconsistency or false
5  statement.
6     MR. RODGERS: I pass the
7  witness.
8     MR. BAUGHMAN: I have just a
9  few questions.
10 EXAMINATION BY
11 MR. BAUGHMAN:
12    Q.  I believe you have in front of
13 you, Mr. Winklevoss, two piles of exhibits.
14 The one on the left is the exhibits from
15 yesterday, the one on the right is the
16 exhibits from today.
17    Each pile, I believe, is in
18 chronological order.  So, I want to ask you
19 just about a few things that you were asked
20 about.
21    Can you look in yesterday's
22 pile and find Exhibit 41, please?
23    MR. RODGERS: And if you can
24 just indulge me, Jack, if I can

81 (Pages 696 - 699)