**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION | |
| *Plaintiff,* | No. 22-cv-4653- AKH |
| v. | Hon. Alvin K. Hellerstein |
| GEMINI TRUST COMPANY, LLC | |
| *Defendant.* | |

**MEMORANDUM OF LAW IN SUPPORT OF GEMINI'S *DAUBERT* MOTION TO PRECLUDE CERTAIN EXPERT TESTIMONY OF LAWRENCE E. HARRIS**

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

Background .............................................................................................................. 2

I.      Witness Qualifications ............................................................................... 2

II.     The Harris Report ...................................................................................... 3

Argument ................................................................................................................. 5

III.    The Court Should Preclude Testimony that Does Not Assist the Jury .............................. 6

        A.      Harris may not assume the role of an advocate for the CFTC ............................. 7

                1.      The Court should preclude Harris from testifying about the CFTC's
                        internal processes as it relates to the self-certification.................... 8

                2.      The Court should preclude Harris from testifying that Gemini made
                        statements, representations, or omissions to the CFTC .................... 9

        B.      Harris' opinions as to Gemini's intent, motive, or state of mind are improper .... 11

        C.      Harris uses chat messages to construct impermissible factual narratives............. 13

IV.     The Court Should Strike Opinions that are Unreliable Under *Daubert*.......................... 17

        A.      The Court should exclude unsupported opinions or characterizations ................ 17

        B.      The Court should preclude Harris from opining that Pearl Street Loans were
                issued "below market" ........................................................................ 19

                1.      Harris' opinions are not based on sufficient facts and data .......................... 20

Conclusion ............................................................................................................... 22

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................17, 20

*Bd. of Trs. v. JP Morgan Chase Bank, N.A.*,
    2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ....................................................12

*Daniels-Feasel v. Forest Pharms., Inc.*,
    2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021),
    *aff'd*, 2023 WL 4837521 (2d Cir. 2023)..........................................................21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    570 U.S. 579 (1993)..................................................................... *passim*

*Edmonson v. RCI Hosp. Holdings, Inc.*,
    2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) ............................................6

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................19

*Hewitt v. Metro-North Commuter R.R.*,
    244 F. Supp. 3d 379 (S.D.N.Y. 2017)..................................................7

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)..........................................13, 16

*Highland Capital Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008)..............................................10

*In re Digital Music Antitrust Litig.*,
    321 F.R.D. 64 (S.D.N.Y. 2017) .....................................................22

*In re Mirena IUD Prods. Liability Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016)..........................................17, 19

*In re Rezulin Prods. Liability Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)......................................6, 12, 13, 16

*LinkCo., Inc. v. Fujitsu Ltd.*,
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ....................................7, 15

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004)..............................................7

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015).................................................................12, 13

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013)..................................................................................15

*Munoz v. United States*,
   2008 WL 2942861 (E.D.N.Y. July 28, 2008)........................................................7

*Nook v. Long Island R. Co.*,
   190 F. Supp. 2d 639 (S.D.N.Y. 2002)....................................................................9

*Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*,
   321 F. Supp. 2d 469 (N.D.N.Y. 2004)...................................................................7

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................................12

*SEC v. Lek Sec. Corp.*,
   2019 WL 1512713 (S.D.N.Y. Apr. 8, 2019)........................................................16

*SEC v. Lek Sec. Corp.*,
   370 F. Supp. 3d 384 (S.D.N.Y. 2019)..................................................................18

*United States v. Collins*,
   581 F. App'x 59 (2d Cir. 2014) ...................................................................6–7, 10

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999)................................................................................11

*United States v. Teman*,
   465 F. Supp. 3d 277 (S.D.N.Y. 2020),
   *aff'd*, 2023 WL 3882974 (2d Cir. June 8, 2023)..................................................6

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007)..................................................................................6

*Washington v. Kellwood Co.*,
   105 F. Supp. 3d 293 (S.D.N.Y. 2015).............................................................1, 20

**Rules & Statutes**

7 U.S.C. § 9(2) ................................................................................................ 10-11

Fed. R. Evid. 702 .......................................................................................... *passim*

Fed. R. Evid. 703 ...................................................................................................15

Pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 570 U.S. 579 (1993), defendant Gemini Trust Company, LLC ("Gemini") respectfully submits this memorandum of law in support of its motion to preclude plaintiff Commodity Futures Trading Commission ("CFTC") from eliciting certain categories of testimony from its expert, Lawrence Harris, at trial.

## PRELIMINARY STATEMENT

The CFTC alleges that Gemini made false and misleading statements on four topics: (i) pre-funding, (ii) bespoke fees and rebates, (iii) self-crossing, and (iv) volume and liquidity. To support this theory, it has retained the services of Lawrence Harris, an economist and finance professor at the University of Southern California ("USC"). Harris, in addition to his professorship, serves as an independent director of Interactive Brokers and was Chief Economist at the Securities and Exchange Commission ("SEC") from 2002 until 2004. He considers his book, *Trading and Exchanges: Market Microstructure for Practitioners*, to be the "standard treatment of the practice of economics and training" among practitioners and academics and has provided expert testimony on a number of occasions. Thus, it is clear that under the right circumstances Harris could be a well-qualified expert.

But those circumstances do not exist here, where his proffered testimony epitomizes the maxim that "[a]n expert qualified in one subject matter does not thereby become an expert for all purposes." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) (alteration in original) (quoting *523 IP LLC v CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2015)). Though perhaps competent to testify on market structures generally, the CFTC proposes to have Harris opine on issues that fall well beyond the limits of his—and in some respects, any expert's— knowledge and expertise. *First*, his report repeatedly offers opinions that are unhelpful to the jury.

