UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | 22-cv-4563 (AKH) |
| v. | Hon. Alvin K. Hellerstein |
| GEMINI TRUST COMPANY, LLC, | |
| Defendant. | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF ANGELO CHAN

COMMODITY FUTURES TRADING
COMMISSION

Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT .......................................................................................... 6

BACKGROUND ................................................................................................................. 7

ARGUMENT .................................................................................................................... 10

    I.  LEGAL STANDARD ......................................................................................... 10

        A.    Qualifications ......................................................................................... 11

        B.    Reliability .............................................................................................. 11

        C.    Relevance ............................................................................................... 13

    II. CHAN SHOULD BE EXCLUDED FROM TESTIFYING ......................................... 14

        A.    Chan's Proffered Opinions No Longer "Fit" the Issues of the Case ............... 14

        B.    Chan Is Not Qualified to Give Opinion Testimony ......................................... 15

        C.    Chan's Opinions Are Irrelevant, Unsupported, or Based Only on Selective

            Snippets from the Factual Record. ................................................................ 17

CONCLUSION.................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469 (S.D.N.Y. 2006) ............... 26

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ................................... 12

*Andrew v. Metro North Commuter R. Co.*, 882 F.2d 705 (2d Cir. 1989) .............................. 20, 29

*Bah* v. *Nordson Corp.,* 2005 WL 1813023 (S.D.N.Y. Aug. 1, 2005) .......................................... 13

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) ................................... 12, 21, 30

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,*

    2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ...................................................................... 28

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,

    769 F. Supp. 2d 269 (S.D.N.Y. 2011)..................................................................................... 11

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).................................................*passim*

*Davis v. Carroll*, 937 F. Supp. 2d 390 (S.D.N.Y. 2013) ............................................................ 12

*Estate of Anderson v. Strohman*, 2016 WL 4013638 (S.D.N.Y. July 27, 2016) ................... 23, 28

*F.T.C. v. Ross*, 743 F.3d 886, 893 (4th Cir. 2014)...................................................................... 14

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ............................................................... 13, 18, 19

*Golden Unicorn Enters. v. Audible, Inc.*,

    682 F. Supp. 3d 368, 380 (S.D.N.Y. Jul. 14, 2023)................................................................ 14

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,

    2010 WL 6363027 (S.D. Fla. Sept. 9, 2010) ........................................................................ 22

*In re Blech Sec. Litig.*, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ......................................... 12

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)............................. 10, 13

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,

   299 F. Supp. 3d 430 (S.D.N.Y. 2018)................................................................. 27, 30

*In re Lyman Good Dietary Supplements Litig.*, 2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019).... 11

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,

   2008 WL 1971538 (S.D.N.Y. May 7, 2008) ........................................................ 12

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................... 20

*Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477 (S.D.N.Y. 2000) ...................... 26

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................ 10, 13

*Loyd v. U.S.*, 2011 WL 1327043 (S.D.N.Y. March 31, 2011)...................................................... 10

*McMahon v. Robert Bosch Tool Corp.*, 2019 WL 5727340 (E.D. Mo. Nov. 5, 2019) .......... 23, 28

*MLB Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .................................... 12

*Music Royalty Consulting, Inc. v. Reservoir Media Mgmt.*,

   598 F. Supp. 3d 158 (S.D.N.Y. 2022)...................................................................... 14

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................................... 10, 11, 13, 29

*R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010)................................................ 17, 20

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997) .................................................................... 13, 22

*Rowe Ent., Inc. v. William Morris Agency, Inc.*,

   2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)...................................................... 12

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013).................................................. 16, 20, 25

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) .......................................................... 11

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004)........................................................ 11

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015)........................................... 11

*Wiener v. AXA Equitable Life Ins. Co.*, 2019 WL 1228074 (S.D.N.Y. Mar. 15, 2019) ............... 23

**Rules**

Fed. R. Civ. P. 26 ................................................................................................ 10

Fed. R. Evid. 702 ............................................................................................... 10

Fed. R. Evid. 702 advisory committee note ....................................................... 11

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or the "Commission") submits this memorandum of law and the accompanying declaration and exhibits[1] in support of its motion to exclude the testimony and report of Angelo Chan, an expert witness identified by Defendant Gemini Trust Company, LLC ("Gemini" or "Defendant").

## PRELIMINARY STATEMENT

Defendant proposes Angelo Chan as an expert witness to provide irrelevant opinion testimony relating to Defendant's prefunding requirement and the cost of capital—a category of statements for which this Court has already ruled in favor of the CFTC in its partial summary judgment opinion, including finding that the statements were false or misleading and material. Specifically, this Court ruled that Defendant's written statements to the CFTC that all orders on its platform must be fully prefunded, which made it "costly" for traders to engage in manipulative conduct, coupled with Defendant's omission that it provided loans to market participants via its affiliate, Pearl Street Financial LLC ("Pearl Street"), violated Section 6(c)(2) of the Commodity Exchange Act, 7 U.S.C. § 9(2), as a matter of law. *See* ECF No. 133 ("7/23/2024 Hr'g Tr.") at 25:1-6, 101:18; ECF No. 135 ("7/24/2024 Hr'g Tr.") at 158:9-159:16, 161:19-162:12, 209:21-210:1, 211:6-16, 216:22-25.

