# EXHIBIT 1

1

1   UNITED STATES DISTRICT COURT
2     SOUTHERN DISTRICT OF NEW YORK
    -----------------------------------------X
3     COMMODITY FUTURES TRADING COMMISSION,

4                     PLAINTIFF,

5        -against-    Case No.:
                       22-cv-4563 (AKH)
6

7   GEMINI TRUST COMPANY, LLC,

8                     DEFENDANT.

9     -----------------------------------------X

10

11                   DATE: February 28, 2024

12                   TIME: 9:32 A.M.

13

14

15            CONFIDENTIAL VIDEOTAPED REALTIME

16   DEPOSITION of the Defendant, CAMERON

17   WINKLEVOSS, taken by the Plaintiff,

18   pursuant to a Subpoena and to the Federal

19   Rules of Civil Procedure, held at the

20   offices of Commodity Futures Trading

21   Commission (CFTC), 290 Broadway, 6th Floor,

22   New York, New York 10007, before Karyn

23   Chiusano, a Notary Public of the State of

24   New York.

25

2

```
 1          A P P E A R A N C E S:

 2
           Commodity Futures Trading Commission
 3             Attorneys for the Plaintiff
            COMMODITY FUTURES TRADING COMMISSION
 4            290 Broadway ~ 6th Floor
           New York, New York 10007
 5            BY: ANDREW RODGERS, ESQ.
           arodgers@cftc.gov
 6
           BAUGHMAN KROUP BOSSE
 7         Attorneys for the Defendant
             GEMINI TRUST COMPANY
 8          1 Liberty Plaza ~ 46th Floor
             New York, New York 10006
 9          BY: JACK BAUGHMAN, ESQ.
               jbaughman@bkbfirm.com
10

11
            ALSO PRESENT:
12         PAUL BAKER, Videographer
             ELIZABETH LEE, ESQ.
13         DIANA WANG, ESQ.

14            BRETT TOMER, ESQ.

15         KATIE RASOR, ESQ.

16            DAVID OAKLAND, ESQ., via Zoom

17         ALEJANDRA de URIOSTE, ESQ., via Zoom

18

19                  *        *        *

20

21

22

23

24

25
```

3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED AND AGREED by and

5      between the counsel for the respective

6      parties herein that the sealing, filing and

7      certification of the within deposition be

8      waived; that the original of the deposition

9      may be signed and sworn to by the witness

10       before anyone authorized to administer an

11       oath, with the same effect as if signed

12       before a Judge of the Court; that an

13       unsigned copy of the deposition may be used

14       with the same force and effect as if signed

15       by the witness, 30 days after service of

16       the original & 1 copy of same upon counsel

17       for the witness.

18

19        IT IS FURTHER STIPULATED AND AGREED that

20       all objections except as to form, are

21       reserved to the time of trial.

