# EXHIBIT 5

JAMS COMMERCIAL ARBITRATION TRIBUNAL
NEW YORK

| | |
|---|---|
| WINKLEVOSS CAPITAL MANAGEMENT, LLC,<br><br>      Claimant/Counterclaim Respondent,<br><br>v.<br><br>BENJAMIN SMALL,<br><br>      Respondent/Counterclaimant. | JAMS Reference No. 1425025351<br><br>Arbitrator:  Mark E. Segall, Esq.<br><br>**DECLARATION OF CAMERON WINKLEVOSS** |

I, Cameron Winklevoss, declare as follows:

1. I am a principal at Winklevoss Capital Management, LLC ("WCM") and the co-founder and president of Gemini Trust Company, LLC ("Gemini"). WCM is a family office, with a special emphasis on investing in early-stage companies and the cryptocurrency space. Gemini, an affiliate of WCM, is an online cryptocurrency exchange, where individuals and institutions can buy and sell bitcoin and ether on our continuous order books, or in our daily auctions. Gemini also serves as a cryptocurrency custodian. Except as to matters stated on information and belief, I have personal knowledge of the information referenced herein and could competently testify as to its truth if called to do so. As to matters stated on information and believe, I am informed and believe them to be true.

2. Benjamin Small worked for WCM from approximately early 2016 until December 2017, when he was terminated for cause.

3. As part of his Employment Agreement, Small could be appointed to work for affiliated companies of WCM, including Gemini and Digital Asset Services, LLC ("DAS"). He

Confidential Treatment Requested by Gemini Pursuant to FOIA      GEM_CFTC004023

was eventually appointed as Chief Operating Officer at Gemini, one of the Company's top five employees.

4. WCM hired Small because of his impressive academic pedigree combined with his extensive work experience on Wall Street. He appeared to have been a good fit for our firm, which has focused on bridging the divide between cryptocurrency and traditional finance. A copy of Small's resume is attached hereto as Exhibit A.

5. As a result of Small's background, he was given access to the most sensitive company information at both WCM and Gemini. He was also placed in charge of some of Gemini's most important strategic business objectives, including increasing liquidity on Gemini's continuous order book and attracting institutional market makers to the exchange.

6. For instance, Small was intimately involved in Gemini's initiatives and strategies for attracting institutional customers to the exchange. Over the course of his employment, Small spoke with and met virtually all of Gemini's institutional customers. He helped spearhead the design and creation of Gemini's end-of-day auction, a product designed and marketed for institutional investors.

7. Because of Small's unique and exceptional background, as well as the access we gave him to our business's most sensitive information and customer lists, we believed a restrictive covenant was an appropriate clause to insert in his employment contract. Because the cryptocurrency industry is both global but fast moving, we believed that a clause that was unrestricted by geography but severely limited in time (one year) was appropriate.

8. Gemini has developed proprietary technology and strategies for capturing retail and institutional customers. Gemini has a large and growing institutional customer base who uses the exchange to buy and sell cryptocurrency. As a C-level officer, Small was privy to all of

Confidential Treatment Requested by Gemini Pursuant to FOIA                    GEM_CFTC004024

Gemini's internal discussions on business strategy about how to target and capture institutional customers.

9.  Genesis serves a substantially similar customer base as Gemini as a cryptocurrency broker-dealer that operates an over-the-counter (OTC) trading desk for high net worth individuals and institutional buyers and sellers. Gemini considers Genesis to be a direct competitor. Both firms target a substantially overlapping customer base, and are in direct competition for institutional customers who wish to buy and sell cryptocurrency. While Genesis uses a broker-dealer model to attract institutional customers, and Gemini uses an exchange model with numerous individual products aimed at institutional investors, both companies are ultimately competing for a slice of the same pie.

10. Gemini wishes to enforce Small's restrictive covenant to prevent him from taking a position at Genesis, which is a direct competitor of Gemini. Gemini fears that Small will use sensitive information and business strategy from Gemini to Gemini's detriment and to the competitive advantage of Genesis. Gemini also fears that Small will take customers who were developed while he was in Gemini's employee over to Genesis. Indeed, OTC desks are built on and sustained by relationships. Undoubtedly, Genesis is interested in hiring Small because of the institutional relationships he developed with cryptocurrency traders and institutions while an employee of Gemini.

11. WCM also considers Genesis, and its parent company Digital Currency Group Inc. ("DCG"), to be competitors. DCG owns and operates a bitcoin ETF sponsor, in addition to owning Genesis. Winklevoss Capital Fund, LLC ("WCF") also owns and operates a bitcoin ETF sponsor, DAS, for which Small was the COO and performed services. WCF is the sole-shareholder of DAS, which is the sponsor of the Winklevoss Bitcoin Trust, a bitcoin ETF that

Confidential Treatment Requested by Gemini Pursuant to FOIA         GEM_CFTC004025

has a pending registration statement filed with the SEC. Genesis' parent company, DCG, owns and operates Grayscale Investments, LLC ("Grayscale"), which has been working to obtain regulatory approval form the SEC to launch a bitcoin ETF, called the Bitcoin Investment Trust. DAS and DCG are in direct competition with one another in a race to be first past the finish line for regulatory approval from the SEC to launch a bitcoin ETF. Moreover, Genesis Global Trading — where Small now seeks employment — is deeply connected to Grayscale's proposed ETF, as it was listed as the sole authorized participant ("AP") for Grayscale's Bitcoin ETF.

