**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**COMMODITY FUTURES TRADING**
**COMMISSION,**

               **Plaintiff,**

    **v.**

**GEMINI TRUST COMPANY, LLC,**

               **Defendant.**

**22 Civ. 4563 (AKH)**

**Hon. Alvin K. Hellerstein**

---

## PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ANDRZEJ SKRZYPACZ

COMMODITY FUTURES TRADING
COMMISSION

Diana Wang
Andrew J. Rodgers
Katherine Rasor
Peter Janowski
Alejandra de Urioste
K. Brent Tomer

Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND .................................................................................................... 3

LEGAL STANDARD .............................................................................................. 5

    A.   Reliability................................................................................................... 5

    B.   Relevance................................................................................................... 6

    C.   Rule 403 of the Federal Rules of Evidence ........................................ 7

ARGUMENT ......................................................................................................... 8

    I.      Skrzypacz's Testimony Is Inadmissible........................................................ 8

    A.   Skrzypacz's Opinions on the Design of Gemini's Auction and Whether the Bitcoin Price Set by the Auction Aligned with Competitor Markets Are Irrelevant to the Issues in Dispute ........................................................ 8

        1.   Whether design elements of the Gemini auction may have reduced its susceptibility to manipulation has no bearing on whether Gemini's false or misleading statements and omissions were material to the CFTC's susceptibility inquiry .................................................................... 8

        2.   Skrzypacz's opinion on the relation between Gemini auction prices and broader market pricing of bitcoin is both irrelevant and unreliable ............. 11

           a.   Whether the Gemini auction resulted in Bitcoin prices in line with competitors' prices is irrelevant to the issues before the jury. ................... 12

           b.   Skrzypacz's conclusion that the Gemini auction was not readily susceptible to manipulation does not follow from his analysis.................................... 13

    B.   Skrzypacz's Opinions about the Pearl Street Loans are Irrelevant.................... 17

        1.   The Court's summary judgment ruling makes Skrzypacz's opinion about the impact of Pearl Street loans on prefunding and cost of capital irrelevant..... 18

        2.   The remainder of Skrzypacz's opinions concerning Pearl Street loans are irrelevant to the issues in the case ................................................... 19

    C.   Skrzypacz's Opinions about Operational Advances Are Irrelevant and Based on an Unreliable Methodology ............................................................... 19

        1.   Skrzypacz's opinions regarding operational advances relate to automated advances, which are not the core of the CFTC's case................................ 21

        2.   Skrzypacz's analysis of operational advances is irrelevant, but even if deemed relevant, his conclusions are misleading.......................................... 25

    D.   Bespoke Fee Arrangements ............................................................... 28

        1.   Skrzypacz's analysis of bespoke fee arrangements' similarity to publicly available fee schedules rests on unsound methodology ............................. 28

i

2. The remainder of Skrzypacz's opinions on bespoke fee arrangements are irrelevant....................................................................................... 33

E. Skrzypacz's Analysis of Self-Trading Relies on Gemini's Own Lay Terminology to Arrive at an Unsound Conclusion............................................. 35

II. The Court Should Exclude the Summary Slides Skrzypacz Proposes to Present at Trial ........................................................................................................ 37

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) .................... 5, 6, 27, 32

*Arista Recs. LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 (KMW),
    2011 WL 1674796 (S.D.N.Y. May 2, 2011) ............................................... 28

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) ........................................... 6, 26

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011)................................................................... 5

*CFTC v. eFloorTrade, LLC*, No. 16 Civ. 7544 (PGG),
    2018 WL 10625588 (S.D.N.Y. Sept. 21, 2018)........................................................... 9

*Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690 (2d Cir. 1980) ........................................... 14

*Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12 Civ. 05803
    (JLG), 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013).................................................. 37

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)................................................. passim

*Davis v. Carroll*, 937 F. Supp. 2d 390 (S.D.N.Y. 2013) ........................................................ 6, 24

*Estate of Anderson v. Strohman*, No. 13 Civ. 3167 (GLR),
    2016 WL 4013638 (S.D.N.Y. July 27, 2016) ........................................................ 24

*F.T.C. v. Ross*, 743 F.3d 886 (4th Cir. 2014)............................................................... 18

*Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*, No. 03 Civ. 969 (CSH),
    2006 WL 1319543 (S.D.N.Y. May 11, 2006) ........................................................ 37

*Golden Unicorn Enters. v. Audible, Inc.*, 682 F. Supp. 3d 368 (S.D.N.Y. 2023)........................ 18

*In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS),
    2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ......................................................... 6

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................ 5, 7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ....... 7

*In re Lyman Good Dietary Supplements Litig.*, No. 17 Civ. 8047 (VEC),
    2019 WL 5682880 (S.D.N.Y Oct. 31, 2019)........................................................... 7

*In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016)........................ 10, 28

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) .................................... 32

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   638 F. Supp. 3d 227 (E.D.N.Y. 2022) ................................................. 31

*King–Ind. Forge, Inc. v. Millennium Forge, Inc.*, No. 07 Civ. 00341 (SEB) (DML),
   2009 WL 3187685 (S.D. Ind. Sept. 29, 2009) .......................................... 37

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................. 5

*MLB Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .................. 6

*Music Royalty Consulting, Inc. v. Reservoir Media Mgmt.*,
   598 F. Supp. 3d 158 (S.D.N.Y. 2022) ................................................ 18

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................... passim

*Pugliano v. United States*, 315 F. Supp. 2d 197 (D. Conn. 2004) ......................... 27

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997) ...................................... 11

*Rowe Ent., Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP),
   2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) .......................................... 6

*SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384 (S.D.N.Y. 2019) .......................... 31

*SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608 (PKL),
   2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ........................................... 7

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............................... 7

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ................................ 13

**STATUTES**

7 U.S.C. § 7(d) ..................................................................... 3

7 U.S.C. § 9(2) ..................................................................... 1

**RULES**

Fed. R. Evid. 403 ....................................................... 7, 10, 25, 27

Fed. R. Evid. 702 ............................................................... passim

**REGULATIONS**

17 C.F.R. § 38.200 (2024) ............................................................ 3

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or the "Commission") submits this memorandum of law and the accompanying declaration and exhibits[1] in support of its motion to exclude the testimony of Andrzej Skrzypacz, an expert witness identified by Defendant Gemini Trust Company, LLC ("Gemini" or "Defendant").

## PRELIMINARY STATEMENT

The proposed testimony of Professor Andrzej Skrzypacz, one of Defendant's offered expert witnesses, is designed to insert irrelevant issues into this case and confuse the questions to be put before the jury about whether Defendant violated Section 6(c)(2) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. § 9(2), for making materially false or misleading statements and omissions to the CFTC.  The majority of Skrzypacz's expert report attempts to answer the irrelevant question of whether the price of bitcoin set by Gemini's daily auction or by its continuous exchange was ever actually manipulated.  He analyzes this question by comparing the price of bitcoin set by Gemini's auction to competitors in the market, by examining the effect of the loans Gemini customers received from Gemini's affiliate, Pearl Street Financial LLC ("Pearl Street"), and by analyzing whether bespoke fee arrangements Gemini offered its customers led to abusive trading or manipulated prices.  He further provides his opinion as an economist that the structure of the Gemini auction was designed to prevent manipulation.  In essence, he is opining that the statements and omissions the CFTC claims are false or misleading are not materially so because manipulation did not occur or was unlikely to occur.

The results of these exercises, however, have zero bearing on the actual materiality issue in this case: whether Gemini's false or misleading statements and omissions *had the capacity to*

---

[1]    All references herein to exhibits will be to exhibits to the Declaration Christopher Giglio in Support of Plaintiff's Motion to Exclude the Testimony of Andrzej Skrzypacz, dated November 15, 2024.

*influence* the CFTC's review of the proposed bitcoin futures contract, including whether the contract complied with Core Principle 3—whether Gemini's auction and exchange were readily susceptible to manipulation. By purporting to answer the question of whether the price of bitcoin on Gemini was *actually* manipulated, or even the question of whether Gemini's auction and exchange were *actually* readily susceptible to manipulation, Skrzypacz offers opinions that are wholly irrelevant to the materiality element of this case. Even if Skrzypacz is correct that the price was not manipulated and the auction was not readily susceptible, his testimony would be of no help to a jury trying to determine whether the CFTC was still entitled to consider the information Gemini hid from it. Skrzypacz's 117-page report ("Skrzypacz Rep.") largely amounts to bolstering Gemini's irrelevant defense of "no harm, no foul," a red herring considering the CFTC need not prove harm to prove its case.[2]

Even to the extent that the content of Skrzypacz's proposed testimony is relevant to the matter, much of it rests on unreliable or outright misleading methodology. Regarding Skrzypacz's analysis concerning Gemini's reported bitcoin volume, Skrzypacz includes line graphs from which he draws conclusions merely by visually inspecting the displayed data sets, without conducting statistical analysis. When discussing operational advances, he touts the importance of the duration of the advances when it suits him but ignores the advances' duration when including it would cause his calculations to reach the wrong result. As to fee rebates, he draws conclusions based on diagrams that give the false appearance that bespoke fees and rebates were available to customers across a whole range, rather than only at the endpoints of that range. And, as to self-trading, instead of relying on his own expertise to offer opinions

---

[2]    *See* CFTC's Third *Motion In Limine*, Plaintiff's Memorandum of Law in Support of Its Omnibus Motion *In Limine* to Exclude and Admit Certain Evidence, ECF No. 176, at 10–11 (Nov. 15, 2024).

about the persistent self-trading on the Gemini auction, he abdicates his role as expert to merely parrot the lay opinion of a Gemini employee.

