UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

        v.

GEMINI TRUST COMPANY, LLC,

                Defendant.

22-cv-4563 (AKH)

Hon. Alvin K. Hellerstein

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT GEMINI TRUST COMPANY, LLC'S DAUBERT MOTION TO
<u>PRECLUDE CERTAIN EXPERT TESTIMONY OF LAWRENCE E. HARRIS</u>**

COMMODITY FUTURES TRADING
COMMISSION
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.     Harris's Opinions Assist the Jury and Gemini's Arguments to the Contrary Should be Rejected ........................................................................................................................ 4

         A.     Harris Does Not Propose to Testify about the CFTC's Internal Procedures .......... 4

         B.     Given the Court's Ruling on *Janus*, Harris Can Characterize Gemini as "Making" the Alleged False or Misleading Statements and Omissions ................................. 6

         C.     Harris Does Not Opine on Gemini's State of Mind ................................................. 7

         D.     Harris Can Use Chat Narratives to Develop His Opinions .................................... 9

II.    Harris's Opinions Are Reliable Under *Daubert* ............................................................... 11

         A.     Harris's Opinions and Characterizations Are Supported by His Extensive Experience and Expertise as an Economist ............................................................ 11

         B.     Harris's Opinion on Whether Pearl Street Loans Were Market Rate Are Sufficiently Supported ................................................................................................. 13

CONCLUSION ....................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.*,
 769 F. Supp. 2d 269 (S.D.N.Y. 2011) ............................................................................................ 4

*Cooper Crouse-Hinds, LLC v. City of Syracuse*,
 568 F. Supp. 3d 205 (N.D.N.Y. 2021) .......................................................................................... 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993) .................................................................................................................. 3, 4

*Highland Capital Management, L.P. v. Schneider*,
 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................................................ 9

*In re Blech Securities Litigation*,
 No. 94 Civ. 7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ................................................ 12

*In re Fosamax Products Liability Litigation*,
 645 F. Supp. 2d 164 (S.D.N.Y. 2009) ............................................................................................ 4

*Janus Capital Group, Inc. v. First Derivative Traders*,
 564 U.S. 135 (2011) ....................................................................................................................... 5

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) ....................................................................................................................... 3

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
 97 F. Supp. 3d 485 (S.D.N.Y. 2015) .............................................................................................. 9

*Nimely v. City of New York*,
 414 F.3d 381 (2d Cir. 2005) ........................................................................................................... 4

*Scott v. Chipotle Mexican Grill*,
 315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................................................................... 7

*SEC v. Lek Securities Corp.*,
 370 F. Supp. 3d 384 (S.D.N.Y. 2019) .......................................................................................... 12

*SEC v. Lek Securities Corp.*,
 No. 17 Civ. 1789, 2019 WL 1512713 (S.D.N.Y. Apr. 8, 2019) ............................................. 9, 12

*Washington v. Kellwood Co.*,
 105 F. Supp. 3d 293 (S.D.N.Y. 2015) .......................................................................................... 14

**Rules**

Fed. R. Evid. 702 ......................................................................................................................... 4

**Regulations**

17 C.F.R. pt. 38, App'x C .......................................................................................................... 5

Plaintiff Commodity Futures Trading Commission ("CFTC," or "Plaintiff") respectfully submits this Opposition to the motion of Defendant Gemini Trust Company, LLC ("Gemini," or "Defendant") under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to preclude certain of the expert testimony of Plaintiff's expert Lawrence E. Harris, ECF No. 169.

## PRELIMINARY STATEMENT

Defendant's motion to preclude certain testimony of the CFTC's expert, Lawrence Harris, does not challenge the admissibility of any of his core opinions regarding self-trading, wash trading, bespoke fee arrangements, prefunding, operational advances, or the Pearl Street loans. Defendant does not challenge Harris's qualifications, nor does it challenge his primary principles and methods. Unable to target Harris's core opinions and conclusions, Defendant instead takes potshots at peripheral targets. Mischaracterizing and taking many statements out of context, Defendant argues that discrete and scattered snippets of Harris's report should be excluded as unreliable and unhelpful to the jury. For the reasons discussed below, Defendant's nitpicks are both immaterial and wrong. Harris's opinions and proposed testimony meet the requirements of *Daubert*, and the motion should be denied.

