**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMMODITY FUTURES TRADING
COMMISSION,

                              Plaintiff,

                v.

GEMINI TRUST COMPANY, LLC,

                              Defendant.

No. 22-cv-4563-AKH

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**
**THE EXPERT TESTIMONY OF ANDRZEJ SKRZYPACZ, PH.D.**

**TABLE OF CONTENTS**

Table of Authorities................................................................................................................ii

Preliminary Statement .......................................................................................................... 1

Argument ............................................................................................................................... 3

I.    Dr. Skrzypacz Is Qualified to Opine on the Gemini Auction's Structure, Its
Purported Susceptibility to Manipulation, and the At-Issue Business Practices................ 4

II.   Dr. Skrzypacz's Opinions Are Admissible because they Are Relevant, Will
Help the Jury, and Are Based on Reliable Methods............................................................ 5

    A.   Dr. Skrzypacz's Opinions about the Gemini Auction's Structure Are
Relevant, Reliable, and Admissible ............................................................ 8

        1.   Dr. Skrzypacz's Discussion of Economic Principles regarding
Susceptibility to Manipulation Is Relevant and Helpful to the Jury .......... 8

        2.   Dr. Skrzypacz's Application of Economic Principles to the Gemini
Auction Is Relevant and Helpful to the Jury ............................................... 9

    B.   Dr. Skrzypacz's Opinions about the Gemini Auction's Prices Are Relevant,
Reliable, and Admissible............................................................................ 13

    C.   Dr. Skrzypacz's Opinions about the Pearl Street Loans Are Relevant,
Reliable, and Admissible............................................................................ 15

    D.   Dr. Skrzypacz's Opinions about Operational Advances Are Relevant,
Reliable, and Admissible............................................................................ 17

    E.   Dr. Skrzypacz's Opinions about Bespoke Fees and Rebates Are Relevant,
Reliable, and Admissible............................................................................ 21

    F.   Dr. Skrzypacz's Opinions about Self-Trading Are Relevant, Reliable, and
Admissible.................................................................................................. 25

III.  Dr. Skrzypacz's Summary Slides Are Admissible............................................................ 27

IV.  Gemini Requests a Rule 104 Hearing if the Court Is Inclined to Grant the Motion ........ 28

Conclusion............................................................................................................................ 29

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't. Consulting, Inc.*,
2024 WL 3638329 (S.D.N.Y. Aug. 2, 2024) ................................................. 3, 5, 6

*Arista Recs. LLC v. Lime Grp. LLC*,
2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...................................................... 26

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
364 F. Supp. 3d 291 (S.D.N.Y. 2019) ............................................................ 3, 6

*Castaldi v. Land Rover N. Am., Inc.*,
363 F. App'x 76129 (2d Cir. 2009) .................................................................. 27

*CFTC v. McDonnell*,
332 F. Supp. 3d 641 (E.D.N.Y. 2018) .............................................................. 10

*Colon ex rel. Molina v. BIC USA, Inc*,
199 F. Supp. 2d 53 (S.D.N.Y. 2001) ...................................................... 3, 9, 28

*Conn. Gen. Life Ins. Co. v. BioHealth Lab, Inc.*,
2024 WL 2106557 (D. Con. Mar. 28, 2024) ...................................................... 6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ......................................................................................... 3

*Dover v. British Airways, PLC (UK)*,
254 F. Supp. 3d 455 (E.D.N.Y. 2017) .............................................................. 28

*FHFA v. Nomura Holding Am., Inc.*,
74 F. Supp. 3d. 639 (S.D.N.Y. 2015) ............................................................... 13

*Forte v. Liquidnet Holdings, Inc.*,
2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015) ................................................... 4

*In re Fosamax Prods. Liab. Litig..*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ............................................................... 6

*Kungys v. United States*,
485 U.S. 7590 (1988) ...................................................................................... 11

*Lickteig v. Cerberus Cap. Mgmt. L.P.*,
589 F. Supp. 3d 302 (S.D.N.Y. 2022) ............................................................... 5

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995) ................................................................................... 7

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
   638 F. Supp. 3d 227 (E.D.N.Y. 2022) ................................................................... 23

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014) ..................................................................... 28

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ................................................................... 6, 7, 13

*SEC v. Lek Securities Corp.*,
   370 F. Supp. 3d 384 (S.D.N.Y. 2019) ................................................................... 23

*SEC v. Revelation Capital Mgmt. Ltd.*,
   215 F. Supp. 3d 267 (S.D.N.Y. 2016) ..................................................................... 3

*SEC v. Ripple Labs, Inc.*,
   2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) ......................................................... 20

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
   112 F. Supp. 3d 122 (S.D.N.Y. 2015) ................................................................... 26

*U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) ..................................................................... 7

*United States v. Janati*,
   374 F.3d 263 (4th Cir. 2004) ................................................................................. 27

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) .............................................................................. 9, 10

*United States v. Londono-Tabarez*,
   121 F. App'x 882 (2d Cir. 2005) ............................................................................. 5

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) ............................................................................ 10, 12

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp. LLC*,
   571 F.3d 206 (2d Cir. 2009) ............................................................................... 4, 7

*In re Zyprexa Prods. Liab. Litig.*,
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ................................................................. 5, 6

**Other Authorities**

Fed. R. of Evid. 104 ............................................................................................... 28

Fed. R. of Evid. 401 ............................................................................................... 14

Fed. R. of Evid. 702 ..................................................................................... 4, 6, 10

Fed. R. Evid. 702 advisory committee note ............................................................ 3

Weinstein's Federal Evidence § 1006.0410 ................................................... 10, 28

Gemini Trust Company, LLC ("Gemini") respectfully submits this memorandum of law in opposition to the motion by plaintiff Commodity Futures Trading Commission ("CFTC") to exclude the expert testimony of Andrzej Skrzypacz, Ph.D. (the "Motion").

### PRELIMINARY STATEMENT

To prevail in this case, the CFTC will need to prove that the at-issue statements and omissions were false, material, and that Gemini acted with the requisite knowledge. Each of these points is vigorously disputed, and the parties will present substantial evidence on each of them. Interpreting this evidence will be a difficult task. The jury is unlikely to know much, if anything, about critical issues like futures trading and what makes a commodities exchange more or less "readily susceptible to manipulation."

To assist the jury in understanding these complex issues, Gemini retained Dr. Andrzej Skrzypacz, a Stanford professor with extensive practical and academic experience studying, designing, and evaluating auctions and assessing market manipulation. Dr. Skrzypacz has submitted a thoughtful, thorough, and meticulous expert report summarizing opinions that will provide the jury with context and information it needs to understand the evidence and reach a just verdict. The CFTC does not dispute that Dr. Skrzypacz is qualified to provide these opinions. Nevertheless, the CFTC seeks to exclude Dr. Skrzypacz's testimony *in its entirety*.

The CFTC's arguments are deeply flawed.

As an initial matter, the CFTC's arguments get the law wrong in important ways. *First*, the CFTC argues that any information about the Gemini exchange or auction that does not strictly concern the alleged false statements or omissions is irrelevant. For example, the CFTC seeks to exclude evidence about what makes auctions more or less susceptible to manipulation and how the Gemini auction was designed to prevent manipulation. But this evidence is critical. Second Circuit

authority makes clear that statements must be evaluated in the context they are made. Thus, the materiality of specific statements or allegedly undisclosed business practices cannot be assessed in a bubble. Dr. Skrzypacz's testimony will help the jury see the full picture. *Second*, the CFTC argues that evidence tending to show that allegedly undisclosed business practices made manipulation of the Gemini exchange *less* likely is immaterial. This argument continues the CFTC's case-long effort to read the materiality requirement out of the statute and, instead, impose a strict liability standard under which the mere fact that a statement is made is proof of its materiality. That is not the law. To prevail on its claim, the CFTC must prove that the allegedly omitted information concerned business practices or activities that could have made the Gemini auction (and thus the Bitcoin Futures Contract) *more* susceptible to manipulation. Dr. Skrzypacz's opinions are directly relevant to refuting that showing.

