**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMMODITY FUTURES TRADING
COMMISSION,

                              Plaintiff,

               v.                                    No. 22-cv-4563-AKH

GEMINI TRUST COMPANY, LLC,

                              Defendant.


**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**
**THE EXPERT TESTIMONY OF JEREMY CUSIMANO**

TABLE OF CONTENTS

Table of Authorities .................................................................................................................... ii

Preliminary Statement ................................................................................................................ 1

Argument .................................................................................................................................... 3

I.      Mr. Cusimano's Substantial Experience Qualifies Him As An Expert ............................. 3

II.     The CFTC's Arguments Rely on Incorrect Assertions of Law about Section
        6(c)(2)'s Materiality and Knowledge Requirements .......................................................... 8

        A.      Materiality Is A Proper Subject for Expert Testimony ........................................... 8

        B.      Section 6(c)(2) Requires Evidence Gemini Knew or Reasonably Should
                Have Known the Allegedly Omitted Information Was Material or Would
                Render Statements Materially Misleading .......................................................... 10

III.    Mr. Cusimano's Opinions Are Admissible because They Are Based on Reliable
        Methods and Will Help the Jury ...................................................................................... 12

        A.      Mr. Cusimano's Opinion about Industry Customs and Practices Are
                Relevant, Reliable, and Admissible .................................................................... 14

        B.      Mr. Cusimano's Opinions about Gemini's Trading Incentives Are
                Relevant, Reliable, and Admissible .................................................................... 17

        C.      Mr. Cusimano's Opinions about Self-Trading Are Relevant, Reliable,
                and Admissible .................................................................................................... 22

        D.      Mr. Cusimano's Opinions about Pre-Funding Are Relevant, Reliable,
                and Admissible .................................................................................................... 27

IV.     Mr. Cusimano's Summary Slides Are Admissible ......................................................... 30

V.      Gemini Requests a Rule 104 Hearing if the Court Is Inclined to Grant the Motion ........ 31

Conclusion ................................................................................................................................ 32

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Recs. LLC v. Lime Grp. LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ......................................................... 21

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
  364 F. Supp. 3d 291 (S.D.N.Y. 2019) ............................................................. 3, 14

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
  666 F. Supp. 3d 328 (S.D.N.Y. 2023) ........................................................... 21, 26

*Borden v. United States*,
  593 U.S. 420 (2021) ........................................................................................ 12

*Bocoum v. Daimler Trucks N. Am. LLC*,
  2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ...................................................... 20

*Castaldi v. Land Rover North America, Inc.*,
  363 F. App'x 761 (2d Cir. 2009) ...................................................................... 31

*Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*,
  769 F. Supp. 2d 269 (S.D.N.Y. 2011) .............................................................. 21

*CFTC v. Byrnes*,
  2019 WL 4515209 (S.D.N.Y. Sept. 19, 2019) ................................................ 9, 10

*CFTC v. Gramalegui*,
  2018 WL 4610953 (D. Colo. Sept. 26, 2018) ................................................ 11, 16

*CFTC v. Walczak*,
  2022 WL 855562 (W.D. Wis. Mar. 23, 2022) ................................................ 10, 20

*CFTC v. Wilson*,
  2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ...................................................... 7

*Colon ex rel. Molina v. BIC USA Inc.*,
  199 F. Supp. 2d 53 (S.D.N.Y. 2001) .................................................................. 32

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ....................................................................................... 3, 12

*Dover v. British Airways, PLC (UK)*,
254 F. Supp. 3d 455 (E.D.N.Y. 2017) ................................................................. 32

*FHFA v. Nomura Holding Am., Inc.*,
74 F. Supp. 3d 639 (S.D.N.Y. 2015) ................................................................... 26

*Forte v. Liquidnet Holdings, Inc.*,
2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015) ..................................................... 13

*Highland Capital Mgmt., L.P. v. Schneider*,
551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................................................................. 13

*Holowecki v. FedEx Corp.*,
644 F. Supp. 2d 338 (S.D.N.Y. 2009) ................................................................. 22

*In re Fosamax Prods. Liability Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ................................................... 7, 14, 21-22

*In re Lyman Good Dietary Supp. Litig.*,
2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019) ..................................................... 19

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ................................................................. 25

*In re Reserve Fund Secs. & Derivative Litig.*,
2012 WL 12356742 (S.D.N.Y. Sept. 10, 2012) .............................................. 19-20

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005) ................................................................. 22

*In re Zyprexa Prods. Liab. Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) ................................................................... 4

*Kumho Tire, Ltd. v. Carmichael*,
526 U.S. 137 (1999) ........................................................................................... 13

*Kungys v. United States*,
485 U.S. 759 (1988) ....................................................................................... 9, 11

*Lennon v. Miller*,
66 F.3d 416 (2d Cir. 1995) ................................................................................. 30

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016) ................................................................... 8

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995) ........................................................................ 7

*Novartis Pharma AG v. Incyte Corp.*,
    2024 WL 3608338 (S.D.N.Y. July 29, 2024) ............................................. 4

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010) ........................................ 7, 14, 16

*Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014) ...................................................... 32

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) ............................................. 16, 22

*Padillas v. Stork-Gamco, Inc.*,
    186 F.3d 412 (3d Cir. 1999) .................................................................. 32

7315 F.R.D. 33 (S.D.N.Y. 2016) ................................................................. 12

*SEC v. Revelation Capital Mgmt. Ltd.*,
    215 F. Supp. 3d 267 (S.D.N.Y. 2016) ........................................ 4, 13, 14

*SEC v. Lek Secs. Corp.*,
    370 F. Supp. 3d 384 (S.D.N.Y. 2019) .................................................... 22

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ..................................................... 8

*Stagl v. Delta Air Lines, Inc.*,
    117 F.3d 76 (2d Cir. 1997) ...................................................................... 7

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019) ................................................................. 15-16

*United States v. Connolly*,
    2018 WL 2411760 (S.D.N.Y. May 15, 2018) ....................................... 16

*United States v. Janati*,
    374 F.3d 263 (4th Cir. 2004) ................................................................. 31

*United States v. Litvack*,
    808 F.3d 160 (2d Cir. 2015) ........................................................... 13, 15

*United States v. Londono-Tabarez*,
    121 F. App'x 882 (2d Cir. 2005) ........................................................... 12

*United States v. Mejia,*
   545 F.3d 179 (2d Cir. 2008) ........................................................................ 19

*United States v. Newkirk,*
   684 F. App'x 95 (2d Cir. 2017) ................................................................... 15

*United States v. Phillips,*
   2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) .............................................. 16

*United States v. Raza,*
   876 F.3d 604 (4th Cir. 2017) ....................................................................9-10

*United States v. Tomasetta,*
   2011 WL 6382562 (S.D.N.Y. Dec. 12, 2011) ............................................. 11

*Washington v. Kellwood Co.,*
   105 F. Supp. 3d 293 (S.D.N.Y. 2015) .......................................................... 7

*Wechsler v. Hunt Health Sys., Ltd.,*
   381 F. Supp. 2d 135 (S.D.N.Y. 2003) .......................................................... 8

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,*
   571 F.3d 206 (2d Cir. 2009) ....................................................................... 13

**Rules/Statutes**

7 U.S.C. § 9(2) ................................................................................................ 11

Fed. R. Civ. P. 26 ........................................................................................... 30

Fed. R. Evid. 702 .............................................................................................. 3

**Secondary Authorities**

6 Weinstein's Federal Evidence § 1006.04 .................................................... 31

Gemini Trust Company, LLC ("Gemini") respectfully submits this memorandum of law in opposition to the motion by plaintiff Commodity Futures Trading Commission ("CFTC" or the "Commission") to exclude the expert testimony of Jeremy Cusimano (the "Motion").

## PRELIMINARY STATEMENT

The claims and defenses in this case involve a number of highly complicated and technical financial products and practices. These topics include (but are not limited to) the operation of digital currency spot exchanges, futures contract trading, potential strategies for manipulating the price on spot and derivatives exchanges, and what business practices affect the susceptibility of exchanges to those manipulative practices. This is not information that jurors can reasonably be expected to have at their fingertips. For this reason, expert testimony will be extraordinarily helpful to the jury in understanding these critical topics.

To provide some of this critical information and insight, Gemini retained Jeremy Cusimano as an expert witness. Mr. Cusimano, a Managing Director at Alvarez & Marsal, is well-credentialed to provide this type of testimony. During more than two decades in the commodities industry, Mr. Cusimano has gained extensive firsthand knowledge and familiarity with many of the critical issues in this case. Indeed, some of that experience came while working at the CFTC, where Mr. Cusimano was heavily involved in assessing potentially manipulative trading on regulated commodities exchanges, as well as assessing whether products complied with Core Principle 3's prohibition on contracts that are readily susceptible to manipulation.

