# EXHIBIT 17

Defendant  
Benjamin Small  
First  
Exhibit BS1  
2 March 2023

| | |
|---|---|
| **IN THE HIGH COURT OF JUSTICE**<br>**BUSINESS AND PROPERTY COURTS**<br>**OF ENGLAND AND WALES**<br>**COMMERCIAL COURT (KBD)** | **CL-2023-000043** |

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**AND**
**IN THE MATTER OF AN ARBITRATION**

**B E T W E E N :**

**HENDERSON & JONES LIMITED**
(a company incorporated in England & Wales)

<u>**Claimant**</u>

- and -

**BENJAMIN SMALL**

<u>**Defendant**</u>

---

**FIRST WITNESS STATEMENT OF BENJAMIN SMALL**

---

I, **BENJAMIN SMALL**, of 5 Walcot Square, London SE11 4UB, will say as follows:

1. I am the Defendant in these proceedings.

2. I make this witness statement in support of my application dated 2 March 2023 to set aside the order of Mrs Justice Cockerill dated 13 February 2023 (the "**Order**") giving permission to enforce an arbitration award dated 12 January 2022 (the "**Award**") (the "**Set Aside Order**").

**DX 750**

3. This application to set aside the Order is made on the grounds that enforcement should be refused because it would be contrary to public policy to recognise or enforce the award within the meaning of s.103(3) of the Arbitration Act 1996.

4. In the alternative, I rely on this statement in support of my application to adjourn the decision on the recognition or enforcement of the Award pursuant to s. 103(5) of the Arbitration Act 1996. That application is made on the basis that I have applied to the Supreme Court of the State of New York to vacate a judgment granting the creditor's application to enforce the Award which, if granted, will have the effect of setting aside the Award at the seat of the arbitration (New York) (the "**Application to Vacate**"). The Application to Vacate, which I describe more fully below, is currently being considered by the New York Supreme Court and decision is awaited.

5. It should be noted that the creditor under the Award, Winklevoss Capital Management, LLC, has since assigned its rights under the Award and the New York judgment to the Claimant.

6. Unless otherwise stated, I make this witness statement from my own knowledge and belief. Where the contents of this witness statement are within my personal knowledge, I believe them to be true. Where matters are not within my personal knowledge, the contents are true to the best of my knowledge, information and belief, and I identify the source of my information. My lawyers, Fox Williams LLP, have assisted me in drafting this statement. They prepared questions for me to answer and I provided written responses. They then prepared the statement on the basis of those responses, and I provided further input by way of written comments and over a series of telephone discussions. I have carefully reviewed the text and confirm that this statement accurately reflects my evidence. Nothing in this witness statement is intended to waive, or is to be read as waiving, privilege.

7. There is now produced and shown to me a paginated exhibit marked **BS1** containing true copies of documents referred to in this witness statement. References in this witness statement in the form **BS1/●** are references to the corresponding pages in Exhibit BS1.

   A. Background to the Arbitration: my employment and complaints to the CFTC

8. I was an employee of Winklevoss Capital Management, LLC ("**WCM**") beginning on 19 January 2016, and at the time of the events in question I was chief operating officer of Gemini Trust Company, LLC ("**Gemini**"), operator of the Gemini bitcoin exchange, having

been promoted to that role in March 2017. I worked in New York, where the principal offices of both entities were located. The principals of both entities are Cameron Winklevoss and Tyler Winklevoss of New York (collectively, the "**Winklevosses**").

9. WCM is effectively the family office of the Winklevosses. It is a venture capital firm that at all material times has mainly invested in and oversees a portfolio of technology start-ups. During my time at WCM, the two entities (WCM and Gemini) shared an office. I understand that some employees of WCM, including myself, were contractually employees of WCM, but in practice most our work was for the benefit of Gemini. During the summer of 2017 (which was a relevant period for the purposes of the allegations in the arbitration), most of my time was spent on work for the benefit of Gemini and the rest for Digital Asset Services, LLC ("**DAS**"), an affiliate of Gemini and WCM of which I was also the chief operating officer. The nature of my work meant that I worked closely with the Winklevosses. I believe that I was often the first person whose advice they sought on topics relating to trading, securities regulation, and strategic planning.

