UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                    :

COMMODITY FUTURES TRADING     :    22 Civ. 04563 (AKH)
COMMISSION,     :

    :    **JOINT MOTION AND**
   v.       :    **MEMORANDUM OF LAW IN**
    :    **SUPPORT OF MOTION  FOR**
GEMINI TRUST COMPANY, LLC,     :    **RELIEF FROM JUDGMENT**
    :    <u>**PURSUANT TO RULE 60(b)**</u>
    Defendant.    :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

---

**JOINT MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
RELIEF FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)**

---

Avi Perry
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
Tel: (202) 538-8330
Email: aviperry@quinnemanuel.com

*Attorney for Defendant Gemini Trust Company, LLC*


John Einstman (*pro hac vice* pending)
Senior Advisor, Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, D.C. 20581
Tel: (202) 418-5337
Email: jeinstman@cftc.gov

*Attorney for Plaintiff Commodity Futures Trading Commission*

**TABLE OF CONTENTS**

I.   CASE BACKGROUND ................................................................................................3

   A.   The Self-Certification Process ..........................................................................3

   B.   Gemini's Victimization And The CFTC's Decision To File A Complaint ..........................4

   C.   The Alleged False Statements And Omissions .......................................................6

   D.   The Settlement .................................................................................12

   E.   Post-Settlement Revelations ....................................................................13

II.   INTERVENING LEGAL AND POLICY CHANGES ................................................19

III.   ARGUMENT .....................................................................................................20

   A.   Rule 60(b)(5) Legal Standard .................................................................20

   B.   Rule 60(b)(6) Legal Standard .................................................................22

   C.   The Consent Order's Civil Monetary Penalty Has Been Satisfied ...............................23

   D.   Exceptional Circumstances Justify Relief .......................................................27

   E.   The Balance Of The Equities Favors Vacatur ..................................................30

   F.   The Motion Is Timely .........................................................................31

IV.   CONCLUSION .................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackermann v. United States,*
340 U.S. 193 (1950)............................................................................................23, 30

*BLOM Bank SAL v. Honickman,*
605 U.S. 204 (2025)................................................................................................ 30

*Calderon v. Wambua,*
2012 WL 1075840 (S.D.N.Y. Mar. 28, 2012)......................................................... 22

*DeWeerth v. Baldinger,*
38 F.3d 1266 (2d Cir. 1994) .............................................................................21, 23

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
322 U.S. 238 (1944) ................................................................................................ 31

*Jackson v. Abernathy,*
960 F.3d 94 (2d Cir. 2020)...................................................................................... 16

*Klapprott v. United States,*
335 U.S. 601 (1949) ...................................................................................... 22, 23, 30

*Liljeberg v. Health Servs. Acquisition Corp.,*
486 U.S. 847 (1988) ................................................................................................ 31

*Nemaizer v. Baker,*
793 F.2d 58 (2d Cir. 1986)...................................................................................... 22

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,*
507 U.S. 380 (1993)............................................................................................23, 30

*Rufo v. Inmates of Suffolk Cnty. Jail,*
502 U.S. 367 (1992)............................................................................................21, 22

*SEC v. Bronson,*
602 F. Supp. 3d 599 (S.D.N.Y. 2022)...................................................................... 21

*SEC v. Thornton,*
2020 U.S. Dist. LEXIS 68700 (S.D. Fla. Apr. 20, 2020) ....................................... 22

*Tapper v. Hearn,*
833 F.3d 166 (2d Cir. 2016) ..............................................................................21, 23

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
531 F.3d 190 (2d Cir. 2008) ................................................................................... 15

*Twelve John Does v. District of Columbia*,
841 F.2d 1133 (D.C. Cir. 1988)........................................................................21

*United States v. Eastman Kodak Co.*,
63 F.3d 95 (2d Cir. 1995)................................................................................22

*United States v. Paramount Pictures*,
2020 WL 4573069 (S.D.N.Y. Aug. 7, 2020)...............................................22, 24

*United States v. Western Elec. Co.*,
46 F.3d 1198 (D.C. Cir. 1995).....................................................................22, 25

**Rules/Statutes**

17 C.F.R. § 38.3(c) ...........................................................................................6

17 C.F.R. § 38.200............................................................................................6

7 U.S.C. § 7(d)(3) .............................................................................................6

7 U.S.C. § 8(a) ................................................................................................6

7 U.S.C. § 9(2) ...............................................................................................15

Federal Rule of Civil Procedure 60(b) ....................................................... passim

Federal Rule of Civil Procedure 60(c)(1)...................................................23, 31

**Other Authorities**

Acting Chairman Pham, *Acting Chairman Pham Lauds DOJ Policy Ending
Regulation by Prosecution of Digital Assets Industry and Directs CFTC Staff
to Comply with Executive Orders* (Apr. 8, 2025).........................................20

Strengthening American Leadership in Digital Financial Technology,
Exec. Order No. 14178, 90 Fed. Reg. 8647 (Jan. 23, 2025).............. 1, 19, 20, 26, 27

Press Release, CFTC, *CFTC Staff Issues Advisory on Cooperation in Enforcement
Matters* (May 19, 2026) ..............................................................................27

Press Release, CFTC, *CFTC Statement on Self-Certification of Bitcoin Products
by CME, CFE, and Cantor Exchange* (Dec. 1, 2017)......................................4

Statement of Comm. Caroline D. Pham, CFTC, *The Deliberative Process
Privilege* (Oct. 23, 2023)............................................................................29

Deputy Attorney General Todd Blanche, DOJ, *Ending Regulation by Prosecution*
(Apr. 7, 2025) .........................................................................................20

Plaintiff Commodity Futures Trading Commission ("CFTC") and Defendant Gemini Trust Company, LLC ("Gemini" or "Gemini Trust") jointly move this Court pursuant to Federal Rule of Civil Procedure 60(b)(5) and, in the alternative, Rule 60(b)(6) to vacate the Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief entered on January 6, 2025 (Dkt. 211) (the "Consent Order"). Following President Donald J. Trump's Executive Order, Strengthening American Leadership in Digital Financial Technology, Exec. Order No. 14178, 90 Fed. Reg. 8647 (Jan. 23, 2025) (the "Executive Order"), multiple U.S. agencies implemented a host of changes, including modifying enforcement approaches and standards for cases involving digital assets. The CFTC has since conducted a comprehensive review of the evidence and charging decision that led to the filing of the Complaint (Dkt. 1) against Gemini, as well as the CFTC Division of Enforcement's ("DOE") prosecution of the post-filing litigation and settlement negotiations. The CFTC has determined that the Complaint would not have been filed under the agency's current standards. Notably, the CFTC's review has revealed that DOE resorted to inappropriate tactics in order to bring this case, as well as during the litigation, and then to extract a settlement from Gemini. In particular, DOE: (1) based its action principally on the account of a whistleblower known to DOE not to be credible; (2) concealed evidence from a CFTC commissioner prior to the Commission's vote on whether to grant DOE authority to file the Complaint against Gemini; (3) charged Gemini despite internally acknowledging the absence of critical evidence; (4) pursued Gemini—then known by DOE to be a fraud victim—rather than Gemini's victimizers; (5) put the CFTC's internal deliberations at issue and then invoked the deliberative process privilege and relevancy objections during post-filing litigation to prevent Gemini from obtaining evidence necessary to defend itself; and (6) exerted improper influence over the CFTC's separate regulatory authority to create settlement leverage.

