# Exhibit A

# EXHIBIT 19

**From:** "Gordon, Nicole" <gordon@cboe.com>
**To:** "'Cameron Winklevoss'" <cameron@gemini.com>, "tyler@gemini.com" <tyler@gemini.com>, "Benjamin Small" <benjamin.small@gemini.com>
**Subject:** FW: CFE-Gemini Responses to CFTC Follow Up Questions - FOIA CONFIDENTIAL TREATMENT REQUESTED
**Date:** Fri, 25 Aug 2017 23:43:19 +0000
**Attachments:** CFE-Gemini_FOIA_Letter_CFTC_Responses_(8-25-17).pdf; 2017-08-25_-_Gemini_-_CBOE_-_CFTC_Questions_-_FINALdocx.pdf; Exhibit_C_-_Gemini_-_BSAAML_-_Policy_-_FOIA_Confidential_Treatment_Requested.pdf

---

FYI – this was just sent to the CFTC.  Have a nice weekend.

Nicole

---

**From:** Gordon, Nicole
**Sent:** Friday, August 25, 2017 6:42 PM
**To:** 'cgoodman@cftc.gov' <cgoodman@cftc.gov>
**Cc:** Mollet, Michael <mollet@cboe.com>; Reinstein, Art <Reinstei@cboe.com>; Dickman, Laura <dickman@cboe.com>
**Subject:** CFE-Gemini Responses to CFTC Follow Up Questions - FOIA CONFIDENTIAL TREATMENT REQUESTED

Hi Chris,

Attached are CFE'S and Gemini's responses to the follow up questions sent to us on August 17, 2017.  Exhibit C is attached as a separate PDF.  I have also attached a letter requesting FOIA confidential treatment of all these materials.

Please let me know if you have any questions.  Have a nice weekend.

Thanks,
Nicole

**Nicole Gordon | Counsel**
CBOE Futures Exchange, LLC
400 South LaSalle Street | Chicago, IL 60605
Phone: 312-786-8109 | Fax: 312-786-7581
E-Mail: gordon@cboe.com
**www.cfe.cboe.com**

This e-mail message and any attachments may contain information that is confidential and proprietary to CBOE Holdings, Inc. (CBOE Holdings), Chicago Board Options Exchange, Incorporated (CBOE), or a CBOE Holdings or CBOE subsidiary and/or information that is protected by the attorney-client or other privilege. If you believe you may not be an intended recipient of this e-mail message, or the employee or agent responsible for delivery of this message to the intended recipient(s), its use and disclosure are STRICTLY prohibited. In that event, please do not read the message or any attachments, notify the sender by reply e-mail that you may have received this message in error, and delete the e-mail message and all attachments and destroy any printed copies of such materials.

Confidential Treatment Requested by Gemini Pursuant to FOIA



August 25, 2017

CFTC FOIA Compliance Office
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C.  20581
FOIAsubmissions@cftc.gov

       Re:     FOIA Confidential Treatment Request:
               Petition Pursuant to Regulation 145.9(d)

Ladies and Gentlemen:

       Pursuant to §145.9(d) of the regulations promulgated by the Commodity Futures Trading Commission ("Commission") under the Commodity Exchange Act, as amended, CBOE Futures Exchange, LLC ("CFE") and Gemini Trust Company, LLC ("Gemini") hereby petition the Commission for confidential treatment of an email and two attachments sent to Christopher Goodman by Nicole Gordon dated August 25, 2017 ("Covered Information").

       The Covered Information should be afforded confidential treatment pursuant to §145.9(d)(1)(ii) of the Commission's regulations because disclosure would reveal CFE and Gemini trade secrets and CFE and Gemini confidential commercial information.

       CFE and Gemini hereby request that the Covered Information be afforded confidential treatment in perpetuity.

       The addresses at which CFE and Gemini can be reached are as follows:

           400 South LaSalle Street
           Chicago, Illinois  60605
           Attention:  Joanne Moffic-Silver

           600 Third Avenue, 2nd Floor
           New York, New York 10016
           Attention: Chief Operating Officer

       Please contact the undersigned at (312) 786-8109 if you have any questions regarding this request.

                    Very truly yours,

                    *Nicole Gordon*

                    Nicole Gordon

cc:  Christopher Goodman, cgoodman@cftc.gov

400 South LaSalle Street        Chicago, Illinois 60605-1023        www.cboe.com/cfe

Confidential Treatment Requested by Gemini Pursuant to FOIA        GEM_CFTC173215

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC



## Questions for CFE

**1. Does CFE plan on providing any "hedge" or other exemptions to the proposed futures contract position limits?**

Position limits for bitcoin futures will be governed by CFE Rule 412, attached as **Exhibit A**. CFE Rule 412 allows for three exemptions for: (1) bona fide hedge transactions; (2) risk management transactions; and (3) arbitrage or spread transactions. Position limits and any available exemptions for bitcoin futures will be applied in the same way as they are applied to other CFE products that are subject to position limits.

