# Exhibit B

**COMMODITY FUTURES TRADING COMMISSION**
140 Broadway
New York, New York 10005
Telephone: (646) 746-9700
Facsimile: (646) 746-9940
*www.cftc.gov*

Division of
Enforcement

**BPAC 67020 A6294**

**MEMORANDUM**

| | |
|---|---|
| TO: | The Commission |
| FROM: | Division of Enforcement ("Division") |
| PROPOSED DEFENDANT: | Gemini Trust Company LLC ("Gemini or "Proposed Defendant") |
| RECOMMENDATION: | The Division recommends that the Commission authorize it to: |

1. Commence a civil injunctive action in the United States District Court for the Southern District of New York pursuant to Section 6c of the Commodity Exchange Act ( "Act or CEA"), 7 U.S.C. § 13a-1, charging that Gemini violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), as described further herein and in the attached Proposed Complaint;

2. Seek the following:

   a. A permanent injunction prohibiting Proposed Defendant and any other persons or entities in active concert with it from engaging in conduct that violates the foregoing provision of the Act as charged;

   b. A civil monetary penalty against Proposed Defendant in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act and Regulations, as described in the Proposed Complaint, plus post-judgment interest; and

   c. Ancillary remedial relief, including, but not limited to, disgorgement of benefits derived from Proposed

d. Defendant's illegal activities, trading and registration prohibitions, fees and costs, pre-judgment and post-judgment interest, and all other equitable relief which under the circumstances the court may deem necessary and appropriate against Proposed Defendant; and

3. Authorize the Division's counsel to exercise the Commission's authority under Section 8(a)(1), (b), and (c) of the Act, 7 U.S.C. § 12(a)(1), (b), (c), to disclose publicly any data and information as appropriate in connection with the conduct of this action.

RESPONSIBLE STAFF:

Alejandra de Urioste
Gates Hurand
David Oakland
Chris Giglio
K. Brent Tomer (646) 746-9738
Lenel Hickson, Jr. (646) 746-9756
Manal Sultan (646) 746-9761

OTHER OFFICES CONSULTED:

Legal Division
Division of Market Oversight

## I.
## SUMMARY

From in or about July 2017 to in or about December 2017 (the "Relevant Period"), officers, employees, and agents acting for Gemini ("Gemini personnel") made false or misleading statements of material facts, and omitted to state material facts, to Commission staff in connection with Commission staff's evaluation of the potential self-certification of a bitcoin futures contract (the "Bitcoin Futures Contract"). The false or misleading statements or omissions to Commission staff violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2). Gemini is responsible for these violations as a principal pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).[1]

[1] This matter came the Division's attention after a whistleblower, Gemini's former Chief Operating Officer, filed a Form TCR. The whistleblower's allegations are described more fully in the Division's memorandum recommending the Commission issue a formal order of investigation in this matter. The pertinent allegations are otherwise incorporated into the facts in the Proposed Complaint and discussed here.

The Bitcoin Futures Contract was to be listed on the Cboe Futures Exchange, LLC ( "CFE"), a designated contract market ("DCM"), and would be settled by reference to the spot price of bitcoin on a certain day as determined by an auction (the "Gemini Auction") held by Gemini through Gemini's digital asset trading platform (the "Gemini Exchange"). CFE and Gemini provided Commission staff from the Division of Market Oversight ("DMO") with information for staff's review concerning draft Bitcoin Futures Contract terms and conditions, including information about the Gemini Exchange and the Gemini Auction. During the Relevant Period, Gemini personnel made numerous false or misleading statements of material facts, or omitted to state material facts, to Commission staff. These statements generally related to four subjects:

(1) Gemini's purported prefunding requirements (i.e., whether the Gemini Exchange required users to deposit funds into their accounts at Gemini before trading on the Gemini Exchange) and the cost of capital to trade on the Gemini Exchange;

(2) self-trading on the Gemini Exchange;

(3) Gemini's trading fee rebate program; and

(4) trading volume on and liquidity of the Gemini Exchange.

When making statements to Commission staff about a proposed futures contract, speaking truthfully, honestly, and with candor is paramount. Moreover, the proposed Bitcoin Futures Contract was particularly significant because it was to be among the first digital asset currency futures contracts listed on a designated contract market, at a time of fervent interest by market participants in obtaining exposure to bitcoin through the derivatives markets. Information provided directly and indirectly by Gemini to Commission staff about the Gemini Exchange, the

Gemini Auction, and the Bitcoin Futures Contract was important to the Commission's work as it sought to fulfill its statutory mission, including ensuring financial integrity of transactions subject to the Commodity Exchange Act, protecting market participants, deterring and preventing price manipulation and any other disruptions to market integrity, and promoting responsible innovation.

The Proposed Complaint seeks a permanent injunction, civil monetary penalties, and ancillary remedial relief. The Division does not propose to seek any preliminary relief because Gemini appears to have ceased its violative conduct by no longer communicating with DMO staff concerning the Bitcoin Futures Contract. Furthermore, CFE delisted the contract in April 2019.

Proposed Defendant made a Wells submission, as well as supplemental submission made directly to Chairman Benham and Commissioner Stump, which are attached hereto. There are some significant risks in litigating this matter, as discussed in the litigation risks section below. However, the Division believes the evidence supports the proposed charges and the risks are manageable. Moreover, the importance of holding parties to account for making false or misleading statements, or material omissions, to Commission staff outweighs the litigation risks here.[2]

Consequently, the Division recommends that the Commission authorize it to file the Proposed Complaint charging violations of Section 6(c)(2) of the Act for making false or misleading statements and material omissions to the Commission in connection with the Bitcoin Futures Contract.[3]

## II.

[2] The Division engaged in settlement discussions with Proposed Defendant, but Proposed Defendant rejected the Division's proposed settlement terms.

[3] The United States Attorney's Office for the Southern District of New York ("SDNY") also investigated Gemini (primarily, its principals) for potential criminal misconduct arising out of the same or similar factual circumstances. The Division understands that SDNY closed its investigation without bringing charges and that this was in part due to concerns about being able to prove false statements beyond a reasonable doubt and concerns about the credibility of the whistleblower. In contrast, the Commission's only need to prove its case by a

## PROPOSED DEFENDANT

**Gemini Trust Company, LLC** is a New York chartered limited liability trust company based in New York, New York, whose business is to operate a digital asset trading platform and to offer custodial and related services. Gemini Trust Company, LLC has never been registered with the Commission.

## OTHER RELATED ENTITIES AND PERSONS

**Pearl Street Financial LLC** ("Pearl Street") is a Delaware limited liability company based in New York, New York. Since its inception in January 2016, Pearl Street has been owned, indirectly through a series of limited liability companies, by Cameron and Tyler Winklevoss. Pearl Street has never been registered with the Commission.

**Cameron Winklevoss** is an individual residing in New York, New York. Cameron Winklevoss is co-founder of Gemini and has been the President of Gemini since 2015. Since Gemini's inception, Cameron and Tyler Winklevoss have together indirectly held majority ownership of Gemini. Cameron Winklevoss has never been registered with the Commission.

**Tyler Winklevoss** is an individual residing in New York, New York. Tyler Winklevoss is co-founder of Gemini and has been the Chief Executive Officer of Gemini since 2015. Since Gemini's inception, Cameron and Tyler Winklevoss have together indirectly held majority ownership of Gemini. Tyler Winklevoss has never been registered with the Commission.

## III.

## FACTS

preponderance of the evidence and, as discussed further below in connection with litigation risk, the Division intends to rely on other witnesses and evidence to prove its case. The Division is not aware of any other agencies taking action against Gemini in connection with the Bitcoin Futures Contract.

As detailed in the Proposed Complaint, this matter involves false or misleading statements Gemini personnel made to Commission staff before and in connection with CFE's self-certification of the Bitcoin Futures Contract on December 1, 2017.

**A. Background**

Section 5c(c)(1) of the Act generally permits a DCM to list a new futures contract for trading by providing the Commission a written certification that the new contract complies with the Act and Regulations. 7 U.S.C. § 7a-2(c)(1). The written certification, often submitted in the form of a letter (a "self-certification letter"), must include, among other things, an explanation and analysis of the product's compliance with the core principles for contract markets set forth in the Act and Regulations,[4] including Core Principle 3. *See* Regulation 40.2(a), 17 C.F.R. § 40.2(a) (2021). Core Principle 3 requires that a DCM shall list only contracts that are not readily susceptible to manipulation. *See* Section 5(d)(3) of the Act, 7 U.S.C. § 7(d)(3); Regulation 38.200, 17 C.F.R. § 38.200 (2021). Core Principle 12 requires that a DCM shall establish and enforce rules to protect markets and market participants from abusive practices committed by any party and to promote fair and equitable trading. *See* Section 5(d)(12) of the Act, 7 U.S.C. § 7(d)(12); Regulation 38.650, 17 C.F.R. § 38.650 (2021).

In evaluating the extent to which cash-settled futures contracts such as the Bitcoin Futures Contract are susceptible to manipulation, Regulations identify several relevant factors, including, for example, the size and liquidity of the underlying cash market and the trading volume and number of participants involved in determining the settlement price. *E.g.*, Part 38 of the Regulations App'x C(c)(2), 17 C.F.R. pt. 38, App'x C(c)(2) (2021) ("In particular, situations

[4] The core principles for contracts markets are set forth in Section 5(d) of the Act, 7 U.S.C § 7(d), and Part 38 of the Regulations, 17 C.F.R. pt. 38 (2021).

susceptible to manipulation include those in which the volume of cash market transactions and/or the number of participants contacted in determining the cash-settlement price are very low.").

Unless the Commission finds that certification of the new product would be inconsistent with the Act or Commission regulations, the DCM may list the new product no sooner than one full business day following the self-certification. *See* Section 5c(c) of the Act, 7 U.S.C. § 7a-2(c); Regulation 40.2(a). The Commission is authorized, upon requisite findings and proceedings, to alter or supplement the rules of a DCM, including relating to such a new product. *See* Section 8a(7) of the Act, 7 U.S.C. § 12a(7). The Commission may stay the listing of the contract during such proceeding, as well as during a proceeding for false certification. Regulation 40.2(c), 17 C.F.R. § 40.2(c) (2021).

Because of the relative nascency of the underlying bitcoin markets and because bitcoin exchanges are largely unregulated, Commission staff engaged in evaluation and extensive discussions with CFE and Gemini in advance of any potential self-certification. Thus, before CFE filed a self-certification letter for the Bitcoin Futures Contract on December 1, 2017, as part of those discussions, CFE and Gemini provided Commission staff with information for its review concerning draft contract terms and conditions for the Bitcoin Futures Contract, including information about the Gemini Exchange and the Gemini Auction.[5] Because the proposed Bitcoin Futures Contract was to be settled by reference to the price of the Gemini Auction, Commission staff reviewed, among other things, whether the Gemini Auction would be susceptible to manipulation. Gemini therefore provided Commission staff with certain information concerning its trading operations, policies and procedures, and Gemini Exchange liquidity and trading

[5] *See CFTC Backgrounder on Self-Certified Contracts for Bitcoin Products* (Dec. 1, 2017) (link to document available at https://www.cftc.gov/digitalassets/index.htm) (explaining self-certification process in context of bitcoin derivatives products) [hereinafter "Backgrounder on Self-Certification"].

volume, including providing trading and other data concerning daily 4:00 p.m. Gemini Auctions since their inception on September 21, 2016.

