# Exhibit D

**FOIA Confidential Treatment Request**

# BEFORE THE UNITED STATES
# COMMODITIES FUTURES TRADING COMMISSION

## IN THE MATTER OF GEMINI TRUST COMPANY, LLC

Submission by Gemini Trust Company, LLC, Cameron Winklevoss, and
Tyler Winklevoss to the Enforcement Division of
The Commodities Futures Trading Commission

October 20, 2021

John Nathanson
Christopher LaVigne
Randall Martin
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000

*Counsel for Gemini Trust Company, LLC*

John F. Baughman
The Law Offices of John F. Baughman
299 Broadway
Suite 1816
New York, NY 10007
Telephone: (212) 528-3212

*Counsel for Cameron Winklevoss and Tyler
Winklevoss*

This submission is provided in connection with consideration by the Division of Enforcement of the Commodity Futures Trading Commission (the "CFTC" or "Commission") of a proposed enforcement action to be recommended against Gemini Trust Company, LLC, Cameron Winklevoss, and Tyler Winklevoss. Gemini Trust Company, LLC, Cameron Winklevoss, and Tyler Winklevoss submit this response to the Division's letter dated October 6, 2021. Gemini Trust Company, LLC, Cameron Winklevoss, and Tyler Winklevoss hereby request that this submission be forwarded to the Commission for consideration.

25.002800004835

*FOIA Confidential Treatment Requested*

**Table of Contents**

BACKGROUND ....................................................................................................................4

MERITS..............................................................................................................................7

I.      False Statements Claims ...........................................................................................7

      A.      Prefunding and the Cost of Capital......................................................9

            1.      Pearl Street Loans .................................................................10

            2.      Out of Policy Advances .........................................................12

      B.      Bespoke Arrangements ........................................................................14

      C.      Self-Crossing........................................................................................16

      D.      Auction Volume....................................................................................18

II.     Misreporting Claims ...............................................................................................19

FURTHER INFORMATION ..............................................................................................19

CONCLUSION....................................................................................................................20

25.002800004836

*FOIA Confidential Treatment Requested*

The CFTC should not pursue enforcement proceedings against Gemini Trust Company, LLC and its principals, Cameron and Tyler Winklevoss (collectively, "Gemini"). The CFTC's Division of Enforcement (the "Staff") has conducted a thorough investigation for over three years, and an extensive record is available. Any fair appraisal of that record demonstrates that nothing occurred that warrants further CFTC action.

*First*: there was no harm, and none has ever been alleged. The CFTC's mission is "to promote the integrity, resilience, and vibrancy of the US derivatives markets." There is no evidence whatsoever that any derivatives market was harmed in any way.

*Second:* this investigation grew out of Gemini trying to do the right thing. When Gemini learned, in 2017, that it had been the victim of a $4 million rebate fraud, it promptly informed regulators. Years later, the CFTC has taken no action against the fraudsters, one of whom is a foreign entity controlled by foreign actors, but, instead, has pursued unsupported theories against the only party harmed by the fraud: Gemini, a new, U.S.-based startup at the time of the alleged conduct. An enforcement action under these circumstances would chill companies' willingness to report issues and work with U.S. regulators, and push start-ups to leave the U.S. for unregulated jurisdictions or those that do not penalize companies trying to do the right thing. Further, given Gemini's role as a leading advocate for regulation—indeed, Gemini is currently seeking *more* oversight by applying to be a Designated Contract Merchant—an enforcement action would suggest to the industry that even extraordinary compliance efforts will prove inadequate, so why follow Gemini's lead in making them.

*Third:* after Gemini self-reported the rebate fraud, one of the people involved, a disgruntled employee named Benjamin Small, filed a ***false whistleblower complaint*** with the CFTC ***only after*** Gemini refused to pay him off. Small is why we are here now, even though his complaint is demonstrably false in material respects. Moreover, Small's *bona fides* should give the CFTC

1

25.002800004837

*FOIA Confidential Treatment Requested*

significant pause. He is an admitted liar and thief, and it is undeniable that he filed his complaint in an attempt to shake down Gemini.[1] Gemini understands that, sometimes, the Government builds cases on the backs of unsavory characters, but it should not do so here. It is one thing to build a case on true statements made by bad people; it is something else to build a case on false statements made by bad people. In pursuing this action, the CFTC would be embracing a dishonest, self-interested actor who, in his own words, vowed to "destroy" Gemini. Such conduct should not be rewarded or accepted as a model for future wrongdoers.

*Fourth:* Gemini has already paid a heavy price for its decision to come forward and not to pay off Small. It was initially victimized by the rebate fraud and subsequently dragged through the wringer by extremely intensive and extraordinarily expensive investigations predicated on Small's false complaint. Gemini has cooperated throughout, producing hundreds of thousands of pages of documents, making employees available, and going to extreme lengths to retrieve electronic records. These matters have cost millions of dollars, consumed thousands of hours of senior management time, and significantly impeded Gemini's growth. Indeed, the XBT futures contract that is the hook for this investigation was withdrawn by the Chicago Board Options Exchange ("CBOE") from the market because of the CFTC's inquiry; Gemini's development costs for that contract significantly exceeded the approximately $225,000 that Gemini earned. When this matter began, Gemini was a small startup—it was approximately three years old and had fewer than 50 employees.[2] Imposing the additional costs, penalties, and reputational injury that would come from a public enforcement action, after the incredible burden these investigations have already placed on the business, **would be unwarranted, disproportionate, and would further victimize Gemini.**

---

[1] GEM_CFTC148097.