He offers speculative opinions on motive, intent, and state of mind and uses excerpts of various chat messages to construct an improper factual narrative. This sort of testimony is improper and should be precluded at trial. *Second*, he offers unreliable opinions for which he either offers no support or relies on insufficient facts and data. As unreliable expert testimony is not admissible under Rule 702 and *Daubert*, the Court should preclude him from offering these opinions as well.

BACKGROUND

## I.    Witness Qualifications

Lawrence Harris is the Fred V. Keenan Chair in Finance at the USC Marshall School of Business. Ex. 1 ¶ 1.[1] He received a Ph.D. in Economics from the University of Chicago in 1982, and since then has focused his research, teaching, and consulting work on "regulatory and practitioner issues" in trading and investment management. *Id*. He has published two books—one about trading economics, the other about electronic markets—and is a research coordinator for the Institute for Quantitative Research in Finance. *Id*. ¶¶ 6, 8.

Apart from his academic work, Harris serves as lead independent director of the global brokerage firm, Interactive Brokers, and was Chief Economist of the SEC between 2002 and 2004. *Id*. ¶¶ 3–4. He is also a professional witness, having provided expert testimony in at least 26 matters since 1997. Ex. 2. Of these, sixteen cases involved either the SEC or the Department of Justice as named parties; tellingly, Harris was the government's expert in all but two. *Id*.

But notwithstanding his credentials, there are significant gaps in Harris' expertise as it relates to the role he was assigned in this case. Most notably, his resume is conspicuously devoid of any meaningful work with cryptocurrency. He has never traded a cryptocurrency or cryptocurrency derivative. Ex. 3 at 17:3–11. Nor has he ever performed a regulatory, supervisory,

---

[1]    "Ex." refers to the exhibit to the Declaration of John F. Baughman filed in support of this motion.

or compliance function at a Bitcoin exchange or lender. *Id*. at 21:1–12. He has not consulted anyone responsible for Bitcoin lending in the period relevant to this case, and has not engaged in such lending personally. *Id*. at 227:14–228:10. And despite his substantial output, Harris has never published a single study or academic paper on the cryptocurrency industry. *Id*. at 18:18–19:11, 31:10–12. Instead, he purports to derive his competency on the subject from "having discussed it extensively with many people, and having participated in many seminars that consider crypto assets . . . ." *Id*. at 20:18–25.

Harris also overstates his regulatory qualifications. Though he claims to derive his opinions in this case from his "extensive" experience as a regulator, *see* Ex. 1 ¶ 150, Harris has only ever worked for one regulatory agency—the SEC—and his time there lasted just three years more than two decades ago. Ex. 3 at 21:13–22:6. Harris has never been employed by the CFTC, and even during his tenure at the SEC, Harris' working relationship with CFTC was limited to a single project where he helped review a narrow stock index futures contract. *Id*. at 43:7–25. Moreover, while he claims a familiarity with CFTC regulations and core principles, Harris has never been asked to consider Core Principle 3 in a professional context (in fact, he had never read it before this case), and could not, until prompted, identify any CFTC guidance regarding whether a contract is readily susceptible to manipulation. *Id*. at 63:5–64:15, 67:1–25.

## II.    The Harris Report

Despite these deficiencies, the CFTC retained Harris as its expert in this case more than a year ago. *Id*. at 176:8–11. In stark contrast to Gemini's experts, who had unrestricted access to the more than 70,000 documents produced in discovery and deposition transcripts for each fact witness, the CFTC gave Harris just 42 case documents and one deposition transcript. *Id*. at 254:6–19. Even more egregiously, at least one of the case documents was manipulated by the CFTC

before being passed off to Harris, who was surprised to learn it had been truncated to exclude information that—while potentially unfavorable to the CFTC—would have been relevant to his analysis of an issue in the case (affiliate loans). *Id*. at 252:1–253:4; *infra* at 20–22. Notably, throughout the course of his engagement, Harris never asked for additional documents and complied with everything the CFTC asked of him. Ex. 3 at 176:25–177:2, 258:22–259:18.

Harris delivered his report on May 15, 2024[2] (the "Harris Report"). In it, he identified five areas about which the CFTC asked him to opine:

1. **Self-Crossing:** Harris was asked to determine whether self-crossing occurred on the Gemini Exchange after it was prohibited, and if so, what proportion of trading volume in the Gemini Auction resulted from self-crossing.[3] Harris opined that self-crossing occurred in the Gemini Auction "after Gemini represented to the CFTC that it had prevented it" and that self-crossing "inflated the Gemini Auction volumes reported to the CFTC." Ex. 1 ¶ 44.

2. **Collusive Trading:** The CFTC also asked Harris to identify whether any collusive trading (characterized in the report as "wash trading") occurred on the Gemini Exchange in August 2017 and, if so, what proportion of trading volume on the Gemini Exchange resulted from it. Harris concluded that two accounts, Hashtech and Cardano, traded collusively in August 2017 to exploit their bespoke fee structures and that "Gemini Investigated Occurrences of Wash Trading Volume and Did Not Disclose [them] to the CFTC." *Id*. at 21.

3. **Bespoke Fee Agreements:** Next, Harris was asked to determine whether the bespoke fees and rebates offered to select Gemini customers were consistent with rebates disclosed

---

[2] Gemini also received an addendum to the Harris Report on May 29, 2024, in which Harris amended some of his analysis but did not change his opinions.