Chan's proffered opinions *only* address the narrow issue of whether the interest rates of the undisclosed Pearl Street loans were low or below market, which relates to whether the undisclosed Pearl Street loans rendered false or misleading Gemini's statements that its prefunding requirement made it costly to engage in manipulative conduct. Thus, Chan's opinions solely pertain to an issue this Court has already decided as a matter of law, and no

---

[1] All references herein to exhibits will be to exhibits to the Declaration Christopher Giglio, dated November 15, 2024.

longer "fit" the remaining issues to be tried (i.e., whether Gemini made additional oral statements about prefunding at an in-person meeting on July 25, 2017, or whether the undisclosed Pearl Street loans made Gemini's statements to the CFTC concerning its trading volume false or misleading). *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591(1993) (explaining that the consideration of whether the proffered expert testimony "relate[s] to any issue in the case" is "one of 'fit'").

Even assuming Chan's proffered testimony were still relevant, the Court should still preclude Chan from testifying entirely. First, Chan is not qualified to give these opinions because he has no relevant academic expertise, nor does he have experience in cryptocurrency lending during 2016-2017, the relevant period in this case. Further, Chan's opinions often reflect basic economic principles that would not help the trier of fact determine the issues of this case. Finally, his opinions are not based on reliable methodology. Instead of relying on relevant expertise or methodical analysis, Chan largely parrots cherry-picked testimony and documents from fact discovery to support his opinions. Chan's proposed testimony and report should be excluded from trial.

## **BACKGROUND**

In 2017, Defendant engaged in discussions with the CFTC about the self-certification of a bitcoin futures contract, which was to be settled by reference to Defendant's daily bitcoin auction price. As part of its evaluation, the CFTC evaluated whether the contract was readily susceptible to manipulation. To persuade the CFTC that the contract was not readily susceptible to manipulation, Defendant made a myriad of false or misleading statements. As is relevant to Chan's proposed testimony and report, Defendant told the CFTC that its platform required all orders to be fully prefunded, which made it "costly" for traders to engage in manipulative conduct. However, Defendant failed to disclose that its affiliate, Pearl Street, extended loans at

low or below market interest rates to market participants on Defendant's platform to bolster the trading volume on Defendant's exchange. The low interest loans provided traders with cheap access to funds they otherwise would not have had, which lowered the cost of capital to trade on Defendant's platform. In other words, the loans allowed traders to trade on Defendant's platform without fully prefunding their accounts with their own funds. Thus, Defendant's statements about its prefunding requirement were made misleading by the omission of the Pearl Street loans. These loans also had the impact of inflating "the apparent volume, liquidity, or number of participants trading" on Defendant's platform by injecting funds into the traders' accounts— funds to which they would not have had access but for the low interest loans. Complaint ¶¶ 47-61.

On July 23 and 24, 2024, the Court granted partial summary judgment in favor of the CFTC by ruling that Defendant violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), for its fifteen written false or misleading statements about its prefunding requirement and the related cost of capital to trade, finding that the written statements were made by Gemini, were false or misleading, were material, and Gemini knew or should have known its statements were false or misleading. *See* 7/23/2024 Hr'g Tr. at 25:1-6, 101:18; 7/24/2024 Hr'g Tr. at 158:9-159:16, 161:19-162:12, 209:21-210:1, 211:6-16, 216:22-25. In particular, the Court found that Defendant's "statement[s] of prefunding [were] misleading without the statement[s] about the exception for lending by Pearl Street," which would have been material to the CFTC. 7/24/2024 Hr'g Tr. at 158:24-159:2.

At the upcoming trial, the CFTC will establish that at an in-person meeting on July 25, 2017, Gemini made additional oral statements to the CFTC concerning its prefunding requirement and the related cost of capital to trade. These oral statements were substantively

similar to the fifteen written statements for which the Court has already established Gemini's liability under 7 U.S.C. § 9(2). Because this Court has already found as a matter of law that Gemini's omission of its Pearl Street loans rendered its statements concerning prefunding and the cost of capital false or misleading, that it knew or should have known they were false or misleading, and that its misstatements and omissions were material, the only remaining issue to for trial with respect to this category of false statements is whether Gemini made the additional, oral statements concerning prefunding at the in-person meeting on July 25, 2017.

At the upcoming trial, the CFTC will also establish that Gemini should be held liable for violations of 7 U.S.C. § 9(2) based on another category of statements made by Gemini, statements concerning Gemini's trading volume and liquidity. Here, the CFTC will establish that these statements were false or misleading in part due to Gemini's trading volume being inflated by the undisclosed Pearl Street loans.

Chan's report and proffered testimony exclusively focus on the Pearl Street loans. Moreover, he does not offer any opinions on whether the Pearl Street loans lowered the cost of capital for traders on Gemini, nor does he opine on whether, or to what extent, the loans impacted the trading volume and activity on Gemini. Instead, he offers only certain factors that purportedly support his conclusion that the Pearl Street loans' interest rates were not "low or below market." Chan Rep. ¶¶ 11, 13, 24-56, App'x D ("Summary of Opinions").

In his report, Chan offers three general opinions. First, Chan opines that the loans were issued in "a nascent environment" with little transparency. *Id.* ¶¶ 24-26. Second, Chan asserts that the borrowers were "capped" at the maximum interest rate they would be willing to pay based on the projected return they could make from trading on the loans. *Id.* ¶¶ 27-30. Chan's third and final opinion is, inexplicably, an umbrella opinion that contains four sub-factors that

attempt to justify why the interest rates on Pearl Street loans declined during the relevant period, including: i) the lack of industry standards and transparency in the market; ii) borrowers who engaged in repeat transactions had no history of default; iii) the borrowers "exertion of bargaining power" in negotiations; and iv) competitive pressure from other lenders in the market. *Id.* ¶¶ 31-56.[2]

Chan is not qualified to testify as to any of these opinions because he has no relevant experience during the time period in question. Additionally, his opinions are largely based on common sense principles that the jury can apply for itself without the aid of an expert. And finally, his opinions are not based on a reliable foundation. Chan's conclusions in his report often lack supporting citations, and where the conclusions have supporting citations, they are often based on selective snippets of the factual record, which he adopts as true where convenient for Defendant's position. Chan's testimony and report should be excluded.