22

23                    *    *    *    *

24

25

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2              I wasn't going to talk about
 3         those conversations.
 4        A.    But I think if we look at every
 5   single major bank in Manhattan, who has a
 6   -- you know, a -- a brokerage in private
 7   wealth business, those banks are also going
 8   to be lending.
 9              So, I -- I think there's --
10    there's nothing abnormal of -- for -- for a
11    company to provide multiple different
12    services, such as trading and -- and
13    lending and borrowing all in the same
14    universe.
15              I think that's just important
16    to note.  And --
17        Q.    But Gemini was not permitted to
18    do that under its charter with DFS.  It
19    could not provide those services that you
20    just outlined.
21        A.    I'm just making the simple
22    point that there are plenty of businesses
23    in traditional finance, where the CEO of a
24    -- is -- there's a CEO of a business that
25    engages in lending to its customers that
```

252

          CONFIDENTIAL ~ CAMERON WINKLEVOSS

1      also trade in the financial markets.

2              There's nothing improper or

3      wrong.  And if there were, then that would

4      mean that there would be something

5      problematic with every major bank in -- in

6      Manhattan.

7              In this case, it's obviously

8      different than that.  We're talking about

9       an independent entity, which we have

10      established.  And Gemini did not make those

11      loans.

12              And so, I think that's worth

13      pointing out.

14         Q.    And in your statement that

15      there's nothing improper about being the

16      President of Gemini, while also being a

17      Manager of PearlStreet, are you relying on

18      the advice of Counsel?

19              MR. BAUGHMAN:  Hang on a

20         second.

21         Q.    It's a yes/no question:  Are

22      you relying on the --

23              MR. BAUGHMAN:  I don't -- I

24         don't actually know -- it's clever,

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2         but I have to think about it for a
 3         second.
 4             (Whereupon, a short recess was
 5         taken.)
 6             MR. BAUGHMAN:  Let me read it
 7         back.
 8             I'm going to instruct you not
 9         to answer the question, but I'm going
10          to ask you just to rephrase it; okay?
11             I think you can ask the
12          question:  Setting aside any advice
13          you've received from Counsel, what do
14          you believe?
15             But I don't think I can let him
16          answer that question, without
17          revealing attorney-client
18          information.
19             So, I will instruct him not to
20          answer that one, though.
21             MR. RODGERS:  Let's see if he
22          we can get through this:
23          Q.    Your statement is that there's
24   nothing improper about being the President
25   of Gemini, while also being the Manager of
```

255

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2            there's some confusion, let's clean

3            it up, but we are not waiving

4            anything.

5                 MR. RODGERS:  I understand.

6                 And I'm not trying to breach

7            any attorney-client confidences.

8            Q.    I just want to understand,

9      whether your position that there's nothing

10      inappropriate about PearlStreet loans and

11      your role, as Manager of PearlStreet and

12      President of Gemini, if -- if that position

13      -- if you're taking that position, based on

14      the advice of Counsel?

15          A.    Um --

16                 MR. BAUGHMAN:  I don't -- I

17            don't -- I'm going to instruct you

18            not to the answer that question.

19                 I think that is clearly

20            designed to impinge on the

21            attorney-client privilege.

22          Q.    Let's maybe -- let me make sure

23      the record is clear:

24                 Are you relying on the advice

25      of -- of Counsel, when you state that

256

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2      "there's nothing improper about PearlStreet

3      loans"?

4          A.    I'm relying on more than just

5      conversations with Counsel.

6          Q.    What else are you relying on?

7          A.    Well, if -- if that's --

8      position were actually true, and there was

9      something problematic or improper, then it

10      would be absurd.  Ev- --every CEO of every

11      major bank would be in violation of

12      something, which clearly isn't the case.

13              And I've read our Supervisory

14      Agreement.  I know what is and is not

15      permitted, and there's nothing permitting

16      involvement with other independent entities

17      that I'm aware of.

18          Q.    Every CEO on Wall Street has a

19      side business, where they provide loans to

20      customers on an exchange that they operate?

21              MR. BAUGHMAN:  Object to the

22          form of the question.

23          A.    If you look at Merrill Pro,

24      Bank of America, Merrill Pro.  I think it's

25      the largest -- one of the largest prime

259

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2      to understand that there are numerous

3      examples, where there's a CEO that is the

4      ultimate decisionmaker, or a leader, of a

5      corporate structure that involves both a

6      lending business and a trading business,

7      and there is absolutely nothing wrong, or

8      improper, and -- and if -- if there were, I

9      think financial markets would cease to work

10      or be efficient, which sort of underscores

11      the -- the -- the -- the absurdia of -- of

12      taking a position like that.

13          Q.    Who is your lawyer that

14      provided advice regarding PearlStreet

15      loans?

16          A.    At the time, it was Ken

17      Raisler, who was, at one point, I believe

18      the General Counsel of the CFTC.