12. Small spent a considerable time and energy at WCM working on DAS's proposed bitcoin ETF. He was a party to meetings with SEC commissioners; helped with drafting the ETF's S-1 filing; is listed as the COO of DAS on amendments to the S-1 filing; participated in internal strategy discussions about how to design, implement, and bring a bitcoin ETF to market; he spent time recruiting and securing APs to provide liquidity to the ETF; and he spent time identifying and securing a trust administrator and trust transfer agent. Small is intimately aware of DAS's regulatory strategy, the competitive landscape, DAS's preferred vendors, and DAS's thinking about using Gemini as a custodian for the ETF. Small had a front row seat to the evolution of DAS's attempt to secure an SEC approved bitcoin ETF.

13. All of this information would be invaluable to Genesis and its affiliated companies, Grayscale and DCG, in their own initiative to secure a SEC-approved ETF. In terms of direct competitors, it is hard to imagine a portfolio of companies that are as similar as WCM/WCF/DAS/Gemini and DCG/Grayscale/Genesis. Aside from fact that Genesis provides over-the-counter liquidity, while Gemini provides liquidity through an exchange, the structure of the companies and their race to secure an SEC-approved bitcoin ETF are nearly identical. Exactly why Dr. Small's restrictive covenant specifically calls out cryptocurrency ETFs. Indeed,

Confidential Treatment Requested by Gemini Pursuant to FOIA                    GEM_CFTC004026

Small himself realized this competitive conflict when Genesis approach DAS to be an AP on the Winklevoss Bitcoin Trust. Dr. Small stated in an email to me: "Under no circumstances whatsoever do I want Genesis or Second Market or whatever the fuck these criminals call themselves now to be an AP." Attached ehreto as Exhibit B is a true and correct copy of that email.

14.    WCM did not intend the restrictive covenant in Small's Employment Agreement to prohibit him from working anywhere in the finance industry. Indeed, the plain language of Section 11 of Small's Employment Agreement makes clear that the covenant is limited to any other businesses in the narrow-world of the digital asset (i.e. cryptocurrency) industry, including any business that "offers, sells, offers to sell or provides any bitcoin, digital assets or other virtual currency exchange, wallet, vault or short, medium or long-term storage, Exchange-Traded Fund or similar product…"

15.    WCM never had any intent to and will not enforce the restrictive covenant if Small seeks employment at any financial services firm that is not in the digital asset space. Small is free to seek employment regarding any other financial services firm or product, as had been his career before joining WCM.

16.    The restrictive covenant was narrowly tailored to prevent Small from joining competitive firms in the digital assets space, such as other exchanges, OTC trading desks, and business that sought to launch similar products as WCM, DAS, or Gemini. Indeed, the covenant explicitly referenced other businesses that might launch a "virtual currency…Exchange-Traded Fund" because we knew that Small would be intimately involved in our own proposed bitcoin ETF. Genesis was exactly the type of company we had in mind when we drafted the restrictive covenant.

Confidential Treatment Requested by Gemini Pursuant to FOIA    GEM_CFTC004027

17. In or around September 2017, WCM and Gemini discovered that Small had extended certain bespoke rebate agreements to traders on the Gemini exchange who colluded to manipulate the Gemini exchange and deprive Gemini of millions of dollars of revenue.

18. Small, previously the head of market structure at Gemini, was the Chief Operating Officer during the critical period when the collusive scheme was ongoing. At a minimum, his approval of the bespoke agreements that allowed the colluding traders to manipulate Gemini's exchange constituted gross negligence and dereliction of duty because Gemini sustained millions of dollars in losses stemming from Small's failures. Small also never received approval from Gemini's Chief Compliance Officer before extending these rebates to the collusive traders, as was required by Gemini policy. Had Gemini's Chief Compliance Officer been aware of the terms of the bespoke agreements approved by Small, the agreements never would have been approved and Gemini would never have suffered such losses.

19. Gemini suspects that Small's failure to disclose the favorable fee agreements to Gemini's Chief Compliance Officer was intentional, as Gemini believes Small was secretly profiting from the collusive trading scheme. Small appears to have conspired with his subordinate, Respondent Shane Molidor, in furtherance of the rebate conspiracy. In the midst of the conspiracy, in May 2017, Mr. Molidor went to the 1Oak nightclub with co-conspirator Satoshi Kobayashi, who had previously purchased an iPhone for Mr. Molidor so that they could speak candidly via encrypted messages. After the meeting between Mr. Molidor and Mr. Kobayashi at the nightclub, Small offered to reimburse Mr. Molidor in cash for expenses from the evening. The contact at 1Oak and the expenses there incurred were never reported to Gemini.

I declare under penalty of perjury under the laws of the United States and the State of New York that the foregoing is true and correct to the best of my knowledge.

Confidential Treatment Requested by Gemini Pursuant to FOIA                                                                 GEM_CFTC004028

Executed on April 26, 2018 in New York, New York.

/s/ Cameron Winklevoss  
Cameron Winklevoss