An expert's opinion is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Skrzypacz's proposed testimony does the exact opposite. His methodologies are unreliable, and most of his opinions are irrelevant to the issues that will be presented to the jury. For these reasons, the CFTC respectfully requests that the Court exclude Skrzypacz's testimony in its entirety.

## BACKGROUND

In 2017, Defendant made materially false and misleading statements and omissions to the CFTC in connection with the self-certification of a bitcoin futures contract that was to be settled by reference to the price of bitcoin set by Defendant's daily auction. Designated Contract Markets ("DCMs") are required by law to comply with core principles of the Act and with applicable requirements established by the Commission. *See* Section 5(d) of the Act, 7 U.S.C. § 7(d). With respect to contract listings, this includes Core Principle 3, which requires that a DCM "shall list . . . only contracts that are not readily susceptible to manipulation." Section 5(d)(3) of the Act, 7 U.S.C. § 7(d)(3); Regulation 38.200, 17 C.F.R. § 38.200 (2024).

To convince the CFTC that the bitcoin futures contract was not readily susceptible to manipulation, Defendant made 31 false or misleading written statements, as well as additional oral statements, that fell into one of the following four groups: (1) statements related to Defendant's prefunding requirement and the related cost of capital to trade on the Gemini exchange and in the auction (Exhibit A to the CFTC's Memorandum of Law in Support of Its Motion for Partial Summary Judgment, ECF No. 99 (statements 1, 2, 5, 6, 9, 10, 13, 14, 17–20, 22, 26, 27 & 32)); (2) statements related to Defendant's fee rebate incentives offered to market participants (*id.* (statements 23, 28 & 32)); (3) statements related to the extent and possibility of

self-trading, self-crossing, or collusive trading on the Gemini exchange and in the auction (*id.* (statements 4, 8, 12, 16, 21, 24, 31 & 32)); and (4) statements related to the volume and liquidity of the Gemini exchange and in the auction (*id.* (statements 3, 7, 11, 15, 25, 29, 30 & 32)). During oral argument on the CFTC's motion for partial summary judgment, ECF No. 97, the Court ruled that Defendant's fifteen written statements about its prefunding requirement and the related cost of capital (Group 1 above) violated Section 6(c)(2) as a matter of law.  (ECF No. 133, 7/23/2024 Hr'g Tr. at 25:1–6, 101:18; ECF No. 135, 7/24/2024 Hr'g Tr. at 158:9–159:16, 161:19–162:12, 209:21–210:1, 211:6–16, 216:22–25 ("Prefunding Ruling").)

Skrzypacz's expert report covers six topics.  First, Skrzypacz highlights certain structural aspects of Gemini's auction and asserts that these facets protected the auction from being readily susceptible to manipulation.  Skrzypacz Rep. ¶ 10–12, 64–100.  Second, Skrzypacz compares the results of Gemini's bitcoin auction to bitcoin prices on competitor exchanges and concludes that no "economically meaningful" difference existed between the prices in the Gemini auction and the prices in the market.  *Id.* ¶¶ 13, 101–20.  Third, Skrzypacz concludes that Pearl Street loans did not affect Gemini's pre-funding requirements, and did not affect the prices of the auction.  *Id.* ¶¶ 14, 121–39.  Fourth, Skrzypacz concludes that operational advances would have reduced susceptibility of the auction to manipulation because they reduced "trading friction" and improved liquidity.  *Id.* ¶¶ 14, 140–47.  Fifth, Skrzypacz opines that the bespoke fee arrangements Gemini offered certain customers were "similar to those that Gemini offered publicly," "did not lead to abusive trading," and did not increase susceptibility to manipulation. *Id.* ¶¶ 14, 148–63.  Last, Skrzypacz asserts that Gemini's self-trade prevention measures prevented self-trading.[3]  *Id.* ¶¶ 14, 164–68.

---

[3]    The last four of these topics address four business practices that the CFTC alleges were not properly disclosed during the self-certification process.  *See* ECF No. 1, Complaint ¶¶ 115–19.

For varying reasons, each of the opinions is inadmissible. Skrzypacz's proposed testimony is irrelevant to the sole element of the CFTC's claims that it purports to speak to—materiality—as his opinions do not address whether the information the CFTC alleges Gemini failed to disclose was capable of influencing the CFTC. Skrzypacz's opinions are also based on misleading or unreliable methodology, or relevant only to issues this Court already resolved in deciding the CFTC's motion for partial summary judgment.

## LEGAL STANDARD

The Supreme Court has explained that a district court has a "gatekeeping" role with respect to expert opinion testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In fulfilling this gatekeeping role, the district court must evaluate the expert based on three criteria: (1) qualifications, (2) reliability, and (3) relevance. Fed. R. Evid. 702; *see also Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009). The party seeking to offer expert testimony bears the burden of showing, by a preponderance of the evidence, that such testimony is admissible. *Daubert*, 509 U.S. at 592 n.10; *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 283 (S.D.N.Y. 2011).

### A.    Reliability

If the Court determines that the expert is qualified, it must then consider "the indicia of reliability identified in Rule 702, namely (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the

facts underlying the expert's opinion, the link between the facts and the conclusions, et alia." *Id.* (internal quotation marks omitted).

An expert's opinion that is "without factual basis" or based on "speculation or conjecture" is inadmissible. *MLB Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (affirming district court's exclusion of expert who declined to cite evidence to support his conclusory statements, and "performed no empirical studies"); *see also In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *23 (S.D.N.Y. Mar. 26, 2003) ("General statements without adequate factual support are inadmissible."). An expert whose testimony "rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts" must be excluded. *Davis v. Carroll*, 937 F. Supp. 2d 390, 418–19 (S.D.N.Y. 2013) (excluding expert who based his conclusions on factual assumptions and failed to reckon with record evidence that contradicted his assumptions); *Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) (affirming district court's exclusion of expert because he "cherry-picked the facts he considered to render an expert opinion"). Finally, an expert cannot rely on information from a party in lieu of conducting his own analysis of the evidence. *Rowe Ent., Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP), 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.").

### B.    Relevance

Even if an expert is qualified and their opinions are based on reliable data and methodology, the Court must "make a third inquiry: whether the expert's testimony (as to a particular matter) will assist the trier of fact." *Nimely*, 414 F.3d at 397 (internal quotation marks omitted). The question of relevance "can be expressed as a question of 'fit'—'whether expert

testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *In re Fosamax*, 645 F. Supp. 2d at 173 (quoting *Daubert*, 509 U.S. at 591). Expert testimony that is "irrelevant, unhelpful, and [had] the potential to mislead or confuse a jury" should be excluded. *In re Lyman Good Dietary Supplements Litig.*, No. 17 Civ. 8047 (VEC), 2019 WL 5682880, at *5 (S.D.N.Y Oct. 31, 2019).

Expert testimony may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). "Although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Id.*; *see also SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608 (PKL), 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) ("[A]n expert may tell the fact-finder 'whether he thinks the method of trading was normal, but not . . . whether it amounted to illegal manipulation.'").

Moreover, an expert cannot offer opinions that "attempt to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 398 (citations omitted); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 489–91 (S.D.N.Y. 2018) (excluding expert opinion that manipulation occurred based on interpretation of trader communications because such interpretations of the factual evidence were "invasive of the province of the trier of fact").

### C.    Rule 403 of the Federal Rules of Evidence

Finally, expert testimony must also comport with Rule 403 of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 595. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more

control over experts than over lay witnesses." *Id.* (internal quotation marks omitted); *see also*

*Nimely*, 414 F.3d at 398 (expert opinion on credibility held inadmissible on Rule 403 grounds).

## ARGUMENT

### I.    Skrzypacz's Testimony Is Inadmissible

#### A.    Skrzypacz's Opinions on the Design of Gemini's Auction and Whether the Bitcoin Price Set by the Auction Aligned with Competitor Markets Are Irrelevant to the Issues in Dispute

The question before the jury on the materiality element is limited to whether Gemini's

false or misleading statements and omissions were material to the CFTC's task of evaluating the

proposed bitcoin futures contract, including whether it and, consequently, the Gemini auction,

were readily susceptible to manipulation.  The first forty pages of Skrzypacz's analysis, however,

focus on two topics that avoid this question and instead answer two different, irrelevant ones: (1)

whether *other* facets of the Gemini auction made it less susceptible to manipulation, and (2)

whether the price of bitcoin as set by the Gemini auction broadly aligned with the price of

bitcoin on competitor exchanges.  *See* Skrzypacz Rep. ¶¶ 64–120.