## BACKGROUND

On May 15, 2024, the CFTC disclosed to Gemini the proposed expert testimony of Professor Lawrence Harris ("Harris Report"). Harris has held a Ph.D. in economics for 42 years and is currently a professor of economics at the Marshall School of Business at the University of Southern California. His research spans the areas of financial market microstructure, investment management, volatility, and econometrics, and he has published extensively on trading rules, transaction costs, index markets, and market regulation. Harris quite literally wrote the book on

1

the economics of trading[1] and has received numerous awards for his scholarship.

But Harris is not just an academic—he has a wealth of real-world experience that also informs his opinions. He served as the Chief Economist for the Securities and Exchange Commission from 2002 to 2004. He currently acts as the lead independent director of Interactive Brokers, one of the world's largest electronic brokers, and is the director or trustee for several mutual funds. He is also an experienced expert witness, having served in that role in more than 20 cases. Harris is undoubtedly qualified to both opine on the market structures and economics relevant to this case and to conduct statistical and economic analyses to quantify the impact of Defendant's alleged false or misleading statements or omissions. *See generally* Harris Rep. ¶¶ 1–10. While Defendant halfheartedly "question[s] whether Harris is sufficiently qualified to opine about Pearl Street's practices," Def. Mot. 20, ECF No. 170, Defendant does not actually challenge his opinion on this basis and does not otherwise attack his qualifications.

The Harris Report reaches five major conclusions: (i) self-trading occurred on the Gemini exchange every month from September 2016 to July 2017 (i.e., including after Gemini implemented self-trade prevention), and comprised as much as 20% of Gemini's total volume in three of those months; (ii) wash trading between two Gemini customers, HashTech and Cardano, constituted a substantial portion of Gemini's total trading volume in August 2017; (iii) Gemini provided undisclosed bespoke fee arrangements to numerous customers during 2016 and 2017; (iv) Gemini provided operational advances to generate auction trade volume, and the advance recipients comprised more than four times the auction volume of all other participants combined; and (v) Pearl Street gave Gemini customers below market-rate loans, and the correlation between

---

[1] Lawrence Harris, *Trading and Exchanges: Market Microstructure for Practitioners* (Oxford University Press, 2003).

2

loan volume and loan recipients' trading volume on Gemini was statistically significant. *See generally* Harris Rep. ¶¶ 13–24. Harris's report also provides background on relevant economic principles of trading and related terminology, summarizes standard compliance procedures at exchanges, and examines the volume data reported in the self-certification letter submitted to the CFTC for listing the bitcoin futures contract at issue in this case. *Id.* ¶¶ 25–43, 138–43. The report paints a compelling picture of the falsity and materiality of Defendant's statements and omissions to the CFTC.

Rather than address Harris's core conclusions, Defendant nitpicks stray words and phrases in Harris's report, often mischaracterizing them or taking them out of context. Defendant makes six arguments: (1) that three sentences in the report improperly address the CFTC's internal deliberations; (2) that Harris improperly asserts that Gemini "made" certain of the alleged false or misleading statements or omissions; (3) that select words in the Harris Report imply he will opine on Defendant's state of mind; (4) that Harris impermissibly includes chat transcripts in his report; (5) that four sentences in Harris's report relating to operational advances, publication of exchange rules, and the Pearl Street loans, are unsupported; and (6) that Harris's opinion on whether Pearl Street loans were below market rate was based on insufficient data.

For the reasons discussed below, each of these arguments fail on the merits.

## LEGAL STANDARD

The Supreme Court has explained that a district court has a "gatekeeping" role with respect to expert opinion testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In fulfilling this gatekeeping role, the district court must evaluate the expert based on three criteria: (1) qualifications, (2)

reliability, and (3) relevance. Fed. R. Evid. 702; *see also Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009). The party seeking to offer expert testimony bears the burden of showing, by a preponderance of the evidence, that such testimony is admissible. *Daubert*, 509 U.S. at 592 n.10; *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 281 (S.D.N.Y. 2011).