The CFTC also posits that Dr. Skrzypacz's analyses showing that the Gemini auction was not manipulated should be excluded because they are irrelevant. This argument is also wrong. Federal Rule of Evidence 401 governs relevance in this context. That is a low bar: to be relevant, evidence need only have "any tendency to make a fact more or less probable than it would be without the evidence." While not dispositive, evidence showing that the Gemini auction was not actually manipulated unquestionably makes it less likely that the exchange was susceptible to manipulation. Indeed, it is deeply hypocritical for the CFTC to make this argument. The CFTC relies heavily on collusive trading between two Gemini customers, Hashtech and Cardano, as proof that bespoke fee agreements were material to whether the Gemini auction was readily susceptible to manipulation. The CFTC cannot have it both ways. Evidence of what actually happened on the Gemini exchange is not relevant when the CFTC thinks it supports its claim and irrelevant when it does not. Relevance does not turn on whether the evidence helps or hurts the CFTC's case.

The third major flaw in the CFTC's argument is that it repeatedly mistakes potential cross-examination topics for grounds to exclude Dr. Skrzypacz's testimony. The Supreme Court made clear in *Daubert* that vigorous cross-examination, not exclusion, is the proper means for attacking "shaky" expert analysis. While Gemini disputes that any of Dr. Skrzypacz's work falls into this category, the CFTC's brief elides this clear instruction and seeks repeatedly to elevate minor disagreements into grounds for exclusion.

For these reasons, and those set forth below, the Court should deny the Motion.

ARGUMENT

Federal Rule of Evidence 702 allows testimony by qualified experts. "Rule 702 'embodies a liberal standard of admissibility for expert opinions.'" *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't. Consulting, Inc.*, 2024 WL 3638329, at *3 (S.D.N.Y. Aug. 2, 2024) (quoting *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)). "Rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

The Second Circuit has "espouse[d] a particularly broad standard for the admissibility of expert testimony." *SEC v. Revelation Capital Mgmt. Ltd.*, 215 F. Supp. 3d 267, 275 (S.D.N.Y. 2016) (quoting *Colon ex rel. Molina v. BIC USA Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001)). Courts assessing whether expert testimony is admissible "focus[] on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony . . . will assist the trier of fact." *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 323–24 (S.D.N.Y. 2019). "[A] trial judge should exclude expert testimony if it is so speculative or conjectural or based on assumptions

3

that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp. LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009).[1] Thus, so long as the expert's testimony "lies within 'the range where experts might reasonably differ,' the jury, and not the trial court, should 'decide among the conflicting views of different experts.'" *Forte v. Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *6 (S.D.N.Y. Sept. 30, 2015) (quoting *Kumho Tire Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)).

## I.    Dr. Skrzypacz Is Qualified to Opine on the Gemini Auction's Structure, Its Purported Susceptibility to Manipulation, and the At-Issue Business Practices

Rule 702 permits testimony by a "witness who is qualified by knowledge, skill, expertise, training, or education." Fed. R. Evid. 702. Dr. Skrzypacz plainly meets this standard, and the CFTC does not dispute his qualifications.

Dr. Skrzypacz is the Theodore J. Kreps Professor of Economics in the Stanford Graduate School of Business and a Professor by courtesy in the Department of Economics at Stanford University. Report ¶ 1.[2] At Stanford, Dr. Skrzypacz has taught a Ph.D.-level course called "Auctions, Bargaining and Pricing" since 2002 and MBA-level courses in "Managerial Economics" and "Economics of Strategy and Organization." *Id.* ¶ 3. He has also been the main doctoral dissertation advisor for 30 Ph.D. students, whose research has focused on a variety of issues, including auctions and market manipulation. *Id.* Dr. Skrzypacz has also written more than 40 academic papers on microeconomics, with a particular focus on information economics, market design, market manipulation, and dynamic games. *Id.* ¶ 1. He has served as an editor on numerous economics journals and is a Fellow of the Econometric Society, the Society for the Advancement

---

[1]    Unless otherwise noted, citations and quotations are omitted, emphasis is added, and quotes are cleaned up.

[2]    "Report" refers to the Expert Report of Andrzej Skrzypacz, Ph.D., dated May 15, 2024. Dkt. 181-1. "Ex." refers to exhibits to the Declaration of John F. Baughman filed in opposition to the Motion. "Self-Certification" refers to the certification submitted by the Cboe Futures Exchange ("CFE") on December 1, 2017. "Bitcoin Futures Contract" refers to the product that was the subject of the Self-Certification.

of Economic Theory, the Accounting and Economics Society, and the Finance Theory Group, as well as a Distinguish Fellow of the International Centre for Economic Analysis. *Id.* ¶ 2.

Dr. Skrzypacz also has extensive practical experience and expertise in auction design. To take but a few examples, Dr. Skrzypacz has been hired by Yahoo, Spotify, Airbnb, Pinterest, and other companies to help design auctions and related pricing strategies for advertising space on their webpages, Ex. 1 at 61:3–15, 62:9–14; worked for wireless carriers around the world on issues relating to high-stakes wireless spectrum auctions, *id.* at 61:16–62:7; and worked for a lender considering running auctions to sell its loan portfolio, *id.* at 62:22–25. Dr. Skrzypacz has also acted as an expert in cases in the Delaware Court of Chancery and the Superior Court of California, including on matters relating to auctions. Report at A-7; Ex. 1 at 64:10–68:20.

## II.    Dr. Skrzypacz's Opinions Are Admissible because they Are Relevant, Will Help the Jury, and Are Based on Reliable Methods

"To be admissible, a district court must conclude that proposed testimony will assist the trier of fact." *Lickteig v. Cerberus Cap. Mgmt. L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022). Expert evidence assists the trier of fact when it provides relevant information about matters "beyond the ken" of lay jurors. *United States v. Londono-Tabarez*, 121 F. App'x 882, 884 (2d Cir. 2005); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 283 (E.D.N.Y. 2007) ("In inquiring into the potential helpfulness of the proffered expert testimony, the court decides whether it concerns matters requiring assistance to the kind of people expected to sit on the jury."). "The Second Circuit has instructed 'trial courts to look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant.'" *Am. Empire Surplus Lines*, 2024 WL 3638329, at *8 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)); *see also In re Zyprexa*, 489 F. Supp. 2d at 283 (applying Rule 401 relevance standard to assess whether proposed expert testimony would help jury).

Whether expert testimony will help the jury is a practical question. Two common situations in which courts routinely find expert testimony helpful are particularly relevant here. *First*, because it would be difficult for lay juries to analyze voluminous data, "[e]xpert testimony is . . . admissible where it synthesizes or summarizes data in a manner that streamline[s] the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016). *Second*, because jurors often lack the context or background knowledge needed to understand or interpret the evidence presented to them, courts "freely admit[]" expert testimony that "simply explains facts and evidence already in the record" when it "is likely to substantially assist the average person in understanding the case." *In re Zyprexa*, 489 F. Supp. 2d at 283.