Notwithstanding his sterling credentials and experience at the Commission, the CFTC filed a blunderbuss motion to exclude Mr. Cusimano's testimony entirely. While the flaws in the CFTC's argument are numerous and varied, two pervade nearly every aspect of the Motion.

*First*, the CFTC's arguments rely on a pair of flawed legal arguments: that an expert cannot testify on issues relevant to the key issue of materiality, and that the CFTC can prevail on its claim

simply by proving that Gemini was aware of allegedly undisclosed information. The CFTC is wrong on both points. Materiality is a classic topic for expert discovery—as the CFTC's own statements and actions amply demonstrate. Indeed, the CFTC's expert, Mr. Harris, specifically opines on matters relating to materiality. And the CFTC cannot prevail simply by proving that Gemini was aware of the allegedly omitted facts. As a matter of straightforward textual interpretation and basic legal principles, the CFTC must prove Gemini either knew or reasonably should have known that not disclosing the allegedly omitted information would render statements materially false or misleading.

The impact of these flawed legal arguments cannot be overstated. Under the CFTC's view of the world, materiality should be presumed based on the fact that the at-issue statements were made, and Gemini cannot introduce testimony from either the CFTC's witnesses or a qualified expert to rebut it. That is not the law. The Supreme Court's decision in *Kungys v. United States*, 485 U.S. 759 (1988), makes clear that materiality cannot be proven simply through evidence that a statement was made. Moreover, the CFTC posits that simply knowing undisclosed facts satisfies Section 6(c)(2)'s knowledge requirement, even absent evidence the speaker knew (or even should have known) it had to disclose that fact. Accepting the CFTC's arguments—which are contrary to the plain statutory text and bely binding precedent—would effectively eliminate Section 6(c)(2)'s materiality and knowledge requirements. The Court should reject the CFTC's effort to lower its evidentiary burden.

*Second*, the CFTC confuses potential cross-examination topics with grounds for excluding Mr. Cusimano's testimony. For example, the CFTC repeatedly complains that Mr. Cusimano does not tie each of his opinions to a specific morsel of experience. But there is no requirement that he provide such specific connections, particularly where his decades of experience so clearly support

the matters on which he is opining. At most, this is a potential point for cross-examination. Similarly, the CFTC repeatedly suggests Mr. Cusimano selectively or incorrectly analyzed evidence to corroborate his opinions. But these arguments (which, in any event, frequently rely on incomplete or outright misleading depictions of Mr. Cusimano's report and deposition) fly in the face of voluminous authority making clear that such criticisms are the province of cross-examination, not exclusion.

The Court should deny the Motion and allow Mr. Cusimano to testify at trial.

**ARGUMENT**

Federal Rule of Evidence 702 allows testimony by qualified experts. Whether expert testimony is admissible "focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony . . . will assist the trier of fact." *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 323–24 (S.D.N.Y. 2019). "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

## I.    Mr. Cusimano's Substantial Experience Qualifies Him As An Expert

Mr. Cusimano is qualified to serve as an expert in this case and to opine on the matters addressed in his Report.[1] The CFTC's complaints about his experience are, at most, grounds for cross-examination. None warrants exclusion.

---

[1]    "Report" refers to the Expert Report of Jeremy Cusimano, which was attached as Exhibit 1 to the Motion. Dkt. 164–1. "Ex." refers to exhibits to the Declaration of John F. Baughman filed in opposition to the Motion. "Self-Certification" refers to the certification submitted by the Cboe Futures Exchange ("CFE") on December 1, 2017. "Bitcoin Futures Contract" refers to the product that was the subject of the Self-Certification.

The test for whether an expert is qualified is flexible. "Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." *SEC v. Revelation Capital Mgmt. Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016).[2] Under this standard, an expert need not "satisfy an overly narrow test of his own qualifications." *Novartis Pharma AG v. Incyte Corp.*, 2024 WL 3608338, at *3, 23 (S.D.N.Y. July 29, 2024). So long as "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)).

Mr. Cusimano's experience provides ample basis to serve as an expert on the matters he will address at trial: the customs and practices of commodities exchanges and how they affect the critical issues of materiality and *mens rea*. Mr. Cusimano has a degree in economics—the same subject as the CFTC employees primarily responsible for reviewing the Bitcoin Futures Contract. Ex. 1 at 26:15–27:15; Ex. 2 at 15:19–16:3. Since obtaining that degree, Mr. Cusimano has gained extensive experience in global financial markets (particularly commodities markets), economic analysis, investigations into commodity and derivatives trading, and regulatory policy. He has held senior positions with government agencies, including stretches as the Chief Economist for Petroleum Reserves at the Department of Energy and an Economic Advisor to the Director of Enforcement at the CFTC. Report ¶ 2.

---

[2]    Unless otherwise noted, all objections are omitted from deposition testimony. In addition, all emphasis is added, all citations and quotations are omitted, and all quotes are cleaned up.

During his time at the CFTC, Mr. Cusimano gained extensive experience with and knowledge about the CFTC's approach to manipulation in the commodities markets. Mr. Cusimano developed and led a team responsible for identifying potential violations of the Commodity Exchange Act ("CEA"), including in particular market manipulation and disruptive trading violations. *Id.* ¶ 3. In that role, Mr. Cusimano performed numerous investigations into exchange-traded and over-the-counter products (including futures and other derivatives) and provided expert analyses to support regulatory and law enforcement investigations on various issues, including manipulative trading. *Id.* Many of these investigations involved assessments of potential misconduct in underlying cash, physical, or spot commodity markets (like the Gemini exchange), as well as the various strategies to prevent that misconduct. This experience gave Mr. Cusimano keen insight into manipulation of commodities markets and what can make such manipulation more or less likely—precisely the issues he addresses in his Report.

Mr. Cusimano also gained specific experience evaluating compliance with DCM regulations, including Core Principle 3, while working at the CFTC. As he explained during his deposition, "as a relatively senior person who had market experience, economic expertise within division of enforcement . . . [he] was asked to provide the enforcement division's view on" product certifications submitted to the CFTC for review. Ex. 3 at 48:5–22. In that capacity, susceptibility to manipulation—which is at the heart of this case—"came up in a number of different contexts," *id.* at 38:3–25, and Mr. Cusimano was specifically involved in assessing whether products were readily susceptible to manipulation, *id.* at 39:16–40:6.

Mr. Cusimano's focus on manipulation-related issues in commodities markets continued after he left the government. In 2012, Mr. Cusimano joined Grant Thornton, where he led the firm's commodities and derivatives-related advisory services. In 2016, Mr. Cusimano moved to

Alvarez & Marsal Disputes and Investigations, LLC, where he continued to specialize in commodities and derivatives markets. In these roles, Mr. Cusimano has done extensive work in— and gained substantial additional knowledge about—issues relating to manipulation of commodities markets, the structure and practices of commodities exchanges, and regulatory requirements for registering and operating as a DCM. *See generally* Report ¶¶ 1–2, App'x A at 1; Ex. 3 at 27:5–29:16 (describing experience advising clients on compliance with CFTC's Core Principles). Mr. Cusimano has also published on issues related to compliance and regulatory matters. *Id.*, App'x A at 5.

Mr. Cusimano has acted as an expert in federal court and a JAMS arbitration on various issues involving manipulative trading in commodities markets, including on cryptocurrency trading platforms. *Id.*

In light of this extensive experience, there is no basis for the CFTC's claim that Mr. Cusimano is not qualified to serve as an expert. The CFTC offers two main criticisms of Mr. Cusimano's credentials. Both fail. The CFTC first complains Mr. Cusimano has not personally analyzed compliance with the CFTC's Core Principles. Dkt. 162 at 10–14. But that is not true, and the CFTC's argument relies on a complete misrepresentation of Mr. Cusimano's testimony. Indeed, Mr. Cusimano said the *opposite* of what the CFTC claims:

> Q.    At any time while you were working at the CFTC, did you analyze a single product's compliance with Core Principle 3?
>
> A.    *It was an issue that came up in a number of different contexts.* You know, particularly around things like having contracts that settled to, you know, market benchmark[s] . . . . [S]imilarly it came up in terms of . . . products where -- that are jointly listed or economically similar equivalent products are listed by [multiple DCMs] . . . . So in those types of scenarios, the considerations around Core Principle 3 would come in.
>
> Q.    Okay. But you never analyzed the product to see whether it complied with Core Principle 3, correct?

A.    I think *I described a deliberative process that could be described as analyzing or considering whether contracts would be susceptible to manipulation.*

Q.    Core Principle 3 came up, but you didn't analyze the product for specific compliance with Core Principle 3?

A.    *I think I'm -- I'm saying the opposite of that.*

Ex. 3 at 38:3–39:15.