10. In spring 2017, I was involved in an application by DAS to list a bitcoin-based exchange traded fund ("**ETF**") with the U.S. Security and Exchange Commission (the "**SEC**") (the "**Application**"). I spent a significant amount of time drafting the required prospectus and addressing comments and questions from the various divisions within the SEC whose approval would be required, alongside the Winklevosses and other senior employees of Gemini and WCM. This process required meetings in person, telephone calls and emails with the relevant personnel at the SEC.

11. The Application was extremely important to the Winklevosses (and, by extension, WCM and Gemini), not just because it might be profitable but also because they had staked their professional reputations on it since 2013 (see attached an article from *The New York Times* dated 1 July 2013 about the Application, which describes the Application as an "*eye-catching development*"[1]). On 10 March 2017, the SEC rejected the Application, citing concerns about, inter alia, "*the potential conflicts of interest related to…the Gemini Exchange*" and "*the potential for fraudulent and manipulative acts and practices*."[2] At the time, I was disappointed, but accepted the SEC's findings. While I did not know there to be any fraudulent practices ongoing at the time (and I had not identified a specific risk of any occurring), I took the SEC's findings at face value.

---

[1] BS1/3-6.
[2] BS1/7-44.

3

12. As a result of this rejection, the Winklevosses made it clear to all employees of Gemini and WCM that addressing the SEC's concerns and reapplying were of paramount importance. This was communicated through multiple discussions, emails, and 'Slack'[3] messages within the companies.  Part of the strategy was to have a different type of financial instrument approved for public listing, a bitcoin-based futures product, to be listed on the Chicago Board Options Exchange (the "**CBOE**"), which is regulated by the U.S. Commodity Futures Trading Commission (the "**CFTC**").

13. At this time, as I have stated above, I was also the Chief Operating Officer of DAS.  DAS was to act as an administrator and sponsor of the ETF and the futures product – in effect, the manager which would benefit the most from the fund's management fees.  Gemini was to act as the ETF's custodian, the entity responsible for the bitcoins' safekeeping, and it would also receive a substantial cut of the management fee. Gemini's role in the futures product was to conduct a daily bitcoin "auction" (an electronic trading event to match buyer with sellers to find a clearing price) which was used to price the futures product itself, and it would also get a substantial cut of the management fee as well as other fees for operating the auction. I participated in many meetings (at least weekly) between DAS, Gemini, the CBOE and the CFTC throughout the spring and summer of 2017.

14. On 28 August 2017, I represented Gemini and DAS in meetings with the CBOE and members of the CFTC's staff.  The topic of the meetings included, inter alia, potential conflicts of interest relating to Gemini and the integrity of Gemini's marketplace, in the context of the CBOE "self-certifying" (in accordance with applicable regulations)[4] the bitcoin-based futures product.  A key focus of the meetings was conflicts of interest and integrity.  Gemini was expected to be fully transparent with the CBOE about the mechanisms, procedures and risks involved with the product.

15. The meetings on 28 August 2017 were not attended by the Winklevosses, who were on holiday at the time.  I reported back to the Winklevosses that evening about the content and outcome of each of the meetings held on 28 August.

Discovery of fraud and whistleblowing

---

[3] 'Slack' is an electronic messaging app which the Winklevosses used for communicating within their businesses.
[4] Notably, under the applicable regulations, the CFTC has the explicit authority to request that a proposed product be "alter[ed] or amend[ed]" or that its listing be stayed (17 Code of Federal Regulations § 40.2).