As a result, the CFTC has determined that DOE's conduct fell short of the standards expected of any litigant, much less a federal agency. The CFTC has further determined that the Complaint should not have been filed, and that maintaining the Consent Order's prospective provisions would be inconsistent with the treatment of other regulated entities and will continue to have a chilling effect on both Gemini's legitimate business operations and routine interactions between Gemini and other regulated entities on the one hand and the CFTC's Division of Market Oversight ("DMO") on the other hand. Accordingly, the CFTC has concluded that continuing enforcement of the Consent Order's prospective provisions serves neither the CFTC's mission nor the public interest. Because the Consent Order's non-prospective provisions (*e.g.*, the imposition of a civil monetary penalty) have already been satisfied, and because applying the Consent Order's remaining provisions prospectively would not be equitable, the Parties thus move the Court to vacate the Consent Order. *See* Fed. R. Civ. P. 60(b)(5).

In the alternative, the Court should vacate the Consent Order's prospective provisions pursuant to Fed. R. Civ. P. 60(b)(6). Although Rule 60(b)(6) is not available where Rule 60(b)(1)-(5) apply, DOE's suspect and inappropriate enforcement processes in this case—bringing a case with significant evidentiary defects; charging a victim rather than its victimizer; withholding evidence from internal decision-makers; putting DMO's deliberative and internal processes at issue only to then invoke the deliberative process privilege and interpose relevance objections; and improperly leveraging separate regulatory proceedings—constitute extraordinary circumstances justifying vacatur. Simply put, the Consent Order is not a judgment that equity should respect.

2

## I.     CASE BACKGROUND

### A.     The Self-Certification Process

Gemini is a U.S. cryptocurrency exchange that was founded in 2014 by Cameron and Tyler Winklevoss. From its inception, Gemini embraced regulatory transparency, and it did not commence operations until it received a charter from the New York State Department of Financial Services ("NYDFS") in 2015.

In mid-2017, Cboe Holdings, Inc. ("Cboe") approached Gemini seeking a spot pricing mechanism to serve as the settlement price for a Bitcoin futures product that Cboe planned to launch. On August 2, 2017, Gemini announced a partnership with Cboe to launch the first Bitcoin futures product in the United States. At the time, Gemini was a small start-up with approximately 25 employees. Because the contract would settle to Gemini's auction price, DMO sought information from Gemini and Cboe during its pre-certification review of the Bitcoin futures contract.

Gemini cooperated with DMO's review. Gemini provided information directly to DMO, principally through written responses to a DMO questionnaire on August 25, 2017 (Ex. A), and through an Auction Review Process submission on September 12, 2017 (Ex. B at 9). The information provided by Gemini was reviewed by experienced outside counsel prior to submission. Gemini also provided information to Cboe that was, in part, incorporated into a slide deck presented to DMO on July 25, 2017 (Ex. B at 13), and in the self-certification letter filed by Cboe on December 1, 2017 (Ex. B at 14). Cboe made independent decisions as to what information to include in, and to omit from, the slide deck and self-certification letter. (*See* Ex. B at 21-22, 45 n.32).

During the review process, which lasted for over four months, Gemini and Cboe held numerous meetings, telephone calls, and document exchanges with DMO. (*See* Ex. I at 2-6).

3

Gemini made its employees available to DMO without limitation, produced trading and operational data, and executed an information-sharing agreement with the CFTC that gave DMO transparent access to Gemini's trading activity. (*See* Ex. D at 5). Gemini also adopted improvements to its Bitcoin auction at DMO's recommendation. (*See* Ex. B at 26 n.19). The CFTC publicly recognized Gemini's cooperation in its December 1, 2017 Statement on Self-Certification of Bitcoin Products by the Chicago Mercantile Exchange Inc. ("CME"), the Cboe Futures Exchange, LLC ("CFE"), and the Cantor Exchange.[1]

The CFE self-certified the Bitcoin futures contract on December 1, 2017, and trading began within days. (*See* Compl. ¶ 111). The contract was listed for 16 months with no identified or alleged price manipulation or other harm to any market participant. (*See* Ex. F at 1). The CFE voluntarily delisted the contract in mid-2019. (Ex. B at 4).

### B.      Gemini's Victimization And The CFTC's Decision To File A Complaint

In August 2017, during the pre-certification review, Gemini discovered that it was the victim of a sophisticated fraud scheme enabled by its own Chief Operating Officer ("COO") and a subordinate. Without authorization, the COO and his subordinate authorized bespoke fee structures combining extremely low taker fees with large maker rebates for two institutional customers ("Customer A" and "Customer B")—without obtaining preapproval from Gemini's Chief Compliance Officer, as Gemini's policies required. Customers A and B exploited the preferential fee structures through a coordinated rebate-fraud scheme. In total, the scheme defrauded Gemini out of more than $7.5 million. (*See* Compl. ¶¶ 98-106; Ex. B at 56 & n.37). The scheme did not impact other market participants. The only victim was Gemini. All of

---

[1]    Press Release, CFTC, *CFTC Statement on Self-Certification of Bitcoin Products by CME, CFE, and Cantor Exchange* (Dec. 1, 2017) ("Commission staff held rigorous discussions with" the relevant parties, who agreed to, among other things, "more information sharing with the underlying cash bitcoin exchanges to assist . . . the CFTC in surveillance").

Customer A's and Customer B's relevant trading activity occurred on Gemini's continuous order book, not on the auction, and Customer B never traded in the auction at all.

The fraud scheme was concealed from Gemini's senior leadership. The COO and his subordinate did not inform Gemini's Chief Executive Officer (Tyler Winklevoss), President (Cameron Winklevoss), or Chief Compliance Officer of the bespoke arrangements at issue or the resulting losses. The subordinate has admitted under oath that he affirmatively concealed the losses from Cameron and Tyler Winklevoss, who first learned of the losses while reviewing Gemini's monthly financial data on August 23, 2017, and immediately launched an internal investigation.

Gemini promptly reported the fraud to its regulator (NYDFS) and to law enforcement. (*See* Ex. B at 56 & n.37). The U.S. Attorney's Office for the Southern District of New York ("SDNY") opened an investigation into the rebate-fraud scheme. Gemini suspended and ultimately fired the COO and his subordinate. (*See* Compl. ¶¶ 100, 103; Ex. B at 11 n.7). During the suspension meeting, the COO threatened Cameron and Tyler Winklevoss, warning that he would interfere with the CFTC's then-ongoing review of the Bitcoin futures contract.

In November 2017, the COO made good on his threat. He filed a CFTC whistleblower complaint making various allegations against Gemini (Ex. B at 2 n.1), prompting DOE to open a new investigation focusing on the whistleblower allegations. Gemini cooperated with both the SDNY and DOE investigations. During the course of the investigations, critical information in the COO's whistleblower complaint was determined to be false, and Customers A and B explicitly admitted their rebate-fraud scheme in interviews with the Federal Bureau of Investigation ("FBI"), with DOE staff present. In late 2021, the SDNY closed its investigation without charges. (Ex. B at 4 n.3 (DOE staff asserting that SDNY closed investigation "without bringing charges . . . in part due to concerns about being able to prove false statements beyond a reasonable doubt and concerns about the credibility of the whistleblower")).

5

Despite the SDNY's declination, DOE pressed forward with its investigation of Gemini. Citing the ongoing investigation, DOE intervened to delay a Designated Contract Market ("DCM") application first submitted in May 2020 by a Gemini affiliate, Gemini Titan, LLC ("Gemini Titan"), which was under review by DMO. (*See* Ex. C; Ex. G at 16). By April 2022—well past the statutory 180-day review period set forth in 7 U.S.C. § 8(a) and 17 C.F.R. § 38.3(c)—DMO staff had completed their review, determined that Gemini Titan's DCM application satisfied all statutory requirements, and issued an internal Designation Memorandum recommending approval with a deadline of May 20, 2022. (Ex. C). DOE blocked it. (Ex. G at 16).

On June 6, 2022, acting on DOE's recommendation, the CFTC filed the Complaint against Gemini, alleging that Gemini made false statements to DMO during the Bitcoin futures pre-certification review—a claim premised in significant part on the former COO's whistleblower report, which DOE knew by that point contained false allegations. (*See* Ex. B at 4 n.3). The CFTC did not charge Cboe, the former COO who submitted a materially false whistleblower complaint to the CFTC, or Customers A and B who defrauded Gemini. Nor did the CFTC assist Gemini in recouping its $7.5 million in losses from Customers A and B.