**2. What is the basis of the proposed position limits? How do the contract position limits compare to the size of the daily Gemini auctions?**

CFE arrived at 250 contracts for the bitcoin futures expiration position limit by evaluating the average amount of bitcoin traded via the Gemini auction ("Gemini Auction"), then adjusting for non-rolled positions[1] and the proposed contract multiplier.

| Auction Data from 10/3/16 thru 07/17/17 | |
| --- | --- |
| Avg Gemini Auction volume | $1,124,748.74 |
| Avg Gemini Auction bitcoin price | $1,292.38 |
| Avg amount of bitcoin traded | 870.29 |
| Non-Roll %* | 30% |
| Derivative Capacity | 2,638 |
| Contract Multiplier | 10 |
| Equivalent number of futures contracts | 264 |

To get a sense for the capacity of the auction in the absence of derivatives, we ran the same analysis against the highest Gemini Auction volume.

---

[1] Based on the observed percentage of VIX futures that are carried to maturity on a monthly basis. Even though other markets surveyed exhibited a lower percentage of contracts being held to maturity, we chose to use a more conservative estimate.

Confidential Treatment Requested by Gemini Pursuant to FOIA

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

| Gemini Auction on 5/23/17 | |
|---|---|
| Gemini Auction volume | $3,675,375 |
| Gemini Auction bitcoin price | $2,227.50 |
| Amount of bitcoin traded | 1,650 |
| Non-Roll %* | 30% |
| Derivative Capacity | 5,000 |
| Contract Multiplier | 10 |
| Equivalent number of futures contracts | 500 |

Accounting for the fact that Gemini Auction participation will likely grow as a result of listed derivatives settling into the Gemini Auction, we felt 250 contracts was a reasonable level. Furthermore, we did not want the position limit to be below the reportable position level of 200.

Based on preliminary conversations with potential customers, CFE is considering lowering the contract multiplier to one bitcoin. In that case, we would propose higher position limits, but possibly not in a 10/1 ratio.

**3. Does CFE have the ability to access Gemini trade data? Would CFE have the ability to share that data with the commission?**

Yes, CFE has the ability to access Gemini trade data. Attached as **Exhibit B** is a draft Information Sharing Agreement under which CFE has the ability to access Gemini trade data and also share that data with the Commission. To the extent you have any feedback regarding the Information Sharing Agreement, we are open to considering that input.

Confidential Treatment Requested by Gemini Pursuant to FOIA

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC



## Questions for Gemini

**4. What are the requirements and responsibilities resulting from Gemini's licensing with the NYSDFS?**

**Regulatory Oversight:** Gemini Trust Company, LLC ("Gemini" or "we") worked closely with the New York State Department of Financial Services (the "NYSDFS") to obtain a limited purpose trust company license. The term "limited purpose trust company" refers to entities that are chartered under the bank and trust company provisions of the New York Banking Law ("the NYBL").[2] Under the NYBL, a "trust company" has general powers available to banks and trust companies, as well as powers generally associated with trustees and other fiduciaries.

Apart from general fiduciary powers and obligations, the following activities are among those specifically identified in the statute as activities that New York trust companies may conduct with respect to their fiduciary accounts, including (i) the power to accept deposits exclusively in a fiduciary capacity, to receive and disburse money, to transfer, register and countersign evidences of indebtedness or other securities, and to act as attorney in fact or agent and (ii) the power to accept appointment as receiver, trustee, or committee of the property of an estate of any person in insolvency or bankruptcy proceedings.[3]

A limited purpose trust company must conduct its business and operations subject to the limitations or restrictions as the NYSDFS may prescribe in its sole discretion. In practice, most limited purpose trust companies typically engage in activities such as employee benefit trust, personal trust, corporate trust, transfer agency, securities clearance, investment management, and custodial services. A trust company, including a limited purpose trust company like Gemini, can serve as the custodian of customer funds itself.

Under the NYBL, the same general procedures, requirements and criteria for the formation of a full-service bank apply also to the formation of a limited purpose trust company with two exceptions: (i) no requirement to carry FDIC insurance and (ii) a level of capitalization deemed satisfactory to the Superintendent of NYSDFS. Once submitted in acceptable form, a limited purpose trust company application receives the same level of scrutiny as other bank and trust company proposals and ultimately requires the approval of the Superintendent of NYSDFS. In addition, trust companies are subject to many of the same requirements that apply to a bank

---

[2] *See* N.Y. Banking Law § 100 *et seq.* (McKinney).
[3] *Ibid.*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

operating under a New York State banking charter, including: (i) capital requirements; (ii) implementation of an anti-money laundering program;[4] (iii) implementation of a cyber security program; and (iv) consumer protection disclosures.[5] Furthermore, as a limited purpose trust company with fiduciary powers under the NYBL, all activities of a trust company, including all exchange functions, are subject to examination and supervision by the NYSDFS. We comply with the capital requirements under the NYBL, have implemented the required anti-money laundering program and cybersecurity program and make the required consumer protection disclosures. Lastly, we are obligated to put the interests of our customers before our own, to provide accurate public market data and pricing information (collectively, "Gemini Market Data") and to monitor for and prevent market manipulation.