### B. Gemini's False or Misleading Statements to Commission Staff

During the Relevant Period, Gemini made statements to Commission staff during at least two in-person meetings with Commission staff in July and August 2017, and in presentation materials, data, and documents provided to the Commission. In some instances, Gemini made statements that were provided in response to specific questions posed by Commission staff who were evaluating the proposed Bitcoin Futures Contract. In its investigation, Division staff identified at least 25 false or misleading statements made in written communications submitted to the Commission. Generally, the false or misleading statements implicated facts relevant to assessing whether the Proposed Bitcoin Futures Contract complied with the core principles for contract markets, including understanding whether the proposed contract would be readily susceptible to manipulation. As discussed further below, these false or misleading statements concerned four main issues: (1) Gemini's prefunding requirement and the cost of capital trade on Gemini; (2) Gemini's rebate program; (3) self-trading on Gemini; and (4) Gemini's trading volume and liquidity.[6]

#### 1. Gemini's False and Misleading Statements Concerning Its Prefunding Requirement and the Cost of Capital To Trade on Gemini

In oral and written communications to Commission staff during the Relevant Period, Gemini personnel highlighted that Gemini was a "full reserve" exchange that required all transactions to be fully "pre-funded." Gemini explained that this meant that a Gemini market

[6] All of the false or misleading statements Gemini made that are charged in the Proposed Complaint were made in writing. However, through witness interviews, Division staff has found additional evidence of false or misleading statements that Gemini Representatives made to Commission staff orally. The additional oral statements concerned the same four main categories of false or misleading statements.

participant "was not permitted to place an order unless they had enough funds in their account to place the order." Gemini repeatedly emphasized this "prefunding requirement" to Commission staff and, relatedly, also represented that Gemini did not permit margin trading. Gemini personnel made these assertions in connection with their claims that the Gemini Exchange and the Gemini Auction were not susceptible to manipulation.

Gemini represented that to trade in Gemini's auction, a participant must tie up their capital to meet the prefunding requirement, and by doing so, the prefunding requirement made it "costly," from a cost-of-capital perspective, for a market participant to perpetrate manipulative trading on Gemini. For example, in a September 12, 2017 written submission, Gemini provided Commission staff with a bulleted list of "attributes" that, according to Gemini, promoted the "integrity of the auction price and discourage manipulation." Under a bullet titled "Cost of Capital," Gemini represented that because market participants were "not permitted to place an order unless they have enough funds in their account to place [the] order," it was "costly for a malicious market participant to engage in manipulative tactics." This representation by Gemini was also incorporated into the product self-certification letter filed with the CFTC on December 1, 2017, as well as drafts of that letter provided to Commission staff in October and November 2017. The self-certification letter stated that one "structural safeguard[] built into the Gemini Exchange auction process" was that "all orders on the Gemini Exchange, including auction-only orders, must be fully pre-funded."

Despite making these and other similar statements to Commission staff concerning prefunding and the cost of capital, Gemini did not disclose to Commission staff significant facts concerning its funding of auction participation through: (1) loans provided by a Gemini affiliate,

Pearl Street; and (2) advancing customer funds. These facts that Gemini failed to disclosed make Gemini's material statements about prefunding and the cost of capital false or misleading.

**a. Gemini's Funding of Auction Participation Through Loans Provided by an Affiliate**

In or around January 2016, Pearl Street, a separate entity beneficially owned by Gemini principals Cameron and Tyler Winklevoss, began providing loans of digital assets to certain Gemini market participants in order to encourage trading on Gemini. In total, there were at least four Gemini market participants comprising substantial trading volume that were given loans. Contemporaneous communications demonstrate that the Winklevosses and other Gemini personnel communicated expectations about trading on Gemini in order to maintain the loans. Moreover, at least one loan agreement contained written terms explicitly requiring trading on Gemini.

In or around September 2016, just before the launch of Gemini's auction, a potential auction participant approached a Gemini personnel with concerns about having to have "cash or coins *in their account*" (emphasis added) in order to be able to participate in the Gemini auctions and asked for a line of credit. In response, the Gemini personnel stated: "[W]e can't do a line of credit for cash. I can ask the twins if they'd do a personal loan to you guys for [bitcoin]." Shortly thereafter, Pearl Street provided the potential auction participant a loan for the purpose of facilitating participation in Gemini auctions. Continuing through the end of the Relevant Period, the Pearl Street provided additional loans of digital assets to "capital constrained" auction participants (as they were referred to by Gemini staff) in order to encourage trading on Gemini and in the Gemini auction. After the Winklevosses disbursed the loan proceeds to the loan recipients, a Gemini employee monitored the loan recipients' participation in Gemini auctions and

encouraged loan recipients to use the loan proceeds to participate in Gemini auctions. Further, the Winklevosses threatened to revoke the loans of at least one recipient after that recipient's auction participation fell below the level Gemini desired.

In late August 2017, during the time when Gemini was making statements to the CFTC, Cameron Winklevoss remarked in an internal Gemini discussion that market participants were using "my capital" to trade on Gemini and that one loan recipient was concerned he would "yank" their loan. On October 6, 2017, a Gemini employee informed Cameron and Tyler Winklevoss that Gemini's chief operating officer (who, at that time, had been suspended by Gemini for potential misconduct) had alleged that he had been suspended because "he had found shady dealings to do with short term BTC loans to inflate exchange volume via pearl street," and that he intended to inform the CFTC of this.[7] Despite this warning that the loans may have been a CFTC concern, Gemini never corrected or supplemented any of its prior statements to the CFTC about pre-funding and the cost of capital. If fact, Gemini continued to represent to Commission staff that its prefunding requirement made manipulation on Gemini "costly" and protected Gemini auctions from manipulation.

### b. Gemini's Funding of Auction Participation Through Advancing Customers Funds

Gemini also did not disclose the following additional facts to Commission staff during the Relevant Period related to its purported "prefunding requirement." Gemini had the ability to credit a Gemini customer's account with either fiat currency or digital assets that could be used for trading on Gemini, irrespective of the customer's actual deposits into its account, and from

[7] The chief operating officer, prior to being suspended by Gemini on August 30, 2017, had been extensively involved in the discussions with CFE and the Commission about the Bitcoin Futures Contract, including leading the presentation to Commission staff at meetings on July 25, 2017 and August 28, 2017.

time to time did so. Gemini often did so after receiving some kind of evidence from the customer that the funds had been transmitted to Gemini but before they had cleared, such as by giving a copy of the wire transfer instruction or the wallet instructions in the case of a crypto transfer. However, at times during 2016 and 2017, Gemini credited the customer account even without any such evidence. Further, at times during 2016 and 2017, Gemini credited an auction participant's account specifically so the participant could participate in Gemini auctions at times when they otherwise would not have been able to participate due to a lack of funds in their Gemini account.

For example, on December 27, 2016, an auction market participant requested an advance credit while the auction was occurring.[8] When making the request, the participant told a Gemini personnel "you can take it after," conveying that Gemini could take the money back after the auction was over and the participant was done using it. At 3:54 p.m., Gemini deposited $400,000 in the participant's account, and the participant traded substantial volume in the auction. After the auction was over, the Gemini personnel asked Cameron Winklevoss to approve a debit from the market participant's account and explained that Gemini had needed "auction volume," so they gave the market participant a "quick operational advance" so they could trade in the auction. A few hours later, Cameron Winklevoss approved the debit.

Further, in several instances, Gemini failed to debit amounts credited to an auction participant's account for extended periods of time, up to several months. While these credits were outstanding, the auction participants could, and did, use the credited funds to trade on Gemini and participate in Gemini auctions. For example, on July 20, 2017, Gemini provided a 750 BTC advance (worth approximately $1,875,000 at the time) to a Gemini market participant that frequently traded in Gemini auctions. Gemini did not debit the advance for over two months,

[8] Gemini's auctions run daily for about ten minutes, from 3:50 p.m. to 4:00 p.m. EST.

until October 2017. When Cameron and Tyler Winklevoss learned that the advance had been outstanding for so long on October 2, 2017, Cameron Winklevoss remarked, "Jesus Christ. . . . Please make a not [sic] of all of these failures – this is gross negligence."

During the Relevant Period, Gemini knew all of the facts described above that Gemini failed to disclose to Commission staff. Further, these facts all related to Gemini's business as a digital asset exchange, its trading operations, and/or its policies and procedures. Gemini's statements related directly to Core Principle 3, which Gemini knew was a central consideration for Commission staff. Further, the facts Gemini failed to disclose were important to the Commission staffs' understanding as they analyzed whether the proposed Bitcoin Futures Contract would be susceptible to manipulation. In light of these facts, Gemini knew or reasonably should have known that its statements to Commission staff concerning prefunding and the cost of capital were false or misleading.

### 2. Gemini's False or Misleading Statements About Self-Trading on Gemini

In oral and written communications to Commission staff during the Relevant Period, Gemini personnel made a series of false and misleading statements concerning self-trading on Gemini. Initially, Gemini represented to Commission staff in a July 25, 2017 written presentation and in-person meeting that self-trading was "prohibited" on Gemini. Commission staff then inquired further as to whether self-trading in Gemini auctions was possible, asking in an August 17, 2017 email: "Could an auction occur where there is one participant trading with themselves." On August 25, 2017, Gemini provided an unequivocal written response to the Commission staff's question, stating: "No, we have instituted self-trade prevention."

Thereafter, Gemini continued to represent to Commission staff that Gemini had a technological means to prevent self-trading from occurring in auctions. For example, in the September 12, 2017 written submission concerning Gemini Auction "attributes" that promoted the "integrity of the auction price and discourage manipulation," under a bullet titled "Self-Trade Prevention," Gemini represented that it "prohibit[ed] the same market participant from crossing with himself or herself (either intentionally or unintentionally) . . . in a Gemini Auction." Gemini's representations concerning self-trading were also incorporated into the product self-certification letter filed with the CFTC on December 1, 2017, and in three drafts of that letter that were provided to Commission staff between October 6 and November 14, 2017, which stated that one "structural safeguard[] built into the Gemini Exchange auction process" was that "self-crossing is prohibited on the Gemini Exchange."

Despite making these and other similar statements to Commission staff concerning self-trading on Gemini, Gemini did not disclose the following facts to Commission staff during the Relevant Period. Before around May 2017, Gemini did not prohibit self-trading in Gemini auctions or have any technological means to prevent self-trading from occurring in Gemini auctions. From the start of the Gemini auction in September 2016 until around May 2017, auction participants regularly self-traded in Gemini auctions.[9] Often, the self-trading that occurred in Gemini auctions during this period accounted for a significant portion of an auction's total trading volume. For example, for one auction in December 2016, approximately 70% of the total auction trading volume resulted from one auction participant trading with themselves. Around May 2017, Gemini implemented a technological means that would prevent some, but not

[9] This includes self-trading in at least seventeen Gemini auctions by accounts belonging to Cameron and Tyler Winklevoss themselves.

all, instances of self-trading from occurring in Gemini auctions.[10] After around May 2017, self-trading in Gemini auctions continued to occur, although less frequently and in significantly lower volumes, through and beyond the end of the Relevant Period.[11] Thus, at all times during the Relevant Period, it was in fact possible to have a Gemini auction in which there was "one participant trading with themselves."

During the Relevant Period, Gemini knew that it did not prevent all self-trading from occurring in Gemini auctions and that self-trading in Gemini auctions could, and did, in fact occur. Gemini's statements to Commission staff concerning self-trading related directly to Core Principle 3, which Gemini knew was a key consideration for Commission staff. Further, the true state of affairs concerning self-trading in Gemini auctions was important to the Commission staffs' understanding as they analyzed whether the proposed Bitcoin Futures Contract would be susceptible to manipulation. In light of these facts, Gemini knew or reasonably should have known that its statements to Commission staff concerning self-trading were false or misleading.

### 3. Gemini's False or Misleading Statements About Its Rebate Program

In oral and written communications to Commission staff during the Relevant Period, Gemini personnel made a series of statements concerning trading fee rebates available to participants on the Gemini Exchange and in the Gemini Auction. Initially, in a July 25, 2017 written presentation to DMO staff discussed in an in-person meeting, Gemini personnel indicated to Commission staff that Gemini provided "market maker" trading fee rebates to encourage participation in, and thereby bolster the function of, the Gemini Auction.

[10] Gemini's auction algorithm takes into account both orders placed solely for execution in the auction (an "auction-only" order) as well as orders resting in Gemini's continuous order book at the time of the auction. Although Gemini developed "self-trade prevention" that prevented two auction-only orders from the same account from self-trading in the auction, Gemini had not developed a technological means to prevent an auction-only order and a resting continuous order book order from the same account from self-trading in the auction.

Commission staff then inquired further, sending a written request for details concerning Gemini's market maker fee rebate program generally, and as it pertained to market makers.[12] In response to the Commission's follow-up inquiry, Gemini personnel denied having any "specifically defined market maker program." Instead, Gemini personnel indicated that Gemini had "implemented a trading fee program which is available to all of our market participants," and directed Commission staff to the public fee schedule on Gemini's website at the time for the details of Gemini's trading fee program supposedly available to all.