[2] Gemini Trust Co. and Winklevoss Capital Management LLC v. Benjamin Small, et al., Arbitration Proceeding Transcript ("Tr.") 2438:25-15; Tr. 3069:6-15.

2

25.002800004838

*FOIA Confidential Treatment Requested*

*Fifth:* the Staff's theories are based on a dangerous warping of the relevant regulatory regime. The basis for the proposed charges is the allegation that Gemini made false statements in connection with CBOE's self-certification of a futures contract tied to an auction held on Gemini's exchange. The fundamental question before the Division of Market Oversight ("DMO") back then was whether the auction price would be readily susceptible to manipulation after the product was listed in December 2017. There is no allegation relating to *that issue* as there is no suggestion that the auction price was in fact manipulated or readily susceptible to manipulation, in part because Gemini adopted measures to address all of the CFTC's specific concerns prior to contract listing. Theories aside, in *reality* the Gemini Bitcoin auction price and associated futures contract **worked as intended**. There is absolutely zero indication that there was any manipulative conduct or other regulatory issue associated with the contract while it was listed. In other words, the process that the Staff has suggested may have been in some way tainted in fact worked and resulted in orderly settlements during the relevant contract's duration, thus fulfilling the CFTC's mission "to promote the integrity, resilience, and vibrancy of the US derivatives markets."

*Sixth:* fundamentally, ***Gemini did not make any false statements***. To the contrary, throughout the self-certification process, Gemini consistently sought to provide complete and accurate information to the CFTC. Not once did it refuse to provide anything of substance that was requested. Rather, the Staff contends that Gemini omitted information—information that was never asked for and was clearly immaterial to the questions actually being asked or the issues being considered. If this information was so important to DMO, then DMO should have asked for it during the five-month long self-certification process. Gemini should not be expected to know to produce information that the Staff now claims DMO would like to have had but did not request; Gemini is not a mind reader. Imposing that burden on any business, particularly a young start-up, is unfair, unreasonable, and an inappropriate basis for an enforcement action.

25.002800004839

*FOIA Confidential Treatment Requested*

***Seventh:*** as importantly, there is not a shred of evidence—no communication or testimony or interview—that Gemini ever believed, or even considered, that the allegedly omitted information was responsive to any question asked or topic raised by DMO.  It is one thing to omit material information that is responsive, or even to omit immaterial responsive information.  It is another thing – and what Gemini faces here – to claim impropriety with respect to an alleged omission of *immaterial* information that is *not responsive.*  Trying to establish and ultimately prove that immaterial, non-responsive information constitutes an actionable omission can only be explained as an effort to come to a predetermined result; instead, the CFTC should be satisfied with having engaged in a thorough investigation that ultimately produced no evidence of impropriety.  Not doing so would create a dangerous moral hazard and elevate process over justice; it would be inconsistent with the CFTC's principles and its mission.

***Finally:*** in the Wells notice, Gemini was informed for the first time that the Staff intended to pursue claims relating to unspecified "false reporting."  This last-minute addition after more than three years reflects the ever-shifting nature of the Staff's investigation.  More troubling, the Staff has refused to explain its theory.  That is not how the enforcement process is supposed to work.  As Gemini has shown, it will cooperate and provide information when requested; it does not deserve to be subjected to last-minute, unspecified accusations.

For all these reasons, the CFTC should close this matter.  It can do so confidently, having fulfilled its duty to investigate but reaching the fair result not to pursue an unwarranted action.

## BACKGROUND

***The Self-Certification Process:***  Between July and December 2017, Gemini and CBOE engaged in a self-certification process for the XBT futures contract.  This contract was to be self-certified by CBOE for trading on its exchange and tied to the closing price of Gemini's daily Bitcoin auction (the "Auction").  During a five-month process, CBOE and Gemini had extensive

25.002800004840

interactions with the DMO, including numerous meetings, phone calls, and emails. Gemini made its employees fully available, produced huge amounts of data, agreed to an information sharing agreement providing full transparency into trading activity, and adopted improvements to the Auction based on DMO's concerns and recommendations.[3] The CFTC itself publicly applauded the cooperation provided in that process.[4]

The Staff does not contend that anyone made any false statements about how the auction worked, about how prices would be set, or about the safeguards in place—many of which were adopted at DMO's recommendation. And there is no allegation that any manipulation occurred during the 19 months that the XBT futures contract was listed (from December 2017 to June 2019), underscoring that any purported omissions were immaterial to DMO's concern—which was the Auction's susceptibility to price manipulation at, and after, the listing date.

***Gemini's Self Reporting:*** In late August and early September 2017, Gemini learned that it had been the victim of a collusive trading "rebate fraud" on its continuous order books. This fraud had nothing to do with the Auction,[5] but was significant: Gemini incurred $4 million in losses in just a few months. The fraud was perpetrated by "Cardano" and "Hashtech"[6] and was made possible because two Gemini employees—Benjamin Small and Shane Molidor—approved inappropriate "fee overrides" for these customers, without obtaining approval from Gemini's Chief Compliance Officer ("CCO"), as was required by Company policy.[7] Small and Molidor have

---

[3] GEM_CFTC188133, at 188139; and GEM_CFTC128497.

[4] *See*, December 1, 2017 CFTC Statement on Self-Certification of Bitcoin Products by CME, CFE and Cantor Exchange, in which the CFTC publicly affirmed the "extensive" and "rigorous" discussions held with Gemini and CBOE and lauded improved "information sharing."

[5] Gemini never identified collusive trading on the Auction and, in any event, Hashtech never traded there. Affidavit of John A. Nathanson in Support of Wells Submission ("Nathanson Aff.") ¶ 5.