[3] Harris' report uses the terms "self-crossing" and "self-trading" interchangeably. For the sake of consistency, this motion uses the term "self-crossing" to refer to both.

to the CFTC. His report identifies two Gemini rebate programs, the first being a "Market Maker Auction incentive program" that ran from September through November of 2016, and a second whereby Gemini gave "special fee rates to select accounts from mid-December 2016 through December 2017." *Id*. ¶¶ 79–80, 88. According to Harris, these so-called "Special Fee Overrides" were more favorable than the rebates listed in Gemini's public fee schedule. *Id*. ¶ 88.

4. **Operational Advances:** With respect to operational advances, the CFTC focused Harris' analysis on a mere 42 instances where "an advance occurred, but no transfer was incoming," and asked whether they correlated with increases in the recipient's trading volumes.[4] Ex. 1 ¶ 96. Harris identified such a correlation and concluded that that Gemini "extended the Operational Advances . . . with the express purpose of boosting Gemini Auction participation and volume in some cases." *Id*. ¶ 97.

5. **Affiliate Loans:** Finally, the CFTC asked Harris to analyze loans issued by Pearl Street Financial (the "Pearl Street Loans") and opine whether (i) their interest rates were consistent with arms-length borrowing, and (ii) any loans correlated with increased trading volumes in the Gemini Auction through December 2017. Harris opined that "Gemini provided these loans at below-market rates to increase Gemini Auction and Gemini Continuous Market volumes," thereby reducing cost of capital for the borrowers. *Id*. ¶¶ 112–14.

## ARGUMENT

Expert testimony is admissible only if it "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. 579, 597 (1993). To this end, Rule 702 requires expert testimony to satisfy each of the following criteria:

---

[4] Harris did not count the total number of operational advances, but was "aware that there were a lot." Ex. 3 at 224:8–11. When asked if "[o]ver a hundred thousand" operational advances was a fair estimate, Harris replied "I have no idea, but it wouldn't surprise me." *Id*. at 224:12–14.

a)     The expert's scientific, technical, or other specialized knowledge must help the trier of fact to understand the evidence or to determine a fact in issue;

b)     The testimony must be based on sufficient facts and data;

c)     The testimony must be the product of reliable principles and methods; and

d)     The expert must have reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702. The proponent of expert testimony bears the burden of establishing these admissibility requirements by a preponderance of the evidence. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). And before admitting such testimony, a court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Edmonson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *3 (S.D.N.Y. Mar. 30, 2020) (quoting *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 152 (1999)).

## III.    The Court Should Preclude Testimony that Does Not Assist the Jury

"One of the fundamental requirements of Rule 702 is that the proposed testimony 'assist the trier of fact to understand the evidence or to determine the fact in issue.'" *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (citation omitted). Accordingly, just as Rule 702 empowers the court to admit expert testimony that aids the jury, it requires the exclusion of expert testimony that does not. *See United States v. Teman*, 465 F. Supp. 3d 277, 328–29 (S.D.N.Y. 2020) (citing Rule 702's "requirement that the Court exclude expert testimony that is not helpful to the jury"), *aff'd*, 2023 WL 3882974 (2d Cir. June 8, 2023).

As relevant here, unhelpful expert testimony can take various forms. "An opinion is unhelpful and therefore may not be received in evidence if, for example, the testimony would merely recapitulate aspects of the evidence that the jury can already perceive on its own . . . ; the

testimony 'would merely tell the jury what result to reach' . . . ; or an expert's testimony would deal with matters within 'the ken of the average juror.'" *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (citations omitted). Expert testimony is also unhelpful—and thus, inadmissible—to the extent it seeks to "usurp the jury's role by dictating the inferences the jurors should draw from the objective facts of the case," *Munoz v. United States*, 2008 WL 2942861, at *19 (E.D.N.Y. July 28, 2008); is "speculative or conjectural," *Hewitt v. Metro-North Commuter R.R.*, 244 F. Supp. 3d 379, 385 (S.D.N.Y. 2017); or consists of legal opinions, conclusions, and interpretations, *see Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004).

A.      **Harris may not assume the role of an advocate for the CFTC**

An expert's role is to assist the jury by "providing information and explanations; the expert's role is not to be an advocate." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). This is because "[w]hen expert witnesses become partisans, objectivity is sacrificed to the need to win." *Id.* (alteration in original) (citation omitted). Thus, where an expert "does no more than counsel for plaintiff will do in argument, i.e., propound a particular interpretation of defendant's conduct," there is "no justification for the admission of [his] testimony." *LinkCo., Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (cleaned up).

Here, the Harris Report nakedly engages in this improper advocacy on two fronts. *First*, Harris offers his opinion about the CFTC's expectations throughout the self-certification process and what information it would have considered in connection with the same. And *second*, he asserts—without any factual basis—that Gemini either withheld or misrepresented this information as it interacted with the CFTC. The Court should not permit him to do so.