## ARGUMENT

### I.    LEGAL STANDARD

The Supreme Court has explained that a district court has a "gatekeeping" role with respect to expert opinion testimony. *Daubert*, 509 U.S. at 597; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In fulfilling this gatekeeping role, the district court must evaluate the expert based on three criteria: (1) qualifications, (2) reliability, and (3) relevance. Fed. R. Evid. 702. *See also Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005); *In re Fosamax*

---

[2] Chan asserted, for the first time at deposition, that Pearl Street already having Bitcoin in its custody made it less costly for it to lend Bitcoin to others. *See* 239:18-240:9. This opinion is not included in his report, and thus Chan has failed to provide a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). To the extent that Chan offers opinions not included in his report or relies on documents not disclosed in his report, those opinions should be excluded. *See Loyd v. U.S.*, 2011 WL 1327043 at *2 n.4 (S.D.N.Y. March 31, 2011) (holding expert failed to comply with Fed. R. Civ. P. 26(a)(2) (B), including, inter alia, failing to include "data considered by [the expert] in forming his opinion").

*Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009).  The party seeking to offer expert testimony bears the burden of showing, by a preponderance of the evidence, that such testimony is admissible.  *Daubert*, 509 U.S. at 592 n.10; *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 283 (S.D.N.Y. 2011).

### A.  Qualifications

As a "threshold" matter, the Court must determine whether the proposed expert is qualified by virtue of some specialized "knowledge, skill, experience, training or education." *Nimely,* 414 F.3d at 396 n.11.  This includes analyzing "the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702 . . . with respect to a relevant field."  *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015).  The Court should "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," which must overlap.  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  An expert may be unqualified "despite the relevance of their testimony because their expertise is too general or too deficient."  *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997). Moreover, simply "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."  *Nimely*, 414 F.3d at 399 n.13; *see also In re Lyman Good Dietary Supplements Litig.*, 2019 WL 5682880, at *5 (S.D.N.Y. Oct. 31, 2019).

### B.  Reliability

If the Court determines that the expert is qualified, it must then consider "the indicia of reliability identified in Rule 702, namely (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the

witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusions, et alia." *Id.* (internal quotation marks omitted).

An expert's opinion that is "without factual basis" or based on "speculation or conjecture" is inadmissible. *MLB Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (affirming district court's exclusion of expert who did not cite evidence to support his conclusory statements, and "performed no empirical studies"); *see also In re Blech Sec. Litig.*, 2003 WL 1610775, at *23 (S.D.N.Y. Mar. 26, 2003) ("General statements without adequate factual support are inadmissible."). An expert whose testimony "rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts" must be excluded. *Davis v. Carroll*, 937 F. Supp. 2d 390, 418-19 (S.D.N.Y. 2013) (excluding expert who based his conclusions on factual assumptions and failed to reckon with record evidence that contradicted his assumptions); *Barber v. United Airlines, Inc*., 17 F. App'x 433, 437 (7th Cir. 2001) (affirming district court's exclusion of expert because he "cherry-picked the facts he considered to render an expert opinion"). Finally, an expert cannot rely on information from a party in lieu of conducting his own analysis of the evidence. *Rowe Ent., Inc. v. William Morris Agency, Inc.,* 2003 WL 22124991 at *3 (S.D.N.Y. Sept. 15, 2003).

"The test of reliability applies equally when an expert's testimony is not scientific in nature." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 2008 WL 1971538, at *3 (S.D.N.Y. May 7, 2008) (citing *Kumho Tire*, 526 U.S. 137). In such cases, the Court should "make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152.  An experience-based

expert "'must explain how that experience leads to the conclusion reached, why that experience

is a sufficient basis for the opinion, and how that experience is reliably applied to the facts,'

because 'the trial court's gatekeeping function requires more than simply taking the expert's word

for it.'" *Bah* v. *Nordson Corp.,* 2005 WL 1813023, at *9 (S.D.N.Y. Aug. 1, 2005) (quoting Fed.

R. Evid. 702 advisory committee note); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

## C.  Relevance

Even if an expert is qualified and their opinions are based on reliable data and

methodology, the Court must "make a third inquiry: whether the expert's testimony (as to a

particular matter) will assist the trier of fact." *Nimely*, 414 F.3d at 397 (internal quotation marks

omitted).  The question of relevance "can be expressed as a question of 'fit' – 'whether expert

testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury

in resolving a factual dispute.'" *In re Fosamax Prods. Liab*, 645 F. Supp. 2d at 173 (quoting

*Daubert*, 509 U.S. at 591).  "[E]xpert testimony which does not relate to any issue in the case is

not relevant and, ergo, non-helpful." *Raskin v. Wyatt Co.*, 125 F.3d 55, 67 n.5 (2d Cir. 1997)

(quoting *Daubert*, 509 U.S. at 591). Moreover, an expert cannot offer opinions that "attempt to

substitute the expert's judgment for the jury's[.]" *Nimely*, 414 F.3d at 398 (citations omitted).

## II.    CHAN SHOULD BE EXCLUDED FROM TESTIFYING

### A.    Chan's Proffered Opinions No Longer "Fit" the Issues of the Case

As noted above, this Court has already granted partial summary judgment in favor of the CFTC on fifteen written statements Gemini made relating to prefunding and the cost of capital to trade, finding that Gemini's omission of its Pearl Street loans rendered its statements false or misleading.  In light of the Court's ruling, Chan's proffered opinions, which solely pertain to the Pearl Street loans and do not concern whether Gemini made oral statements at the July 25, 2017 meeting, no longer bear on any issues that remain in the case.