19          Q.    And he -- he -- and Ken Raisler

20      has a --

21          MR. RODGERS:  Withdrawn.

22          Q.    And does the last sentence, in

23      here, says:

24          "Margin is, to me, the most

25      obvious way to get an instant multiplier on

379

1

    UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF NEW YORK

    -----------------------------------------X

3     COMMODITY FUTURES TRADING COMMISSION,

4                  PLAINTIFF,

5      -against-   Case No.:

                22-cv-4563 (AKH)

6

7    GEMINI TRUST COMPANY, LLC,

8                  DEFENDANT.

9    -----------------------------------------X

10

11                DATE: February 29, 2024

12                TIME: 9:36 A.M.

13

14

15     CONTINUED CONFIDENTIAL VIDEOTAPED

16   REALTIME DEPOSITION of the Defendant,

17   CAMERON WINKLEVOSS, taken by the Plaintiff,

18   pursuant to a Subpoena and to the Federal

19   Rules of Civil Procedure, held at the

20   offices of Commodity Futures Trading

21   Commission (CFTC), 290 Broadway, 6th Floor,

22   New York, New York 10007, before Karyn

23   Chiusano, a Notary Public of the State of

24   New York.

25    Job No. CS6346514

380

1        A P P E A R A N C E S:

2
      COMMODITY FUTURES TRADING COMMISSION
3          Attorneys for the Plaintiff
         COMMODITY FUTURES TRADING COMMISSION
4          290 Broadway ~ 6th Floor
         New York, New York 10007
5          BY: ANDREW RODGERS, ESQ.
         arodgers@cftc.gov
6
         BAUGHMAN KROUP BOSSE
7        Attorneys for the Defendant
           GEMINI TRUST COMPANY
8         1 Liberty Plaza ~ 46th Floor
           New York, New York 10006
9        BY: JACK BAUGHMAN, ESQ.
            jbaughman@bkbfirm.com
10


11
         ALSO PRESENT:
12       PAUL BAKER, Videographer
            ELIZABETH LEE, ESQ.
13       DIANA WANG, ESQ.

14         DAVID OAKLAND, ESQ., CFTC, via Zoom

15       ALEJANDRA de URIOSTE, CFTC, via Zoom

16         STEPHEN HITT, ESQ., JFB Legal

17       KATHERINE RASOR, ESQ.

18         BRENT TOMER, ESQ.

19

20

21

22                 *         *         *

23

24

25

381

1

2       F E D E R A L   S T I P U L A T I O N S

3

4

5       IT IS HEREBY STIPULATED AND AGREED by and

6       between the counsel for the respective

7       parties herein that the sealing, filing and

8       certification of the within deposition be

9       waived; that the original of the deposition

10       may be signed and sworn to by the witness

11       before anyone authorized to administer an

12       oath, with the same effect as if signed

13       before a Judge of the Court; that an

14       unsigned copy of the deposition may be used

15       with the same force and effect as if signed

16       by the witness, 30 days after service of

17       the original & 1 copy of same upon counsel

18       for the witness.

19

20        IT IS FURTHER STIPULATED AND AGREED that

21       all objections except as to form, are

22       reserved to the time of trial.

23

24                    *    *    *    *

25

439

1       CONFIDENTIAL ~ CAMERON WINKLEVOSS

2              But as I also stated earlier,

3     this was not price manipulation, this was a

4     rebate fraud.

5       Q.    You knew that the disclosing

6     manipulative conduct to the CFTC would have

7     raised more questions from the CFTC?

8              MR. BAUGHMAN:  Object to the

9        form of the question.

10       A.    I have no reason to believe --

11    I -- I don't know what the CFTC would have

12    asked about it.

13             And if the CFTC asked -- we --

14    we answered dozens and dozens of questions

15    and multiple submissions throughout the

16    summer and fall of 2017.

17             There's never -- there was

18    never a question that went unanswered.  And

19    all of our answers were complete and

20    accurate.

21             And everything in our behavior

22    demonstrates our willingness to provide

23    information on anything the CFTC requested.