##### 1.    Whether design elements of the Gemini auction may have reduced its susceptibility to manipulation has no bearing on whether Gemini's false or misleading statements and omissions were material to the CFTC's susceptibility inquiry

Skrzypacz opines that "the Gemini auction was designed with several features that

protected it from being readily susceptible to manipulation."  Skrzypacz Rep. ¶ 79.  He lists nine

features: (1) the auction failed if it was more than 5% away from a benchmark price; (2) after

roughly May 2017, customers could not fill buy and sell auction-only orders in the same auction;

(3) Gemini shared indicative prices with the market in the minutes before the auction settled; (4)

the auction order book was not visible to the market; (5) orders could not be cancelled within one

minute of the auction; (6) cancelled orders did not impact the auction price; (7) all orders were

required to be pre-funded; (8) the auction considered both auction-only orders and orders resting

on the continuous exchange; and (9) the operation of the double auction itself. *Id.* ¶¶ 79–80.

Skrzypacz's focus on certain structural aspects of Defendant's auction does nothing to

elucidate whether Defendant's false or misleading statements or omissions were material to the

CFTC's inquiry. The materiality question for the jury is not whether the design elements of the

auction cited by Skrzypacz might have increased or decreased the auction's susceptibility to

manipulation. Nor is the inquiry whether, as Skrzypacz claims, the design of the auction meant

that self-trading, collusive trading, or other forms of manipulative trading "would [] have been

very difficult if not impossible on the Gemini auction." Skrzypacz Rep. ¶¶ 90–91. The jury

likewise will not have to find that the undisclosed business practices *actually did* increase the

auction's susceptibility to manipulation.

The only issue for the fact finder is whether the statements or omissions "have a capacity

to influence the agency, to hinder its investigation, or to distract the investigators' attention away

from a critical matter." *CFTC v. eFloorTrade, LLC*, No. 16 Civ. 7544 (PGG), 2018 WL

10625588, at *8 (S.D.N.Y. Sept. 21, 2018); *see also* ECF No. 133, 7/23/2024 Hr'g Tr. at 82:14–

15 ("[T]he rule of law is that which influences or is capable of influencing . . . ."); *id*. at 102:23–

25 ("I therefore hold that [a prefunding misstatement] had a natural tendency to influence or be

capable of influencing the decision-maker, and, hence, was material.").

Skrzypacz's proposed testimony about the design of the double auction (Skrzypacz Rep.

¶¶ 64–100) illustrates that his testimony is far afield from the materiality issues for the jury.

Whether Defendant endeavored, according to Skrzypacz, to coordinate efficient trading by

conducting a double auction using the various design elements Skrzypacz enumerates at

paragraph 79 of his report has no relevance to the materiality questions that actually will be

posed to the jury: whether the information withheld from the CFTC was material to the CFTC's considerations of the bitcoin futures contract.[4]  Put differently, the jury does not need to find whether Gemini's auction was actually susceptible to manipulation, so the existence of measures designed (according to Skrzypacz) to protect the functioning of the auction from manipulation are neither here nor there.  The structure of a double auction, and whether it reduces the Gemini auction's susceptibility to manipulation or not, does not weigh on whether the CFTC's decision-making process was capable of being influenced by the false or misleading statements and omissions in the complaint.  Expert testimony on the various structures of the auction serve only to distract from the actual dispute over the materiality element in the case.  *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 421 (S.D.N.Y. 2016) (excluding expert testimony that was "not relevant" to the parties' theories of the case) (citing Fed. R. Evid. 403)).

Suppose that a private organization obtains a municipal license to operate a neighborhood swimming pool for the summer.  During the licensing process, which is designed in part to determine whether the pool is safe for the public, the organization represents that the pool will be staffed with a lifeguard whenever the pool is open to swimmers.  A swimmer drowns on a Sunday, and an investigation determines that the pool in fact had no lifeguard on duty on weekends.  A jury in a subsequent enforcement action by the city would be tasked with determining (among other things) whether the organization's statements on lifeguards in its licensing application were material to the city's decision to issue a license.  Whether the organization had set up *other* safeguards to protect swimmers—for example, cameras monitoring activity in and around the pool; a fence surrounding the pool area to keep small children out;

---

[4]    Skrzypacz also asserts the opinion that Gemini "does not have an incentive to run a marketplace that is 'readily susceptible' to manipulation," Skrzypacz Rep. ¶¶ 11, 78, but this opinion is patently immaterial, in addition to being wholly unsupported.

closing the pool entirely at nighttime; life preservers located poolside available to swimmers—

would have no bearing on the materiality of the false statement on lifeguards at issue for trial.

The same is true here. Skrzypacz's opinions regarding whether and how the structures of

the Gemini auction helped reduce the auction's susceptibility to manipulation distract from the

question of whether Gemini's false or misleading statements and omissions were capable of

influencing the CFTC's decision-making. They do not help a jury understand whether the three

remaining categories of Defendant's misrepresentations and omissions for which materiality is

an issue for trial were material to the CFTC, and should be excluded on that basis. *Raskin v.*

*Wyatt Co.*, 125 F.3d 55, 67 n.5 (2d Cir. 1997) ("[E]xpert testimony which does not relate to any

issue in the case is not relevant and, ergo, non-helpful.") (quoting *Daubert*, 509 U.S. at 591);

Fed. R. Evid. 702(a).

### 2. Skrzypacz's opinion on the relation between Gemini auction prices and broader market pricing of bitcoin is both irrelevant and unreliable

Skrzypacz offers the opinion that "a key piece of evidence about whether the Gemini

auction was readily susceptible to manipulation is the actual results of the auction and whether,

and to what extent, those auction prices deviated from the prices for BTC on competitor

exchanges." Skrzypacz Rep. ¶ 101. To support this opinion, Skrzypacz identifies four other

digital asset exchanges that were Gemini's "competitors," and then compares the bitcoin prices

set by the daily Gemini auction to the bitcoin prices listed at those competitor exchanges in the

ten-minute window leading up to the time of the auction, *i.e.*, 3:50 p.m. to 4:00 p.m ET. *Id.*

¶¶ 102–04. He then conducts a statistical analysis to conclude that the prices "did not deviate

from the broader market in an economically meaningful way," and that the "lack of deviation is

inconsistent with the notion of the Gemini auction being readily susceptible to manipulation."

*Id.* ¶¶ 105–20. This opinion is irrelevant to the materiality issue in the case and Skrzypacz's

conclusion does not follow from his analysis, making it misleading to a jury and therefore inadmissible.

> a.    *Whether the Gemini auction resulted in Bitcoin prices in line with competitors' prices is irrelevant to the issues before the jury.*

The bitcoin price as measured on other exchanges has no relevance to whether the facts that Defendant misstated or omitted from its communications with the CFTC were capable of influencing CFTC's assessment of the Gemini auction's susceptibility to manipulation.  Using those competitor prices to analyze whether bitcoin prices set by Gemini's auction were likely to have been manipulated is yet another step removed from the materiality question in the case.[5] Where, as here, an expert report fails to proffer information that bears on the relevant inquiry, it fails to satisfy *Daubert*'s relevance prong, and the helpfulness prong of Fed. R. Evid. 702(a).

By comparing Gemini's bitcoin prices at auction to prices set by its competitors, Skrzypacz opines on whether Defendant's auction was, in fact, readily susceptible to manipulation—an allegation not levied by the CFTC.  At the heart of this matter lies not whether the auction was manipulated, but rather the notion of transparency.  To analyze Defendant's auction and assess its conformity to Core Principle 3, the CFTC needed information submitted to it for the product self-certification not to be false or misleading (for example, regarding Defendant's history of self-trade prevention), and not to contain otherwise true statements that became false or misleading because of material information that Gemini omitted from its disclosures (for example, omitting that substantial portions of Defendant's volume figures were comprised of self-trading, collusive trading, or trading driven by undisclosed loan, operational

---

[5]    Skrzypacz's main analysis focuses on the Relevant Period leading up to the launch of the bitcoin futures contract, on December 10, 2017.  He also analyzes, however, the relationship between the price of bitcoin set by the Gemini auction and the price of bitcoin on Gemini's competitors for the period after the launch of the futures contract.  *See* Skrzypacz Rep. ¶¶ 118–20.  For the same reasons as discussed above, an analysis of the post-launch period is equally irrelevant to the materiality question in this case, but in addition is a step further removed because the CFTC would have already completed its consideration of the Gemini bitcoin futures contract at the time.

advance, and fee arrangement programs). In failing to communicate critical facts regarding incentives and self-trading, Defendant deprived the CFTC of the ability to make an informed determination. Defendant's auction needs not be found to have been readily susceptible to manipulation for the CFTC to prevail on its claim that material facts were not disclosed.