## ARGUMENT

I. **Harris's Opinions Assist the Jury, and Gemini's Arguments to the Contrary Should Be Rejected**

A. **Harris Does Not Propose to Testify about the CFTC's Internal Procedures**

Gemini first argues that Harris "assume[s] the role of advocate" by proposing to "testify[] about the CFTC's internal processes," which it claims he is unqualified to do. Def. Mot. at 7–9. Defendant also argues that Harris should be blocked from "introducing evidence [the CFTC] refused to provide in discovery." *Id.* at 9. In support, Defendant points to just three sentences in two paragraphs of Harris's report (Harris Rep. ¶¶ 25, 42), which Defendant argues show that Harris is intending to testify about information the CFTC has claimed throughout this litigation to be protected by the deliberative process privilege.

Harris does not purport to be an expert on the CFTC's internal deliberations, nor does he intend to introduce any deliberative privilege evidence not provided in discovery, and his proposed testimony does not suggest otherwise. The sentences that Gemini moves to exclude relate to Gemini's reported trading volume—references therein to the CFTC are trivial and do not implicate the CFTC's internal deliberations. Paragraph 25 simply restates the CFTC's allegations in its Complaint. *See* Harris Rep. ¶ 25 ("The CFTC's allegations in this matter concern Gemini's failure to reveal all incentives that may have increased Gemini's reported

4

trading volumes upon which the CFTC would have relied in making regulatory decisions."); Compl. ¶ 117 ("Gemini did not disclose and omitted that the information included trading by customers who were offered special fee rebate incentives and 'fee overrides' to preferred market participants, including incentives designed to induce trading in the Gemini Bitcoin Auction.") *id.* ¶ 113 (alleging that statements about trading volume were material). And Paragraph 42 merely observes that Gemini put its volume data front-and-center in the self-certification documentation, and that, of course, the CFTC would want to know that data was accurate. *See id.* ¶ 42 ("This self-certification application relied upon volume data reported by Gemini to assure the CFTC and the public that the proposed contract would regularly settle fairly and with limited potential for manipulation. The CFTC thus has a strong interest in the accuracy of Gemini's reported volume data and all processes that led to trades in the Gemini markets."). These sentences, which do not form the crux of any of Harris's opinions, do not implicate any specialized or inside knowledge of CFTC decision-making processes, either as a general matter or specifically as it relates to this case.

Far from implicating any specialized knowledge or privileged information, trade volume is *publicly known* as a material factor in the CFTC's analysis of whether a contract is susceptible to manipulation. The CFTC's published guidance on Core Principle 3 specifically cites the "size and liquidity of the cash market that underlies the contract" as fundamental factors in "evaluating the susceptibility of a cash-settled contract to manipulation." 17 C.F.R. pt. 38, App'x C at (c)(2). The guidance continues: "In particular, situations susceptible to manipulation include those in which the volume of cash market transactions . . . are very low." *Id.* Harris is not acting as an advocate for the CFTC simply by reciting public guidance that accurate volume reporting is

5

important to evaluating whether a futures contract is susceptible to manipulation. Defendant's motion in this regard should be denied.

> **B.     Given the Court's Ruling on *Janus*, Harris Can Characterize Gemini as the "Maker" of the Alleged False or Misleading Statements and Omissions**

Gemini also argues that Harris should be precluded from testifying that Gemini "made" certain statements and representations to the CFTC on the ground that "such testimony would impermissibly suggest to the jury what conclusions to reach on the ultimate issues." Def. Mot. at 9–11. To the extent that this argument is premised on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Court has already granted summary judgment to the CFTC on this issue. *See* Order on Pl's Mot. for Summ. Judg., ECF No. 182, at 10 ("Gemini, which drafted, edited, and provided information given or sent directly to the CFTC, and also communicated through the CFE to the CFTC, had ultimate authority over each of the alleged misstatements."). Thus, Gemini's argument on this portion of Harris's testimony is moot. The Court has already decided this ultimate issue, and Harris can testify consistent with the Court's order.

Moreover, Harris's statements concerning Gemini's representations are merely background—their purpose is simply to provide context for his analysis and conclusions regarding self-trading in the Gemini auctions. *See* Harris Rep. ¶ 44 (describing background and conclusions regarding self-trading); *id*. ¶ 45-58 (describing analysis supporting self-trading conclusions). Defendant in any event does not attempt to exclude or otherwise discredit Harris's core conclusion that "self-trading inflated the Gemini Auction volumes reported to the CFTC and was occurring in the Gemini Auctions after Gemini represented to the CFTC that it had prevented it." Harris Rep. ¶ 44.