Courts analyzing the reliability of an expert's testimony look to the expert's process. "In determining the reliability of an expert's testimony or report, courts should consider 'the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" *Am. Empire Surplus Lines*, 2024 WL 3638329, at *7 (quoting *Amorgianos*, 303 F.3d at 265). "[T]he inquiry is a flexible one and must be 'tied to the facts of a particular case' with attention to 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Conn. Gen. Life Ins. Co. v. BioHealth Lab, Inc.*, 2024 WL 2106557, at *2 (D. Conn. Mar. 28, 2024) (quoting *Kumho Tire*, 526 U.S. at 150). "Only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).[3] So long as the expert's

---

[3]    *See also A.V.E.L.A.*, 364 F. Supp. 3d at 324 ("'A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method' does not require exclusion; exclusion is only warranted 'if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'") (quoting *Amorgianos*, 303 F.3d at 267).

testimony is "more than 'subjective belief or unsupported speculation,'" the opinion meets the *Daubert* reliability test. *U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 227 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590).

"Disputes as to . . . faults in [an expert's] use of . . . methodology . . . go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Thus, "[d]isputes regarding the proper variables to employ in statistical studies are more properly left for juries to consider and decide." *Scott*, 315 F.R.D. at 51 (quoting *EEOC v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 458 (S.D.N.Y. 2004)). Criticisms of an expert's use of data to conduct calculations or statistical analyses, or of the assumptions underlying those analyses, also go to the weight of the evidence. *Id.* at 52; *Zerega*, 571 F.3d at 214.

Disagreements about an expert's decision *not* to employ particular analytical tools or methods also go to the weight of the opinions. In *United States Information Systems v. International Brotherhood of Electrical Workers Local Union No. 3*, for example, defendant moved to exclude plaintiff's expert from testifying that his analysis of the relevant market reflected evidence of anticompetitive behavior because the expert did not conduct a regression analysis to rule out other causes for the market's structure. 313 F. Supp. 2d at 228–29. The court denied this motion, ruling the expert was not required to conduct any particular analysis and that his "appl[ication] [of] 'textbook economic theory'" to the data was sufficient to support his conclusions. *Id.* As the court explained, while the question of whether the expert had drawn the "appropriate inference[s] . . . from the data is a question that is currently open to dispute, the defendants [were] fully able . . . to contest this inference . . . through cross-examination." *Id.*

7

A.    **Dr. Skrzypacz's Opinions about the Gemini Auction's Structure Are Relevant, Reliable, and Admissible**

Dr. Skrzypacz begins the Report by explaining economic principles that are key to evaluating the parties' claims and defenses. Report ¶¶ 16–63. The CFTC seeks to exclude this information on the grounds that it is not relevant. The CFTC is wrong.

1.    **Dr. Skrzypacz's Discussion of Economic Principles regarding Susceptibility to Manipulation Is Relevant and Helpful to the Jury**

The parties agree that CFTC Core Principle 3, which bars DCMs from listing contracts that are "readily susceptible to manipulation," is at the heart of this case. *See, e.g.*, Compl. ¶ 41. But the CFTC has never said what "readily susceptible to manipulation" means: the term is not defined in Core Principle 3 or in Appendix C, and the CFTC refused to define it in discovery. *See* 17 C.F.R. § 38.200; Ex. 2; Ex. 3 [Goodman] at 74:23–77:6; Ex. 4, Resps. to Interrogs. 34–36. Drawing on his experience and extensive economic literature, Dr. Skrzypacz fills that void and provides the jury with a framework it can use to assess the parties' claims and defenses:

> [A]s a matter of economics, a market that is "readily susceptible" to manipulation can be defined as one in which a potential manipulator can easily affect prices in the market and can profit from doing so.

Report ¶ 71.

But Dr. Skrzypacz does not only explain when a product *is* readily susceptible to manipulation. He also explains, as a matter of economics, when a product is *not* readily susceptible to manipulation. Specifically, Dr. Skrzypacz explains that "[i]f a potential manipulator cannot affect prices without incurring a significant cost, and/or if they cannot profit from the manipulation, then they do not have the ability or incentive to manipulate prices. Under these conditions, a market is not 'readily susceptible' to manipulation." Report ¶ 71.

This framework will help the jury. For example, if the allegedly omitted practices would have made it easier or cheaper for a potential manipulator to easily affect prices and profit, then

the jury could draw on Dr. Skrzypacz's analysis to find that those practices increased the Gemini auction's susceptibility to manipulation and support the CFTC's claim. If, however, the allegedly omitted practices would have made it more difficult to manipulate the Gemini auction by increasing the cost or difficulty of manipulative tactics, the jury could use Dr. Skrzypacz's explanation to conclude this evidence supports Gemini's defenses. Providing this framework is a common expert task and precisely the type of helpful and relevant evidence that courts routinely admit. *See, e.g.*, *United States v. Litvak*, 808 F.3d 160, 183 (2d Cir. 2015) (expert testimony "could have educated the jury" about complex financial product at issue).[4] Indeed, without this definition, the jury would face an impossible task: having to decide if the at-issue statements and alleged omissions were material to whether the Bitcoin Futures Contract (and, by implication, the Gemini auction) were "readily susceptible to manipulation" without knowing what that phrase means.[5]

### 2. Dr. Skrzypacz's Application of Economic Principles to the Gemini Auction Is Relevant and Helpful to the Jury

Dr. Skrzypacz next applies these fundamental economic principles regarding susceptibility to manipulation to Gemini's auction. Report ¶¶ 78–99. While Gemini commends this entire discussion to the Court's attention, it is too long and too detailed to summarize here. The upshot, however, is critical: because increased order volume makes it "costlier . . . to manipulate the auction price," it is "in the interest of an exchange like Gemini to attract as much trading as possible to make the market deeper and more liquid and less susceptible to manipulation." Report ¶ 89. For this reason, Dr. Skrzypacz explains, business practices (like the ones in this case) that increase

---

[4]    *See also U.S. Info. Sys*, 313 F. Supp. 2d at 236 (expert testimony "could certainly aid the jurors by helping them understand the basic economic principles" at issue in the case); *TC Sys., Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) (expert could educate jury on "broad[] general economic principles").

[5]    Notably, while the CFTC purports to include this section of Dr. Skrzypacz's report in the Motion, *see* Dkt. 180 at 8, it does not actually offer any argument as to why Dr. Skrzypacz's explanation of economic theory or his definition of "readily susceptible to manipulation" should be excluded.

volume and liquidity *reduce*, rather than *increase*, susceptibility to manipulation. Report ¶¶ 95–98. This is key evidence rebutting a central feature of the CFTC's case.

The CFTC's sole argument for excluding Dr. Skrzypacz's analysis of the Gemini auction's structure is that it is not relevant. According to the CFTC, "[t]he only issue for the fact finder is whether the statements or omissions have a capacity to influence the agency, to hinder its investigation, or to distract the investigator's attention away from a critical matter." Dkt. 180 at 9. Thus, the CFTC contends, general information about the Gemini auction—including how its various features affected its susceptibility to manipulation—is irrelevant. *Id.* This argument is wrong for two reasons.