This testimony also disposes of the CFTC's second argument: that Mr. Cusimano's years working for the CFTC are irrelevant because he did not work in the Division of Market Oversight ("DMO"). It does not matter that Mr. Cusimano did not work in a particular division or department. What matters is whether Mr. Cusimano gained exposure to and experience in the general issues he will opine on at trial. The testimony quoted above (and Mr. Cusimano's other experience) makes clear that he has. That experience—plus his many years of work evaluating commodities markets and products for potential manipulation—is precisely the type of expertise that courts routinely find satisfies the requirements of Rule 702 and *Daubert*. *See, e.g.*, *Stagl*, 117 F.3d at 82 (ruling it was error to exclude testimony by expert qualified by experience in human-machine interaction notwithstanding lack of experience with specific topic at issue, which involved airline terminal or baggage claim area design); *CFTC v. Wilson*, 2016 WL 7229056, at *9–10 (S.D.N.Y. Sept. 30, 2016) (finding expert with extensive commodities industry experience was qualified notwithstanding that he had not traded particular futures product at issue in case).[3]

---

3    *See also McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1042–43 (2d Cir. 1995) (permitting expert to testify as to matters within general expertise notwithstanding that he was not expert in certain specific matters at issue); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 308–09 (S.D.N.Y. 2015) (holding expert with extensive experience valuing businesses was qualified notwithstanding lack of experience in particular industry; potential limits of experience was an issue for cross); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 459–61 (S.D.N.Y. 2010) (holding expert qualified based on general experience conducting due diligence notwithstanding lack of experience with issues addressed in opinions; fact that expert was not "the world's leading expert" was a point for cross-examination); *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 202 (S.D.N.Y. 2009) ("[T]he fact that a physician is not a specialist in the field in which he is giving expert opinion does not affect the admissibility of the opinion, but rather the weight the jury may place

The Court should reject the CFTC's attempt to impose precisely the type of "overly narrow test" that courts in this Circuit routinely reject and find that Mr. Cusimano is qualified as an expert.[4]

## II.    The CFTC's Arguments Rely on Incorrect Assertions of Law about Section 6(c)(2)'s Materiality and Knowledge Requirements

The CFTC's arguments for excluding Mr. Cusimano's testimony rely on two fundamental misstatements of the law: (i) materiality is "not [an] appropriate expert topic[]," and (ii) Section 6(c)(2)'s knowledge requirement can be met through evidence Gemini "had access to information contradicting its misstatements." Dkt. 162 at 15, 21. Gemini addresses each point below.

### A.    Materiality Is A Proper Subject for Expert Testimony

The CFTC argues Mr. Cusimano's opinions about issues that bear on the allegedly omitted information's materiality "are not appropriate expert topics." *Id*. at 21–22. That argument can be easily rejected, as it is contrary to the Court's statements, the CFTC's prior positions, and the law.

Throughout this case, the Court has repeatedly stated that materiality is a proper subject for expert testimony. During a February 2023 colloquy about the types of evidence that could be used to prove (or disprove) materiality, the Court observed that, because materiality is measured by an objective standard, "probably [Gemini] may need an expert on this issue." Ex. 4 at 11:14–12:4. Similarly, at the hearing on Gemini's motion to compel the CFTC to provide various

---

on it."); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (finding expert qualified based on general experience conducting audits notwithstanding that he had not worked in industry at issue).

The cases cited by the CFTC do not support a contrary result. For example, *SEC v. Tourre* involved an expert who, unlike Mr. Cusimano, had "no experience" in the relevant industry. 950 F. Supp. 2d 666, 677–78 (S.D.N.Y. 2013). In *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, the court excluded an expert whose work as a professor and academic writings did not include the type of "largely empirical" work that was necessary to answer the "central" question in the case. 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016). Mr. Cusimano's work, by contrast, is directly relevant to the issues on which he will opine.

[4]    The CFTC's other criticism—that some of Mr. Cusimano's experience relates to certifications submitted to the CFTC for approval rather than self-certifications, Dkt. 162 at 12–13—fails for the same reason. Moreover, this argument makes no sense. Compliance with Core Principle 3 is a requirement under both processes; the only difference is whether the DCM or the CFTC makes this decision. *See* Ex. 1 at 77:8–22.

categories of evidence on the grounds, *inter alia*, that they are directly relevant to materiality, the Court made the following statement about how materiality would be proved: "You're arguing for an objective standard in materiality, *provable by an expert witness*." Ex. 5 at 25:21–22.

The CFTC's argument is also inconsistent with the Commission's view of how *it* should be allowed to prove materiality. In *CFTC v. Byrnes*, the Commission (which was represented by one of the lawyers that has appeared on its behalf in this case) introduced expert evidence to support its claim that certain information was material. 2019 WL 4515209, at *7 (S.D.N.Y. Sept. 19, 2019) (CFTC's expert "opined that the information disclosed by [defendants] would be important to a reasonable commodity investor"). In fact, the CFTC has endorsed using experts to prove materiality *in this case*. In March 2024, the CFTC said it intended to have its expert "talk to the materiality of the omitted information among other topics." Ex. 6 at 8:4–16. And, indeed, the CFTC's expert, Mr. Harris, did make a number of assertions about materiality in his report.[5] The CFTC's attempt—yet again—to hold itself to a different standard than it applies to Gemini is, in and of itself, sufficient basis to reject the CFTC's argument.

Of course, the CFTC's argument is also wrong on the law. Materiality under Section 6(c)(2) is measured by an objective standard. Dkt. 77 at 2–3. The Supreme Court has made clear that, for statements made to the government, this objective standard requires that the statement be capable of influencing the particular agency or officials to which it was made. *See Kungys*, 485 U.S. at 772 (explaining materiality test was whether statement had "a natural tendency to influence the decisions of the Immigration and Naturalization Service"); *United States v. Raza*, 876 F.3d

---

[5]   Mr. Harris's attempt to offer opinions on this issue places the CFTC's complaints about Mr. Cusimano's qualifications in their appropriate context. As set forth in Gemini's *Daubert* motion, Mr. Harris (unlike Mr. Cusimano) has no relevant experience but repeatedly opines about what information would have been material to the CFTC. Dkt. 170 at 2–3, 7–8. The CFTC does not even attempt to justify why Mr. Harris is qualified to offer such opinions but Mr. Cusimano is not.

604, 617 (4th Cir. 2017) ("[W]hen the victim is the government, the prosecution must prove materiality by reference to the particular government agency or public officials that were targeted."). Experts routinely provide evidence relevant to similar inquiries. *See, e.g.*, *Byrnes*, 2019 WL 4515209, at *7 (CFTC's expert admitted to testify about materiality of statements); *CFTC v. Walczak*, 2022 WL 855562, at *2 (W.D. Wis. Mar. 23, 2022) (denying CFTC's motion to exclude expert from testifying about issues that "*may* aid the jury in deciding whether an alleged misrepresentation was material to a reasonable investor") (emphasis in original). The Court should permit Mr. Cusimano to opine on these issues at trial.[6]

### B.    Section 6(c)(2) Requires Evidence Gemini Knew or Reasonably Should Have Known the Allegedly Omitted Information Was Material or Would Render Statements Materially Misleading

The CFTC also argues that Mr. Cusimano's opinions about what Gemini reasonably should have known are irrelevant as a matter of law. Dkt. 162 at 14–22. This argument is also wrong.

The CFTC alleges Gemini violated Section 6(c)(2) of the CEA. That statute states the following:

> It shall be unlawful for any person to make any false or misleading statement of material fact to the Commission . . . or to *omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect*, *if the person knew, or reasonably should have known, the statement to be false or misleading.*"

---

[6]    The CFTC's argument to the contrary relies on a particularly egregious misrepresentation of Mr. Cusimano's opinions. The CFTC asserts that "[t]hroughout his report Cusimano opines that certain statements and omissions would not 'be viewed as containing false or misleading statements or material omissions.'" Dkt. 162 at 21. In fact, Mr. Cusimano's statements concern whether Gemini reasonably would have known that its statements could be seen as materially misleading. For example, paragraph 12(a) of the Report observes that "Gemini would not have known or had reason to believe that the information it provided to the CFTC with respect to its pre-funding requirement would be viewed as containing false or misleading statements or material omissions." *See* Report ¶ 12(a). Other paragraphs the CFTC cites contain similar language. *See* Report ¶¶ 12(b), 12(c), 14, 45, 54, 59, 68, 69, 84, 88, 101, 104. Whether or not Gemini reasonably should have known that the facts it allegedly omitted were material or that not disclosing them would render statements materially misleading is a key issue in this case and an appropriate topic for expert testimony. *Infra* § IIIB.