4

16. When I spoke to the Winklevosses on a conference call on 29 August, they informed me that WCM would be terminating the employment of Mr Shane Molidor, and I was to inform Mr Molidor of this the next day. Mr Molidor was a colleague of mine and I had previously (in April or May of 2017) raised concerns with the Winklevosses that he had ignored best practices regarding regulatory compliance. It was this phone call that alerted to me to the fact that the Winklevosses had been engaging in deceptive practices with respect to the bitcoin which was trading on the Gemini exchange.

17. In particular, the Winkelvosses explained to me on this call that Mr Molidor had been facilitating undisclosed and below-market rate loans to be made to market makers (the "**Pearl Street Loans**"). These loans were made by an affiliated entity of the Winklevosses (Pearl Street Financial, LLC) to market participants and provided participants with bitcoin to be traded on the Gemini exchange, inducing participants to remain active on the exchange and likely affecting pricing on the exchange. This ultimately had the effect of increasing the exchange's market share. Whilst I did know about the existence of the Pearl Street Loans in December 2016, the loans were not within the scope of my work responsibilities, and so I had no reason to pay attention to them or consider whether they were compliant with regulations. It was not until my conversations with the Winklevosses on 29 August 2017 that the extent of the program, and the illicit nature of the program, become clear to me and I realised that this was a serious breach of applicable regulations.

18. Because of my dealings with the CFTC, I knew that market share and conflicts of interest were important factors in the Application, so the existence of the Pearl Street Loans was a material consideration for the CFTC. It was only as a result of my participation in the meetings with the CFTC that I understood the seriousness of the breaches. On the call on 29 August 2017, I informed the Winklevosses that the existence of the Pearl Street Loans were a potential breach of securities regulations and that they needed to be disclosed to the CBOE, the CFTC and possibly other regulatory authorities. In particular, I believed that the CFTC was concerned with conflicts on interest in relation to the exchange: this was an obvious conflict of interest, as the owners of the exchange had a direct financial interest in certain transactions. I also understood that exchange's market share was a factor relevant to whether or not the bitcoin futures product would be approved for trading (and an increased market share would make it more likely that the product would be approved); in the circumstances, I believed that the Pearl Street Loans were being used for an improper purpose. I believed that the existence of the Pearl Street Loans, and the Winklevosses'

5

direct participation in the Gemini exchange, was in direct contravention of the Commodity Exchange Act (1936) and needed to be disclosed to the CFTC.[5]

19. On 30 August 2017, I again informed the Winklevosses that I was concerned by the Pearl Street Loans and their interest in the exchange, in particular because it appeared to me that these matters meant that Gemini was in breach of its obligations under the Commodity Exchange Act. The Arbitrator did not accept my evidence that I had raised these concerns with the Winklevosses on 29 and 30 August, but that finding was premised on his finding that there was nothing improper about the Pearl Street Loans. If the Arbitrator had not been misled into believing that there was nothing improper about the Pearl Street Loans, I do not believe that he would have made his other findings.

20. On 30 August 2017, Mr Molidor was suspended (which I believed at the time would ultimately lead to his being fired), and I was suspended pending an "*investigation*", purportedly on the grounds that the Winklevosses believed that I had provided advance notice to Mr Molidor that his employment was to be terminated. I had given no such notice. I considered (and still considered) that this was an act of retaliation for raising the issues detailed above.

21. In light of the Application, I considered that I was obliged to report the Pearl Street Loans to the CFTC. The Winklevosses were informed no fewer than three times throughout October and November 2017 that I intended to provide information to the CFTC about their wrongdoing. On 28 November 2017, through my lawyers, I made a report to the CFTC (the "**Whistleblowing Complaint**").[6] The CFTC started an investigation and as part of that, I gave evidence via confidential written submissions, over the phone, and at in-person meetings beginning on 1 November 2017. I made a supplemental submission on 8 May 2018.[7] I therefore considered, and I still consider, myself a whistleblower under the Commodity Exchange Act, as I provided information to a federal agency.