## C.    The Alleged False Statements And Omissions

The Complaint alleged that—in connection with Cboe's self-certification about the susceptibility of its new futures product to manipulation under 7 U.S.C. § 7(d)(3) and 17 C.F.R. § 38.200—Gemini made false or misleading statements of material facts, or omitted to state material facts, concerning four aspects of its business: (1) prefunding requirements and the cost of capital for Bitcoin auction participants; (2) rebates available to high-volume market makers; (3) self-trading prohibitions; and (4) auction trading volume. (*See* Compl. ¶ 127). Gemini has consistently maintained it made no false statements or omissions of material facts. (*See generally*

6

Ex. D). Based on the CFTC's comprehensive review, the CFTC concurs that there were significant deficiencies in DOE's evidence and the Complaint should not have been filed.

*Prefunding and cost of capital.* Cboe's July 25, 2017 slide deck stated that auction orders, like all orders on the Gemini exchange, "must be fully pre-funded." (Ex. B at 9). Gemini's September 12, 2017 submission to DMO further explained that all orders were required to be prefunded with fiat or Bitcoin held in the participant's Gemini account and that, as a result, "no participant's outstanding interest on our books can exceed their account balance at any time." (Ex. D at 9). That was true.

Nevertheless, DOE alleged these statements were misleading on two grounds. First, although DOE never asked Gemini about the cost of capital of participants trading on Gemini, Gemini did not affirmatively disclose digital-asset loans made by Pearl Street Financial, LLC ("Pearl Street")—a separate entity owned by Cameron and Tyler Winklevoss—to a small number of Gemini customers in 2016 and 2017. (*See* Compl. ¶¶ 47-61; Ex. B at 5, 9-11). Second, Gemini did not affirmatively disclose a *de minimis* number of out-of-policy operational advances of fiat or digital assets that Gemini extended to certain customers in the process of transferring assets onto the exchange—all initiated by the COO's subordinate without management's authorization or knowledge. (*See* Compl. ¶¶ 62-72; Ex. B at 11-13).

The nondisclosure of Pearl Street digital-asset loans did not render Gemini's statements concerning prefunding materially false or misleading. First, the Pearl Street loans were arm's-length lending transactions on negotiated market-rate terms by a separate entity; the borrowed assets were delivered to the borrowers' independent wallets, and any subsequent trading on Gemini occurred only after the borrower transferred the assets into a Gemini account, making any subsequent trading fully prefunded. Second, the operational advances reflected ordinary-course exchange operations of the kind Gemini had publicly described in its own published materials and

involved fiat or digital assets verifiably in transit. Of approximately 65,999 advances made during 2017, only *nine* were plausibly out of policy (again, all initiated by the COO's subordinate without authorization or knowledge of management), and only one of those nine remained outstanding at any time after the first prefunding statement to DMO (and was remediated as soon as management became aware of it later in September 2017). (Ex. D at 13-14). DMO did not ask any questions during the pre-certification review process that would have indicated that operational advances in ordinary-course exchange operations would have been responsive to DMO's review of Cboe's self-certification with respect to the susceptibility to manipulation of Cboe's Bitcoin futures contract. DMO also did not ask any questions during the pre-certification review process that would have indicated the Pearl Street loans would have been responsive to DMO's review. This makes sense, since exchanges (cryptocurrency or otherwise) typically lack visibility into how customers finance their respective balance sheets, and customers presumably would be unwilling to divulge this sensitive information to exchanges. Regardless, DMO was assessing *if* trades were funded prior to execution, not *how* they were financed. The former question—which was asked and answered—related to whether, in these circumstances, the Gemini auction (and by extension the Cboe Bitcoin futures contract) was readily susceptible to manipulation. The latter did not.

It is also important to put the Pearl Street loans into perspective: By September 2017— when Gemini made its Auction Review Process submission—there were only *two* Pearl Street borrowing relationships. (Ex. B at 32). By late December 2017—when Cboe made its self-certification—there was only *one*. (*Id.*). In any event, there is no evidence that anyone at Gemini believed the Pearl Street loans were responsive to DMO's review. Indeed, Gemini's outside counsel was aware of the Pearl Street relationship and reviewed Gemini's submissions to DMO, and Gemini relied on its counsel's advice that a disclosure would not be responsive to DMO's requests.

8

In these circumstances, the evidence does not establish that Gemini made materially false statements or omissions at all, let alone with scienter. Moreover, the evidence does not establish that these bona fide loans and operational advances (which were actually delivered) impacted whether the Gemini auction was readily susceptible to manipulation—DMO's core focus during the pre-certification review.

*Rebates and bespoke arrangements.* In its August 25, 2017 response to a DMO questionnaire, Gemini described its market-maker rebate program: fees were "typically" charged for liquidity-taking trades and could be reduced through high trading volumes, while rebates "can be earned in a similar way" for liquidity-making trades; the public fee schedule was available on Gemini's website; and "between 5 and 10 market participants have earned liquidity-making rebates," typically generating "approximately 90% of volume in the auctions." (Ex. D at 15). That response was drafted by Gemini's COO who, it is undisputed, was acting without authorization as to his approval of certain bespoke fee arrangements. (*Id.*).

DOE alleged this response was misleading because Gemini did not separately disclose that, in addition to the published schedule, Gemini also entered into bespoke fee arrangements with certain market makers under which the volume thresholds for the maximum rebate could be waived. (Ex. B at 49). However, the bespoke arrangements offered no greater rebate than the published schedule already provided to participants who met the volume thresholds; they simply waived the volume condition for selected high-volume liquidity providers. And the existence of preferential arrangements was disclosed in Gemini's *Policies and Procedures Manual*, which Gemini provided to DMO during the pre-certification process and which contained a section—listed in the table of contents—headed "Agreements Granting Preferential Terms." (Ex. E). The "90% of volume in the auctions" disclosure itself put DMO on direct notice that a small number of participants with rebates drove the bulk of auction volume. (Ex. D at 15). DMO asked no follow-

9

up question about the identity of those participants, the magnitude of the rebates, the existence of side letters, or any theoretical impact on auction pricing. Again, in these circumstances, the evidence does not establish that Gemini made any materially false statements or omissions, let alone with scienter.

*Self-trading.* Gemini represented to DMO that self-trading was prohibited on its exchange. That representation was accurate at the time it was made. Gemini had implemented a self-trade prevention mechanism on its continuous order book in March 2017 and an analogous mechanism on the auction in May 2017. (Ex. D at 16). On September 21, 2017, Gemini adopted *Marketplace Conduct Rules* as part of its *User Agreement* that explicitly prohibited self-trading. (*Id.* at 16-17). On October 20, 2017, Gemini adopted a *Market Data Integrity Policy* reinforcing the prohibition. (*Id.* at 17). DMO did not ask Gemini whether self-trading had ever occurred historically before the prevention mechanisms were implemented, and Gemini neither made a backward-looking representation on that issue nor had reason to believe such information should be provided. (*See* Ex. B at 42-43). Nevertheless, DOE alleged an omission because self-trading historically had occurred on the exchange before those mechanisms were implemented, and a small residual amount of *inadvertent* self-trading—less than half of one percent of auction volume—continued thereafter as a result of a technical feature known as "folding," in which auction orders could unintentionally match against orders on the continuous order book. (*Id.*; Ex. D at 17). However, the folding-related self-trades were inadvertent rather than deliberate, and Gemini affirmatively disclosed these trades to Cboe. (Ex. D at 17). Cboe omitted that information from its own submission to DMO—an omission DOE acknowledged in its internal records. (Ex. B at 45 n.32). With respect to the alleged historical self-trading omission, DOE's theory required Gemini to have anticipated, without being asked, that DMO would want a historical accounting of pre-September 2017 trading patterns on a question DMO was deciding prospectively. The evidence does not

10

support a conclusion that Gemini made materially false statements or omissions, let alone that Gemini acted with scienter. And historical information was not relevant to DMO's analysis.