**Financial Statements & Audits:** As part of our supervision under the NYSDFS and the NYBL, we must (i) undergo annual bank safety and soundness exams;[6] (ii) submit unaudited quarterly financial statements to the NYSDFS;[7] (iii) submit audited year-end financial statements to the NYSDFS;[8] (iv) submit semiannual Federal Financial Institutions Examination Council ("FFIEC") Consolidated Reports of Condition and Income (each a "Call Report") to the NYSDFS;[9] (v) undergo an annual independent audit of our overall security program as implemented by our Chief

---

[4] In particular, a prospective trust company must establish policies and procedures designed to ensure and monitor compliance with the Bank Secrecy Act ("BSA") as amended by the USA PATRIOT Act and the anti-money laundering programs of Part 115 of the General Regulations of the Banking Board. A compliance program must include, at a minimum, a system of internal controls to assure ongoing compliance, independent testing for compliance to be conducted by bank personnel or by an outside party, the designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance, and training for appropriate personnel.

[5] Limited purpose trust companies operating virtual currency exchanges are required to provide disclosures to current and prospective customers (in a form approved by NYSDFS) regarding the risks of its services and products and are also required to disclose to current and prospective customers the terms and conditions for using the trust company's products and services prior to any customer using the product or service.

[6] Gemini successfully completed an initial weeklong visitation from NYSDFS bank examiners in April 2016. Gemini successfully completed its first annual month-long bank safety and soundness exam in February 2017, which was conducted by NYSDFS bank examiners.

[7] To date, Gemini has successfully submitted seven (7) unaudited quarterly financial statements to the NYSDFS, reflecting its seven (7) quarters of operation since commencing operations on October 5, 2015.

[8] Gemini successfully completed an opening day balance sheet audit on October 2, 2015, which was performed by BDO USA, LLP. No material issues, weaknesses or concerns were raised. Gemini successfully completed a year-end financial statements audit for December 31, 2015, which was performed by BPM LLP. No material issues, weaknesses, or concerns were raised. Gemini successfully completed a year-end financial statements audit for December 31, 2016, which was performed by BPM LLP. No material issues, weaknesses, or concerns were raised.

[9] To date, Gemini has successfully submitted four (4) FFIEC Call Reports to the NYSDFS on: (i) February 1, 2016, (ii) July 29, 2016, (iii) January 31, 2017, and (iv) July 31, 2017, respectively.

Confidential Treatment Requested by Gemini Pursuant to FOIA

GEM_CFTC173219

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

bitcoin balances can be increased in the case of underpricing (or decreased in the case of overpricing), so as to capture a profit with statistical reliability. This first mechanism does not require physical delivery of bitcoin across venues and is a close analog for what typically occurs in most traditional asset classes; e.g., futures (wherein physical delivery need not be effected in order to encourage price convergence) and ETNs (wherein basket creation and redemption need not be effected in order to encourage price convergence).

The second arbitrage mechanism does require movement of bitcoin across trading venues, in particular from consistently higher-priced ones to lower-priced ones. For many market participants, this process is much faster than for traditional asset classes; e.g., physical commodities, which often take weeks to travel between global trading centers, or securities, which typically require a three-day (soon two-day, within the US only) settlement cycle. A comparison of transaction costs is more difficult and depends heavily on economies of scale. Recently, spikes in mining fees on the Bitcoin Network have resulted in transaction costs of approximately $3 USD, which is nearly insignificant compared to the individual transaction sizes typically used by global bitcoin arbitrageurs (typically in excess of $100,000 USD notional).

Empirically, we have found that our auction price ("Gemini Auction Price") is highly correlated with global prices. Further, there have been studies regarding the speed of global bitcoin price convergence.[13]

### 6. Does Gemini have insights into participant's positions on other Bitcoin exchanges? Are participants contractually obligated to share information with Gemini on their Bitcoin positions or activity away from the Gemini Exchange?

No, this is not standard practice within the bitcoin exchange ecosystem, and there is no consolidated audit trail. CFE would have the ability to obtain information from its Trading Privilege Holders regarding their positions or activity in bitcoin away from Gemini upon CFE's request pursuant to CFE Rule 501(a). A copy of CFE Rule 501(a) is attached as **Exhibit D**.