Despite making these statements to Commission staff—e.g., that Gemini's rebate program was disclosed on the website and available to all—Gemini personnel did not disclose the following facts to Commission staff. From 2016 through the Relevant Period, Gemini regularly entered into bespoke fee arrangements with select market participants, including market makers, that were not disclosed on Gemini's website. In fact, Gemini offered special fee rebate incentives and "fee overrides" to preferred market participants, including incentives specifically designed to promote trading in the auction, at more-favorable terms than those on the public fee schedule. Contrary to Gemini's statements to Commission staff, certain of these incentives were referred to internally as the "auction market maker incentive program" or "market maker incentive program"

Further, in November 2017, after Gemini amended its public rebate schedule to eliminate all auction rebates, Gemini observed dwindling auction volumes. In response, in written communications, Cameron Winklevoss specifically discussed offering select "MM's" (i.e., "market makers") a special ten basis point auction rebate as means to help prevent a failed auction. Further, Gemini did in fact go on to offer and provide this rebate to select market

[12] In an August 8, 2017 email to CFE, which was promptly forwarded to Gemini, DMO asked, among other questions: "Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions."

participants at that time. These rebate offers were not available to all market participants and were not disclosed on Gemini's website. Gemini omitted the implementation of the non-public auction rebate program in its statements to Commission staff. Finally, during the Relevant Period, Gemini personnel considered its trading incentives, including its non-public market maker fee rebates, as way to promote trading volume on the Gemini Exchange, including the Gemini Auction.

Gemini knew that it provided bespoke rebate agreements to select market participants both before, during, and after it made its statement to the Commission. Gemini's response to DMO's questions about rebates were made in connection with gathering facts relevant to Core Principle 3, which Gemini knew was a key consideration for Commission staff. Further, the true state of affairs concerning Gemini's rebate programs, especially as they affected auctions, was important to the Commission staffs' understanding as they analyzed whether the proposed Bitcoin Futures Contract would be susceptible to manipulation. In light of these facts, Gemini knew or reasonably should have known that its statements to Commission staff concerning its market maker fee rebate program were false or misleading.

**4. Gemini's False or Misleading Statements About Trading Volume and Liquidity on the Gemini Exchange**

In oral and written communications to Commission staff during the Relevant Period, Gemini personnel made a series of statements concerning trading volume and liquidity on the Gemini Exchange. Specifically, in addition to and including the above, Gemini provided information describing the number of market participants who placed orders in the Gemini Exchange and the moving average of the Gemini Exchange's trading volume during a twenty-day period in August 2017. This information initially was provided in drafts of the self-certification

letter for the proposed Bitcoin Futures Contract that were submitted to Commission staff beginning in October 2017, and was provided in the final self-certification letter filed with the CFTC on December 1, 2017.

By the time that the first draft letter was provided to Commission staff, Gemini had suspended trading for two customers and their related accounts because Gemini suspected that these two customers had engaged in significant wash and/or coordinated trading during the relevant period in order to take advantage of certain bespoke fee rebates that Gemini had provided. In the various submissions to staff, however, Gemini omitted to state that the trading volume data included the trades by these alleged customers or that a material number of the trading volume reported was attributable to the suspended customers.

During the Relevant Period, Gemini knew that the trading volume data reported to Commission staff included data for these two customers and their related accounts that had been suspended due to suspicious wash trading by these accounts. The trading volume data was material to the submissions and statements to Commission staff and to the CFTC. In light of these facts, Gemini knew or reasonably should have known that its statements to Commission staff concerning trading volume and liquidity were false or misleading.

* * *

In sum, the false or misleading statements and omissions Gemini made each concerned significant aspects of its trading operations, policies, and business as a bitcoin exchange. Further, the statements were drafted, reviewed, and/or approved by senior Gemini personnel that knew or reasonably should have known the true state of affairs with respect to Gemini's trading operations, policies, and business as a bitcoin exchange. Gemini therefore knew or reasonably

should have known that each of the statements discussed above was false or misleading. Each of the false or misleading statements and omissions were also material to the Commission's staff's review of the proposed Bitcoin Futures Contract and whether it complied with core principles, including whether it was susceptible to manipulation.

## IV.

## LEGAL DISCUSSION

### A. Count I: False or Misleading Statements or Omissions to Commission Staff in Violation of Section 6(c)(2) of the Act

Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), makes it

> [U]nlawful for any person to make any false or misleading statement of a material fact to the Commission, including in any registration application or any report filed with the Commission under this chapter, or any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

To prove a violation of Section 6(c)(2), the Commission must prove that: (1) a person made a false or misleading statement to the Commission; (2) the person knew or reasonably should have known that the statement was false or misleading; and (3) the statement was material. *CFTC v. eFloorTrade, LLC*, No. 16 Civ. 7544, 2018 WL 10625588, at *8 (S.D.N.Y. Sept. 21, 2018); *see also CFTC v. Gramalegui*, No. 15-cv-02313, 2018 WL 4610953, at *23 (D. Colo. 2018) (holding statement or omission is material when it has "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.") (citation omitted). Under Section 6(c)(2), statements are actionable "when [they are] either

literally untrue or when [they] fail[] to include all information necessary to give the recipient a complete and accurate picture."[13] *Gramalegui*, 2018 WL 4610953, at *24

During the course of the Commission's review of the Bitcoin Futures Contract and bitcoin trading on the Gemini Exchange, during meetings with Commission staff in July and August 2017, and in certain written submissions to the Commission around that time, Gemini personnel made false or misleading statements of material facts, or omitted material information that would have made the statements not false or misleading in any material respect. These statements were made in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity. The Gemini personnel knew or reasonably should have known that these statements were false or misleading. Accordingly, the Gemini personnel violated Section 6(c)(2) of the Act.

**B. Gemini Is Liable for the Acts of Its Agents**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R.§ § 1.2 (2021), provide that "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust." Pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2, strict liability is imposed on principals for the actions of their agents. *See, e.g.*, *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC,* 837 F.2d 847, 857–58 (9th Cir. 1988); *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 324 (S.D.N.Y. 2014).

[13] False statements to Commission staff constitute statements to the Commission for purposes of Section 6(c)(2) of the Act. *Gramalegui, at *24; In re Obelensky,* CFTC No. 14-05, 2014 WL 795378, at *2-3 (Jan. 2, 2014) (consent order).

Gemini personnel made the false and misleading statements described herein within the scope of their employment or agency with Gemini. Therefore, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2, Gemini is liable for those acts, omissions, and failures in violation of the provisions of the Act and Regulations cited above. Accordingly, as set forth above, Respondent violated Section 6(c)(2) of the Act.

## V.

## WELLS SUBMISSION

Proposed Defendant made a Wells submission ("Wells") and subsequently made a supplemental submission ("Wells Supp.") directly to Chairman Benham and Commissioner Stump, attached hereto. Notably, in response to a direct request by Division staff, Proposed Defendant refused to swear to the majority of the facts cited in their Wells submission, as required by Appendix A to Part 11 of the Regulations, 17 C.F.R. pt. 11 app. A (2021).[14] As discussed below, Proposed Defendant's submissions do identify some significant litigation risks.[15] Still, the Division believes that the evidence set forth above and other evidence gathered in the course of its investigation support the proposed federal court action against Proposed Defendant, and the importance of holding Gemini accountable for making false or misleading statements to Commission staff outweighs the risks presented here.

### A. Proposed Defendant Argues that the Commission Will Not Be Able To Establish Gemini "Made" Any Statements to the CFTC

[14] Counsel for Proposed Defendant submitted: (1) a declaration from counsel attaching certain documents referenced in the Wells submission; and (2) an affidavit from counsel attesting to a very limited set of facts stated in the Wells submission, but otherwise stated that the factual statements in the Wells response were supported by the documentary record cited in the Wells submission.

[15] The Division's Wells Notice raised a potential charge for false reporting in bitcoin and ether, and charges against Cameron and Tyler Winklevoss individually, that are not included in the Proposed Order. The discussion herein focuses on the arguments Gemini made in its Wells submission that are applicable to the charges in the Proposed Order.

Gemini argues that "many" of false or misleading statements at issue were made by CFE, and Gemini cannot be held liable for any statements made by CFE based on the Supreme Court's holding in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 148 (2011). (Wells Supp., at 6.) In *Janus*, the Court found that an investment adviser that participated in drafting false statements included in its client's prospectuses could not be held liable under SEC Rule 10b-5 because it was not the "maker" of the statements at issue. *Id.* at 147-148. The Court held that the "maker" of a statement is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *Id.* at 142. In the case at hand, that Court found there was nothing on the face of the prospectuses at issue that indicated the statements came from the investment adviser, nor any allegation that the investment advisor was the filer of the prospectuses. *Id.* at 147. Thus, the court found that the investment advisor was not the "maker" of the statement. *Id.* at 148.

In response, the Division would argue that *Janus* is wholly inapplicable to Commission enforcement actions. *Janus* involved a private securities fraud claim brought under the implied right of action under SEC Rule 10b-5. In its opinion, the Supreme Court emphasized that its holding rested upon a significant policy concern for narrowly construing implied private rights of action. *See id.* at 142 (("[W]e are mindful that we must give 'narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.'") (citation omitted)).

In other contexts, courts have refused to extend *Janus* beyond cases involving implied private rights of action. *See Prousalis v. Moore*, 751 F.3d 272, 279 (4th Cir. 2014) (refusing to apply *Janus* to a criminal securities fraud case because "to broaden *Janus*'s holding beyond the

domain of implied rights would represent a stark assertion of judicial will, the very thing against which *Janus* itself inveighed."); *SEC v. Pentagon Cap. Mgmt. PLC*, 844 F. Supp. 2d 377, 421–22 (S.D.N.Y. 2012), as amended (Aug. 22, 2012), *and aff'd in part, rev'd in part on other grounds*, 725 F.3d 279 (2d Cir. 2013) (finding that *Janus* does not apply to SEC enforcement actions under Section 17(a) of the Securities Act and stating, "*Janus* was a private suit, not an enforcement action brought by the SEC . . . There is no indication that the Court or Congress intended for actions brought by the SEC to be so limited.").[16] *But see SEC v. Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011) (holding that *Janus* applies to an SEC enforcement action brought under Section 17(a) of the Securities Act, without addressing *Janus*'s policy considerations). The Division would therefore argue that, because a civil enforcement action brought by the Commission is brought pursuant to explicit authority provided in the Commodity Exchange Act and does not implicate an implied right of action, *Janus* is inapplicable. Moreover, unlike the Securities Exchange Act of 1934, the CEA provides an express private right of action, with certain standing requirements, under Section 22 of the Act, 7 U.S.C. § 25.

Even if *Janus* was applicable to the Commission's Section 6(c)(2) charge, the Division believes it would be able to establish that Gemini "made" most, if not all, of the statements at issue. Apart from statements contained in the December 1, 2017 CFE self-certification letter,[17]

[16] *See also SEC v. Stoker*, 865 F. Supp. 2d 457, 465 (S.D.N.Y. 2012) (noting that "there is no need to read Section 17(a) of the Securities Act of 1933 narrowly in light of concerns about the implied private cause of action, because there is no private right of action – implied or explicit under Section 17(a)"); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1186 (C.D. Cal. 2011) (refusing to apply Janus to fraud claims under New York law because New York law embraces a broader scheme of liability and because none of the policy considerations in Janus were present); *SEC v. Daifotis*, No. C 11-00137 WHA, 2011 WL 3295139, at *6 (N.D. Cal. Aug. 1, 2011) (refusing to apply Janus to Section 34(b) of the Investment Company Act because Janus's "stringent reading of the word 'make' followed from the Court's prior decisions limiting the scope of implied private rights of action under Rule 10b-5, and the same rationale does not apply in the context of Section 34(b)").

[17] The Division understands that Gemini senior management was given opportunities to review, comment, and approve the statements charged in the Proposed Complaint that were submitted to the CFTC in CFE's three draft self-certification letters and the final self-certification letter. However, Gemini did not necessarily review,

the Division has identified documentary evidence demonstrating that the statements were drafted, commented on, and/or approved by Gemini senior management before they were submitted to the CFTC. Further, most of the statements at issue were produced within documents containing Gemini's logo prominently displayed, a strong indicia of attribution. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 541 (S.D.N.Y. 2016) (finding allegations of control, coupled with the fact that defendant's logo was printed in bold on the first page of a prospectuses, sufficient to allege the defendant had authority over the information to make the statements attributable to the defendant"). Thus, although Proposed Defendant's *Janus* argument would present an issue of first impression with respect to Section 6(c)(2) of the Act, the Division does not view this argument to pose a significant litigation risk.