[6] The fraud was perpetrated by a handful of Cardano and Hashtech companies as well as their principals.

[7] GEM_CFTC032867; GEM_CFTC032212; GEM_CFTC030027; GEM_CFTC078165, at 78206; WX253; WX455; Tr. 2379:6-2380:8 and Tr. 2527:22-28:4. Small's and Molidor's motivation for facilitating this scheme remains obscure, but they admit that it was not good for Gemini. *E.g.,* Tr. 1300 (Small concedes that phony volume would "unequivocally be a bad thing" for Gemini); Tr. 1745 (Molidor conceded that net negative fees resulting from the Cardano-Hashtech trades were "not a good thing.").

25.002800004841

*FOIA Confidential Treatment Requested*

admitted that they did not inform any of Gemini's CEO (Tyler Winklevoss), President (Cameron Winklevoss), or CCO about (i) the nature of the Cardano and Hashtech fee overrides or (ii) the resulting losses.[8] Molidor has admitted that he hid the losses from Cameron and Tyler Winklevoss.[9] It is undisputed that the Winklevosses were unaware of the losses until August 23, 2017 (approximately 2.5 months after they began), when they learned of them in reviewing monthly financial data. They were justifiably upset and launched an investigation.[10]

In October 2017, after concluding its investigation, Gemini did the right thing. Gemini reported the matter to its primary regulator—the New York Department of Financial Services ("DFS")—and sought guidance on what actions to take.[11] Gemini also detailed remedial steps it had implemented and offered to provide more information to DFS.[12] DFS took no action.

Gemini also filed a SAR with FINCEN describing the fraud,[13] which led to a lengthy investigation by the FBI and the United States Attorney's Office for the Southern District of New York ("SDNY"). Gemini fully cooperated with that investigation, which covered the same ground as the Staff's inquiry. SDNY closed its investigation without bringing any charges.

***Benjamin Small:*** It is impossible to divorce this matter from Benjamin Small: both as a matter of fact and as a matter of equity. He is the author of many of the statements at issue; given his history, it would be unjust to penalize Gemini for his actions.

Small is an unsavory character. He has made a career of filing whistleblowing complaints after being suspended or fired (it has happened at least three times).[14] He is also an inveterate liar.

---

[8] *See* WX555 (Molidor Affidavit); Tr. 116-63 (Small admitted that he knew about the losses and that customers were "taking advantage," but he never called it to anyone's attention).

[9] Tr. 1747-48; GEM_CFTC197675.

[10] GEM_CFTC219253; Tr. 2532:17-24, 3066:10-14.

[11] WX502; WX617; Tr. 2556:6-12.

[12] WX502.

[13] Tr. 2664:10-14.

[14] GEM_CFTC031977; Tr. 670:6-674:3; SX 284; Tr. 674:1-675:8; SX 410; SX 411; SX 412; SX 414; SX 415; SX 416; Tr. 677:9-695:5; SX 205; SX 207; Tr. 695:15-697:24; SX 214; Tr. 699:6-700:9.

25.002800004842

*FOIA Confidential Treatment Requested*

In a recent arbitration between Small and Gemini (the record of which is available on request)[15], it was established that Small obtained his employment by false pretenses.[16] While at Gemini, Small did not follow numerous policies and direct instructions from superiors, and he lied about multiple matters.[17] He also has contempt for the legal process; he admitted that pleadings he filed in the arbitration were not a "fair characterization" of the facts and it is clear that he lied in an affidavit submitted to the arbitrator. And Small conceded that he could not support important and material allegations made in the whistleblowing complaint he filed with the CFTC.

Theoretically at least, Small has a financial interest in any enforcement action. However, his credibility is shot and his motives are suspect. On being suspended, he told the Winklevosses, "I will be pissed at you for the rest of my life" and he has admitted that he took actions to "destroy" the company.[18] Small is not a person the CFTC should be associated with.[19]

***The Big Picture:*** The context set forth above is important. Gemini is still a young company in an emerging industry. It has consistently sought out regulation and striven for transparency with all regulators. It knows that its business is founded on trust, and it wants to make sure that regulators around the world, customers, and counterparties have confidence in it. If Gemini actually did something wrong, it would own up and take remedial action. That is not the situation here.

---

[15] Although the arbitration was confidential, the parties are permitted to provide information about it (and record material from the trial) "in response to a government agency." Consistent with its long history of cooperation, Gemini would be happy to provide the entire arbitration record to the CFTC if requested.

[16] Tr. 770:16-772:3; Tr. 1077:14-23; WX 517; Tr. 786:25-787:5; WX 541; Tr. 1069:8-12; WX 494; Tr. 1073:6-10; Tr. 1073:11-21; Tr. 1080:10-1083:25; WX 499; Tr. 1087:14-1088:8; Tr. 2469:18-22; Tr. 2471:2-4; Tr. 2473:25-2474:6; Tr. 2474:7-9; Tr. 2474:11-15; Tr. 2474:16-18; Tr. 2480:8-2481:14. Technically Small worked for Winklevoss Capital Management, which was the formal party in the arbitration.

[17] GEM_CFTC002991; Tr. 1189:21 – 11191:21; GEM_CFTC020709; GEM_CFTC020712; GEM_CFTC027634.

[18] GEM_CFTC012507; Tr. 992.