1.    **The Court should preclude Harris from testifying about the CFTC's internal processes as it relates to the self-certification**

Since the inception of this case, Gemini has attempted to better understand how the CFTC evaluated the self-certification at issue. During fact depositions of the CFTC's witnesses, for example, Gemini asked a number of times about the relevant factors and decisionmaking underlying the self-certification process. *See*, *e.g.*, Ex. 4 at 81:22–83:7, 85:7–24, 86:21–87:14, 116:6–117:21. Each time, the CFTC instructed the witness not to answer on the grounds that this information was subject to the deliberative process privilege. *Id*. Outrageously, the CFTC now seems poised to elicit the very information it once claimed was privileged through Harris, who writes:

- "The CFTC allegations in this matter concern Gemini's failure to reveal all incentives that may have increased Gemini's reported trading volumes ***upon which the CFTC would have relied*** in making regulatory decisions."[5] Ex. 1 ¶ 25.

- "This self-certification application relied upon volume data reported by Gemini ***to assure the CFTC*** and the public that the proposed contract would regularly settle fairly and with limited potential for manipulation." *Id*. ¶ 42.

- "***The CFTC thus has a strong interest*** in the accuracy of Gemini's reported volume data and all processes that led to trades in the Gemini markets." *Id*.

The Court should not permit this line of testimony. For one, Harris is not qualified by "scientific, technical, or other specialized knowledge" to offer such an opinion. *See* Fed. R. Evid. 702. At his deposition, Harris stated that he was never employed by the CFTC and that he only worked with the CFTC once previously. Ex. 3 at 43:7–25. Furthermore, he could not recall whether he has ever reviewed a self-certification, and the only information he received about the self-certification in this case was from the Complaint. *Id*. at 47:1–49:23. Indeed, when asked for the basis of his assertion that the CFTC "would have relied" on Gemini's trading volumes during the

---

[5]    Unless otherwise noted, all emphasis is added.

self-certification in this case, Harris ultimately conceded that he "would have to speculate." *Id.* at 48:23–49:8. Accordingly, because "knowledge connotes more than subjective belief or unsupported speculation, . . . there is no reliable foundation for [Harris'] expert opinion." *See Nook v. Long Island R. Co.*, 190 F. Supp. 2d 639, 642 (S.D.N.Y. 2002) (quoting *Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999)).

Moreover, the proffered opinion is an improper effort by the CFTC to introduce "evidence" it refused to provide in discovery. As set forth in detail in Gemini's Amended Motion *In Limine* No. 1 (filed concurrently with this motion) the CFTC expansively and aggressively blocked Gemini from obtaining evidence about why the CFTC sought certain information and whether that information was important or material. *See* Dkt. 159. Gemini incorporates those arguments here. Put simply, the CFTC should not be permitted to use Harris to offer opinion evidence on matters about which the CFTC blocked discovery of the actual fact.

### 2.    The Court should preclude Harris from testifying that Gemini made statements, representations, or omissions to the CFTC

The Court should also preclude Harris from testifying that Gemini "made" any statements or omissions to the CFTC. The Harris Report repeatedly asserts, relying only on the CFTC's pleadings, that Gemini made certain statements and representations to the CFTC. In one paragraph alone, Harris writes:

> ***Gemini stated*** to the CFTC that there were "a number of structural safeguards built into the Gemini Exchange auction process that are specifically designed to promote the integrity of the auction price and make it difficult for a market participant to improperly affect the auction price." As early as July 25, 2017, ***Gemini also represented*** to the CFTC that self-trading was prohibited in Gemini Auctions. ***Gemini also made representations*** to the CFTC regarding the specific volume in the Gemini Auctions dating to the start of the Gemini Auctions on September 21, 2016, through July 17, 2017, as evidence that the "[s]ettlement price is not readily susceptible to manipulation" because of Gemini Auction's volume. As I describe below, my analysis concludes that self-trading inflated the Gemini Auction

volumes reported to the CFTC and was occurring in the Gemini Auctions after ***Gemini represented*** to the CFTC that it had prevented it.

Ex. 1 ¶ 44. On other occasions, Harris writes that Gemini "failed to disclose to the CFTC and the public that customers were exploiting special fee rebate incentives that effectively incentivized wash trading," *id*. ¶ 62, and that its "apparent failure to fully inform the CFTC about volumes it knew were due to self-trading and coordinated trading . . . is problematic." *Id*. ¶ 146.

It would be highly improper for Harris to bring these assertions to bear at trial, for several reasons. To start, Harris does not know the manner in which the alleged statements and omissions occurred in this case, other than what the CFTC told him and whatever "understanding" he may have gleaned from the documents. Ex. 3 at 133:18–134:24 ("A. It was my understanding that [Gemini] had [made representations about volume]. Whether that was from the attorneys or documents that I read or otherwise, I can't tell you right now.") But more importantly, such testimony would impermissibly suggest to the jury what conclusions to reach on the ultimate issues. *See Collins*, 581 F. App'x at 60 (explaining experts may not "merely tell the jury what result to reach"). Although experts may make "factual conclusions that embrace an ultimate issue to be decided by the fact-finder, the expert cannot give testimony stating ultimate legal conclusions based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 179 (S.D.N.Y. 2008).

As the Court is aware, the CFTC brought this action under Section 6(c)(2) of the Commodity Exchange Act, which makes it "unlawful for any person to make any false or misleading statement of a material fact to the Commission, . . . or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the

statement to be false or misleading." 7 U.S.C. § 9(2). And in denying Gemini's motion for partial summary judgment, the Court indicated that "whether and to what extent defendant is the maker of the representations passed on to the CFTC . . . is a question of fact." Dkt. 115. For Harris to testify that Gemini "made" or omitted statements, therefore, would improperly "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

**B.     Harris' opinions as to Gemini's intent, motive, or state of mind are improper**

In his report, Harris repeatedly offers conclusions about the intent, knowledge, motivations, and state of mind of Gemini and others. He asserts, for example, that:

- "As with the 2016 Special Auction Rebates, ***Gemini hoped*** that the Special Fee Overrides would increase Gemini Auction volume . . . Further evidence also shows that Gemini extended the Special Fee Overrides ***to boost Gemini Auction volumes***" Ex. 1 ¶ 92.