Because the Court granted partial summary judgment in favor of the CFTC by ruling that Defendant violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2) for its fifteen written false or misleading statements about its prefunding requirement and the related cost of capital to trade, Chan's opinions about the Pearl Street loans, and in particular the interest rates of Pearl Street loans, do not have any tendency to make the remaining fact in issue at trial – whether Gemini made additional oral statements about prefunding and the cost of capital on July 25, 2017 – more or less probable than it would be without the evidence, as the Court has ruled there is no genuine dispute as to any material fact that Gemini's prefunding statements were made misleading by its omission of the Pearl Street loans.  Therefore, Chan should be precluded from testifying entirely. *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt.*, 598 F. Supp. 3d 158 (S.D.N.Y. 2022) (precluding expert testimony when the court has already ruled "as a matter of law" on summary judgment relating to issues on which the expert opined); *Golden Unicorn Enters. v. Audible, Inc.*, 682 F. Supp. 3d 368, 380 (S.D.N.Y. Jul. 14, 2023) (excluding expert's damage calculations when they "do not correspond to Plaintiffs' sole remaining claim" after the court dismissed other claims on summary judgment); *F.T.C. v. Ross*, 743 F.3d 886, 893 (4th Cir. 2014)

("As the district court correctly ruled, however, [the expert's] testimony was irrelevant because it had already decided the deceptiveness issue in favor of the Commission at summary judgment…[the expert's] testimony was immaterial, and thus irrelevant, to the issue reserved for trial.").[3]

### B.    Chan Is Not Qualified to Give Opinion Testimony

Even assuming that Chan's proffered opinions are germane to the remaining issues of the case, his report and testimony should be excluded because he is not qualified, does not cite to sufficient factual bases for his opinions, and does not apply any reliable methods to reach his opinions.  With respect to his qualifications, Chan's dearth of academic expertise or any relevant experience in cryptocurrency lending makes him unqualified to opine on the time period at issue: 2016-2017.  Chan has an undergraduate degree and a master's degree in natural sciences, specializing in theoretical chemistry.  He has no degree or post-graduate education related to finance, economics, or other related fields.  *See* Angelo Chan Deposition ("Dep.") 49:6–52:25[4]; Chan Rep. App'x A (biography and prior testimony).  Moreover, Chan has never been qualified as an expert in a case involving cryptocurrency.  In fact, he has only testified as an expert in one other matter—a tax dispute in front of a non-U.S. tribunal, for which he refused to provide additional detail at deposition, stating that it was "confidential."  *See* Chan Rep. App'x A at 2; Dep. 53:2–54:25.  And, despite advertising his company, 8C Management, as having been "working in cryptocurrencies since 2016," Ex. 1 (8C's website capture from 2024), it appears that, even in as late as 2019, two years after the relevant period ended, the company was

---

[3] After the summary judgment hearing, the CFTC asked Defendant if it intended to withdraw any of its proposed experts, including Chan, in light of the Court's ruling on the prefunding statements.  Defendant stated that it did not intend to withdraw any experts or any portions of any expert reports.

[4] All objections are omitted from quoted testimony.

exclusively marketing itself as a provider of inventory and funding in "the precious metals, gemstones and jewelry industries." Ex. 2 (8C's website capture from 2019); *see also* Dep. 253:3–257:17 (explaining that during the relevant period, 8C Management acted as a "consignor" by lending jewelry pieces and watches to retail stores).

Chan never lent or received cryptocurrency loans in a professional capacity during 2016-2017, the relevant period of this case. Instead, Chan's experience in cryptocurrency lending only started in 2021—*four years after* the relevant period in this case—when he was a managing director at BlockFi. Even then, his experience was primarily in structuring financing transactions that happened to be collateralized by cryptocurrency. *See* Dep. 121:14–122:16; 259:11–17. It is hard to see how that limited professional experience can support his conclusions about the cryptocurrency lending environment in 2016-2017, which he repeatedly characterizes as "nascent" and far different than the well-developed industry it is now (i.e. the industry in which he purports to have experience), *infra* at II.C.a.

While Chan claims that he invested in cryptocurrency start-ups between 2015 and 2017, Chan Rep. ¶ 1, at deposition, he admitted that he was only "generally a passive investor" in all of his start-up investments. *See* Dep. 258:3–6. The same is true for Chan's claim of having had "asset-based lending" experience during 2015-2017. Chan Rep. ¶ 1. At deposition, he admitted that that lending experience referred only to his experience in lending "gemstones," "jewelry pieces and possibly watches." *See* Dep. 252:12-16; 257:4-17. Chan's general experience in lending jewelry and his structured finance experience post-2021 are not sufficient to render him a qualified expert in cryptocurrency lending in 2016-2017, the time period relevant to this case. *See S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (expert was not qualified to opine on synthetic collateralized debt obligations ("CDOs"), when he only had "expertise in the

general area of structured finance," which was "so broad a category as to become meaningless when particularized here to synthetic CDOs"); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 282 (S.D.N.Y. 2010) (excluding jewelry experts when they did not have "any specialized knowledge, training, or experience in understanding how the public perceives jewelry," and neither had "any specialized knowledge of contemporary jewelry design," despite that both were generally "qualified to opine on the value and quality of precious stones").