24             And this was probably one of

25    the longest self-certification processes.

```
1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

2            And then, we've agreed I'm just

3        going to note the basis for my

4        objection outside the presence of the

5        witness, so there's no assertion of

6        improperly witness -- influencing the

7        witness.

8            And I just want to make two

9        points for context using the

10        questioning, based on sentences in

11        Exhibit 54.

12            The first is:  It is a brief --

13        a post-trial brief filed in an

14        arbitration by an entity, Winklevoss

15        Capital Management, that is not a

16        party to this proceeding.  So, it's

17        not a statement of a party adversary.

18            The second point is:  Counsel

19        has read statements -- sentences from

20        the brief, but those are sentences

21        that are -- have citations to the

22        record in the arbitration.

23            So, these are sentences that

24        are designed to summarize evidence

25        that was presented in the
```

463

1      CONFIDENTIAL ~ CAMERON WINKLEVOSS

2       arbitration.

3            They're not general statements,

4         necessarily, in the sense they are

5         being used here.

6            That's the basis for my

7         objection.

8            We can continue.

9            MR. RODGERS:  And is it your

10        position that the statements are not

11        supported by the evidence that's

12        cited in the documents?

13            MR. BAUGHMAN:  No.

14            That's not my position, but --

15            MR. RODGERS:  And the

16        statements in this document --

17            MR. BAUGHMAN:  I'm not going to

18        debate this.

19            MR. RODGERS:  -- were accurate

20        at the time that you made them in the

21        arbitration, Mr. -- Mr. Baughman?

22            MR. BAUGHMAN:  I'm not -- I'm

23        not here to answer your questions.

24            I've made an objection.

25            We can proceed.

529

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     product could not be certified for trading
 3     without the CFTC's consent?
 4          A.    I don't actually know that
 5     that's the case.  I think that if it fits
 6     within the CFTC principles, just because
 7     the underlying asset is new does not
 8     necessarily mean it requires CFTC approval.
 9               I could be -- I could be
10      mistaken, but I do believe that it was a --
11      ultimately filed as a self-certification
12      application after a months long engagement
13      with the commission.
14                But I don't know that there is
15      anything preventing CBOE from filing that
16      application in July.
17                And provided that the
18      commission did not disapprove it, I believe
19      it -- it would be approved.  Or it would go
20      forward.
21          Q.    Is it fair to say that you knew
22      that Gemini had to be truthful in the
23      information it provided, in connection with
24      the new product certification?
25                MR. BAUGHMAN:  Object to the
```

530

```
1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2           form.

3          A.    Well, we are always truthful.

4    That's how we build our business of -- of

5    trust.  And that's -- that's how we

6    operate.  And this -- this -- the

7    engagement with CBOE was no different.

8               All that being said, we

9    provided information to CBOE, but we did

10    not have control or agency on what

11    information, necessarily, they chose or how

12    they chose to present that to the CFTC.

13               Ultimately, they are the

14    interface between us and the CFTC.  We were

15    not -- it's not our application.

16          Q.    So, is it your testimony that

17    the C- -- that CBOE provided information to

18    the CFTC that Gemini did not authorize it

19    to provide?

20          A.    That's not my testimony.

21          Q.    Do you understand that a

22    product certification requires a detailed

23    description of the cash market?