Skrzypacz makes no attempt to connect his analysis of the broader market for bitcoin to the central issue of the materiality of Gemini's misstatements and omissions. From the purportedly strong alignment between Defendant's bitcoin prices and those posted by other exchanges, Skrzypacz infers that manipulation was extremely improbable. Skrzypacz Rep. ¶¶ 13, 117. But this analysis at best confuses probability of manipulation for susceptibility to manipulation, but more to the point does nothing to address the materiality of Gemini's false and misleading statements and omissions. Both things can be true: the auction might not have been actually manipulated and yet still the CFTC would find the omission of key practices to be material to the question of Core Principle 3. *See United States v. Stewart*, 433 F.3d 273, 311–12 (2d Cir. 2006) (affirming district court's decision to preclude defendant's proposed securities law expert on the ground that the proffered expert opinions were "not relevant to the charges under consideration" and "would have increased the potential for confusion" of the jury). Skrzypacz's analysis of whether the Gemini auction diverged from the market is irrelevant and should be precluded.

   b. *Skrzypacz's conclusion that the Gemini auction was not readily susceptible to manipulation does not follow from his analysis.*

Not only does Skrzypacz's contemplated testimony comparing Gemini auction results to bitcoin prices on competitors' exchanges fail to shed light on the materiality of Defendant's omissions, but the conclusion Skrzypacz ultimately draws does not follow from his analysis, and it is thus excludable as both unreliable and misleading. Skrzypacz opines that because his

analysis purports to show that Gemini auction prices fell within a range of prices established by competing exchanges in the broader market, therefore Defendant's auction was not readily susceptible to manipulation.  But just because the auction was not (according to Skrzypacz) manipulated does not mean that the auction was not readily susceptible to manipulation.  Even if one accepts that Skrzypacz's analysis is relevant to the materiality issue in this case (which it is not), his conclusion does not follow from his model.

Skrzypacz finds that the bitcoin price set by the Gemini auction fell outside "the range of efficient prices"—as defined by prices on Gemini competitors' exchanges—on 5.5% of auctions in his data set of September 21, 2016, through March 29, 2019.  Skrzypacz Rep. ¶ 114, Fig. 5.8.  But the conclusion that Skrzypacz seeks to draw, namely that the Gemini auction was not readily susceptible to manipulation does not follow from that finding.  A finding that manipulation (purportedly) did not occur in the past does not mean that the auction is not readily susceptible to manipulation in the future.  Perhaps no Gemini customers attempted to manipulate the price at the auction, but rather engaged in activity that sent false signals of liquidity.  As alleged in the Complaint, the CFTC was deprived of the opportunity to assess the Gemini auction's susceptibility to manipulation when Gemini failed to disclose critical information about its business practices during the self-certification process.  Skrzypacz's opinion rests on a logical fallacy, it is unreliable, unhelpful, and threatens to confuse the jury.  *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 702 n.20 (2d Cir. 1980) ("The proposition that 'A implies B' is not the equivalent of 'non-A implies non-B,' and neither proposition follows logically from the other.  The process of inferring one from the other is known as the fallacy of denying the antecedent.").

Moreover, Skrzypacz's analysis of the Gemini auction prices does not actually support the conclusion he claims to reach, namely that he "find[s] no such evidence" that the Gemini auction "was, in fact, manipulated." Skrzypacz Rep. ¶ 117. A careful reading of his analysis actually *does* show possible evidence of manipulation. Skrzypacz's analysis concludes that Gemini's auction resulted in an auction price that fell outside the range of efficient prices set by Gemini's competitors on 45 of the 811 auction days (or 5.5%) in the data set, which runs from September 21, 2016, through March 29, 2019. Skrzypacz Rep. ¶ 114, Fig. 5.8.

That result is skewed, however, by the inclusion in the data set of auction results occurring after the December 10, 2017 listing of the bitcoin futures contract, when the CFTC no longer would have been considering whether the Gemini auction was susceptible to manipulation. According to Skrzypacz, auctions occurring on or after that date (or 402 auction days) resulted in prices outside the range of efficient prices as defined by Gemini's competitors on 3.5% of days (*i.e.*, on 14 auction days). Skrzypacz Rep. ¶¶ 118–20. If one excludes the post-listing dates from the full data set, resulting in a date range of September 21, 2016, through December 9, 2017, then Skrzypacz's analysis would have shown the Gemini auction fell outside the range of efficient prices as defined by Gemini's competitors on 31 of 409 days, or 7.5% of the auction days occurring prior to the listing of the futures contract.

Thus, by Skrzypacz's own flawed analysis, on about 2.25 days per month over the roughly 15-month period leading up to the listing of the contract, the Gemini auction resulted in bitcoin prices that, in Skrzypacz's framing, "deviate[d] from the Competitor Benchmarks in an economically meaningful way." Skrzypacz Rep ¶ 114. Yet he nevertheless concludes, despite conducting an analysis that shows the Gemini auction regularly deviated from the benchmark he defined, that he sees "no such evidence" that the auction could have been "in fact, manipulated."

*Id.* ¶ 117.  He is relying on his own *ipse dixit* that the auction was not manipulated without grappling with the fact that his analysis came to the opposite result, a clear basis for exclusion of his opinion.  *See Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  Indeed, Skrzypacz's backup data shows that Gemini's auction price differed from the average of its competitors' prices by about 3.5% on, for example, June 15, 2017, and July 31, 2017,[6] divergences obvious by even casual inspection of the line graphs that Skrzypacz includes in his report.  *See* Skrzypacz Rep. Figs. 5.3, 5.4.

After reaching these results, which at the very least suggest that Gemini's auction results exceeded the bounds of the efficient bitcoin market a couple days per month, Skrzypacz takes no further steps to investigate whether the Gemini auction's regularly recurring divergences could have been the result of manipulation.  He instead concludes that he found "no such evidence." *Id.* ¶ 117.  And based on that conclusion, he opines that the Gemini auction results were "inconsistent with the notion of the Gemini auction being readily susceptible to manipulation."

To be clear, analyzing whether particular divergences of the Gemini bitcoin auction price from competitor benchmarks would not have gotten Skrzypacz closer to the issue actually presented in the case: whether the misrepresentations and omissions alleged by the CFTC had the

---

[6]     According to Skrzypacz's backup data, on June 15, 2017, the Gemini auction resulted in a bitcoin price of $2235.565 and the four competitor benchmarks averaged $2316.66 (a difference of 3.5%).  Likewise, on July 31, 2017, the Gemini auction resulted in a bitcoin price of $2950 and the four competitor benchmarks averaged $2846.67 (a difference of 3.63%).  Each day's Gemini auction price also differs from the competitor price closest to Gemini's (as opposed to using an average) by roughly the same amount (3.3% and 3.5%, respectively).  *See* Ex. 6, Skrzypacz backup data, "Fig 3.3, 3.4, 5.1-5.10, App 5.1-5.10.xlsx," "Price Charts Data" tab, at 6–7 (comparing the prices in the second column, which are daily Gemini auction prices, to the prices in the four rightmost columns, which are daily prices from the four competitors).

ability to affect the CFTC's analysis of Gemini's self-certification. *See supra* Section II.A.2.a.

But even if Skrzypacz's analysis is relevant, it does not logically lead to the conclusion

Skrzypacz wants to draw, namely that the auction was not readily susceptible to manipulation.

Skrzypacz's data is skewed by the inclusion of auctions that post-date the CFTC's consideration

of the proposed bitcoin futures contract. And Skrzypacz's failure to even engage on the logical

next step given his own findings show that the Gemini auction resulted in a price that showed an

"economically meaningful difference" from the market multiple days per month, completely

belies any assertion that his opinion is "the product of reliable principles and methods" or

"reflects a reliable application of the principles and methods to the facts of the case." Fed. R.

Evid. 702(c), (d). When rendered without sufficient analysis or support for the information

contained within, an expert report lacks a reliable methodological foundation. Testimony on

these issues should be excluded under *Daubert*.

### B.    Skrzypacz's Opinions about the Pearl Street Loans are Irrelevant

Skrzypacz's proposed testimony also addresses the four business practices at the center of

the CFTC's allegations: Pearl Street loans, operational advances, bespoke fee arrangements, and

self-trade prevention. Skrzypacz's proposed testimony address the Pearl Street loans in three

ways: (1) he opines that the loans were irrelevant to the question of whether a customer's trading

was prefunded, *see* Skrzypacz Rep. ¶¶ 122–27; (2) he analyzes whether loan recipients' trading

patterns were "consistent with efforts to manipulate" Gemini markets, *see* Skrzypacz Rep.

¶¶ 128–34; and (3) he analyzes whether loan recipients appeared to have manipulated the price

of the auction, *see* Skrzypacz Rep. ¶¶ 135–39.

1.    **The Court's summary judgment ruling makes Skrzypacz's opinion about the impact of Pearl Street loans on prefunding and cost of capital irrelevant**

During oral argument on the CFTC's motion for partial summary judgment, ECF No. 97, the Court ruled that Defendant's fifteen written statements about its prefunding requirement and the related cost of capital violated Section 6(c)(2) as a matter of law, including finding that the undisclosed Pearl Street loans rendered false or misleading Gemini's statements that its prefunding requirement made it costly to engage in manipulative conduct.  (Prefunding Ruling, ECF No. 133, 7/23/2024 Hr'g Tr.; ECF No. 135, 7/24/2024 Hr'g Tr.)  Skrzypacz's opinion that the source of a Gemini customer's funds—cash, bitcoin, or loan—"as a matter of economics . . . has no bearing on whether an order was prefunded for the purposes of trading on the Gemini exchange," Skrzypacz Rep. ¶ 122, goes solely toward whether the omission of Pearl Street loans made Gemini's statements about prefunding false or misleading.  Given the Court's summary judgment ruling, Skrzypacz's opinion is no longer relevant for trial and therefore should be excluded.  *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt.*, 598 F. Supp. 3d 158, 194 (S.D.N.Y. 2022) (precluding expert testimony when the court has already ruled "as a matter of law" on summary judgment relating to issues on which the expert opined); *Golden Unicorn Enters. v. Audible, Inc.*, 682 F. Supp. 3d 368, 380 (S.D.N.Y. 2023) (excluding expert's damage calculations when they "do not correspond to Plaintiffs' sole remaining claim" after the court dismissed other claims on summary judgment); *F.T.C. v. Ross*, 743 F.3d 886, 893 (4th Cir. 2014) ("As the district court correctly ruled, however, [the expert's] testimony was irrelevant because it had already decided the deceptiveness issue in favor of the Commission at summary judgment . . . [the expert's] testimony was immaterial, and thus irrelevant, to the issue reserved for trial.").