### C.     Harris Does Not Opine on Gemini's State of Mind

Defendant argues that Harris "repeatedly offers conclusions about the intent, knowledge, motivations, and state of mind of Gemini and others" that the Court should exclude. Def. Mot. at 11–13. In support, Defendant lists seven quotes from the Harris Report that contain words or phrases that Defendant claims are objectionable. *Id.* at 11. Not one of the quotes comprises Harris's opinions. Harris's opinions focus on his economic and statistical analysis of the business practices discussed in the Complaint—Pearl Street loans, operational advances, self-trading, wash trading, and bespoke fee arrangements. His opinions do not concern his interpretation of Gemini's (or any other person's) intent or state of mind.

The statements that Gemini singles out for exclusion are, at worst, inartfully phrased; but most of those statements do not comment on state of mind at all. For example, Defendant quotes Harris writing that Gemini "permitted wash trading by individual traders engaged in self-trading," and highlights "permitted." *Id.* at 11 (quoting Harris Rep. ¶ 144). This is just a statement of fact: it is undisputed that self-trading occurred on Gemini's exchange and auction, and that automated self-trade prevention was not in place to prevent it, until March and May 2017. *See* Def. Resp. to CFTC 56.1 Stmt. ¶ 148, ECF No. 106 ("Undisputed that self-trading occurred before Gemini prevented it.").[2] Gemini's failure to implement self-trade prevention is fairly characterized as "permitting" such trading. Likewise, Harris's statement that the Pearl Street loans were given to market participants "to induce trading on the exchange," *id.* at 11 (quoting Harris Rep. ¶ 113) is not an opinion about anyone's statement of mind; rather, it is

---

[2] Even after Gemini implemented self-trade prevention measures, it was still possible for a single account to trade with itself between the auction book and continuous order book. *See* Def. Resp. to CFTC 56.1 Stmt. ¶ 150 ("Undisputed that Gemini did not prevent a single account's continuous book and auction book orders from crossing. Disputed that such trades are self-trades.").

7

merely a preview of what Harris proceeds to show via statistical analysis and review of loan documents, including (1) an analysis demonstrating that "[t]otal Pearl Street Loans outstanding correlate with significantly higher volumes for the Loan recipients in the Gemini Auction and Gemini Continuous Market," Harris Rep. ¶ 136, and (2) a contract with Gemini customer XBTO that explicitly required XBTO to maintain trading volume on Gemini's auction and exchange, Harris Rep. ¶ 122.  *See generally* Harris Rep. ¶¶ 115-37.

The cases Defendant cites are inapposite.  For example, *Scott v. Chipotle Mexican Grill* concerned an expert who, based on his experience in the food industry, was permitted to testify about Chipotle's business model but was not permitted to assign motivation or intent behind the business model.  315 F.R.D. 33, 45–46 (S.D.N.Y. 2016).  By contrast, when Harris says, for example, that bespoke fee arrangements were used "to boost" volumes, *see* Def. Mot. at 11 (quoting Harris Rep. ¶ 92), he says so only as a summary of explicit quotes from the record where Gemini employees stated that the fee arrangements helped encourage activity in the auction, *see* Harris Rep. ¶ 92 & n.58 (collecting evidence from the record).  The roughly eight sentences that Defendant nitpicks from Harris's 75-page report do not reflect Harris "ventur[ing] to draw . . . inferences about the intent or motive of parties."  Def. Mot. at 13.

Furthermore, to the extent that the statements highlighted by Defendant can be read to opine about Defendant's state of mind, Defendant is simply wrong that Harris "lacks the requisite knowledge to opine" about it.  While Defendant argues that Harris "has not claimed any particular expertise on the intent, motive or state of mind of corporations or regulatory agencies," Def. Mot. 12 (quotation omitted), this flatly contradicts Harris's stated qualifications.  Harris has, in fact, written the standard textbook on the economics of trading, including a chapter that expressly addresses "*how and why exchanges give traders fee incentives to encourage them to*

8

*trade.*" Harris Rep. ¶ 8 (emphasis added). He is therefore well qualified to opine on issues relating to Defendant's hope, purpose, and intent in giving traders incentives to trade. The motion should be denied.