*First*, the CFTC's position would force the jury to assess the materiality of each allegedly omitted business practice in isolation, without any reference to how those practices fit into the larger framework of the Gemini auction. But the law is clear: the materiality of a false statement or omission should be assessed by reference to the full context in which that statement was made. *See Litvak*, 808 F.3d at 183 ("The full context and circumstances in which RMBS are traded were undoubtedly relevant to the jury's determination of materiality."); *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717–18 (E.D.N.Y. 2018) (holding alleged misrepresentations must be viewed in context of "the overall message").[6]

A simple hypothetical shows why it is so important to give the jury all the facts. Imagine that a jeweler represented to his insurance company that he would lock a deadbolt on his store's front door every night before closing. Then, two years later, he stopped locking the door. In

---

[6]    *See also United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) ("Analysis of the misrepresentation must be made in the context in which they were made."); *Weinstock v. United States*, 231 F.2d 699, 702 (D.C. Cir. 1956) ("Materiality must be judged by the facts and circumstances in the particular case. . . . [W]e think that in the setting in which it was made the statement was not material. If the one sentence had stood alone it might well have been material. But in context . . . it was immaterial, wholly without weight or influence in any decision to be made . . . .")

isolation, that might seem to be a material fact. After all, an unlocked door to a store filled with jewelry sounds risky! But the jury might come to a different conclusion if it learned that the jeweler stopped locking the door because he had installed right behind it a locked steel gate connected by secure network to a police station. Under the CFTC's approach, evidence about the steel gate and alarm system would be excluded as irrelevant and hidden from the jury. Gemini submits that is wrong. Nothing happens in isolation, and in all but the simplest cases the jury needs the full context before it can determine whether any statement is or is not material. The CFTC's approach does not simply risk jurors missing the forest for the trees; it asks them to.[7]

*Second*, the CFTC's argument misunderstands what it must show to prove that the alleged omissions were material. To be material, the alleged misstatements and omissions must have had the capacity to influence a decision by the CFTC. *See Kungys v. United States*, 485 U.S. 759, 772 (1988) ("[T]he test of whether Kungys' concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service."). That means the allegedly concealed or misrepresented information must have *increased* the Gemini auction's susceptibility to manipulation, such that the CFTC would have been more likely to find that the Bitcoin Futures Contract did not comply with Core Principle 3.

A variation on the CFTC's hypothetical about a pool operator who falsely states a lifeguard would be on duty on the weekends, Dkt. 180 at 10–11, shows why this is the case. Imagine the pool operator truthfully stated that the pool would be surrounded by a gated fence with lock that

---

[7]    At minimum, the CFTC's arguments about the relevance of Dr. Skrzypacz's opinions are premature. Based on prior statements, Gemini expects CFTC to try to portray Gemini as a rogue actor trying to evade scrutiny. *See, e.g.*, Dkt. 99 at 16–17 (asserting Gemini adopted a "cynical approach to the product certification"); *id.* at 17 (arguing Gemini devised a "strategy" to avoid "additional scrutiny"). That is not true and, if left unrebutted, will leave jury with an inaccurate impression of Gemini. Dr. Skrzypacz's explanation of the Gemini auction and the myriad features that protected it from manipulation would help rebut these false accusations.

could only be opened with a code but did not state that the gate also had a key-locked deadbolt. Under CFTC's theory, the pool operator's failure to disclose the deadbolt could be a material false statement even though the omitted feature *enhanced* security. That position makes no sense and improperly conflates relevance and materiality. *See United States v. Rigas*, 490 F.3d 208, 234 (2d. Cir. 2007) ("Relevance and materiality are not synonymous. . . . To be relevant means to relate to the issue. To be material means to have probative weight, i.e., reasonably likely to *influence the tribunal* in making a determination required to be made.").[8]

As this example demonstrates, to render its verdict the jury will need to assess how the Gemini auction worked and whether and how the allegedly misstated and omitted business practices could have affected the Gemini auction's susceptibility to manipulation. To do this, the jury needs to understand how the allegedly omitted business practices fit into the broader picture of the Gemini exchange and auction. Dr. Skrzypacz's analysis of the Gemini auction provides precisely that information.

Finally, evidence about what Gemini did to help prevent manipulation on its exchange is relevant to the issue of knowledge. Dr. Skrzypacz's analysis shows that Gemini went to great lengths to design an auction would be difficult to manipulate.[9] Gemini's extensive efforts to prevent manipulation make it less likely that Gemini knew that any of its business practices could

---

[8]    By contrast, the CFTC's original hypothetical, Dkt. 180 at 10–11, demonstrates the flaw in its approach. A jury does not need additional context or information to decide if a misstatement about whether a lifeguard would be on duty is material. The importance of lifeguards to pool safety is simple, and jurors are well-suited to evaluate it without additional context based on their common, everyday experiences. That is not the case here. Whether and to what extent any particular business practice could increase the Gemini auction's susceptibility to manipulation depends on the auction's overall structure and is beyond a typical juror's everyday experience. It is not reasonable to ask the jury to rule on the materiality of Gemini's statements while denying it that context.

[9]    In fact, this section of Dr. Skrzypacz's report explains why two potentially manipulative tactics the CFTC has identified—self-trading and collusive trading, both of which are addressed in more detail below—would be difficult or impossible to deploy given the structure of Gemini's auction. Report ¶¶ 90–91. Clearly, this is critical evidence that the jury needs to fully understand and interpret the parties' evidence and arguments concerning the materiality of alleged false statements on those topics.

increase the risk of manipulation or that its alleged failure to disclose them would make any statements materially misleading.[10] Thus, this opinion is relevant under Rule 401.

### B.  Dr. Skrzypacz's Opinions about the Gemini Auction's Prices Are Relevant, Reliable, and Admissible

Dr. Skrzypacz next conducted a series of analyses to see if there is evidence that Gemini's auction was ever manipulated. He found none.

*First*, Dr. Skrzypacz compared the price of bitcoin on the Gemini auction to a benchmark price over different time periods. Report ¶ 107. That comparison showed that "the Gemini auction price is nearly indistinguishable from the Competitor Benchmarks over the more than two-year period." Report ¶ 106. *Second*, Dr. Skrzypacz tested his conclusion by calculating the correlation between the Gemini auction price and price on the exchanges he used to create the benchmark. Report ¶¶ 108–09. This analysis found, *inter alia*, that the Gemini auction price was 98.6% correlated with other exchanges, providing additional support for the conclusion that the Gemini auction was not manipulated. *Id.* ¶ 108, Figure 5.5. *Third*, Dr. Skrzypacz found that deviations between the price of bitcoin on Gemini and other exchanges were less than his estimate of transaction costs on more than 94% of days, which he concluded supports the conclusion that the Gemini auction was not manipulated. *Id.* ¶¶ 112–20.[11]

---

[10]  As explained in Gemini's opposition to the CFTC's Motion to Exclude the Testimony of Jeremy Cusimano, this is the correct standard for assessing whether the knowledge requirement is satisfied. Opp'n to Pl.'s Mot. to Exclude Test. of J. Cusimano at 10–12.

[11]  The CFTC complains that Dr. Skrzypacz draws the wrong conclusion from this analysis. Dkt. 180 at 15. Putting aside that this argument simply ignores portions of Dr. Skrzypacz's explanation of his conclusions, *see* Report ¶¶ 114–16, complaints that go to an expert's conclusions rather than methodology are grounds for cross-examination rather than exclusion. *See Scott*, 315 F.R.D. at 43 ("The district court 'must focus on the principles and methodology employed by the expert, without regard for the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.'") (quoting *Amorgianos*, 307 F.3d at 266). The CFTC's complaint that this analysis included data from after trading in Bitcoin Futures Contract began likewise is not grounds for exclusion, because that information is relevant. *See, e.g.*, *FHFA v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 653 (S.D.N.Y. 2015) (permitting expert to testify about analyses of events that occurred after relevant time period "so long as it is probative of" the facts "at the period of time at issue"). Indeed, this analysis is particularly relevant because the lack of manipulation affects what penalty should be assessed. *Infra* 14–15.