7 U.S.C. § 9(2). The CFTC's claims against Gemini are rooted in alleged omissions. *See* Dkt. 162 at 16.[7] Specifically, the CFTC alleges Gemini's purported failure to disclose certain information rendered statements about pre-funding, self-crossing, fee incentives and rebates, and volume on the Gemini exchange false or misleading. Compl. ¶¶ 40–72, 73–87, 88–107, 108–124.

Under Section 6(c)(2)'s plain language, to prevail on this omissions theory, the CFTC must prove the alleged omissions (i) were of "*material* fact" and (ii) rendered affirmative statements misleading "in a[] *material* respect." But that is not all the CFTC must prove. The CFTC must also prove Gemini "knew, or reasonably should have known, the [at-issue] statement[s] to be false and misleading." *See CFTC v. Gramalegui*, 2018 WL 4610953, at *23 (D. Colo. Sept. 26, 2018). The CFTC's claim that it can meet this knowledge requirement simply by proving that Gemini was aware of the omitted facts, Dkt. 162 at 18–22, makes no sense in the context of this statute. As demonstrated above, Section 6(c)(2) does not create a blanket obligation of disclosure. That duty is directly tied to materiality: if the omission is of an *immaterial* fact, or if the omitted fact does not render an affirmative statement *materially* misleading, then no violation has occurred. *See Kungys*, 485 U.S. at 774–76. It makes no sense for the knowledge requirement to be completely untethered to this critical concept. Yet that is exactly what the CFTC proposes.

Moreover, applying the CFTC's rule would impose liability even on speakers that had no idea they were doing something wrong. A simple example demonstrates this problem. Imagine the CFTC interviews a witness, Amanda, as part of an investigation into another individual, Bob. In response to a question during the interview, Amanda truthfully states that she graduated from Columbia but does not mention that she attended Rutgers for her freshman year. Now, imagine

---

[7]    This critical distinction differentiates this case from *United States v. Tomasetta*, 2011 WL 6382562 (S.D.N.Y. Dec. 12, 2011), on which the CFTC relies. *Tomasetta* concerned affirmative false statements about whether stock options were in or out of the money, not the alleged nondisclosure of additional and purportedly relevant contextualizing information. *Id.*, at *1.

Bob also attended Rutgers at the same time Amanda was there. The fact that Amanda and Bob attended the same school at the same time could, potentially, be material. But Amanda would have had no way to know that. Nevertheless, under the CFTC's theory, Amanda could be found to have broken federal law even though she answered the CFTC's question truthfully and neither knew nor had reason to know the information she omitted was material or that not disclosing it would render her answer materially misleading.

That approach makes no sense. The far better reading of Section 6(c)(2) is that the CFTC must prove Gemini either subjectively knew or objectively should have known that the allegedly omitted facts were material or that not disclosing them would render statements materially false or misleading.[8] Doing otherwise risks imposing liability on Gemini—as in the example above—for not disclosing information it did not know (and reasonably should not have known) it had to disclose. Neither the statute, fundamental legal principles, nor common sense support this result.

## III.    Mr. Cusimano's Opinions Are Admissible because They Are Based on Reliable Methods and Will Help the Jury

Expert evidence is admissible if it is helpful to the jury and based on reliable methods. *Daubert*, 509 U.S. at 589–91. Expert evidence is helpful when it provides relevant information about matters "beyond the ken" of lay jurors. *United States v. Londono-Tabarez*, 121 F. App'x 882, 884 (2d Cir. 2005). Testimony about industry custom and practice does this when the expert uses their experience to place record evidence "within a larger context of industry norms." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016). Such testimony is particularly helpful in complex cases involving financial markets, products, and concepts with which jurors

---

[8]    Contrary to the CFTC's suggestion, requiring evidence that Gemini knew or reasonably should have known the information it did not disclose was material or would render its statements materially misleading does not impose an intent requirement. Dkt. 162 at 19. Intent requires that an individual "consciously desire" a result. *Borden v. United States*, 593 U.S. 420, 426 (2021). The interpretation of knowledge that Gemini advocates for here does not impose any such requirement.

are likely unfamiliar. *See, e.g.*, *United States v. Litvack*, 808 F.3d 160, 183 (2d Cir. 2015) (finding expert testimony about bond trading would have been particularly relevant because jury was likely unfamiliar with how such trading worked); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 180 (S.D.N.Y. 2008) (holding expert testimony about industry custom and practice would help the jury in case involving alleged breach of contract to sell promissory notes).

The Second Circuit has "espouse[d] a particularly broad standard for the admissibility of expert testimony." *Revelation Capital*, 215 F. Supp. 3d at 275 (quoting *Colon ex rel. Molina v. BIC USA Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001)). Under this standard, "a trial judge should exclude expert testimony if it is so speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Thus, so long as the expert's testimony "lies within 'the range where experts might reasonably differ,' the jury, and not the trial court, should 'decide among the conflicting views of different experts.'" *Forte v. Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *6 (S.D.N.Y. Sept. 30, 2015) (quoting *Kumho Tire, Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)).

Courts assess whether opinions rooted in an expert's experience are reliable using a flexible, practical test. *Kumho Tires*, 526 U.S. at 141–42. "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Id.* at 148–49. "[T]he relevant reliability concerns [] focus upon personal knowledge or experience . . . ." *Id.* at 150. "'A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method' does not require exclusion; exclusion is only warranted 'if the flaw is large enough that the expert lacks good grounds for his or her

conclusions.'" *A.V.E.L.A.*, 364 F. Supp. 3d at 324 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *see also In re Fosamax*, 645 F. Supp. 2d at 173 ("[O]nly serious flaws in reasoning or methodology will warrant exclusion.").

Experts offering opinions based on their experience need not identify specific sources or parcels of information to support each opinion. "Industry practices are not like scientific hypotheses, which can be tested through trial and error, or logical arguments, which can be analyzed through probing their underlying premises." *Pension Comm.*, 691 F. Supp. 2d at 464. For this reason, an expert need not "opine that he had X experience, which taught him that Y was advisable." *Id.* Providing an overall description of prior experiences "provides a sufficient link between [an expert's] experience and opinions to satisfy the reliability requirement of Rule 702"; more detailed challenges are grounds for cross-examination, not exclusion. *Id.* at 464–65.

Courts also look to the "preparation and presentation" of the expert's opinions to assess whether they are the product of sufficiently reliable methods. In *Revelation Capital*, for example, the court concluded that a financial industry expert's opinions were "the product of reliable principles and methods" where his report was "broken into sections" that specifically addressed the matters on which he was asked to opine and cited to record evidence and other documents that confirmed his opinions. 215 F. Supp. 3d at 277–28; *see also Pension Comm.*, 691 F. Supp. 2d at 472 (holding expert opinions were "not unsupported" where they were based on expert's review of relevant evidence and understanding as an expert of what that evidence meant).

A.    **Mr. Cusimano's Opinion about Industry Customs and Practices Are Relevant, Reliable, and Admissible**

The CFTC argues the Court should exclude Mr. Cusimano's opinions about customs and practices among commodities and commodity derivatives exchanges because they are irrelevant.

Dkt. 162 at 14–18. In fact, Mr. Cusimano's opinions are directly relevant to both materiality and what Gemini knew or reasonably should have known.

Mr. Cusimano's opinions are directly relevant to the issue of materiality. The CFTC's theory is that the allegedly omitted information was material or rendered statements materially misleading. *Supra* § IIB. Mr. Cusimano's testimony, however, will show that many of the things the CFTC alleges Gemini did not disclose are standard practices used throughout the commodities markets, including on CFTC-regulated exchanges. *See, e.g.*, Report ¶¶ 42–44 (pre-funding), 69–73 (trading incentives), 89–99 (self-trading). As discussed in detail below, this fact makes it less probable than it otherwise would be that Gemini's allegedly undisclosed practices would have affected the Bitcoin Futures Contract's susceptibility to manipulation. *Infra* §§ IIIB, IIIC, IIID. This is critical evidence regarding materiality, and Mr. Cusimano's testimony is relevant for this reason alone.

Courts routinely allow experts to testify about industry customs and practices on the grounds that it is probative of materiality. In fact, the Second Circuit has held that exclusion of this evidence can be reversible error. In *United States v. Litvack*, defendant appealed his conviction for, *inter alia*, making false statements about the price he paid to acquire certain RMBS on the grounds that the trial court improperly excluded an expert who would have testified about industry practices. 808 F.3d 160, 181–82 (2d Cir. 2015). The Second Circuit agreed and overturned the conviction, holding that "the District Court exceeded its allowable discretion in excluding [this] testimony," which "would have been highly probative of materiality, the central issue in this case." *Id.* at 182.[9] Other courts in this Circuit have reached the same conclusion. *See, e.g.*, *United States*

---

[9]    *United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017), on which the CFTC relies, is not to the contrary. In *Newkirk*, defendant did not dispute his false statement—which concerned the identity of his client—was material. For this reason, the Second Circuit determined that expert testimony about industry custom and practice was not relevant and specifically distinguished *Litvak* on that basis. *Id.* at 96–97.