---

[5] The Pearl Street Loans were made below market rates, which lowered the costs of doing business for market participants and also allowed struggling market makers to remain active on the platform. This incentivised trading on the platform. Because the Pearl Street Loans were not disclosed to other market participants, the public or regulators, they constituted the use of a manipulative or deceptive device in connection with a contract for the sale of a commodity (7 US Code. § 9(1) and 17 Code of Federal Regulations. § 180.1), price manipulation (7 US Code. § 9(3) and 17 Code of Federal Regulations § 180.2), and providing false information to the CFTC (7 US Code. § 9(2) and 17 Code of Federal Regulation § 1.2).

[6] I am not able to exhibit the Whistleblowing Complaint to this witness statement because it remains confidential in the US due to it containing confidential material that relates to a current investigation by the CFTC. (See, e.g., 7 US Code 26(h)(2) and 17 Code of Federal Regulations §165.4.)

[7] As explained in footnote 6, I am not able to exhibit the supplemental complaint.

6

22. I understand that the bitcoin futures product began trading on the CBOE 10 December 2017.

   B. **The Arbitration**

23. Hours after the bitcoin futures product launched on 10 December 2017, WCM sent a letter to me terminating my employment and commencing an arbitration against me and Mr Molidor, claiming damages of $11,586,039.27 (the "**Arbitration**"). This arbitration was started under the rules of JAMS, in accordance with the arbitration clause in my employment contract.

24. WCM alleged that (inter alia) I had been involved in an illicit customer rebate scheme to take place on the Gemini exchange. Whilst I was aware of certain rebates, I certainly did not consider any fee deals to be illicit. I therefore denied the allegations. I learned during the Arbitration that the Winklevosses retained private investigators who, alongside Gemini employees, determined that there was a scheme, but there was no evidence of my involvement.[8] While I had approved certain rebates (which the Winklevosses claimed in the Arbitration constituted the rebate scheme), this was done with the full knowledge of the Winklevosses. These claims against me were eventually dismissed by the arbitrator by agreement between the parties, but the Winklevosses maintained their position with regards to the existence of the scheme and my involvement in it, and the Award makes findings in the Winklevosses' favour on this point.

25. I brought counterclaims against WCM for termination of my employment which I believed was a result of my disclosure of, inter alia, the Pearl Street Loans to the CFTC. The Winklevosses maintained that the Pearl Street Loans were legitimate and proper, and made submissions to that effect to the arbitrator.[9] Therefore, it was necessary for the Arbitrator to decide whether my claims that the Pearl Street Loans were improper had any merit; and, relatedly, whether there was any merit to my claim that I had engaged in protected whistleblowing and had been retaliated against as a result.

26. In an Award dated 12 January 2022, the Arbitrator rejected my contention that the real reason for my dismissal was because I was a whistleblower. In rejecting my case, the Arbitrator held that there was "*no evidence*" to support my claims that the Pearl Street Loans were improper. The arbitrator granted WCM's request that I reimburse all fees it

---

[8] BS1/94.
[9] BS1/48-50, 53.

7

had advanced to me in connection with the arbitration (pursuant to my employment agreement with WCM) (see page 19 of the Award, at BS1/72). As a result, the arbitrator made an Award against me to reimburse counsel's fees which had been advanced to me by the Winklevosses, which was later quantified at US$ 5,115,942.52.[10]

27. The Award was expressly based on findings on the evidence put forward by me and the Winklevosses respectively: the Arbitrator acknowledged that the parties agreed that the arbitrator "*had to determine who, as between Small on the one hand and the Winklevoss brothers on the other hand, was telling the truth concerning the events at issue.*" The arbitrator concluded that "*on most important issues in this case the testimony of the Winklevoss brothers is credible while Small's testimony is not.*"[11]

C. Events post-Award

28. On 27 January 2022, WCM issued a petition in the Supreme Court of the State of New York to confirm the Award.[12]

29. By an affidavit sworn on 18 February 2022, I opposed the petition on various grounds, including bias on the part of the arbitrator and because the arbitration was abusive and improper.[13]

30. The hearing of the applications took place on 18 May 2022.

31. On 19 May 2022, WCM through its counsel offered to withdraw the enforcement application if I signed an affidavit in which I stated that the Whistleblowing Complaint was false.[14] I refused, because I believed (and still believe) that the Whistleblowing Complaint is legitimate and based on accurate and true facts of which I had personal knowledge.