*Auction volume.* Cboe's December 1, 2017 self-certification letter reported specific auction trading volume figures for the relevant period: as of August 28, 2017, the 20-day moving average of Gemini's market share in U.S. Dollar-Bitcoin trading was 12.8%; the 20-day moving average of Gemini's Bitcoin trading volume was 11,310 Bitcoin; and the 20-day moving average of dollar trading value in the Gemini Bitcoin auction was approximately $1.74 million. (Ex. D at 18). DOE did not allege that any of these reported figures were inaccurate. Instead, DOE alleged that the volume figures were misleading because Gemini did not separately characterize how the underlying volume was generated—referring to the Pearl Street loans, operational advances, bespoke rebate arrangements, and inadvertent self-crossings addressed above. (Ex. B at 17-18). This allegation was derivative of the other allegedly false statements and omissions and lacks support for the same reasons. The volume generated by Pearl Street borrowers, operational advances, or negotiated rebates was real, risk-bearing trading activity and was accurately reported. The *de minimis* self-trading was less than half of one percent of Gemini's Bitcoin auction volume. And the rebate-fraud scheme executed by Customers A and B, although damaging to Gemini, did not affect any other market participants or distort trading volume or pricing.

Taken together, the evidence does not support a conclusion that Gemini acted with scienter in making *any* of the above-referenced statements or omissions. In each instance, DOE's core allegation was that Gemini failed to volunteer information that DMO did not request and which was arguably immaterial to DMO's consideration of the pre-certification review of the Bitcoin futures contract. The alleged statements and omissions at issue were, in turn, either accurate, disclosed by Gemini to DMO, conveyed by Gemini to Cboe but not subsequently included in Cboe's submissions to DMO, disclosed by Gemini to NYDFS, reviewed by Gemini's outside

11

counsel prior to submission, or related to what Commissioner Mersinger candidly described as "unstated expectations of DMO staff." (Ex. F at 3). As a result, the allegations in the Complaint lacked adequate support.

### D.    The Settlement

After the Complaint was filed, Gemini litigated the case for three years. Because the core issue in the case concerned DMO's deliberative and internal processes and, specifically, what information would have been material to DMO in the context of its pre-certification review of Cboe's Bitcoin futures contract, Gemini repeatedly sought discovery of internal CFTC documents that were necessary to mount a defense. At each turn, DOE asserted privilege claims and relevancy objections to block discovery of its internal communications and other documents relating to DMO's review. These documents included internal communications regarding policies and procedures, acknowledged weaknesses in DOE's case, communications between DMO and DOE regarding the pre-certification review, and assessments of the credibility of the former COO/whistleblower and the institutional customers who admitted defrauding Gemini. The breadth of DOE's privilege assertions and objections caused documentary evidence to be withheld from Gemini bearing on the central questions in the case—the alleged falsity of the statements and omissions at issue, their materiality to DMO, and the credibility of the witnesses on whose accounts DOE relied. DOE's actions obstructed Gemini's ability to defend itself in a case that turned on DMO's deliberative and internal processes.

At the same time, both during the investigative stage and after the Complaint was filed, DOE intervened to hold up DMO's approval of Gemini Titan's DCM application. These processes should have been separate, and DOE's intervention was improper and coercive. It was designed to exert pressure on Gemini to settle the litigation by holding the DCM application hostage. Facing indefinite regulatory paralysis, mounting litigation costs, and the stigma of the pending Complaint,

12

and without the ability to defend itself due to DOE's privilege assertions and objections, Gemini agreed to settle on December 24, 2024, fewer than three weeks before trial was set to begin. The Consent Order was subsequently entered by this Court on January 6, 2025. (Dkt. 211). Gemini paid in full the $5 million civil monetary penalty mandated by the Consent Order and, to date, has complied fully with the other required terms.

### E.     Post-Settlement Revelations

After the settlement, Gemini submitted Freedom of Information Act ("FOIA") requests for records that DOE had shielded during the litigation. Gemini received approximately 16 productions between July 2025 and May 2026, including approximately 9,000 pages in late October 2025. That the CFTC produced these documents at all further undermines the basis for its prior deliberative process privilege assertions and relevancy objections. These documents revealed to Gemini, for the first time, DOE's charging memorandum, the internal record of the closed meeting at which the split Commission voted to authorize the Complaint, and other internal CFTC documents, emails, and chat messages reflecting foundational defects in DOE's case and inequities in its treatment of Gemini. For the first time, Gemini was able to access documents that it initially requested during discovery as critical to its defense, but which DOE previously had claimed were irrelevant or subject to the deliberative process privilege. Taken together, the record exposes deficiencies in the evidentiary basis for this case, deliberate concealment of information from Commissioners, and improper use of regulatory authority to drive settlement negotiations.

***DOE knew the whistleblower was discredited and culpable.*** Compounding the evidentiary issues, DOE built its case in significant part on the false claims of Gemini's former COO, whom DOE knew was not credible. DOE's internal documents acknowledge that "the whistleblower in this matter, Gemini's former [COO], has significant credibility issues" and that "the Division's investigation uncovered that the whistleblower himself made or had partial responsibility for

13

several of the false statements charged in the Proposed Complaint." (Ex. B at 57). In an internal chat on March 21, 2022, a now-former DOE Trial Attorney wrote, "half the statements were made by the [whistleblower] before he left . . . so we would have to prove control over someone [that Gemini's management] ended up firing and lacked trust in." (Ex. G at 7). Another internal chat from February 4, 2022, reflects the reality that the whistleblower "is a liar—yet he is the person who made many of the statements to Commission on behalf of Gemini." (*Id.* at 22). DOE was also aware that the former COO's whistleblower submission to the CFTC contained numerous false statements. (*See* Ex. B at 4 n.3, 57). DOE should not have overlooked these serious credibility issues to pursue this case, especially where certain of the alleged false statements were made by or with the knowledge of the whistleblower himself. Since the Consent Order was entered, the former COO has withdrawn his whistleblower submission that initiated DOE's investigation.

*DOE deliberately concealed the underlying evidence from Commissioners.* DOE withheld material information from the Commission ahead of the vote to file the Complaint. Commissioner Caroline Pham stated on the record during the closed meeting that she had "requested more details on the facts" before the authorization vote but "did not receive such." (Ex. H at 3). In fact, Commissioner Pham's staff had specifically requested copies of the underlying documents in which the allegedly false statements were made—the core evidence the Commission needed to evaluate the case. (*See* Ex. I at 2). DOE refused to provide these records. In an internal DOE email on May 16, 2022, a now-former DOE Trial Attorney wrote: "I really don't think we should send the underlying documents, but let me know if anyone disagrees." (Ex. I at 2). The then-Acting DOE Director concurred: "I agree we do not want to share underlying documents." (Ex. I at 1). Instead of providing Commissioner Pham with the actual documents she requested, DOE offered only a curated summary that omitted key context. DOE thus deliberately prevented its own client—the Commission—from reviewing critical evidence underlying the

14

Complaint and before the Commission voted on whether to approve filing the Complaint. The vote authorizing the Complaint was split. Commissioner Pham and Commissioner Summer Mersinger both dissented. (Ex. F (Mersinger Objections); Ex. H at 21 (recording Mersinger and Pham dissents)).