### 7. How does Gemini envision forks in the bitcoin blockchain affecting continuous trading, the auction process and prices?

This depends on the nature of the fork. The recent series of forks were complicated in that there was little insight into the community's expectations regarding adoption. For situations like this and any fork situation that involves the potential of a "replay attack" (i.e., transactions on the minority branches may be intentionally or unintentionally invalidated due to transactions on the majority branch), we suspend all bitcoin deposit and withdrawals during the period of uncertainty, which is typically one or two days. We generally see no reason to suspend trading of any kind during these

---

[13] *See, e.g.*, https://www.sec.gov/comments/sr-nysearca-2016-101/nysearca2016101-1642621-146805.pdf.

Confidential Treatment Requested by Gemini Pursuant to FOIA

GEM_CFTC173221

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

events; however, uncertainty amongst market participants can sometimes result in volatile prices and reduced liquidity.

**8. Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?**

We have implemented a trading fee program which is available to all of our market participants; we have no specifically defined market maker program. In summary, fees are typically charged for liquidity-taking trades, but these fees can be reduced through high trading volumes and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but rebates can be earned in a similar way. The details are available at https://gemini.com/fee-schedule/. In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participants typically make up approximately 90% of volume in the auctions.

**9. Does Gemini envision adopting any minimum thresholds on numbers of participants and auction volumes to consider an auction successful?**

At this time, we have not, and we have not seen similar requirements for the point-in-time auctions of other asset classes. We strongly believe market forces will encourage participation in auctions which affect futures settlement, especially if such participants observe arbitrage opportunities.

**10. Could an auction occur where there is one participant trading with themselves?**

No, we have instituted self-trade prevention.

**11. Does Gemini evaluate prices on the platform (continuous or auction) relative to other bitcoin exchange prices to observe if they are in line with broader bitcoin market prices? Would that ever be a factor in not using the auction settlement price?**

We compare Gemini prices to other prices within the global bitcoin exchange marketplace regularly but in a non-automated fashion. In the most extreme of circumstances, in consultation with CFE and the Options Clearing Corporation ("OCC"), price divergence may be a factor in setting aside the Gemini Auction Price for contract settlement. In this regard, CFE has the authority to fix a settlement price if an emergency exists pursuant to CFE Rule 418 (a)(v) and CFE Rule 135, including among other things, in any circumstance which may materially adversely affect the performance of a CFE contract. CFE Rule 418(a)(v) and CFE Rule 135 are attached as **Exhibit E.**

Confidential Treatment Requested by Gemini Pursuant to FOIA

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

**12. When does Gemini invoke Settlement Disruption Contingencies? Are there clearly stated guidelines and process for invoking these?**

If a Gemini Auction fails, all Gemini Auction orders are canceled.

If the Gemini Auction Price is not available or the normal settlement procedure cannot be utilized due to a trading disruption or other unusual circumstance, the Final Settlement Value is determined in accordance with the By-Laws and Rules of The OCC. See Article XII, Section 5 of the OCC By-Laws attached as **Exhibit F.** Under this process:

OCC would work with CFE and CFE also would work with Gemini if the Gemini Auction Price is not available or the normal settlement procedure cannot be utilized due to a trading disruption or other unusual circumstance.  Under OCC By-Laws Article XII, Section 5(c)(2), OCC would fix the final settlement price based on its judgment of what is appropriate for the protection of investors and the public interest, taking into account such factors as fairness to buyers and sellers, the maintenance of a fair and orderly market, consistency of interpretation and practice, and consistency with actions taken in related futures or other markets.  Without limiting the generality of the foregoing, OCC may fix the final settlement price using: (i) the reported price or value for the relevant underlying interest at the close of regular trading hours on the last preceding trading day for which such a price or value was reported; (ii) the reported price or value for the relevant underlying interest at the opening of regular trading hours on the next trading day for which such an opening price or value is reported; or (iii) a price or value for the relevant underlying interest at such other time, or representing a combination of average prices or values at such time or times, as OCC deems appropriate.  Specifically, OCC could consider using the following alternatives in order of priority:

- 1) Using the following day Gemini Auction Price as the Final Settlement Value
- 2) Using the bitcoin trade price on the Gemini Exchange continuous order book at 3:00 p.m. CT on a day the Gemini Auction Price is unavailable
- 3) Using a VWAP/TWAP of bitcoin trade prices on the Gemini Exchange on a day the Gemini Auction Price is unavailable
- 4) Using a VWAP/TWAP of bitcoin trade prices from other bitcoin exchanges on a day the Gemini Auction Price is unavailable

**13. Could you please provide more information on what the settlement alternatives are and how Gemini will decide among the alternatives? Are these documented to market participants?**