**B. General Materiality Arguments**

Proposed Defendant makes certain arguments about materiality that apply to all of the statements at issue generally, which are discussed below. Proposed Defendant also makes additional materiality arguments with respect to the particular statements at issue, which are discussed further below in the discussion of each of the four categories of false or misleading statements.

**1. Proposed Defendant Argues that the Commission Did Not Engage in Material Decision-Making with Respect to Self-Certifications**

Gemini argues that the CFTC generally does not engage in material decision making with respect to self-certifications and that there is a "serious question" as to whether there was any

---

comment, or approve the final copy of each draft and the final self-certification letter before they were submitted to the CFTC. Further, the self-certification letter does not contain Gemini's logo or contain explicit language attributing the statements charged in the Proposed Complaint to Gemini. Thus, there is a risk the Division would be unable to establish Gemini was the "maker" of these statements if it were required to meet the requirements of *Janus*.

decision to be made by the CFTC in this particular case. (Wells at 8-9 & n.24.) Gemini further argues that there is a "significant legal question as to whether [the Commission] can bring a false statement case where it does not have true decision-making authority." (Wells Supp. at 6.)

As an initial matter, Proposed Defendant does not cite any legal authority to support its contentions. Proposed Defendant is likely referring to case law holding that a statement is material under Section 6(c)(2) when it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Gramalegui*, 2018 WL 4610953, at *24 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995).

In response, the Division would first argue that there is no requirement for the Commission to be engaging in a formal decision making process when a statement is made for the statement to be material under Section 6(c)(2). To the contrary, the plain text of Section 6(c)(2), which states that it applies to "any" false or misleading statement of material fact made to the Commission, suggests that Section 6(c)(2) has broad applicability, far beyond just those situations where, in Gemini's view, the Commission has "true decision-making authority."[18]

The Division would also argue that courts "construe materiality broadly to include statements that have a capacity to influence the agency, to hinder its investigation, or to distract the investigators' attention away from a critical matter." *eFloorTrade*, 2018 WL 10625588, at *8; *see also United States v. Byrnes*, 644 F.2d 107, 111 (2d Cir. 1981) (under perjury charge under 18 U.S.C. § 1623(a), stating that materiality is "demonstrated if the question posed is such that a truthful answer could help the inquiry, or a false response hinder it, and these effects are

[18] The Commission commented on Section 6(c)(2)'s broad applicability in its final rule release for Regulations 180.1 and 180.2, stating that Section 6(c)(2) "expands the prohibition against false statements made in registration applications or reports filed with the Commission to include any statement of material fact made to the Commission *in any context*." Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398 (July 14, 2011) (emphasis added).

weighed in terms of potentiality rather than probability" (internal citations and quotation marks omitted)). The Division would therefore argue that DMO engaged in an inquiry in connection with the Bitcoin Futures Contract during which DMO "evaluated whether any aspects of the contracts raise questions regarding compliance with the CEA and Commission regulations." Backgrounder on Self-Certification, at 1. The Division would further argue that the statements charged in the Proposed Complaint had the capacity to influence DMO's review and evaluation because they all involved facts relevant to understanding whether the proposed bitcoin futures contract would be readily susceptible to manipulation. In fact, Gemini admits that it made changes to its auction process in order to address concerns raised by DMO staff, demonstrating DMO's review and evaluation.[19] (*See* Wells, at 5.) Thus, DMO's review and evaluation constituted a decision-making process that satisfies any "decision-making" aspect of materiality.

Moreover, the Commission has already promulgated rules establishing that the materiality of statements made in self-certifications is relevant to its decision-making._Regulation 40.2(c), 17 C.F.R. § 40.2(c) (2021), provides the Commission with the authority to stay a self-certification during the pendency of proceedings for filing a false certification. With respect to the Bitcoin Futures Contract, the Commission did not take steps to stay the self-certification under Regulations 40.2(c) (and the Division did not recommend such steps) because early during the investigation CFR delisted the contract. The Division would argue that Gemini's statements to Commission staff during the Relevant Period concealed information which, had fulsome

[19] To the extent Gemini attempts to argue that its statements were not material because it made changes to address DMO staff's concerns, the Division would argue that materiality determinations are premised on materiality at the moment the statement was made. *eFloorTrade*, 2018 WL 10625588, at *8 (citing *United States v. Byrnes*, 644 F.2d 107, 111 (2d Cir. 1981) ("[I]n applying this gauge to specific situations, it is only the question, at the time of its asking, which is considered.") (internal quotation marks and citation omitted)). Gemini's changes to its auction process came very late in its discussions with DMO staff, well after many of its false or misleading statements were made.

information been provided to the Commission staff, may have led to a Commission decision to initiate proceedings for filing a false certification and stay the self-certification, thereby satisfying any "decision-making" aspect of materiality.

Although the Division believes it would prevail if it litigated this issue, this would be an issue of first impression for a court to decide under Section 6(c)(2) of the Act, and there is some risk that a court may credit Proposed Defendant's argument.

**2. Proposed Defendant Argues that Its Statements Were Not Material Because the CFTC Has Not Alleged that the Gemini Auction Was Manipulated or Readily Susceptible to Manipulation**

Proposed Defendant also generally argues that any false or misleading statement or omission made by Gemini is necessarily immaterial because there has been "no suggestion that the auction price was in fact manipulated or readily susceptible to manipulation." (Wells, at 3.)

Proposed Defendant does not cite any authority to support its contention that materiality under Section 6(c)(2) of the Act requires evidence of susceptibility to manipulation or actual manipulation. The Division would argue that there is no basis in law to require such evidence in order to for Gemini's false or misleading statements to the Commission to be considered material.

Further, DMO's review of the Bitcoin Futures Contract broadly considered the proposed contract's compliance with the Act and the Regulations, which includes but is not limited to, Core Principle 3. Thus, a wider set of facts, beyond facts relevant to a Core Principle 3 analysis, were important for DMO to know during its inquiry, and Gemini is therefore incorrect to suggest that materiality must be predicated upon an allegation or finding of susceptibility to manipulation. Gemini's false and misleading statements, and omissions, all related to facts that were important to Commission staff's understanding as they analyzed whether the proposed Bitcoin Futures

Contract would be readily susceptible to manipulation. The Division would argue that this is all that is required to establish that Gemini's statements had a tendency to influence, or were capable of influencing, Commission staff, and the statements were therefore material. *See eFloorTrade*, 2018 WL 10625588, at *8. The Division believes this argument presents a very low litigation risk.

### C. Proposed Defendant's Arguments Concerning Its False or Misleading Statements Regarding Prefunding and the Cost of Capital

Proposed Defendant contends that its statements about prefunding and the cost of capital did not violate Section 6(c)(2), even in light of its failure to disclose: (1) the loans provided by its affiliate, Pearl Street; and (2) its practice of providing its customer advance credits. Proposed Respondent's arguments as to each of these issues are addressed below.

#### 1. Pearl Street Loans

Although it is undisputed that Gemini did not disclose the Pearl Street loans to DMO staff during its discussions about the Bitcoin Futures Contract, Proposed Defendant argues that: (1) this omission does not render Gemini's statements about prefunding and the cost of capital false or misleading; (2) it was not a material omission; and (3) Proposed Defendant did not act with the requisite mens rea.

##### i. Proposed Defendant Argues that No False or Misleading Statements Were Made

Proposed Defendant argues that no false or misleading statements were made because: (1) there is nothing unlawful or improper about the loans, and they were negotiated at arms' length (Wells, at 10-11); (2) there is no support for the contention that the loans were below market rate (Wells, at 11); (3) the borrowers had the loaned digital assets in their accounts at the

time that they traded (Wells, at 10); (4) Gemini had no affirmative duty to provide information about its affiliate's lending activities and the mere existence of the loans was not a reason for Gemini to disclose them (Wells, at 10, 12); (5) the loans were consistent with the statement that the exchange was fully prefunded (Wells, at 10); and (6) the "cost of capital" statement was not intended to suggest anything about how market participants finance their trading (Wells, at 11-12).

In response, the Division would argue that Gemini's arguments emphasize form over substance and largely ignore the misleading nature of Gemini's statements to Commission staff. Although Gemini emphasizes that Pearl Street was a separate entity and that the loans were negotiated at arm's length, Gemini glosses over the extent to which Gemini intertwined the Pearl Street loans with its business. This includes that: (1) Gemini employees were involved in soliciting, managing, and servicing the loans; (2) certain loans were specifically intended to help fund auction trading and, in effect, overcome the prefunding requirement (3); certain loans had written terms explicitly requiring trading on Gemini (4); a Gemini employee monitored the use of the loans toward auction trading; and (5) the Winklevosses threatened to have certain loans revoked if the loan recipient's auction participation fell below the level Gemini desired.[20] Given these facts, the Division would argue that Gemini cannot rely on corporate formalities as an excuse for its failure to disclose the Pearl Street loans.

Gemini's argument that the borrowers had the digital assets "in accounts they fully controlled at the time that they traded," similarly emphasizes form over substance. Gemini's "cost

[20] Although Gemini attempts to portray Pearl Street as a "separate legal entity from Gemini," this ignores significant evidence that Gemini employees solicited, negotiated, and managed the loans. Further, a Gemini employee, along with Cameron and Tyler Winklevoss, also tracked the loan recipients' participation in Gemini Auctions, encouraged loan recipients to use the loan proceeds to participate in Gemini Auctions, and threatened to have the loans revoked if the loan recipient's auction participation fell below the level Gemini desired.

of capital" statement conveyed the message that Gemini's prefunding requirement was a barrier that helped prevent manipulation of Gemini's auction.[21] At the time Gemini conveyed its message, Gemini knew that its affiliate had in the past, and did contemporaneously, provide loans to capital constrained traders such that they could have digital assets in their accounts at the time that they traded in Gemini auctions. The Division will argue that having affirmatively made representations about its prefunding requirement and the cost of capital, Gemini's failure to disclose its affiliate's lending activities was false or misleading.

Further, the Division would argue that the misleading nature of the message Gemini conveyed—that its prefunding requirement made it more "costly" to manipulate the Gemini auction— is not dependent upon the Division proving that the loans charged "below market rate" interest or any particular absolute or relative level of interest. The Division would argue that by failing to disclose loans being provided by the principals of the exchange, at any interest rate, that were made to facilitate trading in Gemini auctions, Gemini failed to provide a complete and accurate picture of the state of affairs communicated through its affirmative statements about prefunding and the cost of capital. *See Gramalegui*, 2018 WL 4610953, at *24 ("[A] statement is actionable under [Section 6(c)(2)] when it is either literally untrue or when it fails to include all information necessary to give the recipient a complete and accurate picture of the state of affairs communicated.").

Moreover, even if the interest rates charged were at issue, Gemini's assertion that there is "no support" for the loans being below market rate is belied by numerous communications that Gemini produced.[22] For example, Gemini produced one communication in which a Gemini

[21] The Division expects various DMO witnesses will testify that they understood Gemini's prefunding and cost of capital statements to mean "without leverage," "paying full freight up front," "that the Gemini participant had to post their own funds," and "no margin."
[22] Further, the Division expects this (now former) Gemini employee would testify that the Pearl Street loans had a

employee with responsibility for communicating with loan recipients referred to an existing Pearl Street loan as "low interest," and another communication in which the same Gemini employee suggested to a prospective borrower the possibility of a "super low interest from [P]earl [S]treet." Separately, the Division has also gathered evidence that after one loan recipient received a Pearl Street loan at 1.5% interest, the recipient explained to his work colleagues that the loan would "help reduce our interest costs" because it would replace a loan at 5% interest that had recently expired and would be used to replace another existing loan that was at 4% interest. Thus, the Division believes it will be able to establish that at least some of the loans charged a low interest rate in comparison to other contemporaneous loans.

As to Gemini's argument that it did not have a duty to disclose the loans, as discussed above, the Division would argue that, having chosen to speak about prefunding and the cost of capital, it was incumbent upon Gemini to disclose the Pearl Street loans in order to make its statements not false or misleading.