[19] As if Small's lies to and about Gemini were not enough, he has also been sued successfully by a landlord for failure to pay rent, sued successfully by Columbia University for failure to pay tuition, and the Federal Government recently filed a lien on his assets for failure to pay taxes. Tr. 819-822; WX539 (Columbia lawsuit); Tr. 1084-85; WX512 (tax lien); Tr. 1086-87. He also admitted to stealing documents from a former employer. Tr. 1391. In addition, Small is a documented homophobe and misogynist. During the arbitration, Gemini learned through after-acquired evidence that Small, in private direct messages with Molidor on Slack, routinely referred to Gemini's customers using homophobic, sexist, and utterly inappropriate language. Tr. 1215-18.

7

Gemini did not do anything justifying the proposed enforcement action. Such an action would be disproportionate when weighed against the facts that the XBT futures contract worked as intended, that there has never been any allegation of investor harm or manipulation, and that Gemini's revenue from the contract—delisted due to this investigation more than two years ago—was approximately $225,000.[20] The CFTC would send exactly the wrong message by bringing a victimless action founded on an unsupported theory against a leading advocate for regulation in a still largely unregulated industry.

## MERITS

### I.    False Statements Claims

The Staff alleges that Gemini made false statements to the CFTC in violation of §6(c)(2) of the Commodities and Exchange Act ("CEA"). To prevail, the CFTC must prove that Gemini made false or misleading statements, or omissions, of material fact, in communications with the CFTC, and acted with *scienter* (*i.e.*, that it knew or should have known the statements or omissions were false or misleading).[21] For a statement to be material, it must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decision making body to which it was addressed."[22]

The Staff has identified four categories of alleged false statements concerning: (1) the prefunded nature of the exchange and cost of capital of Auction participants; (2) rebates made available to market makers; (3) the existence of self-trade prohibition; and (4) trading volume.[23] As a threshold matter, the CFTC typically does not engage in any material decision making with

---

[20] *See* Nathanson Aff. ¶ 6.

[21] *See, e.g., CFTC v. eFloorTrade, LLC*, No. 16 Civ. 7544 (PGG) 2020 WL 2216660, at *5 (S.D.N.Y. May 7, 2020); *CFTC v. Arista, LLC*, No. 12 Civ. 9043 (PAE), 2013 WL 6978529, at *13 (S.D.N.Y. Dec. 3, 2013).

[22] *CFTC v. Gramalegui*, No. 15-cv-2313 (REB), 2018 WL 4610953, at *24 (D. Colo. Sept. 26, 2018) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)); *see also, United States v. Calderon*, 944 F.3d 72, 86 (2d Cir. 2019); United *States v. Litvak*, 808 F.3d 160, 172-74 (2d Cir. 2015).

[23] The statements in question were drawn chiefly from: July 25, 2017 presentation to CFTC, GEM_CFTC242817, August 25, 2017 response to CFTC questionnaire, GEM_CFTC173216, September 12, 2017 Auction Review Process, GEM_CFTC084666, December 1, 2017 CBOE XBT Futures Certification, GEM_CFTC188133.

25.002800004844

respect to self-certifications.[24] Moreover, and fundamentally, none of the statements at issue were false. Rather, the Staff is complaining about alleged omissions of *immaterial* information that was *never requested*. Indeed, the alleged omissions almost uniformly involve historical information with no bearing on the question of the susceptibility of the Auction to price manipulation as of December 2017 (when the XBT futures contract was listed).

This is significant as it will defeat any effort to prove *scienter*. Gemini had no way of knowing that it was omitting information DMO wanted to have and, had Gemini understood that the information was requested, it would have been provided. We know that this is so because Gemini made its staff fully available to DMO during the self-certification process, provided reams of information, executed an information sharing agreement so that the CFTC had transparent access to its trading data, and made changes to its auction mechanism at DMO's request. There is no evidence that Gemini intended to withhold, or ever even discussed withholding, any requested information from DMO.

## A.    Prefunding and the Cost of Capital

A July 25, 2017 slide deck, prepared by CBOE and Benjamin Small in advance of a preliminary meeting with the CFTC, stated, "As with all Gemini orders, auction orders must be fully (pre-) funded".[25] In a September 12, 2017 submission, Gemini further stated:

> **Cost of Capital -** All orders must be prefunded—dollars must be deposited prior to placing a buy order and bitcoin must be deposited before placing a sell order—and participants are not permitted to place an order unless they have enough funds in their account to place such order (orders that are submitted without backing funds are rejected). As a result, no participant's outstanding interest on our books can exceed their account balance at any time and all open orders reduce a participant's available

---

[24] *See* CFTC Backgrounder on Oversight of and Approach to Virtual Currency Futures Markets, dated January 4, 2018. In the "backgrounder," the CFTC acknowledged limited regulatory discretion with respect to the self-certification and suggested it might not be "possible" for the CFTC to have blocked CBOE's product launch, giving rise to a serious question as to whether there was *any decision whatsoever* to be made by the CFTC.

[25] GEM_CFTC242817.

9

*FOIA Confidential Treatment Requested*

balance until such orders are fulfilled or canceled. Therefore, it is costly for a malicious market participant to engage in manipulative tactics.[26]

The Staff has suggested these statements were false because Gemini did not disclose information about: (1) loans made to market makers by an affiliated entity, and (2) operational advances Gemini provided customers. But such information was *never requested* and, in any event, the statements made were not misleading.