- "Gemini extended the Operational Advances . . . ***with the express purpose of boosting*** Gemini Auction participation and volume in some cases." *Id*. ¶ 97.

- "Gemini provided loans to select market participants . . . ***to induce trading*** on the exchange." *Id*. ¶ 113

- "Gemini ***understood*** that Pearl Street was offering the Loans at below-market rates to boost volumes in the Gemini Continuous Market and the Gemini Auctions." *Id*. ¶ 131.

- Gemini "***[p]ermitted*** wash trading by individual traders engaged in self-trading." *Id*. ¶ 144.

- Gemini "***[a]llowed*** pairs of traders to engage in coordinated trades indicative of wash trading." *Id*.

- "Gemini's apparent failure to fully inform the CFTC about volumes ***it knew*** were due to self-trading and coordinated trading and about the methods ***it deliberately used*** to increase volumes is problematic because all parties ***undoubtedly recognized*** the importance of trading volumes in the self-certification process . . . ." *Id*. ¶ 146

These opinions are patently inadmissible. It is well-established that "[d]etermining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony." *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) (quoting *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 268 (S.D.N.Y. 2010)) (alteration in original). "An expert may not testify on the 'intent, motives or states of mind of corporations, regulatory agencies, and others' if the expert has 'no basis in any relevant body of knowledge or expertise.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45–46 (S.D.N.Y. 2016) (quoting *Rezulin Prods.*, 309 F. Supp. 3d at 546). Thus, while courts have held that experts may opine about whether a company's practices are consistent with industry norms, they "may not assign [the company's] motivation or intent behind its business model." *See id.*; *see also Bd. of Trs. v. JP Morgan Chase Bank, N.A.*, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) (allowing expert to opine on defendant's compliance with industry standards but precluding opinion that defendant "relied blindly" on another witness).

Here, Harris lacks the requisite knowledge to opine about anyone's state of mind—he has not "claimed any particular expertise on the intent, motive or state of mind of corporations or regulatory agencies." *See Rezulin Prods.*, 309 F. Supp. 2d at 546 n.40 (excluding expert witnesses who lacked such expertise). His conclusions concerning Gemini's intent are based entirely on the CFTC's pleadings and his subjective interpretation of select chat messages.[6] Even then, however, Harris admitted that some of these chat messages lacked context, Ex. 3 at 82:14–21; that he was given an incomplete record by the CFTC, *supra* at 3–4; and that he did not review the deposition

---

[6] For example, he writes that "[e]vidence from recorded Gemini chats . . . supports the conclusion that Gemini granted the Operational Advances to increase Gemini auction volumes," Ex. 1 ¶ 106, and that "[t]he texts of chat[s] between Shane Molidor . . . and Daniel Matuszewski . . . explicitly show that . . . Gemini was concerned about low auction volume on this date." *Id.* ¶ 108.

transcripts of any Gemini witnesses, Ex. 3 at 174:23–175:13. At best, therefore, he lacks sufficient facts to make a reliable assessment of Gemini's intent; at worst, his opinions are entirely speculative and based on inferences that fall squarely within the province of the jury.

In short, Harris ventures to draw the very sort of "[i]nferences about the intent or motive of parties or others [that] lie outside the bounds of expert testimony." *Rezulin Prods.*, 309 F. Supp. 2d at 547. And because these inferences are inadmissible, the Court should preclude Harris from offering them at trial.

**C.**    **Harris uses chat messages to construct impermissible factual narratives**

For reasons similar to those discussed above, Harris should also be precluded from offering a narrative of the various chat messages he reviewed in connection with his analysis. Not only does Harris use these chats to opine impermissibly as to the motivations of Gemini and others, but he also offers an interpretation of the messages that "simply rehash[es] otherwise admissible evidence about which he has no personal knowledge." *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005). This is improper. Just as an expert may not "attribute subjective motivations to the parties," he also may not "be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Louis Vuitton*, 97 F. Supp. 3d at 507 (cleaned up).

By way of example, Figure 28 of the Harris Report includes an excerpt of the following text conversation between Shane Molidor and Cameron Winklevoss of Gemini and Dan Matuszewski of Circle:

**FIGURE 28: DECEMBER 27, 2016, EXAMPLE OF AN OPERATIONAL ADVANCE**

| | Speaker | Speaking to | Quote/Action | Date/Time (Eastern) |
|---|---|---|---|---|
| [1] | Shane Molidor (Gemini) | Daniel Matuszewski (Circle) | "you gonna get in auction at all?" | 12/27/16 3:51:12 PM |
| [2] | Daniel Matuszewski (Circle) | Shane Molidor (Gemini) | "I'm in there" | 12/27/16 3:51:30 PM |
| [3] | Daniel Matuszewski (Circle) | Shane Molidor (Gemini) | "doesnt seem like anyone else is though" | 12/27/16 3:51:35 PM |
| [4] | Shane Molidor (Gemini) | Daniel Matuszewski (Circle) | "jesus" | 12/27/16 3:51:37 PM |
| [5] | Shane Molidor (Gemini) | Daniel Matuszewski (Circle) | "holidays are just killing me" | 12/27/16 3:51:51 PM |
| [6] | Shane Molidor (Gemini) | Daniel Matuszewski (Circle) | **"you have my permission to cross against yourselves and keep 30 bps"** | 12/27/16 3:52:08 PM |
| [7] | Daniel Matuszewski (Circle) | Shane Molidor (Gemini) | **"if you wanna flash drop me some cash i can make it bigger"** | 12/27/16 3:52:27 PM |
| [8] | Shane Molidor (Gemini) | Daniel Matuszewski (Circle) | **"how much can you do now?"** | 12/27/16 3:52:46 PM |
| [9] | Daniel Matuszewski (Circle) | Shane Molidor (Gemini) | **"250 so not much"** | 12/27/16 3:52:53 PM |
| [10] | Shane Molidor (Gemini) | Daniel Matuszewski (Circle) | "create a ticket" | 12/27/16 3:53:02 PM |
| [11] | Daniel Matuszewski (Circle) | Shane Molidor (Gemini) | "done" | 12/27/16 3:53:20 PM |
| [12] | Shane Molidor (Gemini) | Cameron Winklevoss (Gemini) | "please approve the advanced credit dual control for circle. **Need auction volume"** | 12/27/16 3:54:00 PM |
| [13] | Shane Molidor (Gemini) | Daniel Matuszewski (Circle) | "done" | 12/27/16 3:54:54 PM |
| [14] | | | Gemini extends Circle $400,000 USD Advance Credit. "used for auction funding" | 12/27/16 3:54:54 PM |
| [15] | Daniel Matuszewski (Circle) | Shane Molidor (Gemini) | "and in" | 12/27/16 3:54:57 PM |
| [16] | | | Circle executed $451,889 of buy volume and $631,969 of sell volume in the Auction. | 12/27/16 4:00:00 PM |
| [17] | Shane Molidor (Gemini) | Cameron Winklevoss (Gemini) | **"We needed auction volume, so really it was just like a quick operational advance so they could cross themselves. Now we are taking the cash back"** | 12/27/16 4:23:00 PM |
| [18] | | | Gemini debits Circle's account $400,000 USD to remove the Advance Credit. | 12/27/16 7:19:36 PM |

Ex. 1 at 52. Apparently relying on this single excerpt, Harris concludes that:

(1)    Gemini was concerned about low auction volume on this date;

(2)    Gemini suggested that Circle self-trade to increase Gemini Auction volume;

(3)    Circle's currently available funds limited its participation in the Gemini Auction;

(4)    Circle wanted to participate to obtain a rebate of 30 basis points;

(5)    Gemini extended Circle an advance credit of $400,000 to increase Circle's volume in the auction;

(6)    Circle purchased $451,889 of BTC at auction; and

(7)    Gemini reversed the credit within hours of the auction. Further, Circle was the largest participant in this auction, accounting for 85% of the total auction volume.

*Id*. ¶ 108.

Harris conducts a similar "analysis" of certain chat messages in Figure 29 of his report, and uses these to declare that:

14

(1)     Gemini extended XBTO an operational advance of one thousand BTC on January 17, 2017;

(2)     On March 6, 2017, Gemini reversed the January 17, 2017, advance to remove such advances from their books "As we get closer to a decision";

(3)     On March 7 and 8, 2017, Gemini wanted XBTO to participate in the Gemini Auction and was concerned about low Gemini Auction volume, apparently because XBTO's typically large volume did not occur; XBTO said it was limited in its participation in the Gemini Auctions because Gemini had reversed its 1,000 BTC Operational Advance which was its entire liquidity for the Gemini Auctions; Gemini saw XBTO's volume as needed to maintain high volume "pre-ETF";

(4)     Gemini extended XBTO an additional Operational Advance of one thousand BTC on March 10, 2017, with the express purpose of increasing XBTO's volume in the auction, and expressly required XBTO to use the Advance to trade in the Gemini Auction repeatedly; and

(5)     Gemini reversed the 1,000 BTC Operational advance on March 13, 2017.

*Id.* ¶ 109.

The Court should preclude Harris from offering any chat messages in this manner at trial. While it is not necessarily improper for Harris to have considered them to help contextualize the contemporaneous trading data, *see* Fed. R. Evid. 703, it is improper here, where he offers no more than his subjective interpretation of the chats themselves. For one, both Molidor and Winklevoss are on the CFTC's witness list, and "[t]he appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). Accordingly, if the CFTC intends to introduce the substance of these chats into evidence, "testimony by fact witnesses familiar with [the chats] would be 'far more appropriate . . . and renders [Harris'] secondhand knowledge unnecessary for the edification of the jury.'" *See LinkCo.*, 2002 WL 1585551, at *2 (quoting *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, 1999 WL 945354, at *3 (S.D.N.Y. Oct. 19, 1999)).

Moreover, courts routinely preclude experts from offering factual narratives due to the risk that such testimony might "supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." *See, e.g.*, *Rezulin Prods.*, 309 F. Supp. 2d at 541 ("Examples of 'expert' testimony that courts have excluded on this basis include factual narratives and interpretations of conduct or views as to the motivation of parties."). Indeed, Harris' proffered testimony draws parallels to the opinions at issue in *Highland Capital Management v. Schneider*, where the court excluded an expert's narrative that merely marshaled plaintiff's evidence while offering opinions about defendants' knowledge and state of mind. 379 F. Supp. 2d at 468–69. The court held that this testimony would be inadmissible, in part, because it offered only "a factual narrative of the case and addresse[d] 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *Id*. at 469 (quoting *Andrews v. Metro-North Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989)). Similarly, in *Securities and Exchange Commission v. Lek Securities Corp.*, the court precluded an expert whose report was "little more than a narrative of [defendant's] communications with regulators." 2019 WL 1512713, at *4 (S.D.N.Y. Apr. 8, 2019). The court reasoned that "[b]usiness records and lay witnesses are the appropriate vehicle for providing such historical evidence to the jury" and noted that, in any event, few of the issues in the expert's report were beyond the "ken of a layperson." *Id*. at *4–5.