### C.    Chan's Opinions Are Irrelevant, Unsupported, or Based Only on Selective Snippets from the Factual Record.

#### a.    Chan's First Opinion on the Overall "Nascent" Nature of the Lending Market Is Irrelevant

Not only is Chan not qualified, but his opinions are also irrelevant and unsupported by any expert rigor.  Chan's first opinion, that the market for bitcoin loans was "nascent" and under-developed at the time, is not relevant to any triable issue.  Chan Rep. ¶¶ 11-12, 23-26.  The CFTC alleges that Defendant provided traders low interest loans through Pearl Street, which reduced the traders' cost of capital to trade on Defendant's platform.  This practice undermined Defendant's statements that its prefunding requirement increased that cost of capital to engage in manipulative trading on Gemini.  These undisclosed Pearl Street loans also created the appearance of Defendant having more trading volume than it actually did.  Complaint ¶¶ 47-61.  But at deposition, Chan confirmed that he is not offering any opinions about how the Pearl Street loans impacted the trading activity on Defendant's platform.  *See* Dep. 266:23–267:16 (testifying that because it was outside the "scope" of his work, he did not look at the participation of borrowers trading on the Gemini auction); *id.* 171:9–17 (when asked if he analyzed the Pearl Street loans' impact on the borrowers' auction participation, stating, "No, that's beyond the scope of what I was retained to do.").  His opinions are, at best, peripheral to the core issues relating to the undisclosed loans' impact on the traders' participation in the Gemini auction—and

therefore, have even less relevance to whether the loans undermined Defendant's statements regarding its purported prefunding requirement or trading volume and liquidity.

At most, Chan's first opinion appears to suggest (though he does not say so explicitly) that the Pearl Street loans' interest rates were not low or below-market because it was a "new company" operating in a "nascent environment."  Chan Rep. ¶ 26.  But he does not explain how Pearl Street being a "new" lender operating in such an environment, even if true, could mean that the interest rates it offered were low, high, above, or below the market rate that existed at the time.  Moreover, all but one paragraph in this section of his report solely describes the cryptocurrency lending industry "*after* 2017."  Chan Rep. ¶ 24 (emphasis added).  What happened in the market *after* the relevant period does nothing to help the trier of fact understand whether an interest rate *during* the relevant period was low or below market rate.  In short, Chan's opinion that Pearl Street operated in a "nascent" environment contains an "analytical gap" that does not sufficiently connect the proffered facts to a conclusion bearing on the issues of the case.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) ("[T]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.") (quotation marks omitted).

Moreover, Chan's assertion about the "nascent" nature of the market is without support. Indeed, the entire section devoted to this opinion in Chan's report consists of three paragraphs *with no supporting citations whatsoever.*  Chan Rep. ¶¶ 24-26.  As noted above, Chan has no relevant experience in bitcoin lending in 2016-2017, and thus, could not cite to any of his own

experience in support of his assertions. But instead of citing to appropriate alternative bases for his conclusions, such as academic literature or historic market data, Chan has simply opted to cite to nothing and asks the Court to rely on his *ipse dixit*. Chan made similarly conclusory statements at his deposition, repeatedly calling the 2016-2017 lending environment "nascent" or not "developed," without further elaboration. *See, e.g.,* Dep. 39:25-40:3; 44:21-22; 45:25-46:3; 47:17-18; 174:19–21; 212:19–25; 213:3–5. This court should exclude his baseless and conclusory opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

**b. Chan's Opinion that the Borrowers Had A "Cap" on the Maximum Interest Rate They Were Willing to Pay Is *Ipse Dixit***

Chan's second opinion should be excluded because it is so generic that it is not helpful to resolve the issues of the case. Chan opines that the Pearl Street borrowers were capped at the maximum interest rate that they were "willing to pay" to borrow bitcoin, because if they would not be able to make a profit over and above the interest rate on the loans, they would not enter into the loans in the first place. Chan Rep. ¶¶ 27-30. Although Chan dresses up his opinion with jargon that purports to show the complexities of a trader's business model in the bitcoin market, at bottom, his opinion is so basic a proposition that it borders on tautology. If a borrower does not believe it can make a higher return from using the loan than the loan's interest rate, then of course the borrower would not borrow the loan. Otherwise, the borrower would end up paying a higher interest rate than the amount of return the borrower could hope to make with the loan. This is true for loans of any type, for any amount, and for any purpose.

In other words, Chan's opinion that borrowers have a maximum interest rate they are willing to pay is a conclusion the jury can reach using common sense. His opinion should be

excluded because it goes to "lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrew v. Metro North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989); *see also Tourre*, 950 F. Supp. 2d at 678 (excluding opinion that the defendant disclosed "economically material" information based only on expert's assertion that this is true "as a matter of economic logic," which is "simply a form of inadmissible *ipse dixit*"); *R.F.M.A.S.*, 748 F. Supp. 2d at 269 ("Any juror could have employed common sense to perform the same analysis; no background in marketing or experience in the [] industry is necessary."); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (excluding expert opinions that "articulate nothing save for the principle that research sponsors should be honest," which was "so vague as to be unhelpful to a fact-finder") (internal quotation marks omitted).

Because Chan's second opinion is so vague and generic, it is also not helpful to resolving the core issues of the case. As noted above, the omission of the Pearl Street loans rendered Defendant's statements about the "cost" of trading on its platform misleading, because these loans were a way for Defendant to give traders cheap access to funds with which to trade on Defendant's platform. Chan's second opinion purports to explain that the Pearl Street interest rates may have been low or below market rate for alternative reasons other than to provide sweetheart deals to traders on Gemini. Chan opines that Pearl Street interest rates could be a result of the fact that the borrowers were "capped" by the return they could hope to make from trading bitcoin. Chan Rep. ¶¶ 27-30. But the mere opinion that loan borrowers had a maximum rate they were willing to pay—as is true for all borrowers of any loan—does not shed any light on whether the Pearl Street interest rates were low, either objectively or compared to the rest of the market. Chan does not, for example, compare the Pearl Street loan rates to interest rates charged by other lenders at the time. Indeed, he does not offer any expertise on how to find the

actual "maximum rates" the Pearl Street borrowers were willing to pay—nor could he, because a borrower's "maximum rate" that they are willing to pay will depend on subjective factors such as their risk tolerance, their opportunity cost of forgoing alternative ways to profit from the loans, and the convenience of borrowing from Pearl Street, an affiliate of Gemini. Chan's opinion that the Pearl Street borrowers were "capped" at a certain rate—beyond which they were unwilling to borrow funds—is nothing more than an attempt to substitute an expert opinion for the borrowers' own testimony.[5]