24          A.    What do you mean by "cash

25    market?"
```

1           CONFIDENTIAL ~ CAMERON WINKLEVOSS

2      for the potential for manipulation or

3      distortion of cash settlement prices?

4                MR. BAUGHMAN:  Object to the

5           form.

6           A.    I'm sorry, what is the

7      question?

8           Q.    Do you understand that the CFTC

9      gives careful consideration to the

10      potential for manipulation or distortion of

11      the cash settlement price of the futures

12      contract?

13                MR. BAUGHMAN:  Object -- object

14           to the form.

15           A.    I don't know what their

16      approval process is.

17                All I know is that we got a lot

18      of questions around our auction and the

19      mechanics.  And we answered every question

20      that was asked of us.  We provided truthful

21      and accurate information.

22                What the CFTC deems to be

23      appropriate or not, I -- I don't -- I don't

24      know if there is -- what those rules are.

25           Q.    Would you agree that Gemini

538

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2            MR. RODGERS:  Withdrawn.

 3        Q.   Did you collaborate with the

 4   CBOE --

 5            MR. BAUGHMAN:  Pardon me.

 6        Q.   -- in connection with the

 7   self-certification of the bitcoin futures

 8   contract?

 9            MR. BAUGHMAN:  Object to the

10       form.

11        A.   I don't know what you mean by

12   "collaborate."  But as I testified earlier,

13   we provided information, we were helpful,

14   we were responsive, we were truthful, we

15   were accurate.

16            MR. RODGERS:  Can I see Tab 88,

17       please?

18        Q.   Is it your testimony today that

19   Gemini was an innocent bystander in

20   connection with the self-certification of

21   the bitcoin futures contract?

22            MR. BAUGHMAN:  Object to the

23       form.

24        A.   That's -- that's not my

25   testimony.
```

573

CONFIDENTIAL ~ CAMERON WINKLEVOSS

Q.    Based on information that
Gemini had provided to CBOE in connection
with the self-certification; correct?

MR. BAUGHMAN:  Object to the
form.

A.    Everything we provided was
accurate.  And we also engaged with them
and had an ongoing dialogue.

And I have no reason to believe
that they provided information that was
also not accurate or complete.  I have -- I
have no reason to believe that.

Q.    At the July 25th, 2017 meeting,
did you tell the CFTC that at times there
was no self-trade prevention in either the
Gemini auction or on the Gemini exchange?

A.    I -- it's -- it's possible a
question was asked.

Again, I don't remember if I
even spoke at this meeting.  I was present.
And this presentation, I believe, was an
overview.

I don't -- I don't even know if
this was responsive to any questions at

689

```
1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
2    reviewed information that Gemini presented
3    to CBOE that was then later presented to
4    CFTC.
5               I have no reason to -- to --
6    and -- and having reviewed them through
7    this deposition, once again, they're all
8    accurate statements.
9          Q.   So, he -- he stopped being a
10    serial liar when he was working for Gemini?
11               MR. BAUGHMAN:  Object to the
12          form of the question.
13          A.   There was no incentive for Mr.
14    Small to lie to the CFTC or the CBOE.  And
15    his -- whatever statements that he was a
16    party to or authored have been reviewed by
17    multiple parties, and they're accurate.
18               And we've gone -- I've now gone
19    through them -- though this deposition.  I
20    think I did a deposition with the CFTC two
21    years ago.
22               We've made it very clear that
23    they're truthful statements.
24               And we've also gone through an
25    arbitration, I think it was a two-week
```

691

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2          A.    I believe that he alleged in

3     his complaint that there was something

4     improper or illegal about the PearlStreet

5     loans, and that they "inflated volume on

6     the Gemini exchange," and that they were a

7     secret or not.

8               And that he wasn't aware of

9     them until right before he was suspended,

10     which -- which is just not true.  And --

11     and all the evidence shows that he was

12     fully aware of them.

13          Q.    Well, who cares if he -- when

14     he knew about it --

15               MR. BAUGHMAN:  Please don't

16          interrupt the witness.

17          A.    They were -- they were not

18     secret.

19               And we've been never told by

20     anybody, including the CFTC, that there was

21     anything wrong, illegal, or improper with

22     PearlStreet loans.

23          Q.    Did you ever ask the CFTC if it

24     was improper for you to be the Manager of

25     PearlStreet while also being the President

693

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2       evidence -- it's a fact that his complaint,

3       with the false PearlStreet allegations, was

4       -- was submitted or conveyed to the CFTC

5       in -- in/or around November of 2017.