### 2.   The remainder of Skrzypacz's opinions concerning Pearl Street loans are irrelevant to the issues in the case

Skrzypacz next proceeds to analyze whether recipients of the Pearl Street loans appeared to have traded in a way "consistent with efforts to manipulate the Gemini continuous order book or Bitcoin auction," Skrzypacz Rep. ¶ 128, and analyzed a counterfactual to examine the results of the auctions had the Pearl Street loan recipients not participated, Skrzypacz Rep. ¶ 137.  Both of Skrzypacz's models incorrectly assume, however, that the CFTC's inquiry at the time of Gemini's self-certification would have been to determine whether the Gemini auction was in fact manipulated.  But the jury will not be considering what the CFTC might have found had it been provided information about the Pearl Street loans at the time.  As noted above, the Court has already found as a matter of law that Defendant's omission of Pearl Street loans was material to Defendant's false and misleading statements about prefunding and the cost of capital.  Even if the jury were still tasked with deciding materiality, their only task regarding materiality would be to decide whether the Gemini's false or misleading omissions regarding the Pearl Street loans *had the capacity* to influence the CFTC's analysis of the bitcoin futures contract and Gemini's trading volume, which is relevant to the CFTC's consideration of whether the self-certification met the requirements of Core Principle 3.  Notably, Skrzypacz does not engage in any analysis that might approach the kind of work that the CFTC could have conducted—had it not been denied the chance to do so by Gemini's false and misleading omissions.  Skrzypacz's opinions on whether the Pearl Street loans incentivized manipulative trading or caused a manipulated price are irrelevant and should be excluded.

### C.   Skrzypacz's Opinions about Operational Advances Are Irrelevant and Based on an Unreliable Methodology

As alleged in the Complaint, a second business practice that Gemini failed to disclose to the CFTC during the self-certification process was Gemini's provision to select customers of so-

called operational advances, deposits or credits of bitcoin or U.S. dollars in customer accounts "to induce, facilitate, or fund trading on the Gemini Exchange or in the Gemini Bitcoin Auction that would otherwise not be possible due to lack of funds in the customer's account." Complaint, ECF No. 1, at ¶ 63. The Complaint provides two examples of very large advances—$400,000 in one case, and 750 bitcoin in the other—being given to market-making customers—for periods of several hours and several months, respectively—for the purpose of allowing that customer to participate in the Gemini auction or trade on the Gemini Exchange. *Id.* ¶¶ 65–69.

Skrzypacz's analysis of Gemini's operational advances, however, focuses not on advances that were provided "so that the customer could participate in the auction," *Id.* ¶ 65, but rather on automated advances that were "extremely short-term in duration" and intended to "reduce[] the processing time it took for a market participant to complete transfers of Bitcoin or US dollars into their accounts." Skrzypacz Rep. ¶ 141. By making this distinction, Skrzypacz concludes that these "automated" advances did not "increase[] the susceptibility of the Gemini exchange to manipulation." But by making this distinction, Skrzypacz's opinion on operational advances also becomes irrelevant to the issues before the jury, who will not be tasked with determining whether advances increased or decreased susceptibility to manipulation. Skrzypacz's sole opinion on manual advances—the kind of advances described in the Complaint—is that they comprise a small percentage of the total amount of bitcoin advanced by Gemini. But this opinion ignores the duration of those advances, thus ignoring the very facts that Skrzypacz relied on to opine on automated advances. His opinions on manual advances are misleading and must also be excluded.

**1. Skrzypacz's opinions regarding operational advances relate to automated advances, which are not the core of the CFTC's case**

The CFTC's case for trial regarding operational advances is focused on the impact on trading volume and liquidity on the exchange due to undisclosed advance credits that were given to customers so they could trade at times they otherwise would not have been able to due to the prefunding requirement. Skrzypacz, on the other hand, focuses his analysis on automated advances that were "designed to address frictions in the BTC market," by "resolv[ing] delays in deposit transactions coming from other exchanges or wallets and make trading available immediately."[7] Skrzypacz Rep. ¶ 141 & n.214 (internal quotation marks omitted). These operational advances are then "debited when funds in transit arrived in participants' accounts." *Id.* By Skrzypacz's calculation:

> Gemini's automated operational advances of BTC were very short in duration. The average time outstanding was 34 minutes, and 91 percent of the advances (weighted by volume of advances in BTC) were repaid in under an hour. The longest advance was outstanding for 26.4 hours and was less than 1 BTC in size.

*Id.*¶ 143. Skrzypacz's backup materials indicate that the average size of these automated advances was 5 bitcoin. Ex. 2, Skrzypacz Dep., at 169:3–12.

Gemini's false and misleading statements and omissions that will be presented at trial are not about automated advances. Rather, the statements concern one-off instances whereby Gemini "credited" a customer's account so that the customer could partake in the Gemini auction or trade on the Gemini exchange, later "debiting" the funds from the customer's account, without requiring that the customer provide funds of its own. Complaint, ECF No. 1, at ¶¶ 62–72. As

---

[7]    Skrzypacz also opines that operational advances did not impact whether customers prefunded their trades on Gemini or impact customers' cost of capital, but that opinion is now irrelevant in light of the Court's decision on the CFTC's motion for partial summary judgment finding Gemini liable for false or misleading statements regarding prefunding and cost of capital. *See supra* Section I.B.1 (collecting cases).

Skrzypacz points out, automated advances are common in financial services; what are uncommon, and what Gemini failed to disclose to the CFTC during the self-certification process, are "credits" provided to customers for their own trading when those customers otherwise would not have had sufficient funds to trade themselves. Such advances do not "address frictions" or "resolve delays"; they are intended to influence customers to trade more with Gemini.

The crux of Skrzypacz's opinion on operational advances is at paragraph 144 of his report. In that paragraph, he makes the following assertions: (1) the "limited duration" of operational advances meant the advances could not have been used for multiple trades or to transfer to another account; (2) the advances "would not have lasted long enough to facilitate additional trades beyond one that would have occurred anyway absent" transfer delays; (3) thus, the advances did not "artificially inflat[e] the number of trades on the Gemini exchange"; (4) "given the limited duration" of the advances, they "would not have materially affected market participants' cost of capital"; (5) thus, there is "no support for the CFTC's contention that the operational advances increased the susceptibility of the Gemini exchange to manipulation" (which, again, the CFTC has never contended). Skrzypacz Rep. ¶ 144. At his deposition, Skrzypacz admitted that each of these assertions related solely to automated advances. *See* Ex. 2, Skrzypacz Dep., at 182:23–190:1.

Skrzypacz explicitly acknowledges that his analysis of operational advances ignores the type of advances actually put at issue by the CFTC's complaint. At paragraph 145, Skrzypacz notes that "Gemini made 21 manual BTC advances between October 2016 and October 2017." Skrzypacz Rep. ¶ 145. Skrzypacz's backup material shows that the average size of the manual advances was approximately 771 bitcoin, roughly 150 times larger than the average automated advance. *See* Ex. 2, Skrzypacz Dep., at 169:13–23. He concludes—by virtue of unreliable

methodology to be discussed in the next section—that the manual advances comprised only 2% of the total operational advances by volume, presumably in an effort to minimize the importance of the manual advances, although he declines to say as much. *Id.* ¶ 145, Fig 7.1.

But Skrzypacz offers no opinion whatsoever about the impact that the manual advances—the advances actually put at issue by the CFTC—had on the Gemini exchange's susceptibility to manipulation. Though he offers that the automated advances, due to their "extremely short-term duration" could not have been used for more than one trade, he offers no opinion as to how many times the longer-term manual advances could have been used. And though he concludes that he finds no support for the CFTC's contention that automated advances increased the Gemini exchange's susceptibility to manipulation—an assertion that the CFTC has never contended—he offers no conclusions about what impact the manual advances might have had.