D.     **Harris Can Use Chat Narratives to Develop His Opinions**

Gemini moves to preclude Harris from "offering a narrative of the various chat messages he reviewed in connection with his analysis" of operational advances because it would "rehash[] otherwise admissible evidence about which he has no personal knowledge." Def. Mot. at 13–17 (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005)). This argument mischaracterizes the purpose of Harris's proposed testimony reviewing Gemini's internal chat messages.

One of Harris's opinions regarding operational advances is that "evidence from Gemini's record of customer credits and debits, customer trading data, and various chat messaging indicates that Gemini granted operational advances to generate auction trade volume in the Gemini Auction." Harris Rep. ¶ 21. To support this opinion, Harris conducted both a statistical analysis to prove correlation between operational advances and increased trading volume on Gemini, and also a review of internal chat messages to understand how the advances were used in day-to-day practice. Harris relies on the chats cited by Gemini, *see* Harris Rep. Figs. 28 & 29, to document evidence in the record that, in his opinion, supports the conclusion he reached via statistics. In his words: "Evidence from recorded Gemini chats with [customers who received advances], and chats within Gemini, supports the conclusion that Gemini granted the Operational Advances to increase Gemini Auction volumes, as the statistical relation between Operational Advances and Gemini Auction Volume suggests." *Id.* ¶ 106.

As Defendant itself admits, Harris appropriately reviewed and relied on chat messages to solidify his opinion that operational advances were correlated to increased Gemini trading

9

volume.  *See* Def. Mot. at 15 ("While it is not necessarily improper for Harris to have considered them to help contextualize the contemporaneous trading data . . . ."). Harris's opinion on operational advances divided the advances into three scenarios: (i) when customers had sent Gemini bitcoin or dollars but the funds had not yet arrived; (ii) when Gemini was told a transfer would be incoming but that transfer had not yet been initiated; and (iii) when Gemini gave an advance and later reversed it without receiving funds from the customer. His statistical analysis and opinions focus only on groups two and three, *see* Harris Rep. ¶ 96; but to distinguish those groups, Harris by necessity had to review chats and emails. He described his process for doing so in Appendix C to his report. *See id.* ¶¶ 151–58.

      Harris's testimony regarding Gemini's internal chats is not being offered as a "factual narrative based upon record evidence." *Cf.* Def. Mot. at 13 (citing *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015)). Rather, his review of chats was a critical step in his analysis of the operational advances. The two chat summaries that Gemini argues are inadmissible are "examples of how Operational Advances occurred and could affect Gemini Auction volumes." Harris Rep. ¶ 107. Harris's use of these chats is distinguishable from the cases cited by Defendant, which universally involve experts whose testimony, in whole or in part, was comprised of merely a summary of the evidentiary record. *See, e.g.*, *Louis Vuitton*, 97 F. Supp. 3d at 507 (holding inadmissible a "long overview of [the defendant's] business model and history"); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005) (ruling inadmissible expert testimony that "is simply rehashing otherwise admissible evidence"); *SEC v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 1512713, at *4 (S.D.N.Y. Apr. 8, 2019) (excluding an expert report in part because it was "little more than a narrative of [the defendant's] communications with regulators").

## II. Harris's Opinions Are Reliable Under *Daubert*

### A. Harris's Opinions and Characterizations Are Supported by His Extensive Experience and Expertise as an Economist

Gemini moves to exclude four of Harris's assertions as based on insufficient facts or data: (i) that operational advances are "effectively interest-free loans" (Harris Rep. ¶ 20); (ii) that it was "completely inappropriate" for Gemini to issue operational advances without proof of incoming funds (*id.* ¶ 97); (iii) that "exchanges publicize all their rules and complete fee schedules" (*id.* ¶ 138); and (iv) that Gemini issued the Pearl Street Loans (*id.* ¶ 113). Each of these statements is taken out of the surrounding context of Harris's report, are based on Harris's experience and expertise as an economist, or both.