The relevance of these analyses, and the conclusions Dr. Skrzypacz draws from them, is obvious: the presence (or absence) of *actual* manipulation of the Gemini auction makes it "more or less probable" than it otherwise would be that Gemini's auction was *susceptible* to manipulation. Fed. R. Evid. 401(a). Indeed, while the CFTC argues in the Motion that evidence of what actually happened is not probative of what was susceptible to happen, Dkt. 180 at 11–17, it takes the opposite position with respect to other evidence about actual trading on Gemini. For example, the CFTC asserts that collusive trading between Hashtech and Cardano is evidence that Gemini's exchange was readily susceptible to manipulation. Compl. ¶¶ 119, 127–29. The CFTC's arguments in the Motion cannot be squared with its reliance on evidence about trading between Hashtech and Cardano, and the Court should reject this argument.[12]

Evidence that the Gemini auction was not manipulated is also relevant to determining what (if any) penalty is appropriate. Dr. Skrzypacz's testimony that there was no manipulation of the Gemini auction supports the conclusion that there were no victims of Gemini's alleged wrongdoing. This conclusion is relevant to at least three factors that the CFTC's own Enforcement Manual identifies as relevant to what penalty is appropriate:

- "Whether the violations resulted in harm to victims and, if so, the number and type of victims";

- "Harm (or risk of harm) to victims and market participants"; and

- "Impact on market integrity, customer protection, or the mission and priorities of the Commission in implementing the purposes of the CEA."

---

[12]  While Gemini has moved to preclude evidence of the Hashtech-Cardano trading, Dkt. 163-5 at 1, that motion does not implicate the same consistency concerns. Gemini's argument is that the trading between Hashtech and Cardano is not relevant because it was not conducted on the auction, was not discovered until after the at-issue statements were made, and largely did not involve the asset pair addressed in the Self-Certification. *Id.* It does not dispute the general proposition that evidence of what *did* happen is probative of what *could* happen.

Ex. 5 at 30–31. The CFTC's argument tellingly ignores that its *own Enforcement Manual* undercuts its position.

### C.    Dr. Skrzypacz's Opinions about the Pearl Street Loans Are Relevant, Reliable, and Admissible

The CFTC also seeks to exclude Dr. Skrzypacz from testifying as to his analysis of and opinions about loans made by Pearl Street Financial, LLC ("Pearl Street"). The Court should reject these arguments as well.

Dr. Skrzypacz offers three main opinions about the Pearl Street loans. *First*, Dr. Skrzypacz opines that the Pearl Street loans are not relevant to whether statements about Gemini's pre-funding requirement were false or misleading. According to Dr. Skrzypacz, as a matter of economics, "whether an order is prefunded or not does not depend on the source of funds the trader used to acquire the asset being traded," Report ¶¶ 122, 127, and there is no economic difference between trading using bitcoin borrowed from Pearl Street and trading using bitcoin borrowed from any other lender, Report ¶¶ 124, 126. This opinion goes to the heart of one of the main issues in the case: were the pre-funding statements false or misleading because they did not mention the Pearl Street loans? Moreover, these opinions are reliable because they are offered by a leading expert on auction design and economics and based on substantial economic literature.

*Second*, Dr. Skrzypacz explains why, as a matter of economics, the CFTC's repeated (if utterly unsupported) argument that Pearl Street loans were effectively margin and thus inconsistent with statements about Gemini's pre-funding requirement is wrong. Dkt. 99 at 40–47. As Dr. Skrzypacz explains, trading with margin and trading with bitcoin borrowed from Pearl Street are different. Report ¶¶ 50, 123. The key distinction concerns when the customer incurred the costs associated with each form of borrowing. *Id.* With the Pearl Street loans, the borrower incurred the associated costs immediately when the loan was issued. *Id.* With margin trading, by contrast, the

borrower incurs no costs until a trade is executed, making it cheaper to place manipulative orders that the borrower never intends to execute. *Id.*

*Third*, Dr. Skrzypacz found that there is no evidence any Pearl Street loan recipient tried to manipulate the auction, much less did so. This opinion is based on extensive analysis of Gemini trade data, which showed that:

- Pearl Street loan recipients "made far more market-making orders (i.e., orders providing liquidity) than market-taking orders," which was "consistent with the Pearl Street borrowers being liquidity providers and the Pearl Street loans facilitating liquidity provision." Report ¶ 130, Figure 6.1.

- Trading by Pearl Street's borrowers "followed similar trends as the broader cryptocurrency market." Report ¶ 131, Figure 6.2.

- Pearl Street loan borrowers' "transaction volume far exceeded their outstanding loan amount," and they "continued to trade on the Gemini exchange even after they no longer had loans through Pearl Street." Report ¶ 132, Figure 6.3.

- Pearl Street loan borrowers' trading was "generally in line with the overall trading activity on Gemini's exchange," which is inconsistent with attempts to manipulate, because "[i]f these borrowers were trying to manipulate Gemini's exchange, it would have made more sense to concentrate trading in periods of lower liquidity in the market." Report ¶ 133–34, Figures 6.4, 6.5.

- Trading by Pearl Street loan borrowers did not have a substantial impact on the price of the Gemini auction, as would be expected if there were any form of manipulation ongoing. Report ¶¶ 135–39.

The CFTC's arguments for excluding these opinions are (i) the Court's oral ruling on summary judgment rendered this analysis irrelevant and (ii) evidence of what actually happened is not relevant to the susceptibility analysis. Dkt. 180 at 18–19.[13] The first argument can be put aside in light of the Court's November 18 order, which reversed this ruling and denied the CFTC's motion with respect to these issues. Dkt. 182 at 10–11. The second argument is no more persuasive. As demonstrated above, what did happen is strong evidence of what was susceptible to happen.

---

[13]    The CFTC does not argue there are any flaws in Dr. Skrzypacz's analysis or otherwise dispute their reliability.

*Supra* 14. Indeed, that is the CFTC's entire theory for why evidence about the Hashtech-Cardano trading is relevant. *Id.* What is good for the goose is good for the gander, and Dr. Skrzypacz's analysis is relevant.

**D.    Dr. Skrzypacz's Opinions about Operational Advances Are Relevant, Reliable, and Admissible**

The CFTC next seeks to exclude Dr. Skrzypacz's opinions about operational advances. Those opinions are relevant, based on reliable methods, and admissible. The CFTC's complaints, at most, are grounds for cross-examination, not exclusion.

*First*, Dr. Skrzypacz provides key background about the practice of extending advances, including that "providing advances of funds is a common practice across financial services to reduce frictions related to transfers of funds." Report ¶ 142. He then explains why exchanges provide advances and their economic effect: to "reduce[] the processing time it took for a market participant to complete transfers of Bitcoin or US dollars into their accounts," thus "facilitat[ing] trading a short amount of time sooner than would otherwise" have been possible. Report ¶ 141.

This background gives important context that will help the jury assess three aspects of the CFTC's claim: whether advances were inconsistent with Gemini's pre-funding requirement, whether advances were material, and whether Gemini had the knowledge necessary to establish liability. For example, the jury could find the fact that providing advances is a common practice means it is not likely to increase susceptibility to manipulation—or, at least, that Gemini did not have reason to know they could have been material. Indeed, this evidence could be particularly persuasive given the other evidence in this case, including that Gemini publicly disclosed that it provided advances and that the CFTC never asked Gemini whether it followed this industry-standard practice. Ex. 6, Ex. 7. Similarly, the jury could conclude the fact that advances are

intended to increase volume and liquidity makes it less likely those advances would have increased the Gemini auction's susceptibility to manipulation.[14]

*Second*, Dr. Skrzypacz provides an in-depth analysis of the automated advances that Gemini provided to customers. To conduct this analysis, Dr. Skrzypacz analyzed voluminous data and concluded that those advances (i) tended to be very short-term in nature, (ii) tended to be small in size, and (iii) did not lead to defaults where advances were not repaid. Report ¶ 143. In addition, Dr. Skrzypacz determined that these advances "did not have the effect of artificially inflating the number of trades on the Gemini exchange" and "would not have materially affected market participants' cost of capital." Report ¶ 144. Again, these opinions will help the jury. The CFTC has specifically alleged that advances artificially inflated Gemini's volume *and* that advances were inconsistent with statements that the pre-funding requirement increased cost of capital. Compl. ¶¶ 71–72. Dr. Skrzypacz's opinions are directly relevant to the veracity of that claim.