*v. Calderon*, 944 F.3d 72, 79 n.3, 83, 87, 88–89 (2d Cir. 2019) (experts permitted to testify on industry custom and practice issues relevant to materiality).[10]

Mr. Cusimano's opinions are also relevant to whether the CFTC can satisfy its burden of proof on the knowledge element of its claim. It is well established that what a reasonable person would be expected to know is probative of whether Section 6(c)(2)'s knowledge requirement is met. Indeed, the CFTC's own cases confirm as much. In the Motion, the CFTC cites *CFTC v. Gramalegui*, 2018 WL 4610953, at *26 (D. Colo. Sept. 26, 2018), Dkt. 162 at 15, which states the following about Section 6(c)(2)'s knowledge requirement:

> [T]he CFTC must prove defendant knew or reasonably should have known his statements were false or misleading. Defendant's history and background inform that determination, *as do considerations of what a reasonable person would be expected to know in similar circumstances.*

*Id.*

Mr. Cusimano's testimony will speak directly to this issue. Courts have admitted expert testimony on industry customs and practices as evidence of *actual* knowledge. *See Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 403 (S.D.N.Y. 2013) (admitting expert's custom and practice testimony as "highly relevant" to proving or disproving actual knowledge). Moreover, as demonstrated below, evidence that the allegedly omitted information concerns common and accepted practices used by CFTC-regulated exchanges unquestionably "has a tendency to make [it] more or less probable" that Gemini reasonably should have known that its alleged omissions would render any statements materially misleading. *Infra* §§ IIIB, IIIC, IIID.[11]

---

[10]  *See also United States v. Phillips*, 2023 WL 6620146, at *14 (S.D.N.Y. Oct. 10, 2023) (permitting expert to testify about custom and practice of foreign exchange market participants and how particular facts aligned with those practices); *United States v. Connolly*, 2018 WL 2411760, at *9–10 (S.D.N.Y. May 15, 2018) (permitting expert to testify about industry custom and practice and stating testimony was relevant to objective materiality).

[11]  Because Mr. Cusimano's testimony will focus on industry custom and practice, the CFTC is wrong that his opinions violate the prohibition on expert testimony about a party's mental state. *See Pension Comm.*, 691 F. Supp. 2d at 467 (expert could testify about industry customs but not plaintiffs' actual state of mind).

**B.    Mr. Cusimano's Opinions about Gemini's Trading Incentives Are Relevant, Reliable, and Admissible**

Mr. Cusimano's opinions about trading incentives—namely, that it is common for commodities exchanges to offer trading incentives, including bespoke incentives, and that Gemini would not have reason to know the CFTC views those incentives as relevant to compliance with Core Principle 3—are admissible because they are relevant and reliable.

The CFTC's theory is that statements about incentives Gemini offered traders to increase trading on its exchange were false and misleading because Gemini did not disclose that it offered non-standard or bespoke trading incentives to certain customers. Compl. ¶¶ 88–107. While Gemini disputes that this fact was omitted at all, assuming *arguendo* the CFTC is correct, Mr. Cusimano's opinions are directly relevant to whether this information was material and, if so, whether Gemini reasonably should have known that failing to disclose it would render statements materially false or misleading.

Two examples show why this is the case. *First*, a reasonably jury—armed with the information Mr. Cusimano will provide—could determine that the prevalence of bespoke fee incentives, including on CFTC-regulated exchanges, makes it less probable that their use increases susceptibility to manipulation and, consequently, is material to Core Principle 3. *Second*, the jury could conclude that the widespread use of those incentives makes it less probable that Gemini reasonably would have known that failing to disclose its use of these common practices would render its statements materially misleading.

Indeed, Mr. Cusimano's testimony on this issue is particularly important because it provides critical context for a key exculpatory fact. The evidence shows that Gemini specifically and repeatedly disclosed information about its bespoke fees to CFE before the Self-Certification. *See, e.g.*, Ex. 7 at 47–48; Ex. 8 at 3. CFE, however, did not specifically flag this information for

17

the CFTC, did not amended any prior statements, and did not address this factor as part of the Self-Certification's analysis of Core Principle 3. Mr. Cusimano's analysis helps place CFE's apparent apathy in its proper context. After all, why would CFE think to highlight a common industry practice that nobody—including the CFTC—had ever said implicates Core Principle 3 concerns? Mr. Cusimano's testimony on this topic is thus particularly persuasive evidence about materiality and what Gemini "reasonably should have known."

Mr. Cusimano's opinions are also reliable because they are rooted in his experience and confirmed by his analysis of multiple forms of confirmatory evidence. Mr. Cusimano has extensive experience in the commodities industry and related markets, including analyzing compliance with Core Principle 3 and other CFTC regulations and detecting manipulative trading. *Supra* § I. In the course of that experience, Mr. Cusimano has gained considerable knowledge about types of exchanges and how they work. As reflected in his report, that experience includes information about what fee incentives exchanges commonly provide. For example, Mr. Cusimano's report included the following statements:

- "[I]n my experience, [] trading incentive programs are not uniformly applied to every market participant." Report ¶ 69.

- "To my knowledge, the CFTC has not provided a public position that trading incentive programs, including fee rebates and bespoke fee arrangements, increase susceptibility to manipulation. In fact, many CFTC-regulated exchanges offer such trading incentive programs." *Id.* ¶ 69.

- "In my experience, trading incentive programs, including fee rebates, are broadly ubiquitous at exchanges of digital assets, futures, options, and equities, often involving complex programs of fee rebates, complex tier structures, limited disclosure, and with the stated purposes of increasing trading volume and/or liquidity." *Id.* ¶ 73.

These statements, which are explicitly rooted in Mr. Cusimano's substantial experience, easily satisfy the *Daubert* reliability standard.

However, Mr. Cusimano does not merely rely on his experience. He also confirms that his experience is a reliable source of information by analyzing various pieces of confirmatory evidence. For example, Mr. Cusimano notes that numerous studies, publications, and public statements (including by a former CFTC Commissioner) document the prevalence of bespoke fee structures in financial markets. *Id.* ¶¶ 74–77.[12]

Mr. Cusimano further confirms the reliability of his opinions by analyzing 34 self-certifications to see what they disclose publicly about bespoke fee agreements.[13] This analysis found that CFTC-registered DCMs (which, unlike Gemini, are required to comply with the Core Principles) routinely disclose in self-certifications that they provide fee discounts and rebates but do *not* disclose the specific details of those programs or address how they affect compliance with Core Principle 3. Report ¶¶ 78–84. This is a highly relevant finding. What DCMs say (and don't say) publicly about incentive programs is strong evidence both of what is material to the CFTC *and* whether Gemini "reasonably should have known" that not disclosing information about bespoke fee agreements would render any statements materially misleading.[14]

---

[12] The CFTC derisively calls these authorities "random third-party sources." Dkt. 162 at 23. There is nothing random about citing to reputable publications and statements by former CFTC commissioners and other regulators. These are precisely the places any industry professional would look to gain insight into commodities markets.

[13] Contrary to the CFTC's suggestion that Mr. Cusimano "could not identify the universe of certifications that his sample was drawn from and did not employ an identifiable methodology to select the sample," Dkt. 162 at 25 n.6, the Report and Mr. Cusimano's deposition testimony make clear what his selection criteria was (including, for example, certifications during the relevant time period that contained information about trading incentives) and how he assessed them. *See* Report ¶ 79; Ex. 3 at 286:8–19.