32. On 1 June 2022, the Supreme Court of the State of New York dismissed my application to vacate the Award and granted WCM's application to enforce in New York.[15] After I communicated to WCM's attorney my refusal to submit the affidavit referred to at paragraph 29 above, WCM submitted the judgment to the Court for entry on 8 June 2022. The decision was confirmed in a judgment dated 14 June 2022 (the "**NY Supreme Court**

---

[10] BS1/72.
[11] BS1/58.
[12] BS1/76-85.
[13] BS1/86-108.
[14] BS1/174-192.
[15] BS1/109-110.

8

**Judgment**").[16] The reasons of the judge are not set out in either the decision on 1 June 2022 or the NY Supreme Court Judgment.

33. On 2 June 2022, the CFTC commenced proceedings in the United States District Court for the Southern District of New York against Gemini alleging false and misleading statements made by Gemini staff to the CFTC (the "**CFTC Charges**"), including, inter alia, with respect to the Pearl Street Loans.[17] The remedies sought by the CFTC include an injunction preventing anyone associated with Gemini from trading in commodities. The CFTC Charges overlap with the concerns I raised with the Winklevosses on 29 and 30 August 2017. In particular:

    a. The CFTC Charges detail that "*certain market maker Gemini customers could and did obtain loans of digital assets controlled by Gemini… from an entity they controlled*".[18] The loans in question being referred to by the CTFC were the Pearl Street Loans. The CFTC Charges confirm that the loans were "*designed to facilitate trading on the Gemini Exchange*" and were issued in part "*to induce increased trading on the Gemini Exchange*".[19]

    b. The essence of the CTFC's complaint is that Gemini had made "*false or misleading statements and omissions to the [CTFC]*" by failing to disclose the fact that Gemini had made their own digital assets available to potential market makers to trade with them on the Gemini Exchange.[20] This is precisely what I had told the Winklevosses on 29-30 August 2017, i.e. that Gemini needed to disclose the true nature of the loans and the related conflict of interest to the CTFC.

    c. As explained above, in the Arbitration the Winklevosses maintained that there was nothing improper about the Pearl Street Loans and nothing which needed to be disclosed to the CTFC, and the Arbitrator found in WCM's favour on this question.[21]

    d. I do not believe that the CFTC would have made such serious allegations against Gemini unless it considered that there was a proper evidential basis for doing so. If proven, as I believe will be the case, this will demonstrate that the Winklevosses

---

[16] BS1/139-150.
[17] BS1/111-139.
[18] See paragraph 47 of the CFTC Charges at BS1/121.
[19] See paragraphs 48 and 52 of the CFTC Charges at BS1/121.
[20] See paragraphs 59-60 of the CFTC Charges at BS1/122.
[21] BS1/48, 50, 53.

9

      (deliberately) misled the Arbitrator by suggesting that there was nothing improper about the Pearl Street Loans and that the loans were not something which needed to be disclosed to the CTFC.

   e.  The CTFC Charges are being litigated before the United States District Court for the Southern District of New York and my expectation is that the Charges will be upheld, including (in particular) in relation to the Pearl Street Loans.

34.  The CFTC Charges centre around the fact that various issues were not disclosed to the CFTC during the evaluation of the bitcoin futures product, one such matter being the issue which I raised with the Winklevosses on 29 and 30 August 2017 about the need for the Pearl Street Loans to be disclosed.  The Winklevosses refusal to disclose these matters to the CTFC led me to make the Whistleblowing Complaint which I did in order to ensure that the true picture regarding the operation and oversight of the Gemini exchange was accurately reported to the CFTC.