*DOE's own attorneys internally conceded the absence of critical evidence.* The CFTC's Complaint charged Gemini with making a false statement, a claim that requires proof that the defendant "knew, or reasonably should have known" its statement was "false or misleading." 7 U.S.C. § 9(2). Because Gemini is an entity, the CFTC had to establish that some employee or agent of Gemini, acting at least in part for its benefit, possessed the requisite mental state. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (rejecting "collective scienter" theory and requiring a strong inference that an individual whose intent is imputable to the corporation acted with the requisite mental state); *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020) (same). As described above, internal DOE records reflect awareness of serious evidentiary defects before the Complaint was filed. In fact, a now-former DOE Chief Trial Attorney wrote in an internal chat on February 10, 2022, "I do not have much confidence in this matter," (Ex. G at 14), and another former DOE Trial Attorney wrote on February 28, 2022, that the former Chief Trial Attorney "realize[d] it is a shitty factual case" and would be "very hard to prove without opening up everyone in DMO to discovery," (Ex. G at 26). When the Commission was voting on the Complaint, the former Chief Trial Attorney admitted to the Commission: "We do not have a sort of red flag … no document where Cameron and Tyler Winklevoss or even [the whistleblower] says, hey, we're telling the CFTC this, but we know we have these other issues, no one bring it up." (Ex. H at 11). Nor did DOE possess evidence that some other actor knowingly made a false statement on Gemini's behalf to DMO. (*See* Ex. B at 35-36, 47). And while DOE asserted to the Commission that the "reasonably should have known"

15

standard was satisfied, that claim relied heavily on the former COO's uncorroborated—and later disproven—allegations. (*See* Ex. B at 57-58). As these documents suggest, the evidence again does not establish that Gemini should have known its statements or omissions were materially false or misleading. Many of the statements or omissions alleged in the Complaint were reviewed by Gemini's outside counsel prior to submission; were communicated by Gemini to Cboe, which independently decided such information was not responsive to its submissions to DMO; were disclosed by Gemini to NYDFS; were true; were actually disclosed in materials submitted to DMO; and/or related to "unstated expectations of DMO staff," (Ex. F at 3)—all of which undercuts DOE's scienter allegations. To be sure, the CFTC is entitled to bring challenging cases, even where the record is incomplete. But here, without substantial evidence of scienter, DOE should not have pursued charges.

**DOE knowingly declined to pursue the actual perpetrators.** While devoting years of resources to prosecuting Gemini—a fraud *victim*—DOE failed to pursue an enforcement action against the individuals and entities who actually carried out the scheme to defraud Gemini. DOE staff were present at interviews where Customers A and B openly admitted they had deliberately defrauded Gemini. DOE did nothing with those admissions, made no effort to help Gemini recover the $7.5 million that it was defrauded out of, and did not pursue these bad actors. Instead, Gemini was forced to (successfully) pursue arbitration on its own to recover those funds. (*See* Compl. ¶ 105; Ex. B at 56 & n.37). Nor did the CFTC pursue charges against the former COO for making false statements in his whistleblower filing. Although the CFTC retains discretion to pursue the cases it deems appropriate, DOE's enforcement action against a victim rather than its victimizers was aberrant and contrary to DOE's current approach and longstanding principles of fair enforcement. The decision to do so here was especially unwarranted given that, according to DOE staff, the "United States Attorney's Office for the Southern District of New York [] also

16

investigated Gemini (primarily, its principals) for potential criminal misconduct arising out of the same or similar factual circumstances" and "closed its investigation without bringing charges . . . ." (Ex. B at 4 n.3). While the CFTC's burden of proof is lower than in a criminal case, such credibility concerns likewise affected the CFTC's own evidentiary standard, and DOE's decision to pursue a fraud victim while allowing admitted bad actors to escape consequences was inappropriate.

***DOE's overbroad privilege assertions denied Gemini a critical defense.*** Throughout the litigation, DOE tactically invoked the deliberative process privilege and interposed relevance objections to shield from discovery the very documents the CFTC later disclosed through FOIA. DOE's assertion of the privilege and objections blocked Gemini from obtaining any information about the analysis DMO staff performed (or more accurately, failed to perform), the factors DMO considered important, the decisions DMO made in connection with its pre-certification review, and DOE's acknowledgment that a trading or volume impact analysis had not been performed and would be "extremely challenging." (Ex. B at 58).[2] These materials went to the heart of Gemini's defense—particularly on the question of materiality—and their concealment during the course of litigation deprived Gemini of any meaningful ability to contest DOE's claims at trial or make an informed decision about settlement. As a result, the settlement that produced the Consent Order was reached without Gemini having access to evidence that would have fundamentally altered its litigation calculus.

---

[2]   The Court ultimately ruled that some of Gemini's requested discovery could not be pursued on relevance grounds due to its attenuation from materiality's objective standard. (*See* Dkts. 38, 42, 71, 77). However, DOE's invocation of the deliberative process privilege *prior* to the Court's relevance rulings—in relation to documents the CFTC eventually produced in FOIA disclosures—altered the normal course of discovery. Had DOE not shielded from Gemini documents the CFTC would later determine could be disclosed via FOIA, Gemini might have discovered some of the documents and arguments at issue in this motion before these discovery disputes ripened (and narrowed) into the subject of the Court's rulings.

Indeed, Commissioner Pham had warned in a written dissent from the order authorizing DOE to invoke the deliberative process privilege that—if Gemini was not "able to discover evidence to support a defense" due to the invocation—the CFTC could begin to "resemble a secret tribunal where we accuse others of crimes but will not say why or how." (Ex. J at 13). But the dissent was designated "INTERNAL" in the seriatim voting materials and was not made public at the time. (Ex. J at 1). The CFTC's then-General Counsel advised Commissioner Pham not to publish the dissent: "You will end up getting your deposition taken in the case and it will be messy. If there is going to be a public statement, DoE requests some deletions, both to protect you and to avoid harm to the case." (Ex. K at 1).

**DOE weaponized the DCM application to coerce settlement.** The CFTC's post-settlement FOIA disclosures confirm that DOE intentionally timed the Complaint to interfere with DMO's review of Gemini Titan's DCM application, and then deliberately stalled the DCM application as leverage to force a settlement with Gemini Trust. In a January 19, 2022 internal message, the former Chief Trial Attorney emphasized that "DMO is going to start the clock . . . meaning anything we can do to get this in the commission's hands for review before the 60 days is up we should." (Ex. G at 12). Another former DOE Trial Attorney responded that "[p]resumably if the Commission authorized an injunctive suit based on 6c2, they will have grounds to deny the application." (*Id.*). By January 26, 2022, the manufactured delay had become so extreme that DMO's Deputy Director complained internally that "this is upsetting as I don't like to lie" about the reasons for the delay, and that the CFTC was not being "fair" to Gemini Titan. (Ex. L at 1). On February 2, 2022, the same DMO Deputy Director wrote in an internal email that, other than DOE's investigation, "we don't have a reason to keep the stay." (Ex. M at 1). Another DMO official complained in an internal chat on February 8, 2022, that the then-Acting DOE Director "asked [DMO] to find something to hold it up and then claimed he doesn't want to impact

18

decision." (Ex. G at 16). And a former DOE Trial Attorney wrote in an internal chat on February 4, 2022, that Gemini Trust's pre-filing settlement offer and submissions were "offensive" and "should be a basis for denying a DCM app." (Ex. G at 23).

DMO staff had completed their review and recommended approval by April 2022 (*see* Ex. C), but DOE intervened again to block it. By May 10, 2022, the DMO Deputy Director was explicit: "the application would have gone ahead before the enforcement complaint." (Ex. G at 41). A DMO colleague responded that "there are no grounds for stay" and called the situation "OUTRAGEOUS." (*Id.*). DMO staff also observed that the previously Acting DOE Director— who, by that time, had transitioned from Acting DOE Director to Acting DMO Director—was "still sitting in on DOE/gemini meetings," which prompted DMO's Deputy Director to respond, "that is so bad that he is in both meetings . . . shame on him." (*Id.*; *see also id.* at 44 (calling the same Acting Director the "shadow director of doe")).