See the response to Question 12. Like with other CFE products, CFE rules for this product will provide that if the settlement value is not available or the normal settlement procedure cannot be utilized due to a trading disruption or other unusual circumstance, the settlement value will be determined in accordance with the Rules and By-Laws of the OCC. In connection with the launch of the product, CFE plans to issue a circular to note this provision to market participants and the

Confidential Treatment Requested by Gemini Pursuant to FOIA

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

We only impose a minimum on order sizes; this value is currently 0.00001 bitcoin (approximately $0.04 notional currently). We do not impose a maximum size because we require all orders to be fully pre-funded (i.e., all dollars must be deposited before buy orders are placed, and all bitcoin must be deposited before sell orders are placed), and any participant's outstanding interest on our books at a particular time can never exceed its account balance.

**18. Does Gemini, its employees, or related parties participant in the bitcoin market via trading on the Gemini Exchange? Are there formal restrictions or policies concerning this?**

Yes, but with no additional access to information than any other market participant. There are numerous trading restrictions and disclosure requirements for employees and affiliates who trade bitcoin, as detailed in the 'Trading Policy' section (*see* pages 61-67) of our Policies and Procedures manual, which will be provided separately.

**19. Could a trader break the auction by distorting the continuous market?**

Because we require the Gemini Auction Price to be within 5% of the midpoint of the continuous trading book, it is possible for a malicious market participant to intentionally attempt to exceed this threshold by manipulating either the Gemini Auction Price itself or the midpoint of the continuous trading book. Such manipulation would likely be very easy to detect since it would be concentrated over a short period of time and involve direct interaction with either the price levels at the inside of the continuous trading book (i.e., the highest bid and lowest offer) or the Gemini Auction Price pricing itself. Furthermore, other market participants are strongly economically motivated to counteract or arbitrage any such occurrence in order to receive fills at their desired prices.

Moreover, the manipulation of the continuous trading book would likely require substantial capital commitment and not yield a predictable outcome for the malicious market participant. Because the futures contracts settle to the Gemini Auction Price rather than to the continuous market prices, there is no guarantee that contract settlement would be affected favorably for the malicious participant. In fact, in the event of a failed Gemini Auction, the procedure outlined in Question 12 would determine the settlement price, likely thwarting any attempted manipulation.

- **If so, what procedure would OCC use?**

  See response to Question 12.

- **What effect, if any, would a distorted continuous market have?**

  This is difficult to predict, however, because the removal of liquidity offered (or bid) by other market participants requires executing against those orders and the resulting capital commitment, we believe this to be an inefficient strategy. Similarly, because placing orders

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

on the continuous market (and in the Gemini Auction) requires capital to be held (as discussed above), spoofing and other manipulative techniques are typically quite expensive and inefficient as well.

**20. Could Gemini please provide more information on their current surveillance initiatives. Do they have an official market surveillance program? Automated or manual? What type of tests/monitoring do they conduct? Do they actively look at trading between the continuous and auction market? Have they investigated suspicious trading on the platform or taken any action against participants?**

Our current surveillance initiatives have been instituted within the context of our Financial Crimes Enforcement Network ("FinCEN") SAR reporting requirements, as detailed in our BSA/AML Policy attached as **Exhibit C** (*see* pages 24-27). This monitoring is principally automated, with compliance officers also observing market participant behavior on an ad-hoc basis. We file approximately five SARs with FinCEN per month on average, and these filings often lead to additional law enforcement action.

Our context for actively monitoring is typically as a financial institution in the context of the BSA, and we are seeking CFE's expertise in pricing and marketplace surveillance so that we can implement such a program in the near future. Additionally, Gemini and CFE have entered into an Information Sharing Agreement attached as **Exhibit B**, whereby Gemini will share information as requested by CFE pursuant to this agreement, and as necessary for CFE to satisfy its obligations as a self-regulatory organization ("SRO"), such as conducting market surveillance on its market and of its Trading Privilege Holders, including surveillance of the bitcoin future settlement on CFE.

Confidential Treatment Requested by Gemini Pursuant to FOIA                    GEM_CFTC173226

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

## Exhibit A: CFE Rule 412

**412. Position Limits**

(a) The Exchange shall designate for each Contract whether it is subject to position limits or to position accountability.  This Rule 412 governs Contracts that are subject to position limits.

(b) Position limits shall be as established by the Exchange from time to time as permitted by Commission Regulations 150 and 41.2 as applicable.  Such position limits may be specific to a particular Contract or contract expiration or may be established on an aggregate basis among Contracts or contract expiration.  Except as specified in paragraphs (c) and (d) below, Trading Privilege Holders shall not control, or trade in, any number of Contracts that exceed any position limits so established by the Exchange.  Once established, any such position limits shall be deemed to constitute a part of each Trading Privilege Holder's account and clearing agreement.  Except as specified in paragraphs (c) and (d) below, no Trading Privilege Holder shall be permitted to enter, or place an order to enter, into any transaction on the Exchange that would cause such Trading Privilege Holder to exceed any position limits.