Finally, Gemini argues that the "cost of capital" statement was not intended to suggest anything about how market participants finance their trading. Although the Division believes it can establish the mens rea required for a Section 6(c)(2) violation (as discussed further below), the Division would argue that Gemini's intent behind the statements it made does not detract from the misleading nature of the message that Gemini actually conveyed to DMO through its oral and written communications.

Although the Division believes it will be able to establish that Gemini's statements about prefunding and the cost of capital were false or misleading in light the Pearl Street, the Division

low interest rate and allowed the clients to increase their running operational capital and "expand a client's balance sheet."

acknowledges that Gemini's statements and the associated undisclosed facts are complex. Because the statements may not be obviously false, there is a significant risk that a finder of fact may not understand or appreciate the misleading nature of the statements or find the Division's arguments compelling. The Division still believes, however, that the importance of holding Gemini to account for its statements justifies the litigation risk presented here.

#### ii. Proposed Defendant Argues that Its Statements Were Not Material

Proposed Defendant argues that Gemini's failure to disclose the Pearl Street loans was not material because: (1) DMO never inquired about how Gemini market participants financed their trading or requested information about loans made to market makers by an affiliated entity (Wells, at 10); (2) by September 2017, when the "cost of capital" statement was made, there were only two loan counterparties, and by December 2017, there was only one (Wells, at 10); and (3) the Pearl Street loans did not render the auction "readily susceptible to manipulation" as of the launch of the Bitcoin Futures Contract (Wells, at 12).

Gemini's arguments that DMO "never asked" about how Gemini market participants financed their trading and "never requested" information about loans made to market makers disregards the misleading message Gemini conveyed to Commission staff about prefunding and the cost of capital. Notably, Gemini does not—and cannot—argue that DMO never asked about margined or leverage trading. This is because, from its initial presentation to DMO staff on July 25, 2017 through the end of the Relevant Period, Gemini repeatedly impressed upon DMO staff that its exchange was "fully pre-funded" and "full reserve." DMO staff interviewed by Division staff uniformly understood Gemini to have conveyed through these words that there was no margin or leveraged trading on Gemini.[23] Against this backdrop, it is unsurprising that DMO

[23] Further, the Division expects one DMO witness to testify that at the July 25, 2017 meeting, one of the

"never asked" about how market participants financed their trading or "never requested" information about loans made to market makers. But the import of the issue of loans and leverage to DMO's Core Principle 3 analysis cannot be understated. The Division expects DMO staff to testify that: (1) if loans were being offered by Gemini or an affiliate like Pearl Street, DMO would have wanted to know; (2) if loans were being offered, it would contradict Gemini's statements about pre-funding; (3) if Gemini had disclosed information about the loans, it would likely have necessitated further review on the susceptibility to manipulation; and (4) one of the two biggest factors that weighed in favor of DMO's approval of the Bitcoin Futures Contract was the proposition that all trades were fully pre-funded. The Division would therefore argue that there is more than enough evidence to demonstrate that Gemini's failure to disclose the Pearl Street loans had a tendency to influence, and was capable of influencing, Commission staff. *See eFloorTrade*, 2018 WL 10625588, at *8.

The Division would further argue that Gemini's statements about prefunding and the cost of capital, which were presented as arguments as to why the Bitcoin Futures Contract would not be susceptible to manipulation, were material because they went to the heart of DMO's inquiry into whether the Bitcoin Futures Contract would be susceptible to manipulation. *See In re Butterfield*, CFTC No. 13-33, 2013 WL 9047200 at *2-3 (Sept. 16, 2013) (consent order) (finding false testimony about pre-stamping order tickets statements material because they went to the heart of the CFTC's investigation into an introducing broker's procedures for documenting customer orders).

As to Gemini's argument that the Pearl Street loans were immaterial because there were only two loans open as of July 2017, the Division would argue that the number of loans

---

Winklevosses brothers stated explicitly stated that the Gemini did not have leveraged trading.

outstanding is not the correct standard for materiality under Section 6(c)(2) of the Act. To establish materiality, the Commission must demonstrate that Gemini's statements about prefunding and the cost of capital, and failure to disclose the Pearl Street loans, had a tendency to influence, and or were capable of influencing, Commission staff. *See eFloorTrade*, 2018 WL 10625588, at *8. As explained above, this is the case here.[24]

Finally, Gemini's baseless argument that the Pearl Street loans did not render the auction "readily susceptible to manipulation" as of the launch of the Bitcoin Futures Contract has been addressed above. In short, there is no legal basis for requiring the Commission to demonstrate susceptibility to manipulation in order for Gemini statements to the Commission to be deemed material.

Notwithstanding the strong arguments the Division has concerning the materiality of Gemini's failure to disclose the Pearl Street loans, the Division does believe that there is a significant litigation risk concerning materiality.

#### iii. Proposed Defendant Argues that It Did Not Act with the Requisite Mens Rea

Finally, Proposed Defendant argues there is no evidence that: (1) anyone at Gemini believed the information about the loans was called for by any DMO request (Wells, at 6, 11, 12); (2) that it had no way of knowing that it was omitting information DMO wanted to have (Wells, at 9); and (3) that there is no evidence that Gemini intended to withhold, or ever discussed withholding, any requested information from DMO (Wells, at 9, 12).

---

[24] To the extent the number or size of loans is relevant to materiality, the Division would argue the following. Between July 25, 2017 and the end of August 2017, the total amount lent through the three open loans was 6500 BTC, approximately $23.4 million at the time. Between the beginning of September through the end of the Relevant Period, the total amount lent through the two open loans was 3500 BTC, approximately $22.8 million at the time. The Division has not conducted an analysis to quantify the amount of loaned bitcoin that were using in auction trading, and there may be significant challenges in doing so.

As to Gemini's argument that no one believed information was called for by any DMO request, the Division would argue that it was Gemini, not DMO, that put the Pearl Street loans at issue by make affirmative representations about prefunding and the cost of capital. Thus, whether or not DMO issued a request on the topic is beside the point. Gemini's carefully worded argument that there is no evidence Gemini intended to withhold any "requested" information from DMO also rings hollow for the same reason.

Moreover, there is significant evidence that Gemini fails to address. Mostly notably, Gemini senior management was informed on October 6, 2017, that its COO had alleged that Pearl Street loans were being used to inflate exchange volume and that he intended to inform the CFTC about this. In light of this warning, Gemini's arguments it had no way of knowing DMO would have wanted to know about the loans falls flat. The suggestion that DMO would not want to know about potentially inflated trade volume strains credulity.

Further, the Division would argue that under Section 6(c)(2) of Act, the Commission must prove that a defendant knew or reasonably should have known that its statement was false or misleading. With respect to the Bitcoin Futures Contract, Gemini came to the CFTC and made numerous affirmative representations about its business and trading operations. Gemini's Wells submission fails to even approach the subject of whether it *should have known* that its statements about prefunding and the cost of capital were false or misleading in light of the Pearl Street loans. Put another way, Gemini fails to taken any responsibility, as a party providing information to the Commission, and the party best positioned to know the truth about its business and trading operations, for ensuring that its statements were accurate and did not provide a misleading impression. This Division would argue that it is incumbent upon any person providing information to the Commission to do so.

### 2. Advance Credits

With respect to advance credits, Proposed Defendant argues that: (1) the single long-term advance credit that was outstanding during the Relevant Period does not render Gemini's statements about prefunding and the cost of capital false or misleading; (2) it was not a material omission; and (3) Proposed Defendant did not act with scienter.

#### i. Proposed Defendant Argues that No False or Misleading Statements Were Made

With respect to advance credits, Proposed Defendant argues that no false or misleading statements were made because it publicly disclosed its practice of advancing fiat or digital assets to its customers when they were in the process of transferring assets to Gemini. (Wells, at 12.) Proposed Defendant further argues that its practice was consistent with its statements about "prefunding" because customers "could only trade to the extent of assets in their account or provably in transit to their account." (Wells, at 12.)

In response, the Division would argue that Gemini avoids addressing the real issue. Despite what it disclosed publicly about providing advance credits,[25] Gemini never disclosed (publicly or the CFTC in connection with the Bitcoin Futures Contract) that it had a practice of advancing customers funds in order for them to be able to transact at times they otherwise would not have been able to due to lack of funds in their account, and on a number of occasions without establishing proof of a wire or blockchain transfer. This practice allowed customers to trade beyond the extend of the assets they had put in their account or were in the process of moving to

[25] Gemini's counsel has also suggested to Division staff that its policy for providing customers advance credits was fully disclosed to the CFTC during the Relevant Period by way of being referenced in the middle of a 142-page policies and procedure manual that was submitted to the CFTC on September 12, 2017. The Division disputes that this constitutes adequate disclosure or disclosure that would make its prior statements not misleading.

Gemini.[26] Gemini's internal ledger for tracking credits to customer reflects that, at times, Gemini did this specifically to fund or facilitate auction trading. This Division would argue that this undisclosed practice renders Gemini's statements about prefunding and the cost of capital false or misleading because it potentially undermined a purported rationale as to why the Bitcoin Futures Contract was not readily susceptible to manipulation. Gemini therefore failed to include all information necessary to give the recipient a complete and accurate picture of the state of affairs communicated. *See Gramalegui*, 2018 WL 4610953, at *24.

Although the Division believes it can establish the false and misleading nature of Gemini's statements based on its undisclosed practice described above, as noted above, the concepts of prefunding and the cost of capital, and the message that was conveyed to the CFTC about them, are complex and may be challenging for a finder of fact to appreciate. Thus, there is a significant litigation risk that a finder of fact could credit Proposed Defendant's arguments or fail to credit the Division's arguments.

ii. **Proposed Defendant Argues that Its Omission Was Not Material**

Proposed Defendant also argues the failure to disclose its advance credit practices was not material because there were only nine instances of "out of policy" advances, only one of which was still outstanding during the Relevant Period. Proposed Defendant further argues that this single advance credit that was outstanding during the Relevant Period is not relevant to the question of whether the auction price was readily susceptible to manipulation.

As to Gemini's argument that the its advance credit practices were immaterial because there are only a small number of advance credits at issue, the Division would argue that the

[26] Gemini downplays the extent to which this happened, which is discussed further below with respect to materiality.

number of advance credits given to fund auction trading is not the correct standard for materiality under Section 6(c)(2) of the Act.[27] To establish materiality, the Commission must demonstrate that Gemini's statements about prefunding and the cost of capital, and failure to disclose the Pearl Street loans, had a tendency to influence, and or were capable of influencing, Commission staff. *See eFloorTrade*, 2018 WL 10625588, at *8.

As previously noted, the Division expects DMO staff to testify: (1) if Gemini offered lines of credit to traders, DMO would want to know; (2) if Gemini offered lines of credit to traders, it would contradict Gemini's statements about prefunding; (3) credits given to traders to make it easier to trade could also make it easier for them to manipulate; and (4) one of the two biggest factors that weighed in favor of DMO's approval of the Bitcoin Futures Contract was the proposition that all trades were fully pre-funded. Thus, the Division would argue that Gemini's advance credit practices were important for DMO to know about when considering the Bitcoin Futures Contract and Gemini's omission had a tendency to influence, and was capable of influencing, Commission staff. *See eFloorTrade*, 2018 WL 10625588, at *8. The Division would also argue that Gemini's statements about prefunding and cost of capital were material because they went to the heart of DMO's inquiry into whether the Bitcoin Futures Contract would be susceptible to manipulation. *See Butterfield*, 2013 WL 9047200, at *2-3.

Finally, Gemini's argument that its practice of advancing credits to traders is not relevant to the question of whether the auction price was readily susceptible to manipulation is baseless. First, there is no legal basis for requiring the Commission to demonstrate susceptibility to manipulation in order for Gemini's statements to the Commission to be deemed material. Further,

[27] Even if it were relevant to materiality, the Division would argue that Gemini's calculation of what it considers to be "out of policy" advances significantly downplays the full number of instances that it used advance credits as a means to fund participation in Gemini auctions.

Gemini's historic trading volume figures submitted to the CFTC incorporated trade volume generated by Gemini advancing credits to traders to fund trading, and the Division expects DMO witnesses to testify that volume was an important factor when considering susceptibility to manipulation.