### 1.    Pearl Street Loans

Pearl Street Financial LLC ("Pearl Street") is a separate legal entity from Gemini, controlled by Cameron and Tyler Winklevoss, that provided digital asset loans to four counterparties in 2016 and 2017.[27] By September 2017, when the "cost of capital" statement was made, there were only two loan counterparties; by late December 2017, there was one.[28] *It is undisputed that there was nothing unlawful or improper about the loans themselves.*

The borrowers were sophisticated institutions. They received loans of real digital currency delivered to the borrower's specified digital asset address via a blockchain transfer. If the borrower wished to trade these assets with Gemini, it would as a general matter need to transfer them to its Gemini account.[29] At the borrower's discretion, the borrowed coin could be used to trade on Gemini (including in the Auction), taking on real positions and real risk, and generating real trading volume.[30]

This is entirely consistent with Gemini's statements that its exchange was prefunded, as the borrowers had the digital assets in accounts they fully controlled at the time that they traded. It is

---

[26] GEM_CFTC084667.

[27] Tr. 145:13-148:19; Tr. 2671:9-2672:6; GEM_CFTC052094; WX 449C; Tr. 2672:21-2674:6.

[28] *See, e.g.*, GEM_CFTC358800 and GEM_CFTC063786.

[29] All Bitcoin loans in 2017 were sent from Pearl Street to borrower wallets off Gemini. *See* GEM_CFTC063786; GEM_CFTC208777; GEM_CFTC060841, at 60859-60. Some 2016 loans were sent to borrower wallets at Gemini.

[30] In two of 37 executed loan notes there was language requiring a borrower to engage in activity on Gemini. Those two notes terminated January 31, 2017 and March 15, 2017 and did not cover any period during or after the statements at issue were made. GEM_CFTC055830; GEM_CFTC058610. A handful of internal Gemini communications express concern about whether the borrowers are trading on Gemini; these communications clearly demonstrate that Gemini (and Pearl Street) did not control what the borrowers did with the borrowed coin.

10

25.002800004846

*FOIA Confidential Treatment Requested*

commonplace for sophisticated market participants to finance their balance sheets, and the Pearl Street loans were an indisputably legal mechanism for doing so; this was not low- or no-cost margin trading financed by the exchange, it was lawful arms' length lending by an affiliate. Absent questions to which it would have been responsive, Gemini had no affirmative duty to provide information about its affiliate's legitimate activities to DMO. But DMO never inquired about how Gemini market participants financed their trading; and there is absolutely no evidence that anyone at Gemini ever thought the Pearl Street loans were responsive to any question posed by DMO.

As to the intertwined cost-of-capital question, the Staff has suggested that the loans were inconsistent with the statement that it was "costly" for market participants to engage in manipulative activity (activity which, of course, never occurred). That suggestion is incorrect.

*First:* the interest rates associated with the loans—ranging from 1% to 8%—were negotiated on market terms at arms' length, in a low interest rate environment, and for assets for which there were many alternative borrowing opportunities.[31] While the Staff has implied that it had some basis for questioning whether these rates were "market," the only "supporting evidence" we are aware of are statements made by Small in his whistleblower complaint; but Small had no basis for that allegation, as he recently confessed.[32] This is not an instance in which an exchange offered free money through margin trading or otherwise; the Pearl Street borrowers engaged in risk-taking market activity with digital assets borrowed at negotiated rates.

*Second:* the "cost-of-capital" statement was not intended to suggest, nor could it suggest, anything about how market participants finance their trading. Gemini, like any other exchange,

---

[31] GEM_CFTC058061; GEM_CFTC055742; GEM_CFTC056032; GEM_CFTC279273.

[32] Small's whistleblower complaint alleged that the Pearl Street loans were made at "below market" rates. But Small admitted in the arbitration that he had no basis for this allegation. "Q: Do you see here the confirmation lists the interest rate of the loan at 1.5 percent? Do you see that? A. Yes. Q: Do you have any basis to say whether that interest rate was above market, at market, or below market? A: None." Tr. 1031-32.

11

25.002800004847

*FOIA Confidential Treatment Requested*

does not have visibility into the myriad ways market participants finance trading activity and, therefore, simply would not be able to make any such statement on that matter.

There is no credible basis to assert that these Pearl Street loans somehow rendered the Auction "readily susceptible to manipulation" at any time, but certainly not as of the launch of the XBT futures product when there were only two loans outstanding.[33] And the mere existence of the Pearl Street loans is not a reason for Gemini to be reasonably expected to disclose them. Financing trading activity is legitimate and commonplace, including through exchange affiliates. The premise that trade financing is unique or material to this particular self-certification or inherently problematic is unsupportable. If it was material here, one would expect a question about it to have surfaced during the self-certification; it did not.[34] In any event, there is simply no evidence that anyone at Gemini believed that information about the loans was called for by any DMO request or that such information was nonetheless withheld.

### 2.    Out-of-Policy Advances

The Staff has also questioned the "prefunding" statements because Gemini, consistent with its policies, made operational "advances" of fiat or digital assets to its customers when they were in the process of transferring assets to Gemini.[35] Gemini also publicly disclosed that it made such advances,[36] which typically lasted no longer than a few business days at most, and are entirely consistent with "prefunding": customers could only trade to the extent of the assets that were in their account or provably in transit to their account.

---

[33] GEM_CFTC358800.

[34] We suspect that a review of the numerous other self-certification processes to which the Staff has access would be informative as to the materiality of trade financing.

[35] GEM_CFTC320247, at 320254-55, 320257-58; GEM_CFTC310986, at 310994-95.

[36] Cameron Winklevoss, Instant ACH Deposits Are Here!, Medium (March 11, 2016) available at https://medium.com/gemini/instant-ach-deposits-are-here-795c9bdbac1; Eric Winer, Introducing Zero-Confirmation Bitcoin Deposits, Medium (Jan. 31, 2017) available at https://medium.com/gemini/introducing-zero-confirmation-bitcoin-deposits-c6ea609cc09c.