The same is true here. While Harris contended at his deposition that he "probably understand[s] these types of chats better than a lay person off the street," Ex. 3 at 165:22–166:5, he also admitted that he has no first-hand experience communicating with traders via chat messages and that he has never had the occasion to analyze them outside the litigation support context. *Id*. at 166:6–16. But even assuming he had this expertise, the chats are not particularly difficult for the jury to decipher or comprehend on its own, and as discussed above, any missing

context is properly supplied by the percipient fact witnesses. *Supra* at 15. For these reasons, the Court should preclude Harris from interpreting or otherwise relaying the chat messages identified in his report at trial.

## IV.    The Court Should Strike Opinions that are Unreliable Under *Daubert*

There are four factors a court should consider when examining the reliability of an expert's methodology: (i) whether the expert's technique or theory can be or has been tested; (ii) whether it has been subjected to peer review and publication; (iii) whether there is a high error rate for the expert's technique, and whether there are "standards controlling the technique's operation"; and (iv) whether the expert's technique or theory is generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 592–94. In addition to the four *Daubert* factors, courts have also considered the extent to which the expert's opinion was prepared for the litigation at hand. *In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d 396, 440 (S.D.N.Y. 2016) (explaining that expert methodology prepared "solely for litigation . . . weighs against reliability of an expert's testimony."). Critically, an expert's analysis must be reliable "at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). As a result, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)) (emphasis in original).

### A.    The Court should exclude unsupported opinions or characterizations

The Harris Report makes several blanket assertions or characterizations that are either unsupported or belied by the factual record in this case and for which Harris identifies no independent source. Specifically he:

- Asserts without any foundation that "[a]n operational advance is effectively an interest-free loan credited to the recipient's Gemini account." Ex. 1 ¶ 20.

- Posits that it was "completely inappropriate" for Gemini to extend operational

advances without proof incoming funds—but does not explain why, much less how he came to that conclusion. *See id.* ¶ 97.

- Makes the wholesale generalization, without providing a single comparator, that "exchanges publicize all their rules and complete fee schedules." *Id.* ¶ 138.

- Conflates Gemini and Pearl Street on multiple occasions when discussing the at-issue loans. *See, e.g.*, *id*. ¶ 113 ("Gemini provided loans to select market participants . . . .").

The Court should preclude Harris from offering the opinions listed above. Expert testimony "must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. To be sure, expert opinions need not be reduced to a level scientific certainty, and experts "may express professional opinions that fall short of definitive proof." *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 403 (S.D.N.Y. 2019) (quoting *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017)). Regardless, the proffered opinions must still be reliable under Rule 702. *Id*.

Courts often reject expert testimony as unreliable where it consists of conclusory and unsubstantiated assertions by the expert. For example, in *Lek Securities*, the court took exception to the proposed testimony of an expert who, like Harris, had a "particularly troubling" tendency to make assertions without explaining the basis for them. *See* 370 F. Supp. 3d at 416. The court ultimately struck the expert's opinions because he "provide[d] no explanation as to how he came to his conclusion, nor of what methodologies or evidence substantiate it." *Id*. at 417 (cleaned up). Separately, the court excluded the testimony of another expert whose "naked statements without any supporting analysis" were "unaccompanied by any description of the data examined or the analytical steps taken to form the opinions." *Id*. at 413–14. "These conclusory statements," the court held, "[were] inadmissible for their failure to meet the requirements for expert testimony imposed by *Daubert*." *Id*.

18

Despite having the opportunity to shore up his thinly sourced assertions at his deposition, Harris was unable to do so. Asked, for instance, what he meant when he wrote that operational advances were equivalent to interest-free loans, Harris merely clarified that his description concerned "the economics . . . and not the legal characterization of this operational advance," and that he "simply provided an exact characterization of what those advances were from the point of view of an economist interested in the effect of that activity on . . . trading behaviors." Ex. 3 at 213:22–214:15. But he provided no support or methodology to supplement his conclusion that operational advances are "effectively interest-free loans" beyond his own say-so. Furthermore, he admitted that he is not an accountant; that he did not review Gemini's financial statements to evaluate whether its auditors treated the advances as loans; and that he did not review Gemini's policies and procedures surrounding operational advances. Ex. 3 at 211:6–16, 214:16–215:6.

Thus, where, as here, Harris makes assertions that are "connected to existing data only by the *ipse dixit* of the expert" and nothing more, the Court should conclude that there is "too great an analytical gap between the data and the opinion[s] proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Mirena*, 169 F. Supp. 3d at 431–32 (holding that opinions rendered by expert without explanation or analysis were "speculation, whereby the conclusions are linked to studies only by [the expert's] say-so" and excluding them under *Daubert*). That is, the Court should preclude Harris from testifying that (i) operational advances are "interest-free loans"; (ii) it was "completely inappropriate" for Gemini to issue operational advances without proof of incoming funds; (iii) "exchanges publish all their rules and complete fee schedules"; and (iv) Gemini issued the Pearl Street Loans.