More fundamentally, Chan's opinion about the borrowers' "cap" says nothing about the perspective of Pearl Street as a lender. Just like any borrower would have a *maximum* rate at which it would be willing to pay, any lender would have a *minimum* rate at which it would be willing to lend, based on the returns it could hope to make from alternative uses of the funds. If the rate that a borrower was willing to pay was lower than the rate at which Pearl Street was willing to lend, then Pearl Street could have simply elected to not do business with the borrower. In other words, simply stating that the Pearl Street borrowers were "capped" at a maximum rate they were willing to pay only tells half the story—it does not explain why Pearl Street would have agreed to those rates unless (1) the minimum rate at which Pearl Street was willing to lend was below the maximum rate at which the borrowers were willing to pay, such that the parties enter into an economically rational, arms-length agreement, or (2) Pearl Street had an ulterior motive in making low interest loans to Gemini traders to reduce their cost of trading and bolster

---

[5] At deposition, Chan admitted that he *did* have access to information about other loans that Pearl Street borrowers had obtained from other lenders at the time, but, inexplicably, he opted to not include them in his report or conduct any comparison between the Pearl Street loans and the other lenders' loans, because he didn't "have the context of the negotiations" for them. Dep. 177:24-178:18. His deliberate decision to exclude the other loans that existed in the market at the time evinces his tendency to avoid analyzing evidence that are inconvenient to his positions. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (opinion testimony inadmissible when based on a "selective use of facts").

trading volume.  Chan's opinion that borrowers had a maximum interest rate they were willing to pay, without more, does not address either possibility, and therefore should be excluded as it is not helpful to resolve the issues of the case.  *See Raskin*, 125 F.3d at 67 n.5 ("[E]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (quoting *Daubert*, 509 U.S. at 591).

Finally, Chan's second opinion fails for the independent reason that it is largely based on a selective regurgitation of fact evidence, and thus will not help the jury better understand the evidence or determine any fact at issue.  For example, Chan claims that Circle, a borrower of Pearl Street loans, was "capped" at paying a 4% interest rate for a bitcoin loan because a Circle employee testified that "it was unclear [Circle] would make 4 percent or better" from trading. Chan Rep. ¶ 30.  Chan's assertion here is based on nothing more than quoting deposition testimony from a witness who worked at Circle at the time, which Chan took as true without any independent analysis.  Similarly, Chan cites another email from a borrower in negotiating a second loan with Pearl Street, telling Cameron Winklevoss that "1% is what [the borrower] can realistically afford on the incremental amount."  Chan Rep. ¶ 29 (citing GEM_CFTC061012). Chan then uses this email to conclude that the borrower had a "cap" of 1% interest rate that it was willing to pay on the incremental loan.  *Id.*  When asked if he "attempt[ed] to test or verify" the borrower's statement in the email at deposition, Chan responded, "I read that statement, and I apply this to my own experience in cryptocurrency lending . . . as someone who has negotiated loans with liquidity providers."  Dep. 135:2-16.  In other words, Chan's only "method" for validating the factual record is a blithe reference to his general "experience."  But simply putting his "stamp of approval" on a recitation of the factual record "based on [his] experience," without more, "in no way aids the trier of fact to understand the recycled evidence."  *In re BankAtlantic*

*Bancorp, Inc. Sec. Litig.*, 2010 WL 6363027, at * 7 (S.D. Fla. Sept. 9, 2010); *see also Wiener v. AXA Equitable Life Ins. Co.*, 2019 WL 1228074, at *9 (S.D.N.Y. Mar. 15, 2019) ("Courts within this Circuit have routinely excluded expert testimony when the testimony was based on nothing more than experience and common sense.") (citing cases).

Chan's blind reliance on the statements borrowers made during negotiations with Pearl Street is all the more inappropriate when, elsewhere in his report, Chan repeatedly asserts that borrowers often "lie" as a "negotiating tactic" in order to achieve a lower interest rate from lenders. *See, e.g.,* Chan Rep. ¶¶ 36, 54. On the one hand, Chan takes as true that borrowers were "capped" at certain interest rates based on their say-so during loan negotiations. Chan Rep. ¶¶ 29-30. On the other hand, Chan admits that borrowers "lie" during negotiations as part of the bargaining process. In fact, Chan cites instances in the record where borrowers explicitly admitted to such practice when specifically dealing with Pearl Street. *Id.* ¶ 36. Thus, to the extent Chan relies on the borrower's statements of being "capped" during negotiations with Pearl Street, that is belied by his own findings that those same negotiators lied to get lower interest rates from Pearl Street. Chan's reliance on selective portions of the record, while ignoring evidence to the contrary, is yet another ground for exclusion of his opinion. *See Estate of Anderson v. Strohman*, 2016 WL 4013638, at *8 (S.D.N.Y. July 27, 2016) (excluding experts' opinions where experts ignored facts in the record that contradicted their opinion); *McMahon v. Robert Bosch Tool Corp.*, 2019 WL 5727340, at *9 (E.D. Mo. Nov. 5, 2019) (excluding expert testimony that "does not fit the facts of the case because [the expert] ignores facts in evidence and offers no justification to depart from the facts based on testing, calculation, or other analysis").