6                So, the CFTC has had since then

7       to ask us, and we had never gotten a

8       question from the CFTC during that process,

9       or for, you know, months afterwards about

10       PearlStreet loans.

11                And we've never been told that

12       they were illegal or improper.

13       Q.    Well, the CFTC brought this

14       enforcement action.

15                Does that answer your question?

16                MR. BAUGHMAN:  Object to the

17        form of the question.

18       Q.    Going back to the exhibit that

19       has the draft declaration, there's a

20       paragraph, in Paragraph 5, that says:

21                "The company and Senior

22       Management always strive to comply with the

23       law."

24                Do you see that?

25       A.    Which paragraph?

703

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2          A.    No.
 3          Q.    Were the PearlStreet loans kept
 4      a secret at Gemini during the time you
 5      worked there?
 6          A.    No.
 7          Q.    Did the CFTC ever ask Gemini
 8      about the source of funds or the sources of
 9      capital that Gemini customers used to trade
10       on the Gemini exchange?
11          A.    No.
12          Q.    Did you -- were you ever asked
13      a question by the CFTC that you believe
14      called for information about the
15      PearlStreet loans?
16          A.    No.
17          Q.    If you had been asked about the
18      PearlStreet loans, would Gemini have
19      provided information by -- to the CFTC?
20              MR. RODGERS:  Objection to the
21           form of the question.
22              Calls for speculation.
23          A.    Can you repeat the question?
24          Q.    Sure.
25              If, in 2017, during the
```

704

```
 1        CONFIDENTIAL ~ CAMERON WINKLEVOSS

 2    self-certification process, the CFTC had

 3    asked a question, which you understood

 4    called for information about PearlStreet,

 5    would PearlStreet or Gemini have provided

 6    it?

 7             MR. RODGERS:  Same objection.

 8        A.    Yes.

 9             Yes, is my answer.

10        Q.    Now, do you recall being asked

11    yesterday whether there came a point in

12    time when PearlStreet stopped making loans?

13             Do you recall that topic

14    yesterday?

15        A.    Yes.

16        Q.    And do you recall being shown a

17    couple of spreadsheets that were Exhibit

18    51-A and 51-B that had PearlStreet loans

19    from 2016 to 2017?

20             Do you recall being shown those

21    documents?