On its face, Skrzypacz's opinions on operational advances are irrelevant to any issue before the trier of fact. Testimony addressing *automated* advances—the only advances about which Skrzypacz offers an opinion—have no probative value to the issue of whether Gemini's failure to disclose its practice of granting *manual* advances could have affected the CFTC's consideration of whether the Gemini auction was readily susceptible to manipulation. The best illustrations of this conclusion are the two Figures that Skrzypacz offers in this section of his report. The first, Figure 7.1, is a pie chart comparing the volumes of automated bitcoin advances (98.04%) to manual bitcoin advances (1.96%). Skrzypacz Rep. ¶ 145, Fig. 7.1. The chart makes for a compelling visual, but, as discussed below, *see infra* Section I.C.2, does not consider how those volumes are affected by the duration that those different kinds of advances were outstanding. The second, Figure 7.2, is a bar chart showing the total number of bitcoin that was

advanced for various ranges of durations, with the bulk of the bitcoin landing in the shortest durations (*i.e.*, the automated advances). But the bars along the x-axis are the same width, regardless of whether the duration listed is 0–0.5 hours or 30–75 *days*, creating the misleading impression that bars of the same height would have the same relative importance despite some of them representing advances that lasted orders of magnitude longer than others. These charts, at least one of which Defendant intends to show to the jury, *see* Skrzypacz Rep. at D-56, appear to be designed to mislead, and are inadmissible. *See Estate of Anderson v. Strohman*, No. 13 Civ. 3167 (GLR), 2016 WL 4013638, at *8 (S.D.N.Y. July 27, 2016) (excluding experts' opinions where experts ignored facts in the record that contradicted their opinion); *Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013) (expert testimony cannot be based on "a misleadingly partial selection of relevant facts");

Skrzypacz spends exactly one paragraph on US dollar-based operational advances. *See* Skrzypacz Rep. ¶ 147. Relying only on a lay witness affidavit and deposition testimony, he concludes that Gemini's US dollar advances were "in effect for 24–48 hours" and "addressed a market friction related to electronic fund or wire transfers." Skrzypacz Rep. ¶ 147 n.230. From those two facts alone, Skrzypacz concludes that US dollar advances "did not impact the pre-funding of transactions or have a material effect on participants' cost of capital." *Id.* Skrzypacz does not analyze the length or size of Gemini's US dollar advances. He does not opine on whether US dollar advances could be divided into automated and manual groups. He does not even quantify such basic questions as the total amount of US dollars that Gemini advanced, or for how long they were advanced. Such an opinion is not "based on sufficient facts or data" to be admissible. Fed. R. Evid. 702(b).

Skrzypacz's opinions regarding operational advances are either irrelevant, unsupported, have probative value far outweighed by their danger of confusing the issues and misleading the jury, or a combination of the three. His opinions on this topic are inadmissible under Fed. R. Evid. 702 and 403, and should be precluded in their entirety.

### 2. Skrzypacz's analysis of operational advances is irrelevant, but even if deemed relevant, his conclusions are misleading

Even if Skrzypacz's opinions on operational advances were relevant, they are supported by analysis employing misleading methodology. Skrzypacz calculates that manual advances comprise less than 2% of the total volume of advanced bitcoin, the remaining 98% advanced automatically. Skrzypacz Rep. ¶ 145, Fig. 7.1. But the significance of one bitcoin of operational advance is not merely a function of its size, but also of how long it was advanced. The duration of an advance determines how long a customer can use the advance to trade bitcoin using the increased funds. The manual advances, which Skrzypacz largely ignores, facilitate more trading than automated advances because they remain outstanding for days or weeks or even months at a time, boosting trading volume in the Gemini auction and exchange for the duration.[8]

Skrzypacz acknowledges this fact. His opinions regarding automated advances, primarily set forth in paragraph 144 of his report, repeatedly refer to the duration of the advances as enabling his conclusions. He writes that the "limited duration of the advances" meant that automated advances would not enable a customer "to enter into multiple trades or to transfer funds to another account." Skrzypacz Rep. ¶ 144. As a result of automated advances "not . . . last[ing] long enough to facilitate additional trades . . . the advances did not have the effect of artificially inflating the number of trades on the Gemini exchange." *Id.* He concludes that

---

[8]      The operational advances also reduce customers' cost of capital and undermine Gemini's prefunding requirements, but the Court has already granted summary judgment on that category of false or misleading statements and omissions.

automated advances "would not have materially affected market participants' cost of capital, *given the limited duration of the advances*." *Id.* (emphasis added).

Skrzypacz's opinion on manual advances is thus a comparison of apples to oranges. When he wants to downplay the importance of automated operational advances, he repeatedly references their limited duration. But when Skrzypacz turns to analyze manual advances, he minimizes their importance by comparing their total volume to the total volume of the automated advances, *without* reference to either type's duration. Skrzypacz Rep. ¶ 145, Fig. 7.1. Thus, when Skrzypacz opines that "manual BTC advances represented only 1.96 percent of the total BTC advances Gemini provided by volume," but calculates that figure only in terms of volume, he is omitting one of the two variables relevant to any comparison between two groups of operational advances—duration. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (affirming district court's exclusion of expert because he "cherry-picked the facts he considered to render an expert opinion").

It is possible to calculate a duration-weighted impact of automated and manual operational advances using Skrzypacz's own backup data—and by doing so demonstrate how misleading his opinion is. Skrzypacz's backup data includes a table listing every automated advance in his data set, its size in bitcoin, and its duration in hours. *See* Ex. 7, Skrzypacz backup data, "Fig 7.1, 7.2, App 7.1-7.5.xlsx," "automated" tab.[9] Multiplying the size of each advance ("btc_amount" column on the spreadsheet) by its duration ("duration_hours" column on the spreadsheet) and dividing by 24 (to represent the product in terms of days instead of hours) results in the duration-weighted impact of each automated advance. The sum of all those weights is 19,020 "bitcoin-days." For manual advances, the same calculation results in a total of

---

[9]      The cited materials are an especially voluminous amount of data and can be provided to the Court electronically upon request.

205,549 bitcoin-days. *See* Ex. 8, Skrzypacz backup data, "Fig 7.1, 7.2, App 7.1 -7.5.xlsx,"

"manual" tab. Thus, using Skrzypacz's own data shows that manual advances comprised 91.5%

of the duration-weighted advances made by Gemini (205,549/(205,549 + 19,020) = 0.915).

The point of this exercise is not to engage in a battle over the particular calculations, but

rather to show that Skrzypacz's analysis of operational advances is utterly misleading. His own

opinions on automated advances are based entirely on their short-term duration, *see* Skrzypacz

Rep. ¶ 144, but his comparison between automated and manual advances completely excise

duration as a factor and focus solely on volume. His opinion that manual advances comprised

only 2% of the total amount of advances is based on a methodology that does not account for one

of the two relevant variables. Skrzypacz has not based his testimony "on sufficient facts or

data," Fed R. Evid. 702(b), and his conclusion is not a "reliable application of the principle and

methods to the facts of the case," Fed. R. Evid. 702(d), and is far too misleading and confusing

to be presented to the jury, Fed. R. Evid. 403. *See Pugliano v. United States*, 315 F. Supp. 2d

197, 199 (D. Conn. 2004) ("In deciding whether a step in an expert's analysis is reliable, the

court must undertake a rigorous examination of the data on which the expert relies, the method

by which he draws his opinions from such studies and data, and the application of the data and

methods to the case at hand."). Skrzypacz does not have "good grounds" for his conclusion, *see*

*Amorgianos*, 303 F.3d at 267, and the Court must exercise its gatekeeping function and exclude

Skrzypacz's testimony on operational advances entirely.[10]

---

[10]    Skrzypacz also offers two line graphs, *see* Skrzypacz Rep. Fig. 3.6, 3.7, comparing total monthly
operational advances to total volume on the same four competitor exchanges that he used for his analysis of whether
the Gemini auction was in fact manipulated, *see supra* Section II.A.2. His only conclusion from these graphs is that,
based on visual inspection of the graphs alone, "the trends in Gemini's Bitcoin and USD operational advances were
in line with overall trading activity in the Bitcoin market." Skrzypacz Rep. ¶ 59. He did not conduct any statistical
analysis, such as a linear regression, to quantify the strength of the correlation between these two sets of data. *See*
Ex. 2, Skrzypacz Dep., at 157:10–163:8 ("A: So your conclusion . . . is just based on looking at the graph? . . .
[objection from counsel] A: . . . [I]n my report, I do not offer any quantitative analysis, . . . like I don't offer a
number of, say, correlation co-efficient."). Here, Skrzypacz does not endeavor to apply his expertise in any

27

### D.    Bespoke Fee Arrangements

The CFTC's complaint alleges that Gemini made false or misleading statements to the Commission that the only fee schedules available to its customers were those posted on its public fee schedule when, in fact, Gemini had a long-standing practice of reaching bespoke fee arrangements with preferred customers, allowing such customers to pay lesser fees and receive higher rebates than the public schedule provided.  ECF No. 1, Complaint, at ¶¶ 88–96.  Not only was that program undisclosed, but Gemini also failed to disclose that during the Relevant Period, it discovered two of its customers had engaged in a wash or collusive trading scheme to generate millions of dollars of fee rebates by trading repeatedly with each other and reaping the benefit of their bespoke fee arrangements.  *Id.* ¶¶ 97–107.  Not only did Gemini omit these special programs, but its reported volume disclosures were inflated due to certain customers being additionally incentivized to trade.  *Id.* ¶ 117.

### 1.    Skrzypacz's analysis of bespoke fee arrangements' similarity to publicly available fee schedules rests on unsound methodology

Skrzypacz opines that the bespoke fee arrangements between Gemini and select customers "generally did not differ markedly from Gemini's publicly disclosed fee schedules." Skrzypacz Rep. ¶¶ 14, 60, 151, Fig. 3.8.  His opinion, however, is based on an unreliable methodology that compares a selection of bespoke fee arrangements to the publicly available fees at a single point in time.