First, Gemini plucks these statements out of context. Harris's statement that operational advances are "effectively interest-free loans" is followed by a paragraph explaining his reasoning. *See* Harris Rep. ¶ 20 ("My review of documents indicates that Gemini sometimes credited (added money to) a market participant's account with the intention of subsequently reversing it, thus requiring no corresponding transfer or consideration from the participant."). Harris's use of the phrase "completely inappropriate" was not, as Gemini argues, about whether operational advances were inappropriate; rather, Harris was evaluating whether it was appropriate, "[f]rom an economic perspective," for Gemini to use the term "float" in reference to the advances. *Id.* ¶ 97. Harris's statement about exchanges publishing their rules and schedules was at the end of a page-long description of "normal compliance responsibilities at exchanges." *Id.* ¶ 138. And Gemini nitpicks instances in which Harris states that "Gemini" provided the Pearl Street loans, while ignoring paragraph upon paragraph in which Harris states that "Pearl Street" provided the loans, *see generally id.* ¶¶ 115–37. Indeed, the first sentence of the first paragraph

11

of this section of his report describes the loans as "granted to select customers by Pearl Street [], an affiliated entity owned by the Winklevosses," *id.* ¶ 112.

When taken in context, Harris's report clearly lays the foundation for each of his statements. Operational advances are "effectively interest-free loans" because they "added money to[] a market participant's account with the intention of subsequently reversing it, thus requiring no corresponding transfer or consideration from the participant." *Id.* ¶ 20. According to the deposition testimony that Gemini itself cites, Harris "provided an exact characterization of what those advances were from the point of view of an economist interested in the effect of that activity on . . . trading behaviors." Ex. 1, Harris Dep. ¶ 213:22–214:15. This characterization does not need complex methodology; Harris reviewed the scope of Gemini's conduct in making operational advances and concluded that, in effect, the operational advances were akin to interest-free loans. Gemini can attempt to poke holes in that conclusion on cross-examination if it so desires, but exclusion is not warranted, as the conclusion is fully supported and based on sufficient facts or data.

Likewise, when taken in full context, Harris fully supports his opinion that Gemini's use of the term "float" was not appropriate to describe operational advances. Harris explains that "float" is appropriate to describe "advances against transfers already ordered because these transfers were already moving through the banking or blockchain systems." Harris Rep. ¶ 97. By contrast, according to Harris, "float" is less appropriate for advances made upon the promise of incoming funds, and "completely inappropriate for the advances that Gemini reversed without any incoming funds." *Id.* Harris is describing, based on his expertise as an economist, when the use of the term "float" could be appropriate.

Gemini also takes issue with Harris's opinion that "exchanges publicize all their rules and complete fee schedules." *Id.* ¶ 138(3). Harris is an expert specifically on the structure of trading markets, having written the book that practitioners and academics alike consider to be the preeminent treatment of the "practice and economics of trading," including a chapter on competition between exchanges. *Id.* ¶ 8. He is highly qualified to give his opinion on "normal compliance responsibilities at exchanges," *id.* ¶ 138, and experts are permitted to "testify as to the customs and standards of an industry," *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003) (citations omitted). Gemini may cross-examine Harris, but Harris's opinion would still be admissible.

The case Gemini cites does not support its contention that these statements must be excluded. The cited portions of that case, *SEC v. Lek Securities Corp.*, involve proposed expert testimony where the experts' conclusions about complex layered trades were reached without "empirical or statistical analysis of market liquidity," 370 F. Supp. 3d 384, 417 (S.D.N.Y. 2019), or were "unaccompanied by any description of the data examined or the analytical steps taken to form the opinions," *id.* at 413–14. The statements that Gemini targets in its argument either paraphrase undisputed facts or describe Harris's opinions based on his expertise as an economist. None requires statistical or economic analyses, or even data to examine.

### B. Harris's Opinion on Whether Pearl Street Loans Were Market Rate Are Sufficiently Supported

In his report, Harris evaluated two main questions regarding the loans made by the Winklevoss-affiliated entity Pearl Street to Gemini customers: (i) whether the loans were given to customers at below-market rates, thus reducing the customers' cost of capital to trade on the Gemini exchange; and (ii) whether the loans were effective in inducing trading on the Gemini exchange, by analyzing whether statistically significant correlation existed between loan

13

volumes and customer trading volumes. Harris Rep. ¶¶ 112–37. Defendant argues that Harris's opinion regarding whether the Pearl Street loans were made at below-market rates is not based on a sufficient data. Def. Mot. at 19–22. The motion does not address Harris's study of the correlation between loans and trading volume.