*Third*, Dr. Skrzypacz analyzed so-called "manual" advances that Gemini provided to certain customers. That analysis revealed that those advances "represented only 1.96 percent of the total BTC advances Gemini provided by volume." Report ¶ 145, Figure 7.1.[15] These advances also tended to be relatively short in duration.[16] Specifically, 12 of the 21 manual advances were

---

[14]  Of course, the CFTC may believe there are different conclusions to draw from this information, and it is free to argue those inferences at trial. But the point remains that giving the jury the background and economics framework to assess the evidence will help the jury.

[15]  The CFTC complains that Dr. Skrzypacz did not properly account for the duration of these advances as part of this analysis. Dkt. 180 at 25. But the CFTC's alternate analysis, which uses a "duration-weighted" metric it invented called "bitcoin days," *id.* at 26, fails as a matter of basic economics and the evidence in this case. The CFTC's metric suggests that an advance can be used to trade continuously throughout the day. That is not how the Gemini exchange worked. The Gemini auction only occurred once each day, at 4:00 PM ET, and Gemini's prefunding requirement meant that any orders placed using advanced funds would "occupy" those funds until the offer was executed or canceled. Ex. 8 [Matuszewski] Tr. 241:18–242:11, Ex. 9 [Molidor] Tr. 191:5–192:10, Ex. 15 at 2. In all events, this argument (and the flaws in it) reinforce why lawyer arguments are not a substitute for qualified expert testimony. The Court should allow Dr. Skrzypacz to offer his opinions, and the CFTC can cross-examine him. The jury can decide who is credible.

[16]  While Dr. Skrzypacz notes that one advance was outstanding for more than 2 months, his analysis demonstrates that "the length of this operational advance . . . was not representative of the operational advances, but instead

paid back within three business days, and 5 additional advances were repaid within the month. Report ¶ 146; Figure 7.2.[17] These opinions will also help the jury. As an initial matter, the jury could conclude that the alleged non-disclosure of manual advances was immaterial because they represent a miniscule portion of the advances Gemini provided. Moreover, the CFTC clearly intends to emphasize a single, out-of-policy manual advance that remained outstanding for three months. *See, e.g.*, Compl. ¶¶ 67–69. Dr. Skrzypacz's analysis of how long these advances typically remained outstanding is useful to putting that advance in context by demonstrating that it was an outlier and reinforcing that this was an operational error rather than a standard business practice.

*Finally*, Dr. Skrzypacz addressed U.S. dollar advances that Gemini provided to customers. Because of data limitations, Dr. Skrzypacz could not analyze these advances in the same way as the bitcoin advances described above. However, based on his economic expertise and the evidence in the record (including an affidavit from one of the CFTC's trial witnesses), Dr. Skrzypacz opined that (i) Gemini's U.S. dollar advances were "operationally equivalent" to similar practices employed by numerous financial institutions, and (ii) these advances "addressed a market friction related to electronic fund or wire transfers but otherwise did not impact the pre-funding of transactions or have a material effect on participants' cost of capital." Report ¶¶ 56, 147.

The CFTC's main complaint about Dr. Skrzypacz's analysis of operational advances is that it is irrelevant. This argument is based on an egregious misrepresentation of the CFTC's claim. In its bid to exclude Dr. Skrzypacz's analysis, the CFTC asserts that its claim only concerns "manual advances," so any analysis of automated advances is not relevant. Dkt. 180 at 20.

---

appears to be an operational error." Report ¶ 146.

[17] The CFTC complains Figure 7.2 is misleading because the points on the x-axis do not cover identical time periods. There is nothing misleading about this chart. The x-axis is clearly labeled, and scaling the x-axis as the CFTC proposes would make the chart illegible. Of course, the CFTC can raise this point on cross, or even attempt to create an alternate chart using Dr. Skrzypacz's backup data. *Supra* 7. This quibble does not warrant exclusion.

The CFTC has *never* characterized its claim this way before. Throughout this case, the CFTC has always treated automated advances as part of its claim. To take but a few examples:

- The CFTC's complaint does not draw any distinction between automated and manual advances. *See* Compl. ¶¶ 62–72.

- On December 19, 2023, the CFTC filed a letter responding to Gemini's argument that it had disclosed operational advances in blog posts about automated advances. Dkt. 74 at 5. Presumably, if automated advances were not part of the CFTC's claim, it would have made that point. It did not. *Id.*

- In its Second Set of Interrogatories, the CFTC asked Gemini for information about a spreadsheet containing data about automated advances. *See* Ex. 10, Interrog. 8 (requesting information about GEM_CFTC341312, which is a spreadsheet containing information about automated advances). The nominal purpose of this interrogatory was to obtain the information needed to authenticate this document. Baughman Decl. ¶ 12. The only reason to ask for this information is so the CFTC could use this document at trial. Presumably, the CFTC does not intend to introduce evidence at trial that is irrelevant to its own claim.[18]

- The CFTC's expert, Mr. Harris, described all three types of advances in his report. *See* Dkt. 124-19 ¶ 94. While his analysis focused only on manual advances, *id.* ¶ 96, Mr. Harris's deposition testimony makes clear that this is not because the CFTC instructed him that automated advances are not part of its claim. Rather, Mr. Harris explained that he did not analyze those advances because they are "routine advances of the type that brokers often provide" and "are generally quite risk free." Ex. 11 at 216:4–17.[19]

- During argument on the CFTC's summary judgment motion, the parties spent hours arguing about operational advances—including automated advances. In fact, the CFTC *specifically addressed* automated advances during its argument. *See, e.g.*, Ex. 12 at 163:14–18 (advances "were a method that Gemini developed to ease the transactions between the blockchain and also bank accounts by allowing – by funding customer accounts immediately rather than waiting for them to be processed"); *id.* at 181:21–25, 188:9–189:7 (describing automated advances). At no point did the CFTC say automated advances were not part of its claim.

---

[18]  This interrogatory makes clear that, at best, the CFTC's motion is premature. The Court should not exclude Dr. Skrzypacz's analysis of those advances only for the CFTC to reverse course (again) and present at trial the case and evidence it has clearly contemplated since the beginning.

[19]  That Dr. Skrzypacz and Mr. Harris draw different conclusions about different types of advances underscores that exclusion is not appropriate here. When assessing the admissibility of expert testimony, "[t]rial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts." *SEC v. Ripple Labs, Inc.*, 2023 WL 5670711, at *10 (S.D.N.Y. Mar. 6, 2023) (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995)).

To be clear, these are only examples. The record is replete with instances where the CFTC made no distinction between automated and manual advances when describing its claim. *See, e.g.*, Ex. 13, Requests 11–14, 35–36; Ex. 14, Topics 12, 21; Dkt. 124-19 ¶ 94.

Simply put, this argument is a last-ditch attempt by the CFTC to save a weak claim by manipulating the record to include only the evidence the CFTC thinks helps its case. The full record will show that the CFTC has identified just 42 advances as supposedly problematic out of *more than 152 thousand* advances that Gemini made. Dkt. 124-19, Fig. 23; Dkt. 181-1 ¶¶ 57–58. While the CFTC is, of course, free to focus on the advances it believes supports its claim, the jury should be presented with the full picture. That is what Dr. Skrzypacz's analysis provides. The Court should allow Dr. Skrzypacz to present his findings to the jury, and the CFTC can address any criticisms it has on cross-examination.