[14] The CFTC complains that a jury could interpret these documents as easily as Mr. Cusimano. Not so. Product certifications are technical regulatory documents concerning markets and rules that lay jurors are unlikely to have encountered. Mr. Cusimano can help the jury understand these materials. It is admissible for that reason alone. *Supra* § III. Mr. Cusimano's reliance on these materials as confirmatory evidence about issues foreign to the jury also distinguishes his opinions from those in cases cited by the CFTC. *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 197–99 (2d Cir. 2008) (holding simple facts such as the number of weapons seized from or murders committed by gang did not require expert testimony); *In re Lyman Good Dietary Supp. Litig.*, 2019 WL 5682880, at *4 (S.D.N.Y. Oct. 31, 2019) (excluding expert analysis that consisted solely of taking information from tax returns to calculate simple averages and create simple line graphs); *In re Reserve Fund Secs. & Derivative Litig.*, 2012 WL 12356742, at *3–4 (S.D.N.Y. Sept. 10, 2012) (excluding expert testimony that would consist solely of

Finally, Mr. Cusimano notes that the CFTC has frequently brought enforcement actions against manipulative traders based on alleged "abused trading incentive programs" but has not sued the DCMs that provided those incentives for non-compliance with Core Principle 3. Report ¶ 86. This evidence is also relevant to Section 6(c)(2)'s materiality and knowledge requirements. The fact that the CFTC took no action against the DCMs even after finding actual abuse of trading incentive programs to manipulative ends strongly suggests that the conduct in those cases did not indicate that the DCM's incentive programs, or the way they were designed, were material to Core Principle 3 compliance. *See id.* ¶ 86.

The CFTC's criticisms of Mr. Cusimano's opinions on this subject do not warrant exclusion. *First*, the CFTC's focus on the questions it "specifically asked" before the Self-Certification is misplaced. Dkt. 162 at 23. As an initial matter, the Court should not allow the CFTC to rely on those questions as evidence of materiality because it withheld evidence about why it asked them during discovery. *See* Dkt. 159 at 2–5. This argument also fails on the merits. At most, the CFTC's questions are relevant to what Gemini *subjectively* knew, not what it *objectively* should have known. Those are separate inquiries, and Mr. Cusimano's testimony is directly relevant to the latter. At most, Mr. Cusimano's purported "failure to grapple" with those questions is a matter for cross, not grounds for exclusion. *See Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *15 (S.D.N.Y. Mar. 28, 2022) (argument expert's analysis and conclusions were inconsistent with other evidence went to weight, not admissibility); *CFTC v. Walczak*, 2022 WL 855562, at *2 (W.D. Wis. Mar. 23, 2022) (expert's omission of certain evidence from his analysis was grounds for cross-examination, not exclusion).

---

reading newspaper articles about 2008 financial turmoil without providing any actual expertise or independent insight).

*Second*, the CFTC complains about Mr. Cusimano's reliance on various reports and public statements about commodity exchanges' use of trading incentives. But it is well-established that experts can rely on secondary sources to confirm their opinions and that such reliance *reinforces* that the expert's opinions are reliable. *Supra* § IIIB. That is precisely what Mr. Cusimano did here.

*Third*, the CFTC offers various quibbles about Mr. Cusimano's analysis of prior self-certifications and consent orders, including that he did not use a statistically randomized sample and did not draw the appropriate conclusions from his analyses. These complaints are misplaced as well. Mr. Cusimano does not purport to have conducted a scientific or statistical analysis. As he "does not attempt to reach any kind of scientific conclusion," he was not required to "account[] for any alternative evidence" or conduct any "specific quantitative analyses." *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *17–18 (S.D.N.Y. May 2, 2011). Moreover, Mr. Cusimano's analysis is a survey of public information to demonstrate the types of information that were available to Gemini, and is thus relevant to what Gemini reasonably should have known. The breadth and scope of his analysis does not reflect nearly the type of bad faith or apples-to-oranges comparison that warrants exclusion. *Supra* § III. Here again, the CFTC's gripes are, at most, grounds for cross-examination. *See, e.g.*, *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 374 (S.D.N.Y. 2023) (holding opinions based on expert's personal review of evidence sufficiently reliable to be admitted and complaints about conclusions was a matter for cross-examination); *Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 284–85 (S.D.N.Y. 2011) (admitting expert testimony notwithstanding "gaps" in information on which it was based and holding arguments that evidence considered were "not sufficient [] to support the experts' conclusions" was grounds for cross, not exclusion); *In re Fosamax*, 645 F. Supp. 2d at 178–79 (observing that "an expert need not base his or her opinion on the best possible

evidence, regardless of availability, but upon 'good grounds, based on what is known'" and

admitting opinions "back[ed] up . . . valid scientific evidence, albeit not from controlled studies")

(quoting *Daubert*, 509 U.S. at 590).[15]

### C.    Mr. Cusimano's Opinions about Self-Trading Are Relevant, Reliable, and Admissible

Mr. Cusimano's opinion about self-trading—that Gemini's self-trade prevention practices,

including its treatment of inadvertent matches between a single account's orders on different

trading books[16]—was consistent with industry-standard approaches—is admissible because it is

relevant and reliable.

Mr. Cusimano begins his analysis of self-trading by describing the circumstances under

which such trades may be considered potentially problematic. As he explains, self-trading is not

inherently manipulative, and exchanges (including DCMs) "see self-trading as something that can

happen incidentally in a variety of scenarios." Report ¶ 93; Ex. 3 at 307:6–22. For example, self-

trades are problematic when they are made with an intent to ensure they are "executed in such a

way that traders other than those involved . . . did not have a material opportunity to interact with

the order." Report ¶ 91. Consistent with that background, Mr. Cusimano analyzed how Gemini's

---

[15]    The CFTC's cases do not support exclusion of Mr. Cusimano's opinions. In *Reach*, the court admitted the challenged expert's opinions as sufficiently rooted in experience notwithstanding that he "could have been provided more details on [the relevant] experience" and held that questions about "an expert's methodology for arriving at an opinion" went to the weight of the evidence, not its admissibility. 988 F. Supp. 2d at 405. In *SEC v. Lek Secs. Corp.*, the court excluded an expert's conclusion that defendant's trading did not constitute the manipulative practice at issue, layering, because it was based entirely on trading in a single security over a period of just 45 minutes and included just four of 675,504 potential wrongful trades. 370 F. Supp. 3d 384, 413–15 (S.D.N.Y. 2019). In *Holowecki v. FedEx Corp.*, the court excluded a statistical analysis purporting to show that the average retirement age for FedEx workers was below the national average because the expert "failed to demonstrate that a group composed of 'average' American workers is the proper representative sample for his comparison." 644 F. Supp. 2d 338, 361 (S.D.N.Y. 2009). *In re Rezulin Prods. Liab. Litig.* was a toxic tort case in which the court excluded proposed expert testimony about the causal link between a pharmaceutical and liver failure where the experts did not identify *any* published study that supported causation *and* ignored a number that found none. 369 F. Supp. 2d 398, 425–27, 438 (S.D.N.Y. 2005). None of these cases resemble, or has any bearing on, the facts here.

[16]    The industry term for matches across order books is "implied match" trades. Report ¶ 94. Gemini referred to trades between a single account on its continuous order and auction books as "folding."

self-trade prevention capabilities compared to CFTC-regulated DCMs' capabilities. *Id.* ¶¶ 96–99. Based on that analysis, Mr. Cusimano concluded that (i) "Gemini's self-trading prevention practices were comparable and sometimes superior to what was in place at certain of the CFTC-regulated DCMs," *id.* ¶ 97, and that (ii) "it was not common or required during the Relevant Period to have self-trade prevention between an exchange's continuous order book and its auction-only book," *id.* ¶ 99.[17]

Mr. Cusimano's opinions and analyses are relevant and will help to jury. As an initial matter, Mr. Cusimano's testimony about self-trading (including when and why it might be considered potentially manipulative) is relevant because it will give the jury critical context that it needs to assess this case but that no juror is likely to have otherwise. As Mr. Cusimano explains, Gemini's practices—including concerning implied matches—were directly in line with industry standards. *Id.* ¶ 97. This information could help the jury in many ways. For example, the jury could find the fact that folding trades on the Gemini exchange, by their nature, could always interact with orders placed by other accounts means that they were not the type of self-trade that the industry views as potentially manipulative. *See* Ex. 11 at 3.

Mr. Cusimano's analysis of DCMs' self-trade prevention technology is helpful for a similar reason. The fact that self-trade prevention between different trading books was uncommon even among CFTC-regulated exchanges makes it less likely that Gemini reasonably should have known that not disclosing that fact would render any statements materially misleading. No reasonable juror could be expected to be aware of this information or to parse complex rulebooks governing trading on sophisticated DCMs without help from an expert like Mr. Cusimano.

---

[17]    Mr. Cusimano summarized his findings in a chart attached as Appendix C to his Report.

Indeed, this is yet another place where the probative value of this evidence is particularly high given the specific facts of this case. The evidence shows Gemini specifically told CFE that folding (*i.e.*, implied matches) could occur on its exchange. *See* Ex. 13. Notwithstanding this disclosure, CFE took no action: it did not alert the CFTC; it did not amend any prior statements; and it did not address the issue in the Self-Certification. Mr. Cusimano's testimony can help explain CFE's inaction by placing it in the context of standard industry practices. This evidence could thus have a strong synergistic effect that makes it less probable that this information was material or that Gemini knew (or reasonably should have known) it needed to be disclosed.