35.  On 2 August 2022, Gemini filed an Answer, denying the CFTC Charges.[22]

36.  As well as dealing with the Pearl Street Loans, the CFTC Charges also detail the rebate scheme which was relied on against me in the Arbitration.[23]  In the Arbitration, the Winklevosses submitted that there <u>was</u> illicit and collusive trading on Gemini's platform (i.e. via the rebate scheme), which they described as "*fraud*" before the Arbitrator.[24]  However, in the Answer to the CFTC Charges, Gemini accuses the CFTC of "*attempting to make a case where none exists*" and asserts that it "*did what it was supposed to do and what it was asked to do.  Consistent with its history as the regulated crypto exchange, Gemini did everything right*."  Whilst the Answer admits that "*there was an instance, appropriately reported to authorities, in which unauthorised rebates were associated with a rebate trading scheme on Gemini's exchange*", it also denies that the allegations against it "*present a fair and complete description of the matters described… and on that basis denies them*".

37.  Proceedings relating to the CFTC Charges are ongoing.

---

[22] BS1/151-173.
[23] See, for example, paragraphs 94-124 of the CFTC Charges at BS1/128-132.
[24] BS1/44-47, 52.

10

38. On 1 December 2022, I applied to the Supreme Court of the State of New York for an order to vacate the NY Supreme Court Judgment (i.e. the "**Application to Vacate**")[25] on the basis that (i) the allegations made by the CFTC contradict the submissions made by the Winklevosses in the Arbitration, and the finding made by the arbitrator in the Award that the Pearl Street Loans were not improper; and (ii) the submissions made by the Winklevosses in the Arbitration regarding the existence and materiality of collusion and fraud on the Gemini platform are entirely undermined by the position advanced in the Gemini Answer, which denies and/or minimises the alleged fraud (including the rebate scheme) as "*clearly immaterial*".[26] I submitted (and maintain) that the Award was based on fraudulent evidence put forward by the Winklevosses in order to cover up the illegal practices taking place on the Gemini exchange.

39. WCM filed its response to my application on 19 December 2022.[27] A hearing of my application took place on 5 January 2023 on my order to show cause. My understanding is that the Court aims to issue its judgments in relation to such matters within 60 days of the hearing. On that basis, I expect that a judgment will be handed shortly.

40. My primary case is that, pursuant to section 103(3) of the Arbitration Act 1996, the Court should refuse to recognise the Award as a matter of public policy in light of the fraudulent representations made by the Winklevosses during the course of the Arbitration. I appreciate that the Court may not feel able to make any findings in this regard on the basis of the materials available and, if that is the case, then I respectfully invite the Court to give directions so that the matter can be properly investigated. In the alternative, I respectfully invite the Court to adjourn the decision on the recognition or enforcement of the Award pending the final determination of my Application to Vacate, pursuant to section 103(5) of the Act. Given that a judgment in relation to my Application to Vacate is likely to be issued shortly, I do not believe that the delay caused by such an adjournment would cause any real prejudice to the Claimant.

   **D. Other matters**

41. On 12 January 2023, the SEC charged Gemini for the unregistered offer and sale of securities to retail investors through its asset lending program, because under the applicable law, the program should have been registered with the SEC. Gemini has now

---

[25] BS1/200-201.
[26] BS1/151.
[27] BS1/206.

been charged with breaching the Securities Act (1933).[28] Gemini and the Winklevosses have also been accused of securities fraud by customers in both federal and New York courts.[29]

42. I note that in its claim form and supporting evidence dated 30 January 2023, the Claimant has failed to inform the Court of the existence of the CFTC Charges, or the fact of my extant challenge to the Award in the New York courts. I believe that these are material matters which ought to have been brought to the Court's attention when making the 'without notice' application for an Order under CPR rule 62.18.

**Statement of truth**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: *[signature]*

Date:   02/03/2023

---

[28] BS1/245-266.
[29] BS1/216-244, 267-295, 296-323.

12