DOE's actions ensured that Gemini Titan would not receive approval on its DCM application unless Gemini Trust first resolved the enforcement matter, leveraging the CFTC's regulatory authority to force Gemini to settle.

## II.    INTERVENING LEGAL AND POLICY CHANGES

On January 23, 2025—after the Consent Order was entered—President Trump issued an Executive Order to "support the responsible growth and use of digital assets, blockchain technology, and related technologies," which included the "protect[ion] and promot[ion] [of] the ability of individual citizens and private-sector entities alike to access and use for lawful purposes open public blockchain networks without persecution." Executive Order. The Executive Order also established a "Working Group" to propose changes to the treatment of digital assets by federal law, and directed that Working Group to "receive individual expertise from leaders in digital assets and digital markets." *Id.*

19

Following the Executive Order, as exemplified by a memorandum from the Deputy Attorney General titled "Ending Regulation by Prosecution," there was a whole-of-government abandonment of the "reckless strategy of regulation by prosecution" of the prior administration. Deputy Attorney General Todd Blanche, DOJ, *Ending Regulation by Prosecution* (Apr. 7, 2025), available at www.justice.gov/dag/media/1395781/dl (the "DAG Memo"). Among other things, the DAG Memo announced that "investigations and prosecutions involving digital assets shall focus on prosecuting individuals who victimize digital asset investors, or those who use digital assets in furtherance of criminal offenses" and that the government would "no longer pursue litigation or enforcement actions that have the effect of superimposing regulatory frameworks on digital assets." *Id.* Shortly after the DAG Memo's issuance, the CFTC adopted the outlined enforcement approach. *See* Acting Chairman Pham, *Acting Chairman Pham Lauds DOJ Policy Ending Regulation by Prosecution of Digital Assets Industry and Directs CFTC Staff to Comply with Executive Orders* (Apr. 8, 2025), available at www.cftc.gov/PressRoom/PressReleases/9063-25 ("I direct the CFTC staff and the Director of Enforcement to not take any litigating position or arguments that do not comply with the executive orders, Administration policy, or DOJ policy on digital assets enforcement priorities and digital assets charging considerations.").

## III.    ARGUMENT

### A.    Rule 60(b)(5) Legal Standard

Federal Rule of Civil Procedure 60(b)(5) provides, in relevant part, that a court "may relieve a party or its legal representative from a final judgment, order, or proceeding" where "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Rule also authorizes relief where "the judgment has been satisfied, released, or discharged." *Id.*; *see also Tapper v. Hearn*, 833 F.3d 166, 169 n.2 (2d Cir. 2016).

20

To obtain relief based on prospective inequity, "a movant must show, first, that the challenged order is prospective in nature, and second, that it would be inequitable to permit the order to remain in place." *SEC v. Bronson*, 602 F. Supp. 3d 599, 615 (S.D.N.Y. 2022) (quotation omitted). A judgment has prospective application within the meaning of Rule 60(b)(5) where it is "executory or involves the supervision of changing conduct or conditions." *Tapper*, 833 F.3d at 170-71 (citation modified). Although "[v]irtually every court order causes at least some reverberations into the future, and has, in that literal sense, some prospective effect," that "a court's action has continuing consequences . . . does not necessarily mean that it [applies prospectively] for the purposes of Rule 60(b)(5)." *Id.* at 170 (citation modified). This provision of Rule 60(b)(5) "is rooted in the traditional power of a court of equity to modify its decree in light of changed circumstances," *id.* at 170-71 (citation modified), and typically, "judgments involving injunctions have 'prospective application,' while money judgments do not." *DeWeerth v. Baldinger*, 38 F.3d 1266, 1275 (2d Cir. 1994) (citing *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1139 (D.C. Cir. 1988)).

Once prospective application is established, the movant must show that "a significant change either in factual conditions or in law" renders continued enforcement of the judgment inequitable. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383-84 (1992). That burden may be satisfied "when changed factual conditions make compliance with the decree substantially more onerous," "when a decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the judgment without modification would be detrimental to the public interest." *Id.* at 384 (citation modified). "If the moving party satisfies the first *Rufo* prong, the second prong directs the Court to 'consider whether the proposed modification is suitably tailored to the changed circumstance.'" *Calderon v. Wambua*, 2012 WL 1075840, at *3 (S.D.N.Y. Mar. 28, 2012) (quoting *Rufo*, 502 U.S. at 383). Ultimately, a Court's power to grant relief under Rule 60(b)(5) is

21

"guided by equitable considerations." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995).

A change in law or policy can constitute sufficiently changed facts or law for purposes of the first prong of the *Rufo* test. *See SEC v. Thornton*, 2020 U.S. Dist. LEXIS 68700, at *2 (S.D. Fla. Apr. 20, 2020) (vacating consent-order undertakings "rendered outdated by changes in both law and facts" following Sarbanes-Oxley and revised professional standards); *United States v. Western Elec. Co.*, 46 F.3d 1198, 1206-08 (D.C. Cir. 1995) (affirming Rule 60(b)(5) relief where consent decree's restraints had become inconsistent with the legal regime they were entered to enforce); *United States v. Paramount Pictures*, 2020 WL 4573069, at *6 (S.D.N.Y. Aug. 7, 2020) (granting Rule 60(b)(5) relief in part because the consent decrees' treatment of certain conduct as "per se illegal" prohibited conduct "that today may be deemed legal").

## B.    Rule 60(b)(6) Legal Standard

Rule 60(b)(6) provides that a court "may relieve a party . . . from a final judgment, order, or proceeding" for "any [] reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This catchall provision vests district courts with broad equitable power "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 615 (1949).

In the Second Circuit, Rule 60(b)(6) is "properly invoked only when there are extraordinary circumstances justifying relief, when the judgment may work an extreme and undue hardship, and when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule." *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986) (citation modified). The rule "should be broadly construed to do substantial justice, yet final judgments should not 'be lightly reopened.'" *Nemaizer*, 793 F.2d at 61 (citation modified); *see also Tapper*, 833 F.3d at 170.

22

Relief under Rule 60(b)(6) is appropriate where the moving party demonstrates that it was effectively without meaningful choice in entering the judgment, which courts distinguish from the "free, calculated, deliberate choices" that foreclose relief. *Ackermann v. United States*, 340 U.S. 193, 198 (1950); *see also Klapprott*, 335 U.S. at 613-14 (underscoring the parties' lack of free choice). Similarly, where a party is "faultless" in having been unable to avoid or discover the basis for relief, Rule 60(b)(6) relief is available. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993).

A motion under either Rule 60(b)(5) or Rule 60(b)(6) must be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1).

### C. The Consent Order's Civil Monetary Penalty Has Been Satisfied, And Applying The Remaining Terms Prospectively Is Inequitable

The Consent Order required Gemini to pay a civil monetary penalty of $5 million. That term has been satisfied in full, and can therefore be vacated pursuant to Rule 60(b)(5). Fed. R. Civ. P. 60(b)(5) ("the judgment has been satisfied").