(c) On the basis of an application to the Exchange in accordance with paragraph (d) below, and such supplemental information as the Exchange may request, the Exchange will determine whether to grant a position limit exemption for one or more bona fide hedge transactions, risk management transactions or arbitrage or spread transactions.  For purposes of this Rule 412, the term "bona fide hedge transaction" means any transaction or position in a particular Contract that satisfies the requirements of Commission Regulation 1.3(z).

(d) Any application for a position limit must be made by the relevant Trading Privilege Holder to the Exchange in such form, and within such time limits, as the Exchange may from time to time prescribe.  Without limiting the generality of the foregoing, any such application must include the following:

(i) If a qualified bona fide hedge transaction, a representation that such transaction or position satisfies the requirements of Commission Regulation 1.3(z), which representation shall also describe how the transaction would satisfy the requirements of Commission Regulation 1.3(z);

(ii) If a risk management transaction, a representation that the position held by a Trading Privilege Holder that typically buys, sells or holds positions in the underlying cash market, a related cash market or a related over-the-counter market for which the underlying market has a high degree of demonstrated liquidity relative to the size of the positions and where there exist opportunities for arbitrage which provide a close linkage between the futures or options market and the underlying market;

Confidential Treatment Requested by Gemini Pursuant to FOIA

GEM_CFTC173227

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

(iii) If an arbitrage or spread transaction, an undertaking that the prospective arbitrageur or spreader will specify the extent of the Trading Privilege Holder's current or planned activity in the cash market underlying the Contract for which such exemption is requested;

(iv) A representation that the bona fide hedge, risk management, arbitrage or spread transaction will not be used in an attempt to violate or avoid any Rule of the Exchange;

(v) A representation that the positions involved shall be established and liquidated in an orderly manner based upon the characteristics of the market for which the exemption is sought;

(vi) A representation that such Trading Privilege Holder has complied with any applicable federal requirements, including compliance with all applicable Commission regulations relating to bona fide hedging, risk management, arbitrage or spread transactions;

(vii) A schedule of the maximum number of Contracts, long and short, that such Trading Privilege Holder intends to enter into for bona fide hedging, risk management, arbitrage or spread transaction purposes;

(viii) An agreement that such Trading Privilege Holder will comply with any terms, conditions or limitations imposed by the Exchange with respect to the exemption;

(ix) An agreement by such Trading Privilege Holder to promptly submit a supplemental statement explaining any change in circumstances that may affect the nature of its positions;

(x) An agreement by such Trading Privilege Holder to promptly notify the Exchange of any material change to the information provided in any application; and

(xi) A representation that the Exchange may, at any time, rescind, limit or condition any exemption.

(e) In determining whether any Trading Privilege Holder has exceeded or seeks to exceed the position limits established by the Exchange, all positions in accounts for which such Trading Privilege Holder, by power of attorney or otherwise, directly or indirectly controls trading (as set forth in Commission Regulation 1.3(j) and Commission Regulation 150.5(g)), whether on a proprietary basis or on behalf of Customers, shall be included. Position limits shall apply to positions held by two or more Trading Privilege Holders acting pursuant to an express or implied agreement or understanding in the same manner as if such positions were held by a single Person

(f) The application for a position limit exemption must be submitted to and approved by the Exchange before execution of any transaction for which the exemption is requested. In

Confidential Treatment Requested by Gemini Pursuant to FOIA                    GEM_CFTC173228

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

granting any position limit exemption, the Exchange may impose such limitations or conditions upon the grant of the exemption as it may deem necessary or appropriate. Factors to be taken into account by the Exchange in determining whether to limit or condition a position limit exemption may include, among others, the liquidity of the markets involved, sound commercial practices and the Trading Privilege Holder's financial condition and business circumstances. Any position limit exemption granted by the Exchange for a bona fide hedge transaction, risk management transaction or arbitrage or spread transaction shall remain in effect for the time period designated by the Exchange, unless the exemption is earlier rescinded by the Exchange. The time period for which a position limit exemption may be granted by the Exchange may be up to two years. The Exchange shall have the authority, at any time and in its sole discretion, to review and rescind, limit or condition any position limit exemption granted by it. A Trading Privilege Holder shall promptly submit to the Exchange upon request such supplemental information requested by the Exchange in connection with the review of a position limit exemption granted to the Trading Privilege Holder. A Trading Privilege Holder that has received a position limit exemption must annually file an updated position limit application not later than one year following the approval date of the most recent application. Failure to file an updated application will result in expiration of the exemption.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

Information"). Terms not defined in this Agreement shall have the meaning set forth in the License Agreement. The terms of the License Agreement shall prevail in any conflict between the terms of this Agreement and the License Agreement, except with respect to the sharing of Gemini Information.