Although the Division believes it will be able to establish the materiality of Gemini's failure to disclose its practices concerning advance credits, the Division recognizes that there are significant litigation risks here. Although the Division has found several instances of advance credits being used to fund auction trading, the full extent to which it happened is unknown, and this issue will require additional discovery and analysis during litigation. Further, apart from the one long-term advance credit Gemini admits was "out of policy," the CFTC is not currently aware of other advance credits being provided specifically for auction funding (whether within or without Gemini policy) during the Relevant Period. There is therefore a significant litigation risk that finder of fact could be persuaded that this was mostly a historical issue that was not an issue at the time Gemini made its statements about prefunding and the cost of capital to the Commission.

### iii. Proposed Defendant Argues that It Did Not Act with the Requisite Mens Rea

Proposed Defendant argues that its "error" with respect to long-term advance credits were due to the negligent conduct of a single employee, and the error was unknown to senior management when Gemini made the statement at issue (Wells, at 14). Proposed Defendant also generally argues that there is no evidence "that Gemini ever believed, or even considered, that the allegedly omitted information was responsive to any question asked or topic raised by DMO" (Wells, at 6); that it had no way of knowing that it was omitting information DMO wanted to

have (Well, at 9); and that there is no evidence that Gemini intended to withhold, or ever discussed withholding, any requested information from DMO (Wells, at 9).

The Division would argue that under Section 6(c)(2) of the Act, the Commission is required to show that Gemini knew or should have known that its statement was false or misleading. The Division would argue that Gemini significantly downplays the knowledge and involvement of its senior management in issuing and approving advance credits that were used to fund auction trading. Moreover, Gemini admits that its senior management was fully aware in October 2017, while Gemini was in the midst of making statements to the Commission about prefunding, that there had been a long-term advance credit outstanding for months. Although Gemini senior management recognized this issue as "gross negligence," it never disclosed the problem to the CFTC or corrected or amended its statements about prefunding and the cost of capital. Further, with the exception of the statements about prefunding in CFE's self-certification letter, Gemini's statements about prefunding and the cost of capital were all drafted, reviewed, and/or approved by Gemini senior management.[28] Its practice of providing customers advance credits in order to fund auction trading is also plainly incongruent with the message Gemini conveyed to the CFTC about prefunding and the cost of capital.

Although the Division believes there is substantial evidence to show that Gemini knew or should have known its statements were false or misleading, this issue raises a significant litigation risk. Among other things, it may be challenging for a finder of fact to connect Gemini's history of advancing customers funds to its statements about prefunding and the cost of capital. Further, there is some risk that a finder of fact could find there is too little evidence of Gemini senior

[28] Although the language concerning prefunding in CFE's self-certification letter appears to have originally been drafted by CFE, CFE appears to have drawn this language from information provided by Gemini. Furthermore, Gemini senior management provided CFE with edits to the language CFE drafted.

management discussions concerning advance credits during the Relevant Period to draw a connection between Gemini's history of providing advance credits to customers to fund auction trading and its statements about prefunding and the cost of capital.

### D. False or Misleading Statements about Self-Trading

#### 1. Proposed Defendant Argues that No False or Misleading Statements Were Made

Proposed Defendant argues that: (1) its statements that Gemini prohibited self-trading and had implemented self-trade prevention were accurate (Wells, at 16-17); and (2) Gemini never made any backward-looking representations about self-trading (Wells, at 17).

Gemini's argument that its statements about self-trade prevention were accurate wholly ignores the main message that Gemini conveyed to the CFTC about self-trading, which was that self-trading in Gemini auctions *was not possible*. After being asked: "Could a Gemini auction occur where there is one market participant trading with themselves," Gemini responded: "No, we have instituted self-trade prevention." This answer was false because self-trading in Gemini auctions was, in fact, possible throughout the Relevant Period. In fact, Gemini's Wells submission confirms that self-crossing could, and did, still occur after Gemini had implemented self-trade prevention. *See* Wells, at 16 (referring to the "de minimis amount of inadvertent self-crossing" that occurred after it implemented self-trade prevention).[29] Although Gemini argues that this self-crossing was "inadvertent, not deliberate or intentional," this admission, in turn, confirms that Gemini's September 12, 2017 representation to the CFTC that it prohibited "unintentional" self-trading was false. *Compare* Wells, at 16, *with* Proposed Complaint ¶ 71

[29] Gemini's argument that its automated self-trade prevention mechanisms were "highly" effective (Wells, at 16), is also telling. Gemini does not—and cannot—say that its self-trade prevention mechanisms were "completely" effective because self-trading could, and did, still occur after the mechanisms were implemented and through the Relevant Period.

(quoting Gemini's September 12, 2017 submission to the CFTC stating: "We prohibit the same market participant from crossing with himself or herself (*either intentionally or unintentionally*) on a continuous trading order book or in a Gemini Auction." (emphasis added)). The Division would therefore argue that Gemini's own Wells submission helps demonstrates the falsity of Gemini's representation that self-trading in Gemini auctions was not possible.[30]

Gemini's second argument, that it never made any backward-looking representations to the CFTC about self-trading, is also flawed. As an initial matter, self-trading in Gemini auctions was possible throughout the Relevant Period, making its misstatements about self-trading a live and contemporaneous issue, not merely a "backward-looking" issue.[31]

That said, the Division would argue that Gemini did, in fact, make backward-looking representations to the CFTC about self-trading in connection with its representations about its trading volume. In its July 25, 2017 presentation, Gemini presented DMO staff with a slide deck containing several charts reflecting Gemini's historic trade volume, which incorporated trading volume that was the product of self-trading in Gemini auctions. After the presentation, DMO staff specifically requested that Gemini produce the data underlying the charts, including trade data for all historic Gemini auctions dating back to the auction's inception. Gemini subsequently submitted this data to the CFTC via CFE, and DMO staff expended resources analyzing this data.

[30] Gemini's Wells submission also cites to its Marketplace Conduct rules, updated as of September 21, 2017, and its Market Data Integrity Policy, adopted on October 20, 2017, as evidence that it had "rules against self-trading." To the extent Gemini seeks to rely on these documents as evidence that it "prohibited" self-trading, the Division would note that these policies only came into existence months after July 25, 2017, when Gemini first began representing to DMO staff that self-trading was "prohibited."

[31] Indeed, self-trading in Gemini auctions appears to be an ongoing issue. Although Division Staff has not conducted a full analysis, the Division has gathered some evidence indicated that self-trading occurred in at least six Gemini auctions between February 6, 2018 and May 16, 2018.

The Division expects DMO staff to testify that: (1) volume was an important factor in understanding the robustness of the marketplace; and (2) there was an expectation that the trading volume Gemini represented to DMO staff through its data was bona fide and reflected real economic transactions. The Division would therefore argue that historical volume data was highly important for DMO's review, including to consider whether and to what extent the historical volume would continue. Further, by presenting historic trade volume that incorporated and reflected uneconomic self-trading, Gemini made an affirmative statement that put its historic self-trading practices at issue, rendering Gemini's representations that it "prohibited" self-trading, that it had implemented self-trade prevention, and that it was not possible to self-trade in Gemini auctions, false or misleading.

**2. Proposed Defendant Argues that Its False or Misleading Statements, and Omissions, Were Not Material**

Proposed Defendant argues that its statements about self-trading were not material because: (1) DMO never asked Gemini if self-trading had ever occurred in the past or for information about historic instances of self-trading (Wells, at 17); (2) the self-trading in Gemini auctions that continued to occur after Gemini instituted "self-trade prevention" was de minimis and unintentional (Wells, at 16, 18-19); and (3) Gemini alerted CFE to the "phenomenon" of self-trading in Gemini auctions (Wells, at 17).

As to Gemini's argument that DMO never asked about historic instances of self-trading, the Division would argue that specific questions that DMO *could* have asked are not the determiner of materiality. The Division would argue to establish materiality, the Commission needs to demonstrate that Gemini's statements about self-trading had a tendency to influence, or were capable of influencing, Commission staff. *See eFloorTrade*, 2018 WL 10625588, at *8.

Here, DMO *did* specifically ask about self-trading in Gemini auctions, but was told, in sum and substance, that it was not possible. The Division expects that witnesses from DMO will testify: that: (1) self-trading can be manipulative and alter price; (2) the CFTC's question to Gemini about self-trading related to Core Principle 3; (3) DMO staff would have wanted to know if Gemini's trade data included self-trading or wash trading; and (4) if Gemini knew of self-trading, it should have been disclosed to DMO in response to the CFTC's question. Moreover, as mentioned above, the Division would argue that historical volume data was highly important for DMO's review.

The Division would therefore argue that Gemini's false and misleading statements, and omissions, about self-trading related to facts that were important to Commission staff's understanding as they analyzed whether the proposed Bitcoin Futures Contract would be readily susceptible to manipulation. The Division would further argue that Gemini's statements were capable of influencing DMO staff, or to distract the investigators' attention away from a critical matter, which is all that is required to establish materiality. *See eFloorTrade*, 2018 WL 10625588, at *8. The Division will argue that Gemini's statements about self-trading were material because they were presented as part of an argument as to why the Bitcoin Futures Contract would not be susceptible to manipulation, which goes to the heart of DMO's inquiry. *See Butterfield*, 2013 WL 9047200 at *2-3 (finding false testimony about pre-stamping order tickets statements material because they went to the heart of the CFTC's investigation into an introducing broker's procedures for documenting customer orders).

As to Gemini's argument that the self-trading in Gemini auctions that continued to occur was de minimis and unintentional, the Division would argue that the volume of, or intention

behind, the self-trading that occurred is not the correct standard for materiality under Section 6(c)(2). As explained above, the Division would argue that to establish materiality, the Commission needs to demonstrate that Gemini's statements about self-trading had a tendency to influence, or were capable of influencing, Commission staff.

Finally, as to Gemini's argument that it alerted CFE to the "phenomenon" of self-trading in Gemini auctions, the Division would argue that the materiality question at issue is whether the statements had a tendency to influence, or were capable of influencing, Commission staff. Thus, even if Gemini advised other parties of self-trading in Gemini auctions, this does not detract from whether Gemini's false or misleading statements about self-trading were capable of influencing DMO staff, and were therefore material.[32]

### 3. Proposed Defendant Argues that It Did Not Act with the Requisite Mens Rea

Proposed Defendant argues that: (1) there is no evidence that Gemini believed any information about historical self-trading or the "Auction folding phenomenon" was called for by any requests made by DMO (Wells, at 18); (2) it had no way of knowing that it was omitting information DMO wanted to have (Wells, at 9); and (3) there is no evidence that Gemini intended to withhold, or ever discussed withholding, any requested information from DMO (Wells, at 9).

[32] To the extent Gemini intends to implicate CFE in its false statements, the Division notes that: (1) the statements about self-trading related to self-trading on Gemini's trading platform (not CFE's) and in Gemini auctions (not CFE's); (2) there is substantial evidence the false and misleading about self-trading were drafted, reviewed, and/or approved by senior management at Gemini; and (3) CFE repeatedly asked Gemini for its comments on its submissions to the CFTC before the submissions were made, and Gemini did often provide CFE comments. Under these circumstances, the Division believes that Gemini appropriately bears responsibility for its misstatements about self-trading. However, there is evidence that at least one member of CFE's product development team was informed by Gemini that self-trading in Gemini auctions was possible prior to CFE's December 1, 2017 self-certification letter. It is unclear whether this CFE product development team member reviewed CFE and Gemini's statements to the CFTC about self-trading before they were submitted, or whether there was wider knowledge at CFE of self-trading in Gemini auctions.

With respect to Gemini's mens rea arguments, the Division would argue that under Section 6(c)(2), the Commission is required to show that Gemini knew or should have known that its statement was false or misleading. With the exception of the statement about self-trading in CFE's self-certification letter, Gemini's statements about self-trading were all drafted, reviewed, and/or approved by Gemini senior management.[33] Its statements related directly to its trading operations, and also implicated its marketplace conduct rules and surveillance activities. Self-trading was also a topic raised to the Commission's attention by Gemini and presented as part of its argument that Gemini's auctions were not susceptible to manipulation. Furthermore, there is evidence that Gemini management was informed about the possibility of self-trading in Gemini auctions in at least found instances during the fall of 2017.[34]

The Division acknowledges that there is evidence that in the fall of 2017, Gemini senior management asked a Gemini engineer about whether continuous order book orders could match with auction-only orders in auctions. In response, the engineer made clear that this type of self-matching in an auction could happen, but also stated that her and others at Gemini decided that they would not consider it to be "self crossing" because the auction involves a "bulk trade" that commingles orders. The same engineer also reviewed proposed language concerning self-trading to be added to Gemini's policies and procedures manual and confirmed to Gemini senior

[33] Although the language concerning self-trading in CFE's self-certification letter appears to have originally been drafted by CFE, CFE appears to have drawn this language from language drafted by Gemini and used in the July 25, 2017 presentation slide deck.