12

25.002800004848

*FOIA Confidential Treatment Requested*

While the Staff appears, without basis, to take issue with these advances generally, the Staff has also focused on a small number of advances that did not comply with Gemini policies.[37] We have noted nine advances made during 2017 that were outstanding for more than two days and for which we could not identify advance proof of an incoming transfer.[38] The Staff has not disputed our analysis or pointed to other similar advances.

Some context is important here. These nine potentially out-of-policy advances were made out of a total of 65,999 advances made during 2017.[39] That is less than 0.02%. Each of these nine advances was initiated by Molidor,[40] who acted without authorization in doing so.[41]

Only one of the unauthorized advances existed at any time after the first statement regarding prefunding was made to DMO in July 2017. Any fair assessment of that one incident underscores the immateriality of these advances, both to the prefunding statement itself and to the DMO's concern about the Auction's susceptibility to price manipulation once the futures product was launched in December 2017.

Molidor initiated the aforementioned advance on July 20, 2017.[42] It was intended, and was used, to facilitate a routine same-day Bitcoin block trade between two institutional counterparties.[43] Within minutes of the advance being credited, the party that received the advance deposited a larger

---

[37] GEM_CFTC320247, at 320054-58; GEM_CFTC310986, at 310994-95.

[38] This is based on a review and analysis of key documents related to advances, including the Admin Credits and Debits Spreadsheet (GEM_CFTC219940) and relevant internal and external electronic communications and transfer records produced to the CFTC in connection with this matter. *See* Gemini: Presentation to CFTC, dated October 9, 2020, at page 9.

[39] GEM_CFTC341312; GEM_CFTC341310; see Gemini: Presentation to CFTC, dated October 9, 2020.

[40] GEM_CFTC303676; GEM_CFTC303680; GEM_CFTC021200 at 20417; GEM_CFTC219940 at rows 409, 426, 428, 727, 814, 866, 1632, 2843.

[41] Molidor recently stated under oath, "I never advised Cameron or Tyler Winklevoss of any situation where operational advances did not comply with company policies and procedures. I was never advised by Cameron or Tyler Winklevoss that it was permissible for operational advances to remain outstanding in a manner that was not consistent with company policies and procedures." WX555. To the extent the CFTC is considering relying on Molidor as a witness in any enforcement action, he has significant credibility problems. In the recent arbitration he changed his testimony on important points. He also invoked his Fifth Amendment privilege when questioned about his activities involving the principal of Cardano. Tr. 1703-04.

[42] GEM_CFTC219940 at row 2843.

[43] GEM_CFTC320753; GEM_CFTC303893; GEM_CFTC219940 at rows 2842-43.

13

25.002800004849

*FOIA Confidential Treatment Requested*

amount of Bitcoin into its Gemini account that would have served to extinguish the advance.[44] But Molidor neglected to debit that party's account for the advance; as a result it remained on Gemini's books (unknown to management) after he was suspended; it was identified by Gemini in a quarterly reconciliation process on Friday, September 29, 2017, and was debited on Monday, October 2, 2017, after Cameron Winklevoss wrote that it was "gross negligence" that the advance had been outstanding for a prolonged period.[45] This isolated incident—which involves the last identified out-of-policy advance and the only one that existed during or after the period in which statements at issue were made to DMO—does not render Gemini's statements regarding prefunding false, nor is it relevant to the question of whether the Auction price was readily susceptible to manipulation.[46]

It would be disproportionate to commence an action against Gemini premised on a back-office operational error by a negligent employee who was subsequently fired for misconduct. Especially an error *unknown* to senior management when the statement at issue was made. During 2017, more than 99.98% of Gemini's operational advances were made in a manner consistent with company policy. In light of these facts, it is unreasonable to suggest that Gemini was acting inappropriately by failing to recognize any connection between the prefunding statement and this handful of out-of-policy advances. Flyspecking and then penalizing start-ups as they evolve—particularly a start-up like Gemini that has since inception advocated for regulation—is counter to the principle-based mission of the CFTC. It is anti-innovation and sends the wrong message.

## B.    Bespoke Arrangements

The Staff's second category of alleged misstatements relates to Gemini's disclosures regarding rebates provided to high-volume market makers. The Staff focuses chiefly on an August 25, 2017 Q&A document, in which DMO asked:

---

[44] GEM_CFTC341312 at rows 18879, 18902.

[45] GEM_CFTC208950; GEM_CFTC315995; GEM_CFTC219940 at row 3044; GEM_CFTC208631.

[46] Of the eight other unauthorized advances made by Molidor, the last was debited from the recipient's account on June 12, 2017, more than a month prior to the first statement at issue and six months prior to the self-certification.[46]

14

*FOIA Confidential Treatment Requested*

> Could you please provide more detail on the market makers rebate program? How many market makers are signed up? How much liquidity are they providing to the auctions?

In a response authored by Small,[47] Gemini answered:

> We have implemented a trading fee program which is available to all of our market participants; we have **no specifically defined** market maker program. In summary, fees are **typically** charged for liquidity-taking trades, but these **fees can be reduced through high trading volumes** and maintaining a balance between buy and sell trades; and fees can be charged for liquidity-making trades, but **rebates can be earned in a similar way.** The details are available at https://gemini.com/fee-schedule/. **In a typical month, between 5 and 10 market participants have earned liquidity-making rebates, and these participants typically make up approximately 90% of volume in the auctions.** (Emphasis added)

This response was accurate. Gemini "typically" based fees and rebates on trading volume thresholds disclosed on a public website. And it was true that the vast majority of Auction volume was generated by a small number of participants who received rebates to encourage participation. But the Staff contends that the quoted passage was deceptive because, in addition to the published fee schedule, Gemini also occasionally offered adjustments to that schedule. There are several problems with building a case on this alleged "deception".