**B.     The Court should preclude Harris from opining that Pearl Street Loans were issued "below market"**

With respect to the Pearl Street Loans, Harris opines that "Gemini provided loans to select

market participants . . . to induce trading on the exchange." Ex. 1 ¶ 113. He continues that "[s]uch market participants often were capital-constrained," and that "since Gemini extended the loans at below market rates, Gemini reduced the recipients' capital costs." *Id*. To reach this conclusion, Harris "reviewed case documents and analyzed public data sources to characterize the risk profiles of the Pearl Street loan recipients, identify interest rates charged on their other borrowings, and review their credit ratings (if any)." *Id*. ¶ 115.

However, Harris' opinions on the Pearl Street Loan rates are unreliable, and the Court should exclude them altogether. As an initial matter, it is questionable whether Harris is sufficiently qualified to opine about Pearl Street's practices in the first place; his specialty, in his own words, is "trading, how markets operate, what traders do, what exchanges do, [and] how they're regulated." Ex. 3 at 16:2–9. He has no obvious background in the lending industry and expressly disclaimed any exposure to the Bitcoin lending environment during the period relevant to this case. *Supra* at 5–6; *see also Kellwood*, 105 F. Supp. 3d at 304 ("[A]n expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.") (citation omitted). But even so, Rule 702 requires expert opinion testimony to be based on sufficient facts or data and be the product of reliable principles and methods that the expert has reliably applied to the case. *See* Fed. R. Evid. 702. It follows, therefore, that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

### 1.    Harris' opinions are not based on sufficient facts and data

An expert "must not cherry-pick from the scientific landscape and present the Court with what he believes the final picture looks like," and a court should not "admit opinions that assume

a conclusion and reverse-engineer a theory to fit that conclusion." *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at *4 (S.D.N.Y. Sept. 3, 2021) (cleaned up), *aff'd*, 2023 WL 4837521 (2d Cir. 2023). Here, while Harris did not necessarily cherry-pick the documents that undergird his analysis, the CFTC certainly did. As discussed above, *supra* at 3–4, the CFTC gave Harris just 42 of the more than 70,000 documents exchanged in discovery and only one deposition transcript. And in a particularly bold sleight-of-hand, the CFTC excised over 200 pages of one document before providing it to Harris:

> Q.    Have you seen DX 92 before? DX 92 has the Bates Number CIRCLE 1 to CIRCLE 255.
>
> A.    So I have only seen part of DX 92. The part that I saw was only CIRCLE 1 to CIRCLE 33. The remainder was not given to me.
>
> Q.    Who selected the pages from Circle's document to give to you?
>
> A.    So I have no idea, other than that I received this from the CFTC.

Ex. 3 at 250:6–14; *see also* Ex. 5.

This document—a single PDF consisting of multiple loan agreements between Circle and third parties—is critical, because Harris explicitly relied upon it to draw his conclusion that the Pearl Street Loans were issued at below-market rates. Indeed, his opinion is based on a comparison between the loan documents found in CIRCLE000001–33, which reflects a 12.25% interest rate, against the 1.5% interest rate on a similar loan from Pearl Street. Ex. 1 ¶ 129. Had the CFTC supplied Harris with the 222 pages missing from the document, however, he would have known that Circle was receiving interest rates from other lenders as low as 4%. *See* Ex. 5 at CIRCLE000166. Again, this datapoint is critical, because while Harris opines that the Pearl Street Loans were granted at below-market rates, he also concedes that "the [Pearl Street] loans to Circle and XBTO were at 5% and 3%, respectively (for loans issued September 20, 2016–December 31,

2017)." Ex. 1 ¶ 123. Given Harris' own admission that the full document would have been relevant to his analysis, Ex. 3 at 252:1–253:4, it is beyond evident that Harris lacked sufficient facts or data to form his opinions. This, in turn, renders his opinions on the interest rates unreliable. *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 77 (S.D.N.Y. 2017) ("The Court of Appeals has instructed that expert analysis must be 'reliable at every step,' . . . and that 'a trial judge should exclude expert testimony if it is . . . based on assumptions that are so unrealistic and contradictory as to suggest bad faith.'") (citations omitted). The Court should preclude his testimony about them.

## CONCLUSION

For the foregoing reasons, Gemini respectfully requests that the Court enter an order precluding Harris from:

1. Testifying about the CFTC's internal processes as it relates to the self-certification;

2. Testifying that Gemini made statements, representations, or omissions to the CFTC;

3. Testifying as to Gemini's motive, intent, or state of mind;

4. Constructing a factual narrative for the jury using chat messages;

5.  Testifying that:

    a.    Operational advances are "effectively interest-free loans";

    b.    It was "completely inappropriate" for Gemini to issue operational advances without proof of incoming funds;

    c.    Exchanges "publish all their rules and complete fee schedules";

    d.    Gemini issued the Pearl Street Loans; and

6.   Testifying that the Pearl Street Loans were issued at "below-market" rates.

Dated: New York, New York
       November 15, 2024

BAUGHMAN KROUP BOSSE PLLC

By /s/ John F. Baughman

John F. Baughman
Daniel A. Schwartz
Elizabeth J. Lee
Ernest E. Butner IV
One Liberty Plaza – 46th Floor
New York, NY 10006
(212) 548-3212

*Attorneys for Gemini Trust Company*

23