**c.  Chan's Opinion that the Pearl Street Loans' Interest Rates "Varied" Due to a Variety of Different Factors Is Irrelevant, Cumulative, and Unreliable.**

Chan's third and final opinion is a flawed effort to come up with some alternative explanation for the significant drop in Pearl Street's interest rates from 2016 to 2017 to counter the evidence indicating that the drop was a result of Pearl Street giving out sweetheart bitcoin loans to reduce traders' cost of capital and drum up trading volume on its exchange.  Chan opines that the "decline" in the Pearl Street interest rates from 2016 to 2017 did not indicate that it provided low interest rates, but rather, the decline was consistent with four factors: "(i) the lack of industry-standard or generally established terms for BTC loans and the absence of published or industry-recognized benchmark rates, (ii) lender-borrower dynamics in repeat and larger transactions, (iii) exertion of bargaining power and efforts in individual negotiations, and (iv) competitive pressure on loan interest rates."  Chan Rep. ¶¶ 12(3), 22(3), 31-56.  As discussed below, none of the four sub-factors enumerated in this opinion are based on sufficient facts nor are they the product of reliable methods.  Instead, they are cumulative, not helpful to the factfinder, and based on a selective use of the record without independent analysis.

       i.  *The Lack of Industry-Standard Terms Factor Is Repetitive of Chan's First Opinion*

The first sub-factor is that the "variation in interest rates of the Pearl Street Loans [was] characteristic of the BTC lending environment in 2016-2017, namely that there were no industry standard or generally established terms for BTC loans and little transparency regarding interest rates."  Chan Rep. ¶ 34.  This is largely repetitive of Chan's first opinion about the "nascent" nature of the cryptocurrency lending industry during 2016-2017.  As explained above, *supra* Section II.C.a, the lack of well-established industry terms, alone, does not explain whether the Pearl Street interest rates were actually low or low compared to other Bitcoin loans at the time.

As noted above, Chan's first opinion regarding the "nascent" nature of the market was without any citations.  Here, the only new support Chan marshals for his repetitive opinion is (1) deposition testimony from Cameron Winklevoss stating that he found it "hard to [] verify" what borrowers told him during negotiations, and (2) testimony from a Pearl Street borrower's employee that another person at his institution "lied about interest rates from other sources as a negotiation tactic" against Pearl Street.  Chan Rep. ¶ 36.  As with previous opinions, Chan relies on the factual record without further analysis or verification.  The self-serving testimony of Winklevoss, a principal of both Pearl Street and Defendant, and the hearsay testimony from third-party witness, cannot serve as adequate support for Chan's opinion.  *See Rowe,* 2003 WL 22124991 at *3 ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.").

> ii.    *Chan Concludes that the Pearl Street Borrowers Had No History of Default Based on Biased Selection of the Fact Record*

The second sub-factor of Chan's third opinion is that "repeat borrowers with no prior history of default" can negotiate for lower interest rates.  Chan Rep. ¶¶ 38, 40.  Chan further asserts that Pearl Street loans were all "paid back with no borrower default," a proposition supported only by Cameron Winklevoss's say-so during his deposition in this case.  *Id.* ¶ 38. Again, Chan's regurgitation of fact evidence is not helpful and invades the province of the jury. *Tourre*, 950 F. Supp. 2d at 675 ("It is [] inappropriate for experts to become a vehicle for factual narrative.  Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.") (citing cases).

Even taking Winklevoss's self-serving testimony as true, Chan's opinion amounts to no more than a generic economic principle—borrowers with no history of default may be able to negotiate better interest rates.  Yet, even for such an obvious proposition, Chan could muster no citation to economic literature, guidance, or textbook.  Instead, he blithely asserts that this opinion is based on his "experience in cryptocurrency lending."  Chan Rep. ¶ 40.  Chan merely tacks on a general reference to his "experience" to a common-sense principle—this does not pass the standard for reliability.  *See Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (excluding a report based on the expert's personal experience and common sense because "his report is not based on reliable principles and methods"); *Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477, 481 (S.D.N.Y. 2000) (excluding expert report "because the analysis he provides is largely anecdotal and does not rely upon any particular type of expertise that would assist the trier of fact").

> iii.    *Chan's Conclusions Regarding the Bargaining Skills of the Borrowers and Competitive Pressure Pearl Street Faced Are Based on Cherry-picked Portions of the Factual Record with No Independent Verification*

The third and fourth sub-factors in Chan's final opinion can be considered together.  He opines that the Pearl Street interest rates declined during 2016-2017 due to "the skills of the parties negotiating them," and "competition among lenders."  Chan Rep. ¶¶ 42, 48.  Again, Chan's support for these sub-factors primarily rests on cherry-picked factual evidence that the jury can evaluate for itself, such as loan agreements, communications between Pearl Street and its borrowers during negotiations, or selective snippets of deposition testimony.  Chan offers no expertise to aid the jury in evaluating such evidence, which he takes as true without independent validation or testing.

For example, Chan notes that Pearl Street's borrowers already had an "established and extensive network of contacts with other lenders," which gave them "superior bargaining power

and access to information" over Pearl Street.  *Id.* ¶ 49.  However, the idea that there was an

"established and extensive network" of cryptocurrency lending directly contradicts Chan's

repeated assertions that the market was "nascent" and under-developed.  *See* Chan Rep. ¶¶ 12,

18, 20, 22, 26, 31, 38, 47.  Nor does Chan explain why, if such an "extensive network" existed,

Pearl Street could not have simply contacted other lenders and borrowers in the market to get the

same access to information.  *See* Dep. at 227:6-14 (admitting that even "in an environment where

there was a lack of transparency … borrowers and lenders can try to get information, to gather

market intel so to speak … by talking to [] other people").  Put another way, Chan presumes—

without any support in the evidence—that the Pearl Street borrowers had superior bargaining

skills and informational advantage over Pearl Street.  At deposition, he admitted that he did not

do any research on the level of sophistication of the Pearl Street borrowers, and merely based on

his conclusion on interpreting the communications between Pearl Street and its borrower, *see*

Dep. 198:6-21, an exercise the jury is entirely capable of doing on its own.  *See In re LIBOR-*

*Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 489-91 (S.D.N.Y. 2018) (excluding

expert opinion based on interpretation of trader communications because such interpretations are

"invasive of the province of the trier of fact").