22        A.    Yes.

23        Q.    Okay.  I'd like to show you

24    what's been marked for -- as Exhibit 50- --

25    501, please.
```

709

```
 1         CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2    followed, was that hidden from the CFTC in
 3    any way?
 4         A.    No.
 5         Q.    The C- -- if the CFT- -- the
 6    the CFTC had asked about the compliance
 7    rate for recordkeeping, in connection with
 8    the policy, would Gemini have provided such
 9    information?
10         A.    Yes.
11         Q.    To your knowledge, did Gemini
12     ever refuse to answer any questions asked
13     by the CFTC about operational advances?
14         A.    No.
15         Q.    Okay.  Let me ask you to take
16    out Exhibit 94, please.
17              (Witness complies.)
18         Q.    Exhibit 94 --
19              MR. BAUGHMAN:  I apologize.
20              This is the wrong exhibit.
21         This is not the one I want.  I
22         apologize.
23              Exhibit 73.  Please take out
24         Exhibit 73.
25              (Witness complies.)
```

718

CONFIDENTIAL ~ CAMERON WINKLEVOSS

1

2      attention an actual instance, ever, when

3      folding occurred?

4           A.    No.

5           Q.    Are you aware -- well, is it

6      correct that, in the summer of 2017, Gemini

7      provided data about trading in the auction

8      to the CFTC?

9           A.    Yes.

10          Q.    Is it your understanding that

11     if there were instances of folding in that

12     data, the CFTC could analyze it and

13     identify them?

14               MR. RODGERS:  Objection to the

15          form of the question.

16          A.    Yes.

17          Q.    Has the CFTC ever identified a

18     single instance of folding, to your

19     knowledge?

20          A.    No.

21          Q.    If, in 2017, the CFTC had asked

22     questions about folding, would Gemini have

23     answered them?

24               MR. RODGERS:  Object to the

25          form.

719

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2          A.    Yes.

3          Q.    In 2017, did Gemini have any

4     reason to keep --

5               MR. BAUGHMAN:  Withdrawn.

6          Q.    Now, do you recall being asked

7     questions earlier today about whether or

8     not you knew that certain things were

9     important to the CFTC?

10              Do you recall that?

11         A.    Yes.

12         Q.    Did anyone from the CFTC ever

13     give Gemini any guidance about what the

14     CFTC considered important?

15         A.    No.

16         Q.    Did the CFTC, in 2017, ever

17     give Gemini any guidance about what the

18     CFTC considered material?

19         A.    No.

20         Q.    In 2017, did the CFTC ever give

21     Gemini any information about what

22     information the CFTC considered in making

23     decisions?

24         A.    I'm sorry, can you repeat the

25     question?

720

1          CONFIDENTIAL ~ CAMERON WINKLEVOSS

2          Q.    Yeah.

3              In 2017, did the CFTC ever

4      disclose to Gemini the information the CFTC

5      considered in making decisions in

6      connection with the self-certification

7      process?

8          A.    No.

9          Q.    Did anyone from the CFTC ever

10     indicate to Gemini, in any way, in 2017,

11     that it was Gemini's responsibility to

12     figure out what the CFTC thought was

13     important?

14         A.    No.

15         Q.    In 2017, did anyone from the

16     CFTC ever indicate to Gemini, in any way,

17     that Gemini had a responsibility to figure

18     out what the CFTC thought was material?

19         A.    No.

20         Q.    If the CFTC had told Gemini, in

21     2017, what the CFTC thought was important,

22     would Gemini have tried to provide that

23     information?

24         A.    Yes.

25         Q.    Now, you were asked some

722

```
1           CONFIDENTIAL ~ CAMERON WINKLEVOSS
2      investigation.  And as part of that, I gave
3      evidence via confidential written
4      submissions, over the phone and at
5      in-person meetings beginning on 1,
6      November, 2017?"
7           A.    Yes.
8           Q.    Are you aware that counsel for
9      the CFTC has not denied the truth of Mr.
10      Small's statement?
11           A.    Um --
12           Q.    That there was communications,
13      beginning on November 1, 2017, are you
14      aware that the CFTC has not denied that?
15                MR. RODGERS:  Objection.
16           A.    I don't believe that they have.
17                If they had, I -- I probably
18      would have heard of it.
19           Q.    Okay.  After November 1, 2017,
20      did the CFTC ask any questions about the
21      PearlStreet loans?
22           A.    After --
23                MR. BAUGHMAN:  Withdrawn.
24                Withdrawn.
25           Q.    Between November 1, 2017 and
```

723

```
 1          CONFIDENTIAL ~ CAMERON WINKLEVOSS
 2     December 1, 2017, did the CFTC ask any
 3     questions about the PearlStreet loans?
 4          A.    No.
 5          Q.    If they had, would Gemini had
 6     answered them?
 7          A.    Yes.
 8          Q.    Based on the topics that you
 9     know were raised in Mr. Small's
10      whistleblowing complaint, did the CFTC ask
11      you any questions that you believe were
12      based on information provided in that
13      whistleblower claim between November 1,
14      2017 and December 1, 2017?
15          A.    I'm sorry, can you repeat the
16     question?
17          Q.    Sure.
18               Are you aware of any questions
19      the CFTC asked Gemini between November 1,
20      2017 and December 1, 2017 that relate to
21      topics raised in Mr. Small's so-called
22      "whistleblower sub- -- submission"?
23          A.    No.
24          Q.    Are you aware that if Mr. Small
25      were to testify in this case, he would have
```