---

meaningful respect; instead, he is merely "attribut[ing] [his] opinion to simple logic rather than any application of principles."  *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d at 484.  Basing his conclusion on visual inspection alone reduces his opinion to that of a lay witness, *Arista Recs. LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011) ("A court should not admit expert testimony that is 'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'"), and it thus should be excluded under Fed. R. Evid. 703(c) as not based on reliable methodology.

The basis for Skrzypacz's opinion is set forth at paragraph 60 and Figure 3.8 of Skrzypacz's report.  Figure 3.8 is a chart that shows the "maker fees" and "taker fees"[11] available to twelve Gemini customers as of March 15, 2017, and the same fees that Gemini offered to the public on its website as of March 11, 2017.  The publicly available fees vary according to whether the customer qualified as a "high volume," "medium volume," or "low volume" customer;[12] generally, the more that a customer traded on Gemini, the more advantageous the maker and taker fees and rebates the customer received.  Skrzypacz draws his conclusion that the bespoke and public fee arrangements "did not differ markedly" from Figure 3.8 alone.

There are multiple problems with Skrzypacz's analysis, which appears to be designed to mislead by obscuring the relevant data.  The first problem is one of chart design, which can be understood by, for example, looking at the publicly available fee arrangement for high-volume customers.  Figure 3.8 shows a continuous red line ranging from a 15-basis point rebate to a 15-basis point fee.  By visualizing the publicly available maker and taker fees as a continuous line Skrzypacz's chart suggests that high-volume Gemini customers could receive the full range of fees and rebates anywhere along the expanse of the line.  This was not the case.

Taker fees available to the public were either 25 basis points for most customers or 15 basis points for high-volume customers (*i.e.*, customers who had traded over 10,000 BTC in the

---

[11]     "Maker fees" refer to the fees charged or rebates given by Gemini for orders that rest on Gemini's continuous order book thus creating liquidity on the Gemini exchange that other customers can trade into.  *See* Ex. 3, Gemini, "Trading Fees & Rebates," at 2 (describing the difference between maker and taker fees). "Taker fees" refer to the fees charged by Gemini for orders that match with those resting orders, thus removing liquidity from the Gemini exchange.  *Id.*  If a "maker fee" is listed as a negative number in Figure 3.8, that means the customer was entitled to a rebate for market making orders, calculated in basis points.  *Id.* at 3; Skrzypacz Rep. ¶ 60.

[12]     Skrzypacz explains the difference between these three categories of customers: "Gemini's publicly available fee arrangement examples assume 30-Day Gross Trading Volume (BTC) greater than 10,000 BTC for High Volume Fee, between 3,000 and 5,000 BTC for Medium Volume Fee, and less than 1,000 BTC for Low Volume Fee."  Skrzypacz Rep. at Fig. 3.8 n.2; *see also* Ex. 3, Gemini, "Trading Fees & Rebates," at 3–5 (tabulating the public maker and taker fee structure by, among other things, customer trading volume).

prior 30 days). *See* Ex. 3, Gemini, "Trading Fees & Rebates," at 5 (webpage archived as of

March 11, 2017), available at https://web.archive.org/web/20170311141156/https://gemini.com/

fee-schedule/ (produced by Gemini as Skrzypacz's source for the public fee schedule shown in

Figure 3.8 of his report). Maker fees and rebates spanned a range, depending on the customer's

trading history, but high-volume customers received a rebate of between zero and 15 basis points

(they never paid a maker fee). *Id.* at 3. Thus, under the publicly available fee schedule a high-

volume customer could earn between zero and 15 basis points (for maker trades) or pay a 15-

basis point fee (for taker trades). It was not possible under the public schedule for a high-volume

customer to pay between zero and 15 basis points. *See id.* at 3–7. Yet six of the twelve bespoke

fee arrangements displayed in Figure 3.8[13] show either a maker or taker fee of zero to 15 basis

points, *i.e.*, a fee that falls within what should be shown as a gap for high-volume customers.[14]

Skrzypacz simply has no basis to conclude that the customers listed in his chart had fees that

"did not differ markedly from Gemini's publicly disclosed fee schedules." Figure 3.8 should be

displaying the taker fee end of the public fee schedule as dots, separated from the relevant maker

fee range. Instead, Skrzypacz's chart shows a continuous line.

   The methodological flaw is even more clear for the selection of bespoke fee

arrangements in Skrzypacz's table. The list of "Gemini Fee Overrides & Rebates" that

Skrzypacz cites as his source for bespoke fee arrangements shows that each customer received a

set maker fee or rebate, a set taker fee, and a set auction fee or rebate—not a range of fees. *See*

Ex. 4, "Gemini Fee Overrides & Rebates" (produced as backup to Skrzypacz's report). For

---

[13]    Circle, Effex, Satoshi Kobayashi, SFOX, Bitspread, and Hiroki Hayashi.

[14]    The comparable gap for medium-volume customers falls between a fee of 10 and 25 basis points, a range
within which again 6 of the 12 listed Gemini customers (Susquehanna, Octagon Strategy, Alram, Pythagoras, Hiroki
Hayashi, and SK4 Investment Group) were given bespoke maker fees. The public schedule for low-volume
customers would have no such gap, but notably all but one of the customers listed in Figure 3.8 received a taker fee
10 or more basis points less than the 25-basis point fee applicable to public low-volume customers, a fact that
likewise cannot support a conclusion that the bespoke fees were "similar" to the public fees schedule.

example, by using a continuous blue line, Figure 3.8 creates the appearance that Octagon

Strategy Limited was eligible for fees and rebates between -15 and 15 basis points, but

Skrzypacz's own supporting documentation shows that during the relevant period Octagon

received *only* a 15-basis point maker rebate and paid *only* a 15-basis point taker fee. *Id.* at 2 (on

the ninth line, showing Octagon's bespoke fee arrangement in March 2017). Figure 3.8's line

connecting the two endpoints is deeply misleading, yet Skrzypacz relies on the overlap among

the lines showing ranges of maker and taker fees to conclude that the public and bespoke fees

were similar. Skrzypacz's opinion should be excluded. *See SEC v. Lek Sec. Corp.*, 370 F. Supp.

3d 384, 415 (S.D.N.Y. 2019), *modified on reconsideration on other grounds*, No. 17 Civ. 1789

(DLC), 2019 WL 2114067 (S.D.N.Y. May 8, 2019) (excluding an expert's opinion entirely as

"misleading or unreliable"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust

Litig.*, 638 F. Supp. 3d 227, 267 (E.D.N.Y. 2022) (excluding as misleading a specific

parenthetical within a single paragraph of an expert opinion); *cf. also Daubert*, 509 U.S. at 595

("Expert evidence can be both powerful and quite misleading because of the difficulty in

evaluating it. Because of this risk, the judge in weighing possible prejudice against probative

force under Rule 403 of the present rules exercises more control over experts than over lay

witnesses.").

The second issue with Skrzypacz's methodology is that he does not analyze whether the

customers listed as having received bespoke fee arrangements would have qualified as high-,

medium-, or low-volume customers. *See* Ex. 2, Skrzypacz Dep., at 205:6–206:13 ("Q: What

steps did you take to determine whether each of these customers in Figure 3.8 fell within the

buckets of high, medium, or low volume on the public fee schedules? A: I did not look into this

and -- I did not look into this."). According to Skrzypacz's chart, "high volume" customers

could receive 15-basis point maker rebates, but "medium volume" customers could receive maker rebates only as high as 5 basis points and "low volume" customers *paid* maker fees of no lower than 10 basis points. Thus, to take Octagon Strategy Limited as an example again, its 15-basis point rebate for market making is "not markedly different" from the public available fees only if it qualifies as a "high volume" customer. If Octagon had been a medium- or low-volume customer, then its maker incentive would have been capped either at a 5-basis point rebate or a 10-basis point fee, respectively; the 15-basis point maker rebate it received would thus have been 10 to 25 basis points more generous than what Gemini made available to the public.

Skrzypacz did not analyze Octagon's trading history to determine in which volume bucket it qualified, *id.* at 205:18–22 ("Q: Did you take any steps to determine whether Octagon Strategy was a high-volume fee—would have qualified for high-volume fees according to their trading? A: I did not."), and he therefore has no basis to conclude that Octagon's bespoke fees were "not markedly different" from the public fees. The same goes for Octagon's 15-basis point taker fee. As discussed above, taker fees as low as 15 basis points (instead of the publicly posted 25 basis points) were available only to "high volume" customers. But Skrzypacz takes no steps to determine whether Octagon so qualified. The same methodological deficiency applies to virtually all of the 12 customers Skrzypacz lists in Figure 3.8. Skrzypacz's opinion that Gemini's bespoke fees were "similar" to what was offered to the public must be excluded." *See Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[*A*]*ny* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*").

Lastly, Skrzypacz's opinion on Gemini's bespoke fee arrangements is inadmissible because it is based on only a snapshot of extant public and bespoke fees in the middle of March 2017, but he offers his opinion as though it applies to the entire relevant period of the case. He proffers no information about what fee structures looked like either before or after this time. By limiting his analysis to this snapshot in time, Skrzypacz conveniently ignores both larger maker and auction rebates provided in 2016 as well as the bespoke fee arrangements that allowed two Gemini customers, HashTech and Cardano, to engage in collusive or wash trading with each other in an effort to farm millions of dollars in rebates from Gemini, *see* Complaint, ECF No. 1, at ¶¶ 98–102; Skrzypacz Rep. ¶ 157. For these reasons, Skrzypacz's opinion that Gemini's bespoke fee arrangements were "not markedly different" from its publicly disclosed fee schedule neither "is the product of reliable principles and methods," nor does it "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d).