Harris takes several steps to evaluate whether the loans were made at below-market rates. First, he evaluates the risk profile of the three companies—XBTO, Circle, and B2C2—that received Pearl Street loans by examining what public information was available and finds that they were early-stage, venture-capital-backed startups. *Id.* ¶¶ 115–21. Second, Harris analyzes the loan documents themselves and summarizes their terms, including the obligations imposed on Circle and XBTO to maintain volume in the Gemini exchange or auction. *Id.* ¶¶ 122–23. Third, Harris compares the loans' interest rates to various benchmarks, including the federal funds effective rate, the Bank of England official rate, the Bank of Japan overnight rate, and the US Corporate B-rated yield curve for 3-month maturity. He concludes based on the comparison that the 1.5% interest rate given to Circle and XBTO beginning in December 2016 was below-market, in particular because "the loan rates dropped so substantially and so rapidly when the market rates did not." *Id.* ¶¶ 123–24. Defendant does not challenge any of this analysis.

Harris then goes on to compare the rates on the loans Circle received from Pearl Street (1.5% to 5%) to the rates Circle received on loans from another company, Genesis, which, based on the materials he reviewed, carried rates of 11.1% and 16.8%. As Defendant points out in its motion, however, Harris did not receive, as part of the documentation he reviewed, other Circle–Genesis loans that carried rates as low as 4%. Def. Mot. at 21 (citing CIRCLE000166). Defendant argues that this omission makes his opinion unreliable, but that vastly overstates the issue. Harris's opinion, as discussed above, is based on far more than just comparing the Pearl

14

Street loan interest rates to the rates on the Circle–Genesis loans. The fact that Harris's opinion did not encompass a review of CIRCLE000166 may be fodder for cross examination, but it does not render his opinion on this matter unreliable.

Furthermore, although Defendant quotes in its motion a deposition excerpt where Harris states that he did not receive certain pages of a document, Defendant omits the very next exchange in which states that at least one portion of the omitted materials would have *strengthened* his opinion that the Pearl Street loans were below market rate:

> Q. Do you think [a 7% interest loan][3] would have been relevant to your analysis?
>
> A. It would indicate that the—it's certainly closer to market. It's above 5 percent. It's above 1 and a half percent. It would have been relevant. It would have strengthened the—my observation that when Pearl Street was lending at one and a half percent, it was lending way below market.
>
> Q. But the—so the document—the loan reflected on page 34 of DX 92 would have been relevant if it had been given to you; correct?
>
> A. Yes, it would have—*it would have strengthened my opinion*.

Ex. 1, Harris Dep. at 252:17–253:4 (emphasis added).

To the extent additional data exists that Harris could or should have incorporated into his analysis, the proper remedy for Defendant is to cross-examine Harris on that data at trial. *See Cooper Crouse-Hinds, LLC v. City of Syracuse*, 568 F. Supp. 3d 205, 221 (N.D.N.Y. 2021) ("Defendant County's objection that Plaintiffs' expert failed to consider [certain evidence] goes to the weight of the evidence, not its admissibility."); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 317 (S.D.N.Y. 2015) ("[W]hile the evidence underlying [the expert's analysis] may, in

---

[3] While Defendant now cites to a document purporting to reflect a Circle-Genesis loan with an interest rate of 4%, Defendant did not inquire about that loan during Harris's deposition. Instead, Defendant inquired about a different loan with an interest rate of 7%.

15

defendant's view, be thin, questionable, or self-servingly selective, our role as gatekeeper is not to divest defendant of the task of challenging the weight of such evidence before the trier of fact.").

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendant's *Daubert* motion to preclude some of the testimony of Professor Lawrence Harris.

Dated: New York, New York
December 6, 2024

Respectfully submitted,

By:    /s/ Peter Janowski

K. Brent Tomer, Chief Trial Attorney
Alejandra de Urioste, Chief Trial Attorney
Diana Wang, Trial Attorney
Andrew J. Rodgers, Trial Attorney
Katherine Rasor, Trial Attorney
Peter Janowski, Trial Attorney
Manal M. Sultan, Deputy Director

COMMODITY FUTURES
TRADING COMMISSION
Division of Enforcement
290 Broadway, Suite 600
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9888