**E.    Dr. Skrzypacz's Opinions about Bespoke Fees and Rebates Are Relevant, Reliable, and Admissible**

The CFTC also seeks to exclude Dr. Skrzypacz's opinions about bespoke fees and rebates. The Court should deny this request as well.

*First*, Dr. Skrzypacz explains that entering into bespoke fee agreements is a common business practice that many exchanges—including the New York Stock Exchange and London Stock Exchange—use to increase volume and liquidity. Report ¶¶ 149–52. This opinion is relevant to the CFTC's claims and Gemini's defenses in multiple ways. For example, the fact that providing bespoke fees is a common practice utilized by the largest exchanges in the world makes it less likely than it otherwise would be that such rebates could make an exchange more susceptible to manipulation. Moreover, a jury—armed with Dr. Skrzypacz's explanation of how increased liquidity protects exchanges against manipulation—could conclude that agreements that increase volume and liquidity tend to *decrease* Gemini's susceptibility to manipulation, and thus would not

be material to any decision the CFTC could make. The jury could also hear this testimony and conclude that it makes it less likely that Gemini knew (or reasonably should have known) that this information would have been material or that failing to disclose it would render statements false and misleading.

*Second*, Dr. Skrzypacz compared a sampling of bespoke fee structures to Gemini's standard fee structure from September 2016 through at least March 2017. Report ¶ 60 n.107. Based on that analysis, Dr. Skrzypacz concluded that the "bespoke agreements were similar to Gemini's publicly-disclosed fee schedules." Report ¶ 151, Figure 3.8. This evidence is clearly relevant to materiality, as the fact that these bespoke agreements were similar to Gemini's standard fees makes it less probable than it otherwise would be that those agreements are material.[20]

*Third*, Dr. Skrzypacz analyzed trade data to assess whether bespoke fee arrangements actually led to manipulative trading on Gemini. Specifically, Dr. Skrzypacz compared the trading activity of the 10 highest-volume Gemini customers when they did and did not have bespoke fees in place. Based on this analysis, Dr. Skrzypacz concluded that (except for Hashtech and Cardano, addressed below), there was "no evidence that the bespoke fee arrangements caused [those customers] to engage in abusive trading." Report ¶ 156. This analysis is directly relevant. As explained above, what actually happened is strong evidence of what was susceptible to happen. *Supra* 13–15. Indeed, this analysis is particularly relevant given the CFTC's counterintuitive position that strategies for increasing volume and making the Gemini auction harder to manipulate could have affected its conclusion that the Bitcoin Futures Contract (and, by implication, the Gemini auction) were not readily susceptible to manipulation.

---

[20]    The CFTC complains this analysis represents only a "point in time" comparison. Dkt. 180 at 28. That does not change the fact that it is relevant to evaluating the CFTC's claims. The CFTC is free to explore the limitations of this analysis on cross-examination, but this is not grounds to exclude reliable and relevant expert testimony.

*Fourth*, Dr. Skrzypacz performed a number of analyses of the trading between Hashtech and Cardano. These analyses found that this trading had no meaningful impact on the price of bitcoin on the Gemini exchange and only a minimal impact on the volume of trading on the Gemini exchange. Specifically, Dr. Skrzypacz found:

- "[N]o evidence that the trading of Hashtech and Cardano had any impact whatsoever on the Gemini auctions." Report ¶ 158.

- "[N]either Hashtech nor Cardano ever participated in the Gemini auction," and their trading did not "affect[] the Gemini auction prices." Report ¶ 158.

- Hashtech and Cardano's trading "had essentially no effect on the price on the exchange." Report ¶¶ 160–62.

- Hashtech and Cardano's trading had a *de minimis* impact on Gemini's BTCUSD trade volume, as "during the three month period where Hashtech and Cardano were engaging in this collusive trading behavior, the total Bitcoin-USD trades between the two parties represented *less than six percent of the total trading volume* present on the Gemini continuous order book." Report ¶ 159, Figure 8.2.[21]

The CFTC's criticisms of Dr. Skrzypacz's analysis are meritless. Indeed, some are outright frivolous. For example, the CFTC complains Dr. Skrzypacz's comparison of bespoke fees and Gemini's standard fees is misleading because the chart he uses to present his findings connects maker and taker fees using "a continuous line" rather than displaying them "as dots." Dkt. 180 at 29–31. Respectfully, this is absurd, and it is incredible that the CFTC spends *three pages* of its brief on this point. Unsurprisingly, none of the cases the CFTC cites remotely supports the notion that an expert's use of lines rather than dots is grounds for exclusion under *Daubert*.[22]

---

[21]  Of course, as noted in Gemini's amended motion *in limine* #2, the Hashtech-Cardano trading is not relevant, and the CFTC should be precluded from relying on it at trial. Dkt. 163-5 at 7–10. If the Court grants that aspect of that motion, then Gemini will not introduce this evidence.

[22]  For example, in *SEC v. Lek Securities Corp.*, 370 F. Supp. 3d 384, 414 (S.D.N.Y. 2019), the court excluded an expert analysis of potentially manipulative trading that was based on just 45 minutes of trading activity and 4 of 675,504 potentially manipulative trades. In *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 638 F. Supp. 3d 227, 267 (E.D.N.Y. 2022), the court excluded one parenthetical of an expert's report that "create[d] the misleading" impression that the expert was offering an opinion on an issue about which he "claim[ed] not to opine."

Here is what is actually happening: Dr. Skrzypacz's charts show the CFTC's complaints about bespoke fees to be totally immaterial, because the alternate fees were entirely in line with the fees identified for the CFTC. The only real difference is the volume threshold required to obtain more favorable fees.[23] But there is no reason why reducing a volume threshold in order to increase volume and liquidity would make Gemini *more* susceptible to manipulation. Once again, the CFTC simply does not want the jury to understand the full context of the alleged omissions, so it is trying to use a *Daubert* motion to hide relevant evidence that will make plain just how piddling its claims are. If the CFTC wants to quibble about lines and dots, it can do so on cross-examination.

The CFTC's other complaints concern Dr. Skrzypacz's analysis of trading between Hashtech and Cardano. These are also baseless. The CFTC argues that Dr. Skrzypacz's analysis is somehow irrelevant. Dkt. 180 at 33–35.[24] That argument has it entirely backwards. The CFTC plainly intends to argue that this collusive trading is somehow "proof" that bespoke fees made Gemini's auction more susceptible to manipulation. Indeed, it made that assertion repeatedly in support of its summary judgment motion. *See, e.g.*, Dkt. 99 at 41–48. Dr. Skrzypacz's analyses— which show that this trading (i) did not take place on the auction, (ii) did not affect the price of the auction, and (iii) did not affect the price on Gemini's continuous order book—all refute that claim.

---

[23]  Oddly, the CFTC argues Dr. Skrzypacz's analysis should be excluded because it "does not analyze whether the customers listed as having received bespoke fee arrangements would have qualified as high-, medium-, or low-volume customers." Dkt. 180 at 31–32. Of course he did not do that analysis. Dr. Skrzypacz's analysis shows that many of the "bespoke" agreements had fee structures that precisely matched the publicly available fee schedule. *See* Report, Figure 3.8. Thus, by definition, the fee structures could only be bespoke if the volume requirements were different. If the customers' volumes had matched the standard fee structure, then *those fees would not have been bespoke at all*.

[24]  The CFTC also suggests that Dr. Skrzypacz endorses the CFTC's view that the Hashtech-Cardano trading increased volume on the Gemini exchange in a material way. Dkt. 180 at 35. This is an egregious misrepresentation of Dr. Skrzypacz's conclusions. As noted above, Dr. Skrzypacz's analysis of Gemini's trade data demonstrates that the Hashtech-Cardano trading represented only a small portion of bitcoin-U.S. dollar trading on the Gemini exchange. *Supra* 23.