Mr. Cusimano's opinions are also reliable. Mr. Cusimano's testimony about how the industry views self-trading and when and how those exchanges attempt to stop it are based on Mr. Cusimano's experience. These issues fall squarely within Mr. Cusimano's expertise and are reliable for those reasons. *Supra* § I. Moreover, Mr. Cusimano is not merely relying on his own say-so to support his opinions. To the contrary, Mr. Cusimano examined public documents that demonstrate both when and how exchanges try to prevent self-trading and the information on that subject that is available to the public. This analysis reinforces his opinions' reliability. *Supra* § III.

The CFTC's criticisms of Mr. Cusimano's analyses do not warrant exclusion. *First*, the CFTC's focus on questions it "specifically asked" is misplaced for the same reasons set forth above with respect to Mr. Cusimano's trading incentive opinions. *Supra* § IIIB. *Second*, and also as explained above, the CFTC's complaint that Mr. Cusimano's extensive experience does not form an adequate basis for his opinions confuses areas for cross-examination with grounds for exclusion. *Supra* § *id*.

*Third*, the CFTC's complaints about the basis for Mr. Cusimano's understanding of Gemini's self-trade technology—to the extent Gemini can understand them—make no sense. As

an initial matter, the CFTC is wrong that Mr. Cusimano does not identify the evidentiary basis for his understanding of Gemini's self-trade prevention technology. The Report specifically cites deposition testimony by Rose Toomey, the Gemini engineer in 2017 who wrote Gemini's self-trade prevention code, in support of some of the included information. Report ¶ 96 n.110; Ex. 12 at 46:1–21. Additional sources used to compare Gemini's self-trade prevention to CFTC-regulated DCMs appear in his "list of information considered."[18] Moreover, it is not clear what actual disagreements (if any) the CFTC has with Mr. Cusimano's explanation of Gemini's self-trading prevention capabilities. Indeed, Mr. Cusimano's explanation is nearly identical to the "undisputed facts" that *the CFTC* identified in support of its partial summary judgment motion, including that the prevention technology (i) was mandatory technology imposed by Gemini, Dkt. 98 ¶¶ 145–46, (ii) was implemented in March and May 2017, *id.*; (iii) prevented self-trading on Gemini's continuous order book and auction books, *id.*; and (iv) did not prevent single accounts in Gemini's continuous order book orders and auction book orders from being on opposite sides of a single auction, *id.* ¶ 150. The CFTC's criticisms on this point are little more than quibbles about Mr. Cusimano's citations to support undisputed facts. At most, that is grounds for cross-examination. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 420 (S.D.N.Y. 2016) (holding inclusion of supporting evidence in list of materials considered "show[ed] a reliable foundation" for expert's opinions and "lack of specific citation in her report [went] to the weight of her opinions, not their admissibility").[19]

---

[18]  For example, Mr. Cusimano's list of information considered includes the Cameron Winklevoss deposition transcript, a document produced as Bates number GEMINI-CFTC00003172, as well as the Rose Toomey deposition transcript. Report, App'x B. Together, those documents—which are submitted with this brief as Exhibits 9,10, and 12, respectively—identify information about Gemini's self-trade prevention that Mr. Cusimano identified in his Report. *See* Ex. 9 at 472:17–473:24, 490:22–491:21 632:16–633:16, 662:25–664:4; Ex. 10 at 6; Ex. 12 at 40:5–41:13, 46:1–17, 110:5–12, 121:13–25.

[19]  The CFTC's criticism of Mr. Cusimano's report is particularly remarkable given the extraordinarily thin evidentiary bases for Mr. Harris's opinions, which rely exclusively on cherry-picked (and, in one case, doctored)

*Finally*, the CFTC's complaints about the reports Mr. Cusimano cites to support his conclusions about the prevalence of self-trading and its relevance to susceptibility to manipulation are also misplaced. It is not only proper for experts to cite external evidence to corroborate their opinions, doing so actually *reinforces* their opinions' reliability. *Supra* § IIIB. The CFTC's complaints that Mr. Cusimano's analysis is not based on a statistically randomized sampling is thus not a basis to exclude his opinions. *Supra § Id*. Nor is it relevant that the reports were published after 2017. Courts routinely find evidence that post-dates the relevant timeframe can still be relevant to an expert's opinion. *See, e.g.*, *FHFA v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 653 (S.D.N.Y. 2015) (expert allowed to testify about analyses of events after relevant time period "so long as it is probative of" the facts "at the period of time at issue"). Mr. Cusimano explained at his deposition that the information in those reports "are consistent with what [he] generally expect[s] have been in place at the time." Ex. 3 at 311:14–312:10, 341:2–20. While the CFTC is free to cross-examine Mr. Cusimano on this point, this testimony establishes that this opinion is admissible.[20]

Put simply, Mr. Cusimano's opinions about self-crossing are relevant and reliable. While the CFTC is, of course, free to cross-examine Mr. Cusimano about any of these issues, nothing in the CFTC's motion provides a basis to exclude his opinions.

---

evidence supplied by CFTC's counsel. Dkt. 162 at 37. By contrast, Mr. Cusimano was given access to the full evidentiary record in this case. Report ¶ 41.

[20]  The CFTC's complaint that these documents are hearsay, Dkt. 162 at 31–32, is also misplaced. It is well-established that experts may rely on hearsay to support their opinions. *See, e.g.*, *Better Holdco*, 666 F. Supp. 3d at 363–64 (permitting expert to offer opinions based on hearsay where he "used . . . two pieces of [hearsay] to reach his conclusion"). Moreover, as explained above, the CFTC's assertion that a lay jury will not benefit from Mr. Cusimano's expertise in parsing the terms and understanding the implications of specific provision in dense industry materials is incorrect. *Supra* § IIIC.

### D.    Mr. Cusimano's Opinions about Pre-Funding Are Relevant, Reliable, and Admissible

Mr. Cusimano's opinions about pre-funding—that Gemini's definition is reasonable in light of industry custom and practice; that advances, credits, and affiliate loans are all consistent with pre-funding; and that Gemini reasonably should not have known statements about pre-funding would be materially false and misleading if they did not provide all of the allegedly omitted information about advances, credits, or affiliate loans—are relevant and reliable and therefore admissible.

The relevance of Mr. Cusimano's opinions about pre-funding is particularly acute in light of the Court's November 18, 2024 order denying the CFTC's motion for partial summary judgment with respect to statements about pre-funding. Following that order, the jury will need to decide if information Gemini allegedly omitted was material and, if so, whether Gemini knew or reasonably should have known statements were materially misleading because they omitted this information.

Mr. Cusimano's testimony about industry customs, practices, and understandings is relevant to those issues. *Supra* § IIIA. For example, the jury could find the fact that many financial institutions leverage affiliate relationships for lending makes it less likely that this practice is relevant or material to Core Principle 3 compliance or, at minimum, whether Gemini reasonably should have known that not disclosing such information would render statements materially false and misleading. Report ¶¶ 46–51. The fact that DCMs also leverage affiliate relationships for liquidity leads to the same conclusion. *Id.* Similarly, it is common knowledge in the financial industry that many institutions provide advances to permit customers to transact while deposits are in transit, which is critical context needed to assess whether Gemini's purported failure to disclose this information was material. *Id.* ¶¶ 54–57.

27

Mr. Cusimano's opinions on these issues are also reliable. For example, Mr. Cusimano's discussion of industry practices concerning lending (including affiliate lending) and advances are clearly rooted in his experience. *See id.* ¶¶ 60–68. And, contrary to the CFTC's suggestion, there is no requirement that he specifically tie each of these statements to specific parcels of his experience. *Supra* § III. Indeed, some of CFTC's complaints border on frivolous. For example, the CFTC complains Mr. Cusimano did not conduct research to determine that large Wall Street banks frequently have both lending and trading businesses. Dkt. 162 at 35–36. While this is information that a lay juror may not know, it is, frankly, preposterous to assert that an expert with decades of experience (including at the CFTC) needs to conduct research or identify specific experience for this fundamental and utterly uncontroversial point.[21]

Mr. Cusimano's opinions about the relevance of affiliate loans to statements about pre-funding are also reliable. As Mr. Cusimano explains, unsecured debt does not inherently increase susceptibility to manipulation and it is common for lenders to provide preferential terms to well-known or substantial customers. Report ¶¶ 51–53. These statements are clearly rooted in decades of experience evaluating and assessing manipulation in commodities markets and need not be supported by empirical or other evidence.[22]

---

[21]    On other points, the CFTC simply misstates the record. For example, Mr. Cusimano does not (as the CFTC suggests, Dkt. 162 at 37) rely only on a single trader's testimony to support the claim that it is common for exchanges, including digital asset exchanges, to provide advances on incoming deposits. Rather, Mr. Cusimano cites that testimony—among other evidence—to confirm opinions that are firmly rooted in firsthand experience gained, *inter alia*, working with a digital asset exchange. Report ¶¶ 56, 58; Ex. 3 at 237:4–20 (describing "work[] with a couple of other [digital asset] exchanges that had similar practices" regarding the provision of advances to customers). Similarly, the CFTC asserts Mr. Cusimano's statement that "it is not uncommon for exchanges to experience operational failures, but those failures do not negate established company policies and procedures," Report ¶ 58, is based exclusively on a representation from counsel, Dkt. 162 at 38. Not so. This opinion is based on his experience; the only point that came from counsel is the fact that operational failures occurred at Gemini. Report ¶ 58; Ex. 3 at 245:17–246:7.