The remaining terms mandated by the Consent Order—specifically, the gag order prohibiting Gemini from making any statement denying the allegations in the Complaint or Consent Order, Consent Order ¶ 11; the admissibility provision stipulating that the Consent Order "shall be taken as true and correct and be given preclusive effect" in any future proceeding to which the Commission is a party or claimant, *id.* ¶ 13; and the permanent injunction prohibiting Gemini from making false statements to the CFTC, *id.* ¶ 50—are paradigmatically prospective in nature, *see, e.g.*, *DeWeerth*, 38 F.3d at 1275 (typically, "judgments involving injunctions have 'prospective application'") (citation modified). Continued enforcement of these provisions would be inequitable in the unique circumstances presented here, and that conclusion is reinforced by the breadth and continuing force of the Consent Order's other forward-looking terms. The Consent Order incorporates a finding of "a reasonable likelihood that Defendant will continue to engage in

23

the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations," Consent Order ¶ 49, supplying the predicate for the injunction and a continuing-risk finding that would follow Gemini into any future CFTC proceeding. The injunctive force binds not only Gemini but any "officer, agent, servant, employee, or attorney of" it and "any other persons who are in active concert" with them, *id.* ¶ 61, multiplying the persons subject to restraint indefinitely. The Court retains continuing jurisdiction over Gemini, including over any motion to modify the Consent Order. *Id.* ¶ 60. The Consent Order is enforceable through contempt, and Gemini cannot "challenge the validity of this Consent Order" in any such proceeding. *Id.* ¶ 64. And the Consent Order preserves the CFTC's authority to invoke its findings in any future statutory disqualification proceeding. *Id.* ¶ 14. Each of these provisions is prospective within the meaning of Rule 60(b)(5).

Because of material changes in factual conditions and policy since the entry of the Consent Order on January 6, 2025, continued enforcement of these forward-looking terms would be unfair and detrimental to both Gemini and the public interest. *See, e.g., Paramount Pictures*, 2020 WL 4573069, at *6-7 (granting Rule 60(b)(5) relief in part due to a tension between government policy at the time of a consent order and "current Department of Justice Antitrust Division policy of limiting consent judgments to a period of ten years").

That such material changes have indeed taken place is demonstrated by the fact that the CFTC's new enforcement approach would have foreclosed the action against Gemini from being filed in the first place. For example, unlike the current post-DAG Memo enforcement policy of focusing "on prosecuting individuals who victimize digital asset investors, or those who use digital assets in furtherance of criminal offenses"—like Customers A and B, who defrauded Gemini out of $7.5 million—DOE brought its case against Gemini, the victim of fraud. Similarly, DOE's inappropriate influence over DMO's review of Gemini Titan's DCM application short-circuited

24

the normal regulatory process. *Cf.* DAG Memo at 1 (DOJ will "no longer pursue litigation or enforcement actions that have the effect of superimposing regulatory frameworks on digital assets").

But it is not just that the CFTC has determined that the Complaint should not have been filed under its current enforcement approach; it is that this action confirms the necessity of the CFTC's adoption of the post-DAG Memo enforcement approach. The revelations and critical evidence discovered within the CFTC's July 2025 – May 2026 FOIA productions, as well as the CFTC's comprehensive review of the evidence and charging decisions in this matter, are of a piece with what the DAG Memo termed a "reckless strategy of regulation by prosecution." That recklessness is underscored by a settlement process tainted by DOE's misuse of the CFTC's regulatory authority with respect to Gemini Titan's DCM application. To be clear, DOE's interference with Gemini Titan's application to gain settlement leverage with Gemini Trust would be deemed improper in any context—whether before or after the DAG Memo—and falls short of the agency's standards of conduct.

These inequities do not stand alone. They are accompanied by the inequity of prospectively enforcing the Consent Order, which is not only fundamentally unfair to Gemini, but also disserves the agency's mission and the public interest by conflicting with current federal policy and ongoing CFTC initiatives. *See Western Elec. Co.*, 46 F.3d at 1206 (a consent decree's "prohibition on [Rule 60(b)(5) movant] alone . . . 'would artificially and unfairly restrict competition—an action antithetical to the purposes of the antitrust laws'" pursuant to which the consent decree was originally entered).

*First*, as to the gag order, because the CFTC has determined that the Complaint should not have been filed, it would be inequitable to continue to prohibit Gemini from denying those allegations. Gemini should be free to speak the truth: it did not knowingly make false statements

25

or omissions to DMO. Continuing to restrain Gemini's truthful speech is unfair, stains its reputation, and prejudices its ability to seek licensure and regulatory approvals. Moreover, the Executive Order requires government agencies, including the CFTC, to "receive . . . expertise from leaders in digital assets and digital markets," like Gemini, which was one of the first U.S.-licensed cryptocurrency exchanges. But Gemini might not be able to participate in such discourse without risking violation of the gag order. This public detriment—depriving the government of Gemini's expertise—is particularly acute in light of the CFTC's recent advance notice of proposed rulemaking regarding prediction market event contracts. This appears to be the *only* case in which the CFTC has ever charged an entity solely with making a false statement to DMO during a pre-certification review regarding the susceptibility of a self-certified contract to manipulation. Now that the CFTC has called for comment about the "susceptible to manipulation" standard, *see* Prediction Markets, 91 Fed. Reg. 12,516, 12,519-20 (Mar. 16, 2026), the CFTC has concluded that it would be contrary to the public interest to prevent Gemini from speaking freely about the relevant statutes, regulations, and its experiences engaging with the CFTC over the course of this action.

*Second*, the permanent injunction unfairly stigmatizes Gemini. Although all persons within the CFTC's jurisdiction are required to comply with applicable legal obligations under the Commodity Exchange Act ("CEA"), only prior offenders are bound to do so pursuant to permanent injunctions. Because the CFTC has determined that the Complaint should not have been filed, Gemini's prospective compliance with the CEA should be on the same terms as other regulated persons with clean records, not on the same terms as other persons with prior enforcement histories. This distinction can be meaningful if, for instance, there is a future violation, because the CFTC considers "recidivist intentional or reckless misconduct" as an "[a]ggravating

26

circumstance[].["][3] Although Gemini has every intention of continuing to comply with the law, its ongoing potential exposure to the recidivist-aggravating provisions of the Consent Order hangs over it like the Sword of Damocles. Worse, the Consent Order, if left in place, could impact Gemini's position with other regulators and enforcement agencies, potentially frustrating current federal policy of "support[ing] the responsible growth and use of digital assets, blockchain technology, and related technologies." Executive Order.

For these reasons, the Court should grant the parties' joint motion and vacate the Consent Order under Federal Rule of Civil Procedure 60(b)(5).

### D.    Exceptional Circumstances Justify Relief

In the alternative, the CFTC's post-settlement FOIA disclosures expose, for the first time, a pattern of concealment and fundamental defects that undermine the integrity of the enforcement case and provide a more-than-adequate basis to vacate the prospective provisions of the Consent Order under Rule 60(b)(6). A consent order obtained through an enforcement process that (i) proceeds in the acknowledged absence of essential proof, (ii) is authorized through deliberate concealment of material evidence from the agency's own decision-makers, and (iii) is extracted through improper regulatory leverage is not a judgment that equity should preserve.

The record now confirms foundational evidentiary defects that should have prevented the Complaint from being filed. DOE knew that the core of its case—the whistleblower—had "significant credibility issues" (Ex. B at 57) and "is a liar—yet he is the person who made many of the statements to Commission on behalf of Gemini," (Ex. G at 22). Although Gemini knew before settling this matter that it had not knowingly made a false statement, it was not until it received the CFTC's FOIA response that Gemini discovered DOE *also* had reason to know the

---

[3]  *See* Press Release, CFTC, *CFTC Staff Issues Advisory on Cooperation in Enforcement Matters* (May 19, 2026), available at www.cftc.gov/PressRoom/PressReleases/9234-26.

same. Even proceeding on the "reasonably should have known" standard, DOE should not have relied on the uncorroborated allegations of Gemini's former COO, who DOE staff recognized at the time was not credible. DOE was aware that the former COO was a "liar" and had lied about material facts. DOE's choice to build a case around his claims—in the absence of significant corroborating evidence—was mistaken and inconsistent with core principles of impartial enforcement.