3. Gemini shall provide on a daily basis (in a form and within a time period agreed to by the Parties) to CBOE or a CBOE Trading Venue designated by CBOE, the following Gemini Information for Regulatory Purposes:

    a. Gemini market participant IDs (each, a "Market Participant ID");
    b. Gemini account IDs (each, an "Account ID");
    c. All positions and all changes to positions for the prior trading day by Account ID for Digital Assets specified by CBOE or a CBOE Trading Venue; and
    d. All bids and offers, orders, modifications, cancels, and trades indexed by Market Participant ID and by Account ID for the prior trading day for Digital Assets specified by CBOE or a CBOE Trading Venue.

4. Gemini shall also provide on a monthly basis (in a form and within a time period agreed to by the Parties) to CBOE or a CBOE Trading Venue designated by CBOE, the following Gemini Information for Regulatory Purposes:

    a. Market Participant IDs list including changes or additions from previous report;
    b. Account IDs list including changes or additions from previous report;
    c. Full legal name (or company name, as known by Gemini) related to each Market Participant ID and Account ID;
    d. City and state (or country) related to each Market Participant ID and Account ID;
    e. Email address related to each Market Participant ID and Account ID;
    f. Gemini risk ratings for market participants (including new market participant info and any changes to ratings for current participants) based on its Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance program (collectively, "BSA/AML Program"); and
    g. Tax identification number ("EIN"), broker-dealer SEC number, CRD number and/or similar regulatory or governmental registration numbers, as applicable, but not including personal identifying information such as a social security number.

5. In addition, CBOE and CBOE Trading Venues may request at any time, and Gemini shall promptly provide to the requesting party(ies), the Gemini Information listed in paragraphs 3 and 4, as well as additional information reasonably requested by CBOE or a CBOE Trading Venue regarding accounts, parties, bids, offers, orders, completed transactions (including price and size for bids, offers, orders, and completed transactions), positions, clearing, processes and procedures, and any other information relating to Gemini's market participants (including pending, new, or rejected applicants), Gemini's compliance

Confidential Treatment Requested by Gemini Pursuant to FOIA

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

program and Gemini's trading markets and/or auction mechanisms that are the sources of Gemini Trade Prices, Gemini Auction Prices, and/or Gemini Market Data.

6. CBOE and CBOE Trading Venues may use the Gemini Information listed in paragraphs 3 and 4 and additional information specified and provided pursuant to this Agreement solely in connection with Regulatory Purposes, the IOSCO Principles for Financial Benchmarks, and for such uses as are customary industry practices in connection with Developing Derivative Indexes and Listing and Trading of Derivative Products or related Indexes or Financial Products, as described and defined in the License Agreement (each, a "Permitted Purpose").

7. Gemini acknowledges that CBOE and CBOE Trading Venues may share the information provided by Gemini under this Agreement with each other and with government agencies and other regulators with jurisdiction over CBOE and CBOE Trading Venues, as necessary for a Permitted Purpose. Gemini also acknowledges that CBOE and CBOE Trading Venues may enter into and be party to information sharing agreements and regulatory services agreements with other self-regulatory organizations, regulatory service providers, exchanges, or markets, subject to appropriate confidentiality provisions, pursuant to which CBOE or a CBOE Trading Venue may share information shared with CBOE and CBOE Trading Venues by Gemini under this Agreement, solely in connection with Regulatory Purposes, the IOSCO Principles for Financial Benchmarks or other applicable best practices; provided however, that CBOE will, and will cause CBOE Trading Venues to, request permission from Gemini (which Gemini may reasonably withhold, including but not limited to for concerns related to protecting its proprietary business information) before sharing information under this Agreement, and will not proceed until such permission is obtained, with a Digital Asset trading or auction platform, if such platform is not an ISG member (as defined below). For the purpose of clarity, and absent the express written consent from Gemini otherwise (which Gemini may reasonably withhold, including but not limited to for concerns related to protecting its proprietary business information), this Agreement does not permit CBOE or any CBOE Trading Venue to share the information provided by Gemini under this Agreement with any other third party, including any vendor or service provider, for any purpose.