[34] For example, in a November 2017 Slack chat message, a Gemini employee conveyed to Gemini senior management a request from a Gemini market maker for Gemini to implement a mechanism to prevent its continuous book orders from crossing with its auction-only orders in Gemini auctions. In the subsequent discussion of the request, Cameron Winklevoss commented that "self-cross prevention between books would be good but not sure how difficult to implement." After further discussion about the difficulty of implementing such self-cross prevention and whether Gemini should undertake to address the issue, Winklevoss concluded that "[market markers] are grownups, they can figure it out."

management that it was correct.[35] Based on this, Gemini may argue that its senior management (in reliance on the engineer's confirmation) did not know that its statements about self-trading were false or misleading.

In response, the Division would argue that there are communications from the fall of 2017 making clear that Gemini senior management and others at Gemini referred to this type of self-trading as "self crossing" or "self-trading." Further, there was significant back-and-forth between DMO staff and Gemini regarding the fact that continuous book orders could be filled in Gemini auctions, and Gemini never gave any indication that its statements about self-trading did not apply to continuous book orders filled in Gemini auctions.

Although the Division believes this is ample evidence to show that Gemini knew or should have known its statements were false or misleading, there is still some risk a finder of fact could be sympathetic to Proposed Defendant's arguments.

### E. False or Misleading Statements about Rebates

#### 1. Proposed Defendant Argues that No False or Misleading Statements Were Made

With respect to Gemini's statements about its rebate program, Gemini argues that (1) its response to the CFTC's question was accurate because Gemini "typically" based fees and rebates on trading volume thresholds disclosed on its public website and the vast majority of its auction volume was generated by a small number of participants that received rebates (Wells, at 15); and (2) that it fully disclosed information about its rebates on page 46 of a 142-page policy and procedure manual that Gemini submitted to DMO (Wells, at 15-16).

[35] The language the engineer reviewed stated: "Self-trade prevention that prohibits the same market participant from crossing with himself or herself on a continuous trading Order Book or in a Gemini Auction." However, the engineer qualified her answer by making clear that they "do not attempt 'self trade' prevention" between continuous book orders and auction-only book orders.

In response to Gemini's argument that its response was accurate, Gemini again avoids addressing the misleading nature of the message it conveyed to Commission staff. Whether Gemini "typically" based fee and rebates on trading volume thresholds is not the issue. After initially representing that it had a "market maker rebate," Gemini subsequently denied it and represented that it had one program, the details of which were available on Gemini's website. Furthermore, DMO's questions were aimed at gaining an understanding of how the rebates might affect Gemini auction trading behavior, and Gemini mispresented that the small number of auction participants receiving rebates were subject to the fee and rebate schedule posted to Gemini's website. Further, the Division would argue that historical volume data was highly important for DMO's review, and failing to provide a complete and accurate answer about its rebate program may have influenced how DMO understood the volume data. The Division would therefore argue that Gemini's response was false or misleading because it failed to include all information necessary to give DMO staff a complete and accurate picture. *Gramalegui*, 2018 WL 4610953, at *24.

As to Gemini's argument that it fully disclosed information about its rebates to DMO staff in its policy and procedure manual, the Division would argue the following. Having represented that it only had one fee and rebate program, the policy and procedure manual is not the form or manner of a further disclosure that would make Gemini's prior statements not misleading. Among other things, page 46 of the manual does not contain the words "market maker" or "rebate." It also does not in away provide an accurate response to DMO's rebate questions, or explain or clarify the inconsistencies between the manual and Gemini's prior statements about rebates. Finally, when Gemini and CFE submitted the policies and procedures manual to the

CFTC, in the cover email, they specifically drew the CFTC's attention to an entirely different portion of the manual (pages 93-95) that addressed two specific issues that they identified in the cover email, neither of which had anything to do with rebates.

Although the Division believes there is some risk that it may not be able to establish Gemini's statements about rebates were false or misleading, the Division believes Gemini's arguments to the contrary present a relatively low litigation risk.

**2. Proposed Defendant Argues that Its Omission Was Not Material**

Proposed Defendant argues that its failure to disclose its bespoke rebate agreements was not material because: (1) DMO did not ask for "additional" information about its written response to DMO's question or its disclosure that there was a small number of customers receiving liquidity-making rebates (Wells, at 15); (2) that if DMO had asked for additional information about these rebates, that information would have been provided (Wells, at 15); (3) the "important information" DMO was seeking was that 90 percent of auction volume was associated with customer receiving liquidity-making rebates, which Gemini disclosed (Wells, at 16); and (4) Gemini's failure to disclose that it had bespoke arrangements that waived the volume requirements to achieve rebates was immaterial because it encourages auction participation and is a customary practice of any change (Wells, at 16).

In response, the Division would argue that whether DMO staff asked further questions about false or misleading answers Gemini provided to DMO's initial questions is not the correct measure of materiality. The Division would argue to establish materiality, the Commission needs to demonstrate that Gemini's statements about self-trading had a tendency to influence, or were capable of influencing, Commission staff. *See eFloorTrade*, 2018 WL 10625588, at *8. Here,

DMO *did* specifically ask about Gemini's rebate program and its effect on auction trading. The Division expects DMO staff to testify that, although fee and rebate schedules may not typically be a concern for the product review team, DMO staff's question was asked in order to understand how Gemini designed its rebates to avoid wash trading. Moreover, the Division would argue that historical volume data was highly important for DMO's review, including the extent to which the historical volume was propped up by undisclosed rebate incentives. The Division would therefore argue that Gemini's statements about rebates were capable of influencing Commission staff.

### 3. Proposed Defendant Argues that It Did Not Act with the Requisite Mens Rea

Proposed Defendant does not make specific mens rea arguments concerning its statements about rebates. Proposed Defendant generally argues that there is no evidence "that Gemini ever believed, or even considered, that the allegedly omitted information was responsive to any question asked or topic raised by DMO" (Wells, at 6); that it had no way of knowing that it was omitting information DMO wanted to have (Wells, at 9); and that there is no evidence that Gemini intended to withhold, or ever discussed withholding, any requested information from DMO (Wells, at 9).

In response, the Division would argue that Gemini does not attempt to address whether it should have known that its answer was false or misleading. Moreover, the Division would argue that Gemini's initial representation that it had "market maker" rebates, followed by its curiously and carefully worded denial that it did not have a "specifically defined market maker" program is itself circumstantial evidence that Gemini was intentionally withholding information about its rebate programs. Furthermore, there is evidence that in the months before the statement was drafted, the primary drafter of the statement (Gemini's former chief operating officer) had

concerns that regulators may view Gemini's bespoke rebate agreements as unseemly. Thus, the Division believes it will be able to establish that Gemini knew or should have known its statements about rebates were false or misleading.

**F. False or Misleading Statements about Volume**

**1. Proposed Defendant Argues that No False or Misleading Statements Were Made**

Proposed Defendant argues that: (1) the trading volume figures cited in CFE's December 1, 2017 self-certification letter and reflected in Gemini's trade data were not incorrect, and were not rendered false or misleading due to loans, advance credits, undisclosed rebate programs, or self-trading for the same reasons it believes it made no false or misleading statements, or material omissions, on these topics (Wells, at 18); (2) the volume generate through loans, advance credits, and its undisclosed rebate programs reflected "real trading volume," was "real, legitimate trading activity," and was accurately reported (Wells, at 10, 18); and (3) although Gemini's trading volume figures reflected volume that resulted from a wash trading scheme that Gemini discovered in late August/early September 2017, it would be "unjust" to use this volume as a basis for an action because Gemini was a "victim" of the scheme (Wells, at 18 n.59).

As to Gemini's general argument that its trading volume figures were not misleading for the same reasons it believes it made no materially false or misleading statements, or material omissions, related to loans, advance credits, undisclosed rebate programs, or self-trading, the Division has addressed Gemini's arguments above.

As to Gemini's arguments about "real" trading volume, as an initial matter, Gemini does —and cannot— claim that its trade volume generated through self-trading and wash trading

reflected "real" trading volume. Gemini only argues that its trade volume generated from loans, advance credits, and its undisclosed rebate programs reflected "real trading volume."

In response, the Division would argue that this ignores context of Gemini's statements and the misleading nature of the message conveyed to DMO staff. At the beginning of DMO's inquiry, Gemini presented auction volume figures in the same presentation during which it highlighted its prefunding requirement and rebate program as auction "protections" that encouraged participation in auctions and protected against manipulation.[36] As explained above, Gemini's statements about prefunding and the cost of capital and its market maker rebate program were false or misleading, and/or contained material omissions. The Division would argue that under these circumstances, where Gemini's volume figures were intertwined with its statements about prefunding and its rebate programs, its volume figures that reflected volume generated through loans, advance credits, and undisclosed rebates were false or misleading.

Finally, Gemini argues that it would be "unjust" to hold it responsible for its inflated trading volume that reflected wash trading. This does not appear to be an argument based in law. With respect to the equities of Gemini's argument, the Division would argue that: (1) wash trading is, without question, pernicious trading activity that can distort and manipulate prices in the market and was plainly relevant to DMO's inquiry; and (2) Gemini's failure to disclose known wash trading reflected in its trade volume, at a time when DMO was expending government resources analyzing Gemini's trade data to evaluate whether the Bitcoin Futures Contract would be susceptible to manipulation, is inexcusable. Thus, holding Gemini responsible for its misrepresentations about its trade volume is appropriate and would send an important message to

[36] CFE's December 1, 2017 self-certification letter similarly cited Gemini trading volume figures while highlighting Gemini's prefunding requirement as a "structural safeguard" of Gemini auctions.

all persons making statements to the Commission that speaking truthfully, honestly, and with candor is paramount.

### 2. Proposed Defendant Argues that Its False or Misleading Statements, and Omissions, Were Not material

Proposed Defendant argues that its trade volume generated as a result of self-trading was not material because: (1) self-trading that continued to occur on Gemini after it implemented self-trade prevention was inadvertent and de minimis (Wells, at 19); and (2) historic self-trading on Gemini is "irrelevant" because it happened before the self-certification process began and has no bearing on the self-certification process or on the susceptibility of a futures contract to price manipulation (Wells, at 19).

As to Gemini's argument that self-trading reflected in its volume data after self-trade prevention was implemented was inadvertent and de minimis, the Division would argue that the correct measure of materiality is whether Gemini's statements about volume were capable of influencing Division staff. The Division expects DMO staff to testify that: (1) trade volume was important to understanding the robustness of the marketplace and how easy it would be to manipulate the auction; and (2) if Gemini's data reflected self-trading or wash trading, DMO staff would have wanted to know because that conduct could distort price. The Division would thefore argue that had DMO staff known of the self-trading, DMO staff would potentially have taken it into account, asked questions about it, and considered how it affected their understanding of the robustness of the marketplace.

As to Gemini's arguments that historic self-trading is irrelevant to, and has no bearing on, the self-certification process, the Division would argue that there is ample evidence to the contrary. For example, CFE and Gemini featured Gemini's historic trading data in its

presentation to DMO staff, which they presumably would not have done if it had no bearing on the self-certification process. Further, after Gemini's July 25, 2017 presentation, DMO staff specifically called for the production of Gemini's historic trade data, making clear to Gemini that it was important to DMO for its analysis. Thereafter, as DMO analyzed the data, DMO followed up with several questions about particular historic auctions and about the data itself. Thus, the Division would argue that information concerning historic self-trading reflected in Gemini's trade volume was important for DMO staff to know when analyzing the Proposed Bitcoin Futures Contract, and Gemini's statements were capable of influencing DMO staff during its inquiry.