*First:* nothing about Gemini's rebate structure was hidden. Gemini candidly said that 90 percent of trading on the Auction was done by a small number of customers receiving "liquidity-making rebates." If DMO had asked for additional information about these rebates, it would have been provided. Yet DMO asked not a single question about these participants, their identity, or how much in rebates they received. To say now that details of rebates received by these participants, some of whom had bespoke arrangements, was material to DMO is inconsistent with the facts.

*Second:* during the certification process, Gemini gave DMO its *Policies and Procedures Manual.*[48] That manual spelled out the bespoke arrangements in black and white. It is unfair to say, as the Staff has, that this was "buried." It was on page 46 of a 142-page policy manual, under a

---

[47] GEM_CFTC341317.
[48] GEM_CFTC078165.

15

*FOIA Confidential Treatment Requested*

bold heading entitled "**Agreements Granting Preferential Terms**."[49]  That very heading was right up front in the table of contents on page 3.  This section described policies applicable to customers' "ability to obtain a more favorable Fee Schedule" and the approval of "side letters."  It is difficult to understand how the Staff could make a case that Gemini made a material omission about bespoke arrangements when it produced the applicable policy and was ready to answer any questions about it.

*Third:* the information allegedly omitted was on its face immaterial.  The bespoke arrangements offered the *same* maximum rebates as those offered by the public fee schedule.  As to rebates, the only "new" information that the Staff is stuck on is the fact that volume requirements to obtain the maximum rebates were waived in certain instances for certain customers.[50]  In understanding how volume was created on the Auction, the important information was in the statement the Staff now challenges:  that statement itself disclosed that 90 percent of volume was associated with customers receiving "liquidity-making rebates."  So it is hard to see how anyone was misled about anything.  The fact that Gemini was willing to waive volume requirements for fee schedule rebates, and thereby further encourage auction participation and liquidity is an entirely customary practice for any exchange and has been for some time.  There is no there there.

C.    **Self-Crossing**

The Staff also challenges Gemini's representations that "self-crossing [is] prohibited" on the Gemini's exchange.  These statements were true.

Gemini implemented a self-trade prevention mechanism on its continuous order book ("COB") in March 2017[51] and a self-trade prevention mechanism on its Auction in May 2017,[52] both highly effective.  On September 21, 2017, Gemini adopted Marketplace Conduct rules as part

---

[49] GEM_CFTC084524, at 84569.
[50] GEM_CFTC173703 through GEM_CFTC177156.
[51] *See, e.g.*, GEM_CFTC141940. *See also*, Gemini Presentation to CFTC dated October 9, 2020 at page 12.
[52] *See, e.g.*, GEM_CFTC126770. *See also*, Gemini Presentation to CFTC dated October 9, 2020 at page 12.

16

25.002800004852

*FOIA Confidential Treatment Requested*

of its *User Agreement* which explicitly prohibited self-trading.[53]  On October 20, 2017, Gemini adopted a *Market Data Integrity Policy*, which stressed the importance of self-trade prevention.[54] In other words, there were both rules against self-trading and effective mechanisms in place to prevent it.  As a result, the statement that Gemini prohibited self-trading was accurate.

Nonetheless, the Staff claims that the statement was false because: (i) there had been self-trading on the exchange prior to the self-trading prevention mechanisms; and (ii) there continued to be **unintended** self-crossing in *de minimis* amounts thereafter.  Here common sense must prevail.

Gemini accurately represented to DMO that self-trading was prohibited on its exchange and that it had implemented self-trade prevention.  DMO never asked Gemini if self-trading had ever occurred in the past and Gemini never made any such backward-looking representations.  Despite this, the Staff believes that Gemini should have known that DMO would have wanted information about historic instances of self-trading on Gemini, even though DMO never asked for it during the five-month self-certification process.  Putting this impossible burden on a start-up is unreasonable.

The *de minimis* amount of inadvertent self-crossing—less than 0.5% of Auction volume[55]— was the result of a phenomenon called "folding," in which Auction orders could unintentionally be matched with regular "continuous order book" exchange orders.[56]  It was inadvertent, not deliberate or intentional self-trading as the Staff has suggested.  Furthermore, Gemini did not hide the phenomenon.  In fact, it alerted CBOE to it.[57]

---

[53] GEM_CFTC066693.

[54] GEM_CFTC281155.

[55] *See* Nathanson Aff. ¶ 4.

[56] For this reason, it is doubtful that the type of inadvertent crossing that occurred can fairly be called self-trading at all. There is no evidence of anyone pursuing it as a deliberate strategy.  One Gemini employee even questioned whether that was the correct characterization.  GEM_CFTC143855.

[57] *Id.*

17

25.002800004853

*FOIA Confidential Treatment Requested*

Finally, as with every other category of false statements, there is no evidence that Gemini believed any information about historical self-trading or the Auction folding phenomenon was called for by any request made by DMO.

### D.    Auction Volume

The final category of alleged misstatements relates to Gemini's trading volume. For example, CBOE (with Gemini's input), in its December 1, 2017 self-certification letter to the CFTC, represented that:

> as of August 28, 2017 the 20-day moving average of the Gemini Exchange's market share in exchange trading in bitcoin in U.S. dollars was 12.8% and [ ] the 20-day moving average of the Gemini Exchange's trading volume in bitcoin in U.S. dollars was 11,310 bitcoin.... The 20-day moving average of dollar trading value in Gemini Exchange auctions for bitcoin in U.S. dollars as of August 28, 2017 was $1,739,000.