       Chan also concludes that Pearl Street's competitors issued similar or lower interest rates

by taking selective factual assertions by witnesses as true.  Chan cites to a borrower's statement

during negotiations with Pearl Street that it was able to receive 0% interest rate loans at other

exchanges, as well as Cameron Winklevoss's testimony that he "believed" that other lenders

gave "zero interest rate loans."  Chan Rep. ¶¶ 50-51.[6]  But he did not verify these statements to

---

[6] To the extent Chan is not offering his opinion as to whether 0% interest rate loans from competitors in
fact existed, but only that Cameron Winklevoss "believed" that is to be case, Chan Rep. ¶¶ 50, 55, that is
inadmissible.  It is well-established that "opinions concerning state of mind are an inappropriate topic for expert

see whether such lower interest rate loans in fact existed.  *See* Dep. 226:15–227:2.  Chan cites to the same email *three* times in his report, pointing to a borrower's assertion that he was able to get 0% interest rate loans from Pearl Street's competitors, but omits that in the *very same* email, the borrower eventually acknowledged that it had been paying "5% interest…to another exchange."  *Compare* Chan Rep. ¶¶ 14, 52, 53 (citing GEM_CFTC241891) *with* GEM_CFTC241891 at 1.  In short, Chan selectively adopts portions of the fact record as true when they suit his conclusions but ignores others when inconvenient to his opinions.  *See Estate of Anderson*, 2016 WL 4013638, at *8 (excluding experts' opinions where experts ignored facts in the record that contradicted their opinion); *McMahon*, 2019 WL 5727340, at *9 (same); *Davis*, 937 F. Supp. 2d at 418 (experienced-based expert testimony cannot be based on "a misleadingly partial selection of relevant facts").

      Where Chan *does* attempt to address evidence contrary to his opinions rather than ignoring them entirely, he largely resorts to a contrived parsing of words.  For example, Chan highlights testimony from a borrower that Pearl Street's interest rate of 1.5% was "towards the bottom end of what we saw" as evidence that "Pearl Street's interest rates were not outside the range" of the market.  Chan Rep. ¶ 46.  That conclusion is illogical.  Pearl Street's interest rates, *by definition*, cannot be "outside the range" of the market, as it was a participant in the market.  The CFTC's allegation isn't that Pearl Street's loans were "below" the entire market range, which is axiomatically impossible, it is that the loans were low or below the average market rate, which reduced the cost of capital for traders to trade on Gemini.

---

opinion."  *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,* 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011).

Perhaps Chan's most tortured spin of the record is when he tries to square Pearl Street's lowering of its interest rates with the fact that they were also uncollateralized. As Chan admits, based on his experience, an uncollateralized loan is generally riskier for the lender "than a collateralized loan and could therefore justify a higher rate of interest." Chan Rep. ¶ 44. Yet, from late 2015 to 2016, the Pearl Street loans had the curious trait of decreasing in interest rates *and* going from collateralized to uncollateralized. *Id.* Instead of offering a plausible explanation why this is so, and ignoring the elephant in the room – that Defendant gave out sweetheart loan deals via Pearl Street to boost trading volume on its platform, as the CFTC contends – Chan's only explanation was that the borrowers "bargained during the negotiation process," without further explanation. *Id.* His opinion that the borrowers "bargained" to get such favorable terms is conclusory and clearly "driven by the need to find way of explaining admitted facts." *Nimely*, 414 F.3d at 399. It is the "essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion that the district court has the duty to exclude." *Id.*

*    *    *

In sum, Chan's opinion that the Pearl Street interest rates declined in 2016-2017 due to an absence of industry standards, borrowers' lack of default history, borrowers' use of "bargaining skills," and "competition from lenders" is not based on sufficient facts, is not the product of reliable principles and methods, would not be helpful to the jury, and is based on a parroting of cherry-picked fact evidence. The documents cited in Chan's report speak for themselves, and his selective summary of these documents is neither grounded in reliable methodology nor in pertinent experience. Chan's third and final opinion should be excluded. *See Andrew*, 882 F.2d

at 708; *Davis*, 937 F. Supp. 2d at 418; *Barber*, 17 F. App'x at 437; *In re LIBOR*, 299 F. Supp. 3d
at 489-91.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should exclude entirely the report and testimony to
be offered by Defendant's expert Angelo Chan.

Dated:  New York, New York
        November 15, 2024

                                Respectfully submitted,


                                By:   *Diana Wang*

                                Diana Wang, Trial Attorney
                                Andrew J. Rodgers, Trial Attorney
                                Katherine Rasor, Trial Attorney
                                Peter Janowski, Trial Attorney
                                K. Brent Tomer, Chief Trial Attorney
                                Alejandra de Urioste, Chief Trial Attorney
                                Manal M. Sultan, Deputy Director


                                COMMODITY FUTURES
                                TRADING COMMISSION
                                Division of Enforcement
                                290 Broadway, Suite 600
                                New York, NY 10007
                                Phone: (646) 746-9700
                                Fax: (646) 746-9888