### 2. The remainder of Skrzypacz's opinions on bespoke fee arrangements are irrelevant

The remainder of Skrzypacz's opinions on Gemini's bespoke fee arrangements concern (1) whether the existence of the bespoke arrangements led to the type of collusive trading engaged in by HashTech and Cardano in August 2017, and (2) whether HashTech and Cardano's collusive trading affected the price of bitcoin on the Gemini exchange. *See generally* Skrzypacz Rep. ¶¶ 148–63.

Skrzypacz first opines that, except for HashTech and Cardano, the "fee arrangements [] generally do not appear to have encouraged or led to the types of abusive trading behavior that the CFTC alleges could have affected prices and apparent volume, liquidity, or number of participants trading on the Gemini exchange and Bitcoin auction." Skrzypacz Rep. ¶¶ 14, 156. As elaborated in more detail above, *see supra* Section I.A.1, this opinion is irrelevant to the facts

before the jury. The jury will be tasked with finding, with respect to Defendant's false or misleading statements about rebates, whether Gemini knew or should have known that by failing to disclose its bespoke fee arrangements to the CFTC that its disclosures on fee arrangements were false or misleading, and that the omitted information had the ability to impact the CFTC's consideration of the proposed bitcoin futures contract. That inquiry is irrelevant to Skrzypacz's opinion whether the bespoke fee arrangements *actually* resulted in price manipulation on the Gemini exchange. In other words, whether or not the bespoke fee arrangements affected the price, the CFTC's allegation is that Gemini made false or misleading statements and omissions about the existence of the agreements in the first place. Analysis of whether bespoke fee arrangements led to price manipulation does not reach the question of whether notifying the CFTC of bespoke fee arrangements that might incentivize abusive trading had the capacity to influence the CFTC's decision-making.

Lastly, Skrzypacz asserts that the collusive trading between HashTech and Cardano did not affect prices on the Gemini exchange. Skrzypacz Rep. ¶¶ 159–63. The CFTC need not prove that it did. Again, Skrzypacz's testimony would imply to the jury that the CFTC must meet a much higher bar of materiality than the law requires. Put differently, Skrzypacz's opinion suggests that for the HashTech and Cardano scheme to be material the price of bitcoin must have been affected, whereas the law requires that the CFTC show merely that Gemini's non-disclosure of the scheme had the capacity to influence the CFTC's review of Gemini's fee and rebate structures. *eFloorTrade, LLC*, 2018 WL 10625588, at *8. The CFTC can show that not knowing about HashTech and Cardano's scheme deprived it of the ability to properly analyze Gemini's susceptibility to manipulation regardless of whether the price of bitcoin had been impacted. And whether or not the scheme impacted price, it still could—and did—impact the

34

volume of bitcoin traded on Gemini, which is another category of alleged false or misleading statements or omissions that the HashTech and Cardano scheme relates to. The CFTC alleges that Gemini did not disclose that its volume figures included "substantial amounts of trading" resulting from the HashTech and Cardano scheme, ECF No. 1, Complaint, at ¶ 119, a fact that Skrzypacz *agrees* with: "[T]he wash trades of HashTech and Cardano did have the effect of boosting Gemini's continuous order book volume over a short period of time," Skrzypacz Rep. at ¶ 163. Whether their collusive trading also affected price is not at issue in this case.

Skrzypacz's opinions on bespoke fee arrangements are inadmissible due to methodological errors, and are irrelevant to the issues that will be presented to the jury. His opinions on this topic should be precluded.

### E. Skrzypacz's Analysis of Self-Trading Relies on Gemini's Own Lay Terminology to Arrive at an Unsound Conclusion

The CFTC's complaint alleges that Gemini made false or misleading statements and omissions to the Commission during the self-certification process about the extent and possibility of self-trading on Gemini's platform, including by representing that self-trading was prohibited, that it had instituted self-trading prevention, and that self-crossing was not possible on the Gemini exchange and auction. *See* ECF No. 1, Complaint, at ¶ 73–76. In fact, as alleged in the Complaint, Gemini had no self-trade prevention prior to May 2017, and prior to that date self-trading not only occurred regularly but during certain months it comprised a majority of the trading volume on the Gemini auction. *Id.* ¶¶ 80–87. Self-trading also continued to occur on Defendant's platform after May 2017. Further, by omitting mention of historical self-trading, Gemini's trading volume reported to the CFTC was misleadingly overinflated.

Skrzypacz opines that self-trading prevention measures that Gemini implemented in its auction in May 2017 "worked and that self-trading did not occur after they implemented the

restrictions." Skrzypacz Rep. at ¶¶ 14, 164–68. As background, Skrzypacz outlines that Gemini implemented measures in March 2017 to prevent a customer from matching its own buy and sell orders on its continuous order book (*i.e.*, the exchange), and implemented measures in May 2017 to prevent a customer's buy and sell auction-only orders from matching in the auction. Skrzypacz Rep. at ¶ 166. As Skrzypacz acknowledges, however, "the same account potentially could execute trades in opposite directions in the auction as a result of an auction-only order and open order on the continuous order book." *Id.* ¶ 168 n.266. Not just potentially: Skrzypacz analyzed the auction data and found that this type of self-trade—where a customer's auction order crosses in the auction with its resting exchange order—occurred in the auction in "29 of the 333 successful auctions in 2017." *Id.* In fact, Skrzypacz's backup data shows that 15 of the 29 auctions where folding occurred happened after May 2017, when self-trade prevention in the auction was implemented, and before the listing of the bitcoin futures contract in December 2017. *See* Ex. 5, Skrzypacz backup data, "Section IX Folding Transactions In Text Calc.xlsx," "Daily" tab, at 6–10 (indicating with a "1" in the rightmost column the days on which Skrzypacz observed so-called "folding" in the Gemini auction).

To conclude, therefore, that self-trading "did not occur after [Gemini] implemented the restrictions," Skrzypacz relies entirely on a definition of "folding" suggested by a lay witness, Rose Toomey. Skrzypacz writes that trades between the continuous order book and auction order book "does not constitute self-trading, as the trader does not control the price or amount that might be filled in the auction given the way the orders are aggregated in the auction." Skrzypacz Rep. ¶ 168 n.266 (citing Deposition of Rose Toomey, at 359:9–24). Skrzypacz does not adopt this definition himself, rather he states that he "understand[s] that Gemini refers to the continuous order book trades executed on the auction as being 'folded' into the auction." *Id.* In

other words, the reason he does not consider to be self-trading a trade where a customer's

continuous order book open order gets filled in the auction by the same customer's auction order

book is *because* Rose Toomey considers such a trade to be folding.  This is not the opinion of an

expert.  It is simply parroting the position of Gemini and its employee.  *See* Fed R. Evid. 702(c);

*Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*, No. 03 Civ. 969 (CSH), 2006 WL

1319543, at *8 (S.D.N.Y. May 11, 2006) (granting motion to exclude expert testimony where

court found expert was, in large measure, parroting the testimony of the plaintiff); *King–Ind.*

*Forge, Inc. v. Millennium Forge, Inc.*, No. 07 Civ. 00341 (SEB) (DML), 2009 WL 3187685, at

*2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information

provided to him by a party, that opinion is generally excluded.").

## II.     The Court Should Exclude the Summary Slides Skrzypacz Proposes to Present at Trial

Appendix D to Skrzypacz's report provides a "Summary of Opinion Slides."  *See*

Skrzypacz Rep. at App'x D.  The Court need not address the admissibility of the summary slides

if the Court concludes that Skrzypacz's testimony is inadmissible.  In the event Skrzypacz's

testimony is admissible in whole or in part, the Court should exclude the summary slides, which

merely repeat the opinions set forth in Skrzypacz's written report.  *Crown Cork & Seal Co.*

*Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12 Civ. 05803 (JLG), 2013 WL 978980, at

*7 (S.D.N.Y. Mar. 12, 2013) (collecting cases and observing that "[c]ourts have held that where

an expert is expected to testify at trial, his report is inadmissible hearsay and redundant").  Expert

reports are not admissible, and Defendant cannot circumvent this bedrock principle by reducing

Skrzypacz's report to PowerPoint slides.

## **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that the Court entirely

exclude the testimony of Defendant's proposed expert, Andrzej Skrzypacz.

Dated: New York, New York
       November 15, 2024

                                    Respectfully submitted,
                                    COMMODITY FUTURES TRADING
                                    COMMISSION

                                    By:    */s/ Peter Janowski*

                                    Diana Wang
                                    Andrew J. Rodgers
                                    Katherine Rasor
                                    Peter Janowski
                                    Alejandra de Urioste
                                    K. Brent Tomer

                                    Division of Enforcement
                                    290 Broadway, 6th Floor
                                    New York, NY 10007
                                    Phone: (646) 746-9700
                                    Fax: (646) 746-9888