Moreover, Dr. Skrzypacz's analysis goes directly to the issues of materiality and penalty. If Hashtech and Cardano's trading victimized *Gemini* but had no effect on the price of bitcoin on its auction (and thus on the Bitcoin Futures Contract), the jury could reasonably conclude that this trading was totally immaterial to Core Principle 3. In addition, the lack of price impact is probative of whether any Gemini customers were harmed and whether the trading had an "impact on market integrity." Ex. 5 at 31.

### F.    Dr. Skrzypacz's Opinions about Self-Trading Are Relevant, Reliable, and Admissible

Dr. Skrzypacz offers two opinions about Gemini's self-trade prevention policies and technology. Both are admissible, and the Court should deny the CFTC's motion as to them.

*First*, Dr. Skrzypacz states that after Gemini implemented self-trade prevention technology on the auction in May 2017, there was no self-trading in the auction. As he explains, "Gemini's measures to prevent self-trading effectively prohibited self-trading on the Gemini exchange as of May 2017, and self-trading did not skew the volume, liquidity, or number of participants trading on the Gemini exchange." Report ¶¶ 164–65. Indeed, Dr. Skrzypacz found "zero self-trading on the continuous order book after March 2017" and "no evidence that self-trading occurred within the Gemini auction after restrictions were put in place in May 2017." Report ¶¶ 167–68, Figures 9.1, 9.2, 9.3.[25]

*Second*, Dr. Skrzypacz demonstrates that economic theory supports Gemini's understanding and definition of self-trading, which excluded unintended instances in which a single account's continuous book and auction book orders wound up on different sides of a single auction (a phenomenon Gemini called "folding"). *See, e.g.*, Ex. 17 at 3; Ex. 16 at 2. As he

---

[25]    While not addressed in the Motion, Dr. Skrzypacz also demonstrates that even before Gemini instituted self-trade prevention, "self-trading accounted for less than one percent of total trading on the continuous order book during the first three months of 2017." Report ¶ 167.

explained, after Gemini imposed auction self-trade prevention in May 2017, "auction participants could not manipulate the auction price or volume using a strategy in which they placed both buy and sell auction-only orders that could potentially both be filled." Report ¶ 79. As a result, "self-trading was a risky strategy in the auction because the price and the extent to which a buy or sell order was filled depended on the other buy and sell orders in the auction, which are not observable to auction participants." Report ¶ 90. This is a key point. Predictability is key to manipulation. Report ¶¶ 90, 91. Thus, the fact that a customer could not intentionally or predictably trade across books supports Gemini's view that folding was not self-trading.

The CFTC's sole criticism is that Dr. Skrzypacz's opinions use Gemini's definition of self-trading. Dkt. 180 at 36–37. This is not grounds for exclusion. Dr. Skrzypacz analyzed Gemini's auction data and demonstrated that Gemini's self-trade prevention technology was effective. The CFTC clearly disagrees with how Gemini and Dr. Skrzypacz define self-trading, but that is a disputed fact for trial.[26] The CFTC cannot exclude Dr. Skrzypacz's analysis on the assumption that its arguments will prevail. *See, e.g.*, *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) ("Courts have held that claims 'that the assumptions relied on by an expert are unfounded is generally an argument that goes to the weight rather than the admissibility of the evidence.'") (quoting *MacQuesten Gen. Cont., Inc. v. HCE, Inc.*, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002)); *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 134–35 (S.D.N.Y. 2015) (denying motion to exclude expert testimony based on flaws in expert's "original assumptions" because "[c]hallenges to the factual basis for an expert's application of an otherwise reliable methodology are quintessential jury issues"). Indeed, exclusion

---

[26] Notably, while the CFTC disputes Gemini's definition of self-trading, the CFTC has not identified any definition of self-trading that it published before this case, much less a definition inconsistent with Gemini's. *See* Ex. 4, Resp. to Interrog. 62.

is particularly inappropriate here, because Dr. Skrzypacz's analysis also supports the reasonableness of Gemini's definition of self-trading. The CFTC cannot simply wish away evidence that is highly relevant to assessing the parties' claims and defenses because it uses a definition the CFTC disputes.

## III.    Dr. Skrzypacz's Summary Slides Are Admissible

The CFTC's final request is that the Court preclude Dr. Skrzypacz from using slides summarizing his opinions. Dkt. 180 at 37. This request is, to be frank, odd. Rule 26 allows experts to use "exhibits that will . . . summarize" their opinions. Fed. R. Civ. P. 26(a)(2)(B)(iii). Thus, there can be no dispute that, assuming the relevant disclosure rules are followed, expert witnesses can use demonstratives to summarize their opinions.

In light of this rule, it is no surprise that experts routinely use summary slides to provide structure for their testimony and help jurors understand their opinions. Indeed, the Second Circuit has specifically approved of this practice. In *Castaldi v. Land Rover N. Am., Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009), plaintiff argued the trial court erred by allowing defendant to use "a chart summarizing the testimony of its expert witness." The Second Circuit rejected this argument, explaining courts may "allow the use of demonstrative aides, including the display of charts or tables accurately summarizing the content of primary testimony" so long as the charts do "not misstate the testimony of [defendant's] expert witness or otherwise mischaracterize the expert's opinion." *Id.*; *see also United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("[T]he opinion of expert witnesses can be summarized on pedagogical charts . . . .").

The CFTC does not claim the summary slides inaccurately reflect Dr. Skrzypacz's opinions. To the contrary, the CFTC argues the summary slides are inadmissible hearsay *because* they accurately reflect the opinions laid out in the Report. Dkt. 180 at 37. This argument misunderstands what these slides are. Generally speaking, summary slides used by an expert are

not evidence. *See* 6 Weinstein's Federal Evidence § 1006.04 ("Pedagogical-device summaries are used to summarize evidence and are not themselves admitted into evidence."). They are tools he will use to structure and summarize his *in court* testimony, as allowed by Rule 26. Of course, the court may, if it deems it appropriate, instruct the jury that these slides are not evidence. But the fact that these slides accurately summarize Dr. Skrzypacz's opinions supports, rather than undermines, their use at trial.

## IV.    Gemini Requests a Rule 104 Hearing if the Court Is Inclined to Grant the Motion

In light of the foregoing, Gemini strongly believes there is no basis to exclude, either in whole or in part, Dr. Skrzypacz's testimony. If, however, the Court is inclined to grant any aspect of the Motion, Gemini respectfully requests that the Court hold a hearing pursuant to Federal Rule of Evidence 104. "The Second Circuit has held that, in general, Rule 104(a) pretrial evidentiary hearings are 'highly desirable' because they allow parties to present expert evidence and conduct cross-examination of the proposed expert." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 70 (S.D.N.Y. 2001) (quoting *Borawick v. Shay*, 68 F.3d 597, 608 (2d Cir. 1995), and are particularly helpful in cases "that involve expert testimony on complex scientific or economic topics," *Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 465 (E.D.N.Y. 2017); *see also Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 385 (S.D.N.Y. 2014) (noting court held two-day *Daubert* hearing). That is precisely what Dr. Skrzypacz does in his report, and the Court would benefit from hearing from Dr. Skrzypacz before excluding any of his opinions.

## Conclusion

Dr. Skrzypacz is a qualified expert. His testimony is relevant, is based on reliable methods, and will help the jury reach its verdict. The Court should deny the Motion.

Dated: New York, New York
        December 6, 2024

Baughman Kroup Bosse Pllc

By John F. Baughman

John F. Baughman
Daniel A. Schwartz
Elizabeth J. Lee
One Liberty Plaza – 46th Floor
New York, NY 10006
(212) 548-3212

*Attorneys for Gemini Trust Company, LLC*