[22]    The CFTC's criticism that Mr. Cusimano only cites one Pearl Street loan agreement as proof that customers were required to pay interest on loans is also misplaced. As an initial matter, this argument ignores that deposition exhibits identified in Appendix B to Mr. Cusimano's Report contain this information. Report, App'x B (identifying his consideration of exhibits to deposition of Cameron Winklevoss). In all events, that fact is undisputed and, indeed, indisputable. It is ironic that the CFTC offers this criticism at all given that its expert,

Mr. Cusimano's analysis of KYC and AML regulations is similarly relevant and reliable. As explained in the Report, the CFTC has expressed the importance of and provided guidance to registrants about applicable KYC/AML regulations, including those that detail obligations to monitor the sources of customers funds. Report ¶¶ 61-62, 68. But those regulations are designed to prevent money laundering and detect the movement of funds derived from criminal endeavors. They have *nothing* to do with Core Principle 3, and the CFTC has never suggested otherwise before this case. Report ¶¶ 12, 68.[23]

This is a highly relevant fact, particularly given that Appendix C to the Core Principle regulations, which the CFTC has asserted is the sole source of information about what it considers when assessing compliance with Core Principle 3, Dkt. 162 at 31, says *nothing* about the source of customer funds. The jury could conclude this silence undercuts the CFTC's assertion that where a customer obtains its funds is material to assessing susceptibility to manipulation or that Gemini reasonably should have known that failing to disclose this information would render statements about pre-funding materially misleading.

The CFTC's criticisms of Mr. Cusimano's opinions about pre-funding are misguided. *First*, the CFTC's arguments about the relevance of these opinions fail because they turn on the assumption that the jury need not decide if Gemini is liable for the pre-funding statements. Dkt. 162 at 34–35. This assumption is incorrect in light of the Court's November 18 order, and the CFTC's relevance arguments can be rejected on that basis. *Second*, the CFTC's argument that

---

Mr. Harris, drew broad conclusions about how interest rates on Pearl Street loans compared to broader market rates based on a single document that the CFTC manipulated to exclude evidence that did not support its desired conclusion. *See* Dkt. 170 at 21–22.

[23] While Mr. Cusimano addresses this issue to respond to the CFTC's allegations, it bears emphasis that neither Gemini nor CFE made *any* representations about source of funds in connection with the Self-Certification. This entire issue has been manufactured by the CFTC in hopes of bolstering its case. Gemini vigorously disputes that there is any basis for the CFTC's source of funds arguments, but that is an issue for trial.

Mr. Cusimano's opinion about the reasonableness of Gemini's definition of pre-funding is an improper attempt to offer expert testimony on "a legal determination," *id.* at 35, is contrary to abundant precedent demonstrating that "[d]isputes over reasonableness are usually fact questions for juries," *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). *Finally*, the CFTC's claim that Mr. Cusimano's opinions about the CFTC's source-of-funds regulations are irrelevant fail because they rely on an utter misrepresentation of his testimony. The CFTC asserts Mr. Cusimano testified at his deposition that anti-money laundering rules had nothing to do with his opinions about pre-funding. Dkt. 162 at 38–39. In fact, he said the opposite. In testimony not cited by the CFTC, Mr. Cusimano stated that the purpose of this discussion was to show that "there was no basis . . . for [Gemini] to know that the CFTC would consider the source of funds question to be relevant . . . to Core Principle 3" and that "[t]he prefunding issue is more of a, are funds there versus where they come from." Ex. 3 at 255:13–256:22; *see also id.* at 254:8–21 (explaining that "there wasn't a basis for [Gemini] to assume that the CFTC would connect source of funds . . . and an assessment of Core Principle 3"). As demonstrated above, this testimony makes it less probable that CFTC is correct in asserting that Gemini knew or should have known that information about the source of its customers' pre-funding was relevant and material with respect to Core Principle 3. For that reason, this opinion is relevant.

**IV.    Mr. Cusimano's Summary Slides Are Admissible**

The CFTC's final request is that the Court preclude Mr. Cusimano from using slides summarizing his opinions. Dkt. 162 at 39. This request is, to be frank, odd. Rule 26 allows experts to use "exhibits that will . . . summarize" their opinions. Fed. R. Civ. P. 26(a)(2)(B)(iii). Thus, there can be no dispute that, assuming the relevant disclosure rules are followed, expert witnesses can use demonstratives to summarize their opinions.

In light of this rule, it is no surprise that experts routinely use summary slides to provide structure for their testimony and help jurors understand their opinions. Indeed, the Second Circuit has specifically approved of this practice. In *Castaldi v. Land Rover North America, Inc.*, plaintiff argued the trial court erred by allowing defendant to use "a chart summarizing the testimony of its expert witness." 363 F. App'x 761, 762 (2d Cir. 2009). The Second Circuit rejected this argument, explaining courts may "allow the use of demonstrative aides, including the display of charts or tables accurately summarizing the content of primary testimony" so long as the charts do "not misstate the testimony of [defendant's] expert witness or otherwise mischaracterize the expert's opinion." *Id.*; *see also United States v. Janati*, 374 F.3d 263, 271–73 (4th Cir. 2004) ("[T]he opinion of expert witnesses can be summarized on pedagogical charts . . . .").

The CFTC does not dispute that the summary slides accurately reflect Mr. Cusimano's opinions. To the contrary, the CFTC argues the summary slides are inadmissible hearsay *because* they accurately reflect the opinions set forth in Mr. Cusimano's report. Dkt. 162 at 39–40. This argument misunderstands what these slides are. Generally speaking, summary slides used by experts are not evidence. *See* 6 Weinstein's Federal Evidence § 1006.04 ("Pedagogical-device summaries are used to summarize evidence and are not themselves admitted into evidence."). They are tools he will use to structure and summarize his *in court* testimony, as permitted by Rule 26. Of course, the court may, if it deems it appropriate, instruct the jury that these slides are not evidence. But the fact that these slides accurately summarize Mr. Cusimano's opinions support, rather than undermine, their use at trial.

## V.     Gemini Requests a Rule 104 Hearing if the Court Is Inclined to Grant the Motion

In light of the foregoing, Gemini strongly believes there is no basis to exclude, either in whole or in part, Mr. Cusimano's testimony. If, however, the Court is inclined to grant any aspect of the Motion, Gemini respectfully requests that the Court hold a hearing pursuant to Federal Rule

of Evidence 104. "The Second Circuit has held that, in general, Rule 104(a) pretrial evidentiary hearings are 'highly desirable' because they allow parties to present expert evidence and conduct cross-examination of the proposed expert," *Colon*, 199 F. Supp. 2d at 70 (quoting *Borawick v. Shay*, 68 F.3d 597, 608 (2d Cir. 1995), and are particularly helpful in cases "that involve expert testimony on complex scientific or economic topics," *Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 465 (E.D.N.Y. 2017); *see also Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 394 (S.D.N.Y. 2014) (noting court held two-day *Daubert* hearing). Rule 104 hearings are also particularly appropriate where the argument for excluding the expert's testimony turns on factual questions such as whether the expert's opinions are sufficiently rooted in experience. *See, e.g. Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 416–18 (3d Cir. 1999) (holding trial court abused discretion by excluding expert report on grounds that opinions were not sufficiently rooted in experience without first holding *Daubert* hearing).

## CONCLUSION

Mr. Cusimano is a qualified expert. His testimony is relevant, based on reliable methods, and will help the jury reach its verdict. The Court should deny the Motion.

Dated: New York, New York
      December 6, 2024

BAUGHMAN KROUP BOSSE PLLC

By /s/ John F. Baughman

John F. Baughman
Daniel A. Schwartz
Elizabeth J. Lee
One Liberty Plaza – 46th Floor
New York, NY 10006
(212) 548-3212

*Attorneys for Gemini Trust Company, LLC*