The full record also reveals substantial issues with DOE's proof as to materiality. In particular, DOE's charging memorandum reflects that DMO "generally regarded Gemini's auctions to involve relatively low trading volume and 'little activity,' but did not find this to be irreconcilable with Core Principle 3 or a fatal defect for the Proposed Bitcoin Futures Contract," which undercuts DOE's prosecutive theory that the alleged statements and omissions about trading volume would have been material to DMO. (Ex. B at 54). Similarly, the memorandum states that DOE "has not yet conducted analysis to determine the extent to which loaned digital assets, undisclosed advance credits, self-trading, or wash trading may have inflated Gemini's auction volumes or continuous orderbook trading. Such an analysis may be extremely challenging given the fungible nature of digital assets." (Ex. B at 58). Because DOE had not taken steps sufficient to determine whether the alleged statements and omissions at issue had any impact on the market— and in fact, DOE knew by the time it filed the Complaint that the Bitcoin futures contract had been listed for 16 months with *no* identified or alleged price manipulation or other market impact—it was unreasonable to charge Gemini on the theory that it should have known *ex ante* that those statements and omissions would be material to DMO's analysis.

The charging memorandum likewise notes litigation risks in establishing scienter with respect to the allegedly false statements or omissions about advance credits and self-trading. (Ex. B at 40-41 ("a finder of fact could find there is too little evidence of Gemini senior management

28

discussions concerning advance credits . . . to draw a connection between [such] . . . advance credits . . . and its statements about prefunding and the cost of capital"); *id*. at 47 ("there is still some risk a finder of fact could be sympathetic to Proposed Defendant's arguments" that "senior management (in reliance on [an] engineer's confirmation) did not know that its statements about self-trading were false or misleading"); *see also* Ex. H at 11 (there is "no document where Cameron and Tyler Winklevoss or even [the whistleblower] says, 'hey, we're telling the CFTC this, but we know we have these other issues, no one bring it up.'")). Lacking clear evidence of scienter and materiality, DOE should not have charged this case.

DOE also withheld evidence from the Commission. Commissioner Pham requested copies of the underlying documents in which the allegedly false statements were made, and the then-Acting DOE Director refused to provide them—preventing the Commission from making an informed decision on the Complaint. This concealment, and the resulting split vote, thus calls into question the authorization process that greenlit the filing of the Complaint.

Critically, Gemini could not have litigated this record before it settled because DOE claimed deliberative process privilege and mounted relevance objections over the same materials it later provided in response to Gemini's FOIA requests post-settlement. The practical effect of DOE's invocation of the privilege and objections was to prevent Gemini from learning facts essential to any reasoned settlement calculus. As Commissioner Pham has commented, "[t]here is a disturbing trend among federal agencies that involves overbroad use of the deliberative process privilege against defendants in enforcement actions, so that relevant facts or final policy or final determinations cannot be used to support a defense against the alleged charges."[4] The settlement

---

[4] Statement of Comm. Caroline D. Pham, CFTC, *The Deliberative Process Privilege* (Oct. 23, 2023), available at www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement102323.

reached here in the absence of those facts does not reflect the "free, calculated, deliberate choice" that courts have treated as dispositive. *Ackermann*, 340 U.S. at 198.

That Gemini was deprived of a "free, calculated, deliberate choice," *id.*, is perhaps best demonstrated by DOE's interference with Gemini Titan's DCM application. Even though DMO was prepared to approve the DCM application no later than April 2022, DOE blocked it until after Gemini Trust settled the enforcement case. As a result, Gemini Titan's DCM application was held in limbo while its competitors obtained their own DCM designations and established predominant market positions, making Gemini Titan a latecomer to a market it should have been among the first to enter. That pressure tactic was an improper abuse of regulatory authority to further a litigation position. While "misconduct" typically falls under Rule 60(b)(3) such that it is not a basis for Rule 60(b)(6) relief, *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 210-11 (2025), when governmental coercion forces a party to choose between capitulating to an enforcement action whose merits it cannot fully evaluate and enduring indefinite regulatory paralysis affecting a critical business initiative, the resulting "consent" is not meaningfully voluntary and presents the type of scenario in which extraordinary equitable relief is warranted. *See Klapprott*, 335 U.S. at 613-14; *Pioneer*, 507 U.S. at 393.

### E.    The Balance Of The Equities Favors Vacatur

The equities decisively favor vacatur of the Consent Order's prospective provisions. Gemini does not seek relief from a hard-fought merits loss but seeks to remove the continuing judicial imprimatur from a decree whose entry was materially shaped by concealment and coercive dynamics it could not meaningfully counter at the time. Rule 60(b)(6) is rooted in equitable discretion, and that discretion is at its apex where, as here, the moving party was "faultless" in its inability to discover the basis for relief. *Pioneer*, 507 U.S. at 393. Likewise, the CFTC seeks to correct an unjust outcome that is inconsistent with its longstanding principles of equitable

enforcement. This action should not have been filed in the first place and would not be filed today. Neither party would suffer any concrete prejudice from the prospective provisions' vacatur, and indeed the parties jointly move for the requested relief.

Finality concerns also carry reduced weight where the integrity of the process is itself in question. Courts recognize that relief pursuant to Rule 60 may be necessary to avert outcomes that "undermin[e] the public's confidence in the judicial process," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988), and that equitable power exists to prevent court orders from becoming instruments of the very misconduct that tainted their entry, *see Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). Finality should not be purchasable by concealment or maintained by coercion. Only vacatur vindicates those equitable considerations.

**F.    The Motion Is Timely**

Finally, the parties are bringing this motion within a reasonable time. Fed. R. Civ. P. 60(c)(1). Although just outside the one-year deadline for motions under Rule 60(b)(1)-(3), this motion is being filed reasonably soon after Gemini received and analyzed the CFTC's FOIA disclosures and conferred with the CFTC. More specifically, after receiving the bulk of the CFTC's FOIA productions on November 11, 2025, Gemini acted promptly to review those materials and wrote to the CFTC on March 3, 2026 to request a meeting. After receiving Gemini's letter, the CFTC conducted an internal review on a prioritized basis, and the parties met to confer on April 14, 2026. Following that meeting and an additional FOIA production by the CFTC on May 12, 2026, this motion promptly followed. Given the timing of the CFTC's FOIA productions, the volume of newly produced materials that Gemini had to review before seeking relief from this Court, the need for the CFTC to conduct an internal review, and the parties' efforts to confer, the record establishes that the parties acted diligently to bring this motion to the Court's attention within a reasonable time.

31

## IV.    CONCLUSION

This is not a case of Monday morning regrets. DOE's conduct here violated bedrock principles of fair enforcement. It targeted a fraud victim rather than actual bad actors. Indeed, CFTC staff were present at interviews where participants in the scheme *admitted* they had deliberately defrauded Gemini. Yet DOE declined to pursue a clear fraud case that cost Gemini millions of dollars, hitched its wagon to a discredited whistleblower, disregarded and withheld critical evidence, proceeded to file a Complaint, notwithstanding serious questions about the strength of its evidentiary support, and manufactured settlement leverage through regulatory strong-arm tactics. A settlement reached in these circumstances should not stand.

Nor will vacatur here open the floodgates. This is the only case of its type. The CFTC has conducted a thorough review of this matter and determined that, in the unique circumstances present here, vacatur is the only fair, responsible outcome.

For the foregoing reasons, the parties respectfully request that the Court grant the joint motion to vacate the Consent Order entered on January 6, 2025 (Dkt. 211), following which the CFTC will file a motion to dismiss the Complaint with prejudice.

Respectfully submitted,

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Dated: Washington, D.C.
      May 27, 2026

By:   */s/ Avi Perry*
       Avi Perry
       555 13th St NW., Suite 600
       Washington, D.C. 20004
       Tel.: (202) 538-8330
       Email: aviperry@quinnemanuel.com

*Attorney for Defendant*
*Gemini Trust Company, LLC*

**COMMODITY FUTURES TRADING
COMMISSION**

*/s/ John Einstman*
John Einstman (*pro hac vice* pending)
Senior Advisor, Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, D.C. 20581
Tel: (202) 418-5337
Email: jeinstman@cftc.gov

*Attorney for Plaintiff Commodity Futures*
*Trading Commission*