8. CBOE and certain CBOE Trading Venues are members of the Intermarket Surveillance Group ("ISG") and have obligations to provide information to other ISG members pursuant to an ISG Agreement among all ISG members (the "ISG Agreement"). From time to time, an ISG member may ask CBOE or a CBOE Trading Venue to provide it with information or documents for Regulatory Purposes: (i) relating to a financial instrument traded through the facilities of either CBOE or a CBOE Trading Venue or the ISG member or (ii) relating to a trading or clearing member of either CBOE or a CBOE Trading Venue or the ISG member (including, but not limited to information or documents concerning the identity, trading activity and positions of the responding ISG member's members or customers).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

| **Gemini Trust Company, LLC** | **Chicago Board Options Exchange, Incorporated** |
|---|---|
| Signed:_____ | _____ |
| Name: _____ | _____ |
| Title: _____ | _____ |
| Date: _____ | _____ |

**APPENDIX A**

CBOE Trading Venues:

Bats EDGA Exchange, Inc.
Bats EDGX Exchange, Inc.
Bats BYX Exchange, Inc.
Bats BZX Exchange, Inc.
Bats Hotspot SEF LLC
CBOE Futures Exchange, LLC
Chicago Board Options Exchange, Incorporated
C2 Options Exchange, Incorporated

Confidential Treatment Requested by Gemini Pursuant to FOIA                    GEM_CFTC173235

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CBOE FUTURES EXCHANGE, LLC
AND GEMINI TRUST COMPANY, LLC

# Exhibit F: OCC By-Laws: Article XII, Section 5

**Article XII Unavailability or Inaccuracy of Final Settlement Price**

SECTION 5. (a) This paragraph (a) applies to futures contracts that have an underlying interest (i) traded on one or more organized markets or (ii) that is an index derived from constituents traded on one or more organized markets. If the Corporation shall determine (i) that the primary market(s) (as determined by the Corporation) (A) for the underlying interest in respect of a maturing stock future or cash-settled foreign currency future, or (B) for one or more constituents of (I) the underlying index in respect of a maturing index future or (II) the index that is the reference variable in respect of a maturing variance future, did not open or remain open for trading (or that any such security, foreign currency or constituents did not open or remain open for trading on such market(s)) at or before the time when the final settlement price for such futures would ordinarily be determined, or (ii) that a price, variance or other value to be used as, or to determine, the final settlement price (a "required value") is otherwise unreported, inaccurate, unreliable, unavailable or inappropriate for such use, then, in addition to any other action that the Corporation may be entitled to take under the By- Laws and Rules, the Corporation shall be empowered to take any or all of the actions described in paragraph (c) of this Section with respect to such maturing futures ("affected futures").

(b) This paragraph (b) applies to futures contracts that are not described in the first sentence of paragraph (a) of this Section. If the Corporation shall determine that a required value (as defined in paragraph (a)) for an underlying interest or a constituent of an underlying index for a futures contract is unreported, inaccurate, unreliable, unavailable or inappropriate for such use, then, in additional to any other action that the Corporation may be entitled to take under the By-Laws and Rules, the Corporation shall be empowered to take any or all of the actions described in paragraph (c) of this Section with respect to the affected futures.

(c) (1) The Corporation may suspend the time for making the final variation payment with respect to affected futures and, in the case of physically-settled stock futures, may postpone the delivery date. At such time as the Corporation determines that the required value is available or the Corporation has fixed the final settlement price pursuant to subparagraph (2) of this Section, the Corporation shall fix a new date for making the final variation payment and may fix a new delivery date for physically-settled stock futures. (2) The Corporation may fix the final settlement price for affected futures, based on its judgment as to what is appropriate for the protection of investors and the public interest, taking into account such factors as fairness to buyers and sellers of affected futures, the maintenance of a fair and orderly market in such futures, consistency of interpretation and practice, and consistency with actions taken in related futures or other markets. Without limiting the generality of the foregoing, (A) with respect to affected futures governed by paragraph (a) of this Section, the Corporation may fix the final settlement price using: (i) the reported price or value for the relevant underlying interest or one or more constituents comprising the underlying interest at the close of regular trading hours (as determined by the Corporation) on

25

CONFIDENTIAL                                                Last revised - August 25, 2017

## Appendix 6: Policy Change Log

| Version | Editor | Summary of changes |
|---------|--------|--------------------|
| February 2, 2017 | M.Breu | 1) Addition of Change Log Appendix 6<br>2) Addition of record keeping requirements Appendix 5, and reference to Appendix 5 from multiple points in the document, to clarify both the regulations around record retention and Gemini's simplified seven (7) year blanket policy. (KPMG Audit Item)<br>3) Clarification in SAR reporting section that we comply with the lower thresholds defined by MSB regulation as opposed to those for other financial institutions. (KPMG Audit Item)<br>4) Addition of FATCA Policy<br>5) Addition of Ransomware Policy<br>6) Addition of Source and Destination of Funds Analysis Policy |
| April 3, 2017 | M.Breu | 1) Clarification of roles of CCO, Deputy CCO, other Compliance personnel. |
| August 25, 2017 | M.Breu | 1) Update to customer onboarding diagram to reflect procedural changes. |

Confidential Treatment Requested by Gemini Pursuant to FOIA                          GEM_CFTC173300