**3. Additional Litigation Risk Concerning the Materiality of Proposed Defendant's Statements About Volume**

Although not raised by Proposed Defendant, the Division has identified an additional litigation risk concerning the materiality of Proposed Defendant's statements about volume. There is evidence that DMO staff: (1) questioned whether the graph in the July 25, 2017 presentation reflecting Gemini's auction volume since inception reflected significant and increasing trade volume, as opposed to merely reflecting an increase in the price of bitcoin; and (2) generally regarded Gemini's auctions to involve relatively low trading volume and "little activity," but did not find this to be irreconcilable with Core Principle 3 or a fatal defect for the Proposed Bitcoin Futures Contract. DMO staff expressed concerns to CFE and Gemini about certain aspects of the auction, which prompted Gemini to make changes to its auctions process. Thus, there is a risk Proposed Defendant could argue that Gemini's false and misleading statements about its volume were not material because they did not alter DMO's understanding that Gemini's auction trade volume was low.

In response, the Division would argue that under Section 6(c)(2), materiality does not require the Commission to show that it "actually relied on or was influenced by the statement." *Gramalegui*, 2018 WL 4610953, at *24 (citing *United States v. Strohm*, 671 F.3d 1173, 1186 (10th Cir. 2011). It also does not matter even if the CFTC knew the statement was false at the time it was made. *Gramalegui*, 2018 WL 4610953, at *24 (citing *Butterfield*, 2013 WL 9047200 at *2-3). The Commission need only show that Gemini's statements were capable of influencing DMO's inquiry. *eFloorTrade*, 2018 WL 10625588, at *8. The Division expects DMO staff to testify that they would want wanted to know if Gemini's trade volume reflected inorganic or non-bona fide trading, including volume that came as a result of low interest loans or other assistance Gemini provided market makers. Further, Gemini's statements about its volume went to the heart of DMO's inquiry into whether the Bitcoin Futures Contract would be susceptible to manipulation. *See Butterfield*, 2013 WL 9047200 at *2-3. Thus, Gemini's statements about volume were material.

**4. Proposed Defendant Argues that It Did Not Act with the Requisite Scienter**

Proposed Defendant does not make any mens rea arguments specific to its statements about volume. Proposed Defendant only generally argues that there is no evidence "that Gemini ever believed, or even considered, that the allegedly omitted information was responsive to any question asked or topic raised by DMO" (Wells, at 6); that it had no way of knowing that it was omitting information DMO wanted to have (Wells, at 9); and that there is no evidence that Gemini intended to withhold, or ever even discussed withholding, any requested information from DMO (Wells, at 9).

In response, in addition to the mens rea arguments discussed above, the Division would argue that there is also significant evidence of Gemini's knowledge, during the fall of 2017, of a wash trading scheme that generated millions of dollars of rebates.[37] In August 2017, DMO staff inquired as to whether Gemini had ever investigated suspicious trading on the platform or taken any action against participants. On August 25, 2017, Gemini responded by providing general information about its practices for filing FINCEN suspicion activity reports (SAR) in connection with its BSA/AML policy. Shortly thereafter, however, Gemini senior management: (1) in early September 2017, hired an outside consultant to help investigate two Gemini employees suspected of colluding with the wash traders; (2) in late September 2017, determined to suspend the accounts of the wash traders; (3) in early October 2017, reported the issue to the New York Department of Financial Services and called an emergency meeting of Gemini's Board of Managers to discuss the conduct; (4) in mid-October 2017, determined to claw back rebates from the wash traders and file a FINCEN SAR concerning the trading; and (5) on December 10, 2017 (the same day the Bitcoin Futures Contract began trading), commenced arbitrations against the wash traders. Despite all of these significant developments which were well known to Gemini senior management, Gemini never disclosed the wash trading issue to DMO or provided a correction or supplement to its trade volume figures that reflected wash trading. The Division believes this is ample evidence to establish that Gemini knew or should have known that its trade volume figures were false or misleading.

[37] This includes Gemini senior management: (1) hiring an outside consultant to help investigate the issue in early September 2017; (2) determining to suspend the accounts of the suspected wash traders in late September 2017; (3) reporting the issue to the New York Department of Financial Services and calling an emergency meeting of Gemini's board of directors to discuss the issue in early October 2017; (4) determining to claw back rebates from the wash traders and file a FINCEN suspicious activity report concerning the trading in mid-October 2017; and (5) commencing arbitrations against the wash traders on December 10, 2017 (the same day the Bitcoin Futures Contract began trading).

# VI.

# LITIGATION RISKS

In addition to the issues raised in the Wells submission or otherwise identified above, the Division has identified the following litigation risks.

## A. Lack of On-the-Record Testimony and Availability of Witnesses

Through most of the investigation, the Division conducted, jointly with the SDNY, interviews of persons with relevant knowledge from the Gemini customers that received loans, CFE, CFTC, and current and former Gemini staff, among others, but the Division did not take on-the-record of those individuals.[38] Furthermore, the Division has not collected all potentially relevant documents from Gemini or other third parties. Accordingly, there may be additional relevant documentary evidence or information that may come to light at a later stage.

Furthermore, a significant piece of the Division's case will depend upon testimony from DMO witnesses, particularly with respect to materiality. There is a significant risk that given the passage of time since the summer and fall of 2017, memories made fade and witnesses may have difficulty recalling events.

Finally, the whistleblower in this matter, Gemini's former chief operating officer, has significant credibility issues. Although the Division was able to substantiate many of the whistleblower's allegations, the Division's investigation uncovered that the whistleblower himself made or had partial responsibility for several of the false statements charged in the Proposed Complaint. Further, in discussions with Division staff, the whistleblower sought to downplay his role and knowledge of certain events, and at times provided information that turned out not to be

[38] The Division has, however, taken on-the-record testimony of Gemini's principals, Cameron and Tyler Winklevoss.

true. The Division believes that the whistleblower is vulnerable to being discredited as a witness, and there would be a significant litigation risk if he were to be relied upon as part of the Division's case-in-chief. For that reason, the Division does not intend to rely on testimony from the whistleblower and instead intends to prove its case based on testimony from other witnesses and documentary evidence.

**B. Evidentiary Issues with Data & Lack of Evidence To Establish Wash Trading**

Gemini produced certain auction transaction and order book data to DMO staff during the Relevant Period, which Division staff has collected and preliminarily analyzed. The Division has relied on this data with respect to its understanding self-trading in Gemini auctions. However, the Division has since learned that there may be gaps or inaccuracies in this data. Although the Division has collected other corroborating evidence that confirms that self-trading occurred, the Division will need to conduct further discovery as to Gemini data in its litigation in order to obtain a complete and accurate set of data.

Further, the Division has not yet conducted analysis to determine the extent to which loaned digital assets, undisclosed advance credits, self-trading, or wash trading may have inflated Gemini's auction volumes or continuous orderbook trading. Such an analysis may be extremely challenging given the fungible nature of digital assets.

Finally, there are some evidentiary gaps with respect to the wash trading that occurred in August 2017 and was reflected in the Gemini volume figures submitted in CFE's self-certification letter. Although one individual that was a principal of the wash trading scheme has admitted to colluding with others to use an algorithm that facilitated wash trades (a "wash trading bot"), the Division understands that the parties to the wash trading scheme destroyed all records of the wash

trading bot and its trade and program history prior to learning of the Division's investigation. Although documentary evidence of the wash trading is limited, the Division believes it will be able to establish that Gemini's volume figures reflected the wash trading through account records collected from Gemini, contemporaneous communications, communications related to Gemini's investigation of the wash traders, and legal and factual positions Gemini took in its arbitration against the wash traders.

**C. Deliberative Process Privilege**

Because this matter will center around false or misleading statements made to DMO staff, and the materiality of those statements, Proposed Defendant will likely seek wide-ranging discovery of Commission documents and communications, including documents reflecting the internal deliberations of Commission staff. There is a risk that, during the course of the litigation, the Commission may receive unfavorable rulings that limit the scope of the deliberative process privilege. The Division believes that the importance of holding persons making statements to the Commission accountable for their representations outweighs this litigation risk.

**D. Obey-the-Law Injunctions**

A potential risk arises from seeking injunctive relief barring any future violation of Section 6(c)(2) of the Act by Proposed Defendant. Although Proposed Defendant has not yet raised the issue, some adverse case law has rejected federal agencies' ability to impose "obey-the-law" injunctions. "Overbroad language in an injunction that essentially orders a party to obey the law in the future may be struck from the order." *Public Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 83 (3d Cir. 1990); *see also SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016) ("We note that the injunction the SEC requested in the operative

complaint sought to prevent the defendants from violating federal securities laws, otherwise known as an 'obey-the-law' injunction. Repeatedly we have said that, in the context of SEC enforcement actions and otherwise, 'obey-the-law' injunctions are unenforceable.").

On the other hand, courts in the Second Circuit, where the Division intends to file this case, have generally rejected arguments that injunctive provisions that incorporate the text of specific statutory violations are improper. *See, e.g., SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082, 1102-03 (2d Cir. 1972) ("There can be no abuse of discretion in framing an injunction in terms of the specific statutory provision which the court concludes has been violated."); *SEC v. Zwick*, No. 03 Civ. 2742, 2007 WL 831812, at *19 (S.D.N.Y. Mar. 16, 2007) (finding that a proposed obey-the-law injunction is proper because Manor Nursing authorizes such an injunction). Nonetheless, some courts in the Southern District of New York have more recently expressed disapproval of such injunctions. In *SEC v. Tourre*, 4 F. Supp. 3d 579 (S.D.N.Y. 2014), the Court noted that "the Court is skeptical of the utility of this kind of 'obey-the-law' injunction—after all, everyone is required to obey the law, the law comes with its own penalties, and merely reciting statutory provisions gives an individual 'little guidance on how to conform his conduct to the terms of the injunction.'" *Id.* at 598 (quoting *SEC v. Goble*, 682 F.3d 934, 949-52 (11th Cir. 2012)). However, the Court denied the requested injunction against a former Goldman Sachs on the ground that "there is insufficient evidence in the record to demonstrate a reasonable likelihood of future violations trader." *Id.* Subsequently, in *SEC v. Wyly*, 56 F. Supp. 3d 394, 434 (S.D.N.Y. 2014),a court acknowledged *Tourre* and the "general toothlessness" of obey-the-law injunctions, but granted the SEC's request for injunctive relief given "the extensiveness of [the] scheme [and] the brazenness of [the defendant's] conduct."

Ultimately, the Division believes that this risk is limited. In any case, such risk is better assessed at the end of litigation, not at the outset, because the facts are yet to be determined and the legal propriety of whether an injunction should be entered has not been determined. In addition, the Division anticipates proposing injunctive relief in an appropriately tailored and not overbroad form.

## VII.

## EAJA AND SBREFA ANALYSIS

The Division has assessed that the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412, and the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2021), and the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), Pub. L. No. 104-121, tit. II, §§ 201-253, 110 Stat. 847, 857-74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), pose little risk here for recovery of costs or attorney's fees, or entitlement to a reduced or waived civil monetary penalty. Proposed Defendant is unlikely to be an eligible party under EAJA, and § 2412(d)(1)(A) and (d)(1)(D) therefore likely do not apply. Although the Division does not have complete information as to Proposed Defendant's net worth, as relevant here, Proposed Defendant Gemini likely is not an EAJA-eligible party because it is a corporation that recently received, in November 2021, $400 million in financing based on a valuation of $7.1 billion, and therefore likely has a net worth of more than $7 million. *See* 28 U.S.C. § 2412(d)(2)(B).

Proposed Defendant is also not an eligible small entity under SBREFA. In cases where the Commission has not stated whether an entity is a small entity, the standards supplied in the

Small Business Act ("SBA") apply. SBREFA § 211, 110 Stat. at 858. The SBA generally provides that a commodities or other financial investment industry entity is small if its average annual receipts are equal to or less than $41.5 million. See 13 C.F.R. § 121.201 (2021) (Subsection 523 - Securities, Commodity Contracts, and Other Financial Investments and Related Activities). The Division understands that Gemini has annual receipts in excess of $41.5 million and, therefore, SBREFA does not apply. Accordingly, the Division believes that there is no basis for a reduction or waiver of civil monetary penalties under SBREFA as to Proposed Defendant.

## VII.

## RECOMMENDATION

For the reasons set forth above, the Division recommends that the Commission authorize it to file the attached Proposed Complaint against Proposed Defendant in the United States District Court for the Southern District of New York.

Attachment: Proposed Complaint
Wells Submission and attachments
Wells Supplement

COMMODITY FUTURES TRADING COMMISSION

☆ 1975 ☆

25.002800006519

COMMODITY FUTURES TRADING COMMISSION

☆ 1975 ☆

25.002800006520