Previously, Gemini had provided DMO granular details of trading data for the months of July and August, disclosing specific trades made by individual Auction participants.[58]

The Staff has never alleged that these, or any other similar reported volume figures, were incorrect—because they were not. Instead, the Staff contends that the volume and trading data Gemini provided were misleading because Gemini did not disclose how volume was created on the exchange, in reference to the same topics discussed above (*i.e.*, loans, advances, bespoke arrangements, and self-crossing). This theory is derivative of, and flawed for the same reasons as, the Staff's other alleged false statement allegations.[59]

Furthermore, the issues raised by the Staff do not bear on volume in any meaningful sense. The volume generated by the recipients of Pearl Street loans, advances, and bespoke arrangements was real, legitimate trading activity; it was accurately reported in figures provided to DMO. Self-

---

[58] *See e.g.*, GEM_CFTC084460, GEM_CFTC084462, GEM_CFTC084463, and GEM_CFTC084465.
[59] To the extent the Staff has a concern about volume arising from the fraudulent Cardano and Hashtech trading, it would be unjust to use that trading as the basis for an action. The Cardano and Hashtech fee overrides were unauthorized and losses they caused were hidden from Gemini's CEO, President and CCO. Gemini was the victim; it should not be charged for anything to do with Cardano and Hashtech.

18

*FOIA Confidential Treatment Requested*

trading had been eliminated save for inadvertent, immaterial self-crossing; as to self-trading that occurred prior to Gemini's implementation of self-trading prevention, it was irrelevant to the Auction as it happened before the self-certification process began and well before the XBT contract was listed. What greater good is achieved by litigating a past that has no bearing on the self-certification process or on the susceptibility to price manipulation of a futures contract that was ultimately successful?

## II.   Misreporting Claims

In the Wells notice, and for the first time after more than three years of investigation, the Staff has threatened to allege that Gemini engaged in "false reporting concerning bitcoin and ether" trading volume on the Gemini platform. The Staff has repeatedly refused to provide any detail about the basis for this allegation, nor given Gemini any reasons for its repeated refusals. It is hard to understand why the Staff would object to seeking input from Gemini around this claim. At the least the Staff should want to test the legitimacy of its allegation before recklessly bringing it as a charge against a start-up. In any event, Gemini is confident, even without specifics, that the CFTC could not sustain a misreporting claim.

*First:* it is doubtful Gemini ever made any actionable "report" of volume data. While Gemini typically published Auction (and COB) prices and volumes on its website, this is not the type of "report" to an industry source that can support a false reporting case.[60]

*Second:* if the Staff identifies a relevant report, it will need to establish that Bitcoin and Ethereum volumes were misreported. But the vast majority of all trading was risk taking, market activity and any volumes associated with that activity cannot have been misreported. The only

---

[60] *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *23 (S.D.N.Y. Sept. 20, 2016) (claims dismissed because defendants were not providing "lengthy and detailed reports of trades . . . submitted for publication" that can support a false reporting charge) (citing *United States v. Brooks*, 681 F.3d 678, 691 (5th Cir. 2012); *CFTC v. Atha*, 420 F. Supp. 2d 1373, 1376 (N.D. Ga. 2006)).

19

25.002800004855

*FOIA Confidential Treatment Requested*

possible categories of "non-economic" volume could be self-trading and/or collusive trading (which harmed Gemini), but that activity cannot support a false reporting charge.[61]

**Third:** the CFTC would have to show that Gemini knew or should have known that volumes were misreported *at the time* of reporting. But Gemini only identified the collusive nature of the Cardano-Hashtech wash trades *after* any reporting would have occurred.[62]

**Fourth:** there is no way that misreporting some small fraction of Gemini trading volume could have affected the market price of Bitcoin or Ethereum, and the Staff has not produced any evidence to support this.[63] The markets for those digital currencies are vast and Gemini's 2017 volume made up a tiny fraction of it.[64]

## CONCLUSION

The Staff has conducted an exhaustive investigation that at its conclusion shows that there is no need for further action on the facts, on the law, and as a matter of policy. Proceeding with an enforcement action against Gemini would send exactly the wrong message to the industry: there is no point in seeking out regulation and affirmatively reporting problems. The CFTC—a principles-based regulator—should not in principle pursue academic theories that promote an anti-innovation culture, especially when it refuses to pursue fraudulent activity that injures U.S. companies and marketplaces, to the tune of $4 million. That would not be a fair result for Gemini or a desirable one for the CFTC.

---

[61] *Id.*

[62] Also, successful misreporting cases involve fabricated information that impacts market prices, not accurate reporting of *de minimis* self-crossing that does not. *See, e.g., United Egg Producers v. Bauer Int'l Corp.*, 311 F. Supp. 1375, 1383 (S.D.N.Y. 1970); *Atha*, 420 F. Supp. 2d at 1376-77; *United States v. Futch*, 278 F. App'x 387 (5th Cir. 2008).

[63] Even if the question is whether allegedly misreported volume somehow impacted the prices on Gemini's exchange, rather than market prices—a species of claim that the law does not support – the Staff has never identified any evidence that the Auction price deviated materially from other reported Bitcoin prices.

[64] "Bitcoin trading volume" data available at: https://data.bitcoinity.org/markets/volume/all/USD?c=e&t=a&vu=curr (Gemini reflected only approximately 7% of reported exchange volume in Q4 2